ACCEPTED
03-14-00197-CV
4929353
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/17/2015 10:36:54 AM
JEFFREY D. KYLE
CLERK

**NO. 03-14-00197-CV**

_____

IN THE COURT OF APPEALS
THIRD JUDICIAL DISTRICT OF TEXAS
AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
4/17/2015 10:36:54 AM
JEFFREY D. KYLE
Clerk

_____

**GRAPHIC PACKAGING, INC.,**
*Appellant*

**v.**

**GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS; AND KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS,**
*Appellees.*

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT, CAUSE NO. D-1-GN-12-003038, THE HONORABLE DARLENE BYRNE PRESIDING

# REPLY BRIEF FOR APPELLANT

James F. Martens
jmartens@textaxlaw.com
Texas Bar No. 13050720
Amanda G. Taylor
ataylor@textaxlaw.com
Texas Bar No. 24045921
Lacy L. Leonard
lleonard@textaxlaw.com
Texas Bar No. 24040561
Danielle Ahlrich
dahlrich@textaxlaw.com
Texas Bar No. 24059215
**MARTENS, TODD, LEONARD, TAYLOR & AHLRICH**
301 Congress Avenue, Suite 1950
Austin, Texas 78701
Tele: (512) 542-9898
Fax: (512) 542-9899

Amy L. Silverstein
asilverstein@sptaxlaw.com
California Bar No. 154221
**SILVERSTEIN & POMERANTZ LLP**
12 Gough Street, Second Floor
San Francisco, California 94103
Tele: (415) 593-3502
Fax: (415) 593-3501

ATTORNEYS FOR APPELLANT
GRAPHIC PACKAGING, INC.

**O**RAL **A**RGUMENT **R**EQUESTED

## IDENTITY OF PARTIES AND COUNSEL

| APPELLANT | APPELLEES |
|---|---|
| Graphic Packaging, Inc. | Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and Ken Paxton, Attorney General of the State of Texas |
| **Appellate Counsel:** Amy L. Silverstein asilverstein@sptaxlaw.com **SILVERSTEIN & POMERANTZ LLP** 12 Gough Street, Second Floor San Francisco, California 94103 Tele: (415) 593-3502 Fax: (415) 593-3501 <br><br> **Trial and Appellate Counsel:** James F. Martens jmartens@textaxlaw.com Amanda G. Taylor ataylor@textaxlaw.com Lacy L. Leonard lleonard@textaxlaw.com Danielle Ahlrich dahlrich@textaxlaw.com **MARTENS, TODD, LEONARD, TAYLOR & AHLRICH** 301 Congress Avenue, Suite 1950 Austin, Texas 78701 Tele: (512) 542-9898 Fax: (512) 542-9899 | **Appellate Counsel:** Rance Craft, Assistant Solicitor General rance.craft@texasattorneygeneral.gov Cynthia A. Morales, Assistant Attorney General cynthia.morales@texasattorneygeneral.gov **OFFICE OF THE ATTORNEY GENERAL** P.O. Box 12548 (MC 059) Austin, Texas 78711-2548 Tele: (512) 936-2872 Fax: (512) 474-2697 <br><br> **Trial Counsel:** Kevin D. Van Oort *Formerly with the Office of the Attorney General* |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ..........................................................i

TABLE OF CONTENTS ................................................................... ii

INDEX OF AUTHORITIES...............................................................iv

ABBREVIATIONS ......................................................................x

REPLY ARGUMENT .....................................................................1

    I.    Section 171.106(a) Did Not Impliedly Repeal the Compact Formula. ...................................................................3

    II.    The Compact Is Valid And Binding.....................................5

        A.    The Compact Bears Clear Indicia of a Binding Compact. .........5

            1.    The Commission's Establishment. ................................8

            2.    No Unilateral Modification or Repeal.............................9

            3.    Requires Reciprocal Action...........................................11

        B.    The Compact is Not an Advisory Compact or a Uniform Law.......................................................................12

    III.    THE COMPACT'S ELECTION PROVISION IS UNAMBIGUOUSLY MANDATORY. ............................................14

        A.    The Express Terms are Mandatory.........................................14

        B.    The Most Relevant Extrinsic Evidence Supports the Mandatory Election.....................................................16

        C.    The Conduct of Other Party States Cannot Override the Compact's Express Terms. ......................................17

        D.    The Compact Does Not Surrender Texas's Power to Tax........19

            1.    The Compact Election Does Not Involve the "Power to Tax." .............................................................19

            2.    No Surrender or Suspension. .......................................21

IV.  COMPACT LAW AND THE CONTRACT CLAUSE PRECLUDE TEXAS FROM UNILATERALLY ELIMINATING THE ELECTION. ....................................................22

    A.  Settled Principles for Construing Compacts Are Applicable. ..............................................................................22

    B.  The Contract Clause Would Be Violated By Elimination of The Compact Election. ........................................................25

V.  The Franchise Tax Is an Income Tax under the Compact Definition....................................................................................29

CERTIFICATE OF SERVICE .............................................................34

CERTIFICATE OF COMPLIANCE ....................................................34

iii

# INDEX OF AUTHORITIES

## CASES

*Alabama v. North Carolina*,
 560 U.S. 330 (2010)........................................................................ 9, 16, 19

*Alcorn v. Wolfe*,
 827 F. Supp. 47 (D. D.C. 1993)....................................................................23

*Allied Structural Steel Co. v. Spannaus*,
 438 U.S. 234 (1978)......................................................................................28

*Arizona v. California*,
 292 U.S. 341 (1934)......................................................................................16

*Blair v. State Tax Assessor*,
 485 A.2d 957 (Me. 1984) ...................................................................... 21, 22

*Bolton v. Terra Bella Irrigation Dist.*,
 106 Cal. App. 313 (1930) .............................................................................22

*City of Charleston v. Pub. Serv. Comm'n*,
 57 F.3d 385 (4th Cir. 1995) .........................................................................26

*CT Hellmuth & Association, Inc. v. Washington Metro Area Transit Authority*,
 414 F. Supp. 408 (D. Md. 1976)...................................................................24

*Cuyler v. Adams*,
 449 U.S. 433 (1911)......................................................................................23

*Dartmouth College v. Woodward*,
 17 U.S. 518 (1819)........................................................................................20

*Doe v. Ward*,
 124 F. Supp. 2d 900 (W.D. Pa. 2000) .........................................................25

*Energy Reserves Group v. Kan. Power & Light Co.*,
 459 U.S. 400 (1983)................................................................................ 27, 28

*Gaar, Scott & Co. v. Shannon*,
 115 S.W. 361, 362 (Tex. Civ. App.—Austin 1908) *aff'd*,
 233 U.S. 468 (1912).....................................................................................20

*General Expressways, Inc. v. Iowa Reciprocity Board*,
163 N.W.2d 413 (Iowa 1968)......................................................................25

*Gillette Co. v. Franchise Tax Board*,
207 Cal. App. 4th 1369 (2012) ............................................................ 18, 26

*Green v. Biddle*,
21 U.S. 1 (1823)................................................................................... 25, 28

*Harsha v. Detroit*,
246 N.W. 849 (Mich. Sup. Ct. 1939) .........................................................19

*In re C.B.*,
188 Cal. App. 4th 1024 (2010) ....................................................................9

*Int'l Serv. Ins. Co. v. Jackson*,
335 S.W.2d 420 (Tex. App.—Austin 1960, writ ref'd n.r.e.) ........................3

*Int'l Union of Operating Eng'rs, Local 542 v. Del. River Joint Toll Bridge Comm'n*,
311 F.3d 273 (3rd Cir. 2002)........................................................................9

*Int'l Business Machines Corp. v. Dept. of Treasury*,
852 N.W.2d 865 (Mich. 2014) .............................................................. passim

*Kansas v. Colorado*,
514 U.S. 673 (1995)............................................................................. 18, 19

*McComb v. Wambaugh*, 934 F.2d 474 (3rd Cir. 1991) ................................ 9, 16, 24

*Memphis & Little Rock Railroad v. Railroad Comm.*,
112 U.S. 609 (1884)....................................................................................19

*National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Railway Co.*,
470 U.S. 451 (1985)....................................................................................10

*Northeast Bancorp, Inc. v. Bd. of Governors of the Federal Reserve*,
472 U.S. 159 (1985)............................................................................. passim

*Oklahoma v. New Mexico*,
501 U.S. 221 (1991)....................................................................................16

*People v. Board of Supervisors of Calaveras County*,
126 Cal. App. 670 (1932) ...........................................................................20

*Railroad Tax Cases*,
13 F. 722 (D. Cal. 1882)................................................................20

*Rhoades v. State*,
934 S.W.2d 113 (Tex. 1996) ...........................................................4

*Seattle Masters Builders Ass'n v. Pacific Northwest Electric Power and
Conservation Planning Council*,
786 F.2d 1359 (9th Cir. 1986) ................................................. passim

*Sheehy v. Public Empl. Retirement Div.*,
864 P.2d 762 (Mont. Sup. Ct. 1993)..............................................21

*Standard Oil Co. v. Johnson,*
10 Cal. 2d. 758 (1938).....................................................................21

*State Bank of Ohio v. Knoop*,
57 U.S. 369 (1854)..........................................................................20

*State Highway Dep't v. Gorham*,
162 S.W.2d 934 (Tex. 1942) .......................................................4, 5

*Sunbeam Envtl. Servs. v. Tex. Workers' Comp. Ins. Facility*,
71 S.W.3d 846 (Tex. App.–Austin 2002, no pet.).........................28

*Switzer v. Phoenix,*
341 P.2d 427 (Ariz. Sup. Ct. 1959) .........................................21, 22

*Tarrant Reg'l Water Dist. v. Hermann*,
186 L. Ed. 2d 153 (2013)....................................................10, 16, 19

*Texas v. New Mexico*,
462 U.S. 554 (1983)........................................................................16

*Texas v. New Mexico*,
482 U.S. 124 (1987)........................................................................29

*Trinova Corp. v. Dep't of Treasury*,
498 U.S. 358 (1991)........................................................................29

*U.S. Steel Corp. v. Multistate Tax Commission*,
434 U.S. 452 (1978)................................................................ passim

*U.S. Trust Co. of N.Y. v. New Jersey*,
    431 U.S. 1 (1976)..................................................................... 25, 26, 27, 28

*Valencia Energy Co. v. Dep't of Rev.*,
    959 P.2d 1256 (Ariz. Sup. Ct. 1998) ...............................................19

*Virginia v. Tennessee*,
    148 U.S. 503 (1893)..........................................................................23

*West Virginia ex rel. Dyer v. Sims*,
    341 U.S. 22 (1951)........................................................................9, 23

## STATUTES & RULES

1971 Fla. Laws ch. 71-980 § 2......................................................17

1981 Nev. Stat. ch. 181, at 350 ....................................................18

1985 Neb. Laws L.B. 344 ..............................................................18

1985 W. Va. Acts ch. 160 ..............................................................18

2005 Me. Laws ch. 332, § 29 .........................................................18

2006 Tex. Gen. Laws 1, 38 ............................................................29

2012 Cal. Stat. ch. 37, § 3 .............................................................18

2013 Minn. Ch. Law 143 (H.F. 677) .............................................18

2014 Mich. Pub. Acts 282, § 1.......................................................18

Cal. Fish & Game Code § 14001 .....................................................8

Cal. Gov't Code § 66800 ................................................................10

Cal. Veh. Code § 15207 ..................................................................10

Fla. Stat. § 214.71 ..........................................................................17

I.R.C. § 55 ......................................................................................31

I.R.C. § 63 ......................................................................................31

I.R.C. § 151 ....................................................................................31

I.R.C. §§ 101-140..............................................................................30

Mich. Comp. Laws § 205.581...............................................................3

Mo. Rev. Stat. § 32.200 ....................................................................17

Mont. Code Ann. § 15-1-601 ............................................................17

N.D. Cent. Code § 57-59-01 ............................................................17

N.M. Stat. Ann. § 7-5-1 ...................................................................17

Tex. Code Crim. Proc. art. 42.19 .......................................................8

Tex. Const. art. III, § 36....................................................................4, 5

Tex. Const. art. VIII, § 4 ........................................................ 19, 21, 22

Tex. Fam. Code § 60.010 .................................................................10

Tex. Gov't Code § 510.017 ..............................................................10

Tex. R. App. P. 38.3.........................................................................28

Tex. Tax Code § 141.001 ........................................................ passim

Tex. Tax Code § 171.106........................................................ passim

Tex. Tax Code § 171.1011 ...............................................................30

Tex. Tax Code § 171.1012 ...............................................................30

Tex. Tax Code § 171.1013................................................................31

## OTHER AUTHORITIES

California Chamber of Commerce,
*Special Exhibits Re: A.B. 1304: Ratifying Multistate Tax Compact* (Jul. 13, 1973) ..................................................................................................18

Caroline Broun, Richard Masters and others, *The Evolving Use and Changing Role of Interstate Compacts* (ABA 2006).............................................. 9, 12, 13, 24

*Fletcher Cyclopedia of the Law of Corporations* .....................................................30

*Interstate Compacts vs. Uniform Laws*,
at cglg.org/media/1302/ compacts_vs_uniform_laws-csgncic.pdf (last visited Apr. 9, 2015).......................................................................................14

Kearns B. Taylor, *Texas' Exciting Answer in the Battle with Proponents of Federal Control Over State Taxation of Interstate Commerce*,
30 Tex. B.J. 773 ...................................................................................15

Lilian V. Faulhaber, *The Hidden Limits of the Charitable Deduction: An Introduction to Hypersalience*,
92 B.U. L. Rev. 1307 (2012) ...............................................................31

Public Law 86-272 ......................................................................................29

Texas House of Representatives Ways & Means Committee HB 3.........................29

Texas House Research Organization HB 3...............................................................29

Walter Hellerstein, *State Taxation*
¶ 9.01[1] n.12.19, ¶ 7.12[7] ................................................................30

# ABBREVIATIONS

For ease of reference, Graphic Packaging, Inc. uses the following abbreviated references to the record and the parties herein:

| Abbreviation | Reference |
|---|---|
| **Graphic** | Graphic Packaging, Inc. |
| **The Comptroller** | Appellees Glenn Hegar, Comptroller of Public Accounts of the State of Texas, and Ken Paxton, Attorney General of the State of Texas, collectively |
| **The Compact** | Multistate Tax Compact |
| **The Compact Election** | The election contained in Texas Tax Code Section 141.001, art. III(1) |
| **The Compact Formula** | The apportionment formula contained in Texas Tax Code Section 141.001, art. IV, *i.e.*, an equally-weighted, three-factor formula consisting of a property factor, a payroll factor, and a sales factor |
| **The Texas Formula** | The apportionment formula contained in Texas Tax Code Section 171.106(a), *i.e.*, a single factor formula consisting of only a sales factor |
| **UDITPA** | The Uniform Division of Income for Tax Purposes Act |

# REPLY ARGUMENT

Graphic properly used the Compact Formula to determine its franchise tax base. Texas became a party to the Compact in 1967 and thereby agreed to all of its terms, including the core provision allowing all taxpayers to elect to apportion income by *either* the Compact Formula *or* an alternative state formula, the Texas Formula. Tex. Tax Code § 141.001, art. III(1).

Texas has never repealed the Compact Election or Formula. The Comptroller contends that Texas Tax Code § 171.106(a) eliminated the Compact Formula. Yet, neither the plain language of Section 171.106(a) nor its legislative history indicate an amendment of the Compact to mandate the Texas Formula.

In *International Business Machines Corp. v. Department of Treasury*, 852 N.W.2d 865 (Mich. 2014) ("*IBM*"), the Michigan Supreme Court rejected a nearly identical argument involving the same Compact. The Court agreed that Michigan's apportionment statute was mandatory, but "the Legislature gave no clear indication that it intended to repeal the [Compact Election]," so it assumed "the Legislature intended for both to remain in effect." *Id.* at 875. When enacted, the Compact "contemplat[ed] the future enactment of a state income tax with a mandatory apportionment formula different from the Compact's apportionment formula." *Id.* at 874. The statutes were compatible: if a taxpayer elects the Compact, the Compact Formula applied; otherwise, the taxpayer was "required to apportion its tax

1

base consistently with the mandatory language of" the Michigan's statute. *Id.* at 875. The Michigan Supreme Court's reasoning is on point here and provides the proper analytical path for reconciling the terms of the Compact and the franchise tax law. If this Court agrees, then it need not reach any other issues.

Furthermore, the Compact is valid and binding on Texas until it withdraws. The states and the drafters understood compacts were an established mechanism for resolving cross-border issues and intended the Compact to be binding. The plain terms of the Compact demonstrate a clear intent to create a binding interstate compact. The legislative history confirms that intent. There is no evidence of intent to enact a mere model law. Enactment and withdrawal provisions and a commission are never features of garden-variety statutes. And, there is no evidence of intent to allow piecemeal amendment of the Compact's terms. Subsequent actions of party states are inconsistent; some states never deviated from the Compact Election, some states withdrew, and most notably, some states deviated from the Compact Election and later withdrew.

Finally, the Compact Election applies because the franchise tax is an "income tax" under the Compact's broad definition. All of Texas's alternative tax bases, especially the cost of goods sold computation, begin with gross income and allow deductions not directly related to specific transactions. Thus, they are income taxes under the Compact.

2

# I. SECTION 171.106(A) DID NOT IMPLIEDLY REPEAL THE COMPACT FORMULA.

Tex. Tax Code § 171.106(a) did not impliedly repeal the Compact Formula. An implied repeal would require that the statutes were irreconcilable or that repeal was "plainly intended by the Legislature...  The implication must be clear, necessary, irresistible, and free from reasonable doubt." *Int'l Serv. Ins. Co. v. Jackson*, 335 S.W.2d 420, 424 (Tex. Civ. App. 1960).

Sections 171.106(a) and 141.001 are harmonized to preserve both: if a taxpayer makes the Compact Election, the Compact Formula applies; otherwise, the Texas Formula applies.  *See* Appellant's Brief 23-24.

The Michigan Supreme Court in *IBM*, 852 N.W.2d 865, adopted this analysis, holding the Compact Election reconciled the Compact Formula with the Michigan Formula, which is materially similar to Section 171.106(a).[1]

> [The state's apportionment formula] is not the only provision of Michigan's tax laws pertaining to the apportionment of business income--the Compact's election provision shares the same purpose. Therefore, we cannot interpret [the state's apportionment formula] in a vacuum…  The Department's argument overlooks that the Compact's election provision, by using the terms "may elect," contemplates a divergence between a party state's mandated apportionment formula and the Compact's own formula--either at the time of the Compact's adoption by a

---

1. *Compare* Mich. Comp. Laws § 205.581, art. IV(9) (2011), *with* Section 171.106(a).  The Michigan statute also contained a clause stating "except as otherwise provided in this act."  *IBM*, 852 N.W.2d at 873.

party state or at some point in the future. Otherwise, there would be no point in giving taxpayers an election between the two. In fact, reading the Compact's election provision as forward-looking--i.e., contemplating the future enactment of a state income tax with a mandatory apportionment formula different from the Compact's apportionment formula--is the only way to give meaning to the provision when it was enacted in Michigan. Viewed in this light, the [state's] mandatory apportionment language may plausibly be read as compatible with the Compact's election provision.

*Id.* at 873-74.

To say that prior to enacting the franchise tax in 2006, the "Legislature *never* has intended to apply" the Compact Formula does not establish a policy or say anything about legislative intent in 2006. Appellees' Brief 36. Silence does not evidence intent to eliminate the Compact Formula. Rather this Court must assume "the Legislature intended for both to remain in effect." *IBM*, 852 N.W.2d at 875.

Finally, the Comptroller's interpretation would violate Tex. Const. art. III, § 36, which is aimed at eliminating confusion and uncertainty; requiring amended statutes to be re-enacted and published allows "their meaning [to be] known without the necessity of examining the statute amended." *Rhoades v. State*, 934 S.W.2d 113, 121 (Tex. 1996) (quoting Tex. Const. art. III, § 36 commentary). However, Section 171.106(a) as interpreted by the Comptroller gives no notice it affects Section 141.001, creating just the confusion and uncertainty the Constitution intends to prevent. *See* Appellees' Brief 39; *State Highway Dep't v. Gorham*, 162 S.W.2d

4

934, 937 (Tex. 1942) (a law restricting application of a statute and not expressly referencing the title of the provisions it restricted, violated Tex. Const. art. III, § 36). *Id.* at 937.

Section 171.106(a) did not impliedly repeal the Compact Election or Formula.

## II.    THE COMPACT IS VALID AND BINDING.

The Compact bears clear indicia of a binding compact. Appellant's Brief 38-41 (discussing enactment provisions, imposition of mutual obligations on party states, withdrawal provision, creation of Commission). History confirms the states and the drafters understood compacts to be an established mechanism for resolving cross-border issues, and they intended the Compact to be a binding compact. *Id.* Claiming that the Compact is a uniform law disregards its plain terms and its legislative history. Appellees' Brief 54-55. Arguing that without an express prohibition, party states are free to ignore the Compact (*Id.* at 55-60), turns the concept of compacts on its head.[2]

### A.    The Compact Bears Clear Indicia of a Binding Compact.

*Northeast Bancorp, Inc. v. Board of Governors of the Federal Reserve*, 472 U.S. 159 (1985), and *Seattle Masters Builders Association v. Pacific Northwest*

---

2. The Comptroller misreads Tex. Tax Code § 141.001, art. XI(a) ("Nothing in this compact shall be construed to … [a]ffect the power of any state or subdivision thereof to fix rates of taxation, except that a party state shall be obligated to implement Article III.2 of this compact."). *See* Appellees' Brief 53 n.8. This language anticipates and preempts an argument that Article III.2 might interfere with the power to set tax rates.

*Electric Power and Conservation Planning Council*, 786 F.2d 1359 (9th Cir. 1986), did not establish absolute requirements for the existence of a compact but rather discussed certain indicia common in compacts in a manner pertinent to the facts in those cases. *Seattle Master Builders* also recognized that "[a]n unusual feature of a compact does not make it invalid." 786 F.2d at 1364.

One issue in *Northeast Bancorp* was whether statutes in Massachusetts and Connecticut permitting the acquisitions of banks by out-of-state entities were an invalid compact under the Compact Clause due to lack of Congressional approval. *Northeast Bancorp*, 472 U.S. at 162. The statutes were not titled compacts, were not "entered into" with other states, and lacked withdrawal provisions. The Supreme Court rejected the Compact Clause challenge, expressing doubt as to "whether there is an agreement amounting to a compact." *Id.* at 175-76. The Court noted:

> The two statutes are similar in that they both require reciprocity and impose a regional limitation... But several of the classic indicia of a compact are missing. No joint organization or body has been established to regulate regional banking or for any other purpose. Neither statute is conditioned on action by the other State, and each State is free to modify or repeal its law unilaterally. Most importantly, neither statute requires a reciprocation of the regional limitation.

*Id.* at 175.

6

*Seattle Master Builders* paraphrased *Northeast Bancorp* in determining the Pacific Northwest Electric Power and Conservation Planning Council was a compact organization, not a federal agency (subject to the Constitutional appointments clause):

> The Supreme Court recently outlined some of the indicia of compacts. These are establishment of a joint organization for regulatory purposes; conditional consent by member states in which each state is not free to modify or repeal its participation unilaterally; and state enactments which require reciprocal action for their effectiveness.

*Seattle Master Builders*, 786 F.2d at 1363 (citing *Northeast Bancorp*).

*U.S. Steel Corp. v. Multistate Tax Commission*, 434 U.S. 452 (1978), supports Appellant. The Court reviewed the Compact's terms before determining it was legal without Congressional consent. *See id*. at 471 (detailing the Compact's obligations and the "multilateral nature of the agreement"); Appellant's Brief 14. If the Court doubted whether the Compact was a binding compact, it would have said so, like in *Northeast Bancorp*, and the lengthy Compact Clause analysis would have been irrelevant. The Court held the Compact was valid and the audits authorized by the Compact could proceed. *U.S. Steel*, 434 U.S. at 472-78.

In any event, the Compact indeed contains the "classic indicia of a compact" discussed in *Northeast Bancorp.*

7

### 1. The Commission's Establishment.

The Compact established the Commission, a classic characteristic of a binding compact. *See Northeast Bancorp*, 472 U.S. at 175 (indicia includes "a joint organization or body has been established to regulate regional banking or for any other purpose"). The Commission has been in existence for more than 45 years, employs a large number of people, has a sizeable budget, assembles leaders to advance important proposals, and undertakes numerous audits. *See* Tex. Tax Code § 141.001, arts. VI-VIII; *see also*, www.mtc.gov (Commission website detailing its activities) and www.mtc.gov/Audit.aspx?id=578 (reporting over 1600 audits in the last five years). Although the term "regulatory" power is not defined, the Commission is a robust organization with significant influence and powers. *See Northeast Bancorp*, 472 U.S. at 175 (failing to define "regulatory" power).

*Seattle Master Builders* imprecisely paraphrased *Northeast Bancorp*, and no case holds a compact must create a compact agency with *regulatory* power to be binding. A compact agency is highly suggestive of a compact's existence, but it does not need to be a *regulatory* agency, because even the absence of a regulatory agency does not necessarily mean no compact exists. Many compacts have advisory commissions (*see* Pacific Marine Fisheries Compact (Cal. Fish & Game Code § 14001)), and others have no commission at all (*see, e.g.*, Interstate Corrections Compact (Tex. Code Crim. Proc. art. 42.19) (imposing obligations on

8

states without creating a commission)). *See also* Caroline Broun, Richard Masters and others, *The Evolving Use and Changing Role of Interstate Compacts* (ABA 2006) ("Broun"), at 133-47 (discussing various structures for administering compacts).

### 2. No Unilateral Modification or Repeal.

Silence in the Compact does not mean states may modify Compact provisions. In effect, the Comptroller argues the Compact had to *expressly prohibit* eliminating the Election provision. Appellees' Brief 55-60. The rule is the opposite – the terms of a compact are mandatory, and a party cannot alter or ignore them unless expressly authorized. *See, e.g.*, *West Virginia ex rel. Dyer v. Sims*, 341 U.S. 22, 28 (1951); *McComb v. Wambaugh*, 934 F.2d 474, 479 (3rd Cir. 1991); *In re C.B.*, 188 Cal. App. 4th 1024, 1031 (2010); *Int'l Union of Operating Eng'rs, Local 542 v. Del. River Joint Toll Bridge Comm'n*, 311 F.3d 273, 281 (3rd Cir. 2002) ("This is because the 'concurred in' provision introduces the issue of, and mechanism for, modification, without which there is absolutely no authority for, let alone specific means of accomplishing, a modification of the Compact…"); Broun at 23.

Likewise, a withdrawal provision does not render a Compact non-binding. Many binding compacts have withdrawal provisions. *See Alabama v. North Carolina*, 560 U.S. 330, 352-53 (2010) (discussing analogous withdrawal provision

9

in Southeast Interstate Low-Level Radioactive Waste Management Compact); Cal. Gov't Code § 66800, art. X (c) (Tahoe Regional Planning Compact: "A State party to this compact may withdraw therefrom by enacting a statute repealing the compact…"); Cal. Veh. Code § 15027 (Driver's License Compact: "any party state may withdraw from this compact by enacting a statute repealing the same…"); Tex. Fam. Code § 60.010, art. XI (Interstate Compact on Juveniles); Tex. Gov't Code § 510.017, art. XI (Interstate Compact for Adult Offender Supervision).

The Comptroller cites *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Railway Co.*, 470 U.S. 451, 465-66 (1985), stating that "'absent some clear indication that the legislature intends to bind itself contractually,' an enacted law does not create contractual or vested rights." However, that case is inapplicable because it did not involve a compact. Moreover, the very choice of a compact communicates the legislature's intent to enter into a binding agreement. Appellant's Brief 38-39.

Similarly, the concept that "[s]tates rarely relinquish their sovereign powers" and "when they do we would expect a clear indication of such devolution, not inscrutable silence" is not applicable because the Compact's election provision is unambiguously mandatory. *See* Appellees' Brief 51 (quoting *Tarrant Reg'l Water Dist. v. Hermann*, 186 L. Ed. 2d 153, 169 (2013)); *see* § III.A *infra*. Similarly, the

course of conduct by member states does not establish a right to unilaterally amend the Compact.  *See* § III.C *infra.*

### 3.     Requires Reciprocal Action.

The Compact requires reciprocal action by the party states for effectiveness, because it did not "enter[] into force" until enacted by seven states.   Tex. Tax Code § 141.001, art. X(1); *Seattle Master Builders Ass'n*, 786 F.2d at 1363 (provisions requiring reciprocal action constitute indicia of a compact).   The Comptroller claims, "the Supreme Court could not have meant that the joint action necessary to establish an advisory body with no regulatory power is evidence of a binding regulatory compact."   Appellees' Brief 48.   This statement, without any authority, misconstrues the authorities (particularly *Northeast Bancorp*, which did not refer to *regulatory* power) and the facts (the Commission has broad powers beyond simply providing advice).   Appellant's Brief 37-38; *see* § II.A.1 *supra*.   Requiring enactment by multiple states is never a characteristic of regular statutes and satisfies the requirement of reciprocal action that characterizes a binding compact.   The Comptroller is correct that the Compact would have been effective as a regular statute even if seven other states did not enact it.   Appellees' Brief 48.   But this misses the point.   Enactment by seven states elevated it to a binding compact.

The Compact Election also is reciprocal because it ensures states that their taxpayers will be afforded the Compact Election when they do business in other

party states. This reciprocity was central to staving off Congressional pre-emption, one of the Compact's main purposes. *See* Appellant's Brief 44-45. The sales/use tax credit provision is also reciprocal because party states agree provide credits for taxes paid in other states.

## B.    The Compact is Not an Advisory Compact or a Uniform Law.

The Commissioner cites Broun for its claim that the Compact is "an advisory compact containing model laws." Appellees' Brief 42-43. According to Broun, "[b]y their very terms, advisory compacts cede no state sovereignty nor delegate any governing power to a compact-created agency." Broun at 14. Because the Compact does cede some state sovereignty, including particularly the authority to impose an exclusive apportionment formula, Broun confirms that it is not an advisory compact. Appellant's Brief 36-45.

Advisory compacts also "lack formal enforcement mechanisms and are designed not to actually resolve an interstate matter, but simply to study such matters." Broun at 13. However, the Compact was designed to resolve an interstate matter, *i.e.*, to secure base-line uniformity through binding obligations upon the party states. And the terms go beyond simply study, *e.g.*, they require party states to provide the Election to apportion under the Compact, to honor sales/use tax exemptions and credits, and to pay dues and provide members to the Commission. Tex. Tax Code § 141.001, arts. III(1), V, VI(1), VI(4)(b). The

12

Commission also does more than study; it has a robust audit function. *Id.* at art. VIII.[3]

Regardless, no authority (including Broun) says advisory compacts are not binding. *See* Appellees' Brief 42 (as an advisory compact, the Compact does not "carr[y] the preemptive force that Graphic assigns to it"). A state entering into an advisory compact must conduct the compact's study. Advisory compacts are one of three general types of compacts: boundary compacts, advisory compacts, and regulatory compacts. Broun distinguishes all compacts from administrative agreements, which are between state *agencies*. Broun at 16-17. The Compact is between states, not state agencies. Thus, Broun supports the conclusion that because an advisory compact is one of three established types of compacts, states are bound to the obligations they undertake by entering into an advisory compact.

UDITPA does not operate as a uniform law when enacted as part of the Compact.[4] It was drafted in the late 1950s to address the lack of uniformity in state taxation, but it was insufficient to establish uniformity. *See* Appellant's Brief 2-6.

---

3. Not requiring Congressional consent is not a feature of an advisory compact but rather a consequence of a compact not tending to "encroach upon or interfere with the just supremacy of the United States." *U.S. Steel,* 434 U.S. at 471.

4. The Comptroller's statement that the "Compact simply sets those articles into its text without any prefatory language requiring members to maintain those provisions unchanged in their laws or any means of compelling them to do so" is incorrect. Appellees' Brief 54. The terms of the Compact require it to be enacted "in the form substantially" as written by the drafters. Appellant's Brief, Att. G at 4 (Council of State Governments memorandum accompanying the Compact's final text).

To stave off Congressional preemption, the states and drafters chose a different vehicle, a binding agreement containing the Compact Election. *Id*. at 6-7. According to the Council on State Government's National Center for Interstate Compacts: "If uniform provisions are embodied in a compact, no state could subsequently destroy this uniformity by unilateral amendment of its own statute except to the extent that such variation might be permitted by specific provision of the compact."[5] *Interstate Compacts vs. Uniform Laws*, at cglg.org/media/1302/compacts_vs_uniform_laws-csgncic.pdf (last visited Apr. 9, 2015).

## III. THE COMPACT'S ELECTION PROVISION IS UNAMBIGUOUSLY MANDATORY.

### A. The Express Terms are Mandatory.

The Comptroller incorrectly argues, "applying Article III.1 to the franchise tax creates a latent ambiguity." Appellees' Brief 55.

The Compact Election states:

> A taxpayer subject to an income tax … may elect to apportion and allocate his income in the manner provided by the laws of such States … without reference to this compact, or may elect to apportion and allocate in accordance with Article IV.

---

5. The Comptroller also quotes the Commission's first annual report as saying the Compact had "been enacted as a uniform law" by 15 states. Appellees' Brief 55. The Commission knew then the Compact was not a uniform law. Supp.CR.29. Thus, the more reasonable interpretation of this statement is that it refers simply to the uniform template used by states to enact the Compact.

Tex. Tax Code § 141.001, art. III(1).  Because a taxpayer "may elect," the party

states must make the Election available.   In 1970, the Commission agreed:

> The Multistate Tax Compact thus preserves the right of
> the states to make such alternative formulas available to
> taxpayers even though it makes uniformity available to
> taxpayers where and when desired.

Supp.CR.47; *see* Kearns B. Taylor, *Texas' Exciting Answer in the Battle with*

*Proponents of Federal Control Over State Taxation of Interstate Commerce*, 30 Tex.

B.J. 773, 821 (the Compact "provides for giving a taxpayer the option to achieve

uniformity if he so desires, by utilizing the Uniform Division of Income for Tax

Purposes Act").

The Compact Election was the central provision of the Compact.   *See* § II.B

*supra.*   If the Election were optional, the Compact would have failed its purpose of

establishing the uniformity Congress demanded.   Appellant's Brief 44-45.   In fact,

the Compact Election *advances* each of its express purposes.   The Election

facilitates proper determination of taxpayers' state and local tax liabilities, equitably

apportions their tax bases among states, prevents duplicative taxation, and secures

base-line uniformity and compatibility.   In addition, using the same formula in

multiple states simplifies compliance.   *Id*. at Att. G at 1 (Council of State

Governments memorandum accompanying the Compact's final text), Att. H at 1

(Council of State Governments Compact Summary and Analysis).   Tex. Tax Code

§ 141.001, art. XII directs, the "[C]ompact shall be liberally construed so as to effectuate the purposes thereof."

By contrast, the Comptroller's interpretation eviscerates the Compact's purposes. Different formulas ensure complexity, raise compliance costs, reduce uniformity, and risk double-taxation. *Oklahoma v. New Mexico*, 501 U.S. 221, 230-31 (1991) (compact must be interpreted consistent with its stated purposes).

**B. The Most Relevant Extrinsic Evidence Supports the Mandatory Election.**

The construction aids the Comptroller mentions (Appellees' Brief 57) are irrelevant because there is no ambiguity in the Compact's terms. *Tarrant*, 186 L. Ed. 2d 153. Nonetheless, if this Court considers extrinsic evidence, the contemporaneous drafting and negotiation evidence and the Compact's express purposes are most probative of the parties' intent, not evidence of conduct years or decades later as cited by the Comptroller. *See Alabama v. North Carolina*, 560 U.S. at 345-48; *Oklahoma v. New Mexico*, 501 U.S. at 231-37 (relying on "purpose and negotiating history" to interpret ambiguous phrases in Canadian River Compact); *Texas v. New Mexico*, 462 U.S. 554, 568 n.14 (1983) (using context at time of compact's enactment to aid interpreting ambiguous provision); *Arizona v. California*, 292 U.S. 341, 359-60 (1934); *McComb*, 934 F.2d at 481. That evidence indicates the states and the drafters knew what compacts were and how they operated, and intended to enter into such a binding agreement. *See* Appellant's

16

Brief 44.   The Election was a core element of the Compact to secure a base-line level of uniformity and thus avoid federal imposition of a single apportionment formula.   *See id.* at 43.   A model law (UDITPA) had already proven insufficient to stave off federal action.

## C.    The Conduct of Other Party States Cannot Override the Compact's Express Terms.

The claim "the Compact states consistently have construed that silence to mean that members may unilaterally change or restrict the Compact's terms in their own laws" is incorrect.   *See* Appellees' Brief 51.

First, the Commission's 1972 resolution is inapposite because Fla. Stat. § 214.71 set forth the same formula as Compact Article IV.   1971 Fla. Laws ch. 71-980 § 2 (amending Fla. Stat. § 214.71 and describing an equally-weighted three-factor formula).   Accordingly, Florida did not meaningfully change the Compact Formula after it repealed Articles III and IV.   The Commission's resolution supports this: "Whereas, the State of Florida has repealed Articles III and IV of the Multistate Tax Compact, while still legislatively adhering to the spirit of the Compact…"   CR.487.

Moreover, many states have not altered the Election.   *See, e.g.*, Missouri (Mo. Rev. Stat. § 32.200); North Dakota (N.D. Cent. Code § 57-59-01); Montana (Mont. Code Ann. § 15-1-601); New Mexico (N.M. Stat. Ann. § 7-5-1).   Other states have withdrawn from the Compact.   *See U.S. Steel*, 434 U.S. at 454 n.1

17

(citing statutes repealing the Compact in Florida, Illinois, Indiana, and Wyoming); Nevada (1981 Nev. Stat. ch. 181, at 350); Maine (2005 Me. Laws ch. 332, § 29); Nebraska (1985 Neb. Laws L.B. 344, § 9); West Virginia (1985 W. Va. Acts ch. 160); California Chamber of Commerce, *Special Exhibits Re: A.B. 1304: Ratifying Multistate Tax Compact* (Jul. 13, 1973) (explaining that New York withdrew because of its opposition to "mandat[ing] uniformity").

The most that can be gleaned from states' deviations from the Compact Formula after the complaint in *Gillette Co. v. Franchise Tax Board*, 207 Cal. App. 4th 1369 (2012), was filed is those states recognized a controversy existed about their ability to modify the Compact. Most importantly, some states that previously deviated from the Compact Formula have since withdrawn from the Compact. California (2012 Cal. Stat. ch. 37, § 3); Michigan (2014 Mich. Pub. Acts 282, § 1 (S.B. 156)); Minnesota (2013 Minn. Law ch. Law 143, art. 13, § 24 (H.F. 677)). Other states repealed and re-enacted the Compact. *See* Appellees' Brief 12-13 (Oregon, Utah, and the District of Columbia). From this patchwork of states' conduct, it is impossible to draw a conclusion that party states "consistently have construed that silence" to allow unilateral amendment.

Finally, no court has used course of performance evidence to override the express terms of a compact, as opposed to aiding in the interpretation of an *ambiguous* compact provision. In *Kansas v. Colorado*, 514 U.S. 673 (1995), the

18

Supreme Court explicitly refused to allow "the subsequent practice of the parties" to alter the Court's interpretation of the Arkansas River Compact when that practice was inconsistent with the compact's "clear language." *Id.* at 690; *cf. Tarrant*, 186 L. Ed. 2d at 172 (looking to party states' practical conduct to interpret ambiguous compact provisions); *Alabama v. North Carolina*, 560 U.S. at 345-46 (considering party states' practical conduct in interpreting ambiguous compact provision).

**D.     The Compact Does Not Surrender Texas's Power to Tax.**

A mandatory Compact Election does not violate Texas Constitution, Article VIII, Section 4: "The power to tax corporations and corporate property shall not be surrendered or suspended by act of the Legislature, by any contract or grant to which the State shall be a party." A choice of apportionment formula is not the "power to tax." Nor is it a permanent or irrevocable surrender or suspension because Texas may withdraw under the Compact's terms.

**1.     The Compact Election Does Not Involve the "Power to Tax."**

The purpose of states' anti-surrender provisions was to prohibit legislatures from granting corporate charters with tax immunities they could not later alter. *See, e.g.*, *Valencia Energy Co. v. Dep't of Rev.*, 959 P.2d 1256, 1263-65 (Ariz. Sup. Ct. 1998); *Memphis & Little Rock Railroad v. Railroad Comm.*, 112 U.S. 609 (1884); *Harsha v. Detroit*, 246 N.W. 849, 852 (Mich. Sup. Ct. 1939).

19

Article 13, §§ 1, 6, says that 'the power of taxation shall never be surrendered or suspended by any grant or contract to which the state shall be a party.' … By a contract authorizing certain persons to form a corporation and exercise its franchises, however valuable the consideration received, the state cannot, as we have seen, surrender or suspend its rights to tax its property besides, as all other property is taxed.

*Railroad Tax Cases*, 13 F. 722, 776 (D. Cal. 1882). States conceived of such provisions after Supreme Court cases enforced perpetual tax exemptions in corporate charters. *See, e.g.*, *Dartmouth College v. Woodward*, 17 U.S. 518 (1819); *State Bank of Ohio v. Knoop*, 57 U.S. 369 (1854).

Anti-surrender provisions prohibit relinquishing the power to impose or collect a tax, in particular through an irrevocable contractual tax exemption. For example, in *People v. Board of Supervisors of Calaveras County*, 126 Cal. App. 670 (1932), the court rejected the argument that cancelling taxes due on land acquired by the state would violate the anti-surrender provision: "[T]he power of taxation has [not] been surrendered by the state either by grant or contract. The facts before us show that the power of taxation was exercised, and that by operation of law, it has ceased to be a charge upon the land for the reason that the land is now the property of the state." *Id.* at 674.

Similarly, in *Gaar, Scott & Co. v. Shannon*, 115 S.W. 361, 362 (Tex. Civ. App.—Austin 1908) *aff'd*, 233 U.S. 468 (1912), the sole case cited by the Comptroller, a taxpayer's 10-year business permit did not preclude the state from

20

imposing additional franchise taxes because of Texas's anti-surrender provision. *See also Switzer v. Phoenix,* 341 P.2d 427, 430-31 (Ariz. Sup. Ct. 1959) (parallel provision is a "prohibition against the surrender or relinquishment of the right to impose a tax" and "against the irrepealable grant of immunity from taxation"); *Sheehy v. Public Empl. Retirement Div.*, 864 P.2d 762, 766 (Mont. Sup. Ct. 1993) (Under Montana's anti-surrender provision, "the state cannot promise any group of taxpayers that it will never tax them."); *Blair v. State Tax Assessor*, 485 A.2d 957, 960 (Me. 1984) (Maine Constitution prevents legislature from granting permanent tax exemptions); *Standard Oil Co. v. Johnson,* 10 Cal. 2d. 758, 763-64 (1938) (because state reserved power to tax in ceding federal jurisdiction over national parks, the provision was not implicated).

Providing taxpayers a choice between formulas to apportion income does not implicate the power to impose or collect a tax. *See U.S. Steel*, 434 U.S. at 457 (explaining a party state retains complete control over the tax base, the tax rate, its tax revenues, and the means and methods of tax collection). Rather, the apportionment formula plays a role in the computation of the amount of tax a multistate corporation ultimately owes.

### 2.    No Surrender or Suspension.

In addition, the Compact Election is not a surrender or suspension by grant or contract.  Tex. Const. art. VIII, § 4.  Anti-surrender provisions bar *irrevocable*

21

exemptions from taxation. The legislature cannot act on a permanent basis or even for a specific amount of time (for example, a 10-year charter exempting taxation), without the ability to revoke the tax exemption. *See, e.g.*, *Switzer*, 341 P.2d at 431; *Blair*, 485 A.2d at 960. Here, Texas can reclaim full control over the apportionment formula by withdrawing from the Compact. Tex. Tax Code § 141.001, art. X(2); *U.S. Steel*, 434 U.S. at 473; *see also Bolton v. Terra Bella Irrigation Dist.*, 106 Cal. App. 313, 328 (1930) (anti-surrender provision not implicated when legislative grant can be withdrawn).

In sum, the Compact Election does not violate Texas Constitution, Article VIII, Section 4.

## IV. COMPACT LAW AND THE CONTRACT CLAUSE PRECLUDE TEXAS FROM UNILATERALLY ELIMINATING THE ELECTION.

### A. Settled Principles for Construing Compacts Are Applicable.

The argument that "a non-approved compact's preeminence over other state law arises from its status as a contract" is incomplete and misleading, and Appellant does not concede it. *See* Appellees' Brief 63. Compacts "are a unique type of arrangement, conceptualized by the courts as simultaneously *both* contracts *and* binding reciprocal statutes among sovereign states." Appellant's Brief 32. This accounts for the fundamental interpretive principle of compacts, that they supersede inconsistent state law. *Id.*

22

Lack of Congressional consent does not change compacts' interpretive principles. *See id*. at 34-36. Both Congressionally-approved and unapproved compacts solve cross-border problems. States and other stakeholders rely on the binding nature of compacts. If a state could override a compact term at will, the compact would not serve its vital purposes. Both types of Compacts are simultaneously statutes and binding agreements among sovereign states, and this results in a compact superseding other state laws.

By contrast, Congressional consent is unrelated to states' and other stakeholders' need to rely on the binding nature of compacts. Congressional consent serves an entirely different purpose. A compact requires consent only if it "tend[s] to the increase of political power in the States, [and thus] may encroach upon or interfere with the just supremacy of the United States." *U.S. Steel*, 434 U.S. at 471 (citing *Virginia v. Tennessee*, 148 U.S. 503, 518-19 (1893)). In that case, consent ensures Congress affirmatively agrees to the agreement.

Prior to *Cuyler v. Adams*, 449 U.S. 433 (1911), it was not clear that Congressionally approved compacts were federal law; yet, pre-*Cuyler* cases consistently held compacts supersede other state laws. *Dyer*, 341 U.S. at 28. Thus, Congressional approval is merely an additional reason subsequent state law cannot override a compact. *See Alcorn v. Wolfe*, 827 F. Supp. 47, 52 (D. D.C. 1993) ("In light of the Supremacy Clause … *and because compacts are analogous*

23

*to contracts between states*, the terms of the [] compact cannot be modified unilaterally by state legislation and take precedence over conflicting state law.") (emphasis added); Broun at 65 ("Congressional consent may change the venue in which compact disputes are ultimately litigated; it does not change the controlling nature of the agreement on the member states."); Appellant's Brief 35-36.

The *IBM* dissent is wrong. It began by stating that *IBM* cited only two cases to support the proposition that non-Congressionally approved compacts supersede conflicting state law, *McComb*, 934 F.2d at 479, and *CT Hellmuth & Association, Inc. v. Washington Metro Area Transit Authority*, 414 F. Supp. 408, 409 (D. Md. 1976).

While those cases do support the principle that the Compact supersedes conflicting state law, *IBM* did not rely on them exclusively. Rather, *IBM* and its amici thoroughly discussed the purposes of compacts, and analyzed the caselaw involving compacts, both Congressionally-approved and unapproved. The dissent's failure both to acknowledge and to consider those facts and legal authorities caused it to reach the wrong conclusion. This Court should not make the same mistake. To do so would have negative reverberations throughout the law of compact interpretation and operation.

**B.**     **The Contract Clause Would Be Violated By Elimination of The Compact Election.**

*Green v. Biddle*, 21 U.S. 1, 84 (1823), held that "any deviation" from the terms of a compact violates the Contract Clause. *Green* has not been questioned or overruled and is still frequently cited in modern compact cases. *See Gen. Expressways, Inc. v. Iowa Reciprocity Board*, 163 N.W.2d 413, 420-21 (Iowa 1968); *Doe v. Ward*, 124 F. Supp. 2d 900, 914-15 (W.D. Pa. 2000).

The multi-step analysis invoked by the Comptroller (Appellees' Brief 65) was developed to strike a balance between the nature of a contract's impairment and the state's justification for that impairment. However, this approach has never been applied to a compact *among states* (rather than a contract with at least one private party). This is sensible because compacts are agreements among sovereign states related to collective governance that cannot be unilaterally altered.

Even applying the multi-step analysis, the conclusion is the same. Contract Clause analysis raises two questions: (1) was there substantial impairment, and (2) if so, was it "reasonable and necessary to serve an important public purpose." *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 22, 25 (1976). Elimination of the Compact Election, which was essential to the Compact's purposes, is a substantial impairment. *See* § III.B *supra*.

To avoid this result, the Comptroller focuses on the language of a non-compact case which states, "of greatest concern appears to be the contracting

25

parties' actual reliance on the abridged contractual term." Appellees' Brief 66. The Comptroller contends Graphic could not have relied on the Compact Election because it did not use it until March 2011 and because states can withdraw at will. *Id.*

However, the Comptroller's subjective reliance analysis is wrong.[6] "When assessing whether there has been the requisite reliance, the Court has looked to *objective evidence of reliance.*" *City of Charleston v. Pub. Serv. Comm'n*, 57 F.3d 385, 392 (4th Cir. 1995) (emphasis added). Objective factors confirm that eliminating the Compact Election would substantially impair the Compact. *U.S. Trust*, 431 U.S. 1, 19-21; Tex. Tax Code § 141.001, art. X(2); *see* § III.B *supra*. First, the Compact does not indicate the Compact Election is subject to impairment by unilateral amendment by the states. Instead, by entering into a compact, the states bound themselves to the Compact's terms until they withdrew. Tex. Tax Code § 141.001, art. X(2).

Second, prior regulation of state taxation does not diminish the reliance interests of party states and taxpayers. By acting collectively through a compact,

_____

6. The Comptroller argues that Graphic was not an intended third-party beneficiary of the Compact. Appellees' Brief 65. The Comptroller is mistaken. *See Gillette*. 209 Cal. App. 4th at 952 ("This is a right specifically extended not to the party states but to taxpayers as third parties regulated under the Compact, and as such Taxpayers may seek to enforce this right as part of its tax refund suit.").

the states agreed the Compact's terms bound them, thus eliminating any expectation the states would enact subsequent statutes in conflict with the Compact.

Third, the fact that Texas did not modify the Compact Election but purported to eliminate it is strong evidence of substantial impairment. *U.S. Trust*, 431 U.S. at 19 (state law which "totally eliminated" the state's promise that Port Authority revenues pay bondholders was a substantial impairment).

Fourth, the Compact Election was the central undertaking (core provision) of the party states when they entered into the Compact. *See* § III.B *supra*.

In sum, objective criteria establish reliance and substantial impairment of the Compact if the Election was eliminated.

The Comptroller also claims "Section 171.106 serves a significant and legitimate purpose" because doing so "treats both local and foreign concerns with an even hand." Appellees' Brief 66-67. In actuality, an apportionment formula based only upon gross receipts is universally understood to benefit in-state interests over out-of-state interests. It does not treat them with an even hand. Moreover, the legitimate public purposes that can save an otherwise unconstitutional impairment are typically economic emergencies, such as the Great Depression, or the necessity to regulate a broad-based social ill under a state's police powers. *Energy Reserves Group v. Kan. Power & Light Co.*, 459 U.S. 400, 411-12 (1983);

27

*Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242-44 (1978). No such exigencies exist.

Finally, the Comptroller argues Section 171.106 is reasonable and appropriate because "[t]he Supreme Court has repeatedly held that the single-factor apportionment methods are 'presumptively valid.'" Appellees' Brief 67. This does not explain why eliminating the Compact Election is reasonable. Nor does it explain why eliminating the Compact Election was necessary, another requirement of the multi-step analysis. *U.S. Trust*, 431 U.S. at 22, 25. If the Legislature determined a mandatory apportionment formula should be imposed on all taxpayers, it had the authority to withdraw from the Compact. *See id*. at 30 (state may not impose a drastic impairment when an alternative course is available). In sum, eliminating the Compact Election would violate the Compact and Contract Clauses.[7]

---

7. Graphic did not waive its Contract Clause argument. Appellees' Brief 67-68. Pursuant to Tex. R. App. P. Rule 38.3, Graphic is free to dispute the applicability of *Energy Reserves* because both Appellant's and Appellees' Briefs discussed the Contract Clause. *See* Appellant's Brief 46-48; Appellees' Brief 62-67. Further, *Energy Reserves* is not authoritative here because it did not concern a compact, whereas *Green* did. *Compare Energy Reserves*, 459 U.S. 400, *with Green*, 21 U.S. 1. *See Sunbeam Envtl. Servs. v. Tex. Workers' Comp. Ins. Facility*, 71 S.W.3d 846, 851 (Tex. App.–Austin 2002, no pet.) (the argument alleged to have been waived not raised in appellee's reply brief).

28

## V. THE FRANCHISE TAX IS AN INCOME TAX UNDER THE COMPACT DEFINITION.

The Comptroller's arguments that Texas's franchise tax is not an income tax under this Court's definition, or as the phrase "is commonly understood," and the Legislature stated the tax was not an income tax, miss the point. Appellees' Brief 22, 26. The Compact's definition of an "income tax" controls here, and the franchise tax satisfies that definition. *Texas v. New Mexico*, 482 U.S. 124, 128 (1987) (a compact is "a legal document that must be construed and applied in accordance with its terms"). Appellant's Brief 48-57.

The Legislature's characterization of Texas's franchise tax does not control because the Legislature only considered the definition under Public Law 86-272, which is materially different.[8] 2006 Tex. Gen. Laws 1, 38 ("[T]he franchise tax imposed by Chapter 171, Tax Code, as amended by this Act, is not an income tax *and Pub. L. No. 86-272 does not apply to the tax*."); Texas House of Representatives Ways & Means Committee HB 3 Analysis at 4; Texas House Research Organization HB 3 Bill Analysis at 9. Each time the foregoing documents describe how the Texas franchise tax "is not an income tax," they refer only to Public Law 86-272, not the Compact. *See Trinova Corp. v. Dep't of Treasury*, 498 U.S. 358, 374 (1991)

---

8. Public Law 86-272's definition does not include the broadening phrase, "an amount arrived at by deducting expenses from gross income, one or more forms of which expenses are not specifically and directly related to particular transactions." Tex. Tax Code § 141.001, art. II(4).

29

("labeling the SBT a tax on 'business activity' does not permit [the court] to forgo [sic] examination of the actual tax base").[9]

The franchise tax is an income tax under the Compact. "Total revenue" is federal gross income less federal exclusions (I.R.C. §§ 101-140) and Texas deductions. Tex. Tax Code § 171.1011(c)(1)(B). The Comptroller disregards exclusions because they are not available to all taxpayers. Appellees' Brief 28. The Compact does not require this. Even under the federal income tax and all other state income taxes, not every taxpayer deducts every expense or includes all income. *See* I.R.C. §§ 101-140, 261-280H.

Additionally, the tax base at issue is an income tax base. The only calculation that is relevant here is cost of goods sold ("COGS"), which Appellant used. The Compact definition does not require more than "*one type* of expense," (Appellees' Brief 27) but at least one type of expense that is "not specifically and directly related to particular transactions." Tex. Tax Code § 141.001, art. II(4). COGS deductions satisfy this definition because they do not directly relate to any particular transaction, but instead represent the total costs for products sold in the reporting period. Tex. Tax Code § 171.1012 (c), (d) (COGS deductions include

---

9. *Fletcher Cyclopedia of the Law of Corporations* is not persuasive because it is not a tax treatise and it omits Wyoming as a non-income tax state although it does not impose anything resembling a corporate income tax. *State Taxation* does not take a position regarding Texas but merely observes there is conflict regarding whether the tax is an income tax under the Compact. Walter Hellerstein, *State Taxation* ¶ 9.01[1] n.12.19, ¶ 7.12[7].

both the direct costs of acquiring and producing goods and indirect costs, such as insurance, utilities, rent, administrative salaries, and payroll and property taxes).

An alternative computation, compensation, allows the following deductions not specifically and directly related to particular transactions: total wages, salaries and benefits paid to officers, directors, owners, partners, and employees, including administrative staff. Tex. Tax Code § 171.1013(a), (b).

The Comptroller is also incorrect that taxpayers that deduct the greater of $1 million or 30% of their gross income do not deduct any expenses. Appellees' Brief 26-27. Those deductions are proxies for the taxpayer's actual expenses, just as the federal standard deduction and exemptions (under both the federal alternative minimum tax and the federal personal income tax) are proxies for a taxpayer's expenses. I.R.C. §§ 55(b)(1), (d), 63, 151; *see also* Lilian V. Faulhaber, *The Hidden Limits of the Charitable Deduction: An Introduction to Hypersalience*, 92 B.U. L. Rev. 1307, 1321-22 (2012).

The *IBM* Court properly applied the Compact's "broad definition" of an income tax. 852 N.W.2d at 878. It concluded "the MGRT [Michigan Gross Receipts Tax] fits within the broad definition of 'income tax' under the Compact by taxing a variation of net income--the entire amount received by the taxpayer as determined from any gainful activity minus inventory and certain other deductions that are expenses not specifically and directly related to a particular transaction."

31

*Id.* at 880. "[A] tax is an income tax if the tax measures net income by subtracting expenses from gross income, with at least one of the expense deductions not being specifically and directly related to a particular transaction." *Id.* at 878.

Like Texas's tax, the computation of Michigan's tax began with gross receipts and was reduced "for the purchase of inventory during the tax year, including freight, shipping, delivery, or engineering charges included in the original contract price." *Id.* at 880. The Court noted, "several of these exclusions or deductions are not specifically and directly related to particular transactions," *e.g*., [d]epreciable assets can be assets used over a certain number of years and, thus, not related to a single transaction," "[m]aterials and supplies purchased during a tax year can be used at any time for the operation of a business and for any amount of transactions," and "the purchase of inventory, which includes such things as goods held for resale or raw materials, some of which can stay in a taxpayer's warehouse for an indeterminate amount of time, can be an expense not specifically or directly related to a particular transaction." *Id.*

The tax base used by Graphic and the other tax bases readily satisfy the Compact's income tax definition.

Respectfully submitted,

**SILVERSTEIN & POMERANTZ, LLP**
    12 Gough Street, 2nd Floor
    San Francisco, California 94103
    (415) 593-3502
    (415) 593-3501 (Facsimile)

By: */s/ Amy Silverstein*
    Amy L. Silverstein
    California State Bar No. 154221
    asilverstein@sptaxlaw.com
    *Admitted Pro Hac Vice*

**MARTENS, TODD, LEONARD, TAYLOR & AHLRICH**
    James F. Martens
    jmartens@textaxlaw.com
    State Bar No. 13050720
    Lacy L. Leonard
    lleonard@textaxlaw.com
    State Bar No. 24040561
    Danielle Ahlrich
    dahlrich@textaxlaw.com
    State Bar No. 24059215
    Amanda Taylor
    ataylor@textaxlaw.com
    State Bar No. 24045921
    301 Congress Avenue, Suite 1950
    Austin, Texas   78701
    Tele: (512) 542-9898
    Fax: (512) 542-9899

ATTORNEYS FOR APPELLANT
GRAPHIC PACKAGING, INC.

## CERTIFICATE OF SERVICE

Pursuant to the Texas Rules of Appellate Procedure and Local Rules for the Third Court of Appeals, a true and correct copy of the foregoing was served on counsel, *via e-service and e-mail*, as listed below, on the 17th day of April, 2015. Tex. R. App. P. 9.5; Local Rule 4(d).

Rance Craft,
Assistant Solicitor General
Texas Bar No. 24035655
rance.craft@texasattorneygeneral.gov
Cynthia A. Morales,
Assistant Attorney General
Texas Bar No. 14417420
cynthia.morales@texasattorneygeneral.gov
**OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tele: (512) 936-2872
Fax: (512) 474-2697

*/s/ Amy Silverstein*
Amy Silverstein


## CERTIFICATE OF COMPLIANCE

I hereby certify that this Appellant's Reply Brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i) because, according to the word count tool of the computer program used to prepare this document, it contains **7,494 words**, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

*/s/ Amy Silverstein*
Amy Silverstein



ALLIED STRUCTURAL STEEL CO. v. SPANNAUS, ATTORNEY GENERAL OF
MINNESOTA, ET AL.

No. 77-747

SUPREME COURT OF THE UNITED STATES

438 U.S. 234; 98 S. Ct. 2716; 57 L. Ed. 2d 727; 1978 U.S. LEXIS 130; 1 Employee
Benefits Cas. (BNA) 1477

April 25, 1978, Argued
June 28, 1978, Decided

**SUBSEQUENT HISTORY:** Petition For Rehearing
Denied October 2, 1978.

**PRIOR HISTORY:** APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF
MINNESOTA.

**DISPOSITION:** 449 F.Supp. 644, reversed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant employer filed
an action for injunctive and declaratory relief and claimed
that the Private Pension Benefits Protection Act (Act),
Minn. Stat. 181B.01 et seq., unconstitutionally impaired
the employer's contractual obligations to its employees
under its pension agreement. The United States District
Court for the District of Minnesota upheld the
constitutional validity of the Act as applied to the
employer. The employer appealed.

**OVERVIEW:** Pursuant to the Act, the State assessed a
pension funding charge against the employer because it
closed one of its offices and several of the discharged
employees did not have vested pension rights under the
employer's pension plan. The Court reversed the
judgment that upheld the validity of the Act. As applied
to the employer, the Act violated the Contract Clause
because it operated as a substantial impairment of a

contractual relationship. The Court noted that the State's
police power was limited when its exercise effected
substantial modifications of private contracts. The Act
did not possess the attributes of the state laws that in the
past had survived challenge under the Contract Clause. It
was not enacted to deal with a broad, generalized
economic or social problem. It invaded an area never
before subject to regulation by the State. It did not effect
simply a temporary alteration of the contractual
relationships of those within its coverage, but worked a
severe, permanent, and immediate change in the
relationships, irrevocably and retroactively. Its narrow
aim was leveled only at employers who voluntarily
agreed to establish pension plans for their employees.

**OUTCOME:** The Court reversed the district court's
judgment that upheld the constitutional validity of the
Act as applied to the employer.

**CORE TERMS:** pension plan, pension, plant, state laws,
pension benefits, funding, vesting, Minnesota Act,
contractual obligations, terminated, impairment, vested,
pension right, social problem, contractual relationships,
termination, terminate, severe, private contracts,
retroactive, discharged, impairing, emergency, pension
funds, state legislation, police power, contingency,
mortgage, monthly, Protection Act

**LexisNexis(R) Headnotes**

*Pensions & Benefits Law > Employee Benefit Plans > Single-Employer Plans*
[HN1] Minn. Stat. § 181B.04.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
[HN2] See U.S. Const. art. I, § 10.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
*Governments > State & Territorial Governments > Police Power*
[HN3] Literalism in the construction of the Contract Clause would make it destructive of the public interest by depriving the State of its prerogative of self-protection.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
*Governments > State & Territorial Governments > Police Power*
[HN4] The Contract Clause does not operate to obliterate the police power of the states.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
[HN5] One whose rights are subject to state restriction cannot remove them from the power of the State by making a contract about them. The contract will carry with it the infirmity of the subject matter.

*Contracts Law > Contract Conditions & Provisions > General Overview*
*Governments > State & Territorial Governments > Legislatures*
*Governments > State & Territorial Governments > Police Power*
[HN6] Despite the Contract Clause, the states retain residual authority to enact laws to safeguard the vital interests of their people. In upholding a state law, the following factors are significant; (1) that the state legislature has declared in the Act itself that an emergency need for the protection existed; (2) that the state law was enacted to protect a basic societal interest, not a favored group; (3) that the relief was appropriately

tailored to the emergency that it was designed to meet; (4) that the imposed conditions were reasonable; (5) that the legislation was limited to the duration of the emergency. Another consideration in upholding a state law against a Contract Clause attack: is whether the petitioner had purchased into an enterprise already regulated in the particular to which he now objects.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
*Contracts Law > Contract Modifications > General Overview*
*Governments > State & Territorial Governments > Police Power*
[HN7] Although the absolute language of the Contract Clause leaves room for the "essential attributes of sovereign power," necessarily reserved by the states to safeguard the welfare of their citizens, that power has limits when its exercise effects substantial modifications of private contracts. Despite the customary deference courts give to state laws directed to social and economic problems, legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
*Governments > State & Territorial Governments > Legislatures*
[HN8] The first inquiry in determining whether a state law violates the Contract Clause, must be whether the state law has, in fact, operated as a substantial impairment of a contractual relationship. The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
[HN9] The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular

needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them.

**SUMMARY:**

A company with an office in Minnesota had a pension plan, under which employees could receive a pension upon retirement at age 65 regardless of length of service. Furthermore, an employee's right to a pension vested prior to age 65 if certain requirements as to length of service and age were met. The company was the sole contributor to the pension fund, but the plan neither required the company to make specific contributions nor imposed any sanction for failing to contribute adequately. The company retained a virtually unrestricted right to amend the plan, and was free to terminate it and distribute the assets at any time according to a predetermined method. Minnesota enacted a statute, under which private employers of 100 or more employees providing pension benefits under qualified plans were subject to a "pension funding charge" upon termination of the plan or closing of an office within the state. The charge was assessed if pension funds were not sufficient to cover full pensions for all employees working at least 10 years. After enactment of the statute, in a move planned before its passage, the company closed its Minnesota office. Several discharged employees, who had no vested pension rights under the plan, were nonetheless pension obligees under the statute. The state notified the company that it owed a significant pension funding charge, and the company brought suit in the United States District Court for the District of Minnesota for injunctive and declaratory relief, claiming that the act unconstitutionally impaired its contractual obligation to its employees under its pension agreement. A three-judge District Court upheld the statute as applied to the company (449 F Supp 644).

On direct appeal, the United States Supreme Court reversed. In an opinion by Stewart, J., joined by Burger, Ch. J., and Powell, Rehnquist, and Stevens, JJ., it was held that the Minnesota statute, as applied to the company, violated the contract clause of the Federal Constitution (Art I, 10, cl 1), it not being necessary to hold that the state law impaired the obligation of the company's employment contracts without moderation or reason or in a spirit of oppression, since (1) the law was not enacted to deal with a broad, generalized, economic or social problem, (2) it did not operate in an area already

subject to state regulation at the time the company's contractual obligations were originally undertaken, but invaded an area never before subject to regulation by the state, (3) it did not effect simply a temporary alteration of the contractual relationships of those within its coverage, but worked a severe, permanent, and immediate change in those relationships, irrevocably and retroactively, and (4) its narrow aim was leveled not at every Minnesota employer, and not even at every Minnesota employer who left the state, but only at those who had in the past been sufficiently enlightened to voluntarily agree to establish pension plans for their employees.

Brennan, J., joined by White and Marshall, JJ., dissented, expressing the view that (1) the statute, which simply created an additional duty for the company but which did not abrogate or dilute any obligation due a party to a private contract, did not implicate the contract clause in any way, the clause not protecting all contract-based expectations including that of an employer that his obligations to his employees not be legislatively enlarged beyond those explicitly provided in its pension plan, and (2) the statute did not violate the due process clause of the Fourteenth Amendment.

Blackmun, J., did not participate.

**LAWYERS' EDITION HEADNOTES:**

LAW §271 ;

contract clause -- state statute -- pensions -- ;

Headnote:[1A][1B]

A state statute which subjects certain private employers who provide pension benefits under a covered plan to a "pension funding charge" if the employer terminates the plan or closes an office within the state, such charge being assessed if the pension fund is insufficient to cover full pensions for all employees working at least 10 years, violates the contract clause of the Federal Constitution (Art I, 10, cl 1) insofar as it applies to an employer, some of whose employees, having been discharged upon the closing of its office, had no vested rights under its pension plan (which predated the statute) but nonetheless qualified as pension obligees under the statute, it not being necessary to hold that the state statute impairs the obligation of the company's employment contracts without moderation or reason or in

a spirit of oppression, where (1) the statute was not enacted to deal with a broad, generalized economic or social problem, (2) the statute does not operate in an area already subject to state regulation at the time the company's contractual obligations under the pension plan were originally undertaken, but instead invades an area never before subject to regulation by the state, (3) the statute does not effect simply a temporary alteration of the contractual relationships of those within its coverage, but works a severe, permanent, and immediate change in those relationships, irrevocably and retroactively, and (4) the statute's narrow aim is leveled not at every employer within the state, or not even at every employer leaving the state, but only at those employers who in the past were sufficiently enlightened to voluntarily agree to establish pension plans for their employees. (Brennan, White, and Marshall, JJ., dissented from this holding.)

LAW §214(1) ;

contract clause -- state police power -- ;

Headnote:[2]

The contract clause of the Federal Constitution (Art I, 10, cl 1) does not operate to obliterate the police power of the state; the interdiction of statutes impairing the obligation of contracts does not prevent the state from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected, and this police power, which is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort and general welfare of the people, is paramount to any rights under contracts between individuals.

LAW §142 ;

contract -- subject matter infirmity -- ;

Headnote:[3]

One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the state by making a contract about them, since the contract will carry with it the infirmity of the subject matter.

LAW §124 ;

contract clause -- limitations on state power -- police power -- ;

Headnote:[4]

The contract clause of the Federal Constitution (Art I, 10, cl 1) imposes limits upon the power of the state to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power.

LAW §128 ;

contract clause -- state legislation -- ;

Headnote:[5]

For purposes of the contract clause of the Federal Constitution (Art I, 10, cl 1), despite the customary deference courts give to state laws directed to social and economic problems, legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption.

CONTRACTS §145 ;

bilateral contract -- diminution of duties -- ;

Headnote:[6A][6B]

In any bilateral contract the diminution of duties on one side effectively increases the duties on the other.

## SYLLABUS

Appellant, an Illinois corporation, maintained an office in Minnesota with 30 employees. Under appellant's pension plan, adopted in 1963 and qualified under § 401 of the Internal Revenue Code, employees were entitled to retire and receive a pension at age 65 regardless of length of service, and an employee's pension right became vested if he satisfied certain conditions as to length of service and age. Appellant was the sole contributor to the pension trust fund, and each year made contributions to the fund based on actuarial predictions of eventual payout needs. But the plan neither required appellant to make specific contributions nor imposed any sanction on it for failing to make adequate contributions, and appellant retained a right not

only to amend the plan but also to terminate it at any time and for any reason. In 1974, Minnesota enacted the Private Pension Benefits Protection Act (Act), under which a private employer of 100 employees or more (at least one of whom was a Minnesota resident) who provided pension benefits under a plan meeting the qualifications of § 401 of the Internal Revenue Code, was subject to a "pension funding charge" if he terminated the plan or closed a Minnesota office. The charge was assessed if the pension funds were insufficient to cover full pensions for all employees who had worked at least 10 years, and periods of employment prior to the effective date of the Act were to be included in the 10-year employment criterion. Shortly thereafter, in a move planned before passage of the Act, appellant closed its Minnesota office, and several of its employees, who were then discharged, had no vested pension rights under appellant's plan but had worked for appellant for 10 years or more, thus qualifying as pension obligees under the Act. Subsequently, the State notified appellant that it owed a pension funding charge of $ 185,000 under the Act. Appellant then brought suit in Federal District Court for injunctive and declaratory relief, claiming that the Act unconstitutionally impaired its contractual obligations to its employees under its pension plan, but the court upheld the Act as applied to appellant. *Held*: The application of the Act to appellant violates the Contract Clause of the Constitution, which provides that "[no] State shall . . . pass any . . . Law impairing the Obligation of Contracts." Pp. 240-251.

(a) While the Contract Clause does not operate to obliterate the police power of the States, it does impose *some* limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power. "Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *United States Trust Co.* v. *New Jersey*, 431 U.S. 1, 22. Pp. 242-244.

(b) The impact of the Act upon appellant's contractual obligations was both substantial and severe. Not only did the Act retroactively modify the compensation that appellant had agreed to pay its employees from 1963 to 1974, but it did so by changing appellant's obligations in an area where the element of reliance was vital -- the funding of a pension plan. Moreover, the retroactive state-imposed vesting

requirement was applied only to those employers who terminated their pension plans or who, like appellant, closed their Minnesota offices, thus forcing the employer to make all the retroactive changes in its contractual obligations at one time. Pp. 244-247.

(c) The Act does not possess the attributes of those state laws that have survived challenge under the Contract Clause. It was not even purportedly enacted to deal with a broad, generalized economic or social problem, cf. *Home Building & Loan Assn.* v. *Blaisdell*, 290 U.S. 398, 445, but has an extremely narrow focus and enters an area never before subject to regulation by the State. Pp. 247-250.

**COUNSEL:** George B. Christensen argued the cause for appellant. With him on the briefs were Chester W. Nosal and John R. Kenefick.

Byron E. Starns, Chief Deputy Attorney General of Minnesota, argued the cause for appellees. With him on the brief were Warren Spannaus, Attorney General, pro se, Richard B. Allyn, Solicitor General, and Kent G. Harbison, Richard A. Lockridge, and Jon K. Murphy, Special Assistant Attorneys General. *

> \* Peter G. Nash, Eugene B. Granof, and Stanley T. Kaleczyc filed a brief for the Chamber of Commerce of the United States as amicus curiae urging reversal.

**JUDGES:** STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which WHITE and MARSHALL, JJ., joined, post, p. 251. BLACKMUN, J., took no part in the consideration or decision of the case.

**OPINION BY:** STEWART

**OPINION**

[*236] [***731] [**2718] MR. JUSTICE STEWART delivered the opinion of the Court.

[***LEdHR1A] [1A]The issue in this case is whether the application of Minnesota's Private Pension Benefits Protection Act [1] to the appellant violates the Contract Clause of the United States Constitution.

1 Minn. Stat. § 181B.01 *et seq*. (1974). This is

the same Act that was considered in *Malone* v. *White Motor Corp.*, 435 U.S. 497, a case presenting a quite different legal issue.

I

In 1974 appellant Allied Structural Steel Co. (company), a corporation with its principal place of business in Illinois, maintained an office in Minnesota with 30 employees. Under the company's general pension plan, adopted in 1963 and qualified as a single-employer plan under § 401 of the Internal Revenue Code, 26 U. S. C. § 401 (1976 ed.), [2] salaried employees were covered as follows: At age 65 an employee was entitled to retire and receive a monthly pension generally computed by multiplying 1% of his average monthly earnings by the total number of his years of employment with the company. [3] Thus, an employee aged 65 or more could retire without satisfying any particular length-of-service requirement, but the size of his pension would reflect the length of his service with the company. [4] An employee could also [*237] become entitled to receive a pension, payable in full at age 65, if he met any one of the following requirements: (1) he had worked 15 years for the company and reached the age of 60; or (2) he was at least 55 years old and the sum of his age and his years of service with the company was at least 75; or (3) he was less than 55 years old but the sum of his age and his years of service with the company was at least 80. Once an employee satisfied any one of these conditions, his pension right became vested in the sense that any subsequent termination of employment would not affect his right to receive a monthly pension when he reached 65. [**2719] Those employees who quit or were discharged before age 65 without fulfilling one of the other three conditions did not acquire any pension rights.

> [2] The plan was not the result of a collective-bargaining agreement, and no such agreement is at issue in this case.
> [3] The employee could elect to receive instead a lump-sum payment.
> [4] Thus, an employee whose average monthly earnings were $ 800 and who retired at 65 would receive eight dollars monthly if he had worked one year for the company and $ 320 monthly if he had worked for the company for 40 years.

The company was the sole contributor to the pension trust fund, and each year it made contributions to the fund based on actuarial predictions of eventual payout needs.

Although those contributions once made were irrevocable, in the sense that they remained part of the pension trust fund, the plan neither required the company to make specific [***732] contributions nor imposed any sanction on it for failing to contribute adequately to the fund.

The company not only retained a virtually unrestricted right to amend the plan in whole or in part, but was also free to terminate the plan and distribute the trust assets at any time and for any reason. In the event of a termination, the assets of the fund were to go, first, to meet the plan's obligation to those employees already retired and receiving pensions; second, to those eligible for retirement; and finally, if any balance remained, to the other employees covered under the plan whose pension rights had not yet vested. [5] Employees within each of these categories were assured payment only to the extent of the pension assets.

> [5] Apart from termination of the fund and distribution of the trust assets, there was no other situation in which employees in this third category would receive anything from the pension fund.

[*238] The plan expressly stated:

"No employee shall have any right to, or interest in, any part of the Trust's assets upon termination of his employment or otherwise, except as provided from time to time under this Plan, and then only to the extent of the benefits payable to such employee out of the assets of the Trust. All payments of benefits as provided for in this Plan shall be made solely out of the assets of the Trust and neither the employer, the trustee, nor any member of the Committee shall be liable therefor in any manner."

The plan also specifically advised employees that neither its existence nor any of its terms were to be understood as implying any assurance that employees could not be dismissed from their employment with the company at any time.

In sum, an employee who did not die, did not quit, and was not discharged before meeting one of the requirements of the plan would receive a fixed pension at age 65 if the company remained in business and elected to continue the pension plan in essentially its existing form.

On April 9, 1974, Minnesota enacted the law here in question, the Private Pension Benefits Protection Act, Minn. Stat. §§ 181B.01-181B.17. Under the Act, a private employer of 100 employees or more -- at least one of whom was a Minnesota resident -- who provided pension benefits under a plan meeting the qualifications of § 401 of the Internal Revenue Code, was subject to a "pension funding charge" if he either terminated the plan or closed a Minnesota office. [6] The charge was assessed if the pension funds were not sufficient to cover full pensions for all employees who had worked at least 10 years. The Act required the employer to satisfy the deficiency by purchasing deferred annuities, payable to the employees at their normal retirement age. A separate provision [*239] specified that periods of employment prior to the effective date of the Act were to be included in the 10-year employment criterion. [7]

6  Although the company had only 30 employees in Minnesota, it was subject to the Act because it had over 100 employees altogether.

7  Entitled "Nonvested Benefits Prior to Act," [HN1] Minn. Stat. § 181B.04 provided:

"Every employer who hereafter ceases to operate a place of employment or a pension plan within this state shall owe to his employees covered by sections 181B.01 to 181B.17 a pension funding charge which shall be equal to the present value of the total amount of nonvested pension benefits based upon service occurring before April 10, 1974 of such employees of the employer who have completed ten or more years of any covered service under the pension plan of the employer and whose nonvested pension benefits have been or will be forfeited because of the employer's ceasing to operate a place of employment or a pension plan, less the amount of such nonvested pension benefits which are compromised or settled to the satisfaction of the commissioner as provided in sections 181B.01 to 181B.17."

[***733] [**2720] During the summer of 1974 the company began closing its Minnesota office. On July 31, it discharged 11 of its 30 Minnesota employees, and the following month it notified the Minnesota Commissioner of Labor and Industry, as required by the Act, that it was terminating an office in the State. [8] At least nine of the discharged employees did not have any

vested pension rights under the company's plan, but had worked for the company for 10 years or more and thus qualified as pension obligees of the company under the law that Minnesota had enacted a few months earlier. On August 18, the State notified the company that it owed a pension funding charge of approximately $ 185,000 under the provisions of the Private Pension Benefits Protection Act.

8  According to the stipulated facts, the closing of the company's Minnesota office resulted from a shift of that office's duties to the main company office in Illinois the previous December. The closing was not completed until February 1975, by which time the Minnesota Act had been pre-empted by federal law. See *Malone* v. *White Motor Corp.*, 435 U.S., at 499. We deal here solely with the application of the Minnesota Act to the 11 employees discharged in July 1974.

The company brought suit in a Federal District Court asking [*240] for injunctive and declaratory relief. It claimed that the Act unconstitutionally impaired its contractual obligations to its employees under its pension agreement. The three-judge court upheld the constitutional validity of the Act as applied to the company, *Fleck* v. *Spannaus*, 449 F.Supp. 644, and an appeal was brought to this Court under 28 U. S. C. § 1253 (1976 ed.). [9] We noted probable jurisdiction. 434 U.S. 1045.

9  The claims of Walter Fleck and the other two individual plaintiffs were dismissed by the District Court for lack of standing, *Fleck* v. *Spannaus*, 421 F.Supp. 20, leaving only the company as an appellant. Warren Spannaus, the Attorney General of Minnesota, is an appellee.

II

A

There can be no question of the impact of the Minnesota Private Pension Benefits Protection Act upon the company's contractual relationships with its employees. The Act substantially altered those relationships by superimposing pension obligations upon the company conspicuously beyond those that it had voluntarily agreed to undertake. But it does not inexorably follow that the Act, as applied to the company, violates the Contract Clause of the

Constitution.

The language of the Contract Clause appears unambiguously absolute: [HN2] "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const., Art. I, § 10. The Clause is not, however, the Draconian provision that its words might seem to imply. As the Court [***734] has recognized, [HN3] "literalism in the construction of the contract clause . . . would make it destructive of the public interest by depriving the State of its prerogative of self-protection." *W. B. Worthen Co.* v. *Thomas*, 292 U.S. 426, 433. [10]

> 10   See generally B. Schwartz, A Commentary on the Constitution of the United States, Pt. 2, The Rights of Property 266-306 (1965); B. Wright, The Contract Clause of the Constitution (1938).

[*241] Although it was perhaps the strongest single constitutional check on state legislation during our early years as a Nation, [11] the Contract Clause receded into comparative desuetude with the adoption of the Fourteenth Amendment, and particularly with the development of the large body of jurisprudence under the Due Process Clause of that Amendment in modern constitutional history. [12] Nonetheless, the Contract [**2721] Clause remains part of the Constitution. It is not a dead letter. And its basic contours are brought into focus by several of this Court's 20th-century decisions.

> 11   Perhaps the best known of all Contract Clause cases of that era was *Dartmouth College* v. *Woodward*, 4 Wheat. 518.
> 12   Indeed, at least one commentator has suggested that "the results might be the same if the contract clause were dropped out of the Constitution, and the challenged statutes all judged as reasonable or unreasonable deprivations of property." Hale, The Supreme Court and the Contract Clause: III, 57 Harv. L. Rev. 852, 890-891 (1944).

[***LEdHR2] [2] [***LEdHR3] [3]First of all, it is to be accepted as a commonplace that [HN4] the Contract Clause does not operate to obliterate the police power of the States. "It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the State from exercising such

powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts previously entered into between individuals may thereby be affected. This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the Government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals." *Manigault* v. *Springs*, 199 U.S. 473, 480. As Mr. Justice Holmes succinctly put the matter in his opinion for the Court in *Hudson Water Co.* v. *McCarter*, 209 U.S. 349, 357: [HN5] "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract [*242] about them. The contract will carry with it the infirmity of the subject matter."

B

[***LEdHR4] [4]If the Contract Clause is to retain any meaning at all, however, it must be understood to impose *some* limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power. The existence and nature of those limits were clearly indicated in a series of cases in this Court arising from the efforts of the States to deal with the unprecedented emergencies brought on by the severe economic depression of the early 1930's.

In *Home Building & Loan Assn.* v. *Blaisdell*, 290 U.S. 398, the Court [***735] upheld against a Contract Clause attack a mortgage moratorium law that Minnesota had enacted to provide relief for homeowners threatened with foreclosure. Although the legislation conflicted directly with lenders' contractual foreclosure rights, the Court there acknowledged that, [HN6] despite the Contract Clause, the States retain residual authority to enact laws "to safeguard the vital interests of [their] people." *Id.*, at 434. In upholding the state mortgage moratorium law, the Court found five factors significant. First, the state legislature had declared in the Act itself that an emergency need for the protection of homeowners existed. *Id.*, at 444. Second, the state law was enacted to protect a basic societal interest, not a favored group. *Id.*, at 445. Third, the relief was appropriately tailored to the emergency that it was designed to meet. *Ibid.* Fourth, the imposed conditions were reasonable. *Id.*, at 445-447. And, finally, the legislation was limited to the duration of the emergency. *Id.*, at 447.

The *Blaisdell* opinion thus clearly implied that if the Minnesota moratorium legislation had not possessed the characteristics attributed to it by the Court, it would have been invalid under the Contract Clause of the Constitution. [13] [*243] These implications were given concrete force in three cases that followed closely in *Blaisdell*'s wake.

> 13 In *Veix* v. *Sixth Ward Building & Loan Assn.*, 310 U.S. 32, 38, the Court took into account still another consideration in upholding a state law against a Contract Clause attack: the petitioner had "purchased into an enterprise already regulated in the particular to which he now objects."

In *W. B. Worthen Co.* v. *Thomas*, 292 U.S. 426, the Court dealt with an Arkansas law that exempted the proceeds of a life insurance policy from collection by the beneficiary's judgment creditors. Stressing the retroactive effect of the state law, the Court held that it was invalid under the Contract Clause, since it [**2722] was not precisely and reasonably designed to meet a grave temporary emergency in the interest of the general welfare. In *W. B. Worthen Co.* v. *Kavanaugh*, 295 U.S. 56, the Court was confronted with another Arkansas law that diluted the rights and remedies of mortgage bondholders. The Court held the law invalid under the Contract Clause. "Even when the public welfare is invoked as an excuse," Mr. Justice Cardozo wrote for the Court, the security of a mortgage cannot be cut down "without moderation or reason or in a spirit of oppression." *Id.*, at 60. And finally, in *Treigle* v. *Acme Homestead Assn.*, 297 U.S. 189, the Court held invalid under the Contract Clause a Louisiana law that modified the existing withdrawal rights of the members of a building and loan association. "Such an interference with the right of contract," said the Court, "cannot be justified by saying that in the public interest the operations of building associations may be controlled [***736] and regulated, or that in the same interest their charters may be amended." *Id.*, at 196.

[***LEdHR5] [5]The most recent Contract Clause case in this Court was *United States Trust Co.* v. *New Jersey*, 431 U.S. 1.[14] In [*244] that case the Court again recognized that [HN7] although the absolute language of the Clause must leave room for "the 'essential attributes of sovereign power,' . . . necessarily reserved by the States to safeguard the welfare of their citizens," *id.*, at

21, that power has limits when its exercise effects substantial modifications of private contracts. Despite the customary deference courts give to state laws directed to social and economic problems, "[legislation] adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *Id.*, at 22. Evaluating with particular scrutiny a modification of a contract to which the State itself was a party, the Court in that case held that legislative alteration of the rights and remedies of Port Authority bondholders violated the Contract Clause because the legislation was neither necessary nor reasonable. [15]

> 14 See also *El Paso* v. *Simmons*, 379 U.S. 497. There the Court held that a Texas law shortening the time within which a defaulted land claim could be reinstated did not violate the Contract Clause. "We do not believe that it can seriously be contended that the buyer was substantially induced to enter into these contracts on the basis of a defeasible right to reinstatement . . . or that he interpreted that right to be of everlasting effect. At the time the contract was entered into the State's policy was to sell the land as quickly as possible . . . ." *Id.*, at 514. In sum, "[the] measure taken . . . was a mild one indeed, hardly burdensome to the purchaser . . . but nonetheless an important one to the State's interest." *Id.*, at 516-517.
>
> 15 The Court indicated that impairments of a State's own contracts would face more stringent examination under the Contract Clause than would laws regulating contractual relationships between private parties, 431 U.S., at 22-23, although it was careful to add that "private contracts are not subject to unlimited modification under the police power." *Id.*, at 22.

III

[***LEdHR6A] [6A]In applying these principles to the present case, [HN8] the first inquiry must be whether the state law has, in fact, operated as a substantial impairment of a contractual relationship. [16] [*245] The severity of the impairment [***737] [**2723] measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. [17] Severe impairment, on the other hand, will push the inquiry to a

careful examination of the nature and purpose of the state legislation.

16

[***LEdHR6A] [6B]The novel construction of the Contract Clause expressed in the dissenting opinion is wholly contrary to the decisions of this Court. The narrow view that the Clause forbids only state laws that diminish the duties of a contractual obligor and not laws that increase them, a view arguably suggested by *Satterlee* v. *Matthewson*, 2 Pet. 380, has since been expressly repudiated. *Detroit United R. Co.* v. *Michigan*, 242 U.S. 238; *Georgia R. & Power Co.* v. *Decatur*, 262 U.S. 432. See also, *e. g., Sherman* v. *Smith*, 1 Black 587; *Bernheimer* v. *Converse*, 206 U.S. 516, 530; *Henley* v. *Myers*, 215 U.S. 373; *National Surety Co.* v. *Architectural Decorating Co.*, 226 U.S. 276; *Columbia R., Gas & Electric Co.* v. *South Carolina*, 261 U.S. 236; *Stockholders of Peoples Banking Co.* v. *Sterling*, 300 U.S. 175. Moreover, in any bilateral contract the diminution of duties on one side effectively increases the duties on the other.

The even narrower view that the Clause is limited in its application to state laws relieving debtors of obligations to their creditors is, as the dissent recognizes, *post*, at 257 n. 5, completely at odds with this Court's decisions. See *Dartmouth College* v. *Woodward*, 4 Wheat. 518; *Wood* v. *Lovett*, 313 U.S. 362; *El Paso* v. *Simmons, supra*. See generally Hale, The Supreme Court and the Contract Clause, 57 Harv. L. Rev. 512, 514-516 (1944).

17  See n. 14, *supra*.

[HN9] The severity of an impairment of contractual obligations can be measured by the factors that reflect the high value the Framers placed on the protection of private contracts. Contracts enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them.

Here, the company's contracts of employment with its employees included as a fringe benefit or additional form of compensation, the pension plan. The company's maximum obligation was to set aside each year an amount based on the plan's requirements for vesting. The plan satisfied the current federal income tax code and was subject to no other legislative requirements. And, of course, the company was free to amend or terminate the pension plan at any time. The company thus had no reason to anticipate that its employees' [*246] pension rights could become vested except in accordance with the terms of the plan. It relied heavily, and reasonably, on this legitimate contractual expectation in calculating its annual contributions to the pension fund.

The effect of Minnesota's Private Pension Benefits Protection Act on this contractual obligation was severe. The company was required in 1974 to have made its contributions throughout the pre-1974 life of its plan as if employees' pension rights had vested after 10 years, instead of vesting in accord with the terms of the plan. Thus a basic term of the pension contract -- one on which the company had relied for 10 years -- was substantially modified. The result was that, although the company's past contributions were adequate when made, they were not adequate when computed under the 10-year statutory vesting requirement. The Act thus forced a current recalculation of the past 10 years' contributions based on the new, unanticipated 10-year vesting requirement.

Not only did the state law thus retroactively modify the compensation that the company had agreed to pay its employees from 1963 to 1974, but also it did so by changing the company's obligations in an area where the element of reliance was vital -- the funding of a pension plan. [18] As the Court has recently recognized:

[***738]  "These [pension] plans, like other forms of insurance, depend on the accumulation of large sums to cover contingencies. The amounts set aside are determined by a painstaking assessment of the insurer's likely liability. Risks that the insurer foresees will be included in the [*247] calculation of liability, and the rates or contributions charged will reflect that calculation. The occurrence of major unforeseen contingencies, however, jeopardizes the insurer's solvency and, ultimately, the insureds' benefits. Drastic changes in the legal rules governing pension and insurance funds, like other unforeseen events, [**2724] can have this effect." *Los Angeles Dept. of Water & Power* v. *Manhart*, 435 U.S. 702, 721.

18    In some situations the element of reliance may cut both ways. Here, the company had relied upon the funding obligation of the pension plan

for more than a decade. There was no showing of reliance to the contrary by its employees. Indeed, Minnesota did not act to protect any employee reliance interest demonstrated on the record. Instead, it compelled the employer to exceed bargained-for expectations and nullified an express term of the pension plan.

Moreover, the retroactive state-imposed vesting requirement was applied only to those employers who terminated their pension plans or who, like the company, closed their Minnesota offices. The company was thus forced to make all the retroactive changes in its contractual obligations at one time. By simply proceeding to close its office in Minnesota, a move that had been planned before the passage of the Act, the company was assessed an immediate pension funding charge of approximately $ 185,000.

Thus, the statute in question here nullifies express terms of the company's contractual obligations and imposes a completely unexpected liability in potentially disabling amounts. There is not even any provision for gradual applicability or grace periods. Cf. the Employee Retirement Income Security Act of 1974 (ERISA), 29 U. S. C. §§ 1061 (b)(2), 1086 (b), and 1144 (1976 ed.). See n. 23, *infra*. Yet there is no showing in the record before us that this severe disruption of contractual expectations was necessary to meet an important general social problem. The presumption favoring "legislative judgment as to the necessity and reasonableness of a particular measure," *United States Trust Co.*, 431 U.S., at 23, simply cannot stand in this case.

The only indication of legislative intent in the record before us is to be found in a statement in the District Court's opinion:

"It seems clear that the problem of plant closure and pension plan termination was brought to the attention [*248] of the Minnesota legislature when the Minneapolis-Moline Division of White Motor Corporation closed one of its Minnesota plants and attempted to terminate its pension plan." 449 F.Supp., at 651. [19]

> [19] The Minnesota Supreme Court, *Fleck* v. *Spannaus*, 312 Minn. 223, 251 N. W. 2d 334, engaged in mere speculation as to the state

legislature's purpose.

But whether or not the legislation was aimed largely at a single employer, [20] it clearly has an extremely [***739] narrow focus. It applies only to private employers who have at least 100 employees, at least one of whom works in Minnesota, and who have established voluntary private pension plans, qualified under § 401 of the Internal Revenue Code. And it applies only when such an employer closes his Minnesota office or terminates his pension plan. [21] Thus, this law can [*249] hardly be characterized, like the law at issue in the *Blaisdell* case, as one enacted to protect a broad societal interest rather than a narrow class. [22]

> [20] In *Malone* v. *White Motor Corp.*, 435 U.S., at 501 n. 5, the Court noted that the White Motor Corp., an employer of more than 1,000 Minnesota employees, had been prohibited from terminating its pension plan until the expiration date of its collective-bargaining agreement, May 1, 1974. *International Union, UAW* v. *White Motor Corp.*, 505 F.2d 1193 (CA8). On April 9, 1974, the Minnesota Act was passed, to become effective the following day. When White Motor proceeded to terminate its collectively bargained pension plan at the earliest possible date, May 1, 1974, the State assessed a deficiency of more than $ 19 million, based upon the Act's 10-year vesting requirement.
>
> [21] Not only did the Act have an extremely narrow aim, but also its effective life was extremely short. The United States House of Representatives had passed a version of the Employee Retirement Income Security Act of 1974, 29 U. S. C. § 1001 *et seq.* (1976 ed.), on February 28, 1974, 120 Cong. Rec. 4781-4782 (1974), and the Senate on March 4, 1974, *id.*, at 5011. Both versions expressly pre-empted state laws. That the Minnesota Legislature was aware of the impending federal legislation is reflected in the explicit provision of the Act that it will "become null and void upon the institution of a mandatory plan of termination insurance guaranteeing the payment of a substantial portion of an employee's vested pension benefits pursuant to any law of the United States." Minn. Stat. § 181B.17. ERISA itself, effective January 1, 1975, expressly pre-empts all state laws regulating covered plans. 29 U. S. C. § 1144 (a) (1976 ed.).

Thus, the Minnesota Act was in force less than nine months, from April 10, 1974, until January 1, 1975. The company argues that the enactment of the law while ERISA was on the horizon totally belies the State's need for this pension legislation. 22 In upholding the constitutionality of the Act, the District Court referred to Minnesota's interest in protecting the economic welfare of its older citizens, as well as their surrounding economic communities. 449 F.Supp. 644.

[**2725] Moreover, in at least one other important respect the Act does not resemble the mortgage moratorium legislation whose constitutionality was upheld in the *Blaisdell* case. This legislation, imposing a sudden, totally unanticipated, and substantial retroactive obligation upon the company to its employees, 23 was not enacted to deal with a situation remotely approaching the broad and desperate emergency economic conditions of the early 1930's -- conditions of which the Court in *Blaisdell* took judicial notice. 24

> 23 Compare the gradual applicability of ERISA, which itself is not even mandatory. At the outset ERISA did not go into effect at all until four months after it was enacted. 29 U. S. C. § 1144 (1976 ed.). Funding and vesting requirements were delayed for an additional year. §§ 1086 (b), 1061 (b)(2) (1976 ed.). By contrast, the Minnesota Act became fully effective the day after its passage. The District Court rejected out of hand the argument that employers were constitutionally entitled to some grace period to adjust their pension planning. 449 F.Supp., at 651.
>
> 24 This is not to suggest that only an emergency of great magnitude can constitutionally justify a state law impairing the obligations of contracts. See, *e. g., Veix* v. *Sixth Ward Building & Loan Assn.*, 310 U.S., at 39-40; *East New York Savings Bank* v. *Hahn*, 326 U.S. 230; *El Paso* v. *Simmons*, 379 U.S. 497.

Entering a field it had never before sought to regulate, the Minnesota Legislature grossly distorted the company's existing contractual relationships with its employees by superimposing retroactive obligations upon the company substantially [*250] beyond the terms of its employment contracts. And that burden was imposed upon the company only because it closed its office in the State.

[***740] [***LEdHR1A] [1B]This Minnesota law simply does not possess the attributes of those state laws that in the past have survived challenge under the Contract Clause of the Constitution. The law was not even purportedly enacted to deal with a broad, generalized economic or social problem. Cf. *Home Building & Loan Assn.* v. *Blaisdell*, 290 U.S., at 445. It did not operate in an area already subject to state regulation at the time the company's contractual obligations were originally undertaken, but invaded an area never before subject to regulation by the State. Cf. *Veix* v. *Sixth Ward Building & Loan Assn.*, 310 U.S. 32, 38. 25 It did not effect simply a temporary alteration of the contractual relationships of those within its coverage, but worked a severe, permanent, and immediate change in those relationships -- irrevocably and retroactively. Cf. *United States Trust Co.* v. *New Jersey*, 431 U.S., at 22. And its narrow aim was leveled, not at every Minnesota employer, not even at every Minnesota employer who left the State, but only at those who had in the past been sufficiently enlightened as voluntarily to agree to establish pension plans for their employees.

> 25 See n. 13, *supra.*

"Not Blaisdell's case, but Worthen's (*W. B. Worthen Co.* v. *Thomas*, [292 U.S. 426]) supplies the applicable rule" here. *W. B. Worthen Co.* v. *Kavanaugh*, 295 U.S., at 63. It is not necessary to hold that the Minnesota law impaired the obligation of the company's employment contracts "without moderation or reason or in a spirit of oppression." *Id.*, at 60. 26 But we do hold that if the Contract Clause means anything at [*251] all, it means that Minnesota could not constitutionally do what it tried to do to the company in this case.

> 26 As Mr. Justice Cardozo's opinion for the Court in the *Kavanaugh* case made clear, these criteria are "the outermost limits only." The opinion went on to stress the state law's "studied indifference to the interests" of creditors. 295 U.S., at 60.

The judgment of the District Court is reversed.

*It is so ordered.*

[**2726] MR. JUSTICE BLACKMUN took no part in the consideration or decision of this case.

**DISSENT BY:** BRENNAN

**DISSENT**

MR. JUSTICE BRENNAN, with whom MR. JUSTICE WHITE and MR. JUSTICE MARSHALL join, dissenting.

In cases involving state legislation affecting private contracts, this Court's decisions over the past half century, consistently with both the constitutional text and its original understanding, have interpreted the Contract Clause as prohibiting state legislative Acts which, "[with] studied indifference to the interests of the [contracting party] or to his appropriate protection," effectively diminished or nullified the obligation due him under the terms of a contract. *W. B. Worthen Co.* v. *Kavanaugh*, 295 U.S. 56, 60 [***741] (1935). But the Contract Clause has not, during this period, been applied to state legislation that, while creating new duties, in nowise diminished the efficacy of any contractual obligation owed the constitutional claimant. Cf. *Goldblatt* v. *Hempstead*, 369 U.S. 590 (1962). The constitutionality of such legislation has, rather, been determined solely by reference to other provisions of the Constitution, *e. g.*, the Due Process Clause, insofar as they operate to protect existing economic values.

Today's decision greatly expands the reach of the Clause. The Minnesota Private Pension Benefits Protection Act (Act) does not abrogate or dilute any obligation due a party to a private contract; rather, like all positive social legislation, the Act imposes new, additional obligations on a particular class of persons. In my view, any constitutional infirmity in the law must therefore derive, not from the Contract Clause, but from the Due Process Clause of the Fourteenth Amendment. [*252] I perceive nothing in the Act that works a denial of due process and therefore I dissent.

I

I begin with an assessment of the operation and effect of the Minnesota statute. Although the Court disclaims knowledge of the purposes of the law, both the terms of the Act and the opinion of the State Supreme Court disclose that it was designed to remedy a serious social problem arising from the operation of private

pension plans. As the Minnesota Supreme Court indicated, see *Fleck* v. *Spannaus*, 312 Minn. 223, 231, 251 N. W. 2d 334, 338 (1977), the impetus for the law must have been a legislative belief -- shared by Congress, see generally Employee Retirement Income Security Act of 1974 (ERISA), 29 U. S. C. § 1001 *et seq.* (1976 ed.) -- that private pension plans often were grossly unfair to covered employees. Not only would employers often neglect to furnish their employees with adequate information concerning their rights under the plans, leading to erroneous expectations, but also because employers often failed to make contributions to the pension funds large enough adequately to fund their plans, employees often ultimately received only a small amount of those benefits they reasonably anticipated. See *Fleck* v. *Spannaus, supra*, at 231, 251 N. W. 2d, at 338. Acting against this background, Minnesota, prior to the enactment of ERISA, adopted the Act to remedy, *inter alia*, what was viewed as a related serious social problem: the frustration of expectation interests that can occur when an employer closes a single plant and terminates the employees who work there. [1]

> 1   Since appellant's plan remains in force at its other plants, this case does not involve a termination of a pension plan, and I will therefore not discuss the aspect of the statute that involves such contingencies except to observe that it, too, is a sensitive attempt to protect employees' expectation interests.

Pension plans normally do not make provision to protect [*253] the interests of employees -- even those within only a few months of the "vesting" of their rights under the plan -- who are terminated because an employer closes one of his plants. See generally Bernstein, Employee Pension Rights When Plants Shut Down: Problems and Some Proposals, 76 [***742] Harv. L. Rev. 952 (1963). Even assuming -- contrary to common experience -- [**2727] that an employer adequately informs his employees that a termination for any reason prior to vesting will result in forfeiture of accrued pension credits, denial of all pension benefits not because of job-related failings, but only because the employees are unfortunate enough to be employed at a plant that closes for purely economic reasons, is harsh indeed. For unlike discharges for inadequate job performance, which may reasonably be foreseen, the closing of a plant is a contingency outside the range of normal expectations of both the employer and the

employee -- as is made clear by the fact that Allied did not rely upon the possibility of a plant's closing in calculating the amount of its contributions to its pension plan fund. [2]

> 2 All parties to this case agree that Allied's actuarial assumptions in calculating its annual contributions to the pension plan did not include the possibility of a plant's closing.

The Minnesota Act addresses this problem by selecting a period -- 10 years of employment -- after which this generally unforeseen contingency may not be the basis for depriving employees of their accumulated pension fund credits, and by establishing a mechanism to provide the employees with the equivalent of the earned pension plan credits. Although the Court glides over this fact, it should be apparent that the Act will impose only minor economic burdens on employers whose pension plans have been adequately funded. For, where, as was true here and as will generally be true, the possibility of a plant's closing was not relied upon by actuaries in calculating the amount of the employer's contributions to the plan, an [*254] adequate pension plan fund would include contributions on behalf of terminated employees of 10 or more years' service whose rights had not vested. Indeed, without the Act, the closing of the plant would create a windfall for the employer, because, due to the resulting surplus in the fund, his future contributions would be reduced. In denying the windfall, the Act requires that the employer use the money he will save in the future to purchase annuities for the terminated employees. [3] Of course, the consequence for the employer may be a slightly higher pension expense; the greater outlay might arise, in part, because the past contributions to the plan would have reflected the actuarial possibility that some of the employees who had served 10 years might not ultimately satisfy the plan's vesting requirement.

> 3 Because appellant's pension plan was, at the time of the plant closing, underfunded by in excess of $ 295,000, appellant's pension-funding charge -- which the parties stipulate will be between $ 114,000 and $ 195,000 -- will not in fact be offset by future out-of-pocket savings. But this is incidental. What is critical is that appellant, like all covered employers, will be forced to assume an economic burden only a little greater than that inherent in its original

undertaking to set up a pension plan for the benefit of its employees.

Although the Court refers to the fact that, under the terms of the plan, no sanctions could be imposed on appellant for not adequately funding it, no substantial objection can be levied against the Act to the extent that it mandates funding sufficient to meet the employer's original undertaking. The plan in the present case can be interpreted as imposing a duty on the employer to fund it adequately, see App. to Brief for Appellant 10a (§ 10 of the plan), and the employees here surely would have understood it as imposing that requirement. There can be no serious objection to a measure that makes such a promise enforceable.

I emphasize, contrary to the repeated [***743] protestations of the Court, that the Act does not impose "sudden and unanticipated" burdens. The features of the Act involved in this case come into play only when an employer, after the effective date of the Act, closes a plant. The existence of the Act's duties -- which are similar to a legislatively imposed requirement of [*255] severance pay measured by the length of the discharged employees' service -- is simply one of a number of factors that the employer considers in making the business decision whether to close a plant and terminate the employees who work there. In no sense, therefore, are the Act's requirements unanticipated. While the extent of the employer's obligation depends on pre-enactment [**2728] conduct, the requirements are triggered solely by the closing of a plant subsequent to enactment. [4]

> 4 Although appellant here apparently decided to close its Minnesota plant prior to the Act's effective date, appellant had every opportunity to reconsider that decision after the Act was adopted and presumably reached its final decision after weighing the possible liabilities under the Act.

II

The primary question in this case is whether the Contract Clause is violated by state legislation enacted to protect employees covered by a pension plan by requiring an employer to make outlays -- which, although not in this case, will largely be offset against future savings -- to provide terminated employees with the equivalent of benefits reasonably to be expected under the plan. The Act does not relieve either the employer or his employees

of any existing contract obligation. Rather, the Act simply creates an additional, supplemental duty of the employer, no different in kind from myriad duties created by a wide variety of legislative measures which defeat settled expectations but which have nonetheless been sustained by this Court. See, *e. g., Usery* v. *Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976); *Hadacheck* v. *Sebastian*, 239 U.S. 394 (1915). For this reason, the Minnesota Act, in my view, does not implicate the Contract Clause in any way. The basic fallacy of today's decision is its mistaken view that the Contract Clause protects all contract-based expectations, including that of an employer that his obligations to his employees will not be legislatively enlarged beyond those explicitly provided in his pension plan.

[*256] A

Historically, it is crystal clear that the Contract Clause was not intended to embody a broad constitutional policy of protecting all reliance interests grounded in private contracts. It was made part of the Constitution to remedy a particular social evil -- the state legislative practice of enacting laws to relieve individuals of their obligations under certain contracts -- and thus was intended to prohibit States from adopting "as [their] policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them," *Home Building & Loan Assn.* v. *Blaisdell*, 290 U.S. 398, 439 (1934). But the Framers never contemplated that the Clause would limit the legislative power of States to enact laws creating duties [***744] that might burden some individuals in order to benefit others.

The widespread dissatisfaction with the Articles of Confederation and, thus, the adoption of our Constitution, was largely a result of the mass of legislation enacted by various States during our earlier national period to relieve debtors from the obligation to perform contracts with their creditors. The economic depression that followed the Revolutionary War witnessed "an ignoble array of [such state] legislative schemes." *Id.*, at 427. Perhaps the most common of these were laws providing for the emission of paper currency, making it legal tender for the payment of debts. In addition, there were "installment laws," authorizing the payment of overdue obligations in several installments over a period of months or even years, rather than in a single lump sum as provided for in a contract; "stay laws," statutes staying or postponing the payment of private debts or temporarily closing the

courts; and "commodity payment laws," permitting payments in certain enumerated commodities at a proportion, often three-fourths or four-fifths, of actual value. See *id.*, at 454-459 (Sutherland, J., dissenting); *Sturges* v. *Crowninshield*, 4 Wheat. 122, 204 (1819); see also B. Wright, The Contract Clause of the [*257] Constitution 4 (1938); Hale, The Supreme Court and the Contract Clause, 57 Harv. L. Rev. 512-513 (1944).

Thus, the several provisions of Art. I, § 10, of the Constitution -- "No State shall . . . coin Money; emit Bills of Credit; [**2729] make any Thing but gold and silver Coin a Tender in Payment of Debts; [or] pass any . . . Law impairing the Obligation of Contracts . . . ." -- were targeted directly at this wide variety of debtor relief measures. Although the debates in the Constitutional Convention and the subsequent public discussion of the Constitution are not particularly enlightening in determining the scope of the Clause, they support the view that the sole evil at which the Contract Clause was directed was the theretofore rampant state legislative interference with the ability of creditors to obtain the payment or security provided for by contract. The Framers regarded the Contract Clause as simply an adjunct to the currency provisions of Art. I, § 10, which operated primarily to bar legislation depriving creditors of the payment of the full value of their loans. See Wright, *supra*, at 5-16. The Clause was thus intended by the Framers to be applicable only to laws which altered the obligations of contracts by effectively relieving one party of the obligation to perform a contract duty. [5]

> [5] Of course, as our recent decisions make plain, the applicability of the Clause has not been confined to classic "debtor relief" laws, but has been regarded as implicated by any measure which dilutes or nullifies a duty created by a contract. See, *e. g., El Paso* v. *Simmons*, 379 U.S. 497 (1965).

B

The terms of the Contract Clause negate any basis for its interpretation as protecting all contract-based expectations from unjustifiable interference. [***745] It applies, as confirmed by consistent judicial interpretations, only to *state legislative* Acts. See generally *Tidal Oil Co.* v. *Flanagan*, 263 U.S. 444 (1924). Its inapplicability to impairments by state judicial acts or by national legislation belies interpretation of the Clause as [*258] intended broadly to make all contract

expectations inviolable. Rather, the only possible interpretation of its terms, especially in view of its history, is as a limited prohibition directed at a particular, narrow social evil, likely to occur only through state legislative action. This evil is identified with admirable precision: "[Laws] *impairing* the Obligation of Contracts." (Emphasis supplied.) It is nothing less than an abuse of the English language to interpret, as does the Court, the term "impairing" as including laws which create new duties. While such laws may be conceptualized as "enlarging" the obligation of a contract when they add to the burdens that had previously been imposed by a private agreement, such laws cannot be prohibited by the Clause because they do not dilute or nullify a duty a person had previously obligated himself to perform.

Early judicial interpretations of the Clause explicitly rejected the argument that the Clause applies to state legislative enactments that enlarge the obligations of contracts. *Satterlee* v. *Matthewson*, 2 Pet. 380 (1829), is the leading case. There, this Court rejected a claim that a state legislative Act which gave validity to a contract which the state court had held, before the enactment of the statute, to be invalid at common law could be said to have "impaired the obligation of a contract." It reasoned that "all would admit the retrospective character of [the particular state] enactment, and that the effect of it was to create a contract between parties where none had previously existed. But it surely cannot be contended, that to create a contract, and to destroy or impair one, mean the same thing." *Id.*, at 412-413. [6] Since *creating* an obligation where none had existed previously is not an *impairment* of contract, it of course should follow necessarily that [*259] legislation increasing the obligation of an existing contract is not an impairment. [7] See Hale, *supra*, at 514-516.

> 6    *Satterlee*, which was written by Mr. Justice Washington, necessarily rejected the contrary dictum of *Green* v. *Biddle*, 8 Wheat. 1, 84 (1823), another of Mr. Justice Washington's Court opinions.
> 7    In *Georgia R. & Power Co.* v. *Decatur*, 262 U.S. 432 (1923), *Detroit United R. Co.* v. *Michigan*, 242 U.S. 238 (1916), and in dictum in other cases, see *ante*, at 244-245, n. 16, this Court embraced, without any careful analysis and without giving any consideration to *Satterlee* v. *Matthewson*, 2 Pet. 380 (1829), the contrary view

that the impairment of a contract may consist in "adding to its burdens" as well as in diminishing its efficacy. *Georgia R. & Power Co.* v. *Decatur, supra*, at 439. These opinions reflect the then-prevailing philosophy of economic due process which has since been repudiated. See *Ferguson* v. *Skrupa*, 372 U.S. 726 (1936). In my view, the reasoning of *Georgia R. & Power Co.* and *Detroit United R. Co.* is simply wrong.

[**2730]  C

The Court seems to attempt to justify its distortion of the meaning of the Contract Clause on the ground that imposing new duties on one party to a contract can upset his contract-based expectations as much as can laws that effectively relieve [***746] the other party of any duty to perform. But it is no more anomalous to give effect to the term "impairment" and deny a claimant protection under the Contract Clause when new duties are created than it is to give effect to the Clause's inapplicability to acts of the National Government and deny a Contract Clause remedy when an Act of Congress denies a creditor the ability to enforce a contract right to payment. Both results are simply consequences of the fact that the Clause does not protect all contract-based expectations.

More fundamentally, the Court's distortion of the meaning of the Contract Clause creates anomalies of its own and threatens to undermine the jurisprudence of property rights developed over the last 40 years. The Contract Clause, of course, is but one of several clauses in the Constitution that protect existing economic values from governmental interference. The Fifth Amendment's command that "private property [shall not] be taken for public use, without just [*260] compensation" is such a clause. A second is the Due Process Clause, which during the heyday of substantive due process, see *Lochner* v. *New York*, 198 U.S. 45 (1905), largely supplanted the Contract Clause in importance and operated as a potent limitation on government's ability to interfere with economic expectations. See G. Gunther, Cases and Materials on Constitutional Law 603-604 (9th ed. 1975); Hale, The Supreme Court and the Contract Clause: III, 57 Harv. L. Rev. 852, 890-891 (1944). Decisions over the past 50 years have developed a coherent, unified interpretation of all the constitutional provisions that may protect economic expectations and these decisions have recognized a broad latitude in States to effect even severe interference with existing economic

values when reasonably necessary to promote the general welfare. See *Penn Central Transp. Co.* v. *New York City, ante*, p. 104; *Pittsburgh* v. *Alco Parking Corp.*, 417 U.S. 369 (1974); *Goldblatt* v. *Hempstead*, 369 U.S. 590 (1962); *Sproles* v. *Binford*, 286 U.S. 374 (1932); *Euclid* v. *Ambler Realty Co.*, 272 U.S. 365 (1926). At the same time the prohibition of the Contract Clause, consistently with its wording and historic purposes, has been limited in application to state laws that diluted, with utter indifference to the legitimate interests of the beneficiary of a contract duty, the existing contract obligation, *W. B. Worthen Co.* v. *Kavanaugh*, 295 U.S. 56 (1935); see *United States Trust Co.* v. *New Jersey*, 431 U.S. 1 (1977); cf. *El Paso* v. *Simmons*, 379 U.S. 497 (1965); *Home Building & Loan Assn.* v. *Blaisdell*, 290 U.S. 398 (1934).

Today's conversion of the Contract Clause into a limitation on the power of States to enact laws that impose duties additional to obligations assumed under private contracts must inevitably produce results difficult to square with any rational conception of a constitutional order. Under the Court's opinion, any law that may be characterized as "superimposing" new obligations on those provided for by contract is to be [*261] regarded as creating "sudden, substantial, and unanticipated [***747] burdens" and then to be subjected to the most exacting scrutiny. [**2731] The validity of such a law will turn upon whether judges see it as a law that deals with a generalized social problem, whether it is temporary (as few will be) or permanent, whether it operates in an area previously subject to regulation, and, finally, whether its duties apply to a broad class of persons. See *ante*, at 249-250. The necessary consequence of the extreme malleability of these rather vague criteria is to vest judges with broad subjective discretion to protect property interests that happen to appeal to them. 8

> 8 With respect, the Court's application of these criteria illustrates this point. First, I find it difficult to understand how the Court can assert that the Act's attempt to protect the expectation interests of employees to pension plans does not deal with a "broad, generalized . . . social problem" but that the mortgage moratorium in *Home Building & Loan Assn.* v. *Blaisdell*, 290 U.S. 398 (1934), did. The Court's suggestion that the Act has a "narrow aim" because it applies only to pension plans overlooks that it is the existence of the pension plan that creates the need for this

legislation. Second, the assertion that Minnesota here "invaded an area never before subject to regulation" takes an exceedingly restrictive view of the subject matter of the Act. If it is regarded not as a private pension plan, but rather as the compensation afforded employees by large employers, then the statute operates in an area that has been extensively regulated. The only explanation for the Court's decision is that it subjectively values the interests of employers in pension plans more highly than it does the legitimate expectation interests of employees.

To permit this level of scrutiny of laws that interfere with contract-based expectations is an anomaly. There is nothing sacrosanct about expectations rooted in contract that justify according them a constitutional immunity denied other property rights. Laws that interfere with settled expectations created by state property law (and which impose severe economic burdens) are uniformly held constitutional where reasonably related to the promotion of the general welfare. *Hadacheck* v. *Sebastian*, 239 U.S. 394 (1915) is illustrative. There a property owner had established on a particular parcel [*262] of land a perfectly lawful business of a brickyard, and, in reliance on the existing law, continued to operate that business for a number of years. However, a local ordinance was passed prohibiting the operation of brickyards in the particular locale and diminishing the value of the claimant's parcel and thus of his investment by nearly 90%. Notwithstanding the effect of the ordinance on the value of the investment, the ordinance was sustained against a taking claim. See also *Miller* v. *Schoene*, 276 U.S. 272 (1928) (statute required cutting down ornamental red cedar trees because they had cedar rust which would be harmful to apple trees in the vicinity).

There is no logical or rational basis for sustaining the duties created by the laws in *Miller* and *Hadacheck*, but invalidating the duty created by the Minnesota Act. Surely, the Act effects no greater interference with reasonable reliance interests than did these other laws. Moreover, the laws operate identically: They all create duties that burden one class of persons and benefit another. The only difference between the present case and *Hadacheck* or *Miller* is that here there was a prior contractual relationship between the members of the benefited and burdened classes. I simply cannot accept [***748] that this difference should possess

constitutional significance. The only means of avoiding this anomaly is to construe the Contract Clause consistently with its terms and the original understanding and hold it is inapplicable to laws which create new duties.

III

But my view that the Contract Clause has no applicability whatsoever to the Minnesota Act does not end the inquiry in this case. The Due Process Clause of the Fourteenth Amendment limits a State's power to enact such laws and I therefore address that related challenge to the Act's validity. [9] [**2732] I think that any claim based on due process has no merit.

> 9 I recognize that the only question presented by appellant is whether the Minnesota Act violates the Contract Clause. See Jurisdictional Statement 2. However, I think that a due process claim is fairly subsumed by the question presented and, under the circumstances, elementary fairness requires that I address the due process claim. This reasoning does not apply to the other possible challenges to the Act -- *e. g.*, ones based on the "Taking" Clause or on the Commerce Clause -- for these others involve rather different considerations from those involved in the Contract and Due Process Clause analyses.

[*263] My conclusion rests to a considerable extent upon *Usery* v. *Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976). That case involved a federal statute that required the operators of coal mines to compensate employees who had contracted pneumoconiosis even though the employees had terminated their work in the coal-mining industry before the Act was passed. This federal statute imposed a new duty on operators based on past acts and applied even though the coal mine operators might not have known of the danger that their employees would contract pneumoconiosis at the time of the particular employees' service. *Id.*, at 17; see also *id.*, at 40 n. 4 (POWELL, J., concurring in part). While indicating that the Due Process Clause may place greater limitations on the Government's power to legislate retrospectively than it does on the Government's ability to act prospectively, the statute was upheld on the ground that Congress had broad discretion to deal with the serious social problem of pneumoconiosis affecting former miners and that it was "a rational measure to spread the costs of the employees' disabilities to those who have profited from

the fruits of their labor -- the operators and the coal consumers." *Id.*, at 18.

A similar analysis is appropriate here. The Act is an attempt to remedy a serious social problem: the utter frustration of an employee's expectations that can occur when he is terminated because his employer closes down his place of work. The burden on his employer is surely far less harsh than that saddled upon coal operators by the federal statute. Too, a large part of the employer's outlay that the Act requires will be offset against future savings. To this extent, the Act merely [*264] prevents the employer from obtaining a windfall, an effect which would immunize this aspect of the statutory requirement from attack even under the more stringent standards the Court reads into the Contract Clause. See *El Paso* v. *Simmons*, 379 U.S., at 515 and cases [***749] cited. To the extent the Act does more than prevent a windfall, it is simply implementing a reasonable legislative judgment that the expectation interests of employees of more than 10 years' service in the receipt of a pension but who, as an actuarial matter, would not satisfy the vesting requirements of the pension plan, should not be frustrated by the generally unforeseen contingency of a plant's closing.

Significantly, also, the Minnesota Act, unlike the federal statute upheld in *Turner Elkhorn Mining*, is not wholly retrospective in its operation. The Act requires an outlay from an employer like appellant only if after the enactment date of the Act (thus when it may give full consideration to the economic consequences of its decision) the employer decides to close its plant.

Nor, finally, do I believe it relevant that the Act is limited in coverage to large employers. "In establishing a system of unemployment benefits the legislature is not bound to occupy the whole field. It may strike at the evil where it is most felt." *Carmichael* v. *Southern Coal & Coke Co.*, 301 U.S. 495, 519-520 (1937).

In sum, in my view, the Contract Clause has no applicability whatsoever to the Act, and because I conclude the Act is consistent with the only relevant constitutional restriction -- the Due Process Clause -- I would affirm the judgment of the District Court.

**REFERENCES**

State's exercise of police power as constituting impairment of obligation of private contract in violation of contract clause (Art I, 10, cl 1) of Federal Constitution

16 Am Jur 2d, Constitutional Law 438, 450

USCS, Constitution, Article I, Section 10, Clause 1

US L Ed Digest, Constitutional Law 271

ALR Digests, Constitutional Law 203

L Ed Index to Annos, Impairment of Contract Obligations

ALR Quick Index, Impairment of Contract Obligations

Federal Quick Index, Impairment of Contract Obligations

Annotation References:

State's exercise of a police power as constituting impairment of obligation of private contract in violation of contract clause (Art I, 10, cl 1) of Federal Constitution. 57 L Ed 2d 1279.



**ARIZONA v. CALIFORNIA ET AL.**

**[NO NUMBER IN ORIGINAL]**

**SUPREME COURT OF THE UNITED STATES**

**292 U.S. 341; 54 S. Ct. 735; 78 L. Ed. 1298; 1934 U.S. LEXIS 714**

**April 2, 1934, Return to Rule to Show Cause Presented**
**May 21, 1934, Decided**

**PRIOR HISTORY:** MOTION FOR LEAVE TO FILE BILL TO PERPETUATE TESTIMONY.

ORIGINAL application upon the part of the State of Arizona for leave to file a bill to perpetuate testimony for use in future litigation against the State of California and other parties named.

**DISPOSITION:** Leave to file denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff State filed an original application for leave to file a bill to perpetuate testimony for use in future litigation against defendants, another State and related others. Plaintiff had filed an action against defendants, seeking a declaration that the Colorado River Compact and the Boulder Canyon Project Act of 1928 be declared to be unconstitutional and void. The bill had been dismissed without prejudice.

**OVERVIEW:** The State sought a declaration that the Secretary of the Interior and other states be permanently enjoined from carrying out the Compact or the Act; and that they be enjoined from performing contracts which had been executed by the Secretary on behalf of the United States for the use of stored water and developed power after the project shall have been completed, and from doing any other thing under color of the Act. In the State's original bill of complaint to perpetuate testimony, it alleged that none of its rights had been interfered with,

but attempts would be made thereafter to interfere with its rights, and that it was not possible to bring the issues that would arise to an immediate judicial investigation or determination. The issue before the Court was whether the testimony that the State proposed to take would be material and competent evidence in the contemplated litigation. Denying leave to file, the Court held in part that the evidence sought to be perpetuated was not competent to prove that Congress intended, by the Act, to exclude another state from the waters allotted by the Compact and to reserve all of those waters to the State.

**OUTCOME:** The court denied leave to file the bill to perpetuate testimony.

**CORE TERMS:** compact, basin, river, acre-feet, Boulder Canyon Project Act, upper, apportioned, apportion, tributaries, surplus waters, apportionment, beneficial, perpetuated, ratification, per annum, perpetuate, treaty, consumptive, stream, leave to file, negotiator, perpetuate testimony, depositions, aggregate, ratify, use of water, negotiation, negotiating, ambiguous, ambiguity

**LexisNexis(R) Headnotes**

*Civil Procedure > Discovery > Methods > Perpetuation of Testimony*
[HN1] A bill to perpetuate testimony may be entertained

in aid of litigation pending in the United States Supreme Court, or to be begun there.

*Civil Procedure > Discovery > Methods > Oral Depositions*
*Civil Procedure > Discovery > Methods > Perpetuation of Testimony*
*Civil Procedure > Discovery > Methods > Written Depositions*
[HN2] To sustain a bill to perpetuate testimony, it must appear that the facts which a plaintiff expects to prove by the testimony of the witnesses sought to be examined will be material in the determination of the matter in controversy; that the testimony will be competent evidence; that depositions of the witnesses cannot be taken and perpetuated in the ordinary methods prescribed by law, because the then condition of the suit (if one is pending) renders it impossible, or (if no suit is then pending) because the plaintiff is not in a position to start one in which the issue may be determined; and that taking of the testimony on bill in equity is made necessary by the danger that it may be lost by delay.

*Governments > State & Territorial Governments > Legislatures*
*Governments > State & Territorial Governments > Water Rights*
[HN3] The Boulder Canyon Project Act of 1928 approves the Colorado River Compact subject to certain limitations and conditions, the approval to become effective upon the ratification of the Compact, as so modified, by the legislatures of California and at least five of the six other states.

*Governments > State & Territorial Governments > Water Rights*
[HN4] By Article II the Colorado River Compact defines the terms used: (a) The term "Colorado River system" means that portion of the Colorado River and its tributaries within the United States of America; (b) The term "Colorado River Basin" means all of the drainage area of the Colorado River system and all other territory within the United States of America to which the waters of the Colorado River system shall be beneficially applied; and (g) The term "Lower Basin" means those parts of the States of Arizona, California, Nevada, New Mexico and Utah within and from which waters naturally drain into the Colorado River system below Lee Ferry

and also all parts of said States located without the drainage area of the Colorado River system which are now or shall hereafter be beneficially served by waters diverted from the system below Lee Ferry.

*Governments > State & Territorial Governments > Water Rights*
[HN5] By Article III of the Colorado River Compact, the apportionment is made: (a) There is hereby apportioned from the Colorado River system in perpetuity to the upper basin and to the lower basin, respectively, the exclusive beneficial consumptive use of 7,500,000 acre-feet of water per annum, which shall include all water necessary for the supply of any rights which may now exist; (b) In addition to the apportionment in Paragraph (a), the lower basin is hereby given the right to increase its beneficial consumptive use of such waters by 1,000,000 acre-feet per annum; (d) The States of the upper division (Colorado, New Mexico, Utah and Wyoming) will not cause the flow of the river at Lee Ferry to be depleted below an aggregate of 75,000,000 acre-feet for any period of 10 consecutive years reckoned in continuing progressive series beginning with the first day of October next succeeding the ratification of this compact.

*Governments > State & Territorial Governments > Water Rights*
*International Law > Dispute Resolution > Comity Doctrine > General Overview*
[HN6] Article III of the Colorado River Compact does not in terms apportion as between the upper and the lower basin the surplus waters in excess of the amounts specifically allocated. But it recognizes in Paragraph (c) that there may be "surplus" waters in the River, applicable to the lower basin.

*Contracts Law > Types of Contracts > Covenants*
*Governments > State & Territorial Governments > Water Rights*
[HN7] The Colorado River Compact does not purport to apportion between the States of the lower basin the share of each in the waters of the Colorado River System; but the Boulder Canyon Project Act of 1928 makes some provision for such apportionment. By § 4(a) it provides that California, by act of its legislature, shall agree irrevocably and unconditionally with the United States and for the benefit of the States of Arizona, Colorado,

Nevada, New Mexico, Utah and Wyoming, as an express covenant and in consideration of the passage of the Act, that the aggregate annual consumptive use (diversions less returns to the river) of water of and from the Colorado River for use in the State of California, including all uses under contracts made under the provisions of this Act and all water necessary for the supply of any rights which may now exist, shall not exceed 4,400,000 acre-feet of the waters apportioned to the lower basin States by paragraph (a) of Article III of the Colorado River Compact, plus not more than one-half of any excess or surplus waters unapportioned by said Compact, such uses always to be subject to the terms of said Compact.

*Contracts Law > Remedies > Ratification*
*Governments > State & Territorial Governments > Water Rights*
*Real Property Law > Water Rights > Beneficial Use*
[HN8] Section 4 of the Boulder Canyon Project Act of 1928 authorizes Arizona, California and Nevada to enter into an agreement which, among other things, shall provide: (1) That of the 7,500,000 acre-feet annually apportioned to the lower basin States by paragraph (a) of Article III of the Colorado River compact, there shall be apportioned to the State of Nevada 300,000 acre-feet and to the State of Arizona 2,800,000 acre-feet for exclusive beneficial consumptive use in perpetuity, and (2) that the State of Arizona may annually use one-half of the excess or surplus water unapportioned by the Colorado River compact, and (3) that the State of Arizona shall have the exclusive beneficial use of the Gila River and its tributaries within the boundaries of said State, and (7) said agreement to take effect upon the ratification of the Colorado River compact by Arizona, California and Nevada.

*Governments > State & Territorial Governments > Water Rights*
[HN9] The Boulder Canyon Project Act of 1928 does not purport to apportion among the states of the lower basin the waters to which the lower basin is entitled under the Colorado River Compact. The Act merely places limits on California's use of waters under Article III(a) of the Compact and of surplus waters; and it is such uses which are subject to the terms of said Compact.

*Governments > State & Territorial Governments >*

*Water Rights*
*Real Property Law > Water Rights > Beneficial Use*
[HN10] The provision of Article III(b) of the Colorado River Compact, like that of Article III(a) is entirely referable to the main intent of the Compact which is to apportion the waters as between the upper and lower basins. The effect of Article III (b) (at least in the event that the lower basin puts the 8,500,000 acre-feet of water to beneficial uses) is to preclude any claim by the upper basin that any part of the 7,500,000 acre-feet released at Lee Ferry to the lower basin may be considered as "surplus" because of Arizona waters which are available to the lower basin alone. Congress apparently expected that a complete apportionment of the waters among the States of the lower basin would be made by the sub-compact which it authorized Arizona, California and Nevada to make. If Arizona's rights are in doubt it is, in large part, because she has not entered into the Colorado River Compact or into the suggested sub-compact.

*International Law > Treaty Formation > General Overview*
*International Law > Treaty Interpretation > General Overview*
[HN11] When the meaning of a treaty is not clear, recourse may be had to the negotiations, preparatory works, and diplomatic correspondence of the contracting parties to establish its meaning. But that rule has no application to oral statements made by those engaged in negotiating the treaty which were not embodied in any writing and were not communicated to the government of the negotiator or to its ratifying body.

**LAWYERS' EDITION HEADNOTES:**

DEPOSITIONS, §3 ;

prerequisites of bill to perpetuate testimony for future action. -- ;

Headnote:[1]

To sustain a bill to perpetuate testimony in an action to be brought in the future, it must appear that the facts expected to be proved will be material and the testimony competent, that depositions of the witnesses cannot be taken and perpetuated in the ordinary methods prescribed by law, because the plaintiff is not in a position to start a suit in which the issue may be determined, and that

taking of the testimony on bill in equity is made necessary by the danger that it may be lost by delay.

EVIDENCE, §834

STATES, §52 ;

materiality -- compact between other states. -- ;

Headnote:[2]

The meaning of a compact between several states, considered as a contract, cannot be material in litigation against signatory states by a state which refused to ratify it and is not a party thereto, nor can the construction of the compact by a signatory state or by Congress be material in any suit by the nonsignatory state based upon the contract.

EVIDENCE, §551

STATES, §52 ;

Colorado River Compact -- ambiguity -- extrinsic evidence of meaning. -- ;

Headnote:[3]

The provision of the Colorado River Compact between several states that, in addition to the apportionment made elsewhere therein, the "lower basin" is given the right to increase its beneficial consumptive use of water by 1,000,000 acre-feet per annum, is not ambiguous, so as to admit extrinsic evidence to show its meaning, although the additional waters thereby appropriated are claimed thereunder exclusively by the state seeking to introduce such evidence, on the ground of the geographical situation of the states, where other states were included in the lower basin, and the Compact left to later agreement the apportionment of the water among the states in each basin.

EVIDENCE, §593

STATUTES, §145 ;

extrinsic evidence to show intent of Congress -- Boulder Canyon Project Act. -- ;

Headnote:[4]

Nondocumentary evidence, consisting of testimony of what persons said some years before while negotiating the Colorado River Compact between several states, not embodied in any writing and not communicated to Congress or the legislatures of the ratifying states, is not competent to prove that Congress, by the Boulder Canyon Project Act, intended to exclude a certain state from the waters allotted by the Compact.

**SYLLABUS**

1. This Court may entertain a bill to perpetuate testimony in aid of future litigation within its original jurisdiction. P. 347.

2. The sole purpose of such a suit is to perpetuate the testimony; and in order to sustain the bill it must appear that the facts which the plaintiff expects to prove by the testimony of the witnesses sought to be examined will be material to the determination of the matter in controversy; that the testimony will be competent evidence; that depositions of the witnesses can not be taken and perpetuated in the ordinary methods prescribed by law, because the then condition of the suit (if one is pending) renders it impossible, or (if no suit is then pending) because the plaintiff is not in a position to start one in which the issue may be determined; and that taking of the testimony on bill in equity is made necessary by the danger that it may be lost by delay. P. 347.

3. Arizona asked leave to file a bill to perpetuate the testimony of persons who took part in the formulation of the "Colorado River Compact," apportioning the waters of the Colorado River, which was adopted by all the States embracing the water-shed of that river, except Arizona, and was approved, subject to certain limitations and conditions, by the Act of Congress of December 21, 1928, known as the Boulder Canyon Project Act (see 283 U.S. 423). By the bill she claimed that § 4 (a) of the Act, imposing limitations on the use of water by California, was intended for the benefit of Arizona; that § 4 (a) embodies by reference Article III (b) of the Compact for the purpose of defining those limitations, and that the proper interpretation of Art III (b) will be, therefore, essential in future litigation to the determination of Arizona's rights under the statute; that, read in the light of other parts of the Compact, Art. III (b) is ambiguous; and that the testimony sought to be perpetuated will be material and admissible in removing the ambiguity, and will show that the water apportioned by Art. III (b) to the

lower basin of the water-shed -- 1,000,000 acre feet per annum -- is for the sole and exclusive use and benefit of Arizona. *Held*:

(1) That the meaning of the Compact, considered merely as a contract, can never be material to the contemplated litigation, since Arizona refused to ratify the Compact. P. 356.

(2) The bill does not show that Art. III (b) of the Compact is relevant to the interpretation of § 4 (a) of the Act. The Act does not purport to apportion among the States of the lower basin (to which Arizona and California belong) the waters to which the lower basin is entitled under the Compact; it merely limits California's use of waters under Art. III (a) and of surplus waters; and there can be no claim that Art. III (b) is relevant in defining surplus waters under § 4 (a) of the Act. P. 357.

(3) Proof that Congress understood that Article III (b) had allotted all the waters therein to Arizona would not make Art. III (b) relevant to the interpretation of § 4 (a) of the Act. P. 358.

(4) Ambiguity in Art. III (b) is not shown. The Compact makes an apportionment only between the upper and lower basins. The fact that any of the waters apportioned to the lower basin are useful to Arizona only or have been appropriated by her does not contradict the clear intent of Paragraph (b) to apportion the 1,000,000 acre-feet therein to the States of the lower basin and not specifically to Arizona alone. P. 358.

(5) The proposed testimony, even if it were relevant, would not be competent, since the Act rests not upon what was thought or said by negotiators of the Compact, but upon its ratification by the six States other than Arizona. P. 359.

4. The rule permitting recourse to the negotiations, preparatory works, and diplomatic correspondence of the contracting parties to establish the meaning of a treaty when not clear, has no application to oral statements made by those engaged in negotiating the treaty which were not embodied in any writing and were not communicated to the Government of the negotiator or to its ratifying body. P. 360.

**COUNSEL:** Mr. Arthur T. LaPrade, Attorney General of Arizona, and Messrs. Charles A. Carson, Jr., and A. M. Crawford were on the brief for plaintiff.

Mr. U. S. Webb, Attorney General of California, and Messrs. I. W. Stewart, Arvin B. Shaw, Charles L. Childers, E. C. Finney, Ray L. Chesebro, James M. Stevens, and Fred M. Bottorf were on the brief for California et al., defendants.

Messrs. James H. Howard, Northcutt Ely, Ray W. Bruce, C. L. Byers, Phil D. Swing, and Thos. Whelan, were on the brief for the Metropolitan Water District of Southern California et al., defendants.

Mr. Paul P. Prosser, Attorney General of Colorado, Mr. Gray Mashburn, Attorney General of Nevada, Mr. E. K. Neumann, Attorney General of New Mexico, Mr. Joseph Chez, Attorney General of Utah, and Mr. Ray E. Lee, Attorney General of Wyoming, were on the brief for Colorado et al., defendants.

Solicitor General Biggs, Assistant Attorney General Blair, and Messrs. Charles Bunn, Aubrey Lawrence, and Nathan R. Margold were on the brief for Ickes, Secretary of the Interior, defendant.

By leave of Court, Messrs. James D. Parriott, R. C. Hecox, Malcolm Lindsey, and Stanley P. Smith filed a brief on behalf of the City and County of Denver, as amici curiae.

**JUDGES:** Hughes, Van Devanter, McReynolds, Brandeis, Sutherland, Butler, Stone, Roberts, Cardozo

**OPINION BY:** BRANDEIS

**OPINION**

[*344] [**736] [***1299] MR. JUSTICE BRANDEIS delivered the opinion of the Court.

On October 13, 1930, Arizona sought, by an original bill, a declaration that the Colorado River Compact and the Boulder Canyon Project Act be decreed to be unconstitutional and void; that the Secretary of the Interior and California, Nevada, Utah, New Mexico, Colorado and Wyoming be permanently enjoined from carrying out said Compact or said Act; and that they be enjoined from performing contracts which had been executed by the Secretary on behalf of the United States for the use of stored water and developed power after the project shall have been completed, and from doing any other thing under color of the Act. The bill was "dismissed without prejudice to an application for relief

in case the stored water is used in such a way as to interfere with the enjoyment by Arizona, or those claiming under it, of any rights already perfected or with the right of Arizona to make additional legal appropriation and to enjoy the same." *Arizona* v. *California*, 283 U.S. 423, 464.

[*345] On February 14, 1934, Arizona moved for leave to file in this Court its original bill of complaint to perpetuate testimony in an action or actions arising out of the Boulder Canyon Project Act which "at some time in the future" it will commence in this Court against California, and others therein named as defendants. [1] The bill sets forth:

> 1   Namely, Colorado, Nevada, New Mexico, Utah, Wyoming, Harold L. Ickes, Secretary of the Interior, Palo Verde Irrigation District, Imperial Irrigation District, Coachella Valley Water District, Metropolitan Water District of Southern California, City of Los Angeles, City of San Diego, and County of San Diego.

(a) The Act of Congress, August 19, 1921, c. 72, 42 Stat. 171, which authorized Arizona, California, Colorado, Nevada, New Mexico, Utah and Wyoming to enter into a compact regarding the waters of the Colorado River; and the appointment of a representative to act for the United States.

(b) The Colorado River Compact dated November 24, 1922, signed by representatives of the seven States -- to "become binding and obligatory when it shall have been approved by the legislature of each of the signatory States and by the Congress of the United States."

(c) The Act of Congress, December 21, 1928, known as the Boulder Canyon Project Act, c. 42, 45 Stat. 1057, which approved the Colorado River Compact subject to certain limitations and conditions, the approval to become effective upon the ratification of the compact, as so modified, by the legislature of California and at least five of the other six States.

(d) The Act of California, c. 16, March 4, 1929, limiting its use of the waters of the Colorado River in conformity with the Boulder Canyon Project Act.

[**737] (e) The Proclamation of the President declaring the Boulder Canyon Project Act to be in effect, June 25, 1929, 46 Stat. 3000.

[*346] (f) The General Regulation of the Secretary of the Interior, concerning the storage of water in Boulder Dam Reservoir and the delivery thereof, dated April 23, 1930, as amended September 28, 1931.

[***1300] The bill alleges, among other things:

That no right of Arizona has yet been interfered with; that attempts will be made hereafter to interfere with its rights; that it is not possible to bring the issues which will arise to an immediate judicial investigation or determination and it may be years before this can be done because "the cause or causes of action have not accrued and may not accrue for years to come"; that facts known only to certain named persons will be evidence material in the determination of such controversy or controversies; that these persons will be necessary witnesses in the prosecution of the action or actions which Arizona will be compelled to institute in order to protect its rights and those of persons claiming under it; and that all the persons with present knowledge of the present facts may not be available as witnesses when the cause or causes of action shall have accrued to the plaintiff. The prayer is for process to take the oral depositions and to perpetuate the testimony of these witnesses.

On February 20, 1934, a rule issued to those named as defendants to show cause why leave to file the bill should not be granted. All filed returns. Colorado, Nevada, New Mexico, Utah and Wyoming stated that they have no objection to the filing of the bill or to the taking of any competent testimony; and prayed that to each state should be granted the right of cross-examination and the right to object to any such testimony on any ground either at the time of the taking or of its presentation to this Court. California and the public agencies of that state expressed a doubt as to the existence of jurisdiction in this Court. They opposed the granting of the motion on the ground that the testimony if taken [*347] would not be admissible in evidence; opposed also on the ground that the United States is an indispensable party; and insisted that the bill should not be received in the absence of consent by the United States to be sued. The Secretary of the Interior conceded that this Court has jurisdiction, but objected on the same grounds as California to granting the motion. Thereupon, a brief was filed by Arizona, reply briefs by respondents and a brief *amicus curiae* by the City and County of Denver, Colorado.

*First*. No bill to perpetuate testimony has heretofore been filed in this Court; but no reason appears why such [HN1] a bill may not be entertained in aid of litigation pending in this Court, or to be begun here. Bills to perpetuate testimony had been known as an independent branch of equity jurisdiction before the adoption of the Constitution. [2] Congress provided for its exercise by the lower federal courts. [3] There the jurisdiction has been repeatedly invoked; [4] and it has been recognized by this Court. [5]

> 2   1 Pomeroy's Equity Jurisprudence, (4th ed.) § 211; *West* v. *Lord Sackville*, L.R. [1903] 2 Ch. Div. 378.
>
> 3   Revised Statutes, § 866: ". . . any circuit [district] court upon application to it as a court of equity, may, according to the usages of chancery, direct depositions to be taken *in perpetuam rei memoriam*, if they relate to any matters that may be cognizable in any court of the United States. . . ."
>
> 4   *New York & Baltimore Coffee Polishing Co.* v. *New York Polishing Co.*, 9 Fed. 578; 11 Fed. 813; *Richter* v. *Jerome*, 25 Fed. 679; *Westinghouse Machinery Co.* v. *Electric Storage Battery Co.*, 170 Fed. 430; reversing 165 Fed. 992; *The West Ira*, 24 F.2d 858; *Todd Engineering Co.* v. *United States*, 32 F.2d 734; *Union Solvents Corp.* v. *Butacet Corp.*, 2 F.Supp. 375.
>
> 5   *Richter* v. *Union Trust Co.*, 115 U.S. 55; compare *Green* v. *Compagnia Generale*, 82 Fed. 490, 494-5.

[1]The sole purpose of such a suit is to perpetuate the testimony. [HN2] To sustain a bill of this character, it must appear that the facts which the plaintiff expects [***1301] to prove [*348] by the testimony of the witnesses sought to be examined will be material in the determination of the matter in controversy; that the testimony will be competent evidence; that depositions of the witnesses cannot be taken and perpetuated in the ordinary methods prescribed by law, because the then condition of the suit (if one is pending) renders it impossible, or (if no suit is then pending) because the plaintiff is not in a position to start one in which the issue may be determined; and that taking of the testimony on bill in equity [**738] is made necessary by the danger that it may be lost by delay.

The allegations of the bill presented by Arizona are

sufficient to show danger of losing the evidence by delay; and also to show Arizona's inability to perpetuate the testimony by the ordinary methods prescribed by law for the taking of depositions. The only question which requires consideration is whether the testimony which it is proposed to take would be material and competent evidence in the litigation contemplated.

*Second*. The action or actions which Arizona expects to bring may rest upon a claim that "the stored water is used in such a way as to interfere with the enjoyment by Arizona, or those claiming under it, of any rights already perfected or with the right of Arizona to make additional legal appropriations and to enjoy the same." Specifically, Arizona claims rights under § 4 (a) of the Boulder Canyon Project Act; these rights, it is said, are governed in turn by the terms of the Colorado River Compact. Briefly, the Compact apportions the waters of the Colorado River between a group of States, termed the upper basin, north of Lee Ferry, and a group south thereof, the lower basin, among which are Arizona and California. The interference apprehended will, it is alleged, arise out of a refusal of the respondents to accept as correct that construction of Article III (b) of the [*349] Compact which Arizona contends is the proper one. It claims that this paragraph, which declares:

"In addition to the apportionment in Paragraph (a), the lower basin is hereby given the right to increase its beneficial consumptive use of such waters by 1,000,000 acre-feet per annum"

means:

"that the waters apportioned by Article III (b) of said compact are for the sole and exclusive use and benefit of the State of Arizona."

The bill charges that the Secretary of the Interior and the other defendants refuse to accept such construction; and that, by certain contracts made between the Secretary and the California defendants, they are asserting a right to appropriate the said 1,000,000 acre-feet of water to California uses. The bill states that the decision in some future action construing Paragraph (b) will materially affect rights of Arizona arising under the Boulder Canyon Project Act, in particular § 4 (a) thereof. [6]

> 6   It is claimed that a future decision as to the meaning of Article III (b) will affect rights also

under (a) the Colorado River Compact, (b) the conditions required by the Boulder Canyon Project Act to be attached to patents, grants, contracts, concessions, leases, permits, rights of way and other privileges from the United States, (c) the relative and respective rights of each of the parties (to the suit to perpetuate testimony) in the waters of the Colorado and its tributaries, and the use thereof and the burdens and restrictions upon such use.

Arizona seeks, as stated in the bill, to perpetuate, and proposes to introduce in support of its construction of Paragraph (b) of Article III, of the Compact, in the actions to be brought in the future, testimony to the following effect by those who in 1922 were connected with the negotiation of the Compact:

"The representatives of all the States and the United States except the Arizona delegation were in agreement [*350] as to the definition of the Colorado River System, including the [***1302] Gila River and its tributaries, and as to the division proposed, which substantially apportioned the waters of the Colorado River at Lee Ferry, the point selected as dividing the Upper Basin from the Lower Basin. The Arizona delegation refused and declined to accept the proposed compact because of the inclusion of the Gila River and its tributaries without any compensating provision to the State of Arizona in lieu of the waters thereof, which had already been appropriated and in which no other State could have any interest on account of the further fact that the waters of the Gila River and its tributaries enter the Colorado River at Yuma, at a point so far down stream and of such low elevation that it was and is impossible to put the waters thereof to beneficial use in the United States after they reach the main stream of the Colorado River. Hence, the Arizona delegation pointed out that the conference was discussing something which had already been disposed of and in any event could not concern any State, other than Arizona. Several days elapsed in a discussion between the said representatives of this problem before a solution was found. The problem was finally thought solved by adding subdivision (b) of Article III to the compact as finally approved by said representatives which reads as follows:

"'(b) In addition to the apportionment in paragraph (a), the Lower Basin is hereby given [**739] the right to increase its beneficial consumptive use of such waters by one million acre-feet per annum.'

"It was agreed between all the representatives of the various States and the representative of the United States, negotiating said compact, that said one million acre-feet apportioned by subdivision (b) of Article III of said compact was intended for and should go to the State of Arizona to compensate for the waters of the Gila River and [*351] its tributaries being included within the definition of the Colorado River System and the allocations of said compact, and that said one million acre-feet was to be used exclusively by and for the State of Arizona, that being the approximate amount of water then in use within the State of Arizona from the Gila River and its tributaries, and it was agreed that in view of the fact that no appropriation or allocation of water had otherwise been made by said compact directly to any State, the one million acre-feet for the State of Arizona should be included in said compact by an allocation for the Lower Basin. And it was further agreed that a supplemental compact between the States, California, Nevada and Arizona should be adopted and that such supplemental compact should so provide.

"The Arizona delegation stated that if it were agreed by all the representatives of the several States and of the United States that said million acre-feet should be for the exclusive benefit of the State of Arizona to provide compensation to Arizona on account of the inclusion of the waters of the Gila River and its tributaries in said compact, they would accept said compact, otherwise they would refuse to accept said compact. It was thereupon agreed by all representatives of all the States and of the United States, participating in said negotiations and conferences, that the waters apportioned by Article III (b) of said compact were for the sole and exclusive use and benefit of the State of Arizona, and it was further agreed that a supplemental compact between the States of California, Nevada and Arizona should be adopted and that such supplemental compact should so provide. Thereupon said compact was signed by the representatives of the several States and of the United States."

*Third.* In this suit Arizona asserts rights under the Boulder Canyon Project Act of 1928, not under the Colorado River Compact, which she has refused to ratify. [*352] [HN3] That Act approved the Colorado River Compact [***1303] subject to certain limitations and conditions, the approval to become effective upon the

ratification of the Compact, as so modified, by the legislatures of California and at least five of the six other states. It was so ratified. Arizona claims that § 4 (a) of that Act imposing limitations on the use of water by California was intended for her benefit; that § 4 (a) embodies by reference Article III (b), among others, of the Compact for the purpose of defining the limitation and that the proper interpretation of Article III (b) will be, therefore, essential to a determination of Arizona's rights under the statute; that, read in the light of other sections of the Compact, Article III (b) is ambiguous; and that the testimony sought to be perpetuated will be material and admissible in removing the ambiguity. The elaborate argument in support of these contentions appears to be, in substance, as follows:

1. Colorado River Compact, apportions the water of the Colorado River System between the upper and the lower basin. [HN4] By Article II it defines the terms used:

"(a) The term 'Colorado River system' means that portion of the Colorado River and its tributaries within the United States of America."

"(b) The term 'Colorado River Basin' means all of the drainage area of the Colorado River system and all other territory within the United States of America to which the waters of the Colorado River system shall be beneficially applied."

"(g) The term 'Lower Basin' means those parts of the States of Arizona, California, Nevada, New Mexico and Utah within and from which waters naturally drain into the Colorado River system below Lee Ferry and also all parts of said States located without the drainage area of the Colorado River system which are now or shall hereafter be beneficially served by waters diverted from the system below Lee Ferry."

[*353] [HN5] By Article III, the apportionment is made:

"(a) There is hereby apportioned from the Colorado River system in perpetuity to the upper basin and to the lower basin, respectively, the exclusive beneficial consumptive use of 7,500,000 acre-feet of water per annum, which shall include all water necessary for the supply of any rights which may now exist."

"(b) In addition to the apportionment in Paragraph

(a), the lower basin is hereby given the right to increase its beneficial consumptive [**740] use of such waters by 1,000,000 acre-feet per annum."

"(d) The States of the upper division [Colorado, New Mexico, Utah and Wyoming] will not cause the flow of the river at Lee Ferry to be depleted below an aggregate of 75,000,000 acre-feet for any period of 10 consecutive years reckoned in continuing progressive series beginning with the first day of October next succeeding the ratification of this compact."

[HN6] Article III does not in terms apportion as between the upper and the lower basin the surplus waters in excess of the amounts specifically allocated. But it recognizes in Paragraph (c) that there may be "surplus" waters in the River, applicable to the lower basin. [7]

> [7] Paragraph (c) provides: "If, as a matter of international comity, the United States of America, shall hereafter recognize in the United States of Mexico any right to the use of any waters of the Colorado River system, such waters shall be supplied first from the waters which are surplus over and above the aggregate of the quantities specified in paragraphs (a) and (b); and if such surplus shall prove insufficient for this purpose, then, the burden of such deficiency shall be equally borne by the upper basin and the lower basin, and whenever necessary the States of the upper division shall deliver at Lee Ferry water to supply one-half of the deficiency so recognized in addition to that provided in paragraph (d).

2. [HN7] The Colorado River Compact does not purport to apportion between the States of the lower basin [***1304] the share of each in the waters of the Colorado River System; [*354] but Boulder Canyon Project Act makes some provision for such apportionment. By § 4 (a) it provides that:

"California, by act of its legislature, shall agree irrevocably and unconditionally with the United States and for the benefit of the States of Arizona, Colorado, Nevada, New Mexico, Utah and Wyoming, as an express covenant and in consideration of the passage of this Act, that the aggregate annual consumptive use (diversions less returns to the river) of water of and from the Colorado River for use in the State of California, including all uses under contracts made under the provisions of this Act and all water necessary for the

supply of any rights which may now exist, shall not exceed four million four hundred thousand acre-feet of the waters apportioned to the lower basin States by paragraph (a) of Article III of the Colorado River compact, plus not more than one-half of any excess or surplus waters unapportioned by said compact, such uses always to be subject to the terms of said compact."

And that [HN8] section authorizes Arizona, California and Nevada to enter into an agreement which, among other things, shall provide:

"(1) That of the 7,500,000 acre-feet annually apportioned to the lower basin States by paragraph (a) of Article III of the Colorado River compact, there shall be apportioned to the State of Nevada 300,000 acre-feet and to the State of Arizona 2,800,000 acre-feet for exclusive beneficial consumptive use in perpetuity, and (2) that the State of Arizona may annually use one-half of the excess or surplus water unapportioned by the Colorado River compact, and (3) that the State of Arizona shall have the exclusive beneficial use of the Gila River and its tributaries within the boundaries of said State . . . (7) said agreement to take effect upon the ratification of [*355] the Colorado River compact by Arizona, California and Nevada."

3. Arizona refused to ratify the Colorado River Compact, and the authority conferred upon Arizona, Nevada and California by the Boulder Canyon Project Act to enter into an agreement for apportioning the waters has not been acted on. But California bound itself, by the Act of its legislature, March 16, 1929, to the limitation of 4,400,000 acre-feet, plus one-half of the surplus; Arizona claims that the limitation on California's use must have been enacted for the benefit solely of Arizona, since geographically she alone could use waters in the lower basin which California may not use; and that, because it is embodied in a statute, the limitation imposed by Congress on California's use confers rights upon Arizona, although she failed to sign either the principal or the subsidiary compact.

4. In support of the contention that Article III (b) of the Compact has a bearing on the interpretation of the limitation of § 4 (a) of the Act, Arizona points to the fact that while the Boulder Canyon Project Act makes no mention of the 1,000,000 acre-feet assigned to the lower basin by Article III (b) of the Compact, § 4 (a) of the Act limits California, in terms, to 4,400,000 acre-feet of the waters apportioned to the lower basin under Article III (a)

of the Compact plus one-half [**741] of the "surplus waters unapportioned by said compact"; that § 4 (a) declares that such uses by California are "always to be subject to the terms of said compact"; that California claims that, in addition to the waters already mentioned, she is entitled, as one of the parties to the Compact, to draw upon the Article III (b) waters; and that, acting upon this assumption, the Secretary of the Interior has already contracted with California users for delivery of 5,362,000 acre-feet of water per annum from the main [*356] stream of the Colorado River, though this water is not yet being delivered; whereas [***1305] Arizona contends that by a proper interpretation of Article III (b) California is excluded from all the waters thereunder in favor of Arizona.

5. In support of the contention that Article III (b) is ambiguous, Arizona points out that, whereas the Compact awards to the lower basin, in the aggregate, 8,500,000 acre-feet of water, [8] Article III (d) of the Compact shows that only 7,500,000 of this is to come from the main stream of the Colorado River, since that section provides:

> 8 That is the 7,500,000 of the Article III (a) waters and the 1,000,000 of the Article III (b) waters.

"The States of the upper division will not cause the flow of the River at Lee Ferry to be depleted below an aggregate of 75,000,000 acre-feet for any period of 10 consecutive years reckoned in continuing progressive series beginning with the first day of October next succeeding the ratification of this compact."

It argues that the 75,000,000 was doubtless arrived at through multiplying by ten the 7,500,000 acre-feet per annum apportioned to the lower basin under Article III (a); that though the lower basin is entitled to 8,500,000 acre-feet, it can only call on the upper basin to release 7,500,000 acre-feet from the main stream; that the only other waters below Lee Ferry which are available to the lower basin come from tributaries entirely in Arizona; that these waters enter the Colorado River at a point so far south that they could not be used in the United States after they enter the Colorado; and they have in fact been appropriated for use in Arizona; that, therefore, what has in terms been awarded to the lower basin is in practical effect available only to that part of the lower basin constituted by Arizona.

[2]*Fourth.* It is clear that the meaning of the

Compact, considered merely as a contract, can never be material in the contemplated litigation, since Arizona refused to ratify [*357] the Compact. Arizona rests her rights wholly upon the Acts of Congress and of California. Arizona claims that California's construction of § 4 (a) of the statute would allow her water which under the Compact has been assigned to Arizona, and that a conflict is thus raised between the statute and the Compact which the suggested testimony is competent to resolve. But the resolution of this alleged conflict can never be material to any case based on the Compact considered as contract, since Arizona neither has nor claims any contractual right.

*Fifth*. Nor does Arizona show that Article III (b) of the Compact is relevant to an interpretation of § 4 (a) of the Boulder Canyon Project Act upon which she bases her claim of right. It may be true that the Boulder Canyon Project Act leaves in doubt the apportionment among the states of the lower basin of the waters to which the lower basin is entitled under Article III (b). But [HN9] the Act does not purport to apportion among the states of the lower basin the waters to which the lower basin is entitled under the Compact. The Act merely places limits on California's use of waters under Article III (a) and of surplus waters; and it is "such" uses which are "subject to the terms of said compact."

There can be no claim that Article III (b) is relevant in defining surplus waters under § 4 (a) of the Act; for both Arizona and California apparently consider the waters under Article III (b) as apportioned. [9] It is true that Arizona alleges (not in the bill however but in her brief) that she "hopes to be able to show in the case hereafter to be brought" by evidence of Congressional Committee hearings and other legislative history that the failure in the statute to apportion the 1,000,000 acre-feet of waters was due to an [***1306] understanding by Congress that Article [*358] III (b) of the Compact had already assigned these waters to Arizona and that the limitation on California was passed in the light of this understanding. This hope if fulfilled would not make Article III (b) relevant. The allegation is, not that Congress incorporated Article III (b) into the Act; it is that Congress understood that Article III [**742] (b) had allotted all the waters therein to Arizona.

9 The Secretary of the Interior in his brief seems to be of the opinion that waters under Article III (b) might be surplus waters under § 4 (a) of the

Act.

[3]*Sixth*. The considerations to which Arizona calls attention do not show that there is any ambiguity in Article III (b) of the Compact. Doubtless, the anticipated physical sources of the waters which combine to make the total of 8,500,000 acre-feet are as Arizona contends, but neither Article III (a) nor (b) deal with the waters on the basis of their source. Paragraph (a) apportions waters "from the Colorado River system," i. e., the Colorado and its tributaries, and (b) permits an additional use "of such waters." The Compact makes an apportionment only between the upper and lower basin; the apportionment among the states in each basin being left to later agreement. Arizona is one of the states of the lower basin and any waters useful to her are by that fact useful to the lower basin. But the fact that they are solely useful to Arizona, or the fact that they have been appropriated by her, does not contradict the intent clearly expressed in Paragraph (b) (nor the rational character thereof) to apportion the 1,000,000 acre-feet to the states of the lower basin and not specifically to Arizona alone. It may be that, in apportioning among the states the 8,500,000 acre-feet allotted to the lower basin, Arizona's share of waters from the main stream will be affected by the fact that certain of the waters assigned to the lower basin can be used only by her; but that is a matter entirely outside the scope of the Compact.

[HN10] The provision of Article III (b), like that of Article III (a) is entirely referable to the main intent of the [*359] Compact which was to apportion the waters as between the upper and lower basins. The effect of Article III (b) (at least in the event that the lower basin puts the 8,500,000 acre-feet of water to beneficial uses) is to preclude any claim by the upper basin that any part of the 7,500,000 acre-feet released at Lee Ferry to the lower basin may be considered as "surplus" because of Arizona waters which are available to the lower basin alone. Congress apparently expected that a complete apportionment of the waters among the States of the lower basin would be made by the sub-compact which it authorized Arizona, California and Nevada to make. If Arizona's rights are in doubt it is, in large part, because she has not entered into the Colorado River Compact or into the suggested sub-compact.

[4]*Seventh*. Even if the construction to be given Paragraph (b) of the Compact were relevant to the interpretation of any provision in the Boulder Canyon

Project Act and such provision were ambiguous, the evidence sought to be perpetuated is not of a character which would be competent to prove that Congress intended by § 4(a) of the 1928 Act to exclude California entirely from the waters allotted by Article III (b) to the states of the lower basin and to reserve all of those waters to Arizona. The evidence sought to be perpetuated is not documentary. It is testimony as to what divers persons said six years earlier while negotiating a compact with a view to preparing the proposal for submission to the legislatures of the seven States and to Congress for approval -- a proposal which Arizona has not ratified and which the six other States and Congress did ratify, as later modified, by statutes enacted in 1928 and 1929. The Boulder Canyon Project Act rests, not upon what was thought or said in 1922 by negotiators of the Compact, but upon its ratification by the six States.

[***1307] It has often been said that [HN11] when the meaning of a treaty is not clear, recourse may be had to the negotiations, [*360] preparatory works, and diplomatic correspondence of the contracting parties to establish its meaning. *Nielsen* v. *Johnson*, 279 U.S. 47, 52; compare *United States* v. *Texas*, 162 U.S. 1; *Terrace* v. *Thompson*, 263 U.S. 197, 223; *Cook* v. *United States*, 288 U.S. 102. See Yu, The Interpretation of Treaties, pp. 138, 192; Chang, The Interpretation of Treaties, p. 59 *et seq*. But that rule has no application to oral statements made by those engaged in negotiating the treaty which were not embodied in any writing and were not communicated to the government of the negotiator or to its ratifying body. There is no allegation that the alleged agreement between the negotiators made in 1922 was called to the attention of Congress in 1928 when enacting the Act; nor that it was called to the attention of the legislatures of the several States.

As Arizona has failed to show that the testimony which she seeks to have perpetuated could conceivably be material or competent evidence bearing upon the construction to be given Article III, Paragraph (b), in any action which may hereafter be brought, the motion for leave to file the bill should be denied. We have no occasion to determine whether leave to file the bill should be denied also because [**743] the United States was not made a party and has not consented to be sued.

*Leave to file bill denied.*



MARGUERITE D. BLAIR et al. v. STATE TAX ASSESSOR

Law Docket No. Sag-83-379

Supreme Judicial Court of Maine

485 A.2d 957; 1984 Me. LEXIS 856

September 4, 1984, Argued
December 13, 1984, Decided

**DISPOSITION:** [**1] The entry is: Judgment affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff certified class of taxpayers sought review of the decision of the Superior Court, Sagadahoc County (Maine), which granted defendant state tax assessor's motion for summary judgment in the certified class's action that sought review of the assessor's determination that Maine state retirement benefits and allowances in excess of employees' contributions were subject to state income tax.

**OVERVIEW:** The lower court granted the assessor's summary judgment motion after deciding that by enactment of the state income tax in 1969, the legislature impliedly repealed Me. Rev. Stat. Ann. tit. 5, § 1003 (Supp. 1984), which exempted state retirement benefits from taxation. The court held that the enactment of the state income tax system in 1969 did in fact repeal by implication the exempt status of state retirement benefits. There was no merit in the certified class's contention that there was no inconsistency between the statutes on which to premise an implied repeal of § 1003. The legislature in 1969 enacted a comprehensive system of state income taxation that pre-empted the entire area, and the court noted that it had to give effect to the later statute as the most recent expression of the legislative will.

**OUTCOME:** The court affirmed the summary judgment

granted in favor of the assessor.

**CORE TERMS:** retirement allowances, retirement benefits, gross income, taxation, exemption, adjusted, different meaning, taxable income, repeal, assessor's, state income tax, income tax, implied repeal, contractual, retirement, repealed, earlier act, state income, subject matter, summary judgment, employees' contributions, term used, pertinent part, personal exemptions, modifications, instituted, tax-exempt, exempted, semantic, bare

**LexisNexis(R) Headnotes**

*Tax Law > State & Local Taxes > Administration & Proceedings > General Overview*
[HN1] Me. Rev. Stat. Ann. tit. 36, § 5102(11) (Supp. 1984) provides in part: Any other term used in this part has the same meaning as when used in a comparable context in the laws of the United States relating to federal income taxes, unless a different meaning is clearly required.

*Pensions & Benefits Law > Governmental Employees > State Pensions*
*Tax Law > State & Local Taxes > Administration & Proceedings > General Overview*
*Tax Law > State & Local Taxes > Income Tax >*

*Individuals, Estates & Trusts > General Overview*
[HN2] Me. Rev. Stat. Ann. tit. 5, § 1003 (Supp. 1984) states in part: The right of a person to a retirement allowance, such retirement allowance itself, to the return of contributions, any optional benefit or death benefit or any other right accrued or accruing to any person under this chapter, and the moneys in the various funds created thereby, shall be exempted from any state, county or municipal tax in the State.

*Pensions & Benefits Law > Governmental Employees > State Pensions*
*Tax Law > Federal Income Tax Computation > Dependent & Personal Exemptions (IRC secs. 151-153)*
*Tax Law > Federal Taxpayer Groups > Individuals > Adjustments to Income (IRC secs. 62, 71, 215, 911) > Adjusted Gross Income (IRC sec. 62)*
[HN3] Me. Rev. Stat. Ann. tit. 36, § 5111 imposes a tax for each taxable year on the entire taxable income of every resident individual of this state. Me. Rev. Stat. Ann. tit. 36, § 5121 (1978) defines "entire taxable income" as: federal adjusted gross income as defined in the laws of the United States with the modifications and less the deductions and personal exemptions provided in this chapter. The Internal Revenue Code defines adjusted gross income as gross income minus enumerated deductions, none of which apply to the retirement benefits in excess of employees' contributions at issue here. I.R.C. § 62. The Code clearly includes income derived from pensions and retirement allowances in an individual's federal gross income. I.R.C. § 61(a)(11).

*Governments > Legislation > Expirations, Repeals & Suspensions*
[HN4] The court will find a repeal by implication when a later enactment encompasses the entire subject matter of an earlier act, or when a later statute is inconsistent with or repugnant to an earlier statute. When a later statute does not cover the earlier act in its entirety, but is inconsistent with only some of its provisions, a repeal by implication occurs to the extent of the conflict.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
*Governments > State & Territorial Governments > Legislatures*
[HN5] The legislature shall never, in any manner, suspend or surrender the power of taxation. Me. Const.

art. 9, § 9.

COUNSEL: Attorney for the Plaintiffs: Roger S. Golin, Esq. (orally). Bath.

Attorneys for the Defendant: James E. Tierney, Esq. Attorney General. Crombie J. D. Garrett, Esq. (orally). Jerome S. Matus, Esq. Assistant Attorneys General. Bureau of Taxation. Augusta.

JUDGES: Glassman, J. wrote the opinion. McKusick, C.J., and Nichols, Roberts, Violette, Wathen, Glassman, and Scolnik, JJ.

OPINION BY: GLASSMAN

OPINION

[*958] The plaintiffs, [1] a certified class consisting of all persons who receive Maine state retirement allowances and are subject to income taxation by the State of Maine, appeal from an order of the Superior Court, Sagadahoc County, granting the defendant's motion for summary judgment. We agree with the decision of the Superior Court and affirm the judgment.

    1    The case was certified as a class action pursuant to M.R. Civ. P. 23 on July 11, 1980. The court's order certified the class to be "all persons receiving Maine State Retirement benefits who are subject to income taxation by the State of Maine, not excluding those who are not presently taxed on said retirement benefits under federal law."

[**2] Following the state tax assessor's decision on the petition of the plaintiffs for reconsideration, the plaintiffs instituted this action against the assessor in the Superior Court. The plaintiffs sought review of the assessor's determination that Maine state retirement benefits and allowances in excess of employees' contributions were subject to state income tax. The complaint also alleged the plaintiffs' federal and state constitutional rights to due process, freedom of contract, and equal protection had been violated by the assessor's decision.

Both parties moved for summary judgment, neither presenting issues of fact for resolution. The Superior Court granted the defendant's motion, deciding that by enactment of the state income tax in 1969, the legislature

impliedly repealed 5 M.R.S.A. § 1003 (Supp. 1984), which exempted state retirement benefits from taxation. The court found that the "enactment of a comprehensive system of taxation 'completely covers' the subject matter of state income taxation and its exemptions." The court further found that by adopting the specific federal definition of "income," the legislature intended to repeal section 1003. Additionally, the court [**3] held that subsection 11 of 36 M.R.S.A. § 5102 bars reference to 5 M.R.S.A. § 1003 to support a different meaning for a term used in the income tax statutes. [2] Finally, the court found the [*959] plaintiffs' constitutional and contract claims to be without merit.

> 2    [HN1] Subsection 11 provides in pertinent part:
>
> > **11. Other terms.** Any other term used in this Part has the same meaning as when used in a comparable context in the laws of the United States relating to federal income taxes, unless a different meaning is clearly required.
>
> 36 M.R.S.A. § 5102, subsec. 11 (Supp. 1984).

This case involves the continued vitality of the first paragraph of 5 M.R.S.A. § 1003, originally enacted in essentially its present form in 1942, when the Maine state retirement system was instituted. [3] [HN2] The section states in pertinent part:

> The right of a person to a retirement allowance, such retirement allowance itself, to the return of contributions, any optional benefit or death benefit or any other right [**4] accrued or accruing to any person under this chapter, and the moneys in the various funds created thereby, shall be exempted from any state, county or municipal tax in the State . . . .

5 M.R.S.A. § 1003 (Supp. 1984).

> 3    Section 1003 was amended in 1983 by the addition of a second paragraph providing for the availability of state retirement allowances "to satisfy child support obligations otherwise enforceable by execution, garnishment,

attachment, assignment or other process." 5 M.R.S.A. § 1003 (Supp. 1984).

The precise question presented is whether enactment of the state income tax system in 1969 repealed by implication the exempt status of state retirement benefits. [HN3] Title 36 M.R.S.A. § 5111 imposes a tax "for each taxable year on the entire taxable income of every resident individual of this State." 36 M.R.S.A. § 5111 (Supp. 1984). Section 5121 of title 36 defines "entire taxable income" as:

> federal adjusted gross income as defined in the laws of the United States with the modifications [**5] and less the deductions and personal exemptions provided in this chapter.

36 M.R.S.A. § 5121 (1978). The Internal Revenue Code defines adjusted gross income as gross income minus enumerated deductions, none of which apply to the retirement benefits in excess of employees' contributions at issue here. *See* I.R.C. § 62. The Code clearly includes income derived from pensions and retirement allowances in an individual's federal gross income. I.R.C. § 61(a)(11). None of the modifications, deductions, or personal exemptions provided by chapter 805 of title 36 involves state retirement allowances. *See* 36 M.R.S.A. §§ 5122, 5123, 5124-A, 5125, 5126 (1978 & Supp. 1984).

[HN4] This court will find a repeal by implication when a later enactment encompasses the entire subject matter of an earlier act, or when a later statute is inconsistent with or repugnant to an earlier statute. *State v. London*, 156 Me. 123, 127, 162 A.2d 150, 152 (1960); *accord State ex rel. Tierney v. Ford Motor Co.*, 436 A.2d 866, 871 (Me. 1981). When a later statute does not cover the earlier act in its entirety, but is inconsistent with only some of its provisions, a repeal by implication occurs [**6] to the extent of the conflict. *State v. London*, 156 Me. at 128, 162 A.2d at 153.

We find no merit in the plaintiffs' contention that there is no inconsistency between the statutes on which to premise an implied repeal of section 1003. Relying on subsection 11 of 36 M.R.S.A. § 5102, the plaintiffs claim that section 1003 "clearly requires" a different meaning than that ascribed to "entire taxable income" by the laws of the United States. We agree with the Superior Court's holding that the subsection 11 language "unless a

different meaning is clearly required" applies only to the tax statutes in title 36 M.R.S.A. [4] The legislature's adoption in section 5121 of the federal definition of "adjusted gross income," which incontrovertibly includes retirement allowances, is patently contrary to the 1942 exemption.

> 4  We do not, however, perceive subsection 11 to command our passive acceptance of all interpretations of language in the federal statute as pronounced by federal tribunals. *Central Maine Power Co. v. Public Utilities Commission*, 382 A.2d 302, 320 (Me. 1978).

[**7] In *Tiedemann v. Johnson*, this court discussed the legislative intent behind the adoption of federal adjusted gross income as the standard by which "entire taxable income" would be measured in Maine, concluding:

> [*960] The Legislature intended to resolve, *a priori*, semantic conflicts such as those suggested by the bare words of the statute. As evidence of this intent, the Legislature did not undertake creation of a unique or complicated income tax scheme. Nor did it provide the vast administrative machinery which would be necessary to supply the interpretive and investigative functions of the Internal Revenue Service. We think . . . that our Legislature sought to foreclose the necessity for determination of the "source, nature or composition of the funds."

316 A.2d 359, 364 (Me. 1974) (quoting *Katzenberg v. Comptroller of the Treasury*, 263 Md. 189, 282 A.2d 465, 473 (1971)).

The plaintiffs contend that our determination of the legislature's intent in *Tiedemann* applies only to title 36 and does not affect the exemptions of 5 M.R.S.A. § 1003. We find the plaintiffs' construction of "semantic conflicts such as those suggested by the bare words [**8] of the statute" too narrow. The legislature in 1969 enacted a

comprehensive system of state income taxation that pre-empted the entire area, wherever in the revised statute reference may be found.

This court has never favored finding the implied repeal of one statute by another and will not uphold such a result in a dubious case. *State v. London*, 156 Me. at 126, 162 A.2d at 152; *accord State ex rel. Tierney v. Ford Motor Co.*, 436 A.2d at 871. In this case there is no question that the adoption of the federal definition of "adjusted gross income" is clearly inconsistent with the 1942 exemption from state tax in section 1003. [5] We therefore give effect to the later statute as the most recent expression of the legislative will. *State v. London*, 156 Me. at 128-29, 162 A.2d at 153-54 (quoting *Knight v. Aroostook River Railroad Co.*, 67 Me. 291, 293 (1877)).

> 5  Our decision has no effect on the remaining provisions of section 1003; the section is repealed by implication only to the extent of the conflict with the 1969 enactment.

[**9] The plaintiffs argue that a repeal of section 1003 would amount to a breach of contract, on the theory that the tax-exempt status of their retirement benefits is an essential term of their "contractual" retirement plan arrangement with the state. They also argue that an implied repeal of section 1003 deprives the plaintiffs of property without due process and violates the plaintiffs' equal protection right. Even if we were to find the exemption to be a contractual right of state employment, the legislative grant of such a right would violate the Maine Constitution, which states: [HN5] "The Legislature shall never, in any manner, suspend or surrender the power of taxation." Me. Const. art. 9, § 9. We cannot presume the legislature would intentionally enact a statute that would contract away the power to tax on a permanent basis. We hold that the plaintiffs have no contractual entitlement to tax-exempt retirement benefits; we therefore need not reach the plaintiffs' constitutional challenges.

The entry is:

Judgment affirmed.



**W. A. BOLTON, Respondent, v. TERRA BELLA IRRIGATION DISTRICT, Appellant**

**Civ. No. 215**

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT**

**106 Cal. App. 313; 289 P. 678; 1930 Cal. App. LEXIS 525**

**June 9, 1930, Decided**

**SUBSEQUENT HISTORY:** [***1] A Petition for a Rehearing of this Cause was Denied by the District Court of Appeal on June 30, 1930, and a Petition by Respondent to have the Cause Heard in the Supreme Court, after Judgment in the District Court of Appeal, was Denied by the Supreme Court on August 7, 1930.

**PRIOR HISTORY:** APPEAL from a judgment of the Superior Court of San Diego County. S. M. Marsh, Judge.

**DISPOSITION:** Reversed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant irrigation district challenged an order from the Superior Court of San Diego County (California), which in respondent purchaser's partition action against his partner and the district, adjudicated that the district had no lien upon land acquired by the purchaser and his partner in a tax sale.

**OVERVIEW:** The purchaser acquired land in a tax sale and commenced an action against his partner and the irrigation district seeking, inter alia, to quiet his title to the property as against the district's lien for the prior owner's delinquencies in the payment of assessments. The lower court found that the district had no lien against the property. On appeal, the court reversed the judgment holding that the purchaser did not take title to the land free from the lien of the district assessments. The court determined that the purchaser acquired the land by virtue of Cal. Pol. Code § 3785, which provided that a deed could not be delivered until redemption was made of all taxes of any previous delinquency and that such deed was subject to the provisions of Cal. Pol. Code § 3787. The court found that § 3787 provided that title would pass by the deed and that district taxes were an exception to the clear title. The court concluded that aside from § 3787, there was no statute providing that an unencumbered deed passed to the purchaser from the tax sale and in the absence of statutes providing otherwise, the deed was subject to all existing liens, including the district's assessment liens.

**OUTCOME:** The court reversed a judgment against the irrigation district's lien on property acquired by the purchaser from a tax sale.

**CORE TERMS:** deed, irrigation district, levied, state taxes, tax deed, tax sales, delinquent, county taxes, legislative intent, encumbrances, collected, purchaser, delegated, convey, public agency, tax collector, legal rights, statutory construction, conveyed, quiet, municipal, general laws, state government, power of taxation, equitable relief, real property, incorporating, irrigation, grantee, annual

**LexisNexis(R) Headnotes**

*Governments > State & Territorial Governments > Legislatures*
*Tax Law > State & Local Taxes > Administration & Proceedings > Tax Liens*
*Tax Law > State & Local Taxes > Real Property Tax > Assessment & Valuation > General Overview*

[HN1] Section 40 of the Irrigation District Act provides that the assessment upon land is a lien against the property assessed from and after the first Monday in March for any year. County taxes also become a lien on the first Monday in March in each year. Cal. Pol. Code § 3718. An irrigation district is a public agency of the state. The legislature can without referring the matter to local authority, institute and carry out projects, having purposes similar to those of an irrigation district. The legislature has power to determine how revenues shall be levied and collected, whether by the state itself or by local legislative or administrative agencies. The county is an agency of the state for performing certain functions of government. The legislature has likewise provided for, and authorized, irrigation districts to carry out another function of government.

*Governments > Local Governments > Elections*
*Governments > Public Improvements > General Overview*
*Tax Law > State & Local Taxes > Real Property Tax > Assessment & Valuation > General Overview*

[HN2] For the purpose of meeting the cost of acquiring property, the district is authorized, upon the vote of a majority of its electors, to issue its bonds, and these bonds and the interest thereon are to be paid by revenues derived under the power of taxation, and for which all the real property in the district is to be assessed. Under this power of taxation, one of the highest attributes of sovereignty, the title of the delinquent owner of the real estate assessed, may be divested by sale, and power is conferred upon the board of directors to establish equitable by-laws, rules, and regulations for the distribution and use of water among the owners of said lands, and generally to perform all such acts as shall be necessary to fully carry out the purpose of the act. Here are found the essential elements of a public corporation, none of which pertain to a private corporation. The property held by the corporation is in trust for the public, and subject to the control of the state. Its officers are public officers, chosen by the electors of the district, and invested with public duties. Where a corporation is composed exclusively of officers of the government, having no personal interest in it, or with its concerns, and only acting as organs of the state in effecting a great public improvement, it is a public corporation.

*Tax Law > State & Local Taxes > Administration & Proceedings > Assessments*
*Tax Law > State & Local Taxes > Administration & Proceedings > Tax Liens*
*Tax Law > State & Local Taxes > Sales Tax > General Overview*

[HN3] Where a statute makes the state taxes a superior lien to municipal taxes or local assessments, or where both classes of taxes are to be collected in the same manner and by the same proceedings, those of the latter class will be cut off and their lien extinguished by a sale for state taxes in which the local taxes or assessments might have been included. But otherwise the purchaser will take subject to existing taxes of the inferior class.

*Governments > Public Improvements > Assessments*
*Governments > State & Territorial Governments > Legislatures*
*Tax Law > State & Local Taxes > Real Property Tax > General Overview*

[HN4] An irrigation district assessment, although it is an annual charge, it is an assessment for benefits. The legislature is authorized to apportion the amount of money to be raised in order to meet the expenses of an improvement according to either the ad valorem or assessment according to benefits plan, or to adopt any principle of apportionment which might be devised under the sovereign power of taxation.

*Real Property Law > Financing > Secondary Financing > Lien Priorities*
*Tax Law > State & Local Taxes > Administration & Proceedings > Tax Liens*
*Tax Law > State & Local Taxes > Real Property Tax > General Overview*

[HN5] A lien for unpaid taxes or assessments is superior to all contract liens, whether prior or subsequent in time. But even a tax lien is not entitled to rank ahead of a preexisting mortgage or other contract lien, unless the legislative enactment creating the tax lien has given it priority. It is competent for the legislature to make taxes a paramount lien on the property of the taxpayer, the consequence being that a lien for taxes takes precedence of every other lien or claim upon the property of

whatsoever kind, however created, and whether attaching before or after the assessment of taxes. But this preference does not belong to the tax lien unless it is so declared by statute, and a law, for example, which merely enacts that taxes shall be a lien on real property does not make them a first lien.

*Tax Law > State & Local Taxes > Real Property Tax > Collection > Tax Deeds & Tax Sales*
[HN6] Cal. Pol. Code §§ 3764 and 3771 provide for a sale by the tax collector direct to an individual. Cal. Pol. Code § 3785b provides the form of a deed where real property should be sold to an individual instead of to the state and also provides that such deed should not be delivered until redemption has been made of all taxes and penalties of any previous tax sale or delinquency. It further provides that the provisions of Cal. Pol. Code §§ 3786 and 3787 are made applicable to the deed herein provided for.

*Real Property Law > Title Quality > General Overview*
*Tax Law > State & Local Taxes > Administration & Proceedings > Tax Liens*
*Tax Law > State & Local Taxes > Real Property Tax > Assessment & Valuation > General Overview*
[HN7] Cal. Pol. Code § 3786 provides that the deed under Cal. Pol. Code § 3785 is primary evidence of certain things set forth in that section. Cal. Pol. Code § 3787 provides that such deed is conclusive evidence of certain other proceedings, and also provides what title shall pass by the deed. In 1913, that portion was amended to provide that taxes levied for municipal purposes should be an additional exception to the clear title passed by such a deed. In 1917 that portion of § 3787 was again amended to include irrigation district taxes as an additional exception, and to provide that such deed conveys to the state the absolute title to the property described therein, free of all encumbrances, except any lien of taxes levied for municipal or irrigation district purposes and except when the land is owned by the United States or this state.

*Tax Law > State & Local Taxes > Administration & Proceedings > Assessments*
*Tax Law > State & Local Taxes > Administration & Proceedings > Tax Liens*
*Tax Law > State & Local Taxes > Public Utilities Tax > General Overview*

[HN8] Cal. Pol. Code § 3787 was amended to provide that the deed under Cal. Pol. Code § 3785 conveys to the state the absolute title to the property described therein, free of all encumbrances, except any lien for taxes levied for municipal, or for irrigation, reclamation, protection, flood control, public utility or other district purposes, or for special assessments which are collected on tax-rolls, and except any lien or assessment for other amounts which by law are collected upon tax-rolls by or for account of municipalities, and except interest and penalties on the same, and other amounts which would be paid municipalities or for their account in the event of redemption of such property from sales for such taxes, assessments or other amounts, and except when the land is owned by the United States or this state.

*Real Property Law > Deeds > Types > Tax Deeds*
*Tax Law > State & Local Taxes > Real Property Tax > General Overview*
[HN9] The phrase "such deed," with which both Cal. Pol. Code §§ 3786 and 3787 begin, must, in the present condition of the code, be understood to refer both to the deed authorized by Cal. Pol. Code § 3785 and to that authorized by Cal. Pol. Code § 3785b.

*Governments > Legislation > Effect & Operation > Amendments*
*Governments > Legislation > Interpretation*
[HN10] When one statute by reference incorporates another, the effect is as though the wording of the incorporated statute had been written at length into the incorporating statute, and that no subsequent amendment or repeal of the statute incorporated has any effect upon the incorporating statute.

*Governments > Legislation > Interpretation*
*Governments > Legislation > Special Acts*
[HN11] It is a rule of statutory construction that the adoption in one statute, for the purpose of carrying its provisions into effect, of the provisions of another statute by reference thereto, does not include subsequent modifications of these provisions in the statute referred to, unless a clear intent to do so is expressed. This rule is subject to a qualified exception in cases of the adoption into a special act of the provisions of law then in force by virtue of general laws. In such cases, subsequent modifications of the general law will be deemed to be within the intent of such adoption, so far as they are

consistent with the purposes of the particular act. A repeal of the adopted statute will not take from the adopting statute the operative force of these provisions, so far as they may be necessary to carry the later statute into effect, but these provisions will be regarded as if they had been originally incorporated therein at length. Under the same principles, any amendment of these provisions of the statute thus adopted, whether it be a particular act or a general law, which so far modifies them as to subvert the purpose of the statute by which they were adopted, will be regarded in the same light as a repeal.

*Governments > Legislation > Interpretation*
[HN12] The main object of all statutory construction is to ascertain the legislative will, and, as it is to be assumed that the legislature intends its acts to have effective operation, such amendments will not be construed as depriving the adopting statute of all effect, unless there is a clear necessity for such construction.

*Governments > State & Territorial Governments > Property*
*Tax Law > State & Local Taxes > Real Property Tax > Collection > General Overview*
*Tax Law > State & Local Taxes > Sales Tax > General Overview*
[HN13] The provisions of Cal. Pol. Code § 3787 are, by Cal. Pol. Code § 3785b, expressly made applicable to deeds executed by the tax collector conveying lands sold to the state to purchasers after the five-year period of redemption. No exceptions are there noted.

*Governments > Legislation > Interpretation*
[HN14] A statute should always be so construed, if reasonably possible, as to give each part thereof the meaning and effect, which from the act as a whole, appears to have been intended.

*Tax Law > State & Local Taxes > Administration & Proceedings > Assessments*
*Tax Law > State & Local Taxes > Administration & Proceedings > Tax Liens*
*Tax Law > State & Local Taxes > Real Property Tax > Assessment & Valuation > General Overview*
[HN15] The word "taxes" as used in the 1917 amendment to Cal. Pol. Code § 3787 refers to the annual assessments

of irrigation districts. The word includes both general taxes and special assessments.

*Governments > State & Territorial Governments > Legislatures*
*Tax Law > State & Local Taxes > Real Property Tax > General Overview*
*Tax Law > State & Local Taxes > Sales Tax > General Overview*
[HN16] Section 46 of the California Irrigation District Act provides that on filing the certificates of sale with such county recorder the lien of the assessments vests with the purchaser, and is only divested by the payment to him, or to the collector for his use, of the purchase money.

*Governments > State & Territorial Governments > Property*
*Tax Law > State & Local Taxes > Real Property Tax > General Overview*
[HN17] The constitution and laws upon the subject of taxing property are to be understood as referring to private property and persons, and not including public property of the state, or any subordinate part of the state government. Statutes authorizing liens on or forced sales of property, generally, will not be held applicable to public property, unless the intention to make them so expressly or plainly appears.

*Tax Law > State & Local Taxes > Administration & Proceedings > General Overview*
[HN18] An individual must stand upon his legal rights and cannot ask for equitable relief against taxes authorized by the state.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

**(1) Taxation--Irrigation Districts--State Agencies.** ----An irrigation district is a public agency of the state; and the legislature has the power to provide for, and authorize, irrigation districts to carry out an irrigation project, and to determine how revenues shall be levied and collected, whether by the state itself or by local legislative or administrative agencies.

**(2) Id.--Tax Deeds--Priority--Legislative Intent.** ----Where an individual claiming title under a tax deed

from the county tax collector is seeking to quiet title against assessments levied by an agency created and empowered to levy assessments by authority delegated from the state, his claims must rest on his strict legal rights, and these depend upon the proper interpretation of statutory enactments, and the question of priority is one of legislative intent.

**(3) Id.--Statutory Construction--Reading Sections Together.** -- --In giving effect to the plain intent of the legislature it is necessary to read the various code sections relating to taxation and tax sales together and in relation to each other, and they are to be construed, if reasonably possible, so as to give each part thereof the meaning and effect which, from the sections as a whole, appears to have been intended.

**(4) Id.--Tax Deed--Excepted Liens.** -- --While an assessment is not in all respects the same as a tax, it has many of the same qualities; and as used in the 1917 amendment to section 3787 of the Political Code, the word "taxes" refers to and includes annual assessments of irrigation districts, as well as general taxes; and under said section a tax deed from the county tax collector is subject to irrigation district assessments.

**(5) Id.--Existing Liens--Statutory Construction.** -- --An individual cannot wipe out a part of the taxes or assessments legally levied under authority of the state government, unless that result clearly and expressly appears to be authorized by statute, and any doubt has to be resolved in favor of the public institution and against the individual.

**(6) Id.--Quieting Title--Equitable Relief--Legal Rights.** -- --In an action by an individual claiming title under a tax deed from the county assessor to quiet title as against the lien of unpaid irrigation district assessments, the plaintiff must stand upon his legal rights and cannot ask for equitable relief against taxes authorized by the state.

**(7) Id.--Priority--Constitutional Law.** -- --The amendment of 1917 to section 3787 of the Political Code providing that irrigation district taxes shall be excepted from the absolute title to be conveyed by a tax deed from the county assessor does not give a priority to irrigation district taxes over state taxes, and said section as thus amended is not unconstitutional as being in violation of article XII, section 6, of the state Constitution.

**SYLLABUS**

The facts are stated in the opinion of the court.

**COUNSEL:** Farnsworth, Burke & Maddox for Appellant.

Herbert C. Kelly for Respondent.

Hankins & Hankins, Griffin & Boone, A. L. Cowell and Charles L. Childers, as Amici Curiae.

**JUDGES:** BARNARD, J. Marks, Acting P. J., and Beaumont, J., pro tem., concurred.

**OPINION BY:** BARNARD

**OPINION**

[**679] [*314] BARNARD, J. This action is in form one of partition, although the plaintiff seeks to quiet his title against the defendants. On June 30, 1924, plaintiff, with one T. G. Kelly, purchased at a tax sale a parcel of land situated within the borders of Terra Bella Irrigation District, in Tulare County, California. The land was sold for delinquent county taxes of the fiscal year 1918-19, and said purchasers received a deed from the county tax collector of Tulare County. It is admitted [***2] that all proceedings leading [*315] up to and included within this sale were regular and valid in all respects. Commencing with the year 1918 and up to and including the year 1924, Terra Bella Irrigation District had in each and every year levied assessments for district purposes on said land. No part of these assessments has even been paid and at the date of the above-mentioned sale, they were all delinquent. From year to year the land was noticed for sale for these delinquencies, and certificates of sale therefor were delivered to said Irrigation District in accordance with the Irrigation District Act, but no deed has yet been passed. Plaintiff commenced this action against the said T. G. Kelly and numerous other defendants for the partition of a number of pieces of land, including the land above referred to, seeking to quiet his title to the same, and joining the appellant Irrigation District as a party defendant, as claiming a lien on the particular parcel referred to. The defendant Terra Bella Irrigation District appeared and set up its lien for the unpaid assessments levied by it, as aforesaid. Defendant Kelly joined with plaintiff against the Terra Bella Irrigation District. [***3] After a trial upon stipulated facts, the trial court adjudged that as against the plaintiff and T. G. Kelly, the defendant Terra Bella Irrigation District has no lien upon the land and

entered its interlocutory decree accordingly. The defendant Irrigation District has appealed from that portion of the decree.

The only question herein presented is whether or not a purchaser of land upon a sale thereof for delinquent county taxes, takes title thereto free from any lien for delinquent irrigation district taxes or assessments levied on the same land.

[HN1] Section 40 of the Irrigation District Act provides, "The assessment upon land is a lien against the property assessed from and after the first Monday in March for any year." (Henning's Gen. Laws, p. 1255.) County taxes also become a lien on the first Monday in March in each year. (Sec. 3718, Pol. Code.) **(1)** An irrigation district is a public agency of the state. It has been held that the legislature could, without referring the matter to local authority, institute and carry out projects, having purposes similar to those of an irrigation district. ( *People* v. *Sacramento Drainage Dist.*, 155 Cal. 373 [103 P. 207].) The legislature has [***4] power to determine how revenues shall be levied and collected, [*316] whether by the state itself or by local legislative or administrative agencies. The county is an agency of the state for performing certain functions of government. The legislature has likewise provided for, and authorized, irrigation districts to carry out another function of government. In the case of *In re Madera Irr. Dist.*, 92 Cal. 296 [27 Am. St. Rep. 106, 14 L. R. A. 755, 28 P. 272, 675], [**680] in discussing the nature and powers of an irrigation district the court said:

[HN2] "For the purpose of meeting the cost of acquiring this property, the district is authorized, upon the vote of a majority of its electors, to issue its bonds, and these bonds and the interest thereon are to be paid by revenues derived under the power of taxation, and for which all the real property in the district is to be assessed. Under this power of taxation, -- one of the highest attributes of sovereignty, -- the title of the delinquent owner of the real estate assessed, may be divested by sale, and power is conferred upon the board of directors to establish equitable by-laws, rules, and regulations for the distribution and use of [***5] water among the owners of said lands, and generally to perform all such acts as shall be necessary to fully carry out the purpose of the act. Here are found the essential elements of a public corporation, none of which pertain to a private corporation. The property held by the corporation is in

trust for the public, and subject to the control of the state. Its officers are public officers, chosen by the electors of the district, and invested with public duties. Its object is for the good of the public, and to promote the prosperity and welfare of the public. 'Where a corporation is composed exclusively of officers of the government, having no personal interest in it, or with its concerns, and only acting as organs of the state in effecting a great public improvement, it is a public corporation.' (Angell and Ames on Corporations, sec. 32.)"

Such districts have been held to be public agencies. ( *Lindsay-Strathmore Irr. Dist.* v. *Superior Court*, 182 Cal. 315 [187 P. 1056].) In the case of *Whiteman* v. *Anderson-Cottonwood Irr. Dist.*, 60 Cal. App. 234 [212 P. 706, 708], the court said:

"In fact, it has been consistently held by the Supreme Court from the beginning, [***6] that these districts created under [*317] the elaborate scheme devised for their organization and operation by the legislature are public agencies for the promotion of a public purpose."

The general rule in reference to the relation of state taxes to local assessments is thus put in 37 Cyc. 1478.

[HN3] "Where the statute makes the state taxes a superior lien to municipal taxes or local assessments, or where both classes of taxes are to be collected in the same manner and by the same proceedings, those of the latter class will be cut off and their lien extinguished by a sale for state taxes in which the local taxes or assessments might have been included. But otherwise the purchaser will take subject to existing taxes of the inferior class."

It is true that [HN4] an irrigation district assessment, although it be an annual charge, has been usually interpreted as an assessment for benefits. ( *San Diego* v. *Linda Vista Irr. Dist.*, 108 Cal. 189 [35 L. R. A. 33, 41 P. 291]; *In re Madera Irr. Dist., supra; Barber* v. *Galloway*, 195 Cal. 1 [231 P. 34].) In referring to the method used by irrigation districts in making assessments, the Supreme Court has said:

". . . this court [***7] . . . basing its decision upon the very early case of *Emery* v. *San Francisco*, 28 Cal. 345, as approved in the case of *In re Madera Irr. Dist.*, 92 Cal. 296 [27 Am. St. Rep. 106, 14 L. R. A. 755, 28 P. 272, 675], . . . held that the legislature was authorized to apportion the amount of money to be raised in order to meet the expenses of the improvement according to either

the *ad valorem* or assessment according to benefits plan, or to adopt any principle of apportionment which might be devised under the sovereign power of taxation." ( *County of Los Angeles* v. *Hunt*, 198 Cal. 753 [247 P. 897, 902].)

In the Municipal Utility Act (Stats. 1921, p. 245), the distinction between assessments and taxes is entirely eliminated. Under that act its so-called assessments become taxes and are collected with other taxes. While county taxes are made up of a composite rate for general purposes, for road districts, for school districts and for a number of other purposes, irrigation taxes are not included. It is true, however, that such assessments are levied by an agency created by the state for a public purpose, and under an authority delegated by the state. While the cases [***8] have referred to the annual [*318] assessments levied by an irrigation district as assessments rather than as taxes, they are in many respects more like county taxes than like assessments for street improvements or assessments for the benefit of other particular property. While general county taxes are often referred to as state taxes, as a matter of fact, no taxes for purely state purposes have been levied on real estate in California since 1911, but all general taxes have been levied by authority delegated from the state, either to the county or some other subdivision or district. During the same time there has also been apparent a growing tendency, as shown by the statutes adopted by the legislature, to treat the taxes or assessments levied under such delegated authority as equal.

The respondent relies upon the decisions in a number of cases from other jurisdictions and in such cases as *Dougherty* v. *Henarie*, 47 Cal. 9, and *California Loan etc. Co.* v. *Weis*, 118 Cal. 489 [50 P. 697, 699]. In *Dougherty* v. *Henarie* the court held that a deed based upon a tax sale transferred the title free from all prior liens for taxes or assessments. This [**681] decision [***9] was based on a statute then existing which provided that the tax deed "shall convey to the grantee the absolute title to the lands described in said deed, free and clear of all encumbrances, liens, claims, rights, titles and interest of every kind, of any person or persons . . . excepting only the right and title of the United States or of the State of California," and further that "all right, title, interest, claim, and possession acquired by any individual, corporation, or body politic has been subrogated to the grantee." In *California Loan etc. Co.* v. *Weis, supra*, the court also held that a tax deed conveyed

the property free from any other lien basing its decision upon the statute as it then existed, which provided that such deed conveys to the grantee the absolute title to the land described therein free of all encumbrances except the lien for taxes which may have attached subsequent to the sale. This case also held that while it is within the power of the legislature to make the lien of taxes paramount to all other liens upon the land, so that when a sale is made the purchaser takes title free from all encumbrances, whether or not this state has so provided is to be determined [***10] only by its statutes, the court saying: "As this matter, the power being conceded, depends for its determination entirely upon statutory enactment, adjudications [*319] in sister states will be of little value unless based upon identical laws."

(2) This case being one where an individual is seeking to quiet title against assessments levied by an agency created and empowered to levy assessments by authority delegated from the state, his claims must rest on his strict legal rights and these depend upon the proper interpretation of statutory enactments. The question of priority is one of legislative intent. In *Guinn* v. *McReynolds*, 177 Cal. 230 [170 P. 421, 422], the court said:

[HN5] "A lien for unpaid taxes or assessments is generally held to be superior to all contract liens, whether prior or subsequent in time. But the authorities declare, virtually without dissent, that even a tax lien is not entitled to rank ahead of a preexisting mortgage or other contract lien, unless the legislative enactment creating the tax lien has given it priority," citing 37 Cyc. 1143, where the rule is stated thus:

"It is competent for the legislature to make taxes a paramount lien on the property [***11] of the taxpayer, and this has been done in many states, the consequence being that a lien for taxes takes precedence of every other lien or claim upon the property of whatsoever kind, however created, and whether attaching before or after the assessment of taxes. But this preference does not belong to the tax lien unless it is so declared by statute, and a law, for example, which merely enacts that taxes shall be a lien on real property does not make them a first lien."

Again in the case of *Guinn* v. *McReynolds* the court said:

"In dealing with taxes or assessment liens, as with

others, our decisions have recognized that the question of priority is one of legislative intent."

There is no statute making county taxes paramount to irrigation district assessments in the sense here claimed, unless this results from a proper interpretation of those sections of the Political Code governing deeds given to an individual in pursuance of sales whereby former owners have been divested of title for nonpayment of taxes.

Prior to 1913 all sales for delinquent state and county taxes were made only to the state, the form of such a deed to the state being provided in section 3785 of the Political [***12] Code. In 1913, [HN6] sections 3764 and 3771 of the Political Code [*320] were amended to provide also for a sale by the tax collector direct to an individual, and it is pursuant to such a sale that the respondent herein claims title. In 1913 section 3785b was added to the same code, providing the form of a deed where real property should be sold to an individual instead of to the state, in accordance with the amendments of that year, and also providing that such deed should not be delivered until redemption had been made of all taxes and penalties of any previous tax sale or delinquency. It further provided as follows:

"The provisions of sections 3786 and 3787 of this code are hereby made applicable to the deed herein provided for."

[HN7] Section 3786 has not since been amended and provides that such deed is primary evidence of certain things set forth in that section. Section 3787 provides that such deed is conclusive evidence of certain other proceedings, and also provides what title shall pass by the deed. In 1913, that portion was amended to provide that taxes levied for municipal purposes should be an additional exception to the clear title passed by such a deed. In 1917 that portion [***13] of section 3787 was again amended to include irrigation district taxes as an additional exception, and then read as follows:

"Such deed conveys to the state the absolute title to the property described therein, free of all encumbrances, except any lien of taxes levied for municipal or irrigation district purposes and except when the land is owned by the United States or this state . . ."

Again in 1927, [HN8] this section was amended so that that portion thereof reads as follows:

"Such deed conveys to the state the absolute title to the property described therein, free of all encumbrances, except any lien for taxes levied for municipal, or for irrigation, [**682] reclamation, protection, flood control, public utility or other district purposes, or for special assessments which are collected on tax-rolls, and except any lien or assessment for other amounts which by law are collected upon tax-rolls by or for account of municipalities, and except interest and penalties on the same, and other amounts which would be paid municipalities or for their account in the event of redemption of such property from sales for such taxes, assessments or other amounts, and except when the land is owned by the United [***14] States or this state . . ."

[*321] Section 3785b was amended in 1925 to correct the reference therein to section 3771 of the same code. Prior to this change in 1925, 3785b had authorized a deed whenever a sale had been made to an individual, "in pursuance of section 3771 of this code." But in 1921 the legislature had added 3771a to that code, and the provision authorizing a sale to an individual, instead of to the state, which had previously been in section 3771, was then placed in the new section 3771a.

After the above-mentioned changes in 1913, the provisions of section 3787 of the Political Code referred to the deed provided for in section 3785b, as well as to that of section 3785. In *Bernhard* v. *Wall*, 184 Cal. 612 [194 P. 1040, 1045], the court defines the meaning of the phrase "such deed" as used in these sections, as follows:

"It is proper here to explain that [HN9] the phrase 'such deed,' with which both sections 3786 and 3787 begin, must, in the present condition of the code, be understood to refer both to the deed authorized by section 3785 and to that authorized by section 3785b. When the code was first enacted, and until the year 1909, the three sections -- [***15] 3785, 3786 and 3787 -- appeared therein in regular consecutive order, with no intervening sections. The phrase 'such deed' in sections 3786 and 3787 then necessarily referred to section 3785, it being then the only section authorizing a tax deed. In 1909 section 3785a, and in 1913 section 3785b, were interpolated between section 3785 and section 3786, thus giving rise to some uncertainty as to the particular deed or deeds to which the phrase 'such deed' applied. We are satisfied that it now refers both to section 3785 and section 3785b, and applies to the deeds authorized by both sections."

While the court there mentions only the phrase "such deed" in the first paragraph of the section, it is perfectly apparent that the same reasoning applies to the same phrase in the second paragraph thereof.

Respondent argues that it is a general rule that [HN10] when one statute by reference incorporates another, the effect is as though the wording of the incorporated statute had been written at length into the incorporating statute, and that no subsequent amendment or repeal of the statute incorporated has any effect upon the incorporating statute. In support of this he cites *People* v. *Whipple* [***16] , 47 Cal. 592; *Spring* [*322] *Valley W. W.* v. *San Francisco*, 22 Cal. 434; *Ventura County* v. *Clay*, 112 Cal. 65 [44 P. 488]; *In re Burke*, 190 Cal. 326 [212 P. 193]; *Vallejo* v. *Reed*, 177 Cal. 249 [170 P. 426]; *Ramish* v. *Hartwell*, 126 Cal. 443 [58 P. 920, 921]. He therefore argues that since the amendment to section 3787, making irrigation district taxes an additional exception to the clear title passed by such deed, was adopted in 1917, and such a provision was not in that section in 1913 when the provisions of said section were by the terms of section 3785b made applicable to the deed therein authorized, this *ipso facto* gives priority to state taxes over irrigation district taxes. As we have heretofore noted, this depends upon legislative intent. In *Ramish* v. *Hartwell, supra*, the court uses the following language:

[HN11] "It is a rule of statutory construction that the adoption in one statute, for the purpose of carrying its provisions into effect, of the provisions of another statute by reference thereto, does not include subsequent modifications of these provisions in the statute referred to, unless a clear intent to do so [***17] is expressed. This rule is subject to a qualified exception in cases of the adoption into a special act of the provisions of law then in force by virtue of general laws. In such cases, subsequent modifications of the general law will be deemed to be within the intent of such adoption, so far as they are consistent with the purposes of the particular act. (See *Kirk* v. *Rhoads*, 46 Cal. 398.) A repeal of the adopted statute will not take from the adopting statute the operative force of these provisions, so far as they may be necessary to carry the later statute into effect, but these provisions will be regarded as if they had been originally incorporated therein at length. ( *Spring Valley W. W.* v. *San Francisco*, 22 Cal. 434; *People* v. *Clunie*, 70 Cal. 504 [11 P. 775]; *Collins* v. *Blake*, 79 Me. 218 [9 A. 358]; *Darmstaetter* v. *Maloney*, 45 Mich. 621 [8 N.W. 574];

Sutherland on Statutory Construction, sec. 257.) Under the same principles, any amendment of these provisions of the statute thus adopted, whether it be a particular act or a general law, which so far modifies them as to subvert the purpose of the statute by which they were adopted, [***18] will be regarded in the same light as a repeal. [HN12] The main object of all statutory construction is to ascertain the legislative will, and, as it is to be assumed that the legislature [*323] intends its acts to have effective operation, such amendments will not be construed as depriving the adopting statute of all effect, unless there is a clear necessity for such construction."

In the decisions relied upon by respondent the Supreme Court has, of course, followed the [**683] intention of the legislature. In *People* v. *Whipple*, the incorporating statute in creating an office defined the duties thereof by referring to another statute, and the court held that a later repeal of the other statute did not affect the incorporating statute as it, in effect, included the words of the other statute within itself. *Ventura Co.* v. *Clay*, 112 Cal. 65 [44 P. 488], involves a similar state of facts. In *Spring Valley W. W.* v. *San Francisco* it was held that the amendments made such a complete change that the sections referred to were entirely insufficient to cover the matter in question without the addition of other sections. *In re Burke* expressly reserves an opinion on the [***19] point now under discussion so far as the facts in that case are concerned. In *Vallejo* v. *Reed*, an entirely new section of the number in question had later been adopted, which contained no vestige of the original section. We think that these cases are not controlling in the matter before us, and that the instant case comes rather under both of the exceptions mentioned in *Ramish* v. *Hartwell*.

Since sections 3786 and 3787 contained in 1913, and still contain, all of the statutory provisions defining the effect of the deed in question and what title shall pass thereby, including all of the general laws on that particular subject, it would seem to come under one of the exceptions noted. Also, a careful reading of all of the sections involved seems to disclose a clear intent on the part of the legislature to make amendments of section 3787 apply to section 3787b. Prior to 1913, section 3787 referred to the deed to the state mentioned in section 3785. An entirely new plan for disposing of land upon which taxes had remained unpaid for five years was introduced by the amendments of 1913, and section 3785b was interpolated for the purpose of providing for

the giving of a deed [***20] in accordance with such new plan. The fact that it made applicable to the new deed therein provided for, all of the statutory provisions covering the title that should be conveyed thereby and the effect thereof, which had [*324] applied and which continued to apply to the other and older plan of deed to the state, which provisions were all set forth in sections 3786 and 3787, is a strong indication that it was the intention of the legislature to make the deed to an individual, in respect to the title conveyed, a counterpart of the deed to the state. No good reason appears why the two deeds should be different, nor why the one to an individual should convey more than the one to the state, and a reading of the code sections indicates that such was not the legislative intent. Having in mind the purpose to be accomplished, and the fact that a new deed was being provided for, that otherwise followed the plan of the older deed, the language used, "The provisions of sections 3786 and 3787 of the code are hereby made applicable to the deed herein provided for" lends some support to this view. It must also be borne in mind that the amendment of 1917 made no change in the general purpose [***21] of section 3787, but merely included another item of the same general nature. It is also most significant that when in 1925 it became necessary for the legislature to amend section 3785b, in order to correct a reference therein to section 3771 of the Political Code, as hereinbefore referred to, although section 3787 had in the meantime been amended by the insertion of the clause about irrigation district taxes, the provision now under consideration was not changed. It would, therefore, seem that it was within the intention of the legislature in adopting section 3785b in 1913, to include such an amendment to 3787 as followed in 1917.

In the case of *Gottstein* v. *Holmes*, 89 Cal. App. 145 [264 P. 310, 311], decided in 1928, in passing upon a tax sale made in 1923 when the law was the same as it was when the sale here in question was made in 1924, the court said: [HN13] "The provisions of section 3787 are, by section 3785b, expressly made applicable to deeds executed by the tax collector conveying lands sold to the state to purchasers after the five-year period of redemption." No exceptions are there noted.

Even if it should be held that the amendment of section 3787 in 1917 did [***22] not become a part of section 3785b, through the reference provision therein, still section 3787 as amended in 1917, was in full force and effect at the time respondent's rights arose and

applies to his case as a separate law. Aside from section 3787 there is no statute providing what [*325] such a deed as is relied on by respondent shall convey to him. In the absence of statutes providing otherwise, respondent's deed would be subject to all existing liens which would include the irrigation district assessment liens here in question. Respondent is forced to rely upon section 3787 to place his title above other encumbrances. He does, in fact, place implicit reliance upon it, insisting, however, that he is entitled to stand upon it as it existed in 1913. If, however, that section applied to his deed in 1924, it applied as it stood in 1924, and his deed was subject to taxes levied for irrigation district purposes. Irrespective of whether this amendment was included in section 3785b by legislative intent, no reason appears why it is not, of itself, an additional qualification of the effect of respondent's deed. There is nothing in section 3785b, as it stood in 1913, including its reference [***23] to section 3787, which forbids the adoption of new qualifications of the same deed. Section 3787, as it stood in 1924, applied to the deed relied on by respondent just as much as if the 1917 amendment thereto had been put into section 3785b, or adopted as an additional section of the code.

[**684] The fallacy of such an interpretation of these various statutes as is insisted upon by respondent, is seen from the fact that to take the exact language used, without regard to the real meaning and intent of the legislature, and without allowing for obvious errors in changing certain sections without correcting co-related sections, would necessarily result in the holding that respondent has no deed at all, because he relies upon a deed given in accordance with section 3785b of the Political Code, and insists that he is entitled to rely on that section absolutely as it stood in 1913, unaffected by later amendments of any other sections and governed by the strict language of that section alone. But he acquired his deed under a sale made in 1924. At that time section 3785b provided that when property had been sold to a purchaser at delinquent tax sale, other than the state of California, in pursuance [***24] to section 3771 of that code, a deed should be issued in the form set forth in said section. But at that time section 3771 of this code did not provide for or authorize or contemplate any deed. In 1921 the law had been changed and the provision authorizing such a deed had been moved from section 3771 to section 3771a of that code.

[*326] **(3)** In giving effect to the plain intent of the legislature it is necessary to read the various sections

together and in relation to each other. [HN14] "A statute should always be so construed, if reasonably possible, as to give each part thereof the meaning and effect, which from the act as a whole, appears to have been intended." ( *In re Reineger*, 184 Cal. 97 [193 P. 81, 83].) **(4)** There can be no question that [HN15] the word "taxes" as used in the 1917 amendment to section 3787 refers to the annual assessments of irrigation districts. The word includes both general taxes and special assessments. ( *Los Angeles County F. C. Dist.* v. *Hamilton*, 177 Cal. 119 [169 P. 1028].) While an assessment is not in all respects the same as a tax, it has many of the same qualities of a tax and an irrigation district assessment has been specifically given a lien [***25] on the real property within the district, and the provisions of section 3787 of the Political Code make such a deed as is relied on by the respondent, subject to irrigation district assessments.

An additional reason why the irrigation district assessment in question has not been wiped out by the tax sale referred to is found in another express provision adopted by the state legislature. In speaking of such assessments, [HN16] section 46 of the California Irrigation District Act says:

". . . on filing the certificates (of sale) with such County Recorder the lien of the assessments vests with the purchaser, and is only divested by the payment to him, or to the collector for his use, of the purchase money . . ."

While, as has been pointed out, the decisions of other states are of little value unless based upon similar statutes, we desire to call attention to a decision from the state of New York. The New York statute provided that a conveyance upon a sale of land for a state tax vested in the grantee an absolute estate in fee, subject, however, to all of the claims which the people of the state had thereupon for taxes or other liens or encumbrances. We take it this statute is not essentially [***26] dissimilar from our own in the respect under discussion, since an irrigation district is a public agency deriving its power to tax from the state itself. In *Rochester* v. *Kapell*, 86 A.D. 224 [83 N.Y.S. 640], affirmed in 177 N.Y. 533 [69 N.E. 1121], the court said:

"The tax for the nonpayment of which the sale to appellant was made included a state tax to be collected by the [*327] county, and it is claimed that the only tax liens which are preserved under the language of this section, are pure state taxes. This, we apprehend, is too

narrow a construction of the language of the section. The source of all power to tax within the state, whether by the state, the city, the town, or the county, is the legislature. The legislature has the right to provide for the protection of all such taxes. The policy of the law is to insure the collection of all taxes. We must assume that the legislature intended no conflict between the systems of taxation provided by it for the several political divisions above referred to. It could not have intended that a sale for taxes by one division should cut off and nullify sales made by other divisions for other taxes. The more reasonable [***27] construction of this section is one that preserves all liens for taxes, whether state, county, town or city. All of these political subdivisions represent the people of the state, and their taxes are all claims of the people of the state. This construction results in effect in the principle that no individual can secure a perfect title to real property, purchased upon a tax sale, without paying all taxes thereon imposed by any political subdivision of the state. This is a reasonable and salutary doctrine."

In *Webster* v. *Board of Regents*, 163 Cal. 705 [126 P. 974, 976], in referring to a tax sale as against a mortgage held by the state the court said:

"The rule applicable thereto is thus expressed in *People* v. *Doe*, 36 Cal. 220: [HN17] 'The Constitution and laws upon the subject of taxing property, are, therefore, to be understood as referring to private property and persons, and not including public property of the state, or any subordinate part of the state government.' (See, also, *People* v. *McCreery*, 34 Cal. 432; *Low* v. *Lewis*, 46 Cal. 549; *Doyle* v. *Austin*, 47 Cal. 353; *Smith* v. *Santa Monica*, 162 Cal. 221 [121 P. 920].) The general [***28] rule applied in all such cases is that statutes authorizing liens on or forced sales of property, [**685] generally, will not be held applicable to public property, unless the intention to make them so expressly or plainly appears."

**(5)** In the absence of statutory provisions to the contrary, the same reasoning would apply to an attempt upon the part of an individual to wipe out a part of the taxes or assessments legally levied under authority of the state government. We think this cannot be done unless that [*328] result clearly and expressly appears to be authorized by statute. Any doubt would necessarily have to be resolved in favor of the public institution and against the individual.

**(6)** In such an action as the one at bar, [HN18] an individual must stand upon his legal rights and cannot ask for equitable relief against taxes authorized by the state. ( *Couts* v. *Cornell*, 147 Cal. 560 [109 Am. St. Rep. 168, 82 P. 194]; *Esterbrook* v. *O'Brien*, 98 Cal. 671 [33 P. 765].) In *Imperial Land Co.* v. *Imperial Irr. Dist.*, 173 Cal. 660 [161 P. 113, 116], the court said:

"The complaint contained no offer to pay the amount due. 'It is now firmly settled by our decisions that [***29] where a property owner applies for equitable relief against the public authorities, as, for example, to restrain proceedings for the collection or enforcement of taxes assessed against it, or to enjoin the execution of a tax deed, or to cancel a lien or charge for taxes, of record against his land, and it appears that all or some part of the tax charged is justly and equitably due from plaintiff, or chargeable upon the land, he must, as a condition of obtaining such relief, first pay or offer to pay the amount justly due, or he must be required to do so before the relief to which he shows himself entitled is given.' (Citing cases.) The principle has been applied to an action to enjoin a sale of land for delinquent assessments of an irrigation district organized under the Wright Act, in force prior to the enactment of the statute here involved."

**(7)** It is further urged that the amendment of 1917 to section 3787 of the Political Code providing that irrigation district taxes shall be excepted from the absolute title to be conveyed by the sort of deed here in question, is unconstitutional. The only point raised in addition to those which have been frequently passed upon by our courts, in [***30] connection with irrigation district assessments, is the contention that if this amendment were allowed to stand it would give priority to irrigation assessments over state taxes, and thereby be in violation of article XIII, section 6, of the Constitution of California. No such priority is thus given. And no power of taxation has been thereby surrendered or suspended by any grant or contract. Any such powers as have been delegated to irrigation districts by the legislature may be at any time changed or withdrawn.

[*329] The respondent argues in reference to the two sorts of taxes here involved that a sale under one must of necessity extinguish the other. This does not necessarily follow, and we think that the legislature intended to protect the interests of each of these agencies of the state government. The question before us is not as to which party would get title if at the same time the land was sold to one for delinquent county taxes, and to another for delinquent irrigation district assessments. The only question here involved is as to whether one who has purchased land at a general tax sale takes the title thereto free from the lien of any irrigation district assessments [***31] which have theretofore been levied against it. This being entirely a matter of legislative enactment, under the statutes controlling in this case, we are of the opinion that he does not.

For the reasons given it follows that the portion of the interlocutory decree appealed from should be reversed, and it is so ordered.

Marks, Acting P. J., and Beaumont, J., *pro tem.*, concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 30, 1930, and a petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 7, 1930.



**The TRUSTEES OF DARTMOUTH COLLEGE v. WOODWARD.**

**SUPREME COURT OF THE UNITED STATES**

**17 U.S. 518; 4 L. Ed. 629; 1819 U.S. LEXIS 330; 4 Wheat. 518**

**February 25, 1819, Decided**

**PRIOR HISTORY:** [***1] ERROR to the Superior Court of the State of New-Hampshire.

This was an action of trover brought in the State Court, in which the plaintiffs in error declared for two books of records, purporting to contain the records of all the doings and proceedings of the trustees of Dartmouth College, from the establishment of the corporation until the 7th day of October, 1816; the original charter, or letters patent, constituting the college; the common seal; and four volumes or books of account, purporting to contain the charges and accounts in favour of the college. The defendant pleaded the general issue, and at the trial the following special verdict was found:

"The said jurors, upon their oath, say, that his Majesty George the Third, King of Great Britain, &c. issued his letters patent, under the public seal of the Province, now State, of New-Hampshire, bearing date the 13th day of December, in the 10th year of his reign, and in the year of our Lord, one thousand seven hundred and sixty-nine, in the words following:

GEORGE the THIRD, by the grace of GOD, of Great Britain, France, and Ireland, KING, Defender of the Faith, and so forth.

To all to whom these presents shall come . . .

[***2] GREETING:

WHEREAS is hath been represented to our trusty and well beloved John Wentworth, Esq. Governor and commander in chief, in and over our Province of New-Hampshire in New-England in America, that the Reverend Eleazar Wheelock, of Lebanon, in the colony of Connecticut, in New-England aforesaid, now Doctor in Divinity, did, no or about the year of our Lord one thousand seven hundred and fifty-four, at his own expense, on his own estate and plantation, set on foot an Indian Charity School, and for several years, through the assistance of well disposed persons in America, clothed, maintained and educated a number of the children of the Indian natives, with a view to their carrying the gospel in their own language, and spreading the knowledge of the great Redeemer, among their savage tribes, and hath actually employed a number of them as missionaries and school masters in the wilderness for that purpose: and by the blessing of God upon the endeavours of said Wheelock, the design became reputable among the Indians, insomuch that a larger number desired the education of their children in said school, and were also disposed to receive missionaries and school masters in the wilderness, [***3] more than could be supported by the charitable contributions in these American colonies.

Whereupon, the said Eleazar Wheelock thought it expedient, that endeavours should be used to raise contributions from well disposed persons in England, for the carrying on and extending said undertaking; and for that purpose the said Eleazar Wheelock requested the Rev. Nathaniel Whitaker, now doctor in divinity, to go over to England for that purpose, and sent over with him the Rev. Samson Occom, and Indian minister, who had been educated by the said Wheelock. And to enable the said Whitaker to the more successful performance of said work, on which he was sent, said Wheelock gave him a

full power of attorney, by which said Whitaker solicited those worthy and generous contributors to the charity, viz. The Right Honourable William, Earl of Dartmouth, the Honourable Sir Sydney Stafford Smythe, Knight, one of the Barons of his Majesty's Court of Exchequer, John Thornton, of Clapham, in the county of Surrey, Esquire, Samuel Roffey, of Lincoln's Innfields, in the county of Middlesex, Esquire, Charles Hardy, of the parish of Saint Mary-le-bonne, in said county, Esquire, Daniel West, of Christ's church, [***4] Spitalfields, in the county aforesaid, Esquire, Samuel Savage, of the same place, Gentleman, Josiah Roberts, of the parish of Saint Edmund, the King, Lombard Street, London, Gentleman, and Robert Keen, of the parish of Saint Batolph Aldgate, London, Gentleman, to receive the several sums of money which should be contributed, and to be trustees for the contributors to such charity, which they cheerfully agreed to.

Whereupon, the said Whitaker did, by virtue of said power of attorney, constitute and appoint the said Earl of Dartmouth, Sir Sydney Stafford Smythe, John Thornton, Samuel Roffey, Charles Hardy, and Daniel West, Esquires, and Samuel Savage, Josiah Roberts, and Robert Keen, Gentlemen, to be trustees of the money which had then been contributed, and which should, by his means, be contributed for said purpose; which trust they have accepted, as by their engrossed declaration of the same, under their hands and seals sell executed, fully appears, and the same has also been ratified, by a deed of trust, well executed, by the said Wheelock.

And the said Wheelock further represents, that he has, by power of attorney, for many weighty reasons, given full power to the said trustees, [***5] to fix upon and determine the place for said school, most subservient to the great end in view; and to enable them understandingly to give the preference, the said Wheelock has laid before the said trustees, the several offers which have been generously made in the several governments in America, to encourage and invite the settlement of said school among them, for their own private emolument, and the increase of learning in their respective places, as well as for the furtherance of the general design in view.

And whereas a large number of the proprietors of lands in the western part of this our province of New-Hampshire, animated and excited thereto, by the generous example of his excellency their governor, and by the liberal contributions of many noblemen and gentlemen in England, and especially by the consideration, that such a situation would be as convenient as any for carrying on the great design among the Indians; and also, considering, that without the least impediment to the said design, the same school may be enlarged and improved to promote learning among the English, and be a means to supply a great number of churches and congregations, which are likely soon to be formed [***6] in that new country, with a learned and orthodox ministry; they, the said proprietors, have promised large tracts of land, for the uses aforesaid, provided the school shall be settled in the western part of our said province. And they, the said right honourable, honourable, and worthy trustees, before mentioned, having maturely considered the reasons and arguments, in favour of the several places proposed, have given the preference to the western part of our said province, lying on Connecticut river, as a situation most convenient for said school.

And the said Wheelock has further represented a necessity of a legal incorporation, in order to the safety and well being of said seminary, and its being capable of the tenure and disposal of lands and bequests for the use of the same.

And the said Wheelock has also represented, that for many weighty reasons, it will be expedient, at least in the infancy of said institution, or till it can be accommodated in that new country, and he and his friends be able to remove and settle by and round about it, that the gentlemen, whom he has already nominated in his last will, (which he has transmitted to the aforesaid gentlemen of the trust in England,) [***7] to be trustees in America, should be of the corporation now proposed. And, also, as there are already large collections for said school, in the hands of the aforesaid gentlemen of the trust in England, and all reason to believe, from their singular wisdom, piety, and zeal to promote the Redeemer's cause, (which has already procured for them the utmost confidence of the kingdom,) we may expect they will appoint successors in time to come, who will be men of the same spirit, whereby great good may and will accrue many ways to the institution, and much be done by their example and influence to encourage and facilitate the whole design in view; for which reason, said Wheelock desires, that the trustees aforesaid may be vested with all that power therein, which can consist with their distance from the same.

Know ye, therefore, That We, considering the premises, and being willing to encourage the laudable and charitable design of spreading christian knowledge among the savages of our American wilderness, and also that the best means of education be established in our province of New-Hampshire, for the benefit of said province, do, of our special grace, certain knowledge, and mere motion, [***8] by and with the advice of our counsel for said province, by these presents, will, ordain, grant, and constitute, that there be a college erected in our said province of New-Hampshire, by the name of Dartmouth College, for the education and instruction of youth of the Indian tribes in this land, in reading, writing, and all parts of learning, which shall appear necessary and expedient, for civilizing and christianizing children of pagans, as well as in all liberal arts and sciences, and also of English youth and any others. And the trustees of said college may and shall be one body corporate and politic, in deed, action, and name, and shall be called, named, and distinguished, by the name of the Trustees of Dartmouth College.

And further, we have willed, given, granted, constituted, and ordained, and by this our present charter, of our special grace, certain knowledge, and mere motion, with the advice aforesaid, do, for us, our heirs and successors forever, will, give, grant, constitute, and ordain, that there shall be in the said Dartmouth College, from henceforth and forever a body politic, consisting of Trustees of said Dartmouth College. And for the more full and perfect erection [***9] of said corporation and body politic, consisting of trustees of Dartmouth College, we, of our special grace, certain knowledge, and mere motion, do, by these presents, for us, our heirs and successors, make, ordain, constitute, and appoint our trusty and well beloved John Wentworth, Esq. governor of our said province, and the governor of our said province of New-Hampshire for the time being, and our trusty and well beloved Theodore Atkinson, Esq. now president of our council of our said province, George Jaffrey and Daniel Peirce, Esqrs. both of our said council, and Peter Gilman, Esq. now speaker of our house of representatives in said province, and William Pitkin, Esq. one of the assistants of our colony of Connecticut, and our said trusty and well beloved Eleazar Wheelock, of Lebanon, doctor in divinity, Benjamin Pomroy, of Hebron, James Lockwood, of Weathersfield, Timothy Pitkin and John Smalley, of Farmington, and William Patten, of Hartford, all of our said colony of Connecticut, ministers of the gospel, (the whole number of said

trustees consisting, and hereafter forever to consist, of twelve, and no more,) to be trustees of said Dartmouth College, in this our province of New-Hampshire.

[***10] And we do further, of our special grace, certain knowledge, and mere motion, for us, our heirs and successors, will, give, grant, and appoint, that the said trustees and their successors shall forever hereafter be, in deed, act, and name, a body corporate and politic, and that they, the said body corporate and politic, shall be known and distinguished, in all deeds, grants, bargains, sales, writings, evidences, or otherwise howsoever, and in all Courts forever hereafter plead and be impleaded by the name of The Trustees of Dartmouth College; and that the said corporation, by the name aforesaid, shall be able, and in law capable, for the use of said Dartmouth College, to have, get, acquire, purchase, receive, hold, possess, and enjoy, tenements, hereditaments, jurisdications, and franchises, for themselves and their successors, in fee simple, or otherwise howsoever, and to purchase, receive, or build, any house or houses, or any other buildings, as they shall think needful and convenient, for the use of said Dartmouth College, and in such town in the western part of our said province of New-Hampshire, as shall, by said trustees, or the major part of them, be agreed on; their said agreement [***11] to be evidenced by an instrument in writing, under their hands, ascertaining the same -- And also to receive and dispose of any lands, goods, chattels, and other things, of what nature soever, for the use aforesaid -- And also to have, accept, and receive any rents, profits, annuities, gifts, legacies, donations, or bequests of any kind whatsoever, for the use aforesaid; so, nevertheless, that the yearly value of the premises do not exceed the sum of six thousand pounds sterling; and therewith, or otherwise, to support and pay, as the said trustees, or the major part of such of them as are regularly convened for the purpose, shall agree, the President, Tutors, and other officers and ministers of said Dartmouth College; and also to pay all such missionaries and school masters as shall be authorized, appointed, and employed by them, for civilizing, and christianizing, and instructing the Indian natives of this land, their several allowances; and also their respective annual salaries or allowances, and all such necessary and contingent charges, as from time to time shall arise and accrue, relating to the said Dartmouth College: And also, to bargain, sell, let, or assign, lands, tenements, [***12] or hereditaments, goods or chattels, and all other things whatsoever, by the name aforesaid, in as full and ample a manner, to all intents and purposes, as

a natural person, or other body politic or corporate, is able to do by the laws of our realm of Great-Birtain, or of said province of New-Hampshire.

And further, of our special grace, certain knowledge, and mere motion, to the intent that our said corporation, and body politic, may answer the end of their erection and constitution, and may have perpetual succession and continuance forever, we do, for us, our heirs and successors, will, give, and grant, unto the Trustees of Dartmouth College, and to their successors forever, that there shall be, once a year, and every year, a meeting of said trustees, held at said Dartmouth College, at such time as by said trustees, or the major part of them, at any legal meeting of said trustees, shall be agreed on; the first meeting to be called by the said Eleazar Wheelock, as soon as conveniently may be, within one year next after the enrollment of these our letters patent, at such time and place as he shall judge proper. And the said trustees, or the major part of any seven or more of them, [***13] shall then determine on the time for holding the annual meeting aforesaid, which may be altered as they shall hereafter find most convenient. And we farther order and direct, that the said Eleazar Wheelock shall notify the time for holding said first meeting, to be called as aforesaid, by sending a letter to each of said trustees, and causing an advertisement thereof to be printed in the New-Hampshire Gazette, and in some public newspaper printed in the colony of Connecticut. But in case of the death or incapacity of the said Wheelock, then such meeting to be notified in manner aforesaid, by the governor or commander in chief of our said province for the time being. And we do also, for us, our heirs and successors, hereby will, give, and grant, unto the said Trustees of Dartmouth College, aforesaid, and to their successors forever, that when any seven or more of the said trustees, or their successors, are convened and met together, for the service of said Dartmouth College, at any time or times, such seven or more shall be capable to act as fully and amply, to all intents and purposes, as if all the trustees of said College were personally present -- and all affairs and actions [***14] whatsoever, under the care of said trustees, shall be determined by the majority or greater number of those seven or more trustees so convened and met together.

And we do further will, ordain, and direct, that the president, trustees, professors, tutors, and all such officers as shall be appointed for the public instruction and government of said college, shall, before they undertake the execution of their offices or trusts, or within one year after, take the oaths and subscribe the declaration provided by an act of Parliament made in the first year of King George the First, entitled, "An act for the further security of his Majesty's person and government, and the succession of the crown in the heirs of the late Princess Sophia, being protestants, and for the extinguishing the hopes of the pretended Prince of Wales, and his open and secret abettors;" that is to say, the President, before the Governor of our said Province for the time being, or by one by him empowered to that service, or by the president of our said council, and the trustees, professors, tutors, and other officers, before the president of said college for the time being, who is hereby empowered to administer the same; [***15] an entry of all which shall be made in the records of said college.

And we do, for us, our heirs, and successors, hereby will, give, and grant, full power and authority to the president hereafter by us named, and to his successors, or, in case of his failure, to any three or more of the said trustees, to appoint other occasional meetings, from time to time, of the said seven trustees, or any greater number of them, to transact any matter or thing necessary to be done before the next annual meeting, and to order notice to the said seven, or any greater number of them, of the times and places of meeting for the service aforesaid, by a letter under his or their hands, of the same, one month before said meeting -- Provided always, that no standing rule or order be made or altered, for the regulation of said college, nor any president or professor be chosen or displaced, nor any other matter or thing transacted or done, which shall continue in force after the then next annual meeting of the said trustees, as aforesaid.

And, further, we do, by these presents, for us, our heirs and successors, create, make, constitute, nominate, and appoint our trusty and well beloved Eleazar Wheelock, [***16] Doctor in Divinity, the founder of said college, to be President of said Dartmouth College, and to have the immediate care of the education and government of such students as shall be admitted into said Dartmouth College for instruction and education; and do will, give, and grant, to him, in said office, full power, authority, and right, to nominate, appoint, constitute, and ordain, by his last will, such suitable and meet person or persons as be shall choose to succeed him in the presidency of said Dartmouth College; and the person so appointed, by his last will, to continue in office, vested with all the powers, prinvileges, jurisdiction, and

authority, of a President of said Dartmouth College; that is to say, so long and until such appointment by said last will shall be disapproved by the Trustees of said Dartmouth College.

And we do also, for us, our heirs, and successors, will, give, and grant to the said trustees of said Dartmouth College, and to their successors forever, or any seven or more of them convened as aforesaid, that in the case of the ceasing or failure of a president by any means whatsoever, that the said trustees do elect, nominate, and appoint such qualified person [***17] as they, or the major part of any seven or more of them, convened for that purpose as above directed, shall think fit, to be president of said Dartmouth College, and to have the care of the education and government of the students as aforesaid; and in case of the ceasing of a president as aforesaid, the senior professor or tutor, being one of the trustees, shall exercise the office of a president, until the trustees shall make choice of, and appoint, a president as aforesaid; and such professor or tutor, or any three or more of the trustees, shall immediately appoint a meeting of the body of the trustees for the purpose aforesaid. And also we do will, give, and grant to the said trustees convened as aforesaid, that they elect, nominate, and appoint so many tutors and professors to assist the president in the education and government of the students belonging thereto, as they the said trustees shall, from time to time, think needful and serviceable to the interests of said Dartmouth College. And also, that the said trustees or their successors, or the major part of any seven or more of them convened for that purpose as above directed, shall at any time displace and discharge from [***18] the service of said Dartmouth College any or all such officers, and elect others in their room and stead as before directed. And also that the said trustees, or their successors, or the major part of any seven of them which shall convene for that purpose as above directed, do, from time to time, as occasion shall require, elect, constitute, and appoint a treasurer, a clerk, an usher, and a steward for the said Dartmouth College, and appoint to them and each of them their respective businesses and trust; and displace and discharge from the service of said College, such treasurer, clerk, usher or steward, and to elect others in their room and stead; which officers so elected, as before directed, we do for us, our heirs and successors, by these presents, constitute and establish in their respective offices, and do give to each and every of them full power and authority to exercise the same in said Dartmouth College, according to the directions, and during the

pleasure of said trustees, as fully and freely as any like officers in any of our universities, colleges, or seminaries of learning in our realm of Great-Britain, lawfully may or ought to do. And also, that the said trustees and [***19] their successors, or the major part of any seven or more of them, which shall convene for that purpose as is above directed, as often as one or more of said trustees shall die, or by removal or otherwise shall, according to their judgment, become unfit or incapable to serve the interests of said College, do, as soon as may be after the death, removal, or such unfitness or incapacity of such trustee or trustees, elect and appoint such trustee or trustees as shall supply the place of him or them so dying, or becoming incapable to serve the interests of said College; and every trustee so elected and appointed shall, by virtue of these presents and such election and appointment, be vested with all the powers and privileges which any of the other trustees of said College are hereby vested with. And we do further will, ordain, and direct, that from and after the expiration of two years from the enrolment of these presents, such vacancy or vacancies as may or shall happen, by death or otherwise, in the aforesaid number of trustees, shall be filled up by election as aforesaid, so that when such vacancies shall be filled up unto the complete number of twelve trustees, eight of the aforesaid [***20] whole number of the body of trustees shall be resident, and respectable freeholders of our said Province of New-Hampshire, and seven of said whole number shall be laymen.

And we do further, of our special grace, certain knowledge, and mere motion, will, give, and grant, unto the said Trustees of Darmouth College, that they, and their successors, or the major part of any seven of them which shall convene for that purpose as is above directed, may make, and they are hereby fully impowered, from time to time, fully and lawfully to make and establish such ordinances, orders, and laws, as may tend to the good and wholesome government of the said college, and all the students and the several officers and ministers thereof, and to the public benefit of the same, not repugnant to the laws and statutes of our realm of Great Britain, or of this our province of New-Hampshire, and not excluding any person of any religious denomination whatsoever, from free and equal liberty and advantage of education, or from any of the liberties and privileges or immunities of the said college, on account of his or their speculative sentiments in religion, and of his or their being of a religious profession [***21] different from the said trustees of the said Dartmouth College. And such

ordinance, orders, and laws, which shall as aforesid be made, we do for us, our heirs and successors, by these presents ratify, allow of, and confirm, as good and effectual to oblige and bind all the students, and the several officers and ministers of the said college. And we do hereby authorize and impower the said Trustees of Dartmouth College, and the president, tutors, and professors, by them elected and appointed as aforesaid, to put such ordinances, orders, and laws, in execution, to all proper intents and purposes.

And we do further, of our special grace, certain knowledge, and mere motion, will, give, and grant unto the said Trustees of said Dartmouth College, for the encouragement of learning, and animating the students of said college to diligence and industry, and a laudable progress in literature, that they, and their successors, or the major part of any seven or more of them, convened for that purpose as above directed, do, by the president of said college, for the time being, or any other deputed by them, give, and grant any such degree or degrees to any of the students of the said college, or [***22] any others by them thought worthy thereof, as are usually granted in either of the universities, or any other college in our realm of Great Britain; and that they sign and seal diplomas or certificates of such graduations, to be kept by the graduates as perpetual memorials and testimonials thereof.

And we do further, of our special grace, certain knowledge, and mere motion, by these presents, for us, our heirs and successors, give and grant unto the Trustees of said Dartmouth College, and to their successors, that they and their successors shall have a common seal, under which they may pass all diplomas or certificates of degrees, and all other affairs and business of, and concerning the said college; which shall be engraven in such a form, and with such an inscription as shall be devised by the said trustees, for the time being, or by the major part of any seven or more of them convened for the service of the said college as is above directed.

And we do further, for us, our heirs and sucessors, give and grant unto the said trustees of the said Dartmouth College, and their successors, or to the major part of any seven or more of them convened for the service of the said college, [***23] full power and authority, from time to time, to nominate and appoint all other officers and ministers, which they shall think convenient and necessary for the service of the said college, not herein particularly named or mentioned; which officers and ministers we do hereby impower to execute their offices and trusts, as fully and freely as any of the officers and ministers in our universities or colleges in our realm of Great Britain lawfully may or ought to do.

And further, that the generous contributors to the support of this design of spreading the knowledge of the only true God and Saviour among the American savages, may, from time to time, be satisfied that their liberalities are faithfully disposed of, in the best manner, for that purpose, and that others may, in future time, be encouraged in the exercise of the like liberality for promoting the same pious design, it shall be the duty of the President of said Dartmouth College, and of his successors, annually, or as often as he shall be thereunto desired or required, to transmit to the right honourable, honourable, and worthy gentlemen of the trust in England before mentioned, a faithful account of the improvements and disbursements [***24] of the several sums he shall receive from the donations and bequests made in England, through the hands of said trustees, and also advise them of the general plans laid, and prospects exhibited, as well as a faithful account of all remarkable occurrences, in order, if they shall think expedient, that they may be published. And this to continue so long as they shall perpetuate their board of trust, and there shall be any of the Indian natives remaining to be proper objects of that charity.And, lastly, our express will and pleasure is, and we do, by these presents, for us, our heirs and successors, give and grant unto the said Trustees of Dartmouth College, and to their successors forever, that these our letters patent, on the enrolment thereof in the Secretary's office of our Province of New-Hampshire aforesaid, shall be good and effectual in the law, to all intents and purposes, against us, our heirs and successors, without any other license, grant, or confirmation from us, our heirs and successors, hereafter by the said trustees to be had and obtained, notwithstanding the not writing or misrecital, not naming or misnaming the aforesaid offices, franchises, privileges, immunities, [***25] or other the premises, or any of them, and notwithstanding a writ of ad quod damnum hath not issued forth to inquire of the premises, or any of them, before the ensealing hereof, any statute, act, ordinance, or provision, or any other matter or thing, to the contrary notwithstanding. To have and to hold all and singular the privileges, advantages, liberties, immunities, and all other the premises herein and hereby granted, or which are meant,

mentioned, or intended to be herein and hereby given and granted unto them, the said Trustees of Dartmouth College, and to their successors forever. In testimony whereof, we have caused these our letters to be made patent, and the public Seal of our said Province of New-Hampshire to be hereunto affixed.Witness our trusty and well beloved John Wentworth, Esquire, Governor and Commander in Chief in and over our said Province, &c. this thirteenth day of December, in the tenth year of our reign, and in the year of our Lord one thousand seven hundred and sixty-nine.

N.B. The words " and such professor, or tutor, or any three or more of the trustees, shall immediately appoint a meeting of the body of the trustees, for the purpose aforesaid," between [***26] the first and second lines, also the words "or more," between the twenty-seventh and twenty-eighth lines, also the words "or more," between the twenty-eighth and twenty-ninth lines, and also the words "to all intents and purposes," between the thirty-seventh and thirty-eighth line of this sheet, were respectively interlined before signing and sealing.

And the said jurors, upon their oath, further say, that afterwards, upon the eighteenth day of the same December, the said letters patent were duly enrolled and recorded in the Secretary's office of said Province, now State, of New-Hampshire -- And afterwards, and within one year from the issuing of the same letters patent, all the persons named as trustees in the same accepted the said letters patent, and assented thereunto, and the corporation therein and thereby created and erected was duly organized, and has, until the passing of the act of the legislature of the State of New-Hampshire, of the 27th of June, A.D. 1816, and ever since, (unless prevented by said act and the doings under the same,) continued to be a corporation.

And the said jurors, upon their oath, further say, that immediately after its erection and organization as [***27] aforesaid, the said corporation had, took, acquired, and received, by gift, donation, devise, and otherwise, lands, goods, chattels, and moneys of great value; and from time to tiem since have had, taken, received, and acquired, in manner aforesaid, and otherwise, lands, goods, chattels, and moneys of great value; and on the same 27th day of June, A.D. 1816, the said corporation, erected and organized as aforesaid, had, held, and enjoyed, and ever since have had, held, and enjoyed, divers lands,

tenements, hereditaments, goods, chattels, and moneys, acquired in manner aforesaid, the yearly income of the same, not exceeding the sum of 26,666 dollars, for the use of said Dartmouth College, as specified in said letters patent.

And the said jurors, upon their oath, further say, that part of the said lands, so acquired and holden by the said trustees as aforesaid, were granted by (and are situate in) the State of Vermont, A.D. 1785, and are of great value; and other part of said lands, so acquired and holden as aforesaid, were granted by (and are situate in) the State of New-Hampshire, in the years 1789, and 1807, and are of great value.

And the said jurors, upon their oath, further say, [***28] that the said Trusteees of Dartmouth College, so constituted as aforesaid, on the same 27th day of June, A.D. 1816, were possessed of the goods and chattels in the declaration of the said trustees specified, and at the place therein mentioned, as of their own proper goods and chattels, and continued so possessed until, and at the time of the demand and refusal of the same as hereinafter mentioned, unless devested thereof, and their title thereto defeated, and rendered invalid, by the provisions of the act of the State of New-Hampshire, made and passed on the same 27th day of June, A.D. 1816, and the doings under the same, as hereinafter mentioned and recited.

And the said jurors, upon their oath, further say, that on the 27th day of June, A.D. 1816, the legislature of said State of New-Hampshire made and passed a certain act, entitled, "An act to amend the charter, and enlarge and improve the corporation of Dartmouth College," in the words following: --

An act to amend the charter, and enlarge and improve the Corporation of Dartmouth College.

WHEREAS knowledge and learing generally diffused through a community, are essential to the preservation of a free government, and extending [***29] the opportunities and advantages of education is highly conducive to promote this end, and by the constitution it is made the duty of the legislators and magistrates, to cherish the interests of literature, and the sciences, and all seminaries established for their advancement -- and as the college of the State may, in the opinion of the legislature, be rendered more extensively useful; Therefore,

SECT. 1. Be it enacted by the senate and house of

representatives, in general court convened, That the corporation, heretofore called and known by the name of the Trustees of Dartmouth College, shall ever hereafter he called and known by the name of the Trustees of Dartmouth University. -- And the whole number of said trustees shall be twenty-one, a majority of whom shall from a quorum for the transaction of business. -- And they and their successors in that capacity, as hereby constituted, shall respectively forever have, hold, use, exercise and enjoy all the powers, authorities, rights, property, liberties, privileges and immunities which have hitherto been possessed, enjoyed and used by the Trustees of Dartmouth College -- except so far as the same may be varied or limited by the provisions [***30] of this act. And they shall have power to determine the times and places of their meetings, and manner of notifying the saem; to organize colleges in the university; to establish an institute and elect fellows and members proper, and determine their duties and compensation, and also to displace them; to delegate the power of supplying vacancies in any of the offices of the university, for any term of time not extending beyond their next meeting: to pass ordinances for the government of the students, with reasonable penalties, not inconsistent with the constitution and laws of this State; to prescribe the course of education, and confer degrees; and to arrange, invest, and employ the funds of the university.

SECT. 2. And be it further enacted, That there shall be a board of overseers, who shall have perpetual succession, and whose number shall be twenty-five, fifteen of whom shall constitute a quorum for the transaction of business. The president of the senate, and the speaker of the house of representatives of New-Hampshire, the governor and lieutant governor of Vermont, for the time being, shall be members of said board, ex officio. The board of overseers shall have power to [***31] determine the times and places of their meetings, and manner of notifying the same; to inspect and confirm, or disapprove and negative, such votes and proceedins of the board of trustees as shall relate to the appointment and removal of president, professors, and other permanent officers of the university, and determine their salries; to the establishment of colleges and professorships, and the erection of new college buildings. Provided always, that the said negative shall be expressed within sixty days from the time of said overseers being furnished with copies of such acts. -- Provided also, that all votes and proceedings of the board of trustees shall be valid and effectual, to all intents and purposes, until such

negative of the board of overseers be expressed, according to the provisions f this act.

SECT. 3. Be it further enacted, That there shall be a treasurer of said corporation, who shall be duly sworn, and who, before he enters upon the duties of his office, shall give bonds, with sureties, to the satisfaction of the corporation, for the faithful performance thereof; and also a secretary to each of the boards of trustees and overseers, to be elected by the said boards [***32] respectively, who shall keep a just and true record of the proceedings of the board for which he was chosen. And it shall furthermore be the duty of the secretary of the board of trustees to furnish, as soon as may be, to the said board of overseers, copies of the records of such votes and proceedings, as by the provisions of this act are made subject to their revision and control.

SECT. 4. Be it further enacted, That the president of Dartmouth University, and his successors in office, shall have the superintendence of the government and instruction of the students, and may preside at all meetings of the trustees, and do and execute all the duties devolving by usage on the president of a university. He shall render annually to the governor of this state an account of the number of students, and of the state of the funds of the university; and likewise copies of all important votes and proceedings of the corporation and overseers, which shall be made out by the secretaries of the respective boards.

SECT. 5. Be it further enacted, That the president and professors of the university shall be nominated by the trustees, and approved by the overseers: and shall be liable to be suspended [***33] or removed from office in manner as before provided. And each of the two boards of trustees and overseers shall have power to suspend and remove any member of their respective boards.

SECT. 6. Be it further enacted, That the governor and council are hereby authorized to fill all vacancies in the board of overseers, whether the same be original vacancies, or are occasioned by the death, resignation or removal of any member. And the governor and council in like manner shall, by appointments, as soon as may be, complete the present board of trustees to the number of twenty-one, as provided for by this act, and shall have power also to fill all vacancies that may occur previous to, or during the first meeting of the said board of trustees. But the president of said university for the time being, shall, nevertheless, be a member of said board of

trustees ex officio. And the governor and council shall have power to inspect the doings and proceedings of the corporation, and of all the officers of the university, whenever they deem it expedient -- and they are hereby required to make such inspection, and report the same to the legislature of this State, as often as once in every five [***34] years. And the governor is hereby authorized and requested to summon the first meeting of the said trustees and overseers, to be held at Hanover, on the 26th day of August next.

SECT. 7. Be it further enacted, That the president and professors of the university, before entering upon the duties of their offices, shall take the oath to support the constitution of the United States and of this State; certificates of which shall be in the office of the Secretary of this State, within sixty days from their entering on their offices respectively.

SECT. 8. Be it further enacted, That perfect freedom of religious opinion shall be enjoyed by all the officers and students of the university; and no officer or student shall be deprived of any honours, privileges, or benefits of the institution, on account of his religious creed or belief.The theological colleges which may be established in the university shall be founded on the same principles of religious freedom; and any man, or body of men, shall have a right to endow colleges or professorships of any sect of the protestant christian religion: And the trustees shall be held and obliged to appoint professors of learning and piety of such [***35] sects according to the will of the donors.

Approved, June 27th, 1816.

And the said jurors, upon their oath, further say, that, at the annual meeting of the Trustees of Dartmouth College, constituted agreeably to the letters patent aforesaid, and in no other way or manner, holden at said college, on the 28th day of August, A.D. 1816, the said trustees voted and resolved, and caused the said vote and resolve to be entered on their records, that they do not accept the provisions of the said act of the legislature of New-Hampshire of the 27th of June, 1816, above recited, but do, by the said vote and resolve, expressly refuse to accept or act under the same.

And the said jurors, upon their oath, further say, that the said Trustees of Dartmouth College have never accepted, assented to, or acted under the said act of the 27th of June, A.D. 1816, or any act passed in addition

thereto, or in amendment thereof, but have continued to act, and still claim the right of acting, under the said letters patent.

And the said jurors, upon their oath, further say, that, on the seventh day of October, A.D. 1816, and before the commencement of this suit, the said Trustees of Dartmouth College demanded [***36] of the said William H. Woodward the property, goods, and chattels in the said declaration specified, and requested the said William H. Woodward, who then had the same in his hands and possession, to deliver the same to them, which the said William H. Woodward then and there refused to do, and has ever since neglected and refused to do, but converted the same to his own use, if the said Trustees of Dartmouth College could, after the passing of the said act of the 27th day of June, lawfully demand the same, and if the said William H. Woodward was not, by law, authorized to retain the same in his possession after such demand.

And the said jurors, upon their oath, further say, that on the 18th day of December, A.D. 1816, the legislature of said State of New-Hampshire made and passed a certain other act, entitled, "An act in addition to, and in amendment of, an act, entitled, An act to amend the charter, and enlarge and improve the corporation of Dartmouth College," in the words following:

An act in addition to, and in amendment of, an act, entitled, "An act to amend the charter, and enlarge and improve the Corporation of Dartmouth College."

WHEREAS the meetings of the Trustees and Overseers [***37] of Dartmouth University, which were summoned agreeably to the provisions of said act, failed of being duly holden, in consequence of a quorum of neither said trustees nor overseers attending at the ime and place appointed, whereby the proceedings of said corporation have hitherto been, and still are delayed:

SECTION 1. Be it enacted by the senate and house of representatives, in general Court convened, That the governor be, and he is hereby authorized and requested to summon a meeting of the Trustees of Dartmouth University, at such time and place as he may deem expedient. And the said trustees, at such meeting, may do and transact any matter or thing, within the limits of their jurisdiction and power, as such trustees, to every intent and purpose, and as fully and completely as if the same were transacted at any annual, or other meeting.

And the governor, with advice of council, is authorized to fill all vacancies that have happened, or may happen in the board of said trustees, previous to their next annual meeting. And the governor is hereby authorized to summon a meeting of the overseers of said university, at such time and place as he may consider proper. An provided a less [***38] number than a quorum of said board of overseers convene at the time and place appointed for such meeting of their board, they shall have power to adjourn, from time to time, until a quorum shall have convened.

SECTION 2. And be it further enacted, That so much of the act, to which this is an addition, as makes necessary any particular number of trustees or overseers of said University, to constitute a quorum for the transaction of business, be, and the same hereby is repealed; and that hereafter nine of said trustees, convened agreeably to the provisions of this act, or to those of that to which this is an addition, shall be a quorum for transacting business; and that in the board of trustees six votes at least shall be necessary for the passage of any act or resolution. And provided also, that any smaller number than nine of said trustees, convened at the time and place appointed for any meeting of their board, according to the provisions of this act, or that to which this is an addition, shall have power to adjourn from time to time, until a quorum shall have convened.

SECTION 3. And be it further enacted, That each member of said board of trustees, already appointed or chosen, [***39] or hereafter to be appointed or chosen, shall, before entering on the duties of his office, make and subscribe an oath for the faithful discharge of the duties aforesaid; which oath shall be returned to, and filed in the office of the secretary of state, previous to the next regular meeting of said board, after said member enters on the duties of his office, as aforesaid.

Approved, December 18, 1816.

And the said jurors, upon their oath, further say, that on the 26th day of December, A.D. 1816, the legislature of said State of New-Hampshire made and passed a certain other act, entitled, "An act in addition to an act, entitled, an act in addition to, and in amendment of, an act, entitled, an act to amend the charter and enlarge and improve the corporation of Dartmouth College," in the words following: -- An act in addition to an act, entitled, "an act in addition to, and in amendment of, an act, entitled, an act to amend the charter and enlarge and

improve the corporation of Dartmouth College."

Be it enacted by the senate and house of representatives in general Court convened, That if any person or persons shall assume the office of president, trustee, professor, secretary, treasurer, [***40] librarian, or other officer of Dartmouth University; or by any name, or under any pretext, shall, directly or indirectly, take upon himself or themselves the discharge of any of the duties of either of those offices, except it be pursuant to, and in conformity with, the provisions of an act, entitled, "an act to amend the charter and enlarge and improve the corporation of Dartmouth College," or, of the "act, in addition to and in amendment of an act, entitled, an act to amend the charter and enlarge and improve the corporation of Dartmouth College," or shall in any way, directly or indirectly, wilfully impede or hinder any such officer or officers already existing, or hereafter to be appointed agreeably to the provisions of the acts aforesaid, in the free and entire discharge of the duties of their respective offices, conformably to the provisions of said acts, the person or persons so offending shall for each offence forfeit and pay the sum of five hundred dollars, to be recovered by any person who shall sue therefore, one half thereof to the use of the prosecutor, and the other half to the use of said University.

And be it further enacted, That the person or persons who sustained [***41] the offices of secretary and treasurer of the trustees of Dartmouth College, next before the passage of the act, entitled, "an act to amend the charter and enlarge and improve the corporation of Dartmouth College," shall continue to hold and discharge the duties of those offices, as secretary and treasurer of the Trustees of Dartmouth University, until another person or persons be appointed, in his or their stead, by the trustees of said University. And that the treasurer of said University, so existing, shall in his office have the care, management, direction, and superintendance of the property of said corporation, whether real or personal, until a quorum of said trustees shall have convened in a regular meeting.

Approved, December 26, 1816.

And the said jurors, upon their oath, further say, that the said William H. Woodward, before the said 27th day of June, had been duly appointed by the said Trustees of Dartmouth College, secretary and treasurer of the said corporation, and was duly qualified t exercise, and did exercise the said offices, and perform the duties of the

same; and as such secretary and treasurer, rightfully had, while he so continued sucretary and treasurer as [***42] aforesaid, the custody and keeping of the several goods, chattels, and property, in said declaration specified.

And the said jurors, upon their oath, further say, that the said William H. Woodward was removed by said Trustees of Dartmouth College (if the said trustees could, by law, do the said acts) from said office of secretary, on the 27th day of August, A.D. 1816, and from said office of treasurer, on the 27th day of September then next following, of which said removals he, the said William H. Woodward, had due notice on each of said days last mentioned.

And the said jurors, upon their oath, further say, that the corporation, called the Trustees of Dartmouth University, was duly organized on the fourth day of February, A.D. 1817, pursuant to, and under the said recited acts of the 27th day of June, and of the 18th and 26th days of December, A.D. 1816; and the said William H. Woodward was, on the said fourth day of February, A.D. 1817, duly appointed by the said Trustees of Dartmouth University, secretary and treasurer of the said Trustees of Dartmouth University, and then and there accepted both said offices.

And the said jurors, upon their oath, further say, that this suit [***43] was commenced on the eighth day of February, A.D. 1817.

But whether upon the whole matter aforesaid, by the jurors aforesaid, in manner and form aforesaid found, the said acts of the 27th of June, 18th and 26th of December, A.D. 1816, are valid in law, and binding on the said trustees of Dartmouth College, without acceptance thereof and assent thereunto by them, so as to render the plaintiffs incapable of maintaining this action, or whether the same acts are repugnant to the constitution of the United States, and so void, the said jurors are wholly ignorant, and pray the advice of the Court upon the premises. And if upon the said matter, it shall seem to the Court here, that the said acts last mentioned are valid in law, and binding on said trustees of Dartmouth College, without acceptance thereof, and assent thereto, by them, so as to render the plaintiffs incapable of maintaining this action, and are not repugnant to the constitution of the United States, then the said jurors, upon their oath, say, that the said William H. Woodward is not guilty of the premises above laid to his charge, by the declaration aforesaid, as the said William H.

Woodward hath above in pleading alleged. [***44] But if upon the whole matter aforesaid, it shall seem to the Court here, that the said acts last mentioned are not valid in law, and are not binding on the said trustees of Dartmouth College without acceptance thereof, and assent thereto, by them, so as render them incapable of maintaining this action, and that the said acts are repugnant to the constitution of the United States and void, then the said jurors, upon their oath, say that the said William H. Woodward is guilty of the premises above laid to his charge, by the declaration aforesaid, and in that case, they assess the damages of them, the said trustees of Dartmouth College, by occasion thereof, at twenty thousand dollars.

Judgment having been afterwards rendered upon the said special verdict by the Superior Court of the State of New-Hampshire, being the highest Court of law or equity of said State, for the plaintiff below, the cause was brought before this Court by writ of error.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, the trustees of a college, brought action in trover in the state court for the book of records, corporate seal, and other corporate property, to which plaintiffs alleged they were entitled. The state court, in a special verdict, found for defendant, if certain acts of the legislature were valid. Plaintiffs sought review from a decision of the Superior Court of the State of New Hampshire, which rendered judgment for defendant.

**OVERVIEW:** Plaintiffs, the trustees of a college, brought an action in trover against defendant for corporate property to which plaintiffs alleged they were entitled. Defendant claimed under three acts of the legislature of New Hampshire, one of which amended the charter of the college and increased the number of trustees to 21, that such acts gave over the appointment of the additional members to the executive of the state, and created a board of overseers, with the power to inspect and control the most important acts of the trustees. Plaintiffs refused to accept this amended charter, and brought suit for the corporate property. On appeal, the Supreme Court stated that the circumstances of the case constituted a contract, as an application was made to the crown for a charter to incorporate a religious and literary institution. The donors, the trustees, and the crown were

the original parties to the contract, which was one made on valuable consideration. The court held that the obligation of the contract could not be impaired without violating the Constitution. As the acts of the legislature were repugnant to the Constitution, the Court reversed the judgment of the state court below.

**OUTCOME:** The Court reversed the decision of the state court on the grounds that the legislative acts impaired contractual obligations.

**CORE TERMS:** charter, charity, franchise, founder, vested, eleemosynary, donor, incorporation, founded, appoint, donation, governor, youth, visitatorial, appointed, declare, grantee, charitable, appointment, impairing, valuable consideration, hereditament, endowment, marriage, impair, bounty, endowed, beneficial interest, corporator, repugnant

**LexisNexis(R) Headnotes**

*Business & Corporate Law > Corporations > Formation > Corporate Existence, Powers & Purpose > General Overview*
[HN1] A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence.

*Business & Corporate Law > Corporations > Formation > Corporate Existence, Powers & Purpose > General Overview*
*Education Law > Faculty & Staff > Compensation > Payment*
[HN2] There can be no reason for implying in a charter, given for a valuable consideration, a power which is not only not expressed, but is in direct contradiction to its express stipulations.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
*Contracts Law > Consideration > Enforcement of Promises > General Overview*
[HN3] Contracts, the parties to which have a vested beneficial interest, and those only, it has been said, are

the objects about which the Constitution is solicitous, and to which its protection is extended.

*Business & Corporate Law > Corporations > Formation > Corporate Existence, Powers & Purpose > General Overview*
*Business & Corporate Law > Nonprofit Corporations & Organizations > General Overview*
*Education Law > Administration & Operation > Boards of Postsecondary Schools > Authority*
[HN4] Almost all eleemosynary corporations, those which are created for the promotion of religion, of charity, or of education, are of the same character. In every literary or charitable institution, unless the objects of the bounty be themselves incorporated, the whole legal interest is in trustees, and can be asserted only by them.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
[HN5] The legislature of a state shall pass no act impairing the obligation of contracts.

*Constitutional Law > Substantive Due Process > Scope of Protection*
[HN6] In private eleemosynary institutions, the body corporate, as possessing the whole legal and equitable interest, and completely representing the donors, for the purpose of executing the trust, has rights which are protected by the constitution.

**LAWYERS' EDITION HEADNOTES:**

The charter granted by the British crown to the trustees of Dartmouth College, in New Hampshire, in the year 1769, is a contract within the meaning of that clause of the constitution of the United States, art. 1, s. 10, which declares that no state shall make any law impairing the obligation of contracts. The charter was not dissolved by the revolution.

An act of the state legislature of New Hampshire, altering the charter, without the consent of the corporation, in a material respect, is an act impairing the obligation of the charter, and is unconstitutional and void.

Under its charter, Dartmouth College was a private and not a public corporation. That a corporation is established for purposes of general charity, or for

education generally, does not, per se, make it a public corporation, liable to the control of the legislature.

## SYLLABUS

The charter granted by the British crown to the trustees of Dartmouth College, in New-Hampshire, in the year 1769, is a contract within the meaning of that clause of the constitution of the United States, (art. 1. s. 10.) which declares that [***45] no State shall make any law impairing the obligation of contracts. The charter was not dissolved by the revolution.

An act of the State legislature of New-Hampshire, altering the charter, without the consent of the corporation, in a material respect, is an act impairing the obligation of the charter, and is unconstitutional and void.

Under its charter, Dartmouth College was a private and not a public corporation. That a corporation is established for purposes of general charity, or for education generally, does not, per se, make it a public corporation, liable to the control of the legislature.

COUNSEL: Mr. Webster, for the plaintiffs in error. The general question is, whether the acts of the 27th of June, and of the 18th and 26th of December, 1816, are valid and binding on the rights of the plaintiffs, without their acceptance or assent.

The substance of the facts recited in the preamble to the charter is, that Dr. Wheelock had founded a CHARITY, on funds owned and procured by himself; that he was, at that time, the sole dispenser and sole administrator, as well as the legal owner of these funds; that he had made his will, devising this property in trust to continue the existence [***46] and uses of the school, and appointed trustees; that, in this state of things, he had been invited to fix his school permanently in New-Hampshire, and to extend the design of it to the education of the youth of that province; that, before he removed his school, or accepted this invitation, which his friends in England had advised him to accept, he applied for a charter, to be granted, not to whomsoever the king or government of the province should please, but to such persons as he named and appointed, viz. the persons whom he had already appointed to be the future trustees of his charity by his will. The Charter, or letters patent, then proceed to create such a corporation, and to appoint twelve persons to constitute it, by the name of the "Trustees of Dartmouth College;" to have perpetual existence, as such

corporation, and with power to hold and dispose of lands and goods, for the use of the College, with all the ordinary powers of corporations. They are in their discretion to apply the funds and property of the College to the support of the president, tutors, ministers, and other officers of the College, and such missionaries and schoolmasters as they may see fit to employ among [***47] the Indians. There are to be twelve trustees forever, and no more; and they are to have the right of filling vacancies occuring in their own body. The Rev. Mr. Wheelock is declared to be the FOUNDER of the College, and is, by the charter, appointed first president, with power to appoint a successor, by his last will. All proper powers of government, superintendence, and visitation, are vested in the trustees. They are to appoint and remove all officers at their discretion; to fix their salaries, and assign their duties; and to make all ordinances, orders, and laws, for the government of the students. And to the end that the persons who had acted as depositaries of the contributions in England, and who had also been contributors themselves, might be satisfied of the good use of their contributions, the president was annually, or when required, to transmit to them an account of the progress of the institution, and the disbursements of its funds, so along as they should continue to act in that trust. These letters patent are to be good and effectual in law, against the king, his heirs and successors forever, without further grant or confirmation; and the trustees are to hold all [***48] and singular these privileges, advantages, liberties, and immunities, to them and to their successors forever. No funds are given to the college by this charter. A corporate existence and capacity are given to the trustees, with the privileges and immunities which have been mentioned, to enable the founder and his associates the better to manage the funds which they themselves had contributed, and such others as they might afterwards obtain.

After the institution, thus created and constituted, had existed, uninterruptedly and usefully, nearly fifty years, the legislature of New-Hampshire passed the acts in question. The first act makes the twelve trustees under the charter, and nine other individuals to be appointed by the governor and council, a corporation, by a new name; and to this new corporation transfers all the property, rights, powers, liberties, and privileges of the old corporation; with further power to establish NEW COLLEGES AND AN INSTITUTE, and to apply all or any part of the funds to these purposes, subject to the power and control of a board of twenty-five overseers, to

be appointed by the governor and council. The second act makes further provisions for executing [***49] the objects of the first, and the last act authorizes the defendant, the treasurer of the plaintiffs, to retain and hold their property, against their will.

If these acts are valid, the old corporation is abolished, and a new one created. The first act does, in fact, if it can have effect, create a new corporation, and transfer to it all the property and franchises of the old. The two corporations are not the same, in any thing which essentially belongs to the existence of a corporation. They have different names, and different powers, rights and duties. Their organization is wholly different. The powers of the corporation are not vested in the same, or similar hands. In one, the trustees are twelve, and no more. In the other, they are twenty-one. In one, the power is a single board. In the other, it is divided between two boards. Although the act professes to include the old trustees in the new corporation, yet that was without their assent, and against their remonstrance; and no person can be compelled to be a member of such a corporation against his will. It was neither expected nor intended, that they should be members of the new corporation. The act itself treats [***50] the old corporation as at an end, and going on the ground that all its functions have ceased, it provides for the first meeting and organization of the new corporation. It expressly provides, also, that the new corporation shall have and hold all the property of the old; a provision which would be quite unnecessary upon any other ground, than that the old corporation was dissolved. But if it could be contended, that the effect of these acts was not entirely to abolish the old corporation, yet it is manifest that they impair and invade the rights, property, and powers of the trustees under the charter, as a corporation, and the legal rights, privileges, and immunities which belong to them, as individual members of the corporation. The twelve trustees were the sole legal owners of all the property acquired under the charter. By the acts others are admitted, against their will, to be joint owners. The twelve individuals, who are trustees, were possessed of all the franchises and immunities conferred by the charter. By the acts, nine other trustees, and twenty-five overseers, are admitted against their will, to divide these franchises and immunities with them. If, either as a corporation, [***51] or as individuals, they have any legal rights, this forcible intrusion of others violates those rights, as manifestly as an entire and complete ouster and diapossession. These acts alter the whole constitution of the corporation. They affect the rights of the whole body, as a corporation, and the rights of the individuals who compose it. They revoke corporate powers and franchises. They alienate and transfer the property of the College to others. By the charter, the trustees had a right to fill vacancies in their own number. This is now taken away. They were to consist of twelve, and by express provision, of no more. This is altered. They and their successors, appointed by themselves, where forever to hold the property. The legislature has found successors for them, before their seats are vacant. The powers and privileges, which the twelve were to exercise exclusively, are now to be exercised by others. By one of the acts, they are subjected to heavy penalties, if they exercise their offices, or any of those powers and privileges granted them by charter, and which they had exercised for fifty years. They are to be punished for not accepting the new grant, and taking its [***52] benefits. This, it must be confessed, is rather a summary mode of settling a question of constitutional right. Not only are new trustees forced into the corporation, but new trusts and uses are created. The College is turned into a University. Power is given to create new colleges, and to authorize any diversion of the funds, which may be agreeable to the new boards, sufficient latitude is given by the undefined power of establishing an Institute. To these new Colleges, and this Institute, the funds contributed by the founder, Dr. Wheelock, and by the original donors, the Earl of Dartmouth and others, are to be applied, in plain and manifest disregard of the uses to which they were given. The president, one of the old trustees, had a right to his office, salary, and emoluments, subject to the twelve trustees alone. His title to these is now changed, and he is made accountable to new masters. So also all the professors and tutors. If the legislature can at pleasure make these alterations and changes, in the rights and privileges of the plaintiffs, it may, with equal propriety, abolish these rights and privileges altogether. The same power which can do any part of this work, [***53] can accomplish the whole. And, indeed, the argument, on which these acts have been hitherto defended, goes altogether on the ground, that this is such a corporation as the legislature may abolish at pleasure; and that its members have no rights, liberties, franchises, property or privileges, which the legislature may not revoke, annul, alienate or transfer to others whenever it sees fit.

It will be contended by the plaintiffs, that these acts are not valid and binding on them without their assent. 1. Because they are against common right, and the

constitution of New-Hampshire. 2. Because they are repugnant to the constitution of the United States. I am aware of the limits which bound the jurisdiction of the Court in this case; and that on this record nothing ann be decided, but the single question, whether these acts are repugnant to the constitution of the United States. Yet it may assist in forming an opinion of their true nature and character, to compare them with those fundamental principles, introduced into the State governments for the purpose of limiting the exercise of the legislative power, and which the constitution of New-Hampshire expresses with great fullness and [***54] accuracy.

It is not too much to assert, that the legislature of New-Hampshire would not have been competent to pass the acts in question, and to make them binding on the plaintiffs without their assent, even if there had been, in the constitution of New-Hampshire, or of the United States, no special restriction on their power; because these acts are not the exercise of a power properly legislative. [1] Their object and effect is to take away from one, rights, property, and franchises, and to grant them to another. This is not the exercise of a legislative power. To justify the taking away of vested rights, there must be a forfeiture; to adjudge upon and declare which, is the proper province of the judiciary. Attainder and confiscation are acts of sovereign power, not acts of legislation. The British parliament, among other unlimited powers, claims that of altering and vacating charters; not as an act of ordinary legislation, but of uncontrolled authority. It is theoretically omnipotent.Yet, in modern times, it has attempted the exercise of this power very rarely. In a celebrated instance, those who asserted this power in parliament, vindicated its exercise only in a case, in [***55] which it could be shown, 1st. That the charter in question was a charter of political power. 2d. That there was a great and overruling state necessity, justifying the violation of the charter. 3d. That the charter had been abused, and justly forfeited. [2] The bill affecting this charter did not pass. Its history is well known. The act which afterwards did pass, passed with the assent of the corporation. Even in the worst times, this power of parliament to repeal and rescind charters has not often been exercised. The illegal proceedings in the reign of Charles II. were under colour of law. Judgments of forfeiture were obtained in the Courts. Such was the case of the quo warranto against the city of London, and the proceedings by which the charter of Massachusetts was vacated. The legislature of New-Hampshire has no more power over the rights of the plaintiffs than existed,

somewhere, in some department of government, before the revolution. The British parliament could not have annulled or revoked this grant as an act of ordinary legislation. It is had done it at all, it could only have been in virtue of that sovereign power, called omnipotent, which does not belong to any [***56] legislature in the United States. The legislature of New-Hampshire has the same power over this charter, which belonged to the king, who granted it, and no more.By the law of England, the power to create corporations is a part of the royal prerogative. [3] By the revolution, this power may be considered as having devolved on the legislature of the States, and it has accordingly been exercised by the legislature. But the king cannot abolish a corporation, or new model it, or alter its powers, without its assent. This is the acknowledged and well-known doctrine of the common law. "Whatever might have been the notion in former times," says Lord Mansfield, "it is most certain now, that the corporations of the universities are lay corporations; and that the crown cannot take away from them any rights have been formerly subsisting in them under old charters or prescriptive usage." [4] After forfeiture duly found, the king may regrant the franchises; but a grant of franchises already granted, and of which no forfeiture has been found, is void. Corporate franchises can only be forfeited by trial and judgment. [5] In case of a new charter or grant to an existing corporation, it may accept [***57] or reject it as it pleases. [6] It may accept such part of the grant as it chooses, and reject the rest. [7] In the very nature of things, a charter cannot be forced upon any body. No one can be compelled to accept a grant; and without acceptance the grant is necessarily void. [8] It cannot be pretended that the legislature, as successor to the king in this part of his prerogative, has any power to revoke, vacate, or alter this charter. If, therefore, the legislature has not this power by any specific grant contained in the constitution; nor as included in its ordinary legislative powers; nor by reason of its succession to the prerogatives of the crown in this particular; on what ground would the authority to pass these acts rest, even if there were no special prohibitory clauses in the constitution, and the bill of rights?

1  Calder et ux. v. Bull, 3 Dall. 386.
2  Annual Reg. 1784, p. 160. Parlia. Reg. 1783. Mr. Burke's Speech on Mr. Fox's E. I. Bill. Burke's Works, Vol. III. p. 414, 417. 467, 468. 486.
3  1 Bl. Com. 472.
4  3 Burr. 1656.

5  3 T.R. 244.  King v. Passmore.

6  The King v. Vice Chancellor of Cambridge, 3 Burr. 1656. 3 T.R. 240. per Lord Kenyon.

7  Idem, 1661. and King v. Passmore, ubi supra.

8  Ellis v. Marshall, 2 Mass. R. 277. 1 Kyd on Corp. 65, 66.

[***58] But there are prohibitions in the constitution and bill of rights of New-Hampshire, introduced for the purpose of limiting the legislative power, and of protecting the rights and property of the citizens. One prohibition is, "that no person shall be deprived of his property, immunities or privileges, put out of the protection of the law, or deprived of his life, liberty, or estate, but by judgment of his peers, or the law of the land." In the opinion, however, which was given in the Court below, it is denied that the trustees, under the charter, had any property, immunity, liberty or privilege, in this corporation, within the meaning of this prohibition in the bill of rights. It is said, that it is a public corporation, and public property. That that trustees have no greater interest in it than any other individuals. That it is not private property, which they can sell, or transmit to their heirs; and that, therefore, they have no interest in it. That their office is a public trust like that of the governor, or a judge; and that they have no more concern in the property of the college, than the governor in the property of the State, or than the judges in the fines which they impose [***59] on the culprits at their bar. That it is nothing to them whether their powers shall be extended or lessened, any more than it is to the Courts, whether their jurisdiction shall be enlarged or diminished. It is necessary, therefore, to inquire into the true nature and character of the corporation, which was created by the charter of 1769.

There are divers sorts of corporations; and it may be safely admitted, that the legislature has more power over some, than over others. 9 Some corporations are for government and political arrangement; such for example as cities, counties, and the towns in New England. These may be changed and modified as public convenience may require, due regard being always had to the rights of property. Of such corporations, all who live within the limits are of course obliged to be members, and to submit to the duties which the law imposes on them as such. Other civil corporations are for the advancement of trade and business, such as banks, insurance companies, and the like. These are created, not by general law, but usually by grant. Their constitution is special. It is such as the legislature sees fit to give, and the grantees to accept.

9  1 Wooddes. 474.  1 Bl. Com.467.

[***60] The corporation in question is not a civil, although it is a lay corporation. It is an eleemosynary corporation. It is a private charity, originally founded and endowed by an individual, with a charter obtained for it at his request, for the better administration of his charity. "The eleemosynary sort of corporations are such as are constituted for the perpetual distributions of the free alms or bounty of the founder of them, to such persons as he has directed. Of this are all hospitals for the maintenance of the poor, sick, and impotent; and all colleges both in our universities and out of them." 10 Eleemosynary corporations are for the management of private property, according to the will of the donors. They are private corporations. A college is as much a private corporation as a hospital; especially a college founded as this was, by private bounty. A college is a charity. "The establishment of learning," says Lord Hardwicke, "is a charity, and so considered in the statute of Elizabeth. A devise to a college, for their benefit, is a laudable charity, and deserves encouragement." 11 The legal signification of a charity is derived chiefly from the statute 43 Eliz. c. 4. [***61] "Those purposes," says Sir. W. Grant, "are considered charitable which that statute enumerates." 12 Colleges are enumerated as charities in that statute. The government, in these cases, lends its aid to perpetuate the beneficent intention of the donor, by granting a charter, under which his private charity shall continue to be dispensed, after his death. This is done either by incorporating the objects of the charity, as, for instance, the scholars in a college, or the poor in a hospital; or by incorporating those who are to be governors, or trustees, of the charity. 13 In cases of the first sort, the founder is, by the common law, vistor. In early times it became a maxim, that he who gave the property might regulate it in future. Cujus est dare, ejus est disponere. This right of visitation descended from the founder to his heir, as a right of property, and precisely as his other property went to his heir; and in default of heirs, it went to the King, as all other property goes to the King, for the want of heirs. the right of visitation arises from the property. It grows out of the endowment. The founder may, if he please, part with it, at the time when he establishes the [***62] charity, and may vest it in others. Therefore, if he chooses that governors, trustees, or overseers, should be appointed in

the charter, he may cause it to be done, and his power of visitation will be transferred to them, instead of descending to his heirs.The persons thus assigned or appointed by the founder will be visitors, with all the powers of the founder, in exclusion of his heir. [14] The right of visitation then accrues to them as a matter of property, by the gift, transfer, or appointment of the founder. This is a private right which they can assert in all legal modes, and in which they have the same protection of the law as in all other rights. As visitors, they may make rules, ordinances, and statutes, and alter and repeal them, as far as permitted so to do by the charter. [15] Although the charter proceeds from the crown, or the government, it is considered as the will of the donor. It is obtained at his request. He imposes it as the rule which is to prevail in the dispensation of his bounty in all future times. The king, or government, which grants the charter, is not thereby the founder, but he who furnishes the funds. The gift of the revenues is the foundation. [***63] [16] The leading case on this subject is Phillips v. Bury. [17] This was an ejectment brought to recover the rectory house, &c. of Exeter College, in Oxford. Thie question was, whether the plaintiff or defendant was legal rector. Exeter College was founded by an individual, and incorporated by a charter granted by Queen Elizabeth. The controversy turned upon the power of the visitor, and, in the discussion of the cause, the nature of College charters and corporations was very fully considered; and it was determined that the college was a private corporation, and that the founder had a right to appoint a visitor, and give him such power as he thought fit. [18] The learned Bishop Stilling-fleet's argument in the same cause, as a member of the House of Lords, when it was there heard, exhibits very clearly the nature of colleges and similar corporations. [19] These opinions received the sanction of the House of Lords, and they seem to be settled and undoubted law. Where there is a charter, vesting proper powers of government in trustees, or governors, they are visitors; and there is no control in any body else; except only that the Courts of Equity or of law will interfere so far as to [***64] preserve the revenues and prevent the perversion of the funds, and to keep the visitors within their prescribed bounds. [20] "The foundations of colleges," says Lord Mansfield, "are to be considered in two views, viz. as they are corporations, and as they are eleemosynary. As eleemosynary, they are the creatures of the founder; he may delegate his power, either generally or specially; he may prescribe particular modes and manners, as to the exercise of part of it. If he makes a general visitor, (as by

the general words visitator sit) the person so constituted has all incidental power; but he may be restrained as to particular instances. The founder may appoint a special visitor for a particular purpose and no further. The founder may make a general visitor; and yet appoint an inferior particular power, to be executed without going to the visitor in the first instance." [21] And even if the king be founder, if he grant a charter incorporating trustees and governors, they are visitors, and the king cannot visit. [22] A subsequent donation, or engrafted fellowship, falls under the same general visitatorial power, if not otherwise specially provided. [23] In New-England, and perhaps throughout [***65] the United States, eleemosynary corporations have been generally established in the latter mode, that is, by incorporating governors or trustees, and vesting in them the right of visitation. Small variations may have been in some instances adopted; as in the case of Harvard College, where some power of inspection is given to the overseers, but not, strictly speaking, a visitatorial power, which still belongs, it is apprehended, to the fellows, or members of the corporation. In general, there are many donors. A charter is obtained, comprising them all, or some of them, and such others as they choose to include, with the right of appointing their successors. They are thus the visitors of their own charity, and appoint others, such as they may see fit, to exercise the same office in time to come. All such corporations are private. The case before the Court is clearly that of an eleemosynary corporation. It is, in the strictest legal sense, a private charity. In King v. St. Catherine's Hall, [24] that college is called a private eleemosynary lay corporation. It was endowed by a private founder, and incorporated by letters patent. And in the same manner was Dartmouth College founded [***66] and incorporated. Dr. Wheelock is declared by the charter to be its founder. It was established by him, on funds contributed and collected by himself. As such founder, he had a right of visitation, which he assigned to the trustees, and they received it by his consent and appointment, and held it under the charter. [25] He appointed these trustees visitors, and in that respect to take place of his heir; as he might have appointed devisees to take his estate, instead of his heir. Little, probably, did he think, at that time, that the legislature would ever take away this property and these privileges, and give them to others. Little did he suppose, that this charter secured to him and his successors no legal rights. Little did the other donors think so. If they had, the college would have been, what the university is now, a thing upon paper, existing only in name. The numerous

academies in New-England have been established substantially in the same manner. They hold their property by the same tenure, and no other. Nor has Harvard College any surer title than Dartmouth College. It may, to-day, have more friends; but to-morrow it may have more enemies. Its legal rights are [***67] the same. so also of Yale College; and indeed of all the others. When the legislature gives to these institutions, it may, and does, accompany its grants with such conditions as it pleases. The grant of lands by the legislature of New-Hampshire to Dartmouth College, in 1789, was accompanied with various conditions. When donations are made, by the legislature, or others, to a charity already existing, without any condition, or the specification of any new use, the donation follows the nature of the charity. Hence the doctrine, that all eleemosynary corporations are private bodies. They are founded by private persons, and on private property. The public cannot be charitable in these institutions. It is not the money of the public, but of private persons, which is dispensed. It may be public, that is general, in its uses and advantages; and the State may very laudably add contributions of its own to the funds; but it is still private in the tenure of the property, and in the right of administering the funds. If the doctrine laid down by Lord Holt, and the House of Lords, in Phillips v. Bury, and recognized and established in all the other cases, be correct, the property of this [***68] college was private property; it was vested in the trustees by the charter, and to be administered by them, according to the will of the founder and donors, as expressed in the charter. They were also visitors of the charity, in the most ample sense. They had, therefore, as they contend, privileges, property, and immunities, within the true meaning of the bill of rights. They had rights, and still have them, which they can assert against the legislature, as well as against other wrongdoers. It makes no difference, that the estate is holden for certain trusts. The legal estate is still theirs. They have a right in the property, and they have a right of visiting and superintending the trust; and this is an object of legal protection, as much as any other right. The charter declares, that the powers conferred on the trustees, are "privileges, advantages, liberties, and immunities;" and that they shall be forever holden by them and their successors. The New-Hampshire bill of rights declares, that no one shall be deprived of his "property, privileges, or immunities," but by judgment of his peers, or the law of the land. The argument on the other side is, that although these terms [***69] may mean something in the bill of rights, they mean nothing

in this charter. But they are terms of legal signification, and very properly used in the charter. They are equivalent with franchises. Blackstone says that franchise and liberty are used as synonymous terms. And after enumerating other liberties and franchises, he says, "it is likwise a franchise for a number of persons to be incorporated and subsist as a body politic, with a power to maintain perpetual succession, and do other corporate acts; and each individual member of such corporation is also said to have a franchise or freedom." [26] Liberties is the term used in magna charta, as including franchises, privileges, immunities, and all the rights which belong to that class. Professor Sullivan says, the term signifies the "privileges that some of the subjects, whether single persons or bodies corporate, have above others by the lawful grant of the king; as the chattels of felons or outlaws, and the lands and privileges of corporations." [27] The privilege, then, of being a member of a corporation, under a lawful grant, and of exercising the rights and powers of such member, is such a privilege, liberty, or franchise, [***70] as has been the object of legal protection, and the subject of a legal interest, from the time of magna charta to the present moment. The plaintiffs have such an interest in this corporation, individually, as they could assert and maintain in a court of law, not as agents of the public, but in their own right. Each trustee has a franchise, and if he be disturbed in the enjoyment of it, he would have redress, on appealing to the law, as promptly as for any other injury. If the other trustees should conspire against any one of them, to prevent his equal right and voice in the appointment of a president or professor, or in the passing of any statute or ordinance of the college, he would be entitled to his action, for depriving him of his franchise. It maks no difference, that this property is to be holden and administered, and these franchises exercised, for the purpose of diffusing learning. No principle and no case establishes any such distinction. The public may be benefited by the use of this property. But this does not change the nature of the property, or the rights of the owners. The object of the charter may be public good; so it is in all other corporations; and this [***71] would as well justify the resumption or violation of the grant in any other case as in this. In the case of an advowson, the use is public, and the right cannot be turned to any private benefit or emolument. It is, nevertheless a legal private right, and the property of the owner, as emphatically as his freehold. The rights and privileges of trustees, visitors, or governors of incorporated colleges, stand on the same foundation. They are so considered, both by

Lord Holt and Lord Hardwicke. [28] To contend that the rights of the plaintiffs may be taken away, because they derive from them no pecuniary benefit, or private emolument, or because they cannot be transmitted to their heirs, or would not be assets to pay their debts, is taking an extremely narrow view of the subject. According to this notion, the case would be different, if, in the charter, they had stipulated for a commission on the disbursement of the funds; and they have ceased to have any interest in the property, because they have undertaken to administer it gratuitously. It cannot be necessary to say much in refutation of the idea, that there cannot be a legal interest, or ownership, in any thing which does not yield [***72] a pecuniary profit; as if the law regarded no rights but the rights of money, and of visible tangible property. Of what nature are all rights of suffrage? No elector has a particular personal interest; but each has a legal right, to be exercised at his own discretion, and it cannot be taken away from him. The exercise of this right directly and very materially affects the public; much more so than the exercise of the privileges of a trustee of this college. Consequences of the utmost magnitude may sometimes depend on the exercise of the right of suffrage by one or a few electors. Nobody was ever yet heard to contend, however, that on that account the public might take away the right or impair it. This notion appears to be borrowed from no better source than the repudiated doctrine of the three judges in the Aylesbury case. [29] That was an action against a returning officer, for refusing the plaintiff's vote, in the election of a member of parliament. Three of the judges of the king's bench held, that the action could not be maintained, because, among other objections, "it was not any matter of profit, either in presenti or in futuro." It would not enrich the plaintiff, in presenti, [***73] nor would it, in futuro, go to his heirs, or answer to pay his debts. But Lord Holt and the house of lords were of another opinion. The judgment of the three judges was reversed, and the doctrine they held, having been exploded for a century, seems now for the first time to be revived. Individuals have a right to use their own property for purposes of benevolence, either towards the public, or towards other individuals. They have a right to exercise this benevolence in such lawful manner as they may choose; and when the government has induced and excited it, by contracting to give perpetuity to the stipulated manner of exercising it, to rescind this contract, and seize on the property, is not law, but violence. Whether the State will grant these franchises, and under what conditions it will grant them, it decides for itself. But when once granted, the constitution holds them to be

sacred, till forfeited for just cause. That all property, of which the use may be beneficial to the public, belongs therefore to the public, is quite a new doctrine. It has no precedent, and is supported by no known principle. Dr. Wheelock might have answered his purposes, in this case, by executing [***74] a private deed of trust. He might have conveyed his property to trustees, for precisely such uses as are described in this charter. Indeed it appears that he had contemplated the establishing of his school in that manner, and had made his will, and devised the property to the same persons who were afterwards appointed trustees in the charter. Many literary and other charitable institutions are founded in that manner, and the trust is renewed, and conferred on other persons, from time to time, as occasion may require. In such a case, no lawyer would or could say, that the legislature might devest the trustees constituted by deed or will, seize upon the property, and give it to other persons, for other purposes. And does the granting of a charter, which is only done to perpetuate the trust in a more convenient manner, make any difference? Does or can this change the nature of the charity, and turn it into a public, political corporation? Happily we are not without authority on this point. It has been considered and adjudged. Lord Hardwicke says, in so many words, "The charter of the crown cannot make a CHARITY more or less public, but only more permanent than it would otherwise [***75] be." [30] The granting of the corporation is but making the trust perpetual, and does not alter the nature of the charity. The very object sought in obtaining such charter, and in giving property to such a corporation, is to make and keep it private property, and to clothe it with all the security and inviolability of private property. The intent is, that there shall be a legal private ownership, and that the legal owners shall maintain and protect the property, for the benefit of those for whose use it was designed. Who ever endowed the public? Who ever appointed a legislature to administer his charity? Or who ever heard, before, that a gift to a College, or Hospital, or an Asylum, was, in reality, nothing but a gift to the State? The State of Vermont is a principal donor to Dartmouth College. The lands given lie in that State. This appears in the special verdict. Is Vermont to be considered as having intended a gift to the State of New-Hampshire in this case; as it has been said is to be the reasonable construction of all donations to the College? The legislature of New-Hampshire affects to represent the public, and therefore claims a right to control all property destined [***76] to public use. What hinders Vermont from considering herself equally the representative of the

public, and from resuming her grants, at her own pleasure? Her right to do so is less doubtful than the power of New-Hampshire to pass the laws in question. In University v. Foy, [31] the Supreme Court of North-Carolina pronounced unconstitutional and void, a law repealing a grant to the University of North-Carolina; although that University was originally erected and endowed by a statute of the State. That case was a grant of lands, and the Court decided that it could not be resumed. This is the grant of a power and capacity to hold lands. Where is the difference of the cases, upon principle? In Terret v. Taylor, [32] this Court decided, that a legislative grant or confirmation of lands for the purposes of moral and religious instruction could no more be rescinded than other grants. The nature of the use was not holden to make any difference. A grant to a parish or church, for the purposes which have been mentioned, cannot be distinguished, in respect to the title it confers, from a grant to a College for the promotion of piety and learning. To the same purpose may be cited, the case [***77] of Paylett v. Clark. The State of Vermont, by statute, in 1794, granted to the respective towns in that State, certain glebe lands lying within those towns, for the sole use and support of religious worship. In 1799, an act was passed to repeal the act of 1794; but this Court declared, that the act of 1794, "so far as it granted the glebes to the towns, could not afterwards be repealed by the legislature, so as to devest the rights of the towns under the grant. [33] It will be for the other side to show, that the nature of the use decides the question, whether the legislature has power to resume its grants. It will be for those who maintain such a doctrine, to show the principles and cases upon which it rests. It will be for them also, to fix the limits and boundaries of their doctrine, and to show what are, and what are not, such uses as to give the legislature this power of resumption and revocation. And to furnish an answer to the cases-cited, it will be for them further to show, that a grant for the use and support of religious worship, stands on other ground than a grant for the promotion of piety and learning.

10  1 Bl. Com. 471.
11  1 Ves. 537.
12  9 Ves. 405.
13  1 Wooddes. 474.
14  1 Bl. Com. 471.
15  2 T.R. 350, 351.
16  1 Bl. Com. 480.
17  Reported in 1 Lord Raymond, 5.Comb. 265.

Holt, 715. 1 Show. 360. 4 Mod. 106. Skinn. 447.
18  Lord Holt's judgment, copied from his own manuscript, is in 2 T.R. 346.
19  1 Burns' Eccles. Law, 443.
20  Green v. Rutherforth, 1 Ves. 472. Attorney General v. Foundling Hospital, 2 Ves. jr. 47. Kyd on Corp. 195. Coop. Eq. Pl. 292.
21  St. John's College, Cambridge v. Todington, 1 Burr. 200.
22  Attorney General v. Middleton, 2 Ves. 328.
23  Green v. Rutherforth, ubi supra. St. John's College v. Todington, ubi supra.
24  4 Term Rep. 233.
25  Bl. Com. ub. supr.
26  2 Bl. Com. 37.
27  Sull. 41st Lec.
28  Phillips v. Bury. Green v. Rutherforth, ubi supra. Vide also 2 Black. 21.
29  Ashby v. White, 2 Ld. Raym. 938.
30  Attorney General v. Pearce, 2 Atk. 87.
31  2 Heywood's R.
32  9 Cranch, 43.
33  9 Cranch, 292.

[***78] I hope enough has been said to show, that the trustees possessed vested liberties, privileges, and immunities, under this charter; and that such liberties, privileges, and immunities, being once lawfully obtained and vested, are as inviolable as any vested rights of property whatever. Rights to do certain acts, such, for instance, as the visitation and super-intendence of a college, and the appointment of its officers, may surely be vested rights, to all legal intents, as completely as the right to possess property. A late learned Judge of this Court has said, "when I say, that a right is vested in a citizen, I mean, that he has the power to do certain actions, or to possess certain things, according to the law of the land. [34]

34  3 Dal. 394.

If such be the true nature of the plaintiff's interests under this charter, what are the articles in the New-Hampshire bill of rights which these acts infringe?

They infringe the second article; which says, that the citizens of the State have a right to hold and possess property. The plaintiffs had a legal property in this charter; and they had acquired property under it. The acts deprive them of both. They impair and take away the [***79] charter; and they appropriate the property to

new uses, against their consent. The plaintiffs cannot now hold the property acquired by themselves, and which this article says, they have a right to hold. They infringe the twentieth article. By that article it is declared, that in questions of property, there is a right to trial. The plaintiffs are devested, without trial or judgment. They infringe the twenty-third article. In is therein declared, that no retrospective laws shall be passed. This article bears directly on the case. These acts must be deemed retrospective, within the settled construction of that term. What a retrospective law is, has been decided, on the construction of this very article, in the Circuit Court for the first circuit. The learned Judge of that circuit, says, "every statute which takes away, or impairs, vested rights, acquired under existing laws, must be deemed retrospective." [35] That all such laws are retrospective, was decided also in the case of Dash v. Van Kleek, [36] where a most learned Judge quotes this article from the constitution of New-Hampshire, with manifest approbation, as a plain and clear expression of those fundamental and unalterable [***80] principles of justice, which must lie at the foundation of every free and just system of laws. Can any man deny, that the plaintiffs had rights, under the charter, which were legally vested, and that by these acts, those rights are impaired. [37] These acts infringe also, the thirty-seventh article of the constitution of New-Hampshire; which says, that the powers of government shall be kept separate. By these acts, the legislature assumes to exercise a judicial power. It declares a forfeiture, and resumes franchises, once granted, without trial or hearing. If the constitution be not altogether waste paper, it has restrained the power of the legislature in these particulars. If it has any meaning, it is, that the legislature shall pass no act directly and manifestly impairing private property, and private privileges. It shall not judge, by act. It shall not decide, by act. It shall not deprive, by act. But it shall leave all these things to be tried and adjudged by the law of the land. The fifteenth article has been referred to before. It declares, that no one shall be "deprived of his property, immunities, or privileges, but by the judgment of his peers, or the law of the land." [***81] Notwithstanding the light in which the learned Judges in New-Hampshire viewed the rights of the plaintiffs under the charter, and which has been before adverted to, it is found to be admitted, in their opinion, that those rights are privileges within the meaning of this fifteenth article of the bill of rights. Having quoted that article, they say: "that the right to manage the affairs of this college is a privilege, within the meaning of this clause of the bill of rights, is

not to be doubted." In my humble opinion, this surrenders the point. To resist the effect of this admission, however, the learned judges add, "But how a privilege can be protected from the operation of the law of the land, by a clause in the constitution, declaring that it shall not be taken away but by the law of the land, is not very easily understood." This answer goes on the ground, that the acts in question are laws of the land, within the meaning of the constitution. If they be so, the argument drawn from this article is fully answered. If they be not so, it being admitted that the plaintiffs' rights are "privileges," within the meaning of the article, the argument is not answered, and the article is [***82] infringed by the acts. Are then these acts of the legislature, which affect only particular persons and their particular privileges, laws of the land? Let this question be answered by the text of Blackstone: "And first, it (i.e. law) is a rule: not a transient sudden order from a superior, to, or concerning, a particular person; but something permanent, uniform, and universal. Therefore, a particular act of the legislature to confiscate the goods of Titius, or to attaint him of high treason, does not enter into the idea of a municipal law: for the operation of this act is spent upon Titius only, and has no relation to the community in general; it is rather a sentence than a law." [38] Lord Coke is equally decisive and emphatic. Citing and commenting on the celebrated 29th chap. of Magna Charta, he says, "no man shall be disseized, &c. unless it be by the lawful judgment, that is, verdict of equals, or by the law of the land, that is, (to speak it once for all,) by the due course and process of law." [39] Have the plaintiffs lost their franchises by "due course and process of law?" On the contrary, are not these acts "particular acts of the legislature, which have no relation to the [***83] community in general, and which are rather sentences than laws?" By the law of the land is most clearly intended the general law; a law, which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial. The meaning is, that every citizen shall hold his life, liberty, property, and immunities, under the protection of the general rules which govern society. Every thing which may pass under the form of an enactment, is not, therefore, to be considered the law of the land. If this were so, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man's estate to another, legislative judgments, decrees, and forfeitures, in all possible forms, would be the law of the land. Such a strange construction would render constitutional provisions of the highest importance

completely inoperative and void. It would tend directly to establish the union of all powers in the legislature. There would be no general permanent law for courts to administer, or for men to live under. The administration of justice would be an empty form, an idle ceremony. Judges would sit to execute legislative [***84] judgments and decrees; not to declare the law, or to administer the justice of the country. "Is that the law of the land," said Mr. Burke, "upon which, if a man go to Westminster-Hall, and ask counsel by what title or tenure he holds his privilege or estate according to the law of the land, he should be told, that the law of the land is not yet known; that no decision or decree has been made in his case; that when a decree shall be passed, he will then know what the law of the land is? Will this be said to be the law of the land, by any lawyer who has a rag of a gown left upon his back, or a wig with one tie upon his head?" That the power of electing and appointing the officers of this college is not only a right of the trustees as a corporation generally, and in the aggregate, but that each individual trustee has also his own individual franchise in such right of election and appointment, is according to the language of all the authorities. Lord Holt says, "it is agreeable to reason and the rules of law, that a franchise should be vested in the corporation aggregate, and yet the benefit of it to redound to the particular members, and to be enjoyed by them in their private capacity. [***85] Where the privilege of election is used by particular persons, it is a particular right, vested in every particular man. [40]

35  Society v. Wheeler, 2 Gal. 103.

36  7 Johns. R. 477.

37  "It is a principle in the English law, as ancient as the law itself," says Chief Justice Kent, in the case last cited, "that a statute, even of its omnipotent parliament, is not to have a retrospective effect. Nova constitutio futuris formam imponere debet, et non prateritis. (Braction, lib. 4, fol. 228. 2 Inst. 292.) The maxim in Bracton was probably taken from the civil law, for we find in that system the same principle, that the law-giver cannot alter his mind to the prejudice of a vested right. Nemo potest mutare consilium suum in alterius injuriam. (Dig. 50. 17. 75.) This maxim of Papinian is general in its terms; but Dr. Taylor (Elements of the Civil Law, 168.) applies it directly as a restriction upon the law-giver; and a declaration in the code leaves no doubt as to the sense of the civil law. Leges at

constitutiones futuris certum est dare formam negotiis, non ad facta praeterita revocari, nisi nominatim, et de praeterito tempore, et adhuc pendentibus negotiis coutum sit. (Cod. 1. 14. 7.) This passage, according to the best interpretation of the civilians, relates not merely to future suits, but to future as contradistinguished from past contracts and vested rights.(Perezii Praelec. t.) It is, indeed, admitted, that the prince may anact a retrospective law, provided it be done expressly; for the will of the prince, under the despotism of the Roman emperors, was paramount to every obligation.Great latitude was anciently allowed to legislative expositions of statutes; for the separation of the judicial, from the legislative power, was not then distinctly known or prescribed. The prince was in the habit of interpreting his own laws for particular occasions. This was called the interlocutio principis; and this, according to Huber's definition, was, quando principes inter partes loquuntur, et jus dicunt. (Praelec. Juris. Rom. Vol. 2. 545.) No correct civilian, and especially no proud admirer of the ancient republic, (if any such then existed,) could have reflected on this interference with private rights, and pending suits, without disgust and indignation; and we are rather surprised to find, that under the violent and irregular genius of the Roman government, the principle before us should have been acknowledged and obeyed to the extent in which we find it. The fact shows, that it must be founded in the clearest justice. Our case is happily very different from that of the subjects of Justinian. With us, the power of the law-giver is limited and defend; the judicial is regarded as a distinct independent power; private rights have been better understood, and more exalted in public estimation, as well as secured by provisions dictated by the spirit of freedom, and unknown to the civil law. Our constitutions do not admit the power assumed by the Roman prince; and the principle we are considering, is now to be regarded as sacred."

38  1 Bl. Com9 44.

39  Co. Ins. 46.

40  2 Lord Raym. 952.

[***86] It is also to be considered, that the president and professors of this college have rights to be affected by these acts. Their interest is similar to that of fellors in the

English colleges; because they derive their living wholly, or in part, from the founder's bounty. The president is one of the trustees, or corporators. The professors are not necessarily members of the corporation; but they are appointed by the trustees, are removable only by them, and have fixed salaries, payable out of the general funds of the college. Both president and professors have freeholds in their offices; subject only to be removed, by the trustees, as their legal visitors, for good cause. All the authorities speak of fellowships in colleges as freeholds, notwithstanding the fellows may be liable to be suspended or removed, for misbehaviour, by their constituted visitors. Nothing could have been less expected, in this age, than that there should have been an attempt, by acts of the legislature, to take away these college livings, the inadequate, but the only support of literary men, who have devoted their lives to the instruction of youth. The president and professors were appointed by the twelve [***87] trustees. They were accountable to nobody else, and could be removed by nobody else. They accepted their offices on this tenure. Yet the legislature has appointed other persons, with power to remove these officers, and to deprive them of their livings; and those other persons have exercised that power. No description of private property has been regarded as more sacred than college livings. They are the estates and freeholds of a most deserving class of men; of scholars who have consented to forego the advantages of professional and public employments, and to devote themselves to science and literature, and the instruction of youth, in the quiet retreats of academic life. Whether, to dispossess and oust them; to deprive them of their office, and turn them out of their livings; to do this, not by the power of their legal visitors, or governors, but by acts of the legislature; and to do it without forfeiture, and without fault; whether all this be not in the highest degree an indefensible and arbitrary proceeding, is a question, of which there would seem to be but one side fit for a lawyer or a scholar to espouse. Of all the attempts of James II. to overturn the law, and the rights [***88] of his subjects, none was esteemed more arbitrary or tyranical, than his attack on Magdalen College, Oxford: And, yet, that attempt was nothing but to put one president and put in another. The president of that college, according to the charter and statutes, is to be chosen by the fellows, who are the corporators. There being a vacancy, the king chose to take the appointment out of the hands of the fellows, the legal electors of a president, into his own hands. He therefore sent down his mandate commanding the fellows to admit, for president,

a person of his nomination; and in as much as this was directly against the charter and constitution of the college, he was pleased to add a non obstante clause of sufficiently comprehensive import. The fellows were commanded to admit the person mentioned in the mandate, "any statute, custom or constitution to the contrary notwithstanding, wherewith we are graciously pleased to dispense, in this behalf." The fellows refused obedience to this mandate, and Dr. Hough, a man of independence and character, was chosen president by the fellows, according to the charter and statutes. The king then assumed the power, in virtue of his prerogative, [***89] to send down certain commissioners to turn him out; which was done accordingly; and Parker, a creature suited to the times put in his place. And because the president, who was rightfully and legally elected, would not deliver the keys, the doors were broken open. "The nation, as well as the university," says Bishop Burnet, [41] "looked on all these proceedings with just indignation. It was thought an open piece of robbery and burglary, when men, authorized by no legal commission, came and forcibly turned men out of their possession and freehold." Mr. Hume, although a man of different themper, and of other sentiments, in some respects, than Dr. Burnet, speaks of this arbitrary attempt of prerogative, in terms not less decisive. "The president, and all the fellows," says he, "except two, who complied, were expelled the college; and Parker was put in possession of the office. This act of violence, of all those which were committed during the reign of James, is perhaps the most illegal and arbitrary. When the dispensing power was the most strenuously insisted on by court lawsyers, it had still been allowed, that the statutes which regard private property could not legally be infringed [***90] by that prerogative. Yet, in this instance, it appeared that even these were not now secure from invasion. The privileges of a college are attacked; men are illegally dispossessed of their property for adhering to their duty, to their oaths, and to their religion." This measure king James lived to repent, after repentance was too late. When the charter of London was restored, and other measures of violence retracted, to avert the impending revolution, the expelled president and fellows of Magdalen college were permited to resume their rights. It is evident that this this was regarded as an arbitrary interference with private property. Yet private property was no otherwise attacked, than as a person was appointed to administer and enjoy the revenues of a college, in a manner and by persons not authorized by the constitution of the college. A majority of the members of the corporation would not comply with

the king's wishes. A minority would. The object was, therefore, to make this minority, a majority. To this end, the king's commissioners were directed to interfere in the case, and they united with the two complying fellows, and expelled the rest; and thus effected a change [***91] in the government of the college. The language in which Mr. Hume, and all other writers, speak of this abortive attempt of oppression, shows that colleges were esteemed to be, as they truly are, private corporations, and the property and privileges which belong to them, private property, and private privileges. Court lawyers were found to justify the king in dispensing with the laws; that is, in assuming and exercising a Legislative authority. But no lawyer, not even a court lawyer, in the reign of king James the second, as far as appears, was found to say, that even by this high authority, he could infringe the franchises of the fellows of a college, and take away their livings. Mr. Hume gives the reason; it is, that such franchises were regarded, in a most emphatic sense, as private property. [42] If it could be made to appear, that the trustees and the president and professors held their offices and franchises during the pleasure of the legislature, and that the property holden belonged to the State, then indeed the legislature have done no more than they had a right to do. But this is not so. The charter is a charter of privileges and immunities; and these are holden by the [***92] trustees expressly against the State forever. It is admitted, that the State, by its Courts of law, can enforce the will of the donor, and compel a faithful execution of the trust. The plaintiffs claim no exemption from legal responsibility. They hold themselves at all times answerable to the law of the land, for their conduct in the trust committed to them. They ask only to hold the property of which they are owners, and the franchises which belong to them, until they shall be found by due course and process of law to have forfeited them. It can make no difference, whether the legislature exercise the power it has assumed, by removing the trustees and the president and professors, directly, and by name, or by appointing others to expel them. The principle is the same, and, in point of fact, the result has been the same. If the entire franchise cannot be taken away, neither can it be essentially impaired. If the trustees are legal owners of the property, they are sole owners. If they are visitors, they are sole visitors. No one will be found to say, that if the legislature may do what it has done, it may not do any thing and every thing which it may choose to do, relative [***93] to the property of the corporation, and the privileges of its members and officers.

41  Hist. of his own times, vol. 3. p. 119.
42  Vide a full account of this case in State Trials, 4 Ed. vol. 4. p. 262.

If the view which has been taken of this question be at all correct, this was an eleemosynary corporation; a private charity. The property was private property. The trustees were visitors, and their right to hold the charter, administer the funds, and visit and govern the college, was a franchise and privilege, solemnly granted to them. The use being public, in no way diminishes their legal estate in the property, or their title to the franchise. There is no principle, nor any case, which declares that a gift to such a corporation is a gift to the public. The acts in question violate property. They take away privileges, immunities, and franchises. They deny to the trustees the protection of the law; and they are retrospective in their operation. In all which respects, they are against the constitution of New-Hampshire.

2. The plaintiffs contend, in the second place, that the acts in question are repugnant to the 10th section of the 1st article of the constitution of [***94] the United States. The material words of that section are: "no State shall pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts."

The object of these most important provisions in the national constitution has often been discussed, both here and elsewhere.It is exhibited with great clearness and force by one of the distinguished persons who framed that instrument. "Bills of attainder, ex post facto laws, and laws impairing the obligation of contracts, are contrary to the first principles of the social compact, and to every principle of sound legislation. The two former are expressly prohibited by the declarations prefixed to some of the State constitutions, and all of them are prohibited by the spirit and scope of these fundamental charters. Our own experience has taught us, nevertheless, that additional fences against these dangers ought not to be omitted. Very properly, therefore, have the Convention added this constitutional bulwark in favour of personal security and private rights; and I am much deceived if they have not, in so doing, as faithfully consulted the genuine sentiments as the undoubted interests of their constituents. The [***95] sober people of America are weary of the fluctuating policy which has directed the public councils. They have seen with regret, and with indignation, that sudden changes, and legislative interferences, in cases affecting personal rights, become

jobs in the hands of enterprising and influential speculators; and snares to the more industrious and less informed part of the community. They have seen, too, that one legislative interference is but the link of a long chain of repetitions; every subsequent interference being naturally produced by the effects of the preceding." [43] It has already been decided in this Court, that a grant is a contract, within the meaning of this provision; and that a grant by a State is also a contract as much as the grant of an individual. [44] It has also been decided, that a grant by a State before the revolution, is as much to be protected as a grant since. [45] But the case of Terret v. Taylor, before cited, is of all others most pertinent to the present argument. Indeed, the judgment of the Court in that case seems to leave little to be argued or decided in this. [46] This Court, then, does not admit the doctrine, that a legislature can repeal statutes [***96] creating private corporations. If it cannot repeal them altogether, of course it cannot repeal any part of them, or impair them, or essentially alter them, without the consent of the corporators. If, therefore, it has been shown that this college is to be regarded as a private charity, this case is embraced within the very terms of that decision. A grant of corporate powers and privileges is as much a contract as a grant of land. What proves all charters of this sort to be contracts, is, that they must be accepted, to give them force and effect. If they are not accepted they are void. And in the case of an existing corporation, if a new charter is given it, it may even accept part, and reject the rest. In Rex v. Vice Chancellor of Cambridge, [47] Lord Mansfield says, "there is a vast deal of difference between a new charter granted to a new corporation, (who must take it as it is given,) and a new charter given to a corporation already in being, and acting either under a former charter, or under prescriptive usage. The latter, a corporation already existing, are not obliged to accept the new charter in toto, and to receive either all or none of it; they may act partly under [***97] it, and partly under their old charter or prescription. The validity of these new charters must turn upon the acceptance of them." In the same case, Mr. Justice Wilmot says, "It is the concurrence and acceptance of the university that gives the force to the charter of the crown." In the King v. Passmore, [48] Lord Kenyon observes, "some things are clear: when a corporation exists, capable of discharging its functions, the crown cannot obtrude another charter upon them; they may either accept or reject it." [49] In all cases relative to charters, the acceptance of them is uniformly alleged in the pleadings. This shows the general understanding of the law, that they are grants, or

contracts; and that parties are necessary to give them force and validity. In King v. Dr. Askew, [50] it is said, "The crown cannot oblige a man to be a corporator without his consent; he shall not be subject to the inconveniences of it, without accepting it and assenting to it." These terms, "acceptance," and "assent," are the very language of contract. In Ellis v. Marshall, [51] it was expressly adjudged, that the naming of the defendant, among others, in an act of incorporation did not, of itself, make him [***98] a corporator; and that his assent was necessary to that end. The Court speak of the act of incorporation as a grant, and observe, "that a man may refuse a grant, whether from the government or an individual, seems to be a principle too clear to require the support of authorities." But Mr. Justice Buller, in King v. Passmore, furnishes, if possible, a still more direct and explicit authority. Speaking of a corporation for government, he says, "I do not know how to reason on this point better than in the manner urged by one of the relator's counsel, who considered the grant of incorporation to be a compact between the crown and a certain number of the subjects, the latter of whom undertake, in consideration of the privileges which are bestowed, to exert themselves for the good government of the place." This language applies, with peculiar propriety and force, to the case before the Court. It was in consequence of the "privileges bestowed," that Dr. Wheelock and his associates, undertook to exert themselves for the instruction and education of youth in this college; and it was on the same consideration that the founder endowed it with his property. And because charters of incorporation [***99] are of the nature of contracts, they cannot be altered or varied, but by consent of the original parties. If a charter be granted by the king, it may be altered by a new charter granted by the king, and accepted by the corporators But if the first charter be granted by parliament, the consent of parliament must be obtained to any alteration. In King v. Miller, [52] Lord Kenyon says, "Where a corporation takes its rise from the king's charter, the king by granting, and the corporation by accepting, another charter, may alter it, because it is done with the consent of all the parties who are competent to consent to the alteration. [53] There are, in this case, all the essential constituent parts of a contract. There is something to be contracted about; there are parties, and there are plain terms in which the agreement of the parties, on the subject of the contract, is expressed. There are mutual considerations and inducements. The charter recites, that the founder, on his part, has agreed to establish his seminary in New-Hampshire, and to enlarge

it, beyond its original design, among other things, for the benefit of that province; and thereupon a charter is given to him and his associates, [***100] designated by himself, promising and assuring to them, under the plighted faith of the State, the right of governing the college, and administering its concerns, in the manner provided in the charter. There is a complete and perfect grant to them of all the power of superintendance, visitation, and government. Is not this a contract? If lands or money had been granted to him and his associates, for the same purposes, such grant could not be rescinded. And is there any difference, in legal contemplation, between a grant of corporate franchises, and a grant of tangible property? No such difference is recognized in any decided case, nor does it exist in the common apprehension of mankind.

43    Letters of Publius, or The Federalist, (No. 44., by Mr. MADISON.)

44    In Fletcher v. Peck, 6 Cranch 87. this Court says, "a contract is a compact between two or more parties, and is either executory or executed. An executory contract is one in which a party binds himself to do, or not to do, a particular thing; such was the law under which the conveyance was made by the government. A contract executed is one in which the object of contract is performed; and this, says Blackstone, differs in nothing from a grant. The contract between Georgia and the purchasers was executed by the grant. A contract executed, as well as one which is executory, contains obligations binding on the parties. A grant, in its own nature, amounts to an extinguishment of the right of the grantor, and implies a contract not to reassert that right. If under a fair construction of the constitution, grants are comprehended under the term contracts, is a grant from the State excluded from the operation of the provision? Is the clause to be considered as inhibiting the State from impairing the obligation of contracts between two individuals, but as excluding from that inhibition contracts made with itself? The words themselves contain no such distinction. They are general, and are applicable to contracts of every description. If contracts made with the State are to be exempted from their operation, the exception must arise from the character of the contracting party, not from the words which are employed. Whatever respect might have been felt for the State

sovereignties, it is not to be disguised, that the framers of the constitution viewed, with some apprehension, the violent acts which might grow out of the feelings of the moment; and that the people of the United States, in adopting that instrument, have manifested a determination to shield themselves, and their property, from the effects of those sudden and strong passions to which men are exposed. The restrictions on the legislative power of the States, are obviously founded in this sentiment; and the constitution of the United States contains what may be deemed a bill of rights, for the people of each State."

45    New-Jersey v. Wilson, 7 Cranch, 164.

46    "A private corporation," says the Court, "created by the legislature, may lose its franchises by a misuser or a nonuser of them; and they may be resumed by the government under a judicial judgment upon a quo warranto to ascertain and enforce the forfeiture. This is the common law of the land, and is a tacit condition annexed to the creation of every such corporation. Upon a change of government, too, it may be admitted that such exclusive privileges attached to a private corporation as are inconsistent with the new government, may be abolished. In respect, also, to public corporations which exist only for public purposes, such as counties, towns, cities, &c. the legislature may, under proper limitations, have a right to change modify, enlarge, or restrain them, securing, however, the property for the use of those for whom and at whose expense it was originally purchased. But that the legislature can repeal statutes creating private corporations, or confirming to them property already acquired under the faith of previous laws, and by such repeal can vest the property of such corporations exclusively in the State, or dispose of the same to such purposes as they please, without the consent or default of the corporators, we are not prepared to admit; and we think ourselves standing upon the principles of natural justice, upon the fundamental laws of every free government, upon the spirit and letter of the constitution of the United States, and upon the decisions of most respectable judicial tribunals, in resisting such a doctrine."

47    3 Burr. 1656.

48    3 T.R. 240.

49    Vide also, 1 Kyd. on Cor. 65.

50  4 Burr. 2200.
51  2 Mass. R. 279.
52  6 T.R. 277.
53  Vide also, 2 Bro. Ch. R. 662. Ex parte Bolton School.

[***101] It is therefore contended, that this case falls within the true meaning of this provision of the constitution, as expounded in the decisions of this Court; that the charter of 1769, is a contract, a stipulation, or agreement; mutual in its considerations, express and formal in its terms, and of a most binding and solemn nature. That the acts in question impair this contract, has already been sufficiently shown. They repeal and abrogate its most essential parts.

Much has heretofore been said on the necessity of admitting such a power in the legislature as has been assumed in this case. Many cases of possible evil have been imagined, which might otherwise be without remedy. Abuses, it is contended, might arise in the management of such institutions, which the ordinary courts of law would be unable to correct. But this is only another instance of that habit of supposing extreme cases, and then of reasoning from them, which is the constant refuge of those who are obliged to defend a cause which, upon its merits, is indefensible. It would be sufficient to say, in answer, that it is not pretended, that there was here any such case of necessity. But a still more satisfactory answer [***102] is, that the apprehension of danger is groundless, and, therefore, the whole argument fails. Experience has not taught us that there is danger of great evils of of great inconvenience from this source. Hitherto, neither in our own country nor elsewhere, have such cases of necessity occurred. The judicial establishments of the State are presumed to be competent to prevent abuses and violations of trust, in cases of this kind, as well as in all others. It they be not, they are imperfect, and their amendment would be a most proper subject for legislative wisdom. Under the government and protection of the general laws of the land, those institutions have always been found safe, as well as useful. They go on with the progress of society, accommodating themselves easily, without sudden change or violence, to the alterations which take place in its condition; and in the knowledge, the habits, and pursuits of men.The English colleges were founded in Catholic ages.Their religion was reformed with the general reformation of the nation; and they are suited perfectly well to the purpose of educating the protestant youth of modern times. Dartmouth College was established under a charter [***103] granted by the provincial government; but a better constitution for a college, or one more adapted to the condition of things under the present government, in all material respect, could not now be framed. Nothing in it was found to need alteration at the revolution. The wise men of that day saw in it one of the best hopes of future times, and commended it, as it was, with parental care, to the protection and guardianship of the government of the State. A charter of more liberal sentiments, of wiser provisions, drawn with more care, or in a better spirit, could not be expected at any time, or from any source. The college needed no change in its organization or government. That which it did need was the kindness, the patronage, the bounty of the legislature; not a mock elevation to the character of a university, without the solid benefit of a shilling's donation to sustain the character; not the swelling and empty authority of establishing institutes and other colleges. This unsubstantial pageantry would seem to have been in derision of the scanty endowment and limited means of an unobtrusive, but useful and growing seminary. Least of all was there a necessity, or pretence of [***104] necessity, to infringe its legal rights, violate its franchises and privileges, and pour upon it these overwhelming streams of litigation. But this argument, from necessity, would equally apply in all other cases. If it be well founded, it would prove, that whenever any inconvenience or evil should be experienced from the restrictions imposed on the legislature by the constitution, these restrictions ought to be disregarded. It is enough to say, that the people have thought otherwise. They have, most wisely, chosen to take the risk of occasional inconvenience from the want of power, in order that there might be a settled limit ot is exercise, and a permanent security against its abuse. They have imposed prohibitions and restraints; and they have not rendered these altogether vain and nugatory by conferring the power of dispensation. If inconvenience should arise, which the legislature cannot remedy under the power conferred upon it, it is not answerable for such inconvenience. That which it cannot do within the limits prescribed to it, it cannot do at all. No legislature in this country is able, and may the time never come when it shall be able, to apply to itself the memorable [***105] expression of a Roman pontiff; "Licet hoc DE JURE non possumus, volumus tamen DE PLENITUDINE POTESTATIS."

The case before the Court is not of ordinary importance, nor of every day occurrence. It affects not this college only, but every college, and all the literary institutions of the country. They have flourished, hitherto, and have become in a high degree respectable and useful to the community. They have all a common principle of existence, the inviolability of their charters. It will be a dangerous, a most dangerous experiment, to hold these institutions subject to the rise and fall of popular parties, and the fluctuations of political opinions. If the franchise may be at any time taken away, or impaired, the property also may be taken away, or its use perverted. Benefactors will have no certainty of effecting the object of their bounty; and learned men will be deterred from devoting themselves to the service of such institutions, from the precarious title of their offices. Colleges and halls will be deserted by all better spirits, and become a theatre for the contention of politics. Party and faction will be cherished in the places consecrated to piety and learning. These [***106] consequences are neither remote nor possible only. Ther are certain and immediate.

When the Court in North-Carolina declared the law of the State, which repealed a grant to its university, unconstitutional and void, the legislature had the candour and the wisdom to repeal the law.This example, so honourable to the State which exhibited it, is most fit to be followed on this occasion. And there is good reason to hope, that a State which has hitherto been so much distinguished for tempeperate councils, cautious legislation, and regard to law, will not fail to adopt a course which will accord with her highest and best interest, and, in no small degree, elevate her reputation. It was for many obvious reasons most anxiously desired, that the question of the power of the legislature over this charter should have been finally decided in the State Court. An earnest hope was entertained that the judges of that Court might have viewed the case in a light favourable to the rights of the trustees. That hope has failed. It is here that those rights are now to be maintained, or they are prostrated forever. Omnia alia perfugia bonorum, subsidia, consilia, auxilia, jura ceciderunt. Quem enim [***107] alium appellem? quem obtestor? quem implorem? Nisi hoc loco, nisi apud vos, nisi per vos, judices, salutem nostram, quae spe exigua extremaque pendet, temerimus; nihil est praeterea quo confugere possimus.

Mr. Homes, for the defendant in error, argued, that the prohibition in the constitution of the United States, which alone gives the Court jurisdiction in this case, did not extend to grants of political power; to contracts concerning the internal government and police of a sovereign State. Nor does it extend to contracts which relate merely to matters of civil institution, even of a private nature. Thus marriage is a contract, and a private contract; but relating merely to a matter of civil institution, which every society has an inherent right to regulate as its own wisdom may dictate, it cannot be considered as within the spirit of this prohibitory clause. Divorces unquestionably impair the obligation of the nuptial contract; they change the relations of the marriage state, without the consent of both the parties, and thus come clearly within the letter of the prohibition. But surely, no one will contend, that there is locked up in this mystical clause of the constitution [***108] a prohibition to the States to grant divorces, a power peculiarly appropriate to domestic legislation, and which has been exercised in every age and nation where civilization has produced that corruption of manners, which, unfortunately, requires this remedy. Still less can a contract concerning a public office to be exercised, or duty to be performed, be included within this prohibition. The Convention who framed the constitution, did not intend to interfere in the exercise of the political powers reserved to the State governments. That was left to be regulated by their own local laws and constitutions; with this exception only, that the Union should guarantee to each State a republican from of government, and defend it against domestic insurrection and rebellion. Beyond this, the authorities of the Union have no right to interfere in the exercise of the powers reserved to the State. They are sovereign and independent in their own sphere. If, for example, the legislature of a particular State should attempt to deprive the judges of its Courts (who, by the State constitution, held their places during good behaviour) of their offices without a trial by impeachment; or should arbitrarily [***109] and capriciously increase the number of the judges so as to give the preponderancy in judicature to the prevailing political faction, would it be pretended that the minority could resist such a law, upon the ground of its impairing the obligation of a contract? Must not the remedy, if any where existing, be found in the interposition of some State authority to enforce the provisions of the State constitution? The education of youth, and the encouragement of the arts and sciences, is one of the most important objects of civil government. [54] By our constitutions, it is left exclusively to the States, with the exception of copy rights and patents. It was in the

exercise of this duty of government, that this charter was originally granted to Dartmouth College. Even when first granted under the colonial government, it was subject to the notorious authority of the British parliament over all charters containing grants of political power. It might have been revoked or modified by act of parliament. [55] The revolution, which separated the colony from the parent country, dissolved all connexion between this corporation and the crown of Great Britain. But it did not destroy that supreme [\*\*\*110] authority which every political society has over its public institutions. That still remained, and was transferred to the people of New-Hampshire. They have not relinquished it to the government of the United States, or to any department of that government. Neither does the constitution of New-Hampshire confirm the charter of Dartmouth College, so as to give it the immutability of the fundamental law. On the contrary, the constitution of the State admonishes the legislature of the duty of encouraging science and literature, and thus seems to suppose its power of control over the scientific and literary institutions of the State. The legislature had, therefore, a right to modify this trust, the original object of which, was the education of the Indian and English youth of the province. It is not necessary to contend, that it had the right of wholly diverting the fund from the original object of its pious and benevolent founders. Still it must be insisted, that a regal grant, with a regal and colonial policy, necessarily became subject to the modification of a republican legislature, whose right, and whose duty it was, to adapt the education of the youth of the country to the [\*\*\*111] change in its political institutions. It is a corollary from the right of self-government. The ordinary remedies which are furnished in the Court for a misuser of the corporate franchises, are not adapted to the great exigencies of a revolution in government. They pre-suppose a permanently established order of things, and are intended only to correct occasional deviations, and minor mischiefs. But neither a reformation in religion, nor a revolution in government, can be accomplished or confirmed by a writ of quo warranto or mandamus. We do not say, that the corporation has forfeited its charter for misuser; but that it has become unfit for use by a change of circumstances. Nor does the lapse of time from 1776 to 1816, infer an acquiescence on the part of the legislature, or a renunciation of its right to abolish or reform an institution, which being of a public nature, cannot hold its privileges by prescription. Our argument is, that it is, at all times, liable to be new modelled by the legislative wisdom, instructed by the lights of the age.

> 54  Vattel, L. 1. c. 11. s. 112, 113.
> 55  1 Bl. Com. 485.

The conclusion then is, that this charter is not such a contract as is [\*\*\*112] contemplated by the constitution of the United States; that it is not a contract of a private nature, concerning property or other private interests: but that it is a grant of a public nature, for public purposes, relative to the internal government and police of a State, and, therefore, liable to he revoked or modified by the supreme power of that State.

Supposing, however, this to be a contract such as was meant to be included in the constitutional prohibition, is its obligation impaired by these acts of the legislature of New-Hampshire?

The title of the acts of the 27th of June, and the 18th of December, 1816, shows that the legislative will and intention was to amend the charter, and enlarge and improve the corporation. If by a technical fiction the grant of the charter can be considered as a contract between the king (or the State) and the corporators, the obligation of that contract is not impaired; but is rather engorced, by these acts, which continue the same corporation, for the same objects, under a new name. It is well settled, that a mere change of the name of a corporation will not affect its identity. An addition to the number of the colleges, the creation of new [\*\*\*113] fellowships, or an increase of the number of the trustees, do not impair the franchises of the corporate body. Nor is the franchise of any individual corporator impaired. In the words of Mr. Justice Ashurst, in the case of the King v. Passmore, [56] "the members of the old body have no injury or injustice to complain of, for they are all included in the new charter of incorporation; and if any of them do not become members of the new incorporation, but refuse to accept, it is their own fault." What rights which are secured by this alleged contract are invaded by the acts of the legislature? Is it the right of property, or of privileges? It is not the former, because the corporate body is not deprived of the least portion of its property. If it be the personal privileges of the corporators that are attacked, these must be either a common and universal privilege, such as the right of suffrage, for interrupting the exercise of which an action would lie; or they must be monopolies and exclusive privileges, which are always subject to be regulated and modified by the supreme power of the State. Where a private proprietary interest

is coupled with the exercise of political power or a [***114] public trust, the charters of corporations have frequently been amended by legislative authority. [57] In charters creating artificial persons for purposes exclusively private, and not interfering with the common rights of the citizens, it may be admitted that the legislature cannot interfere to amend without the consent of the grantees. The grant of such a charter might perhaps be considered as analogous to a contract between the State and private individuals, affecting their private rights, and might thus be regarded as within the spirit of the constitutional prohibition. But this charter is merely a mode of exercising one of the great powers of civil government. Its amendment, or even repeal, can no more be considered as the breach of a contract, than the amendment or repeal of any other law. Such repeal or amendment is an ordinary act of public legislation, and not an act impairing the obligation of a contract between the government and private citizens, under which personal immunities or proprietary interests are vested in them.

56  3 T.R. 244.
57  Gray v. The Portland Bank, 3 Mass. R. 364. The Commonwealth v. Bird, 12 Mass. R. 443.

The Attorney-General, on the same [***115] side, stated, that the only question properly before the Court was, whether the several acts of the legislature of New-Hampshire, mentioned in the special verdict, are repugnant to that clause of the constitution of the United States, which provides, that no State shall "pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts."

Beside its intrinsic difficulty, the extreme delicacy of this question is evinced by the sentiments expressed by the Court, whenever it has been called to act on such a question. [58] In the case of Fletcher v. Peck, the Court says, "The question whether a law be void for its repugnancy to the constitution, is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative, in a doubtful case. The Court, when impelled by duty to render such a judgment, would be unworthy of its station could it be unmindful of the solemn obligation which that station imposes. But it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts are to be considered as void. The opposition between the constitution and the law [***116]

should be such that the judge feels a clear and strong conviction of their incompatibility with each other." [59] In Calder et ux. v. Bull et ux. [60] Mr. Justice Chace expressed himself with his usual emphatic energy, and said, "I will not decide any law to be void, but in a very clear case." Is it, then, a very clear case that these acts of New-Hampshire are repugnant to the constitution of the United States?

58  Calder et ux. v. Bull et ux. 3 Dall. 392, 394, 395. Fletcher v. Peck, 6 Cranch, 87. New-Jersey v. Wilson, 7 Cranch, 164. Terret v. Taylor, 9 Cranch, 43.
59  6 Cranch, 128.
60  3 Dall. 395.

1. Are they bills of attainder? The elementary writers inform us, that an attainder is "the stain or corruption of the blood of a criminal capitally condemned." [61] True it is, that the Chief Justice says, in Flctcher v. Peck, [62] that a bill of attainder may affect the life of an individual, or may confiscate his estate, or both. But the cause did not turn upon this point, and the Chief Justice was not called upon to weigh with critical accuracy his expressions in this part of the case. In England, most certainly, the first idea presented is that of corruption of blood, and [***117] consequent forfeiture of the entire property of the criminal, as the regular and inevitable consequences of a capital conviction at common law. Statutes sometimes pardon the attainder, and merely forfeit the estate. But this forfeiture is always complete and entire. In the present case, however, it cannot be pretended that any part of the estate of the trustees is forfeited, and, if a part, certainly not the whole.

61  4 Bl. Com. 380.
62  6 Cranch, 138.

2. Are these acts "laws impairing the obligation of contracts?" The mischiefs actually existing at the time the constitution was established, and which were intended to be remedied by this prohibitory clause, will show the nature of the contracts contemplated by its authors. It was the inviolability of private contracts, and private rights acquired under them, which was intended to be protected; [63] and not contracts which are in their nature matters of civil police, nor grants by a State of power, and even property, to individuals, in trust to be administered for purposes merely public."The prohibitions not to make any thing but gold and silver coin a tender in payment of debts, and not to pass any law

impairing the obligation [***118] of contracts," says Mr. Justice Chace, "were inserted to secure private rights." [64] The cases determined in this Court, illustrate the same construction of this clause of the constitution. Fletcher v. Peck was a case where a State legislature attempted to revoke its grant, so as to devest a beneficial estate in lands; a vested estate; an actual conveyance to individuals as their private property. [65] In the case of New-Jersey v. Wilson, there was an express contract contained in a public treaty of cession with the Indians, by which the privilege of perpetual exemption from taxation was indelibly impressed upon the lands, and could not be taken away without a violation of the public faith solemnly pledged. [66] Therret v. Taylor was also a case of an attempt to devest an interest in lands actually vested under an act amounting to a contract. [67] In all those instances, the property was held by the grantees, and those to whom they had conveyed, beneficially, and under the sanction of contracts, in the ordinary and popular signification of that term. But this is an attempt to extend its obvious and natural meaning, and to apply it by a species of legal fiction to a class of cases which [***119] have always been supposed to be within the control of the sovereign power. Charters to public corporations for purposes of public policy are necessarily subject to the legislative discretion, which may revoke or modify them as the continually fluctuating exigencies of the society may require. Incorporations for the purposes of education and other literary objects, in one age, or under one form of government, may become unfit for their office in another age, or under another government.

63   The Federalist, No. 44.  1 Tucker's Bl. Com. part 1.  Alpendix, 312.
64   Calder et ux. v. Bull et ux. 3 Dall. 390.
65   6 Cranch, 87.
66   7 Cranch, 164.
67   9 Cranch, 43.

This charter is said to be a contract between Doctor Wheelock and the king; a contract founded on a donation of private property by Doctor Wheelock. It is hence infered, that it is a private eleemosynary corporation; and the right of visitation is said to be in the founder and his heirs; and that the State can have no right to interfere, because it is neither the founder of this charity, nor contributor to it.

But if the basis of this argument is removed, what becomes of the superstructure? The fact that Doctor

Wheelock [***120] was a contributor, is not found by the special verdict; and not having been such in truth, it cannot be added under the agreement to amend the special verdict. The jury find the charter, and that does not recite that the college was a private foundation by Doctor Wheelock. On the contrary, the real state of the case is, that he was the projector; that he had a school on his own plantation, for the education of Indians; and through the assistance of others had been employed for several years in cloathing, maintaining, and educating them. He solicited contributions, and appointed others to solicit. At the foundation of the college, the institution was removed from his estate.The honours paid to him by the charter were the reward of past services, and of the boldness, as well as piety, of the project. The State has been a contributor of funds, and this fact is found. It is, therefore, not a private charity, but a public institution; subject to be modified, altered, and regulated, by the supreme power of the State.

This charter is not a contract within the true intent of the constitution. The acts of New-Hampshire, varying in some degree the forms of the charter, do not impair [***121] the obligation of a contract.

In a case which is really a case of contract, there is no difficulty in ascertaining who are the contracting parties. But here they cannot be fixed. Doctor Wheelock can only be said to be a party, on the ground of his contributing funds, and thus being the founder and visitor. That ground being removed, he ceases to be a party to the contract. Are the other contributors alluded to in the charter, and enumerated by Belknap in his history of New-Hampshire, are they contracting parties?They are not, before the Court; and even if they were, with whom did they contract? With the King of Great Britain? He, too, is not before the Court; and has declared, by his Chancellor, in the case of the Attorney General v. The City of London, [68] that he has no longer any connexion with these corporations in America. Has the State of New-Hampshire taken his place? Neither is that State before the Court, nor can it be as a party, originally defendant.But suppose this to be a contract between the trustees, and the people of New-Hampshire. A contract is always for the benefit and advantage of some person. This contract cannot be for the benefit of the trustees. It [***122] is for the use of the people. The cestui que use is always the contracting party; the trustee has nothing to do with stipulating the terms. The people then grant powers for their own use. It is a contract with

themselves!

68   The Attorney General v. The City of London,
3 Bro. Ch. Cas. 171. 1 Ves. jun. 243.

But if the trustees are parties on one side, what do they give, and what do they receive? They give their time and labour. Every society has a right to the services of its members in places of public trust and duty. A town appoints, under the authority of the State, an overseer of the poor, or of the highways. He gives, reluctantly, his labour and services; he receives nothing in return but the privilege of giving his labour and services. Such appointments to offices of public trust have never been considered as contracts which the sovereign authority was not competent to rescind or modify. There can be no contract in which the party does not receive some personal, private, individual benefit. To make this charter a contract, and a private contract, there must be a private beneficial interest vested in the party who pays to consideration. What is the private beneficial [***123] interest vested in the party in the present case? The right of appointing the president and professors of the college, and of establishing ordinances for its government, &c. But to make these rights an interest which will constitute the end and object of a contract, the exercise of these rights must be for the private individual advantage of the trustees. Here, however, so far from that being the fact, it is solely for the advantage of the public; for the interests of piety and learning. It was upon these principles that Lord Kenyon determined, in the case of Weller v. Foundling Hospital, [69] that the governor and members of the corporation were competent witnesses, because they were trustees of a public charity, and had no private personal interest. It is not meant to deny that mere right -- a franchise -- an incorporeal hereditament, may be the subject of a contract; but it must always be a direct, individual, beneficial interest to the party who takes that right. The rights of municipal corporators are of this nature. The right of suffrage there belongs beneficially to the individual elector, and is to be exercised for his own exclusive advantage. It is in relation to these [***124] town corporations that Lord Kenyon speaks, when he says, hat the king cannot force a new charter upon them. [70] This principle is established for the benefit of all the corporators. It is accompanied by another principle, without which it would never have been adopted: the power of proposing amendments at the desire of those for whose benefit the charter was granted. These two principles work together for the good of the whole. By

the one, these municipal corporations are saved from the tyranny of the crown; and by the other, they are preserved from the infinite perpetuity of inveterate errors. But in the present case there is no similar qualification of the immutability of the charter, which is contended for in the argument on the other side. But in truth, neither the original principle, nor its qualification, apply to this case; for there is here no such beneficial interest and individual property as are enjoyed by town corporators.

69   Peake's N. P. Cas. 154.
70   Rex v. Passmore, 3 T.R. 244.

3. But even admitting it to be a case of contract, its obligation is not impaired by these legislative acts. What vested right has been devested? None! The former trustees are [***125] continued. It is true, that new trustees are added, but this affords no reasonable ground of complaint. The privileges of the House of Lords in England are not impaired by the introduction of new members. The old corporation is not abolished, for the foundation as now regulated is substantially the same. It is identical in all its essential constituent parts, and all its former rights are preserved and confirmed. [71] The change of name does not change its original rights and franchises. [72] By the revolution which separated this country from the British empire, all the powers of the British government devolved on the States. The legislature of New-Hampshire then became cloathed with all the powers, both of the king and parliament, over these public institutions. On whom, then, did the title to the property of this college fall? If before the revolution it was beneficially vested in any private individuals, or corporate body, I do not contend that the revolution devested it, and gave it to the State. But it was not before vested beneficially in the trustees. The use unquestionably belonged to the people of New-Hampshire, who were the cestuy que trusts. The legal estate was [***126] indeed vested in the trustees before the revolution by virtue of the royal charter of 1769. But that charter was destroyed by the revolution, [73] and the legal estate, of course, fell upon those who held the equitable estate -- upon the people. If those who were trustees, carried on the duties of the trust after the revolution, it must have been subject to the power of the people. If it be said, that the State gave its implied assent to the ters of the old charter, then it must be subject to all the terms on which it was granted; and among these, to the oath of allegiance to the king. But if to avoid this concession, it be said, that the charter must have been so

far modified as to adapt it to the character of the new government, and to the change in our civil institutions; that is precisely what we contend for. These civil institutions must be modified, and adapted to the mutations of society and manners. They belong to the people, are established for their benefit, and ought to be subject to their authority.

71    See the Mayor of Colchester v. Seaber, 3 Burr. 1866.

72   1 Sand. 344. n. 1.  Luttrel's Case, 4 Co. Rep. 87.

73    Attorney General v. City of London, 3 Bro. Ch. Cas. 171. S. C. 1 Ves. jun. 143.

[***127] Mr. Hopkinson, in reply, insisted, that the whole argument on the other side proceeded on an assumption which was not warranted, and could not be maintained. The corporation created by this charter is called a public corporation. Its members are said to be public officers, and agents of government. They were officers of the king, it is said, before the revolution, and they are officers of the State since. But upon what authority is all this taken? What is the acknowledged principle which decides thus of this corporation? Where are the cases in which such a doctrine has ever prevailed? No case, no book of authority, has been, or can be, cited to this purpose. Every writer on the law of corporations, all the cases in law and equity, instruct us that colleges are regarded in law as private eleemosynary corporations, especially colleges founded, as this was, by a private founder. If this settled principle be not overthrown, there is no foundation for the defendant's argument. We contend that this charter is a contract between the government and the members of the corporation created by it. It is a contract, because it is a grant of valuable rights and privileges; and every grant [***128] implies a contract not to resume the thing granted. Public offices are not created by contract or by charter. They are provided for by general laws. Judges and magistrates do not hold their offices under charters. These offices are created by public laws, for public political purposes, and filled by appointments made in the exercise of political power. There is nothing like this in the origin of the powers of the plaintiffs. Nor is there in their duties, any more than in their origin, any thing which likens them to public political agents. Their duties are such as they themselves have chosen to assume, in relation to a fund created by private benefaction, for charitable uses. These duties relate to the instruction of youth: but instructors of youth are not public officers. The argument on the other side, if it proves any thing, will prove that professors, masters, preceptors, and tutors, are all political persons and public officers; and that all education is necessarily and exclusively the business of the State. The confutation of such an argument lies in stating it. The trustees of this college perform no duties, and have no responsibility in any way connected with the [***129] civil government of the State. They derive no compensation for their services from the public treasury. They are the gratuitous administrators of a private bounty; the trustees of a literary establishment, standing, in contemplation of law, on the same foundation as hospitals, and other charities. It is true, that a college, in a popular sense, is a public institution, because its uses are public, and its benefits may be enjoyed by all who choose to enjoy them. But in a legal and technical sense, they are not public institutions, but private charities. Corporations may, therefore, be very well said to be for public use, of which the property and privileges are yet private. Indeed, there may be supposed to be an ultimate reference to the public good, in granting all charters of incorporation; but this does not change the property from private to public. If the property of this corporation be public property, that is, property belonging to the State, when did it become so? It was once private property; when was it surrendered to the public? The object in obtaining the charter, was not surely to transfer the property to the public, but to secure it forever in the hands of those [***130] with whom the original owners saw fit to entrust it. Whence, then, that right of ownership and control over this property, which the legislature of New-Hampshire has undertaken to exercise? The distinction between public, political, or civil corporations, and corporations for the distribution of private charity, is fully explained, and broadly marked, in the cases which have been cited, and to which no answer has been given. The hospital of Pennsylvania is quite as much a public corporation, as this college. It has great funds, most wisely and beneficently administered. Is it to be supposed, that the legislature might rightfully lay its hands on this institution, violate its charter, and direct its funds to any purpose which its pleasure might prescribe? The property of this college was private property before the charter; and the charter has wrought no change in the nature or title of this property. The school had existed as a charity school, for years before the charter was granted. During this time it was manifestly a private charity. The case cited from Atkyns, shows, that a charter does not make a charity more public, but only more permanent.

Before he accepted the charter, [***131] the founder of this college possessed an absolute right to the property with which it was endowed, and also the right flowing from that, of administering and applying it to the purposes of the charity by him established. By taking the charter, he assented that the right to the property, and the power of administering it, should go to the corporation of which he and others were members. The beneficial purpose to which the property was to be used, was the consideration on the part of the government for granting the charter. The perpetuity which it was calculated to give to the charity, was the founder's inducement to solicit it. By this charter, the public faith is solemnly pledged, that the arrangement thus made shall be perpetual. In consideration that the founder would devote his property to the purposes beneficial to the public, the government has solemnly covenanted with him to secure the administration of that property in the hands of trustees appointed in the charter. And yet the argument now is, that because he so devoted his property to uses beneficial to the public, the government may, for that reason, assume the control of it, and take it out of those hands to which [***132] it was confided by the charter. In other words, because the founder has strictly performed the contract on his part, the government, on its part, is at liberty to violate it. This argument is equally unsound in morality and in law. The founder proposed to appropriate his property, and to render his services, upon condition of receiving a charter which should secure to him and his associates certain privileges and immunities. He undertook the discharge of certain duties, in consideration of obtaining certain rights. There are rights and duties on both sides. On the part of the founder, there is the duty of appropriating the property, and of rendering the services imposed on him by the charter, and the right of having secured to him and his associates the administration of the charity, according to the terms of the charter, forever. On the part of the government, there is the duty of maintaining and protecting all the rights and privileges conferred by the charter, and the right of insisting on the compliance of the trustees with the obligations undertaken by them, and of enforcing that compliance by all due and regular means. There is a plain, manifest, reasonable stipulation, [***133] mixed up of rights and duties, which cannot be separated but by the hand of injustice and violence. Yet the attempt now is to break the mutuality of this stipulation; to hold the founder's property, and yet take away that which was given him as the consideration upon which he parted with his property. The charter was a grant of valuable powers and privileges. The State now claims the right of revoking this grant, without restoring the consideration which it received for making the grant. Such a pretence may suit despotic power. It may succeed where the authority of the legislature is limited by no rule, and bounded only by its will. It may prevail in those systems in which injustice is not always unlawful, and where neither the fundamental constitution of the government sets any limits to power, nor any just sentiment or moral feeling affords a practical restraint against a power which in its theory is unlimited. But it cannot prevail in the United States, where power is restrained by constitutional barriers, and where no legislature is, even in theory, invested with all sovereign powers. Suppose Dr. Wheelock had chosen to establish and perpetuate this charity by his last will, [***134] or by a deed, in which he had given the property, appointed the trustees, provided for their succession, and prescribed their duties. Could the legislature of New-Hampshire have broken in upon this gift, changed its parties, assumed the appointment of the trustees, abolished its stipulations and regulations, or imposed others? This will hardly be pretended, even in this bold and hardy argument -- and why not? Because the gift, with all its restrictions and provisions, would be under the general and implied protection of the law. How is it in our case? Why, in addition to the general and implied protection afforded to all rights and all property, it has an express, specific, covenanted assurance of protection and inviolability, given on good and sufficient considerations, in the usual manner of contracts between individuals. There can be no doubt that, in contemplation of law, a charter, such as this, is a contract. It takes effect only with the assent of those to whom it is granted. Laws enjoin duties, without or against the will of those who are to perform them. But the duties of the trustees, under this charter, and binding upon them only because they have accepted the charter, [***135] and assented to its terms.

But taking this to be a contract, the argument of the defendant is, that it is not such a contract as the constitution of the United States protects. But why not? The constitution speaks of contracts, and ought to include all contracts for property or valuable privileges. There is no distinction or discrimination made by the constitution itself, which will exclude this case from its protection. The decisions which have already been made in this Court are a complete answer to the defendant's argument.

The Attorney General has insisted, that Dr. Wheelock

was not the founder of this college; that other donors have better title to that character; and that, therefore, the plaintiff's argument, so far as it rests on the supposed fact of Dr. Wheelock's being the founder, fails. The first answer to this is, that the charter itself declares Dr. Wheelock to be the founder, in express terms. It also recites facts, which would show him to be the founder, and on which the law would invest him with that character, if the charter itself had not declared him so. But if all this were otherwise, it would not help the defendant's argument. The foundation was still [***136] private; and whether Dr. Wheelock, or Lord Dartmouth, or any other person, possessed the greatest share of merit in establishing the college, the result is the same, so far as it bears on the present question. Whoever was founder, the visitatorial power was assigned to the trustees, by the charter; and it, therefore, is of no importance whether the founder was one individual or another. It is narrowing the ground of our argument to suppose, that we rest it on the particular fact of Dr. Wheelock's being founder; although the fact is fully established by the charter itself. Our argument is, that this is a private corporation; that the founder of the charity, before the charter, had a right of visiting and governing it, a right growing out of the property of the endowment; that by the charter, this visitatorial power is vested in the trustees, as assignees of the founder; and that it is a privilege, right, and immunity, originally springing from property, and which the law regards and protects, as much as it regards and protects property and privileges of any other description. By the charter, all proper powers of government are given to the trustees, and this makes them visitors; [***137] and from the time of the acceptance of the charter, no visitatorial power remained in the founder or his heirs. This is the clear doctrine of the case of Green v. Rutherforth, which has been cited, and which is supported by all the other cases. Indeed we need not stop here in the argument. We might go farther, and countend, that if there were no private founder, the trustees would possess the visitatorial power. Where there are charters, vesting the usual and proper powers of government in the trustees, they thereby become the visitors, and the founder retains no visitatorial power, although that founder be the king. [74] Even then, if this college had originated with the government, and had been founded by it; still, if the government had given a charter to trustes, and conferred on them the powers of visitation, and control, which this charter contains, it would by no means follow, that the government might revoke the grant, merely because it had itself established the institution. Such would not be the legal consequence. If the grant be of privileges and immunities, which are to be esteemed objects of value, it cannot be revoked. But this case is much stronger than that. Nothing [***138] is plainer, than that Dr. Wheelock, from the recitals of this charter, was the founder of this institution. It is true, that others contributed; but it is to be remembered, that they contributed to Dr. Wheelock, and to the funds while under his private administration and control, and before the idea of a charter had been suggested. These contributions were obtained on his solicitation, and confided to his trust.

74   2 Ves. 78.

If we have satisfied the Court that this charter must be regarded as a contract, and such a contract as is protected by the constitution of the United States, it will hardly be seriously denied, that the acts of the legislature of New-Hampshire impair this contract. They impair the rights of the corporation as an aggregate body, and the rights and privileges of individual members. New duties are imposed on the corporation; the funds are directed to new purposes; a controlling power over all the proceedings of the trustees, is vested in a board of overseers unknown to the charter. Nine new trustees are added to the original number, in direct hostility with the provision of the charter. There are radical and essential alterations, which go to alter [***139] the whole organization and frame of the corporation.

If we are right in the view which we have taken of this case, the result is, that before, and at the time of, the granting of this charter, Dr. Wheelock had a legal interest in the funds with which the institution was founded; that he made a contract with the then existing government of the State, in relation to that interest, by which he devoted, to uses beneficial to the public, the funds which he had collected, in consideration of the stipulations and covenants, on the part of the government, contained in the charter; and that these stipulations are violated, and the contract impaired, by the acts of the legislature of New-Hampshire.

**OPINION BY:** MARSHALL

**OPINION**

[*624] [**656] The opinion of the Court was delivered by Mr. Chief Justice MARSHALL.

This is an action of trover, brought by the Trustees of Dartmouth College against William H. Woodward, in the State Court of New Hampshire, for the book of records, corporate seal, and other corporate property, to whcih the plaintiffs allege themselves to be entitled.

A special verdict, after setting out the rights of the parties, finds for the defendant, if certain acts of the legislature [***140] of New-Hampshire, passed on the 27th of June, and on the 18th of December, 1816, be valid, and binding on the trustees without their assent, and not repugnant to the constitution of the United States; otherwise, it finds for the plaintiffs.

[*625] The Superior Court of Judicature of New-Hampshire rendered a judgment upon this verdict for the defendant, which judgment has been brought before this Court by writ of error. The single question now to be considered is, do the acts to which the verdict refers violate the constitution of the United States?

This Court can be insensible neither to the magnitude nor delicacy of this question. The validity of a legislative act is to be examined; and the opinion of the highest law tribunal of a State is to be revised: an opinion which carries with it intrinsic evidence of the diligence, of the ability, and the integrity, with which it was formed. On more than one occasion, this Court has expressed the cautious circumspection with which it approaches the consideration of such questions; and has declared, that, in no doubtful case, would it pronounce a legislative act to be contrary to the constitution. But the American people have said, [***141] in the constitution of the United States, that "no State shall pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts." In the same instrument they have also said, "that the judicial power shall extend to all cases in law and equity arising under the constitution." On the judges of this Court, then, is imposed the high and solemn duty of protecting, from even legislative violation, those contracts which the constitution of our country has placed beyond legislative control; and, however irksome the task may be, this is a duty from which we dare not shrink.

[*626] The title of the plaintiffs originates in a charter dated the 13th day December, in the year 1769, incorporating twelve persons therein mentioned, by the name of "The Trustees of Dartmouth College," granting to them and their successors the usual corporate privileges and powers, and authorizing the trustees, who are to govern the college, to fill up all vacancies which

may be created in their own body.

The defendant claims under three acts of the legislature of New-Hampshire, the most material of which was passed on the 27th of June, 1816, and is entitled, "an act to amend the charter, [***142] and enlarge and improve the corporation of Dartmouth College." Among other alterations in the charter, this act increases the number of trustees to twenty-one, gives the appointment of the additional members to the executive of the State, and creates a board of overseers, with power to inspect and control the most important acts of the trustees. This board consists of twenty-five persons. The president of the senate, the speaker of the house of representatives, of New-Hampshire, and the governor and lieutenant governor of Vermont, for the time being, are to be members ex officio. The board is to be completed by the governor and council of New-Hampshire, who are also empowered to fill all vacancies which may occur. The acts of the 18th and 26th of December are supplemental to that of the 27th of June, and are principally intended to carry that act into effect.

The majority of the trustees of the college have refused to accept this amended charter, and have [*627] brought this suit for the corporate property, which is in possession of a person holding by virtue of the acts which have been stated.

It can require no argument to prove, that the circumstances of this case constitute [***143] a contract. An application is made to the crown for a charter to incorporate a religious and literary institution. In the application, it is stated that large contributions have been made for the object, which will be conferred on the corporation, as soon as it shall be created. The charter is granted, and on its faith the property is conveyed. [**657] Surely in this transaction every ingredient of a complete and legitimate contract is to be found.

The points for consideration are,

1. Is this contract protected by the constitution of the United States?

2. Is it impaired by the acts under which the defendant holds?

1. On the first point it has been argued, that the word "contract," in its broadest sense, would comprehend the political relations between the government and its

citizens, would extend to offices held within a State for State purposes, and to many of those laws concerning civil institutions, which must change with circumstances, and be modified by ordinary legislation; which deeply concern the public, and which, to preserve good government, the public judgment must control. That even marriage is a contract, and its obligations are effected by the laws respecting [***144] divorces. That the clause in the constitution, if construed in its greatest latitude, [*628] would prohibit these laws. Taken in its broad unlimited sense, the clause would be an unprofitable and vexatious interference with the internal concerns of a State, would unnecessarily and unwisely embarrass its legislation, and render immutable those civil institutions, which are established for purposes of internal government, and which, to subserve those purposes, ought to vary with varying circumstances. That as the framers of the constitution could never have intended to insert in that instrument a provision so unnecessary, so mischievous, and so repugnant to its general spirit, the term "contract" must be understood as intended to guard against a power of at least doubtful utility, the abuse of which had been extensively felt; and to restrain the legislature in future from violating the right to property. That anterior to the formation of the constitution, a course of legislation had prevailed in many, if not in all, of the States, which weakened the confidence of man in man, and embarrassed all transactions between individuals, by dispensing with a faithful performance of engagements. [***145] To correct this mischief, by restraining the power which produced it, the State legislatures were forbidden "to pass any law impairing the obligation of contracts," that is, of contracts respecting property, under which some individual could claim a right to something beneficial to himsel; and that since the clause in the constitution must in construction receive some limitation, it may be confined, and ought to be confined, to cases of this [*629] description; to cases within the mischief it was intended to remedy.

The general correctness of these observations cannot be controverted. That the framers of the constitution did not intend to retrain the States in the regulation of their civil institutions, adopted for internal government, and that the instrument they have given us, is not to be so construed, may be admitted. The provision of the constitution never has been understood to embrace other contracts, than those which respect property, or some object of value, and confer rights which may be asserted

in a court of justice. It never has been understood to restrict the general right of the legislature to legislate on the subject of divorces. Those acts enable some tribunal, [***146] not to impair a marriage contract, but to liberate one of the parties because it has been broken by the other. When any State legislature shall pass an act annulling all marriage contracts, or allowing either party to annul it without the consent of the other, it will be time enough to inquire, whether such an act be constitutional.

The parties in this case differ less on general principles, less on the true construction of the constitution in the abstract, than on the application of those principles to this case, and on the true construction of the charter of 1769. This is the point on which the cause essentially depends. If the act of incorporation be a grant of political power, if it create a civil institution to be employed in the administration of the government, or if the funds of the college be [*630] public property, or if the State of New-Hampshire, as a government, be alone interested in its transactions, the subject is one in which the legislature of the State may act according to its own judgment, unrestrained by any limitation of its power imposed by the constitution of the United States.

But if this be a private eleemosynary institution, endowed with a capacity [***147] to take property for objects unconnected with government, whose funds are bestowed by individuals on the faith of the charter; if the donors have stipulated for the future disposition and management of those funds in the manner prescribed by themselves; there may be more difficulty in the case, although neither the persons who have made these stipulations, nor those for whose benefit they were made, should be parties to the cause. Those who are no longer interested in the property, may yet retain such an interest in the preservation of their own arrangements, as to have a right to insist, that those arrangements shall be held sacred. Or, if they have themselves disappeared, it becomes a subject of serious and anxious inquiry, whether those whom they have legally empowered to represent them forever, may not assert all the rights which they possessed, while in being; whether, if they be without personal representatives who may feel injured by a violation of the compact, the trustees be not so completely their representatives in the eye of the law, as to stand in their place, not only as respects the government of the college, but also as respects the maintenance of the college charter.

[***148] It becomes then the duty of the Court most [*631] seriously to examine this charter, and to ascertain its true character.

From the instrument itself, it appears, that about the year 1754, the Rev. Eleazer Wheelock established at his own expense, and on his own estate, a charity school for the instruction of Indians in the christian religion. The success of this institution inspired him with the design of soliciting contributions in England for carrying on, and extending, his undertaking.In this pious work he employed the Rev. Nathaniel Whitaker, who, by virtue of a power of attorney from Dr. Wheelock, appointed the Earl of Dartmouth and others, trustees of the money, which had been, and should be, contributed; which appointment Dr. Wheelock confirmed by a deed of trust authorizing the trustees to [**658] fix on a site for the college.They determined to establish the school on Connecticut river, in the western part of New-Hampshire; that situation being supposed favourable for carrying on the original design among the Indians, and the also for promoting learning among the English; and the proprietors in the neighbourhood having made large offers of land, on condition, that [***149] the college should there be placed. Dr. Wheelock then applied to the crown for an act of incorporation; and represented the expediency of appointing those whom he had, by his last will, named as trustees in America, to be members of the proposed corporation. "In consideration of the premises," "for the education and instruction of the youth of the Indian tribes," &c. "and also of English youth, and any other," the charter was granted, and the trustees of Dartmouth College were by that name created a body [*632] corporate, with power, for the use of the said college, to acquire real and personal property, and to pay the president, tutors, and other officers of the college, such salaries as they shall allow.

The charter proceeds to appoint Eleazer Wheelock, "the founder of said college," president thereof, with power by his last will to appoint a successor, who is to continue in office until disapproved by the trustees. In case of vacancy, the trustees may appoint a president, and in case of the ceasing of a president, the senior professor or tutor, being one of the trustees, shall exercise the office, until an appointment shall be made. The trustees have power to appoint and [***150] displace professors, tutors, and other officers, and to supply any vacancies which may be created in their own body, by death, resignation, removal, or disability; and also to make orders, ordinances, and laws, for the government of the college, the same not being repugnant to the laws of Great Britain, or of New-Hampshire, and not excluding any person on account of his speculative sentiments in religion, or his being of a religious profession different from that of the trustees.

This charter was accepted, and the property both real and personal, which had been contributed for the benefit of the college, was conveyed to, and vested in, the corporate body.

From this brief review of the most essential parts of the charter, it is apparent, that the funds of the college consisted entirely of private donations. It is, perhaps, not very important, who were the donors. The probability is, that the Earl of Dartmouth, and the other trustees in England, were, in fact, the largest [*633] contributors. Yet the legal conclusion, from the facts recited in the charter, would probably be, that Dr. Wheelock was the founder of the college.

The origin of the institution was, undoubtedly, the [***151] Indian charity school, established by Dr. Wheelock, at his own expense. It was at his instance, and to enlarge this school, that contributions were solicited in England. The person soliciting these contributions was his agent; and the trustees, who received the money, were appointed by, and act under, his authority. It is not too much to say, that the funds were obtained by him, in trust, to be applied by him to the purposes of his enlarged school. The charter of incorporation was granted at his instance. The persons named by him in his last will, as the trustees of his charity school, compose a part of the corporation, and he is declared to be the founder of the college, and its president for life. Were the inquiry material, we should feel some hesitation in saying, that Dr. Wheelock was not, in law, to be considered as the founder, [75] of this institution, and as possessing all the rights appertaining to that character. But be this as it may, Dartmouth College is really endowed by private individuals, who have bestowed their funds for the propagation of the christian religion among the Indians, and for the promotion of piety and learning generally. From these funds the salaries [***152] of the tutors are drawn; and these salaries lessen the expense of education to the students. It [*634] is then an eleemosynary, [76] and, as far as respects its funds, a private corporation.

75  1 Bl. Com. 481.
76  1 Bl. Com. 471.

Do its objects stamp on it a different character? Are the trustees and professors public officers, invested with any portion of political power, partaking in any degree in the administration of civil government, and performing duties which flow from the sovereign authority?

That education is an object of national concern, and a proper subject of legislation, all admit. That there may be an institution founded by government, and placed entirely under its immediate control, the officers of which would be public officers, amenable exclusively to government, none will deny. But is Dartmouth College such an institution? Is education altogether in the hands of government? Does every teacher of youth become a public officer, and do donations for the purpose of education necessarily become public property, so far that the will of the legislature, not the will of the donor, becomes the law of the donation? These questions are of serious moment to [***153] society, and deserve to be well considered.

Doctor Wheelock, as the keeper of his charity school, instructing the Indians in the art of reading, and in our holy religion; sustaining them at his own expense, and on the voluntary contributions of the charitable, could scarcely be considered as a public officer, exercising any portion of those duties which belong to government; nor could the legislature have [*635] supposed, that his private funds, or those given by others, were subject to legislative management, because they were applied to the purposes of education. When, afterwards, his school was enlarged, and the liberal contributions made in England, and in America, enabled him to extend his cares to the education of the youth of his own country, no change was wrought in his own character, or in the nature of his duties. Had he employed assistant tutors with the funds contributed by others, or had the trustees in England established a school with Dr. Wheelock at its head, and paid salaries to him and his assistants, they would still have been private tutors; and the fact, that they were employed in the education of youth, could not have converted them into public officers, [***154] concerned in the administration of public duties, or have given the legislature a right to interfere in the management [**659] of the fund. The trustees, in whose care that fund was placed by the contributors, would have been permitted to execute their trust uncontrolled by legislative authority.

Whence, then, can be derived the idea, that

Dartmouth College has become a public institution, and its trustees public officers, exercising powers conferred by the public for public objects? Not from the source whence its funds were drawn; for its foundation is purely private and eleemosynary -- Not from the application of those funds; for money may be given for education, and the persons receiving it do not, by being employed in the education of youth, become members of the civil government. Is it from [*636] the act of incorporation? Let this subject be considered.

[HN1] A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence. These are such as are supposed [***155] best calculated to effect the object for which it was created. Among the most important are immortality, and, if the expression may be allowed, individuality; properties, by which a perpetual succession of many persons are considered as the same, and may act as a single individual. They enable a corporation to manage its own affairs, and to hold property without the perplexing intricacies, the hazardous and endless necessity, of perpetual conveyances for the purpose of transmitting it from hand to hand. It is chiefly for the purpose of clothing bodies of men, in succession, with these qualities and capacities, that corporations were invented, and are in use. By these means, a perpetual succession of individuals are capable of acting for the promotion of the particular object, like one immortal being. But this being does not share in the civil government of the country, unless that be the purpose for which it was created. Its immortality no more confers on it political power, or a political character, than immortality would confer such power or character on a natural person. It is no more a State instrument, than a natural person exercising the same powers would be. If, then, [***156] a natural person, employed [*637] by individuals in the education of youth, or for the government of a seminary in which youth is educated, would not become a public officer, or be considered as a member of the civil government, how is it, that this artificial being, created by law, for the purpose of being employed by the same individuals for the same purposes, should become a part of the civil government of the country? Is it because its existence, its capacities, its powers, are given by law? Because the government has given it the power to take and to hold property in a particular from, and for particular purposes,

has the government a consequent right substantially to change that form, or to vary the purposes to which the property is to be applied? This principle has never been asserted or recognized, and is supported by no authority.Can it derive aid from reason?

The objects for which a corporation is created are universally such as the government wishes to promote. They are deemed beneficial to the country; and this benefit constitutes the consideration, and, in most cases, the sole consideration of the grant. In most eleemosynary institutions, the object would be [***157] difficult, perhaps unattainable, without the aid of a charter of incorporation. Charitable, or public spirited individuals, desirous of making permanent appropriations for charitable or other useful purposes, find it impossible to effect their design securely, and certainly, without an incorporating act. They apply to the government, state their beneficent object, and offer to advance the money necessary for its accomplishment, [*638] provided the government will confer on the instrument which is to execute their designs the capacity to execute them. The proposition is considered and approved. The benefit to the public is considered as an ample compensation for the faculty it confers, and the corporation is created. If the advantages to the public constitute a full compensation for the faculty it gives, there can be no reason for exacting a further compensation, by claiming a right to exercise over this artificial being a power which changes its nature, and touches the fund, for the security and application of which it was created. [HN2] There can be no reason for implying in a charter, given for a valuable consideration, a power which is not only not expressed, but is in direct [***158] contradiction to its express stipulations.

From the fact, them, that a charter of incorporation has been granted, nothing can be inferred which changes the character of the institution, or transfers to the government any new power over it. The character of civil institutions does not grow out of their incorporation, but out of the manner in which they are formed, and the objects for which they are created. The right to change them is not founded on their being incorporated, but on their being the instruments of government, created for its purposes. The same institutions, created for the same objects, though not incorporated, would be public institutions, and, of course, be controllable by the legislature. The incorporating act neither gives now prevents this control. Neither, in reason, can the

incorporating act [*639] change the character of a private eleemosynary institution.

We are next led to the inquiry, for whose benefit the property given to Dartmouth College was secured? The counsel for the defendant have insisted, that the beneficial interest is in the people of New-Hampshire. The charter, after reciting the preliminary measures which had been taken, and the [***159] application for an act of incorporation, proceeds thus: "Know ye, therefore, that we, considering the premises, and being willing to encourage the laudable and charitable design of spreading christian knowledge among the savages of our American wilderness, and, also, that the best means of education be established, in our province of New-Hampshire, for the benefit of said province, do, of our special grace," &c. Do these expressions bestow on New-Hampshire any exclusive right to the property of the college, any exclusive interest in the labours of the professors? Or do they merely indicate a willingness that New-Hampshire should enjoy those advantages which result to all from the establishment of a seminary of learning in the [**660] neighbourhood? On this point we think it impossible to entertain a serious doubt. The words themselves, unexplained by the context, indicate, that the "benefit intended for the province" is that which is derived from "establishing the best means of education therein;" that is, from establishing in the province Dartmouth College, as constituted by the charter. But, if these words, considered alone, could admit of doubt, that [*640] doubt is [***160] completely removed by an inspection of the entire instrument.

The particular interests of New-Hampshire never entered into the mind of the donors, never constituted a motive for their donation. The propagation of the christian religion among the savages, and the dissemination of useful knowledge among the youth of the country, were the avowed and the sole objects of their contributions. In these, New-Hampshire would participate; but nothing particular or exclusive was intended for her. Even the site of the college was selected, not for the sake of New-Hampshire, but because it was "most subservient to the great ends in view," and because liberal donations of land were offered by the proprietors, on condition that the institution should be there established. The real advantages from the location of the college, are, perhaps, not less considerable to those on the west, than to those on the east side of Connecticut river. The clause which constitutes the incorporation, and

expresses the objects for which it was made, declares those objects to be the instruction of the Indians, "and also of English youth, and any others." So that the objects of the contributors, and the incorporating [***161] act, were the same; the promotion of christianity, and of education generally, not the interests of New-Hampshire particularly.

From this review of the charter, it appears, that Dartmouth College is an eleemosynary institution, incorporated for the purpose of perpetuating the application of the bounty of the donors, to the specified objects of that bounty; that its trustees or governors [*641] were originally named by the founder, and invested with the power of perpetuating themselves; that they are not public officers, nor is it a civil institution, participating in the administration of government; but a charity school, or a seminary of education, incorporated for the preservation of its property, and the perpetual application of that property to the objects of its creation.

Yet a question remains to be considered, of more real difficulty, on which more doubt has been entertained than on all that have been discussed. The founders of the college, at least those whose contributions were in money, have parted with the property bestowed upon it, and their representatives have no interest in that property.The donors of land are equally without interest, so long as the corporation [***162] shall exist. Could they be found, they are unaffected by any alteration in its constitution, and probably regardless of its form, or even of its existence. The students are fluctuating, and no individual among our youth has a vested interest in the institution, which can be asserted in a Court of justice. Neither the founders of the college, nor the youth for whose benefit it was founded, complain of the alteration made in its charter, or think themselves injured by it. The trustees alone complain, and the trustees have no beneficial interest to be protected. Can this be such a contract, as the constitution intended to withdraw from the power of State legislation? [HN3] Contracts, the parties to which have a vested beneficial interest, and those only, it has been said, are the objects about [*642] which the constitution is solicitous, and to which its protection is extended.

The Court has bestowed on this argument the most deliberate consideration, and the result will be stated. Dr. Wheelock, acting for himself, and for those who, at his solicitation, had made contributions to his school, applied

for this charter, as the instrument which should enable him, and them, to perpetuate [***163] their beneficent intention. It was granted. An artificial, immortal being, was created by the crown, capable of receiving and distributing forever, according to the will of the donors, the donations which should be made to it. On this being, the contributions which had been collected were immediately bestowed. These gifts were made, not indeed to make a profit for the donors, or their posterity, but for something in their opinion of inestimable value; for something which they deemed a full equivalent for the money with which it was purchased. The consideration for which they stipulated, is the perpetual application of the found to its object, in the mode prescribed by themselves. Their descendants may take no interest in the preservation of this consideration. But in this respect their descendants are not their representatives. They are represented by the corporation. The corporation is the assignee of their rights, stands in their place, and distributes their bounty, as they would themselves have distributed it, had they been immortal. So with respect to the students who are to derive learning from this source. The corporation is a trustee for them also. Their potential [***164] rights, which, taken distributively, [*643] are imperceptible, amount collectively to a most important interest. These are, in the aggregate, to be exercised, asserted, and protected, by the corporation. They were as completely out of the donors, at the instant of their being vested in the corporation, and as incapable of being asserted by the students, as at present.

According to the theory to the British constitution, their parliament is omnipotent. To annual corporate rights might give a shock to public opinion, which that government has chosen to avoid; but its power is not questioned. Had parliament, immediately after the emanation of this charter, and the execution of those conveyances which followed it, annulled the instrument, so that the living donows would have witnessed the disappointment of their hopes, the perfidy of the transaction would have been universally acknowledged. Yet then, as now, the donors would have had no interest in the property; then, as now, those who might be students would have had no rights to be violated; then, as now, it might be said, that the trustees, in whom the rights of all were combined, possessed no private, individual, beneficial [***165] interest in the property confided to their protection. Yet the contract [**661] would at that time have been deemed sacred by all. What

has since occurred to strip it of its inviolability?Circumstances have not changed it. In reason, in justice, and in law, it is now what it was in 1769.

This is plainly a contract to which the donors, the trustees, and the crown, (to whose rights and obligations New-Hampshire succeeds,) were the original [*644] parties. It is a contract made on a valuable consideration. It is a contract for the security and disposition of property. It is a contract, on the faith of which, real and personal estate has been conveyed to the corporation. It is then a contract within the letter of the constitution, and within its spirit also, unless the fact, that the property is invested by the donors in trustees for the promotion of religion and education, for the benefit of persons who are perpetually changing, though the objects remain the same, shall create a particular exception, taking this case out of the prohibition contained in the constitution.

It is more than possible, that the preservation of rights of this description was not particularly [***166] in the view of the framers of the constitution, when the clause under consideration was introduced into that instrument. It is probable, that interferences of more frequent recurrence, to which the temptation was stronger, and of which the mischief was more extensive, constituted the great motive for imposing this restriction on the State legislatures. But although a particular and a rare case may not, in itself, be of sufficient magnitude to induce a rule, yet it must be governed by the rule, when established, unless some plain and strong reason for excluding it can be given. It is not enough to say, that this particular case was not in the mind of the Convention, when the article was framed, nor of the American people, when it was adopted. It is necessary to go farther, and to say that, had this particular case been suggested, the language would have been so varied, as to exclude it, or it would have been made a special exception. The [*645] case being within the words of the rule, must be within its operation likewise, unless there be something in the literal construction so obviously absurd, or mischievous, or repugnant to the general spirit of the instrument, as to justify [***167] those who expound the constitution in making it an exception.

On what safe and intelligible ground can this exception stand. There is no expression in the constitution, no sentiment delivered by its

contemporaneous expounders, which would justify us in making it. In the absence of all authority of this kind, is there, in the nature and reason of the case itself, that which would sustain a construction of the constitution, not warranted by its words? Are contracts of this description of a character to excite so little interest, that we must exclude them from the provisions of the constitution, as being unworthy of the attention of those who framed the instrument? Or does public policy so imperiously demand their remaining exposed to legislative alteration, as to compel us, or rather permit us to say, that these words, which were introduced to give stability to contracts, and which in their plain import comprehend this contract, must yet be so construed, as to exclude it?

[HN4] Almost all eleemosynary corporations, those which are created for the promotion of religion, of charity, or of education, are of the same character. The law of this case is the law of all. In every literary [***168] or charitable institution, unless the objects of the bounty be themselves incorporated, the whole legal interest is in trustees, and can be asserted only by them. The donors, or claimants of the bounty, if [*646] they can appear in Court at all, can appear only to complain of the trustees. In all other situations, they are identified with, and personated by, the trustees; and their rights are to be defended and maintained by them. Religion, Charity, and Education, are, in the law of England, legatees or donees, capable of receiving bequests or donations in this form. They appear in Court, and claim or defend by the corporation. Are they of so little estimation in the United States, that contracts for their benefit must be excluded from the protection of words, which in their natural import include them? Or do such contracts so necessarily require new modelling by the authority of the legislature, that the ordinary rules of construction must be disregarded in order to leave them exposed to legislative alteration?

All feel, that these objects are not deemed unimportant in the United States. The interest which this case has excited, proves that they are not. The framers [***169] of the constitution did not deem them unworthy of its care and protection. They have, though in a different mode, manifested their respect for science, by reserving to the government of the Union the power "to promote the progress of science and useful arts, by securing for limited times, to authors and inventors, the exclusive right to their respective writings and

discoveries." They have so far withdrawn science, and the useful arts, from the action of the State governments. Why then should they be supposed so regardless of contracts made for the advancement of literature, as to intend to exclude them from provisions, made for the security [*647] of ordinary contracts between man and man? No reason for making this supposition is perceived.

If the insignificance of the object does not require that we should exclude contracts respecting it from the protection of the constitution; neither, as we conceive, is the policy of leaving them subject to legislative alteration so apparent, as to require a forced construction of that instrument in order to effect it. These eleemosynary institutions do not fill the place, which would otherwise be occupied by government, but that which [***170] would otherwise remain vacant.They are complete acquisitions to literature. They are donations to education; donations, which any government must be disposed rather to encourage than to discountenance. It requires no very critical examination of the human mind to enable us to determine, that one great inducement to these gifts is the conviction felt by the giver, that the disposition he makes of them is immutable. It is probable, that no man ever was, and that no man ever will be, the founder of a college, believing at the time, that an act of incorporation constitutes no security for the institution; believing, that it is immediately to be deemed a public institution, whose funds are to be governed and applied, not by the will of the donor, but by the will of the legislature. All such [**662] gifts are made in the pleasing, perhaps delusive hope, that the charity will flow forever in the channel which the givers have marked out for it. If every man finds in his own bosom strong evidence of the universality of this sentiment, there can be but little reason to imagine, that the framers of our constitution were [*648] strangers to it, and that, feeling the necessity and [***171] policy of giving permanence and security to contracts, of withdrawing them from the influence of legislative bodies, whose fluctuating policy, and repeated interferences, produced the most perplexing and injurious embarrassments, they still deemed it necessary to leave these contracts subject to those interferences. The motives for such an exception must be very powerful, to justify the construction which makes it.

The motives suggested at the bar grow out of the original appointment of the trustees, which is supposed to have been in a spirit hostile to the genius of our government, and the presumption, that, if allowed to continue themselves, they now are, and must remain forever, what they originally were. Hence is inferred the necessity of applying to this corporation, and to other similar corporations, the correcting and improving hand of the legislature.

It has been urged repeatedly, and certainly with a degree of earnestness which attracted attention, that the trustees deriving their power from a regal source, must, necessarily, partake of the spirit of their origin; and that their first principles, unimproved by that resplendent light which has been shed around them, must [***172] continue to govern the college, and to guide the students. Before we inquire into the influence which this argument ought to have on the constitutional question, it may not be amiss to examine the fact on which it rests. The first trustees were undoubtedly named in the charter by the crown; but at whose suggestion were they named? By whom were they [*649] selected? The charter informs us. Dr. Wheelock had represented, "that, for many weighty reasons, it would be expedient, that the gentlemen whom he had already nominated, in his last will, to be trustees in America, should be of the corporation now proposed." When, afterwards, the trustees are named in the charter, can it be doubted that the persons mentioned by Dr. Wheelock in his will were appointed? Some were probably added by the crown, with the approbation of Dr. Wheelock. Among these is the Doctor himself. If any others were appointed at the instance of the crown, they are the governor, three members of the council, and the speaker of the house of representatives, of the colony of New-Hampshire. The stations filled by these persons ought to rescue them from any other imputation than too great a dependence on the [***173] crown. If in the revolution that followed, they acted under the influence of this sentiment, they must have ceased to be trustees; if they took part with their countrymen, the imputation, which suspicion might excite, would no longer attach to them.The original trustees, then, or most of them, were named by Dr. Wheelock, and those who were added to his nomination, most probably with his approbation, were among the most eminent and respectable individuals in New-Hampshire.

The only evidence which we possess of the character of Dr. Wheelock is furnished by this charter. The judicious means employed for the accomplishment of his object, and the success which attended his endeavours,

would lead to the opinion, that he united a sound understanding to that humanity and [*650] benevolence which suggested his undertaking. It surely cannot be assumed, that his trustees were selected without judgment. With as little probability can it be assumed, that, while the light of science, and of liberal principles, pervades the whole community, these originally benighted trustees remain in utter darkness, incapable of participating in the general improvement; that, while the human race is rapidly [***174] advancing, they are stationary. Reasoning a priori, we should believe, that learned and intelligent men, selected by its patrons for the government of a literary institution, would select learned and intelligent men for their successors; men as well fitted for the government of a college as those who might be chosen by other means. Should this reasoning ever prove erroneous in a particular case, public opinion, as has been stated at the bar, would correct the institution. The mere possibility of the contrary would not justify a construction of the constitution, which should exclude these contracts from the protection of a provision whose terms comprehend them.

The opinion of the Court, after mature deliberation, is, that this is a contract, the obligation of which cannot be impaired, without violating the constitution of the United States. This opinion appears to us to be equally supported by reason, and by the former decisions of this Court.

2. We next proceed to the inquiry, whether its obligation has been impaired by those acts of the legislature of New-Hampshire, to which the special verdict refers.

[*651] From the review of this charter, which has been taken, it appears, [***175] that the whole power of governing the college, of appointing and removing tutors, of fixing their salaries, of directing the course of study to be pursued by the students, and of filling up vacancies created in their own body, was vested in the trustees. On the part of the crown it was expressly stipulated, that this corporation, thus constituted, should continue forever; and that the number of trustees should forever consist of twelve, and no more. By this contract the crown was bound, and could have made no violent alteration in its essential terms, without impairing its obligation.

By the revolution, the duties, as well as the powers, of government devolved on the people of New-Hampshire. It is admitted, that among the latter was

comprehended the transcendent power of parliament, as well as that of the executive department. It is too clear to require the support of argument, that all contracts, and rights respecting property, remained unchanged by the revolution. The obligations then, which were created by the charter to Dartmouth College, were the same in the new, that they had been in the old government. The power of the government was also the same. A repeal of this charter [***176] at any time prior to the adoption of the present constitution of the United States, would have been an extraordinary [**663] and unprecedented act of power, but one which could have been contested only by the restrictions upon the legislature, to be found in the constitution of the State. But the constitution of the United States has imposed this additional limitation, [*652] that [HN5] the legislature of a State shall pass no act "impairing the obligation of contracts."

It has been already stated, that the act "to amend the charter, and enlarge and improve the corporation of Dartmouth College," increase the number of trustees to twenty-one, gives the appointment of the additional members to the executive of the State, and creates a board of overseers, to consist of twenty-five persons, of whom twenty-one are also appointed by the executive of New-Hampshire, who have power to inspect and control the most important acts of the trustees.

On the effect of this law, two opinions cannot be entertained. Between acting directly, and acting through the agency of trustees and overseers, no essential difference is perceived. The whole power of governing the college is transferred from [***177] trustees appointed according to the will of the founder, expressed in the charter, to the executive of New-Hampshire. The management and application of the funds of this eleemosynary institution, which are placed by the donors in the hands of trustees named in the charter, and empowered to perpetuate themselves, are placed by this act under the control of the government of the State. The will of the State is substituted for the will of the donors, in every essential operation of the college. This is not an immaterial change. The founders of the college contracted, not merely for the perpetual application of the funds which they gave, to the objects for which those funds were given; they contracted also, to secure that application by the constitution of the corporation. [*653] They contracted for a system, which should, as far as human foresight can provide, retain forever the government of the literary institution they had formed, in

the hands of persons approved by themselves. This system is totally changed. The charter of 1769 exists no longer. It is reorganized; and reorganized in such a manner, as to convert a literary institution, moulded according to the will of its [***178] founders, and placed under the control of private literary men, into a machine entirely subservient to the will of government. This may be for the advantage of this college in particular, and may be for the advantage of literature in general; but it is not according to the will of the donors, and is subversive of that contract, on the faith of which their property was given.

In the view which has been taken of this interesting case, the Court has confined itself to the rights possessed by the trustees, as the assignees and representatives of the donors and founders, for the benefit of religion and literature. Yet it is not clear, that the trustees ought to be considered as destitute of such beneficial interest in themselves, as the law may respect. In addition to their being the legal owners of the property, and to their having a freehold right in the powers confided to them, the charter itself countenances the idea, that trustees may also be tutors with salaries. The first president was one of the original trustees; and the charter provides, that in case of vacancy in that office, "the senior professor or tutor, being one of the trustees, shall exercise the office of president, [***179] until the trustees shall make choice [*654] of, and appoint a president." According to the tenor of the charter, then, the trustees might, without impropriety, appoint a president and other professors from their own body. This is a power not entirely unconnected with an interest. Even if the proposition of the counsel for the defendant were sustained; if it were admitted, that those contracts only are protected by the constitution, a beneficial interest in which is vested in the party, who appears in Court to assert that interest; yet it is by no means clear, that the trustees of Dartmouth College have no beneficial interest in themselves.

But the Court has deemed it unnecessary to investigate this particular point, being of opinion, on general principles, that [HN6] in these private eleemosynary institutions, the body corporate, as possessing the whole legal and equitable interest, and completely representing the donors, for the purpose of executing the trust, has rights which are protected by the constitution.

It results from this opinion, that the acts of the legislature of New-Hampshire, which are stated in the special verdict found in this cause, are repugnant to the constitution [***180] of the United States; and that the judgment on this special verdict ought to have been for the plaintiffs. The judgment of the State Court must, therefore, be reversed.

**CONCUR BY:** WASHINGTON; STORY

**CONCUR**

Mr. Justice WASHINGTON. -- This cause turns upon the validity of certain laws of the State of New-Hampshire, which have been stated in the case, and which, it is contended by the counsel for the plaintiffs [*655] in error, are void, being repugnant to the constitution of that State, and also to the constitution of the United States. Whether the first objection to these laws be well founded or not, is a question with which this Court, in this case, has nothing to do: because it has no jurisdication, as an appellate Court, over the decisions of a State Court, except in cases where is drawn in question the validity of a treaty, or statute of, or an authority exercised under, the United States, and the decision is against their validity; or where is drawn in question the validity of a statute of, or an authority exercised under, any State, on the ground of their being repugnant to the constitution, treaties, or laws of the United States, and the decision is in favour of their validity; [***181] or where is drawn in question the construction of any clause of the constitution, or of a treaty, or statute of, or commission held under, the United States, and the decision is against the title, right, privilege, or exemption specially set up or claimed by either party, under such clause of the said constitution, treaty, statute, or commission.

The clause in the constitution of the United States which was drawn in question in the Court from which this transcript has been sent, is that part of the tenth section of the first article, which declares, that "no State shall pass any bill of attainder, ex post facto law, or any law impairing the obligation of contracts." The decision of the State Court is against the title specially claimed by the plaintiffs in error, under the above clause, because they contend, [**664] that the laws of New-Hampshire, above referred to, [*656] impair the obligation of a contract, and are, consequently, repugnant to the above clause of the constitution of the United States, and void.

There are, then, two questions for this court to decide:

1st. Is the charter granted to Dartmouth College on the 13th of December, 1769, to be considered as a [***182] contract? If it be, then, 2dly. Do the laws in question impair its obligation?

1. What is a contract? It may be defined to be a transaction between two or more persons, in which each party comes under an obligation to the other, and each reciprocally acquires a right to whatever is promised by the other. [77] Under this definition, says Mr. Powell, it is obvious, that every feoffment, gift, grant, agreement, promise, &c. may be included, because in all there is a mutual consent of the minds of the parties concerned in them, upon an agreement between them respecting some property or right that is the object of the stipulation. He adds, that the ingredients requisite to form a contract, are, parties, consent, and an obligation to be created or dissolved: these must all concur, because the regular effect of all contracts is on one side to acquire, and on the other to part with, some property or rights; or to abridge, or to restrain natural liberty, by binding the parties to do, or restraining them from doing, something which before they might have done, or omitted. If a doubt could exist that a grant is a contract, the point was decided in the case of Flectcher v. Peck, [78] [*657] [***183] in which it was laid down, that a contract is either executory or executed; by the former, a party binds himself to do or not to do a particular thing; the latter is one in which the object of the contract is performed, and this differs in nothing from a grant; but whether executed or executory, they both contain obligations binding on the parties, and both are equally within the provisions of the constitution of the United States, which forbids the State governments to pass laws impairing the obligation of contracts.

> 77  Powell on Contr. 6.
> 78  6 Cranch, 87.

If, then, a grant be a contract, within the meaning of the constitution of the United States, the next inquiry is, whether the creation of a corporation by charter, be such a grant, as includes an obligation of the nature of a contract, which no State legislature can pass laws to impair?

A corporation is defined by Mr. Justice Blackstone [79] to be a franchise. It is, says he, "a franchise for a number of persons, to be incorporated and exist as a body politic, with a power to maintain perpetual succession, and to do corporate acts, and each individual of such corporation is also said to have a franchise, or freedom."

This [***184] franchise, like other franchises, is an incorporeal hereditament, issuing out of something real or personal, or concerning or annexed to, and exercisable within a thing corporate. To this grant, or this franchise, the parties are, the king, and the persons for whose benefit it is created, or trustees for them.The assent of both is necessary. [*658] The subjects of the grant are not only privileges and immunities, but property, or, which is the same thing, a capacity to acquire and to hold property in perpetuity. Certain obligations are created binding both on the grantor and the grantees. On the part of the former, it amounts to an extinguishment of the king's prerogative to bestow the same identical franchise on another corporate body, because it would prejudice his prior grant. [80] It implies, therefore, a contract not to reassert the right to grant the franchise to another, or to impair it. There is also an implied contract, that the founder of a private charity, or his heirs, or other persons appointed by him for that purpose, shall have the right to visit, and to govern the corporation, of which he is the acknowledged founder and patron, and also, that in case of its [***185] dissolution, the reversionary right of the founder to the property, with which he had endowed it, should be preserved inviolate.

> 79  2 Bl. Com. 37.
> 80  2 Bl. Com. 37.

The rights acquired by the other contracting party are those of having perpetual succession, of suing and being sued, of purchasing lands for the benefit of themselves and their succssors, and of having a common seal, and of making bye-laws. The obligation imposed upon them, and which forms the consideration of the grant, is that of acting up to the end or design for which they were created by their founder. Mr. Justice Buller, in the case of the King v. Passmore, [81] says, that the grant of incorporation is a compact between the crown and a number of persons, the latter of whom undertake, in consideration [*659] of the privileges bestowed, to exert themselves for the goods government of the place. If they fail to perform their part of it, there is an end of the compact. The charter of a corporation, says Mr. Justice Blackstone, [82] may be forfeited through negligence, or abuse of its franchises, in which case the law judges, that the body politic has broken the condition that the body politic has broken [***186] the condition upon which it was incorporated, and thereupon the corporation is void.

> 81  3 T.R. 246.

82  2 Bl. Com. 484.

It appears to me, upon the whole, that these principles and authorities prove, incontrovertibly, that a charter of incorporation is a contract.

2. The next question is, do the acts of the legislature of New-Hampshire of the 27th of June, and 18th and 26th of December, 1816, impair this contract, within the true intent and meaning of the constitution of the United States?

Previous to the examination of this question, it will be proper clearly to mark the distinction between the different kinds of lay aggregate corporations, in order to prevent any implied decision by this Court of any other case, than the one immediately before it.

We are informed, by the case of Philips v. Bury, 1 Ld. Raym. 5; s.c. 2 T.R. 346, which contains all the doctrine of corporations connected with this point, that there are two kinds of corporations aggregate, viz. such as are for public government, and such as are for private charity. The first are those for the government of a town, city, or the like; and being for public advantage, are [*660] to be governed according to the law [**665] of the [***187] land. The validity and justice of the their private laws and constitutions are examinable in the king's Courts. Of these there are no particular founders, and consequently no particular visitor. There are no patrons of these corporations. But private and particular corporations for charity, founded and endowed by private persons, are subject to the private government of those who erect them, and are to be visited by them or their heirs, or such other persons as they may appoint. The only rules for the government of these private corporations are the laws and constitutions assigned by the founder. This right of government and visitation arises from the property which the founder had in the lands assigned to support the charity; and, as he is the author of the charity, the law invests him with the necessary power of inspecting and regulating it. The authorities are full to prove, that a college is a private charity, as well as a hospital, and that there is, in reality, no difference between them, except in degree; but they are within the same reason, and both eleemosynary.

These corporations, civil and eleemosynary, which differ from each other so especially in their nature [***188] and constitution, may very well differ in matters which concern their rights and privileges, and their existence and subjection to public control. The one is the mere creature of public institution, created exclusively for the public advantage, without other endowments than such as the king or government may bestow upon it, and having no other founder or visitor than the king or government, the Fundator incipiens. [*661] The validity and justice of its laws and constitution are examinable by the Courts having jurisdiction over them; and they are subject to the general law of the land. It would seem reasonable, that such a corporation may be controlled, and its constitution altered and amended by the government, in such manner as the public interest may require. Such legislative interferences cannot be said to impair the contract by which the corporation was formed, because there is in reality but one party to it, the trustees or governors of the corporation being merely the trustees for the public, the cestui que trust of the foundation. These trustees or governors have no interest, no privileges or immunities, which are violated by such interference, and can have no more [***189] right to complain of them, than an ordinary trustee, who is called upon in a Court of Equity to execute the trust. They accepted the charter for the public benefit alone, and there would seem to be no reason why the government, under proper limitations, should not alter or modify such a grant at pleasure. But the case of a private corporation is entirely different. That is the creature of private benefaction for a charity or private purpose. It is endowed and founded by private persons, and subject to their control, laws, and visitation, and not to the general control of the government; and all these powers, rights and privileges, flow from the property of the founder in the funds assigned for the support of the charity.Although the king, by the grant of the charter, is in some sense the founder of all eleemosynary corporations, because without his grant they cannot exist; yet the patron or endower is the perficient founder, to whom belongs, as of [*662] right, all the powers and privilege, which have been described. With such a corporation, it is not competent for the legislature to interfere. It is a franchise, or incorporeal hereditament, founded upon private property, [***190] devoted by its patron to a private charity of a peculiar kind, the offspring of his own will and pleasure, to be managed and visited by persons of his own appointment, according to such laws and regulations as he, or the persons so selected, may ordain.

It has been shown, that the charter is a contract on the part of the government, that the property with which

the charity is endowed, shall be for ever vested in a certain number of persons, and their successors, to subserve the particular purposes designated by the founder, and to be managed in a particular way. If a law increases or diminishes the number of the trustees, they are not the persons which the grantor agreed should be the managers of the fund. If it appropriate the fund intended for the support of a particular charity to that of some other charity, or to an entirely different charity, the grant is in effect set aside, and a new contract substituted in its place; thus disappointing completely the intentions of the founder, by changing the objects of his bounty. And can it be seriously contended, that a law, which changes so materially the terms of a contract, does not impair it? In short, does not every alteration [***191] of a contract, however, unimportant, even though it be manifestly for the interest of the party objecting to it, impair its obligation? If the assent of all the parties to be bound by a contract be of its essence, how [*663] is it possible that a new contract, substituted for, or engrafted on another, without such assent, should not violate the old charter?

This course of reasoning, which appears to be perfectly manifest, is not without authority to support it. Mr. Justice Blackstone lays it down, [84] that the same identical franchise, that has been before granted to one, cannot be bestowed on another; and the reason assigned is, that it would prejudice the former grant. In the King v. Passmore, [85] Lord Kenyon says, that an existing corporation cannot have another charter obtruded upon it by the crown. It may reject it, or accept the whole, or any part of the new charter. The reason is obvious. A charter is a contract, to the validity of which the consent of both parties is essential, and, therefore, it cannot be altered or added to without such consent.

84   Bl. Com. 37.
85   3 T.R. 246.

But the case of Terrett v. Taylor, [86] fully supports the distinction above [***192] stated, between civil and private corporations, and is entirely in point. It was decided in that case, that a private corporation, created by the legislature, may lose its franchises by misuser, or non-user, and may be resumed by the government under a judicial judgment of forfeiture. In respect to public corporations which exist only for public purposes, such as towns, cities, &c. the legislature may, under proper limitations, change, modify, enlarge, or restrain them,

securing, however, the property for the use of those for whom, and at whose expense, it was purchased. [**666] But it is denied, that it has power to repeal [*664] statutes creating private corporations, or confirming to them property already acquired under the faith of previous laws; and that it can, by such repeal, vest the property of such corporations in the State, or dispose of the same to such purposes as it may please, without the consent or default of the corporators. Such a law, it is declared, would be repugnant both to the spirit and the letter of the constitution of the United States.

86   9 Cranch, 43.

If these principles, before laid down, be correct, it cannot be denied, that the obligations [***193] of the charter to Dartmouth College are impaired by the laws under consideration. The name of the corporation, its constitution and government, and the objects of the founder, and of the grantor of the charter, are totally changed. By the charter, the property of this founder was vested in twelve trustees, and no more, to be disposed of by them, or a majority, for the support of a college, for the education and instruction of the Indians, and also of English youth, and others. Under the late acts, the trustees and visitors are different; and the property and franchises of the college are transferred to different and new uses, not contemplated by the founder. In short, it is most obvious, that the effect of these laws is to abolish the old corporation, and to create a new one in its stead. The laws of Virginia, referred to in the case of Terrett v. Taylor, authorized the overseers of the poor to sell the glebes belonging to the Protestant Episcopal Church, and to appropriate the proceeds to other uses. The laws in question devest the trustees of Dartmouth College of the property vested in them [*665] by the founder, and vest it in other trustees, for the support of a different [***194] institution, called Dartmouth University. In what respects do they differ? Would the difference have been greater in principle, if the law had appropriated the funds of the college to the making of turnpike roads, or to any other purpose of a public nature? In all respects, in which the contract has been altered without the assent of the corporation, its obligations have been impaired; and the degree can make no difference in the construction of the above provision of the constitution.

It has been insisted in the argument at the bar, that Dartmouth College was a mere civil corporation, created for a public purpose, the public being deeply interested in

the education of its youth; and that, consequently, the charter was as much under the control of the government of New-Hampshire, as if the corporation had concerned the government of a town or city. But it has been shown, that the authorities are all the other way. There is not a case to be found which contradicts the doctrine laid down in the case of Philips v. Bury, viz. that a college founded by an individual, or individuals, is a private charity, subject to the government and visitation of the founder, and not to the unlimited [***195] control of the government.

It is objected, in this case, that Dr. Wheelock is not the founder of Dartmouth College. Admit he is not. How would this alter the case? Neither the king, nor the province of New-Hampshire was the founder; and if the contributions made by the governor of New-Hampshire, by those persons who [*666] granted lands for the college, in order to induce its location in a particular part of the State, by the other liberal contributors in England and America, bestow upon them claims equal with Dr. Wheelock, still it would not alter the nature of the corporation, and convert it into one for public government. It would still be a private eleemosynary corporation, a private charity endowed by a number of persons, instead of a single individual. But the fact is, that whoever may mediately have contributed to swell the funds of this charity, they were bestowed at the solicitation of Dr. Wheelock, and vested in persons appointed by him, for the use of a charity, of which he was the immediate founder, and is so styled in the charter.

Upon the whole, I am of opinion, that the above acts of New-Hampshire, not having received the assent of the corporate body of Dartmouth [***196] College, are not binding on them, and, consequently, that the judgment of the State Court ought to be reversed.

Mr. Justice JOHNSON concurred, for the reasons stated by the Chief Justice.

Mr. Justice LIVINGSTON concurred, for the reasons stated by the Chief Justice, and Justices WASHINGTON and STORY.

Mr. Justice STORY. This is a cause of great importance, and as the very learned discussions, as well here, as in the State Court, show, of no inconsiderable difficulty. There are two questions, to which the appellate jurisdiction of this Court properly applies.

[*667] 1. Whether the original charter of Dartmouth College is a contract within the prohibitory clause of the constitution of the United States, which declares, that no State shall pass any "law impairing the obligation of contracts." 2. If so, whether the legislative acts of New-Hampshire of the 27th of June, and of the 18th and 27th of December, 1816, or any of them, impair the obligations of that charter.

It will be necessary, however, before we proceed to discuss these questions, to institute an inquiry into the nature, rights, and duties of aggregate corporations at common law; that we may apply the principles, [***197] drawn from this source, to the exposition of this charter, which was granted emphatically with reference to that law.

An aggregate corporation at common law is a collection of individuals united into one collective body, under a special name, and possessing certain immunities, privileges, and capacities in its collective character, which do not belong to the natural persons composing it. Among other things it possesses the capacity of perpetual succession, and of acting by the collected vote or will of its component members, and of suing and being sued in all things touching its corporate rights and duties. It is, in short, an artificial person, existing in contemplation of law, and endowed with certain powers and franchises which, though they must be exercised through the medium of its natural members, are yet considered as subsisting in the corporation itself, as distinctly as if it were a real personage. Hence, such a corporation may sue and be sued by its own members; and [*668] [**667] may contract with them in the same manner as with any strangers. [87] A great variety of these corporations exist in every country governed by the common law; in some of which the corporate [***198] existence is perpetuated by new elections, made from time to time; and in others by a continual accession of new members, without any corporate act. Some of these corporations are, from the particular purposes to which they are devoted, denominated spiritual, and some law; and the latter are again divided into civil and eleemosynary corporations. It is unnecessary, in this place, to enter into any examination of civil corporations. Eleemosynary corporations are such as are constituted for the perpetual distribution of the free alms and bounty of the founder, in such manner as he has directed; and in this class are ranked hospitals for the relief of poor and impotent persons, and colleges for the promotion of

learning and piety, and the support of persons engaged in literary pursuits. [88]

87   1 Bl. Com. 469. 475. 1 Kyd Corp. 13. 69. 189. 1 Woodes. 471. &c. &c.

88   1 Bl. Com. 469. 470. 471. 482. 1 Kyd Corp. 25. 1 Woodes. 474. Attorney General v. Whorwood, 1 Ves. 534. St John's College v. Todington, 1 Bl. Rep. 84. S.C. 1 Bur. 200. Phillips v. Bury, 1 Ld. Raym. 5. S.C. 2 T.R. 346. Porter's Case, 1 Co. 22. b. 23.

Another division of corporations is into public and private.Public [***199] corporations are generally esteemed such as exist for public political purposes only, such as towns, cities, parishes, and counties; and in many respects they are so, although they involve some private interests; but strictly speaking, public corporations [*669] are such only as are founded by the government for public purposes, where the whole interests belong also to the government. If, therefore, the foundation be private, though under the charter of the government, the corporation is private, however extensive the uses may be to which it is devoted, either by the bounty of the founder, or the nature and objects of the institution. For instance, a bank created by the government for its own uses, whose stock is exclusively owned by the government, is, in the strictest sense, a public corporation. So a hospital created and endowed by the government for general charity. But a bank, whose stock is owned by private persons, is a private corporation, although it is erected by the government, and its objects and operations partake of a public nature.The same doctrine may be affirmed of insurance, canal, bridge, and turnpike companies. In all these cases, the uses may, in a certain [***200] sense, be called public, but the corporations are private; as much so, indeed, as if the franchises were vested in a single person.

This reasoning applies in its full force to eleemosynary corporations. A hospital founded by a private benefactor is, in point of law, a private corporation, although dedicated by its charter to general charity. So a college, founded and endowed in the same manner, although, being for the promotion of learning and piety, it may extend its charity to scholars from every class in the community, and thus acquire the character of a public institution. This is the unequivocal doctrine of the authorities; and cannot be [*670] shaken but by undermining the most solid foundations of the common law. [89]

89   Phillips v. Bury, 1 Ld. Ray. 5. 9. S.C. 2 T.R. 346.

It was indeed supposed at the argument, that if the uses of an eleemosynary corporation be for general charity, this alone would constitute it a public corporation. But the law is certainly not so. To be sure, in a certain sense, every charity, which is extensive in its reach, may be called a public charity, in contradistinction to a charity embracing but a few definite objects. In this sense [***201] the language was unquestionably used by Lord Hardwicke in the case cited at the argument; [90] and, in this sense, a private corporation may well enough be denominated a public charity. So it would be, if the endowment, instead of being vested in a corporation, were assigned to a private trustee; yet in such a case no one would imagine that the trust ceased to be private, or the funds became public property. That the mere act of incorporation will not change the charity from a private to a public one, is most distinctly asserted in the authorities. Lord Hardwicke, in the case already alluded to, says, "the charter of the crown cannot make a charity more or less public, but only more permanent than it would otherwise be; but it is the extensiveness, which will constitute it a public one. A devise to the poor of the parish is a public charity. Where testators leave it to the discretion of a trustee to choose out the objects, though each particular [*671] object may be said to be private, yet in the extensiveness of the benefit accruing from them, they may properly be called public charities. A sum to be disposed of by A. B. and his executors, at their discretion, among poor [***202] house-keepers, is of this kind." The charity, then, may, in this sense, be public, although it may be administered by private trustees; and, for the same reason, it may thus be public, though administered by a private corporation. The fact, then, that the charity is public, affords no proof that the corporation is also public; and, consequently, the argument, so far as it is built on this foundation, falls to the ground. If, indeed, the argument were correct, it would follow, that almost every hospital and college would be a public corporation; a doctrine utterly irreconcilable with the whole current of decisions since the time of Lord Coke. [91]

90   Attorney General v. Pearse, 2 Atk. 87. 1 Bac. Abr. tit Charitable Uses, E. 589.

91   The case of Sutton's Hospital, 10 Co. 23.

When, then, the argument assumes, that because the charity is public, the corporation is public, it manifestly confounds the popular, with the strictly legal sense of the terms. And if it stopped here, it would not be very material to correct the error. But it is on this foundation, that a superstructure is erected, which is to compel a surrender of the cause. When the corporation is said at the bar to [***203] be public, it is not merely meant, that the whole community may be the proper objects of the bounty, but that the government have the sole right, as trustees of the public interests, to regulate, control, and direct the public interests, to regulate, control, and direct the corporation, and its funds and its franchises, at its own good will and pleasure. Now, such [*672] an authority does not exist in the government, except [**668] where the corporation is in the strictest sense public; that is, where its whole interests and franchises are the exclusive property and domain of the government itself. If it had been otherwise, Courts of law would have been spared many laborious adjudications in respect to eleemosynary corporations, and the visitatorial powers over them, from the time of Lord Holt down to the present day. [92] Nay, more, private trustees for charitable purposes would have been liable to have the property confided to their care taken away from them without any assent or default on their part, and the administration submitted, not to the control of law and equity, but to the arbitrary discretion of the government. Yet, who ever thought before, that the munificent [***204] gifts of private donors for general charity became instantaneously the property of the government; and that the trustees appointed by the donors, whether corporate or unincorporated, might be compelled to yield up their rights to whomsoever the government might appoint to administer them? If we were to establish such a principle, it would extinguish all future eleemosynary endowments; and we should find as little of public policy, as we now find of law to sustain it.

92   Rex v. Bury, 1 Ld. Ray. 5. S.C. Comb. 265. Holt, 715. 1 Show. 360. 4 Mod. 106. Skin. 447. and Ld. Holt's opinion from his own MS. in 2 T.R. 346.

An eleemosynary corporation, then, upon a private foundation, being a private corporation, it is next to be considered, what is deemed a foundation, [*673] and who is the founder. This cannot be stated with more brevity and exactness than in the language of the elegant commentator upon the laws of England: "The founder of all corporations (says Sir William Blackstone,) in the strictest and original sense, is the king alone, for he only can incorporate a society; and in civil corporations, such as mayor, commonalty, &c. where there are no possessions or endowments [***205] given to the body, ther is no other founder but the king; but in eleemosynary foundations, such as colleges and hospitals, where there is an endowment of lands, the law distinguishes and maks two species of foundation, the one fundatio incipiens, or the incorporation, in which sense the king is the general founder of all colleges and hospitals; the other fundatio perficiens, or the dotation of it, in which sense the first gift of the revenues is the foundation, and he who gives them is, in the law, the founder; and it is in this last sense we generally call a man the founder of a college or hospital." [93]

93   1 Bl. Com. 480.  10 Co. 33.

To all eleemosynary corporations a visitatorial power attaches, as a necessary incident; for these corporations being composed of individuals, subject to human infirmities, are liable, as well as private persons, to deviate from the end of their institution. The law, therefore, has provided, that there shall somewhere exist a power to visit, inquire into, and correct all irregularities and abuses in such corporations, and to compel the original purposes of the charity to be faithfully fulfilled. [94] The nature and extent of this visitatorial [***206] power has been expounded [*674] with admirable fulness and accuracy by Lord Holt in one of his most celebrated judgments. [95] And of common right by the dotation the founder and his heirs are the legal visitors, unless the founder has appointed and assigned another person to be visitor. For the founder may, if he please, at the time of the endowment, part with his visitatorial power, and the person to whom it is assigned will, in that case, possess it in exclusion of the founder's heirs. [96] This visitatorial power is, therefore, an hereditament founded in property, and valuable in intendment of law; and stands upon the maxim, that he who gives his property, has a right to regulate it in future. It includes also the legal right of patronage, for as Lord Holt justly observes, "patronage and visitation are necessary consequents one upon another." No technical terms are necessary to assign or vest the visitatorial power; it is sufficient if, from the nature of the duties to be performed by particular persons under the charter, it can be inferred, that the founder meant to part with it in their favour; and he may divide it among various persons, or subject it to any modifications

[***207] or control, by the fundamental statutes of the corporation. But where the appointment is given in general terms, the whole power vests in the appointee. [97] In the construction [*675] of charters too, it is a general rule, that if the objects of the charity are incorporated, as for instance, the master and fellows of a college, or the master and poor of a hospital, the visitatorial power, in the absence of any special appointment, silently vests in the founder and his heirs. But where trustees or governors are incorporated to manage the charity, the visitatorial power is deemed to belong to them in their corporate character. [98]

> 94   1 Bl. Com. 480.
> 95   Phillips v. Bury, 1 Ld. Ray. 5. S.C. 2 T.R. 346.
> 96   1 Bl. Com. 482.
> 97   Eden v. Foster, 2 P.W. 325. Attorney General v. Middleton, 2 Ves. 327. St. Johns College v. Todington, 1 Bl. Rep. 84. S.C. 2 Bur. 200. Attorney General v. Clare College, 3 Atk. 662. S.C. 1 Ves. 78.
> 98   Phillips v. Bury, 1 Ld. Ray. 5. S.C. 2 T.R. 346. Green v. Rutherforth, 1 Ves. 472. Attorney General v. Middleton, 2 Ves. 327. Case of Sutton Hospital, 10 Co. 23. 31.

When a private eleemosynary corporation is thus created by the charter of the crown, [***208] it is subject to no other control on the part of the crown, than what is expressly or implicitly reserved by the charter itself. Unless a power be reserved for this purpose, the crown cannot, in virtue of its prerogative, without the consent of the corporation, alter or amend the charter, or devest the corporation of any of its franchises, or add to them, or add to, or diminish, the number of the trustees, or remove any of the members, or change, or control the administration of the charity, or compel the corporation to receive a new charter. This is the uniform language of the authorities, and forms one of the most stubborn, and well settled doctrines of the common law. [99]

> 99   See Rex v. Passmore, 3 T.R. 199. and the case there cited.

But an eleemosynary, like every other corporation, is subject to the general law of the land. It may forfeit its corporate franchises, by misuser or nonuser [*676] of them. It is subject to the controling authority of its legal visitor, who, unless restrained by the terms of the charter, may amend and repeal its statutes, remove [**669] its officers, correct abuses, and generally superintend the management of the trusts. Where indeed [***209] the visitatorial power is vested in the trustees of the charity in virtue of their incorporation, there can be no amotion of them from their corporate capacity. But they are not, therefore, placed beyond the reach of the law. As managers of the revenues of the corporation, they are subject to the general superintending power of the Court of Chancery, not as itself possessing a visitatorial power, or a right to control the charity, but as possessing a general jurisdiction in all cases of an abuse of trusts to redress grievances, and suppress frauds. [100] And where a corporation is a mere trustee of a charity, a Court of equity will go yet farther; and though it cannot appoint or remove a corporator, it will yet, in a case of [*677] gross fraud, or abuse of trust, take away the trust from the corporation, and vest it in other hands. [101]

> 100   2 Fonb. Eq. B. 2. pt. 2. ch. 1. s. 1. note (a.) Coop. Eq. Pl. 292. 2 Kyd Corp. 195. Green v. Rutherforth, 1 Ves. 462. Attorney General v. Foundling Hospital, 4 Bro. Ch. 165. S.C. 2 Ves. jun. 42. Eden v. Foster, 2 P.W. 325. 1 Woodes. 476. Attorney General v. Price, 3 Atk. 108. Attorney General v. Lock, 3 Atk. 164. Attorney General v. Dixie, 13 Ves. 519. Ex parte Kirkby Ravensworth Hospital, 15 Ves. 304. 314. Attorney General v. Earl of Clarendon, 17 Ves. 491. 499. Berkhamstead Free School, 2 Ves. & Beames, 134. Attorney Geenral v. Corporation of Carmarthen, Coop. Rep. 30. Mayor, &c. of Colchester v. Lowten, 1 Ves. & Beames, 226. Rex v. Watson, 2 T.R. 199. Attorney General v. Utica Ins. Co. 2 Johns. Ch. R. 371. Attorney General v. Middleton, 2 Ves. 327.
> 101   Mayor, &c. of Coventry v. Attorney General, 7 Bro. Parl. Cases, 235. Attorney General v. Earl of Clarendon, 17 Ves. 491. 499.

[***210] Thus much it has been thought proper to premise respecting the nature, rights, and duties of eleemosynary corporations, growing out of the common law. We may now proceed to an examination of the original charter of Dartmouth College.

It begins by a recital, among other things, that the Rev. Eleazer Wheelock, of Lebanon, in Connecticut, about the year 1754, at his own expense, on his own estate, set on foot an Indian charity school; and by the assistance of other persons, educated a number of the

children of the Indians, and employed them as missionaries and schoolmaters among the savage tribes; that the design became reputable among the Indians, so that more desired the education of their children at the school, than the contributions in the American colonies would support; that the said Wheelock thought it expedient to endeavour to procure contributions in England, and requested the Rev. Nathaniel Whitaker to go to England as his attorney, to solicit contribution, and also solicited the Earl of Dartmouth, and others, to receive the contributions and become trustees thereof, which they cheerfully agreed to, and he constituted them trustees accordingly by a power of attorney, and [***211] they testified their acceptance by a sealed instrument; That the said Wheelock also authorized the trustees to fix and determine [*678] upon the place for the said school; and, to enable them understandingly to give the preference, laid before them, the several offers of the governments in America, inviting the settlement of the school among them; that a large number of the proprietors of lands, in the western parts of New-Hampshire, to aid the design; and considering that the same school might be enlarged and improved to promote learning among the English, and to supply the churches there with an orthodox ministry, promised large tracts of land for the uses aforesaid, provided the school should be settled in the western part of said province; that the trustees thereupon gave a preference to the western part of said province, lying on Connecticut river, as a situation most convenient for said school: That the said Wheelock further represented the necessity for a legal incorporation, in order to the safety and well-being of said seminary, and its being capable of the tenure and diposal of lands and bequests for the use of the same; that in the infancy of said institution, certain [***212] gentlemen whom he had already nominated in his last will (which he had transmitted to the trustees in England) to be trustees in America, should be the corporation now proposed; and, lastly, that there were already large contributions for said school in the hands of the trustees in England, and further success might be expected; for which reason the said Wheelock desired they might be invested with all that power therein, which could consist with their distance from the same. The charter, after these recitals, declares, that the king, considering the premises, and being willing to [*679] encourage the charitable design, and that the best means of education might be established in New-Hampshire for the benefit thereof, does, of his special grace, certain knowledge, and mere motion, ordain and grant, that there be a college

erected in New-Hampshire, by the name of Dartmouth College, for the education and instruction of youth of the Indian tribes, and also of English youth and others; that the trustees of said college shall be a corporation forever, by the name of the trustees of Dartmouth College: that the then governor of New-Hampshire, the said Wheelock, and ten other persons, [***213] specially named in the charter, shall be trustees of the said college, and that the whole number of trustees shall forever thereafter consist of twelve, and no more; that the said corporation shall have power to sue and to be sued by their corporate name, and to acquire and hold for the use of the said Dartmouth College, lands, tenements, hereditaments, and franchises; to receive, purchase, and build any houses for the use of said college, in such town in the western part of New-Hampshire, as the trustees, or a major part of them, shall be a written instrument agree on; and to receive, accept, and dispose of any lands, goods, chattels, rents, gifts, legacies, &c. &c. not exceeding the yearly value of 6,000l. It further declares, that the trustees, or a major part of them, regularly convened, (for which purpose seven shall form a quorum,) shall have authority to appoint and remove the professors, tutors, and other officers of the college, and to pay them, and also such missionaries and schoolmasters as shall be employed by the trustees for instructing the Indians, salaries and [*680] allowances, as well as other corporate expenses, out of the corporate funds. It further declares, [***214] that, the said trustees, as often as one or more of the trustees shall die, or, by removal or otherwise, shall, according to their judgment, become unfit [**670] or incapable to serve the interests of the college, shall have power to elect and appoint other trustees in their stead, so that when the whole number shall be complete of twelve trustees, eight shall be resident freeholders of New-Hampshire, and seven of the whole number, laymen. It further declares that the trustees shll have power from time to time to make and establish rules, ordinaances, and laws for the government of the college not repugnant to the laws of the land, and to confer collegiate degrees. It further appoints the said Wheelock, whom it denominates "the FOUNDER of the college," to be president of the college, with authority to appoint his successor, who shall be president until disapproved of by the trustees. It then concludes with a direction, that it shall be the duty of the president to transmit to the trustees in England, so long as they should perpetuate their board, and as there should be Indian natives remaining to be proper objects of the bounty, an annual account of all the disbursements from [***215] the

donations in England, and of the general plans and prosperity of the institution.

Such are the most material clauses of the charter. It is observable, in the first place, that no endowment whatever is given by the crown; and no power is reserved to the crown or government in any manner to alter, amend, or control the charter. It is also apparent, [*681] from the very terms of the charter, that Dr. Wheelock is recognized as the founder of the college, and that the charter is granted upon his application, and that the trustees were in fact nominated by him. In the next place it is apparent, that the objects of the institution are purely charitable, for the distribution of the private contributions of private benefactors. The charity was, in the sense already expalined, a public charity, that is, for the general promotion of learning and peity; but in this respect it was just as much public before, as after the incorporation. The only effect of the charter was to give permanency to the design, by enlarging the sphere of its action, and granting a perpetuity of corporate powers and franchises the better to secure the administration of the benevolent donations. As founder, [***216] too, Dr. Wheelock and his heirs would have been completely clothed with the visitatorial power; but the whole government and control, as well of the officers as of the revenues of the college, being with his consent assigned to the trustees in their corporate character, the visitatorial power, which is included in this authority, rightfully devolved on the trustees. As managers of the property and revenues of the corporation, they were amenable to the jurisdiction of the judicial tribunals of the State; but as visitors, their discretion or control, the charter, and liable to no supervision or control, at least, unless it was fraudulently misapplied.

From this summary examination it follows, that Dartmouth College was, under its original charter, a private eleemosynary corporation, endowed with [*682] the usual privileges and franchises of such corporations, and, among others, with a legal perpetuity, and was exclusively under the government and control of twelve trustees, who were to be elected and appointed, from time to time, by the existing board, as vacancies or removals should occur.

We are now led to the consideration of the first question in the cause, whether this charter [***217] is a contract, within the clause of the constitution prohibiting the States from passing any law impairing the obligation of contracts. In the case of Fletcher v. Peck, [102] this

Court laid down its exposition of the word "contract" in this clause, in the following manner: "A contract is a compact between two or more persons, and is either executory or executed. An executory contract is one, in which a party binds himself to do or not to do a particular thing. A contract executed is one in which the object of the contract is performed; and this, says Blackstone, differs in nothing from a grant. A contract executed, as well as one that is executory, contains obligations binding on the parties. A grant in its own nature amounts to an extinguishment of the right of the grantor, and implies a contract not to reassert that right. A party is always estopped by his own grant," This language is perfectly unambiguous, and was used in reference to a grant of land by the Governor of a State under a legislative act. It determines, in the most unequivocal manner, that the grant of a State is a contract within the clause of [*683] the constitution now in question, and that it implies [***218] a contract not to reassume the rights granted. A fortiori, the doctrine applies to a charter or grant from the king.

102   6 Cranch, 87. 136.

But it is objected, that the charter of Dartmouth College is not a contract contemplated by the constitution, because no valuable consideration passed to the king as an equivalent for the grant, it purporting to be granted ex mero motu, and further, that no contracts merely voluntary are within the prohibitory clause. It must be admitted, that mere executory contracts cannot be enforced at law, unless there be a valuable consideration to sustain them; and the constitution certainly did not mean to create any new obligations, or give any new efficacy to nude pacts. But it must, on the other hand, be also admitted, that the constitution did intend to preserve all the obligatory force of contracts, which they have by the general principles of law. Now, when a contract has once passed, bona, fide, into grant, neither the king nor any private person, who may be the grantor, can recal the grant of the property, although the conveyance may have been purely voluntary. A gift, completely executed, is irrevocable. The property conveyed by it [***219] becomes, as against the donor, the absolute property of the donee; and no subsequent change of intention of the donor can change the rights of the donee. [103] And a gift by the crown of incorporeal hereditaments, such as corporate franchises, when executed, comes completely [*684] within the principle, and is, in the strictest sense of the terms, a grant. [104] Was

it ever imagined that land, voluntarily granted to any person by a State, was liable to be resumed at its own good pleasure" Such a pretension would, under any circumstances, be truly alarming; but in a country like ours, where thousands of land titles had their origin in gratuitous grants of the States, it would go far to shake the foundations of the best settled [**671] estates. And a grant of franchises is not, in point of principle, distinguishable from a grant of any other property. If, therefore, this charter were a pure donation, when the grant was complete, and accepted by the grantees, it involved a contract, that the grantees should hold, and the grantor should not reassume the grant, as much as if it had been founded on the most valuable consideration.

103  2 Bl. Com. 441.  Jenk. Cent. 104.
104  2 Bl Com. 317. 346.  Shep. Touch. ch. 12. p. 227.

[***220] But it is not admitted that this charter was not granted for what the law deems a valuable consideration. For this purpose it matters not how trifling the consideration may be; a pepper corn is as good as a thousand dollars. Nor is it necessary that the consideration should be a benefit to the grantor. It is sufficient if it import damage or loss, or forbearanc of benefit, or any act done, or to be done, on the part of the grantee. It is unnecessary to state cases; they are familiar to the mind of every lawyer. [105]

105  Pillans v. Van Mierop. per Yates, J. 3 Burr. 1663. Forth v. Statunton, 2 Saund. Rep. 211. Williams' note 2, and the cases there cited.

With these principles in view, let us now examine [*685] the terms of this charter.It purports, indeed, on its face, to be granted "of the special grace, certain knowledge, and mere motion" of the king; but these words were introduced for a very different purpose from that now contended for. It is a general rule of the common law, (the reverse of that applied in ordinary cases,) that a grant of the king, at the suit of the grantee, is to be construed most beneficially for the king, and most strictly against the grantee. [***221] Wherefore, it is usual to insert in the king's grants a clause, that they are made, not a the suit of the grantee, but of the special grace, certain knowledge, and mere motion of the king; and then they receive a more liberal construction. This is the true object of the clause in question, as we are informed by the most accurate authorities. [106] But the charter also, on its face, purports to be granted in

consideration of the premises in the introductory recitals. Now, among these recitals it appears, that Dr. Wheelock had founded a charity school at his own expense, on his own estate; that divers contributions had been made in the colonies, by others, for its support; that new contributions had been made, and were making, in England for this purpose, and were in the hands of trustees appointed by Dr. Wheelock to act in his behalf; that Dr. Wheelock had consented to have the school established at such other place as the trustees should select; that offers had been made by several of the governments in America, inviting the [*686] establishment of the school among them; that offers of land had also been made by divers proprietors of lands in the western parts of New-Hampshire, [***222] if the school should be established there; that the trustees had finally consented to established it in New-Hampshire; and that Dr. Wheelock represented that, to effectuate the purposes of all parties, an incorporation was necessary. Can it be truly said that these recitals contain no legal consideration of benefit to the crown, or of forbearance of benefit on the other side?  Is there not an implied contract by Dr. Wheelock, if a charter is granted, that the school shall be removed from his estate to New-Hampshire? and that he will relinquish all his control over the funds collected, and to be collected, in England, under his auspices, and subject to his authority? that he will yield up the management of his charity school to the trustees of the college?that he will relinquish all the offers made by other American governments, and devote his patronage to this institution? It will scarcely be denied, that he gave up the right any longer to maintain the charity school already established on his own estate; and that the funds collected for its use, and subject to his management, were yielded up by him as an endowment of the college.  The very language of the charter supposes him to [***223] be the legal owner of the funds of the charity school, and, in virtue of this endowment, declares him the founder of the college. It matters not whether the funds were great or small; Dr. Wheelock had procured them by his own influence, and they were under his control, to be applied to the [*687] support of his charity school; and when he relinquished this control he relinquished a right founded in property acquired by his labours. Besides; Dr. Wheelock impliedly agreed to devote his future services to the colleg, when erected, by coming president thereof at a period when sacrifices must necessarily be made to accomplish the great design in view. If, indeed, a pepper corn be, in the eye of the law, of sufficient value to found a contract, as upon a valuable consideration, are these

implied agreements, and these relinquishments of right and benefit, to be deemed wholly worthless? It has never been doubted, that an agreement not to exercise a trade in a particular place was a sufficient consideration to sustain a contract for the payment of money. A fortiori, the relinquishment of property which a person holds, or controls the use of, as a trust, is a sufficient consideration; [***224] for it is parting with a legal right. Even a right of patronage (jus patronatus) is of great value in intendment of law.Nobody doubts, that an advowson is a valuable hereditament; and yet, in fact, it is but a mere trust, or right of nomination to a benefice, which cannot be legally sold to the intended incumbent. [107]

> 106   2 Bl. Com. 347.  Finch's Law, 100.  10 Rep.
> 112.  1 Shep. Abridg. 136.  Bull, N.P. 136.
> 107   2 Bl. Com. 22. note by Christian.

In respect to Dr. Wheelock, then, if a consideration be necessary to support the charter as a contract, it is to be found in the implied stipulations on his prt in the charter itself. He relinquished valuable rights, and undertook a laborious office in consideration of the grant of the incorporation.

[*688]  This is not all. A charter may be granted upon an executory, as well as an executed or present consideration. When it is granted to persons who have not made application for it, until their acceptance thereof, the grant is yet in fieri. Upon the acceptance there is an implied contract on the part of the grantees, in consideration of the charter, that they will perform the duties, and exericse the authorities conferred [***225] by it. This was the doctrine asserted by the late learned Mr. Justice Buller, in a modern case. [108] He there said, "I do not know how to reason on this point better [**672] than in the manner urged by one of the relator's counsel, who considered the grant of incorporation to be a compact between the crown, and a certain number of the subjects, the latter of whom undertake, in consideration of the privileges which are bestowed, to exert themselves for the good government of the place," (i.e. the place incorporated.) It will not be pretended, that if a charter be granted for a bank, and the stockholders pay in their own funds, the charter is to be deemed a grant without consideration, and, therefore, revocable at the pleasure of the grantor. Yet here, the funds are to be managed, and the services performed exclusively for the use and benefit of the stockholders themselves.And where the grantees are mere trustees to perform services without reward,

exclusively for the benefit of others, for public charity, can it be reasonably argued, that these services are less valuable to the government, than if performed for the private emolument of [*689] the trustees themselves? In [***226] respect then to the trustees also, there was a valuable consideration for the charter, the consideration of services agreed to be rendered by them in execution of a charity, from which they could receive no private remuneration.

> 108   Rex v. Passmore, 3 T.R. 199. 239. 246

There is yet another view of this part of the case, which deserves the most weighy consideration. The corporation was expressly created for the purpose of distributing in perpetuity the charitable donations of private benefactors. By the terms of the charter, the trustees, and their successors, in their corporate capacity, were to receive, hold, and exclusively manage, all the funds so contributed. The crown, then, upon the face of the charter, pledged its faith that the donations of private benefactors should be perpetually devoted to their original purposes, without any interference on its own part, and should be forever administered by the trustees of the corporation, unless its corporate franchises should be taken away by due process of law. From the very nature of the case, therefore, there was an implied contract on the part of the crown with every benefactor, that if he would give his money, it should [***227] be deemed a charity protected by the charter, and be administered by the corporation according to the general law of the land. As soon, then, as a donation was made to the corporation, there was an implied contract springing up, and founded on a valuable consideration, that the crown would not revoke, or alter the charter, or change its administration, without the consent of the corporation. There was also an implied contract between the corporaton itself, and every benefactor [*690] upon a like consideration, that it would administer his bounty according to the terms, and for the objects stipulated in the charter.

In every view of the case, if a consideration were necessary (which I utterly deny) to make the charter a valid contract, a valuable consideration did exist, as to the founder, the trustees and the benefactors. And upon the soundest legal principles, the charter may be properly deemed, according to the various aspects, in which it is viewed, as a several, contract with each of these parties, in virtue of the foundation, or the endowment of the

college, or the acceptance of the charter, or the donations to the charity.

And here we might pause: but there is yet remaining [***228] another view of the subject, which cannot consistently be passed over without notice. It seems to be assumed by the argument of the defendant's counsel, that there is no contract whatsoever, in virtue of the charter, between the crown and the corporation itself. But it deserves consideration, whether this assumption can be sustained upon a solid foundation.

If this had been a new charter granted to an existing corporation, or a grant of lands to an existing corporation, there could not have been a doubt, that the grant would have been an executed contract with the corporation; as much so, as if it had been to any private person. But it is supposed, that as this corporation was not then in existence, but was created and its franchises bestowed, uno flatu, the charter cannot be construed a contract, because there was no person in rerum natura, with whom it might be made. Is this, however, a just and legal view of the [*691] subject? If the corporation had no existence so as to become a contracting party, neither had it for the purpose of receiving a grant of the franchises. The truth is, that there may be a priority of operation of things in the same grant; and the law distinguishes [***229] and gives such priority, wherever it is necessary to effectuate the objects of the grant. [109] From the nature of things, the artificial person called a corporation, must be created before it can be capable of taking any thing. When, therefore, a charter is granted, and it brings the corporation into existence without any act of the natural persons who compose it, and gives such corporation any privileges, franchises, or property, the law deems the corporation to be first brought into existence, and then clothes it with the granted liberties and property. When, on the other hand, the corporation is to be brought into existence by some future acts of the corporators, the franchises remain in abeyance, until such acts are done, and when the corporation is brought into life, the franchises instantaneously attach to it. There may be, in intendment of law, a priority of time, even in an instant, for this purpose. [110] And if the corporation have an existence before the grant of its other franchises attaches, what more difficulty is there in deeming the grant of these franchises a contract with it, than if granted by another instrument at a subsequent period? It behooves those also, [***230] who hold, that a grant to a corporation, not then in existence, is incapable [*692]

of being deemed a contract on that account, to consider, whether they do not at the same time establish, that the grant itself is a nullity for precisely the same reason. Yet such a doctrine would strike us all as pregnant with absurdity, since it would prove that an act of incorporation could never confer any authorities, or rights, or property, on the corporation it created. It may be admitted, that two parties are necessary to form a perfect contract; [**673] but it is denied that it is necessary, that the assent of both parties must be at the same time. If the legislature were voluntarily to grant land in fee to the first child of A. to be hereafter born; as soon as such child should be born, the estate would vest in it. Would it be contended, that such grant, when it took effect, was revocable, and not an executed contract, upon the acceptance of the estate? The same question might be asked in a case of a gratuitous grant by the king or the ligislature to A. for life, and afterwards to the heirs of B., who is then living. Take the case of a bank, incorporated for a limited period, [***231] upon the express condition that it shall pay out of its corporate funds a certain sum, as the consideration for the charter, and after the corporation is organized a payment duly made of the sum out of the corporate funds; will it be contended, that there is not a subsisting contract between the government and the corporation, by the matters thus arising ex post facto, that the charter shall not be revoked during the stipulated period? Suppose an act declaring that all persons, who should thereafter pay into the public treasury a stipulated sum, should be tenants in common of certain [*693] lands belonging to the State in certain proportions; if a person afterwards born, pays the stipulated sum into the treasury, is it less a contract with him, than it would be with a person in esse at the time the act passed? We must admit that there may be future springing contracts in respect to persons not now in esse, or we shall involve ourselves in inextricable difficulties. And if there may be in respect to natural persons, why not also in respect to artificial persons, created by the law, for the very purpose of being clothed with corporate powers? I am unable to distinguish between [***232] the case of a grant of land or of franchises to an existing corporation, and a like grant to a corporation brought into life for the very purpose of receiving the grant. As soon as it is in esse, and the franchises and property become vested and executed in it, the grant is just as much an executed contract, as if its prior existence had been established for a century.

[109]    Case of Sutton's Hospital, 10 Co. 23.

Buckland v. Fowcher, cited 10 Co. 27, 28.; and recognized in Attorney General v. Bowyer, 3 Ves. jun. 714. 726. 727. S. P. Highmore on Mortm. 200, &c.
110 Ib.

Supposing, however, that in either of the views which have been suggested, the charter of Dartmouth College is to be deemed a contract, we are yet met with several objections of another nature.

It is, in the first place, contended, that it is not a contract within the prohibitory clause of the constitution, because that clause was never intended to apply to mere contracts of civil institution, such as the contract of marriage, or to grants of power to State officers, or to contracts relative to their offices, or to grants of trust to be exercised for purposes merely public, where the grantees take no beneficial [***233] interest.

It is admitted, that the State legislatures have [*694] power to enlarge, repeal, and limit the authorities of public officers in their official capacities, in all cases, where the constitutions of the States respectively do not prohibit them; and this, among others, for the very reason, that there is no express or implied contract, that they shall always, during their continuance in office, exercise such authorities. They are to exercise them only during the good pleasure of the legislature. But when the legislature makes a contract with a public officer, as in the case of a stipulated salary for his services, during a limited period, this, during the limited period, is just as much a contract, within the purview of the constitutional prohibition, as a like contract would be between two private citizens. Will it be contended, that the legislature of a State can diminish the salary of a judge holding his office during good behaviour? Such an authority has never yet been asserted to our knowledge. It may also be admitted, that corporations for mere public government, such as towns, cities and counties, may in many respects be subject to legislative control. But [***234] it will hardly be contended, that even in respect to such corporations, the legislative power is so transcendant, that it may at its will take away the private property of the corporation, or change the uses of its private funds acquired under the public faith.Can the legislature confiscate to its own use the private funds which a municipal corporation holds under its charter, without any default or consent of the corporators? If a municipal corporation be capable of holding devises and legacies to

charitable uses (as many municipal corporations [*695] are,) does the legislature, under our forms of limited government, possess the authority to seize upon those funds, and appropriate them to other uses, at its own arbitrary pleasure, against the will of the donors and donees? From the very nature of our governments, the public faith is pledged the other way; and that pledge constitutes a valid compact; and that compact is subject only to judicial inquiry, construction, and abrogation. This Court have already had occiasion, in other causes, to express their opinion on this subject; and the there is not the slightest inclination to retract it. 111

111   Terret v. Taylor, 9 Cranch, 43. Town of Pawlet v. Clark, 9 Cranch, 292.

[***235] As to the case of the contract of marriage, which the argument supposes not to be within the reach of the prohibitory clause, because it is matter of civil institution, I profess not to feel the weight of the reason assigned for the exception. In a legal sense, all contracts, recognized as valid in any country, may be properly said to be matters of civil institution, since they obtain their obligation and construction jure loci contractus. Titles to land, constituting part of the public domain, acquired by grants under the provisions of existing laws by private persons, are certainly contracts of civil institution. Yet no one ever supposed, that when acquired bona fide, they were not beyond the reach of legislative revocation. And so, certainly, is the established doctrine of this Court. 112 A general law regulating divorces from the contract of marriage, like a law regulating [*696] remedies in other cases of breaches of contracts, is not necessarily a law impairing the obligation of such a contract. 113 It may be the only effectual mode of enforcing the obligations of the contract on both sides. A law punishing a breach of a contract, by imposing a forfeiture of the rights [***236] acquired under it, or dissolving it because the mutual obligations were no longer observed, is in no correct sense a law impairing [**674] the obligations of the contract. Could a law, compelling a specific performance, by giving a new remedy, be justly deemed an excess of legislative power? Thus far the contract of marriage has been considered with reference to general laws regulating divorces upon breaches of that contract. But if the argument means to assert, that the legislative power to dissolve such a contract, without any breach on either side, against the wishes of the parties, and without any judicial inquiry to ascertain a breach, I certainly am not prepared to admit such a power, or that its exercise

would not entrench upon the prohibition of the constitution. If under the faith of existing laws a contract of marriage be duly solemnized, or a marriage settlement be made, (and marriage is always in law a valuable consideration for a contract,) it is not easy to perceive why a dissolution of its obligations, without any default or assent of the parties, may not as well fall within the prohibition, as any other contract for a valuable consideration. A man has just as [***237] good a right to his wife, as to the property acquired under a marriage [*697] contract. He has a legal right to her society and her fortune; and to devest such right without his default, and against his will, would be as flagrant a violation of the principles of justice, as the confiscation of his own estate. I leave this case, however, to be settled, when it shall arise. I have gone into it, because it was urged with great earnestness upon us, and required a reply. It is sufficient now to say, that as at present advised, the argument, derived from this source, does not press my mind with any new and insurmountable difficulty.

112   Ib.
113   See Holmes v. Lansing, 3 Johns. Cas. 73.

In respect also to grants and contracts, it would be far too narrow a construction of the constitution, to limit the prohibitory clause to such only where the parties take for their own private benefit. A grant to a private trustee for the benefit of a particular cestui que trust, or for any special, private or public charity, cannot be the less a contract because the trustee takes nothing for his own benefit. A grant of the next presentation to a church is still a contract, although it [***238] limit the grantee to a mere right of nomination or partrongage. [114] The fallacy of the argument consists in assuming the very ground in controversy. It is not admitted, that a contract with a trustee is in its own nature revocable, whether it be for special or general purposes, for public charity or particular beneficence. A private donation, vested in a trustee for objects of a general nature, does not thereby become a public trust, which the government may, at its pleasure, take from the trustee, and administer [*698] in its own way. The truth is, that the government has no power to revoke a grant, even of its own funds, whne given to a private person, or a corporation for special uses. It cannot recal its own endowments granted to any hospital, or college, or city, or town, for the use of such corporations. The only authority remaining to the government is judicial, to ascertain the validity of the grant, to enforce its proper uses, to suppress frauds, and,

if the uses are charitable, to secure their regular administration through the means of equitable tribunals, in cases where there would otherwise be a failure of justice.

114   2 Bl. Com. 21.

Another objection [***239] growing out of, and connected with that which we have been considering, is, that no grants are within the constitutional prohibition, except such as respect property in the strict sense of the term; that is to say, beneficial interests in lands, tenements, and hereditaments, &c. &c. which may be sold by the grantees for their own benefit: and that grants of franchises, immunities, and authorities not valuable to the parties, as property, are excluded from its purview. No authority has been cited to sustain this distinction, and no reason is perceived to justify its adoption. There are many rights, franchises, and authorities which are valuable in contemplation of law, where no beneficial interest can accrue to the possessor. A grant of the next presentation to a church, limited to the grantee alone, has been already mentioned. A power of appointment, reserved in a marriage settlement, either to a party or a stranger, to appoint uses in favour of third persons, without compensation, is another instance. [*699] A grant of lands to a trustee to raise portions or pay debts, is, in law, a valuable grant, and conveys a legal estate. Even a power given by will to executors to sell [***240] an estate for payment of debts is, by the better opinions and authority, coupled with a trust, and capable of survivorship. [115] Many dignities and offices, existing at common law, are merely honorary, and without profit, and sometimes are onerous. Yet a grant of them has never been supposed the less a contract on that account. In respect to franchises, whether corporate or-not, which include a pernancy of profits, such as a right of fishery, or to hold a ferry, a market, or a fair, or to erect a turnpike, bank, or bridge, there is no pretence to say that grants of them are not within the constitution.Yet they may, in point of fact, be of no exchangeable value to the owners. They may be worthless in the market. The truth, however, is, that all incorporeal hereditaments, whether they be immunities, dignities, offices, or franchises, or other rights, are deemed valuable in law. The owners have a legal estate and property in them, and legal remedies to support and recover them, is case of any injury, obstruction or disseizin of them. Whenever they are the subjects of a contract or grant, they are just as much within the reach of the constitution as any other

grant. [*700] [***241] Nor is there any solid reason why a contract for the exercise of a mere authority should not be just as much guarded as a contract for the use and dominion of property. Mere naked powers, which are to be exercised for the exclusive benefit of the grantor, are revocable by him for that very reason. But it is otherwise where a power is to be exercised in aid of a right vested in the grantee. We all know that a power of attorney, forming a part of a security upon the assignment of a chose in action, is not revocable by the grantor. For it then [**675] sounds in contract, and is coupled with an interest. [116] So if an estate be conveyed in trust for the grantor, the estate is irrevocable in the grantee, although he can take no beneficial interest for himself. Many of the best settled estates stand upon conveyances of this nature; and there can be no doubt that such grants are contracts within the prohibition in question.

115 Co. Lit. 113. a. Harg. and Butler's note 2. Sugden on Powers, 140. Jackson v. Jansen, 6 Johns. Rep. 73. Franklin v. Osgood, 2 Johns. Cas. 1. S.C. 14 Johns. Rep. 527. Zebach v. Smith, 3 Binn. Rep. 69. Lessee of Moody v. Vandyke, 4 Binn. 7. 31. Attorney General v. Gleg, 1 Atk. 356. 1 Bac. Abr. 586. (Gwillim edit.)

116 Walsh v. Whitcomb, 2 Esp. 565. Bergen v. Bennett, 1 Caines' Cases in Error, 1. 15. Raymond v. Squire, 11 Johns. Rep. 47.

[***242] In respect to corporate franchises, they are, properly speaking, legal estates vested in the corporation itself as soon as it is in esse. They are not mere naked powers granted to the corporation; but powers coupled with an interest. The property of the corporation vests upon the possession of its franchises; and whatever may be thought as to the corporators, it cannot be denied, that the corporation itself has a legal interest in them. It may sue and be sued for them. Nay, more, this very right is one of its ordinary [*701] franchises. "It is likewise a franchise," says Mr. Justice Blackstone, "for a number of persons to be incorporated and subsist as a body politic, with power to maintain perpetual succession, and do other corporate acts; and each individual member of such corporation is also said to have a franchise or freedom." [117] In order to get rid of the legal difficulty of these franchises being considered as valuable hereditaments or property, the counsel for the defendant are driven to contend, that the corporators or trustees are mere agents of the corporation, in whom no beneficial interest subsists; and so nothing but a naked power is touched by removing them [***243] from the trust; and then to hold the corporation itself a mere ideal being, capable indeed of holding property or franchises, but having no interest in them which can be the subject of contract. Neither of these positions is admissible. The former has been already sufficiently considered, and the latter may be disposed of in a few words. The corporators are not mere agents, but have vested rights in their character, as corporators. The right to be a freeman of a corporation is a valuable temporal right. It is a right of voting and acting in the corporate concerns, which the law recognizes and enforces, and for a violation of which it provides a remedy. It is founded on the same basis as the right of voting in public elections; it is as sacred a right; and whatever might have been the prevalence of former doubts, since the time of Lord Holt, such a right has always been deemed a valuable franchise or privilege. [118]

117 2 Bl. Com. 37. 1 Kyd on Corp. 14. 16.
118 Ashby v. White, 2 Ld. Raym. 938. 1 Kyd on Corp. 16.

[*702] This reasoning, which has been thus far urged, applis with full force to the case of Dartmouth College. The franchises granted by the charter were [***244] vested in the trustees in their corporate character. The lands and other property, subsequently acquired, were held by them in the same manner. They were the private demenses of the corporation, held by it, not, as the argument supposes, for the use and benefit of the people of New-Hampshire, but, as the charter itself declares, "for the use of Dartmouth College." There were not, and in the nature of things could not be, any other cestui que use entitled to claim those funds. They were indeed to be devoted to the promotion of piety and learning, not at large, but in that college, and the establishments connected with it; and the mode in which the charity was to be applied, and the objects of it, were left solely to the trustees, who were the legal governors and administrators of it. No particular person in New-Hampshire possessed a vested right in the bounty; nor could he force himself upon the trustees as a proper object. The legislature itself could not deprive the trustees of the corporate funds, or annul their discretion in the application of them, or distribute them among its own favourites. Could the legislature of New-Hampshire have seized the land given by the State of [***245] Vermont to the corporation, and appropriated it to uses distinct from those intended by the charity, against the will of the

trustees? This question cannot be answered in the affirmative, until it is established, that the legislature may lawfully take the property of A, and give it to B.; and if it [*703] could not take away or restrain the corporate funds, upon what pretence can it take away or restrain the corporate franchises? Without the franchises, the funds could not be used for corporate purposes; but without the funds, the possession of the franchises might still be of inestimable value to the college and to the cause of religion and learning.

Thus far, the rights of the corporation itself, in respect to its property and franchises, have been more immediately considered. But there are other rights and privileges belonging to the trustees collectively, and severally, which are deserving of notice. They are entrusted with the exclusive power to manage the funds, to choose the officers, and to regulate the corporate concerns, according to their own discretion. The jus patronatus is vested in them. The visitatorial power, in its most enlarged extent, also belongs to [***246] them. When this power devolves upon the founder of a charity, it is an hereditament, descendible in perpetuity to his heirs, and in default of heirs, it escheats to the government. [119] It is a valuable right founded in property, as much so as the right of patronage in any other case. It is a right which partakes of a judicial nature. May not the founder as justly contract for the possession of this right in return for his endowment, as for any other equivalent? and, if instead of holding it as an hereditament, he assigns it in perpetuity to the trustees of the corporation, is it less a valuable hereditament in their hands? The right is not merely a collective right in all the trustees; [*704] each of them also has a franchise in it. Lord Holt says, "it is agreeable to reason, and the rules of law, that a franchise should be vested in the corporation aggregate, and yet the benefit redound to the particular members, and be enjoyed by them in their private capacities. Where the privilege of election is used by particular persons, it is a particular right vested in each particular man." [120] Each of the trustees had a right to vote in all elections. If obstructed in the exercise [***247] of it, the law furnished him with an adequate recompense in [**676] damages. If ousted unlawfully from his office, the law would, by a mandamus, compel a restoration.

119 Rex v. St. Catherine's Hall, 4 T.R. 233.
120 Ashby v. White, 2 Ld. Raym. 938. 952. Attorney General v. Dixie, 13 Ves. 519.

It is attempted, however, to establish, that the trustees have no interest in the corporate franchises, because it is said, that they may be witnesses in a suit brought agaisnt the corporation. The case cited at the bar certainly goes the length of asserting, that in a suit brought agaisnt a charitable corporation for a recompence for services performed for the corporation, the governors, constituting the corporation, (but whether entrusted with its funds or not by the act of incorporation does not appear) are competent witnesses against the plaintiff. [121] But assuming this case to have been rightly decided, (as to which upon the authorities there may be room to doubt,) the corporators [*705] being technically parties to the record, [122] it does not establish, that in a suit for the corporate property vested in the trustees in their corporate capacity, the trustees are competent [***248] witnesses. At all events, it does not establish, that in a suit for the corporate franchises to be exercised by the trustees, or to enforce their visitatorial power, the trustees would be competent witnesses. On a mandamus to restore a trustee to his corporate or visitatorial power, it will not be contended, that the trustee is himself a competent witness to establish his own rights, or the corporate rights. Yet why not, if the law deems that a trustee has no interest in the franchise? The test of interest assumed in the argument proves nothing in this case. It is not enough to establish, that the trustees are sometimes competent witnesses; it is necessary to show, that they are always so in respect to the corporate franchises, and their own. It will not be pretended, that in a suit for demages for obstruction in the exercise of his official powers, a trustee is a disinterested witness. Such an obstruction is not a damnum absque injuria. Each trustee has a vested right, and legal interest in his office, and it cannot be devested but by due course of law. The illustration, therefore, lends no new force to the argument, for it does not establish, that when their own rights [*706] [***249] are in controversy, the trustees have no legal interest in their offices.

121 Weller v. The Governor of the Foundling Hospital, Peake's N.P. Rep. 153.
122 Attorney General v. City of London, &c. 3 Bro. Ch. c. 171. S.C. 1 Ves. jun. 243. Burton v. Hinde, 5 T.R. 174. Nason v. Thatcher, 7 Mass. R. 398. Phillips on Evid. 42. 52. 57. and notes. 1 Kyd on Corp. 304. &c. Highmore on Mortm. 514.

The principal objections having been thus answered

satisfactorily, at least to my own mind, it remains only to declare, that my opinion, after the most mature deliberation is, that the charter of Dartmouth College, granted, in 1769, is a contract within the purview of the constitutional prohibition.

I might now proceed to the discussion of the second question; but it is necessary previously to dispose of a doctrine which has been very seriously urged at the bar, viz. that the charter of Dartmouth College was dissolved at the revolution, and is, therefore, a mere nullity. A case before Lord Thurlow has been cited in support of this doctrine. [123] The principal question in that case was, whether the corporation of William & Mary's College in Virginia, (which had received its charter from [***250] King William, and Queen Mary,) should still be permitted to administer the charity under Mr. Boyle's will, no interest having passed to the college under the will, but it acting as an agent or trustee under a decree in chancery, or whether a new scheme for the administration of the charity should be laid before the Court. Lord Thurlow directed a new scheme, because the college belonging to an independent government, was no longer within the reach of the Court. And he very unnecessarily added, that he could not now consider the college as a corporation, or as another report [124] states, [*707] that he could not take notice of it as a corporation, it not having proved its existence as a corporation at all. If, by this, Lord Thurlow meant to declare, that all charters acquired in Amierca from the crown, were destroyed by the revolution, his doctrine is not law; and if it had been true, it would equally apply to all other grants from the crown, which would be monstrous. It is a principle of the common law, which has been recognized as well in this, as in other Courts, that the division of an empire, works no forfeiture of previously vested rights of property. And this maxim is [***251] equally consonant with the common sense of mankind, and the maxims of eternal justice. [125] This objection, therefore, may be safely dismissed without further comment.

123 Attorney General v. City of London, 3 Bro. Ch. C. 171. S.C.1 Ves. jun. 243.
124 1 Ves. jun. 243.
125 Terrett v. Taylor, 9 Cranch, 43. 50. Kelly v. Harrison, 2 Johns. Cas. 29. Jackson v. Lunn, 3 Johns. Cas. 109. Calvin's case, 7 Co. 27.

The remaining inquiry is, whether the acts of the legislature of New-Hampshire now in question, or any of them, impair the obligations of the charter of Drtmouth College. The attempt certainly is to force upon the corporation a new charter against the will of the corporators. Nothing seems better settled at the common law, than the doctrine, that the crown cannot force upon a private corporation a new charter; or compel the old members to give-up their own franchises, or to admit new members into the corporation. [126] Neither can the crown compel a man [*708] to become a member of such corporation against his will. [127] As little has it been supposed, that under our limited governments, the legislature possessed such transcendant authority. On one occasion, a very [***252] able Court held, that the State legislature had no authority to compel a person to become a member of a mere private corporation created for the promotion of a private enterprise, because every man had a right to refuse a grant. [128] On another occasion, the same learned Court declared, that they were all satisfied, that the rights legally vested in a corporation, cannot be controled or destroyed by any subsequent statute, unless a power for that purpose be reserved to the legislature in the act of incorporation. [129] These principles are so consonant with justice, sould policy, and legal reasoning, that it is difficult to resist the impression of their perfect [**677] correctness. The application of them, however, does not, from our limited authority, properly belong to the appellate jurisdiction of this Court in this case.

126 Rex v. Vice Chancellor of Cambridge, 3 Bur. 1656. Rex v. Passmore, 3 T.R. 240. 1 Kyd on Corp. 65. Rex v. Larwood, Comb. 316.
127 Rex. v. Dr. Askew, 4 Bur. 2200.
128 Ellis v. Marshall, 2 Mass. Rep. 269.
129 Wales v. Stetson, 2 Mass. Rep. 143. 146.

A very summary examination of the acts of New-Hampshire will abundantly show, that in many materal [***253] respects they change the charter of Dartmouth College. The act of the 27th of June, 1816, declares that the corporation known by the name of the Trustees of Dartmouth College shall be called the Trustees of Dartmouth University. That the whole number of trustees shall be twenty-one, a majority [*709] of whom shall form a quorum; that they and their successors shall hold, use, and enjoy forever, all the powers, authorities, rights, property, liberties, privileges, and immunities, heretofore held, &c. by the trustees of Dartmouth College, except where the act other wise provides; that they shall also have power to determine the

times and places of their meetings and manner of notifying the same; to organize colleges in the university; to establish an institute, and elect fellows and members thereof; to appoint and displace officers, and determine their duties and compensation; to delegate the power of supplying vacancies in any of the offices of the university for a limited term; to pass ordinances for the government of the students; to prescribe the course of education; and to arrange, invest, and employ the funds of the university. The act then provides for the appointment [***254] of a board of twenty-five overseers, fifteen of whom shall form a quorum, of whom five are to be such ex officio, and the residue of the overseers, as well as the new trustees, are to be appointed by the governor and council. The board of overseers are, among other things, to have power, "to inspect and confirm, or disapprove and negative, such votes and proceedings of the board of trustees as shall relate to the appointment and removal of president, professors and other permanent officers of the university, and determine their salaries; to the establishment of colleges and professorships, and the erection of new college buildings." The act then provides, that the president and professors shall be nominated by the trustees, and appointed by the overseers, [*710] and shall be liable to be suspended and removed in the same manner; and that each of the two boards of trustees and overseers shall have power to suspend and remove any member of their respective boards. The supplementary act of the 18th of December, 1816, declares that nine trustees shall form a quorum, and that six votes at least shall be necessary for the passage of any act or resolution. The act of the 26th of December, [***255] 1816, contains other provisions, not very material to the question before us.

From this short analysis it is apparent, that, in substance, a new corporation is created including the old corporators, with new powers, and subject to a new control; or that the old corporation is newly organized and enlarged, and placed under an authority hitherto unknown to it. The board of trustees are increased from twelve to twenty-one. The college becomes a university. The property vested in the old trustees is transferred to the new board of trustees in their corporate capacities. The quorum is no longer seven, but nine. The old trustees have no longer the sole right to perpetuate their succession by electing other trustes, but the nine new trustees are in the first instance to be appointed by the governor and council, and the new board are then to elect other trustees from time to time as vacancies occur. The

new board, too, have the power to suspend or remove any member, so that a minority of the old board, co-operating with the new trustees, possess the unlimited power to remove the majority of the old board. The powers, too, of the corporation are varied. It has authority to organize [***256] new colleges in [*711] "the university, and to establish an institute, and elect fellows and members thereof." A board of overseers is created, (a board utterly unknown to the old charter,) and is invested with a general supervision and negative upon all the most important acts and proceedings of the trustees. And to give complete effect to this new authority, instead of the right to appoint, the trustees are in future only to nominate, and the overseers are to approve, the president and professors of the university.

If these are not essential changes, impairing the rights and authorities of the trustees, and vitally affecting the interests and organization of Dartmouth College under its old charter, it is difficult to conceive what acts, short of an unconditional repeal of the charter, could have that effect. If a grant of land or franchises be made to A., in trust for special purposes, can the grant be revoked, and a new grant thereof be made to A., B., and C., in trust for the same purposes, without violating the obligation of the first grant? If property be vested by grant in A. and B., for the use of a college, or a hospital, of private foundation, is not the obligation [***257] of that grant impaired when the estate is taken from their exclusive management, and vested in them in common with ten other persons? If a power of appointment be given to A. and B., is it no violation of their right to annul the appointment, unless it be assented to by five other persons, and then confirmed by a distinct body? If a bank, or insurance company, by the terms of its charter, be under the management of directors, elected by the stockholders, would not the [*712] rights acquired by the charter be impaired if the legislature should take the right of election from the stockholders, and appoint directors unconnected with the corporation? These questions carry their own answers along with them. The common sense of mankind will teach us, that all these cases would be direct infringements of the legal obligations of the grants to which they refer; and yet they are, with no essential distinction, the same as the case now at the bar.

In my judgment it is perfectly clear, that any act of a legislature which takes away any powers or franchises vested by its charter in a private corporation or its

corporate officers, or which restrains or controls the legitimate exercise [***258] of them, or transfers them to other persons, without its assent, is a violation of the obligations of that charter. If the legislature mean to claim such an authority, it must be reserved in the grant. The charter of Dartmouth College contains no such reservation; and I am, therefore, bound to declare, that the [**678] acts of the legislature of New-Hampshire, now in question, do impair the obligations of that charter, and are, consequently, unconstitutional and void.

In pronouncing this judgment, it has not for one moment escaped me how delicate, difficult, and ungracious is the task devolved upon us. The predicament in which this Court stands in relation to the nation at large, is full of perplexities and embarrassments. It is called to decide on causes between citizens of different States, between a State and its citizens, and between different States. It stands, therefore, in the midst of [*713] jealousies and rivalries of conflicting parties, with the most momentous interests confided to its care. Under such circumstances, it never can have a motive to do more than its duty; and, I trust, it will always be found to possess firmness enough to do that.

Under these [***259] impressions I have pondered on the case before us with the most anxious deliberation. I entertain great respect for the legislature, whose acts are in question. I entertain no less respect for the enlightened tribunal whose decision we are called upon to review. In the examination, I have endeavoured to keep my steps super antiques vias of the law, under the guidance of authority and principle. It is not for judges to listen to the voice of persuasive eloquence or popular appeal. We have nothing to do but to pronounce the law as we find it; and having done this, our justification must be left to the impartial judgment of our country.

**DISSENT BY:** DUVALL

**DISSENT**

Mr. Justice DUVALL dissented. [130]

130   In the discussions which arose in France in 1786, upon the new charter then recently granted to the French East India Company, it seems to have been taken for granted by the lawyers on both sides, to whom the questions in controversy were submitted by the Company, and by the merchants who considered themselves in jured by

its establishment, that if the charter had regularly issued according to the forms of the French law, it was irrevocable, unless forfeited for non-user or misuser. The advocates, (M. M. LACRETELLE and BLONDE,) who were consulted by the merchants of the kingdom opposed to the establishment of the Company, denied its legal existence, on the ground that the king had been surprised in his grant; that it was not yet perfected by the issuing of letters patent, nor duly registered by the parliaments; and that it both might and ought to be suppressed, as an illegal grant of exclusive privileges, contrary to the true principles of commercial philosophy.

On the other hand it was contended by the Company that their grant was irrevocable; that it was but a renewal and confirmation of the charter of the old Company which had been suspended in 1769, in consequence of the immense losses of capital sustained in the calamitous war of 1756, (but which suspension was at the time solemnly protested against by the parliament of Paris as illegal;) that their new grant might still be perfected by letters patent, which the faith of the king was pledged to issue; and that the privileges thus granted to them were irrevocably vested as a right of property, of which they could not be deprived by any authority in the kingdom. "En effect, quand le roi accorde un privilege exclusif, ce privilege est le prix d'une mise de fonds, dans un commerce hazardeux, dont l'entreprise est jugee avantageuse a l'etat. Dela nait par consequent un contrat synallagmatique, qui se forme entre le souverain et les actionnaries. Dela nait un droit de propriete qui devient inebranlable pour le sourverain lui-meme." And of this opinion were the advocates (M. M. HARDOIN, GERBIER, and DE BONNIERES,) consulted by the company. See a Collection of Tracts on the French East Company, Paris, 1788, in the Library of Congress.

[***260]  [*714]  Upon the suggestion of the plaintiff's counsel, that the defendant had died since the last term, the Court ordered the judgment to be entered nunc pro tunc as of that term, as follows:

JUDGMENT.  This cause came on to be heard on the transcript of the record, and was argued by counsel.  And

thereupon all and singular the premises being seen, and by the Court now here fully understood, and mature deliberation being thereupon had, [*715] it appears to this Court, that the said acts of the legislature of New-Hampshire, of the twenty-seventh of June and of the eighteenth and twenty-sixth of December, Anno Domini, 1816, in the record mentioned, are repugnant to the constitution of the United States, and so not valid; and, therefore, that the said Superior Court of Judicature of the State of New-Hampshire erred in rendering judgment on the said special verdict in favour of the said plaintiffs; and that the said Court ought to have rendered judgment thereon, that the said trustees recover against the said Woodward, the amount of damages found and assessed, in and by the verdict aforesaid, viz. the sum of twenty thousand dollars: Whereupon it is considered, ordered, and [***261] adjudged by this Court, now here, that the aforesaid judgment of the said Superior Court of Judicature of the State of New-Hampshire be, and the same hereby is, reversed and annulled: And this Court proceeding to render such judgment in the premises as the said Superior Court of Judicature ought to have rendered, it is further considered by this Court, now here, that the said trustees of Dartmough College do recover against the said William Woodward the aforesaid sum of twenty thousand dollars, with costs of suit; and it is by this Court, now here, further ordered, that a special mandate do go from this Court to the said Superior Court of Judicature to carry this judgment into execution.



**ENERGY RESERVES GROUP, INC. v. KANSAS POWER & LIGHT CO.**

**No. 81-1370**

**SUPREME COURT OF THE UNITED STATES**

**459 U.S. 400; 103 S. Ct. 697; 74 L. Ed. 2d 569; 1983 U.S. LEXIS 16; 51 U.S.L.W. 4106; 50 P.U.R.4th 489; 76 Oil & Gas Rep. 593**

**November 9, 1982, Argued**
**January 24, 1983, Decided**

**PRIOR HISTORY:** APPEAL FROM THE SUPREME COURT OF KANSAS.

**DISPOSITION:** 230 Kan. 176, 630 P. 2d 1142, affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Petitioner oil company challenged a finding by the Supreme Court of Kansas that the Kansas Natural Gas Protection Act, Kan. Stat. Ann. § 55-1401 et seq., did not violate the Contracts Clause of the U.S. Constitution.

**OVERVIEW:** A public utility entered into a contract with an oil company to purchase gas at a set price. There were two price escalators in the contract. First, if a government fixed a price higher than that in the contract, the price would rise to that level. Also, the oil company could determine a new price every two years based upon market fluctuations. Then, Congress passed the Natural Gas Policy Act of 1978 (Act), 15 U.S.C.S. § 3301 et seq., which allowed for computation of prices at the lower of those set in existing contracts or at a price fixed by the Act. Kansas then adopted the Kansas Natural Gas Protection Act (Kansas Act), Kan. Stat. Ann. § 55-1401 et seq., which permitted increases under escalator clauses. The oil company sought to terminate the contracts, but the utility refused. Thus, the oil company filed suit seeking declaratory relief. The oil company complained

that the Kansas Act violated the Contract Clause of the U.S. Constitution. The Court found that the Kansas Act did not violate the Contract Clause because the natural gas industry was highly regulated in order to protect consumers and the Kansas Act was rationally related to that goal of protection.

**OUTCOME:** The Court affirmed the judgment.

**CORE TERMS:** intrastate, escalator clause, natural gas, Kansas Act, redetermination, gas prices, interstate, ceiling, indefinite, contractual, ceiling price, lawful, contract price, pass-through, terminate, regulated, maximum, price increase, consumers, trigger, contractual right, price ceilings, interstate commerce, substantial impairment, escalation, emergency, impaired, energy, state law, public purpose

**LexisNexis(R) Headnotes**

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
*Governments > Legislation > Effect & Operation > Retrospective Operation*
*Governments > State & Territorial Governments > Police Power*
[HN1] Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated

to the inherent police power of the state to safeguard the vital interests of its people.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*

[HN2] The threshold inquiry is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship. The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected. Total destruction of contractual expectations is not necessary for a finding of substantial impairment. On the other hand, state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment. In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*

[HN3] If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation, such as the remedying of a broad and general social or economic problem. Furthermore, the Court has indicated that the public purpose need not be addressed to an emergency or temporary situation.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*

[HN4] Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption. Unless the State itself is a contracting party, as is customary in reviewing economic and social regulation, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.

**DECISION:**

Kansas statute regulating price of natural gas, held to not impair energy company's contracts with public utility in violation of contract clause.

**SUMMARY:**

A Kansas public utility entered into two intrastate natural gas supply contracts with an energy company in 1975. Each contract contained a governmental price escalator clause, which provided that if a governmental authority fixed a price for any natural gas that was higher than the price specified in the contract, the contract price was to be increased to that level. Each contract also contained a price redetermination clause, which gave the energy company the option to have the contract price redetermined no more than once every 2 years. If the price were increased pursuant to either of these clauses, each contract required the utility to seek approval from the Kansas Corporation Commission to pass the increase through to consumers. On December 1, 1978, the Natural Gas Policy Act of 1978 (15 USCS 3301 et seq.) replaced earlier federal price controls, extended federal price regulation to the intrastate gas market, and permitted states to establish maximum prices for the first sale of natural gas produced in a state. In direct response to the Act, the Kansas Legislature imposed price controls on the intrastate gas market. The state statute, which applied only to contracts executed before 1977, prohibited consideration either of ceiling prices set by federal authorities or of prices paid in Kansas under other contracts in the application of governmental price escalator clauses and price redetermination clauses. The state statute, however, permitted indefinite price escalator clauses to operate after March 1, 1979, to raise the price of old intrastate gas up to the ceiling price set by 109 of the federal Act (15 USCS 3319). The energy company and other gas suppliers notified the public utility that gas prices would be escalated to the ceiling price set for newly discovered or newly produced natural gas under 102 of the Act (15 USCS 3312) on December 1, 1978, pursuant to the governmental price escalator clause. When the public utility never elected to pay the higher price, the energy company notified the utility that it would terminate the contracts because the utility had failed to apply to the Kansas Corporation Commission for pass-through authority within 5 days as required by the contract, had failed to obtain approval by the Commission, and had failed to pay the increased price. The energy company filed an action in a state District Court, praying for a declaratory judgment that it had the contractual right to terminate the contracts. The utility later rejected the energy company's request under the price redetermination clause for a price increase to the 102 ceiling price for newly discovered or newly produced

natural gas, contending that the state statute had extinguished the utility's obligation to comply with that clause. The energy company then filed an amended complaint, alleging that it was entitled to terminate the contracts because of the utility's refusal to redetermine the price. The utility counterclaimed for a declaratory judgment that the contracts were still in effect. On the parties' cross-motions for summary judgment, the state trial court held that the federal Act's imposition of price ceilings on intrastate gas did not trigger the governmental escalator clause. The trial court also found that the state statute did not violate the contract clause of the Federal Constitution (Art I, 10, cl 1). The Supreme Court of Kansas affirmed (230 Kan 176, 630 P2d 1142).

On appeal, the United States Supreme Court affirmed. In an opinion by Blackmun, J., joined by Brennan, White, Marshall, Stevens, and O'Connor, JJ., and joined in part (all but holding 2 below) by Burger, Ch. J., and Powell and Rehnquist, JJ., it was held that (1) the state statute regulating the price of natural gas did not impair the energy company's contracts with the public utility; (2) the state statute did not violate the contract clause of the Federal Constitution (Art I, 10, cl 1) even if it did impair the energy company's contractual interests; and (3) 105 of the Natural Gas Policy Act (15 USCS 3315) did not trigger governmental price escalator clauses automatically.

Powell, joined by Burger, Ch. J., and Rehnquist, J., concurred, expressing the view that it was unnecessary for the Supreme Court to address the question of whether, if there were an impairment of contractual rights, it would constitute a violation of the contract clause.

**LAWYERS' EDITION HEADNOTES:**

LAW §257 ;

impairment of contract -- natural gas supply contract -- price control -- state statute -- ;

Headnote:[1A][1B]

A state statute regulating the price of natural gas does not impair an energy company's contractual rights with a public utility or the energy company's reasonable expectations where the parties are operating in a heavily regulated industry, where the parties included a statement of intent in their contracts making clear that the escalator

clause in the contract was designed to guarantee price increases consistent with anticipated increases in the value of the energy company's gas, which meant that the energy company did not expect to receive deregulated prices, and where the contracts expressly recognized the existence of extensive regulation by providing that any contractual terms are subject to relevant present and future state and federal law, suggesting that the energy company knew its contractual rights were subject to alteration by state price regulation; indefinite price escalator clauses in natural gas contracts cannot exempt an energy company from all regulatory limitation of prices; therefore, the price may be escalated only to the ceiling price prescribed by 109 of the Natural Gas Policy Act (15 USCS 3319) and not to the ceiling price for new natural gas prescribed by 102 of the Act (15 USCS 3312).

LAW §202 ;

contract clause -- natural gas -- price control -- state statute -- ;

Headnote:[2A][2B][2C]

A state statute regulating the price of natural gas does not violate the contract clause of the Federal Constitution (Art I, 10, cl 1), even if the statute did impair an energy company's contracts with a public utility, where the statute rests on and is prompted by significant and legitimate state interests in protecting consumers from the escalation of natural gas prices caused by deregulation and in correcting the imbalance between the interstate and intrastate markets by permitting intrastate prices to rise only to the ceiling price provided by 109 of the Natural Gas Policy Act (15 USCS 3319) and where the means chosen to implement these purposes are not deficient, particularly in light of the deference to which the state legislature's judgment is entitled; the state statute, which is a temporary measure that expires when federal price regulation of certain categories of gas terminates, is consistent with the national policy toward gas regulation.

ENERGY §35 ;

Natural Gas Policy Act -- price control -- governmental price escalator clause -- ;

Headnote:[3A][3B]

Section 105 of the Natural Gas Policy Act (15 USCS 3315), which regulates the ceiling price for sales of natural gas under existing intrastate contracts, does not automatically trigger governmental price escalator clauses, which provide that the contract price is to be increased if a governmental authority fixes a price for any natural gas that is higher than the price specified in the contract, in existing contracts between an energy company and a public utility; 105 sets a ceiling for the operation of contractual provisions and it does not prescribe a price; the energy company is therefore not entitled to a price increase on December 1, 1978, and it can rely only on a price redetermination clause, which gives the energy company the option to have the contract price redetermined no more than once every 2 years, for any increase.

STATUTES §107 ;

construction -- avoiding constitutional question -- ;

Headnote:[4A][4B]

The United States Supreme Court will construe a statute, if fairly possible, so as to avoid a constitutional question.

LAW §128 ;

contract clause -- state police power -- ;

Headnote:[5]

Although the language of the contract clause of the Federal Constitution (Art I, 10, cl 1) is facially absolute, its prohibition must be accommodated to the inherent police power of the state to safeguard the vital interests of its people.

LAW §207 ;

contract clause -- threshold inquiry -- severity of impairment -- ;

Headnote:[6]

The threshold inquiry in determining whether a state statute violates the contract clause of the Federal Constitution (Art I, 10, cl 1) is whether the state law has in fact operated as a substantial impairment of a contractual relationship; the severity of the impairment increases the level of scrutiny to which the legislation will be subjected; total destruction of contractual expectations is not necessary for a finding of substantial impairment; on the other hand, state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment; in determining the extent of the impairment, the court is to consider whether the industry the complaining party has entered has been regulated in the past.

LAW §128 ;

contract clause -- justification of state -- legitimate public purpose -- ;

Headnote:[7]

If a state regulation constitutes a substantial impairment of a contract, the state, in justification, must have a significant and legitimate public purpose behind the regulation such as the remedying of a broad and general social or economic problem; the public purpose need not be addressed to an emergency or temporary situation; one legitimate state interest is the elimination of unforeseen windfall profits; the requirement of a legitimate public purpose guarantees that the state is exercising its police power, rather than providing a benefit to special interests; once a legitimate public purpose has been identified, the next inquiry in determining whether there is a violation of the contract clause of the Federal Constitution (Art I, 10, cl 1) is whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption; unless the state itself is a contracting party, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.

LAW §142 ;

contract clause -- state as party to contract -- ;

Headnote:[8A][8B]

When a state itself enters into a contract, it cannot simply walk away from its financial obligations; when the state is a party to the contract, complete deference to a

legislative assessment of reasonableness and necessity is not appropriate in determining whether a state law violates the contract clause of the Federal Constitution (Art I, 10, cl 1), because the state's self-interest is at stake.

ENERGY §31 ;

natural gas -- price control -- state statute -- ;

Headnote:[9A][9B]

A state statute regulating the price of natural gas has a legitimate public purpose and is not special interest legislation designed to benefit a public utility where, given the nature of the industry, with sales to public utilities, it is impossible for any regulation not to have a major effect on a small number of participants, where there is no indication that the political process has broken down, and where the public utility will not benefit significantly from the statute due to the automatic price pass-through adjustment, which requires the utility to seek approval from a state commission to pass the increase through to consumers.

ERROR §727 ;

natural gas supply contract -- interpretation of state law -- deference by United States Supreme Court -- ;

Headnote:[10]

A state Supreme Court's holding that particular governmental price escalator clauses in natural gas supply contracts between an energy company and a public utility were insufficient to escalate the gas price is an interpretation of state law to which the United States Supreme Court defers.

**SYLLABUS**

In 1975, appellee public utility entered into two intrastate contracts with appellant's predecessor-in-interest to purchase wellhead and residue gas from a certain gas field. Each contract contains a "governmental price escalator clause," which provides that if any governmental authority fixes a price for any natural gas that is higher than the contract price, the contract price shall be increased to that level, and a "price redetermination clause," which gives appellant the option

to have the contract price redetermined no more than once every two years by averaging the prices being paid under three other gas contracts chosen by the parties. If the price is increased pursuant to either clause, each contract requires appellee, within specified time periods, to seek from the Kansas Corporation Commission (Commission) approval to pass the increase through to consumers. If pass-through approval is refused and appellee elects not to pay the increase, appellant has the option to terminate the agreement. Pursuant to the price redetermination clauses, the parties agreed on a higher price to be effective November 27, 1977, the Commission approved the pass-through of the increase to consumers, and appellee paid the new price through 1978. Effective December 1, 1978, the Natural Gas Policy Act of 1978 replaced earlier federal price controls for interstate natural gas with gradually increasing price ceilings, including a ceiling for newly discovered or newly produced gas (§ 102) and a lower ceiling for categories of gas not otherwise covered by the Act (§ 109). The Act also extended federal price regulation to the intrastate gas market, providing in § 105(b)(1) that the ceiling price for intrastate gas shall be the lower of the § 102 price and "the price under the terms of the existing contract, to which such natural gas was subject on [November 9, 1978]." As authorized by the federal Act, the Kansas Natural Gas Price Protection Act was enacted in May 1979, imposing price controls on the intrastate gas market with regard to contracts executed before April 20, 1977, and prohibiting consideration either of ceiling prices set by federal authorities or of prices paid in Kansas under other contracts in the application of governmental price escalator and price redetermination clauses. However, the Kansas Act permits indefinite price escalator clauses to operate after March 1, 1979, to raise the price of "old" intrastate gas up to the federal Act's § 109 ceiling price. In November 1978 appellant notified appellee that gas prices would be escalated to the § 102 price pursuant to the governmental price escalator clauses, but appellee, after failing to obtain pass-through approval because of its failure to file a timely application with the Commission, elected not to pay the higher price and appellant then sought to terminate the contracts. When appellee contended that the governmental price escalator clauses were not triggered by the federal Act and that the Kansas Act prohibited their activation, appellant filed suit in a Kansas state court, seeking a declaratory judgment that it had the contractual right to terminate the contracts. Appellee later rejected appellant's request under the price redetermination clauses for a price increase, to be

effective in November 1979, contending that the Kansas Act had extinguished appellee's obligation to comply with those clauses. Appellant then filed an amended complaint, alleging that it was entitled to terminate the contracts because of appellee's refusal to redetermine the price. Appellee counterclaimed for a declaratory judgment that the contracts were still in effect. The trial court entered summary judgment for appellee, holding that the federal Act's imposition of price ceilings on intrastate gas did not trigger the governmental price escalator clauses, and that the Kansas Act did not violate the Contract Clause of the Federal Constitution. The Kansas Supreme Court affirmed.

*Held*:

1. The Kansas Act does not impair appellant's contracts with appellee in violation of the Contract Clause, and thus the contract price may be escalated under either escalator clause only to the ceiling under § 109 of the federal Act, not to the § 102 ceiling. Pp. 409-419.

(a) The Contract Clause's prohibition of any state law impairing the obligation of contracts must be accommodated to the State's inherent police power to safeguard the vital interests of its people. The threshold inquiry is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Co.* v. *Spannaus*, 438 U.S. 234, 244. If a substantial impairment is found, the State, in justification, must have a significant and legitimate public purpose behind the regulation. Once such a purpose has been identified, the adjustment of the contracting parties' rights and responsibilities must be based upon reasonable conditions and must be of a character appropriate to the public purpose justifying the legislation's adoption. Pp. 410-413.

(b) Here, the Kansas Act has not impaired substantially appellant's contractual rights. The parties are operating in a heavily regulated industry, and the statement of intent in their contracts made clear that the escalator clauses were designed to guarantee price increases consistent with anticipated regulated increases in the value of appellant's gas, not that appellant expected to receive deregulated prices. Moreover, the contract provision making any contractual term subject to relevant present and future state and federal law suggests that appellant knew its contractual rights were subject to alteration by state price regulation. Pp. 413-416.

(c) To the extent, if any, the Kansas Act impairs appellant's contractual interests, it rests on significant state interests in protecting consumers from the escalation of natural gas prices caused by deregulation and in correcting the imbalance between the interstate and intrastate markets by permitting the intrastate prices to rise only to the § 109 level. Nor are the means chosen to implement these purposes deficient, particularly in light of the deference to which the Kansas Legislature's judgment is entitled. Pp. 416-419.

2. The Kansas Supreme Court did not err in holding that the enactment of § 105 of the federal Act did not trigger the governmental price escalator clauses in these contracts so as to entitle appellant to a price increase on December 1, 1978. As a matter of federal statutory interpretation, the federal Act does not trigger such clauses automatically. By the language of § 105(b)(1), Congress set a ceiling for the operation of contractual provisions; it did not prescribe a price. And the Kansas Supreme Court's holding that the particular governmental price escalator clauses involved here were insufficient to escalate the gas price is an interpretation of state law to which this Court defers. Pp. 419-420.

**COUNSEL:** Gary W. Davis argued the cause for appellant. With him on the briefs were Martin W. Bauer, Clark Mandigo, Edwin W. Parker II, I. Michael Greenberger, and Nancy J. Bregstein.

Basil W. Kelsey argued the cause for appellee. With him on the brief were Jerome T. Wolf, Terry W. Schackmann, and David S. Black. \*

> \* Briefs of amici curiae urging affirmance were filed by Brian J. Moline, Special Assistant Attorney General of Kansas, for the State Corporation Commission of the State of Kansas; by William E. Metcalf and Patrick H. Donahue for Kansas Legal Services, Inc.; by Jan Eric Cartwright, Attorney General of Oklahoma, Robert D. Stewart, Jr., and Eddie M. Pope for the Oklahoma Corporation Commission; and by Dennis G. Lyons, Mark J. Spooner, John L. Arrington, Jr., Curtis M. Long, Jay M. Galt, and Harry W. Birdwell for Oklahoma Natural Gas Co. et al.

**JUDGES:** BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, STEVENS, and O'CONNOR, JJ., joined, and in all but

Part II-C of which BURGER, C. J., and POWELL and REHNQUIST, JJ., joined. POWELL, J., filed an opinion concurring in part, in which BURGER, C. J., and REHNQUIST, J., joined, post, p. 421.

**OPINION BY:** BLACKMUN

**OPINION**

[*403] [***575] [**700] JUSTICE BLACKMUN delivered the opinion of the Court.

This case concerns the regulation by the State of Kansas of the price of natural gas sold at wellhead in the intrastate market. It presents a federal Contract Clause issue and a statutory issue.

I

On September 27, 1975, The Kansas Power & Light Company (KPL), a public utility and appellee here, entered into two intrastate natural gas supply contracts with Clinton Oil Company, the predecessor-in-interest of appellant Energy Reserves Group, Inc. (ERG). Under the first contract, KPL agrees to purchase gas directly at the wellhead on the Spivey-Grabs Field in Kingman and Harper Counties in southern Kansas. The second contract obligates KPL to purchase from the same field residue gas, that is, gas remaining after certain recovery and processing steps are completed. The original contract price was $ 1.50 per thousand cubic feet (Mcf) of gas. The contracts continue in effect for the life of the field or for the life of the processing plants associated with the field.

A

Each contract contains two clauses known generically as indefinite price escalators. The first is a governmental price escalator clause; this provides that if a governmental authority fixes a price for any natural gas that is higher than the price specified in the contract, the contract price shall be increased to that level. [1] The second is a price redetermination [*404] [***576] clause; this gives ERG the option to have the contract price redetermined no more than once every two years. [2] The new price is then [**701] set by averaging the prices being paid under three other gas contracts chosen by the parties.

1    The governmental price escalator provision

states:

"If any federal or Kansas regulatory or governmental authority having jurisdiction in the premises shall at any time hereafter fix a price per MCF applicable to any natural gas of any vintage produced in Kansas, higher than the contract price then in effect under this gas contract, the price to be paid for gas thereafter shall be increased to equal such regulated price. In that event, the increased price shall be effective as of the date of action of the governmental or regulatory authority establishing the regulated price, or its effective date, whichever is later . . . ." App. to Juris. Statement 66a.

2    The price redetermination provision states in relevant part:

"SELLER shall have the option to cause the price being paid for its gas by BUYER to be redetermined every two years, beginning in 1977. The request for a price redetermination shall be given in writing by SELLER to BUYER not later than 120 days prior to the beginning of the Contract Year for which the price redetermination is requested. . . .

". . . Within the same one hundred twenty (120) days following SELLER'S request for a price redetermination, the parties shall mutually redetermine the price by considering three (3) contracts under which the highest prices are actually being paid for flowing gas ninety (90) days prior to the date the redetermined price is to be effective. The contracts to be considered shall, (a) have a primary term of one (1) or more years, (b) be for gas produced in Kansas, (c) be for gas purchased by an interstate or intrastate company selling or using an average daily volume of 5,000 MCF or more of gas for the twelve (12) months period ending ninety (90) days prior to the date the redetermined price is to be effective, (d) not be for the purchase of Spivey-Grabs Field gas by BUYER under contracts dated in 1975, (e) not include more than one contract of any one purchaser in any one field, and (f) not be for a price then subject to regulatory suspense or refunds. . . .

"After the BUYER and SELLER have decided on the three contracts and appropriate

prices to be used from each one for this redetermination, the weighted average price per MCF being paid under the three contracts shall be calculated. This price shall become the redetermined price to be paid by BUYER to SELLER." *Id.*, at 67a-68a.

When the price is increased pursuant to either of these clauses, each contract requires KPL to seek from the Kansas Corporation Commission (Commission) approval to pass the increase through to consumers. App. to Juris. Statement 69a. The application for approval is to be submitted within 5 days after a price increase resulting from governmental action, [*405] or no fewer than 60 days before a price redetermination increase is to become effective. *Ibid.* If the Commission refuses to permit the pass-through and KPL elects not to pay the increase, ERG has the option to terminate the agreement on 30 days' written notice.

Each contract states that the purpose of the price escalator clauses is "solely" to compensate ERG for "anticipated" increases in its operating costs and in the value of its gas. *Id.*, at 70a. Each contract also provides: "Neither party shall be held in default for failure to perform hereunder if such failure is due to compliance with," *ibid.*, any "relevant present and future state and federal laws." *Id.*, at 69a.

In 1977, ERG invoked the price redetermination clause, and the parties agreed on a price of $ 1.77 per Mcf, effective November 27 of that year. The Commission approved the pass-through of this increase to consumers. KPL paid the new price through 1978. [3]

3 On June 9, 1978, the Commission gave KPL permission to implement a purchased-gas price adjustment. This authorized an automatic pass-through to consumers of wholesale gas cost increases upon written notice to the Commission. The Commission retained authority to review and revoke any pass-through under its normal standards for reviewing rate increases.

B

[***577] On December 1, 1978, the Natural Gas Policy Act of 1978 (Act), Pub. L. 95-621, 92 Stat. 3350, 15 U. S. C. § 3301 *et seq.* (1976 ed., Supp. V), designed in principal part to encourage increased natural gas production, became effective. The Act replaced the federal price controls that had been established under the Natural Gas Act, ch. 556, 52 Stat. 821, with price ceilings that rise monthly based on "an inflation adjustment factor" and other considerations. Different ceilings are set for different types of gas. Section 102 of the Act, 15 U. S. C. § 3312 (1976 ed., Supp. V), sets a gradually increasing ceiling price for newly discovered or newly produced natural gas. The December 1978 ceiling price under § 102 was [*406] $ 2.078 per million British thermal units. Section 104 sets ceiling prices for "old" interstate gas, that is, gas from already discovered and producing wells. Section 109 sets another ceiling price for categories of natural gas not covered by the other sections of the Act. As of December 1978, the § 109 ceiling price was $ 1.63 per million Btu's.

In another departure from the 1938 Natural Gas Act, the new Act extended federal price regulation to the intrastate gas market. See S. Conf. Rep. No. 95-1126, pp. 67-68 [**702] (1978); H. R. Conf. Rep. No. 95-1752, pp. 67-68 (1978). Section 105 of the Act establishes the rule for applying price ceilings to intrastate gas, described as gas not committed to interstate commerce on November 8, 1978. [4] It provides, in its subsection (b)(1), that the maximum lawful price of such gas "shall be the lower of . . . the price under the terms of the existing contract, to which such natural gas was subject on [November 9, 1978], . . . or . . . the maximum lawful price . . . computed for such month under section 102 (relating to new natural gas)." [5] The parties agree that § 105(b)(1) governs these contracts.

4 In pertinent part, § 105 provides:

"(a) Application. -- The maximum lawful price computed under subsection (b) shall apply to any first sale of natural gas delivered during any month in the case of natural gas, sold under any existing contract or any successor to an existing contract, which was not committed or dedicated to interstate commerce on the day before the enactment of this Act.

"(b) Maximum lawful price. --

"(1) General rule. -- Subject to paragraphs (2) and (3), the maximum lawful price under this section shall be the lower of --

"(A) the price under the terms of the existing contract, to which such natural gas was subject on

the date of the enactment of this Act [November 9, 1978], as such contract was in effect on such date; or

"(B) the maximum lawful price, per million Btu's, computed for such month under section 102 (relating to new natural gas)."
5    Section 105(b)(2) applies to contracts under which the price of gas on November 9, 1978, exceeded the § 102 price.

The Act, by § 602(a), also permits a State "to establish or enforce any maximum lawful price for the first sale of natural [*407] gas produced in such State which does not exceed the applicable maximum lawful price, if any, under title I of this Act."

C

In direct response to the Act, the Kansas Legislature promptly imposed [***578] price controls on the intrastate gas market. In May 1979, the Kansas Natural Gas Price Protection Act (Kansas Act), 1979 Kan. Sess. Laws, ch. 171, codified as Kan. Stat. Ann. §§ 55-1401 to 55-1415 (Supp. 1982), was enacted. [6] The Kansas Act applies only to natural gas contracts executed before April 20, 1977, § 55-1403, and controls natural gas prices until December 31, 1984, § 55-1411. Section 55-1404 prohibits consideration either of ceiling prices set by federal authorities or of prices paid in Kansas under other contracts in the application of governmental price escalator clauses and price redetermination clauses. [7] Section [*408] 55-1405 of the Kansas Act, however, permits indefinite price escalator clauses to operate after March 1, 1979, to raise the price of old intrastate gas up to the federal Act's § 109 ceiling price. Section § 55-1406 exempts new gas and gas from stripper wells.

6    ERG asserts that the Kansas Act is special interest legislation designed to permit KPL to avoid gas price increases and to aid KPL in this and other litigation. ERG notes that KPL supported the bill, that the Special Joint Committee approved the bill by only a narrow margin, and that several members of the Committee's minority believed the bill to be special interest legislation. Brief for Appellant 9-12. The bill, however, was supported by the Governor, labor unions, farmers, and municipal representatives, and was passed by substantial margins in both Houses of the Kansas Legislature.

Although KPL purchases a sizable portion of the gas affected by the Kansas Act, there are other purchasers as well. Moreover, as indicated in n. 3, *supra*, KPL already had obtained from the Commission a purchased-gas price adjustment that allowed it to pass through to its customers any gas cost increase.
7    Section 55-1404 provides, with certain exceptions, that "on or after December 1, 1978, the price allowed to be paid pursuant to federal legislation or any regulation by an agency implementing such legislation, or the price paid or to be paid for any sale of natural gas in the state of Kansas shall not be taken into account in applying any indefinite price escalator clause contained in any gas purchase contract subject to this act, to the extent that such contract provides for the sale in the state of Kansas, of gas produced within this state which was not committed or dedicated to interstate commerce on November 8, 1978. This section shall not require a reduction of any price contained in any gas purchase contract subject to this act below the price actually paid prior to the date of enactment of this act."

D

On November 20, 1978, ERG and other gas suppliers having similar contracts with [**703] KPL notified KPL that gas prices would be escalated to the § 102 price on December 1, pursuant to the governmental price escalator clause. KPL sought pass-through approval from the Commission for this increase by an application filed December 7, one day too late to satisfy the 5-day contractual requirement. KPL never elected to pay the higher price.

On June 5, 1979, ERG notified KPL that it would terminate the contracts within 30 days because KPL had failed to apply to the Commission for pass-through authority within five days of December 1, 1978, had failed to obtain Commission approval, and had failed to pay the increased price ERG contends was required by the governmental price escalator clause. KPL's response was that the clause was not triggered by the Act and that the Kansas Act prohibited its activation. ERG then filed an action in the District Court of Harper County, Kan., praying for a declaratory judgment that it had the contractual right to terminate the contracts.

[***579] On July 24, in light of KPL's refusal to

terminate, ERG requested an increase up to the Act's § 102 ceiling price under the price redetermination clause. The increase was to be effective in November 1979, the next redetermination date possible under the contracts. KPL conceded that the price redetermination clause permitted such an increase, but contended that § 55-1404 of the Kansas Act had extinguished the utility's obligation to comply with that clause. ERG then filed an amended complaint, alleging that it was entitled to terminate the contracts because of KPL's refusal to redetermine [*409] the price. KPL counterclaimed for a declaratory judgment that the contracts were still in effect.

On the parties' cross-motions for summary judgment, the state trial court held that the Act's imposition of price ceilings on intrastate gas did not trigger the governmental escalator clause. It also found that the Kansas Act did not violate the Contract Clause, reasoning that Kansas has a legitimate interest in addressing and controlling the serious economic dislocations that the sudden increase in gas prices would cause, and that the Kansas Act reasonably furthered that interest. App. to Juris. Statement 25a, 42a, 45a. The Supreme Court of Kansas, by unanimous vote, affirmed. 230 Kan. 176, 630 P. 2d 1142 (1981). [8] We noted probable jurisdiction. 456 U.S. 904 (1982).

> 8 The court held that an emergency situation existed because the anticipated sudden escalation of intrastate gas prices threatened to boost dramatically both gas and electricity utility rates. The court suggested that because ERG had not attempted to exercise the price redetermination clause prior to the date of enactment, the Kansas Act was being applied only prospectively. The court concluded, however, that the State's interest and chosen means could justify a retroactive application. 230 Kan., at 189-190, 630 P. 2d, at 1153.

## II

[***LEdHR1A] [1A] [***LEdHR2A] [2A] [***LEdHR3A] [3A] [***LEdHR4A] [4A]ERG raises both statutory and constitutional issues in challenging the ruling of the Kansas Supreme Court. The constitutional issue is whether the Kansas Act impairs ERG's contracts with KPL in violation of the Contract Clause, U.S. Const., Art. I, § 16, cl. 1. [9] The statutory issue is whether the federal enactment of § 105 triggered the governmental price escalator clause. As to the latter issue,

if § 105's enactment did have that effect, ERG was entitled to a price increase on December 1, 1978. If not, ERG could rely only on the price redetermination clause for any increase. That clause could not be exercised until November 1979. The [*410] statutory issue thus controls the timing of any increase. The constitutional issue, on the other hand, affects the price that ERG may claim under either clause. If ERG prevails, the price may be escalated to the § 102 ceiling; if ERG does not prevail, the price may be escalated only to the § 109 ceiling. We consider the Contract Clause issue first. [10]

> 9 "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."

[***LEdHR4A] [4B]

> 10 If fairly possible, we of course construe a statute so as to avoid a constitutional question. *Machinists* v. *Street*, 367 U.S. 740, 749-750 (1961). Because, however, the statutory issue affects only the operation of the governmental price escalator clause, its resolution in no way obviates the need to scrutinize the Kansas Act under the Contract Clause.

[***580] [**704] A

[***LEdHR5] [5][HN1] Although the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State "to safeguard the vital interests of its people." *Home Bldg. & Loan Assn.* v. *Blaisdell*, 290 U.S. 398, 434 (1934).In *Blaisdell*, the Court approved a Minnesota mortgage moratorium statute, even though the statute retroactively impaired contract rights. The Court balanced the language of the Contract Clause against the State's interest in exercising its police power, and concluded that the statute was justified. [11]

> 11 The Court listed five factors that were then deemed to be significant in its analysis: whether the Act (1) was an emergency measure; (2) was one to protect a basic societal interest, rather than particular individuals; (3) was tailored appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration of the emergency. 290 U.S., at 444-447.

The Court in two recent cases has addressed Contract Clause claims. In *United States Trust Co.* v. *New Jersey*,

431 U.S. 1 (1977), the Court held that New Jersey could not retroactively alter a statutory bond covenant relied upon by bond purchasers. One year later, in *Allied Structural Steel Co.* v. *Spannaus*, 438 U.S. 234 (1978), the Court invalidated a Minnesota statute that required an employer who closed its office in the State to pay a "pension funding charge" if its [*411] pension fund at the time was insufficient to provide full benefits for all employees with at least 10 years' seniority. [12] Although the legal issues and facts in these two cases differ in certain ways, they clarify the appropriate Contract Clause standard.

> 12   See also *Malone* v. *White Motor Corp.*, 444 U.S. 911 (1979), summarily aff'g 599 F.2d 283 (CA8).

[***LEdHR6] [6][HN2] The threshold inquiry is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Co.*, 438 U.S., at 244.See *United States Trust Co.*, 431 U.S., at 17. The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected. *Allied Structural Steel Co.*, 438 U.S., at 245. Total destruction of contractual expectations is not necessary for a finding of substantial impairment. *United States Trust Co.*, 431 U.S., at 26-27. On the other hand, state regulation that restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment. *Id.*, at 31, citing *El Paso* v. *Simmons*, 379 U.S. 497, 515 (1965). In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past. *Allied Structural Steel Co.*, 438 U.S., at 242, n. 13, citing *Veix* v. *Sixth Ward Bldg. & Loan Assn.*, 310 U.S. 32, 38 (1940) ("When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic"). The Court long ago observed: "One whose rights, such as they are, [***581] are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Hudson Water Co.* v. *McCarter*, 209 U.S. 349, 357 (1908).

[***LEdHR7] [7][HN3] If the state regulation constitutes a substantial impairment, the State, in justification, must have a significant and legitimate

public purpose behind the regulation, *United* [*412] *States Trust Co.*, 431 U.S., at 22, such as the remedying of a broad and general social or economic [**705] problem. *Allied Structural Steel Co.*, 438 U.S., at 247, 249. Furthermore, since *Blaisdell*, the Court has indicated that the public purpose need not be addressed to an emergency or temporary situation. *United States Trust Co.*, 431 U.S., at 22, n. 19; *Veix* v. *Sixth Ward Bldg. & Loan Assn.*, 310 U.S., at 39-40. One legitimate state interest is the elimination of unforeseen windfall profits. *United States Trust Co.*, 431 U.S., at 31, n. 30. The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests. [13]

> 13   In *Allied Structural Steel Co.* v. *Spannaus*, the Court held that the Minnesota pension law severely impaired established contractual relations between employers and employees. The State had not acted to meet an important general social problem. The pension statute had a very narrow focus: it was aimed at specific employers. Indeed, it even may have been directed at one particular employer planning to terminate its pension plan when its collective-bargaining agreement expired. See 438 U.S., at 247-248, and n. 20.

[***LEdHR8A] [8A][HN4] Once a legitimate public purpose has been identified, the next inquiry is whether the adjustment of "the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption." *United States Trust Co.*, 431 U.S., at 22. Unless the State itself is a contracting party, see *id.*, at 23, [14] "[as] is customary in reviewing [*413] economic and social regulation, . . . courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id.*, at 22-23.

[***LEdHR8A] [8B]

> 14   See generally Note, A Process-Oriented Approach to the Contract Clause, 89 Yale L. J. 1623, 1647-1648 (1980) (distinguishing public from private contracts). In *United States Trust Co.*, but not in *Allied Structural Steel Co.*, the State was one of the contracting parties. When a

State itself enters into a contract, it cannot simply walk away from its financial obligations. In almost every case, the Court has held a governmental unit to its contractual obligations when it enters financial or other markets. See *United States Trust Co*., 431 U.S., at 25-28; *W. B. Worthen Co*. v. *Kavanaugh*, 295 U.S. 56 (1935); *Murray* v. *Charleston*, 96 U.S. 432 (1878). But see *Faitoute Iron & Steel Co*. v. *City of Asbury Park*, 316 U.S. 502 (1942). When the State is a party to the contract, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *United States Trust Co*., 431 U.S., at 26. In the present case, of course, the stricter standard of *United States Trust Co.* does not apply because Kansas has not altered its own contractual obligations.

## B

[***LEdHR1A] [1B]The threshold determination is whether the Kansas Act has impaired [***582] substantially ERG's contractual rights. Significant here is the fact that the parties are operating in a heavily regulated industry. [15] See *Veix* v. *Sixth Ward Bldg. & Loan Assn*., 310 U.S., at 38. State authority to regulate natural gas prices is well established. See *Cities Service Gas Co*. v. *Peerless Oil & Gas Co*., 340 U.S. 179 (1950). [16] [**706] At the time of the execution of these contracts, Kansas did not regulate natural gas prices specifically, [17] but its supervision [*414] of the industry was extensive and intrusive. [18] Moreover, under the authority of § 5(a) of the 1938 Natural Gas Act, the Federal Power Commission (FPC) set "just and reasonable" rates for prices of gas both at the wellhead and in pipelines. Although prices in the intrastate market have diverged somewhat from those in the interstate [***583] market due to the recent shortage of natural gas, [19] the regulation of interstate prices effectively limits intrastate price increases. [20]

15    In addition to the Kansas and federal regulations, 38 States regulate various aspects of gas production and sale. See Interstate Oil Compact Commission, Summary of State Statutes and Regulations for Oil and Gas Production (1979).

16  For some time, the Court has recognized the validity of state regulation of the production and

sale of natural gas in furtherance of conservation goals. See *Ohio Oil Co*. v. *Indiana*, 177 U.S. 190, 210 (1900); see also 5 E. Kuntz, Law of Oil and Gas § 70.2, p. 307 (1978); cf. *Henderson Co*. v. *Thompson*, 300 U.S. 258, 266 (1937) (state statute retrospectively regulating the contractual sale of natural gas containing different amounts of hydrogen sulfide does not violate Contract Clause of Texas Constitution). On several occasions, the Court has approved state price regulation of natural gas that did not interfere with interstate commerce. See, *e. g., Phillips Petroleum Co*. v. *Oklahoma*, 340 U.S. 190 (1950); *Cities Service Gas Co*. v. *Peerless Oil & Gas Co*., 340 U.S. 179 (1950); *Pennsylvania Gas Co*. v. *Public Service Comm'n*, 252 U.S. 23 (1920); 5 E. Kuntz, *supra*, § 75.2, p. 371.

17  Kansas in the past has regulated the wellhead price of natural gas. See *Cities Service Gas Co*. v. *State Corporation Comm'n*, 355 U.S. 391 (1958), rev'g 180 Kan. 454, 304 P. 2d 528 (1956). Although this Court struck down the Commission's earlier attempt to set a wellhead price, it apparently did so because the price regulation extended to gas in interstate commerce. See 355 U.S., at 392, citing *Phillips Petroleum Co*. v. *Wisconsin*, 347 U.S. 672 (1954), and *Natural Gas Pipeline Co*. v. *Panoma Corp*., 349 U.S. 44 (1955); see n. 16, *supra*. The instant case does not raise a Commerce Clause issue because the parties agree that the gas is not in interstate commerce and because Congress, by § 602, authorized the State to regulate its price. See S. Conf. Rep. No. 95-1126, p. 125 (1978) ("The Congress . . . is ceding its authority under the commerce clause of the Constitution to regulate prices for such production to affected States"); H. R. Conf. Rep. No. 95-1752, p. 125 (1978) (same).

18    For more than 75 years now, Kansas has regulated the production, transportation, distribution, and sale of natural gas. See *Cities Service Gas Co*. v. *State Corporation Comm'n*, 222 Kan. 598, 609-610, 567 P. 2d 1343, 1352 (1977).

19    Because of the shortage, some gas was diverted to the intrastate market where consumers were willing to pay higher prices. "As the FPC price ceiling dropped below market levels prevailing in the intrastate sector, new gas supply has increasingly gravitated toward the latter."

Federal Trade Commission, Staff Report of the Bureau of Economics, J. Mulholland, The Economic Structure and Behavior in the Natural Gas Production Industry 10 (1979) (footnote omitted); see Executive Office of the President, The National Energy Plan 18 (1977), reprinted in 1 National Energy Plan, 95th Congress: Legislative History of the National Energy Acts of 1978 (item 5) (1979); Comment, For Gas, Congress Spells Relief N-G-P-A: An Analysis of the Natural Gas Policy Act of 1978, 40 U. Pitt. L. Rev. 429, 434 (1979). The Emergency Natural Gas Act of 1977, § 6(a), Pub. L. 95-2, 91 Stat. 7, addressed this problem by extending federal price regulation to the intrastate market during a Presidentially declared emergency. These emergency provisions were carried forward in § 302(a) of the 1978 Act.

20 "Even if the gas can be sold intrastate, FPC price ceilings will indirectly affect price levels in the unregulated sector over the long term." P. Starratt, The Natural Gas Shortage and the Congress 29 (1974). Determining the actual effect on the intrastate market of federal regulation of the interstate market is difficult because state oil and gas agencies have not collected information on intrastate sales. See Schanz & Frank, Natural Gas in the Future National Energy Pattern, in Regulation of the Natural Gas Producing Industry 18, 28-30 (K. Brown ed. 1972).

[*415] It is in this context that the indefinite escalator clauses at issue here are to be viewed. In drafting each of the contracts, the parties included a statement of intent, which made clear that the escalator clause was designed to guarantee price increases consistent with *anticipated* increases in the value of ERG's gas. App. to Juris. Statement 70a. While it is not entirely inconceivable that ERG in September 1975 anticipated the deregulation of gas prices introduced by the Act in 1978, we think this is highly unlikely, and we read the statement of intent to refer to nothing more than changes in value resulting from changes in the federal regulator's "just and reasonable" rates. In exchange for these anticipated increases, KPL agreed to accept gas from the Spivey-Grabs field for the lifetime of that field. Thus, at the time of the execution of the contracts, ERG did not expect to receive deregulated prices. The very existence of the governmental price escalator clause and

the price redetermination clause indicates that the contracts were structured against the background of regulated gas prices. If deregulation had not occurred, the contracts undoubtedly would have called for a much smaller price [**707] increase than that provided by the Kansas Act's adoption of the § 109 ceiling. [21]

21 Absent deregulation, the existing interstate price would have continued to act as a brake on increases ERG could obtain under the price redetermination clause. As has been noted, the originally specified contract price was $ 1.50 per Mcf. App. to Juris. Statement 66a. Under the contract, ERG was entitled to an increase of two cents per Mcf each year absent a price redetermination in excess of that amount. *Ibid.* A price redetermination occurred in November 1977, and by November 1978, the contract price had risen to $ 1.77 per Mcf. The July 1982 § 109 price ceiling was $ 2.194 and the § 102 ceiling was $ 3.152. 47 Fed. Reg. 17981, 17982 (1982). There is no reason to believe that, by operation of either escalator clause under the old regulatory structure, ERG's prices ever would have reached the Act's levels.

[*416] Moreover, the contracts expressly recognize the existence of extensive regulation by providing that any contractual terms are subject to relevant present and future state and [***584] federal law. [22] This latter provision could be interpreted to incorporate all future state price regulation, and thus dispose of the Contract Clause claim. Regardless of whether this interpretation is correct, [23] the provision does suggest that ERG knew its contractual rights were subject to alteration by state price regulation. Price regulation existed and was foreseeable as the type of law that would alter contract obligations. Reading the Contract Clause as ERG does would mean that indefinite price escalator clauses could exempt ERG from any regulatory limitation of prices whatsoever. Such a result cannot be permitted. *Hudson Water Co.* v. *McCarter*, 209 U.S., at 357. In short, ERG's reasonable expectations have not been impaired by the Kansas Act. See *El Paso* v. *Simmons*, 379 U.S., at 515.

22 Many gas sale contracts contain similar provisions. See 4 H. Williams, Oil and Gas Law § 734, pp. 800-801 (1981). These stem from the assumption that the contracts are subject to governmental price and other regulation. *Id.*, at

802. Their purpose is to "provide that the contract shall continue in effect though modified to conform to the requirements of such law or regulation." *Ibid.*

23   A similar clause has been held implicitly not to incorporate state price regulations that impair interstate commerce. See *Natural Gas Pipeline Co.* v. *Harrington*, 139 F.Supp. 452, 454-455 (ND Tex. 1956), vacated and remanded on other grounds, 246 F.2d 915 (CA5 1957), cert. denied, 356 U.S. 957 (1958). Analogously, state price regulations pre-empted by FPC price regulation have been held not to be incorporated by governmental price escalator clauses. See *Pan American Petroleum Corp.* v. *Kansas-Nebraska Natural Gas Co.*, 297 F.2d 561, 567-568 (CA8 1962).

C

[***LEdHR2A] [2B]To the extent, if any, the Kansas Act impairs ERG's contractual interests, the Kansas Act rests on, and is prompted by, significant and legitimate state interests. Kansas has [*417] exercised its police power to protect consumers from the escalation of natural gas prices caused by deregulation. The State reasonably could find that higher gas prices have caused and will cause hardship among those who use gas heat but must exist on limited fixed incomes.

The

[***LEdHR2A] [2C] [***LEdHR9A] [9A]State also has a legitimate interest in correcting the imbalance between the interstate and intrastate markets by permitting intrastate prices to rise only to the § 109 level. By slowly deregulating interstate prices, the Act took the cap off intrastate prices as well. 24 The Kansas Act attempts to coordinate the intrastate and interstate prices by supplementing the federal Act's regulation of intrastate gas. Congress specifically contemplated such action:

"The conference agreement provides that nothing in this Act shall affect the authority of any State to establish or [**708] enforce any maximum lawful price for sales of gas in intrastate commerce which does not exceed the applicable [***585] maximum lawful price, if any, under Title I of this Act. This authority extends to the operation of any indefinite price escalator clause." S. Conf. Rep. No. 95-1126, pp. 124-125 (1978); H. R. Conf. Rep. No. 95-1752, pp. 124-125 (1978).

There can be little doubt about the legitimate public purpose behind the Act. 25

24   Although the Act does place a ceiling on intrastate gas, it is the highest ceiling under the law, that is, the § 102 limit for newly discovered gas. Old interstate gas is subject to the much lower ceilings of § 104, or § 106 in the case of rollover contracts. In fact, the § 109 price for July 1982 of $ 2.194 per Mcf is substantially higher than any of the § 104 or § 106 prices for old interstate gas from wells drilled before 1974. See 47 Fed. Reg. 17981, 17982-17983 (1982). The Spivey-Grabs Field gas wells covered by these contracts were drilled between 1954 and 1961. Brief for Appellee 41, and n. 139 (citing Kansas Geological Society Library, Drillers' Log (Kansas producers)).

[***LEdHR9A] [9B]

25   ERG claims that the legislation was designed to benefit KPL. See n. 6, *supra*. Unlike *Allied Structural Steel Co.* v. *Spannaus*, 438 U.S. 234 (1978), there is little or nothing in the record here to support the contention that the Kansas Act is special interest legislation. Given the nature of the industry -- sales to public utilities -- it is impossible for any regulation not to have a major effect on a small number of participants. This differs from the statute under challenge in *Allied Structural Steel Co.*, where a small number of employers were singled out from the larger group. The fact that there was a close vote at the committee stage, and that some of the committee dissenters expressed the view that the Kansas Act was special interest legislation, bears little if any resemblance to the circumstantial evidence present in *Allied Structural Steel Co.* Nor is there any indication that the Kansas political process had broken down. Cf. Note, 89 Yale L. J., at 1645 (provided "legislature is functioning properly, selection of a public purpose and determinations of necessity and appropriateness should be left to it"). In addition, the automatic price pass-through adjustment indicates that KPL will not benefit significantly from the statute. Although ERG is correct that the Commission could revoke the pass-through, it has given no indication that it will do so.

[*418] Nor are the means chosen to implement these purposes deficient, particularly in light of the deference to which the Kansas Legislature's judgment is entitled. On the surface, the State's Act seems limited to altering indefinite price escalation clauses of intrastate contracts that affect less than 10% of the natural gas consumed in Kansas. Tr. of Oral Arg. 16. To analyze properly the Kansas Act's effect, however, we must consider the entire state and federal gas price regulatory structure. Only natural gas subject to indefinite price escalator clauses poses the danger of rapidly increasing prices in Kansas. Gas under contracts with fixed escalator clauses and interstate gas purchased by the utilities subject to § 109 would not escalate as would intrastate gas subject to indefinite price escalator clauses. The Kansas Act simply brings the latter category into line with old interstate gas prices by limiting the operation of the indefinite price escalator clauses.

The Kansas Act also rationally exempts the types of new gas the production of which Congress sought to encourage through the higher § 102 prices. Finally, the Act is a temporary measure that expires when federal price regulation of certain categories of gas terminates. The Kansas statute [*419] completes the regulation of the gas market by imposing gradual escalation mechanisms on the intrastate market, consistent with the new national policy toward gas regulation.

We thus resolve the constitutional issue against ERG.

III

[***LEdHR3A] [3B]We turn to ERG's statutory contention that the Kansas courts misconstrued § 105 as fixing the contract price at the November 9, 1978, level. While, on this point, the opinion of the Kansas Supreme Court is not entirely clear to us, it does not appear so to construe § 105. And KPL, in fact, does not contend that it did. Instead, the court recognized [***586] that § 105 permits the indefinite price escalator clauses to continue to operate to raise the contract price up to the lawful ceiling. See *Pennzoil Co*. v. *FERC*, 645 F.2d 360, 379 (CA5 1981) ("[The] NGPA does not preclude escalation of area rate clauses [a type of indefinite price escalators] to NGPA prices"), cert. denied, 454 U.S. 1142 (1982).

The actual point of dispute is whether the governmental price escalator clauses in these contracts were triggered by the enactment of § 105. The Kansas

Supreme Court acknowledged that the Act could trigger a governmental price escalator clause. 230 Kan., at 184, 630 P. 2d, at 1149. In this case, however, it held that "[the] [**709] NGPA did not trigger a price increase because the contracts herein did not contain a sufficient escalation mechanism." *Id*., at 185, 630 P. 2d, at 1150. We agree that, as a matter of federal statutory interpretation, the Act does not trigger such clauses automatically. See 44 Fed. Reg. 16895, 16904 (1979). [26] Section 105(b)(1) provides that the ceiling price shall be the lower of [*420] the § 102 price and "the price under the terms of the existing contract, to which such natural gas was subject on [November 9, 1978], as such contract was in effect on such date." By this language, Congress set a ceiling for the operation of contractual provisions; it did not prescribe a price:

"[The] price under the contract may escalate through the operation of both fixed price escalator clauses and indefinite price escalator clauses in existence as of the date of enactment, but the price may not exceed the new gas price [provided by § 102].

. . . .

". . . The conferees do not intend that the mere establishment of the ceiling prices under this Act shall trigger indefinite price escalator clauses in existing intrastate contracts." S. Conf. Rep. No. 95-1126, pp. 82-83 (1978); H. R. Conf. Rep. No. 95-1752, pp. 82-83 (1978).

See *Pennzoil Co*. v. *FERC*, 645 F.2d, at 379.

[26] On December 1, 1978, the Federal Energy Regulatory Commission issued interim regulations stating: "The establishment of maximum lawful prices under the NGPA shall not trigger indefinite price escalator clauses in existing intrastate or interstate contracts." 43 Fed. Reg. 56448, 56550 (1978). After a comment period, the FERC altered the regulation to reserve to state law the question whether such clauses operate in intrastate contracts. 44 Fed. Reg. 16895, 16904 (1979).

[***LEdHR10] [10]The Kansas Supreme Court relied on its prior decision in *Mesa Petroleum Co*. v. *Kansas Power & Light Co*., 229 Kan. 631, 629 P. 2d 190,

clarified, 230 Kan. 166, 630 P. 2d 1129 (1981), cert. denied, 455 U.S. 928 (1982), which interpreted the effect of § 105 on a similar contract provision. In that decision, it read § 105 to set the lawful ceiling at the lower price provided by the contract. In light of our discussion above, we view this reading of the federal statute as unassailable. The Kansas Supreme Court's further holding in this case that these particular governmental price escalator clauses were insufficient to escalate the gas price is an interpretation of state law to which, of course, we defer.

IV

The regulation of energy production [***587] and use is a matter of national concern. Congress set out on a new path with the Natural Gas Policy Act of 1978. In pursuing this path, Congress explicitly envisioned that the States would regulate intrastate [*421] markets in accordance with the overall national policy. The Kansas Natural Gas Price Protection Act is one State's effort to balance the need to provide incentives for the production of gas against the need to protect consumers from hardships brought on by deregulation of a traditionally regulated commodity. We see no constitutional or statutory infirmity in Kansas' attempt. The judgment of the Supreme Court of Kansas is therefore

*Affirmed.*

**CONCUR BY:** POWELL (In Part)

**CONCUR**

JUSTICE POWELL, with whom THE CHIEF JUSTICE and JUSTICE REHNQUIST join, concurring in part.

I concur in the judgment and all of the Court's opinion except Part II-C. The Court concludes in Part II-B that there has been no substantial impairment of ERG's contractual rights. The closing sentence states that "ERG's reasonable expectations have not been impaired

by the Kansas Act." *Ante*, at 416. This conclusion is dispositive, and it is unnecessary for the Court to address the question of whether, if there were an impairment of contractual rights, it would constitute a violation of the Contract Clause. See *Allied Structural* [**710] *Steel Co*. v. *Spannaus*, 438 U.S. 234, 245 (1978).

The Court concludes in Part II-C that even if ERG's "contractual interests" were impaired, the Act furthers "significant and legitimate state interests" and is a valid exercise of the State's police power. *Ante*, at 416-419. I do not necessarily disagree with this conclusion, particularly in the context of the pervasive regulation of public utilities. I decline to join Part II-C, however, because it addresses a substantial question and our discussion of the separate issue in Part II-B disposes of this case.

**REFERENCES**
16A Am Jur 2d, Constitutional Law 701

15 USCS 3301 et seq.; Constitution, Article I, Section 10, Clause 1

US L Ed Digest, Constitutional Law 128, 202, 207, 257; Energy 35

L Ed Index to Annos, Gas; Impairment of Contract Obligations

ALR Quick Index, Gas and Oil; Impairment of Contract Obligations

Federal Quick Index, Impairment of Contract Obligations; Oil and Gas; Rates and Charges

Annotation References:

State's exercise of police power as constituting impairment of obligation of private contract in violation of contract clause (Art I, 10, cl 1) of Federal Constitution. 57 L Ed 2d 1279.



**Gaar, Scott & Company v. O. K. Shannon.**

**[NO NUMBER IN ORIGINAL]**

**COURT OF CIVIL APPEALS OF TEXAS**

**52 Tex. Civ. App. 634; 115 S.W. 361; 1908 Tex. App. LEXIS 434**

**December 16, 1908, Decided**

**PRIOR HISTORY:** [***1] Appeal from the District Court of Travis County. Tried below before Hon. V. L. Brooks.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant business sought review of a judgment by the District Court of Travis County (Texas), which sustained the demurrer of appellee Secretary of State, in his individual capacity, to the business's action to recover monies it paid to the Secretary as a franchise tax.

**OVERVIEW:** The business predicated its action on the ground that the franchise laws under which the tax was collected were unconstitutional. It argued that, since it had been given a permit for a 10-year period and had paid those taxes, the Legislature had no authority to impose an additional tax by enacting a subsequent act. The Secretary filed a demurrer, which was sustained. On appeal, the court affirmed. Notwithstanding the fact that a former permit had been granted, the court held that inherent power remained in the State of Texas to change or amend the law at any time thereafter, even to the extent of levying an additional burden for the permission granted to foreign corporations to do business within the State. The Court further held that such a change of the law did not violate the Texas Constitution prohibiting the passage of any Act impairing the obligation of contracts.

Moreover, the court ruled that it could not be argued that the demand on the part of the officer that the business should pay the tax for doing business within the State was an unlawful demand, because the officer clearly had the right to make such a demand.

**OUTCOME:** The court affirmed the judgment.

**CORE TERMS:** franchise tax, taxation, domestic, protest, property tax, interstate business, forfeiture, franchise, doing business, collected, license, license tax, demurrer, charter, void, capital stock, full knowledge, taxing power, demanded, insisted, invalid, exacted, duress, former law, license fee, charge imposed, urgent necessity, illegally collected, written protest, obligation of contracts

**LexisNexis(R) Headnotes**

*Business & Corporate Law > Corporations > Finance > Franchise Tax > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > General Overview*
*Tax Law > State & Local Taxes > General Overview*
[HN1] Section 1, pp. 21, 22, 23, Texas Acts 29th Leg., 1905.) provides for the payment by every foreign corporation heretofore authorized or thereafter authorized to do business in Texas a certain franchise tax, based upon the authorized capital stock of such corporation,

provides the time for its payment and prescribing a penalty of 25 percent on the amount of the taxes due for failure to pay the same, as well as forfeiture of right to do business in the State, and directs the Secretary of State to declare such forfeiture without judicial ascertainment by entering the same upon a ledger to be kept in his office relating to such corporations. By an amendment thereto, p. 100, sec. 1, Acts of 29th Leg., it is further provided that it should be a misdemeanor on the part of the officers of said corporations subject to the payment of such franchise tax, to fail to give under oath accurate information as to the amount of its capital stock, when demanded by the Secretary of State.

***Governments > Local Governments > Charters***
***Governments > State & Territorial Governments > Relations With Governments***
***Tax Law > State & Local Taxes > Franchise Tax > Imposition of Tax***
[HN2] See Tex. Rev. Civ. Stat. art. 650.

***Governments > Local Governments > Charters***
***Governments > State & Territorial Governments > Claims By & Against***
***Tax Law > State & Local Taxes > Franchise Tax > General Overview***
[HN3] Even a provision in a charter fixing a specified sum to be paid as taxes, but not providing that such sum shall be in lieu of other taxes, is not a contract that no greater tax shall be laid.

***Business & Corporate Law > Corporations > Formation > Corporate Existence, Powers & Purpose > Powers > General Overview***
***Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview***
***Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview***
[HN4] Tex. Const. art. 8, § 4 provides that the power to tax corporations and corporate property shall not be surrendered or suspended by Act of the Legislature by any contract or grant to which the State shall be a party.

***Business & Corporate Law > Foreign Businesses > General Overview***
***Tax Law > State & Local Taxes > Franchise Tax >***

***Imposition of Tax***
[HN5] It is well settled that a State has the absolute right to exclude or permit foreign corporations from doing business within its boundaries and that it is an act of comity or grace on its part to permit their coming in at all and it has the right to impose such conditions as it may see proper in granting said permission. The granting of such right or privilege rests entirely within the discretion of the State; and, of course, when granted may be accompanied with such conditions as its Legislature may judge most befitting to its interest and policy. It may require, as a condition of the granting of the privilege and also of its continued exercise, that the corporation pay a specified sum to the State each year or month, or a specified portion of its gross receipts or of the profits of its business, or a sum to be ascertained in any convenient mode which it may prescribe. The validity of the tax can in no way be dependent upon the mode which the State may deem fit to adopt in fixing the amount for any year which it will exact for the franchise. No constitutional objection lies in the way of a legislative body prescribing any mode of measurement to determine the amount it will charge for the privileges it bestows.

***Tax Law > International Taxes > Americans Operating Abroad > General Overview***
***Tax Law > State & Local Taxes > Franchise Tax > General Overview***
***Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview***
[HN6] A State may tax any privilege it grants. Such a tax, or rather license fee, is the payment exacted of a foreign corporation for the privilege of doing business within the State. Since a foreign corporation may be allowed to do business in a State upon conditions, the payment of a sum of money may be made a condition; and this may in form be the payment of a tax greater than or different from that paid by a domestic corporation. Such a tax is valid. It is not properly an exercise of the power to tax property, but is a license fee paid for the privilege of entering the State and its validity is a necessary deduction from the right absolutely to exclude the foreign corporation.

***Energy & Utilities Law > Taxation***
***Tax Law > International Taxes > Americans Operating Abroad > General Overview***
***Tax Law > State & Local Taxes > Franchise Tax > Imposition of Tax***

[HN7] Taxes imposed on a foreign corporation as a condition of doing business generally in the State of Texas, not connected with the grant of any special privilege, is a license or privilege tax and not a property tax, although the amount of it may be determined by the capital stock of the corporation. A foreign corporation can only come into the State and do business there by the consent of the State and the charge imposed by the State as the condition of that consent is not a tax on property.

*Tax Law > State & Local Taxes > Administration & Proceedings > General Overview*
[HN8] Where a party pays an illegal demand for taxes with the full knowledge of all the facts which render such demand illegal, without an immediate and urgent necessity therefor or unless to release his person or property from detention or to prevent an immediate seizure of his person or property, such payment must be deemed to be voluntary and can not be recovered back; and the fact that the party at the time of making the payment files a written protest does not make the payment involuntary.

*Constitutional Law > Equal Protection > Scope of Protection*
*Tax Law > International Taxes > Americans Operating Abroad > General Overview*
*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > Imposition of Tax*
[HN9] A tax imposed upon foreign companies, which does not apply to domestic corporations, is not for that reason obnoxious to the provisions of most of the State Constitutions requiring taxes to be equal and uniform. Since the effect of such legislation is simply to classify corporations and to impose certain taxes upon the class of foreign companies.

*Governments > State & Territorial Governments > Employees & Officials*
*Tax Law > State & Local Taxes > Administration & Proceedings > Collection*
*Tax Law > State & Local Taxes > Real Property Tax > Collection > General Overview*
[HN10] A better rule is that the collecting officer is exempt from liability to the taxpayer, who should seek relief from the State of Texas, a county, or a municipality on whose account the tax was collected.

**HEADNOTES**

**Foreign Corporation -- License Tax -- Constitutional Law.**

Though a former permit had been granted a corporation of another State to do business in Texas for a term of ten years, on payment of the franchise tax then fixed by law, it was not unconstitutional for the Legislature to impose a higher tax thereafter and during such term for the same privilege and to provide for forfeiture of the right to do business on failure to pay it.

**Foreign Corporation -- Taxation.**

The charge imposed by a State on the privilege granted to a foreign corporation to do business therein is a license, and not a property tax; and this is so though the amount required to be paid is a graduated one, based on the gross receipts, or the profits of the business, or amount of capital, or such other basis as may be fixed by the Legislature; and this does not constitute double taxation.

**Unlawful Taxation -- Voluntary Payment -- Protest.**

Payment of an illegal demand, with full knowledge of the facts which render it illegal, must be deemed voluntary, though made under protest, unless made under urgent necessity or to release from detention or to prevent immediate seizure of person or property.

**Unlawful Taxation -- Duress -- Interstate Commerce.**

If a foreign corporation is engaged only in business which is interstate commerce, and hence not taxable by the State, its rights would not be affected by a forfeiture of its permit to do business in the State; and such forfeiture for nonpayment of a license tax would not be duress which would make the payment thereof by it under protest an involuntary one.

**Taxation -- License -- Equality and Uniformity.**

A license tax on foreign corporations is not invalid if equal and uniform in its operation and application to all of that class, though a like tax is not imposed on domestic corporations.

**Unlawful Taxes -- Action to Recover Back --**

**Parties.**

It seems, in the opinion of Mr. Justice Rice, that, in an action to recover back from the Secretary of State taxes illegally collected by him from a corporation, the petition should allege that the money collected was still in the possession of that officer.

**COUNSEL:** Bulkley, Gray & More and J. M. Patterson, for appellant.

A taxing officer can be sued. He can not justify upon the ground that the suit is against the State. Virginia Coupon Cases, Poindexter v. Greenhow, 114 U.S. 270; Scottish Union Nat. Ins. Co. v. Herriott, 80 N. W., 666; Insurance Co. v. Van Cleave, 191 Ill., 410; In re Tyler, 149 U.S. 164; Smyth v. Ames, 169 U.S. 466; Pennoyer v. McConnaughy, 140 U.S. 1; Scott v. Donald, 165 U.S. 658; Tindal v. Wesley, 167 U.S. 204; In re Ayres, 123 U.S. 443.

The taxes sought to be recovered in this case were not voluntarily paid. Virginia Coupon Cases, 114 U.S. 270; Insurance Co. v. Van Cleave, 191 Ill., 410; Arkansas Bldg. & Loan Assn. v. Madden, 175 U.S. 269; Erskine v. Van Arsdale, 15 Wall., 75; Denver v. Evans, 84 Pac., 65; Rumford Chemical Works v. Ray, 33 Atl., 443, 34 Atl., 814; Robertson v. Frank Bros., 132 U.S. 17; City of Chicago v. Klinkert, 94 Ill. App., 524; Swift & Co. v. United States, 111 U.S. 22; Galveston County v. Galveston Gas Co., 72 Tex. 509.

Taxes paid under protest, duress or compulsion may be recovered [***2] back in an action at law if illegal. Erskine v. Van Arsdale, 15 Wall., 75; Stone v. Nelson, 42 N. W., 548; City of Marshall v. Snediker, 25 Tex. 460; Scottish Union & Nat. Ins. Co. v. Herriott, 80 N. W., 666; City of Denver v. Evans, 84 Pac., 65; Rumford Chemical Works v. Ray, 33 Atl., 443, 34 Atl., 814; Boston & Sandwich Glass Co. v. City of Boston, 45 Mass., 181; Dunnell Mfg. Co. v. Newell, 2 Atl., 766; Creamer v. Inhabitants of Bremen, 40 Atl., 555; Woodmere Cemetery Assn. v. Springwells Township, 90 N. W., 277; Gaar-Scott & Co. v. Sorum, 90 N. W., 801; La Salle County v. Simmons, 10 Ill., 513; Harvey & Boyd v. Board of Trustees, 42 Ill., 336; Prickett v. Madison County, 14 Ill. App., 454; Chicago v. Sperbeck, 69 Ill. App., 562; Robertson v. Frank Bros. Co., 132 U.S. 17; Chicago v. Klinkert, 94 Ill. App., 524; City of Chicago v. Waukesha Brewing Co., 97 Ill. App., 585; Henry v. Town of Chester, 15 Vt., 460; Chicago & A. R. Co. v.

Chicago, V. & W. Coal Co., 79 Ill., 121; German Alliance Ins. Co. v. Van Cleave, 191 Ill., 410; Swift & Co. v. United States, 111 U.S. 22; Baker v. Panola County, 30 Tex. 87; Wood v. Stirman, 37 Tex. 585; City of Galveston v. Snyder, 39 Tex. 236; Galveston [***3] Gas Co. v. County of Galveston, 54 Tex. 287; Galveston County v. Gorman, 49 Tex. 279; Galveston County v. Galveston Gas Co., 72 Tex. 509.

Chapters 19 and 72 of the laws of the Twenty-ninth Legislature of the State of Texas impair the obligation of the contract entered into between the State of Texas and plaintiff on the 23d day of May, 1901. American Sm. & Ref. Co. v. Colorado, 204 U.S. 103; Cumberland Teleph. & Tel. Co. v. Hopkins, 90 S.W. 594; Virginia Coupon Cases, 114 U.S. 270.

Interstate commerce can not be taxed or discriminated against in any way. A tax upon a foreign corporation doing purely an interstate commerce, like the tax in question, is in violation of paragraph 3, section 1 of the Constitution of the United States. In re Kinyon, 75 Pac., 268; Menke v. State, 97 N. W., 1020; Wrought Iron Range Co. v. Campen, 47 S. E., 658; Rock Island Plow Co. v. Peterson, 101 N. W., 616; DeWitt v. Berger Mfg. Co., 81 S.W. 334; Bateman v. Western Star Milling Co., 1 Tex. Civ. App. 90; Gunn v. White Sewing Machine Co., 20 S.W. 591; Stratford v. City Council of Montgomery, 20 So., 127; Stockard v. Morgan, 185 U.S. 27; Caldwell v. North Carolina, 187 U.S. 622; Norfolk & W. Ry. [***4] Co. v. Sims, 191 U.S. 441; McCall v. California, 136 U.S. 104; McNeil v. Southern Ry. Co., 26 Sup. Ct. Rep., 722.

Soliciting the sale of goods is not doing business, and is protected by the Commerce Clause of the Federal Constitution. In addition to the authorities last above enumerated, the following will apply: Rearick v. State of Pennsylvania, 27 Sup. Ct. Rep. (U.S.), 160; Ex parte Masse, 92 S.W. 1082; French, Fitch & Co. v. Hicks, 92 S.W. 1034; King v. Monitor Drill Co., 92 S.W. 1046; Clark & Marshall on Corporations, 755; Leloup v. Port of Mobile, 127 U.S. 625; Western U. Tel. Co. v. Alabama, 132 U.S. 475.

The keeping of an office in a foreign State by a corporation for the purpose of soliciting business, is not doing business in such foreign State only. Norfolk & W. Ry. Co. v. Pennsylvania, 136 U.S. 114; Texas & P. Ry. Co. v. Davis, 93 Tex. 378.

What is or is not doing business within a State so that the State may exercise some power of taxation other than the ordinary ad valorem tax upon a foreign corporation? Mearcham v. Lumber Co., 187 Pa. St., 12; Wolf Dryer Co. v. Bigler & Co., 192 Pa. St., 466; Coyt v. Sutton, 102 Mich., 324; Talapoosa Lumber Co. v. Holbert, [***5] 5 N. Y., 559; Maxwell & Co. v. Edens, 65 Mo. App., 439; Milan M. & N. Co. v. Gorton, 95 Tenn., 590; Davis & Rankin Co. v. Dix, 64 Fed., 406; Beard v. American Pub. Co., 71 Ala., 60; Doty v. Michigan C. R. Co., 8 Abb. Pr. Rep., 427; Gunn v. White Sewing Mach. Co., 20 S.W. 591; Bateman v. Western Star Milling Co., 1 Tex. Civ. App. 90; Lyons & Thomas Hdw. Co. v. Reading Hdw. Co., 21 S.W. 300; Zuberbier Co. v. Harris, 35 S.W. 403; Havens & Geddes Co. v. Diamond, 93 Ill. App., 557; Sullivan v. Sullivan Timber Co., 15 So., 491; State v. Anniston Rolling Mills, 21 So., 921; In re Schollenberger, 171 U.S. 1.

Corporations are persons and are protected by the Fourteenth Amendment to the Constitution of the United States. Smyth v. Ames, 169 U.S. 466; Santa Clara County v. Southern Pac. Ry. Co., 118 U.S. 394; Charlotte, etc., R. Co. v. Gibbes, 142 U.S. 386; Gulf, C. & S. F. Ry. Co. v. Ellis, 165 Tex. 150; Clark & Marshall on Corporations, 755; Hammond Beef & Provision Co. v. Best, 40 Atl., 338.

The laws of the Twenty-ninth Legislature, being chapters 19 and 72 of the laws of the State of Texas, for the year 1905, are in violation of the Fourteenth Amendment of the Constitution of the [***6] United States. Union Refrigerator Transit Co. v. Kentucky, 199 U.S. 194; Ward v. Maryland, 12 Wall., 418; Cooley on Constitutional Limitations, sec. 16; Brown v. Maryland, 12 Wheaton, 449; Gibbons v. Ogden, 9 Wheaton, 1; Caldwell v. North Carolina, 187 U.S. 622; Norfolk & W. R. R. Co. v. Sims, 191 U.S. 441; Wrought Iron Range Co. v. Campen, 47 S. E., 658; Virginia Coupon Cases, 114 U.S. 270; Smyth v. Ames, 169 U.S. 466; In re Thornton, 12 Fed., 538; Santa Clara County v. Southern Pac. Ry. Co., 118 U.S. 395, 9 Sawyer, 166.

A State law which attempts to tax that which is beyond its jurisdiction is void and violates provisions of the Fourteenth Amendment of the Constitution of the United States. Union Transit Co. v. Kentucky, 199 U.S. 202; United States v. Railway Co., 106 N. Y., 334; Wheat., 430; 15 Wall., 281, 300; St. Louis v. Ferry Co., 11 Wall., 423; Tappen v. Bank, 19 Wall., 490; Delaware Railway

Tax Cases, 18 Wall., 229; Hoyt v. Sprague, 103 U.S. 630; Gloucester Ferry Co. v. Pennsylvania, 114 U.S. 196; Pennsylvania v. Standard Oil Co., 101 Pa. St., 119.

Discriminating taxes are illegal and in violation of the Constitution of the United States. Ward v. Maryland, 79 U.S. [***7] (12 Wall.), 418; Reser v. Umatilla County, 86 Pac., 598; Laundry Cases, 27 Fed., 765; Duckwall v. City of New Albany, 25 Ind., 283; Eden v. People, 161 Ill., 296; Oliver v. Washington Mills, 93 Mass., 268; Cook on Corporations, sec. 572, C and D; Pullman Car Co. v. Pennsylvania, 141 U.S. 18; Gulph & Ship Island Railroad Co. v. Hughes, 183 U.S. 67; Postal Telegraph Co. v. Adams, 155 U.S. 688-696; Guy v. Baltimore, 100 U.S. 434; Weber v. Virginia, 103 U.S. 344; M'Culloch v. State of Maryland, 4 Wheaton, 415; Union Refrigerator Transit Co. v. Kentucky, 199 U.S. 194; Kehrer v. Stewart, 187 U.S. 60.

The tax in question is a property tax. Beach on Private Corporations, secs. 801, 820; San Fransisco v. Insurance Co., 74 Cal., 113; Parker v. Insurance Co., 42 La., 429; Taylor on Private Corporations, 479; Commonwealth v. Standard Oil Co., 101 Pa. St., 119; Ellis v. Frazier, 63 Pac., 642; Reser v. Umatilla County, 86 Pac., 595; Louisville & N. Ry. Co. v. Wright, 116 Fed., 670; Desty on Taxation, 199; Cooley on Taxation, 165.

Graduated taxes are illegal. Chapter 19 is in violation of the Constitution of the State of Texas and special provisions of Section 48, Article 3; and Sections [***8] 1, 2, and 3, Article 8. Schuster v. City of Louisville, 89 S.W. 589; Cook County v. Fairbank, 222 Ill., 578; Dalrymple v. City of Milwaukee, 53 Wis., 178; State v. Gorman, 40 Minn., 232; Fatjo v. Pfister, 117 Cal., 83; Clark & Marshall on Corporations, page 760, sec. 291.

If the tax imposed by Chapters 19 and 72, General Law of 1905, is not a property tax, it is an occupation tax and invalid because not equal and uniform upon the same class of subjects. State v. Galveston, H. & S. A. Ry. Co., 100 Tex. 153; State v. Texas & P. Ry. Co., 100 Tex. 279; Pullman Palace Car Co. v. State, 64 Tex. 274; Hoefling v. City of San Antonio, 85 Tex. 228.

Robert Vance Davidson, Attorney-General and Claude Pollard, Assistant, for appellee.

A tax collecting officer is not personally pecuniarily liable for taxes improperly collected by him, especially so when it is not shown that the money is still in his

possession. Money voluntarily paid under an unconstitutional assessment of taxes can not be recovered of the tax-collecting officer after it has been paid into the treasury. Continental Land and Cattle Co. v. Board, 80 Tex. 492; Texas Land & Cattle Co. v. Hemphill County, 61 S.W. 333; [***9] Dickens v. Jones, 27 Am. Dec., 488; Saunders v. Simmons, 30 Ark., 274.

The taxes sought to be recovered were voluntarily paid, and, therefore, can not be recovered, even though improperly collected. Houston v. Feser, 76 Tex. 365; Galveston City Co. v. Galveston, 56 Tex. 494; Galveston County v. Gorman, 49 Tex. 310; Lamborn v. County Commissioners, 97 U.S. 181; Railroad Co. v. Commissioners, 98 U.S. 542; Little v. Bowers, 134 U.S. 554; San Francisco N. B. Co. v. Dinwiddie, 13 Fed., 789; Wessel v. Johnston L. & Mort. Co., 44 Am. St. Rep., 529; First National Bank v. Mayor, 45 Am. Rep., 476; Peebles v. City of Pittsburg, 47 Am. Rep., 714; McMillan v. Richards, 9 Calif., 417; Phelps v. New York, 2 L. R. A., 626; Phillips v. Jefferson County, 5 Kan., 412; Abaunsee County v. Walker, 8 Kan., 431; Robbins v. Latham, 36 S.W. 33; Sheldon v. School District, 24 Conn., 88; 2 Cooley on Taxation, 1500; 2 Dillon Municipal Corp., 947.

The Acts of the Twenty-ninth Legislature, Chapters 19 and 72, do not impair the obligation of any contract entered into between the State of Texas and appellant. Constitution of Texas, art. 8, sec. 4; Acts of 25th Legislature, pp. 140, 168; Acts of 29th Legislature, [***10] Chapters 19 and 72; New Orleans City, etc., R. R. Co. v. New Orleans, 143 U.S. 192; Delaware Railroad Tax v. P. W. & B. R. R. Co., 18 Wall., 206; Railway Co. v. Philadelphia, 101 U.S. 528; Citizens Savings Bank v. Owensborough, 173 U.S. 636; Covington v. Kentucky, 173 U.S. 231; Louisville Water Co. v. Clark, 143 U.S. 1; Wyandott v. Corrigan, 35 Kan., 21; City of New Orleans v. Orleans R. R. Co., 21 Am. St. Rep., 365; Gray on Limitations of Taxing Power, pars. 1001-5-8; Murphree on Foreign Corporations, pars. 34-36.

If appellant is engaged exclusively in interstate commerce, it is not necessary that it should have a permit to do business in Texas; but if appellant, with full knowledge of the facts constituting the character of its business, voluntarily paid the tax, its suit can not be maintained. A forfeiture of its permit for failure to pay such tax, if its business is exclusively interstate, would have imposed no burden upon it nor deprived it of any property or any right, vested or otherwise. Allen v. Tyson-Jones Buggy Co., 91 Tex. 22; Miller v. Goodman, 91 Tex. 41; Brin v. Wachusetts Shirt Co., 42 S.W. 295; Lasater v. Purcell, Mill and Elevator Co., 22 Tex. Civ. App. 33; Texas [***11] & Pac. Ry. Co. v. Davis, 93 Tex. 378; Purcell v. Johnston L. & Mort. Co., 44 Am. St. Rep., 29; Wessell v. Johnston L. & Mort. Co., 44 Am. St. Rep., 529; 2 Dillon on Municipal Corporations, 947.

Chapters 19 and 72, Acts of the Twenty-ninth Legislature, are not in violation of any provision of the Fourteenth Amendment to the Constitution of the United States. A foreign corporation is not a "citizen" within the meaning of the prohibition that the privileges or immunities of citizens of the United States shall not be abridged. The right of foreign corporations to do business within a State is purely ex comitate, and statutory provisions either limiting such right, or imposing license fees as a prerequisite to such right, or decreeing the forfeiture of such right for failure to comply with prescribed regulations, can not be regarded as depriving foreign corporations of their property without due process of law. Hall v. Virginia, 8 Wallace, 168; Philadelphia Fire Assn. v. New York, 119 U.S. 110; Pembina C. S. M. & M. Co. v. Pennsylvania, 125 U.S. 181; Hooper v. California, 155 U.S. 648; Orient Insurance Co. v. Daggs, 172 U.S. 557; Gray on Limitations of Taxing Power, par. 1098, et seq.; [***12] Murphree on Foreign Corporations, pars. 32-36; Beale on Foreign Corporations, par. 79.

The tax imposed under the Act of the Twenty-ninth Legislature is not discriminating. Murphree on Foreign Corporations, par. 162.

The tax in question is not a property tax, but is a privilege or license tax, and is not in any respect invalid or illegal. Beale on Foreign Corporations, par. 508, and authorities cited; Gray on Limitations of the Taxing Power, pars. 54-57.

The State's power to impose a license tax, whether exercised for revenue or for purposes of regulation, is co-extensive with the power of the sovereignty to exclude foreign corporations from its jurisdiction, and is subject only to the limitation that it must not encroach upon the exclusive power of Congress to regulate interstate commerce. Murphree on Foreign Corporations, par. 143; Beale on Foreign Corporations, pars. 508, 509, and authorities cited.

**JUDGES:** RICE, Associate Justice.

**OPINION BY:** RICE

**OPINION**

[*639] [**361] RICE, Associate Justice.--Appellant instituted this suit against appellee individually to recover the sum of $ 575, with interest thereon, $ 287 of which was alleged to have been paid by it to him as Secretary [***13] of State on or about the 28th day of April, 1905, and $ 288 of which was paid to him as Secretary of State on April 30, 1906, which said amounts were paid as a franchise tax, claimed to be due from it to the State by virtue of the Acts of the 29th Legislature, pp. 21 and 100, for said years.

The suit was predicated on the contention that said Acts of the Legislature under which the tax was collected were and are unconstitutional and void. After all formal requisites were stated, the petition alleged, substantially, that the State in 1901, granted it a permit under the then existing law to transact business within the State for a period of ten years, and that it paid the franchise tax then imposed for said privilege; that thereafter, in the years 1905 and 1906, the Secretary of State, by virtue of the Acts of the 29th Legislature, heretofore mentioned, demanded and received from appellant the amounts sued for as a franchise tax for said years; that said tax was so paid by it under written protest, on the ground that said law was unconstitutional and void, but the points relied upon were not set forth in said protest. The petition, however, asserts the invalidity of said law chiefly [***14] upon the following grounds, viz.: That having been granted a permit under the laws of 1901, for a period of ten years, and having paid the tax therefor, [**362] the Legislature had no authority by a subsequent Act to impose an additional tax, and to do so would be violative of the provision of both the State and Federal Constitutions, which forbids any State to pass any law impairing the obligation of contracts. It further alleged that said law imposed a greater burden upon foreign than upon domestic corporations, and was, therefore, an unjust discrimination as against it in favor of domestic corporations; that the same was an Indiana corporation, doing wholly an interstate business, and was, therefore, not subject to the payment of the franchise tax and was not required to obtain a permit, and to demand the same would be in violation of law. There were other allegations under which it is claimed that said franchise tax was illegal, which we deem unnecessary to set out.

A general demurrer to this petition being sustained by the court, appellants excepted and gave notice of appeal, so that the only question for our consideration is as to the correctness of the judgment of the trial [***15] court sustaining said demurrer.

By its third assignment of error appellant insists that the court erred in sustaining the general demurrer to its petition, because it appeared therefrom that the franchise laws of the State of Texas were unconstitutional and void, being in contravention of the Constitution of the United States and of this State. By its first proposition thereunder it is insisted that said acts impair the obligation of the contract entered into between the State and plaintiff on the 23rd day of May, 1901. The Act of the Legislature under consideration [HN1] provided for the payment by every foreign corporation heretofore authorized or thereafter [*640] authorized to do business in this State, a certain franchise tax, based upon the authorized capital stock of such corporation, providing the time for its payment and prescribing a penalty of twenty-five percent on the amount of the taxes due for failure to pay the same, as well as forfeiture of right to do business in the State, and directing the Secretary of State to declare such forfeiture without judicial ascertainment by entering the same upon a ledger to be kept in his office relating to such corporations. (Sec. 1, [***16] pp. 21, 22, 23, Acts 29th Leg., 1905.) And by an amendment thereto, p. 100, sec. 1, Acts of 29th Leg., it was further provided that it should be a misdemeanor on the part of the officers of said corporations subject to the payment of such franchise tax, to fail to give under oath accurate information as to the amount of its capital stock, when demanded by said Secretary of State. There was a somewhat similar provision in the revised statutes in force in 1901, relative to the right of granting permits to foreign corporations to do business within this State, but the amount of such tax was increased by the Acts of the 29th Legislature.

We do not think that because a permit was granted to appellant under a former law the State would be thereby precluded from passing any further franchise tax law upon the same subject, even though it changed the conditions and imposed a greater tax than the former law. At the time that said permit was first granted our statute (art. 650) expressly provided that [HN2] "all charters or amendments to charters under the provisions of this chapter shall be subject to the power of the Legislature to

alter, reform or amend the same." And while this Act might be regarded [***17] as applicable alone to domestic corporations, there seems to be no good reason why this should not be held to be the law in the absence of such a statute, because it has been held that unless the grant of a franchise to a foreign corporation expressly exempted it from license taxation, the imposition of such tax is not invalid, and does not impair the obligation of any contract, and that no corporation could claim an immunity from taxation or from license because it paid a consideration for its charter or franchise, in the absence of a stipulation on the part of the State or other taxing power that the bonus was received in lieu of any further or future taxation. [HN3] Even a provision in a charter fixing a specified sum to be paid as taxes, but not providing that such sum shall be in lieu of other taxes, is not a contract that no greater tax shall be laid. (New Orleans City R. R. Co. v. New Orleans, 143 U.S. 192; Delaware R. R. Tax, 18 Wall. 206; Union P. Ry. Co. v. Philadelphia, 101 U.S. 528; Citizens' Savings Bank v. Owensboro, 173 U.S. 636; Covington v. Kentucky, 173 U.S. 231; Louisville Water Co. v. Clark, 143 U.S. 1; Wyandotte v. Corrigan, 35 Kan. 21; Gray on Limitations of Taxing [***18] Power, pars. 1001-5-8; Murphree on Foreign Corporations, pars. 34-36.) Besides this, [HN4] our State Constitution provides "that the power to tax corporations and corporate property shall not be surrendered or suspended by Act of the Legislature by any contract or grant to which the State shall be a party" (Art. 8, sec. 4), which was in force when appellant secured its permit. We therefore hold that, notwithstanding a former permit had been granted, the inherent power remained in the State to change or amend the law at any time thereafter, even to the extent of levying [*641] an additional burden for the permission granted to foreign corporations to do business within the State; and that such change of the law would not be in violation of the Constitution prohibiting the passage of any Act impairing the obligation of contracts.

By its eleventh proposition under this assignment appellant urges that the tax in question was a property tax; and by its twelfth, that fees paid to the Secretary of [**363] State for obtaining a permit for incorporation are not taxes; and by its thirteenth, that graduated taxes are illegal, and therefore, that the Acts of the Legislature under consideration [***19] are in violation of the Constitution of the State. Appellee, on the other hand, insists that the tax in question is not a property tax, but is a privilege or license tax, and is, therefore, in no respect invalid or illegal.

[HN5] It is well settled that a State has the absolute right to exclude or permit foreign corporations from doing business within its boundaries, and that it is an act of comity or grace on its part to permit their coming in at all, and it has the right to impose such conditions as it may see proper in granting said permission. In Beale on Foreign Corporations, sec. 508, it is said: "The granting of such right or privilege rests entirely within the discretion of the State; and, of course, when granted may be accompanied with such conditions as its Legislature may judge most befitting to its interest and policy. It may require, as a condition of the granting of the privilege and also of its continued exercise, that the corporation pay a specified sum to the State each year or month, or a specified portion of its gross receipts or of the profits of its business, or a sum to be ascertained in any convenient mode which it may prescribe. The validity of the tax can in no [***20] way be dependent upon the mode which the State may deem fit to adopt in fixing the amount for any year which it will exact for the franchise. No constitutional objection lies in the way of a legislative body prescribing any mode of measurement to determine the amount it will charge for the privileges it bestows."

It is further said in the same section: "This tax is not a property tax, even when it is measured by the amount of property of a corporation. Therefore, to levy such a tax in addition to a property tax is not double taxation, and the tax is not subject to a constitutional requirement that taxes shall be uniform."

The same author, section 509, continuing says: [HN6] "A State may, as has been seen, tax any privilege it grants. Such a tax, or rather license fee, is the payment exacted of a foreign corporation for the privilege of doing business within the State. Since a foreign corporation may be allowed to do business in a State upon conditions, the payment of a sum of money may be made a condition; and this may in form be the payment of a tax greater than or different from that paid by a domestic corporation. Such a tax is valid. It is not properly an exercise of the power to tax [***21] property, but is a license fee paid for the privilege of entering the State, and its validity is a necessary deduction from the right absolutely to exclude the foreign corporation." See also Gray on Limitations of Taxing Powers, pars. 4 to 57; Home Ins. Co. v. New York, 134 U.S. 594.

[*642] [HN7] Taxes imposed on a foreign

corporation as a condition of doing business generally in the State, not connected with the grant of any special privilege, is a license or privilege tax, and not a property tax, although the amount of it may be determined by the capital stock of the corporation. A foreign corporation can only come into the State and do business there by the consent of the State, and the charge imposed by the State as the condition of that consent is not a tax on property. (Horn Silver Mining Co. v. New York, 143 U.S. 305; Murphree on Foreign Corporations, par. 143.)

We think the quotations from the foregoing authorities amply establish the principle that the State has the authority to impose a franchise tax, and that the same is constitutional. We therefore overrule this assignment.

But it is insisted by appellant under another assignment that since it appears from the allegations [***22] of its petition that it was doing an interstate business, therefore, it was not subject to the franchise tax demanded of it, and hence the tax having been paid by it under protest, that it should be held to have the right to recover the same. In reply to this it might be said that the permit granted it was for the purpose of allowing it to do business within the State, and that it was no fault on the part of the State that it failed to conduct a business therein in accordance with its permit. And the fact that it paid a franchise tax for this purpose could not affect the question if said franchise tax was legal, which we hold to be the case. The ground of the protest in this instance was not that the tax was illegal because of the fact that appellant was doing an interstate business, but for the reason alone, as stated in its protest, that the law itself imposing this franchise tax was unconstitutional and void. It therefore follows that if the law imposing the franchise tax is legal, that appellant is in no position to complain on this score; but it is insisted by appellee that the taxes sought to be collected were voluntarily paid, and therefore can not be recovered, even though [***23] illegally exacted. The rule on this subject seems to be clearly stated in Dillon on Municipal Corporations, vol. 2, p. 947, as follows: [HN8] "Where a party pays an illegal demand with the full knowledge of all the facts which render such demand illegal, without an immediate and urgent necessity therefor, or unless to release his person or property from detention, or to prevent an immediate seizure of his person or property, such payment must be deemed to be voluntary, and can not be recovered back; and the fact that the party at the time of making the payment files a written protest does not make

the payment involuntary." So that in the present case it can not be urged that the demand on the part of the officer that appellant should pay the tax for doing business within the State was an unlawful demand, because he clearly had the right to make such demand. The demand was not made for the payment of a tax for doing an interstate business, but for doing [**364] business within the State. This objection, that it was not in fact doing business within the State, was not then urged, and seems not to have been within the contemplation either of the Secretary of State or of appellant at the [***24] time of the demand for and the payment of the money. If appellant was doing an interstate business, as pleaded and contended for by it, then a forfeiture of its [*643] permit could in no wise affect it, because its right to do an interstate business without first obtaining a permit is unquestioned. (Allen v. Tyson-Jones Buggy Co., 91 Tex. 22; Miller v. Goodman, 91 Tex. 41; Lasater v. Purcell Mill & Elevator Co., 22 Tex. Civ. App. 33; Texas & Pac. Ry. Co. v. Davis, 93 Tex. 378.) So that the payment of the franchise tax in response to the demand by the Secretary of State was, in our judgment, a voluntary payment on the part of appellant, with a full knowledge of the facts. It was not made under compulsion or duress, so that even if it were held to have been unlawfully imposed and exacted, which in our judgment was not the case, it is not recoverable. (Houston v. Feeser, 76 Tex. 365; Galveston City Co. v. Galveston, 56 Tex. 486; Galveston Co. v. Gorham, 49 Tex. 279; Lamborn v. County Commissioners, 97 U.S. 181; Union Pac. Railroad Co. v. Commissioners, 98 U.S. 541; Little v. Bowers, 134 U.S. 547; San Francisco N. R. Co. v. Dinwiddie, 13 F. 789; Wessel v. Johnston Land & Mortgage [***25] Co., 44 Am. St. Rep. 529; First Natl. Bank v. Mayor, 45 Am. Rep. 476; Peebles v. City of Pittsburgh, 47 Am. Rep. 714; McMillan v. Richards, 9 Cal. 365; Phelps v. New York, 2 L.R.A. 626; Phillips v. Jefferson County, 5 Kan. 412; Wabaunsee, County v. Walker, 8 Kan. 431; Robins v. Latham, 36 S.W. 33; Sheldon v. South School District, 24 Conn. 88; Cooley on Taxation, vol. 2, p. 1500, Dillon on Municipal Corp., vol. 2. p. 947.)

Again, it is urged that the tax imposed discriminated in favor of domestic corporations as against foreign. It will be observed that the tax is imposed alike upon all foreign corporations. (Acts 29th Leg., Chaps. 19 and 72.) In Murphree on Foreign Corporations, par. 162, where other authorities on the same subject are collated, it is said: [HN9] "A tax imposed upon foreign companies, but

which does not apply to domestic corporations, is not for that reason obnoxious to the provisions of most of the State Constitutions requiring taxes to be equal and uniform. Since the effect of such legislation is simply to classify corporations and to impose certain taxes upon the class of foreign companies; and the classification being based upon legitimate distinctions, and the burden [***26] being equal within the class, there can be no question as to the validity of the tax. Nor could the provision as to equality and uniformity be applied to license taxes, for they are, in their very nature, the subject of governmental discretion." The tax so imposed being equal and alike upon all foreign corporations within the same class, we therefore think can not be assailed merely upon the ground that a less tax is imposed upon domestic corporations; the effect of the Act being simply to classify corporations and impose a like tax upon all within the same class, which under the law, it seems the State has the clear right to do. We therefore overrule this contention.

It will be noticed that the petition in this case fails to allege that appellee had the money so collected from appellant in his possession at the time the suit was instituted. This being true, it is the opinion of the writer, however not concurred in by the majority of the court, that the petition was insufficient on this ground, and that

the demurrer was for this reason also properly sustained; but the decision, of course, is not predicated upon this conclusion. In the case of Hardesty v. Fleming, 57 Tex. 395, it was [***27] held that a suit might be brought against [*644] a tax collector to recover taxes illegally collected, if paid under protest, provided suit was brought before the money was paid over by the collecting officer; but in the case of Continental Land & Cattle Co. v. Board, it is said: [HN10] "A better rule is that the collecting officer is exempt from liability to the tax payer, who should seek relief from the State, county, or municipality on whose account the tax was collected." See also on the same subject, Texas Land & Cattle Co. v. Hemphill, 61 S.W. 333, where the same rule is announced.

The remaining assignments of error, in our judgment, are not well taken, and, without discussing them in detail, the same are overruled.

Believing that no error has been shown, the judgment of the trial court is affirmed.

*Affirmed.*

Writ of error refused.



**THE GILLETTE COMPANY et al., Plaintiffs and Appellants, v. FRANCHISE TAX BOARD, Defendant and Respondent. [And five other cases.*]**

**A130803**

**COURT OF APPEAL OF CALIFORNIA, FIRST APPELLATE DISTRICT, DIVISION FOUR**

**207 Cal. App. 4th 1369; 144 Cal. Rptr. 3d 555; 2012 Cal. App. LEXIS 833**

**July 24, 2012, Opinion Filed**

**NOTICE:**

NOT CITABLE--SUPERSEDED BY GRANT OF REHEARING

**SUBSEQUENT HISTORY:** Rehearing granted, Depublished by Gillette Co. v. Franchise Tax Bd., 2012 Cal. App. LEXIS 970 (Cal. App. 1st Dist., Aug. 9, 2012) Subsequent opinion on rehearing at, Substituted opinion at The Gillette Co. v. Franchise Tax Bd., 2012 Cal. App. LEXIS 1030 (Cal. App. 1st Dist., Oct. 2, 2012)

**PRIOR HISTORY:** [***1]

\* *The Procter & Gamble Manufacturing Co. v. Franchise Tax Bd.* (No. CGC-10-495912); *Kimberly-Clark Worldwide, Inc. v. Franchise Tax Bd.* (No. CGC-10-495916); *Sigma-Aldrich, Inc. v. Franchise Tax Bd.* (No. CGC-10-496437); *RB Holdings (USA) Inc. v. Franchise Tax Bd.* (No. CGC-10-496438); *Jones Apparel Group, Inc. v. Franchise Tax Bd.* (No. CGC-10-499083).

Superior Court of San Francisco City and County, No. CGC-10-495911, Richard A. Kramer, Judge.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant taxpayers sought review of a judgment from the Superior Court of the City and County of San Francisco (California), which sustained respondent Franchise Tax Board's demurrer without leave to amend and dismissed the taxpayers' action for a refund of corporate income taxes paid pursuant to Rev. & Tax. Code, § 19382.

**OVERVIEW:** The taxpayers asserted that the Multistate Tax Compact gave them the option under Rev. & Tax. Code, § 38006, art. III, subd. 1, to elect its apportionment formula. The court observed that interstate compacts were both statutory law and binding contracts between member states, which superseded conflicting state law. The withdrawal provision in § 38006, art. X, subd. 2, did not render the compact less than a binding agreement. California could not unilaterally amend the compact by mandating the use of the double-weighted sales apportionment formula in Rev. & Tax. Code, § 25128, subd. (a). The compact expressly required that taxpayers be allowed to elect its apportionment formula. Depriving the taxpayers of that option would violate the constitutional prohibition in U.S. Const., art. I, § 10, cl. 1, and Cal. Const., art. I, § 9, against impairing the obligation of contracts and also would violate the reenactment rule of Cal. Const., art. IV, § 9, because there had been no amendment and reenactment of the option. Course of performance evidence as to other states' amendments was irrelevant. There was no surrender or suspension of taxing powers under Cal. Const. art. XIII, §

31.

**OUTCOME:** The court reversed the judgment of dismissal.

**CORE TERMS:** compact, interstate compacts, multistate, withdrawal, formula, apportionment, signatory, binding, apportionment formula, uniformity, repeal, repealing, election, enacting, taxation, interstate, withdraw, apportion, refund, elect", business income, amend, unilaterally, enforceable, payroll, taxing, state law, reenactment, mandatory, subject matter

**LexisNexis(R) Headnotes**

*Governments > Legislation > Types of Statutes*
*Governments > State & Territorial Governments > General Overview*
[HN1] Interstate compacts are legislatively enacted, binding and enforceable agreements between two or more states. Some interstate compacts require congressional consent, but others, that do not infringe on the federal sphere, do not. The case law has set forth three primary indicia: establishment of a joint organization for regulatory purposes; conditional consent by member states in which each state is not free to modify or repeal its participation unilaterally; and state enactments which require reciprocal action for their effectiveness.

*Contracts Law > Contract Interpretation > General Overview*
*Governments > Legislation > Interpretation*
*Governments > Legislation > Types of Statutes*
[HN2] Where federal congressional consent was neither given nor required, an interstate compact must be construed as state law. Moreover, since interstate compacts are agreements enacted into state law, they have dual functions as enforceable contracts between member states and as statutes with legal standing within each state; and thus courts interpret them as both. The contractual nature of a compact is demonstrated by its adoption: There is an offer (a proposal to enact virtually verbatim statutes by each member state), an acceptance (enactment of the statutes by the member states), and consideration (the settlement of a dispute, creation of an association, or some mechanism to address an issue of mutual interest).

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > Coverage*
*Governments > Legislation > Effect & Operation > Amendments*
*Governments > Legislation > Types of Statutes*
[HN3] As is true of other contracts, the contract clause of the United States Constitution shields compacts from impairment by the states. Therefore, upon entering a compact, it takes precedence over the subsequent statutes of signatory states and, as such, a state may not unilaterally nullify, revoke or amend one of its compacts if the compact does not so provide. Thus interstate compacts are unique in that they empower one state legislature--namely the one that enacted the agreement--to bind all future legislatures to certain principles governing the subject matter of the compact. Upon entering into an interstate compact, a state effectively surrenders a portion of its sovereignty; the compact governs the relations of the parties with respect to the subject matter of the agreement and is superior to both prior and subsequent law. Further, when enacted, a compact constitutes not only law, but a contract which may not be amended, modified, or otherwise altered without the consent of all parties. One party may not enact legislation which would impose burdens upon the compact absent the concurrence of the other signatories. Nor may states amend a compact by enacting legislation that is substantially similar, unless the compact itself contains language enabling a state or states to modify it through legislation concurred in by the other states.

*Civil Procedure > Justiciability > Standing > General Overview*
*Tax Law > State & Local Taxes > Administration & Proceedings > Credits, Overassessments & Refunds*
*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview*
[HN4] In an action for the refund of corporate taxes paid to the state pursuant to Rev. & Tax. Code, § 19382, the taxpayers have standing to claim that the tax computed and assessed is void in whole or in part.

*Civil Procedure > Justiciability > Standing > General Overview*
*Tax Law > State & Local Taxes > Administration & Proceedings > Credits, Overassessments & Refunds*
*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations >*

*Imposition of Tax*

[HN5] The Multistate Tax Compact, at Rev. & Tax. Code, § 38006, art. III, subd. 1, explicitly gives taxpayers whose income is subject to apportionment and allocation under the laws of a party state the option to elect to apportion its taxes under the Uniform Division of Income for Tax Purposes Act, Rev. & Tax. Code, § 25120 et seq., the compact formula. This is a right specifically extended not to the party states but to taxpayers as third parties regulated under the compact, and as such taxpayers may seek to enforce this right as part of a tax refund suit. Moreover, the stated purposes of the compact explicitly embrace taxpayer interests. These purposes include facilitating (1) proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases; and (2) taxpayer convenience. § 38006, art. I, subds. 1, 3.

*Governments > Legislation > Statutory Remedies & Rights*

[HN6] Compacts are statutory law. Consequently, the assertion of private rights created or otherwise affected by an interstate compact is procedurally similar to the assertion of such rights conferred by other statutes of the jurisdiction dealing with similar subject matter.

*Governments > Legislation > Expirations, Repeals & Suspensions*
*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > Imposition of Tax*

[HN7] The Multistate Tax Compact provides for a state's orderly withdrawal, namely by enacting a statute repealing the compact. However, any repealing legislation must be prospective in nature, because it cannot affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal. Rev. & Tax. Code, § 38006, art. X, subd. 2. Although notice to sister states is not specifically required, by requiring repealing state legislation, the process itself calls for a measured, deliberative decision prior to withdrawal. Nevertheless, the right to withdraw is unilateral. The withdrawal provision does not render the compact something less than a binding agreement. This type of withdrawal provision is common in other interstate compacts and has not been the death knell rendering them nonbinding and invalid. California is a party to a number of interstate compacts containing virtually identical withdrawal provisions, coupled with

some type of notice requirement.

*Governments > State & Territorial Governments > Finance*

[HN8] See Cal. Const. art. XIII, § 31.

*Governments > State & Territorial Governments > Finance*
*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > Imposition of Tax*

[HN9] By entering the Multistate Tax Compact, California has neither surrendered nor suspended its taxing powers.

*Governments > Legislation > Effect & Operation > Amendments*
*Governments > Legislation > Types of Statutes*

[HN10] By its very nature an interstate compact shifts some of a state's authority to another state or states. Thus signatory states cede a level of sovereignty over matters covered in the compact in favor of pursuing multilateral action to resolve a dispute or regulate an interstate affair. Because the compact is both a statute and a binding agreement among sovereign signatory states, having entered into it, California cannot, by subsequent legislation, unilaterally alter or amend its terms. Indeed, an interstate compact is superior to prior and subsequent statutory law of member states.

*Contracts Law > Contract Interpretation > General Overview*
*Governments > Legislation > Interpretation*
*Governments > Legislation > Types of Statutes*

[HN11] In part because compacts are agreements among sovereign states, courts will not read absent terms into them or dictate relief inconsistent with their express terms.

*Governments > Legislation > Expirations, Repeals & Suspensions*
*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > Imposition of Tax*

[HN12] The plain language of the withdrawal provision in the Multistate Tax Compact, enabling a party state to withdraw from the compact by enacting a statute

repealing the same, allows only for complete withdrawal from the compact. California has not withdrawn from the compact. After withdrawal, a state remains liable for any obligations incurred prior to withdrawal. Faced with the desire to escape an obligation under the compact, a state's only option is to withdraw completely by enacting a repealing statute. That is what the plain language says, and a court cannot read into that language an inconsistent term allowing for piecemeal amendment or elimination of compact provisions.

*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > Imposition of Tax*
[HN13] The express, unambiguous terms of the Multistate Tax Compact require extending taxpayers the option of electing the Uniform Division of Income for Tax Purposes Act, Rev. & Tax. Code, § 25120 et seq., and set forth reciprocal repeal terms allowing a member state to cease its participation and reclaim its sovereignty. A contrary interpretation would run counter to the express purposes of the compact, which include facilitating equitable apportionment of tax bases and promoting uniformity or compatibility in significant components of tax systems. Rev. & Tax. Code, § 38006, art. I, subds. 1, 2.

*Contracts Law > Contract Interpretation > Parol Evidence > Course of Dealing*
[HN14] The course of performance of a contract is only relevant to ascertaining the parties' intention at the time of contracting. Civ. Code, § 1636.

*Contracts Law > Contract Interpretation > Parol Evidence > Course of Dealing*
*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > Imposition of Tax*
[HN15] When the parties perform under a contract, without objection or dispute, they are fulfilling their understanding of the terms of the contract. The course of performance doctrine is thus premised on the assumption that one party's response to another party's action is probative of their understanding of the contract terms. But in the context of the Multistate Tax Compact, the member states do not perform or deliver their obligations to one another, unlike a typical contract in which a party provides services or goods to the other party, who in

turns monitors the first party's compliance with contract terms. Thus the foundation for finding course of performance evidence relevant and reliable is faulty.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
[HN16] See U.S. Const., art. I, § 10, cl. 1.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
[HN17] See Cal. Const., art. I, § 9.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > Coverage*
[HN18] The constitutional prohibition against impairing the obligation of contracts extends to interstate compacts.

*Governments > Legislation > Effect & Operation > Amendments*
[HN19] See Cal. Const., art. IV, § 9.

*Governments > Legislation > Effect & Operation > Amendments*
[HN20] The reenactment rule of Cal. Const., art. IV, § 9, applies to acts which are in terms amendatory of some former act. Its applicability does not depend on the method of amendment, but rather on whether legislators and the public have been reasonably notified of direct changes in the law.

**SUMMARY:**

CALIFORNIA OFFICIAL REPORTS SUMMARY

The trial court sustained the Franchise Tax Board's demurrer without leave to amend and dismissed an action for a refund of corporate income taxes (Rev. & Tax. Code, § 19382). The taxpayers asserted that the Multistate Tax Compact gave them the option (Rev. & Tax. Code, § 38006, art. III, subd. 1) to elect the compact's apportionment formula. (Superior Court of the City and County of San Francisco, No. CGC-10-495911, Richard A. Kramer, Judge.)

The Court of Appeal reversed the judgment of dismissal. The court observed that interstate compacts are both statutory law and binding contracts between member

states, which supersede conflicting state law. The withdrawal provision (§ 38006, art. X, subd. 2) does not render the compact less than a binding agreement. California could not unilaterally amend the compact by mandating the use of the double-weighted sales apportionment formula (Rev. & Tax. Code, § 25128, subd. (a)). The compact expressly requires that taxpayers be allowed to elect its apportionment formula. Depriving the taxpayers of that option would violate the constitutional prohibition against impairing the obligation of contracts (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9) and also would violate the reenactment rule (Cal. Const., art. IV, § 9) because there had been no amendment and reenactment of the option. Course of performance evidence as to other states' amendments was irrelevant. There was no surrender or suspension of taxing powers (Cal. Const. art. XIII, § 31). (Opinion by Reardon, J., with Ruvolo, P. J., and Sepulveda, J.,+ concurring.) [*1370]

> + Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

## HEADNOTES

CALIFORNIA OFFICIAL REPORTS HEADNOTES

**(1) State of California § 6--Contracts--Interstate Compacts.**--Interstate compacts are legislatively enacted, binding and enforceable agreements between two or more states. Some interstate compacts require congressional consent, but others, that do not infringe on the federal sphere, do not. The case law has set forth three primary indicia: establishment of a joint organization for regulatory purposes; conditional consent by member states in which each state is not free to modify or repeal its participation unilaterally; and state enactments which require reciprocal action for their effectiveness.

**(2) State of California § 6--Contracts--Interstate Compacts--Interpretation.**--Where federal congressional consent was neither given nor required, an interstate compact must be construed as state law. Moreover, since interstate compacts are agreements enacted into state law, they have dual functions as enforceable contracts between member states and as statutes with legal standing within each state; and thus courts interpret them as both. The contractual nature of a compact is demonstrated by its adoption: There is an

offer (a proposal to enact virtually verbatim statutes by each member state), an acceptance (enactment of the statutes by the member states), and consideration (the settlement of a dispute, creation of an association, or some mechanism to address an issue of mutual interest).

**(3) Constitutional Law § 72--Impairment of Contract--Interstate Compacts.**--As is true of other contracts, the contract clause of the United States Constitution shields compacts from impairment by the states. Therefore, upon entering a compact, it takes precedence over the subsequent statutes of signatory states and, as such, a state may not unilaterally nullify, revoke or amend one of its compacts if the compact does not so provide. Thus interstate compacts are unique in that they empower one state legislature--namely the one that enacted the agreement--to bind all future legislatures to certain principles governing the subject matter of the compact. Upon entering into an interstate compact, a state effectively surrenders a portion of its sovereignty; the compact governs the relations of the parties with respect to the subject matter of the agreement and is superior to both prior and subsequent law. Further, when enacted, a compact constitutes not only law, but a contract which may not be amended, modified, or otherwise altered without the consent of all parties. One party may not enact legislation which would impose burdens upon the compact absent the concurrence of the other signatories. Nor may states amend a compact by enacting legislation that is [*1371] substantially similar, unless the compact itself contains language enabling a state or states to modify it through legislation concurred in by the other states.

**(4) Taxpayers' Remedies § 11--Proceedings--Corporate Tax Refund Action--Standing.**--In an action for the refund of corporate taxes paid to the state pursuant to Rev. & Tax. Code, § 19382, the taxpayers have standing to claim that the tax computed and assessed is void in whole or in part.

**(5) Corporations § 59--Taxation--Apportionment of Unitary Business--Multistate Tax Compact--Option to Elect Formula.**--The Multistate Tax Compact explicitly gives taxpayers whose income is subject to apportionment and allocation under the laws of a party state the option (Rev. & Tax. Code, § 38006, art. III, subd. 1) to elect to apportion its taxes under the Uniform Division of Income for Tax Purposes Act (Rev. & Tax. Code, § 25120 et seq.), the compact formula. This is a

right specifically extended not to the party states but to taxpayers as third parties regulated under the compact, and as such taxpayers may seek to enforce this right as part of a tax refund suit. Moreover, the stated purposes of the compact explicitly embrace taxpayer interests. These purposes include facilitating (1) proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases; and (2) taxpayer convenience (§ 38006, art. I, subds. 1, 3).

**(6) Statutes § 4--Operation and Effect--Interstate Compacts--Assertion of Private Rights.**--Compacts are statutory law. Consequently, the assertion of private rights created or otherwise affected by an interstate compact is procedurally similar to the assertion of such rights conferred by other statutes of the jurisdiction dealing with similar subject matter.

**(7) Corporations § 59--Taxation--Apportionment of Unitary Business--Multistate Tax Compact--Withdrawal Provision.**--The Multistate Tax Compact provides for a state's orderly withdrawal, namely by enacting a statute repealing the compact. However, any repealing legislation must be prospective in nature, because it cannot affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal (Rev. & Tax. Code, § 38006, art. X, subd. 2). Although notice to sister states is not specifically required, by requiring repealing state legislation, the process itself calls for a measured, deliberative decision prior to withdrawal. Nevertheless, the right to withdraw is unilateral. The withdrawal provision does not render the compact something less than a binding agreement. This type of withdrawal provision is [*1372] common in other interstate compacts and has not been the death knell rendering them nonbinding and invalid. California is a party to a number of interstate compacts containing virtually identical withdrawal provisions, coupled with some type of notice requirement.

**(8) Taxation § 4--Governmental Powers--Prohibition Against Surrender or Suspension--Multistate Tax Compact.**--By entering the Multistate Tax Compact, California has neither surrendered nor suspended its taxing powers.

**(9) Corporations § 59--Taxation--Apportionment of Unitary Business--Multistate Tax Compact--Option to Elect Formula--Unaffected by Other Law.**--The Franchise Tax Board (FTB) asserted that Rev. & Tax.

Code, § 25128, had repealed the Rev. & Tax. Code, § 38006, taxpayer election to apportion under the Multistate Tax Compact formula, mandating the exclusive use of the double-weighted sales apportionment formula. However, § 38006 is not just a statute but is also the codification of the compact, and through this enactment California has entered a binding, enforceable agreement with the other signatory states. Multiple flaws in the FTB's position were apparent. First, under established compact law, the Multistate Tax Compact supersedes subsequent conflicting state law. Second, the federal and state Constitutions prohibit states from passing laws that impair the obligations of contracts. And finally, the FTB's construction of the effect of the amended § 25128 ran afoul of the reenactment clause of the California Constitution.

[Cal. Forms of Pleading and Practice (2012) ch. 540, Taxes and Assessments, § 540.340.]

**(10) State of California § 6--Contracts--Interstate Compacts--Unilateral Amendment Impermissible.**--By its very nature an interstate compact shifts some of a state's authority to another state or states. Thus signatory states cede a level of sovereignty over matters covered in the compact in favor of pursuing multilateral action to resolve a dispute or regulate an interstate affair. Because the compact is both a statute and a binding agreement among sovereign signatory states, having entered into it, California cannot, by subsequent legislation, unilaterally alter or amend its terms. Indeed, an interstate compact is superior to prior and subsequent statutory law of member states.

**(11) State of California § 6--Contracts--Interstate Compacts--Interpretation.**--In part because compacts are agreements among sovereign states, courts will not read absent terms into them or dictate relief inconsistent with their express terms. [*1373]

**(12) Corporations § 59--Taxation--Apportionment of Unitary Business--Multistate Tax Compact--Withdrawal Provision--Partial Withdrawal Not Authorized.**--The plain language of the withdrawal provision in the Multistate Tax Compact, enabling a party state to withdraw from the compact by enacting a statute repealing the same, allows only for complete withdrawal from the compact. California has not withdrawn from the compact. After withdrawal, a state remains liable for any obligations incurred prior to withdrawal. Faced with the desire to escape an obligation under the compact, a state's

only option is to withdraw completely by enacting a repealing statute. That is what the plain language says, and a court cannot read into that language an inconsistent term allowing for piecemeal amendment or elimination of compact provisions.

**(13) Corporations § 59--Taxation--Apportionment of Unitary Business--Multistate Tax Compact--Option to Elect Formula--Mandatory Nature.**--The express, unambiguous terms of the Multistate Tax Compact require extending taxpayers the option of electing the Uniform Division of Income for Tax Purposes Act (Rev. & Tax. Code, § 25120 et seq.) and set forth reciprocal repeal terms allowing a member state to cease its participation and reclaim its sovereignty. A contrary interpretation would run counter to the express purposes of the compact, which include facilitating equitable apportionment of tax bases and promoting uniformity or compatibility in significant components of tax systems (Rev. & Tax. Code, § 38006, art. I, subds. 1, 2).

**(14) Contracts § 27--Construction and Interpretation--Evidence to Aid--Course of Performance.**--The course of performance of a contract is only relevant to ascertaining the parties' intention at the time of contracting (Civ. Code, § 1636).

**(15) Corporations § 59--Taxation--Apportionment of Unitary Business--Multistate Tax Compact--Course of Performance Evidence Irrelevant.**--When the parties perform under a contract, without objection or dispute, they are fulfilling their understanding of the terms of the contract. The course of performance doctrine is thus premised on the assumption that one party's response to another party's action is probative of their understanding of the contract terms. But in the context of the Multistate Tax Compact, the member states do not perform or deliver their obligations to one another, unlike a typical contract in which a party provides services or goods to the other party, who in turns monitors the first party's compliance with contract terms. Thus the foundation for finding course of performance evidence relevant and reliable is faulty. [*1374]

**(16) Constitutional Law § 72--Impairment of Contract--Interstate Compacts.**--The constitutional prohibition against impairing the obligation of contracts extends to interstate compacts.

**(17) Statutes § 13--Amendment--Reenactment Rule.**--The reenactment rule (Cal. Const., art. IV, § 9)

applies to acts which are in terms amendatory of some former act. Its applicability does not depend on the method of amendment, but rather on whether legislators and the public have been reasonably notified of direct changes in the law.

**COUNSEL:** Silverstein & Pomerantz, Amy L. Silverstein, Edwin P. Antolin, Johanna W. Roberts and Charles E. Olson for Plaintiffs and Appellants.

BraunHagey & Borden, Matthew Borden; and Jeffrey B. Litwak as Amici Curiae on behalf of Plaintiffs and Appellants.

Wm. Gregory Turner for Council on State Taxation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Law Offices of Miriam Hiser, Miriam Hiser; Masters, Mullins & Arrington and Richard L. Masters for Interstate Commission for Juveniles as Amicus Curiae on behalf of Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Paul D. Gifford, Assistant Attorney General, Joyce E. Hee and Lucy F. Wang, Deputy Attorneys General, for Defendant and Respondent.

Joe Huddleston, Shirley Sicilian and Sheldon Laskin for Multistate Tax Commission as Amicus Curiae on behalf of Defendant and Respondent.

**JUDGES:** Opinion by Reardon, J., with Ruvolo, P. J., and Sepulveda, J.,[*] concurring.

> [*] Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**OPINION BY:** Reardon

**OPINION**
[**558]

**REARDON, J.**--California is a signatory to the Multistate Tax Compact (Compact). (Rev. & Tax. Code,[1] § 38001, California's enactment of the Compact.) This [***2] binding, multistate agreement obligates member states to offer its multistate taxpayers the option of using either the Compact's three-factor formula to apportion and allocate income for state income tax purposes, or the

state's own alternative apportionment formula. (§ 38006, art. [*1375] III, subd. 1.) This is one of the Compact's key mandatory provisions designed to secure a baseline level of uniformity in state income tax systems, a central purpose of the agreement.

> 1 Unless noted otherwise, all statutory references are to the Revenue and Taxation Code.

Prior to 1993, California subscribed to a single method of apportioning and allocating income, the Compact formula, which ascribed equal weight to three factors: property, payroll and sales. (Former § 25128, as added by Stats. 1966, ch. 2, § 7, p. 179.) Then, in 1993 the Legislature amended section 25128 to give double weight to the sales factor for most business activity, specifying that "[n]otwithstanding Section 38006, all business income shall be apportioned to this state by multiplying the [business] income by a fraction, the numerator of which is the property factor plus the payroll factor *plus twice the sales factor*, and the denominator [***3] of which is four ... ." (Former § 25128, subd. (a), italics added, as amended by Stats. 1993, ch. 946, § 1, p. 5441.)[2]

> 2 For purposes of this appeal, the current version of section 25128, subdivision (a) is similar in all material respects to the 1993 amendment, reading as follows: "Notwithstanding Section 38006, all business income shall be apportioned to this state by multiplying the business income by a fraction, the numerator of which is the property factor plus the payroll factor plus twice the sales factor, and the denominator of which is four ... ."

These consolidated appeals brought by appellants The Gillette Company and its subsidiaries, and other corporate entities (Taxpayers),[3] present the issue of whether, for the tax years at issue since 1993, Taxpayers were entitled to elect the Compact formula, or, as respondent Franchise Tax Board (FTB) asserts, did the 1993 amendment to section 25128 repeal and supersede that formula, thereby making the state formula mandatory? We conclude that the Compact is a valid multistate compact, and California is bound by it and its apportionment election provision unless and until California withdraws from the Compact by enacting a statute [***4] that repeals section 38006. Accordingly, since California has not repealed section 38006 and withdrawn from the Compact, we reverse the trial court's order sustaining the FTB's demurrer without leave to

amend.[4]

> 3 Other appellants are Procter & Gamble Manufacturing Company; Kimberly-Clark Worldwide, Inc., and its subsidiaries; Sigma-Aldrich, Inc.; RB Holdings (USA) Inc., and Jones Apparel Group, Inc.
>
> 4 Despite the absence of a judgment of dismissal, we deem the order to incorporate such judgment because the trial court sustained a demurrer to all causes of action, and all that remains to render the order appealable is the formality of entering a judgment of dismissal. (*Melton v. Boustred* (2010) 183 Cal.App.4th 521, 527-528, fn. 1 [107 Cal. Rptr. 3d 481].)

[*1376] [**559]

## I. BACKGROUND

A. *Historical Context Leading to Enactment of the Compact*

Recognizing the need for uniformity in the apportionment of corporate income for tax purposes among the various taxing states, in 1957 the National Conference of Commissioners on Uniform State Laws promulgated the Uniform Division of Income for Tax Purposes Act (UDITPA). (7A pt. I West's U. Laws Ann. (2002) pp. 141-142 & § 9.) To apportion a multistate corporation's business income among the [***5] various taxing states, UDITPA uses a three-factor, equally weighted formula consisting of property, payroll and sales receipts. (7A pt. I West's U. Laws Ann., § 9.) California adopted the UDITPA in 1966. (§ 25120 et seq.; Stats. 1966, ch. 2, § 7, pp. 177-181.)

By 1959, only a few states had adopted the UDITPA. (7A pt. I West's U. Laws Ann., *supra*, p. 141.) That year, the United States Supreme Court delivered its decision in *Northwestern Cement Co. v. Minn.* (1959) 358 U.S. 450, 452 [3 L. Ed. 2d 421, 79 S. Ct. 357] (*Northwestern Cement*), holding that "net income from the interstate operations of a foreign corporation may be subjected to state taxation provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the same." *Northwestern Cement* raised concerns in the business community and within weeks of the decision, Congress commenced hearings, culminating in the passage of Public Law No. 86-272 as an emergency, temporary measure some six months later. This law was

intended to restrict the application of *Northwestern Cement* and created a subcommittee to study state business taxes and recommend legislation establishing uniform standards which states would [***6] observe in taxing income of interstate companies. (Fatale, *Federalism and State Business Activity Tax Nexus: Revisiting Public Law No. 86-272* (Spring 2002) 21 Va. Tax Review, 435, 475-476; *U.S. Steel Corp. v. Multistate Tax Comm'n* (1978) 434 U.S. 452, 455 [54 L.Ed.2d 685, 98 S.Ct. 799] (*U.S. Steel*).) The subsequent study, commonly referred to as the "Willis Report" after Congressman Edwin E. Willis who chaired the subcommittee,[5] called for federal legislation that would have limited state authority to tax interstate business operations and imposed a uniform apportionment regime on the states. (State Taxation of Interstate Commerce, House Com. on Judiciary, Special Subcom. on State Taxation of Interstate Commerce, 89th Cong., 1st Sess. (1965).)

[5] Fatale, *supra*, 21 Va. Tax Rev. at page 477.

In the wake of the Willis Report, Congress introduced a number of bills incorporating its recommendations. (*U.S. Steel, supra*, 434 U.S. at p. 456, fn. [*1377] 4; Sharpe, *State Taxation of Interstate Businesses and the Multistate Tax Compact: The Search for a Delicate Uniformity* (1974) 11 Colum. J. of Law and Social Problems 231, 242 & n. 43.) To stave off federal encroachment [***7] on their taxing powers and devise workable alternatives that would eliminate the need for congressional action, state tax administrators and other state leaders drafted the Compact; by June 1967, nine states had enacted the Compact, which by its terms became effective after seven states had adopted it. [**560] (Multistate Tax Com., First Ann. Rep. (1968) pp. 1-2; § 38006, art. X, subd. 1.)

B. *Compact Provisions*

California enacted the Compact in 1974. (§ 38001, Stats. 1974, ch. 93, § 3, p. 193.) Its purposes are to "1. Facilitate proper determination of State and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases and settlement of apportionment disputes. [¶] 2. Promote uniformity or compatibility in significant components of tax systems. [¶] 3. Facilitate taxpayer convenience and compliance in the filing of tax returns ... . [¶] 4. Avoid duplicative taxation." (§ 38006, art. I.)

Section 38006, article IV adopts the UDITPA and its equally weighted, three-factor apportionment formula, stating in part: "All business income shall be apportioned to this State by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor [***8] plus the sales factor, and the denominator of which is three." (§ 38006, art. IV, subd. 9.) However, article III allows taxpayers the option of apportioning and allocating income pursuant to the UDITPA formula *or* pursuant to a given state's alternative apportionment provisions: "Any taxpayer subject to an income tax whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a party State ... may elect to apportion and allocate his income in the manner provided by the laws of such State ... without reference to this compact, or may elect to apportion and allocate in accordance with Article IV." (§ 38006, art. III, subd. 1.) As noted in the Multistate Tax Commission's Third Annual Report (1969-1970),[6] "The Multistate Tax Compact makes UDITPA available to each taxpayer on an optional basis, thereby preserving for him the substantial advantages with which lack of uniformity provides him in some states. Thus a corporation which is selling into a state in which it has little property or payroll will want to insist upon the use of the three-factor formula (sales, property and payroll) which is included in UDITPA because that will substantially reduce [***9] his tax liability to that state below what it would be if a single sales factor formula were applied to him[;] on the other hand, he will look with favor upon the application of the single sales factor formula to him by a state from which he is selling into [*1378] other states, since that will reduce his tax liability to that state. The Multistate Tax Compact thus preserves the right of the states to make such alternative formulas available to taxpayers even though it makes uniformity available to taxpayers where and when desired." (*Id.* at p. 3.)

[6] Hereafter, Third Commission Report.

Secion 38006, article V sets out the rules for sales and use tax credits and exemptions, therein obligating each party state to provide a full credit to taxpayers who previously paid sales or use tax to another state with respect to the same property, and to honor sales and use tax exemption certificates from other states. (§ 38006, art. V, subd. 1.)

The Compact leaves other matters entirely to state control. For example, it reserves to the states control over

the rate of tax (§ 38006, art. XI, subd. (a)), and simply does not address the composition of a corporation's tax base.

As well, the Compact creates the Multistate Tax Commission [***10] (Commission) with powers to study state and local tax systems, develop and recommend proposals for greater uniformity of state and local tax laws, and compile and publish information helpful to the states. [**561] (§ 38006, art. VI, subds. 1, 3.) Each party state appoints a member to the Commission and pays its share of expenses. (*Id.*, art. VI, subds. 1(a), 4(b).) The Commission may adopt uniform regulations in cases where two or more states have uniform or similar provisions relating to specific types of taxes. (*Id.*, art. VII.) However, such regulations are advisory only--each state makes its own decision whether to adopt the regulation in accordance with its own law. (*Id.*, art. VII, subd. 3.) Additionally, the Commission may perform interstate audits, if requested by a party state; the governing article applies only in states that specifically adopt it by statute. (*Id.*, art. VIII, subds. 1, 2.)

Finally, under the Compact, states are free to withdraw from the Compact at any time "by enacting a statute repealing the same." (§ 38006, art. X, subd. 2.)

C. *U.S. Steel*

In 1972, a group of multistate corporate taxpayers brought an action on behalf of themselves and all other such taxpayers threatened [***11] with audits by the Commission. The complaint challenged the constitutionality of the Compact on several grounds, including that it was invalid under the compact clause of the United States Constitution.[7] (*U.S. Steel, supra*, 434 U.S. at p. 458.)

> 7   The compact clause of article I, section 10, clause 3 of the United States Constitution states: "No state shall, without the consent of Congress, ... enter into any agreement or compact with another state, or with a foreign power ... ."

[*1379]

The high court acknowledged that the compact clause, taken literally, would require the states to obtain congressional approval before entering into any agreement among themselves, "irrespective of form, subject, duration, or interest to the United States." (*U.S. Steel, supra*, 434 U.S. at p. 459.) However, it endorsed an

interpretation, established by case law, that limited application of the compact clause "'to agreements that are "directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States." ' [Citation.] This rule states the proper balance between federal and state power with respect [***12] to compacts and agreements among States." (434 U.S. at p. 471, initial quote from *Virginia v. Tennessee* (1893) 148 U.S. 503, 519 [37 L. Ed. 537, 13 S. Ct. 728].)

Framing the test as whether the Compact enhances state power with respect to the federal government, the court concluded it did not: "This pact does not purport to authorize the member States to exercise any powers they could not exercise in its absence. Nor is there any delegation of sovereign power to the Commission; each State retains complete freedom to adopt or reject the rules and regulations of the Commission. Moreover ... , each State is free to withdraw at any time." (*U.S. Steel, supra*, 434 U.S. at p. 473.) In the end the court rejected all of the plaintiffs' challenges to the constitutional validity of the Compact. (434 U.S. at p. 479.)

D. *Amendment of Section 25128; Litigation*

Prior to 1993, California required corporations to apportion their business income to California using the standard UDITPA, equally weighted three-factor apportionment formula. (§ 25128, as adopted in 1966; see § 38006, art. IV, subd. 9.) In 1993, the Legislature amended this formula to give double weight to the sales factor and specified that the new formula was mandatory, providing [***13] in relevant part: [**562] "*Notwithstanding Section 38006* [(the Compact)], all business income shall be apportioned to this state by multiplying the [business] income by a fraction, the numerator of which is the property factor plus the payroll factor *plus twice the sales factor*, and the denominator of which is four ... ." (§ 25128, subd. (a), italics added; Stats. 1993, ch. 946, § 1, p. 5441.)

In January 2010, the Taxpayers lodged six complaints for the refund of taxes which the court thereafter consolidated. Therein, they argued that the amended section 25128 did not override or repeal the UDITPA formula set forth in section 38006, and sought a refund of approximately $34 million. [*1380] The Taxpayers alleged that they began filing claims for refund in 2006,[8] based on their election to compute their California apportionable income "using the three-factor

apportionment formula (property, payroll, and single-weighted sales) set forth in ... § 38006." The FTB denied the refund claims for the years at issue.

> 8    Sigma-Aldrich, Inc., began filing refund claims in 2003; RB Holdings (USA), Inc., began filing refund claims in 2007.

The FTB demurred on grounds that the amended section 25128 mandated the exclusive [***14] use of the double-weighted sales factor, and according to its plain and unambiguous language, negated the Taxpayers' claim of entitlement to elect the UDITPA formula. The trial court agreed that section 25128 "clearly express[ed] an intention to take away the alternative under [section] 38006," and additionally the court in *U.S. Steel* determined that this alternative statutory scheme "could be obviated in the manner that the Legislature did." Therefore, it sustained the FTB's demurrer to the complaints without leave to amend and entered judgment accordingly.

## II. DISCUSSION

A. *Introduction*

The Taxpayers are adamant that the Compact is a valid, binding compact and as such, the Legislature cannot override and eliminate the section 38006 option for taxpayers to elect the Compact's apportionment formula. The FTB maintains as a threshold matter that the Taxpayers lack standing to complain of any purported violation of the Compact. On the substantive front the FTB contends that the plain language of section 25128 mandates the exclusive use of the double-weighted sales apportionment formula, thereby eliminating use of the equally weighted three-factor apportionment formula set forth as a taxpayer [***15] option in section 38006. Further, it urges that under California statutory and contract law, the Legislature had the power, and properly enacted legislation, to repeal section 38006 to the extent necessary to impose this mandatory apportionment formula on taxpayers.

B. *Nature of Interstate Compacts*

**(1)** Some background on the nature of interstate compacts is in order. [HN1] These instruments are legislatively enacted, binding and enforceable agreements between two or more states. (Litwak, *Interstate Compact Law: Cases and Materials* (Semaphore Press 2011) pp. 5,

12.) Initially used to resolve boundary disputes, today interstate compacts are a staple of interstate cooperation and, in addition to taxes, span a wide range of subject matter and [*1381] issues including forest firefighting; water allocation; mining regulation; storage of low level radioactive waste; transportation; environmental preservation and resource conservation; regulation of electric [**563] energy; higher education and regional cultural development. (Davis, *Interstate Compacts in Commerce and Industry* (1998) 23 Vt. L.Rev. 133, 139-143.)

As we have seen, some interstate compacts require congressional consent, but others, that do not infringe on [***16] the federal sphere, do not. Questioning whether similar statutes in two states constituted a compact, the Supreme Court has outlined what it deemed "classic indicia" of such instruments: "We have some doubt as to whether there is an agreement amounting to a compact. The two statutes are similar in that they both require reciprocity and impose a regional limitation, both legislatures favor the establishment of regional banking in New England, and there is evidence of cooperation among legislators, officials, bankers, and others in the two States in studying the idea and lobbying for the statutes. But several of the classic indicia of a compact are missing. No joint organization or body has been established to regulate regional banking or for any other purpose. Neither statute is conditioned on action by the other State, and each State is free to modify or repeal its law unilaterally. Most importantly, neither statute requires a reciprocation of the regional limitation." (*Northeast Bancorp v. Board of Governors, FRS* (1985) 472 U.S. 159, 175 [86 L. Ed. 2d 112, 105 S. Ct. 2545] (*Bancorp*).) The Ninth Circuit Court of Appeals has aptly summarized *Bancorp* as setting forth three primary indicia: "These are establishment of a [***17] joint organization for regulatory purposes; conditional consent by member states in which each state is not free to modify or repeal its participation unilaterally; and state enactments which require reciprocal action for their effectiveness." (*Seattle Master Builders v. Pacific Northwest Electric Power* (9th Cir. 1986) 786 F.2d 1359, 1363.)

[HN2] **(2)** Where, as here, federal congressional consent was neither given nor required, the Compact must be construed as state law. (*McComb v. Wambaugh* (3d Cir. 1991) 934 F.2d 474, 479.) Moreover, since interstate compacts are agreements enacted into state law,

they have dual functions as enforceable contracts between member states and as statutes with legal standing within each state; and thus we interpret them as both. (*Aveline v. Bd. of Probation and Parole* (1999) 729 A.2d 1254, 1257; see Broun et al., *The Evolving Use and the Changing Role of Interstate Compacts* (ABA 2006) § 1.2.2, pp. 15-24 (Broun on Compacts); 1A Sutherland, Statutory Construction (7th ed. 2009) § 32:5; *In re C.B.* (2010) 188 Cal.App.4th 1024, 1031 [116 Cal.Rptr.3d 294] [recognizing that Interstate Compact on Placement of Children shares characteristics of both contractual agreements and statutory law].)

**(3)** The contractual [***18] nature of a compact is demonstrated by its adoption: "There is an offer (a proposal to enact virtually verbatim statutes by each [*1382] member state), an acceptance (enactment of the statutes by the member states), and consideration (the settlement of a dispute, creation of an association, or some mechanism to address an issue of mutual interest.)" (Broun on Compacts, *supra*, § 1.2.2, p. 18.) [HN3] As is true of other contracts, the contract clause of the United States Constitution shields compacts from impairment by the states. (*Aveline v. Bd. of Probation and Parole, supra*, 729 A.2d at p. 1257, fn. 10.) Therefore, upon entering a compact, "it takes precedence over the subsequent statutes of signatory states and, as such, a state may not unilaterally nullify, revoke or amend one of its compacts if the compact does not so provide." (*Ibid.*; accord, *International Union v. Deleware River Joint Toll Bridge* (3d Cir. 2002) 311 F.3d 273, 281.) [**564] Thus interstate compacts are unique in that they empower one state legislature--namely the one that enacted the agreement--to bind all future legislatures to certain principles governing the subject matter of the compact. (Broun on Compacts, *supra*, § 1.2.2, p. 17.)

As explained [***19] and summarized in *C.T. Hellmuth v. Washington Metropolitan Area Transportation* (D.Md. 1976) 414 F.Supp. 408, 409 (*Hellmuth*): "Upon entering into an interstate compact, a state effectively surrenders a portion of its sovereignty; the compact governs the relations of the parties with respect to the subject matter of the agreement and is superior to both prior and subsequent law. Further, when enacted, a compact constitutes not only law, but a contract which may not be amended, modified, or otherwise altered without the consent of all parties. It, therefore, appears settled that one party may not enact legislation which would impose burdens upon the compact absent the concurrence of the other signatories." Cast a little differently, "[i]t is within the competency of a State, which is a party to a compact with another State, to legislate in respect of matters covered by the compact so long as such legislative action is in approbation and not in reprobation of the compact." (*Henderson v. Delaware River Joint Toll Bridge Com.* (1949) 362 Pa. 475 [66 A.2d 843, 849-850].) Nor may states amend a compact by enacting legislation that is substantially similar, unless the compact itself contains language enabling a state [***20] or states to modify it through legislation " 'concurred in' " by the other states. (*International Union v. Delaware River Joint Toll Bridge, supra*, 311 F.3d at pp. 276-280.)

C. *Taxpayers Have Standing to Pursue These Actions*

The FTB asserts that even if California breached its obligations under the Compact, the Taxpayers have no judicial remedy, are not parties to the agreement and have no enforceable rights under it.

**(4)** First, [HN4] this is an action for the refund of corporate taxes paid to the state pursuant to section 19382, and without question the Taxpayers have standing in such an action to claim "that the tax computed and assessed is void in whole or in part ... ." (*Ibid.*) [*1383]

**(5)** Furthermore, [HN5] the Compact, at section 38006, article III, subdivision 1 explicitly gives taxpayers whose income is subject to apportionment and allocation under the laws of a party state the option to elect to apportion its taxes under UDITPA, the Compact formula. This is a right specifically extended not to the party states but to taxpayers as third parties regulated under the Compact, and as such Taxpayers may seek to enforce this right as part of its tax refund suit. Moreover, the stated purposes of the Compact explicitly embrace [***21] taxpayer interests. These purposes include facilitating (1) "proper determination of State and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases" and (2) "taxpayer convenience." (§ 38006, art. I, subds. 1, 3.)

*Alabama v. North Carolina* (2010) 560 U.S. ___ [176 L. Ed. 2d 1070, 130 S.Ct. 2295], characterized as "particularly instructive" by the FTB, is not. There, the Supreme Court ruled that the agency created by the Compact could not bring claims for breach of compact by a party state *in a stand-alone action under the Supreme Court's original jurisdiction* because it had "neither a

contractual right to performance by the party States nor enforceable statutory rights under [the compact]." (*Id.* 560 U.S. at p. ___ [130 S.Ct. at p. 2315].) Our case has nothing to do with the unique features of federal original jurisdiction. (U.S. Const., art. III, § 2, cl. 2.)

**(6)** [**565] In any event, in contrast, here the codified compact extends the right to election to appropriate taxpayers. We find the decision in *Borough of Morrisville v. Delaware River Basin Com.* (E.D.Pa. 1975) 399 F.Supp. 469, 472-473, footnote 3 persuasive. There, the plaintiff municipalities who used water from the Delaware River claimed that the [***22] compact commission in question exceeded its authority and violated the compact and federal law by imposing certain water charges. Resolving the standing issue in favor of the plaintiffs, the district court further stated that "'[t]o hold that the Compact is an agreement between the political signatories imputing only to those signatories standing to challenge actions pursuant to it would be unduly narrow in view of the direct impact on plaintiffs and other taxpayers.'" (*Id.* at p. 473.) This view is reinforced by commentators: "For the most part, interstate compacts have not created any privately assertable rights ... . However, this is not invariably the case. For example, water allocation compacts, while they apportion water among states, may affect the rights of individual water users in such a way as to make them proper parties to suits. In such situations, the governing fact is that [HN6] compacts are statutory law. Consequently, the assertion of private rights created or otherwise affected by a compact is procedurally similar to the assertion of such rights conferred by other statutes of the jurisdiction dealing with similar subject matter." (Zimmerman & Wendell, *The Law and Use of* [***23] *Interstate Compacts* (The Council of State Governments 1976) Compact Law, ch. 1, pp. 14-15.) [*1384]

D. *The Compact Is a Valid, Enforceable Interstate Compact*

To reiterate, the high court in *U.S. Steel* upheld the facial validity of the Compact against various constitutional challenges. (*U.S. Steel, supra*, 434 U.S. at pp. 473-479.) Our own Attorney General has acknowledged the binding force of the Compact. (80 Ops.Cal.Atty.Gen. 213, 214 (1997): by virtue of enacting the Compact as part of the law of this state, the Compact makes California a member of the Commission and the only way to withdraw from commission membership is

by enacting repealing legislation.)

Moreover, the Compact satisfies indicia of a compact. (See *Seattle Master Builders v. Pacific Northwest Electric Power, supra*, 786 F.2d at p. 1363.) The Commission is an operational body charged with duties and powers in furtherance of the Compact's purposes. It oversees the Compact, is composed of tax administrators from all member states, and is financed through a process of allocation and apportionment. (§ 38006, art. VI.) Meeting on at least an annual basis, and with representation from each signatory state, the Commission is a vehicle for continuing [***24] cooperative action among those states.

Additionally, the Compact builds in binding reciprocal obligations that advance uniformity. First, as we have discussed, it secures an election for multistate taxpayers to opt for apportioning their business income under UDITPA, the Compact formula, or in accordance with the state's own apportionment formula. (§ 38006, art. III, subd. 1.) The election provision is not optional for party states. Because any multistate taxpayer "may elect" either approach, the party states must make the election available.(*Ibid.*) As set forth above, the Commission has explained that the mandate to make UDITPA available on an optional basis to taxpayers preserves "the substantial advantages with which lack of uniformity provides [the taxpayer] in some states." (Third Commission Report, *supra*, at p. 3.) Thus the [**566] Compact reserves to the states the right to provide taxpayers with alternative formulas, while at the same time making uniformity available when and where desired. (Third Commission Report, at p. 3.)

As well, the Compact commits each state to provide sales and use tax credits and exemptions. (§ 38006, art. V.) Again, the sales and use tax provisions are mandatory on signatory states.

**(7)** Finally, [***25] [HN7] the Compact provides for a state's orderly withdrawal, namely by enacting a statute repealing the Compact. However, any repealing legislation must be prospective in nature, because it cannot "affect any liability already incurred by or chargeable to a party State prior to the time of such withdrawal." (§ 38006, art. X, subd. 2.) Although notice to sister states is not specifically required, by requiring repealing state legislation, the [*1385] process itself calls for a measured, deliberative decision prior to withdrawal. Moreover, advance notice could easily be

accomplished through the work of the Commission.

Nevertheless, the right to withdraw is unilateral. Citing *Bancorp*, the FTB suggests that the withdrawal provision renders the Compact something less than a binding agreement. However, this type of withdrawal provision is common in other interstate compacts and has not been the death knell rendering them nonbinding and invalid. California is a party to a number of interstate compacts containing virtually identical withdrawal provisions, coupled with some type of notice requirement. (See Gov. Code, § 66801, art. X, subd. (c) [delineating withdrawal provision for Tahoe Regional Planning [***26] Compact]; Veh. Code, § 15027 [same for Driver License Compact]; Welf. & Inst. Code, § 1400, art. XI, subd. (a) [same for Interstate Compact on Juveniles]; Pen. Code, § 11180, art. XII, § A [Interstate Compact for Adult Offender Supervision]; Ed. Code, § 12510, art. VIII [Compact for Education].)

Furthermore, the situation in *Bancorp*, cited by the FTB, differs dramatically from the case at hand. There, Massachusetts and Connecticut enacted similar statutes allowing regional interstate banking acquisitions. However, unlike section 38006, these statutes were not jointly entered into as a binding agreement; they did not create an administrative body nor did they require reciprocation in key respects; and they could be changed as well as repealed at will. (*Bancorp, supra*, 472 U.S. at p. 175.)

The FTB also points to a recent Commission document that refers to the Compact as a "model law" and "not truly a compact."[9] The Commission's statements do not alter the reality that the Compact is binding on California. Indeed, the Compact operates as a model law as to those states that choose to be associate members, rather than signatory members. Pursuant to the Commission bylaws, the Commission may [***27] grant associate membership to states which have not enacted the Compact but which have, for example, enacted legislation that makes effective adoption of the Compact dependent on a subsequent condition. (Third Commission Report, *supra*, at p. 96.) Before the Legislature enacted the Compact, California was an associate member. Now it is a full Compact member, having enacted the Compact "into law and entered into [it] with all jurisdictions legally joining therein ... ." (§ 38001.) That the Compact did not "enter into force" until enacted into [**567] law by seven states also distinguishes it from a model law.

9     Multistate Tax Compact, Suggested State Legislation and Enabling Act, accessed on the Web site of the Multistate Tax Commission on July 23, 2012 <http://www.mtc.gov/uploadedFiles/Multis tate_Tax_Commission/About_MTC/MTC_Compac t/COMPACT(1).pdf>

[*1386]

**(8)** The FTB also intimates that the Compact is invalid under article 13, section 31 of our state Constitution, which states: [HN8] "The power to tax may not be surrendered or suspended by grant or contract." But of course [HN9] by entering the Compact, California has neither surrendered nor suspended its taxing powers. California retains full control of its tax base, [***28] tax rate and tax revenues; it simply has obligated itself to provide taxpayers with an option to use UDITPA or the state formula and can rescind that obligation by withdrawing from the Compact.

E. *California Cannot Unilaterally Repeal Compact Terms*

The thrust of the FTB on appeal is this: Confirming the Legislature's authority to amend, repeal or supersede existing statutes, it proceeds to urge as a matter of statutory construction that the Legislature's choice of the "[n]otwithstanding Section 38006" language in the 1993 amended section 25128 overrides section 38006, thus excising the taxpayer option to use UDITPA, the Compact apportionment formula. Indeed, it goes so far as to say that this language "constitutes a repeal of section 38006 to the extent necessary to impose a mandatory double-weighted sales apportionment formula upon taxpayers."

**(9)** Were this simply a matter of statutory construction involving two statutes--sections 25128 and 38006--we would at least entertain the FTB's argument that section 25128 repealed the section 38006 taxpayer election to apportion under the Compact formula, and now mandates the exclusive use of the double-weighted sales apportionment formula. However, [***29] this construct is not sustainable because it completely ignores the dual nature of section 38006. Once one filters in the reality that section 38006 is not just a statute but is also the codification of the Compact, and that through this enactment California has entered a binding, enforceable agreement with the other signatory states, the multiple flaws in the FTB's position become apparent. First, under

established compact law, the Compact supersedes subsequent conflicting state law. Second, the federal and state Constitutions prohibit states from passing laws that impair the obligations of contracts. And finally, the FTB's construction of the effect of the amended section 25128 runs afoul of the reenactment clause of the California Constitution.

*The Compact Supersedes Section 25128*

[HN10] **(10)** By its very nature an interstate compact shifts some of a state's authority to another state or states. Thus signatory states cede a level of sovereignty over matters covered in the Compact in favor of pursuing multilateral action to resolve a dispute or regulate an interstate affair. (*Hess v. Port Authority Trans-Hudson Corporation* (1994) 513 U.S. 30, 42 [130 L. Ed. 2d 245, [*1387] 115 S. Ct. 394]; Broun on Compacts, *supra*, § 1.2.2, p. 23.) Because [***30] the Compact is both a statute and a binding agreement among sovereign signatory states, *having entered into it, California cannot, by subsequent legislation, unilaterally alter or amend its terms*. Indeed, as an interstate compact the Compact *is superior to the prior and subsequent statutory laws of member states*. (*McComb v. Wambaugh, supra*, 934 F.2d at p. 479; *Hellmuth, supra*, 414 F.Supp. at p. 409.)

This means that the Compact trumps section 25128, such that, contrary to the FTB's assertion, section 25128 *cannot override* the UDITPA election offered to multistate taxpayers in [**568] section 38006, article III, subdivision 1. It bears repeating that the Compact *requires* states to offer this taxpayer option. If a state could unilaterally delete this baseline uniformity provision, it would render the binding nature of the compact illusory and contribute to defeating one of its key purposes, namely to "[p]romote uniformity or compatibility in significant components of tax systems." (§ 38006, art. I, subd. 2.) Because the Compact takes precedent over subsequent conflicting legislation, these outcomes cannot come to pass.

The FTB offers an alternative argument, namely that the UDITPA election can [***31] be superseded and repealed pursuant to the Compact's own withdrawal provision. Specifically, it casts the withdrawal clause as a flexible tool giving member states the "means of overriding any and all of its provisions, including the election and apportionment provisions. Member states can simply utilize the unrestricted withdrawal provision ... to repeal and withdraw from the Multistate Tax Compact, in whole or in part."

**(11)** As a matter of compact law, this cannot be. Having established that the Compact is a binding, valid compact, we construe and apply it according to its terms. (*Texas v. New Mexico* (1983) 462 U.S. 554, 564, [77 L. Ed. 2d 1, 103 S. Ct. 2558].) [HN11] In part because compacts are agreements among sovereign states, we will not read absent terms into them or dictate relief inconsistent with their express terms. (*Alabama v. North Carolina, supra*, 130 S.Ct at p. 2313.)

**(12)** With these concepts in mind, it is obvious that [HN12] the plain language of the withdrawal provision, enabling a party state to withdraw from the Compact "by enacting a statute repealing the same," allows only for complete withdrawal from the Compact. California has *not* withdrawn from the Compact. After withdrawal, a state remains liable for any obligations [***32] incurred prior to withdrawal. Faced with the desire to escape an obligation under the Compact, a state's only option is to withdraw completely by enacting a repealing statute. That is what the plain language says, and we will not read into that language an inconsistent term allowing for piecemeal amendment or elimination of compact provisions. [*1388]

The FTB refers us to *Alabama v. North Carolina*, involving the same compact withdrawal provision, to support its position that we should not restrictively interpret the withdrawal provisions of the Compact. The FTB focuses on the following passage: "The Compact imposes no limitation on North Carolina's exercise of its statutory right to withdraw. ... [Citation] There is no restriction upon a party State's enactment of such a law ... ." (*Alabama v. North Carolina, supra*, 560 U.S. at p. ___ [130 S.Ct. at p. 2313], italics omitted.) However, the FTB omits the context, which is crucial. North Carolina withdrew from the compact in question by enacting a law repealing its status as a member state, *as required by the compact*. (*Id.*, 560 U.S. at p. ___ [130 S.Ct. at p. 2304].) The plaintiffs alleged that North Carolina withdrew *in bad faith* to avoid monetary sanctions. Holding that there was no limitation [***33] on North Carolina's exercise of its withdrawal right, the Supreme Court explained that there was nothing in the compact suggesting that there were certain purposes for which the conferred withdrawal power could not be employed. (*Id.,* 560 U.S. at p. ___ [130 S.Ct. at p. 2313].) In context, it is apparent that the case does not support the principle of partial withdrawal

or piecemeal alteration or amendment. Rather, the withdrawal provision calls for withdrawal from the Compact by passing a law repealing the Compact, period.

In further support of its position that the withdrawal provision should be construed [**569] to permit partial repeal or unilateral amendment, the FTB interprets the severability clause as providing for liberal construction of Compact provisions. This standard clause says that if any provision is declared invalid, the remaining provisions will not be affected. In other words, if a court declares any provision unconstitutional or invalid, it will be severed to avoid invalidation of the entire Compact. (§ 38006, art. XII.) How this clause advances the FTB's cause is not apparent to this court. It has nothing to do with liberal construction or the validity of state action to alter or amend existing Compact [***34] provisions.

Taking a slightly different tact, the FTB points out that a number of parties to the Compact have adopted statutes over the years that deviate from the Compact's taxing provisions. According to materials furnished in the FTB's request for judicial notice and summarized in its brief, 14 of 20 member states have passed some variation of a *mandatory*, state-specific apportionment formula that departs from the Compact provisions. The states have accomplished this in a variety of ways.

**(13)** The FTB recommends that we consider the extrinsic evidence of this "course of conduct" in ascertaining whether the Compact is reasonably susceptible to an interpretation that renders its taxing provisions nonbinding and capable of being amended, superseded and repealed, in whole or part, by [*1389] member states. Both parties concur that the key is whether the Compact is reasonably susceptible to the interpretation offered. (*Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 980 [41 Cal. Rptr. 3d 48].)[10] It is not. As we have demonstrated, [HN13] the Compact's express, unambiguous terms require extending taxpayers the option of electing UDITPA, and set forth reciprocal repeal terms allowing a member state to cease its [***35] participation and reclaim its sovereignty.

> 10    The FTB adds that "[i]n interpreting a compact, 'the parties' course of performance under the Compact is highly significant,'" quoting *Alabama v. North Carolina, supra*, 560 U.S. at page ___ [130 S.Ct. at page 2309]. As a general statement this is highly misleading. The court's reference to the course of performance pertained

to "whether, in terminating its efforts to obtain a license, North Carolina failed to take what the parties considered 'appropriate' steps ... ." (*Alabama v. North Carolina, supra*, 560 U.S. at p. ___ [130 S.Ct. at p. 2309].) The compact in question obligated the defendant to take appropriate steps to ensure that an application to construct and operate the facility in question was filed and issued by the proper authority. (*Id.*, 560 U.S. at p. ___ [130 S.Ct. at p. 2303].) The issue was what constituted "appropriate steps" under the compact. Of course, in this particular context, the parties' course of performance would help flesh out that concept.

**(14)** As important, the proffered interpretation runs counter to the express purposes of the Compact, which include facilitating "equitable apportionment of tax bases" and promoting "uniformity or compatibility in significant components of tax systems." (§ 38006, [***36] art. I, subds. 1, 2.) The FTB's interpretation, that the Compact does not require states to provide multistate taxpayers with the election to use the UDITPA formula, would eviscerate the availability of a common formula for all taxpayers to use as an alternative, thereby diluting a potent uniformity provision of the Compact. Moreover, [HN14] the course of performance of a contract is only relevant to ascertaining the parties' intention *at the time of contracting*. (Civ. Code, § 1636; *Cedars-Sinai Medical Center v. Shewry, supra*, 137 Cal.App.4th at p. 983.) The express, stated purposes of the Compact are a much truer measure of that intent than the subsequent statutory changes to state apportionment formulae.

**(15)** [**570] Similarly, the purpose of admitting course of performance evidence is grounded in common sense: [HN15] "[W]hen the parties perform under a contract, without objection or dispute, they are fulfilling their understanding of the terms of the contract." (*Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 922 [74 Cal. Rptr. 3d 733].) The course of performance doctrine is thus premised on the assumption that one party's response to another party's action is probative of their understanding of the contract [***37] terms. But in the context of the Compact, the member states do not perform or deliver their obligations to one another, unlike a typical contract in which a party provides services or goods to the other party, who in turn monitors the first party's compliance with contract terms. Thus the foundation for finding course of performance

evidence relevant and reliable is faulty. For example, in *Cedars-Sinai*, the reviewing court concluded that course of conduct [*1390] performance was *not* relevant to interpret a disputed provision because the conduct in question had nothing to do with providing incentives to monitor or enforce contract compliance. (*Cedars-Sinai Medical Center v. Shewry, supra*, 137 Cal.App.4th at p. 983.)

F. *The FTB's Construction Violates the Federal and State Constitutional Prohibition Against Impairment of Contracts*

**(16)** Our federal and state Constitutions forbid enactment of state laws that impair contractual obligations. [HN16] "No state shall ... pass any ... law impairing the obligation of contracts ... ." (U.S. Const., art. I, § 10, cl. 1.) [HN17] "A ... law impairing the obligation of contracts may not be passed." (Cal. Const., art. I, § 9.) [HN18] This constitutional prohibition extends to [***38] interstate compacts. (*Green v. Biddle* (1823) 21 U.S. 1, 12-13, 17 [5 L. Ed. 547] [Kentucky law that narrowed rights and diminished interests of landowners under compact between Kentucky and Virginia violated compact and was unconstitutional]; *Doe v. Ward* (W.D.Pa. 2000) 124 F.Supp.2d 900, 915, fn. 20.) A construction of section 25128 that overrides and disables California's obligation under the Compact to afford taxpayers the option of apportioning income under the UDITPA formula would be unconstitutional, violative of the prohibition against impairing contracts.

G. *The FTB's Construction Runs Afoul of the Constitutional Reenactment Rule*

The FTB is adamant that the intent of the "[n]otwithstanding Section 38006" language in section 25128 is to repeal and supersede the taxpayer election to apportion under the Compact formula. At a minimum this outcome would eliminate or rewrite article III, subdivision 1 and eliminate article IV, subdivision 9 of section 38006. However, this result flies in the face of California Constitution, article IV, section 9, stating in part: [HN19] "A statute may not be amended by reference to its title. A section of a statute may not be amended unless the section is re-enacted [***39] as amended."

**(17)** Long ago our Supreme Court expressed the purpose of the reenactment rule as avoiding " 'the enactment of statutes in terms so blind that legislators themselves [are] sometimes deceived in regard to their effect, and the public, from the difficulty of making the necessary examination and comparison, fail[s] to become appraised [*sic*] of the changes made in the laws.' " (*Hellman v. Shoulters* (1896) 114 Cal. 136, 152 [45 P. 1057]; accord *American Lung Assn. v. Wilson* (1996) 51 Cal.App.4th 743, 748 [59 Cal. Rptr. 2d 428].) [**571] Clearly [HN20] the reenactment rule applies to acts "'which are in terms ... amendatory of some former act.' [Citation.]" (*American Lung Assn. v. Wilson, supra*, 51 Cal.App.4th at p. 749.) Its applicability does not [*1391] depend on the method of amendment, but rather "on whether legislators and the public have been reasonably notified of direct changes in the law." (*Ibid.*)

The FTB's construct would trigger the reenactment statute because it posits that the newly amended section 25128 repealed and superseded the UDITPA apportionment formula. Nonetheless, the purportedly deleted UDITPA election remains in section 38006, causing confusion such that neither the public nor legislators would have adequate notice [***40] that section 38006 had been eviscerated by the later enactment.

**III. DISPOSITION**

The judgment of dismissal is reversed. FTB to bear costs on appeal.

Ruvolo, P. J., and Sepulveda, J.,[*] concurred.

[*] Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.



**HARSHA v. CITY OF DETROIT**

**Docket No. 161**

**SUPREME COURT OF MICHIGAN**

**261 Mich. 586; 246 N.W. 849; 1933 Mich. LEXIS 812; 90 A.L.R. 853**

**January 25, 1933, Submitted (Calendar No. 37,094)**
**January 31, 1933, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff taxpayer sought review of an order of the trial court (Michigan), which entered a decree for defendant city. The taxpayer's equitable action sought a declaratory judgment that certain tax increases enacted after she purchased a bond issued by the city subject to Mich. 1 Comp. Laws § 2228 et seq. (1929) were void as against her because they impaired the contract evidenced by her bond, in violation of the state and federal constitutions.

**OVERVIEW:** The taxpayer contended that statutes that increased the city's power to borrow money and changed the limit of taxation and the amount of bonded indebtedness allowed, which were enacted after she purchased her bond, were void because the laws that existed at the time she made her contract were incorporated into the contract's terms. She sought a decree holding the later legislation void and sought an injunction against the issue of refunding bonds under one of the statutes. On appeal, the court affirmed because the later legislation was an exercise of power authorized by the state constitution and did not impair the taxpayer's contract because her contract was at all times subject to the right of the state, through the legislature, to exercise its constitutional powers and functions. A taxation statute was not subject to repeal or amendment only if the intent not to repeal or amend was so directly and unmistakably expressed as to leave no reason for doubt. The taxpayer's contract, evidenced by the bond, was not impaired by the

legislature when it passed later taxation laws because it was subject to the fundamental power of the state to amend its laws.

**OUTCOME:** The court affirmed the trial court's judgment that entered a decree for the city in the taxpayer's action for a declaration that amendments to tax laws applicable to the city enacted after she purchased the city's bond were void as against her and to enjoin the city from issuing refunding bonds under one of the statutes.

**CORE TERMS:** municipal, rate of taxation, Pub Acts, CONSTITUTIONAL LAW, amend, charter, repeal, bonded indebtedness, indebtedness, municipal purposes, taxation, general law, impaired, impair, legislative power, vested right, borrowing money, constitutional provision, constitutional power, municipality, holder, coupons, power to borrow money, power of taxation, legislative department, obligation of contracts, contracting, bondholder, pursuance, impairing

**LexisNexis(R) Headnotes**

*Governments > Legislation > Enactment*
[HN1] The legislative power is the authority to make, alter, amend, and repeal laws. In Michigan, it is co-extensive with that of the parliament of England, save as limited and restrained by the state and federal Constitutions. One legislature cannot limit or restrict the

Page 2

261 Mich. 586, *; 246 N.W. 849, **;
1933 Mich. LEXIS 812, ***; 90 A.L.R. 853

power of its successor.

*Governments > Legislation > Types of Statutes*
*Governments > Local Governments > Charters*
*Governments > Local Governments > Finance*
[HN2] The Constitution of Michigan provides that the legislature shall provide by a general law for the incorporation of cities, and by a general law for the incorporation of villages; such general laws shall limit their rate of taxation for municipal purposes, and restrict their powers of borrowing money and contracting debts. Mich. Const. art. 8, § 20. Under such general laws, the electors of each city and village shall have power and authority to frame, adopt and amend its charter and to amend an existing charter of the city or village heretofore granted or passed by the legislature for the government of the city or village and, through its regularly constituted authority, to pass all laws and ordinances relating to its municipal concerns, subject to the Constitution and general laws of this State. Mich. Const. art. 8, § 21.

*Administrative Law > Separation of Powers > Constitutional Controls > General Overview*
*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
*Governments > State & Territorial Governments > Relations With Governments*
[HN3] Municipal corporations are state agencies, and, subject to constitutional restrictions, the legislature may modify the corporate charters of municipal corporations at will. Powers are granted to them as state agencies to carry on local government. The state still has authority to amend their charters and enlarge or diminish their powers. They derive all their powers from the source of their creation, and those powers are at all times subject to the control of the legislature. Such powers, also, in the absence of any constitutional regulation forbidding it, may be enlarged or diminished, extended or curtailed, or withdrawn altogether, as the legislature may determine.

*Governments > State & Territorial Governments > Finance*
*Tax Law > State & Local Taxes > General Overview*
[HN4] The power to impose taxes is vested exclusively in the legislative department of government, and cannot be exercised except in pursuance of its authority. The levying of taxes is solely the function of the legislature. Subject to constitutional restrictions, it must be taken as

generally true that the power to tax is limited in extent, in purpose, and in methods only by the will of the state as expressed in its laws.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
*Governments > Local Governments > Finance*
*Governments > State & Territorial Governments > Finance*
[HN5] Fixing the limit of municipal indebtedness is delegated by the Constitution of the state to the legislature, which has full power and authority to increase it by general law. The legislature may regulate the amount of municipal indebtedness and the rate of taxation of cities. It is expressly authorized by Mich. Const. art. 8, § 20 so to do. Its powers are plenary. It may increase or decrease the limit of bonded indebtedness and the rate of taxation for municipal purposes, subject to the prohibition in the Constitution of the state and of the United States that such legislation shall not operate directly upon contracts so as to impair their obligation by abrogating or lessening the means of their enforcement.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
[HN6] Where the right to alter, amend, or repeal a statute existed, it must be held to be a part of a contract based thereon, and the subsequent exercise of that right would be in accordance with the contract and could not impair its obligation.

*Governments > State & Territorial Governments > Finance*
[HN7] The Michigan Constitution provides that the power of taxation shall never be surrendered or suspended by any grant or contract to which the state or any municipal corporation shall be a party. Mich. Const. art. 10, § 9.

*Governments > Local Governments > Finance*
*Governments > State & Territorial Governments > Relations With Governments*
[HN8] Under Mich. Const. art. 8, §§ 20, 21, authorizing the legislature to provide by a general law for the incorporation of cities and to restrict their powers of borrowing, the question of the bonding limits of cities is a legislative one over which they have no control except as

Page 3

261 Mich. 586, *; 246 N.W. 849, **;
1933 Mich. LEXIS 812, ***; 90 A.L.R. 853

provided in the enabling act.

*Governments > Legislation > Expirations, Repeals & Suspensions*
[HN9] Before a statute, particularly one relating to taxation, should be held to be irrepealable or not subject to amendment, an intent not to repeal or amend must be so directly and unmistakably expressed as to leave no reason for doubt. Otherwise the intent is not plainly expressed.

## HEADNOTES

[***1] 1. CONSTITUTIONAL LAW -- POWER OF LEGISLATURE TO MAKE AND CHANGE LAW.

Legislative power is authority to make, alter, amend, and repeal laws.

2. CONSTITUTIONAL LAW -- POWER LIMITED ONLY BY STATE AND FEDERAL CONSTITUTIONS.

In this State, legislative power is co-extensive with that of parliament of England, save as limited and restrained by State and Federal Constitutions.

3. CONSTITUTIONAL LAW -- LEGISLATURE MAY NOT LIMIT ITS SUCCESSOR.

One legislature may not limit or restrict power of its successor.

4. CORPORATIONS -- POWER TO AMEND OR REPEAL CHARTERS OF PRIVATE CORPORATIONS.

Rule that corporate charters in which no power of amendment or repeal is retained, when accepted, constitute contracts between State and corporation, applies to private corporations only.

5. MUNICIPAL CORPORATIONS -- STATE AGENCIES -- LEGISLATURE MAY MODIFY CHARTERS.

Municipal corporations are State agencies, and, subject to constitutional restrictions, legislature may modify corporate charters of municipal corporations at will.

6. MUNICIPAL CORPORATIONS -- CONSTITUTIONAL LAW.

Powers are granted to municipal corporations as State agencies to carry on local government, and State has authority [***2] to amend their charters and enlarge or diminish their powers.

7. CONSTITUTIONAL LAW -- POWER TO IMPOSE TAXES VESTED EXCLUSIVELY IN LEGISLATIVE DEPARTMENT.

Power to impose taxes is vested exclusively in legislative department of government, and may not be exercised except in pursuance of its authority.

8. MUNICIPAL CORPORATIONS -- LEGISLATURE HAS POWER TO INCREASE MUNICIPAL INDEBTEDNESS.

Fixing limit of municipal indebtedness is within constitutional power of legislature, which has full power and authority to increase it by general law.

9. CONSTITUTIONAL LAW -- LEGISLATURE AUTHORIZED TO REGULATE MUNICIPAL INDEBTEDNESS.

Legislature is expressly authorized by Constitution (art. 8, § 20) to regulate amount of municipal indebtedness and rate of taxation of cities.

10. CONSTITUTIONAL LAW -- IMPAIRMENT OF CONTRACTS.

Legislature may increase or decrease limit of bonded indebtedness and rate of taxation for municipal purposes, subject to prohibition of State and Federal Constitutions that such legislation shall not operate so as to impair obligation of contracts by abrogating or lessening means of their enforcement.

11. CONSTITUTIONAL LAW -- CONTRACT OF BONDHOLDER SUBJECT [***3] TO LEGISLATIVE POWER TO INCREASE CITY'S POWER TO BORROW.

Since legislature has power, under Constitution, to increase limit of city's power to borrow money and rate of taxation, contract of holder of city's bond is subject to said power, and therefore its exercise would be in accordance with said contract and not in impairment of

Page 4

261 Mich. 586, *; 246 N.W. 849, **;
1933 Mich. LEXIS 812, ***3; 90 A.L.R. 853

its obligation.

12. CONSTITUTIONAL LAW -- STATUTES -- POWER TO AMEND OR REPEAL.

Before statute, particularly one relating to taxation, should be held to be irrepealable or not subject to amendment, intent not to repeal or amend must be so directly and unmistakably expressed as to leave no reason for doubt.

13. CONSTITUTIONAL LAW -- IMPAIRMENT OF CONTRACTS -- STATUTES.

Constitutional provision prohibiting passage of laws impairing obligation of contracts may not be construed to prohibit exercise by legislature of its constitutional powers.

14. CONSTITUTIONAL LAW -- NO VESTED RIGHT PRECLUDING CHANGE OF EXISTING LAW.

There can, in nature of things, be no vested right in existing law which precludes its change or repeal, nor vested right in omission to legislate upon particular subject which exempts contract from effect of subsequent legislation [***4] upon its subject-matter by competent legislative authority.

15. CONSTITUTIONAL LAW -- IMPAIRMENT OF CONTRACT -- INCREASING POWER OF CITY TO BOND -- STATUTES.

Obligation of contract of holder of bond issued by City of Detroit subject to limitations imposed by Act No. 279, Pub. Acts 1909, *held,* not impaired by enactment of Act No. 126, Pub. Acts 1929, and Act No. 1, Pub. Acts 1932 (2d Ex. Sess.), increasing power of city to bond, in absence of agreement by city that no further bonds would be issued, or that limit of bonded indebtedness would not be raised (U.S. Const., art. 1, § 10; Const. of Mich., art. 2, § 9).

16. CONSTITUTIONAL LAW -- SURRENDERING POWER OF TAXATION -- PURPOSE OF CONSTITUTIONAL PROVISION.

Purpose of constitutional provision prohibiting surrender of power of taxation by grant or contract is to prevent municipalities from granting special rate of taxation to private corporations or exempting from taxation their property for limited time on condition of their locating in particular municipality (Const., art. 10, § 9).

17. CONSTITUTIONAL LAW -- TENDER OF BONDS AND COUPONS IN PAYMENT OF TAXES -- STATUTES.

Provision in Act No. 1, Pub. Acts 1932 (2d Ex. [***5] Sess.), providing that bonds issued by city in pursuance thereto, and attached coupons, due or to become due, may be tendered in payment of general taxes or special assessments of said city, delinquent or due and payable, in lieu of money, *held,* not violative of constitutional provision prohibiting surrender of power of taxation by grant or contract (Const., art. 10, § 9).

**SYLLABUS**

Appeal from Wayne; Miller (Guy A.), J. Submitted January 25, 1933. (Docket No. 161, Calendar No. 37,094.) Decided January 31, 1933.

Bill by Daisy E. Harsha against City of Detroit and others for declaration of rights secured by a bond of the City of Detroit. Bill dismissed. Plaintiff appeals. Affirmed.

**COUNSEL:** *John R. Rood,* for plaintiff.

*Clarence E. Wilcox,* Corporation Counsel, and *Paul T. Dwyer,* Assistant Corporation Counsel, for defendants.

*Hal H. Smith, Archibald Broomfield,* and *Beaumont, Smith & Harris, amici curiae.*

**OPINION BY:** POTTER

**OPINION**

[*588] [**850] POTTER, J. Plaintiff, a citizen, resident, and taxpayer of the city of Detroit, a municipal corporation, by bill in equity for a declaratory decree and [*589] injunction, claims she is the holder of a bond of [***6] defendant city issued subject to the provisions of Act No. 279, Pub. Acts 1909 (see 1 Comp. Laws 1929, § 2228 *et seq.*), which limited the rate of taxation on the assessed value of the real and personal property in defendant city to 2 per cent. per annum, and limited the power of defendant city to borrow money on the credit of the city to 8 per cent. of the assessed valuation of the real and personal property in the city; that by Act No. 203,

Page 5

261 Mich. 586, *589; 246 N.W. 849, **850;
1933 Mich. LEXIS 812, ***6; 90 A.L.R. 853

Pub. Acts 1911, the limit of the rate of taxation and of bonded indebtedness was continued, but by Act No. 126, Pub. Acts 1929, though the rate of taxation was continued as before, the limit of the defendant city's power to borrow money was raised to 10 per cent. of the assessed valuation of the real and personal property in the city; that the limit of taxation and of bonded indebtedness was not changed by Act No. 1, Pub. Acts 1932 (2d Ex. Sess.), and that Act No. 126, Pub. Acts 1929, and Act No. 1, Pub. Acts 1932 (2d Ex. Sess.), are void as against plaintiff, because they impair the obligation of her contract, evidenced by her bond, in violation of the provisions of the Constitution of this State and of the United States prohibiting the passage [***7] of laws impairing the obligation of contracts.

She contends:

"Laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms. This principle embraces alike those laws which affect its construction and those which affect its enforcement or discharge." *Farmers & Merchants Bank* v. *Federal Reserve Bank,* 262 U.S. 649, 660 (43 Sup. Ct. 651, 30 A.L.R. 635).

[*590] She seeks decree holding such later legislation void, and injunction against the issuance of refunding bonds under Act No. 1, Pub. Acts 1932 (2d Ex. Sess.), and other relief. Defendants admit the facts, but deny the legislation complained of impairs the obligation of plaintiff's contract. There was decree for defendants. Plaintiff appeals.

[HN1] The legislative power is the authority to make, alter, amend, and repeal laws. 1 Cooley, Constitutional Limitations (8th Ed.), p. 183. In this State, it is co-extensive with that of the parliament of England, save as limited and restrained by the State and Federal Constitutions. 1 Cooley, Constitutional Limitations [***8] (8th Ed.), p. 177; 12 C.J. p. 749. One legislature cannot limit or restrict the power of its successor. 12 C.J. p. 806. [HN2] The Constitution of this State provides:

"The legislature shall provide by a general law for the incorporation of cities, and by a general law for the incorporation of villages; such general laws shall limit their rate of taxation for municipal purposes, and restrict their powers of borrowing money and contracting debts."

Article 8, § 20, Constitution 1908.

"Under such general laws, the electors of each city and village shall have power and authority to frame, adopt and amend its charter and to amend an existing charter of the city or village heretofore granted or passed by the legislature for the government of the city or village and, through its regularly constituted authority, to pass all laws and ordinances relating to its municipal concerns, subject to the Constitution and general laws of this State." Article 8, § 21, Constitution 1908.

Corporate charters in which no power of amendment or repeal is retained, when accepted, constitute contracts between the State and the corporation. [*591] *Dartmouth College* v. *Woodward,* 4 Wheat. (17 U.S.) [***9] 518. This rule applies to private corporations only. [HN3] Municipal corporations are State agencies, and, subject to constitutional restrictions, the legislature may modify the corporate charters of municipal corporations at will. 12 C.J. p. 1031. Powers are granted to them as State agencies to carry on local government. The State still has authority to amend their charters and enlarge or diminish their powers. 1 Cooley, Constitutional Limitations (8th Ed.), p. 393.

"They derive all their powers from the source of their creation, and those powers are at all times subject to the control of the legislature. Such powers, also, in the absence of any constitutional regulation forbidding it, may be enlarged or diminished, extended or curtailed, or withdrawn altogether, as the legislature may determine." *Rogers* v. *Burlington,* 3 Wall. (70 U.S.) 654.

[HN4] The power to impose taxes is vested exclusively in the legislative department of government, and cannot be exercised except in pursuance of its authority. The levying of taxes is solely the function of the legislature. 37 Cyc. p. 724. Subject to constitutional restrictions, "it must be taken as generally true that the power to tax [***10] is limited in extent, in purpose, and in methods only by the will of the State as expressed in its laws." 1 Cooley on Taxation (3d Ed.), p. 178; 2 Smith, Modern Law of Municipal Corporations, § 1477.

[HN5] Fixing the limit of municipal indebtedness is delegated by the Constitution of this State to the legislature, which has full power and authority to increase it by general law. 44 C.J. p. 1117; 6 McQuillin, Municipal Corporations (2d Ed.), p. 12, § 2366; *Wharton* v. *City of Greensboro,* 149 N.C. 62 (62 [*592] S.E.

Page 6

261 Mich. 586, *592; 246 N.W. 849, **850;
1933 Mich. LEXIS 812, ***10; 90 A.L.R. 853

740). The legislature [**851] may regulate the amount of municipal indebtedness and the rate of taxation of cities. It is expressly authorized by article 8, § 20, of the Constitution so to do. Its powers are plenary. It may increase or decrease the limit of bonded indebtedness and the rate of taxation for municipal purposes, subject to the prohibition in the Constitution of this State and of the United States that such legislation shall not operate directly upon contracts so as to impair their obligation by abrogating or lessening the means of their enforcement. *Wolff* v. *New Orleans,* 103 U.S. 358. There is no constitutional provision against changing [***11] the limit of bonded indebtedness or limiting the rate of taxation for municipal purposes which in cities under the home rule act obtained when plaintiff acquired her bond. She had no contract with the State or with defendant city that the limit of bonded indebtedness or the rate of taxation for municipal purposes might not be changed. She was bound to know the legislative power of the State over the limit of bonded indebtedness and the rate of taxation for municipal purposes of defendant city contained in the Constitution, and that the legislature possessed full power and authority by legislative action to increase the limit of the defendant city's power to borrow money and the rate of taxation for municipal purposes. Her contract was at all times subject to the right of the State, through its legislative department, to exercise its constitutional powers and functions.

As early as *Dartmouth College* v. *Woodward, supra,* 696, Justice Story pointed out that [HN6] where the right to alter, amend, or repeal a statute existed, it must be held to be a part of a contract based thereon, and the subsequent exercise of that right would *** mi143b75 p006 0916 [*593] be in accordance [***12] with the contract and could not impair its obligation. This principle has been repeatedly recognized. *Greenwood* v. *Freight Co.,* 105 U.S. 13; *Hamilton Gas Light & Coke Co.* v. *Hamilton City,* 146 U.S. 258 (13 Sup. Ct. 90).

[HN7] The Constitution of this State provides:

"The power of taxation shall never be surrendered or suspended by any grant or contract to which the State or any municipal corporation shall be a party." Article 10, § 9, Constitution 1908.

In its explanation of the proposed changes in the Michigan Constitution and the reasons therefor, the Constitutional Convention of 1908 said:

"This is a new section and forever prohibits the surrender or suspension of the taxing power of the State or any municipality therein." (2 Debates, Constitutional Convention, p. 1435.)

In *City Commission of Jackson* v. *Vedder,* 209 Mich. 291, it was held (quoting syllabus):

[HN8] "Under the Constitution (article 8, §§ 20, 21) authorizing the legislature to provide by a general law for the incorporation of cities and to restrict their powers of borrowing, the question of the bonding limits of cities is a legislative one over which they have no control except as provided [***13] in the enabling act."

Plaintiff's contract is not impaired unless by the State exercising its legislative power to amend the home rule act by increasing the limit of the restrictions upon cities for borrowing money. The argument in her behalf amounts to saying plaintiff's contract is impaired by the lawful exercise of the legislative power of the State. *Missouri Pacific R. Co.* v. *Kansas,* 216 U.S. 262 (30 Sup. Ct. 330). "The claim of an irrepealable contract cannot be [*594] predicated upon a contract which is repealable." *Hammond Packing Co.* v. *Arkansas,* 212 U.S. 322 (29 Sup. Ct. 370, 15 Ann. Cas. 645); *Coombes* v. *Getz,* 285 U.S. 434 (52 Sup. Ct. 435), per Cardozo, J. [HN9] Before a statute, particularly one relating to taxation, should be held to be irrepealable or not subject to amendment, an intent not to repeal or amend must be so directly and unmistakably expressed as to leave no reason for doubt. Otherwise the intent is not plainly expressed. *Citizens' Savings Bank* v. *Owensboro,* 173 U.S. 636 (19 Sup. Ct. 530, 571).

The power vested by the Constitution of this State in the legislature to limit the rate of taxation of cities for municipal [***14] purposes and restrict their powers of borrowing money and contracting debts is complete in itself and unrestricted. Plaintiff took the bond of defendant city subject to the possibility the legislature might, at some future time when the public interest demanded it, by appropriate legislation, raise the limit of taxation upon the property in the city subject to assessment, and raise the limit upon the bonded indebtedness which might be contracted by defendant city. The constitutional provisions which prohibit the passage of laws impairing the obligation of contracts cannot be construed to prohibit the exercise by the legislature of its constitutional powers. There can, in the nature of things, be no vested right in an existing law

Page 7

261 Mich. 586, *594; 246 N.W. 849, **851;
1933 Mich. LEXIS 812, ***14; 90 A.L.R. 853

which precludes its change or repeal, nor vested right in the omission to legislate upon a particular subject which exempts a contract from the effect of subsequent legislation upon its subject-matter by competent legislative authority. *Fitzgerald* v. *Railroad Co.,* 63 Vt. 169, 173 (22 Atl. 76, 13 L.R.A. 70); *Louisville & Nashville R. Co.* v. *Mottley,* 219 U.S. 467 (31 Sup. Ct. 265).

[*595] Plaintiff had no contract with defendant city [***15] that no further city bonds would be issued nor that no further indebtedness would be contracted. None that the limit of bonded indebtedness and the rate of taxation of property therein might not be raised. This case is to be distinguished from *Von Hoffman* [**852] v. *City of Quincy,* 4 Wall. (71 U.S.) 535; *Antoni* v. *Greenhow,* 107 U.S. 769 (2 Sup. Ct. 91); *Wolff* v. *New Orleans, supra; Louisiana* v. *Pilsbury,* 105 U.S. 278; *Hendrickson* v. *Apperson,* 245 U.S. 105 (38 Sup. Ct. 44), the principles of which were recognized in *Hammond* v. *Place,* 116 Mich. 628 (72 Am. St. Rep. 543), which involved legislation which, in some measure, impaired the ability of a bondholder to obtain payment of his bond; and, from cases like *Smith* v. *Appleton,* 19 Wis. 468, where bonds were issued to refund city indebtedness, under a statute providing no other bonds should be issued until the bonds in question were paid, and a later statute authorizing a subsequent issuance of bonds for railroad purposes was held to impair the obligation of the contract of the holders of the first bonds.

Instead of plaintiff having a contract providing the limit of the rate of [***16] taxation of defendant city for municipal purposes could not be raised, and which restricted defendant city's power of borrowing money and contracting debts, the Constitution, the fundamental law of this State, provides such rate of taxation and such restriction on defendant city's power of borrowing money and contracting debts might be raised by the legislature. Plaintiff contracted with reference to this fundamental law, is bound thereby, and the obligation of her contract, evidenced by her bond, was not impaired by the legislature of the State exercising its constitutional [*596] power in passing Act No. 126, Pub. Acts 1929, and Act No. 1, Pub. Acts 1932 (2d Ex. Sess.).

Plaintiff contends that Act No. 1, Pub. Acts 1932 (2d Ex. Sess.), is invalid because it provides as to bonds issued in pursuance of its provisions that the bonds and coupons attached thereto, due or to become due, may be tendered in payment of general taxes or special assessments of the city, delinquent or due and payable, in lieu of money. There is no provision in the Constitution of this State in relation to this subject which it is claimed has any effect upon this provision in the statute, save that quoted [***17] above, which provides the power of taxation shall never be surrendered or suspended by any grant or contract to which the State or any municipal corporation shall be a party. This provision found its way into the Constitution because in the early history of the State some corporations had been granted special rates of taxation, and these charter provisions were held to be contracts which could not be impaired by subsequent action upon the part of the State; and municipalities, for the purpose of having industrial corporations located therein, were prone to attempt to exempt their property from taxation for a limited time on condition of their locating in the particular municipality. It has no application to a case like that here involved, where it is sought to provide the evidence of the indebtedness of the city to the bondholder may be received and canceled in payment of the obligation of the bondholder as a taxpayer to the city. It amounts to a set-off of indebtedness by the respective parties. In *McGahey* v. *Virginia,* 135 U.S. 662 (10 Sup. Ct. 972), a similar question was before the supreme court of the United States, and it was said:

[*597] "The holders of the [***18] coupons of said bonds, whether still attached thereto or separated therefrom, are entitled, by a solemn engagement of the State, to use them in payment of State taxes and public dues. This was determined in *Hartman* v. *Greenhow,* 102 U.S. 672, decided in January, 1881; in *Antoni* v. *Greenhow,* 107 U.S. 769 (2 Sup. Ct. 91), decided in March, 1883; in the *Virginia Coupon Cases,* 114 U.S. 269 (5 Sup. Ct. 903), decided in April, 1885; and in all the cases on the subject that have come before this court for adjudication. This question, therefore, may be considered as foreclosed and no longer open for consideration. It may be laid down as undoubted law that the lawful owner of any such coupons has the right to tender the same after maturity in absolute payment of all taxes, debts, dues and demands due from him to the State."

This principle is recognized in 3 Cooley on Taxation (4th Ed.), § 1252, and by many other cases.

We hold there is nothing in these provisions of Act No. 1, Pub. Acts 1932 (2d Ex. Sess.), which will render

such bonds invalid, either as impairing the obligation of plaintiff's contract, or in any other manner that has been suggested to this court. [***19] No other questions are raised on this appeal.

Decree affirmed, but without costs.

McDONALD, C.J., and CLARK, SHARPE, NORTH, FEAD, WIEST, and BUTZEL, JJ., concurred.



**INTERNATIONAL BUSINESS MACHINES CORPORATION, Plaintiff-Appellant,
v DEPARTMENT OF TREASURY, Defendant-Appellee.**

**No. 146440**

**SUPREME COURT OF MICHIGAN**

**496 Mich. 642; 852 N.W.2d 865; 2014 Mich. LEXIS 1282**

**January 15, 2014, Argued
July 14, 2014, Decided
July 14, 2014, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, Rehearing denied by, Stay denied by IBM v. Dep't of Treasury, 855 N.W.2d 512; 2014 Mich. LEXIS 2132 (Mich., Nov. 14, 2014)

**PRIOR HISTORY:** [***1]

International Business Machines Corporation (IBM) brought an action in the Court of Claims against the Department of Treasury, challenging the department's ruling that IBM was not entitled to apportion its business income tax base and modified gross receipts tax base using the three-factor apportionment formula provided in the Multistate Tax Compact, MCL 205.581 et seq., and was instead required to apportion its income using the sales-factor formula in the Business Tax Act, MCL 208.1101 et seq., when calculating its state taxes for 2008. Under this ruling, IBM was entitled to a refund of only $1,253,609 for the 2008 tax year rather than the $5,955,218 it had sought. IBM moved for summary disposition under MCR 2.116(C)(10), and the department moved for summary disposition under MCR 2.116(I)(2). After a hearing, the Court of Claims, Joyce A. Draganchuk, J., denied IBM's motion and granted summary disposition in favor of the department, ruling that the BTA mandated the use of the sales-factor apportionment formula. The Court of Appeals, Ronayne Krause, P.J., and Borrello, J. (Riordan, J., concurring), affirmed the Court of Claims order in an unpublished opinion per curiam issued November [***2] 20, 2012

(Docket No. 306618). It held that because there was a facial conflict between the BTA's mandatory sales-factor apportionment formula and the Compact's elective three-factor apportionment formula, the Legislature had repealed the Compact's election provision by implication when it enacted the BTA. The Supreme Court granted IBM's application for leave to appeal. 494 Mich. 874, 832 N.W.2d 388 (2013). In a lead opinion by Justice Viviano, joined by Justices Cavanagh and Markman, and a concurring opinion by Justice Zahra, the Supreme Court held: The modified gross receipts tax is an income tax for purposes of the Multistate Tax Compact. IBM was entitled to use the Compact's elective three-factor apportionment formula to calculate its 2008 Michigan taxes. Court of Appeals judgment reversed; Court of Claims order granting summary disposition in favor of the Department reversed; case remanded to the Court of Claims for entry of an order granting summary disposition in favor of IBM. Justice Viviano, joined by Justices Cavanagh and Markman, held that the modified gross receipts tax fit within the Compact's broad definition of "income tax" by taxing a variation of net income, specifically, the entire [***3] amount received by the taxpayer as determined from any gainful activity minus inventory and certain other deductions that are expenses not specifically and directly related to a particular transaction. He further concluded that the Court of Appeals erred by holding that the BTA had repealed the Compact's election provision by implication because

Page 2

496 Mich. 642, *; 852 N.W.2d 865, **;
2014 Mich. LEXIS 1282, ***3

the statutes could be reconciled when read in pari materia. Justice Zahra, concurring, agreed that IBM was entitled to use the Compact's elective apportionment formula for its 2008 Michigan taxes, and also that the tax bases at issue were "income taxes" within the meaning of the Compact. He would not have reached the question whether the Legislature repealed the Compact's election provision by implication when it enacted the BTA because the Legislature made clear that taxpayers were entitled to use the Compact's election provision for the 2008, 2009, and 2010 tax years. Justice McCormack, joined by Chief Justice Young and Justice Kelly, dissenting, would have affirmed the Court of Appeals judgment, concluding that allowing taxpayers to apportion their multistate income in accordance with the Compact's formula violated the Legislature's unambiguous [***4] directive that taxes established under the BTA must be in accordance with the BTA's sales-only apportionment formula. She further concluded that there was no constitutional barrier that prevented the Legislature from making the Compact's alternative election provision unavailable to taxpayers.

IBM v. Dep't of Treasury, 2012 Mich. App. LEXIS 2293 (Mich. Ct. App., Nov. 20, 2012)

**CASE SUMMARY:**

**OVERVIEW:** HOLDINGS: [1]-A corporation was entitled to use the Multistate Tax Compact's three-factor apportionment formula for its 2008 Michigan taxes; [2]-The express repeal of the Compact's election provision effective January 1, 2011, was evidence that the legislature had not impliedly repealed the provision when it enacted the Michigan Business Tax Act (BTA); [3]-The Compact's election provision remained in effect for the 2008 tax year; [4]-The corporation could use the Compact's apportionment formula for that portion of its tax base subject to the modified gross receipts tax for the 2008 tax year; [5]-The court of appeals erred by holding that the BTA repealed the Compact's election provision by implication.

**OUTCOME:** The Supreme Court reversed the court of appeals judgment in favor of the Department of Treasury, reversed the court of claims order granting summary disposition in favor of the Department, and remanded to the court of claims for entry of an order granting summary disposition in favor of the corporation.

**CORE TERMS:** compact, election, apportionment formula, repeal, apportion, tax base, income tax, apportionment, repealed, multistate, lead opinion's, mandatory, tax acts, tax year, taxation, elect, formula, gross receipts tax, gross receipts, apportioned, allocate, gross income, modified, implied repeal, contractual, enacting, state law, impliedly, business income, pari materia

**LexisNexis(R) Headnotes**

*Civil Procedure > Appeals > Standards of Review > De Novo Review*
*Civil Procedure > Summary Judgment > Appellate Review > Standards of Review*
[HN1] An appellate court reviews de novo a court of claims decision on a motion for summary disposition.

*Civil Procedure > Appeals > Standards of Review > De Novo Review*
*Governments > Legislation > Interpretation*
[HN2] An appellate court reviews de novo issues of statutory interpretation.

*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > General Overview*
*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview*
[HN3] Throughout the evolution of Michigan's method of business taxation, the Multistate Tax Compact has remained in effect. Another constant throughout this history is that the legislature has always required a multistate taxpayer with business income or activity both within and without the state to apportion its tax base. This process, known as formulary apportionment, has allowed Michigan to tax the portion of a taxpayer's multistate business carried on in Michigan without violating the Due Process Clause of the United States Constitution.

*Governments > Legislation > Interpretation*
*Governments > Legislation > Expirations, Repeals & Suspensions*
[HN4] Repeals by implication are disfavored. A court will presume, in most circumstances, that if the legislature had intended to repeal a statute or statutory

Page 3

496 Mich. 642, *; 852 N.W.2d 865, **;
2014 Mich. LEXIS 1282, ***4

provision, it would have done so explicitly. Nevertheless, when the intention of the legislature is clear, repeal by implication may be accomplished by the enactment of a subsequent act inconsistent with a former act or by the occupancy of the entire field by a subsequent enactment. However, where the intent of the legislature is claimed to be unclear, it is the court's duty to proceed on the assumption that the legislature desired both statutes to continue in effect unless it manifestly appears that such view is not reasonably plausible. Repeals by implication will be allowed only when the inconsistency and repugnancy are plain and unavoidable. The court will construe statutes, claimed to be in conflict, harmoniously to find any other reasonable construction than a repeal by implication. Only when the court determines that two statutes are so incompatible that both cannot stand will it find a repeal by implication.

*Governments > Legislation > Interpretation*
[HN5] In attempting to find a harmonious construction of the statutes, a court will regard all statutes upon the same general subject-matter as part of one system. Further, statutes in pari materia, although in apparent conflict, should, so far as reasonably possible, be construed in harmony with each other, so as to give force and effect to each.

*Governments > Legislation > Interpretation*
[HN6] In the construction of a particular statute, or in the interpretation of its provisions, all statutes relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law, although they were enacted at different times, and contain no reference to one another. The endeavor should be made, by tracing the history of legislation on the subject, to ascertain the uniform and consistent purpose of the legislature, or to discover how the policy of the legislature with reference to the subject-matter has been changed or modified from time to time. In other words, in determining the meaning of a particular statute, resort may be had to the established policy of the legislature as disclosed by a general course of legislation. With this purpose in view therefore it is proper to consider, not only acts passed at the same session of the legislature, but also acts passed at prior and subsequent sessions.

*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General*

*Overview*
[HN7] See MCL 205.581, art III(1).

*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview*
[HN8] MCL 205.581, art III(1) of the Multistate Tax Compact allows a taxpayer subject to an income tax to elect to use a party state's apportionment formula or the Compact's three-factor apportionment formula.

*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview*
[HN9] See MCL 205.581, art IV(9).

*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview*
*Governments > Legislation > Interpretation*
[HN10] The language of the Michigan Business Tax Act (BTA) is mandatory in nature. Under the statute, a taxpayer's BTA tax base must be apportioned through the BTA's sales-factor apportionment formula.

*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview*
[HN11] Under MCL 205.581, art III(1) of the Multistate Tax Compact, the legislature provided a multistate taxpayer with a choice between the apportionment method contained in the Compact or the apportionment method required by Michigan's tax laws. If a taxpayer elects to apportion its income through the Compact, MCL 205.581, art IV(9) mandates that the taxpayer do so using a three-factor apportionment formula. Alternatively, if the taxpayer does not make the Compact election, then the taxpayer must use the apportionment formula set forth in Michigan's governing tax laws.

*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview*
*Governments > Legislation > Interpretation*
*Governments > Legislation > Expirations, Repeals & Suspensions*
[HN12] By only repealing the Multistate Tax Compact's

Page 4

496 Mich. 642, *; 852 N.W.2d 865, **;
2014 Mich. LEXIS 1282, ***4

election provision starting January 1, 2011, the legislature created a window in which it did not expressly preclude use of the Compact's election provision for BTA taxpayers. Further, the express repeal of the Compact's election provision effective January 1, 2011, is evidence that the legislature had not impliedly repealed the provision when it enacted the BTA. Therefore, a review of the 2011 amendments supports the conclusion that the Compact's election provision remained in effect for the 2008 tax year.

*Governments > Legislation > Interpretation*
*Governments > Legislation > Expirations, Repeals & Suspensions*
[HN13] Because there is a presumption against implied repeals, it is the court's task to determine if there is any other reasonable construction that would harmonize conflicting statutes and avoid a repeal by implication.

*Governments > Legislation > Expirations, Repeals & Suspensions*
*Governments > Legislation > Interpretation*
*Tax Law > State & Local Taxes > General Overview*
[HN14] Repeals by implication are rare, and properly so, given that a court will presume under most circumstances that if the legislature had intended to repeal a statute or statutory provision, it would have done so explicitly. They are even more unlikely in the realm of a state's taxation laws.

*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview*
*Governments > Legislation > Expirations, Repeals & Suspensions*
*Governments > Legislation > Interpretation*
[HN15] The Michigan Business Tax Act and the Multistate Tax Compact are not so incompatible that both cannot stand.

*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > Imposition of Tax*
[HN16] The Multistate Tax Compact defines "income tax" as follows: a tax imposed on or measured by net income including any tax imposed on or measured by an amount arrived at by deducting expenses from gross income, 1 or more forms of which expenses are not specifically and directly related to particular transactions. MCL 205.581, art II(4). Under the Compact's broad definition, a tax is an income tax if the tax measures net income by subtracting expenses from gross income, with at least one of the expense deductions not being specifically and directly related to a particular transaction.

*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > Imposition of Tax*
[HN17] See MCL 208.1203(2).

*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview*
[HN18] The modified gross receipts tax base is a taxpayer's gross receipts less purchases from other firms.

*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview*
[HN19] The Michigan Business Tax Act defines "gross receipts" as the entire amount received by the taxpayer as determined by using the taxpayer's method of accounting used for federal income tax purposes, less any amount deducted as bad debt for federal income tax purposes that corresponds to items of gross receipts, from any activity whether in intrastate, interstate, or foreign commerce carried on for direct or indirect gain, benefit, or advantage to the taxpayer or to others. MCL 208.1111(1). Not only is the gross receipts amount reduced by numerous exclusions, it is also subject to a deduction for the amount deducted as bad debt for federal income tax purposes that corresponds to items of gross receipts included in the modified gross receipts tax (MGRT) base. This total - the entire amount received by the taxpayer from any activity minus the bad-debt deduction and the numerous exclusions under MCL 208.1111 - is the gross receipts base from which the MGRT liability originates.

*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview*
[HN20] After a taxpayer determines its gross receipts, the taxpayer then reduces the gross receipts base by

Page 5

496 Mich. 642, *; 852 N.W.2d 865, **;
2014 Mich. LEXIS 1282, ***4

purchases from other firms. The purchases from other firms deductions include, among other things, inventory acquired during the tax year, including freight, shipping, delivery, or engineering charges included in the original contract price; assets acquired during the tax year of a type that are, or under the internal revenue code will become, eligible for depreciation, amortization, or accelerated capital cost recovery for federal income tax purposes; and materials and supplies to the extent not included in inventory or depreciable property. There are also deductions for compensation paid in certain industries and for payments to independent contractors. Once gross receipts is reduced by any applicable deductions, the taxpayer arrives at its modified gross receipts tax (MGRT) base, which is then subject to the MGRT at a rate of.80 percent after allocation or apportionment to the state.

*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview*
[HN21] For the modified gross receipts tax to be an income tax under the Multistate Tax Compact, a tax must measure net income by starting with gross income and subtracting expenses, with at least one of the expense deductions not specifically and directly related to a particular transaction.

*Tax Law > Federal Income Tax Computation > Gross Income (IRC sec. 61)*
[HN22] The Internal Revenue Code defines "gross income" as all income from whatever source derived and includes a nonexclusive list of items that includes things such as gross income derived from business and gains derived from dealings in property. 26 U.S.C.S. § 61.

*Tax Law > Federal Income Tax Computation > Gross Income (IRC sec. 61)*
[HN23] 26 C.F.R. § 1.61-1 provides that gross income includes income realized in any form, whether in money, property, or services.

*Tax Law > Federal Income Tax Computation > Gross Income (IRC sec. 61)*
[HN24] 26 C.F.R. § 1.61-3 provides that gross income for manufacturing, merchandising, or mining businesses is the total sales, less the cost of goods sold, plus any

income from investments and from incidental or outside operations or sources.

*Tax Law > Federal Income Tax Computation > Gross Income (IRC sec. 61)*
[HN25] Black's Law Dictionary states that gross income means total income from all sources before deductions, exemptions, or other tax reductions.

*Tax Law > Federal Income Tax Computation > Gross Income (IRC sec. 61)*
*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview*
[HN26] Like gross income under the Internal Revenue Code, gross receipts under the Michigan Business Tax Act are subject to myriad exclusions and deductions. Notably, gross receipts are subject to a reduction for the purchase of inventory during the tax year, including freight, shipping, delivery, or engineering charges included in the original contract price. This is similar to the Internal Revenue Service's definition of "gross income" for manufacturing, merchandising, or mining businesses - total sales less the cost of goods sold. In addition, several of these exclusions or deductions are not specifically and directly related to particular transactions. Depreciable assets can be assets used over a certain number of years and, thus, not related to a single transaction. Materials and supplies purchased during a tax year can be used at any time for the operation of a business and for any amount of transactions. Finally, the purchase of inventory, which includes such things as goods held for resale or raw materials, some of which can stay in a taxpayer's warehouse for an indeterminate amount of time, can be an expense not specifically or directly related to a particular transaction.

*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview*
[HN27] The modified gross receipts tax fits within the broad definition of "income tax" under the Multistate Tax Compact by taxing a variation of net income - the entire amount received by the taxpayer as determined from any gainful activity minus inventory and certain other deductions that are expenses not specifically and directly related to a particular transaction.

Page 6

496 Mich. 642, *; 852 N.W.2d 865, **;
2014 Mich. LEXIS 1282, ***4

**COUNSEL:** For INTERNATIONAL BUSINESS MACHINES CORP, PLAINTIFF-APPELLANT: GREGORY A. NOWAK, DETROIT, MI.

For TREASURY DEPARTMENT OF, DEFENDANT-APPELLEE: AG, MICHAEL R. BELL, LANSING, MI; ZACHARY C. LARSEN, LANSING, MI.

For MICHIGAN MANUFACTURES ASSOCIATION, AC: LONGWORTH GREG, GRAND RAPIDS, MI.

For MULTISTATE TAX COMMISSION, AC: AG, MICHAEL R. BELL, LANSING, MI.

**JUDGES:** Chief Justice: Robert P. Young, Jr. Justices: Michael F. Cavanagh, Stephen J. Markman, Mary Beth Kelly, Brian K. Zahra, Bridget M. McCormack, David F. Viviano. ZAHRA, J. (concurring). MCCORMACK, J. (dissenting).

**OPINION BY:** David F. Viviano

**OPINION**

[*644] [**868] BEFORE THE ENTIRE BENCH

VIVIANO, J.

In this case, we must determine whether plaintiff International Business Machines Corporation (IBM) could elect to use the three-factor apportionment [*645] formula under the Multistate Tax Compact[1] (the Compact) for its 2008 Michigan taxes, or whether it was required to use the sales-factor apportionment [***5] formula under the Michigan Business Tax Act (BTA).[2] The Department of Treasury (the Department) rejected IBM's attempt to use the Compact's apportionment formula and, instead, required IBM to apportion its income using the BTA's sales-factor formula.

1  MCL 205.581 *et seq.*
2  MCL 208.1101 *et seq.*

We conclude that IBM was entitled to use the Compact's three-factor apportionment formula for its 2008 Michigan taxes and that the Court of Appeals erred by holding otherwise on the basis of its erroneous conclusion that the Legislature had repealed the Compact's election provision by implication when it enacted the BTA. We further hold that IBM could use the Compact's apportionment formula for that portion of its

tax base subject to the modified gross receipts tax of the BTA.

Accordingly, we reverse the Court of Appeals judgment in favor of the Department, reverse the Court of Claims order granting summary disposition in favor of the Department, and remand to the Court of Claims for entry of an order granting summary disposition in favor of IBM.

I. FACTS AND PROCEEDINGS

IBM is a corporation based in New York that provides information technology products and services worldwide. In December 2009, IBM [***6] filed its Michigan Business Tax annual return for the 2008 tax year. Line 10 of IBM's return, the "Apportionment Calculation" line, read "SEE ATTACHED ELECTION." IBM filed a separate [*646] statement along with its return, entitled "Election to use MTC Three Factor Apportionment," indicating that it elected to apportion its business income tax base and modified gross receipts tax base using the three-factor apportionment formula provided in the Compact. Under these calculations, IBM sought a refund of $5,955,218. The Department disagreed. It determined that IBM could not elect to use the Compact's formula and that IBM was entitled to a refund of only $1,253,609 when calculated under the BTA's sales-factor apportionment formula.

IBM filed a complaint in the Court of Claims, challenging the Department's decision. Thereafter, IBM moved for summary disposition under MCR 2.116(C)(10), and the Department moved for summary disposition under MCR 2.116(I)(2). [***7] After a hearing on the motions, the Court of [**869] Claims denied summary disposition to IBM and granted summary disposition in favor of the Department. The Court of Claims determined that the BTA mandated the use of the sales-factor apportionment formula.

In an unpublished opinion, the Court of Appeals affirmed the Court of Claims order granting summary disposition in favor of the Department.[3] The Court of Appeals first determined that there was a facial conflict between the BTA and the Compact insofar as the BTA mandates use of the sales-factor formula while the Compact permits taxpayers to elect to use a three-factor apportionment formula.[4] On the basis of this conflict, the Court of Appeals concluded that the Legislature had repealed the Compact's election provision by implication

Page 7

496 Mich. 642, *647; 852 N.W.2d 865, **869;
2014 Mich. LEXIS 1282, ***7

[*647] when it enacted the BTA.[5] The Court of Appeals then stated that it did not need to decide whether the modified gross receipts tax was an "income tax" under the Compact subject to the Compact's apportionment formula in light of its conclusion that the Compact's election provision had been repealed by implication.[6]

> 3  *IBM v Dep't of Treasury*, unpublished opinion per curiam of the Court of Appeals, issued November 20, 2012 (Docket No. 306618), 2012 Mich. App. LEXIS 2293. [***8]
> 4  *Id*. 2012 Mich. App. LEXIS 2293 at *6.
> 5  *Id*. 2012 Mich. App. LEXIS 2293 at *8-*10. It also determined that the Compact was not a binding contract.
> 6  *Id*. 2012 Mich. App. LEXIS 2293 at *11. Judge RIORDAN concurred in all respects except regarding the issue of repeal by implication. He determined that the panel did not need to conclude that the BTA had impliedly repealed the Compact because MCL 208.1309 allowed the taxpayer to petition for another apportionment formula. He concluded that the plain language of the BTA required IBM to apportion its income tax consistently with the BTA.

IBM sought leave to appeal in this Court. We granted IBM's application and asked the parties to address

> (1) whether the plaintiff could elect to use the apportionment formula provided in the Multistate Tax Compact, MCL 205.581, in calculating its 2008 tax liability to the State of Michigan, or whether it was required to use the apportionment formula provided in the Michigan Business Tax Act, MCL 208.1101 *et seq*.; (2) whether § 301 of the Michigan Business Tax Act, MCL 208.1301, repealed by implication Article III(1) of the Multistate Tax Compact; (3) whether the Multistate Tax Compact constitutes a contract that cannot be unilaterally altered or amended by a member state; [***9] and (4) whether the modified gross receipts tax component of the Michigan Business Tax Act constitutes an income tax under the Multistate Tax Compact.[7]

> 7  *IBM v Dep't of Treasury*, 494 Mich 874; 832 N.W.2d 388 (2013).

## II. STANDARD OF REVIEW

[HN1] We review de novo a Court of Claims decision on a motion for summary disposition.[8] [HN2] We also review de novo issues of statutory interpretation.[9]

> 8  *Malpass v Dep't of Treasury*, 494 Mich 237, 245; 833 NW2d 272 (2013).
> 9  *Id*.

## [*648] III. HISTORY OF BUSINESS TAXATION IN MICHIGAN

Because we believe it important to our analysis in this case, we begin with a discussion of the history of business taxation in Michigan. Michigan's taxation of business income or activity began in 1953, when the Legislature enacted a business activities tax that taxed the adjusted receipts of a taxpayer.[10] This tax remained [**870] in effect until Michigan adopted its first corporate income tax as part of the Income Tax Act of 1967 (ITA).[11] Against the backdrop of the ITA, Michigan joined the Multistate Tax Compact in 1970 when the Legislature enacted MCL 205.581.[12] The Compact "symbolized the recognition that, as applied to multistate businesses, traditional state tax administration was inefficient and costly to both [***10] State and taxpayer."[13] Thus, the goals of the Compact include facilitating and promoting equitable and uniform taxation of multistate taxpayers.[14] To this end, the [*649] Compact operates in conjunction with Michigan's tax acts, containing several provisions designed to ensure uniform taxation of multistate taxpayers.

> 10  See 1953 PA 150. See also *Armco Steel Corp v Dep't of Revenue*, 359 Mich 430, 444; 102 NW2d 552 (1960) ("This tax is part of a general scheme of State taxation of business activities in Michigan. It is a tax on Michigan activities measured, in amount, by adjusted receipts derived from or attributable to Michigan sources . . . .").
> 11  See MCL 206.61, as enacted by 1967 PA 281. The stated purpose of the ITA was "to meet deficiencies in state funds by providing for the

Page 8

496 Mich. 642, *649; 852 N.W.2d 865, **870;
2014 Mich. LEXIS 1282, ***10

imposition, levy, computation, collection, assessment, and enforcement by lien and otherwise of taxes on or measured by net income activities . . . ." Title, 1967 PA 281.

12 1969 PA 343. Section 1 of 1969 PA 343, codified under MCL 205.581, includes the mandatory provisions of the Compact that must be enacted for a state to become a member. See *US Steel Corp v Multistate Tax Comm*, 434 U.S. 452, 455-456; 98 S Ct 799; 54 L Ed 2d 682 (1978).

13 *US Steel Corp*, 434 U.S. at 456.

14 See [***11] MCL 205.581, Art I ("The purposes of this compact are to: (1) Facilitate proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment on tax bases and settlement of apportionment disputes[,] (2) Promote uniformity or compatibility in significant components of tax systems[,] (3) Facilitate taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration[,] and (4) Avoid duplicative taxation.").

In 1976, the Legislature replaced the corporate income tax with a single business tax.[15] Unlike its predecessor, the Single Business Tax Act (SBTA) taxed business activity, not income, and operated as "a form of value added tax."[16] In enacting the SBTA, the Legislature expressly amended the ITA to the extent necessary to implement the SBTA and expressly repealed provisions of the ITA that would conflict with the SBTA.[17] The Legislature, however, did not expressly repeal the Compact.[18]

15 See MCL 208.1 *et seq.*, as enacted by 1975 PA 228.

16 *Trinova Corp v Dep't of Treasury*, 433 Mich 141, 149; 445 NW2d 428 (1989).

17 See 1975 PA 233.

18 See *id*.

The SBTA remained in effect until 2008, when the Legislature enacted [***12] the BTA, which is at issue in this case.[19] Representing another shift in business taxation, the BTA imposed two main taxes: the business income tax and the modified gross receipts tax.[20] In enacting the BTA, the Legislature expressly repealed the SBTA, but again did not expressly repeal the Compact.[21]

However, the BTA was short-lived. Effective January 1, 2012, Michigan returned to a corporate income tax.[22] At [**871] the same time, the [*650] Legislature stayed true to its past practice of repealing conflicting tax acts and expressly repealed the BTA.[23]

19 2007 PA 36; MCL 208.1101 *et seq.*

20 See MCL 208.1201; MCL 208.1203.

21 Enacting section 1 of 2006 PA 325 provides: "The single business tax act, 1975 PA 228, MCL 208.1 to 208.145, is repealed effective for tax years that begin after December 31, 2007."

22 See 2011 PA 38.

23 See 2011 PA 39, which reads in part:

Enacting section 1. The Michigan business tax act, 2007 PA 36, MCL 208.1101 to 208.1601, is repealed effective on the date that the secretary of state receives a written notice from the department of treasury that the last certificated credit or any carryforward from that certificated credit has been claimed.

Enacting section 2. This amendatory act [***13] does not take effect unless House Bill No. 4361 of the 96th Legislature is enacted into law.

[HN3] Throughout the evolution of our state's method of business taxation, the Compact has remained in effect. Another constant throughout this history is that the Legislature has always required a multistate taxpayer with business income or activity both within and without the state to apportion its tax base.[24] This process, known as formulary apportionment, has allowed Michigan to tax the portion of a taxpayer's multistate business carried on in Michigan without violating the Due Process Clause of the United States Constitution.[25] We now address whether a multistate taxpayer retained the privilege of electing the apportionment method provided by the Compact for the 2008 tax year.

24 See MCL 205.553, as amended by 1954 PA 17; 1970 CL 206.115; 1979 CL 208.41; MCL 208.1301.

25 *Malpass*, 494 Mich at 245-246.

Page 9

496 Mich. 642, *650; 852 N.W.2d 865, **871;
2014 Mich. LEXIS 1282, ***13

IV. WHETHER IBM COULD ELECT TO USE THE COMPACT'S APPORTIONMENT FORMULA FOR ITS 2008 TAXES

To determine whether IBM could elect to use the Compact's three-factor apportionment formula to calculate its 2008 Michigan taxes, we must decide if the Legislature repealed the Compact's election provision by implication [***14] when it enacted the BTA.[26]

> 26 This is the principal argument offered by the Department in disallowing use of the Compact's apportionment formula. In the alternative, the Department argues the Compact can be harmonized with the BTA by reading the Compact's election provision and apportionment formula into MCL 208.1309. We address this argument in note 55 of this opinion.

[*651] A. LEGAL PRINCIPLES

We begin our analysis "with the axiom that [HN4] repeals by implication are disfavored."[27] We will presume, "in most circumstances, that if the Legislature had intended to repeal a statute or statutory provision, it would have done so explicitly."[28] Nevertheless, "[w]hen the intention of the legislature is clear, repeal by implication may be accomplished by the enactment of a subsequent act inconsistent with a former act" or "by the occupancy of the entire field by a subsequent enactment."[29] [**872] However, "where the intent of the Legislature is claimed to be unclear, it is our duty to proceed on the assumption that the Legislature desired both statutes to continue in effect unless it manifestly appears that such view is not reasonably plausible."[30] Repeals by implication will be allowed "only when the inconsistency [***15] and repugnancy are plain and unavoidable."[31] We will "construe statutes, claimed to be in conflict, harmoniously" to find "*any other* reasonable [*652] construction" than a repeal by implication.[32] Only when we determine that two statutes "are so incompatible that both cannot stand" will we find a repeal by implication.[33]

> 27 *Wayne Co Pros v Dep't of Corrections*, 451 Mich 569, 576; 548 NW2d 900 (1996). The implied repeal doctrine has "remained stable over approximately four centuries of common law in the United Kingdom and then here in the United States." Markham, *The Supreme Court's New Implied Repeal Doctrine: Expanding Judicial*

> *Power to Rewrite Legislation under the Ballooning Conception of "Plain Repugnancy,"* 45 Gonz L Rev 437, 464 (2010). Lord Edward Coke recognized the implied repeal doctrine as far back as 1614. See id., p 456-458 (discussing Lord Coke's seminal case on the implied repeal doctrine--*Doctor Foster's Case*, 77 Eng Rep 1222 (KB, 1614)).
> 28 *Wayne Co Pros*, 451 Mich at 576.
> 29 *Washtenaw Co Rd Comm'rs v Pub Serv Comm*, 349 Mich. 663, 680; 85 N.W.2d 134 (1957).
> 30 *Wayne Co Pros*, 451 Mich at 577.
> 31 *Tillotson v Saginaw*, 94 Mich 240, 244-245; 54 NW 162 (1892).
> 32 *Wayne Co Pros*, 451 Mich at 576-577 [***16] (emphasis added; citations and quotation marks omitted).
> 33 *Valentine v Redford Twp Supervisor*, 371 Mich 138, 144; 123 NW2d 227 (1963). As with any issue of statutory interpretation, our goal "is to give effect to the Legislature's intent, focusing first on the statute's plain language." *Malpass*, 494 Mich at 247-248 (citation and quotation marks omitted).

[HN5] In attempting to find a harmonious construction of the statutes, we "will regard all statutes upon the same general subject-matter as part of one system . . . ."[34] Further, "[s]tatutes *in pari materia*, although in apparent conflict, should, so far as reasonably possible, be construed in harmony with each other, so as to give force and effect to each . . . ."[35] This Court has stated:

> It is a well-established rule that [HN6] in the construction of a particular statute, or in the interpretation of its provisions, all statutes relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law, although they were enacted at different times, and contain no reference to one another. The endeavor should be made, by tracing the history of legislation on the subject, to ascertain the [***17] uniform and consistent purpose of the legislature, or to discover how the policy of the legislature with reference to the subject-matter has been changed or

Page 10

496 Mich. 642, *652; 852 N.W.2d 865, **872;
2014 Mich. LEXIS 1282, ***17

modified from time to time. In other words, in determining the meaning of a particular statute, resort may be had to the established policy of the legislature as disclosed by a general course of legislation. With this purpose in view therefore it is proper to consider, not only acts passed at [*653] the same session of the legislature, but also acts passed at prior and subsequent sessions.[36]

In this case, the Compact's election provision and § 301 of the BTA share the common purpose of setting forth the methods of apportionment of a taxpayer's multistate business income; therefore, we must construe them together as statutes *in pari materia*.[37]

> 34   *Rathbun v State of Michigan*, 284 Mich 521, 544; 280 NW 35 (1938) (citation and quotation marks omitted).
> 35   *Id*. (citation and quotation marks omitted).
> 36   *Id*. at 543-544 (citation and quotation marks omitted).
> 37   *Id*. at 543 ("Statutes *in pari materia* are those . . . which have a common purpose . . . .").

## B. APPLICATION

With the history of Michigan business taxation and applicable legal principles in mind, [***18] we turn to the specific statutes at issue. IBM sought to apportion its [**873] BTA tax base using the Compact's three-factor apportionment formula.[38] In so doing, IBM relied on the Compact's election provision, which reads in pertinent part:

> [HN7] (1) Any taxpayer subject to an income tax whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a party state or pursuant to the laws of subdivisions in 2 or more party states may elect to apportion and allocate his income in the manner provided by the laws of such state or by the laws of such states and subdivisions without reference to this compact, or may elect to apportion and allocate in accordance with article IV . . . .[39]

[HN8] This provision allows a taxpayer subject to an income tax to elect to use a party state's apportionment formula or the Compact's three-factor apportionment formula.

> 38   MCL 205.581, Art IV(9) ([HN9] "All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is 3.").
> 39   MCL 205.581, Art III(1).

[*654] However, the Department rejected IBM's attempts to [***19] apportion its income through the Compact's apportionment formula. Instead, it required IBM to apportion its BTA tax base consistently with the BTA and its sales-factor formula. Section 301 of the BTA reads as follows:

> (1) Except as otherwise provided in this act, each tax base established under this act shall be apportioned in accordance with this chapter.
>
> (2) Each tax base of a taxpayer whose business activities are confined solely to this state shall be allocated to this state. Each tax base of a taxpayer whose business activities are subject to tax both within and outside of this state shall be apportioned to this state by multiplying each tax base by the sales factor calculated under section 303.[40]

> 40   MCL 208.1301.

We recognize that [HN10] the language of the BTA is mandatory in nature.[41] Under the statute, a taxpayer's BTA tax base must be apportioned through the BTA's sales-factor apportionment formula.[42] The Department argues that this mandatory language precludes the use of any other apportionment formula and, reading it in isolation, we would agree. However, as stated previously, § 301 of the BTA is not the only provision of Michigan's tax laws pertaining to the apportionment of business [***20] income--the Compact's election provision shares the same purpose. Therefore, we cannot interpret § 301 of the BTA in a vacuum.[43] Rather, we must [*655]

Page 11

496 Mich. 642, *655; 852 N.W.2d 865, **873;
2014 Mich. LEXIS 1282, ***20

consider it along with the Compact "by tracing the history of legislation on the subject, to ascertain the uniform and consistent purpose of the legislature."[44]

> 41   See *Fradco v Dep't of Treasury*, 495 Mich 104, 114; 845 NW2d 81 (2014) ("The Legislature's use of the word 'shall' . . . indicates a mandatory and imperative directive.").
>
> 42   MCL 208.1301(1).
>
> 43   See also People v Stephan, 241 Mich App 482, 497; 616 NW2d 188 (2000) (recognizing that interpreting the unambiguous language of two conflicting statutes does not end the analysis because "courts do not construe individual statutes in a vacuum" but rather construe statutes together under the doctrine of *in pari materia*).
>
> 44   *Rathbun*, 284 Mich at 543-544 (stating further that courts "'will regard all statutes upon the same general subject matter as part of one system'") (citation omitted).

The BTA is not the first Michigan business tax act to contain a mandatory apportionment formula. All our past business tax acts mandated that a taxpayer with [**874] income or activity that was taxable within and without the [***21] state allocate and apportion its tax base consistently with each respective act.[45] These acts further mandated that the tax base be apportioned through a specific apportionment formula.[46] The mandatory apportionment language of the BTA is nearly identical to the language of its predecessors.

> 45   See MCL 205.552, as amended by 1954 PA 17 (providing that "[t]he adjusted receipts of a taxpayer derived from or attributable to Michigan sources shall be determined in accordance with the provisions of section 3 of this act"); 1970 CL 206.103 (providing that "[a]ny taxpayer having income from business activity which is taxable both within and without this state . . . shall allocate and apportion his net income as provided in this act"); 1979 CL 208.41 (providing that "[a] taxpayer whose business activities are taxable both within and without this state, shall apportion his tax base as provided in this chapter").
>
> 46   See MCL 205.553(b), as amended by 1954 PA 17 (requiring that a taxpayer with adjusted receipts attributable to activity within and without Michigan apportion the receipts consistent with a three-factor formula); 1970 CL 206.115 (requiring

that "[a]ll business income . . . shall be apportioned [***22] to this state" through the standard three-factor apportionment formula); 1979 CL 208.45 (requiring that "[a]ll of the tax base . . . shall be apportioned to this state" through the three-factor apportionment formula). In 1991, the Legislature began to phase out the SBTA's equally weighted, three-factor apportionment formula, requiring a progressively more sales-factor-focused apportionment formula. See MCL 208.45, as amended by 1991 PA 77. However, the new apportionment formula was still mandatory.

The Department argues that the Legislature repealed the Compact's election provision when it enacted [*656] the BTA because § 301 of the BTA is the first tax provision with apportionment language directly in conflict with the Compact's election provision. The import of this argument is that the Compact's election provision was a dead letter when it was enacted because both the ITA and the election provision required use of the same three-factor apportionment formula. However, the Department's argument overlooks that the Compact's election provision, by using the terms "may elect," contemplates a divergence between a party state's mandated apportionment formula and the Compact's own formula--either [***23] at the time of the Compact's adoption by a party state or at some point in the future.[47] Otherwise, there would be no point in giving taxpayers an election between the two. In fact, reading the Compact's election provision as forward-looking--i.e., contemplating the future enactment of a state income tax with a mandatory apportionment formula different from the Compact's apportionment formula--is the only way to give meaning to the provision when it was enacted in Michigan.[48] Viewed in this light, the BTA's mandatory apportionment language may plausibly be read as compatible with the Compact's election provision.

> 47   MCL 205.581, Art III(1). See also *Black's Law Dictionary* (9th ed) (defining an "election" as "[t]he exercise of a choice; esp., the act of choosing from several possible rights or remedies in a way that precludes the use of other rights or remedies").
>
> 48   See *Moore v Fennvile Pub Schs Bd of Ed*, 223 Mich App 196, 201; 566 NW2d 31 (1997) ("It is the duty of the courts to interpret statutes so as to render no provision meaningless.").

Page 12

496 Mich. 642, *656; 852 N.W.2d 865, **874;
2014 Mich. LEXIS 1282, ***23

Moreover, our review of the statutes *in pari materia* indicates a uniform and consistent purpose of the Legislature for the Compact's election provision [***24] to operate alongside Michigan's tax acts.[49] Just as it did [*657] when it enacted the ITA,[50] the Legislature, [**875] in enacting the BTA, had full knowledge of the Compact and its provisions.[51] Even with such knowledge on both occasions, the Legislature left the Compact's election provision intact. By contrast, the Legislature expressly repealed or amended other inconsistent acts regarding the taxation of businesses.[52] Had the Legislature believed that the Compact's election provision no longer had a place in Michigan's tax system or conflicted with the purpose of the BTA, it could have taken the necessary action to eliminate the election provision.

> 49   *Rathbun*, 284 Mich at 543-544.
> 50   Although the ITA's apportionment method is largely consistent with the Compact's apportionment method, caselaw during the period in which both were in effect reflects some potential for inconsistency. See *Consumers Power Co v Dep't of Treasury*, 235 Mich App 380, 386 n 6; 597 NW2d 274 (1999) (discussing definitional differences between the ITA and the Compact); *Chocola v Dep't of Treasury*, 132 Mich App 820, 831; 348 NW2d 290 (1984); *Donovan Const Co v Dep't of Treasury*, 126 Mich. App. 11; 337 N.W.2d 297 (1983).
> 51   *In re Reynolds Estate*, 274 Mich. 354, 362; 264 N.W. 399 (1936) [***25] ("The Legislature, in passing [a new act], is presumed to have done so with a full knowledge of existing statutes.").
> 52   See notes 21 and 23 of this opinion.

Because the Legislature gave no clear indication that it intended to repeal the Compact's election provision, we proceed under the assumption that the Legislature intended for both to remain in effect.[53] After reading the statutes *in pari materia*, we conclude that a reasonable construction exists other than a repeal by implication.[54] [HN11] Under Article III(1) of the Compact, the Legislature provided a multistate taxpayer with a choice between the apportionment method contained in the Compact or the apportionment method required by Michigan's tax laws. If a taxpayer elects to apportion its income through the Compact, Article IV(9) mandates that the [*658] taxpayer do so using a three-factor apportionment formula. Alternatively, if the taxpayer

does not make the Compact election, then the taxpayer must use the apportionment formula set forth in Michigan's governing tax laws. In this case, IBM's tax base arose under the BTA. Had it not elected to use the Compact's apportionment formula, IBM would have been required to apportion its tax base consistently [***26] with the mandatory language of the BTA--i.e., through the BTA's sales-factor apportionment formula.[55] Thus, we believe the BTA and the Compact are compatible and can be read as a harmonious whole.

> 53   See *Wayne Co Pros*, 451 Mich at 577.
> 54   *Id*. at 576-577.
> 55   Despite the above framework, the Department argues that if the BTA and the Compact can be harmonized, it is only through MCL 208.1309(1), which allows a taxpayer to petition to use another apportionment method. We disagree. The Department's "harmonization" would actually be an abrogation of the election provision. Section 309 requires that a taxpayer *petition* the Department for another apportionment method and prove that the BTA's apportionment provision does not fairly represent the taxpayer's business activity in the state. Thus, the Department's interpretation takes the choice out of the taxpayer's hands and is inconsistent with the plain language of the Compact. Therefore, we decline to accept the Department's proposed harmonization.

Subsequent action by the Legislature indicates that it did not impliedly repeal the Compact's election provision when it enacted the BTA.[56] On May 25, 2011, the [**876] Legislature expressly amended the Compact's [***27] election provision by adding the following language:

> [E]xcept that *beginning January 1, 2011* any taxpayer subject to the Michigan business tax act, 2007 PA 36, MCL 208.1101 to 208.1601, or the income tax act of 1967, 1967 PA 281, MCL 206.1 to 206.697, shall, for purposes of that act, apportion and allocate in accordance with the provisions [*659] of that act and shall not apportion or allocate in accordance with article IV.[57]

There is no dispute that the Legislature specifically

Page 13

496 Mich. 642, *659; 852 N.W.2d 865, **876;
2014 Mich. LEXIS 1282, ***27

intended to retroactively repeal the Compact's election provision for taxpayers subject to the BTA beginning January 1, 2011. The Legislature could have--but did not--extend this retroactive repeal to the start date of the BTA. In addressing this legislation, the dissent suggests that "the 2011 Legislature may have simply been acting expressly to confirm what the 2007 Legislature believed it had already done implicitly."[58] We would agree with that conclusion if the Legislature had retroactively repealed the Compact's election provision beginning January 1, 2008, the effective date of the BTA. However, [HN12] by only repealing the Compact's election provision starting January 1, 2011, the Legislature created a window in which [***28] it did not expressly preclude use of the Compact's election provision for BTA taxpayers. Further, we believe that the express repeal of the Compact's election provision effective January 1, 2011, is evidence that the Legislature had not impliedly repealed the provision when it enacted the BTA.[59] Therefore, a review of the 2011 amendments supports our conclusion that the Compact's election provision remained in effect for the 2008 tax year.

> 56   See *Baxter v Robertson*, 57 Mich 127, 132; 23 NW 711 (1885) ("Legislative construction of past legislation . . . is always entitled to be considered with some care, so far as it throws light on doubtful language . . . .").
> 57   2011 PA 40 (emphasis added).
> 58   *Post* at 6.
> 59   See 1A Singer, Sutherland Statutory Construction (7th ed), § 23:11, p 485 ("[T]he later express repeal of a particular statute may be some indication that the legislature did not previously intend to repeal the statute by implication.").

## C. RESPONSE TO THE DISSENT

The dissent's analysis has a tantalizing simplicity to it. It homes in on the plain language and mandatory [*660] nature of the BTA's apportionment provision. However, the dissent spends very little time considering the language of the [***29] Compact, its history, or the history of business taxation in Michigan. While this approach may be proper in construing the BTA in a typical case, it is incomplete when we are faced with the question of implied repeal. Under such circumstances, that the dissent has arrived at the better or even the best interpretation *of the BTA* does not end the inquiry. Rather, [HN13] because there is a presumption *against*

implied repeals,[60] it is our task to determine if there is *any other reasonable construction* that would harmonize the two statutes and avoid a repeal by implication.[61]

> 60   See *Jackson v Mich Corrections Comm*, 313 Mich 352, 356; 21 NW2d 159 (1946).
> 61   *Wayne Co Pros*, 451 Mich at 576-577 (emphasis added). See also *Rathbun*, 284 Mich at 544-545 (If we "can by *any fair, strict, or liberal construction* find for the two provisions a reasonable field of operation, without destroying their evident intent and meaning, preserving the force of both, and construing them together in harmony with the whole course of legislation upon the subject, it is [our] duty to do so.") (emphasis added).

[HN14] Repeals by implication are rare, and properly so, given that we will presume under most circumstances that "if the Legislature [***30] [**877] had intended to repeal a statute or statutory provision, it would have done so explicitly."[62] They are even more unlikely in the realm of our state's taxation laws.[63] This certainly creates a very [*661] high bar, but we disagree with the dissent that we have made it absolute. Rather, by using the applicable canons of construction and faithfully applying our precedents in this area, we have arrived at a reasonable construction that harmonizes the BTA and the Compact.[64]

> 62   *Wayne Co Pros*, 451 Mich at 576. See also *Matsushita Elec Indus Co v Epstein*, 516 U.S. 367, 381; 116 S Ct 873; 134 L Ed 2d 6 (1996) ("The rarity with which we have discovered implied repeals is due to the relatively stringent standard for such findings, namely, that there be an 'irreconcilable conflict' between the two federal statutes at issue.").
> 63   1A Singer, Sutherland Statutory Construction (7th ed), § 23:10, p 484, citing *Sylk v United States*, 331 F Supp 661, 665 (ED Pa, 1971) ("On subjects to which the legislature pays continuous, close attention, such as internal revenue laws, the presumption against implied repeal may have greater force.").
> 64   Contrary to the dissent's suggestion, the question is not whether the 2008 Legislature [***31] could disregard a policy choice by the 1970 Legislature--obviously it could--but instead what action it must take to make its intentions

Page 14

496 Mich. 642, *661; 852 N.W.2d 865, **877;
2014 Mich. LEXIS 1282, ***31

clear in the absence of express repealing language in the statute.

The dissent agrees that "every attempt" must be made to construe the BTA and the Compact harmoniously. But, in the end, the dissent fails to heed this call. Instead, because of its rigid focus on the mandatory language of the BTA--to the exclusion of the language and history of the Compact, and its place in Michigan's taxation scheme--the dissent's analysis is at odds with our longstanding implied-repeal jurisprudence.

D. CONCLUSION AS TO THE ISSUE OF IMPLIED REPEAL

In sum, because we are able to harmonize the BTA and the Compact's election provision, we conclude that [HN15] the statutes are not "'so incompatible that both cannot stand.'"[65] We believe that our interpretation allows the Compact's election provision to serve its purpose of providing uniformity to multistate taxpayers in light of Michigan's enactment of an apportionment formula different from the Compact's formula. Any conflict apparent from a first reading of these statutes is reconcilable when the statutes are read *in pari materia*.[66] [***32] Therefore, the Department has failed to overcome [*662] the presumption against repeals by implication. Accordingly, the Court of Appeals erred by holding that the Legislature repealed the Compact's election provision by implication when it enacted the BTA. Instead, we hold that the Compact's election provision was available to IBM for the 2008 tax year.[67]

65 *Valentine*, 371 Mich at 144 (citation omitted).
66 The Department also cannot show that the Legislature intended to occupy the entire field covered by the Compact when it enacted the BTA to establish a repeal by implication. *Washtenaw Co Rd Comm'rs*, 349 Mich at 680. The BTA and the Compact, while having some overlapping provisions, occupy two different fields. The BTA is a stand-alone tax act that governs the taxation of businesses. The Compact acts as an overlay to Michigan's taxation system. It is specifically designed to leave the member states with "complete control over all legislation and administrative action affecting the rate of tax, the composition of the tax base . . . , and the means and methods of determining tax liability and collecting any taxes determined to be due." *US Steel Corp*, 434 U.S. at 457.

67 Because we are able to [***33] harmonize the statutes and conclude that no repeal by implication occurred, we decline to discuss whether the Compact is binding and, thus, whether the Legislature even could repeal the Compact by implication. That inquiry involves constitutional issues, which we will not reach because they are unnecessary to resolve the case. See *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211, 234; 507 NW2d 422 (1993) ("In addition, there exists a general presumption by this Court that we will not reach constitutional issues that are not necessary to resolve a case.").

[**878] V. WHETHER THE MODIFIED GROSS RECEIPTS TAX IS AN INCOME TAX UNDER THE COMPACT

Having determined that IBM could elect to use the Compact's apportionment formula for the 2008 tax year, we must next consider whether IBM could apportion its entire BTA tax base through the Compact's apportionment formula. IBM's 2008 BTA tax base contained two components: the business income tax base and the modified gross receipts tax (MGRT) base. The parties quarrel over whether both components may be apportioned under the Compact. The Compact election is available to "[a]ny taxpayer subject to an income tax."[68] While it is undisputed that [***34] the business income tax is an income tax, the Department argues that the [*663] MGRT is not an income tax, but rather a gross receipts tax not subject to the Compact's election provision. Therefore, we must determine whether the MGRT is an income tax under the Compact and, thus, apportionable under the Compact's three-factor apportionment formula.

68 MCL 205.581, Art III(1).

[HN16] The Compact defines "income tax" as follows:

[A] tax imposed on or measured by net income including any tax imposed on or measured by an amount arrived at by deducting expenses from gross income, 1 or more forms of which expenses are not specifically and directly related to particular transactions.[69]

Page 15

496 Mich. 642, *663; 852 N.W.2d 865, **878;
2014 Mich. LEXIS 1282, ***34

Under the Compact's broad definition, a tax is an income tax if the tax measures net income by subtracting expenses from gross income, with at least one of the expense deductions not being specifically and directly related to a particular transaction.[70]

69  MCL 205.581, Art II(4). The Compact also defines "gross receipts tax" in Art II(6) as follows:

[A] tax, other than a sales tax, which is imposed on or measured by the gross volume of business, in terms of gross receipts or in other terms, and in the determination of which no deduction [***35] is allowed which would constitute the tax an income tax.

70  We need not put a definitive label on the MGRT, a task with which commentators have struggled. See, e.g., McIntyre & Pomp, *A Policy Analysis of Michigan's Mislabeled Gross Receipts Tax*, 53 Wayne L Rev 1283 (2007) (concluding that the MGRT is akin to a sales-subtraction value added tax but that it is not a transactional tax); Gandhi, *Computing the Tax Base: The Michigan Business Tax*, 53 Wayne L Rev 1369 (2007) (concluding that the MGRT is a reverse-build of Michigan's now-repealed Single Business Tax); Grob & Roberts, *The Michigan Business Tax Replaces the State's Much-Vilified SBT*, 17-Oct J Multistate Tax'n & Incentives 8 (2007) (concluding that the MGRT is something between a gross receipts tax and a gross margin tax). Instead, we are only tasked with determining whether the MGRT qualifies as an income tax under the Compact.

"Modified gross receipts tax" is not defined by the BTA, but MCL 208.1203(2) states, [HN17] "[The MGRT] levied and imposed under this section is upon the privilege of [*664] doing business and not upon income or property." Although this statement indicates that the MGRT is not a tax upon income under the BTA, we must [***36] still determine whether the MGRT fits under the broad definition of "income tax" under the Compact.

[HN18] The MGRT base is "a taxpayer's gross receipts . . . less purchases from other [**879] firms . . .

."[71] [HN19] The BTA defines "gross receipts" as

the entire amount received by the taxpayer as determined by using the taxpayer's method of accounting used for federal income tax purposes, less any amount deducted as bad debt for federal income tax purposes that corresponds to items of gross receipts . . . , from any activity whether in intrastate, interstate, or foreign commerce carried on for direct or indirect gain, benefit, or advantage to the taxpayer or to others . . . .[72]

Not only is the gross receipts amount reduced by numerous exclusions, it is also subject to a deduction for the "amount deducted as bad debt for federal income tax purposes that corresponds to items of gross receipts included in the modified gross receipts tax base."[73] This total--the entire amount received by the taxpayer from any activity minus the bad-debt deduction and the numerous exclusions under MCL 208.1111--is the gross receipts base from which the MGRT liability originates.

71  MCL 208.1203(3).
72  MCL 208.1111(1).
73  *Id.*

[HN20] After the [***37] taxpayer determines its gross receipts through the above calculation, the taxpayer then reduces the gross receipts base by "purchases from other firms."[74] The "purchases from other firms" deductions include, among other things, "inventory acquired during [*665] the tax year, including freight, shipping, delivery, or engineering charges included in the original contract price"; "assets . . . acquired during the tax year of a type that are, or under the internal revenue code will become, eligible for depreciation, amortization, or accelerated capital cost recovery for federal income tax purposes"; and materials and supplies to the extent not included in inventory or depreciable property.[75] There are also deductions for compensation paid in certain industries and for payments to independent contractors.[76] Once gross receipts is reduced by any applicable deductions, the taxpayer arrives at its MGRT base, which is then subject to the MGRT at a rate of .80 percent after allocation or apportionment to this state.[77]

74  MCL 208.1203(3).
75  MCL 208.1113(6)(a) through (c). "Inventory"

Page 16

496 Mich. 642, *665; 852 N.W.2d 865, **879;
2014 Mich. LEXIS 1282, ***37

is defined as "[t]he stock of goods held for resale in the regular course of trade of a retail or wholesale business" and [***38] "[f]inished goods, goods in process, and raw materials of a manufacturing business purchased from another person." MCL 208.1111(4)(a), (b).

76 MCL 208.1113(6)(d) through (g).

77 MCL 208.1203(1).

Having examined how a taxpayer's MGRT base is calculated, we now turn to the question whether the MGRT fits within the Compact's definition of "income tax." [HN21] For the MGRT to be an income tax under the Compact, a tax must measure net income by starting with gross income and subtracting expenses, with at least one of the expense deductions not specifically and directly related to a particular transaction.[78] The Compact and the BTA do not define "gross income." Therefore, we look elsewhere to determine what normally constitutes gross income. [HN22] The Internal Revenue Code defines "gross income" as "all income from whatever source derived" and includes a nonexclusive list of items that includes things such as "gross income derived [*666] from business" and "gains derived from dealings in property."[79] [HN23] 26 CFR § 1.61-1 [**880] provides that "[g]ross income includes income realized in any form, whether in money, property, or services." [HN24] 26 CFR § 1.61-3 further provides that gross income for manufacturing, merchandising, or mining [***39] businesses is "the total sales, less the cost of goods sold, plus any income from investments and from incidental or outside operations or sources." Moreover, [HN25] *Black's Law Dictionary* states that gross income means "[t]otal income from all sources before deductions, exemptions, or other tax reductions."[80]

78 MCL 205.581, Art II(4).

79 26 USC 61.

80 *Black's Law Dictionary* (9th ed), p 831.

These definitions of gross income are similar to the definition of gross receipts under the BTA--the entire amount received by the taxpayer as determined from any gainful activity. [HN26] Like gross income under the Internal Revenue Code, gross receipts are subject to myriad exclusions and deductions. Notably, gross receipts are subject to a reduction for the purchase of inventory during the tax year, including freight, shipping, delivery, or engineering charges included in the original contract price. This is similar to the IRS's definition of "gross income" for manufacturing, merchandising, or mining businesses--total sales less the cost of goods sold.[81] In addition, several of these exclusions or deductions are not specifically and directly related to particular transactions.[82] Depreciable [*667] assets can be assets used [***40] over a certain number of years and, thus, not related to a single transaction.[83] Materials and supplies purchased during a tax year can be used at any time for the operation of a business and for any amount of transactions. Finally, the purchase of inventory, which includes such things as goods held for resale or raw materials, some of which can stay in a taxpayer's warehouse for an indeterminate amount of time, can be an expense not specifically or directly related to a particular transaction.[84]

81 "Cost of goods sold" is determined by a taxpayer's inventory. See 33A Am Jur 2d, Federal Taxation, § 6500 ("A taxpayer must use inventories to determine the cost of goods sold if the production, purchase, or sale of merchandise is an income-producing factor."). See also *Thor Power Tool Co v Comm'r of Internal Revenue*, 439 U.S. 522, 530 n 9; 99 S. Ct. 773; 58 L. Ed. 2d 785 (1979); *Hygienic Prods Co v Comm'r of Internal Revenue*, 111 F2d 330, 331 (CA 6, 1940).

82 While the Compact does not define the phrase "not specifically and directly related to particular transactions," the use of the words "specifically," "directly," and "particular" connotes a close relation to an individual transaction. See [***41] *Random House Webster's College Dictionary* (2001). That is, the tax cannot be a tax focusing on specific transactions, i.e., a transactional tax.

83 See 26 USC 167, 168.

84 MCL 208.1111(4)(a), (b).

We hold that [HN27] the MGRT fits within the broad definition of "income tax" under the Compact by taxing a variation of net income--the entire amount received by the taxpayer as determined from any gainful activity minus inventory and certain other deductions that are expenses not specifically and directly related to a particular transaction. Therefore, IBM could elect to use the Compact's apportionment formula for that portion of its tax base subject to the MGRT for the 2008 tax year.[85]

85 Our holding is limited to the determination that the MGRT is included within the Compact definition of "income tax." As noted earlier in

Page 17

496 Mich. 642, *667; 852 N.W.2d 865, **880;
2014 Mich. LEXIS 1282, ***41

note 70, we do not need to reach the issue whether the MGRT, generally, is an income tax.

## VI. CONCLUSION

We conclude that Court of Appeals erred by holding that the BTA repealed the Compact's election provision by implication. Therefore, IBM could elect to use [**881] the Compact's apportionment formula during the 2008 tax [*668] year. We further hold that IBM could use the Compact's apportionment [***42] formula to apportion its MGRT base under the BTA. Accordingly, we reverse the Court of Appeals judgment in favor of the Department, reverse the Court of Claims order granting summary disposition in favor of the Department, and remand to the Court of Claims for entry of an order granting summary disposition in favor of IBM.

David F. Viviano

Michael F. Cavanagh

Stephen J. Markman

**CONCUR BY:** Brian K. Zahra

**CONCUR**

ZAHRA, J. (*concurring*).

I agree with the lead opinion's holding that IBM was entitled to use the Compact's elective three-factor apportionment and allocation formula for its 2008 Michigan taxes. I also agree with both the lead opinion and the dissenting opinion that the tax bases at issue here are "income taxes" within the meaning of the Compact. Whether the Legislature repealed the Compact's election provision by implication when it enacted the BTA is a very close question. I would not reach that question because the Legislature made clear that taxpayers are entitled to use the Compact's election provision for the 2008, 2009, and 2010 tax years.

Assuming that the Legislature impliedly repealed the Compact's election provision in 2008 by enacting the BTA, IBM could nonetheless avail itself of the Compact's [***43] election provision for tax years 2008 through 2010 because the Legislature, in 2011, clearly intended to provide multistate taxpayers the benefit of the Compact's election provision for these tax years. Specifically, on May 25, 2011, the Legislature necessarily *re-enacted* all the provisions of the Compact, and ordered that act to

take immediate effect.[1] MCL 8.3u provides that

[*669] [t]he provisions of any law or statute which is re-enacted, amended or revised, so far as they are the same as those of prior laws, shall be construed as a continuation of such laws and not as new enactments. If any provision of a law is repealed and in substance re-enacted, a reference in any other law to the repealed provision shall be deemed a reference to the re-enacted provision.

Pursuant to this provision, we must construe the Compact as though it had not been impliedly repealed.[2]

1  2011 PA 40.
2   See also 1A Singer, Sutherland Statutory Construction (7th ed), Repeal and Reenactment, § 23:29.

That said, the BTA's exclusive apportionment method remains in conflict with the election provision of the Compact. This conflict, in my view, is easily resolved because the Legislature in 2011 also expressly supplemented the [***44] Compact. This new provision is not "the same as those of prior laws" and is a "new enactment," which expressly provides that a taxpayer could elect to apportion its income under article IV of the Compact

except that beginning January 1, 2011 any taxpayer subject to the Michigan business tax act, 2007 PA 36, MCL 208.1101 to 208.1601, or the income tax act of 1967, 1967 PA 281, MCL 206.1 to 206.697, shall, for purposes of that act, apportion and allocate in accordance with the provisions of that act and shall not apportion or allocate in accordance with article IV.[3]

3  2011 PA 40.

[**882] There can be no dispute given this language that the Legislature specifically intended to retroactively repeal the Compact's election provision beginning January 1, 2011. Further, I conclude that this language contemplates that any taxpayer could avail itself

Page 18

496 Mich. 642, *669; 852 N.W.2d 865, **882;
2014 Mich. LEXIS 1282, ***44

of the Compact's election provision for tax years 2008 through 2010. This is because the Legislature, either under the [*670] original enactment of the Compact[4] (assuming the Legislature did not repeal the Compact's election provision by implication when it enacted the BTA) or under the above re-enactment and supplementation of the Compact[5] (assuming the Legislature [***45] repealed the Compact's election provision by implication when it enacted the BTA), chose to commence its express repeal of the Compact's election provision on January 1, 2011, even though the conflict between the BTA and the Compact had existed from the 2008 tax year. Simply put, the contrapositive of the Compact's supplemental provision must mean that before January 1, 2011, a taxpayer could, "for purposes of that act [the ITA or the BTA], apportion and allocate in accordance with the provisions of [the ITA or the BTA] and [may] apportion or allocate in accordance with article IV" of the Compact. This is, in my opinion, the most reasonable understanding of this legislation.

> 4   1969 PA 343.
> 5   2011 PA 40.

In sum, the Legislature in 2011 *created* a window in which it intended the Compact's election provision to apply. In this case, IBM sought to "apportion and allocate" its taxes under the BTA well before January 1, 2011, and therefore may apportion or allocate its taxes in accordance with article IV of the Compact. For this reason, I concur in the result reached in the lead opinion.

Brian K. Zahra

**DISSENT BY:** Bridget M. McCormack

**DISSENT**

McCORMACK, J. (*dissenting*).

I respectfully dissent because I conclude that the [***46] Michigan Business Tax Act (BTA), MCL 208.1101 *et seq.*, requires taxpayers to apportion their multistate income in accordance with the BTA's sales-only apportionment formula and without resort to the Multistate Tax Compact's election provision. I reach this result because the Legislature's [*671] command--"each tax base established under this act *shall be apportioned in accordance with this chapter*," MCL 208.1301(1) (emphasis added)--is plain, unambiguous, and permits only one interpretation. Further, there is no

constitutional barrier that prevents the Legislature from making the Compact's alternative election provision unavailable to taxpayers. I would affirm the judgment of the Court of Appeals.

I. AN IRRECONCILABLE CONFLICT OF STATUTES

The threshold issue is, at its core, one of statutory interpretation. When the language of a statute is unambiguous, we give effect to its plain meaning. *Ter Beek v City of Wyoming*, 495 Mich 1, 8; 846 NW2d 531 (2014). It is hard to imagine a more unambiguous command than the mandatory directive found in § 301 of the BTA: "Except as otherwise provided in this act, each tax base established under this act shall be apportioned in accordance with this chapter." MCL 208.1301(1). [***47] There is no "otherwise provided" exception in the BTA that would aid IBM in its [**883] attempt to avoid the statute's sales-only apportionment requirement. And, within Chapter 208 of the Michigan Compiled Laws, it is the BTA alone that provides the formula by which taxpayers are to apportion their multistate income. See MCL 208.1301(2); MCL 208.1303(1). Neither the Compact nor its apportionment provisions are referred to anywhere in the BTA.

I share the lead opinion's view that we must make every attempt "to construe statutes, claimed to be in conflict, harmoniously[.]" *Wayne Co Prosecutor v Dep't of Corrections*, 451 Mich 569, 577; 548 NW2d 900 (1996).[1] When later enacted legislation irreconcilably [*672] conflicts with a prior act, however, "the last expression of the legislative will must control." *Jackson v Mich Corrections Comm*, 313 Mich 352, 356; 21 N.W.2d 159 (1946).

> 1   The lead opinion implies that if the Compact is found to irreconcilably conflict with the BTA, the Compact, as the earlier enacted statute, will necessarily have been repealed by implication. Our caselaw does not demand such a result. See *Metro Life Ins Co v Stoll*, 276 Mich 637, 641; 268 NW 763 (1936) ("It is the rule that where [***48] two laws *in pari materia* are in irreconcilable conflict, the one last enacted will control or be regarded as an exception to or qualification of the prior statute.") In any event, regardless of whether the BTA impliedly repealed the Compact beginning January 1, 2008, the issue remains the same--whether the Compact election was available for tax years 2008 through 2010.

Page 19

496 Mich. 642, *672; 852 N.W.2d 865, **883;
2014 Mich. LEXIS 1282, ***48

Section 301(1) of the BTA directs that taxes established under the BTA be apportioned "in accordance with this chapter." "[T]his chapter" requires taxpayers to use a sales-only apportionment formula.[2] The Compact, however, provides that "[a]ny taxpayer subject to an income tax[3] . . . may elect to apportion" its income in accordance with the Compact's three-factor apportionment formula. MCL 205.581, Art III(1). Reading these provisions side by side, I see two, and only two, possible results: either taxes established under the BTA need not be apportioned "in accordance with this chapter," as § 301 demands, or taxpayers may not elect to use the Compact formula to apportion tax bases established under the BTA. While I agree with the lead opinion that statutes that appear to be conflict should be read together and reconciled, [***49] if reasonably possible, *Rathbun v State of Michigan*, 284 Mich 521, 544; 280 NW 35 (1938), I disagree that this is a case where reconciliation is possible. The differing opinions offered [*673] by this Court here make the underlying conflict undeniably plain. The Compact and the BTA are irreconcilably in conflict; one statute--either the Compact or the BTA--must prevail over the other. And neither alternative is easily dismissed. Traditional rules of construction lead me to resolve the conflict in favor of the later enacted and more specific legislation. See *Kalamazoo v KTS Indus, Inc*, 263 Mich App 23, 38-39; 687 NW2d 319 (2004) (resolving a direct conflict between two statutes in favor of the subsequently enacted legislation).

> 2   Taxpayers may petition the Treasury to use an alternative apportionment method if the apportionment provisions of the BTA "do not fairly represent the extent of the taxpayer's business activity in this state[.]" MCL 208.1309(1).
>
> 3   I agree with the lead opinion that the tax bases at issue here are "income taxes" within the meaning of the Compact. MCL 205.581, Art II(4).

The lead opinion agrees that the plain language of § 301 is mandatory. But it asserts that § 301 can nevertheless [***50] be interpreted as permitting taxpayers to make the Compact election. I do not see how this interpretation of the BTA is reasonable. If a taxpayer can elect an alternative apportionment formula, then § 301 is [**884] in no sense *mandatory*. Quite the opposite: § 301's mandatory apportionment "in accordance with this chapter" becomes *optional*. By interpreting § 301 as permitting taxpayers to make the Compact election, the lead opinion has not, as it claims, settled on a harmonious construction of the BTA and the Compact. Rather, it has resolved the conflict in favor of the Compact, the *earlier* enacted statute. But our precedent is clear: when an irreconcilable conflict exists, as in this case, the later enacted legislation controls. *Jackson*, 313 Mich at 356; see also *Washtenaw Co Rd Comm'rs v Pub Serv Comm*, 349 Mich. 663, 680; 85 N.W.2d 134 (1957). Because I am not convinced that the two statutes can be read harmoniously, I believe that, for tax years 2008 through 2010, the enactment of the BTA impliedly repealed the Compact's election provision.

The lead opinion tries to give some effect to § 301 by stating that a taxpayer "must use the apportionment formula set forth in" the BTA if it does not [***51] make the [*674] Compact election. *Ante* at 15. This construction does not make § 301's mandatory directive "mandatory" at all. When a taxpayer is given a choice as to whether they will apportion their income in accordance with the BTA's sales-only formula, the number of alternative options--a single one, or more--is irrelevant. As long as an alternative option exists, the taxpayer may, not must, use the apportionment formula set forth in the BTA. And once the lead opinion's "mandatory" construction is revealed to be anything but that, I do not believe that the lead opinion has persuasively explained *why* the BTA did not impliedly amend or repeal the Compact's election provision. Rather, the lead opinion, relying on the fact that the Legislature has expressly repealed and amended tax statutes in the past, simply states that "[h]ad the Legislature believed that the Compact's election provision no longer had a place in Michigan's tax system . . . , it could have taken the necessary action to eliminate the election provision." *Ante* at 14-15. Because it did not, the lead opinion "proceed[s] [***52] under the assumption that the Legislature intended for [the Compact's election provision] to remain in effect." *Ante* at 15. This, of course, simply assumes the lead opinion's conclusion that there was no repeal. Yes, repeals by implication are disfavored, and that the Legislature knows how to affect an express repeal is irrefutable. But by demanding that the Legislature take "the necessary action"--i.e., *expressly* amend or repeal the Compact--the lead opinion has elevated the presumption against implied repeals into an absolute bar.

Having failed to adequately explain why the

Page 20

496 Mich. 642, *674; 852 N.W.2d 865, **884;
2014 Mich. LEXIS 1282, ***52

statutory language itself permits the result it reaches, the lead opinion anchors its analysis in a historical overview of business taxation in Michigan. While informative, I find this approach ultimately unpersuasive. The lead opinion argues that because the Compact was enacted at a time when Michigan law applied the same three-factor apportionment [*675] formula as that provided in the Compact, the Legislature, in enacting it, must have anticipated the future enactment of a tax act requiring a different apportionment formula and intended for the Compact to prevail should a conflict arise. But even assuming that the lead [***53] opinion is correct, that interpretation reads into the Compact a policy choice by the *1970* Legislature that the *2008* Legislature was free to disagree with, either by enacting an income tax with a different, mandatory apportionment formula, as it did in 2008, or by repealing the election provision outright, as it did in 2011. See *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642, 661; 698 NW2d 350 (2005) ("[A] fundamental principle of the jurisprudence [**885] of both the United States and this state is that one legislature cannot bind the power of a successive legislature.").

The lead opinion underscores its error by attaching particular significance to 2011 PA 40, which expressly amended the Compact to make the election unavailable to BTA taxpayers beginning January 1, 2011. The effect of this amendment on tax years 2011 and beyond is plain to see, but whether the amendment lends force to IBM's position in *this* dispute is not. In enacting this amendment, the 2011 Legislature may have simply been acting expressly to confirm what the 2007 Legislature believed it had already done implicitly. And even if the 2011 Legislature was expressing its view that the BTA did not, in fact, repeal [***54] the election provision, this Court is not bound by the prior Legislature's construction of the earlier enactment. See *Robertson v Baxter*, 57 Mich 127, 132; 23 NW 711 (1885) ("Legislative construction of past legislation has no judicial force except for the future. But it is always entitled to be considered with some care, so far as it throws light on doubtful language, and for future cases it has authority."); *Frey v Mitchie*, 68 Mich. 323, 327; McGrath 1185, 36 N.W. 184 (1888) ("It is unnecessary to say more than that a [*676] legislative interpretation of old laws has no judicial force. Whether right or wrong must be determined by the statutes themselves."). The question we must answer in this case concerns what the Legislature intended when it enacted the BTA--not what

it intended when it enacted the Compact forty years earlier or amended it three years later. While in answering this question the 2011 amendment may be considered "with some care, so far as it throws light on doubtful language," *Baxter*, 57 Mich at 132, that light does not shine on the lead opinion's argument.

In my view the BTA made the Compact election unavailable. Because the statutes are irreconcilably in conflict, the latter, as the more [***55] specific and later enacted statute, must be given effect over the former. For this reason, I disagree with the lead opinion that the BTA's mandatory directive can be interpreted so as to allow BTA taxpayers to make the Compact election instead. As a result, I find it necessary to address IBM's argument that the Legislature was not constitutionally permitted to make the BTA's sales-only apportionment formula exclusive and mandatory without first repealing the Compact in its entirety.

## II. THE LEGISLATURE WAS NOT BARRED FROM UNILATERALLY AMENDING THE COMPACT

IBM asks this Court to invoke the authority of "compact law" and hold that the Legislature, even had it intended to alter the Compact's election provision when it enacted the BTA, was prohibited from doing so.[4] I would decline that invitation.

> 4 To the extent that IBM is separately arguing that the Compact is a binding contract among its member states and that unilateral amendment of the Compact offends the Contract Clause, that argument is discussed later in this opinion.

> The California First District Court of Appeal recently decided this very issue in *Gillette Co v Franchise Tax Bd*, 209 Cal App 4th 938; 147 Cal Rptr 3d 603 (2012), review [***56] granted and opinion superseded sub nom *Gillette v Franchise Tax Bd*, 151 Cal Rptr 3d 106; 291 P3d 327 (2013). The *Gillette* Court held that "under established compact law, the [Multistate Tax] Compact superseded subsequent conflicting state law . . . [and] the federal and state Constitutions prohibit states from passing laws that impair the obligations of contracts." *Gillette*, 147 Cal Rptr 3d at 615. For the reasons stated herein, I believe that *Gillette* was wrongly decided.

[*677] The United States Constitution provides that

Page 21

496 Mich. 642, *677; 852 N.W.2d 865, **885;
2014 Mich. LEXIS 1282, ***56

"[n]o State shall, without the [**886] Consent of Congress . . . enter into any Agreement of Compact with another State[.]" US Const, art I, § 10, cl 3. As the Supreme Court explained in *US Steel Corp v Multistate Tax Comm*, 434 U.S. 452; 98 S Ct 799; 54 L Ed 2d 682 (1978), the clause is not to be read strictly, but only as requiring congressional consent for compacts that tend to increase the political power of the states in a way that "may encroach upon or interfere with the just supremacy of the United States." *Id*. at 471 (quotation marks and citation omitted). Those compacts that receive congressional authorization *and* fall within the scope of the Compact Clause are treated [***57] as federal law. *Cuyler v Adams*, 449 U.S. 433, 440; 101 S Ct 703; 66 L Ed 2d 641 (1981). Compacts without congressional approval, however, are not transformed into federal law; thus their construction is a matter of state statutory law.

Notwithstanding the fact that the Multistate Tax Compact, as a compact without congressional approval, does not carry the supreme force of federal law, IBM believes that the Legislature could not impose an exclusive apportionment formula because the Compact supersedes conflicting state law in any event. This is contrary to our well-established rule that a statute can be amended, repealed, or superseded, in whole or in [*678] part, expressly or impliedly, by a subsequently enacted statute. *LeRoux v Secretary of State*, 465 Mich. 594, 615; 640 N.W.2d 849 (2002) ("Absent the creation of contract rights, the later Legislature is free to amend or repeal existing statutory provisions."). The essence of IBM's argument is that because a compact is an agreement between Michigan and the other member states, it is not like any other state law subject to traditional principles of statutory construction, but rather it has some greater force and authority. As a result, any variation [***58] from the Compact's terms is strictly prohibited. In support of this proposition, IBM cites as persuasive authority *McComb v Wambaugh*, 934 F2d 474, 479 (CA 3, 1991), and *CT Hellmuth & Assoc, Inc v Washington Metro Area Transit Auth*, 414 F Supp 408, 409 (D Md, 1976). Neither case, in my view, supports such a rule.

In *McComb*, the plaintiff, as guardian ad litem for a minor child, brought a suit against the city of Philadelphia and its employees under 42 USC 1983. The suit sought damages for injuries the child suffered as a result of parental abuse. Before he was injured the child was under the protective custody of a Virginia court. The Virginia court ordered that the child be returned to his parental home in Philadelphia, where the abuse occurred. Plaintiff argued that the Virginia court order, in conjunction with the Interstate Compact for Placement of Children (ICPC), a compact to which Pennsylvania and Virginia are parties that had not been congressionally approved, extended the jurisdiction of the Virginia court into Pennsylvania and thereby imposed a legal duty on the Philadelphia social workers. The United States Court of Appeals for the Third Circuit rejected this argument, ultimately [***59] concluding that the ICPC did not apply when a child is returned by the [*679] sending state to a natural parent residing in another state. *McComb*, 934 F2d at 482.

IBM cites the Third Circuit's discussion of the scope of the ICPC for its argument here:

> Because Congressional consent was neither given nor required, the [ICPC] does not express federal law. Consequently, this Compact must be construed as state law. . . .
>
> Nevertheless, uniformity of interpretation is important in the construction of a Compact because in some contexts it is [**887] a contract between the participating states. *Having entered into a contract, a participant state may not unilaterally change its terms. A Compact also takes precedence over statutory law in member states*. [*McComb*, 934 F2d at 479 (citations omitted; emphasis added).]

The *McComb* court did not cite any authority for the above emphasized rule--that compacts without congressional approval cannot be unilaterally amended and must take precedent over conflicting state law--and I have found none. Moreover, the unsupported statement contradicts the one that precedes it. Either the compact must be construed as state law or it must be construed as something with greater authority [***60] than state law, but the *McComb* court said both. Finally, this statement was dictum, because the court did not identify any potential conflict between the ICPC and Pennsylvania law and the court ultimately determined that the ICPC did not apply. *Id*. at 482.

In *CT Hellmuth*, the plaintiff sought to compel

Page 22

496 Mich. 642, *679; 852 N.W.2d 865, **887;
2014 Mich. LEXIS 1282, ***60

disclosure of documents under Maryland law. The defendant, an interstate agency formed by an interstate compact between Maryland, Virginia, and the District of Columbia, argued that its status as an interstate agency exempted it from the Maryland law. In granting the defendant's motion for summary judgment, the court remarked that

> [*680] when enacted, a compact constitutes not only law, but a contract which may not be amended, modified, or otherwise altered without the consent of all parties. It, therefore, appears settled that one party may not enact legislation which would impose burdens upon the compact absent the concurrence of the other signatories. [*CT Hellmuth*, 414 F Supp at 409.]

*CT Hellmuth* and the cases it relied upon, however, involved congressionally approved compacts, which, as explained, supersede subsequent state law by virtue of the Supremacy Clause. *Cuyler*, 449 U.S. at 440.

IBM's [***61] claim that the Compact trumps the BTA simply because of its status as a compact relies on the faulty premise that the distinction between compacts that have congressional approval and those that do not is unimportant, and that *all* compacts are immune to unilateral modification by their member states because "[a] Compact . . . takes precedence over statutory law in member states." *McComb*, 934 F2d at 479. This assumes too much. Any immunity, if it exists, is a result of a compact's dual nature as both state law and a contract among its member states. See *Green v Biddle*, 21 U.S. (8 Wheat) 1; 5 L Ed 547 (1832) (recognizing that an interstate compact can be a contract). As a result the Legislature is free to amend or repeal an existing statutory provision *as long as it does not impair a contractual obligation. LeRoux*, 465 Mich at 615; see US Const, art I, § 10, cl 1; Const 1963, art 1, § 10. In other words, the Legislature is prohibited from unilaterally amending the Compact only if that amendment impairs contractual obligations created by the Compact itself. When viewed as a matter of *contract* law, I believe that it was within the Legislature's power to require BTA taxpayers to apportion [***62] their multistate income solely in accordance with § 301.

[*681]  III. UNILATERAL AMENDMENT OF MCL

205.581, ART III(2) DOES NOT VIOLATE THE STATE OR FEDERAL CONTRACTS CLAUSE

In evaluating whether § 301 of the BTA unconstitutionally impairs a contract, the threshold question is whether the Compact did, in fact, create a contractual relationship in the first instance. I do not believe [**888] that it did. Two factors weigh heavily in this conclusion. First, the member states' courses of conduct indicate that there is no contractual obligation to strictly adhere to Articles III and IV of the Compact. Second, the Compact is silent regarding a member state's authority to enact exclusive apportionment formulas that differ from the Compact's formula.

Starting with the obvious: taxpayers like IBM were *not* parties to the Compact. To the extent that the Compact can be viewed as a contract, it is an agreement between its member states, not between taxpayers and the states.[5] The Compact member states' courses of performance are critical to understanding the nature of the agreement. As the Supreme Court recently explained, a party's course of performance is "highly significant" evidence of the party's understanding [***63] of the Compact's terms. *Tarrant Regional Water Dist v Hermann*,  U.S.  ; 133 S Ct 2120, 2135; 186 L Ed 2d 153 (2013) (citation and quotation marks omitted).[6] Here, it is plain that the member states did *not* view [*682] strict adherence to Articles III and IV as a binding contractual obligation, as Compact members have deviated from the Compact's election provision and apportionment formula without objection from other members. Arkansas, for example, has retained the Compact's election provision but changed the Compact formula to place additional emphasis on the sales factor. Ark Code 26-5-101, Art IV(9). Nondeviating members have not pursued actions against those states that have deviated, and no member state has intervened on IBM's behalf in this case. Further, the Multistate Tax Commission--the organization charged with administering the Compact--has urged us to reject IBM's rigid interpretation of the Compact. These facts weigh heavily in favor of rejecting IBM's argument that the Compact creates a binding contractual obligation on its member states to refrain from amending the election provision.[7]

> 5  While the Treasury has not made the argument in its brief on appeal, it is not entirely [***64] clear to me why IBM has standing to enforce the

Page 23

496 Mich. 642, *682; 852 N.W.2d 865, **888;
2014 Mich. LEXIS 1282, ***64

Compact *as a contract*, given that IBM is neither a party to the Compact nor is it clear that they were intended as a third-party beneficiary. See *Schmalfeldt v North Pointe Ins Co*, 469 Mich 422; 670 NW2d 651 (2003); MCL 600.1405. In any event, because I conclude that no such contractual relationship was formed, I find it unnecessary to address this issue *sua sponte*.

6   Michigan law recognizes a similar principle. See *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 478-479; 663 NW2d 447 (2003).

7   It bears emphasizing that Compact members have not only refrained from bringing legal action against one another for deviating from Articles III and IV, they have endorsed the Commissioner's interpretation of the Compact: in the *Gillette* litigation, all of the member states jointly filed an amicus brief urging the Supreme Court of California to reject the lower court's construction of the Compact as a binding contract.

Deference to principles of state sovereignty leads me to the same conclusion. As this Court explained in *Studier*, 472 Mich at 661, there is a "strong presumption that statutes do not create contractual rights." This presumption is [***65] grounded in the principle that "surrenders of legislative power are subject to strict limitations that have developed in order to protect the sovereign prerogatives of state governments." *Id*. IBM has not overcome this presumption here. The Compact's silence on the effect of a member state's ability to elect an exclusive apportionment formula indicates that Michigan did not contract away its right to do exactly [*683] that. *Id*. at 662. While it is true that the Compact [**889] does not expressly allow Michigan to adopt a different apportionment formula, neither does the Compact surrender the state's right to do so. When the state's sovereign power of taxation is implicated, as it is here, any uncertainty should be resolved in favor of concluding that the state did *not* cede that power. See *Tarrant*, 133 S Ct at 2132 (recognizing that states "do not easily cede their sovereign powers"). Admittedly, any sovereignty concerns are abated by the fact that a member state may withdraw from the Compact, unilaterally and without repercussion, at any time. MCL 205.581, Art X(2). But this withdrawal provision is equally strong evidence that

the member states did not intend to be contractually bound, as it demonstrates [***66] the member states' desire to retain control over their sovereignty with respect to taxation. Moreover, if continued participation in the Compact is, essentially, completely voluntary, I fail to see how its terms can be construed as creating binding contractual obligations, especially in light of the presumption against such an interpretation. *Studier*, 472 Mich at 661.[8]

8   In arguing that unilateral amendment of the Compact would offend the state and federal constitutions, IBM cites *Green*, 21 U.S. 1; 5 L. Ed. 547, in which the Supreme Court analyzed an interstate compact under the Contract Clause, US Const, art I, § 10, cl 1. While I conclude that the Compact did not create a contractual obligation that precluded Michigan from unilaterally amending its election provision, it is important to note that the Supreme Court has since retreated from the "any deviation" standard it applied in *Green*. See *US Trust Co v New Jersey*, 431 U.S. 1, 21; 97 S Ct 1505; 52 L Ed 2d 92 (1977). Because IBM does not engage these post-*Green* developments, it has failed to explain how a constitutional violation arises under a modern analysis.

## IV. CONCLUSION

I would affirm the judgment of the Court of Appeals because the Legislature [***67] expressly provided that taxes [*684] established under the BTA "shall be in accordance with" the BTA's sales-only apportionment formula. Allowing taxpayers to apportion their multistate income in accordance with the Compact's formula violates this unambiguous directive. And because the state was not contractually obligated to allow taxpayers to make the Compact election, the BTA does not offend the state or federal constitutions.

Bridget M. McCormack

Robert P. Young, Jr.

Mary Beth Kelly



**STATE OF KANSAS, PLAINTIFF v. STATE OF COLORADO**

**No. 105, Orig.**

**SUPREME COURT OF THE UNITED STATES**

**514 U.S. 673; 115 S. Ct. 1733; 131 L. Ed. 2d 759; 1995 U.S. LEXIS 3214; 63 U.S.L.W. 4387; 95 Cal. Daily Op. Service 3593; 95 Daily Journal DAR 6183; 9 Fla. L. Weekly Fed. S 15**

**March 21, 1995, Argued**
**May 15, 1995, Decided**

**DISPOSITION:** Exceptions overruled, and case remanded.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff State of Kansas (Kansas) filed suit alleging violations of Arkansas River Compact (Compact) against defendant State of Colorado (Colorado). A special master recommended the court find that post-compact pumping materially depleted usable flow in violation of Compact art. IV-d, that Kansas did not prove Winter Water Storage Program (WWSP) violated compact, and that the Trinidad reservoir claims should be dismissed. Exceptions were filed.

**OVERVIEW:** Kansas and Colorado filed exceptions to the special master's report. The court determined that Kansas did not prove Colorado violated Operating Compact of the Trinidad Reservoir as Kansas did not demonstrate the two storage practices at the reservoir were a material depletion under Article IV-D. Kansas also failed to prove WWSP program resulted in material depletions of usable flow in violation of Article IV-D after examining computer models that indicated depletions were within the range of error. And, under Article IV-D of the compact, future development and construction along the river basin was allowed if it did not materially deplete state-line flow in usable quantity or availability and the special master concluded the

approach was the best method based on expert testimony offered by Kansas. The court held that (1) Kansas did not inexcusably delay well-pumping claim; (2) Colorado was not prejudiced and doctrine of laches did not apply, as Colorado did not prove lack of diligence and prejudice; (3) replacement of centrifugal with turbine pumps was proper; (4) reports by U.S. Geological Survey were not faulty; and (5) Colorado caused material depletions in post-compact pumping.

**OUTCOME:** The court overruled exceptions filed by Kansas and Colorado and remanded the case to the special master for determination of unresolved issues.

**CORE TERMS:** compact, river, usable, reservoir, pumping, depletion, acre-feet, stateline, laches, overrule, storage, state line, hydrological, materially, basin, failed to prove, beneficial, winter, dam, border, well-pumping, offset, divide, mile, coefficients, interstate, improved, depleted, annual, pumped

**LexisNexis(R) Headnotes**

*Governments > State & Territorial Governments > Water Rights*
*Transportation Law > Water Transportation > Waterways*

[HN1] The Arkansas River Compact's primary purposes are to settle existing disputes and remove causes of future controversy concerning the waters of the Arkansas River and to equitably divide and apportion the waters of the Arkansas River, as well as the benefits arising from the construction, operation and maintenance by the United States of John Martin Reservoir.

*Governments > State & Territorial Governments > Water Rights*
[HN2] The Arkansas River Compact (compact) is not intended to impede or prevent future beneficial development of the Arkansas River basin in Colorado and Kansas by federal or state agencies, by private enterprise, or by combinations thereof, which may involve construction of dams, reservoir, and other works for the purposes of water utilization and control, as well as the improved or prolonged functioning of existing works: Provided, that the waters of the Arkansas River shall not be materially depleted in usable quantity or availability for use to the water users in Colorado and Kansas under this compact by such future development or construction.

*Civil Procedure > Equity > Maxims > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Affirmative Defenses > Laches*
*Governments > State & Territorial Governments > Water Rights*
[HN3] Doctrine of laches, is based upon maxim that equity aids the vigilant and not those who slumber on their rights. It is defined as neglect to assert a right or claim which, taken together with lapse of time and other circumstances causing prejudice to the adverse party, operates as bar in court of equity.

*Governments > State & Territorial Governments > Water Rights*
[HN4] The ultimate responsibility for deciding what are correct findings of fact remains with the court.

**DECISION:**

In original action brought in Supreme Court by Kansas against Colorado to resolve disputes arising under two states' Arkansas River Compact, exceptions by both states to report of Special Master overruled.

**SUMMARY:**

The Arkansas River rises in Colorado and flows through Kansas and some other states until emptying into another river. The states of Colorado and Kansas approved an Arkansas River Compact, which Congress ratified in 1949 (63 Stat 145). The Compact generally involved the apportionment of the river's waters and related matters. Among other provisions, Article IV-D of the Compact stated that (1) the Compact was not intended to impede or prevent future beneficial development of the Arkansas River basin in Colorado and Kansas by federal or state agencies, private enterprise, or combinations thereof, and (2) such development might involve construction of dams, reservoirs, and other works for the purposes of water utilization and control, as well as the improved or prolonged functioning of existing works, provided that the river's waters would not be materially depleted in usable quantity or availability for use to the water users in Colorado and Kansas under the Compact by such development or construction. While Article VIII of the Compact created a joint Arkansas River Compact Administration, every decision by the Administration required a unanimous vote by the representatives of both states. In 1985, the state of Kansas brought an original action in the United States Supreme Court against the state of Colorado to resolve disputes arising under the Compact. In 1986, the Supreme Court granted Kansas leave to file the complaint (475 US 1079, 89 L Ed 2d 712, 106 S Ct 1454). After the death of the case's first Special Master, the court appointed another Special Master (484 US 910, 98 L Ed 2d 212, 108 S Ct 254). The disputes in the case basically involved a fertile agricultural reach of the Arkansas River in Colorado and Kansas that was affected by three federal projects: (1) the John Martin Reservoir, which was on the river and had been completed in 1948; (2) the Pueblo Reservoir, which was on the river and had been substantially completed in 1975; and (3) the Trinidad Reservoir, which (a) was on a major tributary, (b) had been approved by Congress in 1958, and (c) had been completed in 1977. The Special Master bifurcated the trial of the action into a liability phase and a remedy phase. Eventually, the Special Master filed a report with some findings and recommendations concerning the liability phase.

On exceptions to the report of the Special Master, the Supreme Court overruled the exceptions filed by Kansas and Colorado and remanded the case to the Special Master for determination of the unresolved issues. In an

opinion by Rehnquist, Ch. J., expressing the unanimous view of the court, it was held that (1) Kansas' claim concerning the Trinidad Reservoir Operating Principles, which had been approved by the Administration in 1967, was properly dismissed, because Kansas--in order to establish a Compact violation based upon failure to obey the Operating Principles--was required to demonstrate that this failure had resulted in a material depletion under Article IV-D, but Kansas had not established, and had not attempted to establish, such injury; (2) Kansas had failed to prove its claim that the operation of the Winter Water Storage Program at the Pueblo Reservoir had resulted in material depletions of usable flows at stateline in violation of Article IV-D; (3) for purposes of the requirement that Kansas establish that development in Colorado had resulted in material depletions of "usable" river flow at stateline in violation of Article IV-D, the Special Master had properly rejected the method eventually chosen by Kansas in favor of another method; (4) even if the equitable defense of laches was available in the action, Colorado had failed to prove an element necessary to the recognition of that defense--that is, lack of diligence on the part of Kansas--with respect to Kansas' claim to the effect that increases in well pumping in Colorado had caused a significant decline in the river's usable flow at stateline in violation of Article IV-D; (5) pre-Compact wells in Colorado were limited to the highest amount pumped in the years during which the Compact had been negotiated and the highest amount of such pumping was 15,000 acre-feet per year; (6) with respect to the Administration's adoption of the 1980 Operating Plan for the John Martin Reservoir, the Special Master had properly determined that the 1980 Operating Plan was separately bargained for and therefore should not offset any depletions caused by post-Compact well pumping in Colorado, for purposes of deciding Kansas' well-pumping claim; and (7) regardless of which burden of proof was applicable to Kansas' well-pumping claim, there was no difficulty in concluding that post-Compact pumping in Colorado had caused material depletions of the usable stateline flows of the river, in violation of the Compact.

**LAWYERS' EDITION HEADNOTES:**

REFERENCE §19

SUPREME COURT OF THE UNITED STATES §58;

interstate dispute -- Arkansas River Compact -- review -- remand -- ;

Headnote:[1A][1B][1C][1D][1E][1F][1G][1H][1I][1J][1K]

In an original action brought in the United States Supreme Court by the state of Kansas against the state of Colorado to resolve disputes arising under the two states' Arkansas River Compact (ratified by Congress in 1949 at 63 Stat 145), the Supreme Court will overrule the exceptions filed by both Kansas and Colorado to the findings and recommendations of a report by a Special Master who was appointed by the court, and the Supreme Court will remand the case to the Special Master for determination of the unresolved issues in a manner not inconsistent with the court's opinion, where (1) the Special Master bifurcated the trial of the action into a liability phase and a remedy phase; (2) the report in question concerns the liability phase; (3) the Supreme Court adopts the Special Master's recommendations, to which Colorado did not file exceptions, to grant Kansas' motion to dismiss two counterclaims by Colorado; and (4) the Supreme Court agrees with the Special Master's resolution of the liability issues as to which the parties filed exceptions, with respect to (a) the dismissal of Kansas' claim concerning some operating principles for the Trinidad Reservoir, (b) Kansas' failure to prove its claim concerning the operation of the Winter Water Storage Program at the Pueblo Reservoir, (c) the choice of a method for Kansas' establishing that development in Colorado had resulted in material depletions of "usable" river flow at stateline in violation of the Compact's Article IV-D, (d) the rejection of Colorado's attempt to assert the defense of laches concerning Kansas' claim to the effect that increases in well pumping in Colorado had caused a significant decline in the river's usable flow at stateline in violation of Article IV-D, (e) the existence and extent of a limit on pumping by pre-Compact wells in Colorado, (f) the effect of the adoption of the 1980 Operating Plan for the John Martin Reservoir, and (g) the causation by post-Compact well pumping in Colorado of a violation of the Compact.

EVIDENCE §962

STATES, TERRITORIES, AND POSSESSIONS §58;

Arkansas River Compact -- what constitutes

violation -- proof -- ;

Headnote:[2A][2B]

In an original action brought in the United States Supreme Court by the downstream state of Kansas against the upstream state of Colorado to resolve disputes arising under the two states' Arkansas River Compact (ratified by Congress in 1949 at 63 Stat 145), Kansas' claim concerning the Trinidad Reservoir Operating Principles, which were approved by the Arkansas River Compact Administration in 1967, is properly dismissed, because Kansas--in order to establish a Compact violation based upon failure to obey the Operating Principles--was required to demonstrate that this failure resulted in a material depletion under the Compact's Article IV-D, but Kansas has not established, and did not attempt to establish, such injury, where (1) the Trinidad Reservoir (a) is a federal project on a major tributary of the Arkansas River, (b) was approved by Congress in 1958, and (c) was completed in 1977; (2) even though Kansas claimed that any departure from the Operating Principles constituted a violation of the Compact regardless of injury, the theory advocated by Kansas is inconsistent with Article IV-D, which allows for the development and operation of dams and reservoirs so long as there is no resultant material depletion of usable flow at stateline; (3) Kansas offered no evidence, apart from some United States Bureau of Reclamation studies which initially proposed the Operating Principles and later concluded that some practices constituted a departure from the intent of the Operating Principles, to show that the project's actual operation caused Kansas to receive less water than under historical without-project conditions; (4) for Kansas to prevail in its contention, it would have to show that the Operating Principles had the effect of amending the Compact by granting either party the right to sue the other for violation of the Operating Principles even though the violation resulted in no material depletion of usable flow at stateline; and (5) under Article VIII of the Compact, although the Administration is empowered to prescribe procedures for the administration of the Compact, the Administration must do so consistent with the provisions of the Compact.

EVIDENCE §962;

Arkansas River Compact -- failure to prove violation -- ;

Headnote:[3A][3B]

In an original action brought in the United States Supreme Court by the downstream state of Kansas against the upstream state of Colorado to resolve disputes arising under the two states' Arkansas River Compact (ratified by Congress in 1949 at 63 Stat 145), Kansas fails to prove its claim that the operation of the Winter Water Storage Program (WWSP) at the Pueblo Reservoir, a federal project on the river, resulted in material depletions of usable flows at stateline in violation of the Compact's Article IV-D, where (1) under the WWSP, Colorado and the United States Bureau of Reclamation used excess capacity at the Pueblo Reservoir to store a portion of the river's winter-time flow for beneficial use at other times; (2) a Special Master appointed by the Supreme Court has examined the computer models submitted by Kansas and Colorado and has determined that (a) the depletions shown by the Kansas model were well within the model's range of error, and (b) as a result, one could not be sure whether impact or error was being shown; and (3) the Supreme Court believes that the Special Master gave Kansas every reasonable opportunity to meet its burden of proving the WWSP claim.

EVIDENCE §962;

Arkansas River Compact -- establishing violation -- ;

Headnote:[4A][4B]

In an original action brought in the United States Supreme Court by the downstream state of Kansas against the upstream state of Colorado to resolve disputes arising under the two states' Arkansas River Compact (ratified by Congress in 1949 at 63 Stat 145), for purposes of the requirement that Kansas establish that development in Colorado resulted in material depletions of "usable" river flow at stateline in violation of the Compact's Article IV-D, a Special Master appointed by the Supreme Court properly rejects the method eventually chosen by Kansas in favor of another method, where (1) the Compact does not define the term "usable"; (2) the Special Master's chosen method is a modification of a third method to correct some errors resulting from the use of the third method; (3) each of the three methods requires two steps: (a) a calculation of total depletions using a hydrological model presented by Kansas, and (b) an application of "usability" criteria; and (4) Kansas' chosen method is less compatible with the hydrological

model than the other methods proposed, in that Kansas' chosen method requires the model to do something which the model was not designed to do, that is, to predict accurately depletions on a monthly basis.

EVIDENCE §966.5;

failure to prove laches -- ;

Headnote:[5A][5B][5C]

Even if the equitable defense of laches is available in an original action brought in 1985 in the United States Supreme Court by the downstream state of Kansas against the upstream state of Colorado to resolve disputes arising under the two states' Arkansas River Compact (ratified by Congress in 1949 at 63 Stat 145), Colorado fails to prove an element necessary to the recognition of that defense with respect to Kansas' claim to the effect that increases in well pumping in Colorado had caused a significant decline in the river's usable flow at stateline in violation of the Compact's Article IV-D, because in light of the vague and conflicting evidence available to Kansas, Colorado fails to demonstrate lack of diligence, that is, inexcusable delay, on the part of Kansas, where (1) a Special Master appointed by the Supreme Court concludes that while Kansas, prior to 1984, made no formal complaint to the Arkansas River Compact Administration regarding post-Compact well pumping in Colorado, Colorado's evidence does not (a) deal with the issue of impact on usable flow at stateline, or (b) demonstrate that Kansas officials were aware of the number of wells, the extent of Colorado's pumping, or the impact or even potential impact of pumping on usable stateline flows; (2) the Special Master explains the difficulty, due to changing conditions during the 1970's and early 1980's, of assessing the impact of increases in post-Compact well pumping on usable stateline flows; and (3) as late as 1985, Colorado officials refused to permit an investigation by the Administration of well development in Colorado because the officials claimed that the evidence produced by Kansas did not suggest that such development had an impact on usable stateline flows.

LIMITATION OF ACTIONS §16;

defense of laches -- ;

Headnote:[6]

The defense of laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.

STATES, TERRITORIES, AND POSSESSIONS §58;

Arkansas River Compact -- limit on well pumping -- ;

Headnote:[7A][7B]

In an original action brought in the United States Supreme Court by the downstream state of Kansas against the upstream state of Colorado to resolve disputes arising under the two states' Arkansas River Compact (ratified by Congress in 1949 at 63 Stat 145), a Special Master appointed by the Supreme Court properly determines that pre-Compact wells in Colorado are limited to the highest amount pumped in the years during which the Compact was negotiated and that the highest amount of such pumping was 15,000 acre-feet per year, where (1) both parties agree that a certain amount of post-Compact well pumping is allowable under the Compact, as (a) the Compact's Article IV-D prohibits "future" beneficial development of the river basin that materially depletes the river's usable flows, and (b) some wells in Colorado were in existence prior to the Compact; (2) while Colorado argues that the Compact does not limit pumping by pre-Compact wells to the highest amount actually pumped in pre-Compact years, the clear language of Article IV-D refutes Colorado's legal challenge, as (a) regardless of subsequent practice by the parties, improved and increased pumping by existing wells clearly falls within Article IV-D's prohibition against improved or prolonged functioning of existing works, (b) although Article VI-A(2) of the Compact generally supports the rights of Colorado appropriators of river waters, Article VI-A(2) begins with the phrase, "Except as otherwise provided," and must be read in conjunction with and as limited by Article IV-D, and (c) new wells, the replacement of centrifugal with turbine pumps, and increased pumping from pre-Compact wells all come within Article IV-D; and (3) contrary to a factual argument by Colorado as to the figure of 15,000 acre-feet, the Special Master properly concludes that (a) there is no precise answer to the amount of such pre-Compact well pumping, (b) that amount must remain as an estimate, and (c) he will rely on two reports by the

United States Geological Survey and the Colorado legislature, which reports were responsible, reached similar conclusions as to the amounts of Colorado pumping during the 1940's, and had since been used by Colorado's state engineer.

REFERENCE §23

SUPREME COURT OF THE UNITED STATES §58;

interstate dispute -- water rights -- facts -- ;

Headnote:[8]

On exceptions to a report of a Special Master in an original action brought in the United States Supreme Court by the state of Kansas against the state of Colorado to resolve disputes arising under the two states' Arkansas River Compact (ratified by Congress in 1949 at 63 Stat 145), the ultimate responsibility for deciding what are correct findings of fact remains with the Supreme Court.

STATES, TERRITORIES, AND POSSESSIONS §58;

Arkansas River Compact -- offset -- separate bargain -- ;

Headnote:[9A][9B]

In an original action brought in the United States Supreme Court by the downstream state of Kansas against the upstream state of Colorado to resolve disputes arising under the two states' Arkansas River Compact (ratified by Congress in 1949 at 63 Stat 145), with respect to the adoption by the joint Arkansas River Compact Administration of the 1980 Operating Plan for the John Martin Reservoir on the river, a Special Master appointed by the Supreme Court properly determines that the 1980 Operating Plan was separately bargained for and therefore should not offset any depletions caused by post-Compact well pumping in Colorado, for purposes of deciding Kansas' claim that such pumping violated the Compact's Article IV-D, where (1) the Administration resolution adopting the 1980 Operating Plan (a) did not state that post-Compact well pumping in Colorado or Kansas was a cause of changes in the regime of the Arkansas River, and (b) expressly reserved the parties' rights under the Compact; and (2) the Special Master

concludes that (a) there is no evidence to support the assertion that the benefits to Kansas under the 1980 Operating Plan were in settlement of Kansas' well-pumping claims, and (b) Colorado received ample consideration under the agreement for the 1980 Operating Plan without a waiver of Kansas' well-pumping claims.

REFERENCE §20

SUPREME COURT OF THE UNITED STATES §58;

interstate dispute -- water rights -- proof of violation -- review -- ;

Headnote:[10A][10B]

On exceptions to a report of a Special Master in an original action brought in the United States Supreme Court by the downstream state of Kansas against the upstream state of Colorado to resolve disputes arising under the two states' Arkansas River Compact (ratified by Congress in 1949 at 63 Stat 145), the Supreme Court will overrule Colorado's exception as to the burden of proof applicable to Kansas' claim concerning post-Compact well pumping in Colorado, where the Supreme Court holds that it need not resolve the burden-of-proof issue, as the court agrees with the Special Master's conclusion that regardless of which burden of proof applies, there is no difficulty in concluding that post-Compact pumping in Colorado had caused material depletions of the usable stateline flows of the river, in violation of the Compact.

## SYLLABUS

Kansas and Colorado negotiated the Arkansas River Compact to settle disputes and remove causes of future controversies over the river's waters and to equitably divide and apportion those waters and the benefits arising from the United States' construction, operation, and maintenance of John Martin Reservoir. Under Article IV-D, the Compact is not intended to impede or prevent future beneficial development -- including construction of dams and reservoirs and the prolonged or improved functioning of existing works -- provided that such development does not "materially deplete" stateline flows "in usable quantity or availability for use." In this action, the Special Master recommended that the Court, among other things, find that post-Compact well pumping in Colorado has resulted in a violation of Article IV-D of

the Compact; find that Kansas has failed to prove that the operation of Colorado's Winter Water Storage Program (WWSP) violates the Compact; and dismiss Kansas' claim that Colorado's failure to abide by the Trinidad Reservoir Operating Principles (Operating Principles) violates the Compact. Both Kansas and Colorado have filed exceptions.

*Held:* The exceptions are overruled. Pp. 681-694.

(a) Article IV-D permits development of projects so long as their operation does not result in a material depletion of usable flow to Kansas users. Kansas' exception to the dismissal of its Trinidad Reservoir claim fails because Kansas has not established that Colorado's failure to obey the Operating Principles resulted in such a violation. Pp. 681-683.

(b) Because Kansas failed to meet its burden of proving its WWSP claim despite being given every reasonable opportunity to do so by the Special Master, there is no support for its exception to the Special Master's conclusion on that claim. P. 684.

(c) In selecting what method should be used to determine depletions of "usable" flow, the Special Master properly rejected the Spronk method -- which Kansas' exception proposes is correct -- as less compatible with Kansas' hydrological model than the method ultimately adopted by the Special Master. Pp. 684-687.

(d) In ruling on Colorado's exception to the Special Master's conclusion that laches does not bar Kansas' well-pumping claim, it is not necessary to decide whether the laches doctrine applies to a case involving the enforcement of an interstate compact because Colorado has failed to prove that Kansas lacked due diligence in bringing its claim. Colorado errs in arguing that Kansas officials had sufficient evidence about increased well pumping in Colorado to determine that a Compact violation existed in 1956. The evidence available through 1985 was vague and conflicting. Pp. 687-689.

(e) This Court disagrees with both the legal and factual claims Colorado raises in its exception to the Special Master's finding that the Compact limits annual pumping by pre-Compact wells to 15,000 acre-feet, the highest amount actually pumped in those years. Kansas' failure to object to the replacement of pumps or increased pumping by pre-Compact wells does not support Colorado's legal argument that the limit should be the

maximum amount of pumping possible using wells existing prior to the Compact. Regardless of the parties' subsequent practice, such improvements to and increased pumping by existing wells clearly fall within Article IV-D's prohibition. In making the factual determination that 15,000 acre-feet per year is the appropriate limit, the Special Master properly relied on reports by the United States Geological Survey and the Colorado Legislature, reports that have since been used by the Colorado State Engineer. Pp. 689-691.

(f) The Court agrees with the Special Master's conclusion that the 1980 Operating Plan for the John Martin Reservoir (Plan) was separately bargained for and thus there is no evidence to support the claim raised in Colorado's exception that the benefits to Kansas from the Plan were in settlement of its well claims. The Plan does not state that post-Compact well pumping in Colorado or Kansas was a cause of changes in the river's regime, and it expressly reserves the parties' rights under the Compact. Pp. 691-693.

(g) The Special Master concluded that, regardless whether the burden of proof applied to Kansas' well-pumping claim is clear and convincing evidence or preponderance of the evidence, the post-Compact well pumping in Colorado had caused material depletions of usable river flows in violation of the Compact. Thus, this Court need not resolve the issue raised by Colorado's exception: that clear and convincing evidence is the correct standard. Pp. 693-694.

**COUNSEL:** John B. Draper, Special Assistant Attorney General of Kansas, argued the cause for plaintiff. With him on the briefs were Robert T. Stephan, Attorney General, John W. Campbell, Deputy Attorney General, and Leland E. Rolfs and Mary Ann Heckman, Assistant Attorneys General.

David W. Robbins, Special Assistant Attorney General of Colorado, argued the cause for defendant. With him on the briefs were Gale Norton, Attorney General, Stephen K. Erkenbrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, and Dennis M. Montgomery, Special Assistant Attorney General.

Jeffrey P. Minear argued the cause for the United States. With him on the brief were Solicitor General Days, Assistant Attorney General Schiffer, Deputy Solicitor General Kneedler, and Patricia L. Weiss. *

*    Joseph B. Meyer, Attorney General of Wyoming, Donald M. Gerstein, Assistant Attorney General, and Dennis C. Cook, Special Assistant Attorney General, filed a brief for the State of Wyoming as amicus curiae.

**JUDGES:** REHNQUIST, C. J., delivered the opinion for a unanimous Court.

**OPINION BY:** REHNQUIST

**OPINION**

[*675]  [**1736]  [***767] CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

[***LEdHR1A] [1A]This original action involves a dispute between Kansas, Colorado, and the United States over alleged violations of the Arkansas River Compact. The Special Master has filed a report (Report) detailing his findings and recommendations concerning the liability phase of the trial. Both Kansas and Colorado have filed exceptions to those findings and recommendations. We agree with the Special Master's disposition of the liability issues. Accordingly, we overrule the parties' exceptions.

I

The Continental Divide in the United States begins at the Canadian border in the mountains of northwestern Montana. From there, it angles southeast through Montana [**1737] and Wyoming until it enters Colorado. It then runs roughly due south through Colorado, following first the crest of the Front Range of the Rocky Mountains, and then shifting slightly west to follow the crest of the Sawatch Range. The Arkansas River rises on the east side of the Continental Divide, [*676] between Climax and Leadville, Colorado. Thence it flows south and east through Colorado, Kansas, Oklahoma, and Arkansas, emptying into the Mississippi River, which in turn flows into the Gulf of Mexico. As if to prove that the ridge that separates them is indeed the Continental Divide, a short distance away from the source of the Arkansas, the Colorado River rises and thence flows southwest through Colorado, Utah, and Arizona, and finally empties into the Gulf of Baja, California.

The Arkansas River flows at a steep gradient from its source south to Canon City, Colorado, whence it turns east and enters the Royal Gorge. As it flows through the Royal Gorge, the Arkansas River is at some [***768] points half a mile below the summit of the bordering cliffs. The Arkansas River thence descends gradually through the high plains of eastern Colorado and western Kansas; its elevation at the Colorado-Kansas border is 3,350 feet. It then makes its great bend northward through Kansas, and from there flows southeasterly through northeastern Oklahoma and across Arkansas. The Arkansas River covers about 1,450 miles from its source in the Colorado Rockies to the point in southeastern Arkansas where it flows into the Mississippi River. It is the fourth longest river in the United States, and it drains in an area of 185,000 square miles.

The first Europeans to see the Arkansas River were members of the expedition of Francisco Coronado, in the course of their search for the fabled Seven Golden Cities of Cibola. In 1541, they crossed the Arkansas River near what is now the Colorado-Kansas border. One year later, those in the expedition of Hernando DeSoto would see the Arkansas River 1,000 miles downstream at its mouth. The western borders of the Louisiana Purchase, acquired from France in 1803, included within them most, if not all, of the Arkansas River drainage basin. Zebulon Pike, in his expedition of 1805-1806, in the course of which he sighted the mountain peak named after him, traveled up the Arkansas River. [*677] John C. Fremont traversed the river in the other direction in his expedition of 1843-1844.

Today, as a result of the Kerr McClellan Project, the Arkansas River is navigable for oceangoing vessels all the way from its mouth to Tulsa, Oklahoma. The Arkansas River is unique in that the pronunciation of its name changes from State to State. In Colorado, Oklahoma, and Arkansas, it is pronounced as is the name of the State of Arkansas, but in Kansas, it is pronounced Ar-KAN-sas.

The reach of the Arkansas River system at issue here is a fertile agricultural region that extends from Pueblo, Colorado, to Garden City, Kansas. This region has been developed in Colorado by 23 major canal companies and in Kansas by 6 canal companies, which divert the surface flows of the Arkansas River and distribute them to individual farmers. Report 35-38. Also relevant to this dispute, the United States has constructed three large water storage projects in the Arkansas River basin. *Id.*, at 43-48. The John Martin Reservoir, located on the

Arkansas River about 60 miles west of the Kansas border, was authorized by Congress in 1936, 49 Stat. 1570, and was completed in 1948. It is the largest of the federal reservoirs, and initially it had a storage capacity of about 700,000 acre-feet. [1] Report 45. The Pueblo Reservoir, located on the Arkansas River about 150 miles west of the Kansas border, was authorized by Congress in 1962, and was substantially completed in 1975. *Id.*, at 44. In 1977, the storage capacity of the Pueblo Reservoir was estimated to be about 357,000 acre-feet. *Ibid.* Finally, the Trinidad Reservoir, located on the Purgatoire River (a major tributary of the Arkansas River) was approved by Congress in 1958, and was completed in 1977. *Id.*, at 43. [**1738] The total capacity of the Trinidad Reservoir is about 114,000 acre-feet. *Ibid.*

> 1   An acre-foot is equivalent to 325,900 gallons of water; it represents the volume of water necessary to cover one acre of land with one foot of water. Report xvii.

[*678] Twice before in this century, the States of Kansas and Colorado have [***769] litigated in this Court regarding their respective rights to the waters of the Arkansas River. See *Kansas* v. *Colorado*, 206 U.S. 46, 51 L. Ed. 956, 27 S. Ct. 655 (1907); *Colorado* v. *Kansas*, 320 U.S. 383, 88 L. Ed. 116, 64 S. Ct. 176 (1943). In the first suit, the Court denied Kansas' request to enjoin diversions of the Arkansas River by Colorado because the depletions alleged by Kansas were insufficient to warrant injunctive relief. *Kansas* v. *Colorado, supra*, at 114-117. In the second suit, Colorado sought to enjoin lower court litigation brought against Colorado water users, while Kansas sought an equitable apportionment of the Arkansas River. *Colorado* v. *Kansas, supra*, at 388-389. The Court granted Colorado an injunction, but concluded that Kansas was not entitled to an equitable apportionment. 320 U.S. at 400. The Court suggested that the States resolve their differences by negotiation and agreement, pursuant to the Compact Clause of the Constitution. *Id.*, at 392. See U.S. Const., Art. I, § 10, cl. 3.

In 1949, after three years of negotiations, Kansas and Colorado approved, and Congress ratified, the Arkansas River Compact (Compact). See 63 Stat. 145; see also Report 5-6; App. to Report 1-17 (reprinting text of Compact). Article VIII of the Compact creates the Arkansas River Compact Administration (Administration) and vests it with the power and responsibility for administering the Compact. *Id.*, at 11-15. The Administration is composed of a nonvoting presiding officer designated by the President of the United States, and three voting representatives from each State. Each State has one vote, and every decision, authorization, or other action by the Administration requires a unanimous vote. *Id.*, at 12-13 (Article VIII-D).

[HN1] The Compact's primary purposes are to "settle existing disputes and remove causes of future controversy . . . concerning the waters of the Arkansas River" and to "equitably divide and apportion" the waters of the Arkansas River, "as well as the benefits arising from the construction, operation [*679] and maintenance by the United States of John Martin Reservoir." *Id.*, at 1-2 (Articles I-A, I-B). Article IV-D, the provision of the Compact most relevant to this dispute, states:

> [HN2] "This Compact is not intended to impede or prevent future beneficial development of the Arkansas River basin in Colorado and Kansas by Federal or State agencies, by private enterprise, or by combinations thereof, which may involve construction of dams, reservoir, and other works for the purposes of water utilization and control, as well as the improved or prolonged functioning of existing works: *Provided*, that the waters of the Arkansas River . . . shall not be materially depleted in usable quantity or availability for use to the water users in Colorado and Kansas under this Compact by such future development or construction." *Id.*, at 5 (emphasis added).

In 1983, Kansas conducted an independent investigation of possible violations of the Compact arising from the impact of increases in post-Compact well pumping in Colorado and the operation of two of the federal reservoirs. Report 9-10. In December 1985, Kansas brought this original action against the State of Colorado to resolve disputes arising under the Compact. [***770] *Id.*, at 10. The Court granted Kansas leave to file its complaint, *Kansas* v. *Colorado*, 475 U.S. 1079, 89 L. Ed. 2d 712, 106 S. Ct. 1454 (1986), and appointed Judge Wade H. McCree, Jr., to serve as Special Master, *Kansas* v. *Colorado*, 478 U.S. 1018, 92 L. Ed. 2d 736, 106 S. Ct. 3330 (1986). Upon Judge McCree's death, the

Court appointed Arthur L. Littleworth as Special Master. *Kansas* v. *Colorado*, 484 U.S. 910, 98 L. Ed. 2d 212, 108 S. Ct. 254 (1987).

Kansas advanced three principal claims, each involving an alleged Compact violation. See Report 58. First, Kansas alleged that increases in groundwater well pumping in Colorado in the years following adoption of the Compact have caused a significant decline in the Arkansas River's surface [*680] flow [**1739] in violation of Article IV-D of the Compact. Second, Kansas claimed that Colorado's Winter Water Storage Program (WWSP) -- a program whereby the Bureau of Reclamation of the Department of the Interior (Bureau of Reclamation) and Colorado use excess capacity at the Pueblo Reservoir to store a portion of the winter flow of the Arkansas River -- violates the Compact. Third, Kansas claimed that Colorado's failure to abide by the Trinidad Reservoir Operating Principles (Operating Principles) constituted a violation of the Compact. *Ibid.*

[***LEdHR1A] [1B]The Special Master bifurcated the trial into a liability phase and a remedy phase. At the conclusion of the liability phase, the Special Master filed his Report, outlining his findings and recommendations. In his Report, the Special Master recommended, among other things, that the Court: (1) find that post-Compact well pumping in Colorado has "materially depleted" the "usable" flow at the Colorado-Kansas border (state line) in violation of Article IV-D of the Compact, Report 336; (2) find that "Kansas has failed to prove that operation of the [WWSP] program has violated the Compact," *ibid.;* and (3) "dismiss the Kansas claim arising from the operation of Trinidad Reservoir," *ibid.* [2]

2   [***LEdHR1A] [1C]

Colorado presented two counterclaims against Kansas. The Special Master recommended that the Court grant Kansas' motions to dismiss those counterclaims. Report 337. Colorado has not filed exceptions to those recommendations. We adopt the Special Master's recommendations on Colorado's counterclaims.

Both Kansas and Colorado have filed exceptions to the Special Master's Report. Kansas excepts to the Special Master's rejection of its (1) Trinidad Reservoir claim, see *id.*, at 373-433; (2) WWSP claim, see *id.*, at 306-335; and (3) preferred method for determining the usability of depletions of state line flows, see *id.*, at

291-305. Colorado excepts to the Special Master's determination that: (1) Kansas was not guilty of inexcusable delay in making its post-Compact well-pumping claim and that Colorado was not prejudiced by this [*681] delay, see *id.*, at 147-170; (2) pre-Compact wells in Colorado are limited to pumping the highest amount pumped in the years during which the Compact was negotiated and that the highest amount of such pumping was 15,000 acre-feet per year, see *id.*, at 182-200; (3) increases in usable state line flows resulting from the operating plan for the John Martin Reservoir adopted by the Administration in 1980 (1980 Operating Plan) were "separately bargained for" and, therefore, should not offset depletions caused by post-Compact well pumping in Colorado, see *id.*, at 171-181; and (4) [***771] Kansas need only meet the "preponderance of the evidence" standard to prove a breach of Article IV-D of the Compact, see *id.*, at 65-70.

We turn to the parties' exceptions.

II

A

[***LEdHR2A] [2A]In 1958, Congress authorized construction of the Trinidad Project, a dam and a reservoir system on the Purgatoire River slightly upstream from the city of Trinidad, Colorado. See *id.*, at 382-388. Recognizing that Article IV-D of the Compact prohibited any development of the Arkansas River basin that resulted in a material depletion of usable river flow, the Bureau of Reclamation conducted studies regarding the future operation of the Trinidad Project. *Id.*, at 388-390. The Bureau of Reclamation established Operating Principles whereby the Trinidad Project could be administered "without adverse effect on downstream water users and the inflow to John Martin Reservoir." *Id.*, at 390 (internal quotation marks omitted). The Governor of Kansas reviewed the Bureau of Reclamation's proposed Operating Principles and indicated that if five additional conditions were accepted, then "Kansas would be in a position to approve the amended Operating Principles and to support completion of the project." *Id.*, at 392-393. In June 1967, the [*682] Administration approved the Operating Principles as well as Kansas' five additional conditions. *Id.*, at 395.

In 1979, Colorado began storage of water at the Trinidad Reservoir. *Id.*, at 396. Kansas immediately complained that the Operating Principles were being

violated. *Id.*, at [**1740] 397. In 1988, at the request of the Administration, the Bureau of Reclamation conducted a study of the Trinidad Reservoir. It concluded that two storage practices at the Trinidad Reservoir constituted a "'departure from the intent of the operating principles.'" *Ibid.*

At trial, Kansas argued that the Operating Principles were binding on the State of Colorado and that any departure from them constituted a violation of the Compact "regardless of injury." *Id.*, at 408 (internal quotation marks omitted). Kansas, however, "offered no evidence, apart from the Bureau studies, to show that the actual operation of the Trinidad project caused it to receive less water than under historical, without-project conditions." *Id.*, at 412. Instead, Kansas sought to quantify depletions by "comparing the flows into John Martin Reservoir 'as they would have occurred under the Operating Principles with the flows that occurred under actual operations.'" *Id.*, at 409. The Special Master concluded that in order to prove a violation of the Compact, Kansas was required to demonstrate that "the Trinidad operations caused a material depletion within the meaning of Article IV-D." *Id.*, at 431. The Special Master recommends that we dismiss Kansas' Trinidad claim because "Kansas has not established, and did not attempt to establish, such injury." *Ibid.*

Kansas argues that "departure from the Operating Principles is *ipso facto* a violation of the Compact, and it [is] entirely sufficient, for purposes of quantifying the effects of the violation, to compare the actual operation with simulated operation as it should have been under the Operating Principles." Kansas' Exceptions to Special Master's Report 12. But, it must be recalled, this is an original action to [***772] enforce [*683] the terms of the Compact. [3] Article IV-D provides that the Compact is not intended to prevent future beneficial development of the Arkansas River basin -- including dams and reservoirs -- provided that the river flow shall not be materially depleted. The Compact thus permits the development of projects such as Pueblo Reservoir so long as their operation does not result in a material depletion of usable flow to Kansas users. For Kansas to prevail in its contention, it would have to show that the Operating Principles had the effect of amending the Compact by granting either party the right to sue the other for violation of the Operating Principles even though the violation resulted in no material depletion of usable flow at stateline. Although the Administration is empowered

to "prescribe procedures for the administration of the Compact," App. to Report 11 (Article VIII-B(2)), it must do so "*consistent with the provisions of the Compact,*" *ibid.* (Article VIII-B(1)) (emphasis added); see also Report 416 ("The Compact Administration was not delegated power to change the Compact"). The theory advocated by Kansas is inconsistent with Article IV-D, which allows for the development and operation of dams and reservoirs so long as there is no resultant material depletion of usable flows at stateline.

> [3]    The Special Master did "not address the possible question of whether Kansas has a claim for violation of the Operating Principles that is independent of the Compact, that is, a cause of action based upon a separate agreement with Colorado, or as a third party beneficiary under the repayment contract, or otherwise." Report 408, n. 6. We express no view as to that question.

[***LEdHR1A] [1D] [***LEdHR2A] [2B]Thus Kansas, in order to establish a Compact violation based upon failure to obey the Operating Principles, was required to demonstrate that this failure resulted in a material depletion under Article IV-D. Kansas "has not established, and did not attempt to establish, such injury." *Id.*, at 431. We overrule Kansas' exception to the Special Master's dismissal of its Trinidad Reservoir claim.

[*684] B

[***LEdHR3A] [3A]In 1964, the Bureau of Reclamation and Colorado began planning a program to use excess capacity at Pueblo Reservoir in order to store a portion of the winter-time flow of the Arkansas River for beneficial use at other times. Under the WWSP, winter-time flow -- much of which was used previously to flood uncultivated cropland -- is instead stored at the Pueblo Reservoir. Kansas contends that the Special Master erred in finding that it had failed to prove that the [**1741] WWSP had "materially depleted" usable state line flows. We disagree.

In his Report, the Special Master concluded:

> "Kansas has not proved that the WWSP has caused material Stateline depletions. Kansas' case has not been helped by its own contradictions in quantifying impacts to usable flow -- ranging during this trial from 255,000 acre-feet initially, to 44,000

to 40,000; nor by the fact that depletions are essentially eliminated if accretions are taken into account." Report 335.

The Special Master examined the computer models submitted by Kansas and Colorado and determined that "the depletions shown by the Kansas model are well within the model's range of error." *Id.*, at 334-335. As a result, "one [could not] be sure whether impact or error [was] being shown." *Id.*, at 335.

[***773] [***LEdHR1A] [1E] [***LEdHR3A] [3B]We believe that the Special Master gave Kansas every reasonable opportunity to meet its burden of proving its WWSP claim. Kansas, however, failed to prove that operation of the WWSP program resulted in material depletions of usable flows in violation of Article IV-D. See *ibid.* Therefore, we overrule Kansas' exception to the Special Master's conclusion that Kansas had failed to prove its WWSP claim.

C

[***LEdHR4A] [4A]Article IV-D of the Compact permits future development and construction along the Arkansas River Basin provided [*685] that it does not materially deplete state line flows "in *usable* quantity or availability." App. to Report 5 (Article IV-D) (emphasis added). In order to establish a violation of Article IV-D, Kansas was required to establish that development in Colorado resulted in material depletions of "usable" river flow. The Compact does not define the term "usable." Cf. *Colorado* v. *Kansas*, 320 U.S. at 396-397 ("The critical matter is the amount of divertible flow at times when water is most needed for irrigation. Calculations of average annual flow, which include flood flows, are, therefore, not helpful in ascertaining the dependable supply of water usable for irrigation"). At trial, Kansas presented three methods for determining depletions of "usable" flow.

Kansas' first expert, Timothy J. Durbin, analyzed flow data for the period between 1951 and 1985 by plotting actual river diversions in Kansas against actual stateline flows. Report 293-294. Using these data, Durbin developed criteria to determine what river flows were usable. Durbin concluded that during the summer months, April through October, (1) 78% of the stateline flows were diverted; (2) flows greater than 40,000 acre-feet per month were not usable; and (3) flows greater than 140,000 acre-feet for the whole period were

not usable. *Id.*, at 293. With respect to the winter months, November through March, Durbin concluded that (1) 24% of the winter flow was diverted; (2) flows greater than 7,500 acre-feet per month were not usable; and (3) flows greater than 40,000 acre-feet for the whole period were not usable. *Id.*, at 293-294.

After Colorado isolated errors in Durbin's analysis, Kansas presented a replacement case. Kansas' second group of experts, led by Stephen P. Larson, adopted the same methodology but revised certain exhibits and made minor corrections in data. As a result, Larson modified Durbin's coefficients, using 72% for the summer months and 25% for the winter months. *Id.*, at 295.

[*686] Later, well after trial had begun, Kansas enlisted the aid of Brent Spronk, who proposed yet another method to quantify depletions of "usable" state line flow. *Id.*, at 300-305. Spronk attempted to determine the "percentage of days in each month when flows were being fully used in Kansas." *Id.*, at 301. Instead of seasonal averages, the Spronk approach yielded coefficients that varied from month to month. Spronk then multiplied these monthly coefficients by the estimated depletions in flow predicted by Kansas' hydrological model. *Id.*, at 301-302.

[***LEdHR1A] [1F] [***LEdHR4A] [4B]The Special Master concluded that "the Durbin approach, using Larson's coefficients, is the best of the several methods presented for determining usable flow" and that it provided "a reasonable way in which [***774] to determine depletions of usable flow." *Id.*, at 305. [**1742] We agree. Each of the three methods that Kansas proposed for calculating usable depletions required two steps: (1) a calculation of total depletions using the Kansas hydrological model, and (2) an application of "usability" criteria. See Brief for United States in Response to Exeptions of Kansas and Colorado 30. Each of the three methods proposed by Kansas was dependent on the Kansas hydrological model to estimate total depletions. The Spronk method required the Kansas hydrological model to predict accurately depletions for each and every month. Report 303. But as Durbin, Kansas' first expert, testified, Kansas' hydrological model was only a "'good predictor' when 'looking at long periods of time.'" *Id.*, at 303, n. 130 (quoting Durbin's testimony). Thus, the Spronk method required the Kansas hydrological model to do something it was not designed to do, *i. e.*, predict accurately depletions on a monthly

basis. *Id.*, at 303 ("The Spronk analysis assumes that the H-I model can accurately predict changes of Stateline flow on a monthly basis"). Because the Spronk method for determining "usable" river flows was less compatible with Kansas' hydrological model than the other methods proposed, we conclude that the Special Master properly rejected [*687] the Spronk method in favor of the Durbin approach, as modified by the Larson coefficients.

III

A

[***LEdHR5A] [5A]The Special Master concluded that Kansas was not guilty of inexcusable delay in making its well-pumping claim, and that Colorado had not been prejudiced by Kansas' failure to press its claim earlier. *Id.*, at 170. Colorado has excepted to this determination. Colorado argues that the equitable doctrine of laches should bar Kansas' claim for relief. See Colorado's Exceptions to Special Master's Report (Colorado's Exceptions) 24-64. We overrule Colorado's exception.

[***LEdHR5A] [5B] [***LEdHR6] [6]The defense of laches "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Costello* v. *United States*, 365 U.S. 265, 282, 5 L. Ed. 2d 551, 81 S. Ct. 534 (1961); see also Black's Law Dictionary 875 (6th ed. 1990) [HN3] ("'Doctrine of laches,' is based upon maxim that equity aids the vigilant and not those who slumber on their rights. It is defined as neglect to assert a right or claim which, taken together with lapse of time and other circumstances causing prejudice to the adverse party, operates as bar in court of equity"). This Court has yet to decide whether the doctrine of laches applies in a case involving the enforcement of an interstate compact. Cf. *Illinois* v. *Kentucky*, 500 U.S. 380, 388, 114 L. Ed. 2d 420, 111 S. Ct. 1877 (1991) (in the context of an interstate boundary dispute, "the laches defense is generally inapplicable against a State"); *Block* v. *North Dakota ex rel. Board of Univ. and School Lands*, 461 U.S. 273, 294, 75 L. Ed. 2d 840, 103 S. Ct. 1811 (1983) (O'CONNOR, J., dissenting) ("The common law has long accepted the principle *'nullum tempus occurrit regi'* -- neither laches nor statutes of limitations will bar the sovereign"); *Colorado* v. *Kansas, supra*, at 394 (In the context of a suit seeking an equitable apportionment of river flows, facts demonstrating a delay in filing a complaint "might well preclude the award of the relief

[requested]. But, [***775] in any event, they [*688] gravely add to the burden [the plaintiff] would otherwise bear"). We need not, however, foreclose the applicability of laches in such cases, because we conclude that Colorado has failed to prove an element necessary to the recognition of that defense. See *Costello, supra*, at 282.

Colorado argues that Kansas knew or should have known by 1956, or at the latest, before 1968, that both the number of post-Compact wells and the amount of post-Compact pumping in Colorado had increased substantially. Colorado's Exceptions 37, 39. Colorado argues that by 1956 Kansas had sufficient information about increased well pumping in Colorado and its potential impact on usable stateline flows to call for an investigation to determine if a Compact violation existed. *Id.*, at 46.

[***LEdHR1A] [1G] [***LEdHR5A] [5C]The Special Master concluded that prior to 1984, Kansas had made no formal complaint to the Administration regarding post-Compact [**1743] well pumping in Colorado. Report 155-156. Nevertheless, the Special Master concluded that Colorado's evidence did not "deal with the issue of impact on usable flow at the Stateline," *id.*, at 161, and did "not demonstrate that [the Kansas officials] were aware of the number of wells, the extent of Colorado's pumping, or the impact or even potential impact of pumping on usable Stateline flows," *id.*, at 164. The Special Master explained the difficulty of assessing the impact of increases in post-Compact well pumping on usable stateline flows because of changing conditions during the 1970's and early 1980's:

> "The 1970s were generally dry years and some reduction in flow was to have been expected. Pueblo Dam came on line in 1976 and began to reregulate native flows. Transmountain imports increased, which to some extent provided an offset to pumping. The 1980 Operating Plan was placed into effect, which Colorado alleges offset the impacts of increased pumping downstream from John Martin Reservoir. The Winter Water Storage Program was instituted. Moreover, there was no quantitative [*689] or specific entitlement against which depletions to usable flow could be judged. Nor were there any agreed upon criteria for

establishing what flows were usable." *Id.*, at 162-163.

As late as 1985, Colorado officials refused to permit an investigation by the Administration of well development in Colorado because they claimed that the evidence produced by Kansas did not "'suggest that well development in Colorado has had an impact on usable stateline flows.'" *Id.*, at 163 (quoting memorandum of J. William McDonald, chief of the Colorado delegation to the Administration). In light of the vague and conflicting evidence available to Kansas, we conclude that Colorado has failed to demonstrate lack of diligence, *i. e.*, inexcusable delay, on the part of Kansas.

Accordingly, we overrule Colorado's exception to the Special Master's conclusion that the defense of laches should not bar Kansas' well-pumping claim.

### B

[***LEdHR7A] [7A]The Compact prohibits "*future beneficial development* of the Arkansas River basin" that "materially deplete[s]" the usable flows of the Arkansas River. App. to Report 5 (Article IV-D) (emphasis added). Because some wells in Colorado were in [***776] existence prior to the Compact, both parties agree that a certain amount of post-Compact well pumping is allowable under the Compact. Report 182. Kansas and Colorado, however, dispute the extent of this allowance. The Special Master determined that the "highest annual amount shown to have been pumped during the negotiations, namely 15,000 acre-feet, should be allowed under the Compact." *Id.*, at 200. Colorado makes both a legal and a factual challenge to this determination. Colorado's Exceptions 66-73, 73-84.

Colorado argues as a legal matter that the Compact does not limit the pumping by pre-Compact wells to the highest amount actually pumped in pre-Compact years; rather, Colorado [*690] claims that the limit on its pre-Compact pumping is the maximum amount that Colorado law permitted or the maximum amount of pumping possible using wells existing prior to the Compact. *Id.*, at 69-70. In support of its position, Colorado argues that the Special Master failed to consider the subsequent practice of the parties, *i. e.*, Kansas' failure to object to replacement of centrifugal pumps with turbine pumps or increased pumping by pre-Compact wells, and that Article VI-A(2) of the Compact supports its position. [4]

4 Article VI-A(2) provides: "*Except as otherwise provided*, nothing in this Compact shall be construed as supplanting the administration by Colorado of the rights of appropriators of waters of the Arkansas River in said State as decreed to said appropriators by the courts of Colorado, nor as interfering with the distribution among said appropriators by Colorado, nor as curtailing the diversion and use for irrigation and other beneficial purposes in Colorado of the waters of the Arkansas River." App. to Report 10 (emphasis added).

We conclude that the clear language of Article IV-D refutes Colorado's legal challenge. Article IV-D permits "future beneficial development of the Arkansas River basin . . . which may involve construction of dams, reservoir, and other works for the purposes of water utilization and control, *as well as the* [**1744] *improved or prolonged functioning of existing works:* Provided, that the waters of the Arkansas River . . . shall not be materially depleted in usable quantity or availability . . . ." App. to Report 5 (emphasis added). Regardless of subsequent practice by the parties, improved and increased pumping by existing wells clearly falls within Article IV-D's prohibition against "improved or prolonged functioning of existing works," if such action results in "material depletions in usable" river flows. *Ibid.;* see *Texas* v. *New Mexico*, 462 U.S. 554, 564, 77 L. Ed. 2d 1, 103 S. Ct. 2558 (1983) ("Unless the compact to which Congress has consented is somehow unconstitutional, no court may order relief inconsistent with its express terms"). Article VI-A(2) of the Compact, which begins with the phrase, "Except as otherwise provided," App. to [*691] Report 10, must be read in conjunction with and as limited by Article IV-D. We agree with the Special Master that "new wells, the replacement of centrifugal with turbine pumps, and increased pumping from [pre-Compact] wells all come within [Article IV-D]." Report 194.

[***LEdHR1A] [1H] [***LEdHR7A] [7B] [***LEdHR8] [8]Second, Colorado argues as a factual matter that the Special Master unreasonably relied upon faulty reports by the United States Geological Survey (USGS) and the Colorado Legislature to conclude that the greatest amount of annual pre-Compact pumping in Colorado was 15,000 acre-feet. Colorado's Exceptions 73-74. The Special Master concluded:

[***777] "There is no precise answer to the amount of [pre-Compact] pumping. . . . That amount must simply remain as an estimate of water use that affected the general allocation of water between the states when the Compact was being negotiated. Two responsible reports, one published by the USGS and one prepared for the Colorado legislature, reached similar conclusions as to the amounts of Colorado pumping during the 1940s. . . . They have since been used by the Colorado State Engineer. I have relied on these reports and recommend that the highest annual amount shown to have been pumped during the negotiations, namely 15,000 acre-feet, should be allowed under the Compact." Report 199-200.

Although [HN4] the ultimate responsibility for deciding what are correct findings of fact remains with the Court, *Colorado* v. *New Mexico*, 467 U.S. 310, 317, 81 L. Ed. 2d 247, 104 S. Ct. 2433 (1984), in this instance, we are in full agreement with the Special Master. Accordingly, we overrule Colorado's exception.

C

[***LEdHR9A] [9A]In April 1980, the Administration adopted a resolution concerning the method for operating John Martin Reservoir (1980 Operating Plan). Report 47. The 1980 Operating [*692] Plan divides the water conserved in John Martin Reservoir into separate accounts. Kansas is allocated 40% of the conservation storage, with the remaining 60% being divided in specified percentages among the nine canal companies in Colorado Water District 67. *Id.*, at 173. The Special Master concluded that the 1980 Operating Plan for the John Martin Reservoir was "separately bargained for" and therefore should not offset depletions caused by post-Compact well pumping in Colorado. *Id.*, at 180-181. Colorado takes exception to this ruling.

Colorado argues that increases in usable state line flows resulting from the 1980 Operating Plan should offset depletions to usable state line flows. Colorado's Exceptions 85. Colorado maintains that the Administration adopted the 1980 Operating Plan "for more efficient utilization of water under its control

because of changes in the regime of the Arkansas River," *id.*, at 91, "including [post-Compact] well pumping in Colorado and Kansas," *ibid.;* see also App. to Report 107 (Resolution Concerning an Operating Plan for John Martin Reservoir) ("WHEREAS, the Arkansas River Compact Administration . . . recognizes that, because of changes in the regime of the Arkansas River, the present operation of the conservation features of John Martin Reservoir does not result in the most efficient utilization possible of the water under its control"). We disagree.

[***LEdHR1A] [1I] [***LEdHR9A] [9B]As Colorado acknowledges, the resolution adopting the 1980 Operating Plan "does not state that [post-Compact] well pumping in [**1745] Colorado or Kansas was a cause of changes in the regime of the Arkansas River." Colorado's Exceptions 88. In fact, Colorado argues in a separate part of its brief that "Kansas had made no complaint about well pumping in Colorado to the Compact Administration . . . before 1984." *Id.*, at 32. The 1980 Operating Plan expressly reserves the parties' rights under the Compact, stating that "adoption of this resolution does not prejudice the ability of Kansas or of any Colorado ditch to object or to otherwise represent its [*693] interest in [***778] present or future cases or controversies before the Administration or in a court of competent jurisdiction." App. to Report 116. The Special Master concluded:

"The 1980 Operating Plan provided benefits to both Kansas and Colorado which were separately bargained for. There is no evidence to support the claim that benefits to Kansas were in settlement of its well claims. Colorado received ample consideration under the agreement for the 1980 plan without a waiver of Kansas' well claims. The benefits received by Kansas under the plan should not be offset against compact violations, and should not be a bar to any of the Kansas claims in this case." Report 180-181.

We agree with the Special Master's resolution of Colorado's claim. Accordingly, we overrule Colorado's exception.

D

[***LEdHR10A] [10A]Finally, Colorado argues

that Kansas is required to prove its well-pumping claim by clear and convincing evidence. Colorado's Exceptions 91. The Special Master, relying upon *Nebraska* v. *Wyoming*, 507 U.S. 584, 123 L. Ed. 2d 317, 113 S. Ct. 1689 (1993), concluded that the proper burden of proof for enforcing an interstate compact is the preponderance of the evidence standard. Report 70. The Special Master noted that the *Nebraska* Court had drawn a distinction between actions seeking to "modify" a judicial decree and actions seeking to "enforce" a judicial decree. See *Nebraska, supra*, at 592 ("We find merit in [the] contention that, to the extent that Nebraska seeks modification of the decree rather than enforcement, a higher standard of proof applies"). The Special Master concluded that an action seeking to enforce an interstate compact stood on the same footing as an action enforcing a judicial decree, and therefore was subject to the "preponderance of the evidence" standard. Report 70.

[***LEdHR1A] [1J] [***LEdHR10A] [10B]We need not, however, resolve this issue. The Special Master concluded that "regardless of which burden of proof [*694] applies" he had "no difficulty in concluding that [post-Compact] pumping in Colorado had caused material depletions of the usable Stateline flows of the Arkansas River, in violation of the Arkansas River Compact." *Id.*, at 263. We agree with this determination, and thus overrule Colorado's exception.

IV

[***LEdHR1A] [1K]For these reasons, we overrule the exceptions filed by the States of Kansas and Colorado. We remand the case to the Special Master for determination of the unresolved issues in a manner not inconsistent with this opinion.

*It is so ordered.*

**REFERENCES**
32A Am Jur 2d, Federal Practice and Procedure 556, 572, 574; 78 Am Jur 2d, Waters 309-311, 314, 340

7A Federal Procedure, L Ed, Courts and Judicial System 20:294, 20:310, 20:312

L Ed Digest, Evidence 962, 966.5; Reference 19, 29; States, Territories, and Possessions 58; Supreme Court of the United States 58

L Ed Index, Reservoir; Rivers and Streams; Special Masters; Supreme Court of the United States; Waters and Watercourses

ALR Index, Masters; Original Jurisdiction; Reservoirs; Rivers and Streams; Supreme Court of United States; Waters and Watercourses

Annotation References:

Original jurisdiction of United States Supreme Court in suits between states. 68 L Ed 2d 969.



**MEMPHIS & LITTLE ROCK RAILROAD COMPANY v. RAILROAD COMMISSIONERS.**

**SUPREME COURT OF THE UNITED STATES**

**112 U.S. 609; 5 S. Ct. 299; 28 L. Ed. 837; 1884 U.S. LEXIS 1930**

**Submitted November 25, 1884.**
**December 22, 1884 Decided**

**PRIOR HISTORY:** IN ERROR TO THE SUPREME COURT OF THE STATE OF ARKANSAS.

This was a bill in equity filed in the Chancery Court of Pulaski County, Arkansas, seeking to enjoin the Board of Railroad Commissioners of the State from appraising, for the purposes of taxation, any part of the property of the plaintiff in error, on the ground that it is exempted from taxation by a contract with the State contained in its charter of incorporation. The Supreme Court of the State, on appeal, affirmed the decree of the Chancery Court dismissing the bill. That decree of the Supreme Court was brought here by writ of error, for review, on the allegation that it enforced a law of the State impairing the obligation of a contract in violation of the rights of the plaintiff in error under the Constitution of the United States.

The question arises and is to be determined upon the following case:

The Memphis and Little Rock Railroad Company was chartered by an act of the General Assembly of the State of Arkansas, approved January 11, 1853. This act authorized the formation of a company to be a body corporate for the purpose of establishing communication by a railroad between the city of Memphis in Tennessee and Little Rock in Arkansas, and commissioners were named therein to open books for subscriptions to its capital stock. This was fixed for the purpose of organization at $400,000, to be increased to $2,000,000 at the pleasure of the company. When the necessary amount of capital stock had been subscribed, the subscribers were authorized to organize by the election of a board of directors. The 9th section of the act is as follows:

"SEC. 9. The said company may at any time increase its capital to a sum sufficient to complete the said road, and stock it with anything necessary to give it full operation and effect, either by opening books for new stock or by selling such new stock, or by borrowing money on the credit of the company, and on the mortgage of its charter and works; and the manner in which the same shall be done, in either case, shall be prescribed by the stockholders at a general meeting," &c. Laws of Arkansas, 1852-3, 132-3.

It also contains the following:

"SEC. 28. The capital stock of said company shall be exempt from taxation until the road pays a dividend of six per cent., and the road, with all its fixtures and appurtenances, including workshops, warehouses and vehicles of transportation, shall be exempt from taxation for the period of twenty years from and after the completion of said road." Ib. 136.

The company was organized under this act, and afterwards, in order to borrow money for the prosecution of the enterprise, issued its bonds to the amount $1,300,000, dated May 1, 1860, having thirty years to run, with interest at eight per cent. per annum, and, to secure the payment of the same, executed and delivered a mortgage to Tate, Brinkley and Watkins, as trustees for the bondholders, whereby it conveyed to them, in trust,

the Memphis and Little Rock Railroad, its road-bed, right of way, and all works and rolling stock of or belonging to the company, "together with the charter by which said company was incorporated and under which it is organized, and all the rights and privileges and franchises thereof," and also all the lands, &c., belonging to said company.

Subject thereto, a second mortgage was made by the company on March 1, 1871, conveying all its property and franchises to Henry F. Vail, in trust for the holders of bonds secured thereby, amounting to $1,000,000.Default having been made by the company in the payment of interest on this loan, Vail, the trustee, in execution of the power conferred in the mortgage, sold and conveyed the mortgaged property, the title to which became vested in Stillman Witt and his associate bondholders, who organized the Memphis and Little Rock Railway Company, to which, on November 17, 1873, the said property was conveyed. This railway company, on December 1, 1873, issued its bonds to the amount of $2,600,000, and, to secure the same, by a deed of that date, conveyed all the franchises, privileges and property so acquired by it to trustees, of whom Pierson, Matthews and Dow became successors, in trust for the bondholders. The Memphis and Little Rock Railroad Company, the original corporation, made default in the payment of interest accruing upon the bonds secured by the mortgage of May 1, 1860, and its successor, the Memphis and Little Rock Railway Company also made default in the payment of interest maturing on the bonds secured by the deed of December 1, 1873. Afterwards, on November 12, 1876, a bill in chancery was filed, in the Circuit Court of the United States for the Eastern District of Arkansas, by the trustees against the two companies, to foreclose those mortgages, in which suit a final decree was rendered ordering a sale of the property described in the same, embracing the property and franchises of the said companies, and the charter of the Memphis and Little Rock Railroad Company; and a sale thereof was made and confirmed, and a conveyance of the same executed to Pierson, Matthews and Dow, in trust for the holders of the bonds of the Memphis and Little Rock Railway Company, secured by the deed of trust executed by that company. On April 28, 1877, the holders of these bonds executed certain articles of association, by which after reciting the premises, they organized themselves into a company, claiming to become a corporation, under the name of "The Memphis and Little Rock Railroad Company as re-organized," under and by virtue of the

provisions of the act of January 11, 1853, for the incorporation of the original company; and afterwards, on April 30, 1877, Pierson, Matthews and Dow conveyed to said company the property and franchises, including the charter of January 11, 1853; and thereupon the bill proceeds:

"Complainant submits that, having thus duly purchased said charter of the Memphis and Little Rock Railroad Company under the power therein contained, and having organized thereunder, it is the owner and holder thereof, and that it has and is entitled to all the privileges and benefits in said act of the General Assembly mentioned and set forth, among others to the contract contained in said section 28, by which the road, with all the franchises and appurtenances, including workshops, warehouses, and vehicles of transportation, shall be exempt from taxation for the period of twenty years from and after the date of the completion of said road. Complainant further states that said road was not completed till the 15th day of November, 1874, and that the time of the exemption thereafter from taxation has not expired. It further states that the defendant herein first mentioned, acting as a Board of Railroad Commissioners for this State, have demanded from the complainant a detailed inventory of all the rolling stock belonging to the company, and the valuation thereof, as provided in section 48 of an act of the General Assembly of the State of Arkansas, approved March 31, 1883, entitled 'An Act to revise and amend the revenue laws of the State of Arkansas,' and have also demanded from the complainant a statement or schedule showing the length of the main and all the side tracks, switches and turn-outs in each county in which the road is located, and the value of all improvements, stations and structures, including the railroad track, as provided in section 46 of the same act.

"Complainant being willing, so far as it may without injury to itself, to comply with the laws of this said State, has, in compliance with the demand made upon it, made and returned said schedule to the said board, accompanying the same with a protest against any of the property in said schedule contained being assessed for taxation, in which protest complainant stated the grounds upon which said property was exempt from taxation.

"Complainant states and submits that all this property contained in the said schedules, [copies] of which it herewith files, marked 'I' and 'J,' and all the property described in said sections 46 and 48 of said act,

are the identical property which is exempt from taxation by the contract in said charter contained."

On December 9, 1874, an act was passed by the General Assembly of Arkansas, whereby the purchasers of a railroad of any corporation of the State, and their associates, acquiring title thereto by virtue of a judicial sale, or of a sale under a power contained in a mortgage or deed of trust, were authorized to organize themselves into a body corporate, vested with all the corporate rights, liberties, privileges, immunities, powers and franchises of and concerning the railroad so sold, not in conflict with the provisions of the Constitution of the State, as fully as the same were held, exercised and enjoyed by the corporation before such sale. A certificate of such organization was required to be filed in the office of the Secretary of State within six months, specifying certain particulars. Laws of Arkansas, 1874-5, p. 57. Prior to the passage of that act there seems to have been no statute authorizing the formation of such corporations, or prescribing a mode for their organization.

In 1853, when the Memphis and Little Rock Railroad Company was chartered and organized as a corporation, the Constitution of Arkansas then in force permitted the enactment of special acts of incorporation, and without any restriction upon the power to exempt corporations and their property from taxation. In 1868 a new Constitution was adopted by the people of the State, which provided (art. 5, sec. 48), that, "the General Assembly shall pass no special act conferring corporate powers. Corporations may be formed under general laws; but all such laws may, from time to time, be altered or repealed. . . . The property of corporations, now existing or hereafter created, shall forever be subject to taxation the same as the property of individuals;" and in art. 10, sec. 2, that, "laws shall be passed taxing by a uniform rate all moneys, credits, investment in bonds, joint stock companies, or otherwise; and also all real and personal property, according to its true value in money."

It was decided by the Supreme Court of Arkansas in the case of Oliver v. Memphis and Little Rock Railroad Co., 30 Ark. 128, that the 28th section of the act of January 11, 1853, incorporating that company, already quoted, was a contract between it and the State, which could not be impaired by these provisions of the State Constitution, because it was protected by the Constitution of the United States.

On October 13, 1874, the present Constitution of Arkansas was adopted and took effect. Among its provisions are these: That the General Assembly shall pass no special act conferring corporate powers (art. 12, sec. 2); that corporations may be formed under general laws, which laws may, from time to time, be altered or repealed (art. 12, sec. 6); that all property subject to taxation shall be taxed according to its value; that the following property shall be exempt from taxation: public property used exclusively for public purposes, churches used as such, cemeteries used exclusively as such, school buildings and apparatus, libraries and grounds used exclusively for school purposes, and buildings and grounds and materials used exclusively for public charity (art. 16, sec. 5); that all laws exempting property from taxation, other than as above provided, shall be void (art. 16, sec. 6); that the power to tax corporations and corporate property shall not be surrendered or suspended by any contract or grant to which the State may be a party (art. 16, sec. 7); and that the General Assembly shall not remit the forfeiture of the charter of any corporation then existing, or alter or amend the same, or pass any general or special law for the benefit of such corporation, except upon condition that such corporation should thereafter hold its charter subject to the provisions of the Constitution (art. 17, sec. 8).

It was in April, 1877, that the plaintiff in error was organized as a corporation deriving its authority for that purpose, as it claimed, under the special act of January 11, 1853. On behalf of the defendant in error, it is claimed that the plaintiff in error had no power to organize as a corporation, except as enabled by the act of December 9, 1874.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff railroad filed a bill in equity seeking to enjoin defendant railroad commissioner from appraising, for the purposes of taxation, any part of the railroad's property. The railroad alleged that it was exempt from taxation by a contract with the State of Arkansas, the terms of which were contained in its charter of incorporation.

**OVERVIEW:** The act of incorporation of the railroad empowered it to borrow money on the credit of the company and on the mortgage of its charter and works. The railroad claimed that the assignment of the railroad's charter, by way of mortgage and subsequent judicial sale,

resulted in another corporation in lieu of the original one that was entitled to all the provisions of the charter as though it had been originally organized under it. The Court held that the exemption from taxation contained in the act of incorporation for the original railroad applied only to the original corporation organized under it. The Constitution of Arkansas that was adopted in 1874 provided that the power to tax corporations and corporate property should not be surrendered or suspended by any contract or grant to which the state may be a party. The Court held that because the present railroad did not become a corporate body until after the restrictions in the Constitution took effect, it was, therefore, incapable in law of having or enjoying the privilege of holding its property exempt from taxation.

**OUTCOME:** The Court affirmed the decision of the state supreme court that held that the corporate body that was the railroad could not claim the same exemption from taxation that was given to its predecessor.

**CORE TERMS:** franchise, charter, mortgage, purchaser, railroad, corporate existence, corporate bodies, corporators, exemption, organize, confer, judicial sale, successor, taxation, foreclosure sale, mortgage bondholders, way of mortgage, abandonment, bondholders, conveyance, incapable, surrender, becoming, railway, vested, conferred, act of incorporation, general law, foreclosure, acquiring

**LexisNexis(R) Headnotes**

*Mergers & Acquisitions Law > General Overview*
*Tax Law > State & Local Taxes > Franchise Tax > Limitations*
[HN1] The exemption from taxation must be construed to have been the personal privilege of the very corporation specifically referred to, and to have perished with that, unless the expressed clear intention of the law requires the exemption to pass as a continuing franchise to a successor.

*Governments > Legislation > Interpretation*
[HN2] It is an unbending rule that a grant of corporate existence is never implied. In the construction of a statute, every presumption is against it.

*Tax Law > State & Local Taxes > Franchise Tax > General Overview*
[HN3] The franchise of becoming and being a corporation, in its nature, is incommunicable by the act of the parties and incapable of passing by assignment. The franchise to be a corporation clearly cannot be transferred by any corporate body of its own will. Such a franchise is not, in its own nature, transmissible.

*Tax Law > Federal Income Tax Computation > Sales & Exchanges > Intangible Property (IRC secs. 1234-1235, 1241, 1253) > Franchise, Trademark & Trade Name Transfers*
*Tax Law > State & Local Taxes > Franchise Tax > General Overview*
[HN4] The franchise to be a corporation is not a subject of sale and transfer, unless the law, by some positive provision, has made it so, and pointed out the modes in which such sale and transfer may be effected.

**LAWYERS' EDITION HEADNOTES:**

Exemption of railroad from taxation -- does not pass by mortgage and judicial sale -- what passes by such sale -- Arkansas Constitution. --

Headnote:

1. The exemption from taxation contained in the 28th section of the Arkansas Act of 1853, was intended to apply only to the Memphis and Little Rock Railroad Company, as the original Corporation organized under it.

2. Such exemption did not pass by the mortgage of its charter and works, as included in the transfer of the franchise to be a Corporation, to the mortgagees or purchasers at the judicial sale.

3. The franchises embraced in that conveyance were limited to those which had been granted as appropriate to the construction, maintenance, operation and use of the railroad as a public highway, and the right to make profit therefrom.

4. The appellant not having become a corporate body until after the restrictions in the Arkansas Constitution of 1874 took effect, was thereby incapable in law of having or enjoying the privilege of holding its property exempt from taxation.

## SYLLABUS

A statute exempting a corporation from taxation confers the privilege only on the corporation specially referred to, and the right will not pass to its successor unless the intent of the statute to that effect is clear and express. Morgan v. Louisiana, 93 U.S. 217; Wilson v. Gaines, 103 U.S. 417; and Louisville & Nashville Railroad Company v. Palmes, 109 U.S. 244, affirmed.

The franchise to be a corporation is not a subject of sale and transfer, unless made so by a statute, which provides a mode for exercising it.

A franchise to be a corporation is distinct from a franchise, as a corporation, to maintain and operate a railway: the latter may be mortgaged, without the former, and may pass to a purchaser at a foreclosure sale.

A mortgage of the charter of a corporation, made in the exercise of a power given by statute, confers no right upon purchasers at a foreclosure sale to exist as the same corporation: if it confers any right of corporate existence upon them, it is only a right to reorganize and a corporation, subject to laws, constitutional and otherwise, existing at the time of the reorganization.

**COUNSEL:** Mr. B. C. Brown for plaintiff in error. -- Under the statutes of Arkansas the pleadings amount to an admission that the original charter contained on exemption from taxation, that there was authority to mortgage that charter, that it was mortgaged, that the mortgage was foreclosed, and that the mortgaged charter was acquired by the plaintiff in error under the foreclosure sale. We admit that a corporation takes only so much as is granted in express words, or by fair implication; that an exemption from taxation is not to be presumed; that the party claiming the exemption must show his right. But there is another proposition -- which the court overlooked -- that a status or right shown to have been once established or existing is presumed to continue, and it is for him who alleges that it has ended or changed to show when and how the end or change occurred. It is conceded that the property held by plaintiff and now sought to be taxed was at one time exempt. This was established by the Supreme Court of the State itself, in The State v. Oliver, 30 Ark. 129. Before this cause was instituted, both the Supreme Court of Arkansas and this court had held that "a State can no more impair the obligation of a contract by adopting a Constitution than by passing a law." Jacoway, v. Denton,

25 Ark. 625; White v. Hart, 13 Wall. 646. The contract here was that the company created by the act of 1853 might "mortgage its charter." Not mortgage the "franchise." Not mortgage the "right to build and operate a railroad." Not mortgage the "exemption from taxation," but mortgage the charter. The words "charter," and "act of incorporation" are used "convertibly," and mean the same thing. Humphrey v. Pegues, 16 Wall. 244. The grant of a power grants everything necessary to give it beneficial effect; United States v. Fisher, 2 Cranch, 358; McCulloch v. Maryland, 4 Wheat. 316, 428; Fletcher v. Oliver, 25 Ark. 289, 299; N.W. Fertilizing Co. v. Hyde Park, 70 Ill. 634. The power to pledge the franchises and rights of a corporation implies, as incident thereto, the power to pledge everything that may be necessary to the enjoyment of the franchise, and upon which its real value depends. Phillips v. Winslow, 18 B. Mon. 431. Either the whole charter passed or nothing. There is no middle ground. The exemption from taxation was not separable from the body of the charter. This court has held that, with legislative permission, any privilege or immunity may pass. Humphrey v. Pegues, cited above; Tomlinson v. Branch, 15 Wall. 460; Pacific Railroad Co. v. McGuire, 20 Wall. 36. In the cases of Morgan v. Louisiana, 93 U.S. 217, and Louisville & Nashville Railroad Co. v. Palmes, 109 U.S. 244, relied upon by the other side, there was no such permission.

Mr. U. M. Rose, for defendants in error.

**OPINION BY:** MATTHEWS

**OPINION**

[*617] [**302] [***840] MR. JUSTICE MATTHEWS delivered the opinion of the court. He recited the facts as above stated, and continued:

The case of the plaintiff in error rests entirely upon the words of the ninth section of the act of incorporation of the Memphis and Little Rock Railroad Company of January 11, 1853, by which it was empowered to borrow money "on the credit of the company and on the mortgage of its charter and works." It is argued that these words confer power upon the company to convey to its bondholders, by way of mortgage and on foreclosure, to purchasers absolutely, all the property of the company, and all its franchises, including the franchise of becoming and being a corporation, in the sense of acquiring the right to organize as such under the act as successor to, and substitute for, the original company, precisely as if

the act had named them as corporators and endowed them with the corporate faculty. And this being assumed, it is thence inferred that the exemption contained in section 28 of the act applies to the substituted corporation as though no change of corporate existence had taken place; and thus, it is insisted, the case is taken out of rule of decision established in Morgan v. Louisiana, 93 U.S. 217; Wilson v. Gaines, 103 U.S. 417, and Louisville & Nashville Railroad Company v. Palmes, 109 U.S. 244. According to the principle of those decisions, [HN1] the exemption from taxation must be construed to have been the personal privilege of the very corporation specifically referred to, and to have perished with that, unless the express the clear intention of the law requires the exemption to pass as a continuing franchise to a successor. This salutary rule of interpretation is founded upon an obvious public policy, which regards such exemptions as in derogation of the sovereign authority and of common right, and, therefore, not to be extended beyond the [*618] exact and express requirement of the grants, construed strictissimi juris.

It is not claimed that the assignment of the charter, by way of mortgage and subsequent judicial sale, constituted the purchasers to be the identical corporation that the mortgagor had been; for that would involve an assumption of its obligations and debts as well as an acquisition of its privileges and exemptions; but, it is insisted, that it resulted in another corporation in lieu of the original one, entitled to all the provisions of the charter, by relation to its date, as though it had been originally organized under it.

But such a construction of the words authorizing a mortgage of the charter and works of the company, is, in our opinion, beyond the intention of the law and altogether inadmissible.

There is no express grant of corporate existence to any new body. At the time when this charter was granted, in 1853, there was no general law in existence in Arkansas authorizing the formation of corporations. All such grants were by special act. Neither was there any law authorizing the purchasers of railroads at judicial sale under mortgages of the property and franchises of the company, to organize themselves into corporate bodies, such as was first passed in 1874. There is not in the act of January 11, 1853, for the incorporation of the Memphis and Little Rock Railroad Company, [**303] any reference to such a right, as vested in the mortgage

bondholders or other purchasers at a sale under a foreclosure of the mortgage, nor is there any mode or machinery prescribed in the act for such an organization. The desired conclusion rests entirely on the inference deduced from the mortgage of the charter, and is an attempt to create a corporation by a judicial implication.But, as was said by this court in Central Railroad and Banking Co. v. Georgia, 92 U.S. 665, 670, [HN2] "it is an unbending rule that a grant of corporate existence is never implied. In the construction of a statute every presumption is against it."

The application of this rule is not avoided by the claim that the present is not the case of an original creation of a corporate body, but the transfer, by assignment of a previously existing charter, and of the right to exist as a corporation [***841] under it. [*619] The difference is one of words merely. [HN3] The franchise of becoming and being a corporation, in its nature, is incommunicable by the act of the parties and incapable of passing by assignment. "The franchise to be a corporation," said Hoar, J., in Commonwealth v. Smith, 10 Allen, 448, 455, "clearly cannot be transferred by any corporate body of its own will. Such a franchise is not, in its own nature, transmissible." In Hall v. Sullivan Railroad Co., 21 Law Reporter, 138 (2 Redfield's Am. Railway Cases, 621; 1 Brunner's Collected Cases, 613), Mr. Justice Curtis said: [HN4] "The franchise to be a corporation, is, therefore, not a subject of sale and transfer, unless the law, by some positive provision, has made it so, and pointed out the modes in which such sale and transfer may be effected." No such positive provision is contained in the act under consideration, and no mode for effecting the organization of a series of corporations under it is pointed out, either in the act itself or in any other statute prior to that of December 9, 1874.

The franchise of being a corporation need not be implied as necessary to secure to the mortgage bondholders, or the purchasers at a foreclosure sale, the substantial rights intended to be secured. They acquire the ownership of the railroad, and the property incident to it, and the franchise of maintaining and operating it as such; and the corporate existence is not essential to its use and enjoyment. All the franchises necessary or important to the beneficial use of the railroad could as well be exercised by natural persons. The essential properties of corporate existence are quite distinct from the franchises of the corporation. The franchise of being a corporation belongs to the corporators, while the powers and

privileges, vested in and to be exercised by the corporate body as such, are the franchises of the corporation. The latter has no power to dispose of the franchise of its members, which may survive in the mere fact of corporate existence, after the corporation has parted with all its property and all its franchises.If, in the present instance, we suppose that a mortgage and sale of the charter of the railroad company created a new corporation, what becomes of the old one? If it abides for the purpose of responding to obligations not satisfied by the [*620] sale, or of owning property not covered by the mortgage nor embraced in the sale, as it may well do, and as it must if such debts or property exist, then there will be two corporations co-existing under the same charter. For, "after an act of disposition which separates the franchise to maintain a railroad and make profit from its use, from the franchise of being a corporation, though a judgment of dissolution may be authorized yet, until there be such judgment, the rights of the corporators and of third persons may require that the corporation be considered as still existing." Coe v. Columbus, Piqua & Indiana Railroad Co., 10 Ohio St. 372, 386, per Gholson, J.

If, as required by the argument for the plaintiff in error, we regard and treat the franchise of being a corporation as an incorporeal hereditament, and an estate capable of passing between parties by deed, or of being charged by way of mortgage and of being sold under a power or by virtue of judicial process, the logical consequences will be found to involve insuperable difficulties [**304] and contradictions. In the present case, for example, after the execution of the first mortgage, we should have the railroad company continuing as a corporation in esse, and the trustees for the bondholders, or their beneficiaries, or assigns, a corporation in posse; and, after condition broken, the company would hold the title to its own existence as a mere equity of redemption. That equity it makes the subject of a second mortgage, and, in default, the beneficiaries under the power of sale became purchasers of the franchise, and organize themselves, by virtue of it, into the Memphis and Little Rock Railway Company. The latter can hardly claim the status of a corporation at law, as the legal title to the franchise of being a corporation has never passed to it, on the supposition that it might pass by a private grant; and, if a corporation at all, it could only be regarded as the creature of equity, according to the analogy of equitable estates, a nondescript class hitherto unknown in any system of law

relating to the subject. It finally was displaced by the judicial sale, under which the plaintiff in error organized as successor to both. In the mean time, the original corporation has never been dissolved, and for all purposes not covered by the [*621] mortgage, still maintains an existence as a corporate body, capable of contracting, and of suing and being sued. A conception which leads to such incongruities must be essentially erroneous.

If we concede to the argument for the plaintiff in error the position, that the language used, which authorizes the mortgage of the charter, may be taken in a literal sense, still the assignment would transfer it, in the very state in which it might be at the date of the transfer. But at that date the only corporation which the charter provided for had already been organized.The only powers conferred upon corporators to that end had already been exercised and exhausted. The bondholders under the mortgage, and their assignees, the purchasers at the sale, therefore took, and could take, nothing else than the charter, so far as it remained unexecuted, with such franchises and powers as were capable of future enjoyment and activity, and not such as, having already spent their force by having been fully exerted, could not be revived by a conveyance. This would include, by the necessity of the case, the franchise to organize a corporation, which can only be exerted once for all; for the simple act of organization exhausts the authority, and having once been effected, is legally incapable of repetition.

It is a mistake, however, to suppose that the mortgage and sale of a charter by a corporation, in any proper sense which can be legally imputed to the words, necessarily conveys every power and authority conferred by it, so far, at least, as to vest a title in them, as franchises, irrevocable by reason of the obligation of a contract. In many, if not in most, acts of incorporation, however special in their nature, there are various provisions which are matters of general law and not of contract, and are, therefore, subject to modification or repeal.

Such, in our opinion, would be the character of the right in the mortgage bondholders, or the purchasers at the sale under the mortgage, to organize as a corporation, after acquiring title [***842] to the mortgaged property, by sale under the mortgage, if, in the charter under consideration, it had been conferred in express terms, and

particular provision had been made as to the mode of procedure to effect the purpose. It would be matter [*622] of law and not of contract. At least, it would be construed as conferring only a right to organize as a corporation, according to such laws as might be in force at the time when the actual organization should take place, and subject to such limitations as they might impose. It cannot, we think, be admitted that a statutory provision for becoming a corporation in futuro can become a contract, in the sense of that clause of the Constitution of the United States which prohibits State legislation impairing its obligation, until it has become vested as a right by an actual organization under it; and then it takes effect as of that date, and subject to such laws as may then be in force. Such a [**305] contract, so far as it seems to assume that form, is a provision merely that, at the time, or on the happening of the event specified, the parties designated may become a corporation according to the laws that may then be actually in force. The stipulation, whatever be its form, must be construed as subject and subordinate to the paramount policy of the State, and to the sovereign prerogative of deciding, in the mean time, what shall constitute the essential characteristics of corporate existence. The State does not part with the franchise until it passes to the organized corporation; and, when it is thus imparted, it must be what the government is then authorized to grant and does actually confer.

It is immaterial that the form of the transaction is that of a mortgage, sale, or other transfer inter partes of the franchise to be a corporation. "The real transaction, in all such cases of transfer, sale, or conveyance," as was said by the Supreme Court of Ohio in the case of The State v. Sherman, 22 Ohio St. 411, 428, "in legal effect, is nothing more or less, and nothing other, than a surrender or abandonment of the old charter by the corporators, and a grant de novo of a similar charter to the so-called transferees or purchasers. To look upon it in any other light, and to regard the transaction as a literal transfer or sale of the charter, is to be deceived, we think, by a mere figure or form of speech. The vital part of the transaction, and that without which it would be a nullity, is the law under which the transfer is made. The statute

authorizing the transfer and declaring its effect, is the grant of a new charter [*623] couched in few words, and to take effect upon condition of the surrender or abandonment of the old charter; and the deed of transfer is to be regarded as mere evidence of the surrender or abandonment."

It is, of course, the law in force at the time the transaction is consummated and made effectual, that must be looked to as determining its validity and effect. This is the principle on which this court proceeded in deciding the case of Railroad Co. v. Georgia, 98 U.S. 359. The franchise to be a corporation remained in, and was exercised by, the old corporation, notwithstanding the mortgage of its charter, until the new corporation was formed and organized; it was then surrendered to the State, and by a new grant then made passed to the corporators of the new corporation, and was held and exercised by them under the constitutional restrictions then existing.

Our conclusions, then, are, that the exemption from taxation contained in the 28th section of the act of January 11, 1853, was intended to apply only to the Memphis and Little Rock Railroad Company as the original corporation organized under it; that it did not pass by the mortgage of its charter and works, as included in the transfer of the franchise to be a corporation, to the mortgagees or purchasers at the judicial sale; that the franchises embraced in that conveyance were limited to those which had been granted as appropriate to the construction, maintenance, operation, and use of the railroad as a public highway and the right to make profit therefrom; and that the appellant, not having become a corporate body until after the restrictions in the Constitution of 1874 took effect, was thereby incapable in law of having or enjoying the privilege of holding its property exempt from taxation.

The decree of the Supreme Court of Arkansas is accordingly

Affirmed.



**NATIONAL RAILROAD PASSENGER CORPORATION v. ATCHISON, TOPEKA & SANTA FE RAILWAY CO. ET AL.**

**No. 83-1492**

**SUPREME COURT OF THE UNITED STATES**

**470 U.S. 451; 105 S. Ct. 1441; 84 L. Ed. 2d 432; 1985 U.S. LEXIS 65; 53 U.S.L.W. 4285**

**January 15, 1985, Argued**
**March 18, 1985, Decided** [*]

[*] Together with No. 83-1633, Atchison, Topeka & Santa Fe Railway Co. et al. v. National Railroad Passenger Corporation, also on appeal from the same court.

**SUBSEQUENT HISTORY:** As Amended.

**PRIOR HISTORY:** APPEAL FROM THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

**DISPOSITION:** 723 F.2d 1298, reversed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant national railroad sought review of the decision of the United States Court of Appeals for the Seventh Circuit which held that appellee private railroads could be compelled to reimburse national railroad for the incremental cost of carrying pass riders, but that this "windfall" to national railroad violated the Due Process Clause.

**OVERVIEW:** The Rail Passenger Service Act of 1970 (Act), 45 U.S.C.S. § 501 et seq., established national railroad and outlined a procedure under which private railroads could obtain relief from their passenger-service obligations by transferring those responsibilities to national railroad by signing basic agreements. Private railroads challenged the constitutionality of § 405 of the Act, 45 U.S.C.S. § 565(f), which required them to reimburse national railroad for the pass travel of their employees, former employees, and dependents. The district court granted summary judgment to national railroad. The court of appeals reversed in part, finding that the agreements provided railroads with a contractual right to be free from having to finance these aspects of operations. On appeal, the Court found that the agreements in no respect relieved railroads of the "responsibility" to provide their employees with pass privileges, for no state or federal law imposed that "responsibility" on them, in connection with intercity rail passenger operations, when the contracts were executed. Therefore, the Court concluded that § 405(f) in no respect altered railroads' existing contractual rights and duties.

**OUTCOME:** The Court held that the statutory provision was constitutional, and reversed the court of appeals insofar as it held that the 1979 and 1981 amendments to the statute contravened the Due Process Clause.

**CORE TERMS:** railroad, passenger service, intercity, contractual right, reimbursement, passenger, relieved, incremental, rider, reimburse, common carriers, transportation, cross-appeal, pass-rider, contractual obligation, impairment, impaired, fare, travel, trains, passenger train, contractual, impair, repeal, formula, unconstitutionally, contractually, rationally, reserved,

covenant

**LexisNexis(R) Headnotes**

*Transportation Law > Rail Transportation > Amtrak*
*Transportation Law > Rail Transportation > Rates & Tariffs*
[HN1] The Rail Passenger Service Act of 1970 (the Act), 45 U.S.C.S. § 501 et seq., established the National Railroad Passenger Corporation, a private, for-profit corporation that has come to be known as Amtrak. The corporation is not "an agency or establishment" of the government but is authorized by the government to operate or contract for the operation of intercity rail passenger service. The Act outlined a procedure under which private railroads could obtain relief from their passenger-service obligations by transferring those responsibilities to Amtrak; the Act authorized the new corporation to enter into standardized contracts with the private railroads, under which a railroad would be relieved of all its responsibilities as a common carrier of passengers by rail in intercity rail passenger service under Subtitle IV of Title 49 or any state or other law relating to the provision of intercity passenger service. 45 U.S.C.S. § 561(a)(1).

*Transportation Law > Carrier Duties & Liabilities > Duty to Provide Service*
*Transportation Law > Rail Transportation > Abandonment*
*Transportation Law > Rail Transportation > Amtrak*
[HN2] To obtain relief from their common carrier obligations, the railroads had to agree to several conditions in the Rail Passenger Service Act of 1970 (the Act), 45 U.S.C.S. § 501 et seq. First, in consideration of being relieved of this responsibility, a railroad was to pay Amtrak an amount equal to one-half of that railroad's financial losses from intercity passenger service during 1969. 45 U.S.C.S. § 561(a)(2). Participating railroads also were to provide Amtrak with the use of tracks, other facilities, and services at rates to be agreed upon by the parties or, in the event of disagreement, to be set by the Interstate Commerce Commission. 45 U.S.C.S. §§ 561, 562. The Act also includes a labor protection provision requiring the railroads to provide fair and equitable arrangements to protect the interests of employees affected by discontinuances of intercity rail passenger

service. 45 U.S.C.S. § 565(a).

*Transportation Law > Carrier Duties & Liabilities > Duty to Provide Service*
*Transportation Law > Rail Transportation > Amtrak*
*Transportation Law > Rail Transportation > Safety Appliance Act > Couplers*
[HN3] See 45 U.S.C.S. § 541.

*Governments > Legislation > Interpretation*
[HN4] Absent some clear indication that the legislature intends to bind itself contractually, the presumption is that a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise. This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state. Thus, the party asserting the creation of a contract must overcome this well-founded presumption, and the court proceeds cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation.

*Governments > Legislation > Interpretation*
[HN5] In determining whether a particular statute gives rise to a contractual obligation, it is of first importance to examine the language of the statute. Where the claim is that the state's policy embodied in a statute is to bind its instrumentalities by contract, the cardinal inquiry is as to the terms of the statute supposed to create such a contract. If it provides for the execution of a written contract on behalf of the state the case for an obligation binding upon the state is clear. But absent an adequate expression of an actual intent of the state to bind itself, the court will not lightly construe that which is undoubtedly a scheme of public regulation to be, in addition, a private contract to which the state is a party.

*Contracts Law > Formation > Tender & Delivery*
*Transportation Law > Carrier Duties & Liabilities > Duty to Provide Service*
*Transportation Law > Rail Transportation > Amtrak*
[HN6] 45 U.S.C.S. § 501 et seq., expressly established the National Railroad Passenger Corporation as a nongovernmental entity, 45 U.S.C.S. § 541, and it used

the term "contract" not to define the relationship of the United States to the railroads, but instead that of the new, nongovernmental corporation to the railroads. The statute states clearly that the Corporation is authorized to contract and, upon written request therefor from a railroad, shall tender a contract. 45 U.S.C.S. § 561(a), and that, upon its entering into a valid contract, the railroad shall be relieved of all its responsibilities.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > General Overview*
[HN7] To prevail on a claim that federal economic legislation unconstitutionally impairs a private contractual right, the party complaining of unconstitutionality has the burden of demonstrating, first, that the statute alters contractual rights or obligations. If an impairment is found, the reviewing court next determines whether the impairment is of constitutional dimension. If the alteration of contractual obligations is minimal, the inquiry may end at this stage, if the impairment is substantial, a court must look more closely at the legislation. When the contract is a private one, and when the impairing statute is a federal one, this next inquiry is especially limited, and the judicial scrutiny quite minimal. The party asserting a Fifth Amendment due process violation must overcome a presumption of constitutionality and establish that the legislature has acted in an arbitrary and irrational way.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
[HN8] Under the Fifth Amendment's Due Process Clause, Congress remains free to adjust the burdens and benefits of economic life, as long as it did so in a manner that was neither arbitrary nor irrational. Moreover, in the determination of whether economic legislation that substantially alters contractual rights and duties violates due process, the burden of proving irrationality rests squarely on the party asserting a due process violation.

**DECISION:**

Federal statute requiring private railroads to reimburse Amtrak for rail travel privileges that Amtrak provides to railroads' past and present employees, and

their dependents, held constitutional.

**SUMMARY:**

These cases presented the question whether 405(f) of the Rail Passenger Service Act (45 USCS 565(f)), requiring that private railroads reimburse Amtrak for rail travel privileges that Amtrak provides to the railroads' employees and former employees, and their dependents, violates the due process clause of the Fifth Amendment. In an action by five railroads against Amtrak, in which the United States intervened as a defendant, the United States District Court for the Northern District of Illinois granted summary judgment in favor of Amtrak and the United States, ruling that the Rail Passenger Service Act (45 USCS 501 et seq.) which relieved participating railroads of the obligation to provide intercity passenger service, did not constitute a contract between the United States and the railroads and that, therefore, 405(f) did not impair an obligation of the United States under a contract, nor any private contractual obligations between the railroads and Amtrak (577 F Supp 1046). The United States Court of Appeals for the Seventh District affirmed in part and reversed in part, holding that the railroads could be compelled to reimburse Amtrak for the incremental cost of carrying the pass riders, but that the reimbursement scheme in the 1979 and 1981 amendments to the Act requiring the railroads to pay more than the incremental cost violated the due process clause by unreasonably and illegally impairing the rights of the railroads under the Basic Agreements with Amtrak (723 F2d 1298).

On appeal by Amtrak and cross appeal by the railroads, the United States Supreme Court reversed insofar as the Court of Appeals ruled that the 1979 and 1981 amendments to the Act contravened the due process clause. In an opinion by Marshall, J., expressing the unanimous view of the eight participating members of the court, it was held that 405(f) is constitutional, and that even if the 1979 and 1981 amendments, by requiring the payment by the railroads of more than the incremental cost of pass privileges, indirectly subsidized Amtrak operations in violation of a private contractual right, the amendments in no respect offend the due process clause.

Powell, J., did not participate.

**LAWYERS' EDITION HEADNOTES:**

CONSTITUTIONAL LAW §212

RAILROADS §6;

impairment of contracts -- congressional regulation of railroads -- ;

Headnote:[1A][1B][1C][1D]

The Rail Passenger Service Act (45 USCS 501 et seq.) establishing the National Railroad Passenger Corporation (Amtrak), a private corporation authorized to contract with private railroads for the operation of intercity rail passenger service and relieving participating railroads of that obligation, is a regulatory policy and not a contractual arrangement between the United States and the participating railroads; thus, 405(f) of the Act (45 USCS 565(f)) requiring participating railroads to reimburse Amtrak for rail travel privileges provided by Amtrak to the railroads' employees and former employees and their dependents violates no contractual obligation of the United States not to impose any passenger service responsibilities on the railroads, and therefore does not violate the due process clause of the Fifth Amendment on that account.

APPEAL §1262;

jurisdiction of Supreme Court -- cross appeal -- ;

Headnote:[2A][2B]

On an appeal to the United States Supreme Court pursuant to 28 USCS 1252 (from a judgment declaring an act of Congress unconstitutional in an action to which the United States is a party), cross appellants' filing of a jurisdictional statement on cross appeal within 30 days of their receipt of appellants' jurisdictional statement, as required by Supreme Court Rule 12.4, is properly a cross appeal over which the Supreme Court has jurisdiction.

CONSTITUTIONAL LAW §125;

impairment of contracts -- statute -- regulation -- ;

Headnote:[3]

In determining whether a particular statute gives rise to a contractual obligation subject to unconstitutional impairment, it is of first importance to examine the language of the statute and, absent an adequate expression of actual intent to create a contract, that which is undoubtedly a scheme of public regulation will not lightly be construed to be, in addition, a private contract to which the state is a party.

CONSTITUTIONAL LAW §127

RAILROADS §6;

impairment of contracts -- by United States -- existence of contract -- ;

Headnote:[4]

The Basic Agreements into which private railroads entered with the National Railroad Passenger Corporation (Amtrak), a private corporation formed pursuant to the Rail Passenger Service Act (45 USCS 501 et seq.) which relieved the railroads of the obligation to provide intercity passenger service, do not grant the railroads any contractual rights against the United States, including the right to be free from all obligations to provide intercity passenger service.

CONSTITUTIONAL LAW §127;

unconstitutional impairment of contracts -- federal economic legislation -- burden of proof -- ;

Headnote:[5]

To prevail on a claim that federal economic legislation unconstitutionally impairs a private contractual right, the party complaining of unconstitutionality has the burden of demonstrating, first that the statute alters contractual rights or obligations; if an impairment is found, a reviewing court next determines whether the impairment is of constitutional dimension, and if the alteration is minimal, the inquiry may end at that stage, but if the impairment is substantial, a court must look more closely at the legislation; when the contract is a private one, and when the impairing statute is a federal one, this inquiry is especially limited, and judicial scrutiny quite minimal; the party asserting a Fifth Amendment due process violation must overcome a presumption of constitutionality and establish that the Legislature has acted in an arbitrary and irrational way.

CONSTITUTIONAL LAW §212

RAILROADS §6;

impairment of contracts -- reimbursement of Amtrak by private railroads -- ;

Headnote:[6A][6B][6C]

The 1979 and 1981 amendments to 405(f) of the Rail Passenger Service Act (45 USCS 565(f)) requiring private railroads to reimburse the National Railroad Passenger Corporation (Amtrak) for rail travel privileges Amtrak provides to the railroads' employees and former employees, and their dependents, do not impair any private contractual right the railroads obtained under the Basic Agreements with Amtrak, which only relieved the railroads of all pre-existing obligations to provide intercity passenger service.

CONSTITUTIONAL LAW §641

RAILROADS §6;

reimbursement of Amtrak by private railroads -- due process -- ;

Headnote:[7A][7B][7C][7D]

Even if the 1979 and 1981 amendments to 405(f) of the Rail Passenger Service Act (45 USCS 565(f)), by requiring private railroads to pay the National Railroad Passenger Corporation (Amtrak) more than the incremental cost of pass privileges provided by Amtrak to employees and former employees of the railroads, and their dependents, indirectly subsidized Amtrak in violation of private contractual rights under the Basic Agreements between the railroads and Amtrak relieving the railroads of pre-existing obligations to furnish intercity passenger service, the amendments in no respect offend the due process clause; in passing 405(f), Congress rationally required Amtrak to honor the expectations of the railroads' past and present employees and their dependents in order to maintain employee morale and labor peace, and it rationally required the railroads to pay at least a portion of the cost of the privileges both because the railroads were responsible for the creation of the moral obligation to the railroad employees and because the railroads benefited from labor peace and continued employee morale, and after reasonably requiring the railroads to reimburse Amtrak for benefits received, Congress acted wholly rational in selecting the value to the passholders--as opposed to the

cost to Amtrak--as the proper reimbursement amount.

**SYLLABUS**

The Rail Passenger Service Act of 1970 (Act or RPSA) was enacted in an attempt to revive the failing intercity passenger train industry. For this purpose the Act established the National Railroad Passenger Corporation (Amtrak), a private, for-profit corporation, authorized to operate, or contract with private railroads for the operation of, intercity rail passenger service. Most private railroads offering such service entered into "Basic Agreements" with Amtrak, and thereby, as provided by the Act, shed their intercity rail passenger obligations. Section 7.5 of each Basic Agreement, which concerned railroad employees' privileges to travel on Amtrak trains for free or at reduced fares, gave Amtrak discretion to determine such privileges. When a controversy arose over Amtrak's decision to cut back on these privileges, Congress in 1972 added § 405(f) to the RPSA to restore the privileges as they existed when Amtrak took over passenger rail service in 1971. But § 405(f) also required the railroads to pay, at a reimbursement rate determined by the Interstate Commerce Commission, for such costs as might be incurred by Amtrak in providing for the pass privileges. In 1979, Congress decided that the ICC's reimbursement rate resulted in inadequate compensation to Amtrak, and accordingly amended § 405(f) to require the railroads to reimburse Amtrak for pass-rider service at the rate of "25 percent of the systemwide average monthly yield per revenue passenger mile" for two years. In 1981, § 405(f) was again amended to provide that the 25 percent reimbursement requirement remain in effect indefinitely. Five railroads filed suit against Amtrak in Federal District Court, challenging the constitutionality of § 405(f) on the grounds that the reimbursement requirement violated the Due Process Clause of the Fifth Amendment. The United States intervened in the suit as a defendant. The District Court granted summary judgment in favor of Amtrak and the United States, holding that the Act did not constitute a contract between the United States and the railroads, that therefore § 405(f) did not impair an obligation of the United States under a contract, and that moreover § 405(f) did not impair the Basic Agreements. The Court of Appeals affirmed in part and reversed in part, holding that the railroads could be compelled to reimburse Amtrak for the incremental cost of carrying the pass riders, but that the "windfall" to Amtrak under the 1979 amendment, whereby the railroads were required to pay more than the incremental

cost, violated the Due Process Clause, because it unreasonably and illegally impaired the railroads' rights under the Basic Agreements.

*Held*:

1. Section 405(f) is constitutional. Pp. 465-479.

(a) The RPSA does not constitute a binding obligation of Congress. Neither the language of the Act nor the circumstances surrounding its passage manifest any intent on Congress' part to bind itself contractually to the railroads. Pp. 465-470.

(b) The Basic Agreements do not grant the railroads a contractual right against the United States to be free from all obligation to provide passenger service. Those Agreements are not contracts between the railroads and the United States but simply between the railroads and Amtrak. Pp. 470-471.

(c) Section 405(f)'s payment obligation does not unconstitutionally impair the railroads' private contractual rights under the Basic Agreements. Those Agreements relieved the railroads only of common carriage responsibilities and not of the responsibility to provide their employees with pass privileges, for no state or federal law imposed that responsibility on them, as common carriers, when the Agreements were executed. It was not until after the Agreements were signed and Amtrak operations were underway, that Congress imposed new obligations on both parties to the Agreements. Pp. 472-475.

(d) Even if the railroads have a private contractual right not to pay more than the incremental cost of the pass privileges, the Due Process Clause does not limit Congress' power to choose a different reimbursement scheme. Congress' decision to assess the railroads was rational, and the railroads have not met their burden of proving irrationality and thus have not proved a due process violation. Pp. 475-478.

2. The railroads have no contractual right to be free from the obligation to make any payments to Amtrak, even for incremental costs. Nothing in the RPSA or the Basic Agreements suggests that the railroads were relieved of the responsibility to reimburse Amtrak for the pass privileges in question. Pp. 478-479.

**COUNSEL:** Paul F. Mickey, Jr., argued the cause for

appellant in No. 83-1492 and appellee in No. 83-1633. With him on the briefs were William R. Perlik, David R. Johnson, and Andrea Timko Sallet.

Samuel A. Alito, Jr., argued the cause for the United States as appellee under this Court's Rule 10.4 in support of appellant in No. 83-1492 and appellee in No. 83-1633. With him on the brief were Solicitor General Lee, Acting Assistant Attorney General Willard, Leonard Schaitman, and Al J. Daniel, Jr.

George A. Platz argued the cause for appellees in No. 83-1492 and appellants in No. 83-1633. With him on the brief were Howard J. Trienens, Thomas W. Merrill, and W. A. Brasher.

**JUDGES:** MARSHALL, J., delivered the opinion of the Court, in which all other Members joined, except POWELL, J., who took no part in the decision of the cases.

**OPINION BY:** MARSHALL

**OPINION**

[*453] [***438] [**1445] JUSTICE MARSHALL delivered the opinion of the Court.

[***LEdHR1A] [1A]The question presented in these cases is whether Congress violates the Due Process Clause of the Fifth Amendment by requiring private railroads to reimburse the National Railroad Passenger Corporation (Amtrak) for rail travel privileges that Amtrak provides to the railroads' employees and former employees, and their dependents.

I

A

From the middle of the 19th century, the railroad passenger coach played a significant and sometimes romantic role in American cultural and economic life. By the middle of this century, however, "this time-honored vehicle" threatened to "take its place in the transportation museum along with the [*454] stagecoach, the sidewheeler, and the steam locomotive." [1] Whereas in 1929 about 20,000 intercity trains operated in the country, [2] by 1946, there were only about 11,000 such passenger trains; by 1971, fewer than 500 passenger trains still operated. [3] As cars, buses, and airplanes

displaced the passenger railroads, those railroads that continued to provide passenger carriage incurred heavy and continuing losses. At the same time, as common carriers these railroads were bound to continue providing service until the Interstate Commerce Commission (ICC) or state regulatory authorities relieved them of this responsibility. Given the tremendous operating losses, many of the remaining handful of railroads operating passenger coaches sought ICC permission to discontinue passenger train service.

1 Hosmer, Examiner, Report and Recommended Order, Railroad Passenger Train Deficit, ICC Docket No. 31954, p. 69 (1958) (as quoted in G. Hilton, Amtrak: The National Railroad Passenger Corporation 9 (1980)).

2 P. Dorin, Amtrak: Trains & Travel 14 (1979).

3 H. R. Rep. No. 91-1580, pp. 2-3 (1970).

[HN1] The Rail Passenger Service Act of 1970 (Act or RPSA), 84 Stat. 1327, 45 U. S. C. § 501 *et seq.* (1970 ed.), which took effect on May 1, 1971, was Congress' effort to "revive the failing intercity passenger train industry and retain a high-quality rail passenger service for the Nation." 4 On concluding [**1446] that a reorganized and restructured rail passenger system could be successful, Congress established the National [***439] Railroad Passenger Corporation, a private, for-profit corporation that has come to be known as Amtrak. 5 The corporation is not "an agency or establishment" of the Government but is authorized by the Government to operate or [*455] contract for the operation of intercity rail passenger service. 6 The Act outlined a procedure under which private railroads could obtain relief from their passenger-service obligations by transferring those responsibilities to Amtrak; 7 the Act authorized the new corporation to enter into standardized contracts with the private railroads, under which a railroad would be relieved "of all [its] responsibilities as a common carrier of passengers by rail in intercity rail passenger service under [Subtitle IV of Title 49] or any State or other law relating to the provision of intercity passenger service." 45 U. S. C. § 561(a)(1) (1970 ed.). 8

4 GAO, Comptroller General, Nos. B-196907, CED-80-83, Report to the Congress, How Much Should Amtrak Be Reimbursed for Railroad Employees Using Passes to Ride Its Trains? (GAO Report), App. 48.

5 H. R. Rep. No. 91-1580, at 5. Initially the corporation was to be named "Railpax." The corporation instead independently adopted the official nickname "Amtrak," which is a contraction of "American" and "Track." N. Y. Times, Apr. 20, 1971, p. 86, col. 7.

6 H. R. Rep. No. 91-1580, at 5.

7 Railroads that chose not to discontinue passenger service remained subject to the obligation to provide that service imposed on common carriers by the Interstate Commerce Act (ICA), 49 U. S. C. §§ 10908 and 10909. Section 404 of the RPSA, 45 U. S. C. § 564 (1970 ed.), declared a 5-year moratorium on the discontinuance of any intercity passenger train by any railroad that had not transferred its responsibilities to Amtrak, but authorized those railroads to seek discontinuances, through the procedures of the ICA, at the end of the 5-year period. See 49 U. S. C. § 13a (1970 ed.), recodified at 49 U. S. C. §§ 10908, 10909. In addition, all railroads remained subject to common carrier obligations to transport freight. 49 U. S. C. § 10903 *et seq.*

8 The Act originally referred to the common carrier obligations under Part I of the ICA, see 84 Stat. 1328, 1334; that provision of the ICA was recodified in 1978 as Subtitle IV (§ 10101 *et seq.*) of Title 49, which is entitled "Interstate Commerce."

[HN2] To obtain relief from their common carrier obligations, the railroads had to agree to several conditions. First, "[in] consideration of being relieved of this responsibility," a railroad was to pay Amtrak an amount equal to one-half of that railroad's financial losses from intercity passenger service during 1969. § 561(a)(2). Participating railroads also were to provide Amtrak with the use of tracks, other facilities, and services at rates to be agreed upon by the parties or, in the event of disagreement, to be set by the ICC. §§ 561, 562. The Act also included a labor protection provision requiring the railroads to "provide fair and equitable arrangements to [*456] protect the interests of employees affected by discontinuances of intercity rail passenger service." § 565(a). Participating railroads were required to enter into "protective arrangements" with their unions, in which the railroads promised to protect dislocated employees and to preserve employee benefits, including pension rights and fringe benefits. §§ 565(a)-(e).

Finally, in § 301 of the Act, [HN3] 45 U. S. C. § 541 (1970 ed.), Congress "expressly reserved" its right to "repeal, alter or amend this Act at any time."

All but five private railroads offering intercity passenger service took up the option provided by the Act [***440] and entered into contracts, known as "Basic Agreements," with Amtrak. [9] The participating railroads made the required payments to Amtrak and shed their intercity rail passenger obligations. On May 1, 1971, Amtrak began rail passenger service.

> 9    The five nonparticipating railroads were Southern Railway Co., Denver & Rio Grande Western Railroad, Chicago, Rock Island & Pacific Railroad, Georgia Railroad, and Canadian Pacific Railway Co.. GAO Report, App. 48.

The Basic Agreements between the railroads and Amtrak mirrored the provisions of the Act. For example, § 2.1 of each Basic Agreement, entitled "Relief from Responsibility," relieved the signatory railroad "of its entire responsibility for the provision of Intercity Rail Passenger Service." [**1447] App. 13. The Agreements also required the railroads to make services, tracks, and facilities available and to protect employees who would be affected by a discontinuance of passenger service.

Section 7.5 of each Basic Agreement, entitled "Transportation Privileges," spelled out the rights of the railroads and their employees to make use of Amtrak trains. The fifth paragraph, which concerned the rights of railroad employees to travel on Amtrak trains for free or at reduced fares, provided that "[transportation] privileges, if any, with respect to business and personal travel of Railroad personnel shall be as [*457] determined by [Amtrak]." The paragraph did not specify which party was to bear the cost of the transportation.

Shortly after Amtrak began operation, considerable controversy arose over Amtrak's decision to cut back employee pass privileges pursuant to the discretion accorded in this provision. The result of that controversy has given rise to this action, and we turn to consider the evolution of this dispute.

B

Since the 1880's, railroad employees and retirees, and their dependents, have been able to ride passenger trains for free or at reduced rates. Before Amtrak assumed operation, the private railroads often permitted current and retired employees and their dependents to travel on the employees' home lines for free or at reduced rates, and many railroads had reciprocal agreements permitting employees and dependents of other railroads to travel at reduced rates as well. [10]

> 10    See GAO Report, App. 47.

At the time Amtrak was created, between 1.4 million and 2 million rail-travel passes were outstanding. [11] Exercising its discretion under § 7.5 of the Basic Agreements, the corporation decided to confine pass privileges to employees of the railroads that operated trains for Amtrak, and to limit those privileges to half-rate fares. As a result, all railroad employees lost their pre-Amtrak access to completely free transportation, and employees of some railroads lost their pass privileges entirely. Amtrak then was faced with vehement protests from the railroads, which continued to operate both freight trains and some passenger service, and which asserted that the withdrawal of free transportation privileges for their employees threatened to produce severe labor problems for [***441] them. [12] The corporation thereafter restored some, but not all of the canceled privileges.

> 11    Affidavit of Roger Lewis, App. 40.
> 12    *Ibid.*

[*458] The railroads continued to protest vigorously the Amtrak decision to cut back pass-rider privileges. They also reaffirmed their concern about employee morale and the possibility of labor strikes if privileges were not restored. Congress responded to this problem in 1972 by amending the RPSA to restore free or reduced-rate transportation to all people who had enjoyed such privileges when Amtrak took over passenger rail service. Pub. L. 92-316, § 8, 86 Stat. 230-231. The new § 405(f) of the Act, 45 U. S. C. § 565(f) (1976 ed.) (1972 amendment), required Amtrak to assure, "to the maximum extent practicable," that all employees and dependents who had received free or reduced-rate transportation before Amtrak began operation would continue to be eligible for such benefits. In their Committee Reports, both the Senate and the House emphasized that railroad employees should not lose their longstanding pass privileges -- privileges they had earned through years of service -- simply on account of the transfer of service to Amtrak. [13] Amtrak implemented this amendment [**1448] by permitting pass riders to

travel free or at half fare depending on the length of an employee's railroad employment, whether the employee was retired, and whether he was traveling on or off the rail lines of his home railroad. [14] In addition, pass riders were eligible for travel on a space-available basis only; they were permitted to make reservations only 24 hours in advance on trains requiring reservations; and they were not permitted to use the passes on Amtrak's special trains called Metroliners.

13 See S. Rep. No. 92-756, pp. 11-12 (1972) ("The Committee believes that employees who were entitled to free or reduced-rate transportation before the advent of Amtrak should not lose such privileges on account of the transfer of passenger service from the railroads to Amtrak"); see also H. R. Rep. No. 92-905, p. 11 (1972).

14 See GAO Report, App. 53-54.

The 1972 amendment also required the railroads to pay for "such costs as may be incurred" by Amtrak in providing the pass privileges mandated by § 405(f). As the Senate [*459] Committee explained: "Because Congress is merely continuing pass policies which the railroads themselves developed, it would appear that the railroads and not Amtrak should bear the cost, if any." S. Rep. No. 92-756, p. 11 (1972). The amendment did not specify how the costs were to be calculated but did provide that the ICC should resolve the issue if Amtrak and the railroads were unable to agree on the amount to be paid. The matter eventually was referred to the ICC, which set an interim reimbursement rate based on Amtrak's incremental operating costs of providing the service -- that is, based on the additional cost to Amtrak to transport the riders. The initial rate was $ .00079 per passenger mile. This amount was to be offset by the revenue derived from the reduced-rate fares paid by pass riders riding pursuant to the 1972 amendment. [15] The railroads also were to pay Amtrak [***442] for the administrative costs of the program. When the offset formula was applied, the revenue derived from the reduced-rate fares always exceeded the payments otherwise due from the railroads. As a result, the railroads reimbursed Amtrak solely for the pass program's administrative costs. [16] From 1972 to 1979, Amtrak collected from the railroads only administrative expenses amounting to about $ 500,000 per year. [17]

15 *Determination of Cost Reimbursement Under Section 405(f) of the Rail Passenger Service Act,*

No. 27194, as amended, Dec. 21, 1972, App. 23-38 (unamended decision reported at 347 I. C. C. 325 (1972)).

16 GAO Report, App. 51.

17 723 F.2d 1298, 1300 (CA7 1983).

In 1979, however, Congress decided that the ICC's reimbursement rate resulted in inadequate compensation to Amtrak. Accordingly, in the Amtrak Reorganization Act of 1979, Pub. L. 96-73, § 120 (a), 93 Stat. 547 (Reorganization Act), Congress amended the § 405(f) pass-rider provision to require that the railroads prospectively reimburse Amtrak for pass-rider service at the rate of "25 percent of the systemwide average monthly yield per revenue passenger [*460] mile" -- a rate that amounted to approximately one-fourth of the normal fare for ticket-buying passengers. The new rate was to remain in effect for two years. [18]

18 After the amendment, Amtrak billed the railroads at rates from .02067 cents to .02343 cents per passenger mile. *Ibid.* In the first 10 months of operation under the 1979 amendment, the railroads represented to the Court of Appeals that they paid the following additional sums: Santa Fe, $ 336,249.82; Burlington Northern, $ 490,344.72; Chesapeake & Ohio and Baltimore & Ohio, $ 76,345.34; and Union Pacific, $ 287,784.66. *Id.*, at 1300, n. 2. Of course, as the years go by, the number of eligible pass riders declines because of employee and retiree deaths. Whereas amendment of the RPSA in 1972 gave free or reduced rate transportation to about 2.83 million people, in December 1979 only about 1.05 million eligible pass riders remained. GAO Report, App. 56.

At the same time, Congress also directed the Comptroller General to conduct a study and, "taking into account the value of the services being provided," § 120(b), to make recommendations on the appropriate way to reimburse Amtrak for the cost of providing pass-rider transportation. In 1980, the General Accounting Office submitted a report to Congress that analyzed in detail two methods of reimbursement. GAO Report, App. 42-86. The report first considered [**1449] reimbursing Amtrak for its incremental cost in providing the service, and second, for the value *to the pass rider* of the service being provided, which would be less than the fare charged a regular passenger, but which the report

otherwise declined to quantify. Neither approach was necessarily the correct one, GAO decided: "Amtrak's costs to provide transportation to pass riders are debatable, and we did not find adequate analytical evidence to support one position over another or to recommend a specific means to reimburse Amtrak." *Id.*, at 43. The report therefore concluded that the choice between the two cost reimbursement formulas was "a policy decision that the Congress should make," *id.*, at 80; instead of offering an answer, the report simply outlined the available options. *Ibid.*

[*461] After receiving the report, Congress again amended § 405(f) of the Act and provided that the 25-percent [***443] reimbursement requirement would remain in effect indefinitely. Pub. L. 97-35, 95 Stat. 697 (1981 amendment).

C

The cases we consider began in 1980 when five railroads, each of which had taken advantage of the RPSA and discontinued passenger service, filed suit against Amtrak in the United States District Court for the Northern District of Illinois challenging the constitutionality of § 405(f) of the Act. [19] They argued that the requirement that they reimburse Amtrak for the pass travel of their employees, former employees, and dependents violated the Due Process Clause of the Fifth Amendment.

19   The five railroads are Atchison, Topeka, and Santa Fe Railway Co., Burlington Northern, Inc., Chesapeake and Ohio Railway Co., Baltimore and Ohio Railroad Co., and Union Pacific Railroad Co.

The railroads based this claim on four theories. First, they claimed they had a contractual right against the United States, derived from the RPSA and the Basic Agreements, to be free from the obligation to provide intercity rail passenger service. They asserted that § 405(f), which had been added to the Act in 1972, therefore impaired an obligation of the United States under this statutory contract because pass privileges constituted the "intercity rail passenger service," from which the railroads had been relieved of their "entire responsibility" in the RPSA. Thus, since Congress had contracted in the RPSA to relieve the railroads of intercity rail passenger service, and the railroads had fulfilled their obligations under the contract, they had a

right to be free from the responsibility to provide pass privileges. Congress, they claimed, was impairing its contractual obligation through passage of § 405. Next, the railroads claimed that even if the Act itself were not a contractual obligation, the Basic [*462] Agreements, with identical "relief from responsibility" language, were such a contractual obligation of the United States; that obligation, the railroads asserted, was unconstitutionally impaired by the subsequent legislation. Third, they argued that, even if no contract existed between the United States and the railroads, the statutory requirement that the railroads pay Amtrak for allowing pass riders constituted a deprivation of property without due process. Finally, the railroads argued that, even if Congress might constitutionally require the railroads to reimburse Amtrak for the cost of the pass-rider program, the particular reimbursement formula set forth in the 1979 amendment exceeded the incremental cost to Amtrak of providing the service and therefore constituted a deprivation of property without due process. After the 1981 amendment was passed, the railroads amended their complaint to make their claims applicable to that amendment as well.

The railroads filed a motion for summary judgment, and Amtrak filed a cross-motion for summary judgment. The United States then intervened as a defendant under 28 U. S. C. § 2403 and filed a motion to dismiss or, in the alternative, for summary judgment. The District Court entered an order [***444] [**1450] granting summary judgment in favor of Amtrak and the United States. 577 F.Supp. 1046 (1982). It concluded that the Act, as amended, did not constitute a contract between the United States and the railroads. It then assumed that the Basic Agreements were contracts between the United States and the railroads and held that § 405(f) did not impair that contract. The District Court found that the Agreements relieved the railroads of their *responsibility* to provide intercity rail service, but that by the railroads' own admission they never had a legal or contractual responsibility to provide free or reduced rate transportation to employees and their families. The court also observed that the Basic Agreements gave to Amtrak the discretion to determine what pass privileges, if any, the railroad employees should have.

[*463] The District Court rejected the railroads' argument that the requirement that they pay for their employees' pass-rider privileges violated due process and ruled that the railroads had not overcome the firmly established presumption of constitutionality that attaches

to legislative Acts "'adjusting the burdens and benefits of economic life.'" *Id.*, at 1052 (quoting *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 15 (1976)). Because the legislation at issue was neither arbitrary nor irrational, the District Court concluded that the reimbursement requirement of § 405 did not violate due process under the *Turner Elkhorn* standard.

Finally, the court rejected the railroads' argument that Congress' reimbursement formula violated due process by requiring the railroads to pay more than the incremental cost to Amtrak of transporting the pass riders. "Having determined that the Congress acted constitutionally in requiring the railroads to reimburse Amtrak for the pass rider service, this court will not second-guess the legislative branch on its selection of a particular mathematical formula for reimbursement, absent a showing that the formula was selected in an arbitrary or irrational manner." 577 F.Supp., at 1055. The court then traced Congress' decisionmaking process to demonstrate that the choice of reimbursement plans was a rational policy decision, particularly in light of the conclusion in the GAO Report that the reimbursement issue involved a policy choice for Congress.

The Court of Appeals for the Seventh Circuit affirmed in part and reversed in part. 723 F.2d 1298 (1983). The Court of Appeals rejected most of the railroads' arguments and held that the railroads could be compelled to reimburse Amtrak for the incremental cost of carrying the pass riders. The panel held, however, that the Basic Agreements provided the railroads with a contractual right to be free from having to "finance aspects of [Amtrak] operations that were once part of the railroads' entire responsibility for the provision of intercity rail passenger service." *Id.*, at 1302. According to the Court of Appeals, because the reimbursement [*464] scheme in the 1979 amendment required the railroads to pay more than the incremental cost to Amtrak, these payments supported Amtrak's general intercity rail passenger service operations, and the statute therefore impaired the railroads' right to be free from the responsibility for providing intercity rail passenger service. The court [***445] ruled that this "windfall" to Amtrak violated the Due Process Clause, because it unreasonably and illegally impaired the rights of the railroads under the Basic Agreements. [20]

20 The court did not expressly state whether the statute impaired a private obligation between Amtrak and the railroads, or as the railroads maintained, a contract to which the United States was a party as well.

[***LEdHR2A] [2A]Amtrak appealed to this Court under 28 U. S. C. § 1252, arguing that the reimbursement formula in § 405(f) is constitutional, and we noted probable jurisdiction. 469 U.S. 813 (1984). The railroads cross-appealed, contending that any reimbursement violates due process. We deferred ruling on whether jurisdiction [**1451] over the cross-appeal was proper until consideration of the cases on the merits. *Ibid.* [21]

[***LEdHR2A] [2B]

21 We now find that jurisdiction over the cross-appeal is proper. The railroads filed their jurisdictional statement on cross-appeal within 30 days of their receipt of appellant's jurisdictional statement, as required by this Court's Rule 12.4. If the filing was properly a cross-appeal, then this procedure was jurisdictionally sound. We hold that the filing was properly a cross-appeal.

Title 28 U. S. C. § 1252 provides that "[any] party may appeal to the Supreme Court from an interlocutory or final judgment, decree or order of any court of the United States . . . holding an Act of Congress unconstitutional in any civil action . . . to which the United States or any of its agencies . . . is a party." In *Regan* v. *Taxation With Representation of Washington*, 461 U.S. 540, 543, n. 3 (1983), this Court ruled that the language of § 1252 was sufficiently broad to encompass the cross-appeal, which would not otherwise have been a proper appeal. This reading of § 1252 is buttressed by the fact that once we have properly asserted jurisdiction under § 1252, "the whole case is to come before us." *Heckler* v. *Edwards*, 465 U.S. 870, 879 (1984). Since the railroads correctly filed a cross-appeal in this case, the procedures for taking a cross-appeal under this Court's Rule 12.4 were properly invoked, the cross-appeal was timely, and we have jurisdiction over the cross-appeal.

[*465] II

The railroads argue that the RPSA and the Basic

Agreements created a contractual obligation on the part of the United States not to reimpose any rail passenger service responsibilities on those railroads that entered into Basic Agreements, and that the pass-rider amendments to the Act unconstitutionally impair the "contract" into which the United States entered. Thus, the railroads conclude, the Court of Appeals correctly held that the 1979 and 1981 amendments substantially impaired their contractual rights and violated due process, but incorrectly ruled that the 1972 amendment, which required only that the railroads pay for the incremental cost to Amtrak of the pass riders, was constitutional. In making these arguments, the railroads argue first that the United States entered into a contractual relationship with the railroads, either through the RPSA or the Basic Agreements, and second that the scope of the contractual agreements encompassed reimbursement for pass-rider privileges. But, the railroads assert that, even if their contractual rights were only private ones with Amtrak, those private contractual agreements created a right to be free from paying for pass-rider privileges. They maintain that the 1979 and 1981 amendments, as well as the 1972 assessment of incremental costs, therefore unconstitutionally impaired those private contractual [***446] rights. We consider, and reject, each of these arguments in turn.

A

[***LEdHR1A] [1B]The first question we address is whether the RPSA constituted not merely a regulatory policy but also a contractual arrangement between the United States and the railroads that entered into Basic Agreements. [HN4] For many decades, this Court has maintained that absent some clear indication [*466] that the legislature intends to bind itself contractually, the presumption is that "a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise." *Dodge* v. *Board of Education*, 302 U.S. 74, 79 (1937).See also *Rector of Christ Church* v. *County of Philadelphia*, 24 How. 300, 302 (1861) ("Such an interpretation is not to be favored"). This well-established presumption is grounded in the elementary proposition that the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the state. *Indiana ex rel. Anderson* v. *Brand*, 303 U.S. 95, 104-105 (1938). Policies, unlike contracts, are inherently subject to revision and repeal, and to construe laws as contracts when the obligation is

not clearly and unequivocally expressed would be to limit drastically the essential powers of a legislative body. Indeed, "'[the] continued existence of a government [**1452] would be of no great value, if by implications and presumptions, it was disarmed of the powers necessary to accomplish the ends of its creation.'" *Keefe* v. *Clark*, 322 U.S. 393, 397 (1944) (quoting *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 548 (1837)). Thus, the party asserting the creation of a contract must overcome this well-founded presumption, *Dodge, supra*, at 79, and we proceed cautiously both in identifying a contract within the language of a regulatory statute and in defining the contours of any contractual obligation.

[***LEdHR3] [3][HN5] In determining whether a particular statute gives rise to a contractual obligation, "it is of first importance to examine the language of the statute." *Dodge* v. *Board of Education, supra*, at 78.See also *Indiana ex rel Anderson* v. *Brand, supra*, at 104 ("Where the claim is that the State's policy embodied in a statute is to bind its instrumentalities by contract, the cardinal inquiry is as to the terms of the statute supposed to create such a contract"). "If it provides for the execution of a written contract *on behalf of the state* the case for an obligation binding upon the state is clear." 302 U.S., at 78 (emphasis supplied). But absent "an adequate expression of [*467] an actual intent" of the State to bind itself, *Wisconsin & Michigan R. Co.* v. *Powers*, 191 U.S. 379, 386-387 (1903), this Court simply will not lightly construe that which is undoubtedly a scheme of public regulation to be, in addition, a private contract to which the State is a party.

The language of the RPSA discloses [***447] absolutely no congressional intention to have the United States enter into a private contractual arrangement with the railroads. By its terms, the Act does not create or speak of a contract between the United States and the railroads, and it does not in any respect provide for the execution of a written contract *on behalf of the United States*. [HN6] Quite to the contrary, the Act expressly established the National Railroad Passenger Corporation as a nongovernmental entity, 45 U. S. C. § 541, and it used the term "contract" not to define the relationship of the United States to the railroads, but instead that of the new, nongovernmental corporation to the railroads. The statute states clearly that "the Corporation is authorized to contract and, upon written request therefor from a railroad, shall tender a contract . . . ," 45 U. S. C. § 561(a), and that, "[upon] its entering into a valid contract

. . . , the railroad shall be relieved of all its responsibilities. . . ." *Ibid.* We simply cannot agree with the railroads that the frequent usage in a statute of the language of contract, including the term "contract," evidences an intent to bind the Federal Government contractually. Legislation outlining the terms on which private parties may execute contracts does not on its own constitute a statutory contract, but is instead an articulated policy that, like all policies, is subject to revision or repeal. Indeed, lest there be any doubt in these cases about Congress' will, Congress "expressly reserved" its rights to "repeal, alter, or amend" the Act at any time. 45 U. S. C. § 541. This is hardly the language of contract. [22]

> 22    In the *Sinking Fund Cases*, 99 U.S. 700 (1879), this Court recognized the effect of these few simple words. In that case, railroads challenged Congress' amendment of statutes that governed their obligations to the Government on securities issued to aid the initial construction of the railways. The Court rejected the argument that the amendment improperly interfered with vested rights and observed that through the language of reservation "Congress not only retains, but has given special notice of its intention to retain, full and complete power to make such alterations and amendments of the charter as come within the just scope of legislative power." *Id.*, at 720.

> We also reject the railroads' argument that this clause reserved only the power to repeal, alter, or amend the National Railroad Passenger Corporation's corporate charter. The clause expressly reserved the right to change "this Act," and we see no ground to support the railroads' attempt to limit this term merely to a single aspect of the Act.

[*468] [**1453] Moreover, the circumstances of the Act's passage belie an intent to contract away governmental powers. Congress long had regulated the railroads and had compelled them through the ICC to continue unprofitable service and undertake new service. Indeed, the huge sums that the railroads insist they paid to Amtrak in "consideration" for the contractual right to be free from their passenger service obligations represented just one-half of the annual losses they suffered in one year under the prior regulatory scheme.

This atmosphere of pervasive prior regulation leads to several conclusions. For one, Congress would have struck a profoundly inequitable bargain if, in exchange for the equivalent of a half year's losses, it had entered into a binding contract never to impose on the railroads -- which would continue to operate their potentially profitable freight services -- any rail passenger service [***448] obligations at all. [23] Congress simply [*469] cannot be presumed to have nonchalantly shed this vitally important governmental power with so little concern for what it would receive in exchange. Cf. *United States Trust Co.* v. *New Jersey*, 431 U.S. 1, 21-25 (1977) (considering reserved powers doctrine). Also, the pervasiveness of the prior regulation in this area suggests that absent some affirmative indication to the contrary, the railroads had no legitimate expectation that regulation would cease after 1971. Coupled with the statute's express reservation of the power to repeal, the heavy and longstanding regulation of this area strongly cuts against any argument that the statute created binding contractual rights. Cf. *Energy Reserves Group, Inc.* v. *Kansas Power & Light Co.*, 459 U.S. 400, 413 (1983) (discussing implications of pervasive regulation for inquiry into substantial impairment of a contract).

> 23    The Act also required the railroads to enter into agreements with the new corporation to provide operational assistance and facilities at rates to be set by contract (or the ICC in the event of disagreement), 45 U. S. C. § 562 (1970 ed.), and to enter into arrangements to protect the interests of employees disadvantaged by the discontinuance of passenger service. § 565(a). These requirements either were consistent with the railroads' continuing obligations as common carriers, or easily might have been imposed as conditions by the ICC if it granted the railroads' petition to discontinue rail passenger service. See 49 U. S. C. §§ 10903(a)(2), 11101. Far from analogous to consideration, these ongoing regulatory obligations further demonstrate that the RPSA was a legislative policy decision, not a private contractual arrangement.

The railroads argue nevertheless that the RPSA created a contractual obligation "closely analogous to the statutory covenant" at issue in *United States Trust*, "which this Court held to be a contractual obligation of a State subject to the Contract Clause." Brief for Appellees in No. 83-1492, p. 18. Far from recognizing the

similarity, we find that the statute at issue in *United States Trust Co.* v. *New Jersey* highlights the difference between the RPSA and a true statutory contract. In *United States Trust*, the Court held that New Jersey could not retroactively alter a statutory bond covenant relied upon by bond purchasers. The covenant in that case was a part of the bistate legislation authorizing the Port Authority of New York and New Jersey to acquire, construct, and operate the Hudson & Manhattan Railroad and the World Trade Center in New York City. The statute read in part: "The 2 States covenant and agree with each other and with the holders of any affected bonds, as hereinafter defined, that so long as any of such bonds remain [*470] outstanding and unpaid . . . neither the States nor the port authority nor any subsidiary corporation incorporated for any of the purposes of this act will apply any of the rentals, tolls, fares, fees, charges, revenues or reserves, which have been or shall be pledged in whole or in part as security for such bonds, for any railroad purposes whatsoever other than permitted purposes hereinafter set forth." 1962 N. J. Laws, ch. 8, § 6; 1962 N. Y. Laws, ch. 209, § 6. Resort [**1454] need not be had to a dictionary or case law to recognize the language of contract. The States explicitly bound themselves in a covenant not to take [***449] certain actions now or in the future, and the intent to make a contract was, as a result, not even contested in that case. Indeed, the Court found that the States had drafted this language in an effort to invoke the constitutional protections of the Contract Clause as security against repeal.

To the contrary, here the statute does not contain a provision in which the United States "[covenants] and [agrees]" with anyone to do anything, and in fact the United States expressly declined to offer assurances about future activity when it reserved the right to revoke or repeal the Act. We therefore are not persuaded by the railroads' proffered analogy.

[***LEdHR1A] [1C]Because neither the language of the statute nor the circumstances surrounding its passage manifest any intent on the part of Congress to bind itself contractually to the railroads, we hold that the RPSA does not constitute a binding obligation of Congress.

B

[***LEdHR4] [4]We turn next to consider whether the Basic Agreements into which the railroads entered

with Amtrak grant the railroads a contractual right *against the United States* to be free from all obligation to provide passenger service. While there can be no doubt that the Basic Agreements are contracts, they are contracts not between the railroads and the United States but simply between the railroads and the non-governmental corporation, Amtrak. The United States was [*471] not a party to the Basic Agreements; by their terms, the agreements do not implicate the United States. The railroads do not point to any language in the RPSA authorizing Amtrak to bargain away any portion of Congress' Commerce Clause power, or to act as the Government's agent and confer upon the railroads the right to be free of any obligation to provide passenger service, assuming even that Congress could make that delegation. The District Court asserted that the Agreements might constitute contracts between the United States and the railroads because they granted the railroads relief from their passenger service obligations, and because only the United States actually could grant such relief. 577 F.Supp., at 1051. But a careful reading of the RPSA indicates that the Act, and not the Basic Agreements, actually removed that responsibility. Accordingly, we find unpersuasive the railroads' efforts to demonstrate that the United States is contractually bound, either through the RPSA or the Basic Agreements, not to reimpose any rail passenger service obligations.

Because, as we have demonstrated, neither the Act nor the Basic Agreements created a contract between railroads and the United States, our focus shifts from a case in which we confront an alleged impairment, by the Government, of its own contractual obligations, to one in which we face an alleged legislative impairment of a private contractual right. We therefore have no need to consider whether an allegation of a governmental breach of its own contract warrants application of the more rigorous standard of review that the railroads urge us to [***450] apply. [24] Instead, we turn [**1455] to consider [*472] whether the payment obligation in § 405(f) of the Act unconstitutionally impairs the private contractual rights of the railroads.

24 This Court once observed:

"There is a clear distinction between the power of the Congress to control or interdict the contracts of private parties when they interfere with the exercise of its constitutional authority, and the power of the Congress to alter or

repudiate the substance of its own engagements. . . . To say that the Congress may withdraw or ignore that pledge is to assume that the Constitution contemplates a vain promise, a pledge having no other sanction than the pleasure and convenience of the pledgor. This Court has given no sanction to such a conception of the obligations of our Government." *Perry* v. *United States*, 294 U.S. 330, 350-351 (1935).

Thus, the Court has observed that in order to maintain the credit of public debtors, see *Lynch* v. *United States*, 292 U.S. 571, 580 (1934), and because the "State's self-interest is at stake," *United States Trust Co.* v. *New Jersey*, 431 U.S. 1, 26 (1977), the Government's impairment of its own obligations perhaps should be treated differently. See also *Allied Structural Steel Corp.* v. *Spannaus*, 438 U.S. 234, 244, n. 15 (1978). It is clear that, where the Government is not a party to the contract at issue, these concerns are not implicated, and there is no reason to argue for a heightened standard of review.

C

[***LEdHR5] [5][HN7] To prevail on a claim that federal economic legislation unconstitutionally impairs a private contractual right, the party complaining of unconstitutionality has the burden of demonstrating, first, that the statute alters contractual rights or obligations. See *United States Trust Co.* v. *New Jersey*, 431 U.S., at 17-21. If an impairment is found, the reviewing court next determines whether the impairment is of constitutional dimension. If the alteration of contractual obligations is minimal, the inquiry may end at this stage, *Allied Structural Steel Co.* v. *Spannaus*, 438 U.S. 234, 245 (1978); if the impairment is substantial, a court must look more closely at the legislation, *ibid.*; see also *Energy Reserves Group, Inc.*, 459 U.S., at 411. When the contract is a private one, and when the impairing statute is a federal one, this next inquiry is especially limited, and the judicial scrutiny quite minimal. The party asserting a Fifth Amendment due process violation must overcome a presumption of constitutionality and "'establish that the legislature has acted in an arbitrary and irrational way.'" *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.*, 467 U.S. 717, 729 (1984) (quoting *Usery* v. *Turner Elkhorn Mining Co.*, 428 U.S., at 15). [25]

25 When the court reviews state economic legislation the inquiry will not necessarily be the same. As we made clear in *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.*, 467 U.S., at 732-733, we have never held that the principles embodied in the Fifth Amendment's due process guarantee are coextensive with the prohibitions against state impairment of contracts under the Contract Clause, and, we observed, to the extent the standards differ, a less searching inquiry occurs in the review of federal economic legislation. See also n. 24, *supra* (discussing the standard for reviewing claims of a government's impairment of its own contractual obligations).

[*473] [***LEdHR6A] [6A]The starting point for our inquiry is therefore whether the 1979 and 1981 pass-rider amendments impaired the private contractual rights that the railroads obtained under the Basic Agreements. [26] [***451] We must first consider what rights vested in the railroads pursuant to the Basic Agreements and then examine the way in which the 1979 and 1981 amendments altered those rights. [27]

26 We address first the 1979 and 1981 amendments, the issue raised on appeal, and postpone to Part III discussion of the 1972 amendment, the issue raised on cross-appeal.
27 The RPSA established that contracts entered into by the corporation would be governed by the law of the District of Columbia. In the District of Columbia, courts determine as a matter of law whether a contract or its provisions are ambiguous -- that is, whether they are reasonably susceptible of different interpretations. *Kass* v. *William Norwitz Co.*, 509 F.Supp. 618, 623-624 (DC 1980). The Court of Appeals ruled that the Basic Agreement was not ambiguous. 723 F.2d, at 1301. As the following analysis makes clear, we agree.

[***LEdHR6A] [6B]The only right that the railroads obtained under the Basic Agreements was the right to be relieved of the pre-existing responsibilities they had as regulated common carriers. The RPSA expressly permitted the railroads to divest themselves of, and authorized Amtrak to assume, all the railroads' "responsibilities as a common carrier of passengers by rail in intercity rail passenger service *under [Subtitle IV of Title 49] or any State or other law relating to the*

*provision of intercity rail passenger service.*" 45 U. S. C. § 561(a)(1) (1970 ed.) (emphasis added). In turn, the Basic Agreements relieved the railroads of their "entire responsibility for the provision [**1456] of Intercity Rail Passenger Service." § 2.1, App. 13. Thus the statute and the Basic Agreements together relieved the [*474] railroads only of common carriage responsibilities they had by virtue of federal or state law. Moreover, Amtrak had no independent authority to relieve the railroads of obligations imposed by Congress, and it is readily apparent that Congress limited its relief to the previously imposed obligation to operate intercity rail passenger trains.

The railroads do not and could not allege that as common carriers they ever had the responsibility, by statute or regulation, to provide free passes or reduced fares for their employees and their dependents. Here, as in the lower courts, they describe the provision of passes as a "gratuitous undertaking, like providing a 'Christmas turkey.'" 577 F.Supp., at 1051. It plainly is not consistent with the nature of relief provided the railroads under the Basic Agreements to include, within the scope of the contract, relief from the "gratuitous undertakings" of providing free and reduced-fare passes. Nor did the provision of free or half-fare passes become a "responsibility" within the meaning of the statute because some railroads, although not the parties here, did not simply offer the passes as noncontractual fringe benefits, but instead were required to provide passes pursuant to their collective-bargaining agreements. The Basic Agreements did not purport to relieve the railroads of their employee obligations under collective-bargaining agreements, and in fact the Act expressly required the railroads to continue to assume their responsibilities under collective-bargaining agreements. 45 U. S. C. § 565(b) (1970 ed.) (a railroad shall make provision for "the preservation of rights, privileges, and benefits (including continuation of pension rights and benefits) to such employees under existing collective-bargaining agreements").

[***452] [***LEdHR6A] [6C]We therefore find that the Basic Agreements in no respect relieved the railroads of the "responsibility" to provide their employees with pass privileges, for no state or federal law imposed that "responsibility" on them, in connection with intercity rail passenger operations, when the contracts were [*475] executed. The Basic Agreements did not address this payment obligation but instead left

the reimbursement issue completely open. It was not until after the Basic Agreements were signed, and Amtrak operations were under way, that Congress decided to impose new obligations on both parties to the agreements. We therefore conclude that § 405(f) in no respect altered, substantially or otherwise, the railroads' existing contractual rights and duties.

D

The Court of Appeals concluded that, while the Basic Agreements might not expressly have relieved the railroads of the obligation to reimburse Amtrak for pass riders, they did relieve the railroads of all responsibility -- both operational and financial -- for intercity rail passenger service. 723 F.2d, at 1302. But because the railroads were required by the 1979 and 1981 amendments to pay Amtrak more than its incremental costs, the court reasoned that some portion of the railroads' payments might go to cover Amtrak's operational expenses. In that way, the railroads would indirectly be providing the rail passenger service from which they were to have been contractually freed, and Congress' decision to require such payments might therefore violate the railroads' contractual right to be free of the responsibility to provide intercity rail service. The court then considered whether the impairment was unconstitutional and concluded that *Amtrak* had failed to meet *its* burden of proving that the amendments were "paramount to the rights of the railroads under the basic agreement." *Id.*, at 1303. The court held that the 1979 and 1981 amendments "unreasonably and illegally" impaired the rights of the railroads under the Basic Agreements by indirectly requiring the railroads to help Amtrak finance aspects of [**1457] its operations that once were part of the railroads' responsibility. *Ibid.*

Initially, it is far from evident that the railroads have a private contractual right to be free from all obligations [*476] to make financial payments to subsidize Amtrak, which is the way in which the railroads view any payments in excess of Amtrak's incremental costs. The railroads were unambiguously relieved only of burdensome intercity rail responsibilities imposed by the federal and state common carrier regulatory schemes. But even if the Basic Agreements relieved the railroads of the obligation to subsidize Amtrak, they surely did not exempt the railroads from financial obligations to Amtrak of other kinds, and the railroads misdirect their attack when they assert a right to be free from subsidizing

Amtrak. The issue in these cases is not whether the railroads have a right against subsidizing Amtrak, for here Congress has simply required the railroads to pay for the value of a benefit their employees receive from Amtrak. Nothing in the Basic Agreements lifted from the railroads the responsibility to pay Amtrak for the pass-rider privileges it accords their employees, [***453] and nothing gave the railroads a right to special privileges in the pricing of Amtrak services. Whether at some point the amount the railroads are required to pay might be so unreasonably high as to constitute a subsidy we need not decide, for as we demonstrate *infra* Congress acted rationally in setting the value of the pass to the employees. We therefore disagree with the Court of Appeals' conclusion that Congress impaired a private contractual right simply by passing amendments that required the railroads to pay for a service rendered. Having reached this conclusion, we of course need not consider whether the impairment is substantial.

[***LEdHR7A] [7A]Even were the Court of Appeals correct that the railroads have a private contractual right not to pay more than the incremental cost of the passes, we disagree with the Court of Appeals' conclusion that the Due Process Clause limited Congress' power to choose a different reimbursement scheme in these cases. [HN8] Under the Fifth Amendment's Due Process Clause, Congress remained free to "'[adjust] the burdens and benefits of economic life,'" as long as it did so in a manner [*477] that was neither arbitrary nor irrational. *Pension Benefit Guaranty Corporation* v. *R. A. Gray & Co.*, 467 U.S., at 729 (quoting *Usery* v. *Turner Elkhorn Mining Co.*, 428 U.S., at 15). Moreover, in the determination of whether economic legislation that substantially alters contractual rights and duties violates due process, the burden of proving irrationality rests squarely on the party asserting a due process violation. 467 U.S., at 729. When it performed this due process inquiry, the court below erred both in placing the burden of proof on Amtrak to defend the legislation and in defining the standard of review as rigorously as it did.

[***LEdHR7A] [7B]Had it applied the correct standard, the Court of Appeals would have found that the railroads have not met their burden of proof. In passing § 405(f), Congress rationally required Amtrak to honor the expectations of the railroads' past and present employees and their dependents. It rationally took this step to maintain employee morale and labor peace, and it rationally required the railroads to pay at least a portion of the cost of the privileges, both because the railroads, rather than the taxpayers, were responsible for the creation of the moral obligation to the railroad employees and retirees, and because the railroads benefited from labor peace and continued employee morale.

[***LEdHR7A] [7C]Similarly, after reasonably requiring the railroads to reimburse Amtrak for benefits received, Congress acted wholly rationally in selecting the value to the passholders -- as opposed to the cost to Amtrak -- as the proper reimbursement amount, and in settling on the 25-percent figure to quantify the value received. It commissioned a study by the GAO, which [**1458] concluded that several different computations of cost made sense, and that the selection of no one cost-spreading scheme was more inherently rational or fair than any other. App. 80-81. At this point, the decision was uniquely one for Congress, which had absolutely no obligation to select the scheme that a court later would find to be the fairest, but simply one that was rational and not arbitrary. Congress [*478] placed a value on the free passes [***454] that reasonably relates to the normal fares of the public, and "[we] are unwilling to assess the wisdom of Congress' chosen scheme . . . . It is enough to say that the Act approaches the problem of cost spreading rationally; whether a [different] cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension." *Turner Elkhorn, supra*, at 18-19. We therefore conclude that the 1979 and 1981 amendments in no respect offend the Due Process Clause.

Having concluded that the Basic Agreements relieved the railroads only of the direct and onerous responsibilities they had borne as common carriers, and having further concluded that the provision of free and partial-fare passes was not among those responsibilities, we conclude that the 1979 and 1981 amendments to the Act did not impair private contractual rights acquired by the railroads as parties to the Basic Agreements. The amendments imposed new obligations on the railroads and in no respect infringed the railroads' existing contractual rights. But even if the payment of more than the incremental cost of pass privileges indirectly subsidizes Amtrak operations in violation of a private contractual right, Congress' decision to assess the railroads is rational and reasoned, and the railroads have failed to demonstrate a due process violation. We therefore reverse the Court of Appeals insofar as it ruled to the contrary.

III

The foregoing analysis *a fortiori* requires us to reject the railroads' argument on cross-appeal that they have a contractual right to be free from the obligation to make any payments to Amtrak, even for incremental costs. Absolutely nothing in the RPSA or the Basic Agreements suggests that the railroads were relieved of the responsibility to reimburse Amtrak for the costs of providing to the railroads' employees [*479] and retirees, and their dependents, the free passes that the railroads had traditionally provided to them.

IV

[***LEdHR1A] [1D] [***LEdHR7A] [7D]Accordingly we hold that § 405(f) of the RPSA is constitutional, and we reverse the Court of Appeals insofar as it held that the 1979 and 1981 amendments to the Act contravened the Due Process Clause.

*It is so ordered.*

JUSTICE POWELL took no part in the decision of these cases.

**REFERENCES**

13 Am Jur 2d, Carriers 24.5 (Supp); 16A Am Jur 2d, Constitutional Law 595

45 USCS 565(f); Constitution, 5th Amendment

US L Ed Digest, Appeal 1262; Constitutional Law 125, 127, 212, 641; Railroads 6

L Ed Index to Annos, Carriers; Constitutional Law; Contracts; Impairment of Contract Obligations; Railroads; United States.

ALR Quick Index, Carriers; Due Process of Law; Fifth Amendment; Impairment of Contracts; Railroads; United States

Federal Quick Index, Carriers; Constitutional Law; Due Process of Law; Fifth Amendment; Impairment of Contract Obligations; Railroads; United States

Annotation References:

State's exercise of police power as constituting impairment of obligation of private contract in violation of contract clause (Article 1 10, Clause 1) of Federal Constitution--Supreme Court cases. 57 L Ed 2d 1279.



**NORTHEAST BANCORP, INC., ET AL. v. BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM ET AL.**

**No. 84-363**

**SUPREME COURT OF THE UNITED STATES**

**472 U.S. 159; 105 S. Ct. 2545; 86 L. Ed. 2d 112; 1985 U.S. LEXIS 126; 53 U.S.L.W. 4699**

**April 15, 1985, Argued**
**June 10, 1985, Decided**

**PRIOR HISTORY:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT.

**DISPOSITION:** 740 F.2d 203, affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Petitioner prospective competitors sought a writ of certiorari to the United States Court of Appeals for the Second Circuit, which upheld orders issued by the Federal Reserve Board approving respondent bank holding companies' applications for interstate acquisitions.

**OVERVIEW:** Respondents applied to the Federal Reserve Board to obtain approval for acquisition of banks in the New England states other than the ones in which they were principally located. Petitioners challenged the applications, contending that the Douglas Amendment to the Bank Holding Company Act of 1956, 12 U.S.C.S. § 1842(d), did not authorize the proposed interstate acquisitions. Petitioners also argued that the state statutes permitting the regional acquisitions, Mass. Gen. Laws Ann., ch. 167A, § 2 (1984), and 1983 Conn. Pub. Acts 83-411, violated the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, the Compact Clause, U.S. Const. art. I, § 10, cl. 3, and the Equal Protection Clause, U.S. Const. amend. XIV, § 2, by discriminating against non-New England

bank holding companies. The board approved the acquisitions, and the court of appeals affirmed the board's orders. On certiorari, the court affirmed, holding that the state statutes were the kind contemplated by the Douglas Amendment to lift its bar against interstate acquisitions. The court further held that the statutes did not violate the Commerce, Compact, or Equal Protection Clauses.

**OUTCOME:** The court affirmed the judgment.

**CORE TERMS:** acquisition, Douglas Amendment, banking, compact, out-of-state, regional, ban, acquire, state statutes, region, lift, interstate banking, branch banking, McFadden Act, interstate, approving, commerce, local banks, dormant, specifically authorized, interstate bank, legislative history, national banks, partially, authorize, local concern, political power, reciprocal, competitors, supremacy

**LexisNexis(R) Headnotes**

*Banking Law > Bank Holding Companies > Regulation*
*Banking Law > Federal Acts > Bank Holding Company Act*
*Banking Law > Federal Acts > Financial Institutions Regulatory & Interest Rate Control Act*
[HN1] The Bank Holding Company Act (BHCA)

regulates the acquisition of state and national banks by bank holding companies. The Act generally defines a bank as any institution organized under state or federal law which: (1) accepts deposits that the depositor has a legal right to withdraw on demand, and (2) engages in the business of making commercial loans. 12 U.S.C.S. § 1841(c). The Act defines a bank holding company as any corporation, partnership, business trust, association, or similar organization that owns or has control over a bank or another bank holding company. 12 U.S.C.S. §§ 1841(a)(1), (b), 12 U.S.C.S. § 1841(a)(5). Before a company may become a bank holding company, or a bank holding company may acquire a bank or substantially all of the assets of a bank, the Act requires it to obtain the approval of the Federal Reserve Board. 12 U.S.C.S. § 1842.

*Banking Law > Federal Acts > Bank Holding Company Act*
*Banking Law > Federal Acts > Financial Institutions Regulatory & Interest Rate Control Act*
*Mergers & Acquisitions Law > General Overview*
[HN2] The Federal Reserve Board will evaluate the acquisition of state and national banks by bank holding companies for anticompetitive effects, financial and managerial resources, community needs, and the like. 12 U.S.C.S. § 1842(c). In addition, The Bank Holding Company Act § 3(d), 12 U.S.C.S. § 1842(d), known as "the Douglas Amendment," prohibits the Board from approving an application of a bank holding company or bank located in one state to acquire a bank located in another state, or substantially all of its assets, unless the acquisition is specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication.

*Antitrust & Trade Law > Industry Regulation > Financial Institutions > General Overview*
*Banking Law > Bank Holding Companies > Formation*
*Business & Corporate Law > Foreign Businesses > General Overview*
[HN3] Massachusetts law specifically provides that an out-of-state bank holding company with its principal place of business in one of the other New England States (Connecticut, Maine, New Hampshire, Rhode Island, and Vermont), which is not directly or indirectly controlled by another corporation with its principal place of business located outside of New England, may establish or acquire a Massachusetts-based bank or bank holding company,

provided that the other New England state accords equivalent reciprocal privileges to Massachusetts banking organizations. Mass. Gen. Laws Ann., ch. 167A, § 2 (1984). Connecticut has adopted a substantially similar statute. 1983 Conn. Pub. Acts 83-411.

*Administrative Law > Judicial Review > Reviewability > Standing*
*Banking Law > Federal Acts > Bank Holding Company Act*
*Mergers & Acquisitions Law > Antitrust > General Overview*
[HN4] Pursuant to 12 U.S.C.S. § 1848, which provides that: any party aggrieved by an order of the Federal Reserve Board may seek review in a federal court of appeals, and § 1850, permits prospective competitors to be aggrieved parties under § 1848.

*Antitrust & Trade Law > Industry Regulation > Financial Institutions > General Overview*
*Banking Law > Federal Acts > Bank Holding Company Act*
*Mergers & Acquisitions Law > General Overview*
[HN5] The Douglas Amendment to the Bank Holding Company Act of 1956 prohibits the Federal Reserve Board from approving the application of a bank holding company or a bank located in one state to acquire a bank located in another state, or substantially all of its assets, unless the acquisition is specifically authorized by the statute laws of the state in which such bank is located, by language to that effect and not merely by implication. 12 U.S.C.S. § 1842(d).

*Banking Law > Federal Acts > General Overview*
*Banking Law > Regulatory Agencies > U.S. Federal Reserve Board of Governors*
[HN6] The Federal Reserve Board is an authoritative voice on the meaning of a federal banking statute.

*Antitrust & Trade Law > Industry Regulation > Financial Institutions > Bank Holding Company Act*
*Banking Law > Bank Activities > Securities > Nonbank Banks*
*Banking Law > Federal Acts > Bank Holding Company Act*
[HN7] The broader purposes underlying the Bank Holding Company Act of 1956 as a whole, 12 U.S.C.S. §

1841 et seq., and the Douglas Amendment in particular, 12 U.S.C.S. § 1842(d), are to retain local, community-based control over banking.

*Banking Law > Bank Holding Companies > General Overview*
*Banking Law > Federal Acts > Bank Holding Company Act*
*Constitutional Law > Congressional Duties & Powers > Commerce Clause > General Overview*
[HN8] When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3.

*Constitutional Law > Supremacy Clause > General Overview*
[HN9] The application of the Compact Clause is limited to agreements that are directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States.

**DECISION:**

State statutes authorizing interstate bank acquisitions on a regional basis held valid.

**SUMMARY:**

Three bank holding companies applied to the Federal Reserve Board to obtain approval for the acquisitions of banks in New England states other than the ones in which they were located. Three prospective competitors opposed these proposed acquisitions in proceedings before the Board on the grounds (1) that the acquisitions were not authorized by the Douglas Amendment to the Bank Holding Company Act of 1956 (12 USCS 1842(d)), prohibiting the Federal Reserve Board from approving an application of a bank holding company located in one state to acquire a bank located in another state unless the acquisition "is specifically authorized by the statute laws of the state in which such bank is located, by language to that effect and not merely by implication," and (2) that if they were authorized by the Act, the applicable Connecticut and Massachusetts statutes, substantially providing that an out-of-state bank holding company with its principal place of business in one of the other New England states may acquire an in-state bank, provided that the other state accords equivalent reciprocal

privileges to the enacting state's banking organizations, violated the commerce, compact, and equal protection clauses of the Federal Constitution by discriminating against non-New England out-of-state bank holding companies. The Board rejected these arguments and approved the applications, and the United States Court of Appeals for the Second Circuit, in consolidated review proceedings, affirmed (740 F2d 203).

On certiorari, the United States Supreme Court affirmed. In an opinion by Rehnquist, J., expressing the unanimous view of the eight participating members of the court, it was held (1) that the Connecticut and Massachusetts statutes in question, authorizing interstate bank acquisitions on a regional basis, were of the kind contemplated by the Douglas Amendment to lift its ban on interstate acquisitions, and (2) that these statutes did not violate the commerce clause, the compact clause, and the equal protection clause of the United States Constitution.

O'Connor, J., concurred, expressing the view that there is no meaningful distinction for equal protection clause purposes between the Connecticut and Massachusetts statute at issue here and the Alabama statute imposing a substantially lower gross premiums tax rate on domestic insurance companies than on out-of-state insurance companies, at issue in Metropolitan Life Ins. Co. v Ward (1985) 470 US 869, 84 L Ed 2d 751, 105 S Ct 1676.

Powell, J., did not participate.

**LAWYERS' EDITION HEADNOTES:**

BANKS §3.5;

state statutes -- interstate bank acquisitions on regional basis -- validity under Bank Holding Company Act -- ;

Headnote:[1A][1B][1C]

State statutes authorizing interstate bank acquisitions by bank holding companies on a regional basis are of the kind contemplated by the Douglas Amendment to the Bank Holding Company Act of 1956 (12 USCS 1842(d)), which prohibits the Federal Reserve Board from approving an application of a bank holding company located in one state to acquire a bank located in another

state unless the acquisition is authorized by the statutes of the state in which the bank is located; the Amendment's legislative history indicates that Congress contemplated that some states might partially lift the ban on interstate banking without opening themselves up to interstate banking from everywhere in the nation, and these state statutes are not only consistent with the Amendment's anticipation of differing approaches to interstate banking, but they are also consistent with the broader purposes underlying the Act as a whole and the Douglas Amendment in particular to retain local, community-based control over banking.

BANKS §3.5

COMMERCE §113;

commerce clause -- state statutes -- interstate bank acquisitions on regional basis -- ;

Headnote:[2A][2B][2C]

State statutes authorizing interstate bank acquisitions by bank holding companies on a regional basis do not violate the commerce clause of the United States Constitution (art I, 8, cl 3); in this instance, the commerce power of Congress is not dormant, but has been exercised by Congress when it enacted the Douglas Amendment to the Bank Holding Company Act of 1956 (12 USCS 1842(d)); when Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the commerce clause.

BANKS §3.5

STATES, TERRITORIES, AND POSSESSIONS §59;

compact clause -- state statutes -- interstate bank acquisitions on regional basis -- ;

Headnote:[3A][3B][3C]

State statutes authorizing interstate bank acquisitions by bank holding companies on a regional basis do not violate the compact clause of the United States Constitution (art I, 10, cl 3); the application of the compact clause is limited to agreements that are directed to the formation of any combination tending to the increase of political power in the states which may

encroach upon or interfere with the just supremacy of the United States, and these state statutes, which comply with the Douglas Amendment to the Bank Holding Company Act of 1956 (12 USCS 1842(d)), cannot possibly infringe federal supremacy, and they do not enhance the political power of the states within the region at the expense of other states.

BANKS §3.5

CONSTITUTIONAL LAW §409;

equal protection clause -- state statutes -- interstate bank acquisitions on regional basis -- ;

Headnote:[4A][4B]

State statutes authorizing interstate bank acquisitions by bank holding companies on a regional basis do not violate the equal protection clause of the Fourteenth Amendment even though the statutes favor out-of-state corporations within the region over out-of-state corporations from other parts of the country where the states, in enacting these statutes, considered that interstate banking on a regional basis combines the beneficial effect of increasing the number of banking competitors with the need to preserve a close relationship between those in the community who need credit and those who provide credit, and that acquisition of in-state banks by holding companies headquartered outside the region would threaten the independence of local banking institutions.

**SYLLABUS**

The Bank Holding Company Act of 1956 (BHCA) requires a bank holding company to obtain the approval of the Federal Reserve Board (Board) before it may acquire a bank. Section 3(d) of the Act (known as the Douglas Amendment) prohibits the Board from approving an application of a bank holding company located in one State to acquire a bank located in another State unless the acquisition "is specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication." Substantially similar Connecticut and Massachusetts statutes provide that an out-of-state bank holding company with its principal place of business in one of the other New England States may acquire an in-state bank, provided that the other State accords equivalent reciprocal privileges to the enacting State's

banking organizations. Certain bank holding companies (respondents here) applied to the Board as out-of-state companies for purposes of either the Connecticut or Massachusetts statute, seeking approval for acquisitions of banks located in one or the other of those States. Petitioners, prospective competitors, opposed the proposed acquisitions in proceedings before the Board, contending that the acquisitions were not authorized by the Douglas Amendment and that, if they were, the applicable Connecticut or Massachusetts statute, by discriminating against non-New England out-of-state bank holding companies, violated the Commerce, Compact, and Equal Protection Clauses of the Federal Constitution. Rejecting petitioners' contentions, the Board approved the applications, and the Court of Appeals, in consolidated review proceedings, affirmed.

*Held*:

1. The Connecticut and Massachusetts statutes are of the kind contemplated by the Douglas Amendment to lift its ban on interstate acquisitions. The Amendment's language plainly permits States to lift the federal ban entirely, and although it does not specifically indicate that a State may partially lift the ban, neither does it specifically indicate that a State is allowed only the alternatives of leaving the federal ban in place or lifting it completely. The Amendment's legislative history indicates that Congress intended to allow each State flexibility in its approach, contemplating that some States might partially lift the ban on interstate banking without opening themselves up to interstate banking from everywhere in the Nation. Moreover, the Connecticut and Massachusetts statutes, by allowing only regional acquisitions, are consistent with the Amendment's and the BHCA's purpose of retaining local, community-based control over banking. Pp. 168-173.

2. The Connecticut and Massachusetts statutes do not violate the Commerce Clause. Congress' commerce power is not dormant here, but has been exercised by enactment of the BHCA and the Douglas Amendment, authorizing the challenged state statutes. State actions that Congress plainly authorizes are invulnerable to constitutional attack under the Commerce Clause. Pp. 174-175.

3. The challenged state statutes do not violate the Compact Clause, which provides that no State, without Congress' consent, shall enter into an agreement or compact with another State. Even assuming, *arguendo*,

that the state statutes (along with statutes of other New England States under petitioners' theory) constitute an agreement or compact, "application of the Compact Clause is limited to agreements that are 'directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States.'" *New Hampshire* v. *Maine*, 426 U.S. 363, 369, quoting *Virginia* v. *Tennessee*, 148 U.S. 503, 519. In view of the Douglas Amendment, the challenged state statutes, which comply with the BHCA, cannot possibly infringe federal supremacy. Nor do the state statutes in question either enhance the *political* power of the New England States at the expense of other States or have an impact on the federal structure. Pp. 175-176.

4. The Connecticut and Massachusetts statutes do not violate the Equal Protection Clause. The statutes favor out-of-state corporations within the New England region over corporations from other parts of the country. However, Connecticut and Massachusetts, in enacting their statutes, considered that interstate banking on a regional basis combined the beneficial effect of increasing the number of banking competitors with the need to preserve a close relationship between those in the community who need credit and those who provide credit, and that acquisition of in-state banks by holding companies headquartered outside the New England region would threaten the independence of local banking institutions. These concerns meet the traditional rational basis for judging equal protection claims. *Metropolitan Life Ins. Co.* v. *Ward*, 470 U.S. 869, distinguished. Pp. 176-178.

**COUNSEL:** Stephen M. Shapiro argued the cause for petitioners. With him on the brief for petitioner Citicorp were Ira M. Millstein, Robert L. Stern, James W. Quinn, and Jay N. Fastow. George D. Reycraft, John Boyer, Jeffrey Q. Smith, Gregory Scott Mertz, and Joseph Polizzotto filed a brief for petitioners Northeast Bancorp, Inc., et al. The named attorneys filed a joint reply brief and supplemental memorandum for all petitioners.

Solicitor General Lee argued the cause for the federal respondent. With him on the brief were Acting Assistant Attorney General Willard, Deputy Solicitor General Wallace, Anthony J. Steinmeyer, and Michael Kimmel. Laurence H. Tribe argued the cause for respondents Bank of New England Corp. et al. With him on the briefs were Bertram M. Kantor, Michael H. Byowitz, Mark A. Weiss,

Stuart C. Stock, Wilmot T. Pope, and Douglas M. Kraus. Francis X. Bellotti, Attorney General, Jamie W. Katz, Assistant Attorney General, and Thomas R. Kiley, First Assistant Attorney General, filed a brief for respondent Commonwealth of Massachusetts. Joseph I. Lieberman, Attorney General, Elliot F. Gerson, Deputy Attorney General, and John G. Haines and Jane D. Comerford, Assistant Attorneys General, filed a brief for respondents State of Connecticut et al. *

> * Briefs of amici curiae urging reversal were filed for the State of New York by Robert Abrams, Attorney General, Robert Hermann, Solicitor General, R. Scott Greathead, First Assistant Attorney General, and Judith T. Kramer and Howard L. Zwickel, Assistant Attorneys General; for Chase Manhattan Corp. by Joseph A. Califano, Jr., and Kent T. Stauffer; for the David F. Bolger Revocable Trust by William A. Harvey and Edward S. Ellers; for the New York State Bankers Association by John Leferovich, Jr.; for Senator Alphonse D'Amato et al. by J. Robert Lunney; and for Frank L. Morsani by Dewey R. Villareal, Jr.,

> Briefs of amici curiae urging affirmance were filed for the State of Georgia by Michael J. Bowers, Attorney General, James P. Googe, Jr., Executive Assistant Attorney General, H. Perry Michael, First Assistant Attorney General, Verley J. Spivey, Senior Assistant Attorney General, and Grace E. Evans, Assistant Attorney General; for Bank of New York Co., Inc., by John L. Warden; for the Conference of State Bank Supervisors by Erwin N. Griswold, James F. Bell, and Arthur E. Wilmarth, Jr.; for the Council of State Governments et al. by Joyce Holmes Benjamin and Vicki C. Jackson; for Fleet Financial Group, Inc., by Allan B. Taylor, J. Bruce Boisture, Robert M. Taylor III, and Edward W. Dence, Jr.; and for Bob Graham, Governor of Florida, et al. by J. Thomas Cardwell, Sydney H. McKenzie III, S. Craig Kiser, and Carl B. Morstadt.

> Robert F. Mullen filed a brief for the New York Clearing House Association as amicus curiae.

**JUDGES:** REHNQUIST, J., delivered the opinion of the Court, in which all other Members joined except POWELL, J., who took no part in the decision of the case. O'CONNOR, J., filed a concurring opinion, post, p. 178.

**OPINION BY:** REHNQUIST

**OPINION**

[*162] [***117] [**2547] JUSTICE REHNQUIST delivered the opinion of the Court.

[***LEdHR1A] [1A] [***LEdHR2A] [2A] [***LEdHR3A] [3A]Respondents Bank of New England Corporation (BNE), Hartford National Corporation (HNC), and Bank of Boston Corporation (BBC) are bank holding companies which applied to the Federal Reserve Board to obtain approval for the acquisition of banks or bank holding companies in New England States other than the ones in which they are principally located. Petitioners Northeast Bancorp, Inc., Union Trust Company, and Citicorp opposed these proposed acquisitions in proceedings before the Board. The Board approved the acquisitions, and the Court of Appeals for the Second Circuit affirmed the orders of the Board. Petitioners sought certiorari, contending that the acquisitions were not authorized by the Bank Holding Company Act [**2548] of 1956, 70 Stat. 133, as amended, 12 U. S. C. § 1841 et seq., and [***118] that, if they were authorized by that Act, the state statutes which permitted the acquisitions in each case violated the Commerce Clause and the Compact Clause of the United States Constitution. We granted certiorari because of the importance of these issues, 469 U.S. 810, and we now affirm.

[HN1] The Bank Holding Company Act (BHCA) regulates the acquisition of state and national banks by bank holding companies. [*163] The Act generally defines a bank as any institution organized under state or federal law which "(1) accepts deposits that the depositor has a legal right to withdraw on demand, and (2) engages in the business of making commercial loans." 12 U. S. C. § 1841(c). The Act defines a bank holding company as any corporation, partnership, business trust, association, or similar organization that owns or has control over a bank or another bank holding company. §§ 1841(a)(1), (b); see § 1841(a)(5). Before a company may become a bank holding company, or a bank holding company may acquire a bank or substantially all of the assets of a bank, the Act requires it to obtain the approval of the Federal

Reserve Board. § 1842.

[HN2] The Board will evaluate the proposed transaction for anticompetitive effects, financial and managerial resources, community needs, and the like. § 1842(c). In addition, § 3(d) of the Act, 12 U. S. C. § 1842(d), known as "the Douglas Amendment," prohibits the Board from approving an application of a bank holding company or bank located in one State to acquire a bank located in another State, or substantially all of its assets, unless the acquisition "is specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication." Pursuant to the Douglas Amendment, a number of States recently have enacted statutes which selectively authorize interstate bank acquisitions on a regional basis. This case requires us to consider the validity of these statutes.

From 1956 to 1972, the Douglas Amendment had the effect of completely barring interstate bank acquisitions because no State had enacted the requisite authorizing statute. Beginning in 1972, several States passed statutes permitting such acquisitions in limited circumstances or for specialized purposes. For example, Iowa passed a grandfathering statute which had the effect of permitting the only out-of-state bank holding company owning an Iowa bank to maintain and expand its in-state banking activities, Iowa Code § 524.1805 (1983); see *Iowa Independent Bankers* v. *Board of Governors*, [*164] 167 U. S. App. D. C. 286, 511 F.2d 1288, cert. denied, 423 U.S. 875 (1975); Washington authorized out-of-state purchasers to acquire failing local banks, Wash. Rev. Code § 30.04.230(4)(a) (Supp. 1985); and Delaware allowed out-of-state bank holding companies to set up special purpose banks, such as credit card operations, in Delaware so long as they do not compete in other respects with locally controlled full-service banks, Del. Code Ann., Tit. 5, § 801 *et seq.* (Supp. 1984).

Beginning with Massachusetts in December 1982, several States have [***119] enacted statutes lifting the Douglas Amendment ban on interstate acquisitions on a reciprocal basis within their geographic regions. [HN3] The Massachusetts Act specifically provides that an out-of-state bank holding company with its principal place of business in one of the other New England States (Connecticut, Maine, New Hampshire, Rhode Island, and Vermont), which is not directly or indirectly controlled by another corporation with its principal place of business located outside of New England, may establish or acquire a Massachusetts-based bank or bank holding company, provided that the other New England State accords equivalent reciprocal privileges to Massachusetts banking organizations. Mass. Gen. Laws Ann., ch. 167A, § 2 (West 1984). In June 1983, Connecticut followed suit by adopting [**2549] a substantially similar statute. 1983 Conn. Pub. Acts 83-411.

The other New England States have taken different courses or have not acted. Rhode Island, in May 1983, authorized acquisition of local banks by out-of-state bank holding companies on a reciprocal basis similarly limited to the New England region, but this geographic limitation will expire on June 30, 1986, after which the authorization will extend nationwide subject only to the reciprocity requirement. R. I. Gen. Laws § 19-30-1 *et seq.* (Supp. 1984). Since February 1984, Maine has permitted banking organizations from all other States to acquire local banks without any [*165] reciprocity requirement. Me. Rev. Stat. Ann., Tit. 9-B, § 1013 (Supp. 1984-1985). At the other extreme, New Hampshire and Vermont have not enacted any statute releasing the Douglas Amendment's ban on interstate bank acquisitions.

One predictable effect of the regionally restrictive statutes will apparently be to allow the growth of regional multistate bank holding companies which can compete with the established banking giants in New York, California, Illinois, and Texas. See 740 F.2d 203, 209, and n. 16 (1984). The Massachusetts and Connecticut statutes have prompted at least 15 other States to consider legislation which, according to the Federal Reserve Board, would establish interstate banking regions in all parts of the country. 70 Fed. Res. Bull. 374, 375-376 (1984). At least seven of these States have already enacted the necessary statutes.

Two months after Connecticut passed its statute, BNE applied to the Board for approval of its merger with respondent CBT Corporation (CBT), a Connecticut bank holding company, and thereby to acquire indirectly the Connecticut Bank and Trust Company, N. A., of Hartford, Connecticut. Soon thereafter HNC applied to the Board for approval of the acquisition of Arltru Bank Corporation (Arltru), a Massachusetts bank holding company which owns the Arlington Trust Company, a bank located in Lawrence, Massachusetts. Finally BBC applied to the Board for approval of the acquisition of the

successor by merger to Colonial Bancorp, Inc., a Connecticut bank holding company, by which it would acquire Colonial Bank of Waterbury, Connecticut.

Citicorp offers financial services to consumers and businesses nationally through its bank and nonbank subsidiaries. In response to the Board's invitation for comments from interested persons on these three proposed acquisitions, Citicorp submitted [***120] comments opposing all three of them. Northeast owns petitioner Union Trust Company, a Connecticut bank that competes directly with banks owned by CBT, [*166] HNC, and Colonial. In addition, Bank of New York Corporation has agreed to acquire Northeast if Connecticut or the United States enacts the necessary enabling legislation. Northeast and Union Trust submitted comments opposing BNE's application to acquire CBT.

The petitioners challenged the applications in part on the ground that the Douglas Amendment did not authorize them, and in part on the grounds that the Massachusetts and Connecticut statutes, by discriminating against non-New England bank holding companies, violated the Commerce, Compact, and Equal Protection Clauses of the Federal Constitution. They claimed, therefore, that the proposed interstate acquisitions were not authorized by valid state statutes as required by the Douglas Amendment. The Board rejected these arguments. It first determined that the BNE-CBT and BBC-Colonial acquisitions were specifically authorized by the Connecticut statute and the HNC-Arltru acquisition was specifically authorized by the Massachusetts statute, and therefore that the Douglas Amendment would not prevent the Board from approving any of the three proposed transactions.

The Board then rejected the constitutional challenge to the two state statutes. In doing so, it noted that it would hold a state statute unconstitutional only if there was "clear and unequivocal evidence" of its unconstitutionality. [**2550] 70 Fed. Res. Bull. 353, 354 (1984); *id*., at 376; 70 Fed. Res. Bull. 524, 525-526 (1984). While stating that "the issue is not free from doubt," it concluded that this standard had not been met. 70 Fed. Res. Bull, at 376-377. Interpreting the statutory language and the legislative history of the Douglas Amendment, it determined that "the Douglas Amendment should be read as a renunciation of federal interest in regulating the interstate acquisition of banks by bank

holding companies." *Id*., at 380. This renunciation of federal interest eliminated any objection to the statutes under the Compact Clause or dormant Commerce Clause.

[*167] The Board also found nothing in the history of the Amendment to suggest that "the states were to be permitted only to choose between not allowing out-of-state bank holding companies to enter, and allowing completely free entry." *Id*., at 386. The Board disposed of the equal protection challenge by reasoning that the regional restriction in the two statutes was "rationally related to an attempt to maintain a banking system responsive to local needs in New England." *Id*., at 381. The Board then analyzed the proposed transactions in light of the relevant statutory considerations set out in 12 U. S. C. §§ 1842(c) and 1843(c)(8) and approved the applications.

[HN4] Pursuant to 12 U. S. C. § 1848, which provides that "[any] party aggrieved by an order of the Board" may seek review in a federal court of appeals, and § 1850, which permits prospective competitors to be aggrieved parties under § 1848, Citibank, Northeast, and Union Trust petitioned the Court of Appeals for the Second Circuit to review the Board's order approving [***121] the BNE-CBT acquisition. Citibank also petitioned for review of the HNC-Arltru acquisition, and Northeast and Union Trust were permitted to intervene. These petitions were consolidated and the acquisitions stayed pending expedited review. Meanwhile, the Board stayed its order approving the BBC-Colonial acquisition, and the Court of Appeals consolidated a petition filed by Citicorp for review of that transaction with the two other pending review petitions. The court also permitted BBC, BNE, CBT, HNC, the State of Connecticut, and the Commonwealth of Massachusetts to intervene. The Court of Appeals affirmed the Board's orders approving the three applications in all respects. 740 F.2d 203 (1984). It agreed with the Board's determination that the Connecticut and Massachusetts statutes satisfied the terms of the Douglas Amendment, and it then rejected challenges to the Board's orders under the Commerce Clause, the Compact Clause, and the Equal Protection Clause. The Court of Appeals stayed its mandate [*168] and ordered that the status quo be maintained pending disposition by this Court.

*The Douglas Amendment*

[***LEdHR1A] [1B][HN5] The Douglas Amendment to the BHCA prohibits the Board from

approving the application of a bank holding company or a bank located in one State to acquire a bank located in another State, or substantially all of its assets, unless the acquisition "is specifically authorized by the statute laws of the State in which such bank is located, by language to that effect and not merely by implication." § 1842(d). Clearly the proposed acquisitions with which we deal in this case must be consistent with the Douglas Amendment, or they are invalid as a matter of federal statutory law. If the Massachusetts and Connecticut statutes allowing regional acquisitions are not the type of state statutes contemplated by the Douglas Amendment, they would not lift the ban imposed by the general prohibition of the Douglas Amendment. While petitioners blend together arguments about the meaning of the Douglas Amendment with arguments about the effect of the Commerce Clause, U.S. Const., Art. I, § 8, cl. 3, we think the contentions are best treated separately.

The Board resolved the statutory issue in favor of the state statutes, concluding that they were the sort of laws contemplated by the Douglas Amendment. [HN6] While the Board apparently does not consider itself expert on any constitutional issues raised, it is [**2551] nonetheless an authoritative voice on the meaning of a federal banking statute. *Securities Industry Assn*. v. *Board of Governors of Federal Reserve System*, 468 U.S. 207 (1984). The Board may have applied a higher standard than was necessary when it analyzed the Douglas Amendment to see whether there was a "clear authorization" for selective lifting of the ban, such as the Massachusetts and Connecticut statutes undertake to do. Whether or not so stringent a standard was applicable, we think the Board was correct in concluding that it was in fact met in this case.

[*169] The language of the Douglas Amendment plainly permits States to lift the federal ban entirely, as has been done by Maine. It does not specifically indicate that a State may partially lift the ban, for example in [***122] limited circumstances, for special types of acquisitions, or for purchasers from a certain geographic region. On the other hand, it also does not specifically indicate that a State is allowed only two alternatives: leave the federal ban in place or lift it completely. The Board concluded that the language "does not appear *on its face* to authorize discrimination" by region or "to meet the stringent test of explicitness laid down by" this Court in the dormant Commerce Clause cases. 70 Fed. Res. Bull., at 384. We need not resolve this issue because we

agree with the Board that the legislative history of the Amendment supplies a sufficient indication of Congress' intent.

At the time of the BHCA, interstate branch banking was already prohibited by the McFadden Act. 12 U. S. C. § 36(c). The bank holding company device, however, had been created to get around this restriction. A holding company would purchase banks in different localities both within and without a State, and thereby provide the equivalent of branch banking. One of the major purposes of the BHCA was to eliminate this loophole. H. R. Rep. No. 609, 84th Cong., 1st Sess., 2-6 (1955); 101 Cong. Rec. 4407 (1955) (remarks of Rep. Wier); *id*., at 8028-8029 (remarks of Rep. Patman); 102 Cong. Rec. 6858-6859 (1956) (remarks of Sen. Douglas). As enacted by the House in 1955, the BHCA contained a flat ban on interstate bank acquisitions. The legislative history from the House makes it clear that the policies of community control and local responsiveness of banks inspired this flat ban. See 101 Cong. Rec. A2454 (1955) (remarks of Rep. Wier); *id*., at 8030-8031 (remarks of Rep. Rains); H. R. Rep. No. 609, *supra*, at 2-6.

The Douglas Amendment was added on the floor of the Senate. Its entire legislative history is confined to the Senate debate. In such circumstances, the comments of individual [*170] legislators carry substantial weight, especially when they reflect a consensus as to the meaning and objectives of the proposed legislation though not necessarily the wisdom of that legislation. The instant case is not a situation where the comments of an individual legislator, even a sponsor, is at odds with the language of the statute or other traditionally more authoritative indicators of legislative intent such as the conference or committee reports.

The bill reported out by the Senate Committee on Banking and Currency permitted interstate bank acquisitions conditioned only on approval by the Federal Reserve Board. This approach apparently was favored by many of the large bank holding companies which sought further expansion, see, *e. g*., Control of Bank Holding Companies, 1955: Hearings on S. 880 et al. before the Subcommittee of the Senate Committee on Banking and Currency, 84th Cong., 1st Sess., 132, 136 (1955) (testimony of Ellwood Jenkins, First Bank Stock Corp.), 298-299 (Baldwin Maull, Marine Midland Corp.), 320 (Cameron Thomson, Northwest Bancorporation), cf. 375, 385 (Frank N. Belgrano, Jr., Transamerica Corp.), and by

some who thought the total ban in the House bill offensive to States' rights, see 102 Cong. Rec. 6752 (1956) (remarks of Sen. Robertson, floor manager of Committee bill, quoting Sen. Maybank).

[**2552] The Douglas Amendment was a [***123] compromise between the two extremes that also accommodated the States' rights concern:

"Our amendment would prohibit bank holding companies from purchasing banks in other States unless such purchases by out-of-State holding companies were specifically permitted by law in such States." *Id.*, at 6860 (remarks of Sen. Douglas).

Accord, *ibid.* (remarks of Sen. Bennett in opposition to the Amendment).

Of central concern to this litigation, the Douglas compromise did not simply leave to each State a choice one way or [*171] the other -- either to permit or bar interstate acquisitions of local banks -- but to allow each State flexibility in its approach. Senator Douglas explained that under his amendment bank holding companies would be permitted to acquire banks in other States "only to the degree that State laws expressly permit them." *Id.*, at 6858. Petitioners contend that by the phrase "to the degree" Senator Douglas intended merely a quantitative reference to the number of States which might lift the ban, and did not mean that a State could partially lift the ban. Petitioners' contention, however, is refuted by the close analogy drawn by Senator Douglas between his amendment and the McFadden Act, 12 U. S. C. § 36(c):

"The organization of branch banks proceeded very rapidly in the 1920's, and to check their growth various States passed laws limiting, and in some cases preventing it, as in the case of Illinois. National banks had previously been implicitly prohibited from opening branches, and there was a strong movement to remove this prohibition and completely open up the field for the national banks. This, however, was not done. Instead, by the McFadden Act and other measures, national banks have been permitted to open branches only to the degree permitted by State laws and State authorities.

"I may say that what our amendment aims to do is to carry over into the field of holding companies the same provisions which already apply for branch banking under the McFadden Act -- namely, our amendment will permit

out-of-State holding companies to acquire banks in other States only to the degree that State laws expressly permit them; and that is the provision of the McFadden Act." *Ibid.*

See *id.*, at 6860.

In enacting the McFadden Act in 1927, Congress relaxed federal restrictions on branch banking by national banks, but at the same time subjected them to the same branching [*172] restrictions imposed by the States on state banks. *First National Bank* v. *Walker Bank & Trust Co.*, 385 U.S. 252, 258 (1966). Congress intended "to leave the question of the desirability of branch banking up to the States," *ibid.*, and to permit branch banking by national banks "'in only those States the laws of which permit branch banking, and only to the extent that the State laws permit branch banking.'" *Id.*, at 259 (quoting Sen. Glass, 76 Cong. Rec. 2511 (1933)). The McFadden Act did not offer the States an all-or-nothing choice with respect to branch banking. As Senator [***124] Douglas observed, some States had *limited* intrastate branching by state banks, and others like Illinois had *prohibited* it altogether.

This variative approach to intrastate branching was nicely illustrated at the time by the structure in New York, which Senator Douglas described as follows: "In New York the State is divided into 10 zones. Branch banking is permitted within each of the zones, but a bank cannot have branches in another zone." 102 Cong. Rec. 6858 (1956). At the same time, Pennsylvania permitted branching in contiguous counties. *Upper Darby National Bank* v. *Myers*, 386 Pa. 12, 124 A. 2d 116 (1956). In view of this analogy to the McFadden Act and Senator Douglas' explanation of that Act, there can be no other conclusion but that Congress contemplated that some States might partially lift the ban on interstate banking without opening themselves [**2553] up to interstate banking from everywhere in the Nation.

Not only are the Massachusetts and Connecticut statutes consistent with the Douglas Amendment's anticipation of differing approaches to interstate banking, but they are also consistent [HN7] with the broader purposes underlying the BHCA as a whole and the Douglas Amendment in particular to retain local, community-based control over banking. Faced with growing competition from nonbank financial services that are not confined within state lines, these States sought an alternative that allowed expansion and growth of local

[*173] banks without opening their borders to unimpeded interstate banking. The Connecticut General Assembly established a Commission in 1979 to study the problem. It concluded:

"Both at the national and state levels the philosophy underlying our structure of bank regulation has been to promote a pluralistic banking system -- a system comprised of many units, rather than a highly concentrated system made up of a few large banks. The promotion of local ownership and control of banks has as one of its objectives the preservation of a close relationship between those in our communities who need credit and those who provide credit. To allow the control of credit that is essential for the health of our state economy to pass to hands that are not immediately responsive to the interests of Connecticut citizens and businesses would not, we believe, serve our state well. Similarly, to expose our smaller banks to the rigors of unlimited competition from large out-of-state banking organizations -- particularly at a time when deregulation of banking products at the federal level is already putting strains on the resources of smaller banks -- would not be wise." Report to the General Assembly of the State of Connecticut (Jan. 5, 1983), 4 App. in No. 84-4047 (CA2), pp. 1230, 1240-1241.

Rather, the Commission proposed "an experiment in regional banking" as a first step toward full interstate banking which "would afford the legislature an opportunity to make its own calculus of the benefits and detriments that might result from a broader program of interstate banking." *Id*., at 1241-1242. The Connecticut General Assembly adopted the Commission's recommendations, and we believe that Connecticut's approach is precisely what was contemplated [***125] by Congress when it adopted the Douglas Amendment.

We hold that the Connecticut and Massachusetts statutes are of the kind contemplated by the Douglas Amendment to lift its bar against interstate acquisitions.

[*174] *Commerce Clause*

[***LEdHR2A] [2B]Petitioners contend that the regional limitation in the Massachusetts and Connecticut statutes burdens commerce from without the region while permitting a free flow of commerce among the States within the region. They provide numerous citations to prove that one of the principal purposes of the Framers of the Constitution was to break up and forestall precisely

this type of economic "Balkanization" into confederations of States to the detriment of the welfare of the Union as a whole. See, *e. g., H. P. Hood & Sons, Inc*., v. *Du Mond*, 336 U.S. 525, 533 (1949); *Hughes* v. *Oklahoma*, 441 U.S. 322, 325-326 (1979); The Federalist Nos. 7 and 22, pp. 62-63, 143-145 (Rossiter ed. 1961). There can be little dispute that the dormant Commerce Clause would prohibit a group of States from establishing a system of regional banking by excluding bank holding companies from outside the region if Congress had remained completely silent on the subject. *Lewis* v. *BT Investment Managers, Inc*., 447 U.S. 27, 39-44 (1980). Nor can there be serious question that an individual State acting entirely on its own authority would run afoul of the dormant Commerce Clause if it sought to comprehensively regulate acquisitions of local banks by out-of-state holding companies. *Sporhase* v. *Nebraska ex rel. Douglas*, 458 U.S. 941 [**2554] (1982).

But that is not our case. Here the commerce power of Congress is not dormant, but has been exercised by that body when it enacted the Bank Holding Company Act and the Douglas amendment to the Act. Congress has authorized by the latter amendment the Massachusetts and Connecticut statutes which petitioners challenge as violative of the Commerce Clause. [HN8] When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause. *Western & Southern Life Insurance Co*. v. *State Board of Equalization*, 451 U.S. 648, 653-654 (1981); *White* v. *Massachusetts Council of Construction Employers, Inc*., 460 U.S. 204 (1983); cf. *South-Central Timber Development, Inc*. v. *Wunnicke*, [*175] 467 U.S. 82 (1984). Petitioners' Commerce Clause attack on the challenged acquisitions therefore fails.

*Compact Clause*

[***LEdHR3A] [3B]Petitioners maintain that the Massachusetts and Connecticut statutes constitute a compact to exclude non-New England banking organizations which violates the Compact Clause, U. S. Const., Art. I, § 10, cl. 3, because Congress has not specifically approved it. We have some doubt as to whether there is an agreement amounting to a compact. The two statutes are similar in that they both require reciprocity and impose a regional limitation, both legislatures favor the establishment of regional banking in New England, and there is evidence of cooperation

[***126] among legislators, officials, bankers, and others in the two States in studying the idea and lobbying for the statutes. But several of the classic indicia of a compact are missing. No joint organization or body has been established to regulate regional banking or for any other purpose. Neither statute is conditioned on action by the other State, and each State is free to modify or repeal its law unilaterally. Most importantly, neither statute requires a reciprocation of the regional limitation. Bank holding companies based in Maine, which has no regional limitation, and Rhode Island, which will drop the regional limitation in 1986, are permitted by the two statutes to acquire Massachusetts and Connecticut banks. These two States are included in the ostensible compact under petitioners' theory, yet one does not impose the exclusion to which petitioners so strenuously object and the other plans to drop it after two years.

But even if we were to assume that these state actions constitute an agreement or compact, not every such agreement violates the Compact Clause. *Virginia* v. *Tennessee*, 148 U.S. 503 (1893).

[HN9] "The application of the Compact Clause is limited to agreements that are 'directed to the formation of any combination tending to the increase of political power in [*176] the States, which may encroach upon or interfere with the just supremacy of the United States.'" *New Hampshire* v. *Maine*, 426 U.S. 363, 369 (1976), quoting *Virginia* v. *Tennessee, supra*, at 519.

See *United States Steel Corp.* v. *Multistate Tax Comm'n*, 434 U.S. 452, 471 (1978).

In view of the Douglas Amendment to the BHCA, the challenged state statutes which comply with that Act cannot possibly infringe federal supremacy. To the extent that the state statutes might conflict in a particular situation with other federal statutes, such as the provision under which the Federal Deposit Insurance Corporation will arrange for the acquisition of failing banks by out-of-state bank holding companies, 12 U. S. C. § 1823(f), they would be pre-empted by those statutes, and therefore any Compact Clause argument would be academic. Petitioners also assert that the alleged regional compact impermissibly offends the sovereignty of sister States outside of New England. We do not see how the statutes in question either enhance the *political* [**2555] power of the New England States at the expense of other States or have an "impact on our federal structure." *United States Steel Corp.* v. *Multistate Tax Comm'n,*

*supra*, at 471, 473.

*Equal Protection Clause*

[***LEdHR4A] [4A]Petitioners argued before the Board and the Court of Appeals that the Massachusetts and Connecticut statutes violated the Equal Protection Clause, U.S. Const., Amdt. 14, § 2, by excluding bank holding companies from some States while admitting those from others. This claim was abandoned in their petition for [***127] certiorari and their briefs on the merits, but after our decision in *Metropolitan Life Insurance Co.* v. *Ward*, 470 U.S. 869 (1985), petitioners filed a supplemental brief urging us to consider the equal protection issue. Because the issue was fully reviewed by the Board and the Court of Appeals and because it would undoubtedly [*177] cloud other pending applications for acquisitions by bank holding companies, we elect to decide it.

In *Metropolitan Life* we held that encouraging the formation of new domestic insurance companies within a State and encouraging capital investment in the State's assets and governmental securities were not, standing alone, legitimate state purposes which could permissibly be furthered by discriminating against out-of-state corporations in favor of local corporations. There we said:

"This case does not involve or question, as the dissent suggests, *post*, at 900-901, the broad authority of a State to promote and regulate its own economy. We hold only that such regulation may not be accomplished by imposing discriminatorily higher taxes on nonresident corporations solely because they are nonresidents." *Id*., at 882, n. 10.

Here the States in question -- Massachusetts and Connecticut -- are not favoring local corporations at the expense of out-of-state corporations. They are favoring out-of-state corporations domiciled within the New England region over out-of-state corporations from other parts of the country, and to this extent their laws may be said to "discriminate" against the latter. But with respect to the business of banking, we do not write on a clean slate; recently in *Lewis* v. *BT Investment Managers, Inc.*, 447 U.S., at 38, we said that "banking and related financial activities are of profound local concern." This statement is a recognition of the historical fact that our country traditionally has favored widely dispersed control of banking. While many other western nations are

dominated by a handful of centralized banks, we have some 15,000 commercial banks attached to a greater or lesser degree to the communities in which they are located. The Connecticut legislative Commission that recommended adoption of the Connecticut statute in question considered [*178] interstate banking on a regional basis to combine the beneficial effect of increasing the number of banking competitors with the need to preserve a close relationship between those in the community who need credit and those who provide credit. 4 App. in No. 84-4047 (CA2), pp. 1239-1241. The debates in the Connecticut Legislature preceding the enactment of the Connecticut law evince concern that immediate acquisition of Connecticut banks by holding companies headquartered outside the New England region would threaten the independence of local banking institutions. See, *e. g.*, App. to Pet. for Cert. A157-A160. No doubt similar concerns motivated the Massachusetts Legislature.

We think that the concerns which spurred Massachusetts and Connecticut to enact the statutes here challenged, different as they are from those which motivated the enactment [***128] of the Alabama statute in *Metropolitan*, meet the traditional rational basis for judging equal protection claims under the Fourteenth Amendment. *Barry* v. *Barchi*, 443 U.S. 55, 67 (1979); *Vance* v. *Bradley*, 440 U.S. 93, 97 (1979).

[**2556] [***LEdHR1A] [1C] [***LEdHR2A] [2C] [***LEdHR3A] [3C] [***LEdHR4A] [4B]We hold that the state statutes here in question comply with the Douglas Amendment and that they do not violate the Commerce Clause, the Compact Clause, or the Equal Protection Clause of the United States Constitution. The judgment of the Court of Appeals is therefore

*Affirmed*.

JUSTICE POWELL took no part in the decision of this case.

**CONCUR BY:** O'CONNOR

**CONCUR**

JUSTICE O'CONNOR, concurring.

I agree that the state banking statutes at issue here do not violate the Commerce Clause, the Compact Clause, or the Equal Protection Clause. I write separately to note

that I see no meaningful distinction for Equal Protection Clause purposes between the Massachusetts and Connecticut statutes we uphold today and the Alabama statute at issue in *Metropolitan Life Insurance Co.* v. *Ward*, 470 U.S. 869 (1985).

[*179] The Court distinguishes this case from *Metropolitan Life* on the ground that Massachusetts and Connecticut favor neighboring out-of-state banks over all other out-of-state banks. It is not clear to me why completely barring the banks of 44 States from doing business is less discriminatory than Alabama's scheme of taxing the insurance companies from 49 States at a slightly higher rate. Nor is it clear why the Equal Protection Clause should tolerate a regional "home team" when it condemns a state "home team." See *id.*, at 878.

The Court emphasizes that here we do not write on a clean slate as the business of banking is "of profound local concern." *Ante*, at 177. The business of insurance is also of uniquely local concern. *Prudential Insurance Co.* v. *Benjamin*, 328 U.S. 408, 415-417 (1946). Both industries historically have been regulated by the States in recognition of the critical part they play in securing the financial well-being of local citizens and businesses. *Metropolitan Life Insurance Co.* v. *Ward, supra*, at 888-893 (dissenting opinion). States have regulated insurance since 1851. Like the local nature of banking, the local nature of insurance is firmly ensconced in federal law. 470 U.S., at 888-889. The McCarran-Ferguson Act, enacted in 1945, states:

"Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 59 Stat. 33, 15 U. S. C. § 1011.

The Court distinguishes the Connecticut and Massachusetts banking laws as having a valid purpose: "to [***129] preserve a close relationship between those in the community who need credit and those who provide credit." *Ante*, at 178. This interest in preserving local institutions responsive to local concerns was a cornerstone in Alabama's defense of its insurance [*180] tax. It survives as one of the "15 additional purposes" the Court remanded for reconsideration. *Metropolitan Life Insurance Co.* v. *Ward, supra*, at 875-876, n. 5.

Especially where Congress has sanctioned the barriers to commerce that fostering of local industries might engender, this Court has no authority under the Equal Protection Clause to invalidate classifications designed to encourage local businesses because of their special contributions. Today's opinion is consistent with the longstanding doctrine that the Equal Protection Clause permits economic regulation that distinguishes between groups that *are* legitimately different -- as local institutions so often are -- in ways relevant to the proper goals of the State.

**REFERENCES**

10 Am Jur 2d, Banks 16, 27; 54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade Practices 418 et seq.

4 Federal Procedure, L Ed, Banking and Financing 8:754 et seq.

12 USCS 1842(d)

US L Ed Digest, Banks 3.5; Commerce 113; Constitutional Law 409; States, Territories, and Possessions 59

L Ed Index to Annos, Banks; Equal Protection of the Laws

ALR Quick Index, Banks and Banking; Equal Protection of Law

Federal Quick Index, Banks; Equal Protection of the Laws

Annotation References:

Jurisdiction of United States Courts of Appeals to review agency action under 9 of Bank Holding Company Act (12 USCS 1848). 40 ALR Fed 593.

Construction and application of Bank Holding Company Act provision that application for approval to acquire control of bank shall be deemed granted if Federal Reserve Board does not act on application within 91 days (12 USCS 1842(b)). 38 ALR Fed 913.

Who is "party aggrieved" under 9 of Bank Holding Company Act (12 USCS 1848), which allows any party aggrieved by Federal Reserve Board order under Act to obtain judicial review. 36 ALR Fed 349.



**THE PEOPLE, Petitioner, v. BOARD OF SUPERVISORS OF THE COUNTY OF CALAVERAS et al., Respondents**

**Civ. No. 4783**

**COURT OF APPEAL OF CALIFORNIA, THIRD APPELLATE DISTRICT**

**126 Cal. App. 670; 15 P.2d 209; 1932 Cal. App. LEXIS 600**

**October 7, 1932, Decided**

**SUBSEQUENT HISTORY:** [***1] A Petition for a Rehearing of this Cause was Denied by the District Court of Appeal on November 5, 1932, and an Application by Respondents to have the Cause Heard in the Supreme Court, after Judgment in the District Court of Appeal, was Denied by the Supreme Court on December 2, 1932.

**PRIOR HISTORY:** PROCEEDING in Mandamus to compel the Board of Supervisors of Calaveras County to cancel an assessment of taxes assessed against land acquired by the state for park purposes.

**DISPOSITION:** Peremptory writ granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Petitioner, the People of the State of California, brought a proceeding against respondents, the Board of Supervisors of the County of Calveras, to compel the board to cancel an assessment of taxes made against land acquired by the State for park purposes.

**OVERVIEW:** The State of California acquired property which was encumbered by a tax lien filed by the board of supervisors of the county. The State filed a petition with the court to secure a writ of mandamus to order the board to cancel the assessment made against the property because the property was exempt from taxation under the provisions of Cal. Const. art. XIII, § 1. That section of the

Constitution made lands belonging to the State exempt from taxation. The State argued that Cal. Pol. Code § 3408a provided that when the State acquired property and there had been an assessment made against the property which became a lien on the property, the officer who had custody of the record of the lien had to cancel the lien because the property was now public property that was exempt from taxation. The court agreed with the State's contention and held that it was the duty of the board to cancel the assessment. The court overruled the demurrer to the petition and issued the writ of mandamus.

**OUTCOME:** The court granted the peremptory writ.

**CORE TERMS:** cancellation, canceled, supervisors, county purposes, taxation, acquisition, exempt, ownership, levy, writ of mandate, power of taxation, exemptions, directing, lands belonging, fiscal year, satisfactory proof, vesting, deeded, levied, lesser, merger, bare, void, surrendered, complying, prayed

**LexisNexis(R) Headnotes**

*Governments > State & Territorial Governments > Property*
*Tax Law > State & Local Taxes > Personal Property Tax > Exempt Property > General Overview*
[HN1] Under the provisions of Cal. Const. art. XIII, § 1

lands belonging to the state are exempt from taxation.

*Governments > Local Governments > Administrative Boards*
*Governments > Local Governments > Finance*
*Tax Law > State & Local Taxes > Real Property Tax > Assessment & Valuation > General Overview*
[HN2] Cal. Pol. Code § 3408 provides, in part, that when property is acquired and owned by the state, county, city, etc., and that prior to such ownership there had been an assessment of said property, which at the time of said assessment became a lien, and which because of such public ownership is not subject to sale for delinquent taxes, the assessment may, upon satisfactory proof thereof, be canceled by the officer having custody of the record thereof upon the order of the Board of Supervisors, or other governing board with the written consent of the district attorney, city attorney, or other legal adviser of said board. Section 3408 further provides that no cancellation should be made of such charges on property exempt from taxation in event of failure to comply with this law, if any, relative to manner of claiming exemptions.

*Real Property Law > Nonmortgage Liens > Tax Liens*
*Tax Law > State & Local Taxes > Administration & Proceedings > Tax Liens*
*Tax Law > State & Local Taxes > Personal Property Tax > Exempt Property > General Overview*
[HN3] There has been the enactment of a law providing for the cancellation of a lien for taxes attaching prior to the acquisition of the premises by the state. This law is contained in Cal. Pol. Code § 3804a, and it is not in violation of the Constitution.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

**(1) Taxation--Exemptions--Public Lands.** -- --Under the provisions of section 1 of article XIII of the Constitution, lands belonging to the state are exempt from taxation.

**(2) Id.--Assessments--Liens--Public Lands.** -- --Where the state acquires land for park purposes after the lien for taxes thereon has attached, the assessment or tax may be canceled by complying with the requirements of section 3804 of the Political Code.

**(3)** **Id.--Constitutional Law--Exemptions--Cancellation of Assessments.** -- --Section 3804a of the Political Code, which provides that assessments on land acquired by the state after the time a tax or assessment becomes a lien thereon may be canceled, is not in conflict with section 6 of article XIII of the Constitution or with section 12 of article XI; and in this proceeding, where it was shown that there had been a compliance with section 3804 of the Political Code, the state was entitled to a writ of mandate to compel cancellation of the assessment.

**SYLLABUS**

The facts are stated in the opinion of the court.

**COUNSEL:** U. S. Webb, Attorney-General, and Neil Cunningham and Jess Hession, Deputies Attorney-General, for Petitioner.

Virgil M. Airola, District Attorney, for Respondents.

**JUDGES:** JAMISON, J., pro tem. Plummer, Acting P. J., and Thompson (R. L.), J., concurred.

**OPINION BY:** JAMISON

**OPINION**

[*670] [**209] JAMISON, J., *pro tem.* This proceeding is based upon a petition for a writ of mandate requiring the defendants, constituting the Board of Supervisors, to make an order directing the officer having charge of the records thereof to cancel an assessment of taxes assessed against land now [*671] owned by the state of California, and acquired by it for park purposes.

[***2] The said petition sets forth, in substance, the following facts: That the above-named defendants are the duly elected and qualified supervisors of said county of Calaveras; that the Park Commission is a duly authorized body created by act of the legislature of this state for the purpose, among other purposes, of acquiring real estate for park purposes; that petitioner is now the owner of, and ever since the 23d of June, 1931, has been the owner of certain lands described in its petition; that said lands were acquired from one Whitesides by deed dated June 24, 1931; that for the fiscal year 1931-32 the county assessor of said county assessed the said lands for taxation;

That on or about the fifth day of November, 1931, application was made by the said Park Commission to said Board of Supervisors for the cancellation of said assessment and levy upon said property for the fiscal year 1931-32; that with said application petitioner presented satisfactory proof to said Board of Supervisors that said lands had been deeded to the state of California; that said application for cancellation of said tax was made upon the ground that said property was exempt from taxation under the provisions [***3] of section 1, article XIII, of the state Constitution, and that said assessment should be canceled under the provisions of section 3804a of the Political Code;

That on June 14, 1932, the attorney-general, acting in place of the district attorney, under section 470 of the Political Code, gave his consent in writing to the making of [**210] an order by said Board of Supervisors directing that the said taxes be canceled; that the said board has failed and refused to order the cancellation of said taxes.

Upon the filing of this petition an alternative writ of mandate was issued directing the said Board of Supervisors to make said order or show cause why the same should not be done. Thereupon the said defendants demurred to said petition upon the ground that it failed to state facts sufficient to constitute a cause of action and warranted the relief prayed for. Defendant also filed a verified answer to the petition in which it is alleged that prior to the acquisition of said land by plaintiff, that is to say, prior to June 23, [*672] 1931, one Whitesides was the owner thereof and had been such owner for many years, and was such owner when the lien for said tax had attached and become fixed. [***4] And upon information and belief alleged that at the time the owner thereof deeded the said land to plaintiff, the said owner obligated himself to pay all taxes and liens then existing against said land.

(1) It must be conceded that [HN1] under the provisions of section 1 of article XIII of the Constitution lands belonging to the state are exempt from taxation.

(2) The question then for determination is whether or not a tax on lands acquired by the state after the lien for taxes thereon has attached can be canceled by complying with the requirements of section 3804 of the Political Code. This section of said code [HN2] provides in part that when property is acquired and owned by the state, county, city, etc., and that prior to such ownership there had been an assessment of said property, which at the time of said assessment became a lien, and which because of such public ownership is not subject to sale for delinquent taxes, the assessment may, upon satisfactory proof thereof, be canceled by the officer having custody of the record thereof upon the order of the Board of Supervisors, or other governing board with the written consent of the district attorney, city attorney, or other legal adviser of said [***5] board.

This section further provides that no cancellation should be made of such charges on property exempt from taxation in event of failure to comply with this law, if any, relative to manner of claiming exemptions.

Respondent relies upon the case of *Santa Monica* v. *Los Angeles County,* 15 Cal. App. 710 [115 P. 945, 946]. In that case there had been assessment of land for county purposes and the lien of said assessment had attached before the city acquired ownership. The city paid the taxes so assessed and then brought suit against the county of Los Angeles. Judgment was rendered in favor of the city and upon appeal the court in reversing it used the following language: "Under the law, counties are authorized to levy taxes for certain school and county purposes, and when collected the taxes are so applied; with reference to such matters the city may not exercise any right. Plaintiff by its organization as a part of the state government has not been [*673] vested with power to aid the state in connection with county government or school government under the control of the county authorities. The taxes so levied upon the property were levied and assessed by the county [***6] for purposes within its jurisdiction. The bare acquisition of the premises upon which the tax levy attached did not carry with it any interest or estate in the lien therein created for county purposes. There was, therefore, no vesting of any lesser estate, held in the same right or otherwise, through which a merger could be said to result. The plaintiff, when it acquired this land, took it subject to the lien for county purposes to the same extent as would a private purchaser."

No mention is made in said decision of section 3804a of the Political Code.

As a matter of fact, it was not in existence at that time. This decision was rendered March 8, 1911, and the said section was enacted and became a law on June 8, 1911, but as then enacted it did not contain the provision for cancellation hereinbefore set forth, and it was not

until the amendment of 1925 that the said provision was incorporated in said section.

(3) Respondent contends that section 3804a of the Political Code, in so far as it provides that an assessment after the time said tax or assessment becomes a lien thereon, shall be canceled, is in conflict with article XIII, section 6, of the Constitution and, also, in conflict [***7] with article XI, section 12, of said Constitution and therefore void.

No authorities are cited in support of this contention except *City of Santa Monica* v. *Los Angeles County, supra,* which does not pass upon this question.

It is true that article XI, section 12, of the Constitution vests in the county the authority to assess and collect taxes for county purposes, and in the instant case, the assessment was made for county purposes, and as was held in *Santa Monica* v. *Los Angeles County, supra,* the bare acquisition by the state of the premises upon which the assessment attached, did not carry with it any interest or estate in the lien, and therefore there was no vesting of a lesser estate, held in the same right, through which a merger could result, but since that decision was rendered [HN3] there has been the enactment of a law providing for the cancellation of a [*674] lien for taxes attaching prior to the acquisition of the premises by the state.

This law is contained in section 3804a of the Political Code, and if it is not in violation of the Constitution, then unquestionably [**211] the petitioner has the right to have the said assessment canceled.

Respondent contends [***8] that this section of the Political Code is in violation of section 6, article XIII, of the Constitution and therefore void. This section of the Constitution is as follows:

"The power of taxation shall never be surrendered by any grant or contract to which the state shall be a party."

We find nothing in this record indicating that the power of taxation has been surrendered by the state either by grant or contract. The facts before us show that the power of taxation was exercised, and that by operation of law, it has ceased to be a charge upon the land for the reason that the land is now the property of the state.

We are of the opinion that, upon the showing made by petitioner, it was the duty of respondents to order the cancellation of the said assessment.

The demurrer to the petition is overruled.

Let the peremptory writ issue as prayed for.

Plummer, Acting P. J., and Thompson (R. L.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 5, 1932, and an application by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 2, [***9] 1932.



## THE RAILROAD TAX CASES; COUNTY OF SAN MATEO v. SOUTHERN PACIFIC R. CO.

### Circuit Court, D. California

### 13 F. 722; 1882 U.S. App. LEXIS 2045; 8 Sawy. 238

### September 25, 1882

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff county sued defendant railroad to recover back taxes levied on the railroad's property. The railroad demurred alleging that the taxes violated U.S. Const. amend. XIV because they were discriminatory and the railroad was not given an opportunity to contest the assessment.

**OVERVIEW:** A county assessed taxes against a railroad's property and sued the railroad to collect and the railroad demurred. The court entered judgment in favor of the railroad upon the demurrer and held as follows: The railroad was a person for U.S. Const. amend. XIV purposes and was entitled to have the same justice meted out to it as that meted out to the humblest citizen no matter what acts were attributed to it because of its power and wealth. Because the tax imposed a different system of assessment on the railroad than for other persons, the tax violated the equal protection clause of amend. XIV and was thus unlawful and could not be collected. Because the assessment under Cal. Const. art. 13 did not provide for notice and opportunity to be heard on the assessment, the tax procedures violated the due process clause of amend. XIV.

**OUTCOME:** The court entered judgment in favor of a railroad on its demurrer to a county's suit to collect back taxes on the railroad's property.

**CORE TERMS:** taxation, railroad, notice, process of law, taxed, guaranty, franchise, mortgage, deprived, equal

protection, natural persons, levied, corporators, deprive, mile, state board of equalization, rolling stock, charter, constitutional provision, property of individuals, public use, prescribed, uniformity, valuation, situated, state constitutions, road-bed, supposed, railway, void

**LexisNexis(R) Headnotes**

*Constitutional Law > Equal Protection > Scope of Protection*
[HN1] Whatever acts may be imputed justly or unjustly to the corporations, they are entitled when they enter the tribunals of the nation to have the same justice meted out to them which is meted out to the humblest citizen. There cannot be one law for them and another law for others.

*Constitutional Law > The Judiciary > Jurisdiction > Amount in Controversy*
*International Trade Law > General Overview*
*Tax Law > State & Local Taxes > Administration & Proceedings > General Overview*
[HN2] The power of taxation possessed by a state may be exercised upon any subject within her jurisdiction, and to any extent not prohibited by the constitution of the United States. It may touch property in every shape, -- in its natural condition, in its manufactured form, and in its various transmutations. And the amount of the taxation may be determined by the value of the property, or its use, or its capacity, or its productiveness. It may touch

business in the almost infinite forms in which it is conducted, -- in professions, in commerce, in manufactures, and in transportation. Unless restrained by provisions of the federal constitution, the power of the state as to the mode, form, and extent of taxation is unlimited where the subjects to which it applies are within her jurisdiction. The hardship and injustice of a tax levied by a state, considered with reference to its amount, are not subjects of federal cognizance.

*Administrative Law > Separation of Powers > Constitutional Controls > General Overview*
*Constitutional Law > Supremacy Clause > General Overview*
*Governments > Federal Government > General Overview*
[HN3] There are in the very nature of the federal government, and the powers with which it is clothed, many prohibitions upon the taxing power of the states. Within the sphere of its action that government is supreme, and no impediment to the free and full exercise of its power is permissible. The state cannot, therefore, place any restrictions upon the agencies of the federal government; otherwise it might embarrass and even defeat the operations of that government. The power to tax involves the power to destroy; and there would be a manifest repugnance in allowing one government to control the constitutional measures of another government in respect to which the latter is declared to be supreme.

*Constitutional Law > Supremacy Clause > General Overview*
*International Law > Authority to Regulate > General Overview*
*International Trade Law > General Overview*
[HN4] In regard to the express prohibitions upon the states contained in the federal constitution; they apply equally to taxation and to any other action of the state. They cannot be evaded under the plea that the state possesses the unrestricted power to tax. It is to no purpose to speak of the power of taxation as an attribute of state sovereignty which cannot be surrendered; that sovereignty, whatever its extent, must be exerted in subordination to the prohibition of the constitution, which is the supreme law of the land. Many of the attributes of sovereignty which the states would possess if independent political communities, have been in like manner surrendered to the federal government, such as

the power to declare war, to make peace, to enter into treaties of alliance, and to regulate commerce with foreign nations. The question in all cases presented to a federal court, where complaint is made of a tax levied by the states, is whether there is any inhibition, express or implied, in the constitution of the United States upon the imposition of the tax. If there be, it is the duty of the court to enforce the inhibition, it matters not whom its decision may affect, nor how great and irresponsible the power of the state may be independently of such prohibition.

*Constitutional Law > Equal Protection > Scope of Protection*
*Tax Law > State & Local Taxes > Administration & Proceedings > Judicial Review*
[HN5] The fourteenth amendment to the U.S. Constitution, in declaring that no state shall deny to any person within its jurisdiction the equal protection of the laws, imposes a limitation upon the exercise of all the powers of the state which can touch the individual or his property, including among them that of taxation. Whatever the state may do, it cannot deprive any one within its jurisdiction of the equal protection of the laws. And by equal protection of the laws is meant equal security under them to every one on similar terms, -- in his life, his liberty, his property, and in the pursuit of happiness. It not only implies the right of each to resort, on the same terms with others, to the courts of the country for the security of his person and property, the prevention and redress of wrongs and the enforcement of contracts, but also his exemption from any greater burdens or charges than such as are equally imposed upon all others under like circumstances. Unequal exactions in every form, or under any pretense, are absolutely forbidden; and of course unequal taxation, for it is in that form that oppressive burdens are usually laid. It is not possible to conceive of equal protection under any system of laws where arbitrary and unequal taxation is permissible; where different persons may be taxed on their property of the same kind, similarly situated, at different rates.

*Constitutional Law > Equal Protection > Scope of Protection*
*Tax Law > State & Local Taxes > Administration & Proceedings > General Overview*
[HN6] To compel individuals to contribute money or property to the use of the public without reference to any

common ratio, and without requiring the sum paid by one piece or kind of property, or by one person, to bear any relation whatever to that paid by another, is to levy a forced contribution, not a tax, duty, or impost, within the sense of these terms as applied to the exercise of powers by any enlightened or responsible government.

*Constitutional Law > Involuntary Servitude*
*Constitutional Law > Equal Protection > Scope of Protection*
*Tax Law > State & Local Taxes > Administration & Proceedings > General Overview*
[HN7] Absolute equality and uniformity may not be attainable in practice, but an approximation to them is possible, and any plain departure from the rule will defeat the tax. What is called for under a constitutional provision requiring equality and uniformity in the taxation of property must be equally called for by the fourteenth amendment. The forced contribution from one which would follow taxation of his property without reference to a common ratio, would be inconsistent with that equal protection which the amendment requires the state to extent to every person within its jurisdiction. The application of the amendment to taxation has been recognized by the legislation of congress.

*Constitutional Law > Equal Protection > Scope of Protection*
*Tax Law > State & Local Taxes > Administration & Proceedings > General Overview*
[HN8] As the foundation of all just and equal taxation is the assessment of the property taxed, -- that is, the ascertainment of its value, -- in order that the tax may be levied according to some ratio to the value, uniformity of taxation necessarily requires uniformity in the mode of assessment as well as in the rate of taxation. Uniformity in taxing implies equality in the burden of taxation, and this equality of burden cannot exist without uniformity in the mode of assessment as well as in the rate of taxation.

*Tax Law > State & Local Taxes > Administration & Proceedings > General Overview*
*Tax Law > State & Local Taxes > Personal Property Tax > Exempt Property > General Overview*
*Tax Law > State & Local Taxes > Real Property Tax > General Overview*
[HN9] Property may be classified for purposes of taxation. Real property may be subjected to one rate of

taxation; personal property to another rate. Property in particular districts may be taxed for local purposes, while property elsewhere may be exempt.

*Constitutional Law > Involuntary Servitude*
[HN10] The amendment prohibiting slavery and involuntary servitude, except as a punishment for crime, had its origin in the previous existence of African slavery. But the generality of its language makes its prohibition apply to slavery of white men as well as that of black men; and also to serfage, vassalage, villenage, peonage, and every other form of compulsory labor to minister to the pleasure, caprice, vanity, or power of others.

*Constitutional Law > Equal Protection > Scope of Protection*
[HN11] The court cannot limit the application of the prohibition of the fourteenth amendment to legislation touching members of the enfranchised race. It has a much broader operation. It does not, indeed, place any limit upon the subjects in reference to which the states may legislate. It does not interfere with their police power. Upon every matter upon which previously to its adoption they could act, they may still act. They can legislate now, as they always could, to promote the health, good order, and peace of the community; to develop their resources, increase their industries, and advance their prosperity; but it does require that in all such legislation hostile and partial discrimination against any class or person shall be avoided; that the state shall impose no greater burdens upon any one than upon others of the community under like circumstances, nor deprive any one of rights which others similarly situated are allowed to enjoy. It forbids the state to lay its hand more heavily upon one than upon another, under like conditions. It stands in the constitution as a perpetual shield against all unequal and partial legislation by the states, and the injustice which follows from it, whether directed against the most humble or the most powerful; against the despised laborer from China, or the envied master of millions.

*Business & Corporate Law > Corporate Names > Requirements*
*Business & Corporate Law > Corporations > Formation > Corporate Existence, Powers & Purpose > General Overview*
*Constitutional Law > Equal Protection > Scope of Protection*

[HN12] Whenever a provision of the constitution, or of a law, guaranties to persons the enjoyment of property, or affords to them means for its protection, or prohibits legislation injuriously affecting it, the benefits of the provision extend to corporations, and that the courts will always look beyond the name of the artificial being to the individuals whom it represents.

***Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection***
***Criminal Law & Procedure > Grand Juries > Indictments > Right to Indictment by Grand Jury***
***Criminal Law & Procedure > Accusatory Instruments > Indictments > General Overview***
[HN13] See U.S. Const. amend. V.

***Business & Corporate Law > Corporations > Shareholders > Disregard of Corporate Entity > General Overview***
***Constitutional Law > Bill of Rights > Fundamental Rights > Eminent Domain & Takings***
***Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection***
[HN14] To deprive a corporation of its property, or to burden it, is, in fact, to deprive the corporators of their property or to lessen its value. Their interest, undivided though it be, and constituting only a right during the continuance of the corporation to participate in its dividends, and on its dissolution to receive a proportionate share of its assets, has an appreciable value, and is property in a commercial sense, and whatever affects the property of the corporation necessarily affects the commercial value of their interests. If, for example, to take the illustration given by counsel, a corporation created for banking purposes acquires land, notes, stocks, bonds, and money, no stockholder can claim that he owns any particular item of this property, but he owns an interest in the whole of it which the courts will protect against unlawful seizure or appropriation by others, and on the dissolution of the company he will receive a proportionate share of its assets. Now, if a statute of the state takes the entire property, who suffers loss by the legislation? Whose property is taken? Certainly, the corporation is deprived of its property; but at the same time, in every just sense of the constitutional guaranty, corporations are also deprived of their property.

***Business & Corporate Law > Corporations > Formation***
***> Corporate Existence, Powers & Purpose > General Overview***
***Constitutional Law > Relations Among Governments > Privileges & Immunities***
***Constitutional Law > Privileges & Immunities***
[HN15] Nor do all the privileges and immunities of citizenship attach to corporations. These bodies have never been considered citizens for any other purpose than the protection of the property rights of the corporators. The status of citizenship, entitling the citizen to certain privileges and immunities in the several states, does not belong to corporations. The special privileges which citizens acquire by becoming incorporated in one state cannot, therefore, be exercised in another state without the latter's consent, although such consent will generally be presumed in the absence of positive prohibition.

***Business & Corporate Law > Corporations > Formation > Corporate Existence, Powers & Purpose > General Overview***
***Civil Rights Law > Contractual Relations & Housing > General Overview***
***Constitutional Law > Equal Protection > Scope of Protection***
[HN16] The term "person" includes, or may include, corporations; which amounts to what we have already said, that whenever it is necessary for the protection of contract or property rights, the courts will look through the ideal entity and name of the corporation to the persons who compose it, and protect them, though the process be in its name. All the guaranties and safeguards of the constitution for the protection of property possessed by individuals may, therefore, be invoked for the protection of the property of corporations. And as no discriminating and partial legislation, imposing unequal burdens upon the property of individuals, would be valid under the fourteenth amendment, so no legislation imposing such unequal burdens upon the property of corporations can be maintained.

***Tax Law > State & Local Taxes > Personal Property Tax > General Overview***
[HN17] See Cal. Const. art. 13, § 10.

***Tax Law > State & Local Taxes > Administration & Proceedings > General Overview***
[HN18] The presentation to a state board by a corporation of a statement of its property and of its value, which it is

required to furnish, is not the equivalent to a notice of the assessment made and of an opportunity to be heard thereon. It is a preliminary proceeding, and until the assessment the corporation cannot know whether it will have good cause of complaint. No hearing upon the statement presented is allowed, and when the assessment is made the matter is closed; no opportunity to correct any errors committed is provided. The presentation of the statement can no more supersede the necessity of allowing a subsequent hearing of the owners, than the filing of a complaint in court can dispense with the right of the suitor and his contestant to be there heard.

***Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection***
[HN19] The provision in the fourteenth amendment is in the form of an interdict upon the states -- Nor shall any state deprive any person of life, liberty, or property without due process of law. And by due process is meant one which, following the forms of law, is appropriate to the case, and just to the parties to be affected. It must be pursued in the ordinary mode prescribed by the law; it must be adapted to the end to be attained; and it must give to the party to be affected an opportunity of being heard respecting the justice of the judgment sought. Without these conditions entering into the proceeding, it would be anything but due process. If it touched life or liberty, it would be wanton punishment, or rather wanton cruelty.

***Civil Procedure > Eminent Domain Proceedings > General Overview***
***Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection***
***Tax Law > State & Local Taxes > Administration & Proceedings > General Overview***
[HN20] In the taking of property by taxation the proceeding is more summary and stringent. The necessities of revenue for the support of government will not admit of the delays attendant upon judicial proceedings in the courts of justice. The statute fixes the rate of taxation upon the value of the property, and appoints officers to estimate and appraise the value. Due process of law in the proceeding is deemed to be pursued, when, after the assessment is made by the assessing officers upon such information as they may obtain, the owner is allowed a reasonable opportunity, at a time and place to be designated, to be heard respecting the correctness of the assessment, and to show any errors in

the valuation committed by the officers. Notice to him will be deemed sufficient, if the time and place of hearing be designated by statute. But whatever the character of the proceeding, and whether it takes property directly, or creates a charge or liability which may be the basis of taking it, the law directing the proceeding must provide for some kind of notice, and offer to the owner an opportunity to be heard, or the proceeding will want the essential ingredient of due process of law. Nothing is more clearly established by a weight of authority absolutely overwhelming than that notice and opportunity to be heard are indispensable to the validity of the proceeding.

***Tax Law > State & Local Taxes > Personal Property Tax > General Overview***
***Torts > Transportation Torts > Rail Transportation > General Overview***
[HN21] Cal. Const. art. 13 is not intended to make any change in the powers or rights of corporations under the laws of the state. It treats entirely of revenue and taxation, and of the rules which shall govern the assessment of the property of individuals, and of railroad and other quasi public corporations. It is in another article that provisions are made for the control of railroad corporations; and the duties and responsibilities of corporations generally, and the power of the state over them, are declared.

***Business & Corporate Law > Corporations > Formation > Corporate Existence, Powers & Purpose > General Overview***
***Constitutional Law > Supremacy Clause > General Overview***
[HN22] The state, in the creation of corporations, or in amending their charters, or rather in passing or amending general laws under which corporations may be formed and altered, possesses no power to withdraw them when created, or by amendment, from the guaranties of the federal constitution.

***Business & Corporate Law > Corporations > Formation > Corporate Existence, Powers & Purpose > General Overview***
***Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview***
***Governments > Legislation > Expirations, Repeals & Suspensions***
[HN23] The charter of a private corporation is a contract

between the corporators and the state, and that it is, therefore, within the prohibition of the federal constitution against the impairment of contracts. To avoid this result the states have generally inserted clauses in their constitutions reserving a right to repeal, alter, or amend charters granted by their legislatures, or to repeal, alter, or amend the general laws under which corporations are allowed to be formed. The reservation relates only to the contract of incorporation, which, without such reservation, would be irrepealable. It removes the impediment to legislation touching the contract. It places the corporation in the same position it would have occupied had the supreme court held that charters are not contracts, and that laws repealing or altering them did not impair the obligation of contracts. The property of the corporation, acquired in the exercise of its faculties, is held independently of such reserved power, and the state can only exercise over it the control which it exercises over the property of individuals engaged in similar business.

COUNSEL: [**1] *A. L. Rhodes, A. L. Hart,* Atty. Gen., and *Tolles* and *Ware,* Dist. Attys., for plaintiff.

*Creed Haymond, J. Norton Pomeroy, T. I. Bergin,* and *T. B. Bishop,* for defendants.

OPINION BY: FIELD

OPINION

[*727] FIELD, Justice. This action is brought to recover of the Southern Pacific Railroad Company, a corporation formed under the laws of California, certain state and county taxes levied upon its property for the fiscal year of 1881 and 1882, alleged to be due to the plaintiff, with 5 per cent. added for their non-payment, and interest. It was commenced in one of the superior courts of the state, and, on application of the defendant, was removed to this court.

The railroad company, besides a general denial of the allegations of the complaint, sets up as a special answer to the action that in the assessment of its property, according to which the taxes claimed were levied, an unlawful and unjust discrimination was made between its property and the property of individuals, to its disadvantage, subjecting it to an unequal share of the public burdens, and that it was not afforded an opportunity of being heard respecting the assessment, and that such discrimination was [**2] made and proceeding

had under the provisions of the constitution of California, adopted in 1879, which in that respect are in conflict with the fourteenth amendment of the constitution of the United States.

By the constitution of California, all property in the state, not exempt under the laws of the United States, is, with certain exceptions, to be taxed in proportion to its value, to be ascertained as prescribed by law; but in the ascertainment of its value as a basis for taxation, a distinction is made between the property owned by individuals and that owned by railroad corporations. By the thirteenth article, "a mortgage, deed of trust, or other obligation by which a debt is secured, is treated, for the purposes of assessment and taxation, [*728] "as an interest in the property affected thereby," and, "except as to railroad and other *quasi* public corporations," the value of the property affected, less the value of the security, is to be assessed and taxed to its owner, and the value of the security is to be assessed and taxed to its holder. Section 4. But by the same article "the franchise, road-way, road-bed, rails, and rolling stock of all railroads operated in [**3] more than one county" are to be assessed at their actual value, and apportioned to the counties, cities, and districts in which the roads are located in proportion to the number of miles of rail-way laid therein. No deduction from this value is allowed for any mortgages on the property.

By the constitution there is also a different system of assessment provided for "the franchise, road-way, road-bed, rails, and rolling stock" of railroads operated in more than one county from that provided for other property. The assessment of other property is to be made in the county, city, or district in which it is situated in the manner prescribed by law; and the supervisors of each county constitute a board of equalization of the taxable property of the county, and must act upon prescribed rules of notice to its owners. A state board of equalization is also created to equalize the valuation of the taxable property of the several counties, so that equality may be preserved between the tax-payers of the different localities, and its action in this respect must likewise be upon prescribed rules of notice.

The assessment of the franchise, road-way, road-bed, rails, and rolling stock of railroads [**4] operated in more than one county in the state is to be made by this state board. And in making it, the board is not required to give any notice to the owners, nor is any provision made

for affording them an opportunity to be heard respecting the valuation of their property. The tenth section of the article which confers this power of assessment has been held by the supreme court of the state to be self-executing, requiring no legislation for its enforcement.

The defendant, as already stated, is a corporation formed under the laws of the state, and operates a railroad through several counties. The entire length of its road in the state is a little over 711 miles, of which twenty-five miles and one-tenth of a mile pass through the county of San Mateo. Its principal place of business is at San Francisco. Its stockholders are, and always have been, citizens of the United States, some of whom are residents of this state, and some of other states. Previously to January 1, 1881, it was indebted to different citizens of the United States, many of them residents of this [*729] state, in large sums, advanced to construct and equip the road; and to secure this indebtedness it executed, [**5] prior to that date, a mortgage upon its road, its franchise, and its rolling stock and appurtenances, and also upon a large number of tracts of land situated in different counties. The indebtedness secured exceeds $3,000 a mile of the road, no part of which, except the accruing interest, has been paid; the whole remains a valid and subsisting obligation of the company.

In the fiscal year of 1881 and 1882, the state board of equalization assessed the franchise, road-way, road-bed, rails, and rolling stock of the defendant at $11,739,915, -- that is, at the rate of $16,500 per mile, -- and apportioned to the county of San Mateo $414,150. Upon the amount thus apportioned the taxes were levied for which the present action is brought. In the assessment no deduction was allowed for the mortgage, but the property was assessed at its entire value independently of the mortgage. Nor was any notice given to the company by the board of its action, nor was any opportunity allowed the company to be heard respecting the assessment. These facts are admitted by the demurrer, and the validity of the defense rests upon the application of the law to them.

The railroad company contends that the [**6] taxes are invalid and void on two grounds:

(1) Because the assessment, according to which they were levied, was made in pursuance of the discriminating provisions of the state constitution, in the enforcement of which the company was not allowed any deduction from the valuation of its property for the mortgage thereon, and was thus subjected to an unjust proportion of the public burdens, and denied the equal protection of the laws guarantied by the fourteenth amendment of the federal constitution; and (2) because the assessment was made in pursuance of provisions of the state constitution, which gave no notice to the company, and afforded it no opportunity to be heard respecting the value of the property, or for the correction of any errors of the board, thus depriving it of its property without due process of law guarantied by that amendment.

The plaintiff, on the other hand, contends:

(1) That the power of taxation possessed by the state is unlimited, except by the constitution of the United States, and that its exercise cannot be assailed in a federal court, either for the hardship or injustice of the tax levied; (2) that the classification of property for taxation, and the [**7] apportionment of taxes according to such classification, are not forbidden by the constitution of the United States, and that within this principle the taxes on the property of the railroad company were lawfully imposed; (3) that the fourteenth amendment of the constitution of the United States was adopted to protect the newly-made citizens of the African race in their freedom, and [*730] should not be extended beyond that purpose; (4) that corporations are not persons within the meaning of that amendment; (5) that the statute fixing the sessions of the state board of equalization, and requiring a statement in writing from the defendant of the amount and value of its property, afforded all the notice and hearing essential to the validity of the assessment made; and (6) that the provisions of article 13 of the constitution, as to the taxation of railroad property, are to be treated as conditions upon the continued existence of railroad corporations.

We do not state the positions of the several counsel who argued the case in their precise language, for they were presented in various forms, but we give their substance and purport.

The questions thus presented for our determination [**8] are of the greatest magnitude and importance. The answer to them concerns not merely the railroad corporations of this state, but all corporations other than municipal within the United States. It is of the highest interest to them all to know whether their property is subject to the same rules of assessment and taxation to which the property of individuals is subject, or whether it

can be separated and distinguished from that of individuals and made liable to such different burdens in the way of taxation as the state may choose to impose. The questions have been argued with great ability and learning by distinguished counsel on both sides, and they have received from the court the most patient and thoughtful examination. Indeed, their examination has been accompanied with a painful anxiety to reach a right conclusion, aware as the court is of the opinion prevailing throughout the community that the railroad corporations of the state, by means of their great wealth and the numbers in their employ, have become so powerful as to be disturbing influences in the administration of the laws; an opinion which will be materially strengthened by a decision temporarily relieving any one [**9] of them from its just proportion of the public burdens. That consideration, however, cannot be allowed to affect the judgment of the court. [HN1] Whatever acts may be imputed justly or unjustly to the corporations, they are entitled when they enter the tribunals of the nation to have the same justice meted out to them which is meted out to the humblest citizen. There cannot be one law for them and another law for others.

It is undoubtedly true that [HN2] the power of taxation possessed by the state may be exercised upon any subject within her jurisdiction, and to any extent not prohibited by the constitution of the United States. As stated by the supreme court: "It may touch property in every shape, -- in its natural condition, in its manufactured form, and in its various transmutations. And the amount of the taxation may be determined [*731] by the value of the property, or its use, or its capacity, or its productiveness. It may touch business in the almost infinite forms in which it is conducted, -- in professions, in commerce, in manufactures, and in transportation. Unless restrained by provisions of the federal constitution, the power of the state as to the mode, form, and extent [**10] of taxation is unlimited where the subjects to which it applies are within her jurisdiction." *State Tax on Foreign-held Bonds,* 15 Wall. 319.

It is also undoubtedly true that the hardship and injustice of a tax levied by the state, considered with reference to its amount, are not subjects of federal cognizance. Whether a tax upon property, subject to taxation, be 1 per cent. of its value, or 10 per cent., or 20, or more, is a mere matter of state discretion; a question of policy and not of power. So we often find in the reports

language to the affect that the state's power of taxation is without limitation; language which may be correct when applied to the special facts of the cases in which it is used, but which should always be read with a reservation that the exercise of the power does not conflict with any of the inhibitions of the federal constitution.

[HN3] There are in the very nature of the federal government, and the powers with which it is clothed, many prohibitions upon the taxing power of the states. Within the sphere of its action that government is supreme, and no impediment to the free and full exercise of its power is permissible. The state cannot, therefore, place [**11] any restrictions upon the agencies of the federal government; otherwise it might embarrass and even defeat the operations of that government. It was long ago said by Chief Justice Marshall that the power to tax involves the power to destroy; and that there would be a manifest repugnance in allowing one government to control the constitutional measures of another government in respect to which the latter is declared to be supreme. When, therefore, congress had created a bank of the United States as an agency in the menagement of the finances of the government, it was held that the states were inhibited from taxing the institution.

"If the states," said that great judge, "may tax one instrument employed by the government in the execution of its powers, they may tax any and every other instrument. They may tax the mail; they may tax the mint; they may tax the papers of the custom-house; they may tax judicial process; they may tax all the means employed by the government to an excess which would defeat all the ends of government. This was not intended by the American people. They did not design to make their government dependent on the states." *McCullough* v. *Maryland,* 4 [**12] Wheat. 432.

[*732] For like reasons the public securities of the United States are exempt from taxation by the states, except so far as such taxation is permitted by congress. A tax imposed by the city of Charleston upon all personal estate in its limits, including among other things stock of the United States, was therefore adjudged to be invalid. The court said that the tax was upon a contract between the government and individuals, and therefore operated directly upon the power to borrow money on the credit of the United States; that if the right to impose it existed with the states, it was a right which in its nature acknowledged no limits, and might be exercised to an

extent which would seriously embarrass the government. Its existence was therefore held inconsistent with the supremacy of the government in the exercise of its granted powers. *Weston* v. *Charleston,* 2 Pet. 449.

Other illustrations might be given of implied inhibitions of the federal constitution to taxation by the states. The powers of the general government cannot be interfered with, or their exercise embarrassed in any respect, by such taxation; as has often been held with reference to attempted [**13] taxation on goods imported, while retaining the character of imports in unbroken packages, and on goods in transit from one state to another. The power to regulate commerce, foreign and interstate, cannot be thus trammeled by state action. *Brown* v. *Maryland,* 12 Wheat. 434; *Welton* v. *State,* 100 U.S. 275; *Webber* v. *Virginia,* 103 U.S. 344.

So [HN4] in regard to the express prohibitions upon the states contained in the federal constitution; they apply equally to taxation and to any other action of the state. They cannot be evaded under the plea that the state possesses the unrestricted power to tax. Where, for example, a state has stipulated for a valid consideration to exempt certain property from taxation, as it has been repeatedly held that it may do, the stipulation cannot subsequently be withdrawn, and the property subjected to taxation. The provision which secures the inviolability of contracts against state legislation stands as a perpetual interdict against the imposition of the charge. It is to no purpose in such case to speak of the power of taxation as an attribute of state sovereignty which cannot be surrendered; that sovereignty, whatever its extent, [**14] must be exerted in subordination to the prohibition of the constitution, which is the supreme law of the land. Many of the attributes of sovereignty which the states would possess if independent political communities, have been in like manner surrendered to the federal government, such as the power to declare war, to make peace, to enter into treaties of alliance, and to regulate commerce [*733] with foreign nations. The question in all cases presented to a federal court, where complaint is made of a tax levied by the states, is whether there is any inhibition, express or implied, in the constitution of the United States upon the imposition of the tax. If there be, it is the duty of the court to enforce the inhibition, it matters not whom its decision may affect, nor how great and irresponsible the power of the state may be independently of such prohibition.

[HN5] The fourteenth amendment to the constitution, in declaring that no state shall deny to any person within its jurisdiction the equal protection of the laws, imposes a limitation upon the exercise of all the powers of the state which can touch the individual or his property, including among them that of taxation. Whatever [**15] the state may do, it cannot deprive any one within its jurisdiction of the equal protection of the laws. And by equal protection of the laws is meant equal security under them to every one on similar terms, -- in his life, his liberty, his property, and in the pursuit of happiness. It not only implies the right of each to resort, on the same terms with others, to the courts of the country for the security of his person and property, the prevention and redress of wrongs and the enforcement of contracts, but also his exemption from any greater burdens or charges than such as are equally imposed upon all others under like circumstances.

Unequal exactions in every form, or under any prtense, are absolutely forbidden; and of course unequal taxation, for it is in that form that oppressive burdens are usually laid. It is not possible to conceive of equal protection under any system of laws where arbitrary and unequal taxation is permissible; where different persons may be taxed on their property of the same kind, similarly situated, at different rates; where, for instance, one may be taxed at 1 per cent. on the value of his property, another at 2 or 5 per cent., or where one may be thus [**16] taxed according to his color, because he white, or black, or brown, or yellow, or according to any other rule than that of a fixed rate proportionate to the value of his property.

In the constitution of several states a provision is found requiring "equality and uniformity" in the taxation of property, and this is held to mean that taxes must be levied according to some fixed rate or rule of apportionment, so that all persons shall pay the like amount upon similar kinds of property of the same value. As it seemed to one of the judges of the supreme court of Michigan:

[HN6] "To compel individuals to contribute money or property to the use of the public without reference to any common ratio, and without requiring the sum paid by one piece or kind of property, or by one person, to bear any relation [*734] whatever to that paid by another, is to levy a forced contribution, not a tax, duty, or impost, within the sense of these terms as applied to the exercise

of powers by any enlightened or responsible government." *Woodbridge* v. *City of Detroit,* 8 Mich. 301; Burroughs, Taxation, *c.* 5.

[HN7] Absolute equality and uniformity may not be attainable in practice, but an approximation [**17] to them is possible, and any plain departure from the rule will defeat the tax.

What is called for under a constitutional provision requiring equality and uniformity in the taxation of property must be equally called for by the fourteenth amendment. The forced contribution from one which would follow taxation of his property without reference to a common ratio, would be inconsistent with that equal protection which the amendment requires the state to extent to every person within its jurisdiction.

The application of the amendment to taxation has been recognized by the legislation of congress. Soon after the adoption of the constitutional amendment, abolishing slavery and involuntary servitude, measures were proposed to give practical freedom to the emancipated race, which resulted in the passage of the civil-rights act. This act gave citizenship to persons of that race, and then declared that citizens of the United States of every race and color, without regard to any previous condition of slavery or involuntary servitude, should have the same right in every state and territory to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, [**18] sell, own, and convey real and personal property, and to the full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and should be subject to like punishments, pains, and penalties, and to none other. After the adoption of the fourteenth amendment, congress re-enacted this act, and to the clause that all persons within the jurisdiction of the United States should enjoy the same rights as white citizens, and be subject only to like punishments, pains, and penalties, it added, and subject only to like *"taxes, licenses, and exactions of every kind, and to no other."* Rev. St. § 1977.

The adjudications as to the meaning of the rule of equality and uniformity to be observed in taxation, may, therefore, be properly referred to in construing the requirement of the fourteenth amendment, when it is invoked with respect to burdens imposed by taxation. In *Lexington* v. *McQuillan's Heirs* the supreme court of Kentucky said that the legislature of the state had no

constitutional authority to exact from one citizen the entire revenue of the commonwealth; [*735] and though the distinction between constitutional [**19] taxation and the taking of private property for public use by legislation might not be definable with perfect precision, the court was clearly of the opinion that whenever the property of a citizen was taken from him by the sovereign will and appropriated without his consent to the benefit of the public, the exaction could not be considered a tax unless similar contributions were made by the public itself, or rather exacted by the same public will from such constituent members of the same community as own the same kind of property; and that, though there may be a discrimination in the subjects of taxation, still persons of the same class, and property of the same kind, must generally be subjected alike to the same common burden. 9 Dana, (Ky.) 513.

In *State* v. *Township of Readington* the supreme court of New Jersey said:

"Taxation operates upon a community, or a class in a community, according to some rule of apportionment. When the amount levied upon individuals is determined without regard to the amount or value exacted from any other individual or classes of individuals, the power exercised is not that of taxation, but of eminent domain. A tax upon the persons or property [**20] of A., B., and C. individually, whether designated by name or in any other way, which is in excess of an equal apportionment among the persons, or property of the class of persons or kind of property subject to the taxation, is to the extent of such excess, the taking of private property for a public use without compensation. The process is one of confiscation, and not of taxation." 36 N.J. Law, 70.

[HN8] As the foundation of all just and equal taxation is the assessment of the property taxed, -- that is, the ascertainment of its value, -- in order that the tax may be levied according to some ratio to the value, uniformity of taxation necessarily requires uniformity in the mode of assessment as well as in the rate of taxation; or, to quote the language of the supreme court of Ohio expressing the same thought: "Uniformity in taxing implies equality in the burden of taxation, and this equality of burden cannot exist without uniformity in the mode of assessment as well as in the rate of taxation." *Exchange Bank of Columbus* v. *Hines,* 3 Ohio St. 1.

If we now look at the scheme of taxation prescribed by the constitution of California for the property of

railroad companies, we shall [**21] perceive a flagrant departure from the rule of equality and uniformity so essential to equality in the distribution of the burdens of government. Whenever an individual holds property incumbered with a mortgage he is assessed at its value, after deducting [*736] from it the amount of the mortgage. If a railroad company holds property subject to a mortgage, it is assessed at its full value, without any deduction for the mortgage; that is, as though the property were unincumbered. The inequality and discriminating character of the procedure will be apparent by an illustration given by counsel. Suppose a private person owns a farm which is valued at $100,000, and is incumbered with a mortgage amounting to $80,000: he is, in that case, assessed at $20,000; if the rate of taxation be 2 per cent. he would pay $400 taxes. If a railroad corporation owns an adjoining tract worth $100,000, which is also incumbered by a mortgage for $80,000, it would be assessed for $100,000, and be required to pay $2,000 taxes, or five times as much as the private person. There is here a discrimination too palpable and gross to be questioned, and such is the nature of the discrimination made against [**22] the Southern Pacific Railroad Company in the taxation of its property. Nothing can be clearer than that the rule of equality and uniformity is thus entirely disregarded.

The case of *People* v. *Weaver,* 100 U.S. 539, decided by the supreme court, respecting the taxation of shares of the national banks, may be cited in this connection. Without the permission of congress, the shares of these banks could not be taxed by the states. Congress gave the permission on condition that the taxation should not be at a greater rate than is assessed on other moneyed capital in the hands of individual citizens of the state, and that the shares owned by non-residents of the state should be taxed at the place where the bank is located. Rev. St. § 5219. In the case cited the court held, with regard to such taxation:

(1) That the prohibition imposed by congress against discrimination had reference to the entire process of assessment, and included the valuation of the shares as well as the rate of percentage charged; (2) that a statute of New York which established a mode of assessment by which such shares were valued higher in proportion to their real value than other moneyed capital, [**23] was in conflict with the prohibition, although the same percentage on such valuation was levied; and (3) that a statute which permitted a party to deduct his debts from

the valuation of his personal property, except so much as consisted of those shares, taxed the shares at a greater rate than other moneyed capital.

The assessment thus held to be a discrimination against the shares of national banks in the taxation system of New York is similar to what we hold to be a discrimination against the property of railroad corporations in the taxation system of California.

[*737] In the case of the *Evansville Bank* v. *Britton,* decided at the last term of the supreme court, the doctrine of the *Weaver Case* was affirmed, and it was held that the taxation of shares in the national banks, under the revenue laws of Indiana, without permitting the shareholder to deduct from their assessed value the amount of his *bona fide* indebtedness, which was allowed in the case of other investments of moneyed capital, was a discrimination against the act of congress and illegal. 105 U.S. 322.

It is no answer to this discrimination to say that property in the state may be divided into [**24] classes, and different rates prescribed for them. Undoubtedly [HN9] property may be classified for purposes of taxation. Real property may be subjected to one rate of taxation; personal property to another rate. Property in particular districts may be taxed for local purposes, while property elsewhere may be exempt. Taxation on business in the form of licenses may also vary according to the calling or occupation licensed, and the extent of business transacted, but even then there must be uniformity of charges with respect to the same calling or occupation in the same locality. It is, however, only with the taxation of property that we are concerned in this case, and the whole object of classifying property is that each class may be subjected to a special rate of taxation. There is no difference in the rate prescribed by the law of the state for the property of railroad corporations, and the rate prescribed for the property of individuals. There is only one rate for all property. There is, therefore, no case presented for the application of the doctrine of classification. The discrimination complained of arises from the different rule adopted in ascertaining the value of the property [**25] of railroad corporations as a basis for taxation, not from any different rate of taxation when the value is established. In all taxes upon property, whatever its form or nature, the property is taken as representing a pecuniary value; as standing for so much money invested. The tax is the rate per centum of this

pecuniary value. The value being ascertained, the law fixes the rate. The ground of complaint here is that the law requires a higher value to be placed upon the defendant's property than upon the property of individuals similarly incumbered, or rather requires the assessor of the defendant's property, in estimating its value, to disregard and set aside certain elements materially affecting its amount, which are to be considered in estimating the value of the property of individuals. It is not classifying property to make this distinction in determining its value. It [*738] is not classifying property to provide that the property of certain parties, which has a mortgage upon it, shall be assessed at its value after deducting the mortgage; and that the property of other parties, also having a mortgage upon it, shall be taxed at its full value without any deduction. [**26] That is not providing for a different rate of taxation for different kinds of property, but for unequal taxation according to the character of the owner.

Is the defendant, being a corporation, a person within the meaning of the fourteenth amendment, so as to be entitled, with respect to its property, to the equal protection of the laws? The learned counsel of the plaintiff, and attorney general of the state, take the negative of this question, and assert with much earnestness that the amendment applies, and was intended to apply, only to the newly-made citizens of the African race, and should be limited to their protection.

It is undoubtedly true that the amendment had its origin in a purpose to secure to these newly-made citizens the full enjoyment of their freedom. When the amendment abolishing slavery and involitary servitude was adopted, there were men in congress who believed that it was intended to make every one born within the United States a freeman, and as such to give to him the right to pursue his happiness, in the ordinary vocations of life, subject to no restraint except such as affects others, and to enjoy equally with them the fruits of his labor. They therefore [**27] proposed the civil-rights bill, and secured its passage, the substantial provisions of which we have stated. Notwithstanding this expression of the national legislature as to the purpose of the amendment, the newly-made citizens were subjected in several of the states to various disabilities and burdens, and curtailed of their rights to such an extent that their freedom became of little value. To quote from the opinion of Mr. Justice Miller, speaking for the court, in the *Slaughter-house Cases:*

"They were in some states forbidden to appear in the towns in any other character than as menial servants. They were required to reside on and cultivate the soil without the right to purchase or own it. They were excluded from many occupations of gain and hire, and were not permitted to give testimony in the courts in any case where a white man was a party. It was said that their lives were at the mercy of bad men, either because the laws for their protection were inefficient, or were not enforced." 16 Wall. 70.

There was probably much exaggeration in what was reported of their treatment, but the statements made produced a profound impression upon congress. The validity of the [**28] civil-rights act was also [*739] called in question, and in some instances was adjudged by state courts to be invalid. Reports also prevailed that loyal men of the south were treated with exceptional harshness, and that men from the north seeking residence there were met with marked hostility and aversion. It is not surprising that such was the fact, for notwithstanding the fiery courage and martial spirit of her people, their battalions had gone down before the forces of the Union. With the sound of the tread of the victorious army still ringing in their ears; with the desolations of was all around them, and the sudden rupture of their social relations by the emancipation of their former slaves, -- it would have been a miracle if bitterness towards their recent foes had not lingered in their hearts and been exhibited in their conduct. A proud and brave people feel more keenly than others the sting of defeat. Undoubtedly much misconception and falsehood were mingled with the statements made respecting their action; nevertheless they led to the introduction into congress of the proposition for the fourteenth amendment. The discussion which followed, indicated that the purpose [**29] of its framers and advocates was to obviate objections to legislation similar to that contained in the first section of the civil-rights act, and to prevent for the future the possibility of any discriminating and hostile state legislation against any one.

Mr. Stevens, of the house of representatives, in presenting the proposition, after stating the provisions of the first section, said:

"I can hardly believe that any person can be found who will not admit that every one of these provisions is just. They are all asserted in some form or other in our declaration or organic law. But the constitution limits

only the action of congress, and is not a limitation on the states. This amendment supplies that defect, and allows congress to correct the unjust legislation of the states so far *that the law which operates upon one man shall operate equally upon all."*

In reply to an objection that the first section of the amendment was in substance the civil-rights bill, which congress had passed over the president's veto, and that by voting to so amend the constitution as to put the bill into it was to admit that the bill was unconstitutional, Mr. Garfield, then also a member of the [**30] house, said:

"We propose to lift that great and good law above the reach of political strife, beyond the reach of plots and machinations of any party, and fix it in the serene sky, in the eternal firmament of the constitution, where no storm of passion can skake it and no cloud can obscure it. For this reason, and not because I believe the civil-rights bill unconstitutional, I am glad to see that first section here."

[*740] Though the occasion of the amendment was the supposed denial of rights in some states to newly-made citizens of the African race, and the supposed hostility to Union men, the generality of the language used extends the protection of its provisions to persons of every race and condition against discriminating and hostile state action of any kind. Its effect in preserving free institutions, and preventing harsh and oppressive state legislation, can hardly be overstated. When burdens are placed upon particular classes or individuals, while the majority of the people are exempted, little heed may be paid to the complaints of those affected. Oppression thus becomes possible and lasting. But a burdensome law operating equally upon all will soon create a [**31] movement for its repeal. With the amendment enforced, a bad or an oppressive state law will not long be left on any statute book.

The argument that a limitation must be given to the scope of this amendment because of the circumstances of its origin is without force. Its authors, seeing how possible it was for the states to oppress without relief from the federal government, placed in the constitution an interdict upon their action which makes lasting oppression of any kind by them under the form of law impossible.

[HN10] The amendment prohibiting slavery and involuntary servitude, except as a punishment for crime, had its origin in the provious existence of African

slavery. But the generality of its language makes its prohibition apply to slavery of white men as well as that of black men; and also to serfage, vassalage, villenage, peonage, and every other form of compulsory labor to minister to the pleasure, caprice, vanity, or power of others.

The provision of the constitution prohibiting legislation by states impairing the obligation of contracts had its origin in the existence of tender laws, appraisement laws, stay laws, and installment laws passed by the states soon after the [**32] revolution, when their finances were embarrassed and their people were overwhelmed with debts. These laws, according to Story, prostrated all private credit and all private morals, and led to the adoption of the prohibition, by which such legislation was forever prevented. But in its construction the provision has not been limited to mere commercial contracts. In the *Dartmouth College Case* it was urged that the charter of the college was not a contract contemplated by the constitution, because no valuable consideration passed to the king as an equivalent for the grant, and that contracts merely voluntary were not [*741] within the prohibition. But Chief Justice Marshall, after showing that the charter was a contract upon a valuable consideration, said:

"It is more than possible that the preservation of rights of this description was not particularly in view of the framers of the constitution when the clause under consideration was introduced into that instrument. It is probable that interferences of more frequent recurrence, to which the temptation was stronger and of which the mischief was more extensive, constituted the great motive for imposing this restriction on [**33] the state legislatures. But although a particular and a rare case may not in itself be of sufficient magnitude to induce a rule, yet it must be governed by the rule when established, unless some plain and strong reason for excluding it can be given." And again: "The case being within the words of the rule, must be within its operation likewise, unless there be something in the literal construction so obviously absurd or mischievous, or repugnant to the general spirit of the instrument, as to justify those who expound the constitution in making it an exception." 4 Wheat. 644.

Following that authority, [HN11] we cannot adopt the narrow view for which counsel contend, and limit the application of the prohibition of the fourteenth

amendment to legislation touching members of the enfranchised race. It has a much broader operation. It does not, indeed, place any limit upon the subjects in reference to which the states may legislate. It does not interfere with their police power. Upon every matter upon which previously to its adoption they could act, they may still act. They can legislate now, as they always could, to promote the health, good order, and peace of the community; to develop [**34] their resources, increase their industries, and advance their prosperity; but it does require that in all such legislation hostile and partial discrimination against any class or person shall be avoided; that the state shall impose no greater burdens upon any one than upon others of the community under like circumstances, nor deprive any one of rights which others similarly situated are allowed to enjoy. It forbids the state to lay its hand more heavily upon one than upon another, under like conditions. It shands in the constitution as a perpetual shield against all unequal and partial legislation by the states, and the injustice which follows from it, whether directed against the most humble or the most powerful; against the despised laborer from China, or the envied master of millions.

The adoption of the federal constitution met, as all know, with most determined opposition from a large class who believed that the exercise of the powers delegated to the general government would eripple and embarrass the states in the administration of their local [*742] affairs. The dread of centralization disturbed the minds of some of the purest and greatest statesmen of the day. This [**35] feeling continued after the adoption of the constitution, and finally led to the first 10 amendments. The population of the country was sparse; each state afforded security to its people, and was to them the special object of attachment. They enjoyed under its laws protection in their property, in their homes, and in their business. They felt a natural distrust of a power wielded by officers not selected by themselves. They apprehended that the rights which they enjoyed might be encroached upon, if not destroyed. So the amendments proposed contained limitations upon the powers of congress, many of which were, indeed, unnecessary, but were adopted in order to prevent "misconception or abuse of the powers of the general government." They declared, among other things, that certain liberties should not be abridged, such as the free exercise of religion, the freedom of speech and of the press; that certain rights should not be taken away, such as the right of the people to peaceably assemble and petition for a redress of grievances, and to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures; that certain securities against wanton prosecution [**36] for public offenses should not be withdrawn, such as that no person should be held to answer for a felony except upon the presentment or an indictment of a grand jury; that in all prosecutions the accused should have the benefit of a speedy trial; should be informed of the nature and cause of the accusation; should be confronted with the witnesses against him; should have compulsory process for obtaining witnesses, and the assistance of counsel; that certain guaranties against oppression of person and spoliation of property should not be violated, such as afford protection against the deprivation of life, liberty, and property without due process of law, and the taking of private property by the public without compensation; that the enumeration in the constitution of certain rights should not be construed to deny or disparage others retained by the people; and that the powers not delegated to the United States by the constitution, nor prohibited by it to the states, were reserved to the states, respectively, or to the people. These were all restraints upon the general government. Had the population of the United States continued as sparse as when the constitution was formed, and [**37] the means of more rapid intercourse between the states had not been invented, it is possible that further amendments to the constitution would not have been demanded. But the immense development of the resources of the country, the [*743] great increase of population, the constant intercourse between the states by steamer, railway, and telegraph, changed the business and commercial relations of the states to each other, and led the people of one section to seek a closer union, and to desire a greater authority to be exercised by the central government, while the peculiar institutions of the other section, and the different industries they developed, led its people to desire to limit, rather than to strengthen, the central authority. Differences of opinion in matters of internal policy, and the estrangement engendered by controversies growing out of the existence of slavery in some of the states, ultimately culminated in civil war. Men then saw that danger was to be apprehended in a direction opposite to that which led to the original amendments. Restraints upon the power and action of the states were therefore suggested, and to impose them and to abolish slavery, the great [**38] cause of the civil conflict, the new amendments -- the thirteenth, fourteenth, and fifteenth -- were adopted.

"While, therefore," to quote the language of an admirable writer and eminent jurist, Judge Cooley, "the first amendments were for the purpose of keeping the central power within due limits, at a time when the tendency to centralization was alarming to many persons, the last were adopted to impose new restraints on state sovereignty, at a time when state powers had nearly succeeded in destroying the national sovereignty. Of these amendments it may be safely affirmed that the first ten took from the Union no power it ought ever to have exercised, and that the last three required of the states the surrender of no power which any free government should ever employ."

It would tend, therefore, to defeat the great purposes of the late amendments, if to any of them we should give the narrow construction for which counsel contend.

Private corporations are, it is true, artificial persons, but with the exception of a sole corporation, with which we are not concerned, they consist of aggregations of individuals united for some legitimate business. In this state they are formed [**39] under general laws; and the Civil Code provides that they "may be formed for any purpose for which individuals may lawfully associate themselves." Any five or more persons may by voluntary association form themselves into a corporation. And, as a matter of fact, nearly all enterprises in this state, requiring for their execution an expenditure of large capital, are undertaken by corporations. They engage in commerce; they build and sail ships; they cover our navigable streams with steamers; they construct houses; they bring the products of earth and sea to market; they light our streets and buildings; they [*744] open and work mines; they carry water into our cities; they build railroads, and cross mountains and deserts with them; they erect churches, colleges, lyceums, and theaters; they set up manufactories, and keep the spindle and shuttle in motion; they establish banks for savings; they insure against accidents on land and sea; they give policies on life; they make money exchanges with all parts of the world; they publish newspapers and books, and send news by lightning across the continent and under the ocean. Indeed, there is nothing which is lawful to be done to feed [**40] and clothe our people, to beautify and adorn their dwellings, to relieve the sick, to help the needy, and to enrich and ennoble humanity, which is not to a great extent done through the instrumentalities of corporations. There are over 500 corporations in this state; there are 30,000 in the United States, and the aggregate value of their property is several thousand millions. * It would be a most singular result if a constitutional provision intended for the protection of every person against partial and discriminating legislation by the states, should cease to exert such protection the moment the person becomes a member of a corporation. We cannot accept such a conclusion. On the contrary, we think that it is well established by numerous adjudications of the supreme court of the United States and of the several states, that [HN12] whenever a provision of the constitution, or of a law, guaranties to persons the enjoyment of property, or affords to them means for its protection, or prohibits legislation injuriously affecting it, the benefits of the provision extend to corporations, and that the courts will always look beyond the name of the artificial being to the individuals whom it represents. [**41]

> * NOTE. The number of corporations here stated is much less than the number actually existing. There are over 5,000 corporations in California alone.

The case of the *Society for the Propagation of the Gospel in Foreign Parts* v. *Town of New Haven,* 8 Wheat. 464, furnishes an apt illustration of this doctrine. The sixth article of the treaty of peace with Great Britain of 1783 provided that there should be "no future confiscations made, nor any prosecutions commenced, against any person or persons for or by reason of the part which he or they may have taken in the present war, and that no person shall on that account suffer any future loss or damage, either in his person, liberty, or property." An English corporation claimed the benefit of this article with reference to certain lands in Vermont granted to it before the revolution, which the legislature of that state had undertaken to give to the [*745] town where they were situated. It was contended that the treaty only applied to natural persons; that it did not embrace corporations, because they were not persons who could take part in the war, or could be considered British subjects; but the position was held [**42] to be untenable. The court, speaking through Mr. Justice Washington, said that the argument proceeded upon an incorrect view of the subject, and referred to the case of *U.S.* v. *Devaux,* 5 Cranch, 86, to show that the court, when necessary, will look beyond the name of a corporation to reach and protect those whom it represents.

The constitution, in defining the judicial power of the United States, declares that it shall extend to "controversies between citizens of different states;" and in the case referred to by Mr. Justice Washington the question arose whether a corporation composed of citizens of one state could sue in the circuit court of the United States a citizen of another state, and it was held that it could. In deciding the question, the court, speaking through Chief Justice Marshall, said:

"However true the fact may be that the tribunals of the state will administer justice as impartially as those of the nation to parties of every description, it is not less true that the constitution itself either entertains apprehension on this subject, or views with such indulgence the possible fears and apprehensions of suitors, that it has established national tribunals [**43] for the decision of controversies between aliens and citizens, or between citizens of different states. Aliens or citizens of different states are not less susceptible of these apprehensions, nor can they be supposed to be less the objects of constitutional provision because they were allowed to sue by a corporate name. That name, indeed, cannot be an alien or a citizen, but the persons whom it represents may be the one or the other, and the controversy is, in fact and in law, between those persons suing in their corporate character, by their corporate names, for a corporate right, and the individual against whom the suit may be instituted. Substantially and essentially the parties in such a case, where the members of the corporation are aliens or citizens of a different state from the opposite party, come within the spirit and terms of the jurisdiction conferred by the constitution on the national tribunals. Such has been the universal understanding on the subject. Repeatedly has this court decided causes between a corporation and an individual without feeling a doubt respecting its jurisdiction."

The same point was presented in another form in the case of *Marshall* v. [**44] *Baltimore & O.R. Co.* 16 How. 326. There the question was whether a citizen of one state could sue in the circuit court of the United States a corporation of another state, and a similar conclusion was reached. After referring to the clause of the constitution extending the judicial power of the United States to controversies between [*746] citizens of different states, the court proceeded to consider the objections urged to treating a corporation as a citizen, so far as it might be necessary to protect the corporators:

"A corporation," observed Mr. Justice Grier, speaking for the court, "it is said, is an artificial person, a mere legal entity, invisible and intangible. This is no doubt metaphysically true in a certain sense. The inference, also, that such an artificial entity 'cannot be a citizen' is a logical conclusion from the premises, which cannot be denied. But a citizen who has made a contract, and has a controversy with a corporation, may also say, with equal truth, that he did not deal with a mere metaphysical abstraction, but with natural persons; that his writ has not been served on an imaginary entity, but on men and citizens; and that his contract was made [**45] with them as the legal representatives of numerous unknown associates, or secret and dormant partners.

"The necessities and conveniences of trade and business require that such numerous associates and stockholders should act by representation, and have the faculty of contracting, suing, and being sued in a ficititious or collective name. But these important faculties, conferred on them by state legislation, for their own convenience, cannot be wielded to deprive others of acknowledged rights. It is not reasonable that those who deal with such persons should be deprived of a valuable privilege by a syllogism, or rather sophism, which deals subtly with words and names, without regard to the things or persons they are used to represent."

The fifth amendment to the constitution declares that --

[HN13] "No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall he be compelled in any [**46] criminal case to be a witness against himself, nor be deprived of life, liberty, or property without due process of law; nor shall private property be taken for public use without just compensation."

From the nature of the prohibitions in this amendment it would seem, with the exception of the last one, as though they could apply only to natural persons. No others can be witnesses; no others can be twice put in jeopardy of life or limb, or compelled to be witnesses against themselves; and therefore it might be said with much force that the word "person," there used in

connection with the prohibition against the deprivation of life, liberty, and property without due process of law, is in like manner limited to a natural person. But such has not been the construction of the courts. A similar provision is found in nearly all of the state constitutions; and everywhere, and at all times, and in all courts, it has been held, either by tacit assent or express adjudication, to extend, so far as their property is concerned, [*747] to corporations. And this has been because the property of a corporation is in fact the property of the corporators. [HN14] To deprive the corporation of its [**47] property, or to burden it, is, in fact, to deprive the corporators of their property or to lessen its value. Their interest, undivided though it be, and constituting only a right during the continuance of the corporation to participate in its dividends, and on its dissolution to receive a proportionate share of its assets, has an appreciable value, and is property in a commercial sense, and whatever affects the property of the corporation necessarily affects the commercial value of their interests. If, for example, to take the illustration given by counsel, a corporation created for banking purposes acquires land, notes, stocks, bonds, and money, no stockholder can claim that he owns any particular item of this property, but he owns an interest in the whole of it which the courts will protect against unlawful seizure or appropriation by others, and on the dissolution of the company he will receive a proportionate share of its assets. Now, if a statute of the state takes the entire property, who suffers loss by the legislation? Whose property is taken? Certainly, the corporation is deprived of its property; but at the same time, in every just sense of the constitutional guaranty, [**48] corporations are also deprived of their property.

The prohibition against the deprivation of life and liberty in the same clause of the fifth amendment does not apply to corporations, because, as stated by counsel, the lives and liberties of the individual corporators are not the life and liberty of the corporation.

[HN15] Nor do all the privileges and immunities of citizenship attach to corporations. These bodies have never been considered citizens for any other purpose than the protection of the property rights of the corporators. The *status* of citizenship, entitling the citizen to certain privileges and immunities in the several states, does not belong to corporations. The special privileges which citizens acquire by becoming incorporated in one state cannot, therefore, be exercised in another state without the latter's consent, as was held in *Paul* v. *Virginia,* 8 Wall. 168, although such consent will generally be presumed in the absence of positive prohibition.

Decisions of state courts, in harmony with the views we have expressed, exist in great numbers. But it is unnecessary to cite them. It is sufficient to add that in all text writers, in all codes, and in all [**49] revised statutes, it is laid down that [HN16] the term "person" includes, or may include, corporations; which amounts to what we have already said, that whenever it is necessary for the protection of contract or property [*748] rights, the courts will look through the ideal entity and name of the corporation to the persons who compose it, and protect them, though the process be in its name. All the guaranties and safeguards of the constitution for the protection of property possessed by individuals may, therefore, be invoked for the protection of the property of corporations. And as no discriminating and partial legislation, imposing unequal burdens upon the property of individuals, would be valid under the fourteenth amendment, so no legislation imposing such unequal burdens upon the property of corporations can be maintained. The taxation, therefore, of the property of the defendant upon an assessment of its value, without a deduction of the mortgage thereon, is to that extent invalid.

If there were no other objection to the assessment we might, perhaps, order judgment for the amount of taxes due upon the valuation of the property, after deducting therefrom the amount of the mortgage; [**50] but there is another objection, of equal significance, which goes to the validity of the whole assessment. No opportunity was afforded to the defendant to be heard respecting it before the state board of equalization. It was made by the board under the tenth section of article 13 of the constitution, which declares that [HN17] "the franchise, road-way, road-bed, rails, and rolling stock of all railroads operated in more than one county in this state shall be assessed by the state board of equalization at their actual value, and the same shall be apportioned to the counties, cities and counties, cities, towns, townships, and districts in which such railroads are located, in proportion to the number of miles of railway laid in such counties, cities and counties, towns, townships, and districts."

Other articles of the constitution, and laws supplementing their directions, provide for the assessment by county officers of all property except "the

franchise, road-way, road-bed, rails, and rolling stock" of railroads operated in more than one county, for a hearing by property holders respecting the assessment, and for its equalization by county boards. Ample security is thus afforded to individuals [**51] against erroneous and arbitrary assessments. But the assessment of the property mentioned, of railroads operated in more than one county, is placed entirely with the state board.

In *People* v. *Sup'rs of Sacramento County* the supreme court of the state said that --

"It is the manifest intent of the constitution that the valuation of the railroad property mentioned in section 10 of article 13 shall be finally fixed and determined by the state board of equalization. The state board has the [*749] exclusive power to assess and equalize its value. Thus the constitution furnishes a system for the assessment of railroads operated in more than one county, which is separate and distinct from that provided for the assessment of other property." And again: "The portion of the section quoted (the portion above) is clearly self-executing. We are at a loss to imagine how any statute could make the duty of the state board any clearer than does this distinct and positive mandate of the constitution. If any doubt could possibly be built upon the words cited ti would be dispelled by the first clause of the same section: 'All property, except as hereinafter in this section provided, [**52] shall be assessed in the county, city, city and county, town, township, or district in which it is situated, in the manner prescribed by law.' Thus by the very language of the constitution all other but the railroad property mentioned must be assessed by local assessors, in the manner prescribed by statute. The railroad property must be assessed in the manner prescribed by the section of the constitution, that is, by the state board, without the aid of statute." 8 Pac. Law J. 103.

The Political Code provides that the assessment shall be made by the state board on or before the first Monday in May of each year; that the president, secretary, cashier, or managing agent, or such officer of the corporation as the board may designate, shall furnish to the board, on or before the first Monday of April of the year, a statement, signed and sworn to by him, showing in detail the whole number of miles of railway owned, operated, or leased in the state by the corporation, and the value thereof per mile, and all its property of every kind located in the state, the number and value of its engines, passenger,

mail, express, baggage, freight, and other cars, or property used in operating or repairing [**53] the railway in the state, and on railways which are parts of lines extending beyond its limits, the amount of the rolling stock in use during the year, the annual gross earnings of the entire railway, and the proportionate annual gross earnings of the same in the state, and such other facts as the board may in writing require; and that if the officer or officers designated fail to make and furnish such statement, the board shall proceed to assess the property; and the valuation fixed shall be final and conclusive. The law also provides that the property shall be assessed at its actuul value; that the assessment shall be made of the entire railway in the state, including the right of way, road-bed, track, bridges, culverts, and rolling stock; that the state board shall transmit to the county assessor of each county through which the railway runs, a statement showing the length of its main track within the county, and its assessed value per mile, as fixed by a *pro rata* distribution per mile of the assessed value of the whole property; [*750] that this statement shall be entered on the assessment roll of the county, and that at their first meeting after its receipt by the county [**54] assessor the board of supervisors of the county shall cause an order to be entered in the proper record book stating the length of the main track and the assessed value of the railway lying in each city, town, township, school-district, or lesser taxing district in the county through which the railway runs, as fixed by the state board, which shall constitute the taxable value of the property for taxable purposes in the district, and that such property shall be taxed at the same rates as the property of individuals.

We have no doubt that further legislation might have been adopted providing for notice the the company, and a system of procedure by which it might have been heard respecting the assessment. We do not understand that the supreme court of the state intended by the decision cited to hold that the tenth section of the thirteenth article is self-executing, except to the extent that it vests complete power in the state board to make the assessment of the property; not that legislation may not be had providing for the mode in which the powers of the board shall be exercised. Indeed, the concluding section of the article authorizes any legislation necessary to give effect to [**55] its provisions. Unfortunately, no such legislation has been had. The attempted legislation failed, because it did not receive in the legislature the constitutional majority, as is clearly shown by the circuit judge in his

opinion. It is unnecessary to go over the ground he has completely covered.

[HN18] The presentation to the state board by the corporation of a statement of its property and of its value, which it is required to furnish, is not the equivalent to a notice of the assessment made and of an opportunity to be heard thereon. It is a preliminary proceeding, and until the assessment the corporation cannot know whether it will have good cause of complaint. No hearing upon the statement presented is allowed, and when the assessment is made the matter is closed; no opportunity to correct any errors committed is provided. The presentation of the statement can no more supersede the necessity of allowing a subsequent hearing of the owners, than the filing of a complaint in court can dispense with the right of the suitor and his contestant to be there heard.

There being, then, no provision of law giving to the company notice of the action of the state board, and an opportunity [**56] to the heard respecting it, is the assessment valid? Would the taking of the company's [*751] property in the enforcement of the tax levied according to the assessment be depriving it of its property without due process of law? It seems to us there can be but one answer to these questions. There is something repugnant to all notions of justice in the doctrine that any body of men can be clothed with the power of finally determining the value of another's property, according to which it may be taxed, without affording to him an opportunity of being heard respecting the correctness of their action. And the injustice is strikingly apparent when the property consists of the great number of particulars which go to make up the taxable estate of a railroad company, requiring for any just estimate of their value accurate knowledge upon a multitude of subjects, not usually possessed without special study. We cannot assent to any such doctrine. It conflicts with the great principle which lies at the foundation of all just government, that no one shall be deprived of his life, his liberty, or his property without an opportunity of being heard against the proceeding. The principle [**57] is as old as *Magna Charta,* and is embodied in all the state constitutions, and in the fourteenth amendment of the federal constitution. [HN19] The provision in this amendment is in the form of an interdict upon the states -- "Nor shall any state deprive any person of life, liberty, or property without due process of law." And by due process is meant one which, following the forms of law, is appropriate to the case, and just to the parties to be

affected. It must be pursued in the ordinary mode prescribed by the law; it must be adapted to the end to be attained; and it must give to the party to be affected an opportunity of being heard respecting the justice of the judgment sought. Without these conditions entering into the proceeding, it would be anything but due process. If it touched life or liberty, it would be wanton punishment, or rather wanton cruelty; if it touched property, it would be arbitrary exaction. It is significant that the guaranty against the deprivation of property without due process of law is contained in the clause which guaranties against a like deprivation of life and liberty; and it means that there shall be no proceeding against either without the observance [**58] of all the securities applicable to the case recognized by the general law, by those principles which are established in all constitutional governments for the protection of private rights. Notice is absolutely essential to the validity of the proceeding in any case; it may be given by personal citation, and in some cases it may be given by statute; but given it must be in some form. If life and liberty are involved, there [*752] must be a regular course of judicial proceedings; so, also, where title or possession of property is in contention. But [HN20] in the taking of property by taxation the proceeding is more summary and stringent. The necessities of revenue for the support of government will not admit of the delays attendant upon judicial proceedings in the courts of justice. The statute fixes the rate of taxation upon the value of the property, and appoints officers to estimate and appraise the value. Due process of law in the proceeding is deemed to be pursued, when, after the assessment is made by the assessing officers upon such information as they may obtain, the owner is allowed a reasonable opportunity, at a time and place to be designated, to be heard respecting the [**59] correctness of the assessment, and to show any errors in the valuation committed by the officers. Notice to him will be deemed sufficient, if the time and place of hearing be designated by statute. But whatever the character of the proceeding, whether judicial or administrative, summary or protracted, and whether it takes property directly, or creates a charge or liability which may be the basis of taking it, the law directing the proceeding must provide for some kind of notice, and offer to the owner an opportunity to be heard, or the proceeding will want the essential ingredient of due process of law. Nothing is more clearly established by a weight of authority absolutely overwhelming than that notice and opportunity to be heard are indispensable to the validity of the proceeding.

In *Davidson* v. *New Orleans* the supreme court of the United States assumed this position to be unquestionable. In that case an assessment levied on certain real estate in New Orleans for draining the swamps of that city was resisted on the ground that the proceeding deprived the owners of their property without due process of law; and the court refused to disturb it for the reason that the [**60] owners of the property had notice of the assessment and an opportunity to contest it in the courts. After stating that much misapprehension prevailed as to the meaning of the terms "due process of law," and that it would be difficult to give a definition which would be at once perspicuous, comprehensive, and satisfactory, the court, speaking through Mr. Justice Miller, said that it would lay down the following proposition as applicable to the case:

"That whenever by the laws of a state, or by state authority, a tax, assessment, servitude, or other burden is imposed upon property for the public use, whether it be for the whole state or of some more limited portion of the community, and those laws provide for a mode of confirming or contesting the charge [*753] thus imposed, in the ordinary course of justice, with notice to the person, or such proceeding in regard to the property as is appropriate to the nature of the case, the judgment in such proceedings cannot be said to deprive the owner of his property without due process of law, however obnoxious it may be to other objections." 96 U.S. 104.

In *Stuart* v. *Palmer* the meaning of these terms is elaborately considered [**61] by the court of appeals of New York with reference to numerous adjudications on the subject. In that case a law of the state imposed an assessment on certain real property for a local improvement without notice to the owner, and a hearing or an opportunity to be heard by him, and the court held that it had the effect of depriving him of his property without due process of law, and was therefore unconstitutional. Mr. Justice Earl, speaking for the court, said:

"I am of the opinion that the constitution sanctions no law imposing such an assessment without a notice to, and a hearing, or an opportunity of hearing, by the owners of the property to be assessed. It is not enough that the owners may by chance have notice, or that they may, as a matter of favor, have a hearing. The law must require notice to them, and give them the right to a hearing, and an opportunity to be heard. It matters not,

upon the question of the constitutionality of such a law, that the assessment has in fact been fairly apportioned. The constitutional validity of a law is to be tested, not by what has been done under it, but what may, by its authority, be done. The legislature may prescribe the kind of [**62] notice, and the mode in which it shall be given, but it cannot dispense with all notice." And, again, that "no case, it is believed, and be found in which it was decided that this constitutional guaranty [against depriving one of his property without due process of law] did not extend to cases of assessments; and yet we may infer, from certain *dicta* of judges, that their attention was not called to it, or that they lost sight of it in the cases which they were considering. It has sometimes been intimated that a citizen is not deprived of his property, within the meaning of this constitutional provision, by the imposition of an assessment. It might as well be said that he is not deprived of his property by a judgment entered against him. A judgment does not take property until it is enforced, and then it takes the real or personal property of the debtor. So an assessment may generally be enforced, not only against the real estate upon which it is a lien, but, as in this case, against the personal property of the owner also; and by it he may just as much be deprived of his property, and in the same sense, as the judgment debtor is deprived of his by the judgment." 74 N.Y. 188, [**63] 195.

We concur fully in the views thus forcibly expressed.

It remains to consider the last position of counsel, that the provisions of article 13 of the constitution of the state, as to the taxation [*754] of railroad property, are to be treated as conditions upon the continued existence of railroad corporations. On the hearing, this position seemed to us to possess some force, but on careful consideration its supposed force is dissipated. The argument is that on the original creation of the corporation the state might have imposed any conditions whatever as to the manner and the amount in which its property should be taxed; that under the reserved power of amendment of the law creating the corporation, the state could at any time afterwards impose such a condition; that the new constitution, in continuing the defendant and other railroad corporations in existence, and at the same time authorizing the taxation of their property upon a valuation different from that at which the property of individuals is assessed, imposed that condition upon them, and that the subsequent exercise of its franchises by the defendant implies an assent to such

condition.

There are two answers [**64] to this argument. In the first place, article 13 [HN21] is not intended to make any change in the powers or rights of corporations under the laws of the state. It treats entirely of revenue and taxation, and of the rules which shall govern the assessment of the property of individuals, and of railroad and other *quasi* public corporations. It is in another article that provisions are made for the control of railroad corporations; and the duties and responsibilities of corporations generally, and the power of the state over them, are declared.

In the second place, [HN22] the state, in the creation of corporations, or in amending their charters, or rather in passing or amending general laws under which corporations may be formed and altered, possesses no power to withdraw them when created, or by amendment, from the guaranties of the federal constitution. It cannot impose the condition that they shall not resort to the courts of law for the redress of injuries or the protection of its property; that they shall make no complaint if their goods are plundered and their premises invaded; that they shall ask no indemnity if their lands be seized for public use, or be taken without due process of [**65] law, or that they shall submit without objection to unequal and oppressive burdens arbitrarily imposed upon them; that, in other words, over them and their property the state may exercise unlimited and irresponsible power. Whatever the state may do, even with the creations of its own will, it must do in subordination to the inhibitions of the federal constitution. It may confer, by its general laws, upon corporations certain capacities of [*755] doing business, and of having perpetual succession in their members. It may make its grant in these respects revocable at pleasure; it may make the grant subject to modifications and impose conditions upon its use, and reserve the right to change these at will. But whatever property the corporations acquire in the exercise of the capacities conferred, they hold under the same guaranties which protect the property of individuals from spoliation. It cannot be taken for public use without compensation. It cannot be taken without due process of law, nor can it be subjected to burdens different from those laid upon the property of individuals under like circumstances.

The state grants to railroad corporations formed under its laws a [**66] franchise, and over it retains control, and may withdraw or modify it. By the reservation clause it retains power only over that which it grants; it does not grant the rails on the road; it does not grant the depots along-side of it; it does not grant the cars on the track, nor the engines which move them, and over them it can exercise no power except such as may be exercised through its control over the franchise, and such as may be exercised with reference to all property used by carriers for the public. The reservation of power over the franchise, -- that is, over that which is granted, -- makes its grant a conditional or revocable contract, whose obligation is not impaired by its revocation or change. The supreme court established, in the *Dartmouth College Case,* that [HN23] the charter of a private corporation is a contract between the corporators and the state, and that it was, therefore, within the prohibition of the federal constitution against the impairment of contracts. To avoid this result the states have generally inserted clauses in their constitutions reserving a right to repeal, alter, or amend charters granted by their legislatures, or to repeal, alter, or amend the [**67] general laws under which corporations are allowed to be formed. The reservation relates only to the contract of incorporation, which, without such reservation, would be irrepealable. It removes the impediment to legislation touching the contract. It places the corporation in the same position it would have occupied had the supreme court held that charters are not contracts, and that laws repealing or altering them did not impair the obligation of contracts. The property of the corporation, acquired in the exercise of its faculites, is held independently of such reserved power, and the state can only exercise over it the control which it exercises over the property of individuals engaged in similar business.

The case of *Detroit* v. *Detroit & Howell Plank-road Co.,* in the [*756] supreme court of Michigan, is in point on both of the propositions stated. An act of the legislature of the state, amending the charter of the company, required it to remove without the limits of the city of Detroit a toll-gate on its road, then within the limits. The effect of the act was to take from the company about two and a half miles of its road, upon which it collected tolls. The [**68] act under which the company was incorporated reserved a power in the legislature to repeal and amend it at any time, and the question was whether, under this reservation, the legislature could require the removal of the toll-gate out of the city; and it was held that it could not. Ordinarily a law requiring the removal of a toll-gate from one place to another on a road would be a mere police regulation, but

here it was something more; it deprived the company of compensation for the use of its road within the city limits; that is, for a large part of the travel over it. The court, speaking through Mr. Justice Cooley, observed that there were cases in which amendments to charters having some resemblance to this had been sustained, and cited several which involved a mere police regulation, such as requiring a railroad company to build a station-house and stop its trains at a certain locality; to permit and provide for the crossing of its track; and to unite with others in a common passenger station for trains entering a city.

"But [the court added] there is no well-considered case in which it has been held that a legislature, under its power to amend a charter, might take from a [**69] corporation any of its substantial property or property rights. In some cases the power has been denied, where the interest involved seemed insignificant. The case of *Albany, etc., R. Co.* v. *Brownell,* 24 N.Y. 345, is an illustration. It was there decided that although the legislature might require railroad companies to suffer highways to cross their tracks, they could not subject the lands which the companies had acquired for other purposes to the same burden, except in connection with the provision for compensation. The decision was in accord with that in *Com.* v. *Essex Co.* 13 Gray, 239, 253, in which, while the power to alter, amend, or repeal the corporate franchises was sustained, it was at the same time declared that 'no amendment or alteration of the charter can take away the property or rights which have become vested under a legitimate exercise of the powers granted.' The same doctrine is clearly asserted in *Railroad Co.* v. *Maine,* 96 U.S. 499, and is assumed to be unquestionable in the several opinions delivered in the *Sinking-fund Cases,* 99 U.S. 700.

"But for the provision of the constitution of the United States which forbids impairing the [**70] obligation of contracts, the power to amend and repeal corporate charters would be ample without being expressly reserved. The [*757] reservation of the right leaves the state where any sovereignty would be, if unrestrained by express constitutional limitations and with the powers which it would then possess. It might, therefore, do what it would be admissible for any constitutional government to do when not thus restrained, but it could not do what would be inconsistent with constitutional principles. And it cannot be necessary at this day to enter upon a discussion in denial of the right of the government to take from either individuals or corporations any property which they may rightfully have acquired. In the most arbitrary times such an act was recognized as pure tyranny, and it has been forbidden in England ever since *Magna Charta,* and in this country always. It is immaterial in what way the property was lawfully acquired, -- whether by labor in the ordinary avocations of life, by gift or descent, or by making profitable use of a franchise granted by the state; it is enough that it has become private property, and it is then protected by the 'law of the land.'" [**71] 43 Mich. 140-147; [S.C. 5 N.W. Rep. 275.]

We have already extended this opinion to a great length, and we do not think it necessary or important to notice other positions urged by counsel with great learning and ability against the validity of the taxes for which the present action is brought. We are satisfied that the assessment upon which they were levied is invalid and void, and judgment must be accordingly entered on the demurrer for the defendant, and, by stipulation of parties, the judgment must be made final.

**CONCUR BY:** SAWYER

**CONCUR**

SAWYER, C.J., *concurring.* The facts of this case are fully stated by Mr. Justice FIELD, and need not be repeated here. The questions presented are of the gravest character, and of the utmost importance to the people of California. While I concur, generally, in the conclusions, and in the line of argument adopted by my associate, I shall also state as briefly as I reasonably can, considering the gravity of the questions discussed, my conclusions upon the points involved.

1. In my judgment, the word "person," in the clause of the fourteenth amendment to the national constitution, "No state shall * * * deprive any person of life, liberty, or [**72] property without due process of law, nor deny to any *person* the equal protection of the law," includes a private corporation. It must, at least, through the corporation include the natural persons who compose the corporation, and who are the beneficial owners of all the property, the technical and legal title to which is in the corporation in trust for the corporators. The fact that the corporators are united into an ideal legal entity, called a corporation, does not prevent them from [*758] having a right of property in the assets of the corporation which is entitled to the protection of this clause of the constitution. Nor does the intervention of this artificial

being between the real beneficial owners and the state, for the simple purpose of convenient management of the business, enable the state, by acting directly upon the legal entity, to deprive the real parties beneficially interested of the protection of these important provisions. In the language of Mr. Pomeroy, one of the counsel, which I adopt:

"Whatever be the legal nature of a corporation as an artficial, metaphysical being, separate and distinct from the individual members, and whatever distinctions the [**73] common law makes, in carrying out the technical legal conception, between property of the corporation and that of the individual members, still, in applying the fundamental guaranties of the constitution, and in thus protecting the rights of property, these metaphysical and technical notions must give way to the reality. The truth cannot be evaded that, for the purpose of protecting rights, the property of all business and trading corporations is the property of the individual corporators. A state act depriving a business corporation of its property without due process of law, does, in fact, deprive the individual corporators of their property. In this sense, and within the scope of these grand safeguards of private rights, there is no real distinction between artificial persons, or corporations, and natural persons."

This principle is recognized, and the question settled for all time, in an early case by Chief Justice Marshall, in which he says:

"Aliens, or citizens of different states, are not less susceptible of these apprehensions, nor can they be supposed to be less the objects of constitutional provisions, because they are allowed to sue by a corporate name. That name, [**74] indeed, cannot be an alien or a citizen; but the persons whom it represents may be the one or the other; and the controversy is, in fact and in the law, between those persons suing in their corporate character by their corporate name for a corporate right, and the individuals against whom the suit may be instituted. Substantially and essentially the parties in such a case, where the members of the corporation are aliens or citizens of a different state from the opposite party, come within the spirit and terms of the jurisdiction conferred by the constitution on the national tribunals." *Bank U.S.* v. *Devaux,* 5 Cranch, 87.

It is upon this principle that the national courts have ever since entertained jurisdiction on the ground of citizenship of the corporators in cases wherein corporations are the parties to the record. The cases in the supreme court upon this point are numerous, and too familiar to require further citation.

In *Society, etc.,* v. *New Haven,* 8 Wheat. 464-489, it was held that a corporation was protected under the sixth article of the treaty with [*759] England, of 1783, which reads: "There shall be no confiscations made, nor any prosecutions commenced [**75] against any *person* or *persons* for or by reason of the part which he or they may have taken in the present war, and that no *person* shall, on that account, suffer any future loss or damage, either in person, liberty, or property," etc. The word "person" in the civil-rights act of congress of April 20, 1870, (17 St. 13,) was held on the circuit to include a corporation. *N.W. Fert. Co.* v. *Hyde Park,* 3 Biss. 481.

In *Railroad Co.* v. *Richmond,* 96 U.S. 529, the supreme court assumes that a corporation is included in the word "person," as thus used in the fourteenth amendment.

The word "person" is, unquestionably, much broader in its signification than the word "citizen," and the change from the word "citizen," in the first clause of the section, to the word "person" of so much larger import, in the last, must have been well considered, and have been intended to extend the shield of the constitution to all cases which might require the protection of this wholesome and greatly-needed guaranty. There is nothing in the context to indicate a purpose to limit the meaning of the word "person" to a narrower sense than the word ordinarily and naturally imports, or [**76] to make the application of the provision partial only. To exclude corporations from its import, would be to leave, perhaps, at this day, the far larger portion of the vast capital of the country employed in great enterprises, either commercial, manufacturing, mining, or otherwise, beyond the pale of its protection. There is no good reason for excluding the plroperty of corporations from the same protection extended to other property. It is subject to all the burdens, and it should be entitled to all the immunities, of other property. It is, at last, the property of natural persons. The provision is protective and remedial, not punitive in character, and should, therefore, be *liberally,* not *strictly,* construed. No restriction should be put upon the term not called for by the exigencies of the case, or by the public interest; and it must be manifest that the public interest requires that the broadest signification should be adopted.

Blackstone treats of corporations under the head of

"Rights of Persons;" chapter 18 under this head being devoted to the subject. He says: "Persons, also, are divided by law into either natural persons or artificial;" giving a definition [**77] of each. Book 1, p. 123. So, also, does Kent, (2 Kent, 316.)

In *U.S.* v. *Amedy,* 11 Wheat, 412, wherein a person was indicted, under an act of congress, for destroying a vessel belonging to a corporation, [*760] the supreme court held that a corporation is a person within the meaning of the act. The court, among other things, says: "The mischief intended to be reached by the statute is the same, whether it respects private or corporate persons. That corporations are in law, for civil purposes, deemed persons is unquestionable." And the court in this case holds the same for criminal purposes also; and in criminal cases statutes are *strictly* construed. So, in regard to the provisions of the fourteenth amendment under consideration, "the mischief intended to be reached" by the amendment, "is the same, whether it respects private or corporate persons." See, also, cases cited in the opinion. The authorities to a similar effect are numerous. See, as examples, *People* v. *Ins. Co.* 15 Johns. 588; *Planters' Bank* v. *Andrews,* 8 Porter, 404; Kyd, Corp. 15; *Douglas* v. *P.M.S. Co.* 4 Cal. 304; *State* v. *Nash. University,* 4 Humph. 166. There are [**78] many other cases affording support, more or less direct, to this view.

In *Ins. Co.* v. *New Orleans,* 1 Woods, 85, it was held on the circuit that a corporation is not embraced in the word "person," as used in the amendment under consideration, and the supreme court of California, upon the authority of that case, made a similar ruling in *C.P.R. Co.* v. *State Bd. of Equalization,* 8 Pac. Coast Law J. 1155. But notwithstanding their high character for ability, and my respect for the decisions of the judges taking that view, I am compelled to adopt a different conclusion. I think, both upon reason and authority, that the other is the better view. Again, with respect to corporate property, I adopt the language of counsel, which expresses my view accurately and clearly:

"The property of the corporation is in reality the property of its individual corporators. A state statute depriving a corporation of its property does deprive the individual corporators of their property. These clauses of the fifth and fourteenth amendments, ans the similar clauses of the state constitution, apply, therefore, to private corporations, not alone because such corporations are 'persons,' [**79] within the meaning of that word, but also because statutes violating their prohibitions, in dealing with corporations, must necessarily infringe upon the rights of natural persons. In applying and enforcing these constitutional guaranties, corporations cannot be separated from the natural persons who compose them."

It is upon this principle that the decision in *Dodge* v. *Woolsey,* 18 How. 331, rests, which establishes the right of stockholders to maintain a suit against the directors of the corporation and state officers to restrain the payment by the one, and the collection by the other, of a tax illegally assessed against the corporation. See, also, *Marshall* [*761] v. *B. & O.R. Co.* 16 How. 327. But a corporation itself is, in my judgment, a "person," within the meaning of the constitutional provision in question. Such has been the ruling in all cases under statutes containing the word "person," unless the context clearly indicated a more limited signification.

2. I shall not spend much time in discussing the question whether the fourteenth amendment applies only to the African race. Undoubtedly, the negro furnished the immediate occasion and motive for [**80] adoption of the amendment; but its benefits could not have been intended to be limited to the negro. The protection afforded is as important to others as to him, as is clearly shown by experience under this provision. A whole race, not african, large numbers of whom came to our shores under the solemn guaranties of stipulations in a treaty suggested and sought, and in a great part framed, by ourselves, to promote our then supposed interests, were amoung the first to invoke this very provision of the fourteenth amendment to protect them, under the word "person," in the right to earn an honest living, by honest labor; and its protecting power was not invoked in vain. *Parrott's Chinese Case,* 6 Sawy. 349; *In re Ah Chong, (Chinese Fisherman Case,)* Id. 451. Who, in view of past experience, shall say there was no occasion to extend the signification of the word "person" beyond the negro? And are all other races, including our own, to be now withdrawn from its protecting power by so narrow and unnatural a construction. I apprehend not. It the line cannot be drawn at the negro, then no other can be adopted that will not embrace every human being in his individual character, or [**81] in his legal association with his fellows, for the more convenient administration of his property, and more successful pursuit of happiness. I apprehend that it would have struck the world with some astonishment, when this amendment was proposed to the people of the United States for adoption, if it had

read: "Nor shall any state deprive any person of the *negro race* of life, liberty, or property without due process of law; nor deny to any person of the *negro race* within its jurisdiction the equal protection of the laws." Yet so it must, in effect, be read if its operation is to be limited to that race. The rights of the negro are, certainly, no more sacred or worthy of protection than the rights of the Caucasian or other races; and the security of the rights of corporations, and, through them, the rights of the real parties, -- the corporators, -- is as of great public importance as the security of any other private interests.

[*762] 3. Does the assessment in question, made in strict pursuance of the provisions of the constitution of California, violate that clause of the fourteenth amendment of the national constitution which says that no state "shall deprive any [**82] person of life, liberty, or property without due process of law?"

The provision of the state constitution under which the assessment was made is as follows:

"The franchise, road-way, road-bed, rails, and rolling stock of all railroads operated in more than one county in this state shall be assessed by the state board of equalization at their actual value, and the same shall be apportioned to the counties, cities and counties, cities, towns, townships, and districts in which such railroads are located, in proportion to the number of miles of roadway laid in such counties, cities and counties, cities, towns, townships, and districts."

This is the only provision affecting this question.

To take one's property by taxation is to take or deprive one of his property; and if not taken in pursuance of the law of the land -- in some due and recognized course of proceedings, based upon well-recognized principles in force before and at the time this clause was first introduced into the various constitutions, and the legislation of the country -- is to take it "without due process of law." The signification of these words has been the subject of judicial consideration and discussion in [**83] a vast number of cases, and their import has been determined to be the same as that of equivalent phrases in *Magna Charta,* from which the principle adopted was derived.

I shall not attempt to give an accurate definition of the term "due process of law," applicable to all cases. It is not necessary for the determination of this case to do

so. It is enough to say that it has been settled by judicial decision, as I think, that whether the proceeding be judicial, administrative, or executive, if it affects life or liberty, or takes property directly, or imposes a charge which becomes the basis of taking property, some kind of notice, or opportunity to be heard on his own behalf, and to defend his rights, given to the person whose life or liberty is to be affected, or whose property is to be taken, or burdened with the liability, is an indispensable element -- an essential ingredient -- of "due process of law." No one, I apprehend, would for a moment contend that a man's life, or his liberty, could be legally taken away without notice of the proceeding, or without being offered an opportunity to be heard; or that a proceeding whereby his life or liberty should be forfeited, or permanently [**84] [*763] affected, without notice or opportunity to be heard in his own defense, could, by any possibility, be by "due process of law." In such cases there could be no just conception of "due process of law" that would not embrace these elements of notice and opportunity to be heard. Any conception excluding these elements would be abhorrent to all our ideas of either law or justice. If these elements must enter into and constitute an essential part of due process of law, in respect to life and liberty, they must also constitute essential ingredients in due process of law, where property is to be taken; for the guaranty in the constitution is found in the same provision in the same connection, and in the identical language applicable to all. One meaning, therefore, cannot be attributed to the phrase with respect to property, and another with respect to life and liberty.

Having stated the principle, which I conceive to be established by an unbroken line of authorities, I shall refer to some of them. One of the latest and most instructive cases upon the subject was recently decided by the court of appeals of the state of New York, from which I shall extract a passage which I [**85] adopt as expressing my own views, and presenting the question in a very clear and satisfactory light. It involved the validity of an assessment for a public street improvement, and but one question, which was decisive of the case, was examined or determined. The question was as to the validity of the law under which the assessment was made. The court, by Mr. Justice Earl, says: "The latter assessment could be made without any notice to or hearing of any person. The law requires no notice, and a provision for notice cannot be implied. Upon the assumption that the law was valid, there was ample

authority for the commissioners to make the assessment without any notice or hearing." *Stewart* v. *Palmer,* 74 N.Y. 186. The judge proceeds:

"I am of the opinion that the constitution sanctions no law imposing such an assessment without a notice to and a hearing, or an opportunity of a hearing, by the owners of the property to be assessed. It is not enough that the owners may by chance have notice, or that they may, as a matter of favor, have a hearing. The law must require a notice to them, and give them a right to a hearing and an opportunity to be heard. It matters not, upon [**86] the question of the constitutionality of such law, that the assessment has in fact been fairly apportioned. The constitutional validity of a law is to be tested, not by what has been done under it, but what may by its authority be done. The legislature may prescribe the kind of notice and the mode in which it shall be given, but it cannot dispense with all notice. * * *" Id. 188.

"The legislature can no more arbitrarily impose an assessment for which property may be taken or sold, than it can render a judgment against a person without a hearing. It is a rule founded on the first principles of [*764] natural justice, older than written constitutions, that a citizen shall not be deprived of his life, liberty, or property without an opportunity to be heard in defense of his rights; and the constitutional provision that no person shall be deprived of these without due process of law, has its foundation in this rule. This provision is the most important guaranty of personal rights to be found in the federal or state constitutions. It is a limitation upon arbitrary legislation. No citizen shall arbitrarily be deprived of his life, liberty, or property. This the legislature [**87] cannot do, nor authorize to be done. 'Due process of law' is not confined to any judicial proceedings, but extends to every case which may deprive a citizen of his life, liberty, or property, whether the proceedings be judicial, administrative, or executive in its nature. This great guaranty is always and everywhere present to protect the citizen against arbitrary interference with these sacred rights. * * *" Id. 190.

"No case, it is believed, can be found in which it was decided that the constitutional guaranty did not extend to cases of assessments, and yet we may infer from certain *dicta* of judges that their attention was not called to it, or that they lost sight of it in the cases which they were considering. It has sometimes been intimated that a

citizen is not deprived of his property, within the meaning of this constitutional provision, by the imposition of an assessment. It might as well be said that he is not deprived of his property by a judgment entered against him. A judgment does not take property until it is enforced, and then it takes the real or personal property of the debtor. So an assessment may generally be enforced, not only against the real estate [**88] upon which it is a lien, but, as in this case, against the personal property of the owner also, and by it he may just as much be deprived of his property, and in the same sense, as the judgment debtor is deprived of his by the judgment." Id. 195.

Much more is worth quoting, but it would extend this opinion to an unreasonable length.

Thus, it is determined in the case cited that a party is not only entitled to notice and an opportunity to be heard, but that the law, or constitution itself, must expressly provide for notice. This decision was approved by the supreme court of California in October last, in *Mulligan* v. *Smith,* involving the validity of a tax. 8 Pac. Coast Law J. 499. Said *McKinstry,* J.: "In my opinion the statute provides no notice or process by means of which the property owners can be subjected to the judgment of the county court. The act is therefore void;" citing *Stewart* v. *Palmer, supra,* Cooley, Taxation, 266, and other cases; and *McKee,* J., in the same case said:

"It is a principle which underlies all forms of government by laws that a citizen shall not be deprived of life, liberty, or property without due process of law. The legislature [**89] has no power to take away any man's property, nor can it authorize its agents to do so, without first providing for personal notice to be given to him, and for a full opportunity of time, place, and tribunal to be beard in defense of his rights. This constitutional guaranty is not confined [*765] to judicial proceedings, but extends to every case in which a citizen may be deprived of life, liberty, or property, whether the proceeding be judicial, administrative, or executive in its nature."

In *Patten* v. *Green,* 13 Cal. 329, Mr. Justice Baldwin, all the justices, including Mr. Justice Field, concurring in the opinion, said: "We think it would be a dangerous precedent to hold that an absolute power resides in the supervisors to tax land as they may choose, without giving any notice to the owner. It is a power liable to great abuse. The general principles of law applicable to such tribunals oppose the exercise of any such power."

The raising of the tax by the board of equalization was held void for want of notice. Mr. Webster, in the *Dartmouth College Case,* defined due process of law, or "the law of the land," as "the general law, which hears before it condemns, [**90] which proceeds upon inquiry, and renders judgment only after trial." He adds: "Everything which may pass under the form of an enactment is not 'the law of the land.'"

In *Cooper* v. *Board of Works,* 108 Eng. C.L.R. 181, in which was in question the action of the board of public works, in pursuance of a statute which did not require notice, *Willes,* J., said: "I apprehend that a tribunal, which is by law invested with power to affect the property of one of her majesty's subjects, is bound to give such subject an opportunity of being heard before it proceeds; and that that rule is of universal application, and founded upon the plainest principles of justice." In the same case, *Byles,* J., said: "The judgment of Mr. Justice Fortescue, in *Dr. Bentley's Case,* is somewhat quaint, but it is very applicable, and has been the law from that time to the present." He says: "The objection for want of notice can never be got over. The laws of God and man both give the party an opportunity to make his defense, if he has any. I remember to have heard it observed by a very learned man, upon such an occasion, that even God himself did not pass sentence upon Adam before he called upon [**91] him to make his defense. 'Adam, where art thou? Hast thou not eaten of the tree whereof I commanded thee that thou shouldst not eat?'" See, also, *Philadelphia* v. *Miller,* 49 Pa. 448; *Matter of Ford,* 6 Lans. 92; *Overing* v. *Foote,* 65 N.Y. 263; *Westervelt* v. *Gregg,* 12 N.Y. 209; Cooley, Const. Lim. 355; *Butler* v. *Sup'rs Saginaw,* 26 Mich. 22, 29; Sedg. St. & Const. Constr. (Pomeroy's Ed.) 474 *et seq.,* and notes; Cooley, Taxation, 266; 267.

In *Davidson* v. *New Orleans,* 96 U.S. 97, it was not questioned, [*766] but assumed, that the party taxed must have an opportunity to be heard, and decided upon that theory.

In my judgment the authorities establish beyond all controversy that somewhere in the process of assessing a tax under a law, or a state constitution, at some point before the amount of the assessment becomes finally and irrevocably fixed, the statute or the state constitution must provide for notice to be given to the owner of the property taxed, and an opportunity to be afforded to make objections, and to be heard upon them. In some form or

manner he must be afforded an opportunity to defend his interests. In this case the [**92] constitution makes no provision for notice or a hearing, and the answer alleges that there was none, which is admitted by the demurrer.

4. On behalf of the plaintiff, what purorts to be a statute passed March 14, 1881, (St. 1881, p. 83,) is cited, which, it is insisted, supplements the constitution, and provides for a notice and hearing upon a petition filed within five days after the assessment is made upon a railroad. But it is claimed that, although published in the volume of statutes for the year 1881 as a statute, the bill never constitutionally passed, and that it is consequently no law. Section 15 of article 4 of the constitution of California provides that "on the final passage of all bills they shall be by yeas and nays upon each bill separately, and shall be entered on the journals, and no bill shall become a law without the concurrence of a majority of the members elected to each house." Under section 5 of the same article the house consists of 80 members, of whom it would require 41 to constitute a majority of the members elected to the house. Upon reference to the published journals of the legislature it appears that the bill in question passed the house and was [**93] sent to the senate, where it was amended by adding a long provision, being the very provision, if any there is, which gives the owners of railroads of the class in question, dissatisfied with the assessment, a right to file a petition, "within five days after the assessment is made and entered of record on the books of the board," to have the assessment corrected, and providing for proceedings upon said petition. On March 4th the house considered the senate amendment, and upon a call of the yeas and nays, as required by the constitution, 39 members voted for the amendment and 32 against it, there being four paired and not voting. Thus the votes in favor of the amendment were two less than a majority of members elected to the house, and the bill failed. It does not appear that the bill was "read [*767] at length." The speaker declared that this was not the final action of the house, and that the amendment concurred in ay a vote of 39 ayes to 32 nays was adopted. An appeal having been taken from this decision of the chair, it was afterwards laid upon the table. Thereupon two members filed each a separate protest against the decision of the speaker, and the certificate that [**94] the bill had passed, on the expressed ground that it did not receive the vote of a majority of the members elected to the house. All this appears upon the journal. If this was not the final action of the house, then, as there was no further action, the act

never finally passed, even by the numbers indicated. Assembly Journal, 24th Sess. pp. 472-475.

The bill, therefore, never was constitutionally passed, and never became a law. Whether the bill became a law is a question of law of which the court will take judicial notice. *Sherman* v. *Storey,* 30 Cal. 253; *Ottawa* v. *Perkins,* 94 U.S. 268; *Gardner* v. *The Collector,* 6 Wall. 509, 510; *Post* v. *Sup'rs,* 105 U.S. Under the decisions of the courts upon constitutional provisions in all respects similar to that in the present constitution of California, it is settled that the court, to inform itself, will look to the journals of the legislature. So the supreme court of the United States holds where it is so decided by the state courts in construing their own constitutions and laws. See cases last cited. I am not aware of any decision of the supreme court of California giving a different construction to [**95] the state constitution as it now stands. Unless this mode is adopted of resorting to the journals to ascertain whether a statute has been legally passed or not, experience, and the number of cases that have already arisen under similar constitutional provisions, demonstrate that the requirement of the constitution that the vote shall be taken by yeas and nays, and a majority of the members required to vote in the affirmative on the final passage of an act, would be of little avail.

While we think the case of *Sherman* v. *Storey* correctly decided under the constitution as it then was, we are of the opinion that the change in the constitution requires a change in the rule. When California adopted from other states the provision now found in its constitution substantially as found in the constitution of Illinois, it must be deemed to have adopted with the provision the settled construction put upon it by the courts of the state from which it was taken. The leading cases upon the point are *Spangler* v. *Jacoby,* 14 Ill. 278; *Prescott* v. *Board of Trustees, etc.,* 19 Ill. 326; *Osborn* v. *Staley,* 5 W. Va. 89; and the cases cited in *Sherman* v. *Storey,* [**96] and [*768] in those from the United States supreme court. In this case there is something more than an omission in the journals, for it affirmatively appears what the vote was, and that the bill did not pass by the vote required by the constitution.

Statutory provisions, also, have been adopted, which appear to be designed to give effect to this change in the constitution. Section 255 of the Political Code requires the minute clerks of the senate and assembly to "keep a correct record of the proceedings of their respective houses." And sections 256 and 257 require the daily proceedings to be recorded in the journals, and that they "must be read by the secretary each day of meeting, and then be authenticated by the signatures of the president and speaker of the respective houses." Section 1875, Code C.P., provides that "courts take judicial notice of the following facts: * * * Public and private official acts of the legislative, executive, and judicial departments of this state, and of the United States," etc. * * * "In all these cases the court may resort for its aid to appropriate books of documents of reference." Section 1888 provides that "public writings are (1) the written [**97] acts or records of the acts of the sovereign authority of official bodies and tribunals, and of public officers, legislative, judicial, and executive, whether of this state or of the United States," etc. And section 1918 provides that "official documents may be proved as follows: * * * (2) The proceedings of the legislature of this state, and of congress, by the journals of those bodies respectively, or either house thereof, or by published statutes or resolutions." Thus the journals of the legislature are put upon the same footing as the statutes. We think there can be no doubt, under the constitution of the state and these statutes, that we may look to the journals to see what action was in fact had with respect to any apparent law as published in the volumes of the statutes of the state; and looking to the journals it affirmatively appears that the act upon the statute book in question never did become a law.

Even if the act had passed, it is at least extremely doubtful whether the notice, or time for filing the petition, is sufficiently definite to be of any effect. The assessment, under the provision, might be made, even if the party is bound to notice the state of the record [**98] on the first Monday of May, the five days might elapse, and the assessment be transmitted to the county, before the party assessed would know, under the law, that it had been made. All the acts of assessment may have transpired, and the assessment become final, before the first Monday of May. The board, however, is not required to make it before [*769] that day, although it might do so, and the party assessed can scarcely be expected to watch its proceedings, from day to day, before the time fixed by the law.

There being, then, no such statute as is relied on in existence, the validity of the assessment must rest alone upon the constitutional provision quoted, and the act of

1880, adding sections 3664 and 3665 to the Political Code; and neither provides for notice of any kind, or for an opportunity to be heard in any stage of the proceedings. It was therefore made without due process of law, as we understand the meaning of that provision as used in the fourteenth amendment in question.

Section 3664 of the Political Code, as adopted in 1880, requires the president, or some other designated officer of the class of corporations in question, to furnish the state board of equalization, [**99] on or before the first Monday of April in each year, a detailed statement of the whole number of miles of road operated, the number of cars, amount of rolling stock, and their value, the gross earnings, and various other particulars; and requires the said board, on or before the first Monday in May, to assess the franchise, road-way, road-bed, rails, and rolling stock. It is urged on the part of the plaintiff that this provision furnishes sufficient notice and opportunity to be heard, to constitute due process of law on this point, within the meaning of the constitutional provision. In our judgment, this position is clearly untenable. This is simply a mode adopted for obtaining information as to the amount and general value of the property of the corporation, as a basis in part, at least, for their future consideration and action in making the assessment. It is but a preliminary step and not the assessment, or any part of the assessment. The board is under no obligation to adopt either the statement as to what the property is, or its value. It may reject i altogether and adopt an entirely different basis. The party interested is entitled, at some point of the proceeding, to [**100] know what action the board takes, or proposes to take; and to an opportunity to be heard, as to its propriety, before the assessment becomes fixed and irrevocable. Other classes of property holders, also, are required to file a statement of their property under oath, yet in the scheme provided for their assessment an opportunity to be afterwards heard is provided for.

The constitutions of the state and nation provide that private property shall not be "taken for public use without just compensation." When parties cannot agree, there must be some mode provided for [*770] ascertaining the value of property so proposed to be taken for public use under the sovereign right of eminent domain. Suppose a statute should provide a board, or even a court, to assess the value of property proposed to be taken under this power for railroad purposes, or other public use, and should give the owner of the property no notice or

opportunity to be heard, other than to require him at some time, say a month anterior to the consideration and determination of the amount to be paid, to furnish such board or court a similar statement as to the description and value of the property to that required [**101] by section 3664, which the party might do or omit to do; would a subsequent *ex parte* determination of the value, by the board or court, be in pursuance of due process of law within the meaning of the constitution? I apprehend that no court would sustain such a proceeding. I also think that a taking for the purposes of taxation under such an assessment, without notice or opportunity to be heard, would be equally without the protection of due process of law, and equally void.

The state supreme court has held the provision in the constitution of California, authorizing the state board of equalization to assess, finally, the railroads of the class in question, to be self-executing, requiring no legislation of any kind to carry it into full effect; also that the provision is mandatory, *S.F. & N.P.R.Co.* 8 Pac. Coast Law J. 1061.

It is insisted by defendant that, this being so, it is incompetent for the legislature to add to or take from the requirements found in the constitution, and that the additional provision of section 3664, as adopted in 1880, is void. The view already expressed upon the section renders it unnecessary now to determine that question, although presented [**102] by the record and argued by counsel. It would seem, however, that there can be no constitutional objection to legislating upon details for the purpose of more effectually carrying out the scheme of the constitution, so far as the legislation is not inconsistent with any of its provisions. It is a general rule that a state legislature has all legislative power not inhibited by the constitution, state or national. *S.P.R. Co.* v. *Orton,* 6 Sawy. 186.

This being so, it would seem that the legislature might supplement the constitutional provision by statutory provisions intended to more perfectly protect the rights of the parties by other safeguards which are not inconsistent with the constitutional provision. But as this is a question more properly belonging to the state courts, we do not deem it desirable to finally determine it now.

[*771] 5. Is the provision of the state constitution, under which the assessment in question was made, in conflict with the provision of the fourteenth amendment to the national constitution which provides that no state

"shall deny to any person the equal protection of the law?" The circuit justice has discussed this question so fully [**103] and satisfactorily that I shall have little to add. The provision is:

"A mortgage, deed of trust, contract, or other obligation by which a debt it secured, shall for the purposes of assessment and taxation, be deemed and treated as an interest in the property affected thereby. Except as to railroad and other *quasi* public corporations, in case of debts so secured, the value of the property affected by such mortgage, deed of trust, contract, or obligation, less the value of such security, shall be assessed to the owner of the property, and the value of such security shall be assessed and taxed to the owner thereof, in the county, city, or district in which the property affected thereby is situate. The taxes so levied shall be a lien upon the property and security, and may be paid by either party to such security. If paid by the owner of such security, the tax so levied upon the property affected thereby shall become a part of the debt so secured. If the owner of the property shall pay the tax so levied on such security, it shall constitute a payment thereon, and to the extent of such payment a full discharge thereof; provided, that if any such security or indebtedness shall [**104] be paid by any such debtor or debtors, after assessment and before the tax levy, the amount of such levy may likewise be retained by such debtor or debtors, and shall be computed according to the tax levy for the preceding year."

Whatever the property, then, real or personal, mortgaged to secure a debt, the value of the debt so secured, in the case of everybody except "a railroad and other *quasi* public corporations," is to be deducted from the value of the property mortgaged; and the value only of the property mortgaged, "less the value of such security, shall be assessed and taxed to the owner of the property, and the value of such security shall be assessed and taxed to the owner thereof;" that is to say, that, whatever the property, it shall be taxed to the real owner. But in the case of "a railroad or other *quasi* public corporation," there is to be no reduction of the value of the mortgaged property, and the whole is to be taxed to one party, whether he owns the whole or not. In one case, if property is mortgaged to the extent of half its value, the owner is assessed upon one-half the value, and the owner of the debt secured is taxed upon the other half. But in the [**105] other case the owner of the legal title to the property is assessed and taxed upon the whole value of the property, and the other party, who is interested to the extent of one-half, upon none. A., a natural person, has $50,000 in cash -- all the property he has -- and purchases of B., another natural person, a piece of real estate for $100,000, [*772] that being its actual value, paying one-half down, and giving a mortgage for $50,000 to secure the balance of the purchase money. The constitution in effect says -- and in this instance such is the real, actual state of facts -- that A. and B. each has $50,000 in the property, one-half not having been paid for by A., and each shall be assessed and pay a tax upon his own interest in it, amounting to $50,000. A., in this instance, is worth only $50,000, and if he pays taxes upon a larger amount he pays taxes upon property he does not own -- upon property owned by somebody else. This seems to be a self-evident proposition.

C., "a railroad or other *quasi* public corporation," also has $50,000 cash, and purchases of B., for its proper use, an adjoining piece of real estate for $100,000, which is also its actual value, paying [**106] $50,000, and giving a mortgage to secure the balance of the purchase money. In this case, as in the other, the actual interest of each in the property is $50,000. They stand upon precisely the same footing in all particulars with reference to the property. C. has only $50,000 in the property, -- it not having paid for the other half, -- and B. the rest. But in this case the constitution says that C. shall, nevertheless, be assessed for, and pay taxes upon, the whole property, double the amount he owns, and B. shall not be required to pay anything; that is to say, that C. shall not only pay the tax on its own property, but the tax upon B's property; that money, to the amount of the tax assessed upon $50,000 belonging to B., shall be taken by the state or county from C., and appropriated to the use and for the benefit of B., to liquidate B.'s share of the public burdens. This sum, being so much more than C.'s share of the public burdens, and being in fact B.'s share, the result of the operation is not only to take so much property from C. for public use without compensation, but also to arbitrarily take it from C., and apply it to the use and benefit of another private party, B., [**107] without compensation. The result would be the same whether the property of A., B., and C., thus situated and mortgaged is land, a railroad operated in one or more counties, or any other kind of property. Does a law which authorizes such proceedings -- such discriminations -- bear or press equally upon A. and C., or equally upon B. and C.? Is C. equally protected in his rights of property with A., or equally protected with B.?

Although situated precisely alike with reference to their property, do they feel the pressure of the public burdens equally and alike? The question does not appear to me to admit of argument. Upon the very statement of the proposition it seems to me to be self-evident [*773] that a law authorizing and requiring such proceedings does not afford, but expressly denies, the equal protection of the law. The constitution in the one case says that "the mortgage, deed of trust, contract, or obligation" shall be "deemed and treated as an interest in the land affected thereby," which, in the cases supposed, together with the debt secured, it undoubtedly in fact is; but in effect the constitution says it is not so in the other case. Different kinds of property [**108] may require to be taxed in different forms and modes, in order to be equally taxed; and classifications of property, for purposes of taxation, should have reference to the just equality of burdens, so far as that is practically attainable. Classification should have reference to the different character, situation, and circumstances of the property, making a different form or mode of taxation proper, if not absolutely necessary. It cannot be arbitrarily made with mere reference to the nationality, color, or character of the owners, whether natural or artificial persons, without any reference to a difference in the character, situation, or circumstances of the property. If the arbitrary discrimination and classification found in this case can be legally made under the constitution and the law of the land, then the constitution or the law can be so framed as to dispose of a man's rights in property of all kinds by arbitrary classification and definition, without regard to the real facts, circumstances, or condition of the property. A person may be classified and defined out of the equal protection of the law; and if so with reference to this provision, he can also be classified and [**109] defined out of uniformity in the operation of the law in other particulars; out of the protection of due process of law, and of the provision forbidding a law impairing the obligation of contracts, or taking property for public use without just compensation; and, indeed, out of all the guaranties of the constitution, state or national. I am not arguing that property of all kinds may not be taxed where it is found; but in this case there is a personal liability sought to be enforced against the defendant for taxes not imposed upon others in like circumstances, without any means provided for reimbursement, such as are applicable to others similarly situated, by the party who ought to pay the tax.

What constitutes the equal protection of the law is

well stated in *Ah Kow v. Nunan,* 5 Sawy. 562; *In re Ah Fong,* 3 Sawy. 144; *Pearson* v. *Portland,* 69 Me. 278; *Portland* v. *Bangor,* 65 Me. 120; *Missouri* v. *Lewis,* 101 U.S. 22. See, also, *Live Stock, etc., Ass'n,* v. *Crescent City Co.* 1 Abb. 398; *Parrott's Chinese Case,* 6 Sawy. 377. That inequality and different principles of taxation of persons similarly [*774] situated, as in this case, is a violation [**110] of this provision seems to be already determined by the supreme court of the United States. The civil-rights act, as re-enacted in 1870, and again in the Revised Statutes, provides that --

"All persons within the jurisdiction of the United States shall have the same right in every state and territory * * * to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 16 St. p. 144. § 16; Rev. St. 1977.

The congress which passed this act embraced many of the members who were in the congress which framed and proposed the fourteenth amendment, and they may be supposed to be well informed as to the purpose and scope of that amendment. This act was passed in pursuance of the last clause of the amendment, as a part of the appropriate legislation to enforce its provisions. It is therefore a legislative construction as to the scope of the provision inhibiting the states from denying to any person the equal protection of the law. The United States supreme court gives the amendment a similar construction [**111] as to its scope. In *Strauder* v. *West Virginia* the court says that sections 1977 and 1978 of the Revised Statutes "partially enumerate the rights and immunities intended to be granted by the constitution," and after quoting section 1977, as above set out, adds: "This act puts in the form of a statute what had been substantially ordained in the constitutional amendment. It was a step towards enforcing the constitutional provision." 100 U.S. 311.

In *Ex parte Virginia* the court, referring to *Tennessee* v. *Davis* and *Strauder* v. *West Virginia,* said:

"We held that the fourteenth amendment secures, among other civil rights, to colored men, when charged with criminal offenses against a state, an impartial jury trial, by jurors indifferently selected, or chosen without discrimination against such jurors because of their color. We held that immunity from any such discrimination is

one of the equal rights of all persons, and that any withholding it by a state is a denial of the equal protection of the laws, within the meaning of the amendment. We held that such an equal right to an impartial jury trial, and such an immunity from unfriendly discrimination, are [**112] placed by the amendment under the protection of the general government, and guarantied by it. We held, further, that this protection and this guaranty, as the fifth section of the amendment expressly ordains, may be enforced by congress by means of appropriate legislation." 100 U.S. 345.

[*775] If discrimination in fixing the qualifications of jurors inferentially violates the provisions of the fourteenth amendment, as denying the equal protection of the law, it is not easy to perceive why discriminations in the assessment and collection of taxes expressly made are not equally so.

Thus it appears that the supreme court regards the section quoted as within the scope of the fourteenth amendment, and the act provides that every person "shall be subject to like * * * taxes, licenses, and exactions of every kind, and to no other," as "white citizens;" and this is held to be appropriate legislation to enforce the amendment. We have already seen that this defendant is subjected to taxes and exactions other than and different from those imposed upon "white citizens." We have already held that the word "person," as to property rights, as used in the amendment in question, includes [**113] a corporation, and, as used in the provision of the statute cited, it includes a corporation by express definition of the statute itself, which says, in terms: "In determining the meaning of the Revised Statutes * * * the word 'person' may extend and be applied to partnerships and corporations." Page 1, tit. 1, *c.* 1, § 1.

The provision of the constitution of the state of California in question, therefore, violates the provision of the fourteenth amendment in denying to defendant the equal protection of the law. "An unconstitutional law is void, and is no law." *Ex parte Siebold,* 100 U.S. 376. "The constitution and laws of the United States are the supreme law of the land, and to those every citizen of the United States owes obedience, whether in his individual or offical capacity. * * * The laws of the state, in so far as they are inconsistent with the laws of congress on the same subject, cease to have effect as laws." Id. 392, 397.

6. It is further urged on the part of plaintiff that,

under the state constitution, the legislature is authorized to alter or repeal the laws under which corporations are formed, -- they cannot be properly called charters, -- and that this [**114] mode of taxing corporations, in effect, operates as an amendment of the act authorizing the formation of corporations, and that corporations hold their franchises in subordination to that provision.

The proceeding in question is either taxation or something else; either an exercise of the sovereign right of taxation, or the exercise of some other power; either taxation or not taxation. The provision, in terms, purports on its face to provide for taxation. The convention that framed the article, and the people, when they adopted it, [*776] evidently must have supposed they were providing a scheme of taxation. The provision admits of no other construction.

The provision is found in the chapter entitled "Revenue and Taxation," and the section says: "For the purpose of assessment and taxation," etc. If the proceeding is taxation, then it provides, and can only provide, for taking from the defendant an amount of money equal to its just share of the public burden relieved by the taxation, and nothing more. Anything beyond that is taking private property for public use without compensation. If the proceeding is taxation, there is no necessity for resorting to any other provision [**115] of the constitution. If it is not taxation, -- if the amount demanded, or the principle adopted, is imposed as a condition of continued existence, or as a limitation of its rights to exercise its franchises, -- then it is an annual bonus demanded for the franchise, or the privilege of existence, such as was formerly often demanded and paid by corporations for the special privileges given by special charters, when there were no restrictions upon the legislative power upon the subject, and is not taxation. If it is a bonus demanded and paid for this right, then, in addition, the corporation is subject to taxation upon its property; for under the constitution all property must be taxed. "All property in the state," says the constitution, "not exempt under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law." Article 13, §§ 1, 6, says that "the power of taxation shall never be surrendered or suspended by any grant or contract to which the state shall be a party." If, therefore, the provision of section 4 relative to "railroad or other *quasi* public corporations" is a term or condition of the contract upon which its existence [**116] and further exercise of its franchises

depend, then it must still be liable to taxation on its property in the proper mode. By a contract authorizing certain persons to form a corporation and exercise its franchises, however valuable the consideration received, the state cannot, as we have seen, surrender or suspend its rights to tax its property besides, as all other property is taxed. Other tax-payers are entitled to have the property of corporations properly taxed. Again, if the submission to this mode of what is called taxation becomes a valid condition of the continuance of the further existence of the corporation, and the further exercise of its franchises, then a refusal to pay the tax is a violation of the conditions of its being, and the courts, upon a proceeding for the purpose by the state in the nature of a *quo warranto,* would probably adjudge the forfeiture of its charter and wind up its affairs. This would be the appropriate remedy. [*777] I apprehend that no court would so adjudge under the present constitution on that ground. It is clear to me, therefore, from these considerations and the express terms themselves of the constitution, that the provision [**117] in question attempts to provide only for exercising the sovereign power of taxation, -- has no other end to accomplish, and accomplishes no other purpose, -- and that the rights of the parties must be determined on that hypothesis alone. Again, the general act authorizing the formation of corporations confers upon those complying with its provisions certain rights, franchises, and privileges. It endows the parties as organized with certain faculties and capacities, the result being to give them in their united character, under a certain name, a capacity to do business and acquire property. A law merely authorizing the formation of a corporation gives the corporation formed no property. That must be acquired by the corporation for itself. The legislature, under the various guaranties of the constitution, state and national, can only take away, limit, enlarge, or modify that which it gave. And what is given in the creative act is, simply, its capacities; its legal faculties, including all such as are essential to its corporate existence; all those powers which are strictly corporate, being those powers which can only be given by legislative act; powers not possessed by natural [**118] persons or partnerships, acting in their natural, individual, or associate characters, independent of legislation. These strict corporate powers I attempted to define in *Orton's Case,* 6 Sawy. 187. The powers thus given, essential or otherwise, and their future exercise, may be modified, or otherwise affected, by subsequent legislation. A corporation having been formed with capacity to acquire and hold property, the legislature

may, doubtless, grant to it, as well as to natural persons capable of taking, property rights; but such rights of property, when once vested, can no more be withdrawn than the property acquired from other sources, or than property granted to, or acquired by, natural persons. The property acquired in the exercise of its corporate faculties, from whatever source derived, is the property of the metaphysical being called the corporation, held, however, in trust for the sole benefit of the corporators. As such, it is protected like all other property, and can only be taken by the law of the land, in some one of the modes not inhibited by the constitution. It cannot, in my judgment, be taken even as a further condition of corporate existence without the assent [**119] of the corporation or its corporators. There is no consent in this case to submit to any such conditions, and that is not the basis upon which the action is brought. There is no promise [*778] to pay a bonus set out in the complaint upon which an action can be maintained. I apprehend that a mere provision in the form of a statute, or a state constitution adopted after the formation of a corporation, that corporations under the laws should cease to exist unless they surrender to the state all the property theretofore acquired by the corporation, would be void. And power to demand a part, as a condition of existence, however small, is power to demand all. Such a statutory demand would be but a flimsy guise or pretext for evading all the guaranties of the constitution, which would not for a moment be tolerated. It would be to seek indirectly what could not be attained directly; the accomplishment of an unlawful end by what, at best, is but apparently lawful means. See, on this point, *Parrott's Chinese Case,* 6 Sawy. 349; Opinion of *Hoffman,* J. In that case I had occasion to say:

"The end being unlawful and repugnant to the supreme law of the land, it is equally unlawful [**120] and equally in violation of constitution and treaty stipulations to use any means, however proper or within the power of the state for lawful purposes, for the attainment of that unlawful end, or accomplishment of that unlawful purpose. It cannot be otherwise than unlawful to use any means whatever to accomplish an unlawful purpose. This proposition would seem to be too plain to require argument or authority. Yet there is an abundance of authority on the point, although, perhaps, not stated in this particular form. *Brown* v. *Maryland,* 12 Wheat. 419; *Ward* v. *Maryland,* 12 Wall. 431; *Woodruff* v. *Parham,* 8 Wall. 130-140; *Hinson* v. *Lott,* Id. 152; *Welton* v. *Missouri,* 91 U.S. 279-282; *Cook* v.

*Pennsylvania,* 97 U.S. 573."

The observations of Mr. Justice Field in *Cummings* v. *Missouri,* 4 Wall. 325, are pertinent in this connection. He said:

"The deprivation is effected with equal certainty in the one case as it would be in the other, but not with equal directness. The purpose of the law-maker in the case supposed would be openly avowed; in the case existing it is only disguised. The legal result must be the same; for what cannot [**121] be done directly cannot be done indirectly. The constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name. It intended that the rights of the citizen should be secure against deprivation for past conduct by legislative enactment under any form, however disguised. If the inhibition can be evaded by the form of the enactment, its insertion in the fundamental law was a vain and futile proceeding." See, also, *Henderson* v. *Mayor of N.Y.* 92 U.S. 268; *Chy Lung* v. *Freeman,* Id. 279; *Railroad Co.* v. *Huson,* 95 U.S. 472.

The foregoing observations apply equally well to any effort to obtain the property of corporations by irregular means not applicable to natural persons. It seems to be that under our general system embodied in the constitution, providing for corporations, which forbids [*779] the granting of any special privileges not enjoyed by all other persons, it was intended to put corporations, with respect to their property and to all other matters, except what is in fact granted by the laws, in all particulars upon the same footing as natural persons.

In my judgment, the state constitutional provisions under [**122] consideration, and the laws passed to carry them out, violate the provision of the fourteenth amendment in question in two vital particulars: (1) They assess railroad and other *quasi* public corporations upon a different basis from that adopted with respect to the natural persons similarly situated, in the particulars herein pointed out; (2) they provide, with respect to natural persons, notice and an opportunity to be heard in the course of the proceeding to assess their property before the assessment becomes fixed, while they afford no such notice or opportunity to be heard to railroads and other *quasi* public corporations; and in both these particulars deny to the latter the equal protection of the law within the meaning of the fourteenth amendment to the national constitution.

Again, this suit is for a tax and nothing else. It proceeds upon that idea, and the idea alone, that a valid tax has been assessed against the defendant, which this action is brought under the statute to recover. The suit cannot be maintained upon a liability imposed under other and different provisions of the constitution. If it cannot be maintained as for a tax it must fail. The recovery, if [**123] any is had, must be upon the cause of action alleged.

We do not conceive that a provision for assessing railroads operated in more than one county, by the state board of equalization, while other local property is assessed by the local assessors, would be denying the equal protection of the law, provided the assessment in the former case is, in all respects, made upon the same basis, under the same rules, and upon the same principles as to value, notice, opportunity to be heard, etc., as in the latter. The presumption would be that all the officers would perform their duties justly under the law, and that the assessments so made upon property, differently circumstanced, would operate equally. Nor do we think that the assessment of the "franchise, road-way, road-bed, rails, and rolling stock of all railroads operated in more than one county in the state," "by the state board of equalization," as a unit, and apportioning the amount of the assessed value to the several counties, etc., in proportion to the number of miles in each, is objectionable, on the ground that it denies the equal protection of the law to the owner of the road.

[*780] Indeed, this seems to be the only [**124] practicable way of assessing such a road. It is owned and operated as a unit, and cannot be otherwise usefully employed. Its income, expenses, and management, and all its operations, are as a unit. Its rolling stock is at one point at one moment, and at another at a different point of time, but it is all working together as a unit to the accomplishments of one end. In fragments and isolated parts, the road would be comparatively valueless as property. It is only as a unit that it can be properly considered or properly taxed. To tax it otherwise would be to tax it upon principles materially different from those applicable to other property necessarily considered and used as a unit. The character and circumstances of the property are such as seem to justify a classification for this purpose. These points, also, seem to be determined in favor of the plaintiff in the *State Railroad Tax Cases,* 92 U.S. 575. The other points determined in this case are not involved in those cases.

Whatever public inconvenience may temporarily result from our decision, -- and it must necessarily be great, -- being satisfied, as we are, that the provisions of the state constitution now in question [**125] violate the inhibitions of the fourteenth amendment, our duty is plain, and we cannot, if we would, shrink from its performance. There must be judgment for the defendant.

Since the argument in these cases commenced, apparently in anticipation of what must necessarily be the result, various means, more or less violent, have been suggested, through the public press and elsewhere, to prevent railroad corporations from escaping the payment of their just share of the public burdens: such as taking away their franchises; seizing and appropriating their property first, and litigating the right afterwards; and punishing by the severest penalties the officers of all such corporations, in all cases where resistance to payment of a tax is made in the courts, however illegal the exaction or whatever the ground of complaint on their part may be. Violent counsels of this character usually result in constitutional and statutory provisions such as those we have been considering and held void, which render it necessary to seek the protection of our national *magna charta.* It would be idle -- utterly futile -- to insert a provision in the national constitution guarantying to every person within [**126] its jurisdiction his life, his liberty, and his property, if certain classes can be selected out in the subordinate legislation of the country to be visited with condign punishment if they even seek to invoke the protection of this beneficient guaranty against discriminating and wrongful [*781] legislation. If a single individual can be deprived of the protection of this provision by such means, so can all. If such things can be, wherein does the protection of the guaranty consist?

A far wiser and more statesmanlike proceeding would seem to be, to avoid all occasion for resistance to wrong in the guise of void laws, by coolly and calmly re-examining the subject in the light of past experience, and so amending our state constitution and statutes as to bring them into entire harmony with all the guaranties of the fourteenth amendment, "the crowning glory of our national constitution" -- that noblest and best written constitution ever devised by the wisdom of man.

If the life, liberty, property, and happiness of all the people are to be preserved, then it is of the utmost importance to every man, woman, and child of this broad land that every guaranty of our national constitution, [**127] whatever temporary inconvenience may be felt, be firmly and rigorously maintained at all times and under all circumstances. In the language of the supreme court of the United States:

"The constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine involving more pernicious consequences was ever invented by the wit of man, than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism." *Milligan's Case,* 4 Wall. 120.

I concur in the judgment ordered by the circuit justice.

ORDER STAYING PROCEEDINGS.

As the questions we have considered are of the greatest importance, and their correct solution concerns not merely the railroad corporation, which is the defendant, but corporations of every kind, other than municipal, we shall order a stay in all the other cases (not decided to-day) now pending in this court involving the same questions, until these cases can be brought before the supreme court of the United States, and the questions [**128] involved shall have received by its judgment their final and authoritative determination. If the decision now reached be there sustained, the state will be obliged to order a new assessment, in making which the defendant will be allowed a deduction in the valuation of its property for the mortgage thereon, and also a hearing before the state board of equalization with respect to the assessment. If, on the other hand, the decision be reversed, [*782] the other cases can be at once disposed of. By taking out a writ of error immediately on the judgment now rendered, it is possible that the case may be advanced on the calendar and be heard at the coming term.



**RICK ALLAN RHOADES, Appellant v. THE STATE OF TEXAS, Appellee**

**No. 71,595**

**COURT OF CRIMINAL APPEALS OF TEXAS**

**934 S.W.2d 113; 1996 Tex. Crim. App. LEXIS 205**

**October 2, 1996, DELIVERED**
**October 2, 1996, filed**

**SUBSEQUENT HISTORY:** Rehearing denied by, 11/20/1996
Writ of habeas corpus denied Ex parte Rhoades, 2014 Tex. Crim. App. Unpub. LEXIS 833 (Tex. Crim. App., Oct. 1, 2014)

**PRIOR HISTORY:** [**1] Appeal from the 179th District Court of Harris County.

**DISPOSITION:** AFFIRMED

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant sought review of a judgment rendered by the 179th District Court of Harris County (Texas) that convicted appellant of capital murder and sentenced appellant to death.

**OVERVIEW:** Appellant was convicted for capital murder. Appellant sought review of the conviction on 18 grounds. Appellant contended that his Sixth Amendment right to counsel was impinged when the trial court precluded him from discussing, with veniremembers, the statutory 35-year minimum for individuals convicted of capital murder that are given a life sentence. The court overruled this error as it was inadequately briefed. Appellant claimed the trial court erred by providing false and misleading information about parole eligibility, during jury selection. Error was waived since appellant raised the argument for the first time on appeal. Appellant contended the trial court erred when it refused to admit childhood photographs that depicted him as a normal, happy child. Appellant argued that the trial court's preclusive ruling denied him the opportunity to present relevant, mitigating evidence in his defense. The court held the photographs were irrelevant to appellant's moral blameworthiness for the commission of the double-murder. The court affirmed the conviction. Other assignments of error lacked merit, were not preserved for review, or were inadequately briefed.

**OUTCOME:** The court affirmed appellant's conviction for capital murder because several of appellant's 18 points of error were not preserved for review and appellant's other contentions were either not adequately briefed or lacked merit.

**CORE TERMS:** parole, prison, veniremember's, eligible, life sentence, capital murder, juror, mitigating, commit, eligibility, special issue, sentencing, prosecutor, furlough, sentence, future dangerousness, sentenced, life imprisonment, voir dire, mitigating evidence, emergency, violence, death penalty, questioning, culpability, mitigation, inform, capital case, voir dire, photographs

**LexisNexis(R) Headnotes**

*Criminal Law & Procedure > Criminal Offenses >*

Page 2

934 S.W.2d 113, *; 1996 Tex. Crim. App. LEXIS 205, **1

*Homicide > Murder > General Overview*
[HN1] See Tex. Penal Code Ann. § 19.03(a)(6).

*Criminal Law & Procedure > Juries & Jurors > Voir Dire > Questions to Venire Panel*
[HN2] A trial court commits error if it prohibits defense counsel from asking "proper" voir dire questions. A natural corollary to the preceding rule is that a trial court commits no error if it precludes improper voir dire questioning. A "proper" question is one which seeks to discover a veniremember's views on an issue applicable to the case.

*Criminal Law & Procedure > Juries & Jurors > Voir Dire > Appellate Review*
*Criminal Law & Procedure > Juries & Jurors > Voir Dire > Questions to Venire Panel*
*Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion > General Overview*
[HN3] When an appellant challenges a trial court's voir dire limitation, the reviewing court must analyze the claim under an abuse of discretion standard, the focus of which is whether the appellant proffered a proper question.

*Criminal Law & Procedure > Postconviction Proceedings > Parole*
[HN4] Parole, and the issues surrounding the minimum prison term necessary for parole eligibility, are not matters for jury consideration in a capital murder prosecution.

*Civil Procedure > Appeals > General Overview*
[HN5] It is incumbent upon appellate counsel to cite specific legal authority and to provide legal argument based upon that authority.

*Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > Failure to Object*
*Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > Requirements*
*Criminal Law & Procedure > Appeals > Reviewability > Waiver > General Overview*
[HN6] For an issue to be preserved on appeal, there must be a timely objection which specifically states the legal basis for that objection.

*Governments > Legislation > Effect & Operation > Amendments*
[HN7] See Tex. Const. art. III, § 36.

*Governments > Legislation > Effect & Operation > Amendments*
[HN8] See Tex. Gov't Code Ann. § 311.025 (b) and (c).

*Criminal Law & Procedure > Juries & Jurors > Voir Dire > Appellate Review*
*Criminal Law & Procedure > Juries & Jurors > Voir Dire > Questions to Venire Panel*
*Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion > General Overview*
[HN9] When a defendant challenges a trial court's limitation on voir dire questioning on appeal, the reviewing court must analyze the claim under an abuse of discretion standard, the focus of which is whether appellant proffered a proper question. A proper question is one which seeks to discover a veniremember's views on an issue applicable to the case. If a proper question is disallowed, harm to appellant is presumed because he has been denied the ability to intelligently exercise his peremptory strikes. However, the trial court may restrict questions in which counsel attempts to commit a veniremember to a particular resolution based upon facts peculiar to the trial.

*Criminal Law & Procedure > Juries & Jurors > Challenges to Jury Venire > Equal Protection Challenges > General Overview*
*Criminal Law & Procedure > Juries & Jurors > Peremptory Challenges > Proving Discriminatory Use*
[HN10] The procedure to determine an equal protection violation has three prongs in the context of racial discrimination: First, the opponent of the peremptory challenge has to prove a prima facie case of racial discrimination. If this burden is met, the burden of production falls to the proponent of the strike to tender a race-neutral explanation. If a race neutral explanation is tendered, the trial court must then determine if the opponent of the strike has proved purposeful racial discrimination.

*Criminal Law & Procedure > Appeals > Standards of Review > Clearly Erroneous Review > General Overview*

Page 3

934 S.W.2d 113, *; 1996 Tex. Crim. App. LEXIS 205, **1

[HN11] The court reviews the trial court's finding, vel non, of purposeful discrimination under a clearly erroneous standard.

*Criminal Law & Procedure > Juries & Jurors > Voir Dire > Appellate Review*
*Criminal Law & Procedure > Appeals > Standards of Review > Clearly Erroneous Review > General Overview*

[HN12] When applying the clearly erroneous standard, the court will not disturb a trial court's ruling unless the court is left with a definite and firm conviction that a mistake has been committed. In making this determination, the court will review voir dire, the state's race-neutral explanations, the composition of the jury panel, and appellant's rebuttal and impeachment evidence.

*Criminal Law & Procedure > Trials > Judicial Discretion*
*Criminal Law & Procedure > Sentencing > Capital Punishment > Mitigating Circumstances*

[HN13] Within the meaning of Tex. Code Crim. Proc. Ann. art. 37.071, § 2(a), evidence mitigates against the imposition of the death penalty if a reasonable juror could conclude that the evidence was a basis for a sentence less than death. Tex. Code Crim. Proc. Ann. art. 37.071, § 2(f)(4) provides further guidance when it defines mitigating evidence "to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." If a reasonable juror could not conclude that the proffered evidence reduced the defendant's moral blameworthiness, then a trial court would be within its discretion to exclude the evidence.

*Criminal Law & Procedure > Sentencing > Capital Punishment > Mitigating Circumstances*
*Evidence > Relevance > Relevant Evidence*

[HN14] Evidence about the defendant's background and character is relevant because of the belief, long held in society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse. The evidence is relevant because it relates to the moral culpability of a defendant's act. By this logic, if evidence has no relation to a defendant's moral culpability for the charged crime, then it is irrelevant to mitigation.

*Criminal Law & Procedure > Sentencing > Capital Punishment > Mitigating Circumstances*
*Criminal Law & Procedure > Appeals > Standards of Review > Abuse of Discretion > General Overview*
*Evidence > Demonstrative Evidence > Photographs*

[HN15] Photographs of a defendant which depict a cheerful early childhood are irrelevant to appellant's moral blameworthiness for the commission of a violent double-murder because such evidence has no relationship to appellant's conduct in those murders. That a defendant was once a child does not diminish his moral culpability for the act of murder.

*Civil Procedure > Judicial Officers > Judges > General Overview*
*Criminal Law & Procedure > Sentencing > Forfeitures > Proceedings*
*Evidence > Procedural Considerations > Objections & Offers of Proof > Objections*

[HN16] The court has identified the prerequisites to an effective objection respecting the admissibility of evidence. As regards specificity, all a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it. Of course, when it seems from context that a party failed effectively to communicate his desire, then reviewing courts should not hesitate to hold that appellate complaints arising from the event have been lost.

*Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > Jury Instructions*
*Evidence > Procedural Considerations > Objections & Offers of Proof > General Overview*

[HN17] For an objection to be "timely", a party must invoke it as soon as the ground for it becomes manifest.

*Criminal Law & Procedure > Trials > Burdens of Proof > Prosecution*
*Criminal Law & Procedure > Sentencing > Capital Punishment > Mitigating Circumstances*
*Criminal Law & Procedure > Sentencing > Imposition > General Overview*

[HN18] In cases where mitigating evidence is presented, all that is constitutionally required is a vehicle by which the jury may give mitigating effect to appellant's

Page 4

934 S.W.2d 113, *; 1996 Tex. Crim. App. LEXIS 205, **1

evidence. No burden of proof exists for either the state or defendant to prove or disprove the mitigation question.

*Criminal Law & Procedure > Sentencing > Capital Punishment > Mitigating Circumstances*
*Criminal Law & Procedure > Sentencing > Imposition > General Overview*
[HN19] There is no evidence that must be viewed by a juror as having a definitive mitigating effect, per se.

*Criminal Law & Procedure > Jury Instructions > General Overview*
[HN20] An appellant is not entitled to jury instructions specifically informing the jury that certain evidence may be considered or how it may be applied.

*Criminal Law & Procedure > Sentencing > Capital Punishment > Mitigating Circumstances*
[HN21] Each juror may or may not believe certain evidence is mitigating; however, the constitution only requires that where a juror believes there is relevant mitigating evidence, that juror must have a vehicle to give his or her reasoned moral response to such evidence. The Federal Constitution does not require trial courts to instruct juries regarding how they should consider, or apply what they may or may not deem mitigating evidence.

**COUNSEL:** James Stafford, Houston.

Dan McCrory, Assist. DA, Houston.

**JUDGES:** Opinion Judge Mansfield (Judge Baird concurs with note, Judge Maloney and Judge Meyers concur in the result). Dissenting opinion Judge Clinton (Judge Overstreet joins). Dissenting opinion Judge Overstreet

**OPINION BY:** MANSFIELD

**OPINION**

[*118] OPINION

A Harris County jury convicted appellant, Rick Allan Rhoades, of capital murder. [1] At the punishment phase of the trial, the jury unanimously found appellant to be a future danger under Article 37.071 § 2(b), [2] and,

further, declined to find mitigating circumstances under Article 37.071 § 2(e). The trial court sentenced appellant to death. We will affirm the judgment of the trial court.

1 Appellant was convicted for violation of what was then [HN1] Texas Penal Code § 19.03(a) (6), which read in relevant part:

(a) A person commits an offense if he commits murder as defined under Section 19.02 (b) (1) and:

* * *

(6) the person murders more than one person:

(A) during the same criminal transaction;

[**2]
2 All Article references are to those in the Texas Code of Criminal Procedure then in effect.

Appellant raises eighteen points of error in his brief on appeal. There are no evidentiary insufficiency points of error. Hence, we will address his points in chronological order where appropriate.

In point number one, appellant contends the trial court impermissibly restricted his right to intelligent and effective use of peremptory challenges, when it prohibited voir dire discussion of the statutory thirty-five year minimum for Individuals sentenced to life imprisonment. The substance of appellant's argument is that his right to counsel -- as guaranteed by Article I, Section 10, of the Texas Constitution -- was impinged when the trial court precluded voir dire discussion of the minimum calendar years appellant would have to serve before being eligible to parole were he sentenced to life imprisonment instead of death. *See* Ex parte McKay, 819 S.W.2d 478, 482 (Tex.Crim.App. 1990); Shipley v. State, 790 S.W.2d 604 (Tex.Crim.App. 1990).

We have held that [HN2] a trial court commits error if [**3] it prohibits defense counsel from asking "proper" voir dire questions. Caldwell v. State, 818 S.W.2d 790, 793 (Tex.Crim.App. 1991), *cert. denied,* 503 U.S. 990, 118 L. Ed. 2d 399, 112 S. Ct. 1684 (1992). A

Page 5

934 S.W.2d 113, *118; 1996 Tex. Crim. App. LEXIS 205, **3

natural corollary to the preceding rule is that a trial court commits no error if it precludes improper voir dire questioning. A "proper" question is one which seeks to discover a veniremember's views on an issue applicable to the case. *Id.* [HN3] When an appellant challenges a trial court's voir dire limitation, the reviewing court must analyze the claim under an abuse of discretion standard, the focus of [*119] which is whether the appellant proffered a proper question. *Id.*

We have held that [HN4] parole, and the issues surrounding the minimum prison term necessary for parole eligibility, are not matters for jury consideration in a capital murder prosecution. Smith v. State, 898 S.W.2d 838, 846 (Tex.Crim.App. 1995) (plurality opinion), *cert. denied,* 116 S. Ct. 131 (1995); Broxton v. State 909 S.W.2d 912, 919 (Tex.Crim.App. 1995); Sonnier v. State, 913 S.W.2d 511, 521 (Tex.Crim.App. 1995). Given that juries are not to consider any aspect [**4] of parole, a reasonable trial court could find that parole was not an issue applicable to the case. If parole was not an issue applicable to the case, a reasonable trial court could correctly conclude that parole was not a "proper" area of voir dire inquiry. Ford v. State, 919 S.W.2d 107 (Tex.Crim.App. 1996). Point of error number one is overruled.

In his second point, appellant avers that his Sixth Amendment right to counsel was impinged when the trial court precluded him from discussing, with the veniremembers, the statutory thirty-five year minimum for individuals convicted of capital murder who are given a life sentence. Appellant simply declares that his right to counsel was violated, and presents no argument or authority for this contention.

It is not sufficient that appellant globally cite the "Sixth Amendment," and nothing else, in support of his request for reversal. *See* Vuong v. State, 830 S.W.2d 929, 940 (Tex.Crim.App. 1992), *cert. denied,* 113 S. Ct. (1992). [HN5] It is incumbent upon counsel to cite specific legal authority and to provide legal argument based upon that authority. *Id.;* Tex.R.App.Proc. 74(f) and 210(b); Ex parte Granger, 850 S.W.2d [**5] 513, 515, fn. 6 (Tex.Crim.App. 1993). This is especially important where, as in the case at bar, the relevant area of law is not well defined. [3] This Court will not make novel legal arguments for appellant. Point of error two is inadequately briefed, and it is, therefore, overruled.

3   We note that, even if counsel had properly

argued the Sixth Amendment issue, his position is largely untenable. The federal constitutional right to counsel has never been extended to provide such broad voir dire protection. For a discussion of the cases in this area, *see* Ex parte McKay, 819 S.W.2d 478, (Tex.Crim.App. 1991) (Clinton, J., dissenting to denial of rehearing).

In point three, appellant claims the trial court committed error by providing false and misleading information about parole eligibility, during the jury selection process. We note that, in appellant's brief, the argument and authority for this point was combined with the argument and authority for points one, two, and four. Hence, it is difficult for [**6] this Court to ascertain what information appellant believes the trial court erroneously provided to the veniremembers. Nevertheless, appellant apparently complains of two instances.

First, appellant complains the trial court, in response to a question from a veniremember, informed the veniremember that the decision regarding parole eligibility was within the exclusive jurisdiction of the Board of Pardons and Paroles. The exchange follows:

> THE COURT: Did you have a question?
>
> VENIREMEMBER: Yes. When will they be eligible for parole?
>
> THE COURT: I can't answer that.
>
> APPELLANT: I ask the court to answer that.
>
> THE COURT: I am not going to answer it. It's within the exclusive jurisdiction of the Board of Pardons and Paroles and the governor of the State of Texas.
>
> PROSECUTOR: Shall I continue?
>
> THE COURT: Please.

Appellant contends that the time for parole eligibility is not within the jurisdiction of the parole board at all. Rather, appellant avers, under the current statutory scheme, parole eligibility is within the jurisdiction of the Legislature. *See* Article 42.18. However, whether the trial

Page 6

934 S.W.2d 113, *119; 1996 Tex. Crim. App. LEXIS 205, **6

court's response constituted error is [**7] not an issue before this Court because appellant failed to object to the statement. We have long held that, [HN6] for an issue to be preserved on appeal, there must be a timely objection which specifically states the legal basis for that objection. Rezac v. State, [*120] 782 S.W.2d 869, 870 (Tex.Crim.App. 1990). Since, appellant is raising this argument for the first time on appeal, any error is waived. 4

> 4 Appellant does not assert a right to present an untimely objection under the guise of an "absolute right" or a claim of a "waivable-only right." See Marin v. State, 851 S.W.2d 275 (Tex.Crim.App. 1993).

As his second basis for error, appellant contends the trial court misled veniremember Adams when it told her that a person sentenced to death was not eligible for parole, while also stating that a defendant sentenced to life in prison was eligible for parole. The relevant voir dire exchange follows:

> VENIREMEMBER: . . . is he eligible for parole?
>
> THE COURT: Well I think it's obvious [**8] if somebody is assessed the death penalty you don't get paroled on a death penalty.
>
> VENIREMEMBER: That doesn't seem to be what is happening, though. Or are we not knowing the full story when we hear things?
>
> THE COURT: You probably don't know the full story, but you aren't paroled on a death penalty. I think that is obvious. I don't think anybody is going to object at this point to my telling you that, which leaves you with the other option, a life sentence.
>
> VENIREMEMBER: And that's the one that you are eligible for parole at some stage, perhaps?
>
> THE COURT: Yes.
>
> APPELLANT: I would request that

you overrule the State's motion [in limine regarding parole questions] and inform her fully as to the full ramifications of it.

> THE COURT: No. At no time during this exchange did appellant lodge an objection claiming the trial court misled Adams. Rather, appellant simply asked the trial court to overrule the State's motion in limine. In his brief, appellant now seems to argue that the trial court misled Adams by apprising her of the existence of parole without then informing her of the intricacy of its operation.

We do not have to address the merits of this [**9] point because the State exercised a peremptory challenge against veniremember Adams. The alleged error could not have influenced the trial in any conceivable manner. Point of error three is overruled.

In his fourth point, appellant claims that Article 37.071 is unconstitutional if it is interpreted to deny a jury information of the thirty-five year minimum before parole eligibility. Appellant specifically claims that his due process rights protected under both the Fourteenth Amendment, and Article I, Section 19 of the Texas Constitution, were violated when the trial court refused to provide the jury with information of the minimum sentence before parole eligibility. *See* Smith; Broxton; Sonnier, *supra.*

Appellant also contends, under this point, that his Article I, Section 13 rights guaranteed by the Texas Constitution were violated. As to the latter argument, appellant is presumably referring to the Texas right against cruel or unusual punishment. In any event, appellant does not designate in his brief, and we cannot find in the record, where appellant lodged his Article I, Section 13 objection in the trial court. Without such an objection, any error in this regard has [**10] been forfeited. Rezac v. State, 782 S.W.2d at 870.

As to appellant's federal due process claim, this Court has settled the issue unfavorably to appellant. Broxton, supra. With regard to his Texas due course of law contention, appellant presents no argument or authority as to how the protection offered by the Texas Constitution differs from the protection guaranteed by the Federal Constitution. His claim is, therefore, inadequately

Page 7

934 S.W.2d 113, *120; 1996 Tex. Crim. App. LEXIS 205, **10

briefed and presents nothing for our review. Tex.R.App.Proc. 74(f) and 210(b); Smith v. State, *supra,* at 847; Ex parte Granger, *supra*, at 515, fn. 6.

Appellant finally claims, under this point, that his right to equal protection, as protected by the Fourteenth Amendment, was violated. Appellant specifically claims that capital defendants are treated disparately from non-capital defendants. Appellant's argument [*121] was rejected in Smith v. State, *supra*. Point of error four is overruled.

In point eleven, appellant contends that two inconsistent versions of Article 37.071, as enacted by the Texas Legislature, were in effect during the time of appellant's trial. Appellant argues that the existence of these two [**11] versions resulted in a conviction which violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Federal Constitution, and his rights under Article I, Sections 10 and 19 of the Texas Constitution.

Specifically, appellant complains that two legislative amendments -- Senate Bill 880 and House Bill 9 -- both effective on September 1, 1991, are conflicting. See Tex. H.B. 9, 72nd Leg., R.S. Ch. 652 and Tex. S.B. 880, 72nd Leg., R.S., Ch. 838. To establish this purported conflict, appellant notes that Senate Bill 880 amended Article 37.071 so as to delete the special punishment issues concerning "deliberateness" and "provocation," while such a deletion was not reflected in House Bill 9. Appellant argues that there is an "irreconcilable conflict" between the two enactments such that the following rights were violated: First, appellant did not have effective assistance of counsel because he could not know which enactment applied. Second, appellant claims he was unable to effectively prepare and conduct voir dire because of improper statutory uncertainty. Although appellant, in this appeal, presents a "laundry list" of alleged constitutional violations, [**12] we will address only the two claims specifically argued in his brief.

Appellant has failed to indicate in his brief, and we cannot find in the record, where he lodged an objection to Article 37.071 in which he claimed "irreconcilable conflict." These objections were not raised with the trial court; they are raised for the first on appeal. As we held, supra, for an issue to be preserved on appeal, there must be a timely objection which specifically states the legal basis for that objection. Rezac v. State, 782 S.W.2d at 870. Appellant has failed to argue, and we decline to hold

in this context, that an untimely objection -- under the guise of an "absolute right" or a claim of a "waivable-only right" -- is applicable in this case. See Marin v. State, 851 S.W.2d 275 (Tex.Crim.App. 1993). [5]

> [5] Appellant cites Almanza v. State, 686 S.W.2d 157 (Tex.Crim.App. 1984), for the proposition that an objection is unnecessary if error is egregious or fundamental. However, the Almanza holding is limited to charge error; Almanza has no application to this context.

[**13] Appellant seems to argue -- for the first time on appeal -- that even without a trial objection, this Court can review the jury charge to determine if there was a defect so egregious that it deprived appellant of a fair trial. Appellant is correct. Almanza v. State, 686 S.W.2d 157, 171 (Tex.Crim.App 1984). However, there was no error in the Article 37.071 charge because it is plain that there were never two versions of Article 37.071 in existence. If there is no charge error, Almanza has no application.

The Texas Constitution contains a provision which governs the amendment of statutes:

> [HN7] Sec. 36. No law shall be revived or amended by reference to its title; but in such case the act revived, or the section or sections amended, shall be re-enacted and published at length. Tex. Const. art. III, § 36.

Hence, to amend a statute, the Legislature must indicate changes by interlineating the modifications onto the text of the statute as the text was prior to amendment. The purpose of this requirement is straightforward:

> An amendment which sought to insert words or substitute phrases by reference with no publication could well mislead as to its effect. [**14] Such was sometimes the intention. Great confusion was introduced into the law, and to eliminate the uncertainty and confusion, the constitution wisely requires amended statutes to be re-enacted and published so that their meaning may be known without the necessity of examining the statute amended.

> Tex. Const. art. III, § 36 interp.

Page 8

934 S.W.2d 113, *121; 1996 Tex. Crim. App. LEXIS 205, **14

commentary (Vernon 1984).

House Bill 9 made a single substantive change to Article 37.071. That change was the addition of Section One, in which the [*122] State might elect to decline pursuit of a death sentence in a capital case. Tex. H.B. 9, 72nd Leg., R.S. Ch. 652, § 4. To indicate this change, the Legislature was compelled to "re-enact" the entire statute as it was before amendment. Article 37.071 did not yet contain the changes made by Senate Bill 880 because these changes were made during the same legislative session and had not yet taken effect. Hence, House Bill 9 does not contain the changes made by Senate Bill 880.

Senate Bill 880 made more extensive amendments. These changes essentially involved the elimination of the "deliberate" and "provocation" prongs of the jury charge, and the addition of the mitigation finding. To [**15] signify these changes, the Legislature was required to "re-enact" the entire statute, as it was before amendment. House Bill 9 was not yet part of Article 37.071.

The Legislature, anticipating appellant's argument, enacted the following provision in the Code Construction Act:

> [HN8] (b) . . . If amendments to the same statute are enacted at the same session of the legislature, one amendment without reference to the other, the amendments shall be harmonized, if possible, so that effect may be given each.
>
> (c) In determining whether amendments are irreconcilable, text that is reenacted because of the requirements of Article III, Section 36, of the Texas Constitution is not considered to be irreconcilable with additions or omissions in the same text made by another amendment. Unless clearly indicated to the contrary, an amendment that reenacts text in compliance with that constitutional requirement does not indicate legislative intent that the reenacted text prevails over changes in the same text made by another amendment, regardless of the relative dates of the amendment.

Tex.Gov't Code § 311.025 (b) and (c).

Upon review of House Bill 9, and Senate Bill 880, we find [**16] the two enactments are perfectly reconcilable. Each makes substantive changes the other does not; there is no conflict when one comprehends how statutory amendments are achieved. There being no conflict, appellant's argument that there were two inconsistent versions of Article 37.071 in effect during his trial is without basis. Point of error eleven is overruled.

In point seventeen, appellant claims the trial court erroneously restricted voir dire questioning regarding factors that particular veniremembers considered mitigating. Appellant simply cites page references where he claims such a restriction occurred and provides no argument or analysis in support.

[HN9] When a defendant challenges a trial court's limitation on voir dire questioning on appeal, the reviewing court must analyze the claim under an abuse of discretion standard, the focus of which is whether appellant proffered a proper question. Caldwell v. State, 818 S.W.2d 790, 793 (Tex.Crim.App. 1991), *cert. denied,* 503 U.S. 990, 118 L. Ed. 2d 399, 112 S. Ct. 1684 (1992). A proper question is one which seeks to discover a veniremember's views on an issue applicable to the case. 818 S.W.2d at 794. If a proper question [**17] is disallowed, harm to appellant is presumed because he has been denied the ability to intelligently exercise his peremptory strikes. *Id.* However, the trial court may restrict questions in which counsel attempts to commit a veniremember to a particular resolution based upon facts peculiar to the trial. Coleman v. State, 881 S.W.2d 344, 350-51 (Tex.Crim.App. 1995), *cert. denied,* 130 L. Ed. 2d 660, 115 S. Ct. 763 (1995).

In appellant's first contention, he claims an improper voir dire restriction in the following exchange:

> APPELLANT: Drug usage, could that ever be mitigating factor to you in the proper situation?
>
> PROSECUTOR: Your Honor, again I have to object to trying to commit Mr. Tomlinson to exactly what things he would consider mitigating . . .
>
> THE COURT: Okay. Let me reiterate.

Page 9

934 S.W.2d 113, *122; 1996 Tex. Crim. App. LEXIS 205, **17

APPELLANT: Can I ask the court to rule on her motion so I could respond?

THE COURT: I am sustaining it as far as committing. . . .

This questioning occurred just after appellant told the veniremember that the law required him to consider drug use to be mitigating. Appellant was not asking whether [*123] the veniremember could consider drug [**18] usage in the punishment portion of the trial; rather, appellant was asking whether the veniremember believed it to be mitigating. *See* Penry v. State, 903 S.W.2d 715, 736 (Tex.Crim.App. 1995). Indeed, the evidence adduced at trial indicated that appellant was intoxicated when he committed the murders. In this context, the trial court could reasonably find such a question to be an impermissible effort to commit the veniremember to a particular set of facts. Coleman v. State, *supra.*

Upon review of appellant's second claimed voir dire restriction, we find the limitation to be within the trial court's discretion. Appellant asked veniremember Tomlinson whether he thought good conduct in prison to be an aggravating factor or a mitigating factor. Appellant was attempting to elicit, not whether the veniremember could consider good conduct in prison at mitigation, but whether the veniremember would find good conduct in prison to be mitigating. There was evidence presented at trial that appellant was a good prisoner before the killings. A rational trial court could find that such questioning was an improper attempt to bind the veniremember to a particular finding based [**19] upon the facts presented at trial. Id .

Our review of appellant's third claim fails to uncover a voir dire limitation. The following exchange occurred:

APPELLANT: What would be mitigating at the time of punishment? You kind of ruled out bad childhood in a way.

VENIREMEMBER: Oh, no, I mean, there could be a combination of things.

PROSECUTOR: Your Honor, I have to object to trying to commit Ms. Jones as to exactly what she would consider as mitigating. As long as she would consider any mitigating evidence.

THE COURT: I understand. I don't understand the question to be trying to commit her. . . . So if you just want to talk about in general terms.

The trial court then permitted appellant to continue questioning the veniremember in general terms. There was no voir dire limitation.

Our review of appellant's fourth claim again indicates that the trial court reasonably restrained appellant's questioning. Appellant was attempting to commit the veniremember to drug use as a mitigating factor. As we held, supra, given the nature of this case, such a restriction was reasonable. Finally, upon review of appellant's final contention, we fail to find a voir dire [**20] restriction. Although the State objected to appellant's mitigation question, the trial court did not rule on the objection. Hence, appellant was permitted to ask the question.

The trial court legitimately exercised its discretion when it prevented appellant from asking questions which committed veniremembers to particular factual findings which were peculiar to the case on trial. Point of error seventeen is overruled.

In point nine appellant claims the trial court erred when it permitted the State to exercise a peremptory challenge against veniremember Berniece Holiday, in that the challenge was racially motivated and a violation of Batson v. Kentucky, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). [HN10] Under Batson, the procedure to determine an equal protection violation has three prongs in the context of racial discrimination: First, the opponent of the peremptory challenge has to prove a prima facie case of racial discrimination (step one). If this burden is met, the burden of production falls to the proponent of the strike to tender a race-neutral explanation (step two). If a race neutral explanation is tendered, the trial court must then determine if the opponent [**21] of the strike has proved purposeful racial discrimination (step three). *See also* Purkett v. Elem, 514 U.S. 765, 131 L. Ed. 2d 834, 115 S. Ct. 1769, 1770-71 (1995). [HN11] This court reviews the trial court's finding, *vel non,* of purposeful discrimination under a clearly erroneous standard. Wheatfall v. State, 882 S.W.2d 829, 835 (Tex.Crim.App. 1994), *cert. denied,* 130 L. Ed. 2d 644, 115 S. Ct. 742 (1995). [HN12] When applying the clearly erroneous standard, this Court will

Page 10

934 S.W.2d 113, *123; 1996 Tex. Crim. App. LEXIS 205, **21

not disturb a trial court's ruling unless we are left with a definite and firm conviction that a mistake has been committed. Vargas [*124] v. State, 838 S.W.2d 552, 554 (Tex.Crim.App. 1992). In making this determination, this Court will review voir dire, the State's race-neutral explanations, the composition of the jury panel, and appellant's rebuttal and impeachment evidence. *Id.*

To make his prima facie case at trial, appellant made several observations to the trial court. First, appellant confirmed that veniremember Holiday was black. Second, appellant noted that Holiday was the first black veniremember to be interviewed from the fourth jury panel. Appellant also noted that Holiday's [**22] answers seemed very State-oriented. Finally, appellant contended that the State used a peremptory strike against Holiday only two minutes into appellant's voir dire questioning. Appellant claims that the State, by interrupting his voir dire examination to lodge a peremptory strike, changed its pattern of asserting peremptory strikes. These were the only arguments appellant advanced in his effort to demonstrate a prima facie case.

The State contested the legitimacy of appellant's prima facie case. The trial court, nevertheless, ordered the State to provide its race-neutral reasons for the strike. The State provided several race-neutral reasons: (a) Holiday "dozed off" during the State's group voir dire examination; (b) Holiday's answers were very succinct, in a way which demonstrated a lack of candor; (c) Holiday only answered three of seventeen questions on a particular page of her juror questionnaire; (d) Holiday's facial expressions led the prosecutor to believe that she was saying what she believed the prosecutor wanted to hear; (e) Holiday was an elementary school teacher and might identify too closely with evidence of appellant's difficult childhood; (f) Holiday indicated, with [**23] a tone of pride, that, while previously serving on a jury, she "set free" the defendant; (g) Holiday had a first cousin who was in prison. In addition, the State noted that over 64 veniremembers had been questioned to that point, and of those 64 this was the first black veniremember the State peremptorily challenged.

The trial court, noting that it too had observed Holiday napping during voir dire, declared the State's rationale for striking Holiday to be racially neutral. The trial court then overruled appellant's Batson motion.

The record does not manifest whether the trial court ever determined that appellant met his prima facie burden. In Texas, however, once a party articulates the reasons for a peremptory challenge, and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot. Wheatfall v. State, 882 S.W.2d at 835.

Upon review of the record, this Court is not left with a definite and firm conviction that error was committed. Appellant's showing of purposeful discrimination was minimal. The State's race-neutral explanations were not whimsical, Purkett, [**24] *supra,* and the record does not reflect that the State demonstrated a disparate pattern of strikes against any suspect class. Point of error nine is overruled.

In point ten, appellant claims Batson error as to veniremember Gregory Randle. To support his prima facie claim, appellant stated into the record that: (a) Randle was black; (b) the Harris County District Attorney's Office has had a history of trying to exclude blacks from juries; (c) Randle was observant and intelligent, and considerate of the prosecution; (d) Randle was "protective as to society." The trial court ordered the State to provide its race-neutral reasons without ruling upon whether appellant properly made a prima facie case.

The State's explanations were: (a) Randle had a brother in prison, and although Randle had visited him recently, Randle professed that he did not know what crime his brother committed. The prosecutor professed that she was concerned Randle was being disingenuous, and down-playing the effect his relationship with his brother would have on him; (b) Randle vacillated on the kind of evidence he would require to find future danger. Although this vacillation was not legally sufficient to [**25] subject Randle to a challenge for cause, he nevertheless occasionally articulated that he would prefer evidence of past violent behavior to find future danger (the [*125] State had no evidence of past violent behavior); (c) Randle indicated during voir dire that he thought the death penalty was wrong, although he conceded that it might be necessary for some crimes.

Appellant then disputed the State's interpretation of Randle's voir dire answers. The judge found the State's reasons to be race-neutral and overruled appellant's objection. Given the utter lack of any real evidence that the State purposefully discriminated against Randle in the record, and the relative strength of the State's

Page 11

934 S.W.2d 113, *125; 1996 Tex. Crim. App. LEXIS 205, **25

explanations, we are not left with a definite and firm conviction that a mistake was committed. Point of error ten is overruled.

In point eighteen, appellant contends the trial court erred when it refused to admit, during punishment, eleven childhood photographs which depicted him as a normal, happy child. Appellant argues that the trial court's preclusive ruling denied him the opportunity to present relevant, mitigating evidence in his defense. When the trial court asked appellant to demonstrate [**26] relevance, he made the following argument:

> My point is the State has introduced photographs throughout the dehumanizing stage of their punishment hearing, showing various photographs of him when he was arrested at the time of seventeen, eighteen, throughout, mug shots. To aid the jury to understand the development of the defendant though his various stages of his life, we also have the right to show the human side of the defendant as much as the State has attempted to dehumanize and turn him into some sort of monster. I think, under Penry and under the mitigation portion stage of the trial, the jury should be entitled to see the defendant grow and what various stages [sic]. Talking about elementary school and how he appeared, et cetera, et cetera. And let them give whatever weight they think is necessary. It's very material to our lawsuit.

Thus, appellant was trying to "humanize" his client by demonstrating that he was once a normal child.

[HN13] Within the meaning of Article 37.071, § 2(a), evidence "mitigates against the imposition of the death penalty" if a reasonable juror could conclude that the evidence was a basis for a sentence less than death. Alvarado v. [**27] State, 912 S.W.2d 199, 217 (Tex.Crim.App. 1995) (plurality opinion). Article 37.071, § 2(f) (4) provides further guidance when it defines mitigating evidence "to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." As we observed in Alvarado, if a reasonable juror could not conclude that the proffered evidence reduced the defendant's moral blameworthiness, then a trial court would be within its discretion to exclude the evidence. Alvarado v. State, 912 S.W.2d at 217.

The U.S. Supreme Court has never suggested that sentencers be given -- in the context of mitigation -- "unbridled discretion in determining the fates of those charged with capital offenses." Franklin v. Lynaugh, 487 U.S. 164, 108 S. Ct. 2320, 101 L. Ed. 2d 155 (1988) (plurality opinion). As the Supreme Court observed in Franklin, *supra:*

> We find unavailing petitioner's reliance on this Court's statement in Eddings v. Oklahoma, 455 U.S. 104, 114, 71 L. Ed. 2d 1, 102 S. Ct. 869, that the sentencing jury may not be precluded from considering "any relevant, mitigating evidence." This statement leaves unanswered the question: relevant to what? While [**28] Lockett, supra, answers this question at least in part -- making it clear that a State cannot take out of the realm of relevant sentencing considerations the questions of the defendant's "character," "record," or the "circumstances of the offense" -- Lockett does not hold that the State has no role in structuring or giving shape to the jury's consideration of these mitigating factors. Franklin v. Lynaugh, 108 S. Ct. at 2330. [citations omitted].

The Franklin plurality recognized a relevance requirement to evidence bearing on the jury's mitigation determination.

Indeed, Justice O'Connor provides further guidance to the issue of relevancy by [*126] placing a limit on the categories of evidence which are conceivably mitigating. She provides a prism with which to determine the relevance of proposed mitigating evidence: the culpability of the defendant. As she explained in Franklin, *supra,* and later in Penry v. Lynaugh, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989):

> [HN14] Evidence about the defendant's background and character is relevant because of the belief, long held in society, that defendants who commit criminal acts that [**29] are attributable to a disadvantaged background, or to

Page 12

934 S.W.2d 113, *126; 1996 Tex. Crim. App. LEXIS 205, **29

emotional and mental problems, may be less culpable than defendants who have no such excuse. Franklin, 108 S. Ct. at 2333. [citing California v. Brown, 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837 (1987)] [emphasis added].

To Justice O'Connor, the evidence is relevant because it relates to the moral culpability of a defendant's act. By this logic, if evidence has no relation to a defendant's moral culpability for the charged crime, then it is irrelevant to mitigation.

[HN15] In our view, photographs of appellant which depict a cheerful early childhood are irrelevant to appellant's moral blameworthiness for the commission of a violent double-murder because such evidence has no relationship to appellant's conduct in those murders. That appellant was once a child does not diminish his moral culpability for the act of murder. Thus, we find no abuse of discretion on the part of the trial court in refusing to admit these photographs. Point of error eighteen is overruled.

In point five, appellant claims the trial court erred when it admitted evidence, during the punishment phase of the trial, that appellant would be [**30] eligible for unaccompanied emergency furlough from prison if he were assessed a life sentence for the offense of capital murder. The State elicited this evidence from Roy Smithy, who was employed by the Huntsville prison:

Q: If an inmate is in prison and behaves himself for a certain period of time, even if he has been convicted of capital murder, and of course, is there on just a life sentence, is there an opportunity for him to get furloughed?

A: If he obtains SAT status, state approved trustee 3 status, then he is eligible for furloughs.

Q: Just exactly what does a furlough mean?

A: You have different types. You have emergency furloughs. You have other --.

DEFENSE COUNSEL: Your Honor, could I have a running objection to all of this?

THE COURT: Just a moment. Approach the bench, please.

(Counsel went to the bench for an off-the-record conference; then the reporter was called to the bench, and the following proceedings were had:)

DEFENSE COUNSEL: Judge, to allow her to go into this stuff and not let me allude to -- let the jury know he is going to stay locked up for thirty-five years is a gross miscarriage of justice.

THE COURT: I [**31] don't know where your objection is in there. I understand what your previous objection was. She has been admonished.

DEFENSE COUNSEL: I object to any further questions along this line.

THE COURT: I am going to allow her to complete her line of questioning. That is all I am going to say.

Q: I am not even sure I remember what the last question was.

DEFENSE COUNSEL: Talking about furlough.

Q: Thank you. I think I had asked you what is a furlough?

A: A furlough is when an inmate is allowed to leave the prison unit unescorted to attend whatever reason it is that he has requested to leave the unit, things such as funeral, family emergency and things of that sort where he, in essence, signs a piece of paper that says that he is going to be released a certain time and that he will go to wherever this emergency is and that he promises that he will be back and turn himself back into the unit.

Q: Like just for the weekend or something or for a day or so?

Page 13

934 S.W.2d 113, *126; 1996 Tex. Crim. App. LEXIS 205, **31

[*127] A: Yes, ma'am. It may not be just a weekend. It could very well be for a three day period in the middle of the week.

Q: Depending on the circumstances?

A: Yes, ma'am.

This [**32] discussion encompasses the entire testimony regarding furlough.

We do not have to address the merits of appellant's contention because he failed to object to the line of questioning with ample specificity to notify the trial court of his contention. *See* Zillender v. State, 557 S.W.2d 515, 517 (Tex.Crim.App. 1977). [HN16] This Court has identified the prerequisites to an effective objection respecting the admissibility of evidence. As we held in Lankston v. State, 827 S.W.2d 907, 909 (Tex.Crim.App. 1992):

As regards specificity, all a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it. Of course, when it seems from context that a party failed effectively to communicate his desire, then reviewing courts should not hesitate to hold that appellate complaints arising from the event have been lost.

In the instant case, appellant objected only to the trial court's decision to preclude issues of parole eligibility from the trial; appellant [**33] did not actually object to the State's question regarding emergency furlough.

Indeed, the trial court flatly told appellant that it did not comprehend the nature of appellant's objection. Rather than rephrasing the objection in a way that the trial court could fathom, appellant lodged another non-specific objection. Appellant failed to effectively communicate his objection. Appellant then declined to rephrase it when the trial court informed him that it did not understand his objection. We therefore hold that appellant's complaint regarding the State's questioning is waived for failure to object with specificity. Point of error five is overruled.

In point six, appellant again contends error resulting from the admission of evidence with respect to unescorted emergency furlough. In this point, however, appellant claims the trial court erred when it overruled appellant's motion for new trial based upon the admission of such evidence. As we held in point five, appellant waived his objection to evidence of unescorted emergency furlough. Appellant, by failing to object correctly, waived his right to complain of the admission of this evidence. Hence, the admission of evidence regarding [**34] unescorted emergency furlough could not form the basis of a motion for new trial. Point of error six is overruled.

In point seven, appellant again contends error resulting from the admission of evidence with respect to unescorted emergency furlough. However, in this point, appellant claims the trial court erred when it overruled his requested jury instruction at punishment that the jury not consider the possibility of furlough during deliberations. Appellant is again attempting to avoid the consequence of his procedural default regarding emergency furlough. Appellant failed to object to, or request the court to limit, the jury's consideration of this evidence. Indeed, appellant also failed to request that the trial court strike the evidence at the time it was offered, waiting until the jury charge was prepared.

The motion to strike is itself subject to a requirement of timeliness. *See* S. Goode, et al., Guide to the Texas Rules of Evidence: Civil and Criminal § 103.2 at 18 (2nd ed. 1993). [HN17] For an objection to be "timely", a party must invoke it as soon as the ground for it becomes manifest. *Id.* In the case at bar, the basis for a motion to strike became manifest as soon [**35] as the State elicited the testimony regarding emergency furlough. Yet, appellant failed to request that the jury be instructed not to consider the evidence when it was elicited. The motion to strike, in the guise of a requested jury instruction, was untimely. The trial court therefore did not err when it overruled appellant's requested instruction. Point of error seven is overruled.

[*128] In point eight, appellant avers that the trial court erred when it overruled his requested jury instruction regarding the minimum time served on a life sentence before parole eligibility. At the outset we note, that this Court has considered this argument in prior cases and ruled unfavorably to appellant. Smith; Broxton, *supra.* Appellant, however, contends that the parole

Page 14

934 S.W.2d 113, *128; 1996 Tex. Crim. App. LEXIS 205, **35

instruction became necessary when evidence respecting unescorted emergency furlough was introduced to the jury:

> The trial court erred in allowing the jury to consider testimony regarding the procedures applicable to discretionary prison release. This is the type of evidence which courts have consistently ruled inadmissible and which the legislature would still keep from jury deliberation.

The essence [**36] of appellant's argument is that he should be permitted to notify the jury regarding procedures surrounding discretionary prison release if the State is permitted to do so. However, the jury was authorized to consider evidence of unescorted emergency furlough because appellant failed to object properly to its admission. That the jury could consider emergency furlough does not necessitate that it be informed of the factors surrounding parole eligibility. This is because the jury's knowledge of whether appellant was eligible for parole in thirty-five years does not serve to rebut the possibility that appellant could be released on emergency furlough within two days of entering prison. The two issues are unrelated. Hence, the trial court did not err when it refused to give a parole instruction. Point of error eight is overruled.

In point thirteen, appellant contends that Article 37.071 is unconstitutional because it fails to place the burden of proof, with respect to mitigation, upon the State. Appellant's argument follows:

> [Article 37.071] limits and inhibits the jury's consideration of mitigating evidence in violation of the Eighth and Fourteenth Amendments of the [**37] United States Constitution. Said infirmity results by the statute's failure to place the burden of proof on the State for the mitigation special issue as mandated by Art. 37.071 (e).

[HN18] In cases where mitigating evidence is presented, all that is constitutionally required is a vehicle by which the jury may give mitigating effect to appellant's evidence. Penry v. Lynaugh, *supra;* Walton v. State, 497 U.S. 639, 110 S. Ct. 3047, 3055, 111 L. Ed. 2d 511 (1990); Barnes v. State 876 S.W.2d 316, 330 (Tex.Crim.App. 1994), *cert. denied,* U.S. , 130 L. Ed. 2d 110, 115 S. Ct. 174 (1994). No burden of proof exists for either the State or defendant to prove or disprove the mitigation question. *Id;* Penry v. State, 903 S.W.2d 715, 765 (Tex.Crim.App. 1995). Point of error thirteen is overruled.

In point fourteen, appellant claims the trial court erred when it refused to give a punishment instruction which accurately placed the burden of proof as to mitigation on the State. As we held in the prior point of error, no burden of proof exists for either the State or defendant to prove or disprove the mitigating question. Barnes v. State, [**38] *supra.* Hence, the trial court did not err when it overruled appellant's erroneous request to instruct the jury that the burden of proof was on the State to prove mitigation. Point of error fourteen is overruled.

In point sixteen, appellant contends the trial court erred when it overruled his objection to the punishment charge. In his objection, appellant claimed that the charge failed to identify and define which factors presented by the evidence could be considered mitigating. Indeed, appellant bases this contention upon the notion that there are some factors which are mitigating as a matter of law.

[HN19] There is no evidence that must be viewed by a juror as having a definitive mitigating effect, per se. Robertson v. State, 871 S.W.2d 701, 712 (Tex.Crim.App. 1994), *cert. denied,* 130 L. Ed. 2d 94, 115 S. Ct. 155 (1994). As we have previously held: [HN20] "[Appellant] is not entitled to jury instructions specifically informing the jury that certain evidence may be considered or how it may be applied." *Id.* Hence, appellant's request for an instruction informing the jury that certain evidence was mitigating, [*129] per se, was properly denied. Point of error sixteen is [**39] overruled.

In point fifteen, appellant claims Article 37.071 violates the Eighth and Fourteenth Amendments to the U.S. Constitution because it fails to direct or inform the jury regarding the nature of mitigating or aggravating evidence that would call for or against the application of the death penalty. As we held in Robertson, *supra:*

> [HN21] Each juror may or may not believe certain evidence is mitigating; however, the constitution only requires that where a juror believes there is relevant mitigating evidence, that juror must have a vehicle to give his or her

Page 15

934 S.W.2d 113, *129; 1996 Tex. Crim. App. LEXIS 205, **39

reasoned moral response to such evidence.

Robertson v. State, 871 S.W.2d at 712. (citing Johnson v. Texas, 509 U.S. 350, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993). The Federal Constitution does not require trial courts to instruct juries regarding how they should consider, or apply what they may or may not deem mitigating evidence. Point of error fifteen is overruled.

In point twelve, appellant claims the trial court erred when it overruled his contention that Article 37.071 was unconstitutional, in violation of the Eighth and Fourteenth amendments to the U.S. constitution. Appellant specifically [**40] asserts that an untrained jury was incapable of predicting whether a defendant might commit future acts of violence which would constitute a continuing threat to society. Appellant, therefore, argues that Article 37.071 fails "to meet the constitutional requirement that the death penalty not be arbitrarily or capriciously rendered." This Court addressed and rejected appellant's argument in Lackey v. State, 819 S.W.2d 111, 121 (Tex.Crim.App. 1989). Point of error twelve is overruled.

Having found no reversible error, we AFFIRM the judgment of the trial court.

MANSFIELD, J.

DELIVERED OCTOBER 2, 1996

EN BANC

BAIRD, J., concurring

MALONEY and MEYERS, JJ., concur in the result.

**CONCUR BY:** BAIRD

**CONCUR**

BAIRD, J., concurring with the following note: I am sympathetic to the views expressed in Judge Overstreet's well reasoned dissent. Post, 934 S.W.2d at 131 (Overstreet, J., dissenting). However, for the reasons stated in Smith v. State, 898 S.W.2d 838, 856 (Tex.Cr.App. 1993) (Baird, J., concurring), and because the Supreme Court has not revisited its opinion in Simmons v. South Carolina, 512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994), I am [**41] constrained to join only the judgment of the Court.

**DISSENT BY:** CLINTON; OVERSTREET

**DISSENT**

DISSENTING OPINION

CLINTON, Judge

I dissent to the majority's dogged determination to give the slip to Simmons v. South Carolina, 512 U.S. 154, 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994). In my view a requirement that trial courts inform juries about the earliest possible release date attached to a life sentence obtains if a defendant has shown other evidence that, in combination with the information about release dates, tends to show that a capital defendant will not be a future danger to society. Willingham v. State, 897 S.W.2d 351, 359 (Tex.Cr.App. 1995) (Clinton, J., concurring). Unlike most appellants raising Simmons claims, appellant here offered precisely such evidence at trial. During punishment, appellant adduced uncontroverted expert testimony from a psychologist to the effect that his tendency to violence would be greatly mollified by the time he reached the age of sixty-three. Of course the full significance of this testimony will be lost on a jury that does not know that appellant cannot be released into society until at least that age. It escapes [**42] me how this Court can gainsay the force of the reasoning in Simmons when presented with such evidence, evidence that in my view makes information about the earliest potential release date available to appellant should he be sentenced to life imprisonment unquestionably relevant to future dangerousness. [1]

> 1  My resolution of this point of error casts doubt on the propriety of the trial court's refusal to permit appellant to question members of the venire panel on the issue of earliest possible release dates. But if this is indeed voir dire error, it is no doubt error affecting punishment only and thus requires a remand only for a new punishment hearing. See Article 44.29(c); Ransom v. State, 920 S.W.2d 288 (Tex.Cr.App. 1996). As my resolution of the predicate issue would already require the Court to remand for a new punishment hearing, however, there is no need to resolve the voir dire question.

[*130]  I also write to express disagreement with the majority's discussion of appellant's eighteenth point

Page 16

934 S.W.2d 113, *130; 1996 Tex. Crim. App. LEXIS 205, **43

[**43] of error. At punishment, the trial court refused to admit eleven photographs presented by appellant depicting him at various points throughout his childhood. The majority affirmed the trial court's decision on grounds that I find unnecessary, inadequately discussed, and simply wrong.

The majority states that mitigating evidence must relate to a defendant's personal moral culpability. It thus holds that the trial court was correct in refusing to admit the photographs because they do not reflect upon appellant's moral culpability. As I have iterated previously, I do not believe that Supreme Court caselaw answers this very difficult question as the majority, in a few brief paragraphs, does.

By way of the majority's discussion in this regard we essentially revisit the nexus requirement, Lackey v. State, 819 S.W.2d 111 (Tex.Cr.App. 1991) (On appellant's motion for rehearing), in a new setting. This court-created admissibility threshold is again urged by the majority, though not in the precise terms. In my opinion, the fundamental problem with such a relevancy requirement persists. Lackey, 819 S.W.2d at 136 (Clinton, J., dissenting); Goss v. State, 826 S.W.2d 162, 169 (Tex.Cr.App. [**44] 1992) (Clinton, J., dissenting); see also Ex parte Bower, 823 S.W.2d 284, 288-295 (Tex.Cr.App. 1991) (Clinton, J., dissenting). By upholding the trial court's exclusion of the eleven photographs on the basis that the photographs do not pertain to appellant's moral culpability, the majority continues to ignore the Supreme Court's jurisprudence to the contrary. For the same reasons I criticized the nexus requirement, I dissent in this cause as well.

To justify its position, the majority has seized on language in Franklin v. Lynaugh, 487 U.S. 164, 108 S. Ct. 2320, 101 L. Ed. 2d 155 (1988) (plurality opinion), and Penry v. Lynaugh, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989), that indicates that the appropriate punishment in a capital trial is purely a function of the defendant's personal moral culpability. [2] Slip op., at 15-16. While this language indicates that mitigating evidence is relevant only if it reflects on the moral culpability of the defendant, the comments only appear to be dicta. The Supreme Court has never explicitly arrived at that conclusion in a holding of a majority opinion.

> 2   The majority also cites Article 37.071 § 2(f) (4) to support its conclusion. Yet the effect of the

jury instruction called for by § 2(f) (4) on the definition of mitigating evidence in § 2(e) presents a problem that has not been resolved by the Court. Article 37.071 § 2(e) arguably allows a much broader range of mitigating evidence than § 2(f) (4). Though it has been presented to the Court on prior occasions, the issue has not yet been decided in my opinion. The Court has touched on it, though incompletely and even inconsistently. See Lawton v. State, 913 S.W.2d 542, 555-6 (Tex.Cr.App. 1995); McFarland v. State, 928 S.W.2d 482, 1996 Tex. Crim. App. LEXIS 19 (Tex.Cr.App., 1996); Alvarado v. State, 912 S.W.2d 199, 217 (Tex.Cr.App. 1995) (plurality opinion); Goff v. State, 931 S.W.2d 537, 1996 Tex. Crim. App. LEXIS 68 (Tex.Cr.App., 1996).

[**45] Moreover, other portions of the Penry opinion support my long-held belief -- based on my reading of the Court's caselaw -- that there can be no such limitation on the scope of mitigating evidence. For instance, the Court cited the holding in Lockett v. Ohio, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), "that the Eighth and Fourteenth Amendments require that the sentencer 'not be precluded from considering, as a *mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" Id., 492 U.S. at 317, 109 S. Ct. at 2946, 106 L. Ed. 2d at 277 (emphasis in original) (citation omitted) The Court also cited Eddings v. Oklahoma, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982), for the proposition that "[a] State may not by statute preclude the sentencer from considering any mitigating factor . . ." Penry, 492 U.S. at 318, 109 S. Ct. at 2946, 106 L. Ed. 2d at 278. Indeed, as Penry noted, our death penalty scheme survived constitutional scrutiny in Jurek because this Court "broadly interpreted the second [special issue] . . . so as to permit [**46] the sentencer to consider whatever mitigating circumstances the defendant might be able to offer." Id., 492 U.S. at 317, 109 S. Ct. at 2946, [*131] 106 L. Ed. 2d at 277 (internal quotations and citations omitted) (emphasis added).

In any event, the Supreme Court has never renounced its decision in Skipper v. South Carolina, 476 U.S. 1, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986). In Skipper, the Court held that it violates the Eighth and Fourteenth Amendments for the trial court to refuse to admit evidence of the petitioner's post-arrest, pre-trial

Page 17

934 S.W.2d 113, *131; 1996 Tex. Crim. App. LEXIS 205, **46

good conduct and adjustment during incarceration. The Court arrived at this conclusion even though expressly recognizing that the mitigating effect of the evidence did not derive from its relation to the petitioner's culpability for the offense he committed. Despite language to the contrary in Penry, supra, I continue to believe that:

> "the principle of Skipper [that proffered evidence does not necessarily have to relate specifically to culpability for the charged crime to be relevant to serve as a valid basis for a sentence less than death] remains intact . . . and applies beyond the context of good conduct [**47] in jail."

Lackey, 819 S.W.2d at 137 (Clinton, J., dissenting).

Accordingly, the photographs adduced by appellant should have been admitted by the trial court, even if the only purpose of their introduction was to solicit the mercy of the jury. The dispensation of mercy is a "fundamental tradition of our system of criminal jurisprudence," and one of the jury's core prerogatives. Boyd v. State, 811 S.W.2d 105, 130 n.5 (Tex.Cr.App. 1991) (Clinton, J., dissenting) (citations omitted). The majority is wrong to conclude that the photographs are inadmissible on the rationale that they do not relate to appellant's personal moral culpability. Moreover, the majority decides this intractable, complicated, very important constitutional question with but a wave of a hand and a brushing aside of Supreme Court precedent inconsistent with its holding.

To the short-shrift the majority gives a pair of Supreme Court cases from South Carolina, I dissent.

CLINTON, Judge

(Delivered: October 2, 1996)

EN BANC

Overstreet, J., joins.

DISSENTING OPINION

OVERSTREET, JUDGE

Appellant's eighth point of error alleges that "the trial court erred in overruling appellant's requested [**48] instruction in the jury charge regarding the minimum time served for a life sentence assessed for the offense of capital murder." Point number four asserts that if Article 37.07, V.A.C.C.P. "was properly interpreted as preventing the trial court from fully informing the jury of the statutory sentencing provisions for capital murder, the section violated the due process rights afforded by the Fourteenth Amendment to the United States Constitution and Article I, Sections 13 and 19 of the Texas Constitution." Both points complain about the trial court's refusal to inform the jury that a life sentence after conviction of capital murder statutorily required service of 35 years incarceration before becoming eligible for parole. The majority concludes that "the trial court did not err when it refused give a parole instruction." Rhoades v. State, 934 S.W.2d 113, 1996 Tex. Crim. App. LEXIS 205 (Tex.Cr.App. 1996). I respectfully disagree and believe that appellant was entitled to his requested instruction informing the jury that he would not be eligible for parole for 35 years if he received a life sentence.

Appellant sought to inform veniremembers about the statutory requirement of 35 [**49] years incarceration before becoming eligible for parole, but the trial court refused to allow such and instead granted the State's motion in limine restricting the discussion of such during voir dire. Appellant points out that he presented testimony from a psychologist that the risk level for violence decreases with age and that a 65-year-old inmate's risk level would have gone way down from whatever it may have been before and should approximate that of the general population. He suggests that such testimony had no relevant meaning to the jury on the issue of future dangerousness, nor could it be given any mitigating effect, without the jury's knowledge of the mandatory 35 years.

After the close of evidence at punishment, appellant requested that the jury charge include an instruction informing the jury that he would have to serve a mandatory 35 years [*132] before becoming eligible for parole and objected to the jury charge not including an instruction as to such. The trial court refused to include such an instruction.

The State does not specifically dispute the fact that pursuant to Article 42.18, § 8(b) (2), V.A.C.C.P., had appellant been sentenced to life rather than death [**50] for the instant offense he would indeed have been legally required to serve 35 years incarceration before becoming eligible for parole. However, the State asserts that the law

Page 18

934 S.W.2d 113, *132; 1996 Tex. Crim. App. LEXIS 205, **50

prohibits a jury from being informed of the statutorily-mandated minimum amount of time that a person convicted of capital murder, who receives a life sentence, must serve before becoming eligible for parole. However, while Art. 37.07, § 4, V.A.C.C.P., provides for the jury to be informed of various matters as to parole eligibility in non-capital punishment proceedings, by its language it does not even apply to capital punishment proceedings; thus it does not prohibit such information from being provided to juries in capital proceedings. Appellant correctly notes that Art. 37.07, § 4 does not prohibit the trial court from including information about the requirement of serving 35 calendar years before becoming eligible for parole in the punishment jury charge of a capital murder case, but rather requires an appropriate instruction in non-capital felony cases.

A. Texas cases

First, I shall examine Texas cases, prior to Smith v. State, 898 S.W.2d 838 (Tex.Cr.App. 1995) (plurality opinion), cert. denied, [**51]   U.S.   , 116 S. Ct. 131, 133 L. Ed. 2d 80 (1995), on this and related issues. This Court has held that a trial court properly refused to instruct the jury at the punishment stage of a capital murder trial on the parole laws in Texas. Elliott v. State, 858 S.W.2d 478, 490 (Tex.Cr.App. 1993), cert. denied, 510 U.S. 997, 114 S. Ct. 563, 126 L. Ed. 2d 463 (1993); see also Hughes v. State, 897 S.W.2d 285 (Tex.Cr.App. 1994). In Elliott the defendant claimed the denial of the instruction violated the Eighth and Fourteenth Amendments to the United States Constitution, relying on California v. Ramos, 463 U.S. 992, 103 S. Ct. 3446, 77 L. Ed. 2d 1171 (1983), and King v. Lynaugh, 828 F.2d 257 (5th Cir. 1987), vacated in part, 850 F.2d 1055 (5th Cir. 1988) (en banc). We observed that neither this Court nor the Fifth Circuit had interpreted California v. Ramos as requiring an instruction on parole laws in the punishment phase of a capital case. Elliott, 858 S.W.2d at 490. While recognizing that Fifth Circuit opinions have no precedential value for this Court, we were persuaded by the en banc opinion in King v. Lynaugh which found [**52] no federal constitutional requirement for such an instruction. [1] Elliott, 858 S.W.2d at 490. This Court quoted from the Fifth Circuit's en banc opinion stating that in California v. Ramos the Supreme Court determined that a jury instruction on a capital defendant's eligibility for parole or commutation of sentence does not raise a constitutional issue. Elliott, 858 S.W.2d at 490, citing King v. Lynaugh, 850 F.2d 1055, 1061.

Additionally, we determined that an instruction on parole in a capital case would violate Article 4, section 11, of the Texas Constitution. Elliott, 858 S.W.2d at 489, n.7; see also Garcia v. State, 887 S.W.2d 846, 860 (Tex.Cr.App. 1994), cert denied,   U.S.   , 115 S. Ct. 1317, 131 L. Ed. 2d 198 (1995).

> 1  Actually, in King v. Lynaugh the en banc court did not decide the issue of whether a parole instruction should have been given. The en banc court held that this issue was procedurally barred because King did not request such a charge at trial. King v. Lynaugh, 850 F.2d at 1056 n.1. The issue addressed by the en banc court was whether King should have been allowed to voir dire the jury on the twenty-year requirement for parole eligibility under a life sentence for capital murder. Id. at 1058.

[**53] Even before Elliott this Court consistently rejected arguments that the trial court should instruct the jury about parole in the context of a life sentence for capital murder. Boyd v. State, 811 S.W.2d 105, 130 (Tex.Cr.App. 1991), cert. denied, 502 U.S. 971, 112 S. Ct. 448, 116 L. Ed. 2d 466 (1991); Knox v. State, 744 S.W.2d 53, 62-64 (Tex.Cr.App. 1987), cert. denied, 486 U.S. 1061, 108 S. Ct. 2834, 100 L. Ed. 2d 934 (1988); Andrade v. State, 700 S.W.2d 585, 587-88 (Tex.Cr.App. 1985), cert. denied, 475 U.S. 1112, 106 S. Ct. 1524, 89 L. Ed. 2d 921 (1986).

[*133] Similarly we have held that a defendant in a capital case is not permitted to present evidence of parole procedures applicable to life sentences for capital murder. Jones v. State, 843 S.W.2d 487, 495 (Tex.Cr.App. 1992). See also Stoker v. State, 788 S.W.2d 1, 16 (Tex.Cr.App. 1989), cert. denied, 498 U.S. 951, 111 S. Ct. 371, 112 L. Ed. 2d 333 (1990) (no error in failing to appoint expert to testify on issue of parole in a capital case). In Jones the defendant sought to introduce evidence that he would be confined a minimum of twenty years. [2] Jones argued that the [**54] jury should be aware of the length of time he would have to be confined in prison so the jury could intelligently decide whether he was a continuing threat to society. [3] This Court stated that a jury should not consider parole during punishment deliberation in a capital murder case. Jones, 843 S.W.2d at 495. Jones also attempted to present expert testimony showing he would never be paroled, arguing that he would never be a threat to society. We observed that "society" includes

Page 19

934 S.W.2d 113, \*133; 1996 Tex. Crim. App. LEXIS 205, \*\*54

prison inmates as well as free citizens, so the length of time a person remains incarcerated was not relevant to the special issue on future dangerousness. Id.

> 2   See former Art. 42.18, § 8(b), V.A.C.C.P.
> 3   See former Art. 37.071(b) (2), V.A.C.C.P., now Arts. 37.0711, § 3(b) (2), and 37.071, § 2(b) (1) ("whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society").

We have held that a trial court does not err in a capital murder [\*\*55] trial by instructing the jury not to consider how long a defendant would be required to serve to satisfy a life sentence, because parole is not a proper consideration for the jury's deliberations at punishment. Ramirez v. State, 815 S.W.2d 636, 653 (Tex.Cr.App. 1991); Williams v. State, 668 S.W.2d 692, 701 (Tex.Cr.App. 1983), cert. denied, 466 U.S. 954, 104 S. Ct. 2161, 80 L. Ed. 2d 545 (1984).

In voir dire, prospective jurors may not be told about the specifics of parole law relating to life sentences for capital murder. Boyd, 811 S.W.2d at 118-19. A potential juror who is unable to disregard parole in determining the special issues is challengeable for cause. Felder v. State, 758 S.W.2d 760, 762-67 (Tex.Cr.App. 1988), cert. denied, 510 U.S. 829, 114 S. Ct. 95, 126 L. Ed. 2d 62 (1993).

The constant in these Texas cases has been that parole is not a proper matter for consideration in the jury's deliberation in the punishment stage of a capital murder trial. This was due primarily to two reasons: (1) prior to the 1989 amendment of Art. IV, § 11 of the Texas Constitution, parole was never a proper matter for the jury to consider in Texas; [4] and (2) [\*\*56] until recently, the United States Supreme Court had never held that there was a federal constitutional requirement that the jury ever be given any information about parole. See California v. Ramos, supra.

> 4   "The Legislature shall have authority to enact parole laws and laws that require or permit courts to inform juries about the effect of good conduct time and eligibility for parole or mandatory supervision on the period of incarceration served by a defendant convicted of a criminal offense." Tex.Const., Art. IV, § 11(a). As a result of the 1989 amendment to Art. IV, § 11(a), the

Legislature enacted Art. 37.07, § 4, V.A.C.C.P., which provides for such instruction by the courts, but does not mention capital cases. See Boyd, 811 S.W.2d at 121; Felder, 758 S.W.2d at 762 (both cases construing former Art. 37.07, § 4).

B. Simmons v. South Carolina

In a supplemental brief appellant points out that the Supreme Court recently issued its opinion in Simmons v. South Carolina, 512 U.S. 154, [\*\*57] 114 S. Ct. 2187, 129 L. Ed. 2d 133 (1994). Appellant argues that under Simmons the failure to inform the jury of when he would be eligible for parole violated the Due Process Clause and the Eighth Amendment of the United States Constitution.

In Simmons, because of prior convictions for violent crimes, the defendant would have been ineligible for parole if he were given a life sentence. Simmons,    U.S. at    , 114 S. Ct. at 2191 n.2, 129 L. Ed. 2d at 139 n.2. Before jury selection, the trial court granted the prosecutor's motion, over Simmons' objection, and ordered the defense not to voir dire the venire about parole or even mention the subject of parole. In the punishment phase, the prosecutor asked the jury to consider Simmons' future dangerousness. In response, Simmons presented evidence [\*134] that he would not commit acts of violence once he was isolated in a prison setting. Simmons' attorney asked the trial court to instruct the jury that Simmons would be ineligible for parole and, if sentenced to life imprisonment, he in actuality would be sentenced to imprisonment for the balance of his natural life.

Outside the presence of the jury, Simmons [\*\*58] presented evidence showing he was ineligible for parole. There was evidence from Simmons and the prosecution about furloughs and early release programs. Simmons offered results of a survey showing that few people in South Carolina believed that a person sentenced to life imprisonment actually would spend the rest of his life in prison; that almost half believed a convicted murderer might be paroled within twenty years; that almost three-fourths believed a convicted murderer would be released within thirty years; and that more than three-fourths said that if they had to decide a sentence in a capital case, the amount of time the defendant actually would have to spend in prison would be either extremely important or very important in choosing between life and death. The trial court denied Simmons' request for an instruction.

Page 20

934 S.W.2d 113, *134; 1996 Tex. Crim. App. LEXIS 205, **58

During deliberation the jury sent a note to the judge inquiring about the possibility of parole for a life sentence. Over Simmons' objection the trial court instructed the jury not to consider parole or parole eligibility. The court also informed the jury that life imprisonment and death sentence were to be understood in their plain and ordinary meaning. The jury [**59] returned a sentence of death.

The Supreme Court held that when a defendant's future dangerousness is an issue and the defendant is ineligible for parole, due process requires that the jury assessing punishment be told that about the defendant's parole ineligibility. [5] Simmons, U.S. at , 114 S. Ct. at 2190, 129 L. Ed. 2d at 138. "The Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to deny or explain.'" Simmons, .S. at , 114 S. Ct. at 2192, 129 L. Ed. 2d at 141, citing Gardner v. Florida, 430 U.S. 349, 362, 51 L. Ed. 2d 393, 97 S. Ct. 1197 (1977). The Court observed that the jury may have believed Simmons could be released on parole if he were not executed. The Court noted:

> To the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration. This grievous misperception was encouraged by the trial court's refusal to provide the jury with accurate information regarding petitioner's parole ineligibility, and by the [**60] State's repeated suggestion that petitioner would pose a future danger to society if he were not executed. . . . The State thus succeeded in securing a death sentence on the ground, at least in part, of petitioner's future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its non-capital sentencing alternative, namely, that life imprisonment meant life without parole. We think it is clear that the State denied petitioner due process.

Simmons, 512 U.S. at , 114 S. Ct. at 2193, 129 L. Ed. 2d at 141. The Court further observed:

> Petitioner was prevented from rebutting

information that the sentencing authority considered, and upon which it may have relied, in imposing the sentence of death. The State raised the specter of petitioner's future dangerousness generally, but then thwarted all efforts by petitioner to demonstrate that, contrary to the prosecutor's intimations, he never would be released on parole and thus, in his view, would not pose a future danger to society. The logic and effectiveness of petitioner's argument naturally depended on the fact that he was legally ineligible for parole and thus would remain [**61] in prison if afforded a life sentence. Petitioner's efforts to focus the jury's attention on the question whether, in prison, [*135] he would be a future danger were futile, as he repeatedly was denied any opportunity to inform the jury that he never would be released on parole. The jury was left to speculate about petitioner's parole eligibility when evaluating petitioner's future dangerousness, and was denied a straight answer about petitioner's parole eligibility even when it was requested.

Simmons, 512 U.S. at , 114 S. Ct. at 2194-95, 129 L. Ed. 2d at 143-44 (footnote omitted).

> 5 The Supreme Court declined to decide whether appellant's rights under the Eighth Amendment were also violated. Simmons, 512 U.S. at , 114 S. Ct. at 2193 n.4, 129 L. Ed. 2d at 141 n.4. But see Simmons, 512 U.S. at , 114 S. Ct. at 2198, 129 L. Ed. 2d at 147 (Souter, J., concurring).

The Supreme Court observed in Simmons that "prosecutors in South Carolina, like those in [**62] other States that impose the death penalty, frequently emphasize a defendant's future dangerousness in their evidence and argument at the sentencing phase; they urge the jury to sentence the defendant to death so that he will not be a danger to the public if released from prison." Simmons, 512 U.S. at , 114 S. Ct. at 2193, 129 L. Ed. 2d at 142, citing Eiseberg & Wells, "Deadly Confusion: Juror Instructions in Capital Cases," 79 Cornell L.Rev. 1, 4 (1993). Moreover, "in assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant. Holding all other factors constant,

Page 21

934 S.W.2d 113, *135; 1996 Tex. Crim. App. LEXIS 205, **62

it is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not. Indeed, there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole." Simmons, U.S. at , 114 S. Ct. at 2194, 129 L. Ed. 2d at 142.

The Supreme Court noted in Simmons that the State may still argue that a parole ineligible defendant would be a future danger to others in prison, "but the State may [**63] not mislead the jury by concealing accurate information about the defendant's parole ineligibility. The Due Process Clause will not tolerate placing a capital defendant in a straitjacket by barring him from rebutting the prosecution's arguments of future dangerousness with the fact that he is ineligible for parole under State law." Simmons, 512 U.S. at , 114 S. Ct. at 2194-95 n.5, 129 L. Ed. 2d at 143-44 n.5.

South Carolina argued in Simmons that there was no statutory prohibition of Simmons' eventual release into society and that he could be released through legislative reform, commutation, and clemency. Simmons, U.S. at , 114 S. Ct. at 2195, 129 L. Ed. 2d at 144. The Court rejected this argument because the instruction sought by Simmons was legally accurate and was certainly more accurate than no instruction at all. Simmons, U.S. at , 114 S. Ct. at 2195, 129 L. Ed. 2d at 144.

The Court distinguished Simmons from California v. Ramos. The Court explained that Ramos indicates the Supreme Court generally defers to a State's determination about what parole information should be provided to a jury. The Court [**64] continued:

But if the State rests its case for imposing the death penalty at least in part on the premise that the defendant will be dangerous in the future, the fact that the alternative sentence to death is life without parole will necessarily undercut the State's argument regarding the threat the defendant poses to society. Because truthful information of parole ineligibility allows the defendant to "deny or explain" the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an

instruction from the court.

Simmons, U.S. at , 114 S. Ct. at 2196, 129 L. Ed. 2d at 145-46.

Consequently, the Supreme Court found Simmons' right to due process was violated because his future dangerousness was at issue but he was not allowed to inform the jury of his parole ineligibility. Simmons, U.S. at , 114 S. Ct. at 2198, 129 L. Ed. 2d at 147.

C. Applicability of Simmons to Texas Capital Punishment Scheme

i. Statutes

In Texas, the jury must answer the following special issue:

Whether there is a probability that the defendant [**65] would commit criminal acts of [*136] violence that would constitute a continuing threat to society.

Art. 37.071, § 2(b) (1), V.A.C.C.P. [6] Under the statute in effect for the date of this offense:

If a prisoner is serving a life sentence for a capital felony, the prisoner is not eligible for release on parole until the actual calendar time the prisoner has served, without consideration of good conduct time, equals 35 calendar years.

Former Art. 42.18, § 8(b) (2), V.A.C.C.P. [7]

6 The offense in this case occurred on September 13, 1991.
7 The minimum amount of time a person serving a life sentence for capital murder must serve before becoming eligible for parole has evolved from twenty (20) years, to fifteen (15) years, to thirty-five (35) years, and to forty (40) years. See Act 1985, ch. 427, 1985 Tex. Gen. Laws 1531; Act 1987, ch. 384, 1987 Tex. Gen. Laws 1887; Act 1991, ch. 652, 1991 Tex. Gen. Laws 2394; Act 1993, ch. 900, 1993 Tex. Gen. Laws 3586.

ii. Discussion of Texas [**66] Capital Sentencing in Simmons

In Simmons the Supreme Court noted that Texas

Page 22

934 S.W.2d 113, *136; 1996 Tex. Crim. App. LEXIS 205, **66

does not have a life-without-parole sentencing alternative to capital punishment. Simmons, 512 U.S. at , 114 S. Ct. at 2196 n.8, 129 L. Ed. 2d at 145 n.8. The Court said, "In a State in which parole is available, how the jury's knowledge of parole availability will affect the decision whether or not to impose the death penalty is speculative, and we shall not lightly second-guess a decision whether or not to inform a jury of information regarding parole." Simmons, U.S. at , 114 S. Ct. at 2196, 129 L. Ed. 2d at 145. Justice O'Connor's concurring opinion observed that in a State in which parole is available there is no constitutional requirement that the jury be informed about the parole law. Simmons, U.S. at , 114 S. Ct. at 2200, 129 L. Ed. 2d at 150. [8]

8  Of course, the Supreme Court in Simmons was not concerned with a situation in which a defendant was eligible for parole, albeit after serving a substantial period of time. The Supreme Court remarked it would not lightly second-guess a state's decision whether or not a jury should be informed about parole. The Court did not opine that the United States Constitution did not require the jury to be provided with parole eligibility information.

If there were a bright-line rule that such information is available only if the sole alternative to death were life without parole, then several questions would be raised. What of a sentencing scheme in which there are three alternatives: death; life without parole; and life with parole, in which the precise date of parole eligibility would be relevant? See Simmons, U.S. at , 114 S. Ct. at 2202, 129 L. Ed. 2d at 152 (Scalia, J., dissenting). Suppose a state wished to provide assurance that capital murder prisoners serving life sentences would never be released on parole, but did not want to have the jury instructed on that matter. Could the state accomplish this by requiring such a prisoner to serve ninety-nine years before attaining parole eligibility? If a defendant is sixty years old and would have to serve forty years before being eligible for parole, could the jury constitutionally be kept from knowing the unlikelihood that he could ever be released on parole, even though the defendant might argue this is tantamount to life without parole?

These questions are rhetorical, but they underscore the ambivalence of a bright-line rule.

[**67]  iii. "Society" under the Texas Special Issue

The Supreme Court has observed that "the question of a defendant's likelihood of injuring others in prison is precisely the question posed by the second Texas Special Issue." Franklin v. Lynaugh, 487 U.S. 164, 169 n.9, 108 S. Ct. 2320, 2330, 101 L. Ed. 2d 155, 169 (1988). According to Justice O'Connor, a Texas capital sentencing jury may give mitigating effect to evidence of the lack of any prison disciplinary record, as this is evidence that the defendant exist in the highly structured environment of a prison without endangering others. Franklin v. Lynaugh, 487 U.S. at 186, 108 S. Ct. at 2333-34, 101 L. Ed. 2d at 174 (O'Connor, J., concurring). However, this is only one facet of the term "society" in the special issue.

This Court has examined the meaning of "society" as used in the special issue in several cases. See, e.g., Rougeau v. State, 738 S.W.2d 651 (Tex.Cr.App. 1987), cert. denied, 485 U.S. 1029, 108 S. Ct. 1586, 99 L. Ed. 2d 901 (1988), overruled on other grounds, Harris v. State, 784 S.W.2d 5 (1989). The defendant in Rougeau contended the prosecutor was improperly allowed to comment that society [**68] within the meaning of the special issue includes [*137] prison society. We stated that a juror is free to give the term "society" the meaning that is ordinarily acceptable in common language. 738 S.W.2d at 660. This Court held that "society" includes the penitentiary, and the prosecutor properly attempted to learn whether prospective jurors would exclude from "society" inmates and non-inmates within the Texas Department of Corrections. Id. In this context we observed, "It is obvious to us that in deciding whether to answer the second special issue in the negative the jury would clearly focus its attention on the 'society' that would exist for the defendant and that 'society' would be the 'society' that is within the Texas Department of Corrections." Id. (emphasis in original). See also Boyd, 811 S.W.2d at 118 n.12.

In another case, the defendant contended the prosecutor's argument, that the defendant would commit another murder, was a comment that the defendant would be paroled at some point. Sterling v. State, 830 S.W.2d 114 (Tex.Cr.App. 1992), cert. denied, 506 U.S. 1035, 113 S. Ct. 816, 121 L. Ed. 2d 688 (1992). This Court held that the argument [**69] did not necessarily imply that the

Page 23

934 S.W.2d 113, *137; 1996 Tex. Crim. App. LEXIS 205, **69

defendant would be paroled, but that he would commit another murder in prison. 830 S.W.2d at 120-21. However, we noted that the term "society" as used in the special issue includes both inmate and non-inmate populations. Id. at 120 n.5. See also Boyd, 811 S.W.2d at 121 ("Appellant fails to cite us to a single case which arguably supports his theory that a potential juror's 'view is supposed to be that a defendant sentenced to life will serve the rest of his life in prison.'").

"'Society' includes not only free citizens but also inmates in the penitentiary. Jones, 843 S.W.2d at 495. Under the special issue, the State must show the defendant "would, more likely than not, commit violent criminal acts in the future so as to constitute a continuing threat to society whether in or out of prison." Muniz v. State, 851 S.W.2d 238, 250 (Tex.Cr.App. 1993) (emphasis added), cert. denied, 510 U.S. 837, 114 S. Ct. 116, 126 L. Ed. 2d 82 (1993).

iv. Application of Simmons' Rationale to Texas Capital Sentencing Scheme

There is an obvious distinction between the facts in Simmons and in the present case. In Simmons the defendant [**70] was not eligible for parole under a life sentence, whereas in this case had appellant received a life sentence, he would have been eligible for parole after thirty-five years. [9] However, a review of Simmons leads me to conclude that the underlying rationale of that case compels a similar result under our statutory sentencing scheme.

> 9    Another distinction is that in Texas, unlike South Carolina, a jury must answer a special issue about whether there is a probability that a defendant would commit criminal acts of violence that would constitute a continuing threat to society. Thus, future dangerousness is always an issue in a Texas capital case.

In a capital trial, a defendant is entitled to offer evidence concerning recidivism rates relating to length of incarceration and age of the offender, along with expert opinion through hypothetical questions based on the particular circumstances of the individual defendant. Matson v. State, 819 S.W.2d 839, 848-54 (Tex.Cr.App. 1991). Rehabilitation is obviously [**71] a proper consideration under the pertinent special issue. Jackson v. State, 822 S.W.2d 18, 25 (Tex.Cr.App. 1990), cert. denied, 509 U.S. 921, 113 S. Ct. 3034, 125 L. Ed. 2d 722

(1993).

In answering the special issue, a Texas jury must determine whether the defendant would, more likely than not, commit violent criminal acts in the future so as to constitute a continuing threat to society whether in or out of prison. Muniz, 851 S.W.2d at 250. "Society" means both free citizens and people in prison. Jones, 843 S.W.2d at 495.

Under the facts of a given case, the jury may well believe that a defendant does not pose a threat to prison society due to the regimented environment, but that the defendant may be a future danger to society outside of prison. However, under our previous case law, the jury is not allowed to know that such a defendant would not be released into society outside of prison for a minimum of thirty-five years. This would be particularly useful information if a jury believed a defendant would not be a future danger to society [*138] within prison, would currently present a threat to society outside of prison if he were eligible for release [**72] anytime soon, but could be rehabilitated in prison to where he would not be a danger to society outside of prison thirty-five years in the future. Without knowing that a capital murderer sentenced to life is ineligible for parole until serving at least thirty-five years, the jury does not have all of the relevant information available on the issue. "In assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant." Simmons, 512 U.S. at    , 114 S. Ct. at 2194, 129 L. Ed. 2d at 142.

When the prosecution relies on the future dangerousness of the defendant to seek the death penalty, elemental due process requires that the defendant be given an opportunity to introduce evidence on this point. Skipper v. South Carolina, 476 U.S. 1, 5 n.1, 106 S. Ct. 1669, 1671, 90 L. Ed. 2d 1, 7 (1986). In Skipper the Court also found an Eighth Amendment requirement. "Evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." Skipper, 476 U.S. at 5, 106 S. Ct. at 1671, 90 L. Ed. 2d at 7. "[A] defendant's disposition to make a well-behaved and peaceful adjustment [**73] to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination." Skipper, 476 U.S. at 7, 106 S. Ct. at 1672, 90 L. Ed. 2d at 8. If a rule has "the effect of precluding the defendant from introducing otherwise admissible evidence for the explicit

Page 24

934 S.W.2d 113, *138; 1996 Tex. Crim. App. LEXIS 205, **73

purpose of convincing the jury that he should be spared the death penalty because he would pose no undue danger to his jailers or fellow prisoners and could lead a useful life behind bars if sentenced to life imprisonment, the rule would not pass muster under Eddings [v. Oklahoma, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982)]." Skipper, 476 U.S. at 7, 106 S. Ct. at 1672, 90 L. Ed. 2d at 8.

The Texas death penalty statute is constitutional, premised on the jury having all possible relevant information about the individual defendant. Matson, 819 S.W.2d at 850, citing Jurek v. Texas, 428 U.S. 262, 96 S. Ct. 2950, 49 L. Ed. 2d 929 (1976). A jury must not be instructed to disregard relevant mitigating evidence. Matson, 819 S.W.2d at 850 n.8, citing Eddings v. Oklahoma, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982). "Clearly then, for the [**74] Texas death penalty statutes to meet constitutional muster, the sentencing authority in a capital case must be allowed to consider and give effect to all relevant mitigating evidence." Matson, 819 S.W.2d at 851.

It would be difficult at best for a jury to give effect to the type of evidence authorized in Matson, rehabilitation and recidivism rates, without knowing that the defendant will remain incarcerated for at least thirty-five years before even being considered for placement back into society outside of prison. The problem associated with this lack of information provided to a jury is exacerbated by general, though not always accurate, knowledge of the existence of parole.

In Simmons the Supreme Court reviewed the question of whether the trial court's Instruction, that life imprisonment was to be understood in its plain and ordinary meaning, adequately instructed the jury about Simmons' parole ineligibility. The Court capsulized the history of parole and juries in the United States:

> It can hardly be questioned that most juries lack accurate information about the precise meaning of "life imprisonment" as defined by the States. For much of our country's history, [**75] parole was a mainstay of state and federal sentencing regimes, and every term (whether a term of life or a term of years) in practice was understood to be shorter than the stated term. . . . It is impossible to ignore "the

reality, known to the 'reasonable juror,' that, historically, life-term defendants have been eligible for parole."

> An instruction directing juries that life imprisonment should be understood in its "plain and ordinary" meaning does nothing to dispel the misunderstanding reasonable jurors may have about the way in which any particular State defines "life imprisonment." See Boyde v. California, 494 U.S. 370, 380, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990) (where there is a "reasonable likelihood that the jury has applied the [*139] challenged instruction in a way that prevents the consideration of constitutionally relevant evidence," the defendant is denied due process).

Simmons, 512 U.S. at    , 114 S. Ct. at 2197, 129 L. Ed. 2d at 146 (citations omitted).

The Supreme Court addressed South Carolina's argument that the jury was not misled, as the trial court admonished the jury not to consider parole and that parole is not a proper issue [**76] for the jury's consideration.

> Far from ensuring that the jury was not misled, however, this instruction actually suggested that parole was available but that the jury, for some unstated reason, should be blind to this fact. Undoubtedly, the instruction was confusing and frustrating to the jury, given the arguments by both the prosecution and the defense relating to petitioner's future dangerousness, and the obvious relevance of petitioner's parole ineligibility to the jury's formidable sentencing task. While juries ordinarily are presumed to follow the court's instructions, we have recognized that in some circumstances "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."

Page 25

934 S.W.2d 113, *139; 1996 Tex. Crim. App. LEXIS 205, **76

Simmons, 512 U.S. at    , 114 S. Ct. at 2197, 129 L. Ed. 2d at 147 (citations omitted).

Although Simmons involved the failure to inform jurors that the defendant would not be eligible for parole under a life sentence, a jury in Texas faces a similar dearth of information when it comes to intelligently answering the special [**77] issue referencing the probability that a defendant would commit criminal acts of violence that would constitute a continuing threat to society outside of prison.

In Texas, this Court has observed it is common knowledge that from time to time inmates of the Texas Department of Criminal Justice are released on parole. Felder, 758 S.W.2d at 762. Experience demonstrates the best likelihood is that a jury will consider the existence of parole. Arnold v. State, 786 S.W.2d 295, 300 (Tex.Cr.App. 1990), cert. denied, 498 U.S. 838, 111 S. Ct. 110, 112 L. Ed. 2d 80 (1990). Jurors often succumb to the temptation to consider parole. 786 S.W.2d at 311. While jurors conceive of parole, they can, and often do, misperceive its application. "It can hardly be questioned that most juries lack accurate information about the precise meaning of 'life imprisonment.'" Simmons, 512 U.S. at    , 114 S. Ct. at 2197, 129 L. Ed. 2d at 146. Portions of the voir dire involving several veniremembers in the present case are illustrative. [10]

> VENIREMEMBER: Life is life: correct? It's not what we hear on TV?

The trial court told the panel that it would instruct them not [**78] to consider the issue of parole in making their decision.

> PROSECUTOR: Does anything pop into your mind that is important, or I mean why that must be, why we need the death penalty, if we do?
>
> VENIREMEMBER: I just -- there is so much about people that are turned loose after serving such a short period of time in a prison for minor crimes and then go out and commit murder, and it's just really scary to hear things like that, that they are put away for not so serious crimes and then turn around and do much worse crimes after being just sentenced for such a short period, or not sentenced but

allowed to serve such a short period of time, and if people like that can do -- go to that point, people that have already committed horrendous crimes, it just seems a little scary that they might do the same thing again, or be a hazard to society.

Another veniremember discussed the matter as follows:

> DEFENSE COUNSEL: The way the question reads: Do you agree or disagree that life imprisonment is more effective than capital punishment? And you disagreed with that statement. . . . Could you share with me why?
>
> VENIREMEMBER: I guess the reason I answered it in that response [**79] was that basically [*140] we know that even though they get life imprisonment they are up for parole within ten or twenty years and that life imprisonment doesn't mean life imprisonment. Basically the words don't mean anything.

In response to a veniremember's concern about early release, the trial court responded, "Question relating to leniency within the penal institution or criminal laws, and you mentioned early release. Almost everybody does. That is one of the most popular answers."

> VENIREMEMBER: What does life mean? Can they get out in three years or four years with life?

The trial court explained to this veniremember that this was not something that could be considered in the punishment phase. [11] The colloquy continued:

> VENIREMEMBER: I don't think I really got an answer.
>
> COURT: You didn't get a correct answer because I can't tell you. All I can tell you is you can't consider it.

Another veniremember was asked about the potential for a person being a continuing threat to society.

> VENIREMEMBER: Most of them do. Most of them -- I watch the news every night. Early parolees and everything, they

Page 26

934 S.W.2d 113, *140; 1996 Tex. Crim. App. LEXIS 205, **79

get out of jail and they commit [**80] another crime the next day.

Another veniremember expressed a problem with a person convicted of a crime who was suddenly released to commit another crime. She asked if that were possible in a capital murder case.

> COURT: Well I think it is obvious if somebody is assessed the death penalty you don't get paroled on a death penalty.

> VENIREMEMBER: That doesn't seem to be what is happening, though. Or are we not knowing the full story when we hear things?

> COURT: You probably don't know the full story, but you aren't paroled on a death penalty. I think that is obvious. I don't think anybody is going to object at this point to my telling you that, which leaves you with the other option, a life sentence.

> VENIREMEMBER: And that's the one that you are eligible for parole at some stage perhaps?

> COURT: Yes.

This veniremember was told that she would be instructed not to consider parole.

> VENIREMEMBER: See I think that is wrong. I think that if -- I think that if the sentence I am going to -- if the way I vote on this affects whether he is going to be out in two years versus thirty years, then I think I should really have the right to know that up front [**81] because I think that changes can occur and sometimes changes don't occur, and if they get back out again and they repeat the offense then I am really angry about that.

A veniremember was concerned that a "person is put in prison and he is released within just a few months for a crime that he should be in there for a number of years." Several other veniremembers expressed concerns about parole and early release. Other veniremembers asked

when a person sentenced to life could be paroled, but the court declined to answer.

10 These are quoted for illustrative purposes. This is not to suggest that these veniremembers were unqualified.

11 I point out that there is indeed a statutory definition of what life means for "a prisoner serving a life sentence for a capital felony" per Art. 42.18, § 8(b) (2), V.A.C.C.P. - "life" means the prisoner is not eligible for release on parole until the actual calendar time the prisoner has served, without consideration of good conduct time, equals 35 calendar years. The trial court could have answered the veniremember's question about what life means by relating the statutory language; and could have excised the word "parole" in phrasing the answer, e.g., "Per our statutes, a life sentence for capital murder means that the defendant is not eligible for release until he has served 35 years of actual calendar time without consideration of good conduct time." There is absolutely nothing statutory or constitutional, state or federal, that requires such information to remain a "state secret" hidden from jurors - and as I discuss further, there are indeed constitutional considerations that in some situations require that jurors be informed of such.

[**82] The voir dire in this case exemplifies the difficulties and misperceptions potential jurors have with parole, especially in the context of a life sentence for capital murder. Thirty-five years is not an insubstantial length of time. A jury reasonably may believe [*141] that a person convicted of capital murder could be released on parole long before he serves thirty-five years if he were not executed. Cf. Simmons, 512 U.S. at , 114 S. Ct. at 2193, 129 L. Ed. 2d at 141. To the extent this misperception pervades the jury's deliberation, it would have the effect of creating a false choice between sentencing the defendant to death and sentencing him to a relatively short period of incarceration. Cf. Simmons, U.S. at , 114 S. Ct. at 2193, 129 L. Ed. 2d at 141. This misunderstanding would be heightened by the prosecutor's urging the jury that the defendant would be a danger to society on the streets if he were not executed. Simmons, U.S. at , 114 S. Ct. at 2193, 129 L. Ed. 2d at 141.

"There may be no greater assurance of a defendant's

Page 27

934 S.W.2d 113, *141; 1996 Tex. Crim. App. LEXIS 205, **82

future nondangerousness to the public than the fact that he never will be released on [**83] parole." Simmons, 512 U.S. at , 114 S. Ct. at 2194, 129 L. Ed. 2d at 142. It stands to reason that the fact that a capital murder defendant in Texas would not be considered for release on parole for thirty-five years would provide greater assurance of the defendant's future nondangerousness to society outside of prison than any misunderstanding that he would be eligible for parole considerably earlier. When a defendant presents evidence that he could be rehabilitated in prison and that the risk of violence is substantially reduced when the defendant reaches an advanced age, and the prosecutor argues that the defendant would be a danger to society on the streets, the fact that the defendant could not be released from prison for thirty-five years will often be the only way that a violent criminal can successfully rebut the State's case. Cf. Simmons, U.S. at , 114 S. Ct. at , 129 L. Ed. 2d at 150-51 (O'Connor, J., concurring).

Without being allowed to have the jury informed of the thirty-five year requirement for parole eligibility, a defendant may be prohibited from rebutting information that the jury considers in answering the special [**84] issue. Cf. Simmons, 512 U.S. at , 114 S. Ct. at 2194, 129 L. Ed. 2d at 143. The risk that the jury may consider misinformation about parole eligibility is great, and the consequences are vital to the defendant. Simmons, U.S. at , 114 S. Ct. at 2197, 129 L. Ed. 2d at 146-47.

A jury's task at the punishment phase of a capital murder trial is to answer the special issues. Stoker, 788 S.W.2d at 16. Generally, parole is a matter within the exclusive jurisdiction of the Board of Pardons and Paroles and is not a matter of concern for the jury. Felder, 758 S.W.2d at 762. However, the relevance of parole information in a capital case is not so the jury can determine a number of years to assess as punishment to circumvent the Executive branch and ensure the defendant remains incarcerated for a period of time the jury deems proper. Information concerning the thirty-five year parole eligibility requirement is directly relevant to the special issue about whether the defendant would be a continuing threat to society, notwithstanding our statement to the contrary in Jones, 843 S.W.2d at 495.

v. The Texas Constitutional Question

Returning [**85] to the matter of the Texas Constitution mentioned previously, 129 L. Ed. 2d at 138, I again note that prior cases hold that the Texas Constitution prohibits a parole instruction in a capital murder trial. Garcia, 887 S.W.2d at 860; Elliott, 858 S.W.2d at 489 n.7; but see discussion of the 1989 amendment to Tex.Const. Art. IV, § 11(a) and Art. 37.07. V.A.C.C.P., supra at p. 5 n.4. However, it is a firmly entrenched pillar of federalism that when there is a constitutional conflict, a federal constitutional right prevails over a state constitutional restriction. Since I believe that in the instant cause the failure to inform the jury about the thirty-five year parole eligibility plateau violated appellant's federal constitutional right to due process, such federal right prevails.

D. Application to Present Case

Previously I have set out illustrative portions of the jury voir dire wherein parole was discussed. Veniremembers were very interested in parole. In fact, several of the veniremembers who ultimately served as jurors in this case inquired about parole during voir dire. Specifically, I observe that during questioning Juror Flanakin said,

> [*142] I just [**86] -- there is so much about people that are turned loose after serving such a short period of time in a prison for minor crimes and then go out and commit murder, and it's just really scary to hear things like that, that they are put away for not so serious crime and then turn around and do much worse crimes after being just sentenced for such a short period, or not sentenced but allowed to serve such a short period of time, and if people like that can do -- go to that point, people that have already committed horrendous crimes, it just seems a little scary that they might do the same thing again, or be a hazard to society.

Juror Garcia said that he watched the news every night and that "early parolees and everything, they get out of jail and they commit another crime the next day." He indicated that he guessed that he could follow the judge's instructions that the early parole thing should not be considered in reaching the sentence.

Juror Strohbeck stated that she had "a problem with so many people who have thirty-five years and spend a few years, and because of overcrowding, they are let

Page 28

934 S.W.2d 113, *142; 1996 Tex. Crim. App. LEXIS 205, **86

out." Juror Mallard, expressing concern about parole, said he felt "like that it would [**87] serve the criminal and rehabilitation system better if generally fines were fixed or sentences were fixed within a very narrow range, . . .; but, . . . that should be up to the sentencing at the time of sentence, not necessarily probation later, or parole later." Jurors Mitchell, Wilkinson, Englund and Miller, when asked about having previously mentioned concerns about the revolving door and early parole and about how long somebody would be locked away, indicated that they could follow the judge's instructions to not consider such. Thus 8 jurors, i.e. two-thirds of the jury that would decide whether appellant lived or died, expressed a keen interest in the amount of time that this capital defendant would have to serve if he were sentenced to life rather than death.

In the punishment phase of the trial, the State presented evidence of prisoners' eligibility for release on furlough under a life sentence for capital murder. [12] Also at the punishment stage, appellant submitted evidence that he would not be a danger to prison society. Appellant was twenty-eight years old at the time of his trial. Appellant also presented expert testimony from a psychologist, who had been the chief [**88] mental health officer for the entire Texas Department of Corrections system, that indicated that when a person grows older his risk level for violence decreases and that the risk level of violence for a sixty-five-year-old inmate is significantly lower than that for a eighteen to twenty-five-year old. That psychologist specifically testified that he did not want to see appellant on the street, and that he did not think that it was in their or appellant's interest to be on the street, but that he did not believe that he would be a danger in prison society. The State in rebuttal presented testimony from an officer who investigated offenses within the prison system about how a capital murderer who received a life sentence would be classified upon entry into the system and would be reclassified, depending upon behavior, with such classifications depending "on the amount of time that they are pulling good time" and that it basically depended on disciplinary history while in the penitentiary that determined how one was assigned, "either to your trustee status or whether you remain line class and not pull any good time."

> 12    Appellant raises a separate point of error contending that this furlough evidence should not have been admitted. The majority overrules that

point by holding that appellant failed to correctly object to such evidence, thus waiving his right to complain of its admission. Rhoades, supra, 934 S.W.2d at 126, 128.

[**89] At punishment phase jury argument, the prosecutor encouraged the jury to consider appellant's risk to society on the streets. The prosecutor argued:

> [Defense counsel] wants you -- and I understand what he wants you -- to focus only on prison society, and I am not suggesting that society does not include prison society. It includes all. He wants you to forget society on the street; and I'm saying, no, don't do that. This question doesn't say, "if he gets a life sentence." That's getting the cart before the horse. [*143] You answer this question to determine what the sentence is going to be. You determine, whether it's today or tomorrow, next week, next year, inside prison, outside prison, wherever he may be, in whatever aspect of society he may find himself: Is there a probability that he's going to commit future acts of violence that would constitute a continuing threat?

The prosecutor also argued that appellant would be a danger to people in prison.

Another prosecutor argued, "Now we have to look at society's rights, and we look at how that defendant functions in society. The prosecutor traced appellant's history, pointing out the numerous crimes appellant had [**90] committed. The prosecutor argued, unless than 24 hours after his release from prison he slaughters two men." This prosecutor also argued that appellant would be violent in prison.

"In assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant." Simmons, 512 U.S. at    , 114 S. Ct. at 2194, 129 L. Ed. 2d at 142. The jury reasonably may have believed appellant would be released on parole well before serving thirty-five years if he were not executed. Cf. Simmons,    U.S. at    , 114 S. Ct. at 2193, 129 L. Ed. 2d at 141. The trial court did not allow appellant an opportunity to deny or explain whatever misinformation the jury had about the operation of the parole laws. Cf.

Page 29

934 S.W.2d 113, *143; 1996 Tex. Crim. App. LEXIS 205, **90

Simmons, U.S. at , 114 S. Ct. at 2192-94, 129 L. Ed. 2d at 140-44. The State argued that appellant would be a danger to prison society. Cf. Simmons, U.S. at , 114 S. Ct. at 2194-95 n.5, 129 L. Ed. 2d at 143-44 n.5. However, the State also argued that appellant would be a threat to society outside of prison. The State urged the jury to answer the special issue "whether it's today or tomorrow, [**91] next week, next year, inside prison, outside prison, wherever he may be, in whatever aspect of society he may find himself." The State reminded the jury that appellant "slaughtered two men" less than twenty-four hours after he was released from prison. Appellant was not allowed to rebut the State's argument that he would commit criminal acts of violence that would constitute a continuing threat to society outside of prison with information that the earliest he could even be considered for release into society outside of prison was in thirty-five years when he would be in his sixties.

Appellant's efforts to convince the jury that he would not be a danger to society beyond the prison walls were thwarted, as he was prevented from allowing the jury to know that under Texas law he could not be released on parole until he was at an age when, according to defense evidence, he would not endanger that society. Cf. Simmons, 512 U.S. at , 114 S. Ct. at 2194, 129 L. Ed. 2d at 142-43. This effectively limited appellant's attempts to focus the jury's attention on whether he would be a future danger in prison. Cf. Simmons, U.S. at , 114 S. Ct. at 2195, 129 [**92] L. Ed. 2d at 144. The jury was left to speculate about the date of appellant's parole eligibility when evaluating the special issue. Cf. Simmons, 512 U.S. at , 114 S. Ct. at 2195, 129 L. Ed. 2d at 144.

In the punishment charge the trial court instructed the jury:

> During your deliberations, you are not to consider or discuss any possible action of the Board of Pardons and Paroles Division of the Texas Department of Criminal Justice or of the Governor, or how long the Defendant would be required to serve to satisfy a sentence of life imprisonment.

This instruction suggested to the jury that parole was available, but that the jury should be blind to when appellant could be released. Cf. Simmons, U.S. at , 114 S. Ct. at 2197, 129 L. Ed. 2d at 147. At the same time, the jury was required to answer the pertinent special issue with the State urging the jury to find that appellant would be a threat in and out of prison and appellant contending that, although he would be a threat out of prison anytime soon, he would pose no danger in prison and he would not be a threat in his sixties.

In this context, appellant's parole eligibility was obviously [**93] relevant to the jury's sentencing task in answering the future dangerousness special issue. "In some circumstances, 'the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so [*144] vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.'" Simmons, 512 U.S. at , 114 S. Ct. at 2197, 129 L. Ed. 2d at 147 (citations omitted). As this Court has observed, experience demonstrates the best likelihood is that a jury will consider the existence of parole. Arnold, 786 S.W.2d at 300. Moreover, even if the instruction kept the jury from considering parole, it would not have satisfied due process as appellant was entitled to have the jury consider all relevant information in answering the special issue. Cf. Simmons, U.S. at , 114 S. Ct. at 2198, 129 L. Ed. 2d at 147. While being incarcerated until reaching over sixty years of age certainly does not preclude a finding of future dangerousness, the fact of such a lengthy incarceration is evidence which, in the instant case, would be very relevant to the jury's answering of the future dangerousness special [**94] issue.

E. Conclusion

Under the record in this case, and in light of Simmons, I believe that the trial court's failure to allow appellant to have the jury informed at some point that a person sentenced to life for capital murder would not be eligible for parole until he serves thirty-five years violated appellant's right to due process. I do not believe that a capital murder defendant is always entitled to have the jury so informed; this issue is case specific to the facts of each particular case. But based upon the evidence presented in this particular case, I believe that appellant has shown a due process violation. [13] Accordingly, I respectfully dissent to the majority holding of no error in refusing to give a parole instruction as was requested by appellant. Such a holding is particularly ironic in these days of clamor for "truth-in-sentencing" - it would seem that the majority, in violation of constitutional due process, is approving and encouraging "untruth" or

Page 30

934 S.W.2d 113, *144; 1996 Tex. Crim. App. LEXIS 205, **94

"ignorance" in sentencing in situations involving the ultimate punishment, death. I respectfully refuse to go along with such ignorance.

13 Even such a constitutional error is subject to a harmless error analysis per Tex.R.App.Pro. 81(b)(2). Of course all of the evidence, including appellant's prior criminal record and offenses and the facts of the instant offense, would be considered in making such a determination.

[**95] OVERSTREET, JUDGE

Delivered: October 2, 1996

EN BANC



EDMUND F. SHEEHY, CATHERINE N. SHEEHY, JUNIUS CHADWICK, LILLIAN PAUL, and BEN JOHNS, on behalf of themselves, and all other similarly situated taxpayers, Plaintiffs and Appellants, v. PUBLIC EMPLOYEES RETIREMENT DIVISION, TEACHERS RETIREMENT DIVISION, DEPARTMENT OF ADMINISTRATION; STATE OF MONTANA; and DEPARTMENT OF REVENUE, STATE OF MONTANA, Defendants and Respondents, v. ASSOCIATION OF MONTANA RETIRED PUBLIC EMPLOYEES, et al., Defendants and Respondents.

No. 92-499

SUPREME COURT OF MONTANA

262 Mont. 129; 864 P.2d 762; 1993 Mont. LEXIS 358; 50 Mont. St. Rep. 1477

April 28, 1993, Heard on; July 27, 1993, Submitted on
November 23, 1993, Decided

**SUBSEQUENT HISTORY:** Rehearing Denied December 23, 1993. Released for Publication December 27, 1993.

**PRIOR HISTORY:** [***1] APPEAL FROM: District Court of the First Judicial District, In and for the County of Lewis and Clark, The Honorable Thomas C. Honzel, Judge presiding.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant taxpayers and intervenor retiree association challenged the judgment of the First Judicial District, In and for the County of Lewis and Clark (Montana), which granted summary judgment to respondent state in the taxpayers' declaratory judgment action challenging the validity of 1991 Mont. Laws ch. 823, which brought all income, including state and federal pensions, within the Montana income tax.

**OVERVIEW:** The taxpayers contended that ch. 823 impaired private contractual rights that exempted their pensions from state taxation in violation of Mont. Const. art. II, § 35; that a provision phasing out an exemption

violated 4 U.S.C.S. § 111; and that the retirement adjustment payment of 1991 Mont. Laws ch. 823 violated 4 U.S.C.S. § 111. The trial court granted the state summary judgment. The court affirmed the trial court's judgment in part and reversed it in part. The court held that state employees who retired prior to the effective date of 1991 Mont. Laws ch. 823 did not have a contractual right to continued exemption from state taxation because the statute the retirees relied upon contained no manifestation of legislative intent to create private and enforceable contract rights. The provision of ch. 823 phasing out the exemption did not violate 4 U.S.C.S. § 111 because it did not discriminate as to source of income; however, an adjustment payment to state retirees did violate § 111 because it constituted discriminatory taxation based solely on the source of their retirement income. The court concluded that the invalid provisions of 1991 Mont. Laws ch. 823 could be severed.

**OUTCOME:** The court affirmed the grant of summary judgment to the state in the taxpayers' declaratory judgment action as to the trial court's findings that the challenged legislation did not impair private contractual rights and that a provision phasing out a tax exemption

Page 2

262 Mont. 129, *; 864 P.2d 762, **;
1993 Mont. LEXIS 358, ***1; 50 Mont. St. Rep. 1477

did not violate federal law. The court reversed the finding that a retirement adjustment payment did not violate federal law, but the court found that the provision was severable.

**CORE TERMS:** retiree, taxation, retirement benefits, exemption, pension, retirement, severable, retired, invalid, income tax, teacher, Montana Laws, legislative intent, severability, significant differences, equalization, contractual right, discriminatory, discriminate, resident, retirement income, severability clause, phase-out, retirement systems, pension benefits, sovereign, severed, invalid part, inducement, remainder

**LexisNexis(R) Headnotes**

*Governments > Federal Government > Employees & Officials*
*Governments > State & Territorial Governments > Employees & Officials*
*Pensions & Benefits Law > Governmental Employees > State Pensions*
[HN1] 4 U.S.C.S. § 111 waives the immunity retired federal employees otherwise would enjoy from state taxation of retirement benefits received as a result of their employment with the federal government, except to the extent such state taxation discriminates on the basis of the source of the retirement benefits.

*Pensions & Benefits Law > Governmental Employees > State Pensions*
*Tax Law > Federal Taxpayer Groups > Individuals > Adjustments to Income (IRC secs. 62, 71, 215, 911) > General Overview*
*Tax Law > State & Local Taxes > Income Tax > Individuals, Estates & Trusts > General Overview*
[HN2] 1991 Mont. Laws ch. 823 restructures the income tax on pension benefits by equalizing the taxation of all pension benefits. In lieu of extending the total exemption from taxation previously available to state retirement income to federal retirement income, the legislature opted in ch. 823 to bring all retirement income - including both state and federal pensions - within the Montana income tax. Chapter 823 exempts from taxation the first $ 3,600 of all pension and annuity income received, except that the exemption is reduced or phased out by $ 2 for every $ 1 of federal adjusted gross income in excess of $ 30,000.

In addition, 1991 Mont. Laws ch. 823, § 5 grants to state retirees who are Montana residents, and who are now to be taxed, an annual retirement adjustment payment.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
*Governments > State & Territorial Governments > Employees & Officials*
*Pensions & Benefits Law > Governmental Employees > State Pensions*
[HN3] Mont. Const. art. II, § 31 (1972) prohibits the legislature from passing any law impairing the obligation of contracts.

*Evidence > Inferences & Presumptions > General Overview*
*Governments > Legislation > Interpretation*
*Governments > State & Territorial Governments > Employees & Officials*
[HN4] When the legislature enacts a statute fixing certain terms and conditions of public employment, such as salaries and compensation, it is presumed that the statute does not create contractual rights, but is intended merely to declare a policy to be pursued until the legislature declares otherwise.

*Governments > Legislation > Interpretation*
[HN5] If contractual rights are to be created by statute, the language of the statute and the circumstances must manifest a legislative intent to create private rights of a contractual nature enforceable against the State.

*Tax Law > State & Local Taxes > Income Tax > Individuals, Estates & Trusts > General Overview*
[HN6] The United States consents to the taxation of pay or compensation for personal service as an officer or employee of the United States, a territory or possession or political subdivision thereof, the government of the District of Columbia, or an agency or instrumentality of one or more of the foregoing, by a duly constituted taxing authority having jurisdiction, if the taxation does not discriminate against the officer or employee because of the source of the pay or compensation. 4 U.S.C.S. § 111.

*Tax Law > State & Local Taxes > Income Tax > Individuals, Estates & Trusts > General Overview*
[HN7] A taxation exemption truly intended to account for

Page 3

262 Mont. 129, *; 864 P.2d 762, **;
1993 Mont. LEXIS 358, ***1; 50 Mont. St. Rep. 1477

differences in retirement benefits would not discriminate on the basis of the source of those benefits; rather, it would discriminate on the basis of the amount of benefits received by individual retirees.

*Pensions & Benefits Law > Governmental Employees > State Pensions*
*Tax Law > State & Local Taxes > Income Tax > Individuals, Estates & Trusts > General Overview*
[HN8] To determine if disparate state taxation of pension benefits is justified requires a two-pronged analysis of the legislation at issue: 1) Does it constitute discriminatory taxation against federal retirees or in favor of state retirees on the basis of source of income? and 2) If so, is the different treatment directly related to, and justified by, significant differences between the two classes?

*Governments > Legislation > Expirations, Repeals & Suspensions*
[HN9] 1991 Mont. Laws ch. 823, § 20 provides that if a part of the legislation is invalid, all valid parts that are severable from the invalid part remain in effect.

*Governments > Legislation > Expirations, Repeals & Suspensions*
*Governments > Legislation > Interpretation*
*Governments > Legislation > Severability*
[HN10] The inclusion of a severability clause is an indication that the drafters desired judicial severability policy to apply.

*Governments > Legislation > Expirations, Repeals & Suspensions*
*Governments > Legislation > Interpretation*
*Governments > Legislation > Severability*
[HN11] If an invalid part of a statute is severable from the rest, the portion which is constitutional may stand while that which is unconstitutional is stricken out and rejected. A statute is not destroyed in toto because of an improper provision, unless such provision is necessary to the integrity of the statute or was the inducement to its enactment. If, when an unconstitutional portion of an act is eliminated, the remainder is complete in itself and capable of being executed in accordance with the apparent legislative intent, it must be sustained.

*Evidence > Inferences & Presumptions > General*

*Overview*
*Governments > Legislation > Interpretation*
*Governments > Legislation > Severability*
[HN12] The presumption is against the mutilation of a statute, and that the legislature would not have enacted it except in its entirety. The incorporation of a severability clause creates a presumption to the contrary; namely, that the legislature would have enacted the law without its invalid portions being incorporated therein.

**COUNSEL:** For Plaintiffs and Appellants: **Edmund F. Sheehy, Jr.** (argued); Cannon & Sheehy, Helena.

For Defendants and Respondents: **David W. Woodgerd**, Dep't of Revenue, **R. Bruce McGinnis** (argued), Tax Counsel, **Brenda Nordlund** (argued), Dep't of Administration; **Leo Berry**, Browning, Kaleczyc, Berry & Hoven, (Association of Montana Retired Public Employees), Helena.

**JUDGES:** KARLA M. GRAY, J. A. TURNAGE, BYRON L. ROBB District Judge, sitting for Justice John C. Harrison, JOHN WARNER District Judge, sitting in the seat vacated by the retirement of Justice R.C. McDonough, PETER L. RAPKOCH District Judge, sitting for Justice William E. Hunt, Sr., TERRY N. TRIEWEILER, FRED J. WEBER

**OPINION BY:** KARLA M. GRAY

**OPINION**

[*131] [**764] This is an appeal from the grant of summary judgment to defendants by the First Judicial District Court, Lewis and Clark County. We affirm in part and reverse in part.

We consider the following issues on appeal:

1. Did the District Court err in concluding that no contractual right existed [***2] in certain state retirees to continued exemption from taxation of state retirement benefits, and that Ch. 823, 1991 Mont. Laws, does not violate Article II, Sec. 31 of the Montana Constitution?

2. Did the District Court err in concluding that the provision of Ch. 823, 1991 Mont. Laws, phasing out the $ 3,600 exemption does not violate 4 U.S.C. §

Page 4

262 Mont. 129, *131; 864 P.2d 762, **764;
1993 Mont. LEXIS 358, ***2; 50 Mont. St. Rep. 1477

111?

[*132]

3. Did the District Court err in concluding that the retirement adjustment payment contained in Ch. 823, 1991 Mont. Laws, does not violate 4 U.S.C. § 111?

4. Are the retirement adjustment payment and related implementation provisions severable from Ch. 823, 1991 Mont. Laws?

For many years, the State of Montana exempted from income taxation all retirement benefits paid through its various retirement systems to teachers and state government retirees, while taxing retirement benefits paid by the United States to federal retirees. In 1989, the United States Supreme Court decided *Davis v. Michigan Dep't of Treasury* (1989), 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891. The Supreme Court determined that [HN1] 4 U.S.C. § 111 waives the immunity retired federal employees otherwise would enjoy from state taxation [***3] of retirement benefits received as a result of their employment with the federal government, *except* to the extent such state taxation discriminates on the basis of the source of the retirement benefits. Because the Michigan tax at issue favored retired state employees based on the source of their retirement benefits, the Supreme Court concluded that the tax violated principles of intergovernmental tax immunity. *Davis*, 489 U.S. at 810, 817, 109 S.Ct. at 1505, 1509, 103 L.Ed.2d at 901, 906.

Although *Davis* was decided during Montana's 1989 legislative session, the legislature did not amend Montana's tax laws in response to *Davis* prior to adjourning. As a result, a group of federal retirees filed a declaratory judgment action to have the existing taxation scheme declared unconstitutional; they also sought a retroactive application of *Davis* for purposes of entitlement to a refund of taxes illegally collected by the State. By the time that case reached this Court, the district court had adopted the parties' stipulation that the tax was invalid for tax years beginning after December 31, 1988; only the issue of retroactive application of *Davis* was before us. See [***4] *Sheehy v. State, Dep't of Revenue* (1991), 250 Mont. 437, 820 P.2d 1257.

The Montana legislature subsequently passed [HN2] Chapter 823, 1991 Montana Laws, which, according to its title, restructures the income tax on pension benefits by equalizing the taxation of all pension benefits. In lieu of extending the total exemption from taxation previously available to state retirement income to federal retirement income, the legislature opted in Chapter 823 to bring all retirement income -- including both state and federal pensions -- within the Montana income tax. Chapter 823 does exempt from taxation the first [*133] $ 3,600 of all pension and annuity income received, except that the exemption is reduced or phased out by $ 2 for every $ 1 of federal adjusted gross income in excess of $ 30,000. In addition, section 5 of Chapter 823 grants to state retirees who are Montana residents, and who now were to be taxed in response to *Davis*, an annual retirement adjustment payment.

Appellants, who are primarily federal retirees but who include one or more state and teacher retirees (hereafter Taxpayers), filed the instant declaratory judgment action against two state retirement divisions [***5] [**765] of the Montana Department of Administration and the Montana Department of Revenue (hereafter the State), challenging Chapter 823 on a number of grounds. The Association of Montana Retired Public Employees was allowed to intervene. The parties entered into an agreed statement of facts and submitted the case to the District Court on cross motions for summary judgment.

The District Court granted summary judgment to the State on all issues. Taxpayers appeal from portions of that judgment.

I

Did the District Court err in concluding that no contractual right existed in certain state retirees to continued exemption from taxation of state retirement benefits, and that Ch. 823, 1991 Mont. Laws, does not violate Article II, Sec. 31 of the Montana Constitution?

Taxpayers argue that as to state employees who retired on or before the effective date of Chapter 823 and began receiving retirement benefits at a time when those benefits were fully exempt from taxation, Chapter 823 violates [HN3] Article II, Section 31 of the 1972 Montana Constitution, which prohibits the legislature from passing any law impairing the obligation of contracts. The thrust of the argument is that, by taxing

Page 5

262 Mont. 129, *133; 864 P.2d 762, **765;
1993 Mont. LEXIS 358, ***6; 50 Mont. St. Rep. 1477

[***6] these retirees' state pensions, Chapter 823 impairs private contractual rights codified at §§ 19-4-706 and 19-3-105, MCA (1989), that exempted their pensions from taxation.

The State counters that the pre-Chapter 823 statutes did not create private contractual rights, and could not create a right in state retirees *never* to be taxed because it is prohibited from surrendering or contracting away its taxing power by Article VIII, Section 2 of the 1972 Constitution. Thus, the State contends, Article II, Section 31 is inapplicable here.

The District Court correctly relied on *Wage Appeal v. Board of Personnel Appeals* (1984), 208 Mont. 33, 676 P.2d 194, in concluding that §§ 19-4-706 and 19-3-105, MCA (1989), constituted current policy [*134] statements regarding public employment, rather than a contract providing that state retirement benefits would never be taxed. In *Wage Appeal*, a statewide pay plan was challenged on the basis that it impaired employment contracts entered into before it took effect. We stated:

> [HN4] [W]hen the Legislature enacts a statute fixing certain terms and conditions of public employment, such as salaries and compensation, it is presumed that [***7] the statute does not create contractual rights, but is intended merely to declare a policy to be pursued until the Legislature declares otherwise.

*Wage Appeal*, 676 P.2d at 199 (citations omitted). While recognizing the "presumption" language in *Wage Appeal*, Taxpayers rely on additional language therein:

> [HN5] If contractual rights are to be created by statute, the language of the statute and the circumstances must manifest a legislative intent to create private rights of a contractual nature enforceable against the State.

*Wage Appeal*, 676 P.2d at 199 (citations omitted).

Taxpayers assert that the provisions of §§ 19-4-706 and 19-3-105, MCA (1989), clearly manifest legislative intent to create private contractual rights enforceable against the State. We disagree.

Notwithstanding their bald assertion of clearly manifested legislative intent, Taxpayers offer no analysis of the statutes to support the assertion. Thus, it is necessary only to point out that § 19-4-706, MCA (1989), provides that state retirement benefits *are* exempted from state tax. The use of the present tense "are" indicates that the statute is a statement of current policy regarding public [***8] employment. The statute contains no manifestation of legislative intent to create private and enforceable contractual rights as contemplated in *Wage Appeal*; nor does it make or imply any promises regarding ongoing or future tax treatment of state retirement benefits. Taxpayers have not met their burden under *Wage Appeal*.

[**766] Moreover, Taxpayers' reliance on *Clarke v. Ireland* (1948), 122 Mont. 191, 199 P.2d 965, and *State ex rel. Sullivan v. State* (1977), 174 Mont. 482, 571 P.2d 793, as support for their theory that §§ 19-4-706 and 19-3-105, MCA (1989), created a contract right to continued exemption from taxation of state retirement benefits is misplaced. Both cases involved an effort to deny the plaintiffs therein an actual retirement benefit provided by the Teachers' Retirement Act at the time the plaintiffs became members of the teachers' retirement system; [*135] our conclusions in *Clarke* and *Sullivan* that contract rights existed were based on those facts.

Here, we have no issue concerning efforts to deny or limit state retirees' actual retirement benefits. The question before us relates to a taxation provision entirely separate from state [***9] retirement programs and entitlements thereunder. Furthermore, the taxation characteristic which distinguishes this case from *Clarke* and *Sullivan* also brings into play Article VIII, Section 2 of the 1972 Constitution, which prohibits the state from surrendering or contracting away the power to tax. Under that constitutional provision, the state cannot promise any group of taxpayers that it will never tax them.

We hold that the District Court correctly concluded that state employees retiring prior to the effective date of Chapter 823 did not have a contractual right to continued exemption from taxation of their state retirement benefits. On that basis, the District Court also correctly determined that Chapter 823 does not violate Article II, Section 31 of

Page 6

262 Mont. 129, *135; 864 P.2d 762, **766;
1993 Mont. LEXIS 358, ***9; 50 Mont. St. Rep. 1477

the Montana Constitution.

II

Did the District Court err in concluding that the provision of Ch. 823, 1991 Mont. Laws, phasing out the $ 3,600 exemption does not violate 4 U.S.C. § 111?

Prior to adoption of the Public Salary Tax Act of 1939 (the Act), compensation of both state and federal employees generally was thought to be exempt from taxation by another sovereign under the doctrine of intergovernmental tax immunity. [***10] The purpose of the Act was to impose federal income tax on the salaries of all state and local government employees. In order to ensure that federal employees did not remain immune from state taxation while state employees were being required to pay federal income taxes, Congress enacted § 4 of the Act -- now 4 U.S.C. § 111 -- waiving immunity which might otherwise have shielded federal employees from state taxation, but retaining immunity from discriminatory taxation based on the source of the income:

> [HN6] The United States consents to the taxation of pay or compensation for personal service as an officer or employee of the United States, a territory or possession or political subdivision thereof, the government of the District of Columbia, or an agency or instrumentality of one or more of the foregoing, by a duly constituted taxing authority having jurisdiction, *if the taxation does not discriminate* [*136] *against the officer or employee because of the source of the pay or compensation.*

4 U.S.C. § 111 (emphasis added).

In 1989, the United States Supreme Court decided *Davis*, which involved a Michigan income tax system discriminating in favor of state retirees [***11] and against federal retirees by exempting only state retirement benefits from taxation. The Supreme Court determined that the discriminatory tax was based on the source of the retirement benefits and was not justified by significant differences between the two classes of retirees. *Davis*, 489 U.S. at 817, 109 S.Ct. at 1509, 103 L.Ed.2d at 906.

When *Davis* was decided, it became clear that Montana's income tax statutes regarding state versus federal retirement benefits also violated federal law. In responding to *Davis* and restructuring the taxation of pension benefits in Chapter 823, the Montana legislature provided a $ 3,600 exemption from taxation to all retirees; the exemption is phased out beginning at the $ 30,000 income level. Taxpayers contend that the phase-out violates 4 U.S.C. § 111 by discriminating against federal retirees [**767] based on the source of their income. This is so, they contend, because federal pensions are larger than state pensions and, as a result, federal retirees will lose all or part of the exemption. The State contends that the phase-out exemption treats state and federal retirees' pensions equally and that any difference is based [***12] on amount, not source, of income.

As discussed above, the controlling federal statute does not prohibit all differences in state taxation of state and federal pensions. Rather, it precludes taxation which discriminates against federal retirees because of the source of the pension. 4 U.S.C. § 111. Here, the phase-out exemption is neutral on its face; it applies to all taxpayers equally. Any difference in impact on federal and state retirees is based entirely on the amount of income received by each individual taxpayer, without regard to the source of that income.

Indeed, the Supreme Court in *Davis* tacitly approved differences in taxation such as the phase-out exemption before us:

> [HN7] A taxation exemption truly intended to account for differences in retirement benefits would not discriminate on the basis of the source of those benefits . . .; rather, it would discriminate on the basis *of the amount* of benefits received by individual retirees.

*Davis*, 489 U.S. at 817, 109 S.Ct. at 1508, 103 L.Ed.2d at 906 (emphasis added). The phase-out exemption contained in Chapter 823 treats individual retirees differently based on differences in the [*137] amount of retirement [***13] income received. Taxpayers' strained

Page 7

262 Mont. 129, *137; 864 P.2d 762, **767;
1993 Mont. LEXIS 358, ***13; 50 Mont. St. Rep. 1477

interpretation that because federal pensions generally are larger than state pensions and, thus, that the phase-out discriminates as to source rather than amount, simply does not square with *Davis*.

We conclude that the phase-out exemption does not discriminate as to source of income. Therefore, we hold that the District Court correctly concluded that the provision of Chapter 823 phasing out the $ 3,600 exemption does not violate 4 U.S.C. § 111.

### III

Did the District Court err in concluding that the retirement adjustment payment contained in Ch. 823, 1991 Mont. Laws, does not violate 4 U.S.C. § 111?

Observing that *Davis* does not limit the State's ability to set the terms and conditions of public employment, the District Court concluded that the adjustment constitutes a legitimate increased retirement benefit to state retirees. It relied primarily on *Clark v. United States* (7th Cir. 1982), 691 F.2d 837.

Taxpayers argue that the adjustment is part of the taxation scheme and that it impermissibly discriminates against them. They also argue that *Clark* is inapplicable. The State contends that the adjustment is unrelated to the [***14] tax and that, pursuant to *Clark*, it is a valid retirement benefit.

[HN8] *Davis* requires a two-pronged analysis of the legislation at issue here: 1) Does it constitute discriminatory taxation against federal retirees or in favor of state retirees on the basis of source of income? and 2) If so, is the different treatment "directly related to, and justified by, 'significant differences between the two classes'"? *Davis*, 489 U.S. at 816, 109 S.Ct. at 1508, 103 L.Ed.2d at 905 (citation omitted). Application of *Davis* to the case before us mandates our conclusion that the retirement adjustment payment (hereafter adjustment) contained in section 5 of Chapter 823 violates 4 U.S.C. § 111.

It is clear that the revenue, equalization and adjustment provisions of Chapter 823 are related parts of a comprehensive income tax program encompassing all pension income. The provisions were all included in and part of the same bill, originally introduced as Senate Bill 226 in the 1991 Montana legislature. The title of the bill, subsequently enacted as Chapter 823, reads in pertinent part:

> An Act to Restructure the Income Tax on Pension Benefits by Equalizing the Taxation of All Pension [***15] Benefits; To Provide an Exemption of $ 3,600 from Taxation of Benefits from Federal, State, [*138] [**768] and Private Retirement, Annuity, Pension, and Endowment Plans or Systems; To Provide That the Amount of the Exemption be Reduced by $ 2 for Every $ 1 of Federal Adjusted Gross Income Received by the Taxpayer in Excess of $ 30,000; To Provide for an Adjustment Payment to Retirees of State, Local, and Teacher Retirement Systems Who are Montana Residents. . . .

Reading the title makes it clear that the overall purpose of this bill was to tax state and federal pensions in a manner that does not violate 4 U.S.C. § 111 as interpreted in *Davis*. Rather than comply with 4 U.S.C. § 111 by extending the total exemption from state income taxation previously granted to state retirement benefits to include federal retirement benefits, the legislature chose to equalize the burden by taxing all retirement benefits, subject to the phase-out exemption discussed above. Within the same legislative enactment, the legislature provided for an adjustment payment to state retirees who are Montana residents. The State's argument that the two portions of the bill are not related defies [***16] logic.

Moreover, the relationship between the tax equalization provisions of the bill, with their negative impacts on state retirees, and the adjustment intended to make up, in part, for that equalization cannot be gainsaid. The adjustment -- while purporting to be an adjustment to state retirement benefits -- is, in fact, an adjustment to the equalization achieved via the first sections of Chapter 823. This conclusion is inescapable given the inclusion of the adjustment in, and as part of, the tax equalization program. No other interpretation of these two portions of Chapter 823 comports with our duty to construe statutes in a reasonable manner.

It is clear that the adjustment is not an actual and legitimate pension or retirement benefit. If it were a pension benefit, the State would have provided it to *all* of its retirees in recognition of their years of public service rather than just those living in Montana. There was no

Page 8

262 Mont. 129, *138; 864 P.2d 762, **768;
1993 Mont. LEXIS 358, ***16; 50 Mont. St. Rep. 1477

need to do so because the sole purpose of the adjustment was to partially recompense state retirees living in Montana for the tax they now must pay under the equalizing provisions of Chapter 823.

Further evidence that the adjustment is not an actual [***17] increased retirement benefit for retired state employees is the fact that the funding of the section 5 adjustment bears no resemblance to the funding of actual state retirement benefit adjustments previously enacted by the legislature. Such actual retirement adjustments as those contained in the Public Employees' Retirement System at § 19-3-1603, MCA, and in the Teachers' Retirement System at § 19- [*139] 20-713, MCA, are funded by investment income produced by the retirement fund made up of employee and employer contributions. See §§ 19-3-1602 and 19-20-712, MCA. Here, the funding for the so-called retirement adjustment payment is statutorily appropriated from the general fund pursuant to section 4 of Chapter 823 -- that is, from the taxes collected from all Montana taxpayers. The money to pay the adjustment never goes into the state retirement funds, but is simply paid by the state treasurer to the retirement boards, to be distributed by the boards in accordance with the provisions of Chapter 823. While this evidence is not conclusive as to the nature of the adjustment at issue here, it undercuts any notion that the adjustment is a legitimate increase in retirement benefits [***18] for state retirees.

We conclude that the adjustment is a partial tax rebate denominated otherwise in an attempt to evade the requirements of federal law. The discriminatory aspect of the adjustment is clear: the adjustment favors state retirees living in Montana based solely on the source of their retirement income; that is, those retirees living in Montana and receiving state retirement income receive the adjustment, while federal retirees living in Montana and receiving federal retirement income do not. Thus, the adjustment constitutes discriminatory taxation based solely on the source of the respective retiree's income, in violation of 4 U.S.C. § 111.

[**769] The State's reliance on *Clark* for the proposition that the adjustment is merely an allowable increased retirement benefit is misplaced. *Clark* involved a cost-of-living adjustment provided to all federal retirees as an actual and legitimate pension adjustment. *Clark*, 691 F.2d at 841. Here, the adjustment was provided not to all state retirees, but only to state retirees who are

Montana residents. Further, the adjustment provided in *Clark* was entirely independent of, and unrelated to, any tax provisions. [***19] Here, it is part of a tax equalization scheme mandated by federal law.

Because the adjustment contained in section 5 of Chapter 823 violates 4 U.S.C. § 111, the disparate tax treatment of state and federal retirement income is justified only if it is "directly related to, and justified by, 'significant differences between the two classes.'" *Davis*, 489 U.S. at 816, 109 S.Ct. at 1508, 103 L.Ed.2d at 905. Application of this test mandates the conclusion that the adjustment contained in Chapter 823 cannot stand.

The State makes no real argument that significant differences in fact exist between the two classes of retirees that justify the discriminatory adjustment. Perhaps this is to the State's credit, since it is [*140] clear that no such articulable differences exist which could withstand *Davis* scrutiny. The most obvious contention to be made regarding differences between the classes is the State's interest in inducing and retaining qualified state government workers. While this position is not asserted here, it is precisely the argument made by the state of Michigan in *Davis* to justify the preferential treatment of its retired employees, and is the argument [***20] squarely rejected by the *Davis* Court:

> This argument is wholly beside the point, however, for it does nothing to demonstrate that there are "significant differences between the two classes" themselves; rather, it merely demonstrates that the State has a rational reason for discriminating between two similar groups of employees. The State's *interest* in adopting the discriminatory tax, no matter how substantial, is simply irrelevant to an inquiry into the *nature* of the two classes receiving inconsistent treatment.

*Davis*, 489 U.S. at 816, 109 S.Ct. at 1508, 103 L.Ed.2d at 905 (emphasis added).

Moreover, no reasonable argument can be made that the adjustment is necessary or intended (a) to retain retired residents in Montana in order to provide a critical

Page 9

262 Mont. 129, *140; 864 P.2d 762, **769;
1993 Mont. LEXIS 358, ***20; 50 Mont. St. Rep. 1477

mass of retired people to use those services and facilities that are important to retired people; or (b) to entice other retired people into the state. Such arguments would apply to *all* retired people and would support the similarities between state and federal retirees rather than establishing any significant differences between the two classes.

Here, as noted, the State does not address or attempt to meet [***21] the *Davis* requirement that it justify disparate treatment on the basis of significant differences between the two classes of retirees. The reason is clear: the "adjustment" is not based on any difference in the nature of the two classes before us. The disparate treatment is based entirely on the State's desire to continue to provide an advantage to those of its own retirees losing a pre-*Davis* advantage -- namely, state retirees who reside in Montana and whose state pensions are now subject to income tax pursuant to Chapter 823. While the desire is understandable and perhaps even laudable, it is legally insufficient under *Davis* as a justification for taxation which discriminates against federal retirees.

We conclude that the adjustment contained in section 5 of Chapter 823 constitutes discriminatory taxation which is not related to, or justified by, significant differences between state and federal retirees. [*141] We hold that the District Court erred in determining that the retirement adjustment payment does not violate 4 U.S.C. § 111.

IV

Are the retirement adjustment payment and related implementation provisions severable from Chapter 823, 1991 Mont. Laws?

[***22] Having concluded that the adjustment provision contained in section 5 of Chapter [**770] 823 violates 4 U.S.C. § 111, it is necessary to determine whether that provision and related implementing provisions can be severed from Chapter 823, or whether the entirety of Chapter 823 must be stricken. We conclude that the invalid provisions can be severed.

[HN9] Section 20 of Chapter 823 provides that if a part of the legislation is invalid, all valid parts that are severable from the invalid part remain in effect. We previously have concluded that [HN10] the inclusion of a severability clause is an indication that the drafters

desired judicial severability policy to apply. *Montana Automobile Assoc. v. Greely* (1981), 193 Mont. 378, 399, 632 P.2d 300, 311. Thus, we begin our analysis with stated legislative intent favoring severability. We then apply severability principles in determining whether the invalid provisions can be severed or whether the entire legislative act must be stricken:

> [HN11] If an invalid part of a statute is severable from the rest, the portion which is constitutional may stand while that which is unconstitutional is stricken out and rejected. . . . A statute "is not [***23] destroyed in toto because of an improper provision, unless such provision is necessary to the integrity of the statute or was the inducement to its enactment." . . . If, when an unconstitutional portion of an act is eliminated, the remainder is complete in itself and capable of being executed in accordance with the apparent legislative intent, it must be sustained.

*Greely*, 632 P.2d at 311 (citations omitted).

Here, the income tax provisions of Chapter 823 clearly are not destroyed in toto by striking the adjustment provisions contained in sections 4 and 5; indeed, they are not impacted in any way. The income tax still may be imposed and the exemption may be given effect without the adjustment for state retirees living in Montana. Nor was the adjustment the inducement for enacting the legislation; the "inducement" for Chapter 823 was 4 U.S.C. § 111 and the Supreme Court's *Davis* decision.

[*142] The income taxes and exemption contained in Chapter 823 remain complete in themselves and capable of being executed in accordance with the overall legislative intent, which was to equalize taxes. Granted, the legislature also intended to continue an advantage for certain [***24] state retirees through the adjustment. But where we have invalidated the adjustment portion of Chapter 823, it is clear that the legislature intended, through the severability clause it included in Chapter 823, to preserve all valid parts.

Our earlier determination that the revenue, equalization and adjustment provisions of Chapter 823

Page 10

262 Mont. 129, *142; 864 P.2d 762, **770;
1993 Mont. LEXIS 358, ***24; 50 Mont. St. Rep. 1477

are related parts of a comprehensive income tax program encompassing all pension income does not negate our conclusion here regarding severability. The fact that the provisions are related from the standpoint of whether they can withstand 4 U.S.C. § 111 and *Davis* scrutiny does not mean that they are not, and cannot be, separate and independent from a severability standpoint. From an administrative and operational perspective, it is clear that sections 4 and 5 are segregable from the income tax and exemption provisions.

Finally, and returning again to the legislature's specific intent that invalid portions of Chapter 823 be severed, we note that, absent a severability clause:

> [HN12] [T]he presumption is against the mutilation of a statute, and that the legislature would not have enacted it except in its entirety. The incorporation of a provision [***25] such as section 20 [severability clause] creates a presumption to the contrary; namely, that the legislature would have enacted the law without its invalid portions being incorporated therein.

*State v. Holmes* (1935), 100 Mont. 256, 291, 47 P.2d 624, 636 (citation omitted). See also *Ingraham v. Champion Int'l* (1990), 243 Mont. 42, 49, 793 P.2d 769, 773. The presumption operates here in support of the legislature's intent that the remainder of Chapter 823 remains valid even where the adjustment provisions are determined to be invalid. Nothing in Chapter 823 indicates any intent that the tax and exemption provisions are dependent on the validity of the adjustment for state retirees living in [**771] Montana; thus, no inconsistency between such a provision and the contrary and clearly-stated severability clause exists in Chapter 823 which might require us to depart from the plain language used by the legislature and delve into the legislative history to resolve the issue before us.

We conclude that sections 4 and 5 are severable from Chapter 823, 1991 Montana Laws. We hold that those sections are severed and [*143] excised from Chapter 823 and, with those invalid [***26] and severed provisions excepted, Chapter 823, 1991 Montana Laws, remains valid and in full force and effect.

Affirmed in part and reversed in part.

**CONCUR BY:** PETER L. RAPKOCH (In Part); FRED J. WEBER

**DISSENT BY:** PETER L. RAPKOCH (In Part); FRED J. WEBER

**DISSENT**

DISTRICT JUDGE RAPKOCH specially concurring in part and dissenting in part.

I concur in the majority opinion on Issue I, that state employees retiring before the effective date of Chapter 823, 1991 Laws of Montana, did not have a contractual right to continued exemption from taxation of their state retirement benefits.

I also agree that the provision of Chapter 823 phasing out the $ 3600 exemption does not violate 4 U.S.C. § 111 (1966).

Nor do I disagree with the majority that the adjustment contained in section 5 of Chapter 823 constitutes discriminatory taxation and therefore violates 4 U.S.C. § 111 (1966).

It is, however, my opinion that the adjustment payment provision is not severable from the rest of Chapter 823, and therefore, I dissent from the majority's opinion on that point.

Section 20 of Chapter 823 is the severability provision here. The incorporation of that provision raises a presumption that the Legislature would have [***27] enacted the law without its invalid portions. *Williams v. Standard Oil Co.* (1929), 278 U.S. 235, 241-42, 49 S.Ct. 115, 116-17, 73 L.Ed. 287; *State v. Holmes* (1935), 100 Mont. 256, 291, 47 P.2d 624, 636; *Ingraham v. Champion Int'l.* (1990), 243 Mont. 42, 49, 793 P.2d 769, 773.

That is a rebuttable presumption though, and a weak one at that; rebuttable by the nature of the statute being considered: its purpose manifested by its provisions before severance as compared to its apparent purpose, as manifested by the provisions remaining after amputation. Can it be said that the purpose is the same after surgery as

Page 11

262 Mont. 129, *143; 864 P.2d 762, **771;
1993 Mont. LEXIS 358, ***27; 50 Mont. St. Rep. 1477

it was before?

The majority cites and quotes *Montana Automobile Association v. Greely* (1981), 193 Mont. 378, 399, 632 P.2d 300, 311 as follows:

> A statute "is not destroyed in toto because of an improper provision, unless such provision is *necessary to the integrity of the statute or was the inducement to its enactment*." If, when an unconstitutional portion [*144] of an act is eliminated, the remainder is complete in itself and capable of being executed *in accordance with the apparent legislative intent*, it must be sustained. [Citation omitted; [***28] emphasis added].

This cannot be done here. "Apparent legislative intent" must be that intent manifested by the language of the statute *before* severance. It is true that neither the income tax provisions nor the equalization parts are not *themselves* destroyed or affected by striking the adjustment provisions. But the former cannot in this case be considered separate and apart from the amputated adjustment provision. And "amputated" is the right word. What remains and will be enforced under the majority opinion will not be the same as what clearly appears to be the intent of the Legislature in the original enactment. The Legislature did not, in enacting Chapter [**772] 823, set out to do no more than equalize the income tax on all retirees. It went on and set out, *by the adjustment provision*, to remove or lessen that impact on resident Montana retirees.

The general statement of the severability rule in *Greely* is an accurate statement. Portions of a statute are severable if:

(1) the invalid part is not necessary to the integrity of the statute; or

(2) the invalid part was not the inducement to its enactment;

(3) the remainder of the statute is complete [***29] in itself; *and* (conjunctive)

(4) the remainder is capable of being executed *in accordance with the apparent legislative intent. Greely*, 632 P.2d at 311.

I submit that the surgery here performed on Chapter 823 fails to meet condition 1 above in that sections 4 and 5, the adjustment provisions, are necessary to the integrity of the entire Chapter 823 as originally enacted. It is correct that the equalization provisions may be imposed and the exemption given effect without the adjustment to income for Montana resident retirees. But what would then be imposed and given effect would be a law completely different from what is clearly intended in the original act. It may even be a better law, but that is not our business; such would be judicial legislation.

It also seems that the adjustment provision is part of an enactment that is a byzantine effort to avoid *Davis v. Michigan Department of Treasury* (1989), 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891. I stand in awe and admiration of such effort, but we are subject to 4 U.S.C. § 111 (1966) and *Davis* and must apply logic to the premises therein set forth. I, therefore, believe that the adjustment provision is an [***30] inseparable inducement to the enactment of Chapter 823, thereby failing the second condition above.

[*145] The remainder of the statute, after eliminating the adjustment provision is complete in itself, but only in itself. It is not what the Legislature enacted or intended. There go conditions 3 and 4 above.

What remains after our decision is not, as stated *ad nauseam* above, capable of being executed in accordance with the apparent legislative intent. We cannot cut out a third of the legislation where that third completely changes the effect of the whole enactment and say that what is left is what the Legislature started with.

*Greely* is not on point. There the purpose of the Act was to regulate lobbying. The Legislature indulged in overkill by, for instance, defining the proscribed practice so a person of normal intelligence could not figure out what he could not do. Several sections were therefore held void; others, because the subject matter of some of the sections was not embraced in the title of the Initiative, contrary to Article V, Section 11, Clause 3, of the Montana Constitution.

This Court stated:

Page 12

262 Mont. 129, *145; 864 P.2d 762, **772;
1993 Mont. LEXIS 358, ***30; 50 Mont. St. Rep. 1477

The Initiative, while being lengthy, is basically [***31] amendatory in nature. Its purpose was to expand Chapter 7, Title 5, of Montana's Lobbying Act, to provide for the disclosure of money spent to influence action of public officials and to require elected officials to disclose their business interests. *This* purpose is not frustrated by our limitations of the Initiative. Even after our excisions, Chapter 7, Title 5, as amended by the Initiative is complete in itself and capable of being executed in accordance with the intention of the people of Montana. [Emphasis added].

*Greely*, 632 P.2d at 311-12.

The legislation there considered is of a different nature than Chapter 823, where the parts are meaningful only in internal conjunction with each other. The whole of Chapter 823 was enacted as a unit.

I must disagree with the view expressed that the legislative intent is clearly expressed in section 20, Chapter 823, which is the severability clause, and provides that if a part of the Act is invalid, all invalid parts of the Act are severable, and valid parts remain in effect. This is not the legislative intent that is relevant here. In fact, it is [**773] not the legislative intent at all that the act is severable; [***32] the intent is that *if* the act is severable. . . . By use of the word "if" the Legislature recognizes the fact that severance, or declaration of severability is a *judicial* act, not legislative. If the Legislature had intended the severed statute, it could and should and would have legislated accordingly.

 [*146] This may, as is stated and shown earlier, raise a presumption that the Legislature would have enacted the law without its invalid portions being incorporated. But that presumption is, I believe, a rebuttable presumption, here rebutted. Also, the inclusion of a severability provision is to *seek* a *judicial* act. Before it can be given effect, the *judicial branch* must do the severing.

The relevant intent for the judiciary to look at in *considering* severability is not the legislative intent to provide for *severability*, but the legislative intent in *enacting the statute*, the purpose of the statute, as indicated by its provisions. The intent to make portions severable is an interim intention, a procedural means, not the end. This Court has stated:

> The inclusion of a severability clause in the Initiative is an indication that its drafters [***33] and the voters desired this *judicial* policy [the severability rule] to be applied to the Initiative. [Emphasis added].

*Greely*, 632 P.2d at 311.

Lastly, section 20, Chapter 823, reads as follows:

> Severability. If a part of [this act] is invalid, all valid parts that are *severable* from the invalid part remain in effect. If a part of [this act] is invalid in one or more of its *applications*, the part remains in effect *in all valid applications* that are *severable* from the invalid *applications*. [Emphasis added].

That language, I think, is clear. That section speaks not of physical parts of provisions. It speaks of *applications* of those parts. To apply the equalization portions without the adjustment portion is to apply the former portions at a divergence of 180 degrees, more or less, from the application intended by the Legislature as the act is presently constituted. A severability clause is an appeal to the judiciary.

It is, therefore, my opinion that the whole of Chapter 823 is invalid and the adjustment provisions are not severable.

JUSTICE WEBER specially concurs and dissents as follows:

I concur with issues I and II of [***34] the majority, but dissent on issues III and IV. Issue III asks if the District Court erred in concluding that the retirement adjustment payment contained in Chapter 823, 1991 Montana Laws, violates 4 U.S.C. § 111. I do not find

Page 13

262 Mont. 129, \*146; 864 P.2d 762, \*\*773;
1993 Mont. LEXIS 358, \*\*\*34; 50 Mont. St. Rep. 1477

such discrimination.

The majority states:

[\*147]

It is clear that the revenue, equalization and adjustment provisions of Chapter 823 are related parts of a comprehensive income tax program encompassing all pension income.

I agree that Chapter 823 is a comprehensive income tax program; however, this does not preclude this statute from encompassing other issues. The majority quotes verbatim the "pertinent" part of the bill's title. The first part of the title of the restructuring plan indicates that the legislature attempted to "equalize" the taxes on all pension benefits. Although, listed after this in sequence, the provision indicating the legislature's intent to provide the adjustment payment to State retirees living in Montana is an integral part of the Act as seen by the title's wording:

. . . . To Provide for an Adjustment Payment to Retirees of State, Local, and Teacher Retirement Systems Who are Montana Residents . . . .

[\*\*\*35] It is not necessary to rely upon the title to determine the intent of the legislature. The chapter starts with the following list of seven WHEREAS'S, and with the exception of the taxation of benefits referred to in the first WHEREAS, all of the remaining WHEREAS's set forth an intent directly [\*\*774] relating to the adjustment payment and the reasons for the adjustment payment:

WHEREAS, the State of Montana desires to tax federal, state, and private retirement benefits equally; and

WHEREAS, the State of Montana has in the past provided *its employees* with a benefit of employment through its tax system; and

WHEREAS, *the Legislature desires and encourages qualified employees to enter and remain in public service*; and

WHEREAS, it is the policy of the State of Montana to encourage public employees who become superannuated or incapacitated to retire and, to that end, to provide sufficient benefits to provide for retirement; and

WHEREAS, the *Legislature wishes to encourage all retired persons to remain within Montana* to provide a critical mass of retired persons who use certain services and facilities that are important to retired persons and that may keep and perhaps [\*\*\*36] entice other retired persons into the state; and

WHEREAS, the Legislature has in the past granted increases in retirement benefits in a manner designed to provide relatively greater increases to those retirees who were employed during the years of low wages and whose benefits are relatively small; and

[\*148] WHEREAS, *the Legislature therefore grants an increase in benefits to its former public employees who are residents of the state to provide compensation to encourage them to remain in Montana*. (Emphasis added.)

The above statement of intent was added because the legislature knew that the *Davis* decision mandated that all pension holders must be taxed equally. The Act does that. At the same time, the legislature knew that such an increase in taxes on State pensions could create a situation where many retirees would leave the State. Acting through its legislature and governor, Montana as a sovereign and as an employer expressed a desire to provide an incentive for Montana retirees to remain in the State. Without subterfuge of any type the legislature declared this intent. Unfortunately, that openness appears to have been a basis for the majority to conclude [\*\*\*37] there was discrimination.

If the same adjustment payment provided in the Act were provided in another act in some future year, and denominated a cost of living, no one would even raise the discrimination argument. I do not find a basis to condemn the adjustment merely because it is included with the tax.

The adjustment payment is paid to State retirees who

Page 14

262 Mont. 129, *148; 864 P.2d 762, **774;
1993 Mont. LEXIS 358, ***37; 50 Mont. St. Rep. 1477

already are receiving retirement benefits. I find nothing in the record which demonstrates a corresponding obligation by the State of Montana to make some sort of payment to federal retirees whose retirement benefits are paid by the United States. I do not understand how the payment by the State to its retirees can lead to a "clear" determination of discrimination, as compared to a federal increase to federal retirees which would not be such discrimination.

The fact that federal retirees do not get this adjustment is not discrimination as to source. The same adjustment is not given to private retirees either.

The basic intent of 4 U.S.C. § 111 has been lost. That intent is that the income taxation of Montana should tax federal and State retirement benefits at the same rates. The Act does that. An increase in pay to encourage [***38] State retirees to remain in the state is not discrimination as contemplated in § 111. An incentive to stay is not discrimination as to source. There is a recognition on the part of the legislature that the new tax on Montana public employee pensions might cause them to leave the State. Such a recognition, stated up front and in the open, does not equal the discrimination that the majority characterizes as "clear."

[*149] The fact that this adjustment payment comes from the general fund is also of no consequence. Any other cost of living increase for State public employees comes from the same source. This adjustment payment is no different than any other [**775] benefit which the State as an employer has a right to offer a group of its retirees.

The majority refers to § 19-20-713, MCA, which provides a cost of living increase for teachers in the Teachers' Retirement System. The title of Chapter 658 of Montana Laws 1985 shows that only "certain" teachers within the retirees from this system would be benefitted by the increase. I do not understand how the majority condemns the 1991 Act because it is made applicable to "certain" retirees and yet refers to the Teachers' [***39] Retirement Act as nondiscriminatory where it also benefits only "certain" teacher retirees.

In addition, the Teachers' Retirement Act uses the "general fund" as the source of funds with which to pay teachers who retired from the various units of the University System and other schools, stating:

If the employer is the superintendent of

public instruction, a public institution of the state of Montana, a unit of the Montana university system, or the Montana state school for the deaf and blind, the *legislature shall appropriate to the employer an adequate amount to allow payment of the employer's contribution.* (Emphasis added.)

Section 3, amended § 19-20-605(3), MCA. With this annuity type system, the employers' part of the cost of living increase for "certain" retirees is paid by the State of Montana. How is that different from the present Act?

I conclude there is no discrimination "as to source" within the 1991 Act. As a matter of policy, Montana provides its own retirees an "incentive" without an intention to discriminate in any manner.

The *Davis* test of significant differences between the classes is not even reached here. One only has to determine the significant [***40] difference between classes if discrimination has occurred. Here, there is no agreement as to even what the appropriate classes are. The only classes that are pertinent to 4 UCS § 111 are "state retirees" and "federal retirees." Both of these classes are taxed equally under this Act. It is only the segment of State retirees that receive the benefit.

While the majority merely mentions that the discrimination is "clear" it does not go on to explain how the "incentive" or "adjustment" is discriminatory. Nor does it explain how the *Davis* quote applies to what we have before us:

Under our precedents, "[t]he imposition of a *heavier tax burden* on [those who deal with one sovereign] than is imposed on [those who [*150] deal with the other] must be justified by significant differences between the two classes." (Emphasis added.)

*Davis*, 489 U.S. at 815-816, 109 S.Ct. at 1508. The federal retirees have no heavier "tax burden" than do State retirees. The tax burden on both State and federal retirees is identical. The exemption of $ 3,600 is

Page 15

262 Mont. 129, *150; 864 P.2d 762, **775;
1993 Mont. LEXIS 358, ***40; 50 Mont. St. Rep. 1477

identical as are the tax rates applicable to both State and federal retirees. The range at which the exemption begins [***41] is $ 30,000 for both State and federal retirees. The only difference is that State retirees who reside in Montana are given an "incentive" to stay within the State that has employed them and from whom their pensions are derived. I point out here that the "incentive" is still subject to tax at the same rates as any amounts received by the retirees.

The District Court determined that the adjustment was part of a policy decision on the part of the State toward its employees. I would affirm the court on this analysis. The State acting as an employer has every right to act in concert with the sovereign and the legislature to provide an incentive to retired public employees to stay within the State that has been their home for years. This policy decision does not constitute discrimination against the retirees of any other sovereign or any other group of retirees. In this case, the other sovereign's retirees are taxed identically with those of the State sovereign. I conclude that instead of condemning the legislature and the governor for their openness in enacting the Act, they should be commended for the forthright way in which

this was done.

[**776] I also disagree with the [***42] conclusion that the adjustment is severable from the Act. Both the title and the statement of intent make it obvious that the adjustment or incentive to stay in Montana is an integral part of this Act. The incentive, based upon the fact that public retirees will now be receiving less money because of the mandatory taxation, should not be divorced from the tax plan itself. The tax plan explains why the employer State of Montana is granting this incentive. I do not believe the intention of granting some additional monies can be divorced from the taxation which applies to the retiree benefits and the adjustment. As demonstrated clearly in the WHEREAS clauses at the beginning of the Act, the taxation and the granting of the adjustment are not severable. The action of the majority is punitive in nature, taxing all benefits equally while eliminating the additional benefit awarded under the Act.

I also concur in the portion of Judge Rapkoch's concurrence and dissent in which he concludes that the adjustment payment is not severable from the rest of Chapter 823.



**STANDARD OIL COMPANY OF CALIFORNIA (a Corporation), Appellant, v. CHARLES G. JOHNSON, as State Treasurer, etc., Respondent**

**Sac. Nos. 5144, 5145**

**Supreme Court of California**

**10 Cal. 2d 758; 76 P.2d 1184; 1938 Cal. LEXIS 256**

**February 25, 1938**

**SUBSEQUENT HISTORY:** [***1] Rehearing Denied.

**PRIOR HISTORY:** APPEALS from judgments of the Superior Court of Sacramento County. Dal M. Lemmon, Judge.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff oil company appealed from judgments of the Superior Court of Sacramento County (California) that sustained defendant State's demurrers and entered judgment for the State in the oil company's actions seeking to recover gasoline taxes paid under protest, which were imposed for the distribution and sale of gasoline within the boundaries of national parks located within the territorial limits of California.

**OVERVIEW:** An oil company filed several actions seeking to recover gasoline taxes paid under protest, which were imposed by the Motor Vehicle Fuel License Tax Act, 1923 Cal. Stat. 577, for the distribution and sale of gasoline within the boundaries of national parks located within the territorial limits of California. The trial court entered judgment for the State and the oil company appealed. The court affirmed the trial court judgments. The court held that although the State ceded exclusive jurisdiction of the park lands back to the federal government by 1905 Cal. Stat. 54, the State reserved its taxing power in 1919 Cal. Stat. 74 and an acceptance of the act by congress in 41 Stat. 731 (1920). The court held that the express recognition by both sovereigns clearly established the existence of the right of the State to tax in the areas designated in accordance with the power as reserved and defined in both acts.The court also held that the exercise of the reserved power by the imposition of retail sales and gasoline taxes did not create an interference with the exercise of the jurisdiction acquired by the United States pursuant to the grants.

**OUTCOME:** The court affirmed the trial court judgments that were entered in favor of the State in the oil company's action to recover gasoline taxes paid under protest which were imposed for the distribution and sale of gasoline within the boundaries of national parks located within the territorial limits of California.

**CORE TERMS:** national park, exclusive jurisdiction, ceded, reservation, taxing power, reserved, cession, valley, recession, taxation, license fees, fishing, right to fix, gasoline taxes, reserved power, enumerated, franchises, saving, public lands, territorial limits, right to tax, federal government, territory, gasoline, retail, excise, national government, legislative act, sales tax, comprising

**LexisNexis(R) Headnotes**

*Environmental Law > Natural Resources & Public Lands > Public Trust Doctrine*
*Governments > Federal Government > Property*
*Governments > Public Lands > National Parks*
[HN1] On June 30, 1864, in 13 Stats. 325 (1864), that portion of Yosemite National Park designated in the act as the "Cleft" or "George" in the Granite Peak of the Sierra Nevada mountains situated in the county of Mariposa and the headwaters of the Merced River, and known as the Yosemite valley, was granted to the State of California upon the express condition that the premises shall be held for public use, resort, and recreation. By the same act "Mariposa Big Tree Grove", comprising four sections of land, was granted upon like conditions.

*Estate, Gift & Trust Law > Trusts > General Overview*
*Governments > Public Lands > National Parks*
*Real Property Law > Trusts > Holding Trusts*
[HN2] On March 3, 1905, in 1905 Cal. Stat. 54, California receded and re-granted to the United States without reservation the "Cleft" or "Gorge" known as Yosemite Valley, and the "Mariposa Big Tree Grove", and resigned the trusts created and granted by the act of congress of June 30, 1864, upon condition that the lands be held by the United States for public use, resort and recreation. This recession was accepted by congress on June 11, 1906, in 34 Stat. 831, and the areas by the same act were included as part of Yosemite National Park.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Governments > State & Territorial Governments > Property*
[HN3] 1891 Cal. Stat. 262 provides: The State of California hereby cedes to the United States of America exclusive jurisdiction over such piece or parcel of land as may have been or may be hereafter ceded or conveyed to the United States, during the time the United States shall be or remain the owner thereof, for all purposes except the administration of the criminal laws of this State and the service of civil process therein.

*Governments > Public Lands > National Parks*
*Real Property Law > Ownership & Transfer > Transfer Not By Deed > Dedication > General Overview*
*Tax Law > State & Local Taxes > Franchise Tax > Imposition of Tax*

[HN4] The legislative act, 1919 Cal. Stat. 54 in part provides: Exclusive jurisdiction shall be and the same is hereby ceded to the United States over and within all of the territory which is now or may hereafter be included in those several tracts of land in the State of California set aside and dedicated for park purposes by the United States as "Yosemite National Park," "Sequoia National Park" and "General Grant National Park" respectively; saving, however, to the State of California the right to serve civil or criminal process within the limits of the aforesaid parks and saving further, to the said State the right to tax persons and corporations, their franchises and property on the lands included in said parks, and the right to fix and collect license fees for fishing in said parks.

*Governments > Public Lands > National Parks*
*Tax Law > State & Local Taxes > Franchise Tax > Imposition of Tax*
*Tax Law > State & Local Taxes > Real Property Tax > Collection > Methods & Timing*
[HN5] The 1920 Act of Acceptance, 41 Stat. 731 (1920), reads: Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the provisions of the act of the legislature of the State of California (approved April 15, 1919), ceding to the United States exclusive jurisdiction over the territory embraced and included within the Yosemite National Park, Sequoia National Park, and General Grant National Park respectively, are hereby accepted and sole and exclusive jurisdiction is hereby assumed by the United States over such territory, saving, however, to the said State of California, the right to serve civil or criminal process within the limits of the aforesaid parks and saving further to the said State the right to tax persons and corporations, their franchises and property on the lands included in said parks, and the right to fix and collect license fees for fishing in said parks.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Governments > Federal Government > Property*
*Military & Veterans Law > Servicemembers > General Overview*
[HN6] U.S. Const. art. I, § 8, cl. 17 provides: Congress shall have power to exercise exclusive legislation in all cases whatsoever over all places purchased by the consent of the legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals,

dockyards, and other needful buildings.

*Tax Law > State & Local Taxes > Administration & Proceedings > General Overview*
[HN7] Colo. Const. art. XIII, § 6 provides that the power of taxation shall never be surrendered or suspended by any grant or contract to which the State shall be a party.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > Exclusive Jurisdiction*
*Governments > Federal Government > Property*
*Governments > State & Territorial Governments > Property*
[HN8] The Supreme Court of the United States recognized that exclusive jurisdiction could be acquired otherwise than by purchase with the consent of the State legislature, namely by cession, if for one or more of the purposes enumerated in the federal constitutional provision.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > General Overview*
*Tax Law > State & Local Taxes > Administration & Proceedings > General Overview*
[HN9] The taxing power of the State is never presumed to have been relinquished unless the language in which the surrender is made is clear and unmistakable.

*Governments > Federal Government > Property*
*Tax Law > State & Local Taxes > Administration & Proceedings > General Overview*
[HN10] The right of a State to tax the property of others located upon lands owned by the United States, although it cannot tax such lands, will not be held to be abandoned by the State, except for the most compelling reasons, is quite manifest from several decisions of the Supreme Court of the United States. To be accorded immunity from State taxation it must be shown not only that the land was acquired by the United States, but also that it was acquired and used for one of the purposes indicated in U.S. Const. art. I, § 8, cl. 17.

## HEADNOTES

## CALIFORNIA OFFICIAL REPORTS HEADNOTES

**(1) Public Lands--Treaties--Title.** -- --Under the treaty of Guadalupe Hidalgo, by which the Republic of Mexico ceded to the United States government all the lands within the territorial limits of California, the United States government became vested with the title to all such lands not held in private ownership, and it retained title to these public lands upon the admission of California to statehood.

**(2) Id.--Cession to United States--Jurisdiction--Limitation--Taxation--Constitutional Law.** -- --There exists no constitutional inhibition upon the power of the state to cede or the right of the United States to receive limited jurisdiction of lands for park purposes, reserving to the state the right to serve civil or criminal process within the limits of such parks, and also saving to the state the right to tax persons and corporations, their franchises and property on lands included in said parks, and the right to fix and collect license fees for fishing in said parks.

**(3) Id.--Limited Jurisdiction--Modification--Agreement.** -- --The United States may hold limited jurisdiction of land for other than the purposes enumerated in clause 17 of section 8 of article I of the federal Constitution; and the extent of such limited jurisdiction may be the subject of change by mutual agreement between the state and the United States.

**(4) Id.--Cession--Modification--Taxation.** -- --The legislative act of 1919 (Stats. 1919, p. 74), re-ceding to the national government jurisdiction over Yosemite national park, Sequoia national park and General Grant national park for park purposes, reserving to the state, among other things, the right to tax persons and corporations, their franchises and property on the lands included in said parks, and the right to fix and collect license fees for fishing in said parks, and the congressional acceptance of 1920, subject to such reservation, operate to reserve to the state the powers stated in said enactments, notwithstanding a prior recession of one of said parks to the United States, to be held for public use, resort and recreation, and the acceptance thereof by congress, did not reserve to the state any taxing power.

**(5) Id.--Sales Taxes--Gasoline Taxes--Reserved Powers--Statutory Construction.** -- --The taxing power reserved in said act of 1919 must be construed most strongly in favor of the state in order to preserve its jurisdiction as to matters with which it is directly and

immediately concerned, and as to which jurisdiction has not been ceded or granted to the federal government; and the imposition by the state of the retail sales and gasoline taxes in said national park areas is within the taxing power expressly reserved by the state and creates no interference with the exercise of the jurisdiction acquired by the United States.

**(6)           Id.--Privileges--Sales--Taxation--Statutory Construction.** -- --The mere fact that, by said act of 1919, the taxing power for all general purposes has been reserved by the state with the consent of congress is a recognition by the latter that the granting of privileges such as the making of sales within the re-ceded areas emanates from the state as well as the national government; and there is no merit in the contention that the privilege which lessees and concessioners of the United States government have of making sales within said areas emanates solely from the national government.

## SYLLABUS

The facts are stated in the opinion of the court.

**COUNSEL:** Pillsbury, Madison & Sutro, Felix T. Smith and Sigvald Nielson, for Appellant.

U. S. Webb, Attorney-General, and H. H. Linney and James J. Arditto, Deputies Attorney-General, for Respondent.

**JUDGES:** In Bank.

**OPINION BY:** THE COURT

## OPINION

[*759] [**1185] The appeals in several actions brought by the plaintiff, Standard Oil Company of California, involve the question whether sales of gasoline in certain national parks [**1186] are subject to the tax imposed by the Motor Vehicle Fuel License Tax Act (Stats. 1923, p. 577, as amended Stats. 1933, p. 1643). These appeals have been consolidated for determination. A related question is presented in the companion case of *Yosemite Park & Curry Co.* v. *Johnson, post*, p. 770 [76 Pac. (2d) 1191], wherein the Sales Tax Act (Stats. 1933, p. 2599, as amended), is involved. The determination herein will control the disposition of the same questions presented in the Yosemite Park and Curry Company case, and the discussion herein with [*760] [***2] reference

to the effect of the retail sales tax will be deemed sufficient for that purpose.

Standard Oil Company by its several actions sought to recover gasoline taxes paid under protest, which were imposed for the distribution and sale of gasoline within the boundaries of Yosemite national park, Sequoia national park and General Grant national park, located within the territorial limits of California.

The plaintiff is a private corporation authorized to do business in California. The problem revolves around the question whether the state of California ceded exclusive jurisdiction to the United States government of the areas comprising the various national parks in such a way as to divest itself of jurisdiction to impose and collect the taxes so paid under protest.

Demurrers to the various complaints were sustained and judgment entered for the defendants. The plaintiff appeals.

 **(1)** On February 2, 1848, by the treaty of Guadalupe Hidalgo, the Republic of Mexico ceded to the United States government all the lands within the territorial limits of California. The United States thereby became vested with the title to all such lands not held in private ownership. ( *Thompson* v. *Doaksum* [***3] , 68 Cal. 593, 596 [10 Pac. 199].) The areas now comprising the national parks hereinbefore mentioned were therefore then public lands. The United States retained title to these public lands upon the admission of California to statehood. (9 Stats. 452.)

[HN1] On June 30, 1864 (13 Stats. 325), that portion of Yosemite national park designated in the act as the "'Cleft' or 'George' in the Granite Peak of the Sierra Nevada mountains situated in the county of Mariposa . . . and the headwaters of the Merced River, and known as the Yo-Semite valley", was granted to the state of California upon the express condition that the "premises shall be held for public use, resort, and recreation". By the same act "Mariposa Big Tree Grove", comprising four sections of land, was granted upon like conditions.

On October 1, 1890 (26 Stats. 650), congress set apart as a national forest and withdrew from sale and occupancy certain tracts of the public lands in the Sierra Nevada, but expressly excepted therefrom the Yosemite Valley and Mariposa big tree grove theretofore granted to California. A [*761] portion of those reserves

surrounding Yosemite Valley was later, on February 7, 1905, designated [***4] as "Yosemite National Park". (33 Stats. 702.)

[HN2] On March 3, 1905 (Stats. 1905, p. 54), California receded and regranted to the United States without reservation the "Cleft" or "Gorge" known as Yosemite Valley, and the "Mariposa Big Tree Grove", and resigned the trusts created and granted by the act of congress of June 30, 1864, upon condition that the lands be held by the United States for public use, resort and recreation. This recession was accepted by congress on June 11, 1906 (34 Stats. 831), *and the areas by the same act were included as part of Yosemite National Park.*

The area comprising Sequoia national park was withdrawn from occupancy and sale and dedicated as a public park on September 24, 1890 (26 Stats. 478). An act of congress (26 Stats. 651), enacted on October 1, 1890, established General Grant national park.

At the time of the recession to the United States of the Yosemite Valley and Mariposa big tree grove there was in effect a statute passed by the legislature of California in [HN3] 1891 (Stats. 1891, p. 262), providing: "The State of California hereby cedes to the United States of America exclusive jurisdiction over such piece or parcel of land as may have been [***5] or may be hereafter ceded or conveyed to the United States, during the time the United States shall be or remain the owner thereof, for all purposes except the administration of the criminal laws of this state and the service of civil process therein."

The plaintiff relies upon the foregoing quoted statute, together with the act of recession of 1905, as supporting its claim that the state of California by the regrant had relinquished exclusive jurisdiction to the United States in the area known as Yosemite [**1187] Valley, wherein occurred most of the transactions upon which the taxes involved were imposed and collected.

The defendant, however, contends that the act of the California legislature approved April 15, 1919 (Stats. 1919, p. 74), ceding to the national government jurisdiction over Yosemite national park, Sequoia national park and General Grant national park, and the act of acceptance by congress on June [*762] 2, 1920 (41 Stats. 731), constitute the basis upon which depend the rights of the state herein.

[HN4] The legislative act of 1919 in its pertinent parts provides: "Exclusive jurisdiction shall be and the same is hereby ceded to the United States over and within [***6] all of the territory which is now or may hereafter be included in those several tracts of land in the State of California set aside and dedicated for park purposes by the United States as 'Yosemite national park, Sequoia national park' and 'General Grant national park' respectively; saving, however, to the state of California the right to serve civil or criminal process within the limits of the aforesaid parks . . . and saving further, to the said state the right to tax persons and corporations, their franchises and property on the lands included in said parks, and the right to fix and collect license fees for fishing in said parks. . . ."

[HN5] The 1920 Act of Acceptance reads: "Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the provisions of the act of the legislature of the State of California (approved April 15, 1919), ceding to the United States exclusive jurisdiction over the territory embraced and included within the Yosemite National Park, Sequoia National Park, and General Grant National Park respectively, are hereby accepted and sole and exclusive jurisdiction is hereby assumed by the United States over such [***7] territory, saving, however, to the said State of California, the right to serve civil or criminal process within the limits of the aforesaid parks . . . and saving further to the said State the right to tax persons and corporations, their franchises and property on the lands included in said parks, and the right to fix and collect license fees for fishing in said parks. . . ."

The contention of the plaintiff is that the state, having by the 1905 act of recession, granted exclusive jurisdiction of Yosemite Valley to the United States, had nothing more to grant, and that the attempted cession of 1919 with reservations was an empty gesture. Answering this argument the defendant asserts that the 1905 act of recession did not vest exclusive jurisdiction in the United States, because, so he claims, such exclusive jurisdiction can be acquired only pursuant to [HN6] clause 17, section 8, article I of the Constitution of the United States, which provides: "Congress shall have [*763] power to exercise exclusive legislation in all cases whatsoever . . . over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, [***8] arsenals, dockyards, and other needful buildings." In this connection reliance is also

placed on [HN7] section 6 of article XIII of the state Constitution, providing that the power of taxation shall never be surrendered or suspended by any grant or contract to which the state shall be a party.

However, we deem it unnecessary to pursue the inquiry into the constitutional question whether exclusive jurisdiction may be ceded to or acquired by the United States of lands within the territorial limits of a state solely for recreational and park purposes. We need note only that the history and reasons for the vesting in the United States of the power to hold exclusive jurisdiction for the enumerated purposes, and many aspects of the controversial question relating to acquisition of exclusive jurisdiction for other purposes, have been stated in the following cases, among others, and do not require repetition here: *Fort Leavenworth R. R. Co.* v. *Lowe*, 114 U.S. 525, 533 [5 Sup. Ct. 995, 29 L. Ed. 264]; *Benson* v. *United States*, 146 U.S. 325 [13 Sup. Ct. 60, 36 L. Ed. 991]; *Arlington Hotel Co.* v. *Fant*, 278 U.S. 439 [49 Sup. Ct. 227, 73 L. Ed. 447]; *Surplus Trading Co.* [***9] v. *Cook*, 281 U.S. 647 [50 Sup. Ct. 455, 74 L. Ed. 1091]; *In re Kelly*, 71 Fed. 545; *People* v. *Mouse*, 203 Cal. 782 [265 Pac. 944]; *Silas Mason, Inc.,* v. *State Tax Com.*, 188 Wash. 98 [61 Pac. (2d) 1269], (affirmed 302 U.S. 186 [58 Sup. Ct. 233, 82 L. Ed.    ]; *Ryan* v. *State*, 188 Wash. 115 [61 Pac. (2d) 1276], (affirmed 302 U.S. 186 [58 Sup. Ct. 233, 82 L. Ed.    ].) Beginning at least as early as the decision in *Fort Leavenworth R. R. Co.* v. *Lowe, supra*, the [HN8] Supreme Court of the United States recognized that exclusive jurisdiction could be acquired otherwise than by purchase with the consent of the state legislature, namely by cession, if for one or more of the purposes enumerated in the federal constitutional [**1188] provision. (See *Ryan* v. *State, supra*, 61 Pac. (2d) at 1281.) But whether exclusive jurisdiction by any means may be acquired for a purpose not so enumerated may still be an open question. (See *Arlington Hotel Co.* v. *Fant*, 278 U.S. 439 [49 Sup. Ct. 227, 73 L. Ed. 447]; *In re Kelly*, 71 Fed. 545.) The controversial point that the United States has the constitutional power to acquire exclusive [***10] jurisdiction within state [*764] territorial limits of an area devoted solely to park and recreational purposes was expressly left open in the Arlington Hotel case at page 454. So far as we know only two cases have since attempted to resolve the question. In *Yellowstone Park Transp. Co.* v. *Gallatin County*, 31 Fed. (2d) 644, (petition for writ of *certiorari* denied, 280 U.S. 555 [50 Sup. Ct. 16, 74 L. Ed. 611]), the court upheld the exclusive jurisdiction of lands ceded to the United States by the state of Montana for park purposes. The opinion shows that no concurrent jurisdiction or taxing power was reserved and that the express grant of powers to the United States was inconsistent with the reservation of any concurrent jurisdiction. The court supported its statement that "Cessions of exclusive jurisdiction such as that made by the Legislature of Montana, have been very common in the history of this country, and their effect is well settled", by the single reference to the Arlington Hotel decision. The other case, *Yosemite Park & Curry Co.* v. *Collins*, 20 Fed. Supp. 1009 (Circuit Court of Appeals, Southern Div., Northern Dist. of California, No. 4165) [***11] will be later discussed.

If the legislative act of recession of 1905, the congressional acceptance thereof, and the related acts prior to that time, were alone to be considered, it might be said that the constitutional question is squarely presented for determination. But as applied to all the territory named, we have a subsequent act of the legislature ceding title to the United States and expressly reserving, among other matters, the right to exercise in the territory ceded the power to tax persons and corporations, their franchises and property, together with a congressional acceptance in the same express terms. It is not a matter of necessary judicial inquiry as to what prompted these new acts of cession and acceptance, covering public lands reserved to the United States when California was admitted as a state, and lands formerly receded to the United States without the special reservation. It may be that the respective legislative bodies deemed that, except for the purposes enumerated in clause 17, section 8 of article I of the Constitution, and in accord with the declaration of section 6, article XIII of the state Constitution, the power had not been constitutionally delegated [***12] to the United States to hold land for other purposes exclusive of any dominion of the state, and that they therefore desired to reframe their agreement [*765] to accord with the relative existing rights of the respective sovereigns. **(2)** In any event, there exists no constitutional inhibition upon the power of the state to cede or the right of the United States to receive limited jurisdiction of lands for the purposes and with the reservations stated in the grant herein. The only proper function of the court, therefore, is to recognize and give effect to the act of recession of 1919 and the act of acceptance of 1920 which appear to constitute a binding and valid definition and mutual recognition of the rights and powers of the respective

sovereign parties. All other related considerations fade away when it is realized that, whatever had taken place before, the taxing power of the state was reserved by the act of 1919 and that congress, by the acceptance act of 1920, recognized the continuance of that power in the state. This express recognition by both sovereigns clearly establishes the existence of the right of the state to tax in the areas designated in accordance with the power [***13] as reserved and defined in both acts.

(3) It is not questioned that the United States may hold limited jurisdiction of land for other than the purposes enumerated in clause 17 of section 8 of article I of the Constitution; and the cases relied upon do not preclude a holding that the extent of such limited jurisdiction for other than the specified purposes may be the subject of change by mutual agreement between the state and the United States.

In *Fort Leavenworth R. R. Co.* v. *Lowe, supra*, at page 539, we find this statement: "It not being a case where exclusive legislative authority is vested by the Constitution of the United States, that cession could be accompanied with such conditions as the State might see fit to annex not inconsistent with the free and effective use of the fort as a military post." In that case the state by the act of cession of land to be used as a military post had reserved [**1189] the power to tax railroad and other corporations. It was held that the reservation of the taxing power did not interfere with the use of the area as a military post and that there was no constitutional prohibition against the exercise of the reserved power. (See, also, [***14] *Chicago & Pacific Ry. Co.* v. *McGlinn*, 114 U.S. 542, 545, 546 [5 Sup. Ct. 1005, 29 L. Ed. 270]; *United States* v. *Unzeuta*, 281 U.S. 138, 142 [50 Sup. Ct. 284, 74 L. Ed. 761].) The holding in the case of *United* [*766] *States* v. *Unzeuta, supra*, p. 143, that ceded jurisdiction which had been accepted could not be recaptured *by the action of the state alone* (which sought to amend the act of cession), is consistent with our conclusions herein. So, also, is the statement in *In re Ladd*, 74 Fed. 31, at page 38 (wherein a state amendatory act was held to be ineffective to abrogate the existing contract, and there was no express acceptance), that a ceded exclusive jurisdiction continues until "terminated, either by the United States ceasing to own and occupy the reservation, or by the United States retroceding its exclusive jurisdiction to the state". Nor is *Standard Oil Co.* v. *California*, 291 U.S. 242 [54 Sup. Ct. 381, 78 L. Ed. 775], in conflict. There the tax on gasoline (Stats.

1923, p. 571), was attempted to be laid on deliveries to the Post Exchange within the Presidio in San Francisco, a military reservation over which the United States [***15] was held to have been vested with exclusive jurisdiction under the constitutional section.

(4) We conclude that the legislative act of 1919 and the congressional acceptance of 1920 operate to reserve to the state the powers stated in the respective enactments.

(5) Another ground of resistance to the imposition of the sales and gasoline taxes in the national park areas is that such taxes, being in their nature excise taxes rather than taxes on persons or property, are not within the express reserved power.

The reserved taxing power is couched in the following language: "and saving further to the said State the right to tax persons and corporations, their franchises and property on the lands included in said parks, and the right to fix and collect license fees for fishing in said parks". It is asserted that inasmuch as a tax such as the retail sales tax or gasoline tax is in its nature an excise tax ( *People* v. *Ventura Refining Co.*, 204 Cal. 286, 294 [268 Pac. 347, 283 Pac. 60]; *Roth Drug, Inc.,* v. *Johnson*, 13 Cal. App. (2d) 720, 730 [57 Pac. (2d) 1022]), and being neither a tax on persons, such as a poll tax, nor a tax on tangible property, the power to impose it is not [***16] within the express reservation. The plaintiff misconceives the meaning and purpose of the phraseology employed. Contrary to its contention, the rule of strict construction does not necessarily apply. The pertinent considerations are stated in *Ryan* v. *State, supra*, 61 Pac. (2d) at 1283, as follows: "But, since self-preservation is the first [*767] law of nations and states, as well as of individuals, it will not be presumed, in the absence of clearly expressed intent, that the state has relinquished its sovereignty . . . [HN9] The taxing power of the state is never presumed to have been relinquished unless the language in which the surrender is made is clear and unmistakable." And the following is also pertinent: "This is not a contest between the federal government and the state as to jurisdiction. It is a contest between the state, asserting its concurrent, or partial, jurisdiction, and an individual who asserts that exclusive jurisdiction rests in the federal government. So far from there being any contest as to jurisdiction between the two sovereign powers, the record discloses that they are working in harmony and accord, each exercising the field for which it is the [***17] better

equipped and each, at the same time, recognizing the field of the other. The federal government, therefore, cannot possibly be prejudiced by the result of this action."

So, in line with the applicable principle, the reserved power must be construed most strongly in favor of the state in order to preserve its jurisdiction as to matters with which it is directly and immediately concerned, and as to which jurisdiction has not been ceded or granted to the federal government. We find support also in *Nikis* v. *Commonwealth*, 144 Va. 618 [131 S. E. 236, 46 A. L. R. 219], where it was said: [HN10] "That the right of a state to tax the property of others located upon lands owned by the United States, although it cannot tax such lands, will not be held to be abandoned by the state, except for the most compelling reasons, is quite manifest from several decisions of the Supreme Court of the United States." It may be noted that it was there held that to be accorded immunity from [**1190] state taxation it must be shown not only that the land was acquired by the United States, but also that it was acquired and used for one of the purposes indicated in article I, section 8, clause [***18] 17 of the Constitution.

A consideration of the taxing statutes shows that the tax is imposed respectively "upon retailers" (sec. 3, Stats. 1933, p. 2599, Stats. 1935, p. 1252) and upon "distributors" of gasoline, and it has so been held. ( *Roth Drug, Inc.,* v. *Johnson, supra*, p. 736; *People* v. *Herbert's of Los Angeles, Inc.*, 3 Cal. App. (2d) 482 [39 Pac. (2d) 829]; *People* v. *Ventura Refining Co., supra*, at page 294; *Rio Grande Oil Co.* v. *Los* [*768] *Angeles*, 6 Cal. App. (2d) 200, 201 [44 Pac. (2d) 451].) This language in the statutes will not, of course, be construed to disturb the classification of taxable subjects -- persons, property and business ( State Tax on Foreign-Held Bonds, 82 U.S. (15 Wall.) 300, 319 [21 L. Ed. 179]; 26 R. C. L., p. 34; 1 Cooley on Taxation, p. 172.) Neither does it mean that the excise taxes imposed should be considered as a tax "on persons" as a subject of taxation. The language of the statutes and the decisions still leaves the sales and gasoline taxes in the category of "excises" or tax on business. Nevertheless, as stated in volume 1, Cooley on Taxation, pages 68, 69, taxes are contributions from persons or [***19] property, and "whether a tax be considered as imposed on the person or on the property, it is clear that all taxes are imposed either upon the one or the other". It seems obvious that the language of the reservation of the taxing power contemplated the reservation to the state of the general taxing power without any exceptions other than that necessarily arising from the ownership of the land and property by the United States government. There is no inconsistency created by the express inclusion in the reserved power of the "right to fix and collect license fees for fishing in said parks". Because of the nature of the privilege specially singled out, its express inclusion does not necessarily indicate that the taxing of all other privileges was intended to be excluded from the reservation. On the contrary it would seem that it was deemed necessary expressly to refer to that subject-matter, as otherwise it might be claimed that the cession carried the exclusive supervision and regulation of fishing privileges in the streams included in the ceded areas.

**(6)** There is no merit in the contention that the privilege of making sales in the ceded areas emanate solely from the national government. [***20] The mere fact that the taxing power for all general purposes has been reserved by the state with the consent of congress is a recognition by the latter that the granting of such privileges emanates as well from the state.

The main contentions urged to establish the invalidity of the reserved taxing power as here exercised by the state are answered adversely to the claims in the recent case of *Rainier Nat. Park Co.* v. *Martin*, 18 Fed. Supp. 481 (affirmed 302 U.S. 661 [58 Sup. Ct. 478, 82 L. Ed.     ]). There [*769] the power, exercised under a similar reservation, to impose on and collect a state retail sales tax from the Rainier National Park Company was held to be valid and was sustained.

In *Yosemite Park & Curry Co.* v. *Collins, supra*, it was held that the state of California had at one time ceded exclusive jurisdiction of Yosemite Valley to the United States, that the subsequent legislation attempting to reserve the taxing power was ineffective, and therefore that the state had no reserved power to enforce in Yosemite Valley the Alcoholic Beverage Control Act (1935 Stats., chap. 330). That act was there declared to be a complete liquor control measure, [***21] including provisions for license fees and excise taxes. Relative to the balance of Yosemite park, the court held that the reservation of the taxing power did not include the power to impose a license tax. For the reasons hereinabove stated, we are led to disagree with those conclusions of the court in that case. Nor do we perceive that they were necessary to its decision. The result in that case, if it be

correct, is adequately supported by the final ground stated by the court, as follows: "While a revenue measure does not preclude the possibility of a clash between sovereignties, it does not invite one as a regulatory measure does. California has ceded the park to the United States, which has agreed to police it. Now by reason of the Alcoholic Beverage Control Act, California evidently claims the retention of her police power. Such a claim is violative of the police jurisdiction placed in the hands of the national government, and is void. Since the primary purpose of California's tax measure is the [**1191] regulation of the intoxicating liquor business; since such regulation constitutes an exercise of the police power which is beyond the jurisdiction of the state, the [***22] measure cannot bestow upon California the power to collect license taxes from plaintiff for the importation and sale of liquors."

However the exercise of the reserved power by the imposition of retail sales and gasoline taxes creates no interference with the exercise of the jurisdiction acquired by the United States pursuant to the grants herein involved.

The judgment in each case is affirmed.



### THE PIQUA BRANCH OF THE STATE BANK OF OHIO, PLAINTIFF IN ERROR, v. JACOB KNOOP, TREASURER OF MIAMI COUNTY.

### SUPREME COURT OF THE UNITED STATES

### 57 U.S. 369; 14 L. Ed. 977; 1850 U.S. LEXIS 1558; 16 HOW 369

### May 24, 1854, Decided; December 1850 Term

**PRIOR HISTORY:** [***1] THIS case was brought up from the Supreme Court of Ohio, by a writ of error, issued under the twenty-fifth section of the Judiciary Act.

In the record there was the following certificate from the Supreme Court of Ohio, which explains the nature of the case:

And thereupon, on motion of the defendant, it is hereby certified by the court, and ordered to be made a part of the record herein, that in the above entitled cause the petitioner claimed to collect, and prayed the aid of the court to enforce the payment of, the tax in the petition mentioned, under an act of the General Assembly of the State of Ohio, passed March 21st, 1851, entitled "An act to tax banks, and bank and other stocks, the same as other property is now taxable by the laws of this State," a certified copy of which is filed as an exhibit in this cause, marked "A." The said defendant, by way of defence to the prayer of said petitioner, &c., set up on act, entitled "An act to incorporate the State Bank of Ohio, and other banking companies," enacted by the General Assembly of the State of Ohio, February 24th, 1845, a certified copy of which is filed as an exhibit in this cause, marked "B;" under which act the defendants [***2] organized, and became and was a branch of the State Bank of Ohio, exercising the franchises of such bank prior to and ever since the year 1847; and that the defendant claimed that, by virtue of the operation of said act last mentioned, the State of Ohio had entered into a binding contract and obligation, whereby the State of Ohio had agreed and bound herself not to impose any tax upon the defendant, and not to require the defendant to pay any tax for the year 1851, other or greater than six per cent. on its dividends or profits, as provided by the sixtieth section of the said act of February 24th, 1845. And it is further certified, that there was drawn in question in said cause the validity of the said statute of the State of Ohio, passed March 21st, 1851, herein before mentioned, the said defendant claiming that it was a violation of the said alleged agreement and contract between the State of Ohio and the said defendant, and on that account repugnant to the Constitution of the United States, and void; but the court here held and decided: 1st. That the sixtieth section of said act of February 24th, 1845, to incorporate the State Bank of Ohio, and other banking companies, contains [***3] no pledge or contract on the part of the State not to alter or change the mode or amount of taxation therein specified; but the taxing power of the General Assembly of the State of Ohio over the property of companies formed under that act is the same as over the property of individuals. And, 2d. That whether the franchises of such companies may be revoked, changed, or modified, or not, the act of March 21st, 1851, upon any construction, does not impair any right recurred to them by the act of 1845, and is a constitutional and valid law. And it is further certified, that the decision of the question as to the validity of the said statute of 1851, was necessary to the decision of said cause, and the decision in the premises was in favor of the validity of said statute. The court do further certify, that this court is the highest court of law and equity of the State of Ohio in which a decision of this suit could be held. And it is ordered, that said exhibits A and B be made parts of the complete record in this cause.

The contends of exhibits A and B are stated in the opinion of the court.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff in error bank sought review of a decision of the Supreme Court of Ohio that entered judgment in favor of defendant in error county treasurer for a tax assessed against plaintiff in error, pursuant to an act of the General Assembly, passed March 21, 1851.

**OVERVIEW:** Plaintiff in error bank was incorporated under the act of February 24, 1845, in which any number of individuals were entitled to form banking associations to carry on the business of banking in the State of Ohio. Section 16 of the act provided that each bank would pay six percent, semi-annually, to the state on the dividends they declared. Defendant in error county treasurer sought to enforce the provisions of the tax law enacted in the 1851, which plaintiff in error contended was in violation of its charter. The state supreme court affirmed the assessment of the taxes, and plaintiff in error obtained review by writ of error in the United States Supreme Court. The Court reversed the lower court's decision when the Court found that the charter between the state and plaintiff constituted a contract between the parties. Further, under a provision of the contract, plaintiff was only required to pay the six percent semi-annually to the State in lieu of other taxes. The act of March 21, 1851, under which the higher tax was assessed against plaintiff in error, impaired the obligation of the contract and was therefore declared void.

**OUTCOME:** The Court reversed the lower court's decision that affirmed the assessment of the tax against plaintiff in error bank when the Court found that plaintiff's charter, which provided that 6 percent would be paid semi-annually on dividends made in lieu of all taxes, was a contract that was binding on the State and on plaintiff. The tax law passed in 1851 impaired the obligation of the contract and was therefore void.

**CORE TERMS:** taxation, charter, banking, stock, stockholder, dividend, taxed, sovereignty, exemption, sovereign power, franchise, exempt, general assembly, sovereign, compact, repeal, binding, dollar, bridge, repealed, taxing power, declare, presumed, hundred dollars', power of taxation, designated, succeeding,

preceding, declaring, surrender

**LexisNexis(R) Headnotes**

*Banking Law > Bank Activities > Expenses & Income*
*Banking Law > Bank Expansion > Branch Banking > General Overview*
[HN1] The 16th section of the act of February 24, 1845 provides that each banking company under the act, or accepting thereof, and complying with its provisions, shall, semiannually, on the days designated for declaring dividends, set off to the State of Ohio 6 percent on the profits, deducting therefrom the expenses and ascertained losses of the company for the six months next preceding, which sum or amount so set off shall be in lieu of all taxes to which the company, or the stockholders therein, would otherwise be subject. The sum so set off to be paid to the treasurer, on the order of the auditor of State.

*Banking Law > Bank Activities > Expenses & Income*
[HN2] The taxes required by the act of February 24, 1845, are to be in lieu of other taxes -- that is, to take the place of other taxes.

*Governments > Legislation > Expirations, Repeals & Suspensions*
[HN3] In Ohio, the repeal of an act shall not revive any act which had been previously repealed.

*Banking Law > Bank Expansion > Bank Creations & Reorganizations*
[HN4] Every valuable privilege given by the charter, and which conduced to an acceptance of it and an organization under it, is a contract which cannot be changed by the legislature, where the power to do so is not reserved in the charter. The rate of discount, the duration of the charter, the specific tax agreed to be paid, and other provisions essentially connected with the franchise, and necessary to the business of the bank, cannot, without its consent, become a subject for legislative action.

*Governments > Local Governments > Charters*
[HN5] A municipal corporation, in which is vested some portion of the administration of the government, may be

changed at the will of the legislature. Such is a public corporation, used for public purposes. But a bank, where the stock is owned by individuals, is a private corporation.

*Business & Corporate Law > Corporations > Governing Documents & Procedures > Articles of Incorporation & Bylaws > General Overview*
*Business & Corporate Law > Nonprofit Corporations & Organizations > General Overview*

[HN6] Because the action of a corporation may be beneficial to the public does not mean that it is a public corporation. This may be said of all corporations whose objects are the administration of charities. But these are not public, though incorporated by the legislature, unless their funds belong to the government. Where the property of a corporation is private, it gives the same character to the institution, and to this there is no exception.

*Business & Corporate Law > Corporations > Governing Documents & Procedures > Articles of Incorporation & Bylaws > General Overview*

[HN7] The charter of a private corporation is in the nature of a contract between the state and the corporation.

*Governments > Legislation > Expirations, Repeals & Suspensions*
*Governments > Legislation > Types of Statutes*

[HN8] One legislature is competent to repeal any act which a former legislature was competent to pass, and one legislature cannot abridge the powers of a succeeding legislature. The correctness of this principle, so far as respects general legislation, can never be controverted. But if an act be done under a law, a succeeding legislature cannot undo it. When, then, a law is in its nature a contract, a repeal of the law cannot divest those rights; and the act of annulling them, if legitimate, is rendered so by a power applicable to the case of every individual in the community.

*Governments > Legislation > Enactment*

[HN9] No state shall pass any bill of attainder, ex post facto law, or law impairing the obligations of contracts. A bill of attainder may affect the life of an individual, or may confiscate his property, or may do both.

*Contracts Law > Defenses > Ambiguity & Mistake >*

*General Overview*

[HN10] Any ambiguity in the terms of the contract must operate against the adventurers, and in favor of the public.

*Contracts Law > Formation > Capacity of Parties > General Overview*

[HN11] A state has power to make a contract which shall bind it in future.

*Business & Corporate Law > Corporations > Governing Documents & Procedures > Articles of Incorporation & Bylaws > Amendments to Articles of Incorporation*
*Contracts Law > Formation > Capacity of Parties > General Overview*

[HN12] A charter is a contract, to the validity of which the consent of both parties is essential, and therefore it cannot be altered or added to without consent.

*Banking Law > Bank Activities > Expenses & Income*
*Business & Corporate Law > Corporations > Governing Documents & Procedures > Articles of Incorporation & Bylaws > General Overview*

[HN13] A state, in granting privileges to a bank, with a view of affording a sound currency, or of advancing any policy connected with the public interest, exercises its sovereignty, and for a public purpose, of which it is the exclusive judge. Under such circumstances, a contract made for a specific tax is binding. This tax continues, although all other banks should be exempted from taxation. Having the power to make the contract, and rights becoming vested under it, it can no more be disregarded nor set aside by a subsequent legislature, than a grant for land.

*Contracts Law > Formation > Capacity of Parties > General Overview*

[HN14] A sovereign state may make a binding contract with one of its citizens, and, in the exercise of its sovereignty, repudiate it.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*

[HN15] The United States Supreme Court has power only to deal with contracts under U.S. Const. art. I, § 10 whether made by a state or an individual; if such contract be impaired by an act of the state such act is void, as the

power is prohibited to the state. This is the extent of the Court's jurisdiction.

*Civil Procedure > U.S. Supreme Court Review > State Court Decisions*

[HN16] The rule observed by the United States Supreme Court to follow the construction of the statute of the state by its supreme court is strongly urged.

**LAWYERS' EDITION HEADNOTES:**

Municipal corporations -- private -- difference explained -- General Banking Law of Ohio is contract as to taxes -- obligation of. --

Headnote:

In 1845 the Legislature of Ohio passed a general banking law, the fifty-ninth section of which required the officers to make semi-annual dividends, and the sixtieth required them to set off six per cent. of such dividends for the use of the State, which sum or amount so set off should be in lieu of all taxes to which the company, or the stockholders therein, would otherwise be subject.

This was a contract fixing the amount of taxation, and not a law prescribing a rule of taxation, until changed by the Legislature.

In 1851 an Act was passed entitled, "An Act to tax banks, and bank and other stocks, the same as property is now taxable by the laws of this State. The operation of this law being to increase the tax, the banks were not bound to pay that increase.

A municipal corporation, in which is vested some portion of the administration of the government, may be changed at the will of the Legislature. But a bank, where the stock is owned by individuals, is a private corporation. Its charter is a legislative contract, and cannot be changed without its assent.

The preceding case upon this subject, examined, and the case of The Providence Bank v. Billings, 4 Pet. 561, explained.

**SYLLABUS**

In 1845, the Legislature of Ohio passed a general banking law, the fifty-ninth section [***4] of which

required the officers to make semi-annual dividends, and the sixtieth required them to set off six per cent. of such dividends for the use of the State, which sum or amount so set off should be in lieu of all taxes to which the company, or the stockholders therein, would otherwise be subject.

This was a contract fixing the amount of taxation, and not a law prescribing a rule of taxation until changed by the legislature.

In 1851, an act was passed entitled, "An act to tax banks, and bank and other stocks; the same as property is now taxable by the laws of this State." The operation of this law being to increase the tax, the banks were not bound to pay that increase.

A municipal corporation, in which is vested some portion of the administration of the government, may be changed at the will of the legislature. But a bank, where the stock is owned by individuals, is a private corporation. Its charter is a legislative contract, and cannot be changed without its assent.

The preceding case upon this subject, examined, and the case of the Providence Bank v. Biling, 4 Peters, 561, explained.

**COUNSEL:** The case was argued by Mr. Stanberry and Mr. Veriton, for the plaintiff in [***5] error, and by Mr. Spalding and Mr. Pugh, for the defendant in error.

The points made by the counsel for the plaintiff in error were the following:

1st. That the Piqua branch of the State Bank of Ohio is a private corporation.

The principle governing this point is, that if the whole interest of corporation do not belong to the public, it is a private corporation. Angell & Ames on Corporations, §§ 31 to 36 inclusive; Dartmouth College v. Woodward, 4 Wheat. 636; Baily v. Mayor of New York, 3 Hill, 531; Bank United States v. Planters' Bank of Georgia, 9 Wheat. 907; Miners' Bank v. United States, 1 Greene, 553; Bonaparte v. Camden & Amboy R.R. Co. 1 Bald. 222.

2d. The act of the 24th of February, A.D. 1845, providing for the creation of this private corporation, became, by its acceptance, a contract between the State

and the corporators, which contract is entitled to the protection of that clause of the Constitution of the United States which prohibits the States from passing any law impairing the obligation of contracts.

Angell & Ames on Corp. §§ 31, 469, 767; Dartmouth College v. Woodward, 4 Wheat. 636; Gordon v. Appeal Tax Court, 3 How. 145; West River Bridge v. Dix, 6 How. [***6] 531; Planters' Bank of Mississippi v. Sharp. 6 How. 326-7; East Hartford v. Hartford Bridge Company, 17 Conn. 93; New Jersey v. Wilson, 7 Cranch, 164; Flether v. Peck, 6 Cranch, 88; Terrett v. Taylor, 9 Cranch, 43; Town of Pawlett v. Clarke, 9 Cranch, 292; Wales v. Stetson, 2 Mass. 143; Enfield Toll Bridge v. Conn. River Co. 7 Conn. R. 53; McLoren v. Pennington, 1 Paige, Ch. R. 107; 2 Kent's Com. 305, 306; Greene v. Biddle, 8 Wheat. 1; University of Maryland v. Williams, 9 Gill. & Johns. 402; Bayne v. Baldwin, 3 Smedes & Marsh. (Miss.) R. 661; Aberdeen Academy v. Mayor of Aberdeen, 13 Smedes & Marsh. R. 645; Young v. Harrison, 6 Georgia R. 130; Coles v. Madison county, Breese (Ill.) Rep. 120; Bush v. Shipman, 4 Scam. (Ill). R. 190; The People v. Marshall, 1 Gilman (Ill.) R. 672; state v. Hayward, 3 Richardson (S.C.) R. 389; Baily v. Railroad Co. 4 Harrington (Del) R. 389; LeClercq v. Gallipolis, 7 Ohio, 217; State v. Com'l Bank of Cincinnati, 7 Ohio, 125; State v. Wash. Soc. Library, 9 Ohio, 96; Michigan Bank v. Hastings, 1 Doug. (Mich.) R. 225; Bank of Pennsylvania v. Commonwealth, 19 Pennsylvania Rep. 151; Hardy v. Waltham, 9 Pick. 108.

3d. The right of a State to tax the property [***7] of a private corporation (such as a bank) or to tax any specified property of private persons may, by legislative contract, be wholly relinquished, commuted, or limited to an agreed amount, and no State law can impair the validity of such contract.

Angell & Ames on Corp. §§ 469-472 inclusive; Gordon v. Appeal Tax Court, 3 How. 133; Gordon's Ex'rs v. Baltimore, 5 Gill, 231; Bank of Cape Fear v. Edwards, 5 Iredell, 516; Bank of Cape Fear v. Deming, 7 Iredell, 516; Union Bank of Tennessee v. State, 9 Yerger, 490, State of New Jersey v. Bury, 2 Harris, 84; Gordon v. State, 1 Zabriskie, 527; Johnson v. Commonwealth, 7 Dana, 342; Bank of Illinois v. The People, 4 Scam. 304; Williams v. Union Bank of Tennessee, 2 Hump. 339; Atwater v. Woodbridge,6 Conn. 223; Osborne v. Humphrey, 7 Conn. 335; East Hartford v. Hartford Bridge Company, 17 Conn. 93; State v. Com'l Bank of

Cincinnati, 7 Ohio Rep. 125.

In the absence of adjudicated cases to establish the right of the legislature of a State thus to relinquish, commute, or limit the amount of taxation, it might and ought to be inferred from the uniformity and extent of its exercise by the States from their earliest history to the present time.

 [***8] In the case of Briscoe v. Bank of Kentucky, 11 Pet. 318, the court say, "that a uniform course of action involving the right to the exercise of an important power by the State governments for half a century, and this almost without question, is no unsatisfactory evidence that the power is rightly exercised. Cin., Wil. & Zanesville R.R. Co. v. Com'rs. Clinton Co. 21 Ohio Rep. 95.

In accomplishing the lawful purposes of legislation, the choice of means adapted the the end must be left exclusively to the discretion of the legislature, provided the means used are not prohibited by the Constitution. Cin., Wil. & Zanesville R.R. Co. v. Com'rs. Clinton Co., 21 Ohio Rep. 95.

4th. The plaintiff in error claims that by the sixtieth section of the act of 24th of February, 1845, the State, by contract, (and not by legislative command) fixed and agreed upon the time, manner, and amount of taxation to be imposed upon and paid by said bank, which contract is mutually binding on the parties, and cannot be changed or abrogated by either without the consent of the other.

This last proposition involves an into pretation of so much of said law as relates to the subject of taxation in two aspects:

 [***9] 1. Whether the sixtieth section be a contract on the subject of taxation, as claimed by the plaintiff in error, or a law dictating and commanding the amount of taxation, as claimed by the defendant in error.

2. If it be a contract, whether it was temporary and depending on the will of the legislature, or permanent, and to remain in force during the term of the charter.

The court lay down the doctrine in Charles River Bridge v. Warren Bridge, 11 Pet. 545, that in the construction of statutes creating corporations, the rules of the common law must govern in this country; and in the same opinion, at page 548, the court say, that the rules of construing a statutes which surrenders the taxing power, are the same

as those that apply to any other affecting the public interest.

In the case of the Sutton Hospital, Lord Coke lays down the rule of the common law in the construction of charters in the following terms, namely, "That the best exposition of the King's charter is upon the consideration of the whole charter to expound the charter by the charter itself, every material part thereof being explained according to the true and genuine sense, which is the best method." The rule [***10] of interpretation is laid down by the Supreme Court in Charles River Bridge v. Warren Bridge, 11 Pet. 549. Also, by Judge Story, in his dissenting opinion, at page 600. Also, in case of Richmond Railroad Co. v. Louisa Railroad Company, 13 How. 81.

Where a right is not given in express words by the charter, it may be deduced by interpretation, if it is clearly inferrible from some of its provisions. Stourbridge Canal v. Wheely, 2 Barn. & Adol. 792; Union Bank of Tennessee v. The State, 9 Yerg. 495.

In adopting the rule of expounding the charter by the charter itself, the court is referred to all that part of the act of incorporation which is subsequent to the forty-fifth section.

In construing statutes making grants for private enterprise, it is a settled principle,

1st. That all grants for purposes of this sort are to be construed as contracts between the government and the grantee, and not as mere laws. 11 Pet. 660. Judge Story's opinion.

2d. That they are to receive a reasonable construction. And if from the express words of the act, or just and plain inference from the terms used, the intent can be satisfactorily made out, it is to prevail and be carried into effect. [***11] But if the language be ambiguous, or the intent cannot be satisfactorily made out from the terms used, then the act is to be taken most strongly against the grantee and most beneficially to the public. 11 Pet. 600.

The following points made on behalf of the defendant in error, are copied from the brief of Ms. Spalding.

The first section of the "act to tax banks, and bank and other stocks, the same as other property is now taxable by the laws of this State," passed March 21, 1851, reads as follows:

"That it shall be the duty of the president and cashier of each and every banking institution incorporated by the laws of this State, and having the right to issue bills or notes for circulation, at the time for listing personal property under the laws of this State, to list the capital stock of such banking institution, under oath, at its true value in money, and return the same, with the amount of surplus and contingent fund belonging to such banking institution, to the assessor of the township or ward in which such banking institution is located; and the amount so returned shall be placed on the grand duplicate of the proper county, (and upon the city duplicate for city taxes, [***12] in cases where such city tax does not go upon the grand grand duplicate, but is collected by the city officers,) and taxed for the same purposes and to the same extent that personal property is or may be required to be taxed in the place where such bank is located; and such tax shall be collected and paid over in the same manner that taxes on other personal property are required by law to be collected and paid over: Provided, however, that the capital stock of any bank shall not returned or taxed for a less amount than its capital stock paid in."

The single question presented in this case is the following:

Has the Legislature of Ohio, in the enactment last recited, impaired the obligation of a contract, within the meaning of the prohibition contained in the tenth section of the first article of the Constitution of the United States?

I maintain that it has not; and, in support of my position, respectfully advance, for the consideration of the court, the following propositions:

1st. The act of the General Assembly of the State of Ohio, entitled "An act to incorporate the State Bank of Ohio, and other banking companies," passed February 24, 1845, is not a contract in the sense [***13] in which that term is used in the Constitution.

It is a system of rules and regulations prescribed by the lawmaking power in the State for the government of all the citizens of Ohio who may choose, within certain limits, to embark in the business of banking. It is as mandatory in its character as any law upon the statute book, and some of its mandates are enforced under the severest penalties known to the law. See § 67.

It is susceptible of amendment, and it has been amended, without objection, in its most important features. 46 Ohio Laws, 92; 48 Ib. 35. At the time of its enactment, February 24, 1845, there was a general law in force in Ohio, providing that all subsequent corporation, whether possessing banking powers or not, were to hold their charters subject to alteration, suspension, and repeal, in the discretion of the legislature. Ohio Laws, vol. 40, p. 70. The bank of Toledo v. The City of Toledo, 1 Ohio State Reports, 622, 696.

2d. "With the sole exception of duties on imports and exports, the individual States possess an independent and uncontrollable authority to raise their own revenues for the supply of their own wants; and any attempt on the part of the [***14] national government to abridge them in the exercise of it would be a violent assumption of power unwarranted by any article or clause of its Constitution." Alexander Hamilton, No. 32, Federalist, p. 140.

3d. The taxing power is of such vital importance, and is so essentially necessary to the very existence of a State government, that its relinquishment cannot be made the subject-matter of a binding contract between the legislature and individuals or corporations. It is a prerogative of sovereignty that must necessity always be exerted according to present exigencies, and consequently must of necessity continue to be held by each succeeding legislature, undiminished and unimpaired. The Mechanics and Traders Bank v. Henry Debolt, 1 Ohio State Rep. 591; Brewster v. Hough, 10 New Hamp. Rep. 138; The Providence Bank v. Billings, 4 Pet. 541; The Proprietors of the Charles River Bridge v. The Proprietors of the Warren Bridge, 11 Pet. Rep. 420, and cases therein cited; The West River Bridge Company v. Dix, 6 How. Rep. 507; The Richmond Railroad Company v. The Louisa Railroad Company, 13 Howard, 71.

4th. The sixtieth section of the "Act to incorporate the State Bank of Ohio, and other [***15] banking companies," passed February 24, 1845, provides only a measure of taxation for the time being, and does not relinquish the right to increase the rate at the future exigencies of the State may require. Debolt v. The Ohio Life Insurance and Trust Company, 1 Ohio State Rep. 576; 10 Penn. State Rep. 442; 10 New Hamp. Rep. 138; 13 How. Rep. 71; 9 Georgia Rep. 517; 2 Barn. & Adol. 793; 3 Pet. Rep. 289; Ib. 168, 514, 11 Ib. 544.

5th. The Supreme Court of Ohio has done nothing more than give a construction to a statute law of the State, (the act of 1845), that is, to say the least, somewhat ambiguous.

By this construction, the act of March 21, 1851, does no violence to the Constitution of the United States. This court is in the habit of adopting the interpretation given by the State courts to the statutes of their own State. Surely it will not, in this instance, undertake to give a construction counter to that of the State court, when that counter construction will bring subsequent legislation of the State into conflict with the Federal Constitution. 10 Wheat. 159; 11 Ib. 361; 4 Pet. 137; 6 Ib. 291; 16 Ib. 18; 7 How. 40, 219, 818; 13 Ib. 271; 14 Ib. 78, 79.

Upon the 3d point [***16] the counsel cited these further authorities: 16 Pet. 281; 8 How. 584; 10 Ib. 402; 4 Comstock, 423; 2 Denio, 474; 5 Cow. 538; 7 Ib. 585; 1 El. & Black, 858.

And read the following extract from Local Laws of Ohio, vol. 43, p. 51:

An act to incorporate the Milan and Richland Plank Road Company, passed January 31, 1845:

SEC. 9. "That in consideration of the expenses which said company will necessarily incur in constructing said road, with the appurtenances thereof, and in keeping the same in repair, the said road and its appurtenances, together with all tolls and profits arising therefrom, are hereby vested in said corporation, and the same shall be forever exempt from any tax, imposition, or assessment whatever."

An act to incorporate the Huron Plank Road Company, passed February 19, 1845. Local Laws, vol. 43d. pp. 111, 114. The ninth section is copied exactly from the ninth section of the Miland and Richland charter.

On the 4th point: 8 How. 581; 9 Ib. 185; 19 Ohio Rep. 110; 1 Ohio State Rep. 313; 4 Wheat. 235; 4. Cranch, 397; 7 How. 279; 10 Ib. 396.

On the 5th point: 5 How. 342.

**OPINION BY:** McLEAN

**OPINION**

[*376] [**980] Mr. Justice McLEAN delivered

the opinion of the [***17] court.

This is a writ of error to the Supreme Court of the State of Ohio.

The proceeding was instituted to reverse a decree of that court, entered in behalf of Jacob Knoop, treasurer, against the Piqua Branch of the State Bank of Ohio, for a tax of twelve hundred and sixty-six dollars and sixty-three cents, assessed against the said branch bank for the year 1851.

By the act of 1845, under which this bank was incorporated, any number of individuals, not less than five, were authorized to form banking associations to carry on the business of banking in the State of Ohio, at a place designated; the aggregate amount of capital stock in all the companies not to exceed six millions one hundred and fifty thousand dollars.

In the fifty-first section it is provided that every banking company authorized under the act to carry on the business of banking whether as a branch of the State Bank of Ohio, or as an independent banking association, "shall be held and adjudged to be a body corporate, with succession, until the 1st of May, [*377] 1866; and thereafter until its affairs shall be closed." It was made subject to the restrictions of the act.

The fifty-ninth section requires "the [***18] directors of each banking company, semiannually, on the first Mondays of May and November, to declare a dividend of so much of the net profits of the company as they shall judge expedient; and on each dividend day the cashier shall make out and verify by oath, a full, clear, and accurate statement of the condition of the company as it shall be on that day, after declaring the dividend, and similar statements shall also be made on the first Mondays of February and August in each years." This statement is required to be transmitted to the auditor of State.

[HN1] The sixtieth section provides that each banking company under the act, or accepting thereof, and complying with its provisions, shall, semiannually, on the days designated for declaring dividends, set off to the State six per cent. on the profits, deducting therefrom the expenses and ascertained losses of the company for the six months next preceding, which sum or amount so set off shall be in lieu of all taxes to which the company, or the stockholders therein, would otherwise be subject.

The sum so set off to be paid to the treasurer, on the order of the auditor of State.

The Piqua Branch Bank was organized in the year 1847, [***19] under the above at; and still continues to carry on the business of banking, and continued to set off and pay the semiannual amount as required; and on the first Mondays of May and November, in 1851, there was set off to the State six per cent. of the profits, deducting expenses and ascertained losses for the six months next preceding each of those days, and the cashier did, within ten days thereafter, inform the auditor of State of the amount so set off on the 15th of November, 1851, the same amounting to $862.50; which sum was paid to the treasurer of State, on the order of the auditor; which payment the bank claims was in lieu of all taxes to which the company or its stockholders were subject for the year 1851.

On the 21st of March, 1851, an act was passed entitled "An act to tax banks and bank and other stocks, the same as property is now taxable by the laws of the State."

This act provides that the capital stock of every banking company incorporated by the laws of the State, and having the right to issue bills or notes for circulation, shall be listed at its true value in money, with the amount of the surplus and contingent fund belonging to such bank; and that the amount [***20] of such capital stock, surplus, and contingent fund, should be taxed for the same purposes and to the same extent that personal property was or might be required to be taxed in the place [*378] where such bank is located; and that such tax should be collected and paid over in [**981] the same manner that taxes on other personal property are required by law to be collected and paid over.

In pursuance of this act there was assessed, for the year 1851, on the capital stock, contingent and surplus fund of the Piqua Bank, a tax amounting to the sum of twelve hundred and sixty-six dollars and sixty-three cents. The bank refused to pay this tax on the ground that it was in violation of its charter. Suit was brought by the State against the bank for this tax. The defence set up by the bank was, that the tax imposed was in violation of its charter, which fixed the rate of taxation at six per cent. on its dividends, deducting expenses and losses; but the Supreme Court of the State sustained the act of 1851, against the provision of the charter by which, it is insisted, the contract in the charter was impaired.

We will first consider whether the specific mode of taxation, provided [***21] in the sixtieth section of the charter, is a contract.

The operative words are, that the bank shall, "semiannually on the days designated in the fifty-ninth section for declaring dividends, set off to the State six per cent. on the profits, deducting therefrom the expenses and ascertained losses of the company for the six months next preceding, which sum or amount so set off shall be in lieu of all taxes to which such company, or the stockholders thereof, on account of stock owned therein, would otherwise be subject."

This sentence is so explicit, that it would seem to be susceptible of but one construction. There is not one word of doubtful meaning when taken singly, or as it stands connected with the sentence in which it is used. Nothing is left to inference. The time, the amount to be set off, the means of ascertaining it, to whom it is to be paid, and the object of the payment, are so clearly stated, that no one who reads the provision can fail to understand it. The payment was to be in lieu of all taxes to which the company or stockholders would otherwise be subject. This is the full measure of taxation on the bank. It is the place of any other tax which, had it not [***22] been for this stipulation, might have been imposed on the company or stockholder.

This construction, I can say, was given to the act by the executive authorities of Ohio, by those who were interested in the bank, and generally by the public, from the time the bank was organized down to the tax law of 1851.

In the case of Debolt v. The Ohio Insurance and Trust Company, 1 Ohio Rep. 563, new series, the Supreme Court, in considering the 60th section now before us, say: "It must be admitted the section contains no language importing a surrender [*379] of the right to alter the taxation prescribed, unless it is to be inferred from the words, 'shall be in lieu of all taxes to which such company, or the stockholders thereof, on account of stock owned therein, would otherwise be subject;' and it is frankly conceded that if these words had occurred in a general law they would not be open to such a construction. If the place where they are found is important, we have already seen this law is general in many of its provisions, and upon a general subject. Why may not this be classed with these provisions, especially in view of the fact, that in its nature it properly belongs

there? [***23] We think it should be regarded as a law prescribing a rule of taxation, until changed, and not a contract stipulating against any change: a legislative command and not a legislative compact with these institutions." And the court further say, [HN2] "the taxes required by this act are to be in lieu of other taxes -- that is, to take the place of other taxes. What other taxes? The answer is, such as the banks or the stockholders 'would otherwise be subject to pay. The taxes to which they would be otherwise subject were prescribed by existing laws, and this, in effect, operated as a repeal of them, so far as these institutions were concerned.'"

With great respect, it may be suggested there was no general tax law existing, as supposed by the court, under which the banks chartered by the act of 1845 could have been taxed, and on which the above provision could, "in effect, operate to repeal."

The general tax law of the 12th of March, 1831, which raised the tax to five per cent. on dividends, and which operated on all the banks of Ohio, except the "Commercial Bank of Cincinnati," was repealed by the small note act of 1836, and that could operate only on banks doing business at the time [***24] of its passage.

The act of the 13th of March, 1838, repealed the act of 1836, so far "as it restricts or prohibits the issuing and circulation of small bills." The act of 1836 authorized the treasurer of State to draw upon the banks for the amount of twenty per cent. upon their dividends, as their proportion of the State tax; and provided that if any bank should relinquish its charter privilege of issuing bills of less denomination than three and five dollars, the tax should be reduced to five per cent. upon its dividends. As the prohibition of circulating small notes was repealed, the tax necessarily fell. Neither the twenty nor the five per cent. could be exacted. The five per cent. was a compromise for the twenty; as the twenty was repealed by the repeal of the prohibition of small notes, neither the one nor the other could be collected.

But if this were not so, the Bank Act of 1842, which imposed [*380] a tax of one half per cent. on the capital stock of the bank, repealed, by its repugnancy, any part of the act of 1836 which, by construction or otherwise, could be considered in force. And the act of 1842 was repealed by the act of 1845. There is a general act in [***25] Ohio declaring that [HN3] the repeal of an act shall not revive any act which had been previously repealed. Swan's Stat. 59.

If this statement be correct, as it is believed to be, the legislature could not have intended, by the special provision in the sixtieth section, to exempt the bank from tax by the existing law, as no such law existed, but to exempt from the operation of tax laws subsequently passed. This is the clear and fair import of the compact, which we think would not be rendered doubtful if a tax law had existed at the time the act of 1845 was passed.

The 60th section is not found in a general law, as is intimated by the Supreme Court of the State. The act of 1845 is general only in the sense, that all banking associations were permitted to organize under it; but the act is as special to each bank as if no other institution were incorporated by it. We suppose this cannot be controvered by any one. This view [**982] is so clear in itself that no illustration can make it clearer.

[HN4] Every valuable privilege given by the charter, and which conduced to an acceptance of it and an organization under it, is a contract which cannot be changed by the legislature, where the [***26] power to do so is not reserved in the charter. The rate of discount, the duration of the charter, the specific tax agreed to be paid, and other provisions essentially connected with the franchise, and necessary to the business of the bank, cannot, without its consent, become a subject for legislative action.

[HN5] A municipal corporation, in which is vested some portion of the administration of the government, may be changed at the will of the legislature. Such is a public corporation, used for public purposes. But a bank, where the stock is owned by individuals, is a private corporation. This was not denied or questioned by the counsel in argument, although it has been controverted in this case elsewhere. But this court and the courts of the different States, not excepting the Supreme Court of Ohio, have so universally held that banks, where the stock is owned by individuals, are private corporations, that no legal fact is susceptible of less doubt. Mr. Justice Story, in his learned and able remarks in the Dartmouth College case, says: "A bank created by the government for its own uses, where the stock is exclusive owned by the government is, in the strictest sense, a public corporation."

[***27] "But a bank whose stock is owned by private persons is a [*381] private corporation, although it is erected by the government, and its objects and operations partake of a public nature. The same doctrine, he says, may be affirmed of insurance, canal, bridge, and turnpike companies. There can be no doubt that these definitions are sound, and are sustained by the settled principles of law."

[HN6] It by no means follows that because the action of a corporation may be beneficial to the public, therefore it is a public corporation. This may be said of all corporations whose objects are the administration of charities. But these are not public, though incorporated by the legislature, unless their funds belong to the government. Where the property of a corporation is private it gives the same character to the institution, and to this there is no exception. Men who are engaged in banking understand the distinction above stated, and also that privileges granted in private corporations are not a legislative command, but a legislative contract, not liable to be changed.

This fact is shown by the following circumstances: "An act to regulate banking in Ohio," passed the 7th of March, [***28] 1842. The 1st section provided, "that all companies or associations of persons desiring to engage in and carry on the business of banking within this State, which may hereafter be incorporated, shall be subject to the rules, regulations, limitations, conditions, and provisions contained in this act, and such other acts to regulate banking as are now in force, or may hereafter be enacted, in this State."

The 20th section of that act provided that a tax of one half per cent. per annum on its capital should be paid, and such other tax upon its capital or circulation as the general assembly may hereafter impose. An amendment to this act was passed the 21st February, 1843; but the act and the amendment remained a dead letter upon the statute book. No stock was subscribed under them, and they were both repealed by the act of 1845, under which nearly three fourths of the banks in Ohio were organized. There act contained the express stipulation that "six per cent. on the dividends, after deducting expenses and losses, should be paid in lieu of all taxes."

This compact was accepted, and on the faith of it fifty banks were organized, which are still in operation. Up to the year 1851, [***29] I believe, the banks, the profession, and the bench, considered this as a contract, and binding upon the State and the banks. For more than thirty-five years this mode of taxing the dividends of banks had been sanctioned in the State of Ohio. With few exception the banks were so taxed, where any tax on

them was imposed. In the case of the State of Ohio v. The Commercial Bank of Cincinnati, 10 Ohio Rep. 535, the Supreme [*382] Court of Ohio say, we take it to be well settled, that [HN7] the charter of a private corporation is in the nature of a contract between the State and the corporation. Had there ever been any doubts upon this subject, those doubts must have been removed by the decision of the Supreme Court of the United States, in the case of Woodward v. Dartmouth College. And the court remark, "the general assembly say to such persons as may take the stock, you may enjoy the privileges of banking, if you will consent to pay to the State of Ohio, for this privilege, four per cent. on your dividends, as they shall from time to time be made. The charter is accepted, the stock is subscribed, and the corporation pays, or is willing to pay, the consideration stipulated, to wit, [***30] the four per cent. c And the court say, "here is a contract, specific in its terms, and easy to be understood." "A contract between the State and individuals is as obligatory as any other contract. Until a State is lost to all sense of justice and propriety, she will scrupulously abide by her contracts more scrupulously than she will exact their fulfillment by the opposite contracting party."

This opinion commends itself to the judgment, both on account of its sound constitutional views and its elevated morality. It was pronounced at December term, 1835. That decision was calculated to give confidence to those who were desirous to make investments in banking operations, or otherwise, in the State of Ohio.

Ten years after this opinion, and after an ineffectual attempt had been made by the act of 1842, and its amendment in 1843, to organize banks in Ohio, without a compact as to taxation, the act of 1845 was passed, containing a compact much more specific than that which had been sustained by the Supreme Court of the State. Under such circumstances, can the intentions of the Legislature of Ohio, in passing the act of 1845, be doubted, or the inducements of the stockholders to [***31] vest their money under it. Could either have supposed that the 60th section proposed a temporary taxation? Such a supposition does great injustice to the legislature of 1845. It is against the clear language of the section, which must ever shield [**983] them from the imputation of having acted inconsiderately or in bad faith. They passed the charter of 1845, which they knew would be accepted, as it removed the objections to the act of 1842.

Can the compact in the 60th section be "regarded as a law prescribing a rule of taxation until changed, and not a contract stipulating against any change; a legislative command, and not a legislative compact with these institutions?" We cannot but treat with great respect the language of the highest judicial tribunal of a State, and we would say, that in our opinion it does [*383] not import to be a legislative command nor a rule of taxation until changed, but a contract stipulating against any change, from the nature of the language used and the circumstances under which it was adopted. According to our views, no other construction can be given to the contract, then that the tax of six per cent. on the dividends is in lieu of all [***32] subsequent taxes which might otherwise be imposed; in other words, taxes to which the company or the stockholders would have been liable, had the specific tax on the dividends on the terms stated not been enacted.

In the opinion of the Supreme Court of the State, it is said, the 60th section, in effect, repealed the existing law under which the bank would have been taxed, and that this is the obvious application of the language used; and they add, "that the General Assembly intended only this, and did not intend it to operate upon the sovereign power of the State, or to tie up the hands of their successors, we feel fully assured. To suppose the contrary would be to impeach them of gross violation of public duty, if not usurpation of authority."

So far as regards the effect of the 60th section to repeal existing laws, if no such laws existed, it would follow that no such effect was produced, and we may presume that this was in the knowledge of the legislature of 1845; and in saying that the compact was intended to run with the charter, we only impute to the legislature a full knowledge of their own powers, and the highest regard to the public interest. The idea that a State, by [***33] exempting from taxation certain property, parts with a portion of its sovereignty, is of modern growth; and so is the argument that if a State may part with this in one instance it may in every other, so as to divest itself of the sovereign power of taxation. Such an argument would be as strong and as conclusive against the exercise of the taxing power. For if the legislature may levy a tax upon property, they may absorb the entire property of the tax-payer. The same may be said of every power where there is an exercise of judgment.

The Legislature of Ohio passes a statute of

limitations to all civil and criminal actions. Is there no danger that in the exercise of this power it may not be abused? Suppose a year, a month, a week, or a day should be fixed as the time within which all actions shall be brought on existing demands, and if not so brought, the remedy should be barred. This is a supposition more probable under circumstances of great embarrassment, when the voice of the debtor is always potent, than that the legislature will inconsiderately exempt property from taxation.

Under a statute of limitation, as supposed, the remedy of the [*384] creditor would be cut [***34] off, unless the courts should decide that a limitation to bar the right must be reasonable, but this power could not be exercised under any constitutional provision. It could rest only on the great and immutable principles of justice, unless the time was so short as manifestly to have been intended to impair or destroy the contract. To carry on a government, a more practical view of public duties must be taken.

When the State of Ohio was admitted into the Union by the act of the 30th of April, 1802, it was admitted under a compact that "the lands within the State sold by Congress shall remain exempt from any tax laid by or under the authority of the State, whether for state, county, township, or any other purpose whatever, for the term of five years from and after the day of sale." And yet by the same law the State "was admitted into the Union upon the same footing with the original States in all respects whatever."

Now, if this new doctrine of sovereignty be correct, Ohio was not admitted into the Union on the footing of the other sovereign States. Whatever may be considered of such a compact now, it was not held to be objectionable at the time it was made.

The assumption [***35] that a State, in exempting certain property from taxation, relinquishes a part of its sovereign power, is unfounded. The taxing power may select its objects of taxation; and thus is generally regulated by the amount necessary to answer the purposes of the State. Now the exemption of property from taxation is a question of policy and not of power. A sound currency should be a desirable object to every government; and this in our country is secured generally through the instrumentality of a well-regulated system of banking. To establish such institutions as shall meet the public wants and secure the public confidence,

inducements must be held out to capitalists to invest their funds. They must know the rate of interest to be charged by the bank, the time the charter shall run, the liabilities of the company, the rate of taxation, and other privileges necessary to a successful banking operation.

These privileges are proffered by the State, accepted by the stockholders, and in consideration funds are invested in the bank. Here is a contract by the State and the bank, a contract founded upon considerations of policy requires by the general interests of the community, a contract [***36] protected by the laws of England and America, and by all civilized States where the common or the civil law is established. In Fletcher v. Peck, 6 Cranch, 135, Chief Justice Marshall says, "The principle asserted is, that [HN8] one legislature is competent to repeal any act [*385] which a former legislature was competent to pass, and that one legislature cannot abridge the powers of a succeeding legislature."

"The correctness of this principle," he says, "so far as respects general legislation, can never be controverted. But if an act be done under a law, a succeeding legislature cannot undo it. When, then, a law is in its nature a contract, a repeal of the law cannot divest those rights; and the act of annulling them, if legitimate, is rendered so by a power applicable to the case of every individual in the community."

[**984] And in another part of the opinion he says, "Whatever respect might have been felt for the State sovereignties, it is not to be disguised that the framers of the Constitution viewed, with some apprehension, the violent acts which might grow out of the feelings of the moment, and that the people of the United States, in adopting that instrument, have [***37] manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed. The restrictions on the legislative power of the States are obviously founded on this sentiment; and the Constitution of the United States contains what may be deemed a bill of rights for the people of each State."

[HN9] "No State shall pass any bill of attainder, ex post facto law, or law impairing the obligations of contracts. A bill of attainder may affect the life of an individual, or may confiscate his property, or may do both."

In this form he says, "the power of the legislature

over the lives and fortunes of individuals is expressly restrained. What motive, then, for implying, in words which import a general prohibition to impair the obligation of contracts, an exception in favor of the right to impair the obligations of those contracts into which the State may enter."

The history of England affords melancholy instances where bills of attainder were prosecuted in parliament to the destruction of the lives and fortunes of some of its most eminent subjects. A knowledge of this caused a prohibition in the Constitution against such [***38] a procedure by the States.

In the case of the State of New Jersey v. Wilson, 7 Cranch, 164, it was held, "that a legislative act, declaring that certain lands, which should be purchased for the Indians, should not thereafter be subject to any tax, constituted a contract which could not be rescinded by a subsequent legislative act. Such repealing act being void under that clause of the Constitution of the United States which prohibits a State from passing any law impairing the obligation of contracts."

In 1758 the government of New Jersey purchased the Indians' [*386] title to lands in that State, in consideration of which the government bought a tract of land on which the Indians might reside, an act having previously been passed that "the lands to be purchased for them shall not hereafter be subject to any tax, any law, usage, or custom to the contrary thereof in any wise notwithstanding." The Indians continued in possession of the lands purchased until 1801, when they applied for and obtained an act of the legislature, authorizing a sale of their lands. This act contained no provision in regard to taxation; under it the Indian lands were sold.

In October, 1804, the legislature [***39] repealed the act of August, 1758, which exempted these lands from taxes; the lands were then assessed, and the taxes demanded. The court held the repealing law was unconstitutional, as impairing the obligation of the contract, although the land was in the hands of the grantee of the Indians. This case shows that although a State government may make a contract to exempt property from taxation, yet the sovereignty cannot annual that contract.

In the case of Gordon v. The Appeal Tax, 3 How. 133, Mr. Justice Wayne, giving the opinion of the court, held, "that the charter of a bank is a franchise, which is not taxable as such, if a price has been paid for it, which the legislature accepted. But that the corporate property of the bank, being separable from the franchise, may be taxed, unless there is a special agreement to the contrary."

And the court say, the language of the eleventh section of the act of 1821 is, "And be it enacted, that upon any of the aforesaid banks accepting and complying with the terms and conditions of this act, the faith of the State is hereby pledged not to impose any further tax or burden upon them during the continuance of their charters under this act." [***40] This, the court say, is the language of grave deliberation, pledging the faith of the State for some purpose, some effectual purpose. Was that purpose the protection of the banks from what that legislature and succeeding legislatures could not do, if the banks accepted the act, or from what they might do in the exercise of the taxing power. The terms and conditions of the act were, that the banks should construct the road and pay annually a designated charge upon their capital stocks, as the price of the prolongation of their franchise of banking. The power of the State to lay any further tax upon the franchise was exhausted. That is the contract between the State and the banks. It follows, then, as a matter of course, when the legislature go out of the contract, proposing to pledge its faith, if the banks shall accept the act not to impose any further tax or burden upon them, that it must have meant by these words an exemption [*387] from some other tax than a further tax upon the franchise of the banks. The latter was already provided against; and the court held that the exemption extended to the respective capital stocks of the banks as an aggregate, and to the stockholders, [***41] as persons on account of their stocks. The judgment of the Court of Appeals of Maryland, which sustained the act imposing an additional tax on the banks, was reversed.

It will be observed that the above compact was applied to the stocks of the bank and the interest of the stockholders by construction.

The Supreme Court of Ohio say in relation to this case, that "the power to tax and the right to limit the power were both admitted by counsel, and taken for granted in the consideration of the case; and that a very large consideration had been paid for the extension of the franchise and the exemption of the stock from taxation."

In relation to the admissions of the counsel it may be said that they were men not likely to admit any thing to the prejudice of their clients, which could be successfully

opposed; nor would the court, on a constitutional question, rest their judgment on the admissions of counsel. Whether the consideration paid by the banks was large or small, we suppose was not a matter for the court, as the motives or consideration which induced a sovereign State to make a contract, cannot be inquired into as affecting the validity of the act.

In the argument, the [***42] case of the Providence Bank v. Billing, was referred to, 4 Peters, 561. This reference impresses me with the shortness [**985] and uncertainty of human life. Of all the judges on this bench, when that decision was given, I am the only survivor. From several circumstances the principles of that case were strongly impressed upon my memory; and I was surprised when it was cited in support of the doctrines maintained in the case before us. The principle held in that case was, that where there was no exemption from taxation in the charter, the bank might be taxed. This was the unanimous opinion of the judges, but no one of them doubted that the legislature had the power, in the charter or otherwise, from motives of public policy, to exempt the bank from taxation, or by compact to impose a specific tax on it. And this is clear from the language of the court.

The chief justice in that case says: "that the taxing power is of vital importance, that it is essential to the existence of government, are truths which it cannot be necessary to reaffirm. They are acknowledged and asserted by all. It would seem that the relinquishment of such a power is never to be presumed. No one can [***43] controvert the correctness of these axioms." [*388] The relinquishment of such a power is never to be presumed; but this implies it may be relinquished, or taxable objects may be exempted, if specially provided for in the charter. And this is still more clearly expressed, as follows: "We will not say that a State may not relinquish it; that a consideration sufficiently valuable to induce a partial release of it may not exist; but as the whole community is interested in retaining it undiminished, that community has a right to insist, that its abandonment ought not to be presumed, in a case in which the deliberate purpose of a State to abandon it does not appear."

Such a case was not then before the court. There was no provision in the Providence Bank charter which exempted it from taxation, and in that case the court could presume no such intention.

But suppose, in the language of that great man, "a consideration sufficiently valuable to induce a partial release of it, and such release had been contained in the charter; would not that have been held sufficient? And of the sufficiency of the consideration, whether it was a bonus paid by the bank, or in supplying a sound currency, [***44] the legislature would be the exclusive judges. This would constitute a contract which a legislature could not impair.

The above case is a strong authority against the defendants. The Chief Justice further says, "any privileges which may exempt the corporation from the burdens common to individuals, do not flow necessarily from the charter, but must be expressed in it, or they do not exist." But if so expressed, do they not exist?

A case is cited from the Stourbridge Canal v. Wheely, 2 Barn. & Adol. 793, to show that no implications in favor of chartered rights are admissible. Lord Tenterden says, "that [HN10] any ambiguity in the terms of the contract must operate against the adventurers, and in favor of the public; and the plaintiffs can claim nothing that is not clearly given then by the act." In the same opinion his lordship said: "Now, it is quite certain that the company have no right expressly to receive any compensation, except the tonnage paid for goods carried through some of the canals or the locks on the canal, or the collateral cuts, and it is therefore incumbent upon them to show that they have a right clearly given by inference from some of the other clauses."

Neither [***45] this, the Rhode Island Bank case, nor the Charles River Bridge case, affords any aid to the doctrines maintained, with the single exception, that a right set up under a grant must clearly appear, and cannot be presumed; and this has not been controverted.

[*389] That [HN11] a State has power to make a contract which shall bind it in future, is so universally held by the courts of the United States and of the States, that a general citation of authorities is unnecessary on the subject. Dartmouth College v. Woodward, 4 Wheat. 518; Terrett v. Taylor, 9 Cranch, 43; Town of Pawlett, 9 Cranch, 292.

Mr. Justice Blackstone says, 2 Bl. Com. 37, "that the same franchise that has before been granted to one, cannot be bestowed on another, because it would prejudice the former grant. In the King v. Pasmore, 3

Term, 246, Lord Kenyon says, that an existing corporation cannot have another charter obtruded upon it, or accept the whole or any part of the new charter. The reason of this, it is said, is obvious. [HN12] A charter is a contract, to the validity of which the consent of both parties is essential, and therefore it cannot be altered or added to without consent."

There is no constitutional [***46] objection to the exercise of the power to make a binding contract by a State. It necessarily exists in its sovereignty, and it has been so held by all the courts in this country. A denial of this is a denial of State sovereignty. It takes from the State a power essential to the discharge of its functions as sovereign. If it do not possess this attribute, it could not communicate it to others. There is no power possessed by it more essential than this. Through the instrumentality of contracts, the machinery of the government is carried on. Money is borrowed, and obligations given for payment. Contracts are made with individuals, who give bonds to the State. So in the granting of charters. If there be any force in the argument, it applies to contracts made with individuals, the same as with corporations. But it is said the State cannot barter away any part of its sovereignty. No one ever contended that it could.

[HN13] A State, in granting privileges to a bank, with a view of affording a sound currency, or of advancing any policy connected with the public interest, exercises its sovereignty, and for a public purpose, of which it is the exclusive judge. Under such circumstances, [***47] a contract made for a specific tax, as in the case before us, is binding. This tax continues, although all other banks should be exempted from taxation. Having the power to make the contract, and rights becoming vested under it, it can no more be disregarded nor set aside by a subsequent legislature, than a grant for land. This act, so far from parting with any portion of the sovereignty, is an exercise of it. Can any one deny this power to the legislature? Has it not a right to select the objects of taxation and determine the amount? To deny either of these, is to take away State sovereignty.

[*390] [**986] It must be admitted that the State has the sovereign power to do this, and it would have the sovereign power to impair or annul a contract so made, had not the Constitution of the United States inhibited the exercise of such a power. The vague and undefined and

indefinable notion, that every exemption from taxation or a specific tax, which withdraws certain objects from the general tax law, affects the sovereignty of the State, is indefensible.

There has been rarely, if ever, it is believed, a tax law passed by any State in the Union, which did not contain some [***48] exemptions from general taxation. The act of Ohio of the 25th of March, 1851, in the fifty-eighth section, declared that "the provisions of that act shall not extend to any joint-stock company which now is, or may hereafter be organized, whose charter or act of incorporation shall have guaranteed to such company an exemption from taxation, or has prescribed and other as the exclusive mode of taxing the same." Here is a recognition of the principle now repudiated. In the same act, there are eighteen exemptions from taxation.

The federal government enters into an arrangement with a foreign State for reciprocal duties on imported merchandise, from the one country to the other. Does this affect the sovereign power of either State? The sovereign power in each was exercised in making the compact, and this was done for the mutual advantage of both countries. Whether this be done by treaty, or by law, is immaterial. The compact is made, and it is binding on both countries.

The argument is, and must be, that [HN14] a sovereign State may make a binding contract with one of its citizens, and, in the exercise of its sovereignty, repudiate it.

The Constitution of the Union, when first adopted, [***49] made States subject to the federal judicial power. Could a State, while this power continued, being sued for a debt contracted in its sovereign capacity, have repudiated it in the same capacity? In this respect the Constitution was very properly changed, as no State should be subject to the judicial power generally.

Much stress was laid on the argument, and in the decisions of the Supreme Court, on the fact that the banks paid no bonus for their charters, and that no contract can be binding which is not mutual.

This is a matter which can have no influence in deciding the legal question. The State did not require a bonus, but other requisitions are found in the charter, which the legislature deemed sufficient, and this is not

questionable by any other authority. The obligation is as strong on the State, from [*391] the privileges granted and accepted, as if a bonus had been paid.

Another assumption is made, that the banks are taxed as property is taxed in the hands of individuals. No deduction, it appears, is made from banks on account of debts due to depositors or others, whilst debts due by an individual are deducted from this credits. If this be so, it places banks [***50] on a very different footing from individuals.

The power of taxation has been compared to that of eminent domain, and it is said, as regards the question before us, they are substantially the same. These powers exist in the same sovereignty, but their exercise involves different principles. Property may be appropriated for public purposes, but it must be paid for. Taxes are assessed on property for the support of the government under a legislative act.

We were not prepared for the position taken by the Supreme Court of Ohio, that "no control over the right of taxation by the States was intended to be conferred upon the General Government by the section referred to, or any other, except in relation to duties upon imports and exports." This has never been pretended by any one. The section referred to gives the federal government no power over taxation by a State. Such an idea does not belong to the case, and the argument used, we submit, is not legitimate. [HN15] We have power only to deal with contracts under the tenth section of the first article of the Constitution, whether made by a State or an individual; if such contract be impaired by an act of the State such act is void, as [***51] the power is prohibited to the State. This is the extent of our jurisdiction. As well might it be contended under the above section that no power was given to the federal government to regulate the numberless internal concerns of a State which are the subjects of contracts. With those concerns we have nothing to do; but when contracts growing out of them are impaired by an act of the State, under the federal Constitution we inquire whether the act complained of is in violation of it.

[HN16] The rule observed by this court to follow the construction of the statute of the State by its Supreme Court is strongly urged. This is done when we are required to administer the laws of the State. The established construction of a statute of the State is received as a part of the statute. But we are called in the

case before us not to carry into effect a law of the State, but to test the validity of such a law by the Constitution of the Union. We are exercising an appellate jurisdiction. The decision of the Supreme Court of the State is before us for revision, and if their construction of the contract in question impairs its obligation, we are required to reverse their judgment. To follow the [***52] [*392] construction of a State court in such a case, would be to surrender one of the most important provisions in the federal Constitution.

There is no jurisdiction which we are called to exercise of higher importance, nor one of deeper interest to the people of the States. It is, in the emphatic language of Chief Justice Marshall, a bill of rights to the people of the States, incorporated into the fundamental law of the Union. And whilst we have all the respect for the learning and ability which the opinions of the judges of the Supreme Court of the State command, we are called upon the exercise our own judgments in the case.

In the discussion of the principles of this case, we have not felt ourselves at liberty to indulge in general remarks on the theory of our government. That is a subject which belongs to a convention for the formation of a constitution; and, in a limited view, to the law-making power. Theories depend so much on the qualities [**987] of the human mind, and these are so diversified by education and habit as to constitute an unsafe rule for judicial action. Our prosperity, individually and nationally, depends upon a close adherence to the settled [***53] rules of law, and especially to the great fundamental law of the Union.

Having considered this case in its legal aspects, as presented in the arguments of counsel, and in the views of the Supreme Court of the State, and especially as regards the rights of the bank under the charter, we are brought to the conclusion, that in the acceptance of the charter, on its terms, and the payment of the capital stock, under an agreement to pay six per cent. semi-annually on the dividends made, deducting expenses and ascertained losses, in lieu of all taxes, a contract was made binding on the State and on the bank; and that the tax law of 1851, under which a higher tax has been assessed on the bank than was stipulated in its charter, impairs the obligation of the contract, which is prohibited by the Constitution of the United States, and, consequently, that the act of 1851, as regards the tax thus imposed, is void. The judgment of the Supreme Court of Ohio, in giving

effect to that law, is, therefore, reversed.

Mr. Justice CATRON, Mr. Justice DANIEL, and Mr. Justice CAMPBELL, dissented.

[**996contd] [EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; [***54] however, this pagination accurately reflects the pagination of the original published document.]

Order.

This cause came on to be heard on the transcript of the record from the Supreme Court of [**997] Ohio, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court that the judgment of the said Supreme Court of Ohio in this cause be, and the same is hereby reversed with costs, and that this cause be and the same is hereby remanded to the said Supreme Court of Ohio for further proceedings to be had therein in conformity of the opinion of this court.

**CONCUR BY:** TANEY

**CONCUR**

Mr. Chief Justice TANEY gave a separate opinion, as follows:

I concur in the judgment in this case. I think that by the sixtieth section of the act of 1845, the State bound itself by contract to levy no higher tax than the one therein mentioned, upon the banks or stocks in the banks which organized under that law during the continuance of their charters. In my judgment [*393] the words used are too plain to admit of any other construction.

But I do not assent altogether to the principles or reasoning contained in the opinion just delivered. The grounds [***55] upon which I hold this contract to be obligatory on the State, will appear in my opinion in the case of the Ohio Life Insurance and Trust Company, also decided at the present term.

**DISSENT BY:** CATRON; DANIEL; CAMPBELL

**DISSENT**

Mr. Justice CATRON.

This is a contest between the State of Ohio and a portion of her banking institutions, organized under a general banking law, passed in 1845. She was then a wealthy and prosperous community, and had numerous banks which employed a large capital, and were taxed by the general laws five per cent. on their dividends, being equal to thirty cents on each hundred dollars' worth of stock, supposing it to be at par value. But this was merely a State tax, payable into the State treasury. The old banks were liable to taxes for county purposes, besides; and when located in cities or towns, for corporation taxes also. These two items usually amounted to much more than the State tax.

Such was the condition of Ohio when the general banking law was passed in 1845. By this act, any number of persons not less than five might associated together, by articles, to carry on banking.

The State was laid off into districts, and the law prescribes the amount of [***56] stock that may be employed in each. Every county was entitled to one bank, and some to more. Commissioners were appointed to carry the law into effect. It was the duty of this Board of Control to judge of the articles of association, and other matters necessary to put the banks into operation. Any company might elect to become a branch of the State Bank, or to be a separate bank, disconnected with any other. Fifty thousand dollars was the minimum, and five hundred thousand the maximum, that could be employed in any one proposed institution.

By the fifty-first section, each of the banking companies authorized to carry on business was declared to be a body corporate with succession to the first day of May, 1866, with general banking powers; with the privilege to issue notes of one dollar and upwards, to one hundred dollars; and each bank was required to have "on hand in gold, and silver coin, or their equivalent, one half at least of which shall be in gold and silver coin in its vault, an amount equal to thirty per cent. of its outstanding notes of circulation;" and whenever the specie on hand, or its equivalent, shall fall below twenty per cent. of the outstanding [*394] [***57] notes, then no more notes shall be circulated." The equivalent to specie, meant deposits that might be drawn against in the hands of eastern banks, or bankers of good credit. In this provision constituted the great value of the franchise.

The 59th section declares that semiannual dividends shall be made by each bank of its profits, after deducting expenses; and the 60th section provides, that six per cent.

per annum of these profits shall be set off to the State, "which sum or amount so set off shall be in lieu of all taxes to which such company, or the stockholders thereof on account of stock owned therein, would otherwise be subject." This was equal to thirty-six cents per annum on each hundred dollars of stock subscribed, supposing it to yield six per cent. interest.

By an act of 1851, it was declared that bank stock should be assessed at its true value, and that it should be taxed for State, county, and city purposes, to the same extent that personal property was required to be taxed at the place where the bank was located. As this rate was much more than that prescribed by the 60th section of the act of 1845, the bank before us refused to pay the excess, and suffered herself [***58] to be sued by the tax collector, relying on the 60th section, above recited, as an irrepealable contract, which stood protected by the Constitution of the United States.

It is proper to say that the trifling sum in dispute in this cause is the mere ground of raising the question between the State of Ohio and some fifty of her banks, claiming exemption under the act of 1845.

The taxable property of these banks is about eighteen millions of dollars, according to the auditor's report of last year, and which was used on the argument of this cause, by both sides. Of course, the State officers, and other tax payers, assailed the corporations claiming the exemption, and various cases were brought before the Supreme Court of Ohio, drawing in question the validity of the act of 1851 in so far as it increased the taxes of the banks beyond the amount imposed [**988] by the 60th section of the act of 1845. The State court sustained the act of 1851, from which decision a writ of error was prosecuted, and the cause brought to this court.

The opinions of the State court have been laid before us, for our consideration; and on our assent or dissent to them, the case depends.

The first [***59] question made and decided in the Supreme Court of Ohio was, whether the 60th section of the act of 1845, purported to be in its terms, a contract not further to tax the banks organized under it during the entire term of their existence? The court held that it imported no such contract; and with this opinion I concur.

[*395] The question was examined by the judge who delivered the unanimous opinion of the court, in the case of Debolt v. The Ohio Life Insurance and Trust Company, 1 Ohio State Reports, 564, with a fairness, ability, and learning, calculated to command the respect of all those who have his opinion to review; and which opinion has, as I think, construed the 60th section truly. But, as my brother Campbell has rested his opinion on this section without going beyond it, and as I concur in his views, I will not further examine that question, but adopt his opinion in regard to it.

The next question, decided by the State court is of most grave importance; I give it in the language of the State court: "Had the general assembly power, under the constitution then in force, permanently to surrender, by contract, within the meaning and under the protection of the Constitution [***60] of the United States, the right of taxation over any portion of the property of individuals, otherwise subject to it?" On which proposition the court proceeds to remark:

"Our observations and conclusions upon this question, must be taken with reference to the unquestionable facts, that the act of 1851 was a bona fide attempt to raise revenue by an equal and uniform tax upon property, and contained no covert attack upon the franchises of these institutions. That the surrender did not relate to property granted by the State, so as to make it a part of the grant for which a consideration was paid; the State having granted nothing but the franchise, and the tax being upon nothing but the money of individuals invested in the stock; and that no bonus or gross sum was paid in hand for the surrender, so as to leave it open to controversy, that reasonable taxes, to accrue in future, were paid in advance of their becoming due. What effect a different state of facts might have, we do not stop to inquire. Indeed, if the attempt has here been made, it is a naked release of sovereign power without any consideration or attendant circumstance to give it strength or color; and, so far as we are [***61] advised, is the first instance where the rights and interests of the public have been entirely overlooked."

"Under these circumstances, we feel no hesitation in saying the general assembly was incompetent to such a task. This conclusion is drawn from a consideration of the limited authority of that body, and the nature of the power claimed to be abridged.

"That political sovereignty, in its true sense, exists only with the people, and that government is "founded on their sole authority," and subject to be altered, reformed,

or abolished only by them, is a political axiom upon which all the American [*396] governments have been based, and is expressly asserted in the bill of rights. Such of the sovereign powers with which they were invested, as they deem necessary for protecting their rights and liberties, and securing their independence, they have delegated to governments created by themselves, to be exercised in such manner and for such purposes as were contemplated in the delegation. That these powers can neither be enlarged or diminished by these repositories of delegated authority, would seem to result, inevitably, from the fundamental maxim referred to, and to be too [***62] plain to need argument or illustration.

"If they could be enlarged, government might become absolute; if they could be diminished or abridged, it might be stripped of the attributes indispensable to enable it to accomplish the great purposes for which it was instituted. And, in either event, the constitution would be made, either more or less, than it was when it came from the hands of its authors; being changed and subverted without their action or consent. In the one event its power for evil might be indefinitely enlarged; while in the other its capacity for good might be entirely destroyed; and thus become either an engine of oppression, or an instrument of weakness and pusillanimity.

"The government created by the constitution of this State, (Ohio,) although not of enumerated, is yet one of limited powers. It is true, the grant to the general assembly of legislative authority" is general; but its exercise within that limit is necessarily restrained by the previous grant of certain powers to the federal government, and by the express limitations to be found in other parts of the instrument. Outside of that boundary, it needed no express limitations, for nothing was granted. [***63] Hence this court held, in Cincinnati, Wilmington, &c. R.R. v. Clinton Co. 1 Ohio State Rep. 77, that any act passed by the general assembly not falling fairly within the scope of "legislative authority," was as clearly void as though expressly prohibited. So careful was the convention to enforce this principle, and to prevent the enlargement of the granted powers by construction or otherwise, that they expressly declared in art. 8, § 28 -- "To guard against the transgression of the high powers we have delegated, we declare that all powers, not hereby delegated, remain with the people." When, therefore, the exercise of any power by that body is questioned, its validity must be determined from the nature of the power, connected with the manner and purpose of its exercise. What, then, is the taxing power? And to what extent, and for what purposes has it been conferred upon the legislature? That it is a power incident to sovereignty -- "a power of vital importance to the very existence of every government" -- has been as often declared as it has been spoken [*397] of. Its importance is not too strongly represented by Alexander Hamilton, in the 30th number of the Federalist, [***64] when he says: "Money is with propriety considered as the vital principle of the body politic; as that which sustains its life and motion, and enables it to perform its most important functions. A complete power, therefore, [**989] to procure a regular and adequate supply of revenue, as far as the resources of the community will permit, may be regarded as an indispensable ingredient in every constitution. From a deficiency in this particular, one of two evils must ensue; either the people must be subjected to continual plunder, as a substitute for a more eligible mode of supplying the public wants, or the government must sink into a fatal atrophy, and in a short course of time perish."

"This power is not to be distinguished, in any particular material to the present inquiry, from the power of eminent domain. Both rest upon the same foundation -- both involve the taking of private property -- and both, to a limited extent, interfere with the natural right guaranteed by the constitution, of acquiring and enjoying it. But, as this court has already said, in the case referred to, "neither can be classed amongst the independent powers of government, or included in its objects and [***65] ends." No government was ever created for the purpose of taking, taxing, or otherwise interfering with the private property of its citizens. "But charged with the accomplishment of great objects necessary to the safety and prosperity of the people, these rights attach as incidents to those objects, and become indispensable means to the attainment of those ends." They can only be called into being to attend the independent powers, and can never be exercised without an existing necessity.

"To sustain this power in the general assembly, would be to violate all the great principles to which I have alluded. It would affirm its right to deal in, and barter away the sovereign right of the State, and thereby, in effect, to change the constitution. When the general assembly of 1845 convened, it found the State in the unquestionable possession of the sovereign right of taxation, for the accomplishment of its lawful objects,

extending to 'all the persons and property belonging to the body politic.'"

When its successor convened, in 1846, under the same constitution, and to legislate for the same people, if this defence is available, it found the State shorn of this power over fifteen or [***66] twenty millions of property, still within its jurisdiction and protected by its laws. This and each succeeding legislature had the same power to surrender the right, as to any and all other property; until at length the government, deprived of every thing upon which it could operate, to raise the means to attain [*398] its necessary ends, by the exercise of its granted powers, would have worked its own inevitable destruction, beyond all power of remedy, either by the legislature or the people. It is no answer to this to say that confidence must be reposed in the legislative body, that it will not thus abuse the power.

"But, in the language of the court, in McCulloch v. Maryland, 4 Wheat. 316, 'is this a case of confidence?'"

"For every surrender of the right to tax particular property not only tends to paralyze the government, but involves a direct invasion of the rights of property, of the balance of the community; since the deficiency thus created must be made up by larger contributions from them, to meet the public demand."

The foregoing are some of the reasonings of the State court on the consideration here involved. With these views I concur, and will add some of [***67] my own. The first is, "That acts of parliament derogatory from the power of subsequent legislatures, are not binding. Because, (as Blackstone says,) the legislature being in truth the sovereign power, is always equal, always absolute; and it acknowledges no superior on earth, which the prior legislature must have been if its ordinances could bind a subsequent parliament. And upon the same principle Cicero, in his letters to Atticus, treats with proper contempt these restraining clauses which endeavor to tie up the hands of succeeding legislatures. When you repeal the law itself, says he, you at the same time repeal the prohibitory clause which guards against repeal."

If this is so under the British government, how is it in Ohio? Her Supreme Court holds that the State constitution of 1802 expressly prohibited one legislature from restraining its successors by the indirect means of contracts exempting certain property, from taxation. The

court says, -- Power to exempt property, was reserved to the people; they alone could exempt, by an organic law. That is to say, by an amended constitution. The clause mainly relied on declares, "that all powers not delegated, remain with the [***68] people." Now it must be admitted that this clause has a meaning; and it must also be conceded (as I think,) that the Supreme Court of Ohio, has the uncontrollable right to declare what that meaning is; and that this court has just as little right to question that construction as the Supreme Court of Ohio has to question our construction of the Constitution of United States.

In my judgment the construction of the court of Ohio is proper; but if I believed otherwise I should at once acquiesce. Let us look at the matter fairly and truly as it is, and see what a different course on part of this court would lead to; nay, what Ohio is bound to do in self-defence and for self-preservation, under the circumstances.

[*399] In 1845 a general banking law is sought at the hands of the legislature, where five dollars in paper can be circulated for every dollar in specie in the bank, or on deposit, in eastern banks or with brokers. One dollar notes are authorized; every county in the State is entitled to a bank, and the large ones to several; the tempting lure is held out of six per cent. interest on five hundred dollars for every hundred dollars paid in as stock: thus obtaining a profit [***69] of twenty-four dollars on each hundred dollars actually paid in. That such a bill would have advocates enough to pass it through the legislature, all experience attests; and that the slight tax of thirty-six cents on each hundred dollars' worth of stock, subscribed and paid, was deemed a privilege, when the existing banks and other property were taxed much higher, is plainly manifest. As was obvious, when the law passed, banks sprang up at once -- some fifty in number having a taxable basis last year of about eighteen millions. The elder and safer banks were, of course, driven out, and new organizations sought under the general law, by the stockholders. From having constructed large public works, and made great expenditures, Ohio has become indebted so as to require a very burdensome [**990] tax on every species of property; this was imposed by the act of 1851, and on demanding from these institutions their equal share, the State is told that they were protected by a contract made with the legislature of 1845, to be exempt from further taxation, and were not bound by the late law, and, of course, they were sued in their own courts. The

Supreme Court holds that by the express [***70] terms of the State constitution no such contract could be made by the legislature of 1845, to tie up the hands of the legislature of 1851. And then the banks come here and ask our protection against this decision, which declares the true meaning of the State constitution. It expressly guarantees to the people of Ohio the right to assemble, consult, "and instruct their representatives for their common good;" and then "to apply to the legislature for a redress of grievances." It further declares, that all powers not conferred by that constitution on the legislature are reserved to the people. Now, of what consequence or practical value will these attempted securities be if one legislature can restrain all subsequent ones by contracting away the sovereign power to which instructions could apply?

The question, whether the people have reserved this right so as to hold it in their own hands, and thereby be enabled to regulate it by instructions to a subsequent legislature, (or by a new constitution,) is a question that has been directly raised only once, in any State of the Union, so far as I know. In the case of Brewster v. Hough, 10 New Hampshire Reports, 139, it [*400] was [***71] raised, and Chief Justice Parker, in delivering the opinion of the court in a case in all respects like the one before us, says, "That it is as essential that the public faith should be preserved inviolate as it is that individual grants and contracts should be maintained and enforced. But there is a material difference between the right of a legislature to grant lands, or corporate powers, or money, and a right to grant away the essential attributes of sovereignty or rights of eminent domain. These do not seem to furnish the subject-matter of a contract."

This court sustained the principle announced by the Supreme Court of New Hampshire, in the West River Bridge case. A charter for one hundred years, incorporating a bridge company, had been granted; the bridge was built and enjoyed by the company. Then another-law was passed authorizing public roads to be laid out, and free bridges to be erected; the commissioners appropriated the West River Bridge and made it free; the Supreme Court of Vermont sustained the proceeding on a review of that decision. And this court held that the first charter was a contract securing the franchises and property in the bridge to the company; but [***72] that the first legislature could not cede away the sovereign right to eminent domain, and that the franchises and property could be taken for the uses of free roads and bridges, on compensation being made.

Where the distinction lies, involving a principle, between that case and this, I cannot perceive, as every tax-payer is compensated by the security and comfort government affords. The political necessities for money are constant and more stringent in favor of the right of taxation; its exercise is required daily to sustain the government. But in the essential attributes of sovereignty the right of eminent domain and the right of taxation are not distinguishable.

If the West River Bridge case be sound constitutional law (as I think it is) then it must be true that the Supreme Court of Ohio is right in holding that the legislature of 1845 could not deprive the legislature of 1851 of its sovereign powers or of any part of them.

It is insisted, that the case of the State of Ohio v. The Commercial Bank of Cincinnati, 7 Ohio Rep. 125, has held otherwise. This is clearly a mistake. The State in that case raised no question as to the right of one legislature to cede the sovereign [***73] power to a corporation, and tie up the hands of all subsequent legislatures: no such constitutional question entered into the decision; nor is any allusion made to it in the opinion of the court. It merely construed the acts of assembly, and held that a contract did exist on the ground that by the charter the bank was taxed four per cent.; and therefore the charter must [*401] be enforced, as this rate of taxation adhered to the charter, and excluded a higher imposition

It would be most unfortunate for any court, and especially for this one, to hold that a decision affecting a great constitutional consideration, involving the harmony of the Union, (as this case obviously does,) should be concluded by a decision in a case where the constitutional question was not raised by counsel; and so far from being considered by the court, was never thought of: such a doctrine is altogether inadmissible. And in this connection I will say, that there are two cases decided by this court, (and relied on by the plaintiff in error,) in regard to which similar remarks apply. The first one is that of New Jersey v. Wilson, 7 Cranch, 164. An exchange of lands took place in 1758 between the British [***74] colony of New Jersey and a small tribe of Indians residing there. The Indians had the land granted to them by an act of the colonial legislature, which exempted it from taxes. They afterwards sold it, and removed. In 1804, the State legislature taxed these lands

in the hands of the purchasers; they were proceeded against for the taxes, and a judgment rendered, declaring the act of 1804 valid. In 1812, the judgment was brought before this court, and the case submitted on the part of the plaintiff in error without argument; no one appearing for New Jersey. This court held the British contract with the Indians binding; and, secondly, that it run with the land which was exempt from taxation in the hands of the purchasers.

No question was raised in the Supreme Court of New Jersey, nor decided there, or in this court, as to the constitutional question of one legislature having authority to deprive a succeeding one of sovereign power. The question was not considered, nor does it seen to have been thought of in the State court or here.

The next case is Gordon's case, 3 Howard, 144. What questions were there presented on the part of the State of Maryland, does not appear in the report [***75] of the case, but I have turned to them in the record, to see how they were made in the State courts. They are as follows:

"1st. That at the time of passing the general assessment law of 1841, there was no contract [**991] existing between the State and the banks, or any of them, or the stockholders therein or any of them, by which any of the banks or stockholders can claim an exemption from the taxation imposed upon them by the said act of 1841."

"2d. That the contract between the State and the old banks, if there be any contract, extends only to an exemption from further 'taxes or burdens,' of the corporate privileges of banking; [*402] and does not exempt the property, either real or personal, of said banks, or the individual stockholders therein."

"3d. That even if the contract should be construed to exempt the real and personal property of the old banks, and the property of the stockholders therein, yet such exemption does not extend to the new banks, or those chartered since 1830, and, moreover that the power of revocation, in certain cases in these charters, reserves to the State the power of passing the general assessment law."

"4th. That the imposition [***76] of a tax of 20 cents upon every one hundred dollars' worth of property, upon both the old and new banks, under the said assessment law, is neither unequal nor oppressive, nor in violation of the bill of rights."

"5th. That taxation upon property within the State, wherever the owners may reside, is not against the bill of rights."

On these legal propositions the opinion here given sets out by declaring that, "The question, however, which this court is called on to decide, and to which our decision will be confined, is -- Are the shareholders in the old and new banks, liable to be taxed under the act of 1841, on account of the stock which they own in the banks."

The following paragraph is the one relied on as adjudging the question, that the taxing power may be embodied in a charter and contracted away as private property, to wit: "Such a contract is a limitation on the taxing power of the legislature making it, and upon succeeding legislatures, to impose any further tax on the franchise."

"But why, when bought, as it becomes property, may it not be taxed as land is taxed which has been bought from the State, was repeatedly asked in the course of the argument. The reason is, [***77] that every one buys land, subject in his own apprehension to the great law of necessity, that we must contribute from it and all of our property something to maintain the State. But a franchise for banking, when bought, the price is paid for the use of the privilege whilst it lasts, and any tax upon it would substantially be an addition to the price."

As the case came up from the Supreme Court of Maryland, this court had power merely to reexamine the questions raised in the court below, and decided there. All that is asserted in the opinion beyond this is outside of the case of which this court had jurisdiction, and is only so far to be respected as it is sustained by sound reasoning; but its dicta are not binding as authority; and so the Supreme Court of Maryland held in the case of the Mayor, &c. of Baltimore v. The Baltimore and Ohio Railroad Company, 6 Gill, 288.

The State of Maryland merely asked to have her statutes [*403] construed, and if, by their true terms, she had promised to exempt the stockholders of her banks from taxation, then she claimed no tax of them. She took no shelter under constitutional objections, but guardedly avoided doing so.

If an expression [***78] of opinion is authority that binds, regardless of the case presented, then we are as well bound the other way, by another quite equal authority. In the case of East Hartford v. Hartford Bridge Co. 10 Howard, 535, Mr. Justice Woodbury, delivering the opinion of the court, says: The case of Goszler v. The Corporation of Georgetown, 6 Wheat. 596, 598, "appears to settle the principle that a legislative body cannot part with its powers by any proceeding so as not to be able to continue the exercise of them. It can, and should, exercise them again and again, as often as the public interests require." . . . .

"Its members are made, by the people, agents or trustees for them, on this subject, and can possess no authority to sell or grant their power over the trust to others."

The Hartford case was brought here from the Supreme Court of Connecticut, by writ of error, on the ground that East Hartford held a ferry right secured by a legislative act that was a private contract. But this court held, among other things that, by a true construction of the State laws, no such contract existed; so that this case cannot be relied on as binding authority more than Gordon's case. If fair reasoning [***79] and clearness of statement are to give any advantage, then the Hartford case has that advantage over Gordon's case.

It is next insisted that the State legislatures have in many instances, and constantly, discriminated among the objects of taxation; and have taxed and exempted according to their discretion. This is most true. But the matter under discussion is aside from the exercise of this undeniable power in the legislature. The question is whether one legislature can, by contract, vest the sovereign power of a right to tax, in a corporation as a franchise, and withhold the same power that legislature had to tax, from all future ones? Can it pass an irrepealable law of exemption?

General principles, however, have little application to the real question before us, which is this: Has the constitution of Ohio withheld from the legislature the authority to grant, by contract with individuals, the sovereign power; and are we bound to hold her constitution to mean as here Supreme Court has construed it to mean? If the decisions in Ohio have settled the question in the affirmative that the sovereign political power is not the subject of an irrepealable contract, then few will be [***80] so bold as to deny that it is our duty to conform to the construction they have settled; and the only objection to conformity [*404] that I suppose could exist with any one is, that the construction is not settled. How is the fact?

The refusal of some fifty banks to pay their assessed portion of the revenue for the year 1851, raised the question for the first time in the State of Ohio; since then the doctrine has been maintained in various cases, supported unanimously by all the judges of the Supreme Court of that State, in opinions deeply considered, and manifesting a high degree of ability in the [**992] judges, as the extract from one of them, above set forth, abundantly shows. If the construction of the State constitution is not settled, it must be owing to the recent date of the decisions. An opinion proceeding on this hypothesis will, as I think, involve our judgment now given in great peril hereafter; for if the court of Ohio do not recede, but firmly adhere to their construction until the decisions, now existing, gain maturity and strength by time, and the support of other adjudications conforming to them, then it must of necessity occur that this court will be [***81] eventually compelled to hold that the construction is settled in Ohio; when it must be followed to avoid conflict between the judicial powers of that State and the Union, an evil that prudence forbids.

1. The result of the foregoing opinion is, that the sixtieth section of the general banking law of 1845 is, in its terms, no contract professing to bind the Legislature of Ohio not to change the mode and amount of taxation on the banks organized under this law; and for this conclusion I rely on the reasons stated by my brother Campbell, in his opinion, with which I concur.

2. That, according to the constitutions of all the States of this Union, and even of the British Parliament, the sovereign political power is not the subject of contract so as to be vested in an irrepealable charter of incorporation, and taken away from, and placed beyond the reach of, future legislatures; that the taxing power is a political power of the highest class, and each successive legislature having vested in it, unimpaired, all the political powers previous legislatures had, is authorized to impose taxes on all property in the State that its constitution does not exempt.

It is undeniably true that [***82] one legislature may by a charter of incorporation exempt from taxation the property of the corporation in part, or in whole, and with or without consideration; but this exemption will

only last until the necessities of the State require its modification or repeal.

3. But if I am mistaken in both these conclusions, then, I am of opinion that, by the express provisions of the constitution of Ohio, of 1802, the legislature of that State had withheld [*405] from its powers the authority to tie up the hands of subsequent legislatures in the exercise of the powers of taxation, and this opinion rests on judicial authority that this court is bound to follow; the Supreme Court of Ohio having held by various solemn and unanimous decisions, that the political power of taxation was one of those reserved rights intended to be delegated by the people to each successive legislature, and to be exercised alike by every legislature according to the instructions of the people. This being the true meaning of the nineteenth and twenty-eighth sections of the bill of rights, forming part of the constitution of 1802; one section securing the right of instructing representatives, and the other protecting [***83] reserved rights held by the people.

Whether this construction given to the State constitution is the proper one, is not a subject of inquiry in this court; it belongs exclusively to the State courts, and can no more be questioned by us than State courts and judges can question our construction of the Constitution of the United States. For these reasons I am of opinion that the judgment of the Supreme Court of Ohio should be affirmed.

Mr. Justice DANIEL.

In the views so clearly taken by my brother Campbell of the character of the legislation of Ohio, impeached by the decision of the court, I entirely coincide. I will add to the objections he has so well urged to the jurisdiction of this court, another, which to my mind at least is satisfactory; it is this, that one of the parties to this controversy being a corporation created by a State, this court can take no cognizance, by the constitution, of the acts, or rights, or pretensions of that corporation.

Mr. Justice CAMPBELL.

I dissent from the opinion of the court.

The question disclosed by the record, is contained in the sixtieth section of an act of the General Assembly of Ohio, "to incorporate the State Bank of Ohio [***84]

and other banking companies of that State," adopted February, 1845.

The section provides, that every banking company organized by the act, or complying with its provisions, shall semiannually, at designated days, set off to the State, six per cent. of the net profits for the six months next preceding, "which sum or amount so set off shall be in lieu of all taxes to which such company, or the stockholders thereof, on account of stock owned therein, would otherwise be subject;" and the cashier was required to report the amount to the auditor and to pay it to the treasurer; but in computing the profits of the company for the purposes [*406] aforesaid, the interest received on the certificates of the funded debt held by the company, or deposited with and transferred to the treasurer of the State, or to the board of control by such company, shall not be taken into the account." I have extracted the last clause merely because it forms a part of the section.

It is not usual for governments to levy taxes upon the certificates of their funded debt, and Ohio had, in an early statute, forbidden taxation of hers. This clause was a cumulative precaution, wholly unnecessary. Swan Stat. [***85] 747, § 5.

The case lies in the solution of the question whether the clause directing the banks to set apart semiannually, upon the profits for the six months preceding, six per cent. in lieu of all other taxes to which the company or the stockholders would otherwise be subject on account of the stock, institutes an unalterable rule of taxation for the whole time of the corporate existence of these banks? The General Assembly of Ohio thinks otherwise, and has imposed a tax upon the stock of the banks, corresponding with the taxes levied upon other personal property held in the State. The payment of this tax has been resisted by the banks. The Supreme Court of Ohio, by its judgment, affirms the validity of the act of the general assembly, and has condemned the bank to the payment. This judgment is the matter of consideration.

The section of the act above cited furnishes a rule of taxation, and while it remains in [**993] force a compliance with it relieves the banks from all other taxes to which they would otherwise be subject. Such is the letter of the section.

The question is, has the State of Ohio inhibited herself from adopting any other rule of taxation either for

[***86] amount or mode of collection, while these banks continue in existence? It is not asserted that such a prohibition has been imposed by the express language of the section. The term for which this rule of taxation is to continue is not plainly declared. The amounts paid according to it discharge the taxes for the antecedent six months. Protection is given in advance of exaction.

The clause in the section, that this "sum or amount, so set off, shall be in lieu of all taxes to which such company or the stockholders thereof would otherwise to subject," requires an addition to ascertain the duration of the rule. It may be completed in adding, "by the existing laws for the taxation of banks," or "till otherwise provided by law," or at "the date of such apportionment or dividend." Or, following the argument of the banks, in adding, "during the existence of the banks." Whether we shall select from the one series of expressions, leading to one result, or the expression leading to another altogether different, depends upon the rules of interpretation applicable to the subject.

[*407] The first inquiries are of the relations of the parties to the supposed contract to its subject-matter, [***87] and the form in which it has been concluded. The sixtieth section of the act of 1845, was adopted by the General Assembly of Ohio in the exercise of legislative powers, as a part its public law. The powers of that assembly in general, and that of taxation especially, are trust powers, held by them as magistrates, in deposit, to be returned, after a short period, to their constituents without abuse or diminution.

The nature of the legislative authority is inconsistent with an inflexible stationary system of administration. Its office is one of vigilance over the varying wants and changing elements of the association, to the end of ameliorating its condition. Every general assembly is organized with the charge of the legislative powers of the State; each is placed under the same guidance, experience, and observation; and all are forbidden to impress finally and irrevocably their ideas or policy upon the political body. Each, with the aid of an experience, liberal and enlightened, is bound to maintain the State in the command of all the resources and faculties necessary to a full and unshackled self-government. No implication can be favored which convicts a legislature of a departure [***88] from this law of its being.

The subject-matter of this section is the contributive share of an important element of the productive capital of the State to the support of its government. The duty of all to make such a contribution in the form of an equal and apportioned taxation, is a consequence of the social organization. The right to enforce it is a sovereign right, stronger than any proprietary claim to property. The amount to be taken, the mode of collection, and the duration of any particular assessment or form of collection, are questions of administration submitted to the discretion of the legislative authority; and variations must frequently occur, according to the mutable conditions, circumstances, or policy of the State. These conditions are regulated for the time, in the sixtieth section of this act. That section comes from the law maker, who ordains that the officers of certain banking corporations, at stated periods, shall set apart from their property a designated sum as their share of the public burden, in lieu of other sums or modes of payment to which they would be subject; but there is no promise that the same authority may not, as it clearly had a right to [***89] do, apportion a different rate of contribution. I will not say that a contract may not be contained in a law, but the practice is not to be encouraged, and courts discourage the interpretation which discovers them. A common informer sues for a penalty, or a revenue officer makes a seizure under a promise that on conviction the recovery shall be shared, and yet the State [*408] discharges the forfeiture, or prevents the recovery by a repeal of the law, violating thereby no vested right nor impairing the obligation of any contract. 5 Cranch, 281; 10 Wheat. 246; 6 Pet. 404.

A captor may be deprived of his share of prize-money, pensioners of their promised bounty, at any time before their payment. 2 Russ. & M. 35.

Salaries may be reduced, offices having a definite tenure, though filled, amy be abolished, faculties may be withdrawn, the inducements to vest capital impaired and defeated by the varying legislation of a State, without impairing constitutional obligation. 8 How. 163; 10 Ib. 395; 3 Ib. 534; 8 Pet. 88; 2 Sanf. S.C.R. 355. The whole society is under the dominion of law, and acts, which seem independent of its authority, rest upon its toleration. The multifarious [***90] interests of a civilized State must be continually subject to the legislative control. General regulations, affecting the public order, or extending to the administrative arrangements of the State, must overrule individual hopes and calculations, though they may have originated in its legislation. It is only when rights have vested under laws that the citizen can

claim a protection to them as property. Rights do not vest until all the conditions of the law have been fulfilled with exactitude during its continuance, or a direct engagement has been made, limiting legislative power over and producing an obligation. In this case it may be conceded that at the end of every six months the payment then taken is a discharge for all antecedent liabilities for taxes. That there could be no retrospective legislation. But beyond this the concessions of the section do not extend.

A plain distinction exists between the statutes which create hopes, expectations, faculties, conditions, and those which form contracts. There banks might fairly hope that without a change in the necessities of the State, their quota of taxes would not be increased; and that while payment was punctually made the [***91] form of collection would not be altered. But the general assembly represents a sovereign, and as such designated this rule of taxation upon existing considerations of policy, without annexing restraints on its will, or abdicating [**994] its prerogative, and consequently was free to modify, alter, or repeal the entire disposition.

I have thus far considered the sixtieth section of the act as a distinct act, embodying a State regulation with the view of ascertaining its precise limitations.

I shall, however, examine the general scheme and object of the act, of which it forms a part, to ascertain whether a different signification can be given to it. Before doing so, it is a matter of consequence to ascertain on what principles the inquiry must be conducted.

[*409] Three cases occurred in this court, before either of the members who now compose it belonged to it, in which taxation acts of the States or its municipal authorities, involving questions of great feeling and interest, were pronounced invalid. In the last of these the court said, "that in a society like ours, with one supreme government for national purposes, and numerous State governments for other purposes, [***92] in many respects independent and in the uncontrolled exercise of many important powers, occasional interferences ought not to surprise us. The power of taxation is one of the most essential to a State, and one of the most extensive in its operation. The attempt to maintain a rule which shall limit its exercise is undoubtedly among the most delicate and difficult duties which can devolve on those whose province it is to expound the supreme law of the land, in its application to individuals." The court in each of these

cases affirm, "that the sovereignty of the State extends to every thing which exists by its authority, or is introduced by its permission, and all on subjects of taxation." 2 Pet. 449; 9 Wheat. 738; 4 Ib. 316.

The limitations imposed by the court in these cases excited a deep and pervading discontent, and must have directed the court to a profound consideration of the question in its various relations. The case of the Providence Bank v. Billings, 4 Pet. 514, enabled the court to give a practical illustration of sincerity with which the principle I have quoted was declared. A bank, existing by the authority of a State legislature, claimed an immunity from taxation [***93] against the authority of its creator.

The court then said "however absolute the right of an individual (to property) may be, it is still in the nature of that right, that it must bear a portion of the public burdens, and that portion is determined by the legislature." The court declared that the relinquishment of the power of taxation is never to be assumed. "The community has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon it does not plainly appear."

There principles were reaffirmed, their sphere enlarged, and their authority placed upon broad and solid foundations of constitutional law and general policy, in the opinion of this court, in the case of the Charles River Bridge, 11 Pet. 420. No opinion of the court more fully satisfied the legal judgment of the country, and consequently none has exercised more influence upon its legislation. The Supreme Court of Pennsylvania, speaking of these cases, says, "they are binding on the State courts not merely as precedents, and therefore proving what the law is, but as the deliberate judgment of that tribunal [*410] with whom the final decision of [***94] all such questions rests. The State courts have almost universally followed them. But no tribunal of the Union has acceded to the rule they lay down with a more earnest appreciation of its justice than did this court." 7 Har. 144; 10 Barr, 142.

The Supreme Court of Georgia says, "the decision, based as it is upon a subject particularly within the cognizance and jurisdiction of the Supreme Court of the United States, is entitled to the highest deference." And the eminent Chief Justice of that court adds, "that the proposition it establishes commands my entire assent and

approbation." 9 Georgia Rep. 517; 10 N.H. 138; 17 Conn. 454; 21 Verm. 590; 21 Ohio, (McCook's Rep.) 564; 9 Ala. 235; 9 Rob. 324; 4 Coms. 419; 6 Gill, 288.

The chief justice, delivering the opinion of this court in that case, quotes with approbation the principle, that the abandonment of the power of taxation ought not to be presumed in a case in which the deliberate purpose to do so did not appear, and says, "The continued existence of a government would be of no great value, if, by implications and presumption, it was disarmed of the powers necessary to accomplish the ends of it creation, and the functions it [***95] was designed to perform transferred to the hands of privileged corporations. The rule of construction announced by the court was not confined to the taxing power; nor is it so limited in the opinion delivered. On the contrary it was distinctly placed on the ground that the interests of the community were concerned in preserving, undiminished the power in question; and whenever any power of the State is said to be surrendered or diminished, whether it be the taxing power or any other affecting the public interest, the same principle applies, and the rule of construction must be the same."

The court only declared those principles for which the commons of England had struggled for centuries, and which were only established by magnanimous and heroic efforts. The rules that public grants convey nothing by implication, are construed strictly in favor of the sovereign, do not pass any thing not described nor referred to, and when the thing granted is described nothing else passes; that general words shall never be so construed as to deprive him of a greater amount of revenue than he intended to grant, were not the inventions of the craft of crown lawyers, but were established in contests [***96] with crown favorites and impressed upon the administration, executive and judicial as checks for the people. The invention of crown lawyers was employed about such phrases, as ex speciali gratia, certa scientia mero motu, and non obstante, to undermine the strength of such rules, and to enervate the force of wholesome statutes. A writer of the seventeenth century says, "from the time of William [*411] Rufus, our kings have thought they might alienate and dispose of the crown lands at will and pleasure; and in all ages, not only charters of liberty, but likewise letters-patent for lands and manors, have actually passed in every reign. Nor would it have been convenient that the prince's hands should have been absolutely bound up by any law, or that

what had once got into the crown should [**995] have been forever separated from private possession. For then by forfeitures and attaintures he must have become lord of the whole soil in a long course of time. The constitution, therefore, seems to have left him free in this matter; but upon this tacit trust, (as he has all his other power,) that he shall do nothing which may tend to the destruction of his subjects. However, [***97] though he be thus trusted, it is only as head of the commonwealth; and the people of England have in no age been wanting to put in their claim to that to which they conceived themselves to have a remaining interest; which claims are the acts of resumption that from time to time have been made in parliament, when such gifts and grants were made as become burdensome and hurtful to the people. Nor can any government or State divest itself of the means of its own preservation; and if our kings should have had an unlimited power of giving away their whole revenue, and if no authority could have revoked such gifts, every profuse prince, of which we have had many in this kingdom, would have ruined his successor, and the people must have been destroyed with new and repeated taxes; for by our duty we are likewise to support the next prince. So that if no authority could look into this, a nation must be utterly undone without any way of redressing itself, which is against the nature and essence of any free establishment.

Our constitution, therefore, seems to have been, that the king always might make grants, and that these grants, if passed according to the forms prescribed by the law, were [***98] valid and pleadable, against not only him, but his successors. However, it is likewise manifest that the legislative power has had an uncontested right to look into those grants, and to make them void whenever they were thought exorbitant."

Nor were they careless or indifferent to precautionary measures for the preservation of the revenues of the State from spoliation or waste. Official responsibility was established, and the Lords High Treasurer and Chancellor, through whose offices the grants were to pass, were severally sworn "that they would neither know nor suffer the king's hurt, nor his disinheriting, nor that the rights of his crown be distressed by any means as far forth as ye may let; and if ye may not let it, ye shall make knowledge thereof clearly and explicitly to the king with your true advice and counsel."

[*412] The responsibility of these high officers, as the history of England abundantly shows, was something more than nominal; nor did the frequent enforcement of that rule of responsibility, nor the adoption by the judges of the stringent rules I have cited, protect the revenues of the State from spoliation. "The wickedness of men," continues this writer, [***99] "was either too cunning or too powerful for the wisdom of laws in being. And from time to time great men, ministers, minions, favorites, have broken down the fences contrived and settled in our constitution. They have made a prey of the commonwealth, plumed the prince, and converted to their own use what was intended for the service and preservation of the State. That to obviate this mischief, the legislative authority has interposed with inquiries, accusations, and impeachments, till at last such dangerous heads were reached." Davenant's Dis. passim.

Nor let it be said that this history contains no lessons nor instructions suitable to our condition. The discussions before this court in the Indiana Railroad and the Baltimore Railroad cases exposed to us the sly and stealthy arts to which State legislatures are exposed, and the greedy appetites of adventurers, for monopolies and immunities from the State right of government. We cannot close our eyes to their insidious efforts to ignore the fundamental laws and institutions of the States, and to subject the highest popular interests to their central boards of control and directors' management.

This is not the time for the relaxation [***100] of those time-honored maxims, under the rule of which free institutions have acquired their reality, and liberty and property their most stable guaranties. The Supreme Court of Pennsylvania says, with great force, "that if acts of incorporation are to be so construed as to make them imply grants of privileges, immunities, and exemptions, which are not expressly given, every company of adventurers may carry what they wish, without letting the legislature know their designs. Charters would be framed in doubtful or ambiguous language, on purpose to deceive those who grant them; and laws, which seem perfectly harmless on their face, and which plain men would suppose to mean no more than what they say, might be converted into engines of infinite mischief. There is no safety to the public interest except in the rule which declares that the privileges not expressly granted are withheld." 7 Harris, 144.

The principles of interpretation, contained in these cases, control the decision of this, if applied to this act. Indeed, the argument of the plaintiff rests upon rules created for, and adapted to, a class of statutes entirely dissimilar. We were invited to consider the antecedent legislation [***101] of Ohio, in reference to its [*413] banks, the discouraging effects of that legislation, and then to deal with this act, as a medicinal and curative measure; as an act recognizing past error, and correcting for the future the consequences. It is proper to employ this argument to its just limit. The legislation of Ohio since 1825 certainly manifests a distinct purpose of the State to maintain its powers over these corporations, in the matter of taxation, unimpaired. With a very few exceptions this appears in all the statutes. It is seen in the act of 1825, in the charters granted in 1834, in the acts of 1841-2-3, the two last being acts embracing the whole subject-matter of banking. It is said this austerity was the source of great mischief, depreciated the paper currency of the State, and occasioned distress to the people, and that the change apparent in the act of 1845 was the consequence.

The existence of a consistent and uniform purpose for a long period is admitted. The abandonment of such a purpose, and one so in harmony with sound principles of legislation, cannot be presumed. If the application of these principles in Ohio was productive of mischief, we should have [***102] looked for an explicit [**996] and unequivocal disclaimer. We have seen that the act contains no renunciation of this important power. And it may be fairly questioned whether th people of Ohio would have sanctioned such a measure. I know of no principle which enables me to treat the sixtieth section of this act as a remedial statute. Even the dissenting opinions in the Charles River and Louisa Railroad cases, which have formed the repertory from which the arguments of the plaintiffs have been derived, do not in terms declare such a rule, and the opinions delivered by the authority of the court repel such a conclusion. Nor can I consider the decision in 7 Ohio R. 125 of consequence in this discussion. That case was decided upon a form of doctrine which after the judgments of this court, before cited, had no title to any place in the legal judgment of the country. The case was decided in advance of the most important and authoritative of those decisions. It is not surprising to hear that the judges who gave the judgment, afterwards renounced its principle, or that another State court has disapproved it, (7 Harris, 144,) or that it has not been followed in kindred cases, 11 [***103] Ohio, 12, 393; 19 Ib. 110; 21 Ib. (McCook,)

563, 604, 626; and at the first time when it came up for revision it was overruled.

It remains for me to consider the act of 1845, its purpose and details, in connection with the sixtieth section of the act, to ascertain whether it is proper to assume that the State has relinquished its rights of taxation over the banking capital of the State.

The act of 1845 was designed to enable any number, not [*414] fewer than five persons, to form associations to carry on the business of banking.

The legislature determined the whole amount of the capital which should be employed under the act -- that it should be distributed over the State, according to a specified measure of apportionment; that the bills to circulate as currency should have certain marks of uniformity, and be in a certain proportion to capital and specie on hand, and that a collateral security should be given for their redemption. The act contains measures for organization, relating to subscriptions for stock, the appointment of officers and boards of management; sections, of a general interest, referring to the frauds of officers, the insolvency of the corporations, [***104] their misdirection and forfeiture; sections containing explicit and clear statements of corporate right and privilege, the capacities they can exercise, the functions they are to perform, and the term of their existence.

The act initiates a system of banking of which any five of its citizens may avail, and which provides for the confederacy of these associations under the general title of the State Bank of Ohio, and its branches, and their subjection to a board of control, appointed by them.

More than fifty banks have been formed under this act, and thirty-nine belong to the confederacy. Some of the banks over whose charters the State has reserved a plenary control, are by the act permitted to join it. It is said "that the whole of this act is to be taken; the purpose of the act and the time of the act. It is a unit." It will not be contended that the fifty-first section of this act, by which this multitude of banking companies are adjudged to be corporations, with succession for twenty years, places every other relation established by the act, beyond the legislative domain for the same period of time. For there are in the act measures designed for organization and arrangement [***105] for the convenience and benefit of the corporators only; there are concessions creating hopes and expectations out of which rights may

grow by subsequent events; there are sections which convey present rights, or from which rights may possibly arise in the form of a contract; there are others which enter into the general system of administration, affect the public order, and tend to promote the common security. Some of these provisions may be dispensed with by those for whose exclusive benefit they were made. Some may be altered, modified, or repealed, to meet other conditions of the public interest, and some perhaps may not be alterable except with the consent of the corporators themselves. To determine the class to which one enactment or another belongs, we are referred to those general principles I have already considered. In this act, [*415] of seventy-five sections, which organizes a vast machinery for private banking, which directs the delicate and complex arrangements for the supply of a paper currency to the State, and determines the investment of millions of capital, we find this sixtieth section. The act is enabling and permissive. It makes it lawful for persons [***106] to combine and to conduct business in a particular manner. It forms no partnership for the State, compels no one to embrace or to continue the application of industry and capital according to its scheme. It grants licenses under certain conditions and reservations, but is nowhere coercive. Among the general regulations is the one which directs the banks at the end of every six months to ascertain their net profits for the six months next preceding and to set apart six per cent. for. the State in the place of the other taxes or contributions to which they would be liable. But the legislature imposes no limit to its power, nor term to the exercise of its will, nor binds itself to adhere to this or any other rule of taxation.

The subject affects the public order and general administration. It is not properly a matter for bargain or barter; but the enactment is in the exercise of a sovereign power, comprehending within its scope every individual interest in the State. It is a power which every department of government knows that the community is interested in retaining unimparied, and that every corporator understood its abandonment ought not to be presumed in a case in which the [***107] deliberate purpose to abandon it does not appear."

I have sought in vain in the sixtieth section of the act, in the act itself, and in the legislation and jurisprudence of Ohio, for the expression of such a deliberate purpose.

My opinion is that the Supreme Court of Ohio has faithfully applied the lessons inculcated by this court, and

that its judgment should be affirmed.



**STATE HIGHWAY DEPARTMENT OF TEXAS ET AL, V. W. E. GORHAM.**

**No. 7963**

**SUPREME COURT OF TEXAS**

**139 Tex. 361; 162 S.W.2d 934; 1942 Tex. LEXIS 243**

**May 27, 1942**

**SUBSEQUENT HISTORY:** [***1] Rehearing overruled June 24, 1942

**PRIOR HISTORY:** Error to the Court of Civil Appeals for the Tenth District, in an appeal from McLennan County.

W. E. Gorham, having obtained permission by reason of a legislative act, brought this suit against the State Highway Department of Texas to recover workmen's compensation for injuries received by him while in the employ of the department, when an instrument similar to a circular saw, which he was using and which he alleged was defective seriously cut and injured his leg near the ankle joint, resulting in a permanent incapacity to work. Plaintiff had previously filed his claim with the Industrial Accident Board and same was denied. A judgment awarding plaintiff a lump sum recovery for $3,591.70 was affirmed by the Court of Civil Appeals, 158 S.W. (2d) 330, and the State Highway Department has brought error to the Supreme Court.

Judgments of both courts are reversed and judgment is here rendered in favor of the Highway Department.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Petitioners, the Texas State Highway Department and the State, sought review of the order of the Court of Civil Appeals, Texas, which affirmed a district court's judgment granting workmen's compensation benefits to respondent state highway department employee, pursuant to Tex. Rev. Civ. Stat. art 6674s. The district court had reversed a decision by an administrative board, which had denied benefits to the employee.

**OVERVIEW:** The employee was injured by equipment similar to a circular saw, which seriously cut and injured his leg, resulting in a permanent incapacity to work. The Department asserted that he was not entitled to benefits because Tex. Rev. Civ. Stat. art 6674s (1937), which provided for compensation for Department employees, was not in effect on the date of his injury in December 1937. On appeal, the court agreed with the Department, holding that the language of the statute was clear and unambiguous. The workmen's compensation insurance became effective on the date stated in the notice sent by the Department to the Industrial Accident Board , as required by the statute, which was January 1, 1938. The State and the Department were not liable for injuries sustained by employees prior to that time. The court held that a bill passed by the legislature, which provided that all rights and privileges of the statute were to be applied to this individual employee as if the statute had been effective on the date of his injury was unconstitutional and without effect. It violated the constitutional inhibition against the enactment of local or special laws set forth in Tex. Const. art. III, § 56.

**OUTCOME:** The court reversed the judgment of the lower courts and entered judgment in favor of the

Department.

**CORE TERMS:** notice, payroll, special law, compensation insurance, general law, prescribe, violative, notified, work performed, number of employees, estimated amount, physical examinations, annual, workmen's compensation, particular case, permission, deprived, effect prior, reasonable time, appropriation, approximate, promulgate, convenient, physically, designate, furnish, certify, notify

**LexisNexis(R) Headnotes**

*Governments > Legislation > Effect & Operation > Operability*
*Governments > State & Territorial Governments > Employees & Officials*
*Workers' Compensation & SSDI > Administrative Proceedings > Awards > General Overview*
[HN1] See Tex. Rev. Civ. Stat. art 6674s, § 3 (1937).

*Governments > Legislation > Interpretation*
[HN2] Where a statute is plain and unambiguous, it will be enforced according to its wording. It is the duty of an appellate court to examine the entire act, and to construe it as a whole. The statute should be given a fair review, in order to accomplish the legislative intent and pursuable construction, considering the language and the subject pose.

*Governments > Legislation > Interpretation*
[HN3] A statute will not be construed so as to ascribe to the legislature an intention of doing an unjust thing by its enactment, or of causing confusion thereby, if the statute is reasonably susceptible of a construction showing the legislature's intention to have been otherwise.

*Governments > Legislation > Effect & Operation > Operability*
*Governments > Legislation > Enactment*
*Governments > Legislation > Interpretation*
[HN4] Where an act is complete in and of itself, it is fairly within the scope of the legislative power to prescribe that it shall become operative on the happening of some specific contingency or future event.

*Governments > Legislation > Interpretation*
[HN5] While interpretations and construction by the Texas Legislature of its Acts at the same or succeeding sessions are persuasive on a reviewing court in the interpretation of statutes, they are not controlling.

*Governments > Legislation > Effect & Operation > Operability*
*Governments > State & Territorial Governments > Employees & Officials*
*Workers' Compensation & SSDI > Administrative Proceedings > Awards > General Overview*
[HN6] The date upon which workmen's compensation insurance became effective and available to the employees of the Texas State Highway Department is the date stated in the notice, required by the statute, which was sent by the Department to the Industrial Accident Board, -- to wit, January 1, 1938, at 12:01 A.M.; and the State and the Department are not liable, under the general law, for injuries sustained prior to that time.

*Constitutional Law > Bill of Rights > General Overview*
*Governments > Legislation > Enactment*
[HN7] Tex. Const. art. III, § 36 forbids the amendment of a law without its being "re-enacted and published at length."

*Constitutional Law > Bill of Rights > General Overview*
*Constitutional Law > Equal Protection > Scope of Protection*
[HN8] Section 3 of the Texas Bill of Rights provides that all men shall have equal rights.

*Constitutional Law > Equal Protection > Scope of Protection*
*Governments > Legislation > Enactment*
[HN9] Tex. Const. art. III, § 56 provides that no local or special law shall be enacted where a general law can be made applicable.

**COUNSEL:** *Gerald C. Mann,* Attorney General, *Wm. J. Fanning, Ardell Williams, Wm. J. R. King* and *Geo. W. Barcus,* Assistants Attorney General, for petitioners.

It was error for the court to hold that plaintiff proved [***2] a good cause for not filing his claim with the Industrial Accident Board within six months; and that there were no such conflicts in the findings of the jury as

to require a reversal of the judgment of the trial court. Scott v. Texas Emp. Ins. Assn., 118 S.W. (2d) 354; Casualty Reciprocal Exch. v. Richardson, 86 S.W. (2d) 838; Traders & Gen. Ins. Co. v. Wood, 103 S.W. (2d) 1058.

*Witt, Terrell, Lincoln, Jones & Riley,* of Waco, for respondent.

**OPINION BY:** SHARP

**OPINION**

[**935] [*363] MR. JUSTICE SHARP delivered the opinion of the Court.

W. E. Gorham, having obtained legislative consent, brought this suit under Article 6674s, Vernon's Annotated Civil Statutes, against the State Highway Department of Texas, referred to as the Department, and The State of Texas, to recover workmen's compensation for injuries sustained while in the employ of the Department. A recovery was denied by the Industrial Accident Board, referred to as the Board, and Gorham appealed. Upon trial in the district court, the jury found that he was totally and permanently disabled as the result of an accidental injury received on December 7, 1937, in the course of his employment for the Department. The trial [***3] court thereupon awarded Gorham a lump sum recovery of $3,591.70. The judgment was affirmed by the Court of Civil Appeals. 158 S.W. (2d) 330. This Court granted a writ of error.

The principal question is whether the insurance coverage contemplated by the law providing for compensation insurance for employees of the Highway Department was in effect on December 7, 1937, the date on which Gorham was injured. For a determination of this matter the Act itself, Article 6674s, Vernon's Annotated Civil Statutes, must be construed.

This Act was passed on June 11, 1937, and was signed by the Governor on the same day. It carried the emergency clause, and provided that it should take effect immediately after its passage. The Act, therefore, unquestionably became a law on June 11, 1937. The question then remains as to when the insurance provisions in the Act became effective.

The Act provides in part as follows:

[*364] "Sec. 3. [HN1] *After the effective date of this law* any employee * * *, who sustains an injury in the course of his employment shall be paid compensation as hereinafter provided.

"*The Department is hereby authorized to be self insuring and is charged with the administration [***4] of this law. The Department shall notify the Board of the effective date of such insurance,* stating in such notice the nature of the work performed by the employees of the Department, the approximate number of employees, and the estimated amount of the payroll.

"*The Department shall give notice to all employees that, effective at the time stated in such notice, the Department has provided for payment of insurance.*" (Italics ours.)

The Act further provides that the Department is authorized to promulgate and publish rules and regulations, and to prescribe and furnish such forms as may be necessary. It is required to designate a convenient number of physicians and surgeons [**936] to make physical examinations of all persons in the employ of the Department, and to determine those who are physically fit to be classified as employees.

There is a further provision that no person shall be certified as an "employee" unless and until he has submitted himself to a physical examination and is found to be physically fit for the duties to which he is assigned; but it is further provided that failure to be examined shall not bar a recovery.

The Act authorizes the Department to set [***5] aside from its available appropriations an amount, not to exceed 3 1/2% of the annual labor payroll of the Department, for the payment of all costs, administrative expense, charges, benefits, and awards authorized by this law. The Department is charged with the duty of keeping a record of all injuries sustained by its employees and of making a report thereof to the Board.

On December 21, 1937, the Department notified the Board that, "Workmen's Compensation insurance for certain employees of the Highway Department, as provided in said Statute, will become effective at 12:01 A.M., January 1, 1938. The nature of the work performed by employees of the Highway Department is Highway Construction and Maintenance, and all work incidental thereto. The appropriate number of [*365]

such employees is seven thousand (7,000). The estimated amount of annual payroll is Nine Million Dollars ($9,000,000.00)."

The Industrial Accident Board certified that the Department became a subscriber as outlined under the Workmen's Compensation Law on January 1, 1938, at 12:01 A.M.

On May 26, 1939, the Legislature passed House Bill No. 1047, being Chapter 1, page 950, Special Laws of the 46th Legislature, [***6] granting Gorham permission to sue for compensation on account of the alleged injuries and on account of the failure of the Department to provide compensation insurance within a reasonable time; and it was provided that any judgment so recovered should be paid out of the funds of the Department set aside for injuries to its employees. The bill reserved to the Department all defenses available to it under Article 6674s, "except its failure to have compensation insurance and to comply with the law relevant thereto and to certify said Gorham as an employee, and except the Statute of Limitations. It being the purpose of this act to make available to the said W. E. Gorham, all rights and privileges of Article 6674s *as if the Highway Commission had put said Act into effect prior to December 7, 1937.*" (Italics ours.)

It is a settled rule that [HN2] where a statute is plain and unambiguous, it will be enforced according to its wording. It is the duty of the Court to examine the entire Act, and to construe it as a whole. The statute should be given a fair and reamatter, in order to accomplish the legislative intent and pursonable construction, considering the language and the subject pose. [***7] 39 Tex. Jur., p. 166 et seq., secs. 90 and 91.

After June 11, 1937, the Department was authorized and required to promulgate rules and regulations, and to prescribe and furnish forms, for the effective administration of the law. It was authorized to set aside from its appropriation an amount, not to exceed 3 1/2% of its annual labor payroll, to cover all costs of the program. It necessarily had to investigate the number of employees to be included, the risks covered, and the probable cost to the Department. The Department was required to designate a convenient number of doctors, and was authorized to conduct physical examinations of employees. Since the program was to be administered in connection with the Industrial Accident Board, the statute prescribed that the Board be notified of the nature of the work performed by the employees, the [*366] approximate number of employees, and the estimated amount of the payroll. The Legislature must have contemplated that it would take a reasonable time to put this program in operation. Therefore the following provisions of the Act appear to be controlling as to the meaning of the "effective date" upon which the insurance should go [***8] in operation:

"The Department shall notify the Board of the effective date of such insurance. * * * The Department shall give notice to all employees that, *effective at the time stated in the notice,* the Department has provided for payment of insurance." (Italics ours.)

[HN3] A statute will not be construed so as to ascribe to the Legislature an intention of doing an unjust thing by its enactment, or of causing confusion thereby, if the statute is reasonably susceptible of a construction showing the Legislature's intention to have been otherwise. Anderson v. Penix, 138 Texas 596, 161 S.W. (2d) 455; Trimmier v. Carlton, 116 Texas 572, 296 S.W. 1070; Winder v. King (Com. App.), 1 S.W. (2d) 587; 39 Tex. Jur. 174.

We believe, when we read the Act as a whole, that it was the intention of the Legislature [**937] to leave it to the Department to set up the rules, regulations, and machinery necessary to put in operation the method of paying compensation to employees for injuries sustained while in the employ of the Department; and that such insurance could not take effect until the Department had inaugurated the system and notified the Industrial Accident Board of the effective date [***9] of such insurance. In any event, there are no pleadings in this case that the Department was negligent in any manner in getting the plan in operation, or that it was guilty of any unreasonable delay. The distinction between the date upon which a legislative Act becomes a law and the date upon which that law becomes operative has been drawn in numerous other decisions by this Court. See Corpus v Chorn, 136 Texas 209, 150 S.W. (2d) 70; Popham v. Patterson, 121 Texas 615, 51 S.W. (2d) 680; Anderson v. Penix, supra.

[HN4] Where an Act is complete in and of itself, it is fairly within the scope of the legislative power to prescribe that it shall become operative on the happening of some specific contingency or future event. Johnson v. Martin, 75 Texas 33, 12 S.W. 321; 16 C.J.S., p. 414, sec. 141; 9 Tex. Jur., 498. [*367]

It is asserted by respondent that the intention of the Legislature was conclusively demonstrated to the contrary by the passage of House Bill No. 1047, supra, which granted Gorham permission to sue the State, and deprived the State and the Department of the defense that the Act was not effective on December 7, 1937. [HN5] While interpretations and construction by the Legislature [***10] of its Acts at the same or succeeding sessions are persuasive on the Court in the interpretation of statutes, they are not controlling. Caples v. Cole, 129 Texas 370, 102 S.W. (2d) 173, rehearing denied 129 Texas 370, 104 S.W. (2d) 3.

We therefore hold that [HN6] the date upon which the insurance became effective and available to the employees of the Department was the date stated in the notice, required by the statute, which was sent by the Department to the Board, -- towit, January 1, 1938, at 12:01 A.M.; and the State and the Department are not liable, under the general law, for injuries sustained prior to that time.

But it is contended by respondent that, in his particular case, the State and the Department were deprived of that defense by the subsequent enactment of House Bill No. 1047, supra, giving him the privilege of bringing suit against the State and the Department, and wherein it was provided that all defense should be available to the State and the Department, "except its failure to have compensation insurance and to comply with the law relevant thereto and to certify said Gorham as an employee, and except the Statute of Limitations. It being the purpose of this Act to make [***11] available to the said W. E. Gorham, all rights and privileges of Art. 6674s as if the Highway Commission had put said Act into effect prior to December 7, 1937."

The foregoing part of this Act is invalid for many reasons. To enumerate the following will suffice here: If this part of the Act be construed as an amendment to Article 6674s, it is ineffectual; because general laws can not be amended in this manner. Caples v. Cole, supra. It is also violative of Article III, Section 36, of the Texas Constitution, which [HN7] forbids the amendment of a law without its being "re-enacted and published at length." If the Act be construed as a special law, depriving the State of a defense in a particular case, it is unconstitutional, as being violative of Section 3 of the Texas Bill of Rights, which [HN8] provides that all men shall have equal rights. It is also violative of Article III, Section 56, of our State Constitution, [*368] which [HN9] provides that no local or special law shall be enacted where a general law can be made applicable. "The purpose of this constitutional inhibition against the enactment of local or special laws is a wholesome one. It is intended to prevent the granting of special [***12] privileges and to secure uniformity of law throughout the State as far as possible." Miller v. El Paso County, 136 Texas 370, 150 S.W. (2d) 1000. It certainly was not the intention of the framers of our Constitution that the State should have certain defenses against some individuals, but not against others similarly situated.

The judgments of the trial court and of the Court of Civil Appeals are reversed, and judgment is here rendered in favor of petitioners.

Opinion delivered May 27, 1942.

Rehearing overruled June 24, 1942.



**Sunbeam Environmental Services, Inc. and Alphonso Solomon and Company, Inc., Appellants v. Texas Workers' Compensation Insurance Facility, succeeded by the Facility Insurance Corporation, Appellee**

**NO. 03-01-00326-CV**

**COURT OF APPEALS OF TEXAS, THIRD DISTRICT, AUSTIN**

**71 S.W.3d 846; 2002 Tex. App. LEXIS 1380**

**February 22, 2002, Filed**

**NOTICE:** [**1] PURSUANT TO THE TEXAS RULES OF APPELLATE PROCEDURE, UNPUBLISHED OPINIONS SHALL NOT BE CITED AS AUTHORITY BY COUNSEL OR BY A COURT.

**SUBSEQUENT HISTORY:** Released for Publication April 18, 2002.

**PRIOR HISTORY:** FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT. NO. 97-0115, HONORABLE SCOTT JENKINS, JUDGE PRESIDING.

**DISPOSITION:** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The District Court of Travis County, 250th Judicial District, Texas, granted summary judgment to appellee insurer, finding appellant insureds liable for unpaid premiums, interest, and attorney's fees. The insureds appealed.

**OVERVIEW:** The insureds challenged judgment against them, contending that: (1) the insurer was barred from recovering on the first of their policies by the statute of limitations, (2) the evidence was insufficient to sustain the decision, (3) the insurer failed to give proper pre-suit notice sufficient to award attorney's fees, and (4)

attorneys not designated as the attorney in charge purported to act for the insurer. The court of appeals disagreed. The statute of limitations was four years, as the suit for debt was based on a breach of contract. Evidence was sufficient to warrant the insurer's recovery, as complete documentation was provided of a breach, despite the insurer's failure to introduce a copy of the policy. There was no evidence that the insured's contract differed in any material respect from those in evidence to illustrate the terms therein. Further, the second insured shared liability for the premiums. The insureds' failure to pay the amounts billed was sufficient to support attorney's fees, despite their claim they did not receive the bills. Finally, any attorney employed by the firm representing the insurer was entitled to correspond with the insured.

**OUTCOME:** The judgment was affirmed.

**CORE TERMS:** premium, coverage, workers' compensation, attorney's fees, owed, payroll, insured, wholly owned, invoice, limitations periods, servicing, complain, audit, statute of limitations, limitations bars, evidence supports, trial record, documents filed, opposing party, reply brief, designated, scintilla, claimant, expired, signing, notice, uphold, insurance policy, evidence admitted, coverage provided

**LexisNexis(R) Headnotes**

Smith and Puryear.

**OPINION BY:** Bea Ann Smith

**OPINION**

[*848] Appellants Sunbeam Environmental Services, Inc. (Sunbeam) and Alphonso Solomon and Company, Inc. (ASC) challenge a judgment favoring the Texas Workers' Compensation Insurance Facility (the Facility). [1] The district court found appellants jointly and severally liable to the Facility for unpaid premiums, interest on those premiums, and attorney's fees. Because we find this cause is not barred by the statute of limitations and the evidence is sufficient to support the award, we affirm the district court's judgment.

> 1    According to testimony at trial and appellate briefs, the Facility Insurance Corporation succeeded the Texas Workers' Compensation Insurance Facility. The succession had occurred by time of trial and had no known effect on this case; we will refer to appellee simply as the Facility.

[**2] **BACKGROUND**

Sunbeam and ASC are both Texas corporations wholly owned by Alphonso Solomon (Solomon). Sunbeam received workers' compensation insurance coverage through the Facility. The Facility was "a private, non-profit, unincorporated association of insurers authorized to write workers' compensation insurance in Texas for employers who are unable to obtain coverage through private insurance companies." *See All Star Sheet Metal & Roofing, Inc. v. Texas Dep't of Ins.*, 935 S.W.2d 186, 189 (Tex. App.--Austin 1996, no writ).

This dispute concerns premiums on policies in effect in 1992 and 1993. Workers' compensation insurance premiums are based on payroll expenditures. Insureds are required to pay premiums based on their estimated payroll, but the final premium cannot be calculated until all salaries and wages for the coverage period have been disbursed. Part five of the standard workers' compensation insurance policy calls for a payroll audit to calculate the final premium within three years of the end of the coverage period. Coverage for Sunbeam under the first policy in this case began January 29, 1992. Upon learning that Sunbeam was a "combinable" risk with [**3] ASC because Solomon wholly owned both

**Contracts Law > Breach > General Overview**
**Contracts Law > Defenses > Statutes of Limitations**
**Governments > Legislation > Statutes of Limitations > Time Limitations**
[HN1] A suit for debt based on a breach of contract has a four-year statute of limitations. Tex. Civ. Prac. & Rem. Code Ann. § 16.004 (West Supp. 2002).

**Civil Procedure > Appeals > Standards of Review > Substantial Evidence > General Overview**
[HN2] When reviewing no-evidence challenges, an appellate court considers all the evidence in the light most favorable to the judgment, making every reasonable inference in its favor. It will uphold the jury's finding if more than a scintilla of evidence supports it. The evidence supporting a finding is more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case.

**Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review**
[HN3] When reviewing factual-sufficiency challenges, an appellate court considers all the evidence and upholds the jury's verdict unless it finds that (1) the evidence is too weak to support the finding, or (2) the finding is so against the overwhelming weight of the evidence as to be manifestly unjust.

**Civil Procedure > Parties > Required Representation**
**Civil Procedure > Remedies > Costs & Attorney Fees > General Overview**
[HN4] Tex. Civ. Prac. & Rem. Code Ann. § 38.002 (West 1997) requires that in order for a claimant to recover attorney's fees: (1) the claimant must be represented by an attorney; (2) the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party; and (3) payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is presented.

**Civil Procedure > Appeals > Briefs**
[HN5] A reply brief is limited in scope to responding to matters in an appellee's brief. Tex. R. App. P. 38.3.

**JUDGES:** Before Chief Justice Aboussie, Justices B. A.

companies, the Facility required ASC to apply for coverage or the Facility would cancel Sunbeam's policy. ASC applied and, on February 21, 1992, was added as an insured through an endorsement on the first policy issued to Sunbeam. The two [*849] companies renewed coverage under the second policy for the year beginning January 29, 1993. The Facility canceled the second policy on June 8, 1993, for nonpayment of premiums and failure to make required reports.

The district court found that appellants owed the Facility for unpaid premiums on these policies, less an offset due for a refund of a maintenance tax. Audits showed that appellants owed $ 7,520.13 in additional premium on the first policy and $ 5,808.33 in premium on the second policy, less the credit of $ 871.47, yielding a total due of $ 12,456.99; the court also assessed prejudgment interest of $ 6,223.27, court costs, and postjudgment interest. The court awarded attorney's fees of $ 3114 plus additional amounts for appeals.

## DISCUSSION

Appellants raise eight issues on appeal. They assert that limitations bars the Facility from recovering on the first policy. By five issues, they complain [**4] about various aspects of the evidence admitted in support of the judgment, including the sufficiency of the evidence. They further complain that the Facility did not give pre-suit notice sufficient to empower the court to award attorney's fees and that attorneys not designated as the attorney in charge purported to act for the Facility.

### Limitations

Appellants contend that the statute of limitations bars the Facility's claims for premiums owed on the policy that expired at 12:01 a.m. on January 29, 1993. Because this is [HN1] a suit for debt based on a breach of contract, a four-year statute of limitations applies. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.004 (West Supp. 2002). Appellants contend that the suit was filed too late because it was filed hours after the four-year period expired at 12:01 a.m. on January 29, 1997.

We find no authority to support appellants' assertion that limitations periods are computed on any unit of time shorter than a day. The Facility's cause of action was thus timely filed even if the limitations period began running on January 29, 1993.

The limitations period did not begin running on January 29, 1993, however. [**5] Part five of the workers' compensation policy states that, because the final premium is based on the actual payroll disbursed, the final premium cannot be determined until after the end of the policy term; the policy specifies that the audit will occur within three years of the end of the policy term. Here, the auditors sent an invoice on May 28, 1993 for the additional $ 7520.13 they determined appellants owed in premiums on the first policy. This suit for collection of this amount, filed less than four years after the date of this invoice, was timely.

### Sufficiency of the evidence

Appellants raise five issues that essentially challenge the sufficiency of the evidence to support the judgment. [HN2] When reviewing no-evidence challenges, we will consider all the evidence in the light most favorable to the judgment, making every reasonable inference in its favor. *See Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285-86 (Tex. 1998); *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 25 (Tex. 1994). We will uphold the jury's finding if more than a scintilla of evidence supports it. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995); [**6] *Seideneck v. Cal Bayreuther Assocs.*, 451 S.W.2d 752, 755 (Tex. 1970); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (Tex. 1951). The evidence supporting a finding is more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case. *See Crye*, 907 S.W.2d at 499; *Moriel*, 879 S.W.2d at 25. [HN3] When reviewing [*850] factual-sufficiency challenges, we consider all the evidence and uphold the jury's verdict unless we find that (1) the evidence is too weak to support the finding, or (2) the finding is so against the overwhelming weight of the evidence as to be manifestly unjust. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Appellants complain that the Facility did not provide "complete documents as evidence to show the court that a contract was violated." They point to the sole witness's testimony that she did not know whether appellants had received any of the insurance documents. Appellants' argument regarding receipt of the contract is made for the first time on appeal. The witness was an [**7] employee of the Facility, not the servicing company or any of the appellants, and so did not have direct knowledge of what

the servicing company sent or what the appellants received. She testified that the standard procedure would be for the servicing company to send to the insured a standard policy with boilerplate language dictated by the State. The policy's boilerplate language explains the process of estimating premiums and calculating them within three years after the coverage period based on actual payroll. Though the Facility did not introduce a copy of a policy contained in appellants' files, there was no evidence that the appellants' contract differed in any material respect from the contracts in evidence used to illustrate the terms of appellants' contract. Further, appellants' attorney effectively conceded receipt and coverage at trial, stating that "no one is arguing that they're not covered by insurance." The evidence admitted was sufficient to show the terms of the contracts.

Appellants next contend that ASC was only an additional named insured and not liable for premiums on Sunbeam's policies. They contend that ASC never had an account or policy with the Facility, that [**8] a policy was never issued to ASC, and that ASC never received a policy or endorsement. Appellants do not cite to any evidence from the trial record supporting these claims. Appellants' argument that ASC had no liability for premiums is premised on the fact that ASC did not voluntarily apply for the insurance policy. The Facility did not mandate that ASC request coverage; Solomon could have chosen to forego workers' compensation insurance for both companies, but chose to apply for coverage for ASC to preserve coverage for Sunbeam. The only evidence is that ASC applied for and received coverage on equal footing with Sunbeam--ASC was "combined" with Sunbeam for purposes of workers' compensation insurance--rather than passively receiving coverage under Sunbeam's policy. The January 1993 application for insurance lists both Sunbeam and ASC as names of the applicant, as does the binder issued for that policy. Both companies were wholly owned by Solomon and received their mail at the same address. The only evidence is that both were insureds, and thus that they were both liable for premiums owed on the coverage provided to both companies. The evidence supports the finding that ASC shared [**9] liability for premiums for the coverage provided.

Appellants contend for the first time on appeal that the Facility miscalculated the premiums due on both policies. They contend that they were erroneously charged the same rate for supervisory employees as for janitorial workers, causing overcharges because the rate for supervisory employees was lower. The affidavits attached to appellants' brief were not offered or admitted at trial and do not bear file stamps indicating that they were filed with the district court. Some of the exhibits [*851] attached to the affidavits are the same as documents admitted at trial, but they do not require us to find that the Facility miscalculated the premiums due. Appellants neither preserved this argument nor presented a record requiring reversal.

## Attorney's fees

Appellants contend that the Facility cannot recover attorney's fees because it did not give proper notice before filing suit. They also contend that bills sent do not satisfy the statute permitting attorney's fees. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.002 (West 1997). [2] Appellants contend the bills do not satisfy the statute because [**10] they were not issued by the Facility's attorney. Appellants misread section 38.002; though the party requesting attorney's fees must both make demand for payment (to ensure that the debtor is aware of the debt being sued upon) and be represented by counsel (so that there is an attorney who is due the fees requested), there is no requirement that the demand must be made *by* counsel. *See id.* The only evidence in the record is that the Facility sent invoices to the appellants for premiums due on each of the policies; there is no evidence in the trial record that the appellants did not receive the bills. The only evidence is that appellants failed to pay the amounts the Facility billed them and that the Facility was represented by counsel. The record supports the conclusion that the Facility satisfied section 38.002. *Id.*

> 2    This statute [HN4] requires that "(1) the claimant must be represented by an attorney; (2) the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party; and (3) payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is presented." Tex. Civ. Prac. & Rem. Code Ann. § 38.002 (West 1997).

[**11] In their reply brief, appellants for the first time challenge their liability for $ 350 in attorney's fees awarded to the Facility for filing a motion to compel them to respond to interrogatories. [HN5] A reply brief is limited in scope to responding to matters in an appellee's brief. Tex. R. App. P. 38.3. The Facility did not mention

the $ 350 award. Appellants waived this complaint by failing to raise it in their initial brief.

### Authorization of attorneys

Appellants contend that all pleadings and documents filed by attorneys other than David Dillon were unauthorized. Appellants correctly assert that, by signing the Facility's original petition, Dillon became the Facility's attorney in charge. *See* Tex. R. Civ. P. 8. The record plainly shows that attorneys other than Dillon signed and filed documents without being designated as attorneys in charge. All attorneys signing and filing documents on the Facility's behalf were from the same firm as Dillon. Though appellants were entitled to continue to correspond with the attorney in charge, they cite no authority for the proposition that documents filed by other attorneys from his firm were invalidly filed. Most important, appellants [**12] have not shown how they were harmed by the filing of documents by co-counsel in the firm of the attorney in charge. *See* Tex. R. App. P. 44.1; *see also Spellmon v. Collins*, 970 S.W.2d 578, 580 (Tex. App.--Houston [14th Dist.] 1998, no pet.). We resolve this issue in favor of the judgment.

### CONCLUSION

Having resolved all issues in favor of the judgment, we affirm the district court's judgment.

Bea Ann Smith, Justice



**Walter E. SWITZER, Jr., Appellant, v. CITY OF PHOENIX, Jack Williams, Mayor of the City of Phoenix, David P. Jones, Wesley Johnson, Faith I. North, V. A. Cordova, Dr. Joseph Madison Greer, and Clarence H. Shivvers, Members of the Phoenix City Council, John E. Burke, Phoenix City Clerk, Appellees**

**No. 6770**

**Supreme Court of Arizona**

**86 Ariz. 121; 341 P.2d 427; 1959 Ariz. LEXIS 145**

**July 1, 1959**

**DISPOSITION:** [***1] Modified and affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** A lower court (Arizona) granted motion for summary judgment filed by appellees, a city, the city council members, and the city clerk, in appellant real estate taxpayer's action seeking a declaratory judgment and injunctive relief to prevent the issuance of certain street improvement bonds.

**OVERVIEW:** The city adopted an ordinance authorizing the issuance of street and highway improvement bonds which were to be paid from the city's share of the funds received from the state's motor vehicle fuel and gasoline tax receipts. The taxpayer argued, inter alia, that the bonds would increase the city's total debt above the limit set by Ariz. Const. art. IX, § 8. The trial court found for appellees, and the court modified and affirmed. The court held that an obligation payable from a special fund created by the imposition of excise taxes and for the payment of which the general credit of the taxing authority was not pledged was not a debt within the meaning of constitutional debt limitations. The court rejected the taxpayer's argument that the city could not bind the state not to decrease the motor vehicle tax. The court held that the ordinance's broad language that the state fuel tax could not be decreased was ultra vires. The

court found instead that a decrease in the proportion payable to the city, so long as the bondholders received their quid pro quo, was permissible.

**OUTCOME:** The court modified the summary judgment in favor of appellees and affirmed as modified.

**CORE TERMS:** convention, taxation, street, modification, ordinance, highway, improvement bonds, right to impose, power of taxation, issuance, decrease, existing law, excise tax, continuation, surrendered, proportion, contracted, suspended, memorial, sentence, pledge, impair, right to tax, contracting, bonds issued, taxes collected, power to impose, crystal clear, indebtedness, collection

**LexisNexis(R) Headnotes**

*Governments > Local Governments > Finance*
*Governments > Public Improvements > Financing*
[HN1] Phoenix, Ariz., Ordinance No. S-1186 states that a bond and the issue of which it is a part are payable solely, as to both principal and interest, from the proceeds of revenues to be derived by said city from taxes collected by the state of Arizona and returned to the city for street and highway purposes.

Page 2

86 Ariz. 121, *; 341 P.2d 427, **;
1959 Ariz. LEXIS 145, ***1

*Governments > Public Improvements > Financing*
[HN2] Bonds issued to finance public improvements, if made payable solely from the revenues to be derived from the operation of the improvement, do not constitute an indebtedness within the meaning of the limitation clauses of the constitution.

*Governments > Public Improvements > Financing*
[HN3] The weight of authority generally is to the effect that an obligation payable from a special fund created by the imposition of fees, penalties, or excise taxes and for the payment of which the general credit of the taxing authority is not pledged is not a debt within the meaning of constitutional debt limitations.

*Governments > Local Governments > Finance*
*Governments > Public Improvements > Financing*
*Tax Law > State & Local Taxes > Administration & Proceedings > Collection*
[HN4] Phoenix, Ariz., Ordinance No. S-1186 provides that no decrease in the proportion thereof of the motor vehicle fuel tax payable to the city of Phoenix may be made while any of such bonds so remain outstanding and there is hereby vested in the holders of such bonds and the interest coupons thereto attached a contract right in the continuation of such tax and its allocation as above set forth. And further, the contract rights herein vested in the holders of such bonds shall extend to the imposition, collection and proper application of the street revenues, that is the taxes collected by the state of Arizona and returned to the city for street and highway purposes, until such bonds shall have been paid in full as to principal and interest and shall not be subject to repeal, impairment or modification either by the city or by the legislature or people of the state of Arizona.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
*Governments > Public Improvements > Financing*
[HN5] A modification of the constitution and the statutes which does not lessen the likelihood of payment or delay payment of the bonds will not impair the obligation of the contract arising in consideration of the existing law.

*Governments > State & Territorial Governments > Finance*
[HN6] See Ariz. Const. art. IX, § 1.

*Governments > Legislation > Enactment*
*Governments > State & Territorial Governments > Finance*
*Tax Law > State & Local Taxes > General Overview*
[HN7] 'The right to impose taxes is a legislative power, inherent in organized government. In the absence of constitutional limitations, a legislature may enact such tax laws as it sees fit, subject only to the restrictions contained in the constitution of the United States. Everything over which the authority of the state reaches may be the subject of taxation, whether it be person, property, or occupation. There are certain safeguards, however, that should be provided: First; The legislature should be prohibited from contracting away the right to tax anything or person whatsoever, or from making any irrepealable grant of exemption.

**COUNSEL:** Gust, Rosenfeld, Divelbess & Robinette, Phoenix, for appellant.

William C. Eliot, City Atty., Merle L. Hanson, Anis Mitchell and Leven B. Ferrin, Asst. City Attys., Phoenix, for appellees.

**JUDGES:** Struckmeyer, Justice. Phelps, C. J., and Udall and Johnson, JJ., concurring.Note: BERNSTEIN, J., having heard this case in the Superior Court, disqualified, and took no part in the determination of this appeal.

**OPINION BY:** STRUCKMEYER

**OPINION**

[*123] [**428] This is an action wherein appellant, an elector and real property taxpayer of the City of Phoenix, seeks a declaratory judgment and injunctive relief to prevent the issuance of certain street improvement bonds. The court below entered a summary judgment in favor of appellees, declaring that the ordinance of the City of Phoenix under which the bonds were issued did not violate the state constitution and was not otherwise unlawful.

On May 7, 1957, the city held a bond election at which the duly qualified electors authorized the issuance of certain street and highway improvement bonds; thereafter, on September 27, 1957, the city adopted its Ordinance No. S-1186, by which there was authorized the issuance [***2] of street and highway improvement bonds in the amount of $ 2,500,000, the principal and interest thereon to be paid from the city's share of the

Page 3

86 Ariz. 121, *123; 341 P.2d 427, **428;
1959 Ariz. LEXIS 145, ***2

funds received from the Motor Vehicle Fuel and Gasoline Tax receipts collected by the State and distributed to the city pursuant to the applicable statutes.

Appellant first urges that the issuance of the bonds would increase the total indebtedness of the city above the four per cent limit set by the constitution of Arizona, Art. IX, § 8, A.R.S. Both the proposition submitted to the voters on May 7, 1957 and the Ordinance recite:

> "* * * [HN1] This bond and the issue of which it is a part are payable solely, as to both principal and interest, from the proceeds of revenues to be derived by said City from taxes collected by the State of Arizona and returned to the city for street and highway purposes. * * *"

It is the settled law of this state that [HN2] bonds issued to finance public improvements, if made payable solely from the revenues to be derived from the operation of the improvement, do not constitute an indebtedness within the meaning of the limitation clauses of the constitution. [*124] Guthrie v. City of Mesa, 47 Ariz. 336, 56 P.2d [***3] 655; Crandall v. Town of Safford, 47 Ariz. 402, 56 P.2d 660; Humphrey v. City of Phoenix, 55 Ariz. 374, 102 P.2d 82; Board of Regents of University of Arizona v. Sullivan, 45 Ariz. 245, 42 P.2d 619.

Appellant argues, however, that the same rule should not apply when the obligations are to be paid out of the fund created by the collection of a special excise tax. The authorities dealing with this problem are not entirely in accord, but [HN3] the weight generally is to the effect that an obligation payable from a special fund created by the imposition of fees, penalties, or excise taxes and for the payment of which the general credit of the taxing authority is not pledged is not a debt within the meaning of constitutional debt limitations. See Stone v. City of Hobbs, 54 N.M. 237, 220 P.2d 704, and Annotation 100 A.L.R. 878; Gruen v. Tax Commission, 35 Wash.2d 1, 211 P.2d 651. We will follow the weight of authority at least to the extent where, as here, the fund from which the obligations are to be paid is created [**429] by voluntary contributions of the state to the city.

Appellant next urges that a municipality may not, under the existing law, pledge all the revenues to be received [***4] from the Motor Vehicle and Gasoline

taxes to the repayment of highway improvement bonds. We notice that section 7 of the Ordinance is a pledge of revenues in the alternative. The city pledges all "or so much thereof as may be necessary." Consequently, the question presented is academic and does not pertain to an actual controversy. It is not subject to resolution by this court. Podol v. Jacobs, 65 Ariz. 50, 173 P.2d 758.

The city's Ordinance S-1186, among other things, promises the bond purchaser:

> "* * * [HN4] that no decrease in the proportion thereof [the Motor Vehicle Fuel Tax] payable to the City of Phoenix may be made while any of such bonds so remain outstanding and there is hereby vested in the holders of such bonds and the interest coupons thereto attached a contract right in the continuation of such tax and its allocation as above set forth."

And further,

> "* * * The contract rights herein vested in the holders of such bonds shall extend to the imposition, collection and proper application of the street revenues [meaning the taxes collected by the State of Arizona and returned to the City for street and highway purposes] until such bonds shall have been paid [***5] in full as to principal and interest and shall not be subject to repeal, impairment or modification either by the city or by the [*125] Legislature or people of the State of Arizona."

Appellant contends that the quoted language is an attempt by the city to bind the legislature and the state of Arizona not to decrease the state Motor Vehicle Fuel Tax nor to decrease the portion of the proceeds payable to the City of Phoenix until the bonds issued by the City of Phoenix are all paid and that as such it is invalid. In part we agree. To the extent that the language of the resolution purports to require the continuance of all laws without modification of the amount of the Motor Vehicle Fuel Tax or the proportion payable to the city, it is clearly a usurpation of the legislative function of the people of the State.

There can be no doubt that the legislature, in

Page 4

86 Ariz. 121, *125; 341 P.2d 427, **429;
1959 Ariz. LEXIS 145, ***5

permitting the Motor Vehicle Fuel Tax to be used for the retirement of the bonds has, by clear implication, promised that it would do nothing to impair the obligation arising in consideration of the existing law. But [HN5] a modification of the constitution and the statutes which does not lessen the likelihood of payment [***6] or delay payment of the bonds will not impair the obligation of the contract. Scougale v. Page, 194 Ark. 280, 106 S.W.2d 1023; Flint v. Duval County, 126 Fla. 18, 170 So. 587; State ex rel. Freeling v. Howard, 67 Okl. 296, 171 P. 41. The bondholders cannot be injured by modification of the statute, such as a decrease in the proportion payable to the city, so long as they receive their quid pro quo, and the legislature and the people of the state may make any changes in the law, organic and otherwise, save those which will impair the obligation of the contract. We therefore hold that the broad language alluded to, in so far as it purports to restrict any changes in the existing law, is ultra vires and ineffective to transfer to the bondholders the right to a continuation without modification.

There is an implication from the appellant's argument that a construction of the statutes committing the legislature and the State of Arizona to the continuation of a law imposing a tax, since of necessity the law must be continued in order to retire the contemplated bonds, violates that portion of Art. IX, § 1 of the constitution which provides:

> [HN6] "The power of taxation shall never be surrendered, [***7] suspended, or contracted away."

[**430] Appellant directs the attention of this court to Gruen v. Tax Commission, supra. There, with four judges dissenting, the Washington Supreme Court, in construing an identical provision, stated [35 Wash.2d 1, 211 P.2d 680]:

> "It is crystal clear that the legislature did not in any way relinquish or yield its right to impose a tax * * *."

[*126] The four dissenting judges were of the opinion that where the state pledged the proceeds of an excise tax on cigarettes to the payment of bonds, the power of taxation was suspended, surrendered, and contracted away until the retirement of the bonds -- possibly thirty years.

We have considered Art. IX, § 1, and arrived at the same conclusion as the majority in the Gruen case, but for different reasons.

The Minutes of the Constitutional Convention of this state establish that the article was introduced in the Convention as Substitute Proposition No. 106. This proposition came before the Convention for discussion on Saturday morning, November 19, 1910. At that time, the Honorable George W. P. Hunt, who later became the seven-time Governor of Arizona, said:

> "In regard to that [***8] first section. The Committee on Taxation had a memorial gotten up by the Tax Association composed of men all over the United States who have made this a study for years, and I have on my desk here letters from nearly every professor on economics in all the universities of the country, from Harvard, in Massachusetts to Stanford, in California, and they are for anyone who wants to look at these letters. They one and all believe this is the only way to put this in the constitution, and if the members of the convention will allow me to read them a letter from Washington, which is a sample of the letters I have received, it will throw some light on the subject. It is from J. E. Frost, President of the State Board of Tax Commissioners of the State of Washington, at Olympia, Washington."

Here follows the letter, the pertinent portions of which we set forth:

> "'Dear Sir: I am just in receipt of a letter from the Hon. Allen R. Foote, of Columbus, Ohio, President of the International Tax Association, asking me to express to you my views on the subject of constitutional provisions relative to taxation.
>
> * * *
>
> [HN7] "'The right to impose taxes is a legislative power, inherent in organized [***9] government. In the absence of

Page 5

86 Ariz. 121, *126; 341 P.2d 427, **430;
1959 Ariz. LEXIS 145, ***9

constitutional limitations, a legislature may enact such tax laws as it sees fit, subject only to the restrictions contained in the constitution of the United States. Everything over which the authority of the state reaches may be the subject of taxation, whether it be person, property, or occupation.

\* \* \*

"'There are certain safeguards, however, that should be provided: *First; The legislature should be prohibited* [*127] *from contracting away the right to tax anything or person whatsoever, or from making any irrepealable grant of exemption*.'" (Emphasis supplied.)

1

1   In the discussion that followed, Mr. M. G. Cunniff stated from the floor: "I am satisfied with the proposition as it stands. but I am not satisfied that the courts of Arizona will get the right interpretation."

From the content of the letter, it can be gleaned that since the legislature should be prohibited from contracting away the right to tax, the Convention intent was to accomplish the converse; [***10] that is, that the legislature would have the right to tax anything and all persons whatsoever. Viewed in this light, it would appear that by the use of the words "power of taxation," the [**431] Convention meant "the power to impose taxes."

The complete text of the Memorial referred to in the statement by the Honorable George W. P. Hunt can be found in the report of State and Local Taxation, 5th National Conference of the National Tax Association held in Richmond, Virginia, September, 1911, pp. 451 through 457. A reading of the Memorial leads us to the conclusion that the language contained in the first

sentence of Art. IX, § 1 was designed to leave legislators unencumbered in so far as their power to impose taxes. We note also from the report of the Third Conference of the same Association, p. 88, that one M. H. Carver of the Louisiana State Tax Commission is quoted as stating:

"There is little necessity for putting anything at all in the constitution about taxation, and some distinguished authorities hold that everything on the subject in a constitution is dangerous. To meet the decision of the Supreme Court of the United States, though, in the Dartmouth College case [***11] [Trustees of Dartmouth College v. Woodward], 4 Wheat. 518, [4 L.Ed. 629], it is well to provide:

"'That the power of taxation shall never be suspended, surrendered or contracted away. \* \* \*'"

Thus, it becomes apparent that the first sentence of Substitute Proposition No. 106, now Art. IX, § 1, was adopted for the purpose of restricting the legislature's right to alienate the power to tax anything and all persons. The prohibition is against the irrepealable grant of immunity from taxation. It was not intended to prohibit the levying of a tax. The scope of the language was communicated to, and understood by, the members of the Constitutional Convention.

Therefore, we are of the opinion that the first sentence of Art. IX, § 1 is a prohibition against the surrender or relinquishment [*128] of the right to impose a tax. In the instant case, "it is crystal clear" that the legislature is not contracting away the right to impose a tax. The legislature has imposed a tax and has simply applied the proceeds of the tax to a particular purpose.

Except as modified by this opinion, the judgment of the court below is affirmed.



TEXAS v. NEW MEXICO

No. 65, Orig.

SUPREME COURT OF THE UNITED STATES

462 U.S. 554; 103 S. Ct. 2558; 77 L. Ed. 2d 1; 1983 U.S. LEXIS 67; 51 U.S.L.W. 4805

March 30, 1983, Argued
June 17, 1983, Decided

**PRIOR HISTORY:**　ON EXCEPTIONS TO REPORT OF SPECIAL MASTER.

**DISPOSITION:**　Exceptions to Special Master's report sustained in part and overruled in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** The State of Texas sued the State of New Mexico, claiming New Mexico breached its obligations under the Pecos River Compact by depleting the flow of the Pecos River. The U.S. Government intervened. The court granted leave to file the complaint and appointed a special master, who recommended that the court appoint a third party to the Pecos River Commission to resolve the dispute and other relief. The Government and New Mexico filed exceptions.

**OVERVIEW:** The Compact provided that New Mexico should not deplete by man's activities the flow of the Pecos River at the New Mexico-Texas state line below an amount that would give to Texas a certain quantity of water. The Compact also established the Commission, which was to be composed of a representative from each State and the Government; the Government's representative was not permitted to vote. Texas alleged that New Mexico breached its obligations under the Compact so as to deplete the flow of the River. The master recommended that to resolve the dispute, either the Government's representative or a third party be

permitted to vote on the Commission and participate in all Commission deliberations. In the alternative, the master recommended the continuance of the suit as presently postured. The court sustained the exceptions to the master's recommendation that another person be permitted to vote on the Commission. Once Congress approved the Compact, it had the force of law and the court was not entitled to order relief inconsistent with its terms. To provide a third, tie-breaking vote on the Commission would fundamentally alter the Commission in contravention of the Compact's terms.

**OUTCOME:** The court sustained the exceptions filed by the Government and New Mexico to the master's recommendation that another party be given a vote on the Commission. The court overruled all other exceptions and returned the case to the master with directions that he determine the unresolved issue of whether New Mexico breached its obligations under the Compact and related questions.

**CORE TERMS:** compact, river, inflow, inflow-outflow, special masters, engineering, shortfall, state-line, outflow, basin, dam, interstate, curve, state line, correlation, original jurisdiction, recommendation, depletion, advisory committee, stream, flood, reservoir, negotiation, measured, quantity of water, apportionment, equitable, acre-feet, ratified, appoint

**LexisNexis(R) Headnotes**

*Constitutional Law > Congressional Duties & Powers >
Contracts Clause > General Overview*
*Governments > State & Territorial Governments >
Relations With Governments*
[HN1] See U.S. Const. art. I, § 10, cl. 3.

*Governments > State & Territorial Governments >
Relations With Governments*
*Governments > State & Territorial Governments >
Water Rights*
*Real Property Law > Water Rights > General Overview*
[HN2] Art. III of the Pecos River Compact provides that
the State of New Mexico shall not deplete by man's
activities the flow of the Pecos River at the New
Mexico-Texas state line below an amount which will give
to the State of Texas a quantity of water equivalent to that
available to Texas under the 1947 condition. The term
"1947 condition" is expressly defined as that situation in
the Pecos River Basin as described and defined in the
Report of the Engineering Advisory Committee, Art.
II(g) of the Pecos River Compact. In turn, the Report
includes basic data, processes, and analyses utilized in
preparing that report, Art. II(f) of the Pecos River
Compact, and "deplete by man's activities" is defined to
include any beneficial consumptive uses of water within
the Pecos River Basin, but excludes diminutions of flow
due to "encroachment of salt cedars" or deterioration of
the channel of the stream, Art. II(e) of the Pecos River
Compact.

*Governments > State & Territorial Governments >
Relations With Governments*
*Governments > State & Territorial Governments >
Water Rights*
*Real Property Law > Water Rights > General Overview*
[HN3] The Pecos River Compact establishes the Pecos
River Commission as a permanent body, in more or less
the same form that it had during the negotiations on the
Compact. It is to have three Commissioners, one from the
State of Texas, one from the State of New Mexico, and
one representing the United States, but the United States
representative can not vote, Art. V(a) of the Pecos River
Compact. Accordingly, the Commission can take official
action only with the concurrence of both state
Commissioners. The Commission is given broad powers
to make all findings of fact necessary to administer the
Compact, Arts. V(d)(5)-(10) of the Pecos River Compact,
as well as to engage in studies of water supplies of the
Pecos River and to collect, analyze, correlate, preserve

and report on data as to the stream flows, storage,
diversions, salvage, and use of the waters of the Pecos
River and its tributaries, Arts. V(d)(3), (4) of the Pecos
River Contract.

*Constitutional Law > Congressional Duties & Powers >
Contracts Clause > General Overview*
*Governments > Federal Government > U.S. Congress*
*Governments > State & Territorial Governments >
Relations With Governments*
[HN4] Under the Compact Clause, two States may not
conclude an agreement without the consent of the United
States Congress. However, once given, congressional
consent transforms an interstate compact within the
Compact Clause into a law of the United States. One
consequence of this metamorphosis is that, unless the
compact to which Congress has consented is somehow
unconstitutional, no court may order relief inconsistent
with its express terms.

*Governments > State & Territorial Governments >
Relations With Governments*
*Governments > State & Territorial Governments >
Water Rights*
*Real Property Law > Water Rights > General Overview*
[HN5] The Pecos River Compact clearly delimits the role
of the United State Commissioner on the Pecos River
Commission. Although the United States Commissioner
must be present at a Commission meeting in order to
provide a quorum and serves as its presiding officer, and
although the engineering advisers to the United States
Commissioner have consistently participated fully in the
work of the various engineering committees and
subcommittees, Art. V(a) of the Compact specifies that
the Commissioner representing the United States shall
not have the right to vote in any of the deliberations of
the Commission. No other third party is given the right to
vote on matters before the Commission. To provide a
third, tie-breaking vote on regular Commission business
would be to alter fundamentally the structure of the
Commission.

*Governments > Federal Government > Employees &
Officials*
*Governments > State & Territorial Governments >
Water Rights*
*Real Property Law > Water Rights > General Overview*
[HN6] Congress may vest a federal official with the

responsibility to administer the division of interstate streams.

*Governments > State & Territorial Governments > Claims By & Against*
*Governments > State & Territorial Governments > Relations With Governments*
*Real Property Law > Water Rights > General Overview*
[HN7] Under the Pecos River Compact, the solution for impasse is judicial resolution of such disputes as are amenable to judicial resolution, and further negotiation for those disputes that are not.

*Governments > State & Territorial Governments > Relations With Governments*
*Governments > State & Territorial Governments > Water Rights*
*Real Property Law > Water Rights > General Overview*
[HN8] The United States Supreme Court expressly refuses to make indefinite appointments of quasi-administrative officials to control the division of interstate waters on a day-to-day basis, even with the consent of the states involved.

*Civil Procedure > Justiciability > Case or Controversy Requirements > General Overview*
*Constitutional Law > The Judiciary > Congressional Limits*
*Governments > State & Territorial Governments > Relations With Governments*
[HN9] There is no doubt that the United States Supreme Court's jurisdiction to resolve controversies between two states, U.S. Const., Art. III, § 2, cl. 1; 28 U.S.C.S. § 1251(a)(1), extends to a properly framed suit to apportion the waters of an interstate stream between states through which it flows, or to a suit to enforce a prior apportionment. It also extends to a suit by one state to enforce its compact with another state or to declare rights under a compact. If there is a compact, it is a law of the United States, and the Court's first and last order of business is interpreting the compact.

*Constitutional Law > Congressional Duties & Powers > Census > Apportionment & Redistricting*
*Governments > State & Territorial Governments > Water Rights*
*Real Property Law > Water Rights > General Overview*

[HN10] Where Congress has so exercised its constitutional power over waters, courts have no power to substitute their own notions of an "equitable apportionment" for the apportionment chosen by Congress. Nevertheless, the mere existence of a compact does not foreclose the possibility that the United States Supreme Court will be required to resolve a dispute between the compacting states.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > General Overview*
*Governments > State & Territorial Governments > Water Rights*
*Real Property Law > Water Rights > General Overview*
[HN11] The United States Supreme Court's equitable power to apportion interstate streams and the power of the states and Congress acting in concert to accomplish the same result are to a large extent complementary.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
*Constitutional Law > The Judiciary > Jurisdiction > General Overview*
*Governments > Legislation > Interpretation*
[HN12] In the absence of an explicit provision or other clear indications that a bargain to that effect was made, the United States Supreme Court shall not construe a compact between states to preclude a state from seeking judicial relief when the compact does not provide an equivalent method of vindicating the state's rights.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Constitutional Law > The Judiciary > Jurisdiction > General Overview*
*Governments > State & Territorial Governments > Claims By & Against*
[HN13] 28 U.S.C.S. § 1251(a) is construed as providing the United States Supreme Court with substantial discretion to make case-by-case judgments as to the practical necessity of an original forum in the Court for particular disputes within its constitutional original jurisdiction. The Court exercises that discretion with an eye to promoting the most effective functioning of the Court within the overall federal system. If authorized representatives of the states to a compact have reached an agreement within the scope of their congressionally

ratified powers, recourse to the Court when one state has second thoughts is hardly necessary for the state's protection.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > General Overview*
*Governments > State & Territorial Governments > Relations With Governments*
*Governments > State & Territorial Governments > Water Rights*
[HN14] Absent extraordinary cause, the United States Supreme Court shall not review the Pecos River Commission's actions without a more precise mandate from Congress than either the Pecos River Compact or 28 U.S.C.S. § 1251 provides.

*Governments > State & Territorial Governments > Relations With Governments*
*Governments > State & Territorial Governments > Water Rights*
*Real Property Law > Water Rights > General Overview*
[HN15] See Article VI of the Pecos River Compact.

**DECISION:**

Supreme Court held not authorized under Pecos River Compact to designate third party to cast tie-breaking votes on Pecos River Commission's water allocation disputes.

**SUMMARY:**

Texas and New Mexico entered into an agreement, known as the Pecos River Compact, which governed the allocation of the waters of the Pecos River Basin between the two states. The Compact, which was approved by Congress, provided in part that New Mexico was not to deplete by man's activities the flow of the river at the state line below that which would give Texas a quantity of water equivalent to that which was available to Texas under certain consumption conditions existing in 1947. Under the Compact, an "Inflow-Outflow Manual" was used to determine how much water Texas should expect to receive over any particular period under the 1947 conditions. The Compact also established the Pecos River Commission to resolve water allocation disputes by the unanimous vote of the two voting members representing their respective states, with a third non-voting member representing the United States. It later became apparent

that the Inflow-Outflow Manual did not accurately describe the actual state of the river, the flow of water at the state line almost every year being significantly below the amount predicted. The Commission was unable to agree on the appropriate method for determining annual shortfalls of water flow. Texas then invoked the original jurisdiction of the United States Supreme Court, alleging in its complaint that New Mexico had breached its obligations under the Compact by allowing man's activities to deplete the water available from the flow of the river at the state line below that which was available under the 1947 conditions, and seeking a decree ordering New Mexico to deliver water in accordance with the Compact. The United States intervened to protect its own claims to the Pecos River waters under the Compact. The Supreme Court granted leave to file the complaint (44 L Ed 2d 84), and appointed a Special Master (46 L Ed 2d 274). The Special Master, in his first report to the court, concluded that a new Inflow-Outflow Manual was required in order to provide an accurate description of the conditions existing in 1947. The Supreme Court approved the report in full (64 L Ed 2d 485). The Special Master then recommended in a later report that in order to resolve the water allocation issues, the Supreme Court should appoint a third party to participate in all Commission deliberations and cast the tie-breaking vote whenever the two Commissioners could not agree. The Special Master also rejected a motion by New Mexico to dismiss the case, and one by Texas to adopt a simpler method than provided by the Inflow-Outflow Manual for determining the extent of shortfalls in state-line water deliveries.

On exceptions to the report of the Special Master, the United States Supreme Court sustained in part and overruled in part, and returned the case to the Special Master for a final decision on whether New Mexico was in compliance with obligations imposed by the Pecos River Compact. In an opinion by Brennan, J., expressing the unanimous view of the court, it was held that (1) the Supreme Court could not order a third party to be designated and empowered to participate in all Commission deliberations and cast the tie-breaking vote when necessary, since it would be inconsistent with the express terms of the Compact, (2) it was within the original jurisdiction of the Supreme Court under Article III, 2, cl 1 of the United States Constitution and 28 USCS 1251(a) to resolve by equitable apportionment the dispute between the two states regarding the allocation of the Pecos River Basin waters under the Compact, since the

express terms of the Compact did not make the Commission the sole arbiter of those disputes, and the lack of jurisdiction would leave the court powerless to grant Texas relief on its claim, and (3) the Supreme Court could not adopt the simplified method for determining water flow shortfalls, since the Commission had not adopted it or any other feasible method as an alternative to replace the inflow-outflow method, and the simplified method was not similar enough to the inflow-outflow method.

**LAWYERS' EDITION HEADNOTES:**

POSSESSIONS §58 ;

compact between states -- water rights -- resolution of disputes -- ;

Headnote:[1A][1B]

The United States Supreme Court cannot order that a third party be designated and empowered to participate in all deliberations of the Pecos River Commission and cast the tie-breaking vote when the two Commission members are not in agreement concerning the allocation of the waters of the Pecos River Basin between the two states they respectively represent pursuant to the Pecos River Compact that was entered into between the two states and approved by Congress, since the order would be inconsistent with the express terms of the Compact, the effect of the provision of a third, tie-breaking vote on regular Commission business being to alter fundamentally the structure of the Commission.

POSSESSIONS §58

STATES §58 ;

original jurisdiction -- compact between states -- water rights -- resolution of dispute -- ;

Headnote:[2A][2B][2C]

It is within the original jurisdiction of the United States Supreme Court under Article III, 2, cl 1 of the United States Constitution and 28 USCS 1251(a) to resolve by equitable apportionment the dispute of two states regarding the allocation of the waters of the Pecos River Basin pursuant to the Pecos River Compact that was entered into by the two states and approved by

Congress, since the lack of such jurisdiction would leave the court powerless to grant one of the states relief on its claim under the Compact, and the express terms of the Compact do not establish the Pecos River Commission as the sole arbiter of these disputes between the two states.

POSSESSIONS §58 ;

compact between states -- water rights -- method of measurement -- ;

Headnote:[3A][3B]

The United States Supreme Court may not order the adoption of a "double mass analysis" method for determining when a shortfall has occurred in the amount of water from the Pecos River Basis that a state is entitled to under the Pecos River Compact that was entered into between two states and approved by Congress, where the Pecos River Commission, which was established under the Compact to resolve disputes regarding the allocation of the waters, has not adopted that method, although it is entitled to do so, and the "double mass analysis" method is not similar enough to the "inflow-outflow method" established by the Compact, the Commission not having adopted a more feasible method as allowed by the Compact to replace the inflow-outflow method.

POSSESSIONS §58;

compact clause -- state compacts -- consent of Congress -- effect -- ;

Headnote:[4]

Under the compact clause found in Article 1, 10, cl 3 of the United States Constitution, two states may not without the consent of Congress conclude an agreement, such as the Pecos River Compact, which was agreed to in order to allocate the waters of Pecos River Basin between two states, but once given, congressional consent transforms the interstate compact within this clause into a law of the United States.

COURTS §111

POSSESSIONS §59 ;

compact between states -- congressional consent -- judicial relief -- ;

Headnote:[5]

Unless a compact between two states to which Congress has consented is somehow unconstitutional, no court may order relief inconsistent with its express terms.

WATERS §18.5 ;

division of interstate streams -- administration -- power of Congress -- ;

Headnote:[6]

Congress may vest a federal official with responsibility to administer the division of interstate streams.

COURTS §120

POSSESSIONS §58 ;

compact between states -- water rights -- failure to resolve disputes -- ;

Headnote:[7]

The failure of two states to agree on one issue, however important, does not render void the Pecos River Compact, which was established to allocate between the states the waters of the Pecos River Basin, and by which the Pecos River Commission was created to resolve disputes pursuant to the unanimous vote of the two voting members representing their respective states, and neither does it provide a justification for altering its structure by judicial decree.

POSSESSIONS §58

REFERENCE §2 ;

compact between states -- water rights -- appointment of master -- ;

Headnote:[8]

The United States Supreme Court will not appoint a master to control the diversion, storage and use of the Pecos River Basin waters within the State of New Mexico, the allocation of those waters being governed by the Pecos River Compact that was entered into between

two states and approved by Congress, since continuing supervision by the court of water decrees would test the limits of proper judicial function.

STATES §54.5;

jurisdiction suits between states -- water rights -- compacts -- ;

Headnote:[9A][9B]

The United States Supreme Court's jurisdiction to resolve controversies between two states pursuant to Article III, 2, cl 1 of the United States Constitution and 28 USCS 1251(a) extends to a properly framed suit to apportion the waters of an interstate stream between states through which it flows, or to a suit to enforce a prior apportionment, even though litigation of such disputes is a poor alternative to negotiations between the interested states, and also extends to a suit by one state to enforce its compact with another state or to declare rights under a compact.

COURTS §120 ;

equitable apportionment between states -- congressional power -- ;

Headnote:[10]

Courts have no power to substitute their own notions of an equitable apportionment of waters between states for the apportionment chosen by Congress, where Congress has exercised its constitutional power over waters.

STATES §58

WATERS §18.5 ;

interstate streams -- equitable apportionment -- ;

Headnote:[11]

The equitable power of the United States Supreme Court to apportion interstate streams and the power of the states and Congress acting in concert to accomplish the same result are to a large extent complementary.

POSSESSIONS §58 ;

compact between states -- water rights -- dispute -- judicial resolution -- ;

Headnote:[12]

In the absence of an explicit provision or other clear indications that one state has agreed to trade away its right to seek an equitable apportionment of a river in return for a promise that the other state could avoid at will, the United States Supreme Court will not construe a compact between the states to preclude a state from seeking judicial relief when the compact does not provide an equivalent method of vindicating the state's rights.

POSSESSIONS §58

STATES §58 ;

compact between states -- water rights -- administrative action -- judicial review -- ;

Headnote:[13]

Without a more precise mandate from Congress than is provided by the Pecos River Compact or 28 USCS 1251, the United States Supreme Court, absent extraordinary cause, will not in its discretion under 1251(a) review the actions of the Pecos River Commission, which was created by the Compact to resolve disputes concerning the allocation of the waters of the Pecos River Basin between the compacting states, such review not being necessary for a state's protection, where both Commission members representing their respective states must first vote to approve the action.

STATES §54 ;

original jurisdiction -- disputes between states -- ;

Headnote:[14A][14B]

The model case for invocation of the United States Supreme Court's original jurisdiction is a dispute between states of such seriousness that it would amount to "casus belli" if the states were fully sovereign.

**SYLLABUS**

The Pecos River Compact was entered into by Texas

and New Mexico (and approved by Congress) to govern allocation of the waters of the Pecos River, which rises in New Mexico and flows into Texas. Article III(a) of the Compact requires that New Mexico "not deplete by man's activities the flow of the Pecos River at the New Mexico-Texas state line below an amount which will give to Texas a quantity of water equivalent to that available to Texas under the 1947 condition." The Compact establishes the Pecos River Commission (Commission) -- consisting of one Commissioner from each State and a nonvoting representative of the United States -- and empowers it to make all findings of fact necessary to administer the Compact. The two voting Commissioners were unable to agree when a dispute arose between the States concerning the methods for determining annual shortfalls of state-line water flow with regard to Texas' right to receive as much water as it would have received under the consumption conditions prevailing in New Mexico in 1947. Texas filed this action against New Mexico (the United States intervened to protect its claims on the waters of the river), alleging that New Mexico had breached its obligations under Art. III(a) of the Compact and seeking a decree commanding New Mexico to deliver water in accordance with the Compact. This Court appointed a Special Master, who ultimately filed the report involved here, and the parties filed various exceptions thereto.

*Held*:

1. Exceptions of the Government and New Mexico to the Master's recommendation that either the United States Commissioner or some other third party be given a vote on the Commission and be empowered to participate in all Commission deliberations are sustained. Once congressional consent is given to an interstate compact as required by the Compact Clause, the compact is transformed into a law of the United States, and unless the compact is unconstitutional, no court may order relief inconsistent with its express terms. Here, the Compact provides that the Government Commissioner shall not have the right to vote, and no other third party is given the right to vote on matters before the Commission. This Court cannot rewrite the Compact so as to provide for a third, tie-breaking vote. Moreover, the Court's equitable powers have never been exercised so as to appoint quasi-administrative officials to control the division of interstate waters on a day-to-day basis. Pp. 564-566.

2. New Mexico's exception to the Master's

alternative recommendation to continue the suit as presently postured is overruled, and the recommendation is accepted. There is no merit to New Mexico's contention that this Court may do nothing more than review the Commission's official actions, and that the case should be dismissed if it is found either that there is no Commission action to review or that actions taken by the Commission were not arbitrary or capricious. This Court's original jurisdiction to resolve controversies between two States extends to a suit by one State to enforce its compact with another State or to declare rights under a compact. Here, fundamental structural considerations of the Compact militate against New Mexico's theory, since if all questions under the Compact had to be decided by the Commission in the first instance, New Mexico could indefinitely prevent authoritative Commission action solely by exercising its veto on the Commission. Nor do the Compact's express terms constitute the Commission as the sole arbiter of disputes over New Mexico's Art. III obligations. Moreover, if authorized representatives of the compacting States have reached an agreement on action to be taken by the Commission, this Court will not review the Commission's action at the behest of one of the States absent extraordinary cause or a precise mandate from Congress. Pp. 566-571.

3. Texas' exception to the Master's recommendation against approval of Texas' motion to adopt a so-called "Double Mass Analysis" method for determining when a shortfall in state-line flows has occurred is overruled. The Compact provides that until the Commission adopts a more feasible method, an "inflow-outflow method" shall be used to measure state-line shortfalls. The "Double Mass Analysis" is not close enough to what the Compact terms an "inflow-outflow method, as described in the Report of the Engineering Advisory Committee" to make it acceptable for use in determining New Mexico's compliance with its Art. III obligations. While the Compact leaves the Commission free to adopt the "Double Mass Analysis," this Court may not apply it against New Mexico in the absence of Commission action. Pp. 571-574.

**COUNSEL:** R. Lambeth Townsend, Assistant Attorney General of Texas, argued the cause for plaintiff. With him on the briefs were Mark White, Attorney General, John W. Fainter, Jr., First Assistant Attorney General, Richard E. Gray III, Executive Assistant Attorney General, and Frank R. Booth.

Charlotte Uram, Special Assistant Attorney General of New Mexico, argued the cause for defendant. With her on the briefs were Paul G. Bardacke, Attorney General, Jeff Bingaman, former Attorney General, and Peter Thomas White, Special Assistant Attorney General.

Solicitor General Lee, Deputy Solicitor General Claiborne, and John H. Garvey filed a brief for the United States.

**JUDGES:** BRENNAN, J., delivered the opinion for a unanimous Court.

**OPINION BY:** BRENNAN

**OPINION**

[*556] [***7] [**2561] JUSTICE BRENNAN delivered the opinion of the Court.

[***LEdHR1A] [1A] [***LEdHR2A] [2A] [***LEdHR3A] [3A]For the second time we consider exceptions to a report of the Special Master in this case. The States of Texas and New Mexico and the United States have filed exceptions to a report submitted by the Special Master on September 10, 1982 (1982 Report). We sustain an exception in which both New Mexico and the United States concur, overrule all other exceptions, and return the case to the Special Master for a final decision on the basic issue in dispute -- whether New Mexico is in compliance with obligations imposed by the Pecos River Compact.

I

The Pecos River rises in north-central New Mexico and flows in a southerly direction into Texas until it joins the Rio Grande near Langtry, Tex. [1] It is the principal river in eastern New Mexico, draining roughly one-fifth of the State, and it is a major tributary of the Rio Grande.

> 1  From north to south, the Pecos River flows past Pecos and Santa Rosa, N. M., and then into the Alamogordo Reservoir above Alamogordo (or Sumner) Dam. It then passes Fort Sumner and traverses a relatively desolate region in the central part of the State. From Acme to Artesia, in the area around Roswell, the river is fed by a large, slowly flowing aquifer. Below Artesia, the river passes through a set of deltas and lakes formed by the now-deteriorated McMillan and Avalon

Dams, then flows past Carlsbad and into the Red Bluff Reservoir, which straddles the state line and is used to regulate the river in Texas.

[*557] Due in large part to many natural difficulties, [2] the Pecos barely supports a level of development reached in the first third of this century. If development in New Mexico were not restricted, especially the [**2562] groundwater pumping near Roswell, no water at all might reach Texas in many years. As things stand, the amount of water Texas receives in [***8] any year varies with a number of factors besides beneficial consumption in New Mexico. These factors include, primarily, precipitation in the Pecos Basin over the preceding several years, evaporation in the McMillan and Alamogordo Reservoirs, and nonbeneficial consumption of water by salt cedars and other riverbed vegetation.

2    In its natural state, the Pecos may dry up completely for weeks at a time over fairly long reaches in central New Mexico. Much of its annual flow comes in flash floods, carrying with them great quantities of topsoil that both progressively destroy reservoirs, by silting, and render the river's waters quite saline. The nonflood "base" flow of the Pecos below Alamogordo Dam is supplied to a large part by groundwater aquifers that empty into the river in the reach between Acme and Artesia, N. M. The operation of these aquifers is little understood. They are depleted by pumping from wells in the Roswell area, and there is some suggestion that at times heavy groundwater pumping in the area around Roswell may actually reverse the direction of flow of the underground aquifer, so that water flows away from the river. See Texas' Brief on the 1947 Condition (filed Aug. 21, 1978), p. 34. In addition, a steady stream of underground brine enters the river at Malaga Bend, some 10 miles above the Texas border, severely impairing the quality of water that reaches Texas when the river is low. Salt cedars, which consume large amounts of water, proliferate along its channel and in the silt deposits at the heads of its reservoirs.

A

After 20 years of false starts, [3] in 1945 Texas and New Mexico commenced negotiations on a compact to allocate the [*558] waters of the Pecos Basin. A

Compact Commission was formed, consisting of three Commissioners, representing the two States and the United States. In January 1948, the Compact Commission's engineering advisory committee submitted a lengthy report (1947 Study), the central portion of which was a set of river routing studies describing six "conditions" of the Pecos, one of which consisted of the actual conditions as of the beginning of 1947. [4] Each of the studies was embodied in a 41-column table accounting for all known inflows and outflows of water on the river during each of the years between 1905 and 1946. [5] The engineering advisory committee also drafted a Manual of Inflow-Outflow Methods [*559] of Measuring Changes in Stream-Flow Depletion (1948) (Inflow-Outflow Manual), which contained charts and tables, derived from data in the 1947 Study, to be used in determining how much water Texas should expect to receive over any particular period for any particular levels of precipitation, under the consumption conditions prevailing in New Mexico in 1947.

3    In 1925, the States negotiated a compact for regulating the river. It was approved by both state legislatures, but the Governor of New Mexico vetoed its bill. In the early 1930's, the Texas congressional delegation succeeded in holding up federal funding for construction of the Alamogordo Dam until New Mexico agreed to ensure that Texas received the same portion of flood flows originating above Avalon Dam that it had received during the period from 1905 to 1935. This agreement was signed in 1935 by the Secretary of the Interior, the United States Senators from both States, and representatives of the irrigation districts concerned, and it was formally ratified by the Texas Legislature but never by the New Mexico Legislature. New Mexico did, however, sharply restrict groundwater pumping in the Roswell area in 1937, thus restoring to some extent the base flow of the river.

4    The six "conditions" studied by the engineering committee represented various combinations of historical facts from different periods and hypothetical assumptions about the existence, condition, and operation of the dams and irrigation projects that had been built since 1905. See S. Doc. No. 109, 81st Cong., 1st Sess., 9-11 (1949) (S. Doc. 109). The only one material to the Compact as adopted is the "1947

condition," which assumed actual conditions as of 1947, with some additional use by the Carlsbad and Fort Sumner projects.

5   For instance, on each table column 14 showed depletion by pumps between Acme and Artesia, column 15 showed inflows from aquifers in the same reach, and column 16 showed depletion by salt cedars. Some of the entries in the tables could be inferred more or less easily from observed data -- *e. g.*, the flow of the river past specific gauges, or diversions to irrigation projects. Others, such as the entries for salt-cedar depletions or evaporation from each reservoir, could only be estimated, albeit with some degree of reliability. However, many entries -- *e. g.*, the three columns showing "flood inflows" and the two columns entitled "channel losses" -- required a great deal of speculation, and to some extent they may have been used as residual categories to "balance the books." See S. Doc. 109, at 41-42; Report of Review of Basic Data to Engineering Advisory Committee, Pecos River Commission 24 (1960) (stipulated exhibit No. 8) (Review of Basic Data).

On the basis of the 1947 Study and the Inflow-Outflow Manual, the [***9] two States successfully negotiated the Pecos River Compact. It was signed by the Commissioners from both States on December 3, 1948, and thereafter ratified by both state legislatures and -- as required under the Compact Clause of the Constitution [6] -- approved by Congress. Ch. 184, 63 Stat. 159. The 1947 Study and the Inflow-Outflow Manual were [**2563] incorporated into S. Doc. 109, and they unquestionably provided the basis upon which Congress approved the Compact, see S. Rep. No. 409, 81st Cong., 1st Sess. (1949).

6   [HN1] "No State shall, without the Consent of Congress, . . . Compact with another State, or with a foreign Power . . . ." U.S. Const., Art. I, § 10, cl. 3.

The crucial substantive provision of the Pecos River Compact is found at Art. III(a): [HN2] "New Mexico shall not deplete by man's activities the flow of the Pecos River at the New Mexico-Texas state line below an amount which will give to Texas a quantity of water equivalent to that available to Texas under the 1947 condition." The term "1947 condition" was expressly

defined as "that situation in the Pecos River Basin as described and defined in the Report of the Engineering Advisory Committee." Art. II(g). In turn, the Report was defined to include "basic data, processes, and analyses utilized in preparing that report," Art. II(f), and "deplete by man's activities" was defined to include any "beneficial consumptive uses of water within the Pecos River Basin," but to exclude diminutions of flow due to "encroachment of [*560] salt cedars" or "deterioration of the channel of the stream," Art. II(e).

[HN3] The Compact also established the Pecos River Commission as a permanent body, in more or less the same form that it had during the negotiations on the Compact. It was to have three Commissioners, one from each State and one representing the United States, but the United States representative could not vote. Art. V(a). Accordingly, the Commission could take official action only with the concurrence of both state Commissioners. The Commission was given broad powers to make all findings of fact necessary to administer the Compact, Arts. V(d)(5)-(10), as well as to "[engage] in studies of water supplies of the Pecos River" and to "[collect], analyze, correlate, preserve and report on data as to the stream flows, storage, diversions, salvage, and use of the waters of the Pecos River and its tributaries," Arts. V(d)(3), (4). [7]

7   Further relevant provisions in Arts. V and VI are discussed *infra*, at 568, n. 14, 571-572.

For roughly 15 years, the Pecos River Commission functioned more or less as had been contemplated in the Compact. It met regularly, passed resolutions, and undertook studies of various questions of importance to those who use the waters of the Pecos. The apparent harmony that characterized the Commission in those years, however, seems largely to have been the result of a tacit agreement to defer disagreement on a problem of serious magnitude. For it became clear soon after the Compact went into effect that the 1947 Study and, more importantly, the tables in the Inflow-Outflow Manual did not describe the actual state of the river. In almost every year following adoption of the Compact, state-line flows were significantly [***10] below the amount that one would have predicted on the basis of the Inflow-Outflow Manual, with no obvious change either in natural conditions along the river or in "man's activities."

The initial response of the Commission to this problem was to authorize, in 1957, an ambitious "Review

of Basic Data," [*561] which would essentially retrace the steps of the engineering committee's 1947 Study to provide a more accurate description of the "1947 condition." The Review of Basic Data was presented to the Commission in 1960; it essentially duplicated the 1947 Study, but using different periods of time, revised records, a number of different assumptions, and different hydrological and mathematical procedures. The Commission took no action on the Review of Basic Data until two years later, when it directed the engineering committee to proceed with a draft of a new Inflow-Outflow Manual, and adopted as findings of fact a set of figures derived from the new study showing that the cumulative shortfall of state-line flows for the years 1950-1961 was approximately 53,000 acre-feet. [8]

> [8] This figure was far less than the shortfall that would have been found had the tables in the original Inflow-Outflow Manual been used. The Commission did not determine whether any difference between expected flows and actual flows was due to "man's activities" in New Mexico, and later engineering committee reports indicated that adjustments to the 1950-1961 figures were contemplated.

[**2564] This was essentially the Commission's last action with respect to the all-important question of Texas' right under the Compact to receive as much water as it would have received under the "1947 condition." [9] Disputes that had been deferred and avoided in the past now surfaced. They came to a head at a special meeting of the Commission in July 1970, at which the Texas Commissioner stated his position that, calculated according to the original Inflow-Outflow Manual, there had been a cumulative shortfall in state-line flows of 1.1 million [*562] acre-feet for the years 1950-1969, that the Review of Basic Data was "incomplete and replete with errors," and that Texas had a right to an annual determination of departures in state-line flows under the original assumptions of the 1947 Study until the Commission adopted a different method. Thereafter, the Texas and New Mexico staffs prepared different reports in 1971 and 1974 on cumulative shortfalls under the "1947 condition," with Texas relying on the original Inflow-Outflow Manual and New Mexico on the Review of Basic Data. Attempts to mediate between the two positions failed, and the Commission took no action for lack of agreement between the two voting Commissioners.

[9] The Commission did not meet at all between January 1967 and November 1968, during which period the identities of four key persons changed. Both the Texas Commissioner (first appointed immediately after the Compact was ratified) and the Engineering Advisor to the United States Commissioner (also chairman of the engineering committee and principal author of the 1947 Study and Inflow-Outflow Manual) died. The New Mexico and United States Commissioners (the latter an important force in the original compact negotiations) retired. Thus, by late 1968, administration of the Compact was largely in the hands of people with no personal connection to the Commission's early work.

B

In June 1974, Texas invoked the original jurisdiction of this Court [***11] under Art. III, § 2, cl. 2, of the United States Constitution and 28 U. S. C. § 1251. Its bill of complaint alleged that New Mexico had breached its obligations under Art. III(a) of the Compact "by countenancing and permitting depletions by man's activities within New Mexico to the extent that from 1950 through 1972 there has occurred a cumulative departure of the quantity of water available from the flow of the Pecos River at the Texas-New Mexico State Line in excess of 1,200,000 acre-feet from the equivalent available under the 1947 condition . . . ." Texas sought a decree commanding New Mexico to deliver water in accordance with the Compact. The United States intervened to protect its own claims on the waters of the Pecos River, which had been preserved in Arts. XI-XII of the Compact. We granted leave to file the complaint, 421 U.S. 927 (1975), and appointed a Special Master, 423 U.S. 942 (1975).

In 1979, the Special Master made his first report to this Court. In that report, he recommended that we reject Texas' position that the phrase "1947 condition" in Art. III(a) of the Compact should be taken to mean an artificial condition [*563] as described by the 1947 Study embodied in S. Doc. 109, however erroneous the data in that study might have been. Instead, he concluded that "[the] 1947 condition is that situation in the Pecos River Basin which produced in New Mexico the man-made depletions resulting from the stage of development existing at the beginning of the year 1947 . . . .," and that a new Inflow-Outflow Manual was required.

1979 Report 41. We approved the report in full. 446 U.S. 540 (1980).

Over the following two years, the Special Master received evidence on the question of what corrections to the 1947 Study and the Inflow-Outflow Manual were required to produce an accurate description of the 1947 condition, and thus of New Mexico's obligations under Art. III(a) of the Compact. In his 1982 Report, however, he concluded that resolution of these issues [**2565] would require that we "exercise administrative powers delegated to the [Pecos River Commission]" and that "such exercise of administrative power is beyond the judicial function." 1982 Report 27. Recognizing that the Commission would be unlikely to act by unanimous vote of both State Commissioners, and that continued impasse favored the upstream State, the Special Master recommended:

"[The] equity powers of the Court are adequate to provide a remedy. If within a reasonable time . . . the States do not agree on a tie-breaking procedure, the Court would be justified in ordering . . . that either the representative of the United States, or some other third-party, be designated and empowered to participate in all Commission deliberations and act decisively when the States are not in agreement. The order should provide that the decision of the tie-breaker is final, subject only to appropriate review by the Court. Upon the selection of a tie-breaker, the States should be ordered to return to the Commission for determination of this long-standing controversy." *Id*., at 26.

[*564] At the same time, the Special Master rejected two pending motions, [***12] one by New Mexico for dismissal of the case altogether, and one by Texas to adopt a simpler method than the Inflow-Outflow Manual provides for determining the extent of shortfalls in state-line water deliveries.

II

Both the United States and New Mexico have filed exceptions to the Special Master's key recommendation -- that either the United States Commissioner or some other third party be given a vote on the Pecos River Commission and empowered to participate in all Commission deliberations. We sustain their exceptions.

[***LEdHR1A] [1B] [***LEdHR4] [4] [***LEdHR5] [5][HN4] Under the Compact Clause, two States may not conclude an agreement such as the Pecos River Compact without the consent of the United States Congress. However, once given, "congressional consent transforms an interstate compact within this Clause into a law of the United States." *Cuyler* v. *Adams*, 449 U.S. 433, 438 (1981); see *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 13 How. 518, 566 (1852).One consequence of this metamorphosis is that, unless the compact to which Congress has consented is somehow unconstitutional, no court may order relief inconsistent with its express terms. Yet that is precisely what the Special Master has recommended. [HN5] The Pecos River Compact clearly delimits the role of the United State Commissioner. Although the United States Commissioner must be present at a Commission meeting in order to provide a quorum and serves as its presiding officer, and although the engineering advisers to the United States Commissioner have consistently participated fully in the work of the various engineering committees and subcommittees, Art. V(a) of the Compact specifies that "the Commissioner representing the United States . . . shall not have the right to vote in any of the deliberations of the Commission." No other third party is given the right to vote on matters before the Commission. To [*565] provide a third, tie-breaking vote on regular Commission business would be to alter fundamentally the structure of the Commission.

[***LEdHR6] [6][HN6] Congress may vest a federal official with the responsibility to administer the division of interstate streams. See *Arizona* v. *California*, 373 U.S. 546, 564-567 (1963).Other interstate compacts, approved by Congress contemporaneously with the Pecos River Compact, allow federal representatives a vote on compact-created commissions, or expressly provide for arbitration by federal officials of commission disputes. *E. g*., Upper Colorado Basin Compact, 63 Stat. 31, 35-37; Arkansas River Compact, 63 Stat. 145, 149-151; Yellowstone River Compact, 65 Stat. 663, 665-666. The Pecos River Compact clearly lacks the features of these other compacts, and we are not free to rewrite it.

[**2566] [***LEdHR7] [7]Without doubt, the structural likelihood of impasse on the Pecos River Commission is a serious matter. In light of other States' experience, Texas and New Mexico might well consider amending their Compact to provide for some mutually acceptable method for resolving paralyzing impasses such as the one that gave rise to this suit. Nevertheless, [***13] the States' failure to agree on one issue, however

important, does not render the Compact void, nor does it provide a justification for altering its structure by judicial decree. The Commission *has* acted on many matters by unanimous vote. [10] We cannot say whether unanimity would have been achieved had a tie breaker stood ready to endorse one State's position over the other's. [HN7] Under the Compact as it now stands, the solution for impasse is judicial resolution of such disputes as are amenable to judicial resolution, and further negotiation for those disputes that are not. See *infra*, at 569-571.

> 10    For instance, the Commission has taken a number of concrete actions with regard to salt-cedar eradication and salinity alleviation, especially at Malaga Bend. Furthermore, it has participated in and coordinated studies of various features of the river, and it has maintained the numerous gauges and other equipment used in such studies.

[*566]   [***LEdHR8] [8]Texas, in support of the Special Master's recommendation, argues that reformation of the Compact is within this Court's equitable powers. Indeed, in its complaint Texas specifically requested that we appoint a Master "to control the diversion, storage and use of [the] Pecos River Basin waters within the State of New Mexico"; given the scope of the Commission's mandate, a tie breaker on the Commission would be the functional equivalent of such a Master. Texas has not, however, identified a single instance where we have granted similar relief. [11] [HN8] We have expressly refused to make indefinite appointments of quasi-administrative officials to control the division of interstate waters on a day-to-day basis, even with the consent of the States involved. *E. g., Vermont* v. *New York*, 417 U.S. 270 (1974); *Wisconsin* v. *Illinois*, 289 U.S. 710, 711 (1933). Continuing supervision by this Court of water decrees would test the limits of proper judicial functions, and we have thought it wise not to undertake such a project. *Vermont* v. *New York, supra*, at 277.

> 11    On occasion in the past, before the device of appointing special masters in original jurisdiction cases became common, we have gone so far as to appoint a commission with broad powers to resolve factual questions in a controversy between two States, see *Iowa* v. *Illinois*, 147 U.S. 1 (1893), but even then we declined to accept the

commission's decisions without providing the States an opportunity to challenge them, see *Iowa* v. *Illinois*, 151 U.S. 238 (1894). We have, however, been willing to appoint a River Master solely to perform ministerial tasks. *New Jersey* v. *New York*, 347 U.S. 995, 1002-1004 (1954).

### III

In the alternative, the Special Master recommends "continuance of [this] suit as presently postured." 1982 Report 28. New Mexico excepts to this recommendation insofar as it embodies a certain conception of this Court's role in resolving the present dispute. It contends that this Court may do nothing more than review official actions of the Pecos River Commission, on the deferential model of judicial review of administrative action by a federal agency, and that this case [*567] should be dismissed if we find either that there is no Commission action to review or that the actions the Commission has taken were not arbitrary or capricious. Thus, in New Mexico's view, this suit may be maintained only as one for judicial review of the Commission's [***14] quantification of the 1950-1961 shortfall, and the implied acceptance of the Review of Basic Data which, New Mexico argues, that entailed. [12] According to New [**2567] Mexico, "[this] Court has no authority to act *de novo* or assume the powers of the Pecos River Commission." Motion of New Mexico to Recommend Final Decree (filed Feb. 19, 1982), p. 2. We disagree.

> 12    We note that the Special Master's 1979 Report, which we approved, decisively rejected New Mexico's argument that the Pecos River Commission in fact adopted the Review of Basic Data, but that same report did not suggest that we dismiss this action. See 1979 Report 40-41, 44. Thus, at least by implication, the argument New Mexico now advances was also rejected. New Mexico did not object to those portions of the Special Master's Report, although it did object to others. New Mexico's Objections to the Report of the Special Master and Brief (filed Nov. 29, 1979).

[***LEdHR9A] [9A] [***LEdHR10] [10][HN9] There is no doubt that this Court's jurisdiction to resolve controversies between two States, U.S. Const., Art. III, § 2, cl. 1; 28 U. S. C. § 1251(a)(1), extends to a properly

framed suit to apportion the waters of an interstate stream between States through which it flows, *e. g., Kansas* v. *Colorado*, 185 U.S. 125, 145 (1902), or to a suit to enforce a prior apportionment, *e. g., Wyoming* v. *Colorado*, 298 U.S. 573 (1936).[13] It also extends to a suit by one State to enforce its compact with another State or to declare rights under a compact. *Virginia* v. *West Virginia*, 206 U.S. 290, 317-319 (1907); cf. *West Virginia ex rel. Dyer* v. *Sims*, 341 U.S. 22, 30 (1951) (jurisdiction to interpret a compact on writ of certiorari); *Green* v. *Biddle*, 8 Wheat. 1, 91 (1823). If there is a compact, it is a law of the United States, see *supra*, at 564, and our first and last order of business is interpreting the [\*568] compact. [HN10] "Where Congress has so exercised its constitutional power over waters, courts have no power to substitute their own notions of an 'equitable apportionment' for the apportionment chosen by Congress." *Arizona* v. *California*, 373 U.S., at 565-566. Nevertheless, as *Virginia* v. *West Virginia* proves, the mere existence of a compact does not foreclose the possibility that we will be required to resolve a dispute between the compacting States.

> 13 [\*\*\*LEdHR9A] [9B]That jurisdiction exists even though litigation of such disputes is obviously a poor alternative to negotiation between the interested States. See *Vermont* v. *New York*, 417 U.S. 270, 277-278 (1974); *infra*, at 575-576.

[\*\*\*LEdHR2A] [2B]The question for decision, therefore, is what role the Pecos River Compact leaves to this Court. The Compact itself does not expressly address the rights of the States to seek relief in the Supreme Court, although it clearly contemplates some independent exercise of judicial authority. [14] Fundamental [\*\*\*15] structural considerations, however, militate against New Mexico's theory. First, if all questions under the Compact had to be decided by the Commission in the first instance, New Mexico could indefinitely prevent authoritative Commission action solely by exercising its veto on the Commission. As New Mexico is the upstream State, with effective [\*569] power to deny water altogether to Texas except under extreme flood conditions, the Commission's failure to take action to enforce New Mexico's obligations under Art. III(a) would invariably work to New Mexico's [\*\*2568] benefit. [15] Under New Mexico's interpretation, this Court would be powerless to grant Texas relief on its claim under the Compact.

14 Article V(f) provides: "Findings of fact made by the Commission shall not be conclusive in any court, or before any agency or tribunal, but shall constitute prima facie evidence of the facts found." That language is ambiguous as to the role of the Supreme Court, but an earlier version of Art. V(f) -- one that was proposed by New Mexico -- sheds further light: "The findings of the Commission shall not be conclusive in any court or tribunal which may be called upon to interpret or enforce this Compact." Minutes of Meeting of the Pecos River Compact Commission, Sept. 28, 1943, p. 11 (proposed Art. XII, para. 4). Since the only parties with rights and duties to be enforced under any draft of the Compact were the United States and the two signatory States, it is clear that the New Mexico draft reflected the assumption that this Court might be called upon to enforce the Compact. Article V(f) assumed its present from at a late stage in the negotiations and with no discussion on the record; its change was most likely due to the efforts of a federal drafting expert brought in after all significant disputes had been resolved, see Pecos River Compact Commission Meeting, Nov. 8-13, 1948, p. 61, reprinted in S. Doc. 109, at 101. In the light of the other factors discussed in text, we need not consider whether, standing alone, this history would be dispositive.

15 Cf. *Kansas* v. *Colorado*, 206 U.S. 46, 117 (1907). See also Frankfurter & Landis, The Compact Clause of the Constitution -- A Study in Interstate Adjustments, 34 Yale L. J. 685, 701 (1925) ("[One] answer is clear: no one State can control the power to feed or to starve, possessed by a river flowing through several States"); Bannister, Interstate Rights in Interstate Streams in the Arid West, 36 Harv. L. Rev. 960, 979-980 (1923) (describing practice in international law).

[\*\*\*LEdHR2A] [2C] [\*\*\*LEdHR11] [11] [\*\*\*LEdHR12] [12]If it were clear that the Pecos River Commission was intended to be the exclusive forum for disputes between the States, then we would withdraw. But the express terms of the Pecos River Compact do not constitute the Commission as the sole arbiter of disputes between the States over New Mexico's Art. III obligations. [HN11] Our equitable power to apportion interstate streams and the power of the States and Congress acting in concert to accomplish the same result

are to a large extent complementary. See Frankfurter & Landis, The Compact Clause of the Constitution -- A Study in Interstate Adjustments, 34 Yale L. J. 685, 705-708 (1925). Texas' right to invoke the original jurisdiction of this Court was an important part of the context in which the Compact was framed; indeed, the threat of such litigation undoubtedly contributed to New Mexico's willingness to enter into a compact. It is difficult to conceive that Texas would trade away its right to seek an equitable apportionment of the river in return for a promise that New Mexico could, for all practical purposes, avoid at will. [16] [HN12] In the absence of an explicit provision or other clear indications that a bargain to that effect was made, we shall not construe a compact to preclude a [*570] State from seeking judicial relief when the compact does not provide an equivalent method of vindicating the State's rights. Cf. *Green* v. *Biddle*, 8 Wheat., at 91. [17]

16 Note that under Art. XIV of the Compact Texas may withdraw from the Compact only with the concurrence of the New Mexico State Legislature.

17 In *Green* v. *Biddle*, the owners of certain lands in Kentucky sued their tenant to recover the lands. The tenant relied on two Kentucky statutes which gave him a good defense to the action, and the owners responded that the statutes were invalid as violations of a compact between Kentucky and Virginia, ratified by Congress, which provided that "all private rights, and interests of lands within [Kentucky] derived from the laws of Virginia prior to [the separation of Kentucky from Virginia], shall remain valid and secure under the laws of [Kentucky], and shall be determined by the laws now existing in [Virginia]." 8 Wheat., at 3. An argument was made -- similar to New Mexico's argument in this case -- that disputes concerning the compact could only be resolved by a commission to be appointed under the terms of the agreement, and not by the courts that would ordinarily resolve questions of title to land. We rejected the argument because the possibility that one State could defeat the rights of the other's citizens or allow the occupants of the land to enrich themselves without title simply by refusing to appoint commissioners "is too monstrous to be for a moment entertained. The best feelings of our nature revolt against a construction which leads to

it." *Id*., at 91.

[***16] [***LEdHR13] [13] [***LEdHR14A] [14A]Considerations outside the Compact itself also render New Mexico's theory of the role of this Court untenable. According to New Mexico, Texas *may* seek judicial review in this Court of decisions actually made by the Commission -- presumably on the votes of both States' Commissioners. That is not the proper function of our original jurisdiction to decide controversies between two States. In recent years, [HN13] we have consistently interpreted 28 U. S. C. § 1251(a) as providing us with substantial discretion to make case-by-case judgments as to the practical necessity of an original forum in this Court for particular disputes within our constitutional original jurisdiction. See *Maryland* v. *Louisiana*, 451 U.S. 725, 743 (1981); *Ohio* v. *Wyandotte Chemicals Corp.*, 401 U.S. 493, 499 (1971). We exercise that discretion with an eye to promoting the most effective functioning of this Court within the overall federal [**2569] system. See *ibid*. If authorized representatives of the compacting States have reached an agreement [*571] within the scope of their congressionally ratified powers, recourse to this Court when one State has second thoughts is hardly "necessary for the State's protection," *Massachusetts* v. *Missouri*, 308 U.S. 1, 18 (1939). [18] [HN14] Absent extraordinary cause, we shall not review the Pecos River Commission's actions without a more precise mandate from Congress than either the Compact or 28 U. S. C. § 1251 provides.

18

[***LEdHR14A] [14B]Cf. *Illinois* v. *Milwaukee*, 406 U.S. 91, 93 (1972) (original jurisdiction will not be taken where there is an adequate alternative forum for resolution of the dispute). The model case for invocation of this Court's original jurisdiction is a dispute between States of such seriousness that it would amount to *casus belli* if the States were fully sovereign. *North Dakota* v. *Minnesota*, 263 U.S. 365, 372-374 (1923); *Missouri* v. *Illinois*, 200 U.S. 496, 519-521 (1906). When it is able to act, the Commission is a completely adequate means for vindicating either State's interests. The need for burdensome original jurisdiction litigation, which prevents this Court from attending to its appellate docket, would seem slight.

Therefore, we accept the Special Master's alternative recommendation that this suit continue as presently framed.

IV

[***LEdHR3A] [3B]The Special Master also recommends that we deny a motion made by Texas -- apparently at the Special Master's invitation -- to adopt what it calls a "Double Mass Analysis" as the method for determining when a shortfall in state-line flows has occurred. 1982 Report 21. Texas excepts to that recommendation. We overrule the exception.

[***17] Once again, we turn to the provisions of the Compact. Article VI provides:

[HN15] "The following principles shall govern in regard to the apportionment made by Article III of this Compact:

. . . .

"(c) Unless and until a more feasible method is devised and adopted by the Commission the inflow-outflow method, as described in the Report of the Engineering Advisory Committee, shall be used to:

[*572] "(i) Determine the effect on the state-line flow of any change in depletions by man's activities or otherwise, of the waters of the Pecos River in New Mexico."

It is clear that the Commission has not adopted "a more feasible method," so the question is whether Texas' "Double Mass Analysis" fairly comes within the Compact phrase "inflow-outflow method, as described in the Report of the Engineering Advisory Committee." If it does not, then we may not use it to measure state-line shortfalls in enforcing the Compact.

As an illustration of the method, [19] and to permit administration of the Compact to begin, the Inflow-Outflow Manual provides a correlation curve and set of tables for the critical reach of the river between Alamogordo Dam and the state line. See Appendix to this opinion. Plotted along the horizontal axis are overlapping 3-year averages [**2570] of the sums of four "index inflows" -- the actual, measured flow into Alamogordo Reservoir, and unmeasured estimates of "flood inflows," see n. 5, *supra*, in three sub-reaches between Alamogordo [*573] Dam and the state line.

The vertical axis measures corresponding 3-year averages of the measured "outflow" at the state line. The data points form a smooth curve that, according to the Manual, "fairly accurately [covers] the entire range of expected water supply so far as such a supply is affected by meteorological factors" under the "1947 condition" as described in the 1947 Study. S. Doc. 109, at 149.

19   The Inflow-Outflow Manual appended to the engineering committee's 1947 Study describes the inflow-outflow method as follows:

"The inflow-outflow method involves the determination of the correlation between an index of the inflow to a basin as measured at certain gaging stations and the outflow from the basin. It is obviously impossible to measure all of the inflow. The gaging stations which are utilized to measure a part of the inflow are termed index inflow stations because the amount of water measured at those stations is an acceptable index of the inflow to the basin. From the plotting by years of the sum of the index inflows against the outflow there is developed a correlation curve showing the relationship between inflow and outflow. Any changes thereafter in the basin which occur between the points of inflow and the point of outflow and which affect the water supply of the basin can be measured by the change in correlation between the inflow and outflow from that indicated by the correlation curve previously developed. For example, if over a period of years additional depletions occur between the inflow points and the outflow point, the correlation between the inflow and the outflow will change: With a given inflow into the basin there will be less outflow." S. Doc. 109, at 149.

At this point in the litigation, it has been decided that the actual curve provided by the original Inflow-Outflow Manual does not accurately describe the correlation between inflows and the state-line outflow under the 1947 condition. The parties' evidence now must be directed [***18] to drawing a new curve, like the old one but using more accurate data, and the disputes between them involve questions of which inflows should be "index inflows" and how the historic values of those inflows should be deduced and incorporated into the curve. See n. 21, *infra*. Texas' motion to substitute its

"Double Mass Analysis" represents a bold effort to simplify this initial process by reducing the number of index inflows to one, directly measurable value -- the measured flow past Alamogordo Dam. In essence, Texas' position is that this single inflow provides an adequate index for all the inflows into the river that are more difficult (if not impossible) to measure. If so, the correlation curve described by plotting 3-year averages of the single inflow against the state-line outflow would furnish an adequate benchmark to which post-Compact flows could be compared to determine whether Texas is receiving the water it may expect to receive under the Compact. [20]

> 20    It deserves emphasis that neither the Inflow-Outflow Manual in any of its past or projected versions nor the Texas "Double Mass Analysis" has anything to say about whether a particular shortfall in state-line water deliveries is due to "man's activities," a critical qualification on New Mexico's obligation to deliver water under Art. III(a) of the Compact. At best, correlation curves for sub-reaches of the river can be helpful in identifying *where* a shortfall seems to originate.

[*574] Although simplification would be desirable, and the question is a close one, on balance we conclude that the "Double Mass Analysis" is not close enough to what the Compact terms an "inflow-outflow method, as described in the Report of the Engineering Advisory Committee" to make it acceptable for use in determining New Mexico's compliance with its Art. III obligations. The flows past Alamogordo Dam do not always bear a physical relationship to the state-line outflow. In its natural state, the Pecos actually dries up for long periods of time between Alamogordo and the state line, so the water that crosses the state line is not the same water that passes the dam, except in periods of extreme flood. The Compact, by reference to the 1947 Study, clearly contemplates that the adequacy of state-line flows can be determined without taking into account *all* inflows into the Pecos, but the intent of the Compact's framers was clearly to use as much information as possible rather than relying on a single index inflow, even if that inflow reflects the same meteorological factors that produce the other inflows. The Inflow-Outflow Manual expressly indicates that the engineering committee intended to develop more precise correlation curves for smaller sub-reaches of the river, taking into account inflows not incorporated into the curve it provided. See S. Doc. 109,

at 150-151. The "Double Mass Analysis" represents a sharply different approach to how to go about measuring shortfalls at the state line, an approach which the Compact leaves the Commission free to adopt, but which this Court may not apply against New Mexico in the absence of Commission action.

V

In a pretrial order dated October 31, 1977, the Special Master identified four [**2571] broad questions to be resolved. The first was settled by our approval of his 1979 Report, 446 U.S. 540 [***19] (1980). See *supra*, at 563. The crucial question that remains to be decided is the fourth: "[Has] New Mexico fulfilled her obligations under Article III(a) of the Pecos River Compact?" [*575] Pretrial Order 6. That question necessarily involves two subsidiary questions. First, under the proper definition of the "1947 condition," see *supra*, at 563, what is the difference between the quantity of water Texas could have expected to receive in each year and the quantity it actually received? For the 1950-1961 period, that difference has been determined by unanimous vote of the Commission; for 1962 to the present, determining the extent of the shortfall will require adjudicating disputes between the States as to specific issues raised by the 1947 Study, the Review of Basic Data, and the Inflow-Outflow Manual. The States have fully briefed their positions, however, and the Special Master has already heard extensive evidence on these questions. [21] Second, to what extent were the shortfalls due to "man's activities in New Mexico"?

> 21    New Mexico has generally relied on the Review of Basic Data. Texas has submitted a document entitled "Texas 'Workability' Statement," filed Nov. 18, 1981, which identifies nine "[questions] which must be resolved in connection with the flood inflow computation." *Id.*, at 4-5. Not all of them involve large quantities of water. At this stage of the litigation, there seems to be no more than three or four issues upon which the Special Master will have to resolve difficult questions of fact or of hydrological method. We leave to the Special Master's discretion whether these issues should be considered as framed in § 4(b) of his original pretrial order or whether a revised formulation would be more appropriate. See Order of Dec. 29, 1981, pp. 5-7; 1982 Report 10-11.

Time and again we have counseled States engaged in litigation with one another before this Court that their dispute "is one more likely to be wisely solved by co-operative study and by conference and mutual concession on the part of representatives of the States so vitally interested in it than by proceedings in any court however constituted." *New York* v. *New Jersey*, 256 U.S. 296, 313 (1921); cf. *Vermont* v. *New York*, 417 U.S., at 277-278; *Minnesota* v. *Wisconsin*, 252 U.S. 273, 283 (1920); *Washington* v. *Oregon*, 214 U.S. 205, 218 (1909). It is within this Court's power to determine whether New Mexico is in compliance with Art. III(a) of the [*576] Pecos River Compact, but it is difficult to believe that the bona fide differences in the two States' views of how much water Texas is entitled to receive justify the expense and time necessary to obtain a judicial resolution of this controversy. With that observation, we return this case to the Special Master for determination of the unresolved issues framed in his pretrial order, in a manner consistent with this opinion.

*It is so ordered.*

[*577] [SEE appendix to opinion of the court IN ORIGINAL] [***20] [**2572] APPENDIX TO OPINION OF THE COURT

[See Illustration in Original]

[*578] Inflow-outflow relationships, Alamogordo Dam to New Mexico-Texas State line

[1,000 acre-feet units]

| Index inflow | Outflow relationship |
|---|---|
| 140 | 77 |
| 150 | 83 |
| 160 | 89 |
| 170 | 96 |
| 180 | 102 |
| 190 | 109 |
| 200 | 115 |
| 210 | 122 |
| 220 | 129 |
| 230 | 136 |
| 240 | 143 |
| 250 | 151 |
| 260 | 159 |
| 270 | 166 |
| 280 | 174 |
| 290 | 182 |
| 300 | 189 |
| 310 | 197 |
| 320 | 205 |
| 330 | 212 |
| 340 | 220 |

| | |
|---|---|
| 350 | 228 |
| 400 | 267 |
| 450 | 307 |
| 500 | 352 |
| 550 | 402 |
| 600 | 454 |
| 650 | 506 |
| 750 | 615 |
| 800 | 671 |
| 850 | 728 |
| 900 | 786 |

[1,000 acre-feet units]

[**2573] Inflow-outflow calculations, Alamogordo Dam to New Mexico-Texas State line (from 1947 condition theoretical studies)

| | Index inflow | Routed outflow | Outflow from curve | Differences | Accumulated differences | |
|---|---|---|---|---|---|---|
| | | | | | All years | Omitting 1942-44 |
| 1919-21 | 557.8 | 412.3 | 410.1 | +2.2 | +2.2 | +2.2 |
| 1920-22 | 370.3 | 259.9 | 243.8 | +16.1 | +18.3 | +18.3 |
| 1921-23 | 392.3 | 259.6 | 261.0 | -1.4 | +16.9 | +16.9 |
| 1922-24 | 268.4 | 156.3 | 164.9 | -8.6 | +8.3 | +8.3 |
| 1923-25 | 300.1 | 178.0 | 189.1 | -11.1 | -2.8 | -2.8 |
| 1924-26 | 318.7 | 200.6 | 204.0 | -3.4 | -6.2 | -6.2 |
| 1925-27 | 325.9 | 203.9 | 209.1 | -5.2 | -11.4 | -11.4 |
| 1926-28 | 307.2 | 187.5 | 194.8 | -7.3 | -18.7 | -18.7 |
| 1927-29 | 250.2 | 150.2 | 151.2 | -1.0 | -19.7 | -19.7 |
| 1928-30 | 275.0 | 168.8 | 170.0 | -1.2 | -20.7 | -20.7 |
| 1929-31 | 294.4 | 189.2 | 185.1 | +4.1 | -16.8 | -16.8 |
| 1930-32 | 377.2 | 251.7 | 249.2 | +2.5 | -14.3 | -14.3 |
| 1931-33 | 342.2 | 236.0 | 221.8 | +14.2 | -.1 | -.1 |
| 1932-34 | 292.0 | 191.9 | 183.4 | +8.5 | +8.4 | +8.4 |
| 1933-35 | 223.6 | 136.0 | 131.5 | +4.5 | +12.9 | +12.9 |
| 1934-36 | 227.4 | 127.8 | 134.2 | -6.4 | +6.5 | +6.5 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1935-37 | 367.1 | 243.5 | 241.3 | +2.2 | +8.7 | +8.7 |
| 1936-38 | 388.5 | 253.1 | 258.0 | -4.9 | +3.8 | +3.8 |
| 1937-39 | 392.2 | 256.3 | 161.0 | -4.7 | -.9 | -.9 |
| 1938-40 | 269.0 | 151.1 | 165.3 | -14.2 | -15.1 | -15.1 |
| 1939-41 | 267.1 | 639.8 | 634.2 | +5.6 | -9.5 | -9.5 |
| 1940-42 | 859.7 | 732.3 | 739.2 | -6.9 | -16.4 | -16.4 |
| 1941-43 | 859.3 | 746.2 | 738.8 | +6.4 | -10.1 | -10.0 |
| 1942-44 | 337.4 | 246.2 | 217.9 | +28.3 | +18.3 | |
| 1943-45 | 224.8 | 139.0 | 132.4 | +6.6 | +24.9 | -3.4 |
| 1944-46 | 201.2 | 121.0 | 115.8 | +5.2 | +30.1 | +1.8 |

**REFERENCES**

32A Am Jur 2d, Federal Practice and Procedure 537, 556; 72 Am Jur 2d, States, Territories, and Dependencies 5; 78 Am Jur 2d, Waters 309-315

8 Federal Procedure, L Ed, Courts and Judicial System 20:200, 20:219

2 Federal Procedural Forms, L Ed, Appeal, Certiorari, and Review 3:721-3:742

USCS, Constitution, Article I, Section 10, Clause 3, and Article III, Section 2, Clause 1; 28 USCS 1251(a)

US L Ed Digest, States, Territories, and Possessions 58

Supreme Court of the United States 58

L Ed Index to Annos, States; Supreme Court of the United States; Waters

ALR Quick Index, Federal Courts; Riparian Owners; States; Waters and Watercourses

Federal Quick Index, Compacts; Riparian Rights; Rivers; States; Supreme Court of the United States; Waters and Watercourses

Annotation References:

Original jurisdiction of United States Supreme Court in suits between states. 68 L Ed 2d 969.



TRINOVA CORPORATION v. MICHIGAN DEPARTMENT OF TREASURY

No. 89-1106

SUPREME COURT OF THE UNITED STATES

498 U.S. 358; 111 S. Ct. 818; 112 L. Ed. 2d 884; 1991 U.S. LEXIS 842; 59 U.S.L.W.
4097; 91 Cal. Daily Op. Service 1278; 91 Daily Journal DAR 2066

October 1, 1990, Argued
February 19, 1991, Decided

**PRIOR HISTORY:** CERTIORARI TO THE SUPREME COURT OF MICHIGAN.

**DISPOSITION:** 433 Mich. 141, 445 N. W. 2d 428, affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant corporation sought review of the judgment from the Supreme Court of Michigan, which denied its claim for a refund of taxes assessed under appellee state's single business tax statute. Mich. Comp. Laws § 208.1 et seq. (1979).

**OVERVIEW:** The corporation filed a suit for a refund of taxes assessed under the state's single business tax (SBT) statute. The state supreme court affirmed the judgment denying his claim for a refund. On certiorari, the corporation contended that the state's SBT was not fairly apportioned as applied to it and that the tax discriminated against interstate commerce. The court affirmed the judgment denying his claim for a refund and held that the three-factor apportionment formula of the state's SBT, Mich. Comp. Laws § 208.1 et seq. (1979), did not violate either the Due Process Clause or the Commerce Clause of the Federal Constitution. The court found that the SBT was applied to an activity with a substantial nexus with the taxing state, was fairly apportioned, and did not discriminate against interstate commerce. The court determined that there was a rational relationship between

the tax base measure attributed to the state and the contribution of state business activity to the entire value added process. The court concluded that the corporation failed to meet its burden of proving by clear and cogent evidence that the state's apportionment provided a distorted result.

**OUTCOME:** The Court affirmed the judgment denying the corporation's claim for a refund because the three-factor apportionment formula of the appellee state's single business tax did not violate either the Due Process Clause or the Commerce Clause of the Federal Constitution.

**CORE TERMS:** apportionment, tax base, business activity, formula, depreciation, payroll, apportionment formula, geographic, taxation, apportioned, income taxes, taxing, adjusted, business tax, unitary, interstate commerce, gross receipts, value-added, interstate, realized, out-of-state, subtraction, assigned, tax year, taxable income, company-wide, discriminate, calculated, multiplied, taxed

**LexisNexis(R) Headnotes**

*Tax Law > State & Local Taxes*
[HN1] Value added is an economic concept. Value added is defined as the increase in the value of goods and

services brought about by whatever a business does to them between the time of purchase and the time of sale. The value a business adds to a single product is the difference between the value of the product at sale and the cost of goods purchased from other businesses that went into the product. It follows that the sale price of a product is the total of all value added by each step of the production process to that point.

*Tax Law > Federal Income Tax Computation > Valuation > Business Interests*
*Tax Law > State & Local Taxes > Value Added Tax*
[HN2] A business adds value by handling or processing these goods with its labor force, machinery, buildings and capital. Value added usually refers to the activities of a single business enterprise. The term can, however, be used with regard to a single product, or even an entire economy. Value added is a means of consistently measuring the size of business firms and other economic enterprises comprising the total economy. Gross National Product is virtually equivalent to national value added.

*Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview*
*Tax Law > State & Local Taxes > Minimum Tax*
*Tax Law > State & Local Taxes > Value Added Tax*
[HN3] One of the acknowledged advantages of value added as a measure of taxation is its neutrality. A value added tax (VAT) is neutral in the sense that it taxes all business activity alike: Under a pure VAT, all forms of business organization (corporation, partnership, proprietorship), all types of financing (debt, equity) and all methods of production (capital intensive, labor intensive) bear the same tax burden. Tax factors are minimized in business decisions; inherent advantages and relative efficiencies are allowed to operate in the market economy with minimum tax distortions. This neutrality of a value-added tax is in notable contrast to the effects of both the corporation income tax and the payroll taxes. The former, by definition, is applied only to corporations and varies with their reliance on equity rather than debt capital and the efficiency with which they use equity capital -- that is, their net profits.

*Governments > Public Improvements > General Overview*
*Tax Law > State & Local Taxes > Income Tax >*

*General Overview*
*Tax Law > State & Local Taxes > Value Added Tax*
[HN4] A value added tax (VAT) differs in important respects from a corporate income tax. A corporate income tax is based on the philosophy of ability to pay, as it consists of some portion of the profit remaining after a company has provided for its workers, suppliers, and other creditors. A VAT, on the other hand, is a much broader measure of a firm's total business activity. Even if a business entity is unprofitable, under normal circumstances it adds value to its products and, as a consequence, will owe some VAT. Because value added is a measure of actual business activity, a VAT correlates more closely to the volume of governmental services received by the taxpayer than does an income tax. Further, because value added does not fluctuate as widely as net income, a VAT provides a more stable source of revenue than the corporate income tax.

*Tax Law > Federal Income Tax Computation > Deductions for Amortization, Depletion & Depreciation > Amortization, Cost Recovery & Depreciation (IRC secs. 167-169, 171, 178, 194-195, 197, 216, 248, 280F) > General Overview*
*Tax Law > State & Local Taxes > Personal Property Tax > General Overview*
[HN5] Depreciation is the reduction in value of a firm's assets, through wear and tear, obsolescence, or other factors, and thus roughly measures consumption of capital.

*Tax Law > Federal Income Tax Computation > General Overview*
*Tax Law > State & Local Taxes > Franchise Tax > General Overview*
[HN6] The Michigan single business tax (SBT) is levied against any person with business activity within the State of Michigan. Mich. Comp. Laws § 208.31(1). In order to calculate the amount of a taxpayer's SBT the taxpayer must, first, determine its total tax base. The total tax base consists of the taxpayer's value added, calculated by the addition method: Cost of Labor + Depreciation + Interest + Profit. Under Mich. Comp. Laws § 208.9, the taxpayer begins with federal taxable income (representing profit), adds other elements that reflect consumption of labor and capital including compensation, depreciation, dividends, and interest paid by the taxpayer, and makes other detailed adjustments.

*Tax Law > State & Local Taxes > Franchise Tax > General Overview*
*Tax Law > State & Local Taxes > Personal Property Tax > General Overview*

[HN7] Business activity is broadly defined as a transfer of legal or equitable title to or rental of property, whether real, personal, or mixed, tangible or intangible, or the performance of services, or a combination thereof, made or engaged in, or caused to be made or engaged in, within this state, whether in intrastate, interstate, or foreign commerce, with the object of gain, benefit, or advantage, whether direct or indirect, to the taxpayer or to others, but shall not include the services rendered by an employee to his employer, services as a director of a corporation, or a casual transaction. Mich. Comp. Laws § 208.3 (1979)

*Tax Law > State & Local Taxes > Franchise Tax > General Overview*
*Tax Law > State & Local Taxes > Personal Property Tax > General Overview*

[HN8] If a taxpayer does business both within and without Michigan, it must determine the portion of its total value added attributable to Michigan. That portion is the average of three ratios: (1) Michigan payroll to total payroll, (2) Michigan property to total property, and (3) Michigan sales to total sales. The total tax base is multiplied by the portion of business activity attributable to Michigan (under the three-factor formula), and the result, subject to several further adjustments, is the taxpayer's adjusted tax base. Mich. Comp. Laws § 208.31(2). Mich. Comp. Laws § 208.23(a) permits a taxpayer to deduct a portion of its capital acquisitions, and Mich. Comp. Laws § 208.31(5) permits a labor-intensive taxpayer to reduce its adjusted tax base by a percentage equal to the percentage by which compensation exceeds 63 percent of the total tax base, but with such reduction not to exceed a maximum of 37 percent. Actual tax liability equals the adjusted tax base multiplied by a tax rate of 2.35 percent.

*Tax Law > State & Local Taxes > Franchise Tax > General Overview*
*Tax Law > State & Local Taxes > Personal Property Tax > General Overview*

[HN9] The amended Mich. Comp. Laws § 208.69 creates a presumption that the statutory apportionment formula fairly represents the taxpayer's business activity in Michigan unless the adjusted tax base meets one of two tests.

*Constitutional Law > Congressional Duties & Powers > Commerce Clause > General Overview*
*Tax Law > State & Local Taxes > Sales Tax > General Overview*

[HN10] The Court will sustain a tax against Commerce Clause challenge so long as the tax is applied to an activity with a substantial nexus with the taxing state, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the state.

*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
*Energy & Utilities Law > Taxation*
*Tax Law > State & Local Taxes > General Overview*

[HN11] The due process requires that there be a minimal connection between the interstate activities and the taxing state, and a rational relationship between the income attributed to the state and the intrastate values of the enterprise.

*Tax Law > State & Local Taxes > Franchise Tax > General Overview*
*Tax Law > State & Local Taxes > Personal Property Tax > General Overview*

[HN12] In a unitary enterprise, compensation, depreciation, and profit are not independent variables to be adjusted without reference to each other.

*Energy & Utilities Law > Taxation*
*Tax Law > State & Local Taxes > Administration & Proceedings > Audits & Investigations*
*Tax Law > State & Local Taxes > Franchise Tax > General Overview*

[HN13] Separate accounting, while it purports to isolate portions of income received in various states, may fail to account for contributions to income resulting from functional integration, centralization of management, and economies of scale. Because these factors of profitability arise from the operation of the business as a whole, it becomes misleading to characterize the income of the business as having a single identifiable source. Although separate geographical accounting may be useful for internal auditing, for purposes of state taxation it is not constitutionally required.

*Tax Law > State & Local Taxes > Franchise Tax >*

*General Overview*

[HN14] In the case of a more-or-less integrated business enterprise operating in more than one state, arriving at precise territorial allocations of value is often an elusive goal, both in theory and in practice.

*Constitutional Law > Bill of Rights > Fundamental Rights > Procedural Due Process > Scope of Protection*
*Tax Law > State & Local Taxes*
*Tax Law > State & Local Taxes > Income Tax > General Overview*

[HN15] The first component of fairness in an apportionment formula is what might be called internal consistency -- that is, the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business income being taxed. The second and more difficult requirement is what might be called external consistency -- the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated.

*Tax Law > State & Local Taxes > Value Added Tax*

[HN16] In order to prevail on a challenge that an apportionment formula fails the external consistency test, an income taxpayer must prove by clear and cogent evidence that the income attributed to the state is in fact out of all appropriate proportions to the business transacted in that state, or has led to a grossly distorted result. The party must demonstrate that, in the context of a value added tax, there is no rational relationship between the tax base measure attributed to the state and the contribution of state business activity to the entire value added process.

*Tax Law > State & Local Taxes*
*Transportation Law > Intrastate Commerce*

[HN17] States are free to structure their tax systems to encourage the growth and development of intrastate commerce and industry.

*Tax Law > State & Local Taxes > General Overview*

[HN18] In reviewing state taxation schemes under the Commerce Clause, the Court attempts to ensure that each state taxes only its fair share of an interstate transaction. The Court acts as a defense against state taxes which, whether by design or inadvertence, either give rise to serious concerns of double taxation, or attempt to capture tax revenues that, under the theory of the tax, belong of right to other jurisdictions. The Court has always declined to undertake the essentially legislative task of establishing a single constitutionally mandated method of taxation.

**DECISION:**

Michigan's value added, single business tax, as applied to particular foreign corporation during particular tax year, held not to violate commerce clause (Art I, 8, cl 3) or due process.

**SUMMARY:**

The state of Michigan levied, on any person with business activity in the state, a tax which was (1) called the "single business tax," and (2) described by some as a type of "value added tax." For purposes of the tax, the total tax base generally consisted of the taxpayer's "value added," calculated under an "addition method" as cost of labor plus depreciation plus interest plus profit. As applied to taxpayers doing business both within and without the state, (1) such taxpayers were authorized to use an apportionment formula which multiplied the total tax base by a factor which consisted of the average of the three ratios of (a) Michigan payroll to total payroll, (b) Michigan property to total property, and (c) Michigan sales to total sales; (2) several further adjustments were permitted, including (a) a deduction by taxpayers of a portion of their capital acquisitions, and (b) a limited reduction by labor-intensive taxpayers of excessive compensation; and (3) the actual tax liability equaled the tax base, as finally adjusted, multiplied by a 2.35-percent tax rate. During 1980, an Ohio corporation which manufactured automobile components made more than $ 103 million worth of sales in Michigan, but maintained only a 14-employee sales office in the state. The corporation had a net loss of taxable income for that year, but was liable, under the Michigan apportionment formula, for a single business tax of about $ 294,000, based upon (1) multiplying the corporation's total tax base of about $ 221 million by an 8.9717-percent factor, which was the average of a (a) payroll ratio of 0.2328 percent, (b) property ratio of 0.0930 percent, and (c) sales ratio of 26.5892 percent; and (2) reducing the initial result of about $ 19.8 million to a tax base, as finally adjusted, of about $ 12.5 million, through (a) about a $ 9,000 capital-acquisitions deduction, and (b) about a $ 7.3 million labor-intensive reduction. In 1985, the

Michigan Court of Appeals, an intermediate appellate court, ruled in another case that a state statutory provision entitled certain taxpayers to relief from the apportionment formula for the single business tax. The Ohio corporation then filed an amended return and refund claim for the 1980 tax year. When the Michigan treasury department denied relief, the corporation sued for a refund in the Michigan Court of Claims, which ruled in the corporation's favor based upon the prior Court of Appeals decision. While the department's appeal was pending, a restrictive amendment to the statutory relief provision was enacted, and the Court of Appeals, in ordering a reversal and remand, ruled that the amendment was to be given retroactive effect (166 Mich App 656, 421 NW2d 258). On appeal, the Michigan Supreme Court, in affirming on other grounds without addressing the amendment's retroactivity, expressed the view that (1) the statutory relief provision applied only if necessary to save the single business tax against unconstitutional application; (2) under the Federal Constitution's commerce clause (Art I, 8, cl 3) and under the due process clause of the Constitution's Fourteenth Amendment, "business activity," as defined for purposes of the single business tax, was not susceptible to accurate analysis when only one component of the total business effort was analyzed; and (3) the averaged ratios of the corporation's payroll, property, and sales were a fair representation of the corporation's business activity in Michigan, thus making the corporation ineligible for relief on statutory or constitutional grounds (433 Mich 141, 445 NW2d 428).

On certiorari, the United States Supreme Court affirmed. In an opinion by Kennedy, J., joined by Rehnquist, Ch. J., and White, Marshall, and O'Connor, JJ., it was held that Michigan's value added, single business tax, as applied to the Ohio corporation during 1980, did not violate either the commerce clause or the due process clause, because (1) the corporation did not dispute that its business activities had a substantial nexus with the state and subjected the corporation to the state's taxing authority; (2) the corporation did not argue that the amount of tax that the corporation was required to pay bore no fair relation to the services provided by the state; (3) it was proper for the state to apportion the tax, for the state, absent an apportionment formula, was unable to assign the tax base and its principal components to separate geographic locations and to separate accounts in each state without serious theoretical and practical difficulty, where, even if the corporation could identify

the location of its plant and equipment and much of its compensation, the tax, for apportionment purposes, was (a) an indivisible tax upon a bona fide measure of business activity--the value added--not (b) three separate and independent taxes on compensation, depreciation, and income; (4) the corporation had failed to prove by clear and cogent evidence that the state's apportionment formula provided a distorted result, where the state had consistently applied the formula, the elements of which appeared to reflect a very large share of activities from which value was generated, with further relief for labor-intensive taxpayers such as the corporation; and (5) the corporation had failed to show that the tax discriminated against out-of-state businesses.

Scalia, J., concurring in the judgment, expressed the view that (1) the court's conclusion that Michigan's single business tax was not facially discriminatory was sufficient to comply with the requirements of the commerce clause; and (2) the single business tax did not violate the due process clause, because (a) the corporation conceded that there was a minimal connection between the corporation's interstate activities and the taxing state, and (b) the single business tax did not tax extraterritorial values.

Stevens, J., joined by Blackmun, J., dissenting, expressed the view that (1) although the parties referred to the single business tax as a value added tax, the Michigan tax, as a practical matter, was nothing more than an amalgam of three separate taxes on payroll, depreciable fixed assets, and income; (2) because the value added by the two principal components of the single business tax--labor and capital--are fully realized and thus can be precisely quantified and geographically assigned when the actual purchase of labor services and use of capital occur, Michigan's apportionment of a taxpayer's entire payroll and capital expenses resulted in the unconstitutional taxation by Michigan of a portion of the taxpayer's extraterritorial activities, in violation of due process; and (3) with respect to the case at hand, although less than 1 percent of the corporation's property and payroll expenses were incurred within Michigan's borders, the state, by applying its apportionment formula to the corporation's payroll and capital, treated 9 to 10 percent of the corporation's labor and capital costs as if they were in-state expenses.

Souter, J., did not participate.

**LAWYERS' EDITION HEADNOTES:**

COMMERCE §238

CONSTITUTIONAL LAW §605;

foreign corporation -- state value added tax -- apportionment -- nondiscrimination -- due process -- ;

Headnote:[1A][1B][1C][1D][1E][1F][1G]

A state's value added, single business tax, as applied during a particular tax year to a foreign manufacturing corporation which had more than $ 103 million in sales, but maintained only a 14-employee sales office in that state in that year, does not violate either the Federal Constitution's commerce clause (Art I, 8, cl 3) or the due process clause of the Constitution's Fourteenth Amendment--where the state (1) uses a total tax base calculating "value added" as cost of labor plus depreciation plus interest plus profit, (2) authorizes the use of an apportionment formula which multiplies the total tax base by a factor which consists of the average of the three ratios of (a) in-state payroll to total payroll, (b) in-state property to total property, and (c) in-state sales to total sales, (3) permits several further adjustments to the tax base, including (a) a deduction by taxpayers of a portion of their capital acquisitions, and (b) a limited reduction by labor-intensive taxpayers of excessive compensation, and (4) calculates actual tax liability as the tax base, as finally adjusted, multiplied by a tax rate of 2.35 percent--because (1) the corporation does not dispute that its business activities have a substantial nexus with the state and subject the corporation to the state's taxing authority; (2) the corporation does not argue that the amount of tax that the corporation is required to pay bears no fair relation to the services provided by the state; (3) it is proper for the state to apportion the tax; (4) the corporation has failed to prove by clear and cogent evidence that the state's apportionment formula provides a distorted result; and (5) the corporation has failed to show that the tax discriminates against out-of-state businesses. (Stevens and Blackmun, JJ., dissented from this holding.)

TAXES §68;

value added tax -- what taxable -- ;

Headnote:[2]

A "pure" value added tax (VAT)--without any special exemptions, deductions, or other adjustments--is neutral in the sense that the VAT taxes all business activity alike, for the same tax burden is borne by (1) all forms of business organization (corporation, partnership, proprietorship); (2) all types of financing (debt, equity); and (3) all methods of production (capital intensive, labor intensive).

INCOME TAXES §1

TAXES §3;

value added tax -- nature -- computation -- ;

Headnote:[3]

A value added tax (VAT) differs in important respects from a corporate income tax: (1) a corporate income tax is based on the philosophy of ability to pay, as such a tax consists of some portion of the profit remaining after a company has provided for its workers, suppliers, and other creditors, but a VAT is a much broader measure of a firm's total activity, because even if a business entity is unprofitable, such an entity, under normal circumstances, adds value to its products and thus will owe some VAT; (2) a VAT correlates more closely to the governmental services received by the taxpayer than does an income tax, because value added is a measure of actual business activity; and (3) a VAT provides a more stable source of revenue than the corporate income tax, because value added does not fluctuate as widely as net income.

TAXES §192;

value added tax -- computation -- ;

Headnote:[4A][4B][4C]

A value added tax is assessed as a percentage of "value added" for the relevant fiscal period, where value added may be calculated under either a "subtraction" or an "addition" method, each of which provides an identical measurement, given that (1) under the subtraction method, value added equals revenues minus cost of materials, and (2) under the addition method, value added equals cost of labor plus depreciation plus interest plus profit.

COMMERCE §238

CONSTITUTIONAL LAW §603;

state tax on multistate business -- due process -- ;

Headnote:[5]

A state tax on a multistate business will be sustained against a challenge under the Federal Constitution's commerce clause (Art I, 8, cl 3), so long as the tax (1) is applied to an activity with a substantial nexus with the taxing state, (2) is fairly apportioned, (3) does not discriminate against interstate commerce, and (4) is fairly related to the services provided by the state; this four-part test, while responsive to commerce clause dictates, encompasses as well the requirement, under the due process clause of the Constitution's Fourteenth Amendment, that there be (1) a minimal connection between the interstate activities and the taxing state, and (2) a rational relationship between (a) the income attributed to the state, and (b) the intrastate values of the enterprise; the principles which govern the validity of such state taxes seek (1) to accommodate the necessary abstractions of tax theory to the realities of the marketplace, (2) to avoid formalism, and (3) to rely upon a consistent and rational method of inquiry focusing on the practical effect of the challenged tax.

COMMERCE §238

CONSTITUTIONAL LAW §605

EVIDENCE §979.2;

Headnote:[6A][6B][6C][6D][6E][6F][6G][6H ][6I]

For purposes of determining liability under a state's value added, single business tax, it is proper, under the Federal Constitution's commerce clause (Art I, 8, cl 3) and under the due process clause of the Constitution's Fourteenth Amendment, for the state to apportion the "value added" of a foreign manufacturing corporation which had more than $ 103 million in sales, but maintained only a 14-employee sales office in the state in a particular tax year, because the state, absent an apportionment formula, is unable to assign the tax base and its principal components to separate geographic locations and to separate accounts in each state without serious theoretical and practical difficulty, where the state uses a total tax base calculating "value added" under an

"addition method" as cost of labor plus depreciation plus interest plus profit, for (1) even if the corporation can identify the location of its plant and equipment and much of its compensation, the tax, for apportionment purposes, is (a) an indivisible tax upon a bona fide measure of business activity--the value added--not (b) three separate and independent taxes on compensation, depreciation, and income; (2) since the corporation was unprofitable in that year, so that overall value added amounted to less than compensation plus depreciation, a nonapportionment approach would require a conclusion that (a) the corporation added value at its out-of-state factory through the consumption of capital and labor, but (b) the corporate products somehow lost value outside of that process, perhaps between the time that they left the factory and the time that they were delivered to in-state customers; (3) such an approach is incompatible with the rationale of a value added tax and unsupported in the record, where (a) for all that the record shows, production operations might have added little value and the sales office might have added significant value through superior marketing skill, liaison between the corporation and its customers, or mere fortuity, (b) in a unitary enterprise such as the corporation, compensation, depreciation, and profit are not independent variables to be adjusted without reference to the other, and (c) it would distort the application of the tax in both theory and practice to confine the value added consequences of the state market to solely the labor and capital expended by the in-state sales force; (4) given that "value added" also may be calculated by a "subtraction method"--which uses revenues minus cost of materials, but reaches an identical result--(a) the difference between the addition and subtraction methods is one of form and lacks constitutional significance, and (b) under either method, value added includes a residual that cannot be geographically located with economic precision, since, under the subtraction method, even though both revenues and the purchase of materials might be located, value added would itself be a remainder which would be no more assignable than income; (6) the same factors--such as functional integration, centralization of management, and economies of scale--which lead to a conclusion that separate geographical accounting is not constitutionally required for state income taxation of a unitary business make it impossible to determine the location of value added with exact precision; and (7) in the case of a more-or-less integrated business enterprise operating in more than one state, arriving at precise territorial allocations of "value" is often an elusive goal, in both

theory and practice. (Stevens and Blackmun, JJ., dissented from this holding).

COMMERCE §238;

state tax on multistate business -- apportionment -- ;

Headnote:[7]

Under the Federal Constitution's commerce clause (Art I, 8, cl 3), apportionment of a state tax on a multistate business is permitted only when precise geographical measurement is not feasible, for to allow apportionment where there is no practical or theoretical justification could provide the opportunity for a state to export tax burdens and import tax revenues.

COMMERCE §238

CONSTITUTIONAL LAW §605;

state value added tax -- apportionment -- foreign corporation -- due process -- ;

Headnote:[8]

For purposes of determining whether apportionment of a state's single business tax is permitted, under the Federal Constitution's commerce clause (Art I, 8, cl 3) and under the due process clause of the Constitution's Fourteenth Amendment, with respect to a foreign manufacturing corporation which had sales and a sales office in the state in a particular tax year, the tax cannot be analyzed as a tax upon "business activity," where the state's tax statute (a) does not say that the tax is a tax upon business activity, but (b) provides that the tax is a tax of 2.35 percent upon the adjusted tax base of every person with business activity in the state which is allocated or apportioned to the state; even though in-state business activity is a threshold requirement for the single business tax, and even though "value added" is the measure of that tax, an attempt to label the tax as a tax upon business activity does not permit the court to forgo examination of the actual tax base and the tax's apportionment provisions.

EVIDENCE §414;

state tax -- validity -- assumptions -- ;

Headnote:[9]

For purposes of determining a state's authority, under the Federal Constitution's commerce clause (Art I, 8, cl 3) and under the due process clause of the Constitution's Fourteenth Amendment, to apportion the state's value added, single business tax--as applied to a foreign manufacturing corporation which had more than $ 103 million in sales, but maintained only a 14-employee sales office in the state in a particular tax year--the United States Supreme Court can and must assume that the corporation's in-state sales were part of the corporation's essential economic strategies and were an integral part of corporationwide value added, where (1) without those in-state sales, the corporation's value added would have been lowered to a remarkable degree; (2) the market demand that sustained those sales did not arise solely, perhaps not even substantially, from the activities of the corporation's in-state sales personnel; but (3) the requirements of the state market determined the direction of the corporation's design, production, and distribution process; and (4) the corporation, by serving that market and by meeting that market's demands, generated value added in the sums that the corporation did. (Stevens and Blackmun, JJ., dissented from this holding).

COMMERCE §239

CONSTITUTIONAL LAW §603;

state tax -- due process -- ;

Headnote:[10]

For purposes of determining whether a state is permitted, under the Federal Constitution's commerce clause (Art I, 8, cl 3) and under the due process clause of the Constitution's Fourteenth Amendment, to apportion the state's value added, single business tax, the Constitution does not require a formalistic analysis resulting in a penalty for the state's selection of an easier calculation method for the state's taxpayers.

COMMERCE §238

CONSTITUTIONAL LAW §605

EVIDENCE §979.2;

Headnote:[11A][11B][11C][11D][11E][11F]

A foreign manufacturing corporation which had more than $ 103 million in sales, but maintained only a 14-employee sales office in the state in a particular tax year fails to prove by clear and cogent evidence that a distorted result, in violation of the Federal Constitution's commerce clause (Art I, 8, cl 3) or the due process clause of the Constitution's Fourteenth Amendment, is provided by the state's apportionment formula to calculate the corporation's in-state "value added" subject to the state's value added, single business tax for that tax year, where (1) the corporation's liability is based upon an adjusted tax base of about $ 12.5 million, which base is calculated by (a) multiplying the corporation's total "value added" tax base of about $ 221 million by an 8.9717-percent factor, which is the average of a (i) 0.2328-percent ratio of in-state payroll to total payroll, (ii) 0.0930-percent ratio of in-state property to total property, and (iii) 26.5892-percent ratio of in-state sales to total sales, and (b) reducing the initial result of about $ 19.8 million through (a) about a $ 9,000 capital-acquisitions deduction, and (b) about a $ 7.3 million reduction for excessive compensation by a labor-intensive taxpayer; (2) the corporation does not contest the internal consistency of the state's apportionment formula; and (3) with respect to the formula's external consistency, (a) a three-factor formula of payroll, property, and sales has been approved for the apportionment of state income taxes, for, even though the one-third weight given to each factor is not precise for every case, the three factors appear in combination to reflect a very large share of the activities by which value is generated, (b) sales do not have to be excluded for value added purposes, for (i) sales, as a measure of market demand, have a profound impact upon the amount of an enterprise's value added, and (ii) value added is not subject to geographic ascertainment, (c) thus, the single business tax does not tax value earned outside the state's borders, and (d) it is not necessary to say for certain whether the three-factor formula or one of several other proposed formulas gives the most accurate calculation, where (i) the corporation has not convincingly demonstrated which formula is the most accurate, and (ii) the corporation gives no estimate of the value added that would take into account both in-state sales activity and in-state market demand for the corporation's products, but (iii) the state has consistently applied a formula, the elements of which appear to reflect a very large share of activities from which value is generated, with further relief for labor-intensive taxpayers such as the corporation. (Stevens and Blackmun, JJ., dissented from this holding.)

APPEAL §1092

COMMERCE §330

CONSTITUTIONAL LAW §607;

failure to contest issue -- income apportionment -- state tax on multistate business -- due process -- ;

Headnote:[12]

With respect to a state tax on a unitary, multistate business, the test for fair income apportionment, under the Federal Constitution's commerce clause (Art I, 8, cl 3) and under the due process clause of the Constitution's Fourteenth Amendment, has two components: (1) internal consistency, that is, the formula must be such that, if applied by every jurisdiction, the formula would result in no more than all of the unitary business' income being taxed, and (2) external consistency, that is, the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated; the United States Supreme Court, on certiorari to review a foreign corporation's challenge to the apportionment formula of a state's tax, need not consider the internal consistency of the state's formula, where the corporation does not contest such internal consistency.

EVIDENCE §414;

burden of proof -- validity -- income tax -- value added tax -- ;

Headnote:[13]

In order to prevail on a claim, under the Federal Constitution's commerce clause (Art I, 8, cl 3) and under the due process clause of the Constitution's Fourteenth Amendment, that a state tax on the income of a multistate business violates the external consistency test, a taxpayer must prove by clear and cogent evidence that the income attributed to the state (1) is in fact out of all appropriate proportions to the business transacted in that state, or (2) has led to a grossly distorted result; the same test applies to apportionment of a state value added tax.

APPEAL §1662;

effect of decision on other grounds -- ;

Headnote:[14A][14B]

On certiorari to review a foreign corporation's claim that a state's value added tax violates the Federal Constitution's commerce clause (Art I, 8, cl 3) and the due process clause of the Constitution's Fourteenth Amendment, the United States Supreme Court need not consider the state's alternative claim that the state, instead of taxing value added, could have taxed gross receipts of sales into the state, where the Supreme Court concludes that neither the commerce clause nor the due process clause is violated by the state's value added tax, as applied to the corporation in a particular tax year.

COMMERCE §239

COURTS §124.5

EVIDENCE §918;

nondiscrimination -- state value added tax -- motive -- ;

Headnote:[15A][15B][15C]

A foreign corporation fails to demonstrate that a state's value added, single business tax discriminates against out-of-state businesses in violation of the Federal Constitution's commerce clause (Art I, 8, cl 3), where (1) the corporation cannot point to any treatment of in-state and out-of-state firms that is discriminatory on its face; (2) in the absence of any facial discrimination, the corporation, other than a vague accusation of discrimination, presents no other standard--not involving fair apportionment--by which the constitutionality of the tax might be considered; and (3) although the state's governor said that the tax was enacted to promote the development and investment of business within the state, (a) it is a laudatory goal in the design of a tax system to promote investment that will provide jobs and prosperity to citizens of the taxing state, (b) states are free to structure their tax systems to encourage the growth and development of intrastate commerce and industry, (c) all the contemporaneous evidence concerning passage of the tax suggests a benign motivation, combined with the practical need to increase revenues, and (d) neither the corporation nor the secondary sources that the corporation relies upon present any evidence that the tax was inspired as a way to export tax burdens or import tax revenues.

COMMERCE §238;

state tax -- nondiscrimination -- apportionment -- ;

Headnote:[16]

With respect to a state tax on a multistate business, the Federal Constitution's commerce clause (Art I, 8, cl 3) has a deeper meaning that may be implicated even though state provisions do not allocate tax burdens between insiders and outsiders in a manner that is facially discriminatory; thus, the commerce clause requires more than mere facial neutrality, but the content of that requirement is fair apportionment, and the deeper meaning is embodied in the requirement of fair apportionment, as expressed in the tests of internal and external consistency.

COMMERCE §238

COURTS §124;

state tax -- fair share -- double taxation -- legislative task -- ;

Headnote:[17]

In reviewing state taxation schemes under the Federal Constitution's commerce clause (Art I, 8, cl 3), the United States Supreme Court (1) attempts to insure that each state taxes only its fair share of an interstate transaction; and (2) acts as a defense against state taxes which, whether by design or inadvertence, either (a) give rise to serious concerns of double taxation, or (b) attempt to capture tax revenues that, under the theory of the tax, belong of right to other jurisdictions; but (3) declines to undertake the essentially legislative task of establishing a single constitutionally mandated method of taxation.

**SYLLABUS**

Michigan's single business tax (SBT) is a value added tax (VAT) levied against entities having "business activity" within the State. As part of the SBT computation, a taxpayer doing business both within and without the State must determine its apportioned tax base by multiplying its total value added -- which consists of its profit, as represented by its federal taxable income, plus compensation paid to labor, depreciation on capital, and other factors -- by the portion of its business activity attributable to Michigan -- which consists of the average of three ratios: (1) Michigan payroll to total payroll, (2) Michigan property to total property, and (3) Michigan

sales to total sales. During 1980, the tax year in question, petitioner Trinova, an Ohio corporation, maintained a 14-person sales office in Michigan. Under the SBT formula, its 1980 payroll and property apportionment factors were only 0.2328% and 0.0930% respectively, while its sales factor was 26.5892%, representing Michigan sales of over $ 100 million. Although its 1980 federal taxable income showed a loss of almost $ 42.5 million, Trinova's SBT computation resulted in a tax of over $ 293,000. Trinova paid the tax, but subsequently filed an amended return and refund claim, alleging that it was entitled to relief under Michigan law because the SBT's apportionment provisions did not fairly represent the extent of its business activity within the State. The amended return proposed that Trinova's company-wide compensation and depreciation be excluded from its preapportionment value added, and that its actual Michigan compensation and depreciation be added back into its apportioned tax base, which would result in a negative value added apportioned to Michigan and entitle the company to a refund for its entire 1980 SBT payment. When respondent Department of Treasury denied relief, Trinova sued for a refund in the State Court of Claims, which ruled in its favor. However, the State Court of Appeals held that Trinova was not entitled to statutory relief, and the State Supreme Court affirmed, holding, among other things, that the SBT's three-factor apportionment formula did not violate either the Due Process Clause or the Commerce Clause of the Federal Constitution.

*Held:* As applied to Trinova during the tax year at issue, the SBT's three-factor apportionment formula does not violate either the Due Process Clause or the Commerce Clause. Pp. 372-387.

(a) Under the test stated in *Complete Auto Transit, Inc.* v. *Brady*, 430 U.S. 274, 279, 51 L. Ed. 2d 326, 97 S. Ct. 1076, a state tax levied upon multistate businesses is valid under the Commerce Clause if, as relevant here, it is fairly apportioned and does not discriminate against interstate commerce. Moreover, the *Complete Auto* test encompasses the Due Process Clause requirement that, *inter alia*, a rational relationship exist between the income attributed to the State and the intrastate values of the enterprise. See, *e. g., Mobil Oil Corp.* v. *Commissioner of Taxes of Vt.*, 445 U.S. 425, 436-437, 63 L. Ed. 2d 510, 100 S. Ct. 1223.

(b) Because the SBT attempts to tax a base that

cannot be assigned to one geographic location with any precision, the decision to apportion the tax is not unconstitutional. Although Trinova's compensation and depreciation may appear in isolation to be susceptible of geographic designation, those elements cannot be separated from income, which cannot be located in a single State. The SBT is not a combination or series of several smaller taxes on compensation, depreciation, and income, but is an indivisible tax upon a different, bona fide measure of business activity, the value added. This conclusion is no different from the one this Court has reached in upholding the validity of state apportionment of income taxes. The same factors that prevent determination of the geographic location where income is generated -- such as functional integration of the intrastate and extrastate activities of a unitary business enterprise, centralization of management, and economies of scale -- make it impossible to determine the location of value added with exact precision. See, *e. g., Mobil Oil Corp., supra*, at 438; *Amerada Hess Corp.* v. *Director, Div. of Taxation, N. J. Dept. of Treasury*, 490 U.S. 66, 74, 104 L. Ed. 2d 58, 109 S. Ct. 1617. Thus, although Trinova had no federal income during 1980, it cannot be relieved of tax upon its Michigan business. Such relief would be incompatible with the rationale of a VAT, under which tax becomes due even if the taxpayer was unprofitable, and is unsupported by the record. Trinova's approach would require the conclusion that it added value only at the factory through the consumption of capital and labor, while the record would as easily support a finding that its production operations added little value and its sales offices added significant value. Although Trinova's 14 Michigan sales personnel need not be relied on as the sole, or even a substantial, source of all the value added that can be apportioned fairly to Michigan, it cannot be doubted that, without the company's $ 100 million in Michigan sales, its total value added would have been lower to a remarkable degree. It distorts the SBT both in application and theory to confine value added consequences of the Michigan market solely to the labor and capital expended by the resident sales force. Pp. 373-379.

(c) The SBT's three-factor apportionment formula cannot be ruled unfair, since Trinova has failed to meet its burden of proving, by clear and cogent evidence, that there is no rational relationship between its tax base measure attributed to Michigan and the contribution of its Michigan business activity to the entire value added process. Cf., *e. g., Container Corp. of America* v.

*Franchise Tax Bd.*, 463 U.S. 159, 169, 180-181, 77 L. Ed. 2d 545, 103 S. Ct. 2933; *Moorman Mfg. Co.* v. *Bair*, 437 U.S. 267, 274, 57 L. Ed. 2d 197, 98 S. Ct. 2340. This Court has approved the same formula for apportionment of income, see, *e. g., Butler Bros.* v. *McColgan*, 315 U.S. 501, 86 L. Ed. 991, 62 S. Ct. 701, and the formula has gained wide acceptance in that context "because payroll, property, and sales appear in combination to reflect a very large share of the activities *by which value is generated," Container Corp., supra*, at 183 (emphasis added). Trinova's argument -- that the formula leads to a distorted result, out of all proportion to the company's Michigan business, because sales have no relationship to, and add nothing to, the value that compensation and depreciable plant contribute to the Michigan tax base -- is rejected, since sales (as a measure of market demand) do have a profound impact upon the amount of an enterprise's value added, and since there is no basis for distinguishing similar arguments that were pressed, and rejected by this Court, with regard to the apportionment of income. Because the three-factor formula causes no distortion, the SBT does not tax value earned outside Michigan. The argument that the value was added in Ohio, by labor and capital, and that no value has been added in Michigan, wrongly assumes that value added is subject to geographic ascertainment and that a sales factor is inappropriate in apportionment. Trinova gives no estimate of the value added that would take account of both its Michigan sales activity and Michigan market demand for its products, whereas the State has consistently applied the three-factor formula and has enacted further provisions giving relief to labor intensive taxpayers like Trinova. Pp. 379-384.

(d) The SBT does not discriminate against interstate commerce. Trinova cannot point to any treatment of in-state and out-of-state firms that is discriminatory on its face. Although *American Trucking Assns., Inc.* v. *Scheiner*, 483 U.S. 266, 281, 97 L. Ed. 2d 226, 107 S. Ct. 2829, states that the Commerce Clause has a "deeper meaning" that may be implicated even absent facial discrimination, that meaning is embodied in the requirement of fair apportionment and does not encompass Trinova's vague accusation of discrimination. Nor is that accusation supported by a statement of Michigan's Governor that the SBT was enacted to promote business development and investment within the State. Such promotion is a laudable goal in the absence of evidence of an impermissible motive to export tax burdens or import tax revenues. Pp. 384-386.

**COUNSEL:** Peter S. Sheldon argued the cause for petitioner. With him on the briefs were Thomas D. Hammerschmidt, Jr., Jeffery V. Stuckey, Benjamin O. Schwendener, Jr., William F. Sheehan, Collette C. Goodman, and Walter Hellerstein.

Richard R. Roesch, Assistant Attorney General of Michigan, argued the cause for respondent. With him on the brief were Frank J. Kelley, Attorney General, Gay Secor Hardy, Solicitor General, and Thomas L. Casey, Assistant Solicitor General. *

> * Briefs of amici curiae urging reversal were filed for Alcan Aluminum Corp. et al. by Patrick R. Van Tiflin, Myra L. Willis, and James H. Geary; and for Caterpillar Inc. by Don S. Harnack and Richard A. Hanson.
>
> Benna Ruth Solomon and Charles Rothfeld filed a brief for the Council of State Governments et al. as amici curiae urging affirmance.

**JUDGES:** KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, MARSHALL, and O'CONNOR, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, post, p. 387. STEVENS, J., filed a dissenting opinion, in which BLACKMUN, J., joined, post, p. 388. SOUTER, J., took no part in the consideration or decision of the case.

**OPINION BY:** KENNEDY

**OPINION**

[*361] [***896] [**823] JUSTICE KENNEDY delivered the opinion of the Court.

[***LEdHR1A] [1A]The principal question before us is whether the three-factor apportionment formula of the Michigan single business tax (SBT), Mich. Comp. Laws § 208.1 *et seq.* (1979), violates either the Due Process Clause or the Commerce Clause of the Federal Constitution. The applicability of a three-factor formula to a state income tax is well settled, but we have not considered whether a similar apportionment formula may be applied to a value added tax (VAT). We granted certiorari to consider this question and to determine whether the Michigan SBT discriminates against out-of-state businesses.

[*362]  I

Although in Europe and Latin [***897] America VAT's are common, see Lindholm, The Origin of the Value-Added Tax, 6 J. Corp. L. 11 (1980); Due, Economics of the Value Added Tax, 6 J. Corp. L. 61 (1980), in the United States they are much studied but little used. Michigan is the first and, the parties tell us, the only State to have enacted a VAT as a tax on business activity. We begin with a description of value added and VAT's in general, and then discuss the Michigan SBT.

A

[HN1] Value added is an economic concept. "Value added is defined as the increase in the value of goods and services brought about by whatever a business does to them between the time of purchase and the time of sale." Haughey, The Economic Logic of the Single Business Tax, 22 Wayne L. Rev. 1017, 1018 (1976) (hereinafter Haughey). The value a business adds to a single product is "the difference between the value of the product at sale and the cost of goods purchased from other businesses that went into the product." Taxation and Economic Policy Office, Michigan Department of Treasury, Analysis of the Michigan Single Business Tax 20-21 (1985) (hereinafter SBT Analysis). It follows that the sale price of a product is the total of all value added by each step of the production process to that point. "The value added of a loaf of bread is the sum of the value contributed at each stage of the production and distribution process. Among others, it includes the contribution of the farmer, miller, baker, wholesaler and retailer." Haughey 1019.

[HN2] A business "adds value by handling or processing these [goods] with its labor force, machinery, buildings and capital." R. Kleine, Advisory Commission on Intergovernmental Relations, The Michigan Single Business Tax: A Different Approach to State Business Taxation 1 (1978) (hereinafter Kleine). In this litigation, value added usually refers to the [*363] activities of a single business enterprise. The term can, however, be used with regard to a single product, or even an entire economy. "[Value added] is a means of consistently measuring the size of business firms and other economic enterprises [**824] comprising the total economy . . . . Gross National Product is virtually equivalent to national value added." Haughey 1017.

[***LEdHR2] [2][HN3] One of the acknowledged advantages of value added as a measure of taxation is its neutrality. A VAT is neutral in the sense that it taxes all business activity alike: Under a pure VAT, all forms of business organization (corporation, partnership, proprietorship), all types of financing (debt, equity) and all methods of production (capital intensive, labor intensive) bear the same tax burden.

"Tax factors are minimized in business decisions; inherent advantages and relative efficiencies are allowed to operate in the market economy with minimum tax distortions.

"This neutrality of a value-added tax is in notable contrast to the effects of both the corporation income tax and the payroll taxes. The former, by definition, is applied only to corporations and varies with their reliance on equity rather than debt capital and the efficiency with which they use equity capital -- that is, their net profits." Smith, Value-added tax: [***898] the case for, 48 Harv. Bus. Rev. 77, 79 (Nov.-Dec. 1970).

Though neutral in theory, VAT's often depart in practice from the pure value added model because of special exemptions, deductions, and other adjustments. These features can eliminate much of the claim to neutrality. See generally The Value-Added Tax: Lessons from Europe (H. Aaron ed. 1981).

[***LEdHR3] [3][HN4] A VAT differs in important respects from a corporate income tax. A corporate income tax is based on the philosophy of ability to pay, as it consists of some portion of the profit remaining after a company has provided for its workers, [*364] suppliers, and other creditors. A VAT, on the other hand, is a much broader measure of a firm's total business activity. Even if a business entity is unprofitable, under normal circumstances it adds value to its products and, as a consequence, will owe some VAT. Because value added is a measure of actual business activity, a VAT correlates more closely to the volume of governmental services received by the taxpayer than does an income tax. Further, because value added does not fluctuate as widely as net income, a VAT provides a more stable source of revenue than the corporate income tax. See generally Kleine 3, figure 1. "'The logic or

rationale of the [VAT] rests squarely on the benefits received principle of taxation -- government services are essential to the operation of any business enterprise . . . and a part of these public service costs should properly be included in the cost of doing business.'" *Id.*, at 4 (citation omitted).

[***LEdHR4A] [4A]The SBT Analysis, at 20-21, provides us with the following simplified example of how value added is determined. Assume a bakery's sole revenue comes from the sale of bread. The bakery's costs consist of materials (flour, sugar, spices, utilities), labor (baker, sales clerk), capital (building, mixer, utensils, oven), and credit (interest paid on loans). Any excess of revenues over costs represents profit. Thus:

Revenues = Cost of Labor + Cost of Materials + Depreciation [1] + Interest + Profit.

Because value added is defined as the difference between the value of products sold (revenues), and the cost of materials going into the products, we can represent value added (for the entire firm) by a second simple equation:

[*365] Value added = Revenues - Cost of Materials.

The same result is reached by another common method. If we subtract Cost of Materials [**825] from each side of the first equation above, we have:

Revenues - Cost of Materials = Cost of Labor + Depreciation + Interest + Profit.

[***899] So in practice value added can be calculated as *either* Revenues - Cost of Materials; *or* Cost of Labor + Depreciation + Interest + Profit. Not surprisingly, these are referred to as the "subtraction" and the "addition" methods. Each provides an identical measurement of a taxpayer's value added. [2] Once value added is determined, the VAT is assessed as a percentage of the value added for the relevant fiscal period. [3]

1   In calculating value added, a firm's use of capital is represented by depreciation. [HN5] Depreciation is the reduction in value of a firm's assets, through wear and tear, obsolescence, or other factors, and thus roughly measures consumption of capital. See McGraw-Hill Dictionary of Modern Economics 130 (3d ed.

1983); P. Samuelson & W. Nordhaus, Economics 902 (12th ed. 1985).

2   See, *e. g.*, Aaron, Introduction and Summary, in The Value-Added Tax: Lessons from Europe 1, 2 (H. Aaron ed. 1981) (hereinafter Aaron); Haughey 1018; Special Committee on the Value-Added Tax of the Section of Taxation, American Bar Association, The Choice Between Value-Added and Sales Taxation at Federal and State Levels in the United States, 29 Tax Lawyer 457, 459 (1976) (addition and subtraction methods "reac[h] the same result by the opposite means"); SBT Analysis 20 (addition and subtraction are "two *alternative*, but *equivalent* ways of calculating value added. . . . The important point is that, conceptually, these two calculations are *equal*").

3   The nations of the European Economic Community (EEC) each levy a VAT under yet a third method, as a multistage sales tax. See generally Aaron. Under the EEC system, the bakery in our example would be taxed on each sale of bread and would receive a credit for each purchase of materials going into production of the bread. Similarly, at each other link in the chain of production and distribution, tax is assessed on sales, but credit is provided on purchases. This multistage sales tax system places the burden on the taxpayer to demonstrate that it did, in fact, purchase goods for which it requests a credit. The multistage sales tax version of the VAT has been advocated as promoting tax compliance, though the evidence does not necessarily support this view. See Oldman & Woods, Would a Value-Added Tax System Relieve Tax Compliance Problems, in Income Tax Compliance: A Report of the ABA Section of Taxation Invitational Conference on Income Tax Compliance 317 (1983) (multistage consumption VAT has traditionally been regarded as self-enforcing because the tax credit mechanism is said to induce firms to report transactions accurately).

The requirement of "fiscal frontiers" to record and tax interstate transactions makes the multistage sales tax approach impracticable for an individual State. McLure, State and Federal Relations in the Taxation of Value Added, 6 J. Corp. L. 127, 130-131 (1980); see also Haughey

1025 ("invoice credit method is not workable in a subeconomy without the legal authority and means to control the flow of imports and exports").

On international transactions, the EEC's VAT's are assessed in the jurisdiction of destination. As a result, no tax is applied on exports, while full tax is applied to imports. See *id.*, at 1024-1025; Aaron 4. The destination principle does not, however, purport to determine whether value was added in the jurisdiction of destination, or the jurisdiction of origin.

[\*366] B

The Michigan SBT went into effect on January 1, 1976. 1975 Mich. Pub. Acts 228. [4] The SBT replaced seven [\*\*\*900] different business taxes. Kleine 22; Brief for Respondent 8. Before 1976, a typical manufacturer with business activity in [\*367] Michigan would have been subject to a franchise tax, an income tax, an intangible property tax, and an ad valorem property tax upon inventories. Mitchell, Taxes Repealed and Amended, 22 Wayne L. Rev. 1029 (1976); Brief for Respondent 8-9. After enactment [\*\*826] of the SBT, the same manufacturer would pay only one tax.

4  The SBT was not Michigan's first experiment with a VAT. Between 1953 and 1967, Michigan had utilized a Business Activities Tax (BAT) similar to the Michigan SBT. Although the BAT was a subtraction method VAT, and permitted different adjustments than the SBT, the BAT tax base included "a company's payroll, profits, and capital outlay less depreciation allowed," Lock, Rau, & Hamilton, The Michigan Value-Added Tax, 8 Nat. Tax J. 357, 363 (1955), and was apportioned among States by the same three-factor formula that is challenged here. See Mich. Stat. Ann. §§ 7.557(1)-7.557(24) (Supp. 1955), repealed, 1967 Mich. Pub. Acts 281. The Michigan Supreme Court upheld the BAT against a challenge on facts remarkably similar to those presented here by Trinova. *Armco Steel Corp.* v. *State*, 359 Mich. 430, 102 N.W.2d 552, 555-556 (1960) (Ohio corporation had nominal Michigan property and payroll, but substantial Michigan sales). We dismissed an appeal of the judgment in *Armco* for want of a substantial federal question. *Armco Steel Corp.* v. *Michigan*, 364 U.S. 337, 5

L. Ed. 2d 99, 81 S. Ct. 124 (1960). The arguments in that case focused on whether the BAT was best characterized as a tax on income or a tax on gross receipts, with the concern that under our jurisprudence of the time a "direct" tax on gross receipts from interstate commerce would be unconstitutional.

The Michigan SBT is an addition method VAT, although it inevitably permits various exclusions, exemptions, and adjustments that depart from the simple value added examples described above. Subject to exemptions contained at Mich. Comp. Laws § 208.35 (1979), [HN6] the Michigan SBT is levied against any person with "business activity" within the State of Michigan. § 208.31(1). [5] In order to calculate the amount of a taxpayer's SBT the taxpayer must, first, determine its total tax base. The total tax base consists of the taxpayer's value added, calculated by the addition method: Cost of Labor + Depreciation + Interest + Profit. Under § 208.9, the taxpayer begins with federal taxable income (representing profit), adds other elements that reflect consumption of labor and capital including compensation, depreciation, dividends, and interest paid by the taxpayer, and makes other detailed adjustments.

5  "[HN7] Business activity" is broadly defined as "a transfer of legal or equitable title to or rental of property, whether real, personal, or mixed, tangible or intangible, or the performance of services, or a combination thereof, made or engaged in, or caused to be made or engaged in, within this state, whether in intrastate, interstate, or foreign commerce, with the object of gain, benefit, or advantage, whether direct or indirect, to the taxpayer or to others, but shall not include the services rendered by an employee to his employer, services as a director of a corporation, or a casual transaction. . . ." Mich. Comp. Laws § 208.3 (1979).

Second, [HN8] if a taxpayer does business both within and without Michigan, it must determine the portion of its total value added attributable to Michigan. That portion, the crux of this case, is the average of three ratios: (1) Michigan payroll [\*368] to total payroll, (2) Michigan property to total property, and (3) Michigan sales to total sales. §§ 208.45, 208.46, 208.49, 208.51. The total tax base is multiplied by the portion of business activity attributable to Michigan (under the three-factor

formula), and the result, subject to several further adjustments, is the taxpayer's "adjusted tax base." § 208.31(2).

Two further adjustments are relevant here: § 208.23(a), which permits a taxpayer to deduct a portion of its capital acquisitions, and § 208.31(5), which permits a labor-intensive taxpayer to reduce its adjusted tax base by a percentage equal to the percentage by which compensation exceeds 63% of the total tax base, but with such reduction not to exceed a maximum of 37%. Actual tax liability [***901] equals the adjusted tax base multiplied by a tax rate of 2.35%. [6]

> 6 Any taxpayer can, in the alternative, calculate its adjusted tax base as total gross receipts multiplied by the apportionment figure (derived using the three-factor formula) divided by two. This figure is then multiplied by the 2.35% tax rate to give actual tax liability. § 208.31(2). Under

this alternative calculation, no firm's Michigan SBT liability will ever exceed 1.175% of apportioned gross receipts.

II

Trinova, an Ohio corporation, manufactures automobile components. Its principal office is located in Maumee, Ohio, a suburb of Toledo located near the Michigan border. During 1980, the tax year in question, Trinova maintained a fixed presence in Michigan: a sales office of 14 employees who solicited orders, maintained contact with Trinova's Michigan customers, and performed clerical work. Michigan, with its automobile industry, was a major market for Trinova's products. Indeed, Trinova made $ 103,981,354 worth of sales to Michigan during 1980, 26.5892% of its total sales of $ 391,065,866. Trinova calculated its 1980 SBT adjusted tax base as follows: [*369]

| U. S. taxable income (loss) | ($ 42,466,114) |
|---|---|
| Add: | |
| Compensation | $ 226,356,271 |
| Depreciation | $ 23,262,909 |
| Dividends, interest, and royalties | |
| paid | $ 22,908,950 |
| Other | $ 549,526 |
| Subtotal | $ 230,611,542 |
| | |
| Subtract: | |
| Dividends, interest, and royalties | |
| received | ($ 9,486,223) |
| Total Tax Base | $ 221,125,319 |
| Apportionment: | |
| Payroll Factor | 0.2328% |
| Property Factor | 0.0930% |
| Sales Factor | 26.5892% |
| | |
| Average Factor | 8.9717% |
| Apportioned Tax Base: | |
| | $ 221,125,319 |

|  | x 8.9717% |
|---|---|

[**827] See 433 Mich. 141, 150-152, 445 N.W.2d 428, 431-433 (1989). Trinova further adjusted its tax base by subtracting a capital acquisition deduction ($ 9,063) and by taking the maximum (37%) reduction for labor-intensive [***902] taxpayers. These adjustments resulted in a 1980 adjusted tax base of $ 12,492,671. When multiplied by the tax rate of 2.35%, Trinova's tax liability amounted to $ 293,578 ($ 12,492,671 x 2.35%). 7 Trinova timely filed its return and paid its tax liability.

7 Trinova could have calculated its tax liability under the alternative gross receipts method, Mich. Comp. Laws § 208.31(2) (1979), as follows: Total gross receipts ($ 391,065,866) multiplied by Michigan apportionment factor (8.9717%) divided by two (equals $ 17,542,628) multiplied by 2.35% equals tax liability of $ 412,251. This figure amounts to less than 0.4% of Trinova's Michigan sales. Of course, Trinova did not use this method, as it was required to pay only $ 293,578 (or 0.28% of Michigan sales) under the apportionment method challenged here.

[*370] In 1985, a Michigan intermediate Court of Appeals ruled that taxpayers similarly situated to Trinova were entitled to "relief" under Mich. Comp. Laws § 208.69 (1979), a provision of the SBT. *Jones & Laughlin Steel Corp.* v. *Department of Treasury*, 145 Mich. App. 405, 377 N.W.2d 397, leave to appeal and reconsideration denied, 424 Mich. 895 (1986). At the time, § 208.69 provided that if the apportionment provisions of the SBT did not "fairly represent the extent of the taxpayer's business activity" in Michigan, the taxpayer could, among other alternatives, petition for the employment of "any other method to effectuate an equitable allocation and apportionment of the taxpayer's tax base."

Soon after the decision in *Jones & Laughlin*, Trinova filed an amended return and refund claim for the 1980 tax year. Based on the relief granted in *Jones & Laughlin*, Trinova proposed that despite admitted company-wide value added of $ 221 million and Michigan sales of over $ 100 million, for purposes of the Michigan SBT it should be treated as if it had negative total value added. Value added apportioned to Michigan would also have been negative, and Trinova would have been entitled to a refund for its entire 1980 SBT payment. 8 Upon denial of relief by the Michigan Department of [*371] Treasury, Trinova sued for a refund in the Michigan Court of Claims, which ruled in Trinova's favor on the authority of *Jones & Laughlin*. No. 86-10430-CM (May 5, 1987); App. to Pet. for Cert. 42a-51a.

8 The amended return proposed that Trinova's company-wide compensation and depreciation be excluded from the preapportionment tax base, and actual Michigan compensation and depreciation be added back into the apportioned tax base, as follows:

| Total Tax Base -- statutory formula: | $ 221,125,319 |
|---|---|
| | |
| Deduct Compensation | ($ 226,356,271) |
| Deduct Depreciation | ($ 23,262,909) |
| | |
| Trinova's Proposed Total Tax Base: | ($ 28,493,861) |
| Apportionment (8.9717%) | ($ 2,556,384) |
| Add Michigan Compensation | $ 511,774 |
| Add Michigan Depreciation | $ 2,152 |

433 Mich. 141, 147, n.4, 445 N.W.2d 428, 431, n.4 (1989).

[***903] While the Department of Treasury's appeal was pending in the Michigan Court of Appeals, the legislature amended § 208.69. 1987 Mich. Pub. Acts 39. [HN9] The amended § 208.69 creates a presumption that the statutory apportionment formula fairly represents the taxpayer's business activity in [**828] Michigan unless the adjusted tax base meets one of two tests, neither of which Trinova could satisfy, and which do not merit discussion here. See Mich. Comp. Laws Ann. § 208.69(3) (West Supp. 1990). The Court of Appeals referred to the legislature's statement that its Act was intended to be

> "curative, expressing the original intent of the legislature that the single business tax . . . is an indivisible value added type of tax and not a combination or series of several smaller taxes and that relief from formulary apportionment should be granted only under extraordinary circumstances." 1987 Mich. Pub. Acts 39, § 2.

Relying upon this language, the Court of Appeals determined that the amendment was to be given retroactive effect as a "remedial and procedural" statute and that Trinova was not entitled to statutory relief. 166 Mich. App. 656, 666, 421 N.W.2d 258, 262 (1988).

The Michigan Supreme Court affirmed the Court of Appeals. 433 Mich. 141, 445 N.W.2d 428 (1989). Without addressing retroactive application of the amendments to § 208.69, it construed § 208.69 as a "constitutional 'circuit [*372] breaker'" to be applied only if required in order to save the SBT against unconstitutional application. 433 Mich. 141 at 156, 445 N.W.2d at 434. The court then upheld the SBT against Trinova's federal constitutional challenges. The Michigan Supreme Court noted that formulary apportionment of income taxes is uncontroversial and that it did "not believe that 'business activity' as defined under the [SBT] is susceptible to accurate analysis when only one component of the total business effort is examined." Id., at 163, 445 N.W.2d at 438. The court concluded that

Trinova's averaged ratios of payroll, property, and sales are a fair representation of the extent of its business activity in Michigan, making it ineligible for relief on statutory or constitutional grounds. Id., at 163-166, 445 N.W.2d at 438-439. We granted Trinova's petition for a writ of certiorari. 494 U.S. 1015 (1990).

III

[***LEdHR5] [5]The principles which govern the validity of state taxes levied upon multistate businesses seek to accommodate the necessary abstractions of tax theory to the realities of the marketplace. Under the test stated in *Complete Auto Transit, Inc.* v. *Brady*, 430 U.S. 274, 279, 51 L. Ed. 2d 326, 97 S. Ct. 1076 (1977),[HN10] we will sustain a tax against Commerce Clause challenge so long as "the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." We applied this four-part test in later cases addressing a wide variety of taxes. See *Goldberg* v. *Sweet*, 488 U.S. 252, 260, n.12, 102 L. Ed. 2d 607, 109 S. Ct. 582 (1989) (citing applications in cases involving sales, severance, use, corporate income, and business and occupation taxes).

[***904] In *Complete Auto*, we renounced the formalistic approach of *Spector Motor Service, Inc.* v. *O'Connor*, 340 U.S. 602, 95 L. Ed. 573, 71 S. Ct. 508 (1951), which had prohibited a State from taxing the privilege of doing business in the State, treating it as a tax upon interstate commerce and so beyond the authority of the [*373] State. We seek to avoid formalism and to rely upon a "consistent and rational method of inquiry [focusing on] the practical effect of a challenged tax." *Mobil Oil Corp.* v. *Commissioner of Taxes of Vt.*, 445 U.S. 425, 443, 63 L. Ed. 2d 510, 100 S. Ct. 1223 (1980). The *Complete Auto* test, while responsive to Commerce Clause dictates, encompasses as well [HN11] the due process requirement that there be "a 'minimal connection' between the interstate activities and the taxing State, and a rational relationship between the income attributed to the State and the intrastate values of the enterprise." *Mobil Oil Corp., supra*, at 436- 437; see also *Amerada Hess Corp.* v. *Director, Div. of Taxation, N. J. Dept. of Treasury*, 490 U.S. 66, 80, 104 L. Ed. 2d 58, 109 [**829] S. Ct. 1617 (1989) (SCALIA, J., concurring).

[***LEdHR1A] [1B]In this Court, Trinova does not dispute that its business activities have a substantial nexus with Michigan and subject it to the State's taxing authority. Nor does Trinova argue that the amount of tax it is required to pay bears no fair relation to the services provided by the State. *Complete Auto, supra*, at 279. Trinova instead contends that Michigan's SBT fails the other two prongs of the *Complete Auto* test: that the SBT is not fairly apportioned as applied to Trinova and that the tax discriminates against interstate commerce. We consider these claims and begin with the matter of apportionment.

A

[***LEdHR6A] [6A]Trinova's claim that apportionment of the tax is unconstitutional concentrates on the elements of the apportionment formula. The original rationale for apportionment of income was the difficulty of identifying the geographic source of the income earned by a multistate enterprise. See *Underwood Typewriter Co.* v. *Chamberlain*, 254 U.S. 113, 120-121, 65 L. Ed. 165, 41 S. Ct. 45 (1920) (legislature "faced with the impossibility of allocating specifically the profits earned by the [taxpayer's] processes conducted within its borders"). As we stated the problem in *Container Corp. of America* v. *Franchise Tax Bd.*, 463 U.S. 159, 192, 77 L. Ed. 2d 545, 103 S. Ct. 2933 (1983): "Allocating income among various taxing jurisdictions [*374] bears some resemblance . . . to slicing a shadow. " Trinova argues that because its SBT tax base is composed in large part of compensation and depreciation, elements which can be assigned to a geographic source, we must reject apportionment altogether.

[***LEdHR6A] [6B] [***LEdHR7] [7]We can accept the premise that apportionment is permitted only when precise geographic measurement is not feasible, for to allow apportionment where there is no practical or theoretical justification could provide the opportunity for a State to export tax burdens and import tax revenues. The Commerce Clause prohibits this competitive mischief. The issue becomes whether, without an apportionment formula, Michigan can assign the SBT tax base and its principal components to separate geographic locations [***905] and to separate accounts in each State. Michigan has decided it cannot do so without serious theoretical and practical difficulty, and upon review of the case we accept that determination.

[***LEdHR8] [8]We reject at the outset, however,

arguments by Michigan and some *amici curiae* that the Michigan SBT can be analyzed as a tax upon "business activity." Brief for Council of State Governments et al. as *Amici Curiae* 11. The statute does not say that the SBT is a tax upon business activity, but rather that it is a "tax of 2.35% *upon the adjusted tax base* of every person *with business activity in this state* which is allocated or apportioned to this state." Mich. Comp. Laws § 208.31(1) (1979) (emphasis added). While Michigan business activity is a threshold requirement for the tax, and value added is its measure, labeling the SBT a tax on "business activity" does not permit us to forgo examination of the actual tax base and apportionment provisions. "A tax on sleeping measured by the number of pairs of shoes you have in your closet is a tax on shoes." Jenkins, State Taxation of Interstate Commerce, 27 Tenn. L. Rev. 239, 242 (1960).

[***LEdHR6A] [6C]Trinova errs in the opposite direction. It would dissect the tax base as if the SBT were three separate and independent taxes: a tax on compensation, a tax on depreciation, and a [*375] tax on income, each apportioned. Trinova insists that compensation and depreciation can be located and can be separated from the total value added calculation. As a result, Trinova would be taxed upon its Michigan compensation and Michigan depreciation. It would owe no additional tax upon income [**830] apportionable to Michigan, because it had no income during the relevant tax year.

This characterization, and with it Trinova's constitutional argument, fails. Doubtless Trinova can identify the location of its plant and equipment and much of its compensation. The Michigan SBT, however, is not three separate and independent taxes, and Trinova cannot purport to identify the geographic source of value added by assuming that two elements can be located in a single State while the third cannot. Trinova's proposed apportionment for the 1980 tax year, n.8, *supra*, provides a good example of the problems that accompany its argument.

In 1980, Trinova's company-wide value added amounted to much less than its compensation plus depreciation. In short, Trinova was unprofitable. Under a VAT, however, tax becomes due in any event. Trinova's approach would require us to conclude that Trinova added value at the factory through the consumption of capital and labor, but that its products somehow lost

value outside of this process, perhaps between the time they left the factory and the time they were delivered to customers in Michigan. This approach is incompatible with the rationale of a VAT and is unsupported in the record.

For all this record shows, Trinova's production operations might have added little value and its sales offices might have added significant value, through superior marketing skill, liaison between the company and its customers, or mere fortuity. See *Moorman Mfg. Co.* v. *Bair*, 437 U.S. 267, 272, 57 L. Ed. 2d 197, 98 S. Ct. 2340 (1978) (record lacked analysis of what portion of profits was apportionable [***906] to sales, to manufacturing, or to other phase of company's operations).

[*376] But we need not rely upon Trinova's 14 Michigan sales personnel as the source of all the value added that can be apportioned fairly to Michigan. [HN12] In a unitary enterprise, compensation, depreciation, and profit are not independent variables to be adjusted without reference to each other. If Trinova had paid an additional $ 100 million in compensation during 1980, there is no way of knowing whether, or to what extent, value added would have increased. In fact, value added would not have increased so long as revenues did not increase. These elements of value added are inextricable, codependent variables.

[***LEdHR6A] [6D] [***LEdHR9] [9]Without Trinova's $ 100 million in 1980 Michigan sales, the company's value added would have been lower to a remarkable degree. The market demand that sustained those sales did not arise solely, perhaps not even substantially, from the activities of Trinova's 14 Michigan sales personnel. But there can be little doubt that requirements of the Michigan market determined the direction of Trinova's design, production, and distribution process. By serving that market and meeting its demands, Trinova generated value added in the sums that it did. We can and must assume that Michigan sales were a part of the company's essential economic strategies and were an integral part of company-wide value added. It distorts the tax both in application and theory to confine value added consequences of the Michigan market solely to the labor and capital expended by the resident sales force.

[***LEdHR4A] [4B] [***LEdHR6A] [6E]Trinova's attempted characterization is arguable only because Michigan calculates value added by the addition method. The addition and subtraction methods of calculating value, however, are but two different paths to the same result. See n.2, *supra*. Had Michigan calculated the SBT tax base by the subtraction method, reporting total revenues minus total cost of materials, Trinova's characterization would collapse of its own weight. Trinova could geographically locate its revenues and even determine where it purchased its materials. The Michigan apportionment formula [*377] assumes as much. But were Trinova to calculate value added based upon the location of its revenues, it would apportion a much greater share of its value added to Michigan (26.5892%) than was apportioned under Michigan's [**831] three-factor formula (8.9717%). An apportionment of value added based solely on the source of revenues is no less justifiable than an apportionment based solely upon the location of compensation or depreciation.

[***LEdHR6A] [6F] [***LEdHR10] [10]The difference between the addition and subtraction methods is one of form and lacks constitutional significance. Michigan chose the addition method of calculating value added as a convenience to taxpayers, for whom federal taxable income provided an easy starting point. Kleine 6-7 (discussing advantages of addition method); SBT Analysis 21 (same). The Constitution does not require a formalistic analysis resulting in a penalty for Michigan's selection of an easier calculation method for its taxpayers.

[***LEdHR4A] [4C] [***LEdHR6A] [6G]Both methods of calculation, moreover, illustrate the justification for the State's adoption of an apportionment formula. Under either [***907] method, value added includes a remainder or residual that cannot be located with economic precision. Under the addition method, value added contains the element of income, one calculated by and dependent upon factors (revenues minus total costs) not included in the addition method equation; under the subtraction method, value added is itself a remainder, no more assignable than income. It would be impractical to locate value added by a geographic test. We thus agree with the Michigan Legislature's statement that the SBT is not, for apportionment purposes, "a combination or series of several smaller taxes," 1987 Mich. Pub. Acts 39, § 2, but an "indivisible," *ibid.*, tax upon a different, bona fide measure of business activity, the value added. [***LEdHR6A] [6H]This conclusion is no different from

the one we have reached in upholding the validity of state apportionment of income taxes. As with a VAT, the discrete components of a state income tax may appear in isolation susceptible of geographic [*378] designation. Nevertheless, since *Underwood Typewriter Co.* v. *Chamberlain*, 254 U.S. 113, 65 L. Ed. 165, 41 S. Ct. 45 (1920), we have recognized the impracticability of assuming that all income can be assigned to a single source. In this respect, Trinova's argument becomes a familiar and often rejected genre of tax-payer challenge:

> "Apportionability often has been challenged by the contention that . . . the source of [particular] income may be ascertained by separate geographical accounting. The Court has rejected that contention so long as the intrastate and extrastate activities formed part of a single unitary business. See *Butler Bros.* v. *McColgan*, 315 U.S. 501, 506-508, 86 L. Ed. 991, 62 S. Ct. 701 (1942); *Ford Motor Co.* v. *Beauchamp*, 308 U.S. 331, 336, 84 L. Ed. 304, 60 S. Ct. 273 (1939); cf. *Moorman Mfg. Co.* v. *Bair*, 437 U.S. at 272. In these circumstances, the Court has noted that [HN13] separate accounting, while it purports to isolate portions of income received in various States, may fail to account for contributions to income resulting from functional integration, centralization of management, and economies of scale. *Butler Bros.* v. *McColgan*, 315 U.S. at 508-509. Because these factors of profitability arise from the operation of the business as a whole, it becomes misleading to characterize the income of the business as having a single identifiable 'source.' Although separate geographical accounting may be useful for internal auditing, for purposes of state taxation it is not constitutionally required." *Mobil Oil Corp.*, 445 U.S. at 438.

In a recent challenge to this unitary business principle, we rejected the argument that particular assignable costs of a business should be excluded from a broader tax base. *Amerada Hess Corp.* v. *Director, Div. of Taxation, N. J. Dept. of Treasury*, 490 U.S. 66, 104 L. Ed. 2d 58, 109 S. Ct. 1617 (1989). We considered the

New Jersey corporate income tax, which used federal taxable income as a benchmark and required certain [**832] adjustments (as does the Michigan SBT). New Jersey required oil companies to [*379] add back into income any deduction taken for taxes paid under the federal windfall profits tax. The taxpayers objected [***908] that the windfall profits tax is "an exclusively out-of-state expense because it is associated with the production of oil outside New Jersey." *Id.*, at 74.

In like manner, Trinova objects to the SBT's requirement that it add compensation and depreciation to federal taxable income on the grounds that these are, with limited exception, out-of-state expenses. In *Amerada Hess Corp.* we rejected outright the idea that geographically assignable costs of production must be excluded from an apportionment of income:

> "Just as each [taxpayer's] oil-producing revenue -- as part of a unitary business -- is not confined to a single State, *Exxon Corp.*, 447 U.S. 207 at 226, 65 L. Ed. 2d 66, 100 S. Ct. 2109, . . . so too the costs of producing this revenue are unitary in nature. See *Container Corp.*, 463 U.S. at 182 (the costs of a unitary business cannot be deemed confined to the locality in which they are incurred)." *Ibid.*

[***LEdHR1A] [1C] [***LEdHR6A] [6I]The reasoning of *Amerada Hess Corp.* applies with equal force to the case here. The same factors that prevent determination of the geographic location where income is generated, factors such as functional integration, centralization of management, and economies of scale, make it impossible to determine the location of value added with exact precision. In concluding that Michigan can apportion the SBT, we merely reaffirm what we have written before: "[HN14] In the case of a more-or-less integrated business enterprise operating in more than one State, . . . arriving at precise territorial allocations of 'value' is often an elusive goal, both in theory and in practice." *Container Corp.*, 463 U.S. at 164.

B

[***LEdHR1A] [1D] [***LEdHR11A] [11A]Having determined that Michigan's SBT attempts to tax a base that cannot be assigned to one location with any precision, and that apportionment is proper, we must

next [*380] consider whether Michigan's apportionment formula for Trinova's value added is fair. [***LEdHR11A] [11B] [***LEdHR12] [12]*Container Corp.* states our test for fair income apportionment:

> "[HN15] The first, and again obvious, component of fairness in an apportionment formula is what might be called internal consistency -- that is, the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business' income being taxed. The second and more difficult requirement is what might be called external consistency -- the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated." *Id.*, at 169.

Trinova does not contest the internal consistency of the SBT's apportionment formula, and we need not consider that question. [***LEdHR11A] [11C] [***LEdHR13] [13]Instead, Trinova argues that the SBT [HN16] apportionment formula fails the external consistency test. In order to prevail on such a challenge, an income taxpayer must prove "by 'clear and cogent evidence' that the income attributed to the State is in fact 'out of all appropriate proportions [***909] to the business transacted . . . in that State,' *[Hans Rees' Sons, Inc.,]*283 U.S. 123 at 135, 51 S. Ct. 385, 75 L. Ed. 879, or has 'led to a grossly distorted result,' *[Norfolk & Western R. Co.,]*390 U.S. 317 at 326, 88 S. Ct. 995, 19 L. Ed. 2d 1201." *Moorman Mfg. Co.*, 437 U.S. at 274.We conclude that the same test applies to apportionment of a VAT. Trinova must demonstrate that, in the context of a VAT, there is no rational relationship between the tax base measure attributed to the State and the contribution of Michigan business activity to the entire value [**833] added process. See *Container Corp., supra*, at 180-181. [***LEdHR11A] [11D]The Michigan SBT uses the same three-factor apportionment formula we first approved for apportionment of income in *Butler Brothers* v. *McColgan*, 315 U.S. 501, 86 L. Ed. 991, 62 S. Ct. 701 (1942).This standard has become "something of a benchmark against [*381] which other apportionment formulas are judged." *Container Corp., supra*, at 170; see also *Moorman Mfg. Co., supra*, at 282 (BLACKMUN, J., dissenting); *id.*, at 283-284 (Powell, J., dissenting). Although the one-third weight given to each of the three factors -- payroll, property, and sales -- is not a precise

apportionment for every case, the formula "has gained wide approval precisely because payroll, property, and sales appear in combination to reflect a very large share of the activities *by which value is generated." Container Corp., supra*, at 183 (emphasis added). The three-factor formula is widely used and is included in the Uniform Division of Income for Tax Purposes Act, 7A U. L. A. 331 (1990 Cum. Supp.) (approved in 1957 by the National Conference of Commissioners on Uniform State Laws and the American Bar Association).

Trinova argues that on the facts of this case, the three-factor formula leads to a distorted result, out of all proportion to the business done by Trinova in Michigan. Trinova's Michigan payroll constituted 0.2328% of total payroll, its Michigan property constituted 0.0930% of total property, and its Michigan sales constituted 26.5892% of total sales. The three-factor formula averages these ratios, with the result that 8.9717% of Trinova's value added, or $ 19,838,700, is assigned to Michigan. Because Trinova is a labor-intensive taxpayer, and can deduct capital acquisitions, the tax base is further reduced to $ 12,492,671.

In this Court, Trinova proposes an alternative two-factor apportionment, excluding the sales factor. Under the two-factor formula, only 0.1629% of Trinova's value added, or $ 360,213, would be assigned to Michigan. Brief for Petitioner 33-34. [9]

> 9   Trinova's proposed two-factor apportionment differs drastically from the apportionment Trinova requested in the Michigan state courts. Under the approach Trinova took in state court, following *Jones & Laughlin Steel Corp.* v. *Department of Treasury*, 145 Mich. App. 405, 377 N.W.2d 397 (1985), Trinova's apportioned tax base would be -$ 2,042,458. See n.8, *supra*. Under the two-factor formula that Trinova now urges upon us, it is $ 360,213.

[*382] Although the three-factor formula "can be justified as a rough, practical approximation of the distribution of either a corporation's sources of income or the social costs which it generates," *General Motors Corp.* v. [***910] *District of Columbia*, 380 U.S. 553, 561, 14 L. Ed. 2d 68, 85 S. Ct. 1156 (1965), Trinova argues that the formula does not reflect how the value added tax base is generated. The principal flaw, it contends, is that the formula includes a sales factor. "Sales have no relationship to, and add nothing to, the

value that [compensation and depreciable plant] contribute to the tax base in Michigan." Brief for Petitioner 31. Trinova's position finds some support among economists. See Barlow & Connell, The Single Business Tax, in Michigan's Fiscal and Economic Structure 673, 704 (H. Brazer ed. 1982); Kleine 7, 14, n.5.

We have, *supra*, at 376, already concluded that sales (as a measure of market demand) do have a profound impact upon the amount of an enterprise's value added, and therefore reject the complete exclusion of sales as somehow resulting in more accurate apportionment. We further reject this critique because it cannot distinguish application of the three-factor formula to a VAT from application to an income tax. In fact, nearly identical criticisms were levied against the three-factor formula as a method for apportioning income by economists who theorize that income (like value added) is the product of labor and capital, and that the [**834] marketplace contributes nothing to production of income. See Studenski, The Need for Federal Curbs on State Taxes on Interstate Commerce: An Economist's Viewpoint, 46 Va. L. Rev. 1121, 1131-1132 (1960); Harriss, Economic Aspects of Interstate Apportionment of Business Income, 37 Taxes 327, 362-363 (1959); Harriss, Interstate Apportionment of Business Income, 49 Am. Econ. Rev. 398, 400 (1959). If it were not for their age, these criticisms could have been taken almost verbatim from Trinova's brief:

> [*383] "Sales-by-destination are not a proper allocation factor . . . . Taken by themselves, they do not necessarily represent the location of the company's productive income-creating effort. Only the location of the company's capital and labor, which may be wholly different from the destination of the sales, identifies the location of that effort and hence the situs for the imposition of a state income tax upon it." Studenski, *supra*, at 1131-1132.

Despite such criticism, the Uniform Division of Income for Tax Purposes Act decided upon an income apportionment formula that included sales, and the importance of sales in generating value has been acknowledged by this Court. *Container Corp.*, 463 U.S. at 183. Thus, as we responded to a similar argument in

*Moorman Mfg. Co.*, whatever the merit of Trinova's argument that sales do not contribute to value added "from the standpoint of economic theory or legislative policy, it cannot support a claim in this litigation that [the State] in fact taxed profits not attributable to activities within the State during the yea[r 1980]." 437 U.S. at 272. Trinova gives no basis for distinguishing the same arguments that were pressed, and rejected, with regard to the apportionment of income. We could not accept Trinova's argument that the sales factor distorts Michigan's apportionment formula without rejecting our precedents which approve [***911] the use of the same formula to apportion income.

As we find no distortion caused by the three-factor formula, it follows that the Michigan SBT does not tax "value earned outside [Michigan's] borders." *ASARCO Inc.* v. *Idaho Tax Comm'n*, 458 U.S. 307, 315, 73 L. Ed. 2d 787, 102 S. Ct. 3103 (1982). The argument that the value was added in Ohio, by labor and capital, and that no value has been added in Michigan assumes that value added is subject to geographic ascertainment and assumes further the inappropriateness of a sales factor in apportionment. For the reasons we have given, we reject both arguments.

[*384]    [***LEdHR1A] [1E]  [***LEdHR11A] [11E]  [***LEdHR14A]  [14A]We need not say for certain which method -- unadjusted apportionment by the three-factor formula ($ 19,838,700), apportionment by Trinova's alternative two-factor formula ($ 360,213), Trinova's *Jones & Laughlin* apportionment urged in state court (-$ 2,042,458), or the adjusted tax base as calculated in Trinova's original 1980 return ($ 12,492,671) -- gives the most accurate calculation of Trinova's value added in Michigan. Trinova has not convincingly demonstrated which figure is most accurate. Trinova gives no estimate of the value added that would take account of both its Michigan sales activity and Michigan market demand for its products. Michigan, on the other hand, has consistently applied a formula, the elements of which appear to reflect a very large share of the activities by which value is generated, with further relief for labor-intensive taxpayers such as Trinova. Trinova has failed to meet its burden of proving "by 'clear and cogent evidence,'" *Moorman Mfg. Co., supra*, at 274, that the State of Michigan's apportionment provides a distorted result. [10]

10    [***LEdHR11A] [11F]  [***LEdHR14A]

[14B]

As an alternative ground for upholding the tax, Michigan reminds us that, instead of taxing value added, it could have taxed gross receipts of sales into Michigan. We have repeatedly upheld such taxes. *Standard Pressed Steel Co.* v. *Washington Revenue Dept.*, 419 U.S. 560, 564, 95 S. Ct. 706, 42 L. Ed. 2d 719 (1975); *General Motors Corp.* v. *Washington*, 377 U.S. 436, 448, 12 L. Ed. 2d 430, 84 S. Ct. 1564 (1964); *McGoldrick* v. *Berwind-White Coal Mining Co.*, 309 U.S. 33, 58, 84 L. Ed. 565, 60 S. Ct. 388 (1940). While we accept the analogy Michigan has drawn between a VAT and an income tax, we recognize that the SBT also bears some similarities to a gross-receipts tax. Further, the SBT's alternative method of taxation (based upon gross receipts) might provide an additional limit on any distortion or possibility that out-of-state values might be taxed. See n.6, *supra*. In light of our disposition, we need not address these arguments.

[**835] C

[***LEdHR1A] [1F] [***LEdHR15A] [15A]Trinova also urges that the Michigan SBT should be struck down because it discriminates against out-of-state businesses in violation of the Commerce Clause. Trinova cannot point to any treatment of in-state and out-of-state firms that is discriminatory on its face, as in the cases it cites. See, *e. g.,* [*385] *Westinghouse Electric Corp.* v. *Tully*, 466 U.S. 388, 393, 80 L. Ed. 2d 388, 104 S. Ct. 1856 (1984) (tax credit was limited to gross receipts from export products shipped from a regular place of business of the taxpayer within New York); *Boston Stock Exchange* v. *State Tax Comm'n*, 429 U.S. 318, 324-328, 50 L. Ed. 2d 514, 97 S. Ct. 599 (1977) (tax facially discriminated against transactions on securities exchanges located outside of New York and had been enacted in an [***912] effort to discourage growth of such exchanges); *Halliburton Oil Well Cementing Co.* v. *Reily*, 373 U.S. 64, 10 L. Ed. 2d 202, 83 S. Ct. 1201 (1963) (sales tax exempted isolated sales within State, but use tax lacked a similar exemption for similar isolated sales outside of the State). [***LEdHR15A] [15B] [***LEdHR16] [16]In the absence of any facial discrimination, Trinova recalls our statement in *American Trucking Assns., Inc.* v. *Scheiner*,

483 U.S. 266, 281, 97 L. Ed. 2d 226, 107 S. Ct. 2829 (1987), that "the Commerce Clause has a deeper meaning that may be implicated even though state provisions . . . do not allocate tax burdens between insiders and outsiders in a manner that is facially discriminatory." The Commerce Clause requires more than mere facial neutrality. The content of that requirement is fair apportionment. The "deeper meaning" to which *American Trucking* refers is embodied in the requirement of fair apportionment, as expressed in the tests of internal and external consistency. Other than the vague accusation of discrimination, Trinova presents no other standard by which we might consider the constitutionality of the Michigan SBT. [***LEdHR15A] [15C]In further support of its discrimination argument, Trinova relies upon the 1987 statement of Michigan's Governor that the SBT was enacted "'to promote the development and investment of business within Michigan.'" Executive Message of Governor James J. Blanchard to the Michigan Supreme Court, Nov. 6, 1987, App. to Pet. for Cert. 73a. This statement helps Trinova not at all. It is a laudatory goal in the design of a tax system to promote investment that will provide jobs and prosperity to the citizens of the taxing State. [HN17] States are free to "structure their tax systems to [*386] encourage the growth and development of intrastate commerce and industry." *Boston Stock Exchange, supra*, at 336.Although Trinova repeats the Governor's statement in an attempt to demonstrate an impermissible motive on the part of the State, all the contemporaneous evidence concerning passage of the SBT suggests a benign motivation, combined with a practical need to increase revenues. [11] Neither Trinova nor the secondary sources it relies upon [**836] present any evidence that the SBT was inspired as a way to export tax burdens or import tax revenues.

11 According to Kleine, proponents of the SBT argued as follows: (1) because of Michigan's volatile economy, the State's corporate income tax had proven unpredictably cyclical, and therefore a poor source of revenue. The SBT would provide a much broader tax base, and thus prove a more stable revenue source; (2) the SBT would lessen the tax burden on capital, thereby encouraging new investment; (3) the SBT would replace numerous taxes, resulting in less paperwork for both the taxpayer and the tax collector; (4) the SBT would not discriminate against businesses on the basis of their forms of organization; and (5) the SBT would tax inefficient and efficient firms

equally for their use of government services, whereas an income tax would burden more heavily efficient, highly profitable firms. In addition, at the time of the SBT's enactment, Michigan faced a fiscal crisis. The legislature provided that the new SBT would overlap with the old corporate franchise tax, resulting in additional cash flow of $ 180 million. Kleine 20-23. The argument that a VAT would permit "exporting" the tax to taxpayers outside the State "was not used to any great extent by the proponents of the Michigan [SBT]." *Id.*, at 23.

IV

[***LEdHR1A] [1G] [***LEdHR17] [17][HN18] In reviewing state taxation [***913] schemes under the Commerce Clause, we attempt "to ensure that each State taxes only its fair share of an interstate transaction." *Goldberg* v. *Sweet*, 488 U.S. 252, 260-261, 102 L. Ed. 2d 607, 109 S. Ct. 582 (1989). We act as a defense against state taxes which, whether by design or inadvertence, either give rise to serious concerns of double taxation, or attempt to capture tax revenues that, under the theory of the tax, belong of right to other jurisdictions. We have always "declined to undertake the essentially legislative task of establishing [*387] a 'single constitutionally mandated method of taxation.'" *Id.*, at 261, quoting *Container Corp.*, 463 U.S. at 171. We do not say today whether other States should adopt a VAT, or whether Michigan's three-factor formula is the only acceptable method of apportionment. We do hold that, as applied to Trinova during the tax year at issue, the Michigan SBT does not violate the Due Process or Commerce Clauses of the Constitution.

The judgment of the Supreme Court of Michigan is

*Affirmed.*

JUSTICE SOUTER took no part in the consideration or decision of this case.

**CONCUR BY:** SCALIA

**CONCUR**

JUSTICE SCALIA, concurring in the judgment.

As the Court notes, *ante*, at 384, the Michigan single business tax is not facially discriminatory. Since I am of

the view that this suffices to comply with the requirements of the Commerce Clause, see *Amerada Hess Corp.* v. *Director, Div. of Taxation, N. J. Dept. of Treasury*, 490 U.S. 66, 80, 104 L. Ed. 2d 58, 109 S. Ct. 1617 (1989) (SCALIA, J., concurring in judgment); *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue*, 483 U.S. 232, 265, 107 S. Ct. 2810, 97 L. Ed. 2d 199 (1987) (SCALIA, J., concurring in part and dissenting in part), I would forgo the additional Commerce Clause analysis articulated in *Complete Auto Transit, Inc.* v. *Brady*, 430 U.S. 274, 279, 51 L. Ed. 2d 326, 97 S. Ct. 1076 (1977). Some elements of that analysis, however, are relevant to the quite separate question whether the tax complies with the requirements of the Due Process Clause, see *Mobil Oil Corp.* v. *Commissioner of Taxes of Vt.*, 445 U.S. 425, 436-437, 63 L. Ed. 2d 510, 100 S. Ct. 1223 (1980); *Amerada Hess Corp., supra*, at 80-81 (SCALIA, J., concurring in judgment).

Trinova concedes that there is a minimal connection between its interstate activities and the taxing State, see *Mobil, supra; ante*, at 373. The only issue, then, is whether the tax violates the Due Process Clause by taxing extraterritorial values. For the reasons stated in Parts III-A and III-B of the Court's opinion, I agree that it does not.

**DISSENT BY:** STEVENS

**DISSENT**

[*388] JUSTICE STEVENS, with whom JUSTICE BLACKMUN joins, dissenting.

Although the parties refer to Michigan's "Single Business Tax" (SBT) as a "Value Added Tax" (VAT), that term does not appear in the text of the statute. The text of the relevant Act describes the SBT as a tax on "certain commercial, [***914] business, and financial activities." [1] As a practical matter, Michigan's SBT is nothing more than an amalgam of three separate taxes: a tax on payroll, a tax on depreciable fixed assets, and a tax on income. Payroll and depreciation represent [**837] over 90 percent of the SBT base, and the productive activities that are measured by payroll and depreciation take place at geographic locations that are readily identifiable. Because Michigan's SBT uses an apportionment formula to tax a portion of those activities occurring outside Michigan, I depart from the Court's analysis and conclude that the state taxation scheme

violates established principles of due process.

1   The preamble to the statute states, in part:

"AN ACT to provide for the imposition, levy, computation, collection, assessment and enforcement, by lien or otherwise, of taxes on certain commercial, business, and financial activities . . . ." See Mich. Comp. Laws § 208.1, p. 4 (1986).

The Michigan Supreme Court's explanation of the significance of the label "value added tax" describes it as a tax upon business activity. In its opinion below, the Michigan court explained:

"In short, a value added tax is a tax upon business activity. The act employs a value added measure of business activity, but its intended effect is to impose a tax upon the privilege of conducting business activity within Michigan. It is not a tax upon income. MCL 208.31(4); MSA 7.558(31) (4)." 433 Mich. 141, 149, 445 N.W.2d 428, 431-432 (1989).

This Court today also states that "value added is a measure of actual business activity." *Ante*, at 364.

I

Petitioner Trinova's executive offices and manufacturing facilities are located in Ohio. Most of its employees live and work in Ohio. In fact, significantly less than one percent of [*389] Trinova's capital assets and labor were employed in Michigan in 1980. [2] The company operated at a substantial loss in that year. The question presented is whether the fact that 26 percent of Trinova's unprofitable sales were made to Michigan customers provides a constitutionally sufficient justification for the State to attribute to Michigan (and thus to tax) approximately nine percent of Trinova's productive activities, almost all of which actually occurred in Ohio.

2   The Company's total payroll was $ 226,356,271; its Michigan payroll was only $ 511,774 or less than one-fourth of one percent. Its Michigan depreciation was only $ 2,152, representing less than one-tenth of one percent of its entire depreciation.

In upholding the constitutionality of the SBT against a Due Process Clause challenge, the Court today concludes that even though the bulk of Trinova's property and payroll are located outside Michigan, it does not follow that the bulk of its value-adding activities are located outside Michigan and thus are not attributable to or taxable by Michigan. Rather, the Court assumes that the value added to a product is largely contingent upon the revenue that the product generates when it is sold in the marketplace. Because the value added by Trinova's use of labor and capital in Ohio is not realized until Trinova's product is sold in Michigan and the product is given market value by consumers, the Court concludes that Michigan's sales contribute greatly to the value of Trinova's product, and thus that allowing a portion of the value added by Trinova's business activities in Ohio to be attributed to Michigan through use of an apportionment formula is justified.

The Court's assumption that value [***915] added from labor and capital is not realized until the product is sold, however, is simply wrong. Finished goods, even though stored in a warehouse and not yet sold, are more valuable than raw materials. Moreover, under the Michigan statute, the revenues generated by the sales of the finished product are reflected in the net income component of the tax base. Thus, [*390] in this case, because Trinova operated at a loss, the value added by labor and capital is reduced, rather than enhanced, by the ultimate sales made in Michigan. It necessarily follows that allowing Michigan to apportion out-of-state expenses incurred for fixed assets and labor on the basis of Michigan sales in effect allows Michigan to tax extraterritorial business activity.

Under this Court's due process jurisprudence, a State may constitutionally tax only those interstate business activities or income to which it has a rational nexus. See *Container Corp. of America* v. *Franchise Tax Bd.*, 463 U.S. 159, 165-166, 77 L. Ed. 2d 545, 103 S. Ct. 2933 [**838] (1983). However, in the context of state income taxes on "unitary" interstate businesses, our cases allow States to deviate from the fixed rule of geographic accounting in favor of a more flexible system of formulary apportionment. In so doing, we have cautioned that "the functional meaning of this requirement [of a rational nexus between the taxing State and the taxed activities] is that there be some sharing or exchange of value not capable of precise [geographic] identification or measurement . . . which renders formula apportionment a

reasonable method of taxation." *Id.*, at 166.

The Court today extends its analysis upholding the constitutionality of income apportionment as an exception to the general rule of geographic accounting to situations in which the original justification for the use of an imprecise apportionment formula no longer holds. Unlike the income of a unitary business, which we before have recognized may not be precisely allocated, the two principal elements of Michigan's SBT -- property and payroll -- are subject to precise geographic identification and thus do not warrant being subject to an apportionment formula.

The Court concedes, as it must, that far less than one percent of Trinova's capital assets and labor were employed in Michigan in 1980, but rejects the logical result of such analysis by concluding that it does not necessarily follow that far less than one percent of Trinova's "value added" can be precisely [*391] identified as having been realized outside Michigan. Instead, the Court concludes that the value added by Trinova's factors of production located outside of Michigan cannot be precisely determined until the ultimate product is sold and the market value or revenue that the product commands is considered. As the Court states, "the Michigan SBT . . . is not three separate and independent taxes, and Trinova cannot purport to identify the geographic source of value added by assuming that two elements can be located in a single State while the third cannot." *Ante*, at 375. Rather, "in a unitary enterprise, compensation, depreciation, and profit are not independent variables to be adjusted without reference to each other. If Trinova had paid an additional $ 100 million in compensation [***916] during 1980, there is no way of knowing whether, or to what extent, value added would have increased. *In fact, value added would not have increased so long as revenues did not increase."* *Ante*, at 376 (emphasis added).

Driving the Court's analysis is the recognition that Trinova in 1980 netted a loss of over $ 42 million. This, the Court concludes, means that the ultimate value added by Trinova's use of labor and capital resources was not equivalent to its actual payroll and capital expenses. Resisting the perceived awkwardness of finding "that Trinova added value at the factory through the consumption of capital and labor, but that its products somehow lost value outside of this process," *id.*, at 375, the Court holds that the value added by capital and labor

should not be deemed to be realized and should not be geographically assigned until Trinova's product is sold, and that the measure of value added by payroll and capital expenses should be adjusted by the ultimate revenue the product generates.

II

The Court's assumption that value added by property and payroll is not realized and cannot be determined until the product is sold is belied by the rationale underlying the VAT. [*392] The "concept of value added . . . is derived from the most basic of economic facts -- the scarcity of resources -- and hence consistently measures the amount of scarce labor and capital resources used up (and not available for use elsewhere) in every economic activity." See Haughey, The Economic Logic of the Single Business Tax, 22 Wayne L. Rev. 1017, 1018 (1976). That a product is ultimately unprofitable does not diminish the [**839] amount of resources a company utilized in manufacturing the product. Nor does the value added to the economy or gross national product by the company's purchase of labor and utilization of capital diminish when the product is not sold or is sold for a net loss.

Rather, value added is fully realized at each stage of the production process -- at the stages where labor services are sold and paid for by the company in the form of payroll expenses and where capital is consumed. The amount of value added at these intermediate stages of production is the price paid for the labor services and for the capital expended. See *ibid.* (value added may be determined by "adding up all of the payments paid internally to the owners of the labor and capital used"). Regardless of the profitability (or unprofitability) of the ultimate product, value added by labor and capital is not eliminated or diminished if the ultimate product is unable to command equivalent value or revenue in the marketplace. [3] As [***917] the Court itself concedes early in its opinion, [*393] "even if a business entity is unprofitable, under normal circumstances it adds value to its products and, as a consequence, will owe some VAT." *Ante*, at 364. This immunity of the VAT base from the vagaries of the marketplace is the basic justification for the SBT: "Because value added does not fluctuate as widely as net income, a VAT provides a more stable source of revenue than the corporate income tax." *Ibid.*

3    Unlike the tax bases under the VAT schemes that are found in European and South American

countries, see *ante*, at 365-366, n.3, the tax base under Michigan's SBT is affected by the revenues that the product brings in only insofar as such revenues are reflected in the company's net income, which is a component of the tax base under the additive method. In the foreign jurisdictions utilizing the VAT, however, the starting point for computing the tax base is the revenue received by the taxpayer from sales made in the taxing jurisdiction, with certain amounts exempted or subtracted from the in-state revenues. Although measuring value added with reference to revenues might therefore be warranted in traditional European models of the VAT, it is unjustified under Michigan's SBT, because the income component of the VAT base in Michigan already accounts for revenues.

Concededly, under the Michigan statute, the task of calculating precisely Trinova's value added by its capital and labor resources without looking to its ultimate sales or profit is complicated by the unprofitability of Trinova's business during the tax year in question. Under Michigan's method for calculating the SBT base, the corporation's profit is added to the sum of labor costs and capital expenditures (consisting of depreciation and interest expenses) and represents the value added by the corporation's skill and entrepreneurial effort. Insofar as Trinova in 1980 netted a loss of over $ 42 million, Trinova's VAT base was actually reduced by "addition" of its profit to its labor and capital costs.

It is nevertheless clear that value added under the additive method is realized at each stage of the production process and is undiminished if the product suffers a net loss. That Michigan chooses to allow a company's VAT base to be reduced by the extent of its unprofitability does not in any way lead to the Court's conclusion that the value added by labor and capital is not realized when (and where) those resources are purchased, and that the amount of that value added to the economy is not equivalent to the price paid by the company for those resources.

Because the value added by the two principal components of Michigan's SBT -- labor and capital -- are fully realized and thus can be precisely quantified and geographically assigned when the actual purchase of labor services and use of capital occur, Michigan's apportionment of a company's entire payroll and capital

expenses results in the unconstitutional taxation [*394] by Michigan of a portion of the taxpayer's extraterritorial activities. [4] In fact, in Trinova's case, although less than [**840] one percent of Trinova's property and payroll expenses are incurred within its borders, Michigan, by applying the apportionment formula to payroll and capital, treats nine to ten percent of Trinova's labor and capital costs as if they were in-state expenses. [5] Because [***918] such extraterritorial taxation violates basic principles of due process, I respectfully dissent.

4   "The taxation of property not located in the taxing State is constitutionally invalid, both because it imposes an illegitimate restraint on interstate commerce and because it denies to the taxpayer the process that is his due. A State will not be permitted, under the shelter of an imprecise allocation formula or by ignoring the peculiarities of a given enterprise, to 'project the taxing power of the state plainly beyond its borders. . . .' Any formula used must bear a rational relationship, both on its face and in its application, to property values connected with the taxing State." *Norfolk & Western R. Co.* v. *Missouri State Tax Comm'n*, 390 U.S. 317, 325, 19 L. Ed. 2d 1201, 88 S. Ct. 995 (1968) (footnote omitted).

5   The Court implies that it would be unjust to apportion Trinova's net income without also apportioning its company-wide labor and appreciation. *Ante*, at 381-382, n.9. My reaction to the facts of this case is just the opposite. Because the apportioned share of the taxpayer's net loss far exceeds the actual use of labor and capital in Michigan, there is no more justification for imposing the SBT on Trinova than there would be to collect an income tax from a taxpayer whose company-wide operations, as well as its Michigan operations, produced a substantial net loss.

## REFERENCES

71 Am Jur 2d, State and Local Taxation 19, 75, 77, 110, 285, 296-299, 305, 306

USCS, Constitution, Art I, 8, cl 3; Amendment 14

L Ed Digest, Commerce 238, 244; Constitutional Law 605

L Ed Index, Apportionment and Allocation; Commerce; Corporate Taxes; Taxes

Index to Annotations, Apportionment and Allocation; Discrimination; Taxes

Annotation References:

What issues will the Supreme Court consider, though not, or not properly, raised by the parties. 42 L Ed 2d 946.

Validity, under commerce clause of Federal Constitution, of state gross receipts or income taxes involving interstate transactions-- Supreme Court cases. 34 L Ed 2d 749.

Validity, under Federal Constitution, of state tax on, or measured by, net income of foreign corporation. 3 L Ed 2d 1787.

Construction and application of Uniform Division of Income for Tax Purposes Act. 8 ALR4th 934.

Comment Note.--Validity, under Federal Constitution, of state tax on, or measured by, income of foreign corporation. 67 ALR2d 1322.



# UNITED STATES TRUST COMPANY OF NEW YORK, TRUSTEE v. NEW JERSEY ET AL.

## No. 75-1687

## SUPREME COURT OF THE UNITED STATES

## 431 U.S. 1; 97 S. Ct. 1505; 52 L. Ed. 2d 92; 1977 U.S. LEXIS 1

**Argued November 10, 1976**
**April 27, 1977**

**PRIOR HISTORY:** APPEAL FROM THE SUPREME COURT OF NEW JERSEY

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant, trustee for port authority bonds, sought review of the Supreme Court of New Jersey, which affirmed a lower court's holding that the statutory repeal of a statutory covenant was a reasonable exercise of the state's police power and was not prohibited by the Contract Clause, U.S. Const. art. I, § 10, cl. 1.

**OVERVIEW:** Appellant, trustee for port authority bonds, brought an action to contest the repeal of a statutory covenant limiting the ability of a port authority to subsidize rail passenger transportation from revenues and reserves. Appellant claimed that repeal of the covenant impaired the obligation of the state's contract with the bondholders because it totally eliminated its security provision, which protected the port authority's reserve fund from depletion. The state superior court ruled that the statutory repeal was a reasonable exercise of the state's police power and found that it was not prohibited by the Contract Clause, U.S. Const. art. I, § 10, cl. 1. The state supreme court affirmed. Appellant challenged the decision. The court reversed, holding that the Contract Clause was violated because the repeal had the effect of impairing a contractual obligation of the state. The court found that the state's financial obligation

was not a reserved power that could not be contracted away. Also, the court also determined that the impairment was not reasonable or necessary to serve an important public purpose.

**OUTCOME:** The court reversed a state's supreme court's affirmance of a lower court's holding that the statutory repeal of a statutory covenant did not violate the Contract Clause of U.S. Constitution. The court held that the repeal of the statutory covenant did violate the Contract Clause because it impaired a financial contractual obligation of the state and the impairment was not reasonable or necessary to serve an important public purpose.

**CORE TERMS:** covenant, port authority, repeal, bondholder, impairment, transportation, mass transit, deficit, toll, railroad's, bridge, police power, passenger, consolidated bonds, transit, reserve fund, N.J Laws, environmental, holder, impair, modification, impaired, commuter, energy, tunnel, path, Y Laws, public purpose, contractual obligations, contractual

**LexisNexis(R) Headnotes**

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
[HN1] See U.S. Const. art. I, § 10, cl. 1.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
*Contracts Law > Contract Modifications > General Overview*

[HN2] It is not every modification of a contractual promise that impairs the obligation of contract under federal law.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
*Contracts Law > Contract Modifications > General Overview*
*Governments > Legislation > Effect & Operation > Retrospective Operation*

[HN3] The Contract Clause, U.S. Const. art. I, § 10, cl. 1, limits the power of the states to modify their own contracts as well as to regulate those between private parties. Yet the Contract Clause does not prohibit the states from repealing or amending statutes generally, or from enacting legislation with retroactive effects.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*
*Governments > Legislation > Interpretation*

[HN4] In general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the state.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*

[HN5] Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid.

*Constitutional Law > Congressional Duties & Powers > Contracts Clause > General Overview*

[HN6] Although the Contract Clause, U.S. Const. art. I, § 10, cl. 1, appears literally to proscribe "any" impairment, the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula. Thus, a finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether that impairment is permitted under the Constitution.

**SUMMARY:**

The states of New York and New Jersey, which had previously established the Port Authority of New York and New Jersey to effectuate a better coordination of facilities of commerce in the port of New York, entered into a statutory covenant in 1962, as part of bi-state legislation authorizing Port Authority involvement in a construction project and the acquisition of a railroad, whereby the two states agreed with each other, and with the holders of bonds which the Port Authority had previously issued, that so long as any of such bonds remained outstanding and unpaid and the holders had not given their consent, neither the states nor the Port Authority would use, for other than permitted purposes, any revenues or reserves which were then, or in the future might be, pledged as security for such bonds. Both states passed legislation, effective in 1973, rendering the 1962 covenant inapplicable, or in effect repealed, with respect to bonds issued by the Port Authority after such effective date. In 1974, both states enacted legislation which repealed the 1962 covenant outright. Thereafter, a trustee and holder of Port Authority bonds brought an action in the Superior Court of New Jersey, Law Division, Bergen County, New Jersey, challenging the constitutionality of New Jersey's 1974 repealing legislation. The Superior Court ruled that the statutory repeal was a reasonable exercise of New Jersey's police power, not prohibited under the contract clause of the United States Constitution (Art I, 10, cl 1), which prohibits state laws impairing the obligation of contracts, nor under the clause's counterpart in the New Jersey Constitution (134 NJ Super 124, 338 A2d 833). The Supreme Court of New Jersey affirmed (69 NJ 253, 353 A2d 514).

On appeal, the United States Supreme Court reversed. In an opinion by Blackmun, J., joined by Burger, Ch. J., and Rehnquist and Stevens, JJ., expressing the view of a majority of the seven participating members of the court, it was held that the 1974 New Jersey law violated the contract clause of the United States Constitution, since outright repeal of the 1962 covenant impaired a contractual obligation of the states, having eliminated an important security provision which was a purely financial obligation, and since such impairment--allegedly justified as necessary for implementing the states' plan for encouraging private automobile users to shift to public transportation--was neither necessary to achievement of the states' plan nor reasonable in light of the circumstances.

Burger, Ch. J., concurring, expressed the view that

the constitutional prohibition against the impairment of contracts had been violated because the state had failed to demonstrate that the impairment was essential to the achievement of an important state purpose and had not shown that it did not know, and could not have known, the impact of the contract on that state interest at the time the contract was made.

Brennan, J., joined by White and Marshall, JJ., dissenting, expressed the view that there had been a relatively inconsequential infringement of contract rights in the pursuit of substantial and important public ends that was not violative of the contract clause.

Stewart and Powell, JJ., did not participate.

**LAWYERS' EDITION HEADNOTES:**

LAW §216 ;

contract clause -- statutory covenant -- repeal -- security provision for bondholders -- ;

Headnote:[1A][1B][1C]

A state statute which retroactively repeals a statutory covenant between two states and the holders of bonds issued by the states' port authority--under which covenant it was agreed that so long as any bonds remained outstanding and unpaid and the holders had not given their consent, the states and the port authority would not use, for other than permitted purposes, any revenues or reserves pledged as security for such bonds--violates the contract clause of the United States Constitution (Art I, 10, cl 1), prohibiting state law impairment of contract obligations, since outright repeal of the covenant eliminates an important security provision which is a purely financial obligation, thus constituting an impairment of the states' contract obligation, and since such impairment is not reasonable and necessary to serve the purposes claimed by the state. (Brennan, White, and Marshall, JJ., dissenting from this holding.)

LAW §135;

contract clause -- limit on states -- statutes -- ;

Headnote:[2]

The contract clause of the United States Constitution (Art I, 10, cl 1) limits the power of the states to modify their own contracts as well as to regulate those between private parties, but the clause does not prohibit the states from repealing or amending statutes generally, or from enacting legislation with retroactive effects.

OUTLAWRY §1

LAW §74 ;

bill of attainder -- ex post facto law -- state limitation -- ;

Headnote:[3A][3B]

The prohibitions of the United States Constitution against any state's enacting a bill of attainder or ex post facto law (Art I, 10, cl 1) limit the powers of the states only with regard to the imposition of punishment.

LAW §513 ;

due process -- retrospective civil laws -- ;

Headnote:[4A][4B]

The due process clause of the Fourteenth Amendment generally does not prohibit retrospective civil legislation, unless the consequences are particularly harsh and oppressive.

CONTRACTS §67

STATUTES §91 ;

statute as contract -- statute governing contract -- ;

Headnote:[5A][5B]

In general, a statute is treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the state; in addition, statutes governing the interpretation and enforcement of contracts may be regarded as forming part of the obligation of contracts made under their aegis.

STATES §51 ;

legislative covenant -- prospective repeal -- ;

Headnote:[6A][6B]

Two states, which had covenanted and agreed with each other, and with the holders of bonds of the states' port authority, that as long as such bonds remained outstanding and the bondholders had not given their consent, the states and the port authority would not use any "revenues or reserves, which have been or shall be pledged in whole or in part as security for such bonds, for ... other than permitted purposes," have the power to repeal the statutory covenant prospectively as to bonds issued after the repeal goes into effect.

STATES §51 ;

legislative covenant -- contractual obligation -- ;

Headnote:[7]

A legislative covenant--under which two states "covenant and agree with each other and with the holders of ... bonds" of the states' port authority that so long as any of the bonds of such holders remained outstanding and unpaid and the bondholders had not given their consent, the states and the port authority would not use, for other than permitted purposes, any revenues or reserves pledged as security for the bonds--constitutes a contractual obligation of the two states, since (1) the intent to make a contract appears in the language of the covenant, (2) the purpose of the covenant was to invoke, as security against repeal, the constitutional protection of the contract clause of the United States Constitution (Art I, 10, cl 1), which prohibits states from passing any law impairing the obligation of contracts, and (3) the states received, in return for their promise, public marketability of bonds to finance a construction project and acquisition of a railroad.

LAW §530 ;

contract rights as property -- ;

Headnote:[8A][8B]

Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid.

LAW §286 ;

contract clause -- change in statutory remedy -- ;

Headnote:[9A][9B]

Under the contract clause of the United States Constitution (Art I, 10, cl 1) protecting the obligation of contracts from state impairment, it is not always unconstitutional for changes in statutory remedies to affect preexisting contracts.

LAW §207;

contract clause -- remedies and obligations -- modification -- ;

Headnote:[10A][10B]

Obligations as well as remedies may be modified without necessarily violating the contract clause of the United States Constitution (Art I, 10, cl 1), which protects the obligation of contracts from state impairment.

LAW §10;

contract clause -- construction -- technical impairment as necessitating further inquiry -- ;

Headnote:[11]

Since the prohibition of the contract clause of the United States Constitution (Art I, 10, cl 1) against a state's impairing the obligation of contracts is not an absolute one and is not to be read with literal exactness like a mathematical formula, a finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether such impairment is permitted under the Constitution, and the court must attempt to reconcile the strictures of the contract clause with the essential attributes of sovereign power necessarily reserved by the states to safeguard the welfare of their citizens.

LAW §214(1) ;

contract clause -- police power of states -- ;

Headnote:[12]

The contract clause of the United States Constitution

(Art I, 10, cl 1), prohibiting state impairment of contract obligations, limits otherwise legitimate exercises of state legislative authority, and the existence of an important public interest is not always sufficient to overcome that limitation; whatever is reserved of state power must be consistent with the fair intent of the constitutional limitation of that power, and the scope of the state's reserved power depends on the nature of the contractual relationship with which the challenged law conflicts.

LAW §271 ;

contract clause -- police power -- private contracts -- ;

Headnote:[13]

Although the states must possess broad power to adopt general regulatory measures without being concerned that private contracts will be impaired or even destroyed as a result, private contracts are not subject to unlimited modification under the states' police power for purposes of the contract clause of the United States Constitution (Art I, 10, cl 1), prohibiting state impairment of contract obligations; legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption, but, as is customary in reviewing economic and social regulation, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.

LAW §214(2) ;

contract clause -- reasonableness of impairment -- emergency -- ;

Headnote:[14A][14B]

Although the existence of an emergency and the limited duration of a relief measure are factors to be assessed in determining the reasonableness of an impairment for purposes of the contract clause of the United States Constitution (Art I, 10, cl 1), such factors cannot be regarded as essential in every case.

LAW §142 ;

contract clause -- state contract -- ;

Headnote:[15]

Under the contract clause of the United States Constitution (Art I, 10, cl 1), prohibiting state impairment of contract obligations, a state is not required to adhere to a contract that surrenders an essential attribute of its sovereignty.

STATES §51 ;

power -- financial contracts -- ;

Headnote:[16]

A state has the power to enter into effective financial contracts.

CORPORATIONS §45

STATES §51 ;

borrowing money -- contracts to repay -- ;

Headnote:[17A][17B]

States and cities, when they borrow money and contract to repay it with interest, are not acting as sovereignties, but their contracts have the same meaning as similar contracts between private persons.

LAW §216;

contract clause -- state's financial obligations -- private contracts -- public purpose -- ;

Headnote:[18]

The contract clause of the United States Constitution (Art I, 10, cl 1), which prohibits the states from passing any law impairing the obligation of contracts, is not an absolute bar to subsequent modification of a state's own financial obligations; as with laws impairing the obligations of private contracts, an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose, although in applying such standard, complete deference to a legislative assessment of reasonableness and necessity is not appropriate, since the state's self-interest is at stake. (Brennan, White, and Marshall, JJ., dissented in part from this holding.)

LAW §216 ;

contract clause -- impairment of state's financial obligations -- reasonableness determination -- ;

Headnote:[19]

An impairment of a state's own financial obligations is constitutional under the contract clause of the United States Constitution (Art I, 10, cl 1), if the impairment is reasonable and necessary to serve an important public purpose; the extent of impairment is a relevant factor in determining its reasonableness.

STATES §68 ;

financial obligations -- ;

Headnote:[20]

A state cannot refuse to meet its legitimate financial obligations simply because it would prefer to spend the money to promote the public good rather than the private welfare of its creditors.

LAW §215 ;

contract clause -- eminent domain -- ;

Headnote:[21A][21B]

For purposes of the contract clause of the United States Constitution (Art I, 10, cl 1), which prohibits states from passing laws impairing the obligation of contracts, states are free to exercise their powers of eminent domain to abrogate contractual rights upon payment of just compensation.

LAW §216 ;

impairment of contract obligations -- state contracts -- ;

Headnote:[22]

A state is not completely free to consider impairing the obligation of its own contracts on a par with other policy alternatives, and is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well.

## SYLLABUS

A 1962 statutory covenant between New Jersey and New York limited the ability of the Port Authority of New York and New Jersey to subsidize rail passenger transportation from revenues and reserves pledged as security for consolidated bonds issued by the Port Authority. A 1974 New Jersey statute, together with a concurrent and parallel New York statute, retroactively repealed the 1962 convenant. Appellant, both as a trustee for, and as a holder of, Port Authority bonds, brought suit in the New Jersey Superior Court for declaratory relief, claiming that the 1974 New Jersey statute impaired the obligation of the States' contract with the bondholders in violation of the Contract Clause of the United States Constitution. The Superior Court dismissed the complaint after trial, holding that the statutory repeal was a reasonable exercise of New Jersey's police power and was not prohibited by the Contract Clause. The New Jersey Supreme Court affirmed. Held: The Contract Clause prohibits the retroactive repeal of the 1962 covenant. Pp. 14-32.

(a) The outright repeal of the 1962 covenant totally eliminated an important security provision for the bondholders and thus impaired the obligation of the States' contract. Pp. 17-21.

(b) The security provision of the 1962 covenant was purely a financial obligation and thus not necessarily a compromise of the States' reserved powers that cannot be contracted away. Pp. 21-25.

(c) The repeal of the 1962 covenant cannot be sustained on the basis of Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502, and W. B. Worthen Co. v. Kavanaugh, 295 U.S. 56, simply because the bondholders' rights were not totally destroyed. Pp. 26-28.

(d) An impairment of contract such as is involved in this case can only be upheld if it is both reasonable and necessary to serve an important public purpose, but here the impairment was neither necessary to achieve the States' plan to encourage private automobile users to shift to public transportation nor reasonable in light of changed circumstances. Total repeal of the 1962 covenant was not essential, since the States' plan could have been implemented with a less drastic modification of the covenant, and since, without modifying the covenant at all, the States could have adopted alternative means of achieving their twin goals of discouraging automobile use

and improving mass transit. Nor can the repeal be claimed to be reasonable on the basis of the need for mass transportation, energy conservation, and environmental protection, since the 1962 covenant was adopted with knowledge of such concerns. Pp. 28-32.

69 N.J. 253, 353 A. 2d 514, reversed.

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C.J., and REHNQUIST and STEVENS, JJ., joined. BURGER, C.J., filed a concurring statement, post, p. 32. BRENNAN, J., filed a dissenting opinion, in which WHITE and MARSHALL, JJ., joined, post, p. 33. STEWART, J., took no part in the decision of the case. POWELL, J., took no part in the consideration or decision of the case.

**COUNSEL:** Devereux Milburn argued the cause for appellant. With him on the briefs were Robert A. McTamaney and Robert B. Meyner.

William F. Hyland, Attorney General of New Jersey, pro se, argued the cause for appellees. With him on the brief were Michael I. Sovern and Murray J. Laulicht. *

* Louis J. Lefkowitz, Attorney General, Samuel A. Hirshowitz, First Assistant Attorney General, and Daniel M. Cohen, Assistant Attorney General, filed a brief for the State of New York as amicus curiae urging affirmance.

**JUDGES:** Burger, Brennan, White, Marshall, Blackmun, Rehnquist, Stevens;, Stewart took no part in the decision of the case. Powell took no part in the consideration or decision of the case.

**OPINION BY:** BLACKMUN

**OPINION**

[*3] [***97] [**1508] MR. JUSTICE BLACKMUN delivered the opinion of the Court.

[***LEdHR1A] [1A]This case presents a challenge to a New Jersey statute, 1974 N.J. Laws, c. 25, as violative of the Contract Clause [1] of the United States Constitution. That statute, together with a concurrent and parallel New York statute, 1974 N. Y. Laws, c. 993, repealed a statutory covenant made by the two States in

1962 that had limited the ability of The Port Authority of New York and New Jersey [2] to subsidize rail passenger transportation from revenues and reserves.

1 [HN1] "No State shall... pass any... Law impairing the Obligation of Contracts...." U.S. Const., Art. I, § 10, cl. 1.

2 The name originally was "The Port of New York Authority." 1921 N.J. Laws, c. 151, p. 416; 1921 N. Y. Laws, c. 154, p. 496. It was changed to "The Port Authority of New York and New Jersey," effective July 1, 1972. 1972 N.J. Laws, c. 69; 1972 N. Y. Laws, c. 531.

The suit, one for declaratory relief, [***98] was instituted by appellant United States Trust Company of New York in the Superior Court of New Jersey, Law Division, Bergen County. Named as defendants were the State of New Jersey, its Governor, and its Attorney General. Plaintiff-appellant sued as trustee for two series of Port Authority Consolidated Bonds, as a holder of Port Authority Consolidated Bonds, and on behalf of all holders of such bonds. [3]

3 Appellant is trustee for the Fortieth and Forty-first Series of Port Authority Consolidated Bonds, with an aggregate principal amount of $ 200 million. At the time the complaint was filed, appellant also held approximately $ 96 million of Consolidated Bonds in its own account, as custodian, and as fiduciary in several capacities. There were then over $ 1,600 million of Consolidated Bonds outstanding.

After a trial, the Superior Court ruled that the statutory repeal was a reasonable exercise of New Jersey's police power, and declared that it was not prohibited by the Contract Clause or by its counterpart in the New Jersey Constitution, Art. IV, § 7, P3. Accordingly, appellant's complaint was dismissed. 134 N.J. Super. 124, 338 A. 2d 833 (1975). The Supreme Court of New Jersey, on direct appeal and by per [*4] curiam opinion, affirmed "substantially for the reasons set forth in the [trial court's] opinion." 69 N.J. 253, 256, 353 A. 2d 514, 515 (1976). We noted probable jurisdiction. 427 U.S. 903 (1976). [4]

4 The State of New York is not a party to this case, although its Attorney General has filed a brief as amicus curiae. A challenge to the parallel

New York statute has been pending in the Supreme Court of New York, County of New York, since 1974. United States Trust Co. of New York v. New York, No. 09128/74.

I

BACKGROUND

A. Establishment of the Port Authority. The Port Authority was established in 1921 by a bistate compact to effectuate "a better co-ordination of the terminal, transportation and other facilities of commerce in, about and through the port of New York." 1921 N.J. Laws, c. 151, p. 413; 1921 N. Y. Laws, c. 154, p. 493. See N.J. Stat. Ann. § 32:1-1 et seq. (1940); N. Y. Unconsol. Laws § 6401et seq. (McKinney 1961). The compact, as the Constitution requires, Art. I, § 10, cl. 3, received congressional consent. 42 Stat. 174.

The compact granted the Port Authority enumerated powers and, by its Art. III, "such other and additional powers as shall be conferred upon it by the Legislature of either State concurred in by the Legislature of the other, or by Act or Acts of Congress." The powers are enumerated in Art. VI. Among them is "full power and authority to purchase, construct, lease and/or [**1509] operate any terminal or transportation facility within said district." "Transportation facility" is defined, in Art. XXII, to include "railroads, steam or electric,... for use for the transportation or carriage of persons or property."

The Port Authority was conceived as a financially independent entity, with funds primarily derived from private investors. The preamble to the compact speaks of the "encouragement of [*5] the investment of capital," and the Port Authority was given power to mortgage its facilities and to pledge its revenues to secure [***99] the payment of bonds issued to private investors. [5]

5 The Port Authority possessed no taxing power and was unable to pledge the credit of either State. The trial court found:

"Under the terms of the Compact the power to levy taxes or to pledge the credit of either state was expressly withheld from the Authority. From its inception, with the exception of monies advanced as loans by the states, the Authority was required to finance its facilities solely with money borrowed from the public and to be repaid out of

the revenues derived from its operations. By reason of these financial limitations two concepts initially emerged which have played an important role in the realization of the purposes for which the Authority was created: first, the specific projects undertaken by the Authority should be self-supporting, i. e., the revenues of each should be sufficient to cover its operating expenses and debt service requirements; and second, since the Authority is a public agency over which its creditors have no direct control, the bondholders should be protected by covenants with the Authority and with the states which have ultimate control over its operations." 134 N.J. Super. 124, 139-140, 338 A. 2d 833, 841 (1975).

The two States subsequently took steps to protect the Port Authority's financial integrity. See, for example, the 1925 statutory declarations not to authorize the construction of competitive bridges within the district or to limit the right of the Port Authority to levy such charges and tolls as it deemed necessary to produce revenues to fund its bonds. 1925 N.J. Laws, c. 37, § 5; 1925 N. Y. Laws, c. 210, § 5.

See generally E. Bard, The Port of New York Authority (1942).

B. Initial Policy Regarding Mass Transit. Soon after the Port Authority's inception, the two States, again with the consent of Congress, 42 Stat. 822, agreed upon a comprehensive plan for the entity's development. 1922 N.J. Laws, c. 9; 1922 N. Y. Laws, c. 43. This plan was concerned primarily, if not solely, with transportation of freight by carriers and not with the movement of passengers in the Port Authority district. The plan, however, was not implemented. [6] The New [*6] Jersey Legislature at that time declared that the plan "does not include the problem of passenger traffic," even though that problem "should be considered in co-operation with the port development commission." 1922 Laws, c. 104. The Port Authority itself recognized the existence of the passenger service problem. 1924 Annual Report 23; 1928 Annual Report 64-66; App. 574a-575a.

6 The parties are not in agreement as to the original perception of the compact and the plan. The appellant claims that the Port Authority was organized "as a freight coordinating agency," Brief for Appellant 5, whereas the appellees

challenge that description and emphasize the presence of a mass transit problem as a factor of profound concern in the Port Authority's development. Brief for Appellees 2-5. The trial court found that neither the commission which recommended the creation of the Port Authority nor the comprehensive plan contemplated responsibility of the agency for passenger transit. 134 N.J. Super., at 134-139, 338 A. 2d, at 838-841.

In 1927 the New Jersey Legislature, in an Act approved by the Governor, directed the Port Authority to make plans "supplementary to or amendatory of the comprehensive plan... as will provide adequate interstate and suburban transportation facilities for passengers." 1927 Laws, c. 277. The New York Legislature followed suit in 1928, but its bill encountered executive veto. [7] The [***100] trial court observed that this [**1510] veto "to all intents and purposes ended any legislative effort to involve the Port Authority in an active role in commuter transit for the next 30 years." 134 N.J. Super., at 149, 338 A. 2d, at 846.

7 Governor Alfred E. Smith in his statement in support of his veto said:

"[It] has been a great disappointment to me to find that the opposition of the railroads has prevented to date the making of real progress in working out the program of freight distribution in the port which always has been the main object and purpose of the Port of New York Authority. I am satisfied that the Port Authority should stick to this program and I am entirely unwilling to give my approval to any measure which at the expense of the solution of the great freight distribution problem will set the Port Authority off on an entirely new line of problem connected with the solution of the suburban passenger problem." App. 573a-574a.

[*7] C. Port Authority Fiscal Policy. Four bridges for motor vehicles were constructed by the Port Authority. A separate series of revenue bonds was issued for each bridge. Revenue initially was below expectations, but the bridges ultimately accounted for much of the Port Authority's financial strength. The legislatures transferred the operation and revenues of the successful Holland Tunnel to the Port Authority, and this more than made up for the early bridge deficits.

The States in 1931 also enacted statutes creating the general reserve fund of the Port Authority. 1931 N.J. Laws, c. 5; 1931 N. Y. Laws, c. 48. Surplus revenues from all Port Authority facilities were to be pooled in the fund to create an irrevocably pledged reserve equal to one-tenth of the par value of the Port Authority's outstanding bonds. This level was attained 15 years later, in 1946.

In 1952, the Port Authority abandoned the practice of earmarking specific facility revenues as security for bonds of that facility. The Port Authority's Consolidated Bond Resolution established the present method of financing its activities; under this method its bonds are secured by a pledge of the general reserve fund. [8]

8 The appellees state that the creation of the general reserve fund "made the Port Authority's fiscal strength possible." Brief for Appellees 6 n. 7.

The parties, however, are in disagreement as to the actual and proper fiscal policy of the Port Authority. Appellant claims that each facility should have prospects of producing sufficient revenue to support itself. Appellees' position is apparent from their assertion that although the self-supporting-facility concept may have "initially emerged," as the trial court stated, 134 N.J. Super., at 140, 338 A. 2d, at 841, "the concept had no practical significance because it was not attained prior to 1931 and was unnecessary after 1931," with the establishment of the general reserve fund. Brief for Appellees 7.

The trial court observed that upon the adoption of the Consolidated Bonds Resolution in 1952, the self-supporting-facility concept "ceased to have the significance previously attached to it." 134 N.J. Super., at 143, 338 A. 2d, at 843.

[*8] D. Renewed Interest in Mass Transit. Meanwhile, the two States struggled with the passenger transportation problem. Many studies were made. The situation was recognized as critical, great costs were envisioned, and substantial deficits were predicted for any mass transit operation. The Port Authority itself financed a study conducted by the Metropolitan Rapid Transit Commission which the States had established in 1954.

In 1958, Assembly Bill No. 16 was introduced in the New Jersey Legislature. This would have had the Port Authority take over, improve, and operate interstate rail mass transit between New Jersey and New York. The bill was opposed vigorously by the Port Authority on legal and financial grounds. The Port Authority also retaliated, in a sense, by including a new safeguard in its contracts with bondholders. This prohibited the issuance of any bonds, [***101] secured by the general reserve fund, for a new facility unless the Port Authority first certified that the issuance of the bonds would not "materially impair the sound credit standing" of the Port Authority. App. 812a. Bill No. 16 was not passed.

In 1959, the two States, with the consent of Congress, Pub. L. 86-302, 73 Stat. 575, created the New York-New Jersey Transportation Agency to deal "with matters affecting public mass transit within and between the 2 States." 1959 N.J. Laws, c. 13, § 3.1, as amended by c. 24; 1959 N. Y. Laws, c. 420, § 3.1.

Also in 1959, the two States enacted legislation providing that upon either State's election the Port Authority would be authorized to purchase and own railroad passenger cars for the purpose of leasing them to [**1511] commuter railroads. 1959 N.J. Laws, c. 25; 1959 N. Y. Laws, c. 638. Bonds issued for this purpose would be guaranteed by the electing State. New York so elected, N. Y. Const., Art. X, § 7, effective January 1, 1962, and approximately $ 100 million of Commuter Car Bonds were issued by the Port Authority to purchase about [*9] 500 air-conditioned passenger cars and eight locomotives used on the Penn Central and Long Island Railroads.

E. The 1962 Statutory Covenant. In 1960 the takeover of the Hudson & Manhattan Railroad by the Port Authority was proposed. This was a privately owned interstate electric commuter system then linking Manhattan, Newark, and Hoboken through the Hudson tubes. It had been in reorganization for many years, and in 1959 the Bankruptcy Court and the United States District Court had approved a plan that left it with cash sufficient to continue operations for two years but with no funds for capital expenditures. In re Hudson & Manhattan R. Co., 174 F. Supp. 148 (SDNY 1959), aff'd sub nom. Spitzer v. Stichman, 278 F. 2d 402 (CA2 1960). A special committee of the New Jersey Senate was formed to determine whether the Port Authority was "fulfilling its statutory duties and obligations," App.

605a. The committee concluded that the solution to bondholder concern was "[l]imiting by a constitutionally protected statutory covenant with Port Authority bondholders the extent to which the Port Authority revenues and reserves pledged to such bondholders can in the future be applied to the deficits of possible future Port Authority passenger railroad facilities beyond the original Hudson & Manhattan Railroad system." Id., at 656a. And the trial court found that the 1962 New Jersey Legislature "concluded it was necessary to place a limitation on mass transit deficit operations to be undertaken by the Authority in the future so as to promote continued investor confidence in the Authority." 134 N.J. Super., at 178, 338 A. 2d, at 863-864.

The statutory covenant of 1962 was the result. The covenant itself was part of the bistate legislation authorizing the Port Authority to acquire, construct, and operate the Hudson & Manhattan Railroad and the World Trade Center. The statute in relevant part read: S

"The 2 States covenant and agree with each other and [*10] with the holders of any affected bonds, as hereinafter defined, that so long as any of such bonds remain outstanding and unpaid and the holders thereof shall not have given [***102] their consent as provided in their contract with the port authority, (a)... and (b) neither the States nor the port authority nor any subsidiary corporation in corporated for any of the purposes of this act will apply any of the rentals, tolls, fares, fees, charges, revenues or reserves, which have been or shall be pledged in whole or in part as security for such bonds, for any railroad purposes whatsoever other than permitted purposes hereinafter set forth." 1962 N.J. Laws, c. 8, § 6; 1962 N.Y. Laws, c. 209, § 6. [9]I

> 9 Not at issue in the instant case is part (a) of § 6 of the statutory covenant (omitted in the quoted material in the text), which promises that the States will not impair the Port Authority's control over its fees or services. This provision has not been repealed, even prospectively.

The "permitted purposes" were defined to include (i) the Hudson & Manhattan as then existing, (ii) railroad freight facilities, (iii) tracks and related facilities on Port Authority vehicular bridges, and (iv) a passenger railroad facility if the Port Authority certified that it was "self-supporting" or, if not, that at the end of the preceding calendar year the general reserve fund contained the prescribed statutory amount, and that all the

Port Authority's passenger revenues, including the Hudson & Manhattan, would not produce deficits in excess of "permitted deficits."

A passenger railroad would be deemed "self-supporting" if the amount estimated by the Authority as average annual net income equaled or exceeded the average [**1512] annual debt service for the following decade. Though the covenant was not explicit on the point, the States, the Port Authority, and its bond counsel have agreed that any state subsidy might be included in the computation of average annual net income of the facility.

 [*11] "Permitted deficits," the alternative method under permitted purpose (iv), was defined to mean that the annual estimated deficit, including debt service, of the Hudson tubes and any additional non-self-sustaining railroad facility could not exceed one-tenth of the general reserve fund, or 1% of the Port Authority's total bonded debt.

The terms of the covenant were self-evident. Within its conditions the covenant permitted, and perhaps even contemplated, additional Port Authority involvement in deficit rail mass transit as its financial position strengthened, since the limitation of the covenant was linked to, and would expand with, the general reserve fund.

A constitutional attack on the legislation containing the covenant was promptly launched. New Jersey and New York joined in the defense. The attack proved unsuccessful. Courtesy Sandwich Shop, Inc. v. Port of New York Authority, 12 N.Y. 2d 379, 190 N.E. 2d 402, appeal dismissed, 375 U.S. 78 (1963). See Kheel v. Port of New York Authority, 331 F. Supp. 118 (SDNY 1971), aff'd, 457 F. 2d 46 (CA2), cert. denied, 409 U.S. 983 (1972).

With the legislation embracing the covenant thus effective, the Port Authority on September 1, 1962, assumed the ownership and operating responsibilities of the Hudson & Manhattan through a wholly owned [***103] subsidiary, Port Authority Trans-Hudson Corporation (PATH). Funds necessary for this were realized by the successful sale of bonds to private investors accompanied by the certification required by § 7 of the Consolidated Bond Resolution that the operation would not materially impair the credit standing of the Port Authority, the investment status of the Consolidated

Bonds, or the ability of the Port Authority to fulfill its commitments to bondholders. This § 7 certification was based on a projection [*12] that the annual net loss of the PATH system would level off at about $ 6.6 million from 1969 to 1991. At the time the certification was made the general reserve fund contained $ 69 million, and thus the projected PATH deficit was close to the level of "permitted deficits" under the 1962 covenant. 134 N.J. Super., at 163, and n. 27, 338 A. 2d, at 855, and n. 27.

The PATH fare in 1962 was 30 cents and has remained at that figure despite recommendations for increase. App. 684a-686a. As a result of the continuation of the low fare, PATH deficits have far exceeded the initial projection. Thus, although the general reserve fund had grown to $ 173 million by 1973, substantially increasing the level of permitted deficits to about $ 17 million, the PATH deficit had grown to $ 24.9 million. In accordance with a stipulation of the parties, id., at 682a-683a, the trial court found that the PATH deficit so exceeded the covenant's level of permitted deficits that the Port Authority was unable to issue bonds for any new passenger railroad facility that was not self-supporting. 134 N.J. Super., at 163 n. 26, 338 A. 2d, at 855 n. 26. [10]

> 10 Notwithstanding the "permitted deficits" formula, the covenant permits use of Port Authority revenues for mass transit if 60% of the bondholders give their consent. The procedures for obtaining such consent are provided in § 16 (b) of the Consolidated Bond Resolution. App. 802a-809a. The Port Authority commissioned a study by First Boston Corporation in 1971 that proposed placing a surcharge on bridge and tunnel tolls, with the extra revenues going to a special fund to secure bonds for mass transportation projects. This proposal would not have diminished the historic reserves pledged to secure the bonds. The study concluded, however, that some increase in the interest rates of existing bonds would have been necessary to obtain a favorable vote of the bondholders. Id., at 696a-699a. There is some evidence in the record that such a proposal could not win bondholder approval, partly because the requisite procedures are unwieldy. Id., at 191a-192a.

[**1513]  F. Prospective Repeal of the Covenant.

Governor Cahill of New Jersey and Governor Rockefeller of New York in April 1970 jointly sought increased Port Authority participation in mass transit. In November 1972 they agreed upon a [*13] plan for expansion of the PATH system. This included the initiation of direct rail service to Kennedy Airport and the construction of a line to Plainfield, N.J., by way of Newark Airport. The plan anticipated a Port Authority investment of something less than $ 300 million out of a projected total cost of $ 650 million, with the difference to be supplied by federal and state grants. It also proposed to make the covenant inapplicable with respect to bonds issued after the legislation went into effect. This program was enacted, effective May 10, 1973, and the 1962 covenant was thereby rendered inapplicable, or in effect repealed, with respect to bonds issued subsequent to the effective date of the new legislation. 1972 N.J. Laws, c. 208; [***104] 1972 N.Y. Laws, c. 1003, as amended by 1973 N.Y. Laws, c. 318. [11]

> [11] The introductory statement appended to the New Jersey bill recited:
>
> "The bill is also designed to preclude the application of the 1962 covenant to holders of bonds newly issued after the effective date of this act, while maintaining in status quo the rights of the holders of the bonds issued after March 27, 1962 (the effective date of the 1962 covenant legislation) but prior to the effective date of this act." Id., at 707a.
>
> Earlier in 1972 the New York Legislature had enacted, and the Governor had signed, a bill repealing the 1962 covenant in its entirety. 1972 N.Y. Laws, c. 1003. New Jersey did not adopt the necessary complementary legislation at that time. The 1973 amendment to the New York legislation, noted in the text, was then enacted to conform to the New Jersey statute.

G. Retroactive Repeal of the Covenant. It soon developed that the proposed PATH expansion would not take place as contemplated in the Governors' 1972 plan. New Jersey was unwilling to increase its financial commitment in response to a sharp increase in the projected cost of constructing the Plaintield extension. As a result the anticipated federal grant was not approved. App. 717a.

New Jersey had previously prevented outright repeal

of the 1962 covenant, but its attitude changed with the election of a new Governor in 1973. In early 1974, when bills were pending in the two States' legislatures to repeal the covenant [*14] retroactively, a national energy crisis was developing. On November 27, 1973, Congress had enacted the Emergency Petroleum Allocation Act, 87 Stat. 627, as amended, 15 U.S.C. § 751 et seq. (1970 ed., Supp. V). In that Act Congress found that the hardships caused by the oil shortage "jeopardize the normal flow of commerce and constitute a national energy crisis which is a threat to the public health, safety, and welfare." 87 Stat. 628, 15 U.S.C. § 751 (a)(3). This time, proposals for retroactive repeal of the 1962 covenant were passed by the legislature and signed by the Governor of each State. 1974 N.J. Laws, c. 25; 1974 N.Y. Laws, c. 993. [12]

> [12] Governor Wilson of New York, upon signing that State's repealer, observed:
>
> "It is with great reluctance that I approve a bill that overturns a solemn pledge of the State. I take this extraordinary step only because it will lead to an end of the existing controversy over the validity of the statutory covenant, a controversy that can only have an adverse affect [sic] upon the administration and financing of the Port Authority, and because it will lead to a speedy resolution by the courts of the questions and issues concerning the validity of the statutory covenant. Because it is the province of the courts to decide questions of constitutionality, I will not prevent the covenant issue from being brought before them, especially where it is the unanimously expressed desire of the members of both houses of the New York State Legislature as well as the expressed will of the Governor and both houses of the Legislature of the State of New Jersey to do so." App. 774a.

On April 10, 1975, the Port Authority announced an increase in its basic bridge and tunnel tolls designed to raise an estimated $ 40 million annually. App. 405a-407a, 419a-421a, 528a. This went into effect May 5 and was, it was said, "[t]o increase [the Port Authority's] ability to finance vital mass transit improvements." Id., at 405a.

[**1514] II

At the time the Constitution was adopted, and for nearly a century thereafter, the Contract Clause was one

of the few express limitations on state power. The many decisions of [*15] [***105] this Court involving the Contract Clause are evidence of its important place in our constitutional jurisprudence. Over the last century, however, the Fourteenth Amendment has assumed a far larger place in constitutional adjudication concerning the States. We feel that the present role of the Contract Clause is largely illuminated by two of this Court's decisions. In each, legislation was sustained despite a claim that it had impaired the obligations of contracts.

Home Building & Loan Assn. v. Blaisdell, 290 U.S. 398 (1934), is regarded as the leading case in the modern era of Contract Clause interpretation. At issue was the Minnesota Mortgage Moratorium Law, enacted in 1933, during the depth of the Depression and when that State was under severe economic stress, and appeared to have no effective alternative. The statute was a temporary measure that allowed judicial extension of the time for redemption; a mortgagor who remained in possession during the extension period was required to pay a reasonable income or rental value to the mortgagee. A closely divided Court, in an opinion by Mr. Chief Justice Hughes, observed that "emergency may furnish the occasion for the exercise of power" and that the "constitutional question presented in the light of an emergency is whether the power possessed embracees the particular exercise of it in response to particular conditions." Id., at 426. It noted that the debates in the Constitutional Convention were of little aid in the construction of the Contract Clause, but that the general purpose of the Clause was clear: to encourage trade and credit by promoting confidence in the stability of contractual obligations. Id., at 427-428. Nevertheless, a State "continues to possess authority to safeguard the vital interests of its people.... This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court." Id., at 434-435. The great clauses of the Constitution are to be considered in the [*16] light of our whole experience, and not merely as they would be interpreted by its Framers in the conditions and with the outlook of their time. Id., at 443.

This Court's most recent Contract Clause decision is El Paso v. Simmons, 379 U.S. 497 (1965). That case concerned a 1941 Texas statute that limited to a 5-year period the reinstatement rights of an interest-defaulting purchaser of land from the State. For many years prior to the enactment of that statute, such a defaulting purchaser, under Texas law, could have reinstated his claim to the land upon written request and payment of delinquent interest, unless rights of third parties had intervened. This Court held that "[HN2] it is not every modification of a contractual promise that impairs the obligation of contract under federal law." Id., at 506-507. It observed that the State "has the 'sovereign right... to protect the... general welfare of the people'" and "'we must respect the "wide discretion on the part of the legislature in determining what is and what is not necessary,"'" id., at 508-509, [***106] quoting East New York Savings Bank v. Hahn, 326 U.S. 230, 232-233 (1945). The Court recognized that "the power of a State to modify or affect the obligation of contract is not without limit," but held that "the objects of the Texas statute make abundantly clear that it impairs no protected right under the Contract Clause." 379 U.S., at 509.

Both of these cases eschewed a rigid application of the Contract Clause to invalidate state legislation. Yet neither indicated that the Contract Clause was without meaning in modern constitutional jurisprudence, or that its limitation on state power [**1515] was illusory. Whether or not the protection of contract rights comports with current views of wise public policy, the Contract Clause remains a part of our written Constitution. We therefore must attempt to apply that constitutional provision to the instant case with due respect for its purpose and the prior decisions of this Court.

[*17]  III

[***LEdHR1A]    [1B]    [***LEdHR2]    [2] [***LEdHR3A]   [3A]   [***LEdHR4A]   [4A]We first examine appellant's general claim that repeal of the 1962 covenant impaired the obligation of the States' contract with the bondholders. It long has been established that[HN3] the Contract Clause limits the power of the States to modify their own contracts as well as to regulate those between private parties. Fletcher v. Peck, 6 Cranch 87, 137-139 (1810);Dartmouth College v. Woodward, 4 Wheat. 518 (1819).Yet the Contract Clause does not prohibit the States from repealing or amending statutes generally, or from enacting legislation with retroactive effects. [13] Thus, as a preliminary matter, appellant's claim requires a determination that the repeal has the effect of impairing a contractual obligation.

13    [***LEdHR3A] [3B]  [***LEdHR4A] [4B]

The Contract Clause is in the phrase of the Constitution which contains the prohibition against any State's enacting a bill of attainder or ex post facto law. Notwithstanding Mr. Chief Justice Marshall's reference to these two other forbidden categories in Fletcher v. Peck, 6 Cranch, at 138-139, it is clear that they limit the powers of the States only with regard to the imposition of punishment. Cummings v. Missouri, 4 Wall. 277, 322-326 (1867); Calder v. Bull, 3 Dall. 386, 390-391 (1798). The Due Process Clause of the Fourteenth Amendment generally does not prohibit retrospective civil legislation, unless the consequences are particularly "harsh and oppressive." Welch v. Henry, 305 U.S. 134, 147 (1938). See Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 14-20 (1976).

[***LEdHR5A]   [5A]   [***LEdHR6A]   [6A] [***LEdHR7] [7]In this case the obligation was itself created by a statute, the 1962 legislative covenant. It is unnecessary, however, to dwell on the criteria for determining whether state legislation gives rise to a contractual obligation. [14] The trial court [*18] [***107] found, 134 N.J. Super., at 183 n. 38, 338 A. 2d, at 866 n. 38, and appellees do not deny, that the 1962 covenant constituted a contract between the two States and the holders of the Consolidated Bonds issued between 1962 and the 1973 prospective repeal. [15] The intent to make a contract is clear from the statutory language: "The 2 States covenant and agree with each other and with the holders of any affected bonds...." 1962 N.J. Laws, c. 8, § 6; 1962 N. Y. Laws, c. 209, § 6. Moreover, as the chronology set forth above reveals, the purpose of the covenant was to invoke the constitutional protection of the Contract [**1516] Clause as security against repeal. In return for their promise, the States received the benefit they bargained for: public marketability of Port Authority bonds to finance construction of the World Trade Center and acquisition of the Hudson & Manhattan Railroad. We therefore have no doubt that the 1962 covenant has been properly characterized as a contractual obligation of the two States.

14   [***LEdHR5A] [5B]

[HN4] In general, a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State. Compare Dodge v. Board of Education, 302 U.S. 74, 78-79 (1937), with Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 104-105 (1938). In addition, statutes governing the interpretation and enforcement of contracts may be regarded as forming part of the obligation of contracts made under their aegis. See n. 17, infra. See generally Hale, The Supreme Court and the Contract Clause: II, 57 Harv. L. Rev. 621, 663-670 (1944).

15   [***LEdHR6A] [6B]

Between the enactment of the 1962 covenant and its retrospective repeal in 1974, the Port Authority issued and sold to the public $ 1,260 million of Consolidated Bonds. The Fortieth and Forty-first Series, for which appellant is trustee, were issued after the 1973 prospective repeal and prior to the retrospective repeal. The holders of those bonds were not parties to the 1962 covenant, since the States undoubtedly had the power to repeal the covenant prospectively. See Ogden v. Saunders, 12 Wheat. 213 (1827). The subsequent bondholders arguably are like third-party beneficiaries of the covenant. There is testimony in the record that they were indirectly protected because the bonds outstanding at the time of the prospective repeal (in excess of $ 1 billion) could not be expected to be retired in the foreseeable future. App. 1105a. We need not decide whether that indirect relationship supports standing to challenge the retroactive repeal, however. Appellant also sued as a holder of Consolidated Bonds (some $ 72 million) issued between 1962 and 1973. Id., at 56a-57a.

The parties sharply disagree about the value of the 1962 [*19] covenant to the bondholders. Appellant claims that after repeal the secondary market for affected bonds became "thin" and the price fell in relation to other formerly comparable bonds. This claim is supported by the trial court's finding that "immediately following repeal and for a number of months thereafter the market price for Port Authority bonds was adversely affected." 134 N.J. Super., at 180, 338 A. 2d, at 865. Appellees respond that the bonds nevertheless retained an "A" rating from the leading evaluating services and that after

an initial adverse effect they regained a comparable price position in the market. Findings of the trial court support these claims as well. Id., at 179-182, 338 A. 2d, at 864-866. The fact is that no one can be sure precisely how much financial loss the bondholders suffered. Factors unrelated to repeal may have influenced price. In addition, the market may not have reacted fully, even as yet, to the covenant's repeal, because of the pending litigation and the possibility that the repeal would be nullified by the courts.

[***LEdHR8A] [8A] [***LEdHR9A] [9A] [***LEdHR10A] [10A]In any event, the question of valuation need not be resolved in the instant case because the State has made no effort to compensate the bondholders for any loss [***108] sustained by the repeal. [16] As a security provision, the covenant was not superfluous; it limited the Port Authority's deficits and thus protected the general reserve fund from depletion. Nor was the covenant merely modified or replaced by an arguably comparable security provision. Its outright repeal totally eliminated an important security provision and thus impaired the obligation of the States' contract. See Richmond Mortgage & Loan Corp. v. Wachovia Bank & Trust Co., 300 U.S. 124, 128-129 (1937). [17]

16   [***LEdHR8A] [8B]

[HN5] Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid. Contributors to Pennsylvania Hospital v. Philadelphia, 245 U.S. 20 (1917); see El Paso v. Simmons, 379 U.S. 497, 533-534 (1965) (Black, J., dissenting).

17   The obligations of a contract long have been regarded as including not only the express terms but also the contemporaneous state law pertaining to interpretation and enforcement. "This Court has said that 'the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a prt of it, as if they were expressly referred to or incorporated in its terms.'" Home Building & Loan Assn. v. Blaisdell, 290 U.S. 398, 429-430 (1934), quoting Von Hoffman v. City of Quincy, 4 Wall. 535, 550 (1867). See also Ogden v. Saunders, 12 Wheat., at 259-260, 297-298 (opinions of Washington and Thompson, JJ.). This principle presumes that contracting parties

adopt the terms of their bargain in reliance on the law in effect at the time the agreement is reached.

[***LEdHR9A] [9B]It is not always unconstitutional, however, for changes in statutory remedies to affect pre-existing contracts. During the early years when the Contract Clause was regarded as an absolute bar to any impairment, this result was reached by treating remedies in a manner distinct from substantive contract obligations. Thus, for example, a State could abolish imprisonment for debt because elimination of this remedy did not impair the underlying obligation. Penniman's Case, 103 U.S. 714 (1881); Mason v. Haile, 12 Wheat. 370 (1827); see Sturgesv.Crownishield, 4 Wheat. 122, 200-201 (1819).

[***LEdHR10A] [10B]Yet it was also recognized very early that the distinction between remedies and obligations was not absolute. Impairment of a remedy was held to be unconstitutional if it effectively reduced the value of substantive contract rights. Greenv. Biddle, 8 Wheat. 1, 75-76, 84-85 (1823). See also Bronson v. Kinzie, 1 How. 311, 315-318 (1843); Von Hoffman v. City of Quincy, 4 Wall., at 552-554. More recent decisions have not relied on the remedy/obligation distinction, primarily because it is now recognized that obligations as well as remedies may be modified without necessarily violating the Contract Clause. El Paso v. Simmons, 379 U.S. at 506-507, and n. 9; Home Building & Loan Assn. v. Blaisdell, 290 U.S., at 429-435.

Although now largely an outdated formalism, the remedy/obligation distinction may be viewed as approximating the result of a more particularized inquiry into the legitimate expectations of the contracting parties. The parties may rely on the continued existence of adequate statutory remedies for enforcing their agreement, but they are unlikely to expect that state law will remain entirely static. Thus, a reasonable modification of statutes governing contract remedies is much less likely to upset expectations than a law adjusting the express terms of an agreement. In this respect, the repeal of the 1962 covenant is to be seen as a serious

disruption of the bondholders' expectations.

[*20] [**1517] The trial court recognized that there was an impairment in this case: "To the extent that the repeal of the covenant authorizes the Authority to assume greater deficits for such [*21] purposes, it permits a diminution of the pleadged revenues and reserves and may be said to constitute an impairment of the states' contract with the bondholders." 134 N.J. Super., at 183, 338 A. 2d, at 866.

Having thus established that the repeal impaired a contractual obligation [***109] of the States, we turn to the question whether that impairment violated the Contract Clause.

IV

[***LEdHR11] [11][HN6] Although the Contract Clause appears literally to proscribe "any" impairment, this Court observed in Blaisdell that "the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula." 290 U.S., at 428.Thus, a finding that there has been a technical impairment is merely a preliminary step in resolving the more difficult question whether that impairment is permitted under the Constitution. In the instant case, as in Blaisdell, we must attempt to reconcile the strictures of the Contract Clause with the "essential attributes of sovereign power," id., at 435, necessarily reserved by the States to safeguard the welfare of their citizens. Id., at 434-440.

[***LEdHR12] [12]The trial court concluded that repeal of the 1962 covenant was a valid exercise of New Jersey's police power because repeal served important public interests in mass transportation, energy conservation, and environmental protection. 134 N.J. Super., at 194-195, 338 A. 2d, at 873.Yet the Contract Clause limits otherwise legitimate exercises of state legislative authority, and the existence of an important public interest is not always sufficient to overcome that limitation. "Undoubtedly, whatever is reserved of state power must be consistent with the fair intent of the constitutional limitation of that power." Blaisdell, 290 U.S., at 439. Moreover, the [*22] scope of the State's reserved power depends on the nature of the contractual relationship with which the challenged law conflicts.

[***LEdHR13] [13]The States must possess broad

power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result. Otherwise, one would be able to obtain immunity from state regulation by making private contractual arrangements. This principle is summarized in Mr. Justice Holmes' well-known dictum: "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." Hudson Water Co. v. McCarter, 209 U.S. 349, 357 (1908).[18]

18   Accord: Stephenson v. Binford, 287 U.S. 251, 276 (1932); Manigault v. Springs, 199 U.S. 473, 480 (1905). See Home Building & Loan Assn. v. Blaisdell, 290 U.S., at 437-438.

[***LEdHR14A] [14A]Yet private contracts are not subject to unlimited modification under the police power. The Court in Blaisdell recognized that laws intended to regulate existing contractual relationships must serve a legitimate public purpose. 290 U.S., at 444-445.A State could not "adopt as its policy the repudiation of debts or the [**1518] destruction of contracts or the denial of means to enforce them." Id., at 439. Legislation adjusting the rights and responsibilities of contracting parties must be upon reasonable conditions [***110] and of a character appropriate to the public purpose justifying its adoption. Id., at 445-447.[19] As is customary in reviewing economic and social [*23] regulation, however, courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure. East New York Savings Bank v. Hahn, 326 U.S. 230 (1945).

19   [***LEdHR14A] [14B]

Blaisdell suggested further limitations that have since been subsumed in the overall determination of reasonableness. The legislation sustained in Blaisdell was adopted pursuant to a declared emergency in the State and strictly limited in duration. Subsequent decisions struck down state laws that were not so limited. W.B. Worthen Co. v. Thomas, 292 U.S. 426, 432-434 (1934) (relief not limited as to "time, amount, circumstances, or need"); Treigle v. Acme Homestead Assn., 297 U.S. 189, 195 (1936) (no emergency or temporary measure). Later decisions abandoned these limitations as absolute requirements. Veix v. Sixth Ward Building &

Loan Assn., 310 U.S., 32, 39-40 (1940) (emergency need not be declared and relief measure need not be temporary); East New York Savings Bank v. Hahn, 326 U.S. 230 (1945) (approving 10th extension of one-year mortgage moratorium). Undoubtedly the existence of an emergency and the limited duration of a relief measure are factors to be assessed in determining the reasonableness of an impairment, but they cannot be regarded as essential in every case.

[***LEdHR15] [15]When a State impairs the obligation of its own contract, the reserved-powers doctrine has a different basis. The initial inquiry concerns the ability of the State to enter into an agreement that limits its power to act in the future. As early as Fletcher v. Peck, the Court considered the argument that "one legislature cannot abridge the powers of a succeeding legislature." 6 Cranch, at 135. It is often stated that "the legislature cannot bargain away the police power of a State." Stone v. Mississippi, 101 U.S. 814, 817 (1880). [20] This doctrine requires a determination of the State's power to create irrevocable contract rights in the first place, rather than an inquiry into the purpose or reasonableness of the subsequent impairment. In short, the Contract Clause does not require a State to adhere to a contract that surrenders an essential attribute of its sovereignty.

20    Stone v. Mississippi sustained the State's revocation of a 25-year charter to operate a lottery. Other cases similarly have held that a State is without power to enter into binding contracts not to exercise its police power in the future. E. g., Pierce Oil Corp.v. City of Hope, 248 U.S. 498, 501 (1919); Atlantic Coast Line R. Co. v. Goldsboro, 232 U.S. 548, 558 (1914); Douglas v. Kentucky, 168 U.S. 488, 502-505 (1897). See Home Building & Loan Assn. v. Blaisdell, 290 U.S., at 436-437.

[***LEdHR16] [16]In deciding whether a State's contract was invalid ab initio under the reserved-powers doctrine, earlier decisions relied on distinctions among the various powers of the State. Thus, the [*24] police power and the power of eminent domain were among those that could not be "contracted away," but the State could bind itself in the future exercise of the taxing and

spending powers. [21] [***111] Such formalistic distinctions perhaps cannot be dispositive, but they contain an important element of truth. Whatever the propriety of a State's binding itself to a [**1519] future course of conduct in other contexts, the power to enter into effective financial contracts cannot be questioned. Any financial obligation could be regarded in theory as a relinquishment of the State's spending power, since money spent to repay debts is not available for other purposes. Similarly, the taxing power may have to be exercised if debts are to be repaid. Notwithstanding these effects, the Court has regularly held that the States are bound by their debt contracts. [22]

21    In New Jersey v. Wilson, 7 Caranch 164 (1812), the Court held that a State could properly grant a permanent tax exemption and that the Contract Clause prohibited any impairment of such an agreement. This holding has never been repudiated, although tax exemption contracts generally have not received a sympathetic construction. See B. Wright, The Contract Clause of the Constitution 179-194 (1938).

By contrast, the doctrine that a State cannot contract away the power of eminent domain has been established since West River Bridge Co. v. Dix, 6 How. 507 (1848). See Contributors to Pennsylvania Hospital v. Philadelphia, 245 U.S., at 23-24. The doctrine that a State cannot be bound to a contract forbidding the exercise of its police power is almost as old. See n. 20, supra.

22    State laws authorizing the impairment of municipal bond contracts have been held unconstitutional. W.B. Worthen Co. v. Kavanaugh, 295 U.S. 56 (1935); Louisiana v. Pilsbury, 105 U.S. 278 (1882). Similarly, a tax on municipal bonds was held unconstitutional because its effect was to reduce the contractual rate of interest. Murray v. Charleston, 96 U.S. 432, 443-446 (1878).

A number of cases have held that a State may not authorize a municipality to borrow money and then restrict its taxing power so that the debt cannot be repaid. Louisiana ex rel. Hubert v. New Orleans, 215 U.S. 170, 175-178 (1909); Wolff v. New Orleans, 103 U.S. 358, 365-368 (1881); Von

Hoffman v. City of Quincy, 4 Wall., at 554-555. See Fisk v. Jefferson Police Jury, 116 U.S. 131 (1885) (contract for payment of public officer).

See also Wood v. Lovett, 313 U.S. 362 (1941); Indiana ex rel. Anderson v. Brand, 303 U.S. 95 (1938).

[***LEdHR17A] [17A]The instant case involves a financial obligation and thus as a threshold matter may not be said automatically to fall [*25] within the reserved powers that cannot be contracted away. 23 Not every security provision, however, is necessarily financial. For example, a revenue bond might be secured by the State's promise to continue operating the facility in question; yet such a promise surely could not validly be construed to bind the State never to close the facility for health or safety reasons. The security provision at issue here, however, is different: The States promised that revenues and reserves securing the bonds would not be depleted by the Port Authority's operation of deficit-producing passenger railroads beyond the level of "permitted deficits." Such a promise is purely financial and thus not necessarily a compromise of the State's reserved powers.

23   [***LEdHR17A] [17B]

"The truth is, States and cities, when they borrow money and contract to repay it with interest, are not acting as sovereignties. They come down to the level of ordinary individuals. Their contracts have the same meaning as that of similar contracts between private persons. Hence, instead of there being in the undertaking of a State or city to pay, a reservation of a sovereign right to withhold payment, the contract should be regarded as an assurance that such a right will not be exercised. A promise to pay, with a reserved right to deny or change the effect of the promise, is an absurdity." Murray v. Charleston, 96 U.S., at 445.

[***LEdHR18] [18]Of course, to say that the financial restrictions of the 1962 covenant were valid when adopted does not finally resolve this case. The Contract Clause is not an absolute bar to subsequent modification of a [***112] State's own financial obligations. 24 As with laws impairing the obligations of private contracts,

an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose. In applying [*26] this standard, however, complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all. 25

24   See El Paso v. Simmons, 379 U.S. 497 (1965); Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502 (1942); Louisiana v. New Orleans, 102 U.S. 203 (1880).

25  For similar reasons, a dual standard of review was applied under the Fifth Amendment to federal legislation abrogating contractual gold clauses. "There is a clear distinction between the power of the Congress to control or interdict the contracts of private parties when they interfere with the exercise of its constitutional authority, and the power of the Congress to alter or repudiate the substance of its own engagements when it has borrowed money under the authority which the Constitution confers." Perry v. United States, 294 U.S. 330, 350-351 (1935). Cf. Norman v. Baltimore & O.R. Co., 294 U.S. 240, 304-305 (1935). See also Lynch v. United States, 292 U.S. 571, 580 (1934) (need for money is no excuse for repudiating contractual obligations); Note, The Constitutionality of the New York Municipal Wage Freeze and Debt Moratorium: Resurrection of the Contract Clause, 125 U. Pa. L. Rev. 167, 188-191 (1976).

[**1520] The trial court recognized to an extent the special status of a State's financial obligations when it held that total repudiation, presumably for even a worthwhile public purpose, would be unconstitutional. But the trial court regarded the protection of the Contract Clause as available only in such an extreme case: "The states' inherent power to protect the public welfare may be validly exercised under the Contract Clause even if it impairs a contractual obligation so long as it does not destroy it." 134 N.J. Super., at 190, 338 A. 2d, at

870-871.

[***LEdHR19] [19]The trial court's "total destruction" test is based on what we think is a misreading of W.B. Worthen Co. v. Kavanaugh, 295 U.S. 56 (1935).[26] In the first place, the impairment held [*27] unconstitutional in Kavanaugh was one that affected the value of a security provision, and certainly not every bond would have been worthless. More importantly, Mr. Justice Cardozo needed only to state an "outermost limits" test in the Court's opinion, id., at 60, because the impairment was so egregious. [***113] He expressly recognized that the actual line between permissible and impermissible impairments could well be drawn more narrowly. Thus the trial court was not correct when it drew the negative inference that any impairment less oppressive than the one in Kavanaugh was necessarily constitutional. The extent of impairment is certainly a relevant factor in determining its reasonableness. But we cannot sustain the repeal of the 1962 covenant simply because the bondholders' rights were not totally destroyed.

> 26  In Kavanaugh, the State changed its statutory procedure for enforcing certain municipal assessments against property owners. The holders of bonds for which the assessments were pledged as security were found to have contract rights in the previous statutory scheme. Without classifying the enforcement statutes as substantive or remedial, the Court held the change unconstitutional because it "[took] from the mortgage the quality of an acceptable investment for a rational investor." 295 U.S., at 60. In the instant case the State has repudiated an express promise rather than one implied from the statutory scheme in effect at the time of the contract. Thus, the instant case may be regarded as a more serious abrogation of the bondholders' expectations than occurred in Kavanaugh. See n. 17, supra.

The only time in this century that alteration of a municipal bond contract has been sustained by this Court was in Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502 (1942). That case involved the New Jersey Municipal Finance Act, which provided that a bankrupt local government could be placed in receivership by a state agency. A plan for the composition of creditors' claims was required to be approved by the agency, the municipality, and 85% in amount of the creditors. The plan would be binding on nonconsenting creditors after a

state court conducted a hearing and found that the municipality could not otherwise pay off its creditors and that the plan was in the best interest of all creditors. Id., at 504.

[*28] Under the specific composition plan at issue in Faitoute, the holders of revenue bonds received new securities bearing lower interest rates and later maturity dates. This Court, however, rejected the dissenting bondholders' Contract Clause objections. The reason was that the old bonds represented only theoretical rights; as a practical matter the city could not raise its taxes enough to pay off its creditors under the old contract terms. The composition plan enabled the city to meet its financial obligations more effectively. "The necessity compelled [**1521] by unexpected financial conditions to modify an original arrangement for discharging a city's debt is implied in every such obligation for the very reason that thereby the obligation is discharged, not impaired." Id., at 511. Thus, the Court found that the composition plan was adopted with the purpose and effect of protecting the creditors, as evidenced by their more than 85% approval. Indeed, the market value of the bonds increased sharply as a result of the plan's adoption. Id., at 513.

It is clear that the instant case involves a much more serious impairment than occurred in Faitoute. No one has suggested here that the States acted for the purpose of benefiting the bondholders, and there is no serious contention that the value of the bonds was enhanced by repeal of the 1962 covenant. Appellees recognized that it would have been impracticable to obtain consent of the bondholders for such a change in the 1962 covenant, Brief for Appellees 97-98, even though only 60% approval would have been adequate. See n. 10, supra. We therefore conclude that repeal of the 1962 covenant cannot be sustained on the basis of this Court's prior decisions in Faitoute and other municipal bond cases.

V

[***LEdHR1A] [1C] [***LEdHR20] [20] [***LEdHR21A] [21A]Mass transportation, energy conservation, and environmental [***114] protection are goals that are important and of legitimate public concern. Appellees contend that these goals are so [*29] important that any harm to bondholders from repeal of the 1962 covenant is greatly outweighed by the public benefit. We do not accept this invitation to engage in a utilitarian comparison of public benefit and private loss.

Contrary to Mr. Justice Black's fear, expressed in sole dissent in El Paso v. Simmons, 379 U.S., at 517, the Court has not "balanced away" the limitation on state action imposed by the Contract Clause. Thus a State cannot refuse to meet its legitimate financial obligations simply because it would prefer to spend the money to promote the public good rather than the private welfare of its creditors. We can only sustain the repeal of the 1962 covenant if that impairment was both reasonable and necessary to serve the admittedly important purposes claimed by the State. [27]

27   [***LEdHR21A] [21B]

The dissent suggests, post, at 41-44, that such careful scrutiny is unwarranted in this case because the harm to bondholders is relatively small. For the same reason, however, contractual obligations of this magnitude need not impose barriers to changes in public policy. The States remain free to exercise their powers of eminent domain to abrogate such contractual rights, upon payment of just compensation. See n. 16, supra.

The more specific justification offered for the repeal of the 1962 covenant was the States' plan for encouraging users of private automobiles to shift to public transportation. The States intended to discourage private automobile use by raising bridge and tunnel tolls and to use the extra revenue from those tolls to subsidize improved commuter railroad service. Appellees contend that repeal of the 1962 covenant was necessary to implement this plan because the new mass transit facilities could not possibly be self-supporting and the covenant's "permitted deficits" level had already been exceeded. We reject this justification because the repeal was neither necessary to achievement of the plan nor reasonable in light of the circumstances.

[***LEdHR22] [22]The determination of necessity can be considered on two levels. First, it cannot be said that total repeal of the covenant [*30] was essential; a less drastic modification would have permitted the contemplated plan without entirely removing the covenant's limitations on the use of Port Authority revenues and reserves to subsidize commuter railroads. [28] Second, without [**1522] modifying the covenant at all, the States could have adopted alternative means of achieving their twin goals of discouraging automobile use and improving [***115] mass transit. [29] Appellees contend, however, that choosing among these alternatives

is a matter for legislative discretion. But a State is not completely free to consider impairing the obligations [*31] of its own contracts on a par with other policy alternatives. Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well. In El Paso v. Simmons, supra, the imposition of a five-year statute of limitations on what was previously a perpetual right of redemption was regarded by this Court as "quite clearly necessary" to achieve the State's vital interest in the orderly administration of its school lands program. 379 U.S., at 515-516. In the instant case the State has failed to demonstrate that repeal of the 1962 covenant was similarly necessary.

28   If in fact the States sought to divert only new revenues to subsidize mass transit, then the covenant could have been amended to exclude the additional bridge and tunnel tolls from the revenue use limitation that was imposed. Such a change would not have reduced the covenant to a nullity because it would have continued to prevent the diminution of revenues and reserves that historically secured the bonds. And even if the plan contemplated use of current revenues and reserves, the formula for computing "permitted deficits" perhaps could have been modified without totally abandoning an objective limitation on the Port Authority's involvement in deficit mass transit. Finally, the procedures for obtaining bondholder approval could have been modified so that such consent would present a feasible means of undertaking new projects. See n. 10, supra.

Of course, we express no opinion as to whether any of these lesser impairments would be constitutional.

29   Transportation control strategies are available that do not require direct application of revenues from bridge and tunnel tolls to subsidize mass transit. In calling for air pollution abatement measures in New Jersey, the Administrator of the Environmental Protection Agency encouraged "close examination" of such measures as, inter alia, "State taxes to encourage VMT [vehicle miles traveled] reductions while raising revenues to benefit mass transit" and realignment of toll structures by "elimination of commuter discounts"

and "possibly an increase in tolls during peak commuting times to encourage carpools." 38 Fed. Reg. 31389 (1973). Thus, the States could discourage automobile use through taxes on gasoline or parking, for example, and use the revenues to subsidize mass transit projects so they would be "self-supporting" within the meaning of the covenant. Bridge and tunnel tolls could be increased for commuters and decreased at other times, so that there would be no excess revenue for purposes of the General Bridge Act of 1946, 33 U.S.C. § 526.

We also cannot conclude that repeal of the covenant was reasonable in light of the surrounding circumstances. In this regard a comparison with El Paso v. Simmons, supra, again is instructive. There a 19th century statute had effects that were unforeseen and unintended by the legislature when originally adopted. As a result speculators were placed in a position to obtain windfall benefits. The Court held that adoption of a statute of limitation was a reasonable means to "restrict a party to those gains reasonably to be expected from the contract" when it was adopted. 379 U.S., at 515. [30]

30    This Court previously has regarded the elimination of unforeseen windfall benefits as a reasonable basis for sustaining changes in statutory deficiency judgment procedures. These changes were adopted by several States when unexpected reductions in property values during the Depression permitted some mortgagees to recover far more than their legitimate entitlement. See Gelfert v. National City Bank, 313 U.S. 221, 233-235 (1941); Honeyman v. Jacobs, 306 U.S. 539, 542-543 (1939); Richmond Mortgage & Loan Corp. v. Wachovia Bank & Trust Co., 300 U.S. 124, 130-131 (1937).

By contrast, in the instant case the need for mass transportation in the New York metropolitan area was not a new development, and the likelihood that publicly owned commuter railroads would produce substantial deficits was well known. As early as 1922, over a half century ago, there were pressures to involve the Port Authority in mass transit. It was with [*32] full knowledge of these concerns that the 1962 covenant was adopted. Indeed, the covenant was specifically intended to protect the pledged revenues and reserves against the possibility that such concerns [***116] would lead the Port Authority into greater involvement in deficit mass transit.

[**1523] During the 12-year period between adoption of the covenant and its repeal, public perception of the importance of mass transit undoubtedly grew because of increased general concern with environmental protection and energy conservation. But these concerns were not unknown in 1962, and the subsequent changes were of degree and not of kind. We cannot say that these changes caused the covenant to have a substantially different impact in 1974 than when it was adopted in 1962. And we cannot conclude that the repeal was reasonable in the light of changed circumstances.

We therefore hold that the Contract Clause of the United States Constitution prohibits the retroactive repeal of the 1962 covenant. The judgment of the Supreme Court of New Jersey is reversed.

It is so ordered.

MR. JUSTICE STEWART took no part in the decision of this case.

MR. JUSTICE POWELL took no part in the consideration or decision of this case.

**CONCUR BY:** BURGER

**CONCUR**

MR. CHIEF JUSTICE BURGER, concurring.

In my view, to repeal the 1962 covenant without running afoul of the constitutional prohibition against the impairment of contracts, the State must demonstrate that the impairment was essential to the achievement of an important state purpose. Furthermore, the State must show that it did not know and could not have known the impact of the contract on that state interest at the time that the contract was made. So reading the Court's opinion, I join it.

=P1100*33 For emphasis, I note that the Court pointedly does not hold that, on the facts of this case, any particular "less drastic modification" would pass constitutional muster, ante, at 30, and n. 28.

**DISSENT BY:** BRENNAN

**DISSENT**

MR. JUSTICE BRENNAN, with whom MR. JUSTICE WHITE and MR. JUSTICE MARSHALL join, dissenting.

Decisions of this Court for at least a century have construed the Contract Clause largely to be powerless in binding a State to contracts limiting the authority of successor legislatures to enact laws in furtherance of the health, safety, and similar collective interests of the polity. In short, those decisions established the principle that lawful exercises of a State's police powers stand paramount to private rights held under contract. Today's decision, in invalidating the New Jersey Legislature's 1974 repeal of its predecessor's 1962 covenant, rejects this previous understanding and remolds the Contract Clause into a potent instrument for overseeing important policy determinations of the state legislature. At the same time, by creating a constitutional safe haven for property rights embodied in a contract, the decision substantially distorts modern constitutional jurisprudence governing regulation of private economic interests. I might understand, though I could not accept, this revival of the Contract Clause were it [***117] in accordance with some coherent and constructive view of public policy. But elevation of the Clause to the status of regulator of the municipal bond market at the heavy price of frustration of sound legislative policymaking is as demonstrably unwise as it is unnecessary. The justification for today's decision, therefore, remains a mystery to me, and I respectfully dissent.

I

The Court holds that New Jersey's repeal of the 1962 covenant constitutes an unreasonable invasion of contract rights and hence an impairment of contract. The formulation of [*34] the legal standard by which the Court would test asserted impairments of contracts is, to me, both unprecedented and most troubling. But because the Constitution primarily is "'intended to preserve practical and substantial rights, not to maintain theories,'" Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502, 514 (1942), it is necessary to sketch the factual background of this dispute before discussing the reasons for my concern. In my [**1524] view, the Court's casual consideration both of the substantial public policies that prompted New Jersey's repeal of the 1962 covenant, and of the relatively inconsequential burdens that resulted for the Authority's creditors, belies its

conclusion that the State acted unreasonably in seeking to relieve its citizens from the strictures of this earlier legislative policy.

A

In an era when problems of municipal planning increasingly demand regional rather than local solutions, the Port Authority provides the New York-New Jersey community with a readymade, efficient regional entity encompassing some 1,500 square miles surrounding the Statute of Liberty. As the Court notes, from the outset public officials of both New York and New Jersey were well aware of the Authority's heavy dependence on public financing. Consequently, beginning in the decade prior to the enactment of the 1962 covenant, the Authority's general reserve bonds, its primary vehicle of public finance, have featured two rigid security devices designed to safeguard the investment of bondholders. First, pursuant to a so-called "1.3 test," the Authority has been disabled from issuing new consolidated bonds unless the best one-year net revenues derived from all of the Authority's facilities at least equal 130% of the prospective debt service for the calendar year during which the debt service for all outstanding and proposed bonds would be at a maximum. Second, according to a procedure known as a "section 7 certification," [*35] the Authority may not issue bonds to finance additional facilities unless it "shall certify" that the issue "will not, during the ensuing ten years or during the longest term of any such bonds proposed to be issued..., whichever shall be longer,... materially impair the sound credit standing of the Authority...." App. 811a-812a.

The 1962 covenant existed alongside these security provisions. Viewed in simplest terms, the covenant served to preclude Authority investment and participation in transportation programs by shifting the financial focal point from the creditworthiness of the Authority's activities as a whole to the solvency [***118] of each proposed new transit project. Whereas the 1.3 and section 7 tests permit expanded involvement in mass transportation provided that the enormous revenue-generating potential of the Authority's bridges and tunnels aggregately suffice to secure the investments of creditors, the covenant effectively foreclosed participation in any new project that w as not individually "self-supporting." [1] Both parties to this litigation are in apparent agreement that few functional mass transit systems are capable of satisfying this requirement.

1   The covenant does enable the Authority to finance passenger railroad facilities to a level of "permitted deficits," defined as one-tenth of the General Reserve Fund or 1% of the total bonded indebtedness. While the Court notes in passing that this provision "permitted, and perhaps even contemplated, additional Port Authority involvement in deficit rail mass transit," ante, at 11, the formula restricts the Authority to a small percentage of the fund, even though aggregate reserves and revenues may far exceed expenses and creditor claims. In any event, the parties have stipulated that as a practical matter the Authority has been unable to expand its involvement in rapid transit by reliance on this alternative formula. App. 692a.

Whether the 1962 New Jersey Legislature acted wisely in accepting this new restriction is, for me, quite irrelevant. What is important is that the passage of the years conclusively demonstrated that this effective barrier to the development [*36] of rapid transit in the port region squarely conflicts with the legitimate needs of the New York metropolitan community, and will persist in doing so into the next century. 2 In the [**1525] Urban Mass Transportation Assistance Act of 1970, 49 U.S.C. § 1601a, Congress found that "within urban areas... the ability of all citizens to move quickly and at a reasonable cost [has become] an urgent national problem." Concurrently, the Clean Air Act, as amended, 42 U.S.C. § 1857 et seq., advocated the curtailment of air pollution through the development of transportation-control strategies that place heavy emphasis on rapid transit alternatives to the automobile. For northern New Jersey in particular, with ambient air-quality levels among the worst in the Nation, the Clean Air Act has led to new regulations premised on the policy: S

"The development of large-scale mass transit facilities and the expansion and modification of existing mass transit facilities is essential to any effort to reduce automotive pollution through reductions in vehicle use. The planning, acquisition, and operation of a mass transit system is, and should remain, a regional or State responsibility. Many improvements are being planned in mass transit facilities in the State that will make it possible for more people to use mass transit instead of automobiles." 38 Fed. Reg. 31389 (1973).I

Finally, the Court itself cites the Emergency Petroleum

Allocation Act, 15 U.S.C.§ 751(a)(3) (1970 ed., Supp. V), which signaled "a national energy crisis which is a [***119] threat to the public health, safety, and welfare," and sought to stimulate [*37] further initiatives toward the development of public transportation and similar programs. See ante, at 14.

2   The 1962 covenant does not merely bind the Authority's hands for the decades of the 1960's and 1970's. Rather, the covenant will preclude the deployment of the Authority's toll revenues to public transit needs until all the bonds previously issued under the covenant have been retired. Appellant trust company advises that the covenant thus continues "as a practical matter until the year 2007," Brief for Appellant 24, even if now repealed prospectively as suggested ante, at 18 n. 15.

It was in response to these societal demands that the New Jersey and New York Legislatures repealed the 1962 covenant. The trial court found: S

"In April 1970 Governors Cahill and Rockefeller announced a joint program to increase the Port Authority's role in mass transportation by building a rail link to John F. Kennedy International Airport and extending PATH [a commuter rail line under Authority control] to Newark International Airport and other parts of New Jersey." 134 N.J. Super. 124, 168-169, 338 A. 2d 833, 858 (1975).I

But, the court found, this expansion "was not economically feasible under the terms of the 1962 covenant." Id., at 170, 338 A. 2d, at 859. Consequently, the States repealed the covenant. On signing the New York legislation, Governor Rockefeller stated: S

"Passed with overwhelming bipartisan support in both houses of the Legislature, the bill removes the absolute statutory prohibition against the use of the revenues of the Port of New York Authority for railroad purposes. That statutory covenant, together with the provision of the bi-state compact creating the Authority that neither State will construct competing facilities within the Port District, could forever preclude the two states from undertaking vitally needed mass transportation projects. In removing the present restriction, the bill would not jeopardize the security of Port Authority bondholders or their rights to maintain that security." Quoted ibid.I

In following suit, New Jersey also expressly grounded its action upon the necessity of overturning "'the restrictions imposed by the covenant [that] effectively preclude sufficient port authority participation in the development of a public transportation system in the port district.'" Id., at 172, 338 [*38] A. 2d, at 860. Approximately one year later, on April 10, 1975, the Port Authority announced an increase in bridge and tunnel tolls amounting to $ 40 million, the resulting revenue designed to assist in the financing of passenger transportation facilities without jeopardizing the reserve fund set aside for the Authority's creditors.

The Court's consideration of this factual background is, I believe, most unsatisfactory. The Court never explicitly takes issue with the core of New Jersey's defense of the repeal: that the State was faced with [**1526] serious and growing environmental, energy, and transportation problems, and the covenant worked at cross-purposes with efforts at remedying these concerns. Indeed, the Court candidly concedes that the State's purposes in effectuating the 1974 repeal were "admittedly important." Ante, at 29. Instead, the Court's analysis focuses upon related, but peripheral, matters.

For example, several hypothetical alternative methods are proposed whereby New Jersey might hope to secure funding for public transportation, and these are made the basis [***120] for a holding that repeal of the covenant was not "necessary." Ante, at 29-31. Setting aside the propriety of this surprising legal standard, [3] the Court's effort at fashioning its own legislative program for New York and New Jersey is notably unsuccessful. In fact, except for those proffered alternatives which also amount to a repeal or substantial modification of the 1962 covenant, [4] none of the Court's suggestions is compatible [*39] with the basic antipollution and transportation-control strategies that are crucial to metropolitan New York. As the Court itself accurately recognizes, the environmental and transportation program for the New York area rests upon a two-step campaign: "The States inten[d] [1] to discourage private automobile use by raising bridge and tunnel tolls and [2] to use the extra revenue from those tolls to subsidize improved commuter railroad service." Ante, at 29. This co-ordinated two-step strategy has not been arbitrarily or casually created, but is dictated by contemporaneous federal enactments such as the Clean Air Act, [5] and stems both from New York City's unique geographic situation [6]

and from longstanding provisions in federal law that require the existence of "reasonable and just" expenses -- which may include diversion to mass transit subsidies -- as a precondition to any increase in interstate bridge tolls. [7] The Court's various [*40] alternative proposals, while perhaps interesting speculations, [***121] simply are not responsive to New York's and New [**1527] Jersey's real environmental and traffic problems, [8] and, in any event, intrude the Court deeply into complex and localized policy matters that are for the States' legislatures and not the judiciary to resolve.

3  See, e. g., infra, at 59, and n. 17.

4  See ante, at 30 n. 28. I am puzzled whether the Court really intends these alternatives to be taken seriously in view of the footnote's closing reminder that even these "lesser impairments" also may be found to be unconstitutional. If the Court, in fact, means that New Jersey and New York could remedy any Contract Clause defects merely by modifying their repeal of the 1962 covenant so as to limit transit subsidization solely to future toll increases -- the policy that is being followed by the States in actual practice -- then today's decision would be rendered into a temporary formalism.

5  Cf. Friends of the Earth v. Carey, 552 F. 2d 25 (CA2 1977); Friends of the Earth v. Carey, 535 F. 2d 165 (CA2 1976); Friends of the Earth v. EPA, 499 F. 2d 1118 (CA2 1974).

6  Because cars entering or leaving Manhattan must pass over bridges or through tunnels, the regulation of tolls offers an unusually convenient and effective method of discouraging automobile usage in addition to promising a highly lucrative revenue base.

7  Thus, if toll funds cannot be diverted to rapid transit needs, any increase in bridge revenues necessarily would produce an expansion of the Authority's general reserve fund well beyond that necessary or contemplated for the protection of bondholders. Faced with such a mere accumulation of capital, the Federal Highway

Administrator, acting under § 503 of the General Bridge Act of 1946, 33 U.S.C. § 526, evidently would be obligated to disallow any toll increases as not "reasonable and just" under the Act. See generally Delaware River Port Authority v. Tiemann, 531 F. 2d 699 (CA3 1976). The United States Department of Transportation, however, has stated that "in some areas (New York, Philadelphia, San Francisco), bridge toll revenues provide significant support for transit capital and/or operating costs, thereby providing transit service improvements which promote decreased dependence on automobile travel." App. 726a-727a. The Department has recommended that a diversion of funds to serve rapid transit needs should qualify as "reasonable and just," and, therefore, would be capable of supporting a general increase in toll revenues. Ibid. This is in stark contrast with the Court's suggested alternative policies outlined ante, at 30 n. 29, which would permit no general increase in bridge tolls and no coordination of the bridge toll and transit subsidization strategies that are central to the antipollution effort in metropolitan New York, and, therefore, until today, have been considered secondary and inadequate to serve the community's needs.

8     See, e. g., n. 7, supra. In short, all the alternatives that the Court leaves to the States, ante, at 30 n. 29, deny access to the Authority's tolls, even though they represent a potentially lucrative revenue source which can be tapped without injury to the bondholders. See Part B, infra.

Equally unconvincing is the Court's contention that repeal of the 1962 covenant was unreasonable because the environmental and energy concerns that prompted such action "were not unknown in 1962, and the subsequent changes were of degree and not of kind." Ante, at 32. Nowhere are we told why a state policy, no matter how responsive to the general welfare of its citizens, can be reasonable only if it confronts issues that previously were absolutely unforeseen. 9 Indeed, [*41] this arbitrary perspective seems peculiarly inappropriate in a case like this where at least three new and independent congressional enactments between the years 1962 and 1974 summoned major urban centers like New York and New Jersey to action in the environmental, energy, and transportation fields. In short, on this record, I can neither understand nor accept the Court's characterization of New Jersey's action as unreasonable.

9   Indeed, the Court's single-minded emphasis on the existence of changed circumstances leads it to embrace a rather perverse constellation of values in which New Jersey's desire to care for the health, environmental, and energy needs of its citizenry is relegated to lesser importance than the desire of Texas in El Paso v. Simmons, 379 U.S. 497 (1965), to deny windfall economic gains to purchasers of school land from the State. Ante, at 31. I, of course, do not dispute the importance of Texas' stake in Simmons. But surely any reasonable ordering of values and social objectives would compel the conclusion that a State's concern for its citizens' health and general welfare is far more deserving of this Court's recognition.

B

If the Court's treatment of New Jersey's legitimate policy interests is inadequate, its consideration of the countervailing injury ostensibly suffered by the appellant is barely discernible at all. For the Court apparently holds that a mere "technical impairment" of contract suffices to subject New Jersey's repealer to serious judicial scrutiny and invalidation under the Contract Clause. Ante, at 21. The Court's modest statement of the economic injury that today attracts its judicial intervention is, however, understandable. For fairly read, the record before us makes plain that the repeal of the 1962 covenant has occasioned only the most minimal damage on the part of the Authority's bondholders.

Obviously, the heart of the obligation to the bondholders -- and the interests ostensibly safeguarded by the 1962 covenant -- is the periodic payment of interest and the repayment of principal when due. The Court does not, and indeed cannot, contend that either New Jersey or the Authority has called into question the validity of these underlying obligations. No creditor complains that public authorities have defaulted on a coupon payment or failed to redeem a bond that has matured. In fact, the Court does not [***122] even offer any reason whatever for fearing that, as a result of the covenant's repeal, the securities in appellant's portfolio

are jeopardized. Such a contention cannot be made in the face of the finding of the trial judge, who, in referring to the increasingly lucrative financial [*42] position of the Authority at the date of the covenant's repeal in comparison to 1962, concluded: S

"Suffice it to say that between 1962 and 1974 the security afforded bondholders had been substantially augmented by a vast increase in Authority revenues and reserves, and the Authority's financial ability to absorb greater deficits, from whatever source and without any significant impairment of bondholder security, [**1528] was correspondingly increased." 134 N.J. Super., at 194-195, 338 A. 2d, at 873. [10]I

10 The court found: "between 1961 and 1973 the net revenues of the Authority increased from $ 68,000,000 to $ 137,000,000, and over that period the Authority had available to it $ 582,732,000 in excess of its debt service requirements.... Through 1974, the corresponding figures are $ 161,283,000 and $ 649,750,000, respectively." 134 N.J. Super., at 195 n. 43, 338 A. 2d, at 873 n. 43. Thus, both prior to and following the repeal of the covenant, the Authority's revenues and earned surplus continued their unhampered and overwhelmingly impressive growth.

By simply ignoring this unchallenged finding concerning the Authority's overall financial posture, the Court is able to argue that the repeal of the 1962 covenant impaired the Authority's bonds in two particular respects. First, it is suggested that repeal of the covenant may have adversely affected the secondary market for the securities. Ante, at 19. The Court, however, acknowledges that appellant has adduced only ambiguous evidence to support this contention, and that the actual price position of Authority bonds was, at most, only temporarily affected by the repeal. Ibid. [11] In fact, the trial [*43] court also explicitly rejected the ultimate significance of this alleged injury: S

"The bottom line of plaintiff's proofs on this issue is simply that the evidence fails to demonstrate that the secondary market price of Authority bonds was adversely affected by the repeal of the covenant,except for a short-term fall-off in price, the effect of which has now been dissipated insofar as it can be related to the enactment of the repeal." 134 N.J. Super., at 181-182, 338 A. 2d, at 866 (emphasis supplied).I

11 Indeed, one of the anomalous aspects of this suit is the Court's willingness to invalidate an Act of the State of New Jersey, and indirectly of New York, while apparently recognizing that if this were an action by creditors for damages, or an action to fix "just compensation," the trial court's findings raise serious doubt that any compensable monetary loss would be found. Ante, at 19. By sidestepping the damages question, ibid., and by mandating reinstatement of the covenant, the Court manages to burden the Port Authority with an unwanted contract, while relieving the creditor-appellant of the need to establish any tangible economic injury arising from the covenant's repeal. This suggests that any protection afforded bondholders today may well prove to be purely illusory. Even after the mandate issues, New Jersey, we are told, may again condemn or repeal the covenant and offer just compensation to its creditors. See ante, at 29 n. 27. However, in light of the trial court's factual conclusions, this promise of compensation will entitle bondholders to little or no financial recovery.

Secondly, repeal of the covenant is said to have canceled an important [***123] security provision enjoyed by the creditors. Ante, at 19. Of course, there is no question that appellant prefers the retention to the removal of the covenant, but surely this alone cannot be an acceptable basis for the Court's wooden application of the Contract Clause or for its conclusion that the repeal unfairly diminished bondholder security. By placing reliance on this superficial allegation of economic injury, the Court again is able simply to disregard the trial court's contrary finding that appellant's complaint of insecurity is without factual merit: S

"The claim that bondholder security has been materially impaired or destroyed by the repeal is simply not supported by the record. The pledge of the Authority's net revenues and reserves remains intact; the Authority will still be barred from the issuance of any new consolidated bonds unless the 1.3 test required by the CBR is met, and the Authority will continue to be prohibited from the [*44] issuance of any consolidated bonds or other bonds secured by a pledge of the general reserve fund without the certification required by section 7 of the series resolutions, to wit, that in the opinion of the Authority the estimated expenditures in connection

with any additional facility for which such bonds are to be issued would not, for the ensuing ten years, impair the sound credit standing of the Authority, the investment status of its consolidated bonds, or the Authority's obligations to its consolidated bondholders." 134 N.J. Super., at 196, [**1529] 338 A. 2d, at 874 (emphasis supplied). [12]I

12 The fundamental soundness of the Authority's bonds is reflected in the ratings received from the principal financial surveys, Moody's and Standard & Poor's, following repeal of the covenant. The trial court found: "The bonds carried the same ["A"] rating prior to the enactment of the covenant, after it was enacted, after it was prospectively repealed, and after the [retroactive] repeal act of 1974." 134 N.J. Super., at 179, 338 A. 2d, at 864.

In brief, only by disregarding the detailed factual findings of the trial court in a systematic fashion is the Court today able to maintain that repeal of the 1962 covenant was anything but a minimal interference with the realistic economic interests of the bondholders. The record in this case fairly establishes that we are presented with a relatively inconsequential infringement of contract rights in the pursuit of substantial and important public ends. Yet, this meager record is seized upon by the Court as the vehicle for resuscitation of long discarded Contract Clause doctrine -- a step out of line with both the history of Contract Clause jurisprudence and with constitutional doctrine generally in its attempt to delineate the reach of the lawmaking power of state legislatures in the face of adverse claims by property owners.

II

The Court today dusts off the Contract Clause and thereby undermines the bipartisan policies of two States that manifestly [*45] seek to further the legitimate needs of their citizens. The Court's analysis, I submit, fundamentally misconceives the nature of the Contract Clause guarantee.

One of the fundamental premises [***124] of our popular democracy is that each generation of representatives can and will remain responsive to the needs and desires of those whom they represent. Crucial to this end is the assurance that new legislators will not automatically be bound by the policies and undertakings of earlier days. In accordance with this philosophy, the

Framers of our Constitution conceived of the Contract Clause primarily as protection for economic trans-actions entered into by purely private parties, rather than obligations involving the State itself. See G. Gunther, Constitutional Law 604 (1975); B. Schwartz, A Commentary On the Constitution of the United States, pt. 2, The Rights of Property 274 (1965); B. Wright, The Contract Clause of the Constitution 15-16 (1938). [13] The Framers fully recognized that nothing would so jeopardize the legitimacy of a system of government that relies upon the ebbs and flows of politics to "clean out the rascals" than the possibility that those same rascals might perpetuate their policies simply by locking them into binding contracts.

13 One scholar for example, after undertaking extensive research into the history of the Constitutional Convention, concluded that there is no evidence that the Constitution's Framers perceived of the Contract Clause as applicable to public agreements. "[I]t is evident that all of them discussed the clause only in relation to private contracts, i. e., contracts between individuals." B. Wright, The Contract Clause of the Constitution 15 (1938). Moreover, "[a] careful search has failed to unearth any other statements even suggesting that the contract clause was intended to apply to other than private contracts." Id., at 16. Indeed, Professor Wright found that only two antifederalists, neither of whom was a member of the Convention, ever suggested that the Clause would support "a broader meaning" encompassing public contracts, but "their interpretations were denied by members of the Convention, and the denials were not challenged." Ibid.

Following an early opinion of the Court, however, that [*46] took the first step of applying the Contract Clause to public undertakings, Fletcher v. Peck, 6 Cranch 87 (1910), later decisions attempted to define the reach of the Clause consistently with the demands of our governing processes. The central principle developed by these decisions, beginning at least a century ago, has been that Contract Clause challenges such as that raised by appellant are to be resolved by according unusual deference to the lawmaking authority of state and local governments. Especially when the State acts in furtherance of the variety of broad social interests that came clustered together under the rubric of "police [**1530] powers," see E. Freund, The Police Power

(1904) -- in particular, matters of health, safety, and the preservation of natural resources -- the decisions of this Court pursued a course of steady return to the intention of the Constitution's Framers by closely circumscribing the scope of the Contract Clause.

This theme of judicial self-restraint and its underlying premise that a State always retains the sovereign authority to legislate in behalf of its people was commonly expressed by the doctrine that the Contract Clause will not even recognize efforts of a State to enter into contracts limiting the authority of succeeding legislators to enact laws in behalf of the health, safety, and similar collective interests of the policy [14] -- [***125] in [*47] short, that that State's police power is inalienable by contract. For example, in Fertilizing Co. v. Hyde Park, 97 U.S. 659 (1978), the Illinois General Assembly granted to a fertilizer company an 1867 corporate charter to run for 50 years. The corporation thereafter invested in a factory and depot on land which it owned within the area designated by the charter. Five years later, the village authorities of Hyde Park adopted an ordinance that rendered the company's charter valueless [*48] by prohibiting the transportation of offal within the village and forbidding the operation of a fertilizer factory within the village confines. This Court nonetheless rejected the contention that the new ordinance offended the Contract Clause: S

"We cannot doubt that the police power of the State was applicable and adequate to give an effectual remedy [to the nuisance]. That power belonged to the States when the Federal Constitution was adopted. They did not surrender it, and they all have it now....

.....

"... [**1531] Pure air and the comfortable enjoyment of property are as much rights belonging to [the village residents] as the right of possession and occupancy....

. . . . .

"The [company's] charter was a sufficient license until revoked; but we cannot regard it as a contract [***126] guaranteeing, in the locality originally selected, exemption for fifty years from the exercise of the police power of the State, however serious the nuisance might become in the future...." Id., at 667, 669, 670.I

14  Parallel doctrines worked to the same end of freeing the States from contractual duties allegedly imposed by earlier legislators. For example, it has long been held that in applying the Contract Clause to government contracts, every ambiguity and gap is to be strictly construed in behalf of the State. "[I]n grants by the public, nothing passes by implication." Charles River Bridge v. Warren Bridge, 11 Pet. 420, 546 (1837). "Every reasonable doubt is to be resolved adversely [to the private party claiming under the contract]. Nothing is to be taken as conceded but what is given in unmistakable terms, or by an implication equally clear. The affirmative must be shown. Silence is negation, and doubt is fatal to the claim. This doctrine is vital to the public welfare." Fertilizing Co. v. Hyde Park, 97 U.S. 659, 666 (1878).

Along these lines, it is noteworthy that the state law of New Jersey itself raises serious doubts concerning the reasonableness of appellant's reliance on the covenant for permanent protection from later laws enacted by the state legislature. In a case involving an alleged impairment of a township's municipal bonds, Hourigan v.. North Bergen Township, 113 N.J.L. 143, 149, 172 A. 193, 196 (1934), the State's highest court declared: "It is a well established doctrine that the interdiction of statutes impairing the obligation of contracts does not prevent the state from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public, though contracts entered into between individuals may thereby be affected.This power, which in its various ramifications is known as the police power, is an exercise of the sovereign right of the government to protect the lives, health, morals, comfort and general welfare of the people, and is paramount to any rights under contracts between individuals. While this power is subject to limitations in certain cases, there is wide discretion on the part of the legislature in determining what is and what is not necessary -- a discretion which courts ordinarily will not interfere with." In my view, therefore, appellant should be held to have purchased the Authority's bonds subject to the knowledge that under New Jersey law the State's obligation was conditionally

undertaken subject to reasonable future legislative action.

The record raises similiar doubts and ambiguities. Thus, State Senator Farley, who chaired the committee that inquired into the status of the Authority's bonds prior to enactment of the covenant, noted: "[W]e well appreciate that... we could not impair any obligation such as contracts of bond issues. Likewise, you [Commissioner Clancy of the Port Authority] as a lawyer know that one legislature cannot bind the other involving policy five, ten, or twenty years hence." App. 89a (emphasis supplied). It may well be that appellant subjectively believed that the covenant was unimpeachable under state law. But given the doubts and hesitancies contained in the record, the principles established in earlier cases extending back to John Marshall should require that such "doubt is fatal to [appellant's] claim." Fertilizing Co., supra, at 666.

Two years later, this principle of the Contract Clause's subservience to the States' broad lawmaking powers was reasserted in another context. In 1867, the Mississippi Legislature entered into a contract with a company whereby the latter was chartered to operate a lottery within the State "in consideration of a stipulated sum in cash...." The next year the State adopted a constitutional provision abolishing lotteries. The Court once again unhesitantly dismissed a challenge to this provision grounded on the Contract Clause, Stone v.. Mississippi, 101 U.S. 814, 817-818 (1880): S

"'Irrevocable grants of property and franchises may be made if they do not impair the supreme authority to make laws for the right government of the State; but no legislature can curtail the power of its successors to make [*49] such laws as they may deem proper in matters of police'.... No one dnies... that [this legislative power] extends to all matters affecting the public health or the public morals."I

Later cases continued to read the Contract Clause as qualified by the States' powers to legislate for the betterment of their citizens, while further expanding the range of permissible police powers. For example, in Atlantic Coast Line R. Co. v. Goldsboro, 232 U.S. 548 (1914), the State chartered and contracted with the plaintiff railway company to operate rail lines within the State. Pursuant to this contract, the railroad acquired in

fee land for use as rights-of-way and similar transportation activities. The Court recognized that the charter was a binding contract, and that the company, in reliance on the agreement, had acquired land which it enjoys as "complete and unqualified" owner. Id., at 556, 558. Yet, the Court brushed aside a constitutional challenge to subsequent ordinances that greatly circumscribed the railroad's activities on its own land: S

"For it is settled that neither the 'contract' clause nor the 'due process' clause has the effect of overriding the power of the State to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise." Id., at 558.I

In perfect conformity with these earlier cases that recognized the States' broad authority to legislate for the welfare of their citizens, New Jersey and New York sought to repeal the 1962 covenant in furtherance of "admittedly important" interests, ante, at 29, in environmental protection, clean air, and safe and efficient [***127] transportation facilities. The States' policy of deploying excess tolls for the maintenance and expansion [*50] of rapid transit was not oppressively or capriciously chosen; rather, it squarely complies with the commands embodied by Congress in several contemporaneous national laws. Supra, at 36-37. By invalidating the 1974 New Jersey repeal -- and, by necessity, like action by New York -- the Court regrettably departs from the virtually unbroken line of our cases that remained true to the principle that all private rights of property, even if acquired through contract with the State, are subordinated to reasonable exercises of the States' lawmaking powers in the areas of health ( Fertilizing Co. v. Hyde Park, 97 U.S. 659 [**1532] (1878); Butchers' Union Co. v. Crescent City Co., 111 U.S. 746 (1884)); environmental protection ( Hudson Water Co. v. McCarter, 209 U.S. 349 (1908); Manigault v. Springs, 199 U.S. 473 (1905); cf. Henderson Co. v. Thompson, 300 U.S. 258, 267 (1937); Illinois Central R. Co. v. Illinois, 146 U.S. 387, 452-453 (1892)); and transportation ( New Orleans Pub. Serv. v. New Orleans, 281 U.S. 682 (1930); Erie R. Co.v. Public Util. Comm'rs, 254 U.S. 394 (1921); Denver & R.G.R. Co. v. Denver, 250 U.S. 241 (1919); Atlantic Coast Line R. Co. v. Goldsboro, supra; Northern Pac. R. Co. v. Duluth, 208

U.S. 583 (1908); Chicago, B. & Q.R. Co. v. Nebraska ex rel. Omaha, 170 U.S. 57 (1898); New York & N.E.R. Co. v. Bristol, 151 U.S. 556 (1894)). In its disregard of these teachings, the Court treats New Jersey's social and economic policies with lesser sensitivity than have former Members of this Court who stressed the protection of contract and property rights. Even Mr. Justice Butler recognized that the Contract Clause does not interfere with state legislative efforts in behalf of its citizens' welfare unless such actions S

"are... clearly unreasonable and arbitrary.... [And in applying this standard] [u]ndoubtedly the city, acting as the arm of the State, has a wide discretion in determining what precautions in the public interest are necessary or appropriate under the circumstances." New Orleans Pub. Serv., supra, at 686.I

[*51] Thus, with at best a passing nod to the long history of judicial deference to state lawmaking in the face of challenges under the Contract Clause, see ante, at 23 n. 20, the Court today imposes severe substantive restraints on New Jersey's attempt to free itself from a contractual provision that it deems inconsistent with the broader interests of its citizens. Today's decision cannot be harmonized with our earlier cases by the simple expedient of labeling the covenant "purely financial," ante, at 25, rather than a forfeiture of "an essential attribute of [New Jersey's] sovereignty," ante, at 23. As either an analytical or practical matter, this distinction is illusory. It rests upon an analytical foundation that has long been discarded [***128] as unhelpful. [15] And as a [*52] [**1533] purely practical matter, an interference with state policy is no less intrusive because a contract prohibits the State from resorting to the most realistic and effective financial method of preserving its citizens' legitimate interests in healthy and safe transportation systems rather than directly proscribing the States from exercising their police powers in this area. The day has long since passed when analysis under the Contract Clause usefully can turn on such formalistic differences. Cf. Home Bldg. & Loan Assn. v. Blaisdell, 290 U.S. 398, 438 (1934).

15 Among other difficulties, the question-begging attempt to categorize inviolable legislation powers vis-a-vis the Contract Clause depends upon a conception of state sovereignty that is both simplistic and unpersuasive. We are told that the Contract Clause "does not require a

State to adhere to a contract that surrenders an essential attribute of its sovereignty," ante, at 23, but in applying this principle, the Court finds that the States' "taxing and spending powers," unlike the power of eminent domain, lie outside this rule, ante, at 24. Before today, one might well have supposed that the States' authority to tax, spend money, and generally make basic financial decisions is among the most important of their governmental powers. Indeed, only last Term, this Court announced that a State's decision to pay its employees less than the minimum wage -- a decision of far less importance to the citizens generally than efforts to derive funding for improving the facilities that directly and vitally affect their health and safety -- is immune from federal regulation under the Commerce Clause, an authority previously thought to be virtually plenary in nature. The Court there reasoned that the minimum-wage decision falls within the sovereign powers of "States qua States." National League of Cities v. Usery, 426 U.S. 833, 847 (1976).One may rightfully feel unease that the Court is in the process of developing a concept of state sovereignty that is marked neither by consistency nor intuitive appeal.

In any event, in addition to resting on a most dubious conception of sovereignty, the Court's effort to demonstrate that the States are free to contract away their taxing and spending powers -- and hence free "to enter into effective financial contracts" notwithstanding later exercises of the police power -- must fail because it is untenable. While it is true that New Jersey v. Wilson, 7 Cranch 164 (1812) (Contract Clause precludes a legislature from repudiating a grant of tax exemption) has never explicitly been overruled, subsequent cases have almost uniformly avoided adherence to either its reasoning or holding. See, e. g., New York ex rel. Clyde v. Gilchrist, 262 U.S. 94 (1923); Seton Hall College v. South Orange, 242 U.S. 100 (1916); Rochester R. Co. v. Rochester, 205 U.S. 236 (1907); Wisconsin & M.R. Co. v. Powers, 191 U.S. 379 (1903); Morgan v. Louisiana, 93 U.S. 217 (1876). These cases appreciate, as today's decision does not, that the operative consideration for constitutional purposes is not whether a contract can or cannot be branded as "financial." Rather, in adjudging

the constitutionality of "an exercise of the sovereign authority of the State," Seton Hall College, supra, at 106 -- be it financial or otherwise -- the Contract Clause tolerates reasonable legislative Acts in the service of the broader interests of the society generally.

Nor is the Court's reading of earlier constitutional doctrine aided by cases where the Contract Clause was held to forestall state efforts intentionally to withhold from creditors the unpaid interest on, Von Hoffman v. City of Quincy, 4 Wall. 535 (1867), or principal of, Louisiana ex rel. Hubertv. New Orleans, 215 U.S. 170 (1909); Wolff v. New Orleans, 103 U.S. 358 (1881), outstanding bonded indebtedness. Beyond dispute, the Contract Clause has come to prohibit a State from embarking on a policy motivated by a simple desire to escape its financial obligations or to injure others through "the repudiation of debts or the destruction of [***129] contracts or the denial of means to enforce them." Home Bldg. & Loan Assn. v. Blaisdell, supra, at 439. Nor will the Constitution permit [*53] a State recklessly to pursue its legitimate policies involving matters of health, safety, and the like with "studied indifference to the interests of the mortgagee or to his appropriate protection...." W.B. Worthen Co. v. Kavanaugh, 295 U.S. 56, 60 (1935). In this regard, the Court merely creates its own straw man when it characterizes the choice facing it today either as adopting its new, expansive view of the scope of the Contract Clause, or holding that the Clause "would provide no protection at all." Ante, at 26. The Constitution properly prohibits New Jersey and all States from disadvantaging their creditors without reasonable justification or in a spirit of oppression, and New Jersey claims no such prerogatives. But if a State, as here, manifestly acts in furtherance of its citizens' general welfare, and its choice of policy, even though infringing contract rights, is not "plainly unreasonable and arbitrary," Denver & R.G.R. Co. v. Denver, 250 U.S., at 244, our inquiry should end: S

"The question is... whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate to that end." Home Bldg. & Loan Assn. v. Blaisdell, supra, at 438.I

The Court, however, stands the Contract Clause completely on its head, see supra, at 45, and both formulates and strictly applies a novel standard for reviewing a State's attempt to relieve its citizens from unduly harsh contracts entered into by earlier legislators: Such "an impairment may [***130] be constitutional [*54] if it is reasonable and necessary to serve an important public purpose." [**1534] Ante, at 25. Not only is this apparently spontaneous formulation virtually assured of frustrating the understanding of court and litigant alike, [17] but it [*55] is wholly out of step with the modern attempts of this Court to define the reach of the Contract Clause when a State's own contractual obligations are placed in issue.

16   The Court makes clear that it contemplates stricter judicial review under the Contract Clause when the government's own obligations are in issue, but points to no case in support of this multiheaded view of the scope of the Clause. See ante, at 25-26. As noted previously, see n. 13, supra, this position finds no support in the historical rationale for inclusion of the Contract Clause in the Constitution.  And it is clear that the Court's citation to Perry v. United States, 294 U.S. 330 (1935), see ante, at 26 n. 25, offers no support for its rewriting of history.  In that case, one of the Gold Clause Cases, Perry challenged the constitutionality of a congressional enactment which authorized the redemption of outstanding United States gold bonds by payment of legal tender currency rather than "'by the payment of 10,000 gold dollars each containing 25.8 grains of gold, .9 fine,'" 294 U.S., at 347, the value of the dollar in gold when the bonds were acquired.Perry complained that inflation had devalued the worth of legal tender with respect to gold and, therefore, claimed financial injury by the conversion. The Government defended its actions on the ground that the gold clause obstructed Congress' express power to "regulate the Value" of money, Art. I, § 8, and, accordingly, argued that Congress was free to repudiate the gold standard under that power. Although Perry ultimately was denied recovery, the Court found that the authority to "regulate the Value" of money, while permitting Congress "to control or interdict the contracts of private parties" with regard to the legal exchange rate, 294 U.S., at 350, did not include the power to repudiate the Government's own obligations, which were governed by entirely different constitutional provisions: E. g., Congress may "borrow Money on the credit of the United States," Art. I, § 8, cl. 2, and "The validity of the

public debt of the United States... shall not be questioned," Amdt. 14, § 4. Thus the differential standard in Perry emerged from the collision of competing grants of power to the Federal Government, and did not purport to suggest that the Contract Clause -- or its federal counterpart, the Fifth Amendment -- standing alone would produce different standards for reviewing governmental interference with public and private contractual obligations.

17 The Court's newly announced standard of review, like all such formulations, can merely hope to suggest the direction that a court's inquiry should take, and the relative weight to be afforded a constitutional right. But particular words like "reasonable" and "necessary" also are fused with special meaning, for judges have long experience in applying such standards to constitutional contexts. Reasonableness generally has signified the most relaxed regime of judicial inquiry. See, e. g., Dandridge v. Williams, 397 U.S. 471, 485 (1970) ("If the classification has some 'reasonable basis,' it does not offend the Constitution"). Contrariwise, the element of necessity traditionally has played a key role in the most penetrating mode of constitutional review. See e. g., Shapiro v. Thompson, 394 U.S. 618, 634 (1969) (a classification which burdens a fundamental constitutional right must be "necessary to promote a compelling governmental interest"). The Court's new test, therefore, represents a most unusual hybrid which manages to merge the two polar extremes of judicial intervention, see generally Gunther, Foreword: In Search of Evolving Doctrine on A Changing Court: A Model for a Newer Equal Protection, 86 Harv. L. Rev. 1, 8 (1972), into one synthesis. Plainly, courts are apt to face considerable confusion in wielding such a schizophrenic new instrument. And well they might, for until today one would have fairly thought that as a matter of common sense as well as doctrine, state policies that are "necessary to serve an important public purpose." ante, at 25, a fortiori would be "reasonable."

The Court, however, seems to discover new

meanings in these terms. "Necessary" appears to comport with some notion of a less restrictive alternative. As applied by the Court in this instance, however, the less restrictive alternative bears no relationship to previous uses of that analytical tool when economic and social matters were involved. Thus, the Court does not actually inquire whether "the government can achieve the purposes of the challenged regulation equally effectively by one or more narrower regulations." Struve, The Less-Restrictive-Alternative Principle and Economic Due Process, 80 Harv. L. Rev. 1463 (1967). Rather, the Court concludes that an impairment of contract was not "necessary" because the Court apparently is able to hypothesize other means of achieving some or all of the State's objectives, even though these alternatives have long been deemed as secondary in importance, nn. 7, 8, supra, or arguably are unconstitutional, ante, at 30 n. 28. Under this approach, few, if any, Contract Clause cases in history that have deferred to state policymaking have been correctly decided. See infra, at 59.

The "reasonableness" test does no better. No longer does it mean that this Court will defer to the "reasonable judgments" of the authorized policymakers. Knebel v. Hein, 429 U.S. 288, 297 (1977). Instead, the Court appears to ask whether changed circumstances took the state legislature by surprise, ante, at 31-32. Again, I find no basis in this Court's prior cases for adopting such a constrictive view of that constitutional test. See infra, at 59-60.

[**1535] Mr. Justice Cardozo's opinion in W.B. Worthen Co. v. Kavanaugh, 295 U.S. 56 (1935), is the prime exposition of the [*56] modern view. As a relief measure for financially depressed local governments, Arkansas enacted a statute that greatly diminished the remedies available to creditors under their bonds. This resulted in a remedial scheme whereby creditors were "without an effective remedy" for a minimum of 6 1/2 years, during which time the government's obligation to [***131] pay principal or interest was suspended. Id., at 61. The Court invalidated the alteration in remedies. It did so, however, only after concluding that the challenged state law cut recklessly and excessively into the value of the creditors' bonds: "[W]ith studied indifference to the interests of the mortgagee or to his appropriate protection

[the State has] taken from the mortgage the quality of an acceptable investment for a rational investor." Id., at 60. "So viewed [the State's action is] seen to be an oppressive and unnecessary destruction of nearly all the incidents that give attractiveness and value to collateral security." Id., at 62.

In the present case, the trial court expressly applied the Kavanaugh standard to New Jersey's repeal of the covenant, and properly found appellant's claim to be wanting in all material respects: In a detailed and persuasive discussion, the court concluded that neither New Jersey nor New York repealed the covenant with the intention of damaging their creditors' financial position. Rather, the States acted out of "vital interest[s]," for "[t]he passage of time and events between 1962 and 1974 satisfied the Legislatures of the two states that the public interest which the Port Authority was intended to serve could not be met within the terms of the covenant." 134 N.J. Super., at 194, 338 A. 2d, at 873. And the creditors' corresponding injury did not even remotely reach that proscribed in Kavanaugh: Not only have Authority bonds remained "an 'acceptable investment,'" but "[t]he claim that bondholder security has been materially impaired or destroyed by the repeal is simply not supported by the record." Id., at 196, 338 A. 2d, at 874.

The Court, as I read today's opinion, does not hold that [*57] the trial court erred in its application of the facts of this case to Mr. Justice Cardozo's formulation. Instead, it manages to take refuge in the fact that Kavanaugh left open the possibility that the test it enunciated may merely represent the "'outermost limits'" of state authority. Ante, at 27. This, I submit, is a slender thread upon which to hang a belated revival of the Contract Clause some 40 years later. And, in any event, whatever opening remained after Kavanaugh was surely closed by Mr. Justice Frankfurter in Faitoute Iron & Steel Co. v. Asbury Park, 316 U.S. 502 (1942). Speaking for a unanimous Court, id., at 515, he employed the precise constitutional standard established by Mr. Justice Cardozo seven years earlier, and upheld under the Contract Clause a New Jersey plan to reorganize the outstanding debt obligations held by creditors of Asbury Park. The Court thereby authorized an impairment of creditors' financial interests that was far more substantial than that involved here: In fact, the reorganization plan both extended the maturity date of the city's bonds by some 30 years and reduced the relevant coupon rate. Yet, rather than suggesting, as does the Court today, that New

Jersey possessed lesser authority in the public interest to amend its own contracts than to alter private undertakings, the Court made clear [***132] that the State's powers are more expansive S

"[w]here... the respective parties are not private persons... but are persons or corporations whose rights and powers were created for public purposes, by legislative acts, and where the subject-matter of the contract is one which affects the safety and welfare of the public." Id., at 514 n. 2, quoting Chicago, B. & Q. R. Co. v. Nebraska, 170 U.S., at 72.I

[**1536] In my view, the fact that New Jersey's repeal of the 1962 covenant satisfies the constitutional standards defined in Kavanaugh and Faitoute should, as the state courts concluded, terminate this litigation. But even were I to agree that the test [*58] in Kavanaugh remains open to further refinement, that, I repeat, would hardly justify the Court's attempt to deploy the Contract Clause as an apparently unyielding instrument for policing the policies of New Jersey and New York. For such an interpretation plainly is at odds with the principles articulated in Kavanaugh and Faitoute, and subsequently reconfirmed by El Paso v. Simmons, 379 U.S. 497 (1965). The Court there considered a provision of Texas law that abolished an unlimited redemption period for landowners whose land had been defaulted to the State for nonpayment of interest, substituting a 5-year reinstatement period in its place. Unlike appellant here, Simmons at least could claim to have suffered tangible economic injury by virtue of the State's modification of his land-sale contract; indeed, as a result of that "impairment" he permanently lost property to the State. And, of course, Texas' "self-interest [was] at stake," ante, at 26, since it alone was the beneficiary of Simmons' curtailed right of reinstatement. Yet, properly applying the teachings of Blaisdell, Kavanaugh, and Faitoute, the Court had little difficulty in sustaining the measure as a means of removing clouds on title arising from pending reinstatement rights, 379 U.S., at 508-509 (citations omitted): S

"The Blaisdell opinion, which amounted to a comprehensive restatement of the principles underlying the application of the Contract Clause, makes it quite clear that '[n]ot only is the constitutional provision qualified by the measure of control which the State retains over remedial processes, but the State also continues to possess authority to safeguard the vital

interests of its people. It does not matter that legislation appropriate to that end "has the result of modifying or abrogating contracts already in effect."...' 'Once we are in this domain of the reserve power of a State we must respect the "wide discretion on the part of the legislature in determining what is and what is not necessary."'" I [*59] It need hardly be said that today's decision is markedly out of step with this deferential philosophy. The Court's willingness to uphold an impairment of contract -- no matter how "technical" the injury -- only on a showing of "necessity" ante, at 29-31, is particularly distressing, for this Court always will be able to devise abstract alternatives to the concrete [***133] action actually taken by a State. For example, in virtually every decided Contract Clause case, the government could have exercised the Court's "lesser alternative" of resorting to its powers of taxation as a substitute for modifying overly restrictive contracts. Ante, at 30 n. 29. Nothing, at least on the level of abstraction and conjecture engaged in by the Court today, prevented the appropriation of monies by Illinois to buy back or modify the corporate charter of the polluting fertilizer company in Fertilizing Co. v. Hyde Park, 97 U.S. 659 (1878); or by New Jersey to ensure the financial solvency of Asbury Park bonds, Faitoute Iron & Steel Co. v. City of Asbury Park, supra; or by Texas to purchase the unlimited redemption rights involved in El Paso v. Simmons, supra. Yet, in all these cases, modifications of state contracts were countenanced, and this Court did not feel compelled or qualified to instruct the state legislatures how best to pursue their business. In brief, these cases recognized that when economic matters are concerned, "the availability of alternatives does not render the [decisionmaker's] choice invalid." Knebel v. Hein, 429 U.S. 288, 294 (1977). State legislation "may not be held unconstitutional simply because a court finds it unnecessary, in whole or in part." Whalen v. Roe, 429 U.S. 589, 597 (1977).

By the same token, if unforeseeability is the key to a "reasonable" decision, as the Court now contends, ante, at 32, almost [**1537] all prior cases again must be repudiated. Surely the legislators of Illinois could not convincingly have claimed surprise because a fertilizer company polluted the air and transported fertilizer to its factory, Fertilizing Co. v. Hyde [*60] Park, supra. Nor was it unforeseeable to Mississippi that a corporation which was expressly chartered to operate a lottery, in fact, did so, Stone v. Mississippi, 101 U.S. 814 (1880). And, of course, it was "not unknown," ante, at 32, to

either debtor or creditor that a municipality's financial condition might falter as in Faitoute Iron & Steel Co. v. City of Asbury Park, supra; indeed, the foreseeability of that very risk inheres in the process of selecting an appropriate coupon rate. Yet, in all of these instances this Court did not construe the Contract Clause to prevent the States from confronting their real problems if and when their legislators came to believe that such action was warranted. It is not our province to contest the "reasonable judgments" of the duly authorized decisionmakers. Knebel v. Hein, supra, at 297.

Thus, as I had occasion to remark only last Term, the Court again offers a constitutional analysis that rests upon "abstraction[s] without substance," National League of Cities v. Usery, 426 U.S. 833, 860 (1976) (dissenting opinion). Given that this is the first case in some 40 years in which this Court has seen fit to invalidate purely economic and social legislation on the strength of the Contract Clause, one may only hope that it will prove a rare phenomenon, turning on the Court's particularized appraisal of the facts before it. But there also is reason for broader concern. It is worth remembering that there is nothing sacrosanct about a contract. All property [***134] rights, no less than a contract, are rooted in certain "expectations" about the sanctity of one's right of ownership. Compare ante, at 19-21, n. 17, with J. Bentham, Theory of Legislation c. 8 (1911 ed.). And other constitutional doctrines are akin to the Contract Clause in directing their protections to the property interests of private parties. Hence the command of the Fifth Amendment that "private property [shall not] be taken for public use, without just compensation" also "remains a part of our written Constitution." Ante, at 16. And during the heyday of economic due process associated with Lochner v. New [*61] York, 198 U.S. 45 (1905), and similar cases long since discarded, see Whalen v. Roe, supra, at 597, this Court treated "the liberty of contract" under the Due Process Clause as virtually indistinguishable from the Contract Clause. G. Gunther Constitutional Law, 603-604 (1975); Hale, The Supreme Court and the Contract Clause: III, 57 Harv. L. Rev. 852, 890-891 (1944). In more recent times, however, the Court wisely has come to embrace a coherent, unified interpretation of all such constitutional provisions, and has granted wide latitude to "a valid exercise of [the States'] police powers," Goldblatt v. Hempstead, 369 U.S. 590, 592 (1962), even if it results in severe violations of property rights. See Pittsburgh v. Alco Parking Corp., 417 U.S. 369 (1974); Sproles v.

Binford, 286 U.S. 374, 388-389 (1932); Miller v. Schoene, 276 U.S. 272, 279-280 (1928); cf. Williamson v. Lee Optical Co., 348 U.S. 483, 488 (1955). If today's case signals a return to substantive constitutional review of States' policies, and a new resolve to protect property owners whose interest or circumstances may happen to appeal to Members of this Court, then more than the citizens of New Jersey and New York will be the losers.

### III

I would not want to be read as suggesting that the States should blithely proceed down the path of repudiating their obligations, financial or otherwise. Their credibility in the credit market obviously is highly dependent on exercising their vast lawmaking [**1538] powers with self-restraint and discipline, and I, for one, have little doubt that few, if any, jurisdictions would choose to use their authority "so foolish[ly] as to kill a goose that lays golden eggs for them," Erie R. Co. v. Public Util. Comm'rs, 254 U.S., at 410. But in the final analysis, there is no reason to doubt that appellant's financial welfare is being adequately policed by the political processes and the [*62] bond marketplace itself. [18] The role to be played by the [***135] Constitution is at most a limited one. Supra, at 52-53. For this Court should have learned long ago that the Constitution -- be it through the Contract or Due Process Clause -- can actively intrude into such economic and policy matters only if my Brethren are prepared to bear enormous institutional and social costs. Because I consider the potential dangers of such judicial interference to be intolerable, I dissent.

> [18] And, of course, there is every reason to expect that appellant, with combined trust and fiduciary holdings of Authority bonds amounting

to some $ 300 million, is not powerless in protecting its interests either before the state legislature or in the economic marketplace. Indeed, a myriad of sophisticated investors, investment banks, and market analysts regularly oversee the operation of the bond market and the affairs of municipalities which appear in search of credit. Accordingly, any city or State that enters the marketplace is well aware that, should it treat its creditors abusively, the market is apt to exact "justice" that is quicker and surer than anything that this Court can hope to offer. In brief, appellant is the paradigm of a litigant who is neither "discrete" nor "insular" in appealing for this Court's time or protection.

**REFERENCES**

16 Am Jur 2d, Constitutional Law 459

USCS, Constitution, Article I, Section 10, Clause 1

US L Ed Digest, Constitutional Law 216

ALR Digests, Constitutional Law 171

L Ed Index to Annos, Impairment of Contract Obligations

ALR Quick Index, Impairment of Contract Obligations

Federal Quick Index, Impairment of Contract Obligations

Annotation References:

What constitutes bill of attainder under the Federal Constitution. 90 L Ed 1267, 4 L Ed 2d 2155.



**VALENCIA ENERGY COMPANY, Plaintiff-Appellant, v. ARIZONA DEPARTMENT OF REVENUE, Defendant-Appellee.**

**Supreme Court No. CV-96-0666-PR**

**SUPREME COURT OF ARIZONA**

**191 Ariz. 565; 959 P.2d 1256; 1998 Ariz. LEXIS 43; 270 Ariz. Adv. Rep. 3**

**May 19, 1998, Filed**

**PRIOR HISTORY:** [***1] Court of Appeals No. 1 CA-TX 94-0015. Arizona Tax Court No. TX 93-00277. Appeal from the Tax Court of the State of Arizona. The Honorable William J. Schafer, III, Judge. 178 Ariz. 251, 872 P.2d 206 (Tax 1994). Opinion of the Court of Appeals, Division One. 189 Ariz. 79, 938 P.2d 474 (App. 1996).

**DISPOSITION:** Appeal from the Tax Court of the State of Arizona REVERSED AND REMANDED. Opinion of the Court of Appeals, Division One AFFIRMED IN PART, VACATED IN PART.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant taxpayer sought review of the order of the Court of Appeals (Arizona) which affirmed the lower court's grant of summary judgment in favor of appellee state department of revenue on a notice of deficiency for transaction privilege taxes on transportation activities. Appellant contended that appellee was estopped from assessing back taxes because its agent had advised appellant that revenue from that activity was not taxable.

**OVERVIEW:** Appellant taxpayer obtained from an agent of appellee state revenue department a letter stating that appellant's transportation charges were not subject to tax. In reliance on that advice, appellant did not charge or collect transaction privilege taxes on that activity.

Appellee issued a notice of deficiency assessment. The lower court granted summary judgment to appellee, which was affirmed by the lower appellate court. On appeal, the court reversed and remanded the case. It held that the doctrine of equitable estoppel against appellee in tax cases was not precluded by the Ariz. Const. art. IX, § 1 or art. III. Appellant could establish the affirmative defense of estoppel against appellee by proving that appellee's conduct was inconsistent with the position later assumed, that appellant relied and had a right to rely on appellee's conduct, and that appellant therefore sustained damage that would make it unjust to allow appellee to maintain the later-taken position.

**OUTCOME:** The court vacated the opinion of the lower appellate court which affirmed the summary judgment awarded by the lower court to appellee state revenue department on its notice of deficiency assessment against appellant taxpayer. The court reversed the lower court's summary judgment. Appellant was not precluded from establishing the affirmative defense of equitable estoppel against appellee. The case was remanded.

**CORE TERMS:** estoppel, transportation, taxation, estopped, equitable estoppel, advice..., coal, incorrect, taxing, detriment, certificate, unauthorized act, summary judgment, sovereign immunity, contracting, convention, exemption, handling, separation of powers, estopping, corpus, tax commission, power to tax, power of taxation, unauthorized, surrendered, contracted, suspended, owed,

Page 2

191 Ariz. 565, *; 959 P.2d 1256, **;
1998 Ariz. LEXIS 43, ***1; 270 Ariz. Adv. Rep. 3

general rule

**LexisNexis(R) Headnotes**

*Tax Law > State & Local Taxes > Administration & Proceedings > General Overview*
[HN1] Ariz. Const. art. IX, § 1 is not an absolute ban to estopping the Department of Revenue from collecting revenue from a single taxpayer for a single event.

*Tax Law > State & Local Taxes > Administration & Proceedings > General Overview*
[HN2] Neither Ariz. Const. art. III nor Ariz. Const. art. IX, § 1 prohibits equitable estoppel against the Department of Revenue.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Affirmative Defenses > General Overview*
[HN3] The three elements of equitable estoppel are traditionally stated as: (1) the party to be estopped commits acts inconsistent with a position it later adopts, (2) reliance by the other party, and (3) injury to the latter resulting from the former's repudiation of its prior conduct.

**COUNSEL:** Ulrich Kessler & Anger P.C., Phoenix, By: Paul G. Ulrich, David L. Abney, of counsel -and- Hartley E. Newkirk, Tucson, -and- Walker Ellsworth P.L.C., Phoenix, By: Francis Migray, -and- Newmark Irvine, P.A., Phoenix, By: Stephen C. Newmark, Attorneys for Valencia Energy Company.

Grant Woods, Arizona Attorney General, Phoenix, By: James M. Susa, Patrick Irvine, Attorneys for Arizona Department of Revenue.

Quarles & Brady, Phoenix, By: Michael G. Galloway, Jeffrey A. Sandquist, Attorneys for Amicus Curiae General Motors Corporation.

**JUDGES:** STANLEY G. FELDMAN, Justice. CONCURRING: THOMAS A. ZLAKET, Chief Justice, CHARLES E. JONES, Vice Chief Justice, FREDERICK J. MARTONE, Justice, JAMES MOELLER, Justice (Retired).

**OPINION BY:** STANLEY [***2] G. FELDMAN

**OPINION**

[**1259]  [*568]  En Banc

OPINION

FELDMAN, Justice

P1 The Arizona Department of Revenue ("Department") audited Valencia Energy Company ("Valencia") and assessed a deficiency. The court of appeals affirmed the grant of summary judgment against Valencia. We granted review to determine whether the Department can be estopped from collecting back taxes owed because a Department agent advised Valencia in writing that the activity now levied on was not subject to tax. We have jurisdiction pursuant to Ariz. Const. art. VI, § 5(3) and A.R.S. § 12-102.

FACTS AND PROCEDURAL HISTORY

P2 We view the facts in the light most favorable to the party against whom summary judgment was granted. Martinez v. Woodmar IV Condominiums Homeowners Ass'n, Inc., 189 Ariz. 206, 211, 941 P.2d 218, 223 (1997).

P3 Tucson Electric Power Company ("TEP") built and owns a coal-fired electric plant in Springerville, Arizona, operated by Alamito Company ("Alamito"). [1] On October 4, 1984, Valencia, a wholly owned subsidiary of TEP, contracted to supply Alamito's coal requirements for the Springerville plant. The agreement set the price per ton of coal, payable monthly and subject to renegotiation [***3] as needed. [2] Valencia began performance, buying the coal in New Mexico, transporting [**1260] [*569] it to Springerville, and then preparing it for burning by Alamito.

> 1    After 1989, Alamito Company became Century Power Company.
> 2  Section 7 of the agreement provides:
>
>> The circumstances attendant to the providing of Coal... are subject to variation, including, but not limited to, the amount of capital equipment which must be provided by Valencia, the cost and size of inventories necessary to assure

Page 3

191 Ariz. 565, *569; 959 P.2d 1256, **1260;
1998 Ariz. LEXIS 43, ***3; 270 Ariz. Adv. Rep. 3

reliable coal supply, the costs incurred or to be incurred by various coal and transportation arrangements entered into by Valencia and the recovery of interest expense by Valencia.

P4 Prior to beginning performance, Valencia questioned "the status of the business for Arizona tax purposes." Valencia's representatives met with Department officials on December 17, 1985, to ascertain what taxes would be due on Valencia's operations. Valencia thereafter corresponded with Mr. Deemer, a Department tax analyst. [***4] As a tax analyst, Deemer regularly rendered written advice to taxpayers after such advice was first cleared with his supervisor. Deemer issued three letters to Valencia. The third letter, dated January 31, 1986, stated that Valencia's transportation charges were not subject to tax. In reliance on the Department's advice, Valencia did not charge or collect transaction privilege taxes from Alamito on the transportation receipts at issue.

P5 The Department conducted a transaction privilege tax audit of Valencia for the period November 1985 through March 1990. Although there were no pertinent, substantive changes in the Arizona statutes or Department rules during the audit period, the Department concluded that the transportation charges were subject to the transaction privilege tax. In May 1990, the Department issued a Notice of Deficiency Assessment to Valencia claiming underpayment of almost $ 5 million, plus interest.

P6 After an adverse administrative decision to its challenge to the assessment, Valencia appealed to the superior court. In a published opinion, the judge presiding in the tax division of the superior court granted summary judgment in favor of the Department [***5] and denied Valencia's motion for summary judgment, upholding the assessment of back taxes and interest. Valencia Energy Co. v. Arizona Dep't of Revenue, 178 Ariz. 251, 872 P.2d 206 (Tax 1994).

P7 Valencia raised numerous issues on appeal, including whether the Department was estopped from assessing back taxes because a Department agent advised that revenue from coal transportation and handling was not taxable. The court of appeals found for the Department on all issues, holding that Valencia's coal handling and transportation activities were subject to the tax. Valencia Energy Co. v. Arizona Dep't of Revenue, 189 Ariz. 79, 938 P.2d 474 (App. 1996). On the estoppel issue, the court held that Ariz. Const. art. IX, § 1, Crane Co. v. Arizona State Tax Comm'n, 63 Ariz. 426, 163 P.2d 656 (1945), and Duhame v. State Tax Comm'n, 65 Ariz. 268, 179 P.2d 252 (1947), prevent the Department from being equitably estopped by its incorrect representations that no tax was applicable. Id. at 84, 938 P.2d at 479 (citing PCS, Inc. v. Arizona Dep't of Revenue, 186 Ariz. 539, 925 P.2d 680 (App. 1995)). We granted Valencia's petition for review on the estoppel issue only.

[***6] DISCUSSION

A. Equitable estoppel against the Department

P8 This case requires us to decide whether and to what extent a taxpayer may assert equitable estoppel against the Department. The Department first argues that article IX, section 1 of the Arizona Constitution, which provides that the "power of taxation shall never be surrendered, suspended, or contracted away," absolutely bars estopping the government from collecting taxes owed. Valencia and amicus argue that article IX, section 1 is inapplicable here because its purpose is only to restrict the Legislature from contracting away its power to tax.

1. Article IX, section 1 and *Crane Co. v. Arizona State Tax Commission*

P9 Crane was the genesis of our construction of article IX, section 1 as it relates to estopping the state taxing authority. The tax commission had adopted a rule excepting from taxation certain items sold to contractors. The commission later repealed the rule, audited the taxpayer, and assessed back taxes owed on completed transactions. We recognized that the taxpayer could no longer pass the cost of the tax to its buyers but nonetheless upheld the tax and rejected the taxpayer's claim of [***7] estoppel:

The general rule is that the state will not be estopped in the collection of its revenues *by an unauthorized act of its officers.* In the matter of collecting revenues, the state is acting in its governmental or sovereign [**1261] [*570] capacity, and ordinarily there can be no estoppel. Were this not the rule the

Page 4

191 Ariz. 565, *570; 959 P.2d 1256, **1261;
1998 Ariz. LEXIS 43, ***7; 270 Ariz. Adv. Rep. 3

taxing officials could waive most of the state's revenue. The Constitution, Art. 9, Sec. 1, provides that the power of taxation (which must of necessity include collection) "shall never be surrendered, suspended, or contracted away." To hold that the commission by regulation may waive taxes which the law required to be imposed would be violative of this provision.

The regulation of the tax commission, upon which appellant bases its plea of estoppel, was wholly unauthorized. The tax commission cannot by any rule or regulation exempt a taxpayer from the payment of a tax unless such authority has been specifically granted to it by the legislature. Here no such authority exists.

63 Ariz. at 441, 163 P.2d at 662 (emphasis added) (citations omitted).

P10 Two years later, in Duhame, we disapproved Crane's substantive holding that the sales to contractors [***8] were subject to the sales tax. With little discussion and relying on Crane, we again declined to apply equitable estoppel against the state taxing authorities.

It is true that during the time plaintiff was engaged in the contracting here in question he might have passed this tax on to the government had he not been misled, by an improper interpretation of the Act by the Commission, into believing no tax was due. Still, it is the settled law of the land and of this jurisdiction that as taxation is a governmental function, there can be no estoppel against a government or governmental agency with reference to the enforcement of taxes. Were this not the rule the taxing officials could waive most of the state's revenue. Therefore there is no merit to plaintiff's claim of estoppel in this case.

65 Ariz. at 281, 179 P.2d at 260. Our court of appeals has rigidly adhered to the letter of Crane and Duhame. *See, e.g.,* General Motors Corp. v. Arizona Dep't of

Revenue, 189 Ariz. 86, 938 P.2d 481 (App. 1996). [3]

3 *See also* State ex rel. Arizona Dep't of Revenue v. Driggs, 189 Ariz. 74, 938 P.2d 469 (App. 1996); PCS, Inc. v. Arizona Dep't of Revenue, 186 Ariz. 539, 925 P.2d 680 (App. 1995); Arizona Dep't of Revenue v. M. Greenberg Const., 182 Ariz. 397, 897 P.2d 699 (App. 1995); Knoell Bros. Const., Inc. v. State of Arizona, 132 Ariz. 169, 644 P.2d 905 (App. 1982).

[***9]

P11 In a different context, however, we held that the corporation commission could be estopped to deny the validity of a certificate of convenience and necessity improperly issued fifty years earlier. In reaching that conclusion, we disapproved of the "no estoppel against the sovereign" rule, stating:

Whatever the basis for these exceptions to the general rule [of no estoppel], it would appear that where the application of estoppel will not affect the exercise by the state of its governmental powers and sovereignty, or bind it by unauthorized acts of its officers and employees, estoppel will, when justice dictates, be applied to the state.

Freightways, Inc. v. Arizona Corp. Comm'n, 129 Ariz. 245, 248, 630 P.2d 541, 544 (1981).

P12 Following Freightways, the court of appeals distinguished Crane and Duhame to find the Department estopped because of prior incorrect representations about procedural requisites for claiming income tax deductions. If not for the procedural errors the taxpayer committed by following the Department's instructions, it was clearly entitled to the deductions as a matter of substantive law and legislative intent. Tucson [***10] Electric Power Co. v. Arizona Dep't of Revenue, 174 Ariz. 507, 851 P.2d 132 (App. 1992). The court reasoned:

The taxpayer in this case, however, presents a very different situation. Here, the taxpayer is not relying upon estoppel to avoid the application of a taxing statute to the activities contemplated by the statute.... It is undisputed in the record presented to this court that, from a factual

Page 5

191 Ariz. 565, *570; 959 P.2d 1256, **1261;
1998 Ariz. LEXIS 43, ***10; 270 Ariz. Adv. Rep. 3

standpoint, the taxpayer clearly was entitled to claim the benefits of that accelerated amortization.

In advancing its estoppel argument, the taxpayer seeks to enforce, rather than avoid, the basic intent of the statute.

*Id.* at 515, 851 P.2d at 140 (footnotes omitted). Moreover, the court clarified the scope of the Crane/Duhame prohibition on estoppel [**1262] [*571] in tax cases in light of Freightways' acknowledgment that the government could be estopped under some circumstances. The court observed:

The central principle underlying past Arizona decisions is that the sovereign power of the state to impose taxes is vested in the legislature, and the state taxing authorities may not, *by their words or conduct,* waive the collection of taxes imposed by a valid legislative [***11] enactment.

*Id.* (emphasis added).

P13 But the basic assumption on which Crane and its progeny were decided is questionable. Crane stated that estoppel was impermissible when based on the "unauthorized acts" of the taxing authority. 63 Ariz. at 441, 163 P.2d at 662. Thus the case appears to recognize the possibility of estoppel based on authorized acts but ignores the fact that the action taken by the officials in Crane was actually well within their authority. In Crane, the transaction in question was exempt from taxation under a tax commission rule. In adopting the rule, the commission exercised authority granted by statute. 4 Given that the commission's procedural action was clearly authorized, the substantive determination that no tax was due could be deemed unauthorized only because it was wrong. Thus, under Crane an unauthorized act means any Department decision or action later found to be incorrect under the tax statutes.

4   Ariz. Code § 73-1333 (1939) provided:

Immediately upon this act becoming effective, the tax commission is hereby authorized and directed as a preliminary matter to the application and

enforcement of this act, to formulate rules and regulations, and prescribe the forms and procedure necessary to the efficient enforcement thereof.

[***12] P14 In sum, Arizona law governing estoppel against the Department under the Crane rule is quite restrictive--the Department may not be estopped based on its erroneous advice unless doing so results in substantive compliance with the tax statutes. Under this regime, the court of appeals was correct to reject Valencia's claim of equitable estoppel based on the Department's prior erroneous advice. Valencia and amicus argue, however, we should find those cases incorrectly decided. It is to that argument we now turn.

2. Whether article IX, section 1 was correctly applied

P15 We begin by noting that Crane and Duhame were decided in an era when the government could do no wrong. The rigid rule forbidding estoppel against the government was a logical corollary to the previous notions of sovereign immunity. *See* John F. Conway, Note, *Equitable Estoppel of the Federal Government: An Application of the Proprietary Function Exception to the Traditional Rule,* 55 FORDHAM L.REV. 707, 709 (1987) (citing 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 17.01, at 492 (1958) ("The theory that the government cannot be estopped is no doubt a part of the broad doctrine of sovereign [***13] immunity. In the early days of the American Republic, the government was liable neither for breach of contract nor for torts of its agents. Sovereign immunity from contract and tort liability naturally carried with it sovereign immunity from equitable estoppel.")).

P16 Significant changes have since occurred with respect to the sovereign immunity doctrine and, concomitantly, in our view of equitable estoppel against the government. *See* Stone v. Arizona Highway Comm'n, 93 Ariz. 384, 392, 381 P.2d 107, 112 (1963) (sovereign immunity doctrine abolished); *see also* Freightways, 129 Ariz. at 247-48, 630 P.2d at 543-44. This case provides the court with its first opportunity to examine how the abolition of sovereign immunity affects the issue of equitable estoppel against the Department.

P17 Unlike numerous cases in which equitable estoppel has been asserted against various other

Page 6

191 Ariz. 565, *571; 959 P.2d 1256, **1262;
1998 Ariz. LEXIS 43, ***13; 270 Ariz. Adv. Rep. 3

government agencies, [5] taxation is governed by a specific constitutional provision. The parties draw clear battle lines: [**1263] [*572] the Department contends that article IX, section 1 is an absolute ban to any interference with the state's taxation and collection activities. Valencia argues that, [***14] properly understood, the provision is irrelevant to the issue before us.

> 5 *See, e.g.,* Carondelet Health Serv. v. Arizona Health Care Cost Containment Sys. Admin., 187 Ariz. 467, 930 P.2d 544 (App. 1996); Rivera v. City of Phoenix, 186 Ariz. 600, 925 P.2d 741 (App. 1996); Carlson v. Arizona Dep't of Econ. Sec., 184 Ariz. 4, 906 P.2d 61 (App. 1995); Outdoor Sys., Inc. v. Arizona Dep't of Transp., 171 Ariz. 263, 830 P.2d 475 (App. 1992).

P18 Article IX, section 1 is best understood in the context of the problem it addresses. In the early nineteenth century, state legislatures frequently included tax exemptions in the charters of private corporations; [6] litigation ensued over the power of subsequent legislatures to eliminate the exemptions. *See, e.g.,* Home of the Friendless v. Rouse, 75 U.S. (8 Wall.) 430, 19 L. Ed. 495 (1869); Washington Univ. v. Rouse, 75 U.S. (8 Wall.) 439, 19 L. Ed. 498 (1869); Rector of Christ Church v. Philadelphia County, 65 U.S. (24 How.) 300, 16 [***15] L. Ed. 602 (1860); Piqua Branch of State Bank of Ohio v. Knoop, 57 U.S. (16 How.) 369, 14 L. Ed. 977 (1853); New Jersey v. Wilson, 11 U.S. (7 Cranch) 164, 3 L. Ed. 303 (1812). The United States Supreme Court held as early as 1812 that a state legislature's repeal of tax exemptions contracted by the state violate the Contract Clause of article I, section 10 of the United States Constitution. *See, e.g.,* Wilson, 11 U.S. (7 Cranch) 164, 3 L. Ed. 303.

> 6 *See, e.g.,* Tex. Const. art. VIII, § 4 (Vernon's ann. ed.) (West 1993), which provides that the "power to tax corporations and corporate property shall not be surrendered or suspended by act of the Legislature, by any contract or grant to which the State shall be a party." As the "Interpretive Commentary" explains:
>
> > Prior to 1874 when the first general incorporation statute was passed in Texas, the sole means of incorporation was through special legislative acts creating private

corporations. The desire to encourage certain industries, particularly railroads, led some of the early legislatures to include in the incorporating act a grant of partial or total tax immunity. Subsequent regret of the generosity of these earlier legislatures led to the inclusion in the Constitution of 1876, this provision....

[***16] P19 The Dartmouth College case subsequently established that the Contract Clause prevents a state from altering or amending terms in a private corporation's charter, unless the state's power to amend was reserved in the charter itself or in some general or special law to which it was originally subject. Trustees of Dartmouth College v. Woodward, 17 U.S. (4 Wheat.) 518, 4 L. Ed. 629 (1819). The Supreme Court applied this principle to protect perpetual tax exemptions granted in corporate charters. *See* Home of the Friendless, 75 U.S. (8 Wall.) 430, 19 L. Ed. 495; Washington Univ., 75 U.S. (8 Wall.) 439, 19 L. Ed. 498; Piqua Branch Bank, 57 U.S. (16 How.) 369, 14 L. Ed. 977. The Court later acknowledged, however, that grants in a corporate charter would not be protected by the Contract Clause if a state's constitution prohibited the state from granting permanent tax exemptions. Home of the Friendless, 75 U.S. at 438. Accordingly, many states adopted such prohibitions in their constitutions. *See* Stewart E. Sterk & Elizabeth E. Goldman, *Controlling Legislative Shortsightedness; The Effectiveness of Constitutional Debt Limitations,* 1991 WIS. L. REV. [***17] 1301, 1319 (1991) ("Once the scope of Contract Clause doctrine became apparent, a number of states adopted constitutional provisions that prohibited legislatures from contracting away taxing power.").

P20 Concern for inordinate corporate influence in state affairs was particularly acute in Arizona. Professor John D. Leshy, the most prominent historian of the Arizona Constitution, described the concerns of Senator Beveridge, one of Arizona's most respected statesmen during the territorial period:

> He [Beveridge] complained bitterly that the businessmen and rich among the statehood proponents wanted nothing

Page 7

191 Ariz. 565, *572; 959 P.2d 1256, **1263;
1998 Ariz. LEXIS 43, ***17; 270 Ariz. Adv. Rep. 3

except continued escape from taxation, charging that the "mining corporations of Arizona have taken out... over $ 400,000,000 of mineral wealth; and they have paid the Territory nothing in the way of taxes."

Leshy then concluded:

Concern about giant corporations evading taxation had been repeatedly rehearsed in the territorial legislature to little avail, demonstrating the railroad and mining companies' strong grip on the political process. Small wonder that both contemporary reformers and historians agreed that the large corporations "reigned... virtually [***18] untrammeled" in territorial days.

John D. Leshy, *The Making of the Arizona Constitution,* 20 ARIZ. ST. L.J. 1, 11-12 (1988).

[**1264] [*573] P21 An examination of article IX's evolution through the 1910 Constitutional Convention confirms that the drafters of our constitution were concerned about legislative capitulation to special interests. [7] Article IX, section 1 was submitted at the convention as Substitute Proposition No. 106 and ultimately replaced numerous provisions relating to finance and taxation. One of these provisions was Proposition No. 11, "A Proposition Relative to Exemption from Taxation," which demonstrated the specific concern with grants of tax immunity to corporations:

That none of the property of any private corporation shall ever be exempted from taxation by the State or by any political subdivision of the State, except property used solely for charitable, religious, or other eleemosynary purpose and not for profit.

On November 16, 1910, Proposition No. 11 was deemed incorporated into Proposition No. 106 and was therefore abandoned. *See* THE RECORDS OF THE ARIZONA CONSTITUTIONAL CONVENTION OF 1910, at 406 (John S. Goff ed.). Section 4 of Proposition [***19] No. 106 provided:

The power to tax corporations and

corporate property shall not be surrendered or suspended by any contract or grant to which the state shall be a party.

On November 16, the Committee on Public Debt, Revenue and Taxation recommended an amended Proposition No. 106, which ultimately became article IX of the constitution. *See id* at 405. The revised section on the power of taxation, now article IX, section 1, commanded that the "power of taxation shall never be surrendered, suspended, or *contracted* away." (Emphasis added.)

7   Article IV, section 23 also evinces the framers' serious concern with undue corporate influence in politics:

It shall not be lawful for any person holding public office in this state to accept or use a pass or to purchase transportation from any railroad or other corporation, other than as such transportation may be purchased by the general public....

Commenting on this provision, Professor Leshy observed that it "reflects the framers' preoccupation with potential governmental corruption by corporations, a realistic concern given the political dominance, exercised by means fair and foul, of large railroad and mining corporations during the territorial period." JOHN D. LESHY, THE ARIZONA STATE CONSTITUTION: A REFERENCE GUIDE 123 (1993).

[***20] P22 Almost forty years ago, we reviewed the framers' intent with respect to Proposition No. 106 and article IX, section 1. In determining whether the clause prohibited the City of Phoenix from committing the proceeds of a fuel tax to repay road repair bonds, Justice Struckmeyer thoroughly examined the Minutes of the Constitutional Convention, noted that the provision was inserted in our constitution to address the Dartmouth College problem, and concluded:

Thus, it becomes apparent that the first sentence of Substitute Proposition No. 106, now Art. IX, § 1, was adopted for the purpose of restricting the legislature's right

Page 8

191 Ariz. 565, *573; 959 P.2d 1256, **1264;
1998 Ariz. LEXIS 43, ***20; 270 Ariz. Adv. Rep. 3

to alienate the power to tax anything and all persons. The prohibition is against the irrepealable grant of immunity from taxation. ...

Therefore, we are of the opinion that the first sentence of Art. IX, § 1 is a prohibition against the surrender or relinquishment of the right to impose a tax.

Switzer v. City of Phoenix, 86 Ariz. 121, 127-28, 341 P.2d 427, 431 (1959). [8]

> 8 Because we believe all of Justice Struckmeyer's discussion is worth reading, we have reprinted it in the Appendix.

[***21] P23 From the foregoing we conclude that the purpose of article IX, section 1 was to void grants of tax immunity that would otherwise become permanent under article I, section 10 of the federal constitution as interpreted in the Dartmouth College case. Accordingly, this provision of our state constitution prohibits *the Legislature and state agencies* from alienating the Legislature's *fundamental power* to tax.

P24 This understanding of the purpose of article IX, section 1 casts a different light on the Department's claim. The Department maintains that article IX, section 1 restrains all branches of government, not just the Legislature, and its purpose is to prevent any waiver of taxes due. The foregoing discussion illustrates that the Department is correct on the first assertion but [**1265] [*574] wrong on the second. Article IX, section 1 restrains all branches of government, but only as to relinquishment of the Legislature's fundamental power to tax. An estoppel from collecting revenue from a single taxpayer for a single event is not the kind of permanent capitulation with which the framers were concerned. We therefore hold that [HN1] article IX, section 1 is not an absolute ban to [***22] estopping the Department. [9]

> 9 The Legislature seems to have reached the same conclusion. In A.R.S. § 42-139.21(C), effective September 21, 1991, the Legislature effectively overruled Crane and Duhame.

3. Separation of powers

P25 The Department raises a separation of powers challenge under article III of the Arizona Constitution, arguing that "enforcement of estoppel in tax cases deprives the legislature of the power to make the law and the judiciary the power to interpret it." Following the demise of the state-can-do-no-wrong doctrine, the no-estoppel-against-the-government rule has been most commonly justified on separation of powers principles. [10] Article IX aside, our cases have long recognized the limitations imposed by article III on exercising judicial power in tax matters. *See, e.g.,* Tanque Verde Enter. v. City of Tucson, 142 Ariz. 536, 691 P.2d 302 (1984) (the judiciary would usurp legislative function by striking down even excessive revenue-raising taxes). While Freightways [***23] held that estoppel may lie against the government, we have yet to consider the effect of separation of powers in such a case.

> 10 Frederick S. Kuhlman, Comment, *Governmental Estoppel: The Search for Constitutional Limits,* 25 LOY. L.A. L. REV. 229, 229 (1991) ("Separation of powers has emerged as the linchpin on which the government estoppel debate turns."); Deborah Walrath, Note, *Estopping the Federal Government: Still Waiting for the Right Case,* 53 GEO. WASH. L. REV. 191, 192 (1985) ("Estoppel traditionally does not lie against the government. This distinction arose largely as a corollary to the doctrine of sovereign immunity that 'the King can do no wrong.' ... As Congress has passed legislation waiving sovereign immunity and allowing the government to be sued in limited circumstances, the power of this traditional rationale has diminished. One justification frequently invoked to support governmental exemptions from equitable estoppel is the separation of powers doctrine.").

P26 "Nowhere in the [***24] United States is this system of structured liberty [separation of powers] more explicitly and firmly expressed than in Arizona." Mecham v. Gordon, 156 Ariz. 297, 300, 751 P.2d 957, 960 (1988). Article III of our constitution provides:

> The powers of the government of the State of Arizona shall be divided into three separate departments, the Legislative, the Executive, and the Judicial; and, except as provided in this Constitution, such departments shall be separate and distinct,

Page 9

191 Ariz. 565, *574; 959 P.2d 1256, **1265;
1998 Ariz. LEXIS 43, ***24; 270 Ariz. Adv. Rep. 3

and no one of such departments shall exercise the powers properly belonging to either of the others.

P27 The Department presents several arguments. Estopping the Department, it contends, violates separation of powers by (1) binding the Legislature and thus the state's taxing authority through the unauthorized act of an executive branch officer, (2) effectively permitting an executive agent to legislate with respect to taxpayers who relied on the agent's statements, and (3) precluding the judiciary from declaring the existing law.

P28 On the first point, Valencia responds that because the Department is statutorily authorized to give tax advice, [11] and occasional erroneous advice is [***25] foreseeable and unavoidable, mistakes are impliedly if not explicitly authorized. While Crane seems to define unauthorized acts as any Department interpretation later found to be incorrect under the tax statutes, this definition does not comport with more recent decisions. In Freightways, we found the corporation commission estopped from denying the validity of a motor carrier certificate [**1266] [*575] issued without complying with statutory requirements because the commission had recognized the validity of the certificate for over fifty years. 129 Ariz. at 248, 630 P.2d at 544. The Legislature authorized the commission to issue certificates, but through deliberate error or oversight it issued Freightways' certificate contrary to the law's requirements. [12] We applied estoppel, concluding it would not "affect the exercise by the state of its governmental powers and sovereignty, or bind it by the *unauthorized acts* of its officers or employees...." Id. at 248, 630 P.2d at 544 (emphasis added). Thus the Freightways court found that the act of issuing a certificate, something the commission was authorized to do by statute, did not become unauthorized simply because the act was performed [***26] erroneously. This changed definition of unauthorized was used and applied by the court of appeals in Tucson Electric Power, 174 Ariz. at 516 n.9, 851 P.2d at 141 n.9. [13] Even if incorrect, the acts of the Department in this case, like those of the commission in Freightways and the Department in Tucson Electric Power, were within the general parameters of the government agent's authority. Thus, the Crane definition of unauthorized acts is not only patently illogical but has been effectively modified. We adopt and apply the view taken in Freightways and Tucson Electric Power. The advice given Valencia was wrong but not so

unauthorized as to violate separation of powers.

11   A.R.S. § 42-104(A)(6) provides:

A. The department shall administer and enforce the provisions of this title, title 43 and other laws assigned to it and has all the powers and duties prescribed by law for such purposes. In all proceedings prescribed by law the department may act on behalf of this state. In addition, the department shall:

\*\*\*

6. Provide information and advice within the scope of its duties subject to the laws on confidentiality of information and departmental rules adopted pursuant to such laws.

[***27]

12   Freightways submitted two applications for a certificate: one a renewal filed after a deadline imposed by commission rule, and the other an original application that, by statute, would have required a hearing before being granted. Id. at 246, 630 P.2d at 542. It is unclear which application was acted upon in issuing the certificate, but it is irrelevant for our purposes because issuance of the certificate under either circumstance contravened statutory requirements. *See* Tucson Warehouse & Transfer Co. v. Al's Transfer, Inc., 77 Ariz. 323, 327, 271 P.2d 477, 479-80 (1954) ("The rule is that general rules and regulations of an administrative board or commission prescribing methods of procedure have the effect of law and are binding on the Commission and must be followed by it so long as they are in force and effect.").

13   The court of appeals explained in a footnote:

While the audit supervisor's representations were "unauthorized" in the sense that they were contrary to the provisions of the statute as we have

Page 10

191 Ariz. 565, *575; 959 P.2d 1256, **1266;
1998 Ariz. LEXIS 43, ***27; 270 Ariz. Adv. Rep. 3

interpreted it, there is no evidence that he was not *acting within the general parameters of his authority.* Therefore, under appropriate circumstances otherwise supporting the application of estoppel, his representations would be binding on the state.

*Id.* (emphasis added).

[***28]

P29 The Department next argues that estoppel in these circumstances effectively permits an executive agency to change the law, which constitutes a usurpation of legislative power. This argument fails to recognize that the law and its execution are separate and distinct spheres. *See, e.g.,* Salt River Pima-Maricopa Indian Community v. Hull, 190 Ariz. 97, 104, 945 P.2d 818, 825 (1997) ("The Legislature, in the exercise of [its] lawmaking power, establishes state policies and priorities and, through the appropriation power, gives those policies and priorities effect. Once the Legislature has acted, however, it becomes the duty of the Executive to 'take care that the laws be faithfully executed.'") (citing Rios v. Symington, 172 Ariz. 3, 12, 833 P.2d 20, 29 (1992)). The axiom that an administrative agency such as the Department must execute the law as it is written does not lead to the result that the Department asserts here. Estopping the Department from assessing a tax does not work any change in the law but impacts only its execution. If the Department's absolutist interpretation were true, then the constitution would be similarly violated whenever the Department exercises [***29] its discretion to enter into closing agreements [14] or to abate balances owed. [15] These provisions, like the operation of estoppel against the Department, involve administration of the law not its creation. The legislative prerogative to tax was not impaired.

14  *See* A.R.S. § 42-139.06.
15  *See* A.R.S. § 42-104(B).

P30 We turn, then, to the contention that judicial recognition that the Department is estopped from correcting its prior, erroneous interpretation of law operates as a retroactive concession of judicial power, enabling the Department to make determinations [**1267] [*576] immunized from judicial revision.

Thus, the argument goes, the Department would effectively be exercising the powers properly belonging to the judiciary, in violation of article III of our constitution. We do not find a separation of powers violation based on such an attenuated notion. Estoppel is a judicial doctrine. Its application by the courts can hardly be construed as placing judicial power in the hands of the executive [***30] branch. While estoppel protects the Department's prior incorrect interpretation of the law from further judicial review in a particular case, it does not give the Department the judicial power to interpret the law in any case before the court. Nor does it give the Department the authority to determine when, where, or in what situation estoppel should be recognized. Judicial application of estoppel does nothing more than preclude the Department from arguing the substantive issue of law in the first place. The court remains the final arbiter of the law; it alone decides the correct interpretation of the law and whether estoppel will nevertheless apply in a given case.

P31 Thus, we conclude that [HN2] neither article III nor article IX, section 1 of the constitution prohibits equitable estoppel against the Department. We must then consider whether circumstances exist in this case that could warrant the application of estoppel against the Department.

4. Factual predicate for equitable estoppel against the Department

P32 That the constitution does not prohibit estoppel against the Department does not necessarily mean that the Department will be estopped. Estoppel sounds in *equity* [***31] and will therefore not apply to the detriment of the public interest. Spur Indus., Inc. v. Del E. Webb Dev. Co., 108 Ariz. 178, 184, 494 P.2d 700, 706 (1972) ("the courts have long recognized a special responsibility to the public when acting as a court of equity"). Accordingly, we look carefully to the underlying considerations that traditionally have been advanced for and against the application of estoppel against the Department.

P33 Even the cases applying estoppel against the government have recognized that "equitable estoppel... generally may not be invoked against the sovereign." Freightways, 129 Ariz. at 246, 630 P.2d at 542. We said the government may be estopped only when its "wrongful conduct threatens to work a serious injustice and ... the public interest would not be unduly damaged...." Id. at 248, 630 P.2d at 544. Despite our holding in Freightways,

Page 11

191 Ariz. 565, *576; 959 P.2d 1256, **1267;
1998 Ariz. LEXIS 43, ***31; 270 Ariz. Adv. Rep. 3

however, estoppel has remained all but prohibited as against the Department under the Crane/Duhame line of cases.

P34 We recognize the fundamental importance of the state's taxing power but believe the state's obligation to treat its citizens justly is as essential to the existence of government [***32] as the Legislature's power to levy taxes. *See, e.g.,* Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 172 n.19, 71 S. Ct. 624, 649 n.19, 95 L. Ed. 817 (1951) (Frankfurter, J., concurring) (quoting 5 THE WRITINGS AND SPEECHES OF DANIEL WEBSTER 163) ("In a government like ours, entirely popular, care should be taken in every part of the system, not only to do right, but to satisfy the community that right is done.")). Moreover, as our tax system relies primarily on the good faith of citizens to self report, it is imperative that the system itself manifest fairness by requiring that all citizens contribute their fair share. But it is patently unjust to permit the erroneous advice of the government to cause detriment beyond the tax itself. There is no justice, one might say, if the government can punish its citizens for following its instructions. We therefore join the many states permitting equitable estoppel against the government in tax matters. *See, e.g.,* Michael A. Rosenhous, Annotation, *Estoppel of State or Local Government in Tax Matters,* 21 A.L.R. 4th 573 (collecting cases). We overrule Crane and Duhame and hold that equitable estoppel may lie against [***33] the Department under certain limited circumstances.

P35 [HN3] The three elements of equitable estoppel are traditionally stated as: (1) the party to be estopped commits acts inconsistent with a position it later adopts; (2) reliance by the other party; and (3) injury to the latter resulting from the former's repudiation [**1268] [*577] of its prior conduct. [16] *See, e.g.,* Tucson Electric Power, 174 Ariz. at 516, 851 P.2d at 141. In light of the serious considerations implicated by the taxing power, we examine these elements as they apply to the Department in this case.

> 16 The Department argues that Freightways promulgated a four-prong standard that governs estoppel against the government. In Freightways, we cited a federal case holding that the elements of estoppel were "(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe

it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury." 129 Ariz. at 246, 630 P.2d at 542 (citing Hampton v. Paramount Pictures Corp., 279 F.2d 100, 104, (9th Cir. 1960)). We note that this four-prong test was not expressly adopted in Freightways. More important, the test cited in Freightways is, in substance, no different than the three-prong test traditionally applied in Arizona.

[***34] P36 The first element requires affirmative acts inconsistent with the position later relied on. Common sense tells us that the evidentiary burden in cases such as the present would require that the state's action bear some considerable degree of formalism under the circumstances. An off-the-cuff opinion, for example, will not suffice if the question presented requires a measure of research or deliberation. It is rare that satisfactory evidence of an absolute, unequivocal, and formal state action will be found unless it is in writing. In addition, the action must be taken by or have the approval of a person authorized to act in the area under consideration. *See* Freightways, 129 Ariz. at 248, 630 P.2d at 544. In general, the state may not be estopped due to the casual acts, advice, or instructions issued by nonsupervisory employees. [17]

> 17 We note that an additional standard has been enunciated by our court of appeals. In Carlson v. Arizona Dep't of Econ. Sec., the court of appeals discussed the wrongful conduct element of an estoppel claim against the government, finding that estoppel will lie against the state only if the government's actions constitute "affirmative misconduct." 184 Ariz. 4, 6, 906 P.2d 61, 63 (App. 1995). Carlson distinguished between mere neglect or oversight and more egregious intentional or willful conduct. *Id.* at 8, 906 P.2d at 65. The affirmative misconduct standard adopted in Carlson may conflict with Freightways.

[***35] P37 The second requirement demands both that the party claiming estoppel actually relied on the state's act and that such reliance was reasonable under the circumstances. Actual reliance means that the party seeking estoppel has the burden to demonstrate that it prospectively relied on the state action. That the reliance be reasonable requires, among other things, that the party

Page 12

191 Ariz. 565, *577; 959 P.2d 1256, **1268;
1998 Ariz. LEXIS 43, ***35; 270 Ariz. Adv. Rep. 3

seeking estoppel have acted in good faith by providing the state with correct information and neither knew nor was put on notice that the state's position was erroneous. *See* Heltzel v. Mecham Pontiac, 152 Ariz. 58, 60, 730 P.2d 235, 237 (1986). In general, "reliance should be considered reasonable if 'a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.'" Freightways, 129 Ariz. at 247, 630 P.2d at 543; *see also* Bohonus v. Amerco, 124 Ariz. 88, 90, 602 P.2d 469, 471 (1979) ("As a general rule, it is essential to the existence of an estoppel that the representation be relied upon and that such reliance be justifiable. Reliance is not justified where knowledge to the contrary exists."); [***36] Suburban Pump & Water Co. v. Linville, 60 Ariz. 274, 283, 135 P.2d 210, 214 (1943) (One who acts "with a careless indifference to means of information reasonably at hand or ignores highly suspicious circumstances which should warn him of danger or loss cannot invoke the doctrine of estoppel.").

P38 The third requirement is that there be substantial detriment to the party resulting from a repudiation of prior representations. As asserted against the Department, detriment requires a positional change not compelled by law. Thus, no detriment is incurred when the party's only injury is that it must pay taxes legitimately owed under the correct interpretation of the law. Nor will liability for non-punitive interest on the tax legitimately due constitute detrimental reliance. State ex rel. Arizona Dep't of Revenue v. Driggs, 189 Ariz. 74, 938 P.2d 469 (App.1996). Non-punitive interest [**1269] [*578] is, after all, nothing more than compensation for the use of money. *See, e.g.,* Dingle v. Prudential Prop. & Cas. Ins. Co., 85 N.Y.2d 657, 651 N.E.2d 883, 885, 628 N.Y.S.2d 15 (N.Y. 1995). The taxpayer had the benefit of using the funds before paying the tax claim and, in the legal sense, [***37] suffers no loss by reason of paying interest on the money it retained in its possession.

P39 A federal decision is illustrative on the question of detriment. In Schuster v. Commissioner, the Internal Revenue Service assessed a tax deficiency against Schuster, the surviving beneficiary, and the trustee bank, claiming that it erred in an earlier audit determination that the corpus of a trust was not a taxable part of the decedent's estate. Schuster was thus liable for the tax that would have been due if the audit had been correctly performed, and the bank, which had distributed the entire

corpus, was by statute jointly and severally liable. 312 F.2d 311, 318 (9th Cir. 1962). The United States Court of Appeals held that the IRS was estopped against the bank but not against Schuster:

> We are unaware of any particular detriment sustained by Schuster in reliance on the Commissioner's mistake, for she did not materially change her position in reliance on his earlier determination. But the Bank has been greatly prejudiced because of the Commissioner's mistake. After it was informed that the trust corpus was not includable in the decedent's gross estate, it distributed the corpus [***38] to the beneficiary, and thus no longer retains the property which was the subject of the deficiency. Therefore, any liability of the Bank would have to come out of its own pocket, not the corpus of the trust. This would be grossly unfair to the Bank, especially because it never enjoyed the use of the corpus but merely acted in the capacity of a trustee. It is difficult to see what additional action the Bank might have taken to protect itself from liability, faced with the beneficiary's demand for the corpus and the Commissioner's determination that it was not taxable. It is our conclusion that the Bank's equitable interest is so compelling, and the loss which it would sustain so unwarrantable, as to justify the application of the estoppel doctrine against the Commissioner.

*Id.* Thus, a detriment must involve some collateral loss other than payment of the tax due under the law as property interpreted. We note that this is precisely the type of detriment alleged in Crane and Duhame, [18] and had the law then recognized estoppel against the Department, the detriment may have been sufficient.

> 18 "It is true that during the time plaintiff was engaged in the contracting here in question he might have passed this tax on to the government had he not been misled, by an improper interpretation of the Act by the Commission, into believing no tax was due." Duhame, 65 Ariz. at 281, 179 P.2d at 260 (citing Crane).

Page 13

191 Ariz. 565, *578; 959 P.2d 1256, **1269;
1998 Ariz. LEXIS 43, ***38; 270 Ariz. Adv. Rep. 3

[***39] P40 Finally, all these requirements are conditioned by the general rule that estoppel may apply against the state only when the public interest will not be unduly damaged and when its application will not substantially and adversely affect the exercise of governmental powers. Freightways, 129 Ariz. at 248, 630 P.2d at 544. This rule requires prudence in the application of estoppel, recognizing that the state's solvency is of paramount importance and that equity will not sacrifice the fundamental welfare of the whole community to accomplish justice for the individual. *See, e.g.,* Trull Nursing Home, Inc. v. Maine Dep't of Human Serv., 461 A.2d 490, 499 (Me. 1983) ("Estoppel against the government should be 'carefully and sparingly applied,' especially where application would have an adverse impact on the public fisc.") (citations omitted)).

P41 We believe the court's comments in Schuster are appropriate here:

We recognize the force of the proposition that estoppel should be applied against the Government with utmost caution and restraint, for it is not a happy occasion when the Government's hands, performing duties in behalf of the public, are tied by the [***40] acts and conduct of particular officials in their relations with particular individuals. Estoppel has been applied against the Commissioner in limited situations, but they have usually arisen where [**1270] [*579] the Commissioner's act involved matters of a purely administrative nature. Indeed the tendency against Government estoppel is particularly strong where the official's conduct involves questions of essentially legislative significance, as where he conveys a false impression of the laws of the country. Obviously, Congress's legislative authority should not be readily subordinated to the action of a wayward or unknowledgeable administrative official. Accordingly, the general proposition has been that the estoppel doctrine is inapplicable to prevent the Commissioner from correcting a mistake of law.

But we regard this proposition as one of general application, not as embracing the

concept that the Commissioner might always correct a legal mistake regardless of the injustice which will result. It is conceivable that a person might sustain such a profound and unconscionable injury in reliance on the Commissioner's action as to require, in accordance with any sense of justice and fair [***41] play, that the Commissioner not be allowed to inflict the injury. It is to be emphasized that such situations must necessarily be rare, for the policy in favor of an efficient collection of the public revenue outweighs the policy of the estoppel doctrine in its usual and customary context. But as long as the concept of estoppel retains any validity, it is conceivable that such situations might arise.

312 F.2d at 317 (citations omitted). Such a situation arose in Schuster, and Valencia claims it made a similar case here.

B. Valencia's claim of equitable estoppel

P42 Valencia claims it advanced sufficient facts to justify vacating the tax court's grant of summary judgment in favor of the Department and to require that its cross-motion for summary judgment be granted.

1. Affirmative acts inconsistent with a claim later relied on

P43 The Department does not dispute that Deemer, its tax analyst, stated in his January 31, 1986, letter to Valencia that transportation charges were not subject to tax. To Valencia, the letter could have appeared to be the Department's official, unequivocal position on the question. If Valencia is correct on its facts, the letter [***42] was sufficient at best to create a genuine issue that the state had acted and taken a position inconsistent with its later claim that the transaction was taxable.

2. Action by a party reasonably relying on such conduct

P44 Valencia asserts that it reasonably relied on the Department's statements that the coal transportation activities were not subject to the transaction privilege tax. The Department concedes that relying on the Department's statements, Valencia did not collect the tax

Page 14

191 Ariz. 565, *579; 959 P.2d 1256, **1270;
1998 Ariz. LEXIS 43, ***42; 270 Ariz. Adv. Rep. 3

from its customer, [19] but it argues that Valencia's reliance was not reasonable. The Department argues that Valencia, a sophisticated business enterprise, should have known that Deemer's advice was wrong, or at least suspect. The Department issued three letters to Valencia. The Department asserts that the first was patently incorrect, the second stated concepts Valencia should have recognized as patently erroneous, and the third, advising that no tax applied and written after Valencia provided additional information, stated the same erroneous concepts as the second. [20] Department [**1271] [*580] also argues that Valencia's accountants, who worried that too little tax was being collected, should have put Valencia [***43] on notice that Deemer's letter was incorrect.

> 19    While the Department expressly concedes that Valencia relied on Deemer's advice, the Department also points out in a footnote facts that indicate otherwise. The Department implies that because Valencia had already sold over $ 60 million of coal by January 31, 1986, Deemer's letter did not cause Valencia's reliance. These facts, if true, present a genuine issue on the question of whether Valencia actually relied. *See* Virginia v. Washington Gas Light Co., 221 Va. 315, 269 S.E.2d 820, 826 (Va. 1980).
>
> 20    The Department also argues that the third letter is facially incorrect because it states with respect to transportation of the coal that "'title passes in New Mexico' -- which is clearly wrong because the sale of coal to Alamito occurs in Arizona at the power plant.'" However, Valencia responded in its motion papers that title to the coal passed from *the mine to Valencia* in New Mexico, and therefore the letter was not facially incorrect. We only note here that the focal point of the inquiry is not whether the letter was facially incorrect but whether the facts are such that the party asserting estoppel could not have reasonably relied on them.

[***44] P45 We cannot say as a matter of law that Valencia acted with "careless indifference to means of information reasonably at hand or ignored highly suspicious circumstances which should warn ... of danger or loss...." Suburban Pump & Water Co., 60 Ariz. at 284-85, 135 P.2d at 214. Valencia met with Department officials and made three separate inquiries regarding whether the tax applied. They were finally advised the transaction was not taxable. The fact that Valencia's accountants questioned why receipts did not reflect a greater amount of tax does not conclusively establish that Valencia should have known something was amiss because the accountants' inquiries occurred after Valencia received Deemer's letter. We cannot say it was unreasonable as a matter of law for Valencia to disregard the accountants' questions in light of the Department's stated position. Nor does the fact that the letters contained references to irrelevant concepts necessarily mean that the Department's position was patently incorrect. On the record before us, which contains none of Valencia's communications with the Department, it is not clear why such references were made. It is clear that Valencia struggled [***45] to obtain the Department's position and provided information to the Department for that purpose. On the present record, there exists a genuine question of fact whether the errors in the Department's letters gave Valencia information that made reliance unreasonable.

P46 Of course, Valencia's reliance would not have been reasonable if the law clearly precluded its theory of nontaxability. Valencia is a sophisticated taxpayer, no doubt advised by in-house and private counsel and accountants. We assume it approached the Department with considerable knowledge and understanding of the law. Were it clear that the business operations in question were subject to tax, Valencia could not in good faith assert reliance on an erroneous Department interpretation. In this connection, the Department asserts that the statute clearly imposes the tax, common sense confirms that result, and the case law is unequivocal.

P47 The statutes provide that a "transaction privilege tax" is imposed on "the volume of business transacted by persons on account of their business activities...." A.R.S. § 42-1306(A) & (C). The tax applies to "the business of selling tangible personal property at retail." A.R.S. [***46] § 42-1310.01(A) (Supp. 1995). The tax base for the sale of retail goods is "the gross proceeds of sales or gross income derived from the business." *See* Arizona State Tax Comm'n v. Garrett Corp., 79 Ariz. 389, 390, 291 P.2d 208, 209 (1955).

P48 Valencia argues, however, that the coal transportation and handling operations were nontaxable services separate and distinct from the taxable sales. "Services rendered in addition to selling tangible personal

Page 15

191 Ariz. 565, *580; 959 P.2d 1256, **1271;
1998 Ariz. LEXIS 43, ***46; 270 Ariz. Adv. Rep. 3

property at retail" are not subject to the sales tax. A.R.S. § 42-1310.01(A)(2). Therefore, the dispositive legal issue was whether it was reasonable to think that Valencia's transportation and handling operations could be deemed services separable from the sales for tax purposes.

> Where it can be readily ascertained without substantial difficulty which portion of the business is for non-taxable professional services..., the amounts in relation to the company's total taxable Arizona business are not inconsequential, and those services cannot be said to be incidental to the contracting business, the professional services are not merged for tax purposes into the taxable contracting business and are not subject to [***47] taxation.

State Tax Comm'n v. Holmes & Narver, Inc., 113 Ariz. 165, 169, 548 P.2d 1162, 1166 (1976).

P49 Thus, to be considered separable, the activities must be (1) easily ascertainable, (2) not inconsequential, and (3) not incidental to the taxable activity. Valencia maintains that the transportation and handling charges were accounted for separately, were substantial in that they comprised nearly one-half of the business, and were not incidental to the sales activities. It also argues that transportation [**1272] [*581] was both inseparable from and interwoven with the principal business.

P50 We did not grant review of Valencia's challenge to the court of appeals' ruling on the substantive issue of whether the transportation and handling operations were subject to tax. We therefore consider only whether Valencia's position was reasonable in light of the circumstances. The court of appeals' opinion is instructive on this issue. The court acknowledged that "Valencia might have been able to avoid taxation of the services by selling coal separately from the services." 189 Ariz. at 83 n.5, 938 P.2d at 478 n.5. However, the court held that the transportation and handling charges [***48] were not separate from the sales, primarily because Valencia had not entered into separate sales and transportation contracts and had failed to separately bill for those charges. *Id.* at 83, 938 P.2d at 478. But as the court of appeals' opinion indicates, it is possible to structure a transaction in such a manner as to avoid the tax. *Id.* at 83 n.5, 938 P.2d at 478 n.5. On this record,

therefore, we conclude that Valencia could have believed that it had taken sufficient measures to structure its transaction, as confirmed by Deemer's letter. In hindsight, Valencia's position was wrong, but we cannot say it was unreasonable as a matter of law. That question can be resolved only by the tax court.

P51 The Department also argues that it is inappropriate to apply estoppel in this case because, while the Department's answer to Valencia's inquiries is clearly presented in Deemer's letters, the inquiries themselves have yet to be disclosed. As the Department said in response to Valencia's petition for review, to "simply read the 'answer' without knowing the 'question' is of dubious value." No doubt this is true, but for summary judgment purposes, Valencia's factual statements are [***49] sufficient to raise a genuine issue of material fact. We note, however, that the facts, though not Valencia's conclusions, may be germane and even necessary to prove Valencia acted in good faith when dealing with the Department. Equitable estoppel will not apply in favor of a party that has misled or deceived the government into making erroneous representations. As Justice Holmes observed long ago, "Men must turn square corners when they deal with the Government." Rock Island. Arkansas & Louisiana R. Co. v. United States, 254 U.S. 141, 143, 41 S. Ct. 55, 56, 65 L. Ed. 188 (1920).

P52 Finally, the Department contends Valencia did not follow Deemer's advice, which assumed that the transportation, sales, and handling operations would be segregated in Valencia's records *and invoices.* The Department contends there was no segregation, but Valencia argues the charges were segregated when the invoices were read-in light of a tariff sheet. Again, a genuine issue of material fact exists.

3. Injury to Valencia resulting from reliance on the state's conduct

P53 Valencia presented affidavits stating that the tax would have been passed on to the customer but for reliance on the [***50] Department's advice. The Department concedes that "Valencia did not collect the tax that it could have [from its customers] because it relied upon the Department's advice...." Therefore, we only note here that the detriment incurred was substantial (about $ 5 million, not including interest) and exceeded the mere payment of a tax owed in that Valencia lost the opportunity for recoupment from its customer.

Page 16

191 Ariz. 565, *581; 959 P.2d 1256, **1272;
1998 Ariz. LEXIS 43, ***50; 270 Ariz. Adv. Rep. 3

4. The public interest

P54 Finally, we observe that on this record estopping the Department does not threaten undue damage to the public interest, nor will the application of estoppel substantially and adversely affect the exercise of governmental powers. The state's solvency has not been threatened by its inability to collect this particular tax liability, now eight years past due, from this single taxpayer. Moreover, in this case estoppel only applies retroactively to the transactions completed by Valencia; it does not impair the state from exercising its authority prospectively. Thus, there is no substantial and adverse effect on the state's taxing power.

[**1273] [*582] CONCLUSION

P55 We hold that recognition of the doctrine of equitable estoppel against the Department of Revenue [***51] in tax cases is not precluded by either article IX, § 1 or article III of the Arizona Constitution. Crane and Duhame are accordingly overruled insofar as they hold to the contrary. A taxpayer may establish the affirmative defense of estoppel against the Department of Revenue by proving the Department's conduct was inconsistent with a position later assumed, the taxpayer relied and had a right to rely on the Department's conduct, and the taxpayer therefore sustained damage that would make it unjust to allow the Department to maintain the later-taken position.

P56 On the record before us, we are unable to affirm or direct the grant of summary judgment to either party. Therefore, the court of appeals' opinion is vacated insofar as it conflicts with this opinion, the tax court's opinion is vacated, its judgment is reversed, and the case is remanded to the tax court for further action consistent with this opinion.

STANLEY G. FELDMAN, Justice

CONCURRING:

THOMAS A. ZLAKET, Chief Justice

CHARLES E. JONES, Vice Chief Justice

FREDERICK J. MARTONE, Justice

JAMES MOELLER, Justice (Retired)

APPENDIX

In discussing the background of article IX, [***52] section 1, Justice Struckmeyer said:

This proposition [Substitute Proposition No. 106] came before the Convention for discussion on Saturday morning, November 19, 1910. At that time, the Honorable George W.P. Hunt, who later became the seven-time Governor of Arizona, said:

In regard to that first section. The Committee on Taxation had a memorial gotten up by the Tax Association composed of men all over the United States who have made this a study for years, and I have on my desk here letters from nearly every professor on economics in all the universities of the country, from Harvard, in Massachusetts to Stanford, in California, and they are for anyone who wants to look at these letters. They one and all believe this is the only way to put this in the constitution, and if the members of the convention will allow me to read them a letter from Washington, which is a sample of the letters I have received, it will throw some light on the subject. It is from J.E. Frost, President of the State Board of Tax Commissioners of the State of Washington, at Olympia, Washington....

Dear Sir: I am just in receipt of a letter from the Hon. Allen R. Foote, of Columbus, Ohio, President [***53] of the International Tax

Page 17

191 Ariz. 565, *582; 959 P.2d 1256, **1273;
1998 Ariz. LEXIS 43, ***53; 270 Ariz. Adv. Rep. 3

Association, asking me to express to you my views on the subject of constitutional provisions relative to taxation.

***

The right to impose taxes is a legislative power, inherent in organized government. In the absence of constitutional limitations, a legislature may enact such tax laws as it sees fit, subject only to the restrictions contained in the constitution of the United States. Everything over which the authority of the state reaches may be the subject of taxation, whether it be person, property, or occupation.

***

There are certain safeguards, however, that should be provided: First; the legislature should be prohibited from contracting away the right to tax anything or person whatsoever, or from making any irrepealable grant of exemption.

From the content of the letter, it can be gleaned that since the legislature should be prohibited from contracting away the right to tax, the Convention intent was to accomplish the converse; that is, that the legislature would have the right to tax anything and all persons whatsoever. Viewed in this light, it would appear that by the use of the words "power of taxation," the Convention meant [***54] "the power to impose taxes."

The complete text of the Memorial referred to in the statement by the Honorable George W.P. Hunt can be found in the [**1274] [*583] report of State and Local Taxation, 5th National Conference of the National Tax Association held in Richmond, Virginia, September, 1911, pp. 451 through 457. A reading of the Memorial leads us to the conclusion that the language contained in the first sentence of Art. IX, § 1 was designed to leave legislators unencumbered in so far as their power to impose taxes. We note also from the report of the Third Conference of the same Association, p. 88, that one M.H. Carver of the Louisiana State Tax Commission is quoted as stating:

There is little necessity for putting anything at all in the constitution about taxation, and some distinguished authorities hold that everything on the subject in a constitution is dangerous. To meet the decision of the Supreme Court of the United States, though, in the Dartmouth College case [Trustees of Dartmouth College v. Woodward], 17 U.S. 518, 4 Wheat. 518, [4 L. Ed. 629], it is well to provide: "That the power of taxation shall never be suspended, surrendered or contracted away...."

[***55] 86 Ariz. at 126-27, 341 P.2d at 430-31 (footnote omitted).

General Acts
of Special Application
and
SPECIAL ACTS

ADOPTED BY THE

SECOND LEGISLATURE OF FLORIDA
UNDER THE CONSTITUTION
AS REVISED IN 1968

At Its First Regular Session
April 6 to June 4, 1971
and Special Session
June 9 to June 24, 1971.



Volume II

Published by Authority of Law
Under the Direction of
FLORIDA LEGISLATIVE PRINTING COMMITTEE
TALLAHASSEE
1971

EXHIBIT A

a~~ fee of ten dollars.~~ Photographs or microphotographs of any records made in compliance with section 608.36, *Florida Statutes,* shall be acceptable and have the same force and effect as the originals thereof. Restoration shall be effective from the date of dissolution or cancellation of permit.

(3) Should the name of the dissolved ~~corporation~~ *entity* have been lawfully appropriated by another ~~corporation~~ *entity* the applicants shall be permitted to amend the application by adopting another name and thereafter the ~~corporation~~ *entity* shall continue under the name so adopted~~,~~ *provided however, the name of the dissolved entity shall not be available for use by another entity until after the passage of one (1) year from the date of the final dissolution.*

(4) Restored ~~corporations~~ *entities* shall be subject to the ~~capital stock~~ *privilege* tax from the effective date of restoration.

Section 7. Chapter 608, Florida Statutes, is amended by adding a new section to read:

*In such cases where the department of state has caused to be made copies of any records maintained by it by miniature photographic microfilming or other processes as authorized by section 15.16, Florida Statutes, the department of state may destroy the original of said documents, pursuant to law.*

Section 8. This act shall take effect immediately upon becoming law.

Approved by the Governor December 16, 1971.

Filed in Office Secretary of State December 17, 1971.

---

## CHAPTER 71-980

### House Bill No. 30-D

AN ACT relating to taxation and finance; repealing Articles III and IV of the Multistate Tax Compact, section 213.15, Florida Statutes; repealing subparagraph 214.71(3)(a)(2), Florida Statutes; providing an effective date.

*Be It Enacted by the Legislature of the State of Florida:*

51

Section 1.   Articles III and IV of section 213.15, Florida Statutes, are hereby repealed.

Section 2.   Paragraph 214.71(3)(a), Florida Statutes, is amended to read:

214.71 Apportionment; general method.—Except as otherwise provided in sections 214.72 and 214.73, the base upon which any tax made applicable to this chapter shall be apportioned shall be determined by multiplying same by a fraction, the numerator of which is the sum of the property factor, the payroll factor and the sales factor, and the denominator of which is three (3). In the event any of the factors described in subsections (1), (2) or (3) has a denominator which is zero or is determined by the department to be insignificant, the denominator of the apportionment fraction shall be reduced by the number of such factors.

(3)   The sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this state during the taxable year or period and the denominator of which is the total sales of the taxpayer everywhere during the taxable year or period.

(a)   Sales of tangible personal property are in this state if: ~~(1)~~ the property is delivered or shipped to a purchaser within this state, regardless of the f.o.b. point or other conditions of the sale; ~~or.~~

~~(2)   the property is shipped from an office, store, warehouse, factory, or other place of storage in this state, and either the purchaser is the United States government or the taxpayer is not subject to a comparable tax on the sale in the state of the purchaser.~~

Section 3.   This act shall take effect on January 1, 1972.

Approved by the Governor December 16, 1971.

Filed in Office Secretary of State December 17, 1971.

**REVISED STATUTES OF NEBRASKA 1943 > CHAPTER 77 REVENUE AND TAXATION > ARTICLE 29 MULTISTATE TAX COMPACT**

## 77-2901 to 77-2903. Repealed

## History

Laws 1985, LB 344, § 9.

REVISED STATUTES OF NEBRASKA 1943

## *W. Va. Code Ch. 11, Art. 10A Note*

Text Current through Acts of the 2015 Regular Session with effective dates February 13, 2015 or earlier.

*Michie's* ™ *West Virginia Code* > *Chapter 11. Taxation.* > *Article 10A. West Virginia Office of Tax Appeals.*

## Article 10A. West Virginia Office of Tax Appeals.

**Annotations**

## Notes

**Editor's notes. —**

Former article ten-a, concerning the **_multistate tax compact_**, was repealed by Acts 1985, c. 160.

**Effective dates. —**

Acts *2002, c. 303*, provided that the act take effect June 6, 2002.

## Research References & Practice Aids

**Hierarchy Notes:**

*W. Va. Code Ch. 11*

Michie's ™ West Virginia Code
Copyright © 2015 Matthew Bender & Company, Inc.,
A member of the LexisNexis Group.
All rights reserved. All rights reserved.

Current with Legislation through the 2013 Second Regular Session of the 126th Legislature. The Second Regular Session convened January 8, 2014 and adjourned May 2, 2014. The general effective date is August 1, 2014

*Maine Revised Statutes* **>** *TITLE 36. TAXATION* **>** *PART 10. INTERSTATE TAX COMPACTS* **>** *CHAPTER 920. MULTISTATE TAX COMPACT* **[REPEALED]**

## §§ 7101 to 7103. Repealed. Laws 2005, c. 332, § 29

Maine Revised Statutes Annotated by LexisNexis®

# 2012 Cal SB 1015

Enacted, June 27, 2012

**Reporter**

2012 Cal ALS 37; 2012 Cal SB 1015; 2012 Cal Stats. ch. 37

**DEERING'S CALIFORNIA ADVANCE LEGISLATIVE SERVICE > 2012 REGULAR SESSION > CHAPTER 37 > (Senate Bill No. 1015)**

## Notice

⚑   Urgency legislation is effective immediately, Non-urgency legislation will become effective January 1, 2013

**Added:** Text highlighted in green

**Deleted:** Red text with a strikethrough

## Digest

**Taxation: administration.**

(1) Existing law authorizes the state to issue a withholding order for taxes to collect a state tax liability, including any penalties, accrued interest, and costs, in accordance with certain procedures. Existing law defines "state tax liability" to mean an amount for which the state has a state tax lien created pursuant to specified provisions.

This bill would expand the definition of "state tax liability" to also include any liability under the Personal Income Tax Law, the Corporation Tax Law, or specified franchise and income tax provisions that is due and payable and that is unpaid, as specified.

(2) Existing laws require the Franchise Tax Board to administer specified taxes and collect those taxes from delinquent tax debtors and requires the Franchise Tax Board, in coordination with financial institutions doing business in this state, to operate a Financial Institution Record Match System utilizing automated data exchanges to the maximum extent feasible in order to allow the Franchise Tax Board to match its list of delinquent tax debtors, as defined, with the lists provided by the financial institutions. Existing law authorizes the Franchise Tax Board to disclose specified taxpayer information for purposes of data matching, and provides that the specified use of certain data is a misdemeanor.

This bill would expand the definition of delinquent tax debtor to include a person liable for specified taxes, fees, surcharges, debts, penalties, interest, or other amounts required to be paid to the State Board of Equalization or paid or referred to the Employment Development Department, as provided. This bill would authorize the State Board of Equalization and the Employment Development Department to provide the Franchise Tax Board with information relating to delinquent tax debtors, would allow that information to be used in the collection of delinquent amounts under the Financial Institution Record Match System (FIRM), and would require the State Board of Equalization and the Employment Development Department to reimburse the Franchise Tax Board for its costs in the implementation and administration of FIRM.

EDWARD BEEBY

By expanding the definition of an existing crime, this bill would impose a state-mandated local program.

(3) Existing law has enacted the **_Multistate Tax Compact_**, which contains provisions regarding state tax laws, forms the Multistate Tax Commission, and requires the budget of the Multistate Tax Commission to be funded by party states. Existing law provides that, notwithstanding the provisions of the **_Multistate Tax Compact_**, including a provision that would allow a taxpayer to apportion its business income in accordance with a specified 3-factor formula, business income derived from or attributable to sources both within and without this state shall be apportioned between this state and other states and foreign countries in accordance with a specified 4-factor formula based on the property, payroll, and sales within and without this state, except that in the case of an apportioning trade or business that derives more than 50% of its gross business receipts from conducting one or more qualified business activities, as defined, business income is apportioned in accordance with a specified 3-factor formula. That law, for taxable years beginning on or after January 1, 2011, allows a taxpayer to apportion its income in accordance with a single sales factor formula, except as provided, pursuant to an irrevocable annual election, as specified.

This bill would repeal all provisions related to the **_Multistate Tax Compact_**. This bill would find and declare that the doctrine of election provides that an election affecting the computation of tax must be made on an original timely filed return for the taxable period for which the election is to apply and once made is binding, and that the doctrine of election applies to any election that affects the computation of tax, as specified, which does not constitute a change in, but is declaratory of, existing law. This bill would also provide that the repeal of the **_Multistate Tax Compact_** in this bill shall not be construed to create any inference that a change in interpretation with respect to the compact or any reference to the compact prior to its repeal is implied by this bill.

(4) This bill would appropriate $1,000 from the General Fund to the Franchise Tax Board for administrative costs.

(5) The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

(6) This bill would declare that it is to take effect immediately as a bill providing for appropriations related to the Budget Bill.

Appropriation: yes.

## Synopsis

An act to amend _Section 706.070 of the Code of Civil Procedure_, and to amend Section 19266 of, and to repeal Part 18 (commencing with _Section 38001) of Division 2 of, the Revenue and Taxation Code_, relating to taxation, and making an appropriation therefor, to take effect immediately, bill related to the budget.

EDWARD BEEBY

## Text

*The people of the State of California do enact as follows:*

**SECTION 1.** *Section 706.070 of the Code of Civil Procedure* is amended to read:

§ 706.070.

As used in this article:

(a) "State" means the State of California and includes any officer, department, board, or agency thereof.

(b) "State tax liability" means an amount for which the state has a state tax lien as defined in *Section 7162 of the Government Code* excluding a state tax lien created pursuant to the Fish and Game Code. (C) FOR PURPOSES OF AN EARNINGS WITHHOLDING ORDER FOR TAXES ISSUED BY THE FRANCHISE TAX BOARD, "STATE TAX LIABILITY" ALSO INCLUDES ANY LIABILITY UNDER PART 10 (COMMENCING WITH SECTION 17001), PART 10.2 (COMMENCING WITH SECTION 18401), OR PART 11 (COMMENCING WITH SECTION 23001) OF DIVISION 2 OF THE REVENUE AND TAXATION CODE THAT IS DUE AND PAYABLE WITHIN THE MEANING OF SUBDIVISION (B) OF SECTION 19221 OF THE REVENUE AND TAXATION CODE, AND UNPAID. THE AMENDMENTS TO THIS SECTION BY THE ACT ADDING THIS SUBDIVISION SHALL APPLY TO ANY AMOUNT THAT IS UNPAID ON OR AFTER THE EFFECTIVE DATE OF THAT ACT, OR ANY AMOUNT THAT FIRST BECOMES DUE AND PAYABLE, AND UNPAID, AFTER THE EFFECTIVE DATE OF THAT ACT.

**SEC. 2.** *Section 19266 of the Revenue and Taxation Code* is amended to read:

§ 19266.

(a)

(1) The Franchise Tax Board, in coordination with financial institutions doing business in this state, shall operate a Financial Institution Record Match System utilizing automated data exchanges to the maximum extent feasible.

(2) The Franchise Tax Board shall prescribe any rules and regulations that may be necessary or appropriate to implement this section. These rules and regulations shall include all of the following:

(A) A structure by which financial institutions, or their designated data-processing agents, shall receive from the Franchise Tax Board the file or files of delinquent debtors that the institution shall match with its own list of accountholders to identify delinquent tax debtor accountholders at the institution.

(B) An option by which financial institutions without the technical ability to process the data exchange, or without the ability to employ a third-party data processor to process the data exchange, may forward to the Franchise Tax Board a list of all accountholders and their social security numbers or other taxpayer identification numbers, so that the Franchise Tax Board shall match that list with the file or files

of delinquent tax debtors.

 (C)  Authority for the Franchise Tax Board to exempt a financial institution from the requirements of this section if the Franchise Tax Board determines that the financial institution participation would not generate sufficient revenue to be cost effective for the Franchise Tax Board.

(D)  Authority for the Franchise Tax Board to temporarily suspend the requirements of this section for a financial institution if the financial institution provides the Franchise Tax Board with a written notice from its supervisory banking authority that it is determined to be undercapitalized, significantly undercapitalized, or critically undercapitalized as defined by FDIC Regulation 325.103(b)(3), (4), and (5) or NCUA Regulation 702.102. The notice provided pursuant to this subparagraph shall be subject to the protections of Section 19542.

(b) The Financial Institution Record Match System shall not be subject to any limitation set forth in Chapter 20 (commencing with *Section 7460) of Division 7 of Title 1 of the Government Code.* However, any use of the information provided pursuant to this section for any purpose other than the collection of ~~delinquent franchise or income tax or other debts referred to the Franchise Tax Board for collection, as imposed under Part 5 (commencing with Section 10701), Part 10 (commencing with Section 17001), Part 10.2 (commencing with Section 18401), or Part 11 (commencing with Section 23001)~~ AMOUNTS IDENTIFIED IN PARAGRAPHS (1), (2), AND (3) shall be a violation of Section 19542. (1)    DELINQUENT AMOUNTS DUE THE BOARD, AS IMPOSED UNDER PART 1 (COMMENCING WITH SECTION 6001), PART 1.5 (COMMENCING WITH SECTION 7200), PART 1.6 (COMMENCING WITH SECTION 7251), PART 1.7 (COMMENCING WITH SECTION 7280), PART 3 (COMMENCING WITH SECTION 8601), PART 3.5 (COMMENCING WITH SECTION 9401), PART 6 (COMMENCING WITH SECTION 11201), PART 13 (COMMENCING WITH SECTION 30001), PART 14 (COMMENCING WITH SECTION 32001), PART 18.5 (COMMENCING WITH SECTION 38101), PART 19 (COMMENCING WITH SECTION 40001), PART 20 (COMMENCING WITH SECTION 41001), PART 22 (COMMENCING WITH SECTION 43001), PART 22.5 (COMMENCING WITH SECTION 44000), PART 23 (COMMENCING WITH SECTION 45001), PART 24 (COMMENCING WITH SECTION 46001), PART 26 (COMMENCING WITH SECTION 50101), PART 30 (COMMENCING WITH SECTION 55001), OR PART 31 (COMMENCING WITH SECTION 60001).    (2)    DELINQUENT AMOUNTS DUE THE EMPLOYMENT DEVELOPMENT DEPARTMENT, AS IMPOSED UNDER THE UNEMPLOYMENT INSURANCE CODE, OR OTHER DEBTS OR PENALTY ASSESSMENTS REFERRED TO THE EMPLOYMENT DEVELOPMENT DEPARTMENT FOR COLLECTION.  (3)    DELINQUENT FRANCHISE OR INCOME TAX OR OTHER DEBTS REFERRED TO THE FRANCHISE TAX BOARD FOR COLLECTION, AS IMPOSED UNDER PART 5 (COMMENCING WITH SECTION 10701), PART 10 (COMMENCING WITH SECTION 17001), PART 10.2 (COMMENCING WITH SECTION 18401), OR PART 11 (COMMENCING WITH SECTION 23001).

EDWARD BEEBY

**(c)**

 **(1)** To effectuate the Financial Institution Record Match System, financial institutions subject to this section shall provide to the Franchise Tax Board on a quarterly basis the name, record address, and other addresses, social security number or other taxpayer identification number, and other identifying information for each delinquent tax debtor, as identified by the Franchise Tax Board by name and social security number or other taxpayer identification number, who maintains an account at the institution.

 **(2)** The first data file created by the Franchise Tax Board for purposes of matching tax debtor records to financial institution accountholder records shall be limited to 600,000 tax debtor records. The number of tax debtor records included in a subsequent data file created by the Franchise Tax Board may be increased by no more than 600,000 tax debtor records greater than the number of tax debtor records included in the immediately preceding data file until all eligible tax debtor records are included in the data match file.

**(d)** Unless otherwise required by law, a financial institution furnishing a report or providing information to the Franchise Tax Board pursuant to this section shall not disclose to a depositor or an accountholder, or a codepositor or coaccountholder, that the name, address, social security number or other taxpayer identification number, or other identifying information of that delinquent tax debtor has been received from or furnished to the Franchise Tax Board.

**(e)** A financial institution shall incur no obligation or liability to any person arising from any of the following:

 **(1)** Furnishing information to the Franchise Tax Board as required by this section.

 **(2)** Failing to disclose to a depositor or accountholder that the name, address, social security number or other taxpayer identification number, or other identifying information of that delinquent tax debtor was included in the data exchange with the Franchise Tax Board required by this section.

 **(3)** Any other action taken in good faith to comply with the requirements of this section.

**(f)** The Franchise Tax Board may institute civil proceedings to enforce this section.

**(g)** Any financial institution that willfully fails to comply with the rules and regulations promulgated by the Franchise Tax Board for the administration of delinquent tax collections, unless it is shown to the satisfaction of the Franchise Tax Board that the failure is due to reasonable cause, shall be assessed a penalty upon notice and demand of the Franchise Tax Board and collected in the same manner as tax. The penalty imposed under this section shall be in an amount equal to fifty dollars ($50) for each record not provided, but the total imposed on that financial institution for all such failures during any calendar year shall not exceed one hundred thousand dollars ($100,000).

**(h)** For purposes of this section:

 **(1)** "Account" means a demand deposit account, share or share draft account, checking or negotiable withdrawal order account, savings account, time deposit account, or money market mutual fund account, regardless of whether the account bears interest.

**(2)** ″Financial institution″ means:

**(A)** A depository institution, as defined in Section 1813(c) of Title 12 of the United States Code.

**(B)** An institution-affiliated party, as defined in Section 1813(u) of Title 12 of the United States Code.

**(C)** A federal credit union or state credit union, as defined in Section 1752 of Title 12 of the United States Code, including an institution-affiliated party of a credit union, as defined in Section 1786(r) of Title 12 of the United States Code.

**(D)** A benefit association, insurance company, safe deposit company, money-market fund, or similar entity authorized to do business in this state.

(3) ″Delinquent tax debtor″ means any OF THE FOLLOWING: (A) ANY PERSON LIABLE FOR ANY TAX, FEE, OR SURCHARGE AMOUNTS, AND ANY PENALTY, INTEREST, OR OTHER AMOUNTS REQUIRED TO BE PAID TO THE BOARD, WHERE THE LIABILITY REMAINS UNPAID AFTER 30 DAYS FROM DEMAND FOR PAYMENT BY THE BOARD, AND THE PERSON IS NOT MAKING CURRENT TIMELY INSTALLMENT PAYMENTS ON THE LIABILITY UNDER AN INSTALLMENT PAYMENT AGREEMENT AS PROVIDED BY LAW. (B) ANY PERSON LIABLE FOR ANY AMOUNTS REQUIRED TO BE PAID TO THE EMPLOYMENT DEVELOPMENT DEPARTMENT OR FOR ANY DEBTS OR PENALTY ASSESSMENTS REFERRED TO THE EMPLOYMENT DEVELOPMENT DEPARTMENT FOR COLLECTION AND THE PERSON IS NOT MAKING CURRENT TIMELY INSTALLMENT PAYMENTS ON THE LIABILITY UNDER AN APPROVED INSTALLMENT PAYMENT AGREEMENT AS PROVIDED BY LAW. (C) ANY person liable for any income or franchise tax or other debt referred to the Franchise Tax Board for collection as imposed under Part 5 (commencing with Section 10701), Part 10 (commencing with Section 17001), Part 10.2 (commencing with Section 18401), or Part 11 (commencing with Section 23001), including tax, penalties, interest, and fees, where the tax or debt, including the amount, if any, referred to the Franchise Tax Board for collection remains unpaid after 30 days from demand for payment by the Franchise Tax Board, and the person is not making current timely installment payments on the liability under an agreement pursuant to Section 19006 19008 .

**(i)** A financial institution shall be reimbursed by the Franchise Tax Board for actual costs incurred to implement the provisions of this section. Upon receipt of an invoice from the financial institution, cost reimbursement by the Franchise Tax Board shall be limited to the following:

**(1)** For one-time startup costs of a financial institution, no more than two thousand five hundred dollars ($2,500).

**(2)** For data matching costs of a financial institution, other than one-time startup costs, no more than two hundred fifty dollars ($250) per calendar quarter.

**(j)** The first data exchange for purposes of matching tax debtor records to financial institution

accountholder records shall occur no earlier than April 1, 2012.

(k) This section shall be operative 120 days after the effective date of the act adding this section and shall apply with respect to persons that are delinquent tax debtors on and after that date. (1) NOTWITHSTANDING ANY OTHER PROVISION OF LAW, ON OR AFTER JANUARY 1, 2013, AND ON A QUARTERLY BASIS THEREAFTER, THE BOARD AND THE EMPLOYMENT DEVELOPMENT DEPARTMENT SHALL, IN THE FORMAT AND MANNER SPECIFIED BY THE FRANCHISE TAX BOARD, PROVIDE THEIR RESPECTIVE DELINQUENT TAX DEBTOR INFORMATION TO THE FRANCHISE TAX BOARD FOR INCLUSION IN THE FINANCIAL INSTITUTIONS RECORDS MATCH SYSTEM. (2) THE FRANCHISE TAX BOARD SHALL INCLUDE THE DELINQUENT TAX DEBTOR INFORMATION PROVIDED BY THE BOARD AND THE EMPLOYMENT DEVELOPMENT DEPARTMENT IN ITS DATA FILE USED TO MATCH DELINQUENT TAX DEBTOR RECORDS TO FINANCIAL INSTITUTION ACCOUNTHOLDER RECORDS. (3) THE FRANCHISE TAX BOARD SHALL PROVIDE THE BOARD OR THE EMPLOYMENT DEVELOPMENT DEPARTMENT, AS APPLICABLE, WITH ANY MATCHED FINANCIAL INSTITUTION ACCOUNTHOLDER RECORD INFORMATION RESULTING FROM THE DELINQUENT TAX DEBTOR INFORMATION PROVIDED BY THE BOARD OR THE EMPLOYMENT DEVELOPMENT DEPARTMENT. (4) THE BOARD AND THE EMPLOYMENT DEVELOPMENT DEPARTMENT SHALL REIMBURSE THE FRANCHISE TAX BOARD FOR ANY COSTS INCURRED BY THE FRANCHISE TAX BOARD RELATED TO THE IMPLEMENTATION AND ADMINISTRATION OF THIS SECTION WITH RESPECT TO DELINQUENT TAX DEBTORS DESCRIBED IN SUBPARAGRAPH (A) OR (B), RESPECTIVELY, OF PARAGRAPH (3) OF SUBDIVISION (H).

**SEC. 3.** Part 18 (commencing with *Section 38001) of Division 2 of the Revenue and Taxation Code* is repealed.

**SEC. 4.**

The Legislature finds and declares the following:

**(a)** The doctrine of election (see generally Pacific Nat. Co. v. Welch (1938) *304 U.S. 191),* provides that an election affecting the computation of tax must be made on an original timely filed return for the taxable period for which the election is to apply and once made is binding.

**(b)** The doctrine of election described in subdivision (a) applies to any election that affects the computation of tax under Part 10 (commencing with Section 17001), Part 10.2 (commencing with Section 18401), and Part 11 (commencing with *Section 23001) of Division 2 of the Revenue and Taxation Code*, unless otherwise provided.

**(c)** Subdivision (b) does not constitute a change in, but is declaratory of, existing law.

**SEC. 5.**

The repeal of Part 18 (commencing with *Section 38001) of Division 2 of the Revenue and Taxation Code* in Section 3 of this act shall not be construed to create any inference that a change in

EDWARD BEEBY

interpretation with respect to that part, or any reference to that part, prior to its repeal is implied by this act.

**SEC. 6.**

There is hereby appropriated one thousand dollars ($1,000) from the General Fund to the Franchise Tax Board for administrative costs.

**SEC. 7.**

No reimbursement is required by this act pursuant to *Section 6 of Article XIII B of the California Constitution* because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of *Section 17556 of the Government Code*, or changes the definition of a crime within the meaning of *Section 6 of Article XIII B of the California Constitution.*

**SEC. 8.**

This act is a bill providing for appropriations related to the Budget Bill within the meaning of subdivision (e) of *Section 12 of Article IV of the California Constitution*, has been identified as related to the budget in the Budget Bill, and shall take effect immediately.

## History

Approved by Governor June 27, 2012.

Filed with Secretary of State June 27, 2012.

DEERING'S CALIFORNIA ADVANCE LEGISLATIVE SERVICE

Copyright © 2015 Matthew Bender & Company, Inc. a member of the LexisNexis Group. All rights reserved.

Checkpoint Contents

  State & Local Tax Library

   State Legislation

    Prior Legislative Sessions

     2013

      Full Text of Prior Enacted Legislation

       Minnesota

        House

         2013 MN H 6 - 2013 MN H 1444

          **2013 MN H 677, Adopted**

*2013 Minnesota House File No. 677, Minnesota First Regular Session of the Eighty-Eighth Legislative Session*

TITLE: Omnibus Tax Bill.

*Author:* Lenczewski, Skoe
*Version:* Adopted
*Version date:* 20130523

Changes are annotated clearly to make it easy to review modifications. See the color scheme listed below.

     A. <span style="color:red">**[D] Text Deleted [D]**</span>

     B. <span style="color:green">**[A] Text Added [A]**</span>

     C. **[V] Text Vetoed [V]**

## Full Text

TEXT: Minnesota Office of the Revisor of Statutes HF 677 4th Engrossment - 88th Legislature (2013 - 2014) Posted on 05/21/2013 02:49pm Bill Text Versions Engrossments Introduction Pdf Posted on 02/21/2013 1st Engrossment Pdf Posted on 04/18/2013 2nd Engrossment Pdf Posted on 04/20/2013 3rd Engrossment Pdf Posted on 04/24/2013 4th Engrossment Pdf Posted on 05/21/2013 Unofficial Engrossments 1st Unofficial Engrossment Pdf Posted on 04/30/2013 Conference Committee Reports LS88-CCR-HF0677 Pdf Posted on 05/19/2013

A bill for an act relating to financing and operation of state and local government; making changes to individual income, corporate franchise, property, sales and use, estate, mineral, tobacco, alcohol, special, local, and other taxes and tax-related provisions modifying the property tax refund; changing property tax aids and credits; modifying the Sustainable Forest Incentive Act; modifying education aids and levies; providing additional pension funding; modifying definitions and distributions for property taxes; providing for property tax exemptions; modifying the payment in lieu of tax provisions; modifying education aids and levies; modifying tobacco tax provisions; making changes to additions and subtractions from federal taxable income; providing for federal conformity; changing income tax rates for individuals, estates, and trusts; providing income tax credits; modifying estate tax provisions; providing for a state gift tax; expanding the sales tax base; modifying the duty to collect and remit sales taxes for certain sellers; imposing the sales tax on digital products and selected services; modifying the definition of sale and purchase; modifying provisions for the rental motor vehicle tax rate; providing for multiple points of use certificates; modifying sales tax exemptions; authorizing local sales taxes; authorizing economic development powers; modifying tax increment financing rules; providing authority, organization, powers, duties, and requiring a prevailing wage for development of a Destination Medical Center; authorizing state infrastructure aid; modifying the distribution of taconite production taxes; authorizing taconite production tax bonds for grants to school districts; modifying and providing provisions for public finance; providing funding for legislative office facilities; modifying the definition of market value for tax, debt, and other purposes; making conforming, policy, and technical changes to tax provisions; requiring studies and reports; appropriating money;amending Minnesota Statutes 2012, sections 13.792; 16A.46; 16A.727; 38.18; 40A.15, subdivision 2; 69.011, subdivision 1; 69.021, subdivisions 7, 8; 88.51, subdivision 3; 103B.102 , subdivision 3; 103B.245 , subdivision 3; 103B.251 , subdivision 8; 103B.335 ; 103B.3369 , subdivision 5; 103B.635 , subdivision 2; 103B.691 , subdivision 2; 103C.501 , subdivision 4; 103D.905 , subdivisions 2, 3, 8; 103F.405 , subdivision 1; 116J.8737 , subdivisions 1, 2, 8; 117.025 , subdivision 7; 118A.04 , subdivision 3; 118A.05 , subdivision 5; 123A.455 , subdivision 1; 126C.10 , subdivision 1, by adding a subdivision; 126C.13 , subdivision 4; 126C.17 ; 126C.48 , subdivision 8; 127A.48 , subdivision 1; 138.053 ; 144F.01 , subdivision 4; 162.07 , subdivisions 3, 4; 163.04 , subdivision 3; 163.06 , subdivision 6; 165.10 , subdivision 1; 168.012 , subdivision 9, by adding a subdivision; 216C.436 , subdivision 7; 237.52 , subdivision 3, by adding a subdivision; 270.077 ; 270.41 , subdivisions 3, 5, by adding a subdivision; 270.45 ; 270B.01 , subdivision 8; 270B.03 , subdivision 1; 270B.12 , subdivision 4; 270C.03 , subdivision 1; 270C.34 , subdivision 1; 270C.38 , subdivision 1; 270C.42 , subdivision 2; 270C.56 , subdivision 1; 271.06 , subdivision 2a, as added; 272.01 , subdivision 2; 272.02 , subdivisions 39, 97, by adding subdivisions; 272.03 , subdivision 9, by adding subdivisions; 273.032 ; 273.061 , subdivision 2; 273.0645 ; 273.11 , subdivision 1; 273.114 , subdivision 6; 273.117 ; 273.124 , subdivisions 3a, 13; 273.13 , subdivisions 21b, 23, 25; 273.1398 , subdivisions 3, 4; 273.19 , subdivision 1; 273.372 , subdivision 4; 273.39 ; 275.011 , subdivision 1; 275.077 , subdivision 2; 275.71 , subdivision 4; 276.04 , subdivision 2; 276A.01 , subdivisions 10, 12, 13, 15; 276A.06 , subdivision 10; 279.01 , subdivision 1, by adding a subdivision; 279.02 ; 279.06 , subdivision 1; 279.37 , subdivisions 1a, 2; 281.14 ; 281.17 ; 287.05 , by adding a subdivision; 287.08 ; 287.20 , by adding a subdivision; 287.23 , subdivision 1; 287.385 , subdivision 7; 289A.08 , subdivision 3; 289A.10 , subdivision 1, by adding a subdivision;

289A.12 , subdivision 14, by adding a subdivision; 289A.18 , by adding a subdivision; 289A.20 , subdivisions 3, 4, by adding a subdivision; 289A.26 , subdivisions 3, 4, 7, 9; 289A.55 , subdivision 9; 289A.60 , subdivision 4; 290.01 , subdivisions 19, as amended, 19b, 19c, 19d; 290.06 , subdivisions 2c, 2d, by adding a subdivision; 290.0677 , subdivision 2; 290.068 , subdivisions 3, 6a; 290.0681 , subdivisions 1, 3, 4, 5, 10; 290.091 , subdivisions 1, 2, 6; 290.0921 , subdivision 3; 290.0922 , subdivision 1; 290.095 , subdivision 2; 290.10 , subdivision 1; 290.17 , subdivision 4; 290.191 , subdivision 5; 290.21 , subdivision 4; 290.9705 , subdivision 1; 290A.03 , subdivision 3; 290A.04 , subdivisions 2, 2a, 4; 290B.04 , subdivision 2; 290C.02 , subdivision 6; 290C.03 ; 290C.055 ; 290C.07 ; 291.005 , subdivision 1; 291.03 , subdivisions 1, 8, 9, 10, 11, by adding a subdivision; 296A.01 , subdivisions 7, 8, 14, 19, 20, 23, 24, 26, by adding a subdivision; 296A.09 , subdivision 2; 296A.17 , subdivision 3; 296A.22 , subdivisions 1, 3; 297A.61 , subdivisions 3, 4, 10, 25, 38, 45, by adding subdivisions; 297A.64 , subdivision 1; 297A.66 , subdivision 3, by adding a subdivision; 297A.665 ; 297A.668 , by adding a subdivision; 297A.67 , subdivisions 7, 13, by adding a subdivision; 297A.68 , subdivisions 2, 5, 42, by adding a subdivision; 297A.70 , subdivisions 2, 4, 5, 7, 13, 14, by adding subdivisions; 297A.71 , by adding subdivisions; 297A.75 , subdivisions 1, 2, 3; 297A.82 , subdivision 4, by adding a subdivision; 297A.99 , subdivision 1; 297B.11 ; 297E.021 , subdivision 3; 297E.14 , subdivision 7; 297F.01 , subdivisions 3, 19, 23, by adding subdivisions; 297F.05 , subdivisions 1, 3, 4, by adding subdivisions; 297F.09 , subdivision 9; 297F.18 , subdivision 7; 297F.24 , subdivision 1; 297F.25 , subdivision 1; 297G.04 , subdivision 2; 297G.09 , subdivision 8; 297G.17 , subdivision 7; 297I.05 , subdivisions 7, 11, 12; 297I.30 , subdivisions 1, 2; 297I.80 , subdivision 1; 298.01 , subdivisions 3, 3b; 298.018 ; 298.17 ; 298.227 , as amended; 298.24 , subdivision 1; 298.28 , subdivisions 4, 6, 9c, 10; 325D.32 , subdivision 2; 325F.781 , subdivision 1; 349.166 , subdivision 1; 353G.08 , subdivision 2; 360.531 ; 360.66 ; 365.025 , subdivision 4; 366.095 , subdivision 1; 366.27 ; 368.01 , subdivision 23; 368.47 ; 370.01 ; 373.01 , subdivisions 1, 3; 373.40 , subdivisions 1, 2, 4; 375.167 , subdivision 1; 375.18 , subdivision 3; 375.555 ; 383A.80 , subdivision 4; 383B.152 ; 383B.245 ; 383B.73 , subdivision 1; 383B.80 , subdivision 4; 383D.41 , by adding a subdivision; 383E.20 ; 383E.23 ; 385.31 ; 394.36 , subdivision 1; 398A.04 , subdivision 8; 401.05 , subdivision 3; 403.02 , subdivision 21, by adding subdivisions; 403.06 , subdivision 1a; 403.11 , subdivision 1, by adding subdivisions; 410.32 ; 412.221 , subdivision 2; 412.301 ; 428A.02 , subdivision 1; 428A.101 ; 428A.21 ; 430.102 , subdivision 2; 447.10 ; 450.19 ; 450.25 ; 458A.10 ; 458A.31 , subdivision 1; 465.04 ; 469.033 , subdivision 6; 469.034 , subdivision 2; 469.053 , subdivisions 4, 4a, 6; 469.071 , subdivision 5; 469.107 , subdivision 1; 469.169 , by adding a subdivision; 469.176 , subdivisions 4c, 4g, 6; 469.177 , subdivisions 1a, 9, by adding subdivisions; 469.180 , subdivision 2; 469.187 ; 469.206 ; 469.319 , subdivision 4; 469.340 , subdivision 4; 471.24 ; 471.571 , subdivisions 1, 2; 471.73 ; 473.325 , subdivision 2; 473.39 , by adding a subdivision; 473.606 , subdivision 3; 473.629 ; 473.661 , subdivision 3; 473.667 , subdivision 9; 473.671 ; 473.711 , subdivision 2a; 473F.02 , subdivisions 12, 14, 15, 23; 473F.08 , subdivisions 3a, 10, by adding a subdivision; 474A.04 , subdivision 1a; 474A.062 ; 474A.091 , subdivision 3a; 475.521 , subdivisions 1, 2, 4; 475.53 , subdivisions 1, 3, 4; 475.58 , subdivisions 2, 3b; 475.73 , subdivision 1; 477A.011 , subdivisions 20, 30, 34, 42, by adding subdivisions; 477A.0124 , subdivision 2; 477A.013 , subdivisions 1, 8, 9, by adding a subdivision; 477A.015 ; 477A.03 , subdivisions 2a, 2b, by adding a subdivision; 477A.11 , subdivisions 3, 4, by adding subdivisions; 477A.12 , subdivisions 1, 2, 3; 477A.14 , subdivision 1, by adding a subdivision; 641.23 ; 641.24 ; 645.44 , by

adding a subdivision; Laws 1971, chapter 773, section 1, subdivision 2, as amended; Laws 1988, chapter 645, section 3, as amended; Laws 1993, chapter 375, article 9, section 46, subdivisions 2, as amended, 5, as amended; Laws 1998, chapter 389, article 8, section 43, subdivisions 1, 3, as amended, 5, as amended; Laws 1999, chapter 243, article 6, section 11; Laws 2002, chapter 377, article 3, section 25, as amended; Laws 2005, First Special Session chapter 3, article 5, section 37, subdivisions 2, 4; Laws 2006, chapter 259, article 11, section 3, as amended; Laws 2008, chapter 366, article 5, sections 26; 33; 34, as amended; article 7, section 19, subdivision 3, as amended; Laws 2009, chapter 88, article 2, section 46, subdivisions 1, 3; Laws 2010, chapter 216, sections 11; 55; Laws 2010, chapter 389, article 1, section 12; article 5, section 6, subdivision 6; proposing coding for new law in Minnesota Statutes, chapters 116J; 116V; 124D; 136A; 270C; 287; 290A; 292; 403; 423A; 469; 477A; repealing Minnesota Statutes 2012, sections 16A.725; 97A.061; 256.9658 ; 272.69 ; 273.11 , subdivisions 1a, 22; 276A.01 , subdivision 11; 289A.60 , subdivision 31; 290.01 , subdivision 6b; 290.06 , subdivision 22a; 290.0921 , subdivision 7; 290.171 ; 290.173 ; 290.174 ; 297A.61 , subdivision 27; 297A.68 , subdivision 35; 473F.02 , subdivision 13; 477A.011 , subdivisions 2a, 19, 21, 29, 31, 32, 33, 36, 39, 40, 41; 477A.013 , subdivisions 11, 12; 477A.0133 ; 477A.0134 ; Laws 1973, chapter 567, section 7, as amended; Laws 2009, chapter 88, article 4, section 23, as amended.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MINNESOTA: ARTICLE 1 HOMESTEAD CREDIT REFUND AND RENTER PROPERTY TAX REFUND

Section 1. AMEND Minnesota Statutes 2012, section 290A.03, subdivision 3 , is amended to read: Subd. 3. Income. (1) "Income" means the sum of the following:

(a) federal adjusted gross income as defined in the Internal Revenue Code; and

(b) the sum of the following amounts to the extent not included in clause (a):

(i) all nontaxable income;

(ii) the amount of a passive activity loss that is not disallowed as a result of section 469, paragraph (i) or (m) of the Internal Revenue Code and the amount of passive activity loss carryover allowed under section 469(b) of the Internal Revenue Code;

(iii) an amount equal to the total of any discharge of qualified farm indebtedness of a solvent individual excluded from gross income under section 108(g) of the Internal Revenue Code;

(iv) cash public assistance and relief;

(v) any pension or annuity (including railroad retirement benefits, all payments received under the federal Social Security Act, Supplemental Security Income, and veterans benefits), which was not exclusively funded by the claimant or spouse, or which was funded exclusively by the claimant or spouse and which funding payments were excluded from federal adjusted gross income in the years when the payments were made;

(vi) interest received from the federal or a state government or any instrumentality or political subdivision thereof;

(vii) workers' compensation;

(viii) nontaxable strike benefits;

(ix) the gross amounts of payments received in the nature of disability income or sick pay as a result of accident, sickness, or other disability, whether funded through insurance or otherwise;

(x) a lump-sum distribution under section 402(e)(3) of the Internal Revenue Code of 1986, as amended through December 31, 1995;

(xi) contributions made by the claimant to an individual retirement account, including a qualified voluntary employee contribution; simplified employee pension plan; self-employed retirement plan; cash or deferred arrangement plan under section 401(k) of the Internal Revenue Code; or deferred compensation

plan under section 457 of the Internal Revenue Code [A>, to the extent the

sum of amounts exceeds the retirement base amount for the claimant and spouse <A];

(xii) [A>to the extent not included in federal adjusted gross income,

distributions received by the claimant or spouse from a traditional or Roth style retirement account or plan; <A]

[A>(xiii) <A] nontaxable scholarship or fellowship grants;

[D>(xiii) <D]

[A>(xiv) <A] the amount of deduction allowed under section 199 of the Internal Revenue Code;

[D>(xiv) <D]

[A>(xv) <A] the amount of deduction allowed under section 220 or 223 of the Internal Revenue Code;

[D>(xv) <D]

[A>(xvi) <A] the amount [D>of <D]

[A>deducted for <A] tuition expenses

[D>required to be added to income under section 290.01, subdivision 19 a , clause (12); <D] [A>under section 222 of the Internal Revenue Code; and <A]

[D>(xvi) <D]

[A>(xvii) <A] the amount deducted for certain expenses of elementary and secondary school teachers under section 62(a)(2)(D) of the Internal Revenue

Code
    [D>; and <D]

[A>. <A]

[D>(xvii) unemployment compensation. <D] In the case of an individual who files an income tax return on a fiscal year basis, the term "federal adjusted gross income" shall mean federal adjusted gross income reflected in the fiscal year ending in the calendar year. Federal adjusted gross income shall not be reduced by the amount of a net operating loss carryback or carryforward or a capital loss carryback or carryforward allowed for the year.

(2) "Income" does not include:

(a) amounts excluded pursuant to the Internal Revenue Code, sections 101(a) and 102;

(b) amounts of any pension or annuity which was exclusively funded by the claimant or spouse and which funding payments were not excluded from federal adjusted gross income in the years when the payments were made;

(c)
    [A>to the extent included in federal adjusted gross income, amounts

contributed by the claimant or spouse to a traditional or Roth style retirement account or plan, but not to exceed the retirement base amount reduced by the amount of contributions excluded from federal adjusted gross income, but not less than zero; <A]

[A>(d) <A] surplus food or other relief in kind supplied by a governmental agency;

[D>(d) <D]

[A>(e) <A] relief granted under this chapter;

[D>(e) <D]

[A>(f) <A] child support payments received under a temporary or final decree of dissolution or legal separation; or

[D>(f) <D]

[A>(g) <A] restitution payments received by eligible individuals and excludable interest as defined in section 803 of the Economic Growth and Tax Relief Reconciliation Act of 2001, Public Law 107-16.

(3) The sum of the following amounts may be subtracted from income:

(a) for the claimant's first dependent, the exemption amount multiplied by 1.4;

(b) for the claimant's second dependent, the exemption amount multiplied by 1.3;

(c) for the claimant's third dependent, the exemption amount multiplied by 1.2;

(d) for the claimant's fourth dependent, the exemption amount multiplied by 1.1;

(e) for the claimant's fifth dependent, the exemption amount; and

(f) if the claimant or claimant's spouse was disabled or attained the age of 65 on or before December 31 of the year for which the taxes were levied or rent paid, the exemption amount. For purposes of this subdivision, the "exemption amount" means the exemption amount under section 151(d) of the Internal Revenue Code for the taxable year

```
for which the income is reported
    [A>; "retirement base amount" means the
```

deductible amount for the taxable year for the claimant and spouse under section 219(b)(5)(A) of the Internal Revenue Code, adjusted for inflation as provided in section 219(b)(5)(D) of the Internal Revenue Code, without regard to whether the claimant or spouse claimed a deduction; and "traditional or Roth style retirement account or plan" means retirement plans under sections 401, 403, 408, 408A, and 457 of the Internal Revenue Code <A].

[A>EFFECTIVE DATE. This section is effective beginning with refunds based on property taxes payable in 2014 and rent paid in 2013. <A]

Sec. 2. AMEND Minnesota Statutes 2012, section 290A.04, subdivision 2 , is amended to read:

```
Subd. 2. Homeowners
    [A> ; homestead credit refund  <A] .
```

A claimant whose property taxes payable are in excess of the percentage of the household income stated below shall pay an amount equal to the percent of income shown for the appropriate household income

level along with the percent to be paid by the claimant of the remaining amount of property taxes payable. The state refund equals the amount of property taxes payable that remain, up to the state refund amount shown below. [D>Household Income Percent of Income Percent Paid by Claimant Maximum State Refund $0 to 1,549 1.0 percent 15 percent $ 2,460 1,550 to 3,089 1.1 percent 15 percent $ 2,460 3,090 to 4,669 1.2 percent 15 percent $ 2,460 4,670 to 6,229 1.3 percent 20 percent $ 2,460 6,230 to 7,769 1.4 percent 20 percent $ 2,460 7,770 to 10,879 1.5 percent 20 percent $ 2,460 10,880 to 12,429 1.6 percent 20 percent $ 2,460 12,430 to 13,989 1.7 percent 20 percent $ 2,460 13,990 to 15,539 1.8 percent 20 percent $ 2,460 15,540 to 17,079 1.9 percent 25 percent $ 2,460 17,080 to 18,659 2.0 percent 25 percent $ 2,460 18,660 to 21,759 2.1 percent 25 percent $ 2,460 21,760 to 23,309 2.2 percent 30 percent $ 2,460 23,310 to 24,859 2.3 percent 30 percent $ 2,460 24,860 to 26,419 2.4 percent 30 percent $ 2,460 26,420 to 32,629 2.5 percent 35 percent $ 2,460 32,630 to 37,279 2.6 percent 35 percent $ 2,460 37,280 to 46,609 2.7 percent 35 percent $ 2,000 46,610 to 54,369 2.8 percent 35 percent $ 2,000 54,370 to 62,139 2.8 percent 40 percent $ 1,750 62,140 to 69,909 3.0 percent 40 percent $ 1,440 69,910 to 77,679 3.0 percent 40 percent $ 1,290 77,680 to 85,449 3.0 percent 40 percent $ 1,130 85,450 to 90,119 3.5 percent 45 percent $ 960 90,120 to 93,239 3.5 percent 45 percent $ 790 93,240 to 97,009 3.5 percent 50 percent $ 650 97,010 to 100,779 3.5 percent 50 percent $ 480 <D] [A>Household Income Percent of Income Percent Paid by Claimant Maximum State Refund $0 to 1,619 1.0 percent 15 percent $ 2,580 1,620 to 3,229 1.1 percent 15 percent $ 2,580 3,230 to 4,889 1.2 percent 15 percent $ 2,580 4,890 to 6,519 1.3 percent 20 percent $ 2,580 6,520 to 8,129 1.4 percent 20 percent $ 2,580 8,130 to 11,389 1.5 percent 20 percent $ 2,580 11,390 to 13,009 1.6 percent 20 percent $ 2,580 13,010 to 14,649 1.7 percent 20 percent $ 2,580 14,650 to 16,269 1.8 percent 20 percent $ 2,580 16,270 to 17,879 1.9 percent 25 percent $ 2,580 17,880 to 22,779 2.0 percent 25 percent $ 2,580 22,780 to 24,399 2.0 percent 30 percent $ 2,580 24,400 to 27,659 2.0 percent 30 percent $ 2,580 27,660 to 39,029 2.0 percent 35 percent $ 2,580 39,030 to 56,919 2.0 percent 35 percent $ 2,090 56,920 to 65,049 2.0 percent 40 percent $ 1,830 65,050 to 73,189 2.1 percent 40 percent $ 1,510 73,190 to 81,319 2.2 percent 40 percent $ 1,350 81,320 to 89,449 2.3 percent 40 percent $ 1,180 89,450 to 94,339 2.4 percent 45 percent $ 1,000 94,340 to 97,609 2.5 percent 45 percent $ 830 97,610 to 101,559 2.5 percent 50 percent $ 680 101,560 to 105,499 2.5 percent 50 percent $ 500 <A] The payment made to a claimant shall be the amount of the state refund calculated under this subdivision.

No payment is allowed if the claimant's household income is [D>$100,780

<D] [A>$105,500 <A] or more.

[A>EFFECTIVE DATE. This section is effective for refund claims based on taxes payable in 2014 and thereafter. <A]

Sec. 3. AMEND Minnesota Statutes 2012, section 290A.04, subdivision 2 a , is amended to read: Subd. 2a. Renters. A claimant whose rent constituting property taxes exceeds the percentage of the household income stated below must pay an amount equal to the percent of income shown for the appropriate

household income level along with the percent to be paid by the claimant of the remaining amount of rent constituting property taxes. The state refund equals the amount of rent constituting property taxes that remain, up to the maximum state refund amount shown below. Household Income Percent of Income Percent Paid by Claimant Maximum State

Refund
   [D>$0 to 3,589 1.0 percent 5 percent $ 1,190 3,590 to 4,779 1.0

percent 10 percent $ 1,190 4,780 to 5,969 1.1 percent 10 percent $ 1,190 5,970 to 8,369 1.2 percent 10 percent $ 1,190 8,370 to 10,759 1.3 percent 15 percent $ 1,190 10,760 to 11,949 1.4 percent 15 percent $ 1,190 11,950 to 13,139 1.4 percent 20 percent $ 1,190 13,140 to 15,539 1.5 percent 20 percent $ 1,190 15,540 to 16,729 1.6 percent 20 percent $ 1,190 16,730 to 17,919 1.7 percent 25 percent $ 1,190 17,920 to 20,319 1.8 percent 25 percent $ 1,190 20,320 to 21,509 1.9 percent 30 percent $ 1,190 21,510 to 22,699 2.0 percent 30 percent $ 1,190 22,700 to 23,899 2.2 percent 30 percent $ 1,190 23,900 to 25,089 2.4 percent 30 percent $ 1,190 25,090 to 26,289 2.6 percent 35 percent $ 1,190 26,290 to 27,489 2.7 percent 35 percent $ 1,190 27,490 to 28,679 2.8 percent 35 percent $ 1,190 28,680 to 29,869 2.9 percent 40 percent $ 1,190 29,870 to 31,079 3.0 percent 40 percent $ 1,190 31,080 to 32,269 3.1 percent 40 percent $ 1,190 32,270 to 33,459 3.2 percent 40 percent $ 1,190 33,460 to 34,649 3.3 percent 45 percent $ 1,080 34,650 to 35,849 3.4 percent 45 percent $ 960 35,850 to 37,049 3.5 percent 45 percent $ 830 37,050 to 38,239 3.5 percent 50 percent $ 720 38,240 to 39,439 3.5 percent 50 percent $ 600 38,440 to 40,629 3.5 percent 50 percent $ 360 40,630 to 41,819 3.5 percent 50 percent $ 120 <D] [A>$0 to 4,909 1.0 percent 5 percent $ 2,000 4,910 to 6,529 1.0 percent 10 percent $ 2,000 6,530 to 8,159 1.1 percent 10 percent $ 1,950 8,160 to 11,439 1.2 percent 10 percent $ 1,900 11,440 to 14,709 1.3 percent 15 percent $ 1,850 14,710 to 16,339 1.4 percent 15 percent $ 1,800 16,340 to 17,959 1.4 percent 20 percent $ 1,750 17,960 to 21,239 1.5 percent 20 percent $ 1,700 21,240 to 22,869 1.6 percent 20 percent $ 1,650 22,870 to 24,499 1.7 percent 25 percent $ 1,650 24,500 to 27,779 1.8 percent 25 percent $ 1,650 27,780 to 29,399 1.9 percent 30 percent $ 1,650 29,400 to 34,299 2.0 percent 30 percent $ 1,650 34,300 to 39,199 2.0 percent 35 percent $ 1,650 39,200 to 45,739 2.0 percent 40 percent $ 1,650 45,740 to 47,369 2.0 percent 45 percent $ 1,500 47,370 to 49,009 2.0 percent 45 percent $ 1,350 49,010 to 50,649 2.0 percent 45 percent $ 1,150 50,650 to 52,269 2.0 percent 50 percent $ 1,000 52,270 to 53,909 2.0 percent 50 percent $ 900 53,910 to 55,539 2.0 percent 50 percent $ 500 55,540 to 57,169 2.0 percent 50 percent $ 200 <A] The payment made to a claimant is the amount of the state refund calculated under this subdivision.

No payment is allowed if the claimant's household income is
   [D>$41,820

<D] [A>$57,170 <A] or more.

[A>EFFECTIVE DATE. This section is effective for claims based on rent paid in 2013 and following years. <A]

Sec. 4. AMEND Minnesota Statutes 2012, section 290A.04, subdivision 4 , is amended to read: Subd. 4. Inflation adjustment. (a) Beginning for property tax refunds payable in calendar year 2002, the commissioner shall annually adjust the dollar amounts of the income thresholds and the maximum refunds under subdivisions 2 and 2a for inflation. The commissioner shall make the inflation adjustments in accordance with section 1(f) of the Internal Revenue Code, except that for purposes of this subdivision the percentage increase shall be determined as provided in this subdivision.

(b) In adjusting the dollar amounts of the income thresholds and the maximum refunds under subdivision 2 for inflation, the percentage increase shall be

```
determined from the year ending on June 30,
    [D>2011 <D]
```

[A>2013 <A], to the

year ending on June 30 of the year preceding that in which the refund is payable.

(c) In adjusting the dollar amounts of the income thresholds and the maximum refunds under subdivision 2a for inflation, the percentage increase shall be

```
determined from the year ending on June 30,
    [D>2000 <D]
```

[A>2013 <A], to the

year ending on June 30 of the year preceding that in which the refund is payable.

(d) The commissioner shall use the appropriate percentage increase to annually adjust the income thresholds and maximum refunds under subdivisions 2 and 2a for inflation without regard to whether or not the income tax brackets are adjusted for inflation in that year. The commissioner shall round the thresholds and the maximum amounts, as adjusted to the nearest $10 amount. If the amount ends in $5, the commissioner shall round it up to the next $10 amount.

(e) The commissioner shall annually announce the adjusted refund schedule at the same time provided under section 290.06 . The determination of the commissioner under this subdivision is not a rule under the Administrative Procedure Act.

[A>EFFECTIVE DATE. This section is effective for refund claims based on taxes payable in 2014 and rent paid in 2013 and following years. <A]

Sec. 5. [A> [290A.28 ] NOTIFICATION OF POTENTIAL ELIGIBILITY. <A]

[A>Subdivision 1. Notification of eligibility. <A]

[A>(a) By September 1, 2014, the commissioner shall notify, in writing or electronically, individual homeowners whom the commissioner determines may be eligible for a homestead credit refund under this chapter for that property taxes payable year as provided in this section. In determining whether to notify a homeowner, the commissioner shall consider the property tax information available to the commissioner under paragraph (b) for the homeowner and must estimate the homeowner's household income using the most recent income information available to the commissioner from filing under this chapter for the prior year, under chapter 290 for the current or prior year, and any other income information available to the commissioner. For each homeowner, the commissioner must estimate the homestead credit refund amount under the schedule in section 290A.04, subdivision 2 , using the homeowner's property tax amount and estimated household income. If the estimated homestead credit refund is at least $1,000, the commissioner must notify the homeowner of potential eligibility for the homestead credit refund. The notification must include information on how to file for the homestead credit refund. The notification requirement under this section does not apply to a homeowner who has already filed for the homestead credit refund for the current or prior year. <A]

[A>(b) By May 15, 2014, each county auditor shall transmit to the commissioner of revenue the following information for each property classified as a residential or agricultural homestead under section 273.13, subdivision 22 or 23: <A]

[A>(1) the property taxes payable; <A]

[A>(2) the name and address of the owner; <A]

[A>(3) the Social Security number or numbers of the owners; and <A]

[A>(4) any other information the commissioner deems necessary or useful to carry out the provisions of this section. The information must be provided in the form and manner prescribed by the commissioner. <A]

[A>Subd. 2. Reports. <A]

[A>(a) By March 15, 2015, the commissioner must provide a written report to the chairs and ranking minority members of the legislative committees with jurisdiction over taxes, in compliance with sections 3.195 and 3.197. The report must provide information on the number and dollar amount of homeowner property tax refund claims based on taxes payable in 2014, including: <A]

[A>(1) the number and dollar amount of claims projected for homestead credit refunds based on taxes payable in 2014 prior to enactment of the notification requirement in this section; <A]

[A>(2) the number of notifications issued as provided in this section, including the number issued by county; <A]

[A>(3) preliminary information on the number and dollar amount of claims for homestead credit refunds based on taxes payable in 2014; and <A]

[A>(4) a description of any outreach efforts undertaken by the commissioner for homestead credit refunds based on taxes payable in 2014, in addition to the notification required in this section. <A]

[A>(b) By February 1, 2016, the commissioner must provide a written report to the chairs and ranking minority members of the legislative committees with jurisdiction over taxes, in compliance with sections 3.195 and 3.197. The report must include the information required in paragraph (a) and must also include final information on the number and dollar amount of claims for homestead credit refunds based on taxes payable in 2014. <A]

[A>EFFECTIVE DATE. This section is effective for refund claims based on property taxes payable in 2014. <A] ARTICLE 2 PROPERTY TAX AIDS AND CREDITS

Section 1. AMEND Minnesota Statutes 2012, section 273.1398, subdivision 4 , is amended to read: Subd. 4. Disparity reduction credit. (a) Beginning with taxes payable in 1989, class 4a and class 3a property qualifies for a disparity reduction credit if: (1) the property is located in a border city that has an enterprise zone, as defined in section 469.166 ; (2) the property is located in a city with a population greater than 2,500 and less than 35,000 according to the 1980 decennial census; (3) the city is adjacent to a city in another state or immediately adjacent to a city adjacent to a city in another state; and (4) the adjacent city in the other state has a population of greater than 5,000 and less than 75,000 according to the 1980 decennial census.

(b) The credit is an amount sufficient to reduce (i) the taxes levied on class

```
4a property to
     [D>2.3 <D]
```

[A>1.9 <A] percent of the property's market valueand (ii) the tax on class 3a
```
property to
     [D>2.3 <D]
```

[A>1.9 <A] percent of

market value.

(c) The county auditor shall annually certify the costs of the credits to the Department of Revenue. The department shall reimburse local governments for the property taxes forgone as the result of the credits in proportion to their total levies.

[A>EFFECTIVE DATE. This section is effective beginning with taxes payable in 2014. <A]

Sec. 2. AMEND Minnesota Statutes 2012, section 290C.02, subdivision 6 , is amended to read: Subd. 6. Forest land. " Forest land" means land containing a minimum of 20 contiguous acres for which the owner has implemented a forest management plan that was prepared or updated within the past ten years by an approved plan writer. For purposes of this subdivision, acres are considered to be contiguous even if they

are separated by a road, waterway, railroad track, or other similar intervening property. At least 50 percent of the contiguous acreage must meet the definition of forest land in section 88.01, subdivision 7 . For the purposes of sections290C.01 to 290C.11 , forest land does not include (i) land used for residential or agricultural purposes, (ii) land enrolled in the reinvest in Minnesota program, a state or federal conservation reserve or easement reserve program under sections 103F.501 to 103F.531 , the Minnesota agricultural property tax law under section 273.111 , or land subject to agricultural land preservation controls or restrictions as defined in section 40A.02 or under the Metropolitan

```
Agricultural Preserves Act under chapter 473H,
    [D>or <D] (iii)
    [A>land
```

exceeding 60,000 acres that is subject to a single conservation easement funded under section 97A.056 or a comparable permanent easement conveyed to a governmental or nonprofit entity; (iv) any land that becomes subject to a conservation easement funded under section 97A.056 or a comparable permanent easement conveyed to a governmental or nonprofit entity after May 30, 2013; or (v) <A] land improved with a structure, pavement, sewer, campsite, or any road, other than a township road, used for purposes not prescribed in the forest management plan.

[A>EFFECTIVE DATE. This section is effective for certifications and applications due in 2013 and thereafter. <A]

Sec. 3. AMEND Minnesota Statutes 2012, section 290C.03 , is amended to read: 290C.03 ELIGIBILITY REQUIREMENTS. (a) Land may be enrolled in the sustainable forest incentive program under this chapter if all of the following conditions are met:

(1) the land consists of at least 20 contiguous acres and at least 50 percent of the land must meet the definition of forest land in section 88.01, subdivision 7 , during the enrollment;

(2) a forest management plan for the land must be prepared by an approved plan writer and implemented during the period in which the land is enrolled;

(3) timber harvesting and forest management guidelines must be used in conjunction with any timber harvesting or forest management activities conducted on the land during the period in which the land is enrolled;

(4) the land must be enrolled for a minimum of eight years;

(5) there are no delinquent property taxes on the land; and

(6) claimants enrolling more than 1,920 acres in the sustainable forest incentive program must allow year-round, nonmotorized access to fish and

```
wildlife resources
```

[A>and motorized access on established and maintained

roads and trails, unless the road or trail is temporarily closed for safety, natural resource, or road damage reasons <A] on enrolled land except within one-fourth mile of a permanent dwelling or during periods of high fire hazard as determined by the commissioner of natural resources.

(b) Claimants required to allow access under paragraph (a), clause (6), do not by that action:

(1) extend any assurance that the land is safe for any purpose;

(2) confer upon the person the legal status of an invitee or licensee to whom a duty of care is owed; or

(3) assume responsibility for or incur liability for any injury to the person or property caused by an act or omission of the person.

[A>EFFECTIVE DATE. This section is effective for calculations made in 2013 and thereafter. <A]

Sec. 4. AMEND Minnesota Statutes 2012, section 290C.055 , is amended to read: 290C.055 LENGTH OF COVENANT.[A>(a) <A] The covenant remains in effect for a minimum of eight years. If land is removed from the program before it has been enrolled for four years, the covenant remains in effect for eight years from the date recorded.

[A>(b) <A] If land that has been enrolled for four years or more is removed from the program for any reason, there is a waiting period before the covenant terminates. The covenant terminates on January 1 of the fifth calendar year that begins after the date that:

(1) the commissioner receives notification from the claimant that the claimant wishes to remove the land from the program under section 290C.10 ; or

(2) the date that the land is removed from the program under section 290C.11 .

[A>(c) <A] Notwithstanding the other provisions of this section, the covenant

is terminated
    [A>: <A]

[A>(1) <A] at the same time that the land is removed from the program due to acquisition of title or possession for a public purpose under section 290C.10

[A>; or <A]

[A>(2) at the request of the claimant after a reduction in payments due to changes in the payment formula under section 290C.07 <A].

[A>EFFECTIVE DATE. This section is effective for calculations made in 2013 and thereafter. <A]

Sec. 5. AMEND Minnesota Statutes 2012, section 290C.07 , is amended to read: 290C.07 CALCULATION OF INCENTIVE PAYMENT.[D>(a) <D] An approved claimant under the sustainable forest incentive program is eligible to receive an annual payment. The payment shall equal $7 per acre for each acre enrolled in the sustainable forest incentive program.

[D>(b) The annual payment for each Social Security number or state or federal business tax identification number must not exceed $100,000. <D]

[A>EFFECTIVE DATE. This section is effective for calculations made in 2013 and thereafter. <A]

Sec. 6. [A> [423A.022 ] POLICE AND FIREFIGHTER RETIREMENT SUPPLEMENTAL STATE AID. <A]

[A>Subdivision 1. Supplemental state aid. Annually, the commissioner of revenue shall allocate police and firefighter retirement supplemental state aid appropriated under subdivision 6 as provided in subdivision 2 and paid as provided in subdivision 4. <A]

[A>Subd. 2. Allocation. Of the total amount appropriated as supplemental state aid: <A]

[A>(1) 58.065 percent must be paid to the executive director of the Public Employees Retirement Association for deposit in the public employees police and fire retirement fund established by section 353.65, subdivision 1 ; <A]

[A>(2) 35.484 percent must be paid to municipalities other than municipalities solely employing firefighters with retirement coverage provided by the public employees police and fire retirement plan which qualified to receive fire state aid in that calendar year, allocated in proportion to the most recent amount of fire state aid paid under section 69.021, subdivision 7 , for the municipality bears to the most recent total fire state aid for all municipalities other than the municipalities solely employing firefighters with retirement coverage provided by the public employees police and fire retirement plan paid undersection 69.021, subdivision 7 , with the allocated amount for fire departments participating in the voluntary statewide lump-sum volunteer firefighter retirement plan paid to the executive director of the Public Employees Retirement Association for deposit in the fund established by section 353G.02, subdivision 3 , and credited to the respective account and with the balance paid to the treasurer of each municipality for transmittal within 30 days of receipt to the treasurer of the applicable volunteer firefighter relief association for deposit in its special fund; and <A]

[A>(3) 6.452 percent must be paid to the executive director of the Minnesota State Retirement System for deposit in the state patrol retirement fund. <A]

[A>Subd. 3. Reporting; definitions. <A]

[A>(a) On or before September 1, annually, the executive director of the Public Employees Retirement Association shall report to the commissioner of revenue the following: <A]

[A>(1) the municipalities which employ firefighters with retirement coverage by the public employees

police and fire retirement plan; <A]

[A>(2) the number of firefighters with public employees police and fire retirement plan coverage employed by each municipality; <A]

[A>(3) the fire departments covered by the voluntary statewide lump-sum volunteer firefighter retirement plan; and <A]

[A>(4) any other information requested by the commissioner to administer the police and firefighter retirement supplemental state aid program. <A]

[A>(b) For this subdivision, (i) the number of firefighters employed by a municipality who have public employees police and fire retirement plan coverage means the number of firefighters with public employees police and fire retirement plan coverage that were employed by the municipality for not less than 30 hours per week for a minimum of six months prior to December 31 preceding the date of the payment under this section and, if the person was employed for less than the full year, prorated to the number of full months employed; and (ii) the number of active police officers certified for police state aid receipt under section 69.011, subdivisions 2 and 2b, means, for each municipality, the number of police officers meeting the definition of peace officer in section 69.011, subdivision 1 , counted as provided and limited by section 69.011, subdivisions 2 and 2b. <A]

[A>Subd. 4. Payments; conditions prerequisite. <A]

[A>(a) The payments under this section must be made on October 1 each year, with interest at one percent for each month, or portion of a month, that the amount remains unpaid after October 1. Any necessary adjustments must be made to subsequent payments. <A]

[A>(b) The provisions of sections 69.011 to 69.051 that prevent municipalities and relief associations from being eligible for, or receiving fire state aid under sections 69.011 to 69.051 until the applicable financial reporting requirements have been complied with, apply to the amounts payable to municipalities and relief associations under this section. <A]

[A>Subd. 5. Aid termination. The aid program under this section ends on the December 1 next following the actuarial valuation date on which the assets of the retirement plan on a market value basis equals or exceeds 90 percent of the total actuarial accrued liabilities of the retirement plan as disclosed in an actuarial valuation prepared under section 356.215 and the Standards for Actuarial Work promulgated by the Legislative Commission on Pensions and Retirement, for the State Patrol retirement plan or the public employees police and fire retirement plan, whichever occurs last. <A]

[A>Subd. 6. Appropriation. $15,500,000 is appropriated annually to the commissioner of revenue for this aid program. <A]

[A>EFFECTIVE DATE. This section is effective beginning in the fiscal year beginning July 1, 2013. <A]

Sec. 7. AMEND Minnesota Statutes 2012, section 477A.011, subdivision 30 , is amended to read: Subd. 30. Pre-1940 housing percentage.

[A>(a) Except as provided in paragraph (b), <A] "pre-1940 housing percentage"

```
for a city is 100 times the most recent
    [D>federal census <D] count
    [A>by
```

the United States Bureau of the Census <A] of all housing units in the city built before 1940, divided by the total number of all housing units in the city. Housing units includes both occupied and vacant housing units as defined by the federal census. [A>For aids payable in 2014, "pre-1940 housing percentage" shall be based on 2010 housing data. <A]

[A>(b) For the city of East Grand Forks only, "pre-1940 housing percentage" is equal to 100 times the 1990 federal census count of all housing units in the city built before 1940, divided by the most recent count by the United States Bureau of the Census of all housing units in the city. Housing units includes both occupied and vacant housing units as defined by the federal census. <A]

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2014 and thereafter. <A]

Sec. 8. AMEND Minnesota Statutes 2012, section 477A.011 , is amended by adding a subdivision to read:[A>Subd. 30a. Percent of housing built between 1940 and 1970. " Percent of housing built between 1940 and 1970" is equal to 100 times the most recent count by the United States Bureau of the Census of all housing units in the city built after 1939 but before 1970, divided by the total number of all housing units in the city. Housing units includes both occupied and vacant housing units as defined by the federal census. For aids payable in 2014, "percent of housing built between 1940 and 1970" shall be based on 2010 housing data. <A]

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2014 and thereafter. <A]

Sec. 9. AMEND Minnesota Statutes 2012, section 477A.011, subdivision 34 , is amended to read: Subd. 34. City revenue need.

```
(a) For a city with a population equal to or greater than
    [D>2,500<D]
```

[A>10,000 <A], "city revenue need" is
```
    [D>the greater of 285 or <D]
```

[A>1.15
```
times <A] the sum of (1)
    [D>5.0734098 <D]
```

[A>4.59 <A] times the pre-1940
housing percentage; plus (2)
[D>19.141678 times the population decline

percentage <D] [A>0.622 times the percent of housing built between 1940 and 1970

<A]; plus (3)
[D>2504.06334 times the road accidents factor <D]

[A>169.415times the jobs per capita <A]; plus (4)
[D>355.0547; minus (5) the

metropolitan area factor; minus (6) 49.10638 times the household size <D] [A>the sparsity adjustment; plus (5) 307.664 <A].

[A>(b) For a city with a population equal to or greater than 2,500 and less than 10,000, "city revenue need" is 1.15 times the sum of (1) 572.62 ; plus (2) 5.026 times the pre-1940 housing percentage; minus (3) 53.768 times household size; plus (4) 14.022 times peak population decline. <A]

[D>(b) <D]

[A>(c) <A] For a city with a population less than 2,500, "city revenue need" is the sum of

[D>(1) 2.387 times the pre-1940 housing percentage; plus (2) 2.67591 times the commercial industrial percentage; plus (3) 3.16042 times the population decline percentage; plus (4) 1.206 times the transformed population; minus (5) 62.772 <D] [A>410 plus 0.367 times the city's population over 100. The city revenue need under this paragraph shall not exceed 630 <A].

[D>(c) <D]

[A>(d) <A] For a city with a population of
[A>at least <A] 2,500
[D>or

more and a population in one of the most recently available five years that was less than 2,500, "city revenue need" is the sum of (1) its city revenue need calculated under paragraph (a) multiplied by its transition factor; plus (2) its city revenue need calculated under the formula in paragraph <D]

[D>(b) multiplied by the difference between one and its transition factor. For purposes of this paragraph, a city's "transition factor" is equal to 0.2 multiplied by the number of years that the city's population estimate

has been 2,500 or more. This provision only applies for aids payable in calendar years 2006 to 2008 to cities with a 2002 population of less than 2,500. It applies to any city for aids payable in 2009 and thereafter <D] [A>but less than 3,000, the "city revenue need" equals (1) the transition factor times the city's revenue need calculated in paragraph (b) plus (2) 630 times the difference between one and the transition factor. For a city with a population of at least 10,000 but less than 10,500, the "city revenue need" equals (1) the transition factor times the city's revenue need calculated in paragraph (a) plus (2) the city's revenue need calculated under the formula in paragraph (b) times the difference between one and the transition factor. For purposes of this paragraph "transition factor" is 0.2 percent times the amount that the city's population exceeds the minimum threshold in either of the first two sentences <A].

[D>(d) <D]

[A>(e) <A] The city revenue need cannot be less than zero.

[D>(e) <D]

[A>(f) <A] For calendar year
    [D>2005 <D]

[A>2015 <A] and subsequent years,

the city revenue need for a city, as determined in paragraphs (a) to

[D>(d) <D]

[A>(e) <A], is multiplied by the ratio of the annual implicit price deflator for government consumption expenditures and gross investment for state and local governments as prepared by the United States Department of Commerce, for

the most recently available year to the
    [D>2003 <D]

[A>2013 <A] implicit

price deflator for state and local government purchases.

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2014 and thereafter. <A]

Sec. 10. AMEND Minnesota Statutes 2012, section 477A.011, subdivision 42 , is amended to read: Subd. 42. [D> City jobs base <D] [A> Jobs per capita <A] .

[D>(a) "City jobs base" for a city with a population of 5,000 or more is equal to the product of (1) $25.20, (2) the number of jobs per capita in the city, and (3) its population. For cities with a population less than

5,000, the city jobs base is equal to zero. For a city receiving aid under subdivision 36 , paragraph (k), its city jobs base is reduced by the lesser of 36 percent of the amount of aid received under that paragraph or $1,000,000. No city's city jobs base may exceed $4,725,000 under this paragraph. <D]

[D>(b) For calendar year 2010 and subsequent years, the city jobs base for a city, as determined in paragraph (a), is multiplied by the ratio of the appropriation under section 477A.03, subdivision 2 a , for the year in which the aid is paid to the appropriation under that section for aids payable in 2009. <D]

[D>(c) For purposes of this subdivision, <D] "Jobs per capita in the city" means (1) the average annual number of employees in the city based on the data from the Quarterly Census of Employment and Wages, as reported by the Department of Employment and Economic Development, for the most recent calendar

```
year available
     [D>as of May 1, 2008 <D]
```

[A>November 1 of every odd-numbered

year <A], divided by (2) the city's population for the same calendar year as the employment data. The commissioner of the Department of Employment and Economic Development shall

```
certify to the city the average annual number of employees for each city by
```

[D>June 1, 2008 <D] [A>January 1, of every even-numbered year beginning with January 1, 2014 <A]. A city may challenge an estimate under this paragraph by filing its specific objection, including the names of employers that it feels may have misreported

```
data, in writing with the commissioner by
     [D>June 20, 2008 <D]
```

[A>December 1

of every odd-numbered year <A]. The commissioner shall make every reasonable effort to address the specific objection and adjust the data as necessary. The commissioner shall certify the estimates of the annual employment to the

```
commissioner of revenue by
     [D>July 15, 2008 <D]
```

[A>January 1 of all

even-numbered years <A], including any estimates still under objection. [A>For aids payable in 2014,

"jobs per capita" shall be based on the annual number of employees and population for calendar year 2010 without additional review. <A]

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2014 and thereafter. <A]

Sec. 11. AMEND Minnesota Statutes 2012, section 477A.011 , is amended by adding a subdivision to read:[A>Subd. 44. Peak population decline. " Peak population decline" is equal to 100 times the difference between one and the ratio of the city's current population, to the highest city population reported in a federal census from the 1970 census or later. " Peak population decline" shall not be less than zero. <A]

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2014 and thereafter. <A]

Sec. 12. AMEND Minnesota Statutes 2012, section 477A.011 , is amended by adding a subdivision to read:[A>Subd. 45. Sparsity adjustment. For a city with a population of 10,000 or more, the sparsity adjustment is 100 for any city with an average population density less than 150 per square mile, according to the most recent federal census, and the sparsity adjustment is zero for all other cities. <A]

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2014 and thereafter. <A]

Sec. 13. AMEND Minnesota Statutes 2012, section 477A.013, subdivision 1 , is amended to read: Subdivision 1. Towns. [D>In 2002, no town is eligible for a distribution under this subdivision. <D] [A>In 2014 and thereafter, each town is eligible for a distribution under this subdivision equal to the product of (i) its agricultural property factor, (ii) its town area factor, (iii) its population factor, and (iv) 0.0045. As used in this subdivision, the following terms have the meanings given them: <A]

[A>(1) "agricultural property factor" means the ratio of the adjusted net tax capacity of agricultural property located in a town, divided by the adjusted net tax capacity of all other property located in the town. The agricultural property factor cannot exceed eight; <A]

[A>(2) "agricultural property" means property classified under section 273.13 , as homestead and nonhomestead agricultural property, rural vacant land, and noncommercial seasonal recreational property; <A]

[A>(3) "town area factor" means the most recent estimate of total acreage, not to exceed 50,000 acres, located in the township available as of July 1 in the aid calculation year, estimated or established by: <A]

[A>(i) the United States Bureau of the Census; <A]

[A>(ii) the State Land Management Information Center; or <A]

[A>(iii) the secretary of state; and <A]

[A>(4) "population factor" means the square root of the towns' population. If the sum of the aids payable to all towns under this subdivision exceeds the limit under section 477A.03, subdivision 2 c, the

distribution to each town must be reduced proportionately so that the total amount of aids distributed under this section does not exceed the limit in section 477A.03, subdivision 2 c. <A]

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2014 and thereafter. <A]

Sec. 14. AMEND Minnesota Statutes 2012, section 477A.013, subdivision 8 , is amended to read: Subd. 8. City formula aid.

[A>(a) For aids payable in 2014 only, the formula aid for a city is equal to the sum of (1) its 2013 certified aid and (2) the product of (i) the difference between its unmet need and its 2013 certified aid and (ii) the aid gap percentage. <A]

[A>(b) For aids payable in 2015 and thereafter, <A] the formula aid for a city

is equal to the sum of (1) its
    [D>city jobs base, (2) its small city aid

base, and (3) the need increase percentage multiplied by the average of its unmet need for the most recently available two years <D] [A>formula aid in the previous year and (2) the product of (i) the difference between its unmet need and its certified aid in the previous year under subdivision 9, and (ii) the aid gap percentage <A]. No city may have a formula aid amount less than zero.

The
    [D>need increase <D]

[A>aid gap <A] percentage must be the same for all

cities.

The applicable
    [D>need increase <D]

[A>aid gap <A] percentage must be

calculated by the Department of Revenue so that the total of the aid under subdivision 9 equals the total amount available for aid under section 477A.03 . Data used in calculating aids to cities under sections 477A.011 to 477A.013 shall be the most recently available data as of January 1 in the year in which

the aid is calculated
    [D>except that the data used to compute "net levy" in

subdivision 9 is the data most recently available at the time of the aid computation <D].

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2014 and thereafter. <A]

Sec. 15. AMEND Minnesota Statutes 2012, section 477A.013, subdivision 9 , is amended to read: Subd. 9. City aid distribution.

(a) In calendar year [D>2013 <D]

[A>2014 <A] and thereafter, each city shall

receive an aid distribution equal to the sum of (1) the city formula aid under

subdivision 8, and (2) its [D>city aid base <D]

[A>aid adjustment under

subdivision 13 <A].

[D>(b) For aids payable in 2013 and 2014 only, the total aid in the previous year for any city shall mean the amount of aid it was certified to receive for aids payable in 2012 under this section. For aids payable in 2015 and thereafter, the total aid in the previous year for any city means the amount of aid it was certified to receive under this section in the previous payable year. <D]

[D>(c) For aids payable in 2010 and thereafter, the total aid for any city shall not exceed the sum of (1) ten percent of the city's net levy for the year prior to the aid distribution plus (2) its total aid in the previous year. For aids payable in 2009 and thereafter, the total aid for any city with a population of 2,500 or more may not be less than its total aid under this section in the previous year minus the lesser of $10 multiplied by its population, or ten percent of its net levy in the year prior to the aid distribution. <D]

[D>(d) <D]

[A>(b) For aids payable in 2014 only, the total aid for a city may not be less than the amount it was certified to receive in 2013. <A]

For aids payable in [D>2010 <D]

[A>2015 <A] and thereafter, the total aid fora city [D>with a population less than 2,500 <D] must not be less than the

amount it was certified to receive in the previous year minus the lesser of $10

multiplied by its population, or five percent of [D>its 2003 certified aid

amount. For aids payable in 2009 only, the total aid for a city with a population less than 2,500 must not be less than what it received under this section in the previous year unless its total aid in calendar year 2008 was aid under section477A.011 , subdivision 36, paragraph (s), in which case its minimum aid is zero <D] [A>its net levy in the year prior to the aid distribution <A].

[D>(e) A city's aid loss under this section may not exceed $300,000 in any year in which the total city aid appropriation under section 477A.03, subdivision 2 a , is equal or greater than the appropriation under that subdivision in the previous year, unless the city has an adjustment in its city net tax capacity under the process described in section 469.174, subdivision 28 . <D]

[D>(f) If a city's net tax capacity used in calculating aid under this section has decreased in any year by more than 25 percent from its net tax capacity in the previous year due to property becoming tax-exempt Indian land, the city's maximum allowed aid increase under paragraph (c) shall be increased by an amount equal to (1) the city's tax rate in the year of the aid calculation, multiplied by (2) the amount of its net tax capacity decrease resulting from the property becoming tax exempt. <D]

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2014 and thereafter. <A]

Sec. 16. AMEND Minnesota Statutes 2012, section 477A.013 , is amended by adding a subdivision to read:[A>Subd. 13. Certified aid adjustments. <A]

[A>(a) A city that received an aid base increase under Minnesota Statutes 2012,section 477A.011, subdivision 36 , paragraph (e), shall have its total aid under subdivision 9 increased by an amount equal to $150,000 for aids payable in 2014 through 2018. <A]

[A>(b) A city that received an aid base increase under section 477A.011, subdivision 36 , paragraph (r), shall have its total aid under subdivision 9 increased by an amount equal to $160,000 for aids payable in 2014 and thereafter. <A]

[A>(c) A city that received a temporary aid increase under Minnesota Statutes 2012, section 477A.011, subdivision 36 , paragraph (o), shall have its total aid under subdivision 9 increased by an amount equal to $1,000,000 for aids payable in 2014 only. <A]

Sec. 17. AMEND Minnesota Statutes 2012, section 477A.015 , is amended to read: 477A.015 PAYMENT DATES. The commissioner of revenue shall make the payments of local government aid to affected taxing authorities in two installments on July 20 and December 26 annually. When the commissioner of public safety determines that a local government has suffered financial hardship due to a natural disaster, the commissioner of public safety shall notify the commissioner of revenue, who shall make payments of aids under AMEND sections 477A.011 toAMEND 477A.014 , which are otherwise due on December 26, as soon as is practical after the determination is made but not before July 20. The commissioner may pay all or part of the payments of aids under AMEND sections 477A.011 toAMEND 477A.014 , which are due on December 26 at any time after August 15 if a local government requests such payment as being necessary for meeting its cash flow needs.[A>For aids payable in 2013 only, a city that is located in an

area deemed a disaster area during the month of April 2013, as defined in section 12A.02, subdivision 5 , shall receive its December 26, 2013 payment with its July 20, 2013 payment. <A> [A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2013 and thereafter. <A]

Sec. 18. AMEND Minnesota Statutes 2012, section 477A.03, subdivision 2 a , is amended to read: Subd. 2a.

```
Cities. For aids payable in
    [D>2013 <D]
```

[A>2014 <A]

[D>and thereafter <D], thetotal aid paid under section 477A.013, subdivision 9, is
```
    [D>$426,438,012
```

<D] [A>$507,598,012. The total aid paid under section 477A.013, subdivision 9 , is $509,098,012 for aids payable in 2015. For aids payable in 2016 and thereafter, the total aid paid under section 477A.013, subdivision 9 , is $511,598,012 <A].

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2014 and thereafter. <A]

Sec. 19. AMEND Minnesota Statutes 2012, section 477A.03, subdivision 2 b , is amended to read: Subd. 2b.

```
Counties. (a) For aids payable in
    [D>2013 <D]
```

[A>2014 <A] and thereafter, thetotal aid payable under section 477A.0124, subdivision 3, is
```
    [D>$80,795,000
```

<D] [A>$100,795,000 <A].

```
Each calendar year, $500,000
    [A>of this appropriation <A] shall be retained
```

by the commissioner of revenue to make reimbursements to the commissioner of management and budget for payments made under section 611.27 . [D>For calendar year 2004, the amount shall be in addition to the payments authorized under section 477A.0124, subdivision 1 . For calendar year 2005 and subsequent years, the amount shall be deducted from the appropriation under this paragraph. <D] The reimbursements shall be to defray the additional costs associated with court-ordered counsel under section 611.27 . Any retained amounts not used for reimbursement in a year shall be included in the next

distribution of county need aid that is certified to the county auditors for the purpose of property tax reduction for the next taxes payable year.

(b) For aids payable in [D>2013 <D]

[A>2014 <A] and thereafter, the total aid under section 477A.0124, subdivision 4 , is [D>$84,909,575

<D] [A>$104,909,575 <A].

The [D>commissioner of management and budget shall bill the <D] commissionerof revenue [A>shall transfer to the commissioner of management and budget

$207,000 annually <A] for the cost of preparation of local impact notes as

required by section 3.987, [D>not to exceed $207,000 in fiscal year 2004 and

thereafter <D] [A>and other local government activities <A].

The [D>commissioner of education shall bill the <D] commissioner of revenue

[D>for the cost of preparation of local impact notes for school districts as required by section 3.987 , not to exceed $7,000 in fiscal year 2004 and thereafter <D] [A>shall transfer to the commissioner of education $7,000 annually for the cost of preparation of local impact notes for school districts as required by section 3.987 <A].

The commissioner of revenue shall deduct the amounts [D>billed

<D] [A>transferred <A] under this paragraph from the appropriation under this paragraph.

The amounts [D>deducted <D]

[A>transferred <A] are appropriated to thecommissioner of management and budget and the commissioner of education

[D>for the preparation of local impact notes <D] [A>respectively <A].

[A>EFFECTIVE DATE. This section is effective for aid payable in 2014 and thereafter. <A]

Sec. 20. AMEND Minnesota Statutes 2012, section 477A.03 , is amended by adding a subdivision to read:[A>Subd. 2c. Towns. For aids payable in 2014, the total aids paid under section 477A.013, subdivision 1 , is limited to $10,000,000. For aids payable in 2015 and thereafter, the total aids paid under section 477A.013, subdivision 1 , is limited to the amount certified to be paid in the previous year. <A]

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2014 and thereafter. <A]

Sec. 21. [A> [477A.085 ] DEBT SERVICE AID; CITY OF MINNEAPOLIS. On or before November 1, 2016, and the first day of each November thereafter, the commissioner shall pay to the city of Minneapolis an amount equal to 40 percent of the city's otherwise required levy to pay its general obligation library referendum bonds for the following calendar year. The levy excludes any amount to pay bonds, other than refunding bonds, issued after May 1, 2013. An amount sufficient to pay the aid under this section is appropriated from the general fund to the commissioner of revenue. <A]

Sec. 22. [A> [477A.10 ] NATURAL RESOURCES LAND PAYMENTS IN LIEU; PURPOSE. The purposes of sections 477A.11 to 477A.14 are: <A]

[A>(1) to compensate local units of government for the loss of tax base from state ownership of land and the need to provide services for state land; <A]

[A>(2) to address the disproportionate impact of state land ownership on local units of government with a large proportion of state land; and <A]

[A>(3) to address the need to manage state lands held in trust for the local taxing districts. <A]

Sec. 23. AMEND Minnesota Statutes 2012, section 477A.11, subdivision 3 , is amended to read: Subd. 3. Acquired natural resources land. " Acquired natural resources land" means:

(1)
    [D>any <D] land
    [A>, other than wildlife management land, <A]

presently administered by the commissioner in which the state acquired by purchase, condemnation, or gift, a fee title interest in lands which were previously privately owned; and

(2) lands acquired by the state under chapter 84A that are designated as state parks, state recreation areas, scientific and natural areas, or wildlife management areas.

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2013 and thereafter. <A]

Sec. 24. AMEND Minnesota Statutes 2012, section 477A.11, subdivision 4 , is amended to read: Subd. 4.

Other natural resources land. "

```
Other natural resources land" means any
    [D>other <D] land
    [A>, other than
```

acquired natural resource land or wildlife management land, <A] presently owned in fee title by the state and administered by the commissioner, or any tax-forfeited land, other than platted lots within a city or those lands described under subdivision 3, clause (2), which is owned by the state and administered by the commissioner or by the county in which it is located.

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2013 and thereafter. <A]

Sec. 25. AMEND Minnesota Statutes 2012, section 477A.11 , is amended by adding a subdivision to read:[A>Subd. 6. Military game refuge. " Military game refuge" means land owned in fee by another state agency for military purposes and designated as a state game refuge under section 97A.085. <A]

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2013 and thereafter. <A]

Sec. 26. AMEND Minnesota Statutes 2012, section 477A.11 , is amended by adding a subdivision to read:[A>Subd. 7. Transportation wetland. " Transportation wetland" means land administered by the Department of Transportation in which the state acquired, by purchase from a private owner, a fee title interest in over 500 acres of land within a county to replace wetland losses from transportation projects. <A]

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2013 and thereafter. <A]

Sec. 27. AMEND Minnesota Statutes 2012, section 477A.11 , is amended by adding a subdivision to read:[A>Subd. 8. Wildlife management land. " Wildlife management land" means land administered by the commissioner in which the state acquired, from a private owner by purchase, condemnation, or gift, a fee interest under the authority granted in chapter 94 or 97A for wildlife management purposes and actually used as a wildlife management area. <A]

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2013 and thereafter. <A]

Sec. 28. AMEND Minnesota Statutes 2012, section 477A.12, subdivision 1 , is amended to read: Subdivision 1. Types of land; payments.

[D>(a) As an offset for expenses incurred by counties and towns in support of natural resources lands, <D] The following amounts are annually appropriated to the commissioner of natural resources from the general fund for transfer to the commissioner of revenue. The commissioner of revenue shall pay the transferred funds to counties as required by sections 477A.11 to 477A.14 .

```
The amounts
```

[A>, based on the acreage as of July 1 of each year prior to the payment year, <A] are:

(1) [D>for acquired natural resources land, <D] $5.133 multiplied by the total number of acres of acquired natural resources land or, at the county's option three-fourths of one percent of the appraised value of all acquired natural resources land in the county, whichever is greater;

(2) [A>$5.133, multiplied by the total number of acres of transportation wetland or, at the county's option, three-fourths of one percent of the appraised value of all acquired natural resources land in the county, whichever is greater; <A]

[A>(3) three-fourths of one percent of the appraised value of all wildlife management land in the county; <A]

[A>(4) 50 percent of the dollar amount as determined under clause (1), multiplied by the number of acres of military refuge land in the county; <A] [D>$1.283 <D]

[A>(5) $1.50, <A] multiplied by the number of acres of county-administered other natural resources land [A>in the county <A];

[D>(3) $1.283 <D]

[A>(6) $5.133, <A] multiplied by the total number of acres of land utilization project land [A>in the county <A]; [D>and <D]

[D>(4) 64.2 cents <D]

[A>(7) $1.50, <A] multiplied by the number of acres of commissioner-administered other natural resources land [D>located <D] in [D>each <D]

[A>the <A] county

[D>as of July 1 of each year prior to the

payment year. <D] [A>; and <A]

[A>(8) without regard to acreage, $300,000 for local assessments under section 84A.55, subdivision 9 . <A]

[D>(b) The amount determined under paragraph (a), clause (1), is payable for land that is acquired from a private owner and owned by the Department of Transportation for the purpose of replacing wetland losses caused by transportation projects, but only if the county contains more than 500 acres of such land at the time the certification is made under subdivision 2. <D]

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2013 and thereafter. <A]

Sec. 29. AMEND Minnesota Statutes 2012, section 477A.12, subdivision 2 , is amended to read: Subd. 2. Procedure. [D>Lands for which payments in lieu are made pursuant to section 97A.061, subdivision 3 , and Laws 1973, chapter 567, shall not be eligible for payments under this section. <D] Each county auditor shall certify to the Department of Natural Resources during July of each year prior to the payment year the number of acres of county-administered other natural resources land within the county. The Department of Natural resources may, in addition to the certification of acreage, require descriptive lists of land so certified. The commissioner of natural resources shall determine and certify to the commissioner of revenue by March 1 of the payment year:

(1) the number of acres and most recent appraised value of acquired natural

resources land
    [A>, wildlife management land, and military refuge land <A]

within each county;

(2) the number of acres of commissioner-administered natural resources land within each county;

(3) the number of acres of county-administered other natural resources land within each county, based on the reports filed by each county auditor with the commissioner of natural resources; and

(4) the number of acres of land utilization project land within each county. The commissioner of transportation shall determine and certify to the commissioner of revenue by March 1 of the payment year the number of acres of

[D>land <D] [A>transportation wetland <A] and the appraised value of the land

[D>described in subdivision 1, paragraph (b) <D], but only if it exceeds 500

acres
    [A>in a county <A].

The commissioner of revenue shall determine the distributions provided for in this section using the number of acres and appraised values certified by the commissioner of natural resources and the commissioner of transportation by March 1 of the payment year.

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2013 and thereafter. <A]

Sec. 30. AMEND Minnesota Statutes 2012, section 477A.12, subdivision 3 , is amended to read: Subd. 3. Determination of appraised value. For the purposes of this section, the appraised value of acquired natural

resources land is the purchase price
[D>for the first five years after

acquisition <D] [A>until the next six-year appraisal required under this subdivision <A]. The appraised value of acquired natural resources land received as a donation is the value determined for the commissioner of natural resources by a licensed appraiser, or the county assessor's estimated market value if no appraisal is done.

The appraised value must be determined by the county assessor every
[D>five<D]

[A>six <A] years
[D>after the land is acquired <D].

[A>All reappraisals shall be done in the same year as county assessors are required to assess exempt land under section 273.18 . <A]

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2013 and thereafter. <A]

Sec. 31. AMEND Minnesota Statutes 2012, section 477A.14, subdivision 1 , is amended to read: Subdivision 1. General distribution.

Except as provided in
[D>subdivision 2 or in section 97A.061, subdivision 5

<D] [A>subdivisions 2 and 3 <A], 40 percent of the total payment to the county shall be deposited in the county general revenue fund to be used to provide property tax levy reduction. The remainder shall be distributed by the county in the following priority:

(a) 64.2 cents
[A>, <A] for each acre of county-administered other natural

resources land shall be deposited in a resource development fund to be created within the county treasury for use in resource development, forest management, game and fish habitat improvement, and recreational development and maintenance of county-administered other natural resources land. Any county receiving less than $5,000 annually for the resource development fund may elect to deposit that amount in the county general revenue fund;

(b) from the funds remaining, within 30 days of receipt of the payment to the

```
county, the county treasurer shall pay each organized township
    [D>51.3 cents
```

for each acre of acquired natural resources land and each acre of land described in section 477A.12, subdivision 1 , paragraph (b), and 12.8 cents for each acre of other natural resources land and each acre of land utilization project land located within its boundaries <D] [A>ten percent of the amount received under section 477A.12, subdivision 1 , clauses (1), (2), and (5) to (7) <A].

Payments for natural resources lands not located in an organized township shall be deposited in the county general revenue fund. Payments to counties and townships pursuant to this paragraph shall be used to provide property tax levy reduction, except that of the payments for natural resources lands not located in an organized township, the county may allocate the amount determined to be necessary for maintenance of roads in unorganized townships. Provided that, if the total payment to the county pursuant to section 477A.12 is not sufficient to fully fund the distribution provided for in this clause, the amount available shall be distributed to each township and the county general revenue fund on a pro rata basis; and

(c) any remaining funds shall be deposited in the county general revenue fund. Provided that, if the distribution to the county general revenue fund exceeds $35,000, the excess shall be used to provide property tax levy reduction.

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2013 and thereafter. <A]

Sec. 32. AMEND Minnesota Statutes 2012, section 477A.14 , is amended by adding a subdivision to read:[A>Subd. 3. Distribution for wildlife management lands and military refuge lands. <A]

[A>(a) The county treasurer shall allocate the payment for wildlife management land and military game refuge land among the county, towns, and school districts on the same basis as if the payments were taxes on the land received in the year. Payment of a town's or a school district's allocation must be made by the county treasurer to the town or school district within 30 days of receipt of the payment to the county. The county's share of the payment shall be deposited in the county general revenue fund. <A]

[A>(b) The county treasurer of a county with a population over 39,000, but less than 42,000, in the 1950 federal census shall allocate the payment only among the towns and school districts on the same basis as if the payments were taxes on the lands received in the current year. <A]

[A>(c) If a town received a payment in calendar year 2006 or thereafter under this subdivision, and subsequently incorporated as a city, the city shall continue to receive any future year's allocations of wildlife land payments that would have been made to the town had it not incorporated, provided that the payments shall terminate if the governing body of the city passes an ordinance that prohibits hunting within the boundaries of the city. <A]

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2013 and thereafter. <A]

Sec. 33. Laws 2006, chapter 259, article 11, section 3, as amended by Laws 2008, chapter 154, article 1, section 4, is amended to read: Sec. 3. MAHNOMEN COUNTY; COUNTY, CITY, SCHOOL DISTRICT, PROPERTY TAX REIMBURSEMENT.

Subdivision 1. Aid appropriation. [D>$600,000 <D] [A>$1,200,000 <A] is appropriated annually from the general fund to the commissioner of revenue to be used to make payments to compensate for the loss of property tax revenue related to the trust conversion application of the Shooting Star Casino.

```
The commissioner shall pay the county of Mahnomen,
    [D>$450,000<D]
```

[A>$900,000 <A]; the city of Mahnomen,
```
    [D>$80,000 <D]
```

[A>$160,000 <A]; and
```
Independent School District No. 432, Mahnomen,
    [D>$70,000 <D]
```

[A>$140,000

<A].

```
The payments shall be made on July 20, of
    [D>2008 <D]
```

[A>2013 <A] and each

subsequent year.

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2013 and thereafter. <A]

Sec. 34. [A> INELIGIBILITY; SUSTAINABLE FOREST INCENTIVE PROGRAM. Lands that no longer qualify as forest land under Minnesota Statutes, section 290C.02, subdivision 6 , item (iii), are released from the covenant required under Minnesota Statutes, section 290C.04. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 35. [A> REENROLLMENT; SUSTAINABLE FOREST INCENTIVE PROGRAM. A person who elected to terminate participation in the sustainable forest incentive program, as provided in Laws 2011, First Special Session chapter 7, article 6, section 12, may reenroll lands for which the claimant terminated participation and be eligible for a payment in October 2013. A person must apply for reenrollment under this section within 60 days after the effective date of this section. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 36. [A> REPEALER. <A]

[A>(a) AMEND Minnesota Statutes 2012, sections 477A.011 , subdivisions 2a , 19, 29, 31, 32, 33, 36, 39, 40, and 41;AMEND 477A.013 , subdivisions 11 and 12 ;REPEAL 477A.0133 ; andREPEAL 477A.0134 , are repealed.<A] [A>(b) REPEAL Minnesota Statutes 2012, section 97A.061 , and Laws 1973, chapter 567, section 7, as amended by Laws 1977, chapter 403, section 12, are repealed on July 1, 2013.<A]

[A>EFFECTIVE DATE. This section is effective for aids payable in calendar year 2014 and thereafter. <A] ARTICLE 3 EDUCATION AIDS AND LEVIES

Section 1. [A> [124D.862 ] ACHIEVEMENT AND INTEGRATION REVENUE. <A]

[A>Subdivision 1. Initial achievement and integration revenue. <A]

[A>(a) An eligible district's initial achievement and integration revenue equals the sum of (1) $350 times the district's adjusted pupil units for that year times the ratio of the district's enrollment of protected students for the previous school year to total enrollment for the previous school year and (2) the greater of zero or 66 percent of the difference between the district's integration revenue for fiscal year 2013 and the district's integration revenue for fiscal year 2014 under clause (1). <A]

[A>(b) In each year, 0.3 percent of each district's initial achievement and integration revenue is transferred to the department for the oversight and accountability activities required under this section and section 124D.861 . <A]

[A>Subd. 2. Incentive revenue. An eligible school district's maximum incentive revenue equals $10 per adjusted pupil unit. In order to receive this revenue, a district must be implementing a voluntary plan to reduce racial and economic enrollment disparities through intradistrict and interdistrict activities that have been approved as a part of the district's achievement and integration plan. <A]

[A>Subd. 3. Achievement and integration revenue. Achievement and integration revenue equals the sum of initial achievement and integration revenue and incentive revenue. <A]

[A>Subd. 4. Achievement and integration aid. For fiscal year 2015 and later, a district's achievement and integration aid equals 70 percent of its achievement and integration revenue. <A]

[A>Subd. 5. Achievement and integration levy. A district's achievement and integration levy equals its achievement and integration revenue times 30 percent. For Special School District No. 1, Minneapolis;

Independent School District No. 625, St. Paul; and Independent School District No. 709, Duluth, 100 percent of the levy certified under this subdivision is shifted into the prior calendar year for purposes of sections 123B.75, subdivision 5 , and 127A.441 . <A]

[A>Subd. 6. Revenue uses. <A]

[A>(a) At least 80 percent of a district's achievement and integration revenue received under this section must be used for innovative and integrated learning environments, school enrollment choices, family engagement activities, and other approved programs providing direct services to students. <A]

[A>(b) Up to 20 percent of the revenue may be used for professional development and staff development activities and placement services. <A]

[A>(c) No more than ten percent of the total amount of revenue may be spent on administrative services. <A]

[A>Subd. 7. Revenue reserved. Integration revenue received under this section must be reserved and used only for the programs authorized in subdivision 2. <A]

[A>Subd. 8. Commissioner authority to withhold revenue. <A]

[A>(a) The commissioner must review the results of each district's integration and achievement plan by August 1 at the end of the third year of implementing the plan and determine if the district met its goals. <A]

[A>(b) If a district met its goals, it may submit a new three-year plan to the commissioner for review. <A]

[A>(c) If a district has not met its goals, the commissioner must: <A]

[A>(1) develop a district improvement plan and timeline, in consultation with the affected district, that identifies strategies and practices designed to meet the district's goals under this section and section 120B.11 ; and <A]

[A>(2) use up to 20 percent of the district's integration revenue, until the district's goals are reached, to implement the improvement plan. <A]

[A>EFFECTIVE DATE. This section is effective for revenue for fiscal year 2014 and later. Subdivision 5 is effective for taxes payable in 2014 only. <A]

Sec. 2. AMEND Minnesota Statutes 2012, section 126C.10, subdivision 1 , is amended to read: Subdivision 1. General education revenue.

[A>(a) For fiscal years 2013 and 2014, <A] the general education revenue for each district equals the sum of the district's basic revenue, extended time revenue, gifted and talented revenue, small schools revenue, basic skills

revenue,
       [D>training and experience revenue, <D] secondary sparsity revenue,

elementary sparsity revenue, transportation sparsity revenue, total operating capital revenue, equity revenue, alternative teacher compensation revenue, and transition revenue.

[A>(b) For fiscal year 2015 and later, the general education revenue for each district equals the sum of the district's basic revenue, extended time revenue, gifted and talented revenue, declining enrollment revenue, location equity revenue, small schools revenue, basic skills revenue, secondary sparsity revenue, elementary sparsity revenue, transportation sparsity revenue, total operating capital revenue, equity revenue, pension adjustment revenue, and transition revenue. <A]

Sec. 3. AMEND Minnesota Statutes 2012, section 126C.10 , is amended by adding a subdivision to read: [A>Subd. 2d. Location equity revenue. <A]

[A>(a) For a school district with any of its area located within the seven-county metropolitan area, location equity revenue equals $424 times the adjusted pupil units of the district for that school year. <A]

[A>(b) For all other school districts with more than 2,000 pupils in adjusted average daily membership for the fiscal year ending in the year before the levy is certified, location equity revenue equals $212 times the adjusted pupil units of the district for that year. <A]

[A>(c) A district's location equity levy equals its location equity revenue times the lesser of one or the ratio of its referendum market value per resident pupil unit to $510,000. The location equity revenue levy must be spread on referendum market value. <A]

[A>(d) A district's location equity aid equals its location equity revenue less its location equity levy, times the ratio of the actual amount levied to the permitted levy. <A]

[A>(e) A school district may elect not to participate in the location equity revenue program by a board vote taken prior to September 1 of the fiscal year before the fiscal year for which the decision not to participate becomes effective. The board resolution must state which fiscal years the district will not participate. A copy of the board resolution to not participate must be submitted to the commissioner. <A]

[A>EFFECTIVE DATE. This section is effective for revenue for fiscal year 2015 and later. <A]

Sec. 4. AMEND Minnesota Statutes 2012, section 126C.13, subdivision 4 , is amended to read: Subd. 4. General education aid.

[A>(a) <A] For fiscal years
       [D>2007 <D]

[A>2013 <A] and
[D>later

<D] [A>2014 only <A], a district's general education aid is the sum of the following amounts:

(1) general education revenue, excluding equity revenue, total operating capital revenue, alternative teacher compensation revenue, and transition revenue;

(2) operating capital aid under section 126C.10, subdivision 13 b;

(3) equity aid under section 126C.10, subdivision 30 ;

(4) alternative teacher compensation aid under section 126C.10, subdivision 36 ;

(5) transition aid under section 126C.10, subdivision 33 ;

(6) shared time aid under section 126C.01, subdivision 7 ;

(7) referendum aid under section 126C.17 , subdivisions 7 and 7a; and

(8) online learning aid according to section 124D.096 .

[A>(b) For fiscal year 2015 and later, a district's general education aid equals: <A]

[A>(1) general education revenue, excluding operating capital revenue, equity revenue, location equity revenue, and transition revenue, minus the student achievement levy, multiplied times the ratio of the actual amount of student achievement levy levied to the permitted student achievement levy; plus <A]

[A>(2) equity aid under section 126C.10, subdivision 30 ; plus <A]

[A>(3) transition aid under section 126C.10, subdivision 33 ; plus <A]

[A>(4) shared time aid under section 126C.10, subdivision 7 ; plus <A]

[A>(5) referendum aid under section 126C.17 , subdivisions 7 and 7a; <A]

[A>(6) online learning aid under section 124D.096 ; plus <A]

[A>(7) location equity aid according to section 126C.10, subdivision 2 d, paragraph (d). <A]

Sec. 5. AMEND Minnesota Statutes 2012, section 126C.17 , is amended to read: 126C.17 REFERENDUM REVENUE. Subdivision 1. Referendum allowance.

[D>(a) For fiscal year 2003 and later, a district's initial referendum revenue allowance equals the sum of the allowance under section 126C.16, subdivision 2 , plus any additional allowance per resident marginal cost pupil unit authorized under subdivision 9 before May 1, 2001, for fiscal year 2002 and later, plus the referendum conversion allowance approved under subdivision 13, minus $415. For districts with more

than one referendum authority, the reduction must be computed separately for each authority. The reduction must be applied first to the referendum conversion allowance and next to the authority with the earliest expiration date. A district's initial referendum revenue allowance may not be less than zero. <D]

[D>(b) For fiscal year 2003, a district's referendum revenue allowance equals the initial referendum allowance plus any additional allowance per resident marginal cost pupil unit authorized under subdivision 9 between April 30, 2001, and December 30, 2001, for fiscal year 2003 and later. <D]

[D>(c) For fiscal year 2004 and later, a district's referendum revenue allowance equals the sum of: <D]

[D>(1) the product of (i) the ratio of the resident marginal cost pupil units the district would have counted for fiscal year 2004 under Minnesota Statutes 2002, section 126C.05 , to the district's resident marginal cost pupil units for fiscal year 2004, times (ii) the initial referendum allowance plus any additional allowance per resident marginal cost pupil unit authorized under subdivision 9 between April 30, 2001, and May 30, 2003, for fiscal year 2003 and later, plus <D]

[D>(2) any additional allowance per resident marginal cost pupil unit authorized under subdivision 9 after May 30, 2003, for fiscal year 2005 and later. <D]

[A>(a) A district's initial referendum allowance for fiscal year 2015 equals the result of the following calculations: <A]

[A>(1) multiply the referendum allowance the district would have received for fiscal year 2015 under Minnesota Statutes 2012, section 126C.17, subdivision 1 , based on elections held before July 1, 2013, by the resident marginal cost pupil units the district would have counted for fiscal year 2015 under Minnesota Statutes 2012, section 126C.05 ; <A]

[A>(2) add to the result of clause (1) the adjustment the district would have received under Minnesota Statutes 2012, section 127A.47, subdivision 7 , paragraphs (a), (b), and <A]

[A>(c), based on elections held before July 1, 2013; <A]

[A>(3) divide the result of clause (2) by the district's adjusted pupil units for fiscal year 2015; and <A]

[A>(4) if the result of clause (3) is less than zero, set the allowance to zero. <A]

[A>(b) A district's referendum allowance equals the sum of the district's initial referendum allowance for fiscal year 2015, plus any additional referendum allowance per adjusted pupil unit authorized after June 30, 2013, minus (i) the location equity revenue subtraction, and (ii) any allowances expiring in fiscal year 2016 or later, provided that the allowance may not be less than zero. For a district with more than one referendum allowance for fiscal year 2015 under Minnesota Statutes 2012, section 126C.17 , the allowance calculated under paragraph (a) must be divided into components such that the same percentage of the district's allowance expires at the same time as the old allowances would have expired under Minnesota Statutes 2012, section 126C.17 . <A]

[A>(c) For purposes of this subdivision, a district's location equity revenue subtraction equals $424 for a district receiving location equity revenue undersection 126C.10, subdivision 2 d, paragraph (a), $212 for a district receiving location equity revenue under section 126C.10, subdivision 2 d, paragraph (b), and zero for all other school districts. <A]

Subd. 2. Referendum allowance limit.

```
(a) Notwithstanding subdivision 1, for fiscal year
    [D>2007 <D]
```

[A>2015 <A]and later, a district's referendum allowance must not exceed
    [D>the greater

of: <D]

[D>(1) the sum of: (i) a district's referendum allowance for fiscal year 1994 times 1.177 times the annual inflationary increase as calculated under paragraph (b) plus (ii) its referendum conversion allowance for fiscal year 2003, minus (iii) $215; <D]

[D>(2) the greater of (i): 26 percent of the formula allowance or (ii) $1,294

times <D] the annual inflationary increase as calculated under paragraph (b)

[D>; or <D] [A>times the greatest of: <A]

[A>(1) $1,845; <A]

[A>(2) the sum of the referendum revenue the district would have received for fiscal year 2015 under Minnesota Statutes 2012, section 126C.17, subdivision 4 , based on elections held before July 1, 2013, and the adjustment the district would have received under Minnesota Statutes 2012, section 127A.47, subdivision 7 , paragraphs (a), (b), and <A]

[A>(c), based on elections held before July 1, 2013, divided by the district's adjusted pupil units for fiscal year 2015; or <A]

[A>(3) the product of the referendum allowance limit the district would have received for fiscal year 2015 under Minnesota Statutes 2012, section 126C.17, subdivision 2 , and the resident marginal cost pupil units the district would have received for fiscal year 2015 under Minnesota Statutes 2012, section 126C.05, subdivision 6 , plus the adjustment the district would have received under Minnesota Statutes 2012, section 127A.47, subdivision 7 , paragraphs (a), (b), and (c), based on elections held before July 1, 2013, divided by the district's adjusted pupil units for fiscal year 2015; minus $424 for a district receiving

location equity revenue under section 126C.10, subdivision 2 d, paragraph (a), minus $212 for a district receiving location equity revenue under section 126C.10, subdivision 2 d, paragraph (b), or <A]

[D>(3) <D]

[A>(4) <A] for a newly reorganized district created after July 1,
    [D>2006

<D] [A>2013 <A], the referendum revenue authority for each reorganizing district

in the year preceding reorganization divided by its
    [D>resident marginal

cost <D] [A>adjusted <A] pupil units for the year preceding reorganization.

(b) For purposes of this subdivision, for fiscal year
    [D>2005 <D]

[A>2016 <A]

and later, "inflationary increase" means one plus the percentage change in the Consumer Price Index for urban consumers, as prepared by the United States

Bureau of Labor Standards, for the current fiscal year to fiscal year

[D>2004 <D] [A>2015 <A].

For fiscal
    [D>years 2009 <D]

[A>year 2016 <A] and later, for purposes of

paragraph (a), clause

[D>(1) <D]

[A>(3) <A], the inflationary increase equals
    [D>the inflationary increase

for fiscal year 2008 plus <D] one-fourth of the percentage increase in the formula allowance for that year compared with the formula allowance for fiscal

```
year
    [D>2008 <D]
```

[A>2015 <A].

Subd. 3. Sparsity exception. A district that qualifies for sparsity revenue under section 126C.10 is not subject to a referendum allowance limit.

Subd. 4. Total referendum revenue. The total referendum revenue for each district equals the district's referendum

```
allowance times the
    [D>resident marginal cost <D]
```

[A>adjusted <A] pupil units

for the school year.

Subd. 5. Referendum equalization revenue.

```
(a)
    [D>For fiscal year 2003 and later, <D] A district's referendum
```

equalization revenue equals the sum of the first tier referendum equalization

```
revenue and the second tier referendum equalization revenue
    [A>, and the
```

third tier referendum equalization revenue <A].

(b) A district's first tier referendum equalization revenue equals the

```
district's first tier referendum equalization allowance times the district's
```

[D>resident marginal cost <D] [A>adjusted <A] pupil units for that year.

```
(c)
    [D>For fiscal year 2006, a district's first tier referendum equalization
```

allowance equals the lesser of the district's referendum allowance under subdivision 1 or $500. For fiscal year 2007, a district's first tier referendum equalization allowance equals the lesser of the district's referendum allowance under subdivision 1 or $600. For fiscal year 2008 and later, <D] A district's first tier referendum equalization allowance equals the lesser of the district's referendum allowance

under subdivision 1 or
    [D>$700 <D]

[A>$300 <A].

(d) A district's second tier referendum equalization revenue equals the district's second tier referendum equalization allowance times the district's

[D>resident marginal cost <D] [A>adjusted <A] pupil units for that year.

(e)
    [D>For fiscal year 2006, a district's second tier referendum

equalization allowance equals the lesser of the district's referendum allowance under subdivision 1 or 18.6 percent of the formula allowance, minus the district's first tier referendum equalization allowance. For fiscal year 2007 and later, <D] A district's second tier referendum equalization allowance equals the lesser of the district's referendum allowance

under subdivision 1 or
    [D>26 percent of the formula allowance <D]

[A>$760

<A], minus the district's first tier referendum equalization allowance.

(f)
    [D>Notwithstanding paragraph (e), the second tier referendum allowance

for a district qualifying for secondary sparsity revenue under section 126C.10, subdivision 7 , or elementary sparsity revenue under section 126C.10, subdivision 8 , equals the district's referendum allowance under subdivision 1 minus the district's first tier referendum equalization allowance. <D] [A>A district's third tier referendum equalization revenue equals the district's third tier referendum equalization allowance times the district's adjusted pupil units for that year. <A]

[A>(g) A district's third tier referendum equalization allowance equals the lesser of the district's referendum allowance under subdivision 1 or 25 percent of the formula allowance, minus the sum of the district's first tier referendum equalization allowance and second tier referendum equalization allowance.

<A]

[A>(h) Notwithstanding paragraph (g), the third tier referendum allowance for a district qualifying for secondary sparsity revenue under section 126C.10, subdivision 7 , or elementary sparsity revenue under section 126C.10, subdivision 8 , equals the district's referendum allowance under subdivision 1 minus the sum of the district's first tier referendum equalization allowance and second tier referendum equalization allowance. <A]

Subd. 6. Referendum equalization levy. (a) For fiscal year 2003 and later, a district's referendum equalization levy

```
equals the sum of the first tier referendum equalization levy
    [D>and <D] thesecond tier referendum equalization levy
    [A>, and the third tier referendum
```

equalization levy <A].

(b) A district's first tier referendum equalization levy equals the district's first tier referendum equalization revenue times the lesser of one or the ratio

```
of the district's referendum market value per resident
    [D>marginal cost <D]pupil unit to
    [D>$476,000 <D]
```

[A>$880,000 <A].

(c) A district's second tier referendum equalization levy equals the district's second tier referendum equalization revenue times the lesser of one or the

```
ratio of the district's referendum market value per resident
    [D>marginalcost <D] pupil unit to
    [D>$270,000 <D]
```

[A>$510,000 <A].

[A>(d) A district's third tier referendum equalization levy equals the district's third tier referendum equalization revenue times the lesser of one or the ratio of the district's referendum market value per resident pupil unit to $290,000. <A]

Subd. 7. Referendum equalization aid. (a) A district's referendum equalization aid equals the difference between its referendum equalization revenue and levy.

```
(b) If a district's actual levy for first
```

[D>or <D]

[A>, <A] second
[A>,

or third <A] tier referendum equalization revenue is less than its maximum levy limit for that tier, aid shall be proportionately reduced.

(c) Notwithstanding paragraph (a), the referendum equalization aid for a district, where the referendum equalization aid under paragraph (a) exceeds 90

percent of the referendum revenue, must not exceed
[D>26 <D]

[A>25 <A]percent of the formula allowance times the district's
[D>resident marginal

cost <D] [A>adjusted <A] pupil units. A district's referendum levy is increased by the amount of any reduction in referendum aid under this paragraph.

Subd. 7a. Referendum tax base replacement aid. For each school district that had a referendum allowance for fiscal year 2002 exceeding $415, for each separately authorized referendum levy, the commissioner of revenue, in consultation with the commissioner of education, shall certify the amount of the referendum levy in taxes payable year 2001 attributable to the portion of the referendum allowance exceeding $415 levied against property classified as class 2, noncommercial 4c(1), or 4c(4), under section 273.13 , excluding the portion of the tax paid by the portion of class 2a property consisting of the house, garage, and surrounding one acre of land. The resulting amount must be used to reduce the district's referendum levy amount otherwise determined, and must be paid to the district each year that the referendum authority remains in effect, is renewed, or new referendum authority is approved. The aid payable under this subdivision must be subtracted from the district's referendum equalization aid under subdivision 7. The referendum equalization aid after the subtraction must not be less than zero.

[A>Subd. 7b. Referendum aid guarantee. <A]

[A>(a) Notwithstanding subdivision 7, a district's referendum equalization aid for fiscal year 2015 must not be less than the sum of the referendum equalization aid the district would have received for fiscal year 2015 under Minnesota Statutes 2012, section 126C.17, subdivision 7 , and the adjustment the district would have received under Minnesota Statutes 2012, section 127A.47, subdivision 7 , paragraphs (a), (b), and (c). <A]

[A>(b) Notwithstanding subdivision 7, referendum equalization aid for fiscal year 2016 and later, for a district qualifying for additional aid under paragraph (a) for fiscal year 2015, must not be less than the product of (1) the district's referendum equalization aid for fiscal year 2015, times (2) the lesser of one or

the ratio of the district's referendum revenue for that school year to the district's referendum revenue for fiscal year 2015, times <A]

[A>(3) the lesser of one or the ratio of the district's referendum market value used for fiscal year 2015 referendum equalization calculations to the district's referendum market value used for that year's referendum equalization calculations. <A]

Subd. 8. Unequalized referendum levy. Each year, a district may levy an amount equal to the difference between its total referendum revenue according to subdivision 4 and its referendum equalization revenue according to subdivision 5.

Subd. 9. Referendum revenue. (a) The revenue authorized by section 126C.10, subdivision 1 , may be increased in the amount approved by the voters of the district at a referendum called for the purpose. The referendum may be called by the board. The referendum must be conducted one or two calendar years before the increased levy authority, if approved, first becomes payable. Only one election to approve an increase may be held in a calendar year. Unless the referendum is conducted by mail under subdivision 11, paragraph (a), the referendum must be held on the first Tuesday after the first Monday in November.

The ballot must state the maximum amount of the increased revenue per

[D>resident marginal cost <D] [A>adjusted <A] pupil unit. The ballot may state a schedule, determined by the board, of increased revenue

per
    [D>resident marginal cost <D]

[A>adjusted <A] pupil unit that differs

from year to year over the number of years for which the increased revenue is authorized or may state that the amount shall increase annually by the rate of inflation. For this purpose, the rate of inflation shall be the annual inflationary increase calculated under subdivision 2, paragraph (b).

The ballot may state that existing referendum levy authority is expiring. In this case, the ballot may also compare the proposed levy authority to the existing expiring levy authority, and express the proposed increase as the amount, if any, over the expiring referendum levy authority. The ballot must designate the specific number of years, not to exceed ten, for which the referendum authorization applies. The ballot, including a ballot on the question to revoke or reduce the

increased revenue amount under paragraph (c), must abbreviate the term "per

[D>resident marginal cost <D] [A>adjusted <A] pupil unit" as "per pupil." The notice required under

section 275.60 may be modified to read, in cases of renewing existing levies at the same amount per pupil as in the previous year: "BY VOTING "YES" ON THIS BALLOT QUESTION, YOU ARE VOTING TO EXTEND AN EXISTING PROPERTY TAX REFERENDUM THAT IS SCHEDULED TO EXPIRE." The ballot may contain a textual portion with the information required in this subdivision and a question stating substantially the following: "Shall the increase in the revenue proposed by (petition to) the board of ........., School District No. .., be approved?"

If approved, an amount equal to the approved revenue per [D>residentmarginal cost <D]

[A>adjusted <A] pupil unit times the [D>resident marginal

cost <D] [A>adjusted <A] pupil units for the school year beginning in the year after the levy is certified shall be authorized for certification for the number of years approved, if applicable, or until revoked or reduced by the voters of the district at a subsequent referendum.

(b) The board must prepare and deliver by first class mail at least 15 days but no more than 30 days before the day of the referendum to each taxpayer a notice of the referendum and the proposed revenue increase. The board need not mail more than one notice to any taxpayer. For the purpose of giving mailed notice under this subdivision, owners must be those shown to be owners on the records of the county auditor or, in any county where tax statements are mailed by the county treasurer, on the records of the county treasurer. Every property owner whose name does not appear on the records of the county auditor or the county treasurer is deemed to have waived this mailed notice unless the owner has requested in writing that the county auditor or county treasurer, as the case may be, include the name on the records for this purpose. The notice must project the anticipated amount of tax increase in annual dollars for typical residential homesteads, agricultural homesteads, apartments, and commercial-industrial property within the school district. The notice for a referendum may state that an existing referendum levy is expiring and project the anticipated amount of increase over the existing referendum levy in the first year, if any, in annual dollars for typical residential homesteads, agricultural homesteads, apartments, and commercial-industrial property within the district. The notice must include the following statement: "Passage of this referendum will result in an increase in your property taxes." However, in cases of renewing existing levies, the notice may include the following statement: "Passage of this referendum extends an existing operating referendum at the same amount per pupil as in the previous year."

(c) A referendum on the question of revoking or reducing the increased revenue amount authorized pursuant to paragraph (a) may be called by the board. A referendum to revoke or reduce the revenue amount must state the amount per resident marginal cost pupil unit by which the authority is to be reduced. Revenue authority approved by the voters of the district pursuant to paragraph (a) must be available to the school district at least once before it is subject to a referendum on its revocation or reduction for subsequent years. Only one revocation or reduction referendum may be held to revoke or reduce referendum revenue for any specific year and for years thereafter.

(d) The approval of 50 percent plus one of those voting on the question is required to pass a referendum authorized by this subdivision.

(e) At least 15 days before the day of the referendum, the district must submit a copy of the notice required under paragraph (b) to the commissioner and to the county auditor of each county in which the district is located. Within 15 days after the results of the referendum have been certified by the board, or in the case of a recount, the certification of the results of the recount by the canvassing board, the district must notify the commissioner of the results of the referendum.

[A>Subd. 9a. Board-approved referendum allowance. Notwithstanding subdivision 9, a school district may convert up to $300 per adjusted pupil unit of referendum authority from voter approved to board approved by a board vote. A district with less than $300 per adjusted pupil unit of referendum authority may authorize new referendum authority up to the difference between $300 per adjusted pupil unit and the district's referendum authority. The board may authorize this levy for up to five years and may subsequently reauthorize that authority in increments of up to five years. <A]

Subd. 10. School referendum levy; market value. A school referendum levy must be levied against the referendum market value of all taxable property as defined in section 126C.01, subdivision 3 . Any referendum levy amount subject to the requirements of this subdivision must be certified separately to the county auditor under section 275.07 .

Subd. 11. Referendum date. (a) Except for a referendum held under paragraph (b), any referendum under this section held on a day other than the first Tuesday after the first Monday in November must be conducted by mail in accordance with section 204B.46 . Notwithstanding subdivision 9, paragraph (b), to the contrary, in the case of a referendum conducted by mail under this paragraph, the notice required by subdivision 9, paragraph (b), must be prepared and delivered by first-class mail at least 20 days before the referendum.

(b) In addition to the referenda allowed in subdivision 9, clause (a), the commissioner may grant authority to a district to hold a referendum on a different day if the district is in statutory operating debt and has an approved plan or has received an extension from the department to file a plan to eliminate the statutory operating debt.

(c) The commissioner must approve, deny, or modify each district's request for a referendum levy on a different day within 60 days of receiving the request from a district.

Subd. 13. Referendum conversion allowance. A school district that received supplemental or transition revenue in fiscal year 2002 may convert its supplemental revenue conversion allowance and transition revenue conversion allowance to additional referendum allowance under subdivision 1 for fiscal year 2003 and thereafter. A majority of the school board must approve the conversion at a public meeting before November 1, 2001. For a district with other referendum authority, the referendum conversion allowance approved by the board continues until the portion of the district's other referendum authority with the earliest expiration date after June 30, 2006, expires. For a district with no other referendum

authority, the referendum conversion allowance approved by the board continues until June 30, 2012.

[A>EFFECTIVE DATE. This section is effective for revenue for fiscal year 2015 and later. <A]

Sec. 6. [A> OPERATING REFERENDUM FREEZE, FISCAL YEAR 2015. <A]

[A>(a) Notwithstanding Minnesota Statutes, section 126C.17, subdivision 9 , a school district may not authorize an increase to its operating referendum in fiscal year 2015. A school district may reauthorize an operating referendum that is expiring in fiscal year 2015. <A]

[A>(b) Paragraph (a) shall not apply to a district if, prior to June 30, 2013, the board adopted a resolution to conduct a referendum in 2013. <A]

[A>(c) Paragraph (a) shall not apply to a district if the district did not authorize an operating referendum in fiscal year 2014. <A]

[A>(d) Paragraph (a) shall not apply to a district if the district is in statutory operating debt under Minnesota Statutes, section 123B.81 , as of June 30, 2013, and has an approved plan with the Department of Education. <A] ARTICLE 4 PROPERTY TAXES

Section 1. AMEND Minnesota Statutes 2012, section 103B.102, subdivision 3 , is amended to read: Subd. 3. Evaluation and report. The Board of Water and Soil Resources shall evaluate performance, financial, and activity information for each local water management entity. The board shall evaluate the entities' progress in accomplishing their adopted

```
plans on a regular basis
    [A>as determined by the board based on budget and
```

operations of the local water management entity <A], but not less than once

```
every
    [D>five <D]
```

[A>ten <A] years.


The board shall maintain a summary of local water management entity performance on the board's Web site. Beginning February 1, 2008, and annually thereafter, the board shall provide an analysis of local water management entity performance to the chairs of the house of representatives and senate committees having jurisdiction over environment and natural resources policy.

Sec. 2. AMEND Minnesota Statutes 2012, section 103B.335 , is amended to read: 103B.335 TAX LEVY AUTHORITY. Subdivision 1. Local water planning and management. The governing body of any county, municipality, or township may levy a tax in

an amount required to implement sections 103B.301 to 103B.355
    [A>or a

comprehensive watershed management plan as defined in section 103B.3363 <A].

Subd. 2. Priority programs; conservation and watershed districts.

A county may levy amounts necessary to pay the reasonable
    [D>increased <D]

costs to soil and water conservation districts and watershed districts of administering and implementing priority programs identified in an approved and

adopted plan
    [A>or a comprehensive watershed management plan as defined in

section 103B.3363 <A].

Sec. 3. AMEND Minnesota Statutes 2012, section 103B.3369, subdivision 5 , is amended to read: Subd. 5. Financial assistance. A base grant may be awarded to a county that provides a match utilizing a water implementation tax or other local source. A water implementation tax that a county intends to use as a match to the base

grant must be levied at a rate
    [A>sufficient to generate a minimum amount

<A] determined by the board. The board may award performance-based grants to local units of government that are responsible for implementing elements of applicable portions of watershed management plans, comprehensive plans, local water management plans, or comprehensive watershed management plans, developed or amended, adopted and approved, according to chapter 103B, 103C, or 103D. Upon request by a local government unit, the board may also award performance-based grants to local units of government to carry out TMDL implementation plans as provided in chapter 114D, if the TMDL implementation plan has been incorporated into the local water management plan according to the procedures for approving comprehensive plans, watershed management plans, local water management plans, or comprehensive watershed management plans under chapter 103B, 103C, or 103D, or if the TMDL implementation plan has undergone a public review process. Notwithstanding section 16A.41, the board may award performance-based grants on an advanced basis. [A>The fee authorized in section 40A.152 may be used as a local match or as a supplement to state funding to accomplish implementation of comprehensive plans, watershed management plans, local water management plans, or comprehensive watershed management plans under chapter 103B, 103C, or 103D. <A]

Sec. 4. AMEND Minnesota Statutes 2012, section 103C.501, subdivision 4 , is amended to read: Subd. 4.

Cost-sharing funds.

(a) The state board shall allocate
[D>at least 70 percent of <D]

cost-sharing funds to areas with high priority erosion, sedimentation, or water quality problems or water quantity problems due to altered hydrology.

The areas must be selected based on
[D>the statewide <D] priorities

established by the state board.

[A>(b) <A] The allocated funds must be used for conservation practices for high priority problems identified in the comprehensive and annual work plans of the

districts
[A>, for the technical assistance portion of the grant funds to

leverage federal or other nonstate funds, or to address high-priority needs identified in local water management plans or comprehensive watershed management plans <A].

[D>(b) The remaining cost-sharing funds may be allocated to districts as follows: <D]

[D>(1) for technical and administrative assistance, not more than 20 percent of the funds; and <D]

[D>(2) for conservation practices for lower priority erosion, sedimentation, or water quality problems. <D]

Sec. 5. AMEND Minnesota Statutes 2012, section 103F.405, subdivision 1 , is amended to read: Subdivision 1. Authority. Each statutory or home rule charter city, town, or county that has planning and zoning authority under sections 366.10 to 366.19 , 394.21 to 394.37 , or 462.351 to 462.365 is encouraged to adopt a soil loss ordinance. The soil loss ordinance must use the soil loss tolerance for each soil series

described in the United States
[D>Soil <D]

[A>Natural Resources <A]Conservation Service Field Office Technical Guide
[A>, or another method

approved by the Board of Water and Soil Resources, <A] to determine the soil loss limits, but the soil loss limits must be attainable by the best practicable soil conservation practice.

Ordinances adopted by local governments

[D>within the metropolitan areadefined in section 473.121 <D] must be consistent with
    [D>local water

management plans adopted under section 103B.235 <D] [A>a comprehensive plan, local water management plan, or watershed management plan developed or amended, adopted, and approved according to chapter 103B, 103C, or 103D <A].

Sec. 6. AMEND Minnesota Statutes 2012, section 168.012, subdivision 9 , is amended to read: Subd. 9. Manufactured homes and park trailers. Manufactured homes and park trailers shall not be taxed as motor vehicles using the public streets and highways and shall be exempt from the motor vehicle tax provisions of this chapter. Except as provided in section 273.125 , manufactured homes and park trailers shall be taxed as personal property. The provisions of Minnesota Statutes 1957, section 272.02 or any other act providing for tax exemption shall be inapplicable to manufactured homes and park trailers, except such manufactured homes as are held by a licensed dealer

[A>or limited dealer, as defined in section 327B.04 , <A] and exempted as

inventory
    [A>under subdivision 9a <A].


Travel trailers not conspicuously displaying current registration plates on the property tax assessment date shall be taxed as manufactured homes if occupied as human dwelling places.

[A>EFFECTIVE DATE. This section is effective for taxes payable in 2014 and thereafter. <A]

Sec. 7. AMEND Minnesota Statutes 2012, section 168.012 , is amended by adding a subdivision to read: [A>Subd. 9a. Manufactured home as dealer inventory. Manufactured homes as defined in section 327.31, subdivision 6 , shall be considered as dealer inventory, on the January 2 assessment date, if the home is: <A]

[A>(1) listed as inventory and held by a licensed or limited dealer; <A]

[A>(2) unoccupied and not available for rent; <A]

[A>(3) connected or not connected to utilities when located in a manufactured home park; and <A]

[A>(4) connected or not connected to utilities when located at a dealer's sales center. The exemption under this subdivision is allowable for up to five assessment years after the date a home is initially claimed as dealer inventory. <A]

[A>EFFECTIVE DATE. This section is effective for taxes payable in 2014 and thereafter. <A]

Sec. 8. AMEND Minnesota Statutes 2012, section 270.41, subdivision 3 , is amended to read: Subd. 3.

[D> Licenses; refusal or revocation <D] [A> Assessor sanctions; refusal to license <A] .

[A>(a) <A] The board may

[A>(i) <A] refuse to grant or renew, or may suspend or revoke, a license of an

```
applicant or licensee
     [A>, or (ii) censure, warn, or fine any licensed
```

assessor, or any other person employed by an assessment jurisdiction or contracting with an assessment jurisdiction for the purpose of valuing or classifying property for property tax purposes, <A] for any of the following causes or acts:

(1) failure to complete required training;

(2) inefficiency or neglect of duty;

(3) failure to comply with the Code of Conduct and Ethics for Licensed Minnesota Assessors adopted by the board pursuant to Laws 2005, First Special Session chapter 3, article 1, section 38;

```
(4) conviction of a crime involving moral turpitude;
     [D>or <D]
```

[A>(5) failure to faithfully and fully perform his or her duties through malfeasance, misfeasance, or nonfeasance; or <A]

[D>(5) <D]

[A>(6) <A] any other cause or act that in the board's opinion warrants a

```
refusal to issue
     [D>or suspension or revocation of <D] a license
     [A>or
```

the imposition of a sanction provided under this subdivision <A].

[A>(b) When appropriate for the level of infraction, a written warning must be given to assessors who have no prior identified infractions. The warning must identify the infraction and, as appropriate, detail future expectations of performance and behavior. Fines must not exceed $1,000 for the first occurrence and must not exceed $3,000 for each occurrence thereafter, and suspensions must not exceed one year for each occurrence, depending in each case upon the severity of the infraction and the level of negligence or intent. An action by the board to impose a sanction is subject to review in a contested case hearing under chapter 14. <A]

[A>EFFECTIVE DATE. This section is effective beginning July 1, 2013. <A]

Sec. 9. AMEND Minnesota Statutes 2012, section 270.41 , is amended by adding a subdivision to read: [A>Subd. 3a. Report on disciplinary actions. Each odd-numbered year, the board must publish a report detailing the number and types of disciplinary actions recommended by the commissioner of revenue under section 273.0645, subdivision 2 , and the disposition of those recommendations by the board. The report must be presented to the house of representatives and senate committees with jurisdiction over property taxes by February 1 of each odd-numbered year. <A]

[A>EFFECTIVE DATE. This section is effective beginning July 1, 2013. <A]

Sec. 10. AMEND Minnesota Statutes 2012, section 270.45 , is amended to read: 270.45 DISPOSITION OF FEES[A>AND FINES<A].

```
All fees
    [A>and fines <A] so established and collected shall be paid to the
```

commissioner of management and budget for deposit in the general fund. The expenses of carrying out the provisions of AMEND sections 270.41 to 270.50 shall be paid from appropriations made to the board. [A>EFFECTIVE DATE. This section is effective beginning July 1, 2013. <A]

Sec. 11. [A> [270C.9901 ] ASSESSOR ACCREDITATION. Every individual who appraises or physically inspects real property for the purpose of determining its valuation or classification for property tax purposes must obtain licensure as an accredited Minnesota assessor from the State Board of Assessors by July 1, 2019, or within four years of that person having become licensed as a certified Minnesota assessor, whichever is later. <A]

[A>EFFECTIVE DATE. This section is effective beginning January 1, 2014. <A]

Sec. 12. AMEND Minnesota Statutes 2012, section 272.02, subdivision 39 , is amended to read: Subd. 39. Economic development; public purpose. The holding of property by a political subdivision of the state for later resale for economic development purposes shall be considered a public purpose in accordance with subdivision 8 for a period not to exceed nine years, except

```
that
    [A>: <A]

[A>(1) <A]
 for property located in a city of
    [D>5,000 <D]

[A>20,000 <A]
```

population or under that is located outside of the metropolitan area as defined

```
in section 473.121, subdivision 2, the period must not exceed 15 years
    [D>.
```

<D] [A>; and <A]

[A>(2) for any property that was acquired on or after January 1, 2000, and on or before December 31, 2010, and is located in a city, the period must not exceed 15 years. <A] The holding of property by a political subdivision of the state for later resale (1) which is purchased or held for housing purposes, or (2) which meets the conditions described in section 469.174, subdivision 10 , shall be considered a public purpose in accordance with subdivision 8. The governing body of the political subdivision which acquires property which is subject to this subdivision shall after the purchase of the property certify to the city or county assessor whether the property is held for economic development purposes or housing purposes, or whether it meets the conditions of section 469.174, subdivision 10 . If the property is acquired for economic development purposes and buildings or other improvements are constructed after acquisition of the property, and if more than one-half of the floor space of the buildings or improvements which is available for lease to or use by a private individual, corporation, or other entity is leased to or otherwise used by a private individual, corporation, or other entity the provisions of this subdivision shall not apply to the property. This subdivision shall not create an exemption from section 272.01, subdivision 2 ; 272.68 ; 273.19 ; or 469.040 , subdivision 3; or other provision of law providing for the taxation of or for payments in lieu of taxes for publicly held property which is leased, loaned, or otherwise made available and used by a private person.

[A>EFFECTIVE DATE. This section is effective for assessment year 2013 and thereafter and for taxes payable in 2014 and thereafter. <A]

Sec. 13. AMEND Minnesota Statutes 2012, section 272.02 , is amended by adding a subdivision to read: [A>Subd. 98. Certain property owned by an Indian tribe. <A]

[A>(a) Property is exempt that: <A]

[A>(1) was classified as 3a under section 273.13, subdivision 24 , for taxes payable in 2013; <A]

[A>(2) is located in a city of the first class with a population greater than 300,000 as of the 2010 federal census; <A]

[A>(3) was on January 2, 2012, and is for the current assessment owned by a federally recognized Indian tribe, or its instrumentality, that is located within the state of Minnesota; and <A]

[A>(4) is used exclusively for tribal purposes or institutions of purely public charity as defined in subdivision 7. <A]

[A>(b) For purposes of this subdivision, a "tribal purpose" means a public purpose as defined in subdivision 8 and includes noncommercial tribal government activities. Property that qualifies for the

exemption under this subdivision is limited to no more than two contiguous parcels and structures that do not exceed in the aggregate 20,000 square feet. Property acquired for single-family housing, market-rate apartments, agriculture, or forestry does not qualify for this exemption. The exemption created by this subdivision expires with taxes payable in 2024. <A]

[A>EFFECTIVE DATE. This section is effective beginning with taxes payable in 2014. <A]

Sec. 14. AMEND Minnesota Statutes 2012, section 272.02 , is amended by adding a subdivision to read: [A>Subd. 99. Electric generation facility; personal property. <A]

[A>(a) Notwithstanding subdivision 9, clause (a), and section 453.54, subdivision 20 , attached machinery and other personal property which is part of an electric generation facility that exceeds five megawatts of installed capacity and meets the requirements of this subdivision is exempt. At the time of construction, the facility must be: <A]

[A>(1) designed to utilize natural gas as a primary fuel; <A]

[A>(2) owned and operated by a municipal power agency as defined in section 453.52, subdivision 8 ; <A]

[A>(3) designed to utilize reciprocating engines paired with generators to produce electrical power; <A]

[A>(4) located within the service territory of a municipal power agency's electrical municipal utility that serves load exclusively in a metropolitan county as defined in section 473.121, subdivision 4 ; and <A]

[A>(5) designed to connect directly with a municipality's substation. <A]

[A>(b) Construction of the facility must be commenced after June 1, 2013, and before June 1, 2017. Property eligible for this exemption does not include electric transmission lines and interconnections or gas pipelines and interconnections appurtenant to the property or the facility. <A]

[A>EFFECTIVE DATE. This section is effective for assessment year 2013, taxes payable in 2014, and thereafter. <A]

Sec. 15. AMEND Minnesota Statutes 2012, section 273.061, subdivision 2 , is amended to read: Subd. 2. Term; vacancy. (a) The terms of county assessors appointed under this section shall be four years. A new term shall begin on January 1 of every fourth year after 1973. When any vacancy in the office occurs, the board of county commissioners, within 90 days thereafter, shall fill the same by appointment for the remainder of the term, following the procedure prescribed in subdivision 1. The term of the county assessor may be terminated by the board of county commissioners at any time, on charges of malfeasance, misfeasance, or nonfeasance by the commissioner of revenue. If the board of county commissioners does not intend to reappoint a county assessor who has been certified by the state Board of Assessors, the board shall present written notice to the county assessor not later than 90 days prior to the termination of the assessor's term, that it does not intend to reappoint the assessor. If written notice is not timely made, the county assessor will automatically be reappointed by the board of county

commissioners. [D>The commissioner of revenue may recommend to the state Board of Assessors the nonrenewal, suspension, or revocation of an assessor's license as provided in sections 270.41 to 270.50 . <D]

(b) In the event of a vacancy in the office of county assessor, through death, resignation or other reasons, the deputy (or chief deputy, if more than one) shall perform the functions of the office. If there is no deputy, the county auditor shall designate a person to perform the duties of the office until an appointment is made as provided in clause (a).

Such person shall perform the duties of the office for a period not exceeding 90 days during which the county board must appoint a county assessor. Such 90-day period may, however, be extended by written approval of the commissioner of revenue.

(c) In the case of the first appointment under paragraph (a) of a county assessor who is accredited but who does not have senior accreditation, an approval of the appointment by the commissioner shall be provisional, provided that a county assessor appointed to a provisional term under this paragraph must reapply to the commissioner at the end of the provisional term. A provisional term may not exceed two years. The commissioner shall not approve the appointment for the remainder of the four-year term unless the assessor has obtained senior accreditation.

[A>EFFECTIVE DATE. This section is effective beginning July 1, 2013. <A]

Sec. 16. AMEND Minnesota Statutes 2012, section 273.0645 , is amended to read: 273.0645 COMMISSIONER REVIEW OF[D>LOCAL<D]ASSESSMENT PRACTICES.[A>Subdivision 1. Local assessment practices.

<A] The commissioner of revenue must review the assessment practices in a taxing jurisdiction if requested in writing by a qualifying number of property owners in that taxing jurisdiction. The request must be signed by the greater of:

(1) ten percent of the registered voters who voted in the last general election; or

(2) five property owners. The request must identify the city, town, or county and describe why a review is sought for that taxing jurisdiction. The commissioner must conduct the review in a reasonable amount of time and report the findings to the county board of the affected county, to the affected city council or town board, if the review is for a specific city or town, and to the property owner designated in the request as the person to receive the report on behalf of all the property owners who signed the request. The commissioner must also provide the report electronically to all property owners who signed the request and provided an e-mail address in order to receive the report electronically.

[A>Subd. 2. Nonfeasance, misfeasance, and malfeasance. County assessors may file a written complaint with the commissioner of revenue detailing allegations of nonfeasance, misfeasance, or malfeasance by a local assessor. After receiving a complaint from a county assessor, the commissioner must complete an investigation and recommend an appropriate action to the State Board of Assessors. The commissioner is

not required to have a written complaint from a county assessor in order to conduct an investigation and recommend an action to the board. Active investigative data relating to the investigation of complaints against an assessor by the commissioner of revenue are subject to section 13.39. <A]

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 17. AMEND Minnesota Statutes 2012, section 273.117 , is amended to read: 273.117 CONSERVATION PROPERTY TAX VALUATION. The value of real property which is subject to a conservation restriction or

```
easement
     [D>may be adjusted <D]
```

[A>shall not be reduced <A] by the assessor

if: (a) the restriction or easement is for a conservation purpose as defined in

```
section 84.64, subdivision 2 , and is recorded on the property;
     [A>and <A]
```

(b) the property is being used in accordance with the terms of the conservation restriction or easement. [A>This section does not apply to (1) conservation restrictions or easements covering riparian buffers along lakes, rivers, and streams that are used for water quantity or quality control; or (2) to easements in a county that has adopted, by referendum, a program to protect farmland and natural areas since 1999. <A]

[A>EFFECTIVE DATE. This section is effective for assessment year 2013 and thereafter, and for taxes payable in 2014 and thereafter. <A]

Sec. 18. AMEND Minnesota Statutes 2012, section 273.13, subdivision 25 , is amended to read: Subd. 25. Class 4. (a) Class 4a is residential real estate containing four or more units and used or held for use by the owner or by the tenants or lessees of the owner as a residence for rental periods of 30 days or more, excluding property qualifying for class 4d. Class 4a also includes hospitals licensed under sections 144.50 to 144.56 , other than hospitals exempt under section 272.02 , and contiguous property used for hospital purposes, without regard to whether the property has been platted or subdivided. The market value of class 4a property has a class rate of 1.25 percent.

(b) Class 4b includes:

(1) residential real estate containing less than four units that does not qualify as class 4bb, other than seasonal residential recreational property;

(2) manufactured homes not classified under any other provision;

(3) a dwelling, garage, and surrounding one acre of property on a nonhomestead farm classified under subdivision 23, paragraph (b) containing two or three units; and

(4) unimproved property that is classified residential as determined under subdivision 33. The market value of class 4b property has a class rate of 1.25 percent.

```
(c) Class 4bb includes
    [D>: <D]
```

[D>(1) <D] nonhomestead residential real estate containing one unit, other than seasonal residential recreational property; and

[D>(2) <D] a single family dwelling, garage, and surrounding one acre of property on a nonhomestead farm classified under subdivision 23, paragraph (b).

Class 4bb property has the same class rates as class 1a property under subdivision 22. Property that has been classified as seasonal residential recreational property at any time during which it has been owned by the current owner or spouse of the current owner does not qualify for class 4bb.

(d) Class 4c property includes:

(1) except as provided in subdivision 22, paragraph (c), real and personal property devoted to commercial temporary and seasonal residential occupancy for recreation purposes, for not more than 250 days in the year preceding the year of assessment. For purposes of this clause, property is devoted to a commercial purpose on a specific day if any portion of the property is used for residential occupancy, and a fee is charged for residential occupancy. Class 4c property under this clause must contain three or more rental units. A "rental unit" is defined as a cabin, condominium, townhouse, sleeping room, or individual camping site equipped with water and electrical hookups for recreational vehicles. A camping pad offered for rent by a property that otherwise qualifies for class 4c under this clause is also class 4c under this clause regardless of the term of the rental agreement, as long as the use of the camping pad does not exceed 250 days. In order for a property to be classified under this clause, either (i) the business located on the property must provide recreational activities, at least 40 percent of the annual gross lodging receipts related to the property must be from business conducted during 90 consecutive days, and either (A) at least 60 percent of all paid bookings by lodging guests during the year must be for periods of at least two consecutive nights; or (B) at least 20 percent of the annual gross receipts must be from charges for providing recreational activities, or (ii) the business must contain 20 or fewer rental units, and must be located in a township or a city with a population of 2,500 or less located outside the metropolitan area, as defined under section 473.121, subdivision 2 , that contains a portion of a state trail administered by the Department of Natural Resources. For purposes of item (i)(A), a paid booking of five or more nights shall be counted as two bookings. Class 4c property also includes commercial use real property used exclusively for recreational purposes in conjunction with other class 4c property classified under this clause and devoted to temporary and seasonal residential occupancy for recreational purposes, up to a

total of two acres, provided the property is not devoted to commercial recreational use for more than 250 days in the year preceding the year of assessment and is located within two miles of the class 4c property with which it is used. In order for a property to qualify for classification under this clause, the owner must submit a declaration to the assessor designating the cabins or units occupied for 250 days or less in the year preceding the year of assessment by January 15 of the assessment year. Those cabins or units and a proportionate share of the land on which they are located must be designated class 4c under this clause as otherwise provided. The remainder of the cabins or units and a proportionate share of the land on which they are located will be designated as class 3a. The owner of property desiring designation as class 4c property under this clause must provide guest registers or other records demonstrating that the units for which class 4c designation is sought were not occupied for more than 250 days in the year preceding the assessment if so requested. The portion of a property operated as a

(1) restaurant, (2) bar, (3) gift shop, (4) conference center or meeting room, and (5) other nonresidential facility operated on a commercial basis not directly related to temporary and seasonal residential occupancy for recreation purposes does not qualify for class 4c. For the purposes of this paragraph, "recreational activities" means renting ice fishing houses, boats and motors, snowmobiles, downhill or cross-country ski equipment; providing marina services, launch services, or guide services; or selling bait and fishing tackle;

(2) qualified property used as a golf course if:

(i) it is open to the public on a daily fee basis. It may charge membership fees or dues, but a membership fee may not be required in order to use the property for golfing, and its green fees for golfing must be comparable to green fees typically charged by municipal courses; and

(ii) it meets the requirements of section 273.112, subdivision 3 , paragraph (d).

A structure used as a clubhouse, restaurant, or place of refreshment in conjunction with the golf course is classified as class 3a property;

(3) real property up to a maximum of three acres of land owned and used by a nonprofit community service oriented organization and not used for residential purposes on either a temporary or permanent basis, provided that:

(i) the property is not used for a revenue-producing activity for more than six days in the calendar year preceding the year of assessment; or

(ii) the organization makes annual charitable contributions and donations at least equal to the property's previous year's property taxes and the property is allowed to be used for public and community meetings or events for no charge, as appropriate to the size of the facility. For purposes of this clause:

(A) "charitable contributions and donations" has the same meaning as lawful gambling purposes under section 349.12, subdivision 25 , excluding those purposes relating to the payment of taxes, assessments, fees, auditing costs, and utility payments;

(B) "property taxes" excludes the state general tax;

(C) a "nonprofit community service oriented organization" means any corporation, society, association, foundation, or institution organized and operated exclusively for charitable, religious, fraternal, civic, or educational purposes, and which is exempt from federal income taxation pursuant to section 501(c)(3), (8), (10), or (19) of the Internal Revenue Code; and

(D) "revenue-producing activities" shall include but not be limited to property or that portion of the property that is used as an on-sale intoxicating liquor or 3.2 percent malt liquor establishment licensed under chapter 340A, a restaurant open to the public, bowling alley, a retail store, gambling conducted by organizations licensed under chapter 349, an insurance business, or office or other space leased or rented to a lessee who conducts a for-profit enterprise on the premises. Any portion of the property not qualifying under either item (i) or (ii) is class 3a. The use of the property for social events open exclusively to members and their guests for periods of less than 24 hours, when an admission is not charged nor any revenues are received by the organization shall not be considered a revenue-producing activity. The organization shall maintain records of its charitable contributions and donations and of public meetings and events held on the property and make them available upon request any time to the assessor to ensure eligibility. An organization meeting the requirement under item (ii) must file an application by May 1 with the assessor for eligibility for the current year's assessment. The commissioner shall prescribe a uniform application form and instructions;

(4) postsecondary student housing of not more than one acre of land that is owned by a nonprofit corporation organized under chapter 317A and is used exclusively by a student cooperative, sorority, or fraternity for on-campus housing or housing located within two miles of the border of a college campus;

(5)(i) manufactured home parks as defined in section 327.14, subdivision 3 , excluding manufactured home parks described in section 273.124, subdivision 3 a, and (ii) manufactured home parks as defined in section 327.14, subdivision 3 , that are described in section 273.124, subdivision 3 a;

(6) real property that is actively and exclusively devoted to indoor fitness, health, social, recreational, and related uses, is owned and operated by a not-for-profit corporation, and is located within the metropolitan area as defined in section 473.121, subdivision 2 ;

(7) a leased or privately owned noncommercial aircraft storage hangar not exempt under section 272.01, subdivision 2 , and the land on which it is located, provided that:

(i) the land is on an airport owned or operated by a city, town, county, Metropolitan Airports Commission, or group thereof; and

(ii) the land lease, or any ordinance or signed agreement restricting the use of the leased premise, prohibits commercial activity performed at the hangar. If a hangar classified under this clause is sold after June 30, 2000, a bill of sale must be filed by the new owner with the assessor of the county where the property is located within 60 days of the sale;

(8) a privately owned noncommercial aircraft storage hangar not exempt undersection 272.01, subdivision 2 , and the land on which it is located, provided that:

(i) the land abuts a public airport; and

(ii) the owner of the aircraft storage hangar provides the assessor with a signed agreement restricting the use of the premises, prohibiting commercial use or activity performed at the hangar; and

(9) residential real estate, a portion of which is used by the owner for homestead purposes, and that is also a place of lodging, if all of the following criteria are met:

(i) rooms are provided for rent to transient guests that generally stay for periods of 14 or fewer days;

(ii) meals are provided to persons who rent rooms, the cost of which is incorporated in the basic room rate;

(iii) meals are not provided to the general public except for special events on fewer than seven days in the calendar year preceding the year of the assessment; and

(iv) the owner is the operator of the property. The market value subject to the 4c classification under this clause is limited to five rental units. Any rental units on the property in excess of five, must be valued and assessed as class 3a. The portion of the property used for purposes of a homestead by the owner must be classified as class 1a property under subdivision 22;

(10) real property up to a maximum of three acres and operated as a restaurant as defined under section 157.15, subdivision 12 , provided it: (A) is located on a lake as defined under section 103G.005, subdivision 15 , paragraph (a), clause (3); and (B) is either devoted to commercial purposes for not more than 250 consecutive days, or receives at least 60 percent of its annual gross receipts from business conducted during four consecutive months. Gross receipts from the sale of alcoholic beverages must be included in determining the property's qualification under subitem (B).

The property's primary business must be as a restaurant and not as a bar. Gross receipts from gift shop sales located on the premises must be excluded. Owners of real property desiring 4c classification under this clause must submit an annual declaration to the assessor by February 1 of the current assessment year, based on the property's relevant information for the preceding assessment year;

(11) lakeshore and riparian property and adjacent land, not to exceed six acres, used as a marina, as defined in section 86A.20, subdivision 5 , which is made accessible to the public and devoted to recreational use for marina services. The marina owner must annually provide evidence to the assessor that it provides services, including lake or river access to the public by means of an access ramp or other facility that is either located on the property of the marina or at a publicly owned site that abuts the property of the marina. No more than 800 feet of lakeshore may be included in this classification. Buildings used in conjunction with a marina for marina services, including but not limited to buildings used to provide food and beverage services, fuel, boat repairs, or the sale of bait or fishing tackle, are classified

as class 3a property; and

(12) real and personal property devoted to noncommercial temporary and seasonal residential occupancy for recreation purposes. Class 4c property has a class rate of 1.5 percent of market value, except that (i) each parcel of noncommercial seasonal residential recreational property under clause (12) has the same class rates as class 4bb property, (ii) manufactured home parks assessed under clause (5), item (i), have the same class rate as class 4b property, and the market value of manufactured home parks assessed under clause (5), item (ii), has the same class rate as class 4d property if more than 50 percent of the lots in the park are occupied by shareholders in the cooperative corporation or association and a class rate of one percent if 50 percent or less of the lots are so occupied, (iii) commercial-use seasonal residential recreational property and marina recreational land as described in clause (11), has a class rate of one percent for the first $500,000 of market value, and 1.25 percent for the remaining market value, (iv) the market value of property described in clause (4) has a class rate of one percent, (v) the market value of property described in clauses (2), (6), and

(10) has a class rate of 1.25 percent, and (vi) that portion of the market value of property in clause (9) qualifying for class 4c property has a class rate of 1.25 percent.

(e) Class 4d property is qualifying low-income rental housing certified to the assessor by the Housing Finance Agency under section 273.128, subdivision 3 . If only a portion of the units in the building qualify as low-income rental housing units as certified under section 273.128, subdivision 3 , only the proportion of qualifying units to the total number of units in the building qualify for class 4d. The remaining portion of the building shall be classified by the assessor based upon its use. Class 4d also includes the same proportion of land as the qualifying low-income rental housing units are to the total units in the building. For all properties qualifying as class 4d, the market value determined by the assessor must be based on the normal approach to value using normal unrestricted rents.

[A>(f) The first tier of market value of <A] class 4d property has a class rate of 0.75 percent. [A>The remaining value of class 4d property has a class rate of 0.25 percent. For the purposes of this paragraph, the "first tier of market value of class 4d property" means the market value of each housing unit up to the first tier limit. For the purposes of this paragraph, all class 4d property value must be assigned to individual housing units. The first tier limit is $100,000 for assessment year 2014. For subsequent years, the limit is adjusted each year by the average statewide change in estimated market value of property classified as class 4a and 4d under this section for the previous assessment year, excluding valuation change due to new construction, rounded to the nearest $1,000, provided, however, that the limit may never be less than $100,000. Beginning with assessment year 2015, the commissioner of revenue must certify the limit for each assessment year by November 1 of the previous year. <A]

[A>EFFECTIVE DATE. This section is effective beginning with assessment year 2014. <A]

Sec. 19. AMEND Minnesota Statutes 2012, section 279.01, subdivision 1 , is amended to read:
Subdivision 1. Due dates; penalties.

Except as provided in [D>subdivision <D]

[A>subdivisions <A] 3 [D>or 4

<D] [A>to 5 <A], on May 16 or 21 days after the postmark date on the envelope containing the property tax statement, whichever is later, a penalty accrues and thereafter is charged upon all unpaid taxes on real estate on the current lists in the hands of the county treasurer. The penalty is at a rate of two percent on homestead property until May 31 and four percent on June 1. The penalty on nonhomestead property is at a rate of four percent until May 31 and eight percent on June 1. This penalty does not accrue until June 1 of each year, or 21 days after the postmark date on the envelope containing the property tax statements, whichever is later, on commercial use real property used for seasonal residential recreational purposes and classified as class 1c or 4c, and on other commercial use real property classified as class 3a, provided that over 60 percent of the gross income earned by the enterprise on the class 3a property is earned during the months of May, June, July, and August. In order for the first half of the tax due on class 3a property to be paid after May 15 and before June 1, or 21 days after the postmark date on the envelope containing the property tax statement, whichever is later, without penalty, the owner of the property must attach an affidavit to the payment attesting to compliance with the income provision of this subdivision. Thereafter, for both homestead and nonhomestead property, on the first day of each month beginning July 1, up to and including October 1 following, an additional penalty of one percent for each month accrues and is charged on all such unpaid taxes provided that if the due date was extended beyond May 15 as the result of any delay in mailing property tax statements no additional penalty shall accrue if the tax is paid by the extended due date. If the tax is not paid by the extended due date, then all penalties that would have accrued if the due date had been May 15 shall be charged. When the taxes against any tract or lot exceed $100, one-half thereof may be paid prior to May 16 or 21 days after the postmark date on the envelope containing the property tax statement, whichever is later; and, if so paid, no penalty attaches; the remaining one-half may be paid at any time prior to October 16 following, without penalty; but, if not so paid, then a penalty of two percent accrues thereon for homestead property and a penalty of four percent on nonhomestead property. Thereafter, for homestead property, on the first day of November an additional penalty of four percent accrues and on the first day of December following, an additional penalty of two percent accrues and is charged on all such unpaid taxes. Thereafter, for nonhomestead property, on the first day of November and December following, an additional penalty of four percent for each month accrues and is charged on all such unpaid taxes. If one-half of such taxes are not paid prior to May 16 or 21 days after the postmark date on the envelope containing the property tax statement, whichever is later, the same may be paid at any time prior to October 16, with accrued penalties to the date of payment added, and thereupon no penalty attaches to the remaining one-half until October 16 following. This section applies to payment of personal property taxes assessed against improvements to leased property, except as provided by section 277.01, subdivision 3 . A county may provide by resolution that in the case of a property owner that has multiple tracts or parcels with

aggregate taxes exceeding $100, payments may be made in installments as provided in this subdivision. The county treasurer may accept payments of more or less than the exact amount of a tax installment due. Payments must be applied first to the oldest installment that is due but which has not been fully paid. If the accepted payment is less than the amount due, payments must be applied first to the penalty accrued for the year or the installment being paid. Acceptance of partial payment of tax does not constitute a waiver of the minimum payment required as a condition for filing an appeal under section 278.03 or any other law, nor does it affect the order of payment of delinquent taxes under section 280.39 .

Sec. 20. AMEND Minnesota Statutes 2012, section 279.01 , is amended by adding a subdivision to read: [A>Subd. 5. Federal active service exception. In the case of a homestead property owned by an individual who is on federal active service, as defined in section 190.05, subdivision 5 c, as a member of the National Guard or a reserve component, a four-month grace period is granted for complying with the due dates imposed by subdivision 1. During this period, no late fees or penalties shall accrue against the property. The due date for property taxes owed under this chapter for an individual covered by this subdivision shall be September 15 for taxes due on May 15, and February 15 of the following year for taxes due on October 15. A taxpayer making a payment under this subdivision must accompany the payment with a signed copy of the taxpayer's orders or form DD214 showing the dates of active service which clearly indicate that the taxpayer was in active service as a member of the National Guard or a reserve component on the date the payment was due. This grace period applies to all homestead property owned by individuals on federal active service, as herein defined, for all of that property's due dates which fall on a day that is included in the taxpayer's federal active service. <A]

Sec. 21. AMEND Minnesota Statutes 2012, section 279.02 , is amended to read: 279.02 DUTIES OF COUNTY AUDITOR AND TREASURER.[A>Subdivision 1. Delinquent property; rates.

<A] On the first business day in January, of each year, the county treasurer shall return the tax lists on hand to the county auditor, who shall compare the same with the statements receipted for by the treasurer on file in the auditor's office and each tract or lot of real property against which the taxes, or any part thereof, remain unpaid, shall be deemed delinquent, and thereupon an additional penalty of two percent on the amount of the original tax remaining unpaid shall immediately accrue and thereafter be charged upon all such delinquent taxes; and any auditor who shall make out and deliver any statement of delinquent taxes without including therein the penalties imposed by law, and any treasurer who shall receive payment of such taxes without including in such payment all items as shown on the auditor's statement, shall be liable to the county for the amounts of any items omitted.

[A>Subd. 2. Federal active service exception. Notwithstanding subdivision 1, a homestead property owned by an individual who is on federal active service, as defined in section 190.05, subdivision 5 c, as a member of the National Guard or a reserve component, shall not be deemed delinquent under this section if the due dates imposed under section 279.01 fall on a day in which the individual was on federal active service. <A]

Sec. 22. AMEND Minnesota Statutes 2012, section 279.37, subdivision 1 a , is amended to read: Subd.

1a. Class 3a property. (a) The delinquent taxes upon a parcel of property which was classified class

3a, for the previous year's assessment [D>and had a total market value of

$500,000 or less for that same assessment <D] shall be eligible to be composed

into a confession of judgment [A>with the approval of the county auditor

<A]. Property qualifying under this subdivision shall be subject to the same provisions as provided in this section except as provided in paragraphs (b) to

[D>(d) <D]

[A>(f) <A].

(b) Current year taxes and penalty due at the time the confession of judgment is entered must be paid.

(c) The down payment must include all special assessments due in the current tax year, all delinquent special assessments, and 20 percent of the ad valorem tax, penalties, and interest accrued against the parcel. The balance remaining is payable in four equal annual installments. [A>A municipality as defined in section 429.011 , cities of the first class, and other special assessment authorities, that have certified special assessments against any parcel of property, may, through resolution, waive the requirement of payment of all current and delinquent special assessments at the time the confession is entered. If the municipality, city, or authority grants the waiver, 100 percent of all current year taxes, special assessments, and penalties due at the time, along with 20 percent of all delinquent taxes, special assessments, penalties, interest, and fees must be paid. The balance remaining shall be subject to and included in the installment plan. <A]

[A>(d) When there are current and delinquent special assessments certified and billed against a parcel, the assessment authority or municipality as defined in section 429.011 may abate under section 375.192, subdivision 2 , all special assessments and the penalty and interest affiliated with the special assessments, and reassess the special assessments, penalties, and interest accrued thereon, under section 429.071, subdivision 2 . The municipality shall notify the county auditor of its intent to reassess as a precondition to the entry of the confession of judgment. Upon the notice to abate and reassess, the municipality shall, through resolution, notify the county auditor to remove all current and delinquent special assessments and the accrued penalty and interest on the special assessments, and the payment of all or a portion of the current and delinquent assessments shall not be required as part of the down payment due at the time the confession of judgment is entered in accordance with paragraph (c). <A]

[D>(d) <D]

[A>(e) <A] The amounts entered in judgment bear interest at the rate provided in section 279.03,

subdivision 1 a , commencing with the date the judgment is entered. The interest rate is subject to change each year on the unpaid balance in the manner provided in section 279.03, subdivision 1 a .

[A>(f) The county auditor may require conditions on properties including, but not limited to, environmental remediation action plan requirements, restrictions, or covenants, when considering a request for approval of eligibility for composition into a confession of judgment for delinquent taxes upon a parcel of property which was classified class 3a for the previous year's assessment. <A]

Sec. 23. AMEND Minnesota Statutes 2012, section 279.37, subdivision 2 , is amended to read: Subd. 2. Installment payments. The owner of any such parcel, or any person to whom the right to pay taxes has been given by statute, mortgage, or other agreement, may make and file with the county auditor of the county in which the parcel is located a written offer to pay the current taxes each year before they become delinquent, or to contest the taxes under Minnesota Statutes 1941, sections 278.01 to 278.13 , and agree to confess judgment for the amount provided, as determined by the county auditor. By filing the offer, the owner waives all irregularities in connection with the tax proceedings affecting the parcel and any defense or objection which the owner may have to the proceedings, and also waives the requirements of any notice of default in the payment of any installment or interest to become due pursuant to the composite judgment to be so entered. [A>Unless the property is subject to subdivision 1a, <A] with the offer, the owner shall

[A>(i) <A] tender one-tenth of the amount of the delinquent taxes, costs,

```
penalty, and interest, and
    [D>shall <D]
```

[A>(ii) <A] tender all current year taxes and penalty due at the time the confession of judgment is entered. In the offer, the owner shall agree to pay the balance in nine equal installments, with interest as provided in section 279.03 , payable annually on installments remaining unpaid from time to time, on or before December 31 of each year following the year in which judgment was confessed. The offer must be substantially as follows: "To the court administrator of the district court of ........... county, I, ....................., am the owner of the following described parcel of real estate located in .................... county, Minnesota: ............................. Upon that real estate there are delinquent taxes for the year ........., and prior years, as follows: (here insert year of delinquency and the total amount of delinquent taxes, costs, interest, and penalty).

By signing this document I offer to confess judgment in the sum of $...... and waive all irregularities in the tax proceedings affecting these taxes and any defense or objection which I may have to them, and direct judgment to be entered for the amount stated above, minus the sum of $............, to be paid

```
with this document, which is one-tenth
    [A>or one-fifth <A] of the amount of
```

the taxes, costs, penalty, and interest stated above.

```
I agree to pay the balance of the judgment in nine
    [A>or four <A] equal,
```

annual installments, with interest as provided in section 279.03 , payable annually, on the installments remaining unpaid. I agree to pay the installments and interest on or before December 31 of each year following the year in which this judgment is confessed and current taxes each year before they become delinquent, or within 30 days after the entry of final judgment in proceedings to contest the taxes under Minnesota Statutes, sections 278.01 to 278.13 . Dated .............., ......."

Sec. 24. AMEND Minnesota Statutes 2012, section 281.14 , is amended to read: 281.14 EXPIRATION OF TIME FOR REDEMPTION. The time for redemption from any tax sale, whether made to the state or to a private person, shall not expire until notice of expiration of redemption, as

```
provided in section
    [D>281.13 <D]

[A>281.17 <A], shall have been given.
```

Sec. 25. AMEND Minnesota Statutes 2012, section 281.17 , is amended to read: 281.17 PERIOD FOR REDEMPTION. Except for properties for which the period of redemption has been limited under sections 281.173 and 281.174 , the following periods for redemption apply. The period of redemption for all lands sold to the state at a tax judgment sale shall be three years from the date of sale to the state of Minnesota [D>if the land is within an incorporated area unless it is: (a) nonagricultural homesteaded land as defined in section 273.13, subdivision 22 ; (b) homesteaded agricultural land as defined in section 273.13, subdivision 23 , paragraph (a); or (c) seasonal residential recreational land as defined in section 273.13, subdivision 22 , paragraph (c), or 25, paragraph (d), clause (1), for which the period of redemption is five years from the date of sale to the state of Minnesota <D]. The period of redemption for homesteaded lands as defined in AMEND section 273.13, subdivision 22 , located in a targeted neighborhood as defined in Laws 1987, chapter 386, article 6, section 4, and sold to the state at a tax judgment sale is three years from the date of sale. The period of redemption for all lands located in a targeted neighborhood as defined in Laws 1987, chapter 386, article 6, section 4, except (1) homesteaded lands as defined in AMEND section 273.13, subdivision 22 , and (2) for periods of redemption beginning after June 30, 1991, but before July 1, 1996, lands located in the Loring Park targeted neighborhood on which a notice of lis pendens has been served, and sold to the state at a tax judgment sale is one year from the date of sale. The period of redemption for all real property constituting a mixed municipal solid waste disposal facility that is a qualified facility under section 115B.39, subdivision 1 , is one year from the date of the sale to the state of Minnesota. [D>The period of redemption for all other lands sold to the state at a tax judgment sale shall be five years from the date of sale, except that the period of redemption for nonhomesteaded agricultural land as defined in section 273.13, subdivision 23 , paragraph <D]

[D>(b), shall be two years from the date of sale if at that time that property is owned by a person who

<span style="color:red">owns one or more parcels of property on which taxes are delinquent, and the delinquent taxes are more than 25 percent of the prior year's school district levy. <D]</span>

Sec. 26. AMEND Minnesota Statutes 2012, section 287.05 , is amended by adding a subdivision to read: [A>Subd. 10. Hennepin and Ramsey Counties. For properties located in Hennepin and Ramsey Counties, the county may impose an additional mortgage registry tax as defined in sections 383A.80 and 383B.80 . <A]

[A>EFFECTIVE DATE. This section is effective for deeds and mortgages acknowledged on or after July 1, 2013. <A]

Sec. 27. [A> [287.40 ] HENNEPIN AND RAMSEY COUNTIES. For properties located in Hennepin and Ramsey Counties, the county may impose an additional deed tax as defined in sections 383A.80 and 383B.80 . <A]

[A>EFFECTIVE DATE. This section is effective for deeds and mortgages acknowledged on or after July 1, 2013. <A]

Sec. 28. AMEND Minnesota Statutes 2012, section 383A.80, subdivision 4 , is amended to read: Subd. 4. Expiration.

The authority to impose the tax under this section expires January 1,

[D>2013 <D] [A>2028 <A].

[A>EFFECTIVE DATE. This section is effective for all deeds and mortgages acknowledged on or after July 1, 2013. <A]

Sec. 29. AMEND Minnesota Statutes 2012, section 383B.80, subdivision 4 , is amended to read: Subd. 4. Expiration.

The authority to impose the tax under this section expires January 1,

[D>2013 <D] [A>2028 <A].

[A>EFFECTIVE DATE. This section is effective for all deeds and mortgages acknowledged on or after July 1, 2013. <A]

Sec. 30. AMEND Minnesota Statutes 2012, section 428A.101 , is amended to read: 428A.101 DEADLINE FOR SPECIAL SERVICE DISTRICT UNDER GENERAL LAW.

The establishment of a new special service district after June 30,

[D>2013

<D] [A>2028 <A], requires enactment of a special law authorizing the establishment. [A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 31. AMEND Minnesota Statutes 2012, section 428A.21 , is amended to read: 428A.21 DEADLINE FOR HOUSING IMPROVEMENT DISTRICTS UNDER GENERAL LAW.

The establishment of a new housing improvement area after June 30,
    [D>2013

<D] [A>2028 <A], requires enactment of a special law authorizing the establishment of the area. [A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 32. AMEND Minnesota Statutes 2012, section 473F.08, subdivision 3 a , is amended to read: Subd. 3a. Bloomington computation.

[A>(a) <A] Beginning in 1987 and each subsequent year through 1998, the city of Bloomington shall determine the interest payments for that year for the bonds which have been sold for the highway improvements pursuant to Laws 1986, chapter 391, section 2, paragraph (g).

Effective for property taxes payable in 1988 through property taxes payable in 1999, after the Hennepin County auditor has computed the areawide portion of the levy for the city of Bloomington pursuant to subdivision 3, clause (a), the auditor shall annually add a dollar amount to the city of Bloomington's areawide portion of the levy equal to the amount which has been certified to the auditor by the city of Bloomington for the interest payments for that year for the bonds which were sold for highway improvements. The total areawide portion of the levy for the city of Bloomington including the additional amount for interest repayment certified pursuant to this subdivision shall be certified by the Hennepin County auditor to the administrative auditor pursuant to subdivision 5. The Hennepin County auditor shall distribute to the city of Bloomington the additional areawide portion of the levy computed pursuant to this subdivision at the same time that payments are made to the other counties pursuant to subdivision 7a.

For property taxes payable from the year 2009 through
    [D>2018 <D]

[A>2014

<A], the Hennepin County auditor shall adjust Bloomington's contribution to the areawide gross tax capacity upward each year by a value equal to ten percent of the total additional areawide levy distributed to Bloomington under this subdivision from 1988 to 1999, divided by the areawide tax rate for taxes payable in the previous year.

[A>(b) For property taxes payable from 2015 through 2018, the administrative auditor shall increase the

areawide net tax capacity each year by an amount equal to ten percent of the total additional areawide levy distributed to Bloomington under this subdivision from 1988 to 1999, divided by the areawide tax rate for taxes payable in the previous year. The administrative auditor must notify the commissioner of revenue of the amount determined by multiplying the increase in the areawide net tax capacity by the areawide tax rate determined under subdivision 5. The commissioner of revenue must pay the amount determined each payable year to the administrative auditor in two installments on July 10 and November 10, for distribution and settlement as provided in subdivision 7a. <A]

[A>(c) A sum sufficient to meet the obligations under this subdivision is annually appropriated from the general fund to the commissioner of revenue. <A]

[A>EFFECTIVE DATE. This section is effective beginning with taxes payable in 2015. <A]

Sec. 33. Laws 1988, chapter 645, section 3, as amended by Laws 1999, chapter 243, article 6, section 9, Laws 2000, chapter 490, article 6, section 15, and Laws 2008, chapter 154, article 2, section 30, is amended to read: Sec. 3. TAX; PAYMENT OF EXPENSES.

(a) The tax levied by the hospital district under Minnesota Statutes, section 447.34 , must not be levied at a rate that exceeds the amount authorized to be levied under that section. The proceeds of the tax may be used for all purposes of the hospital district, except as provided in paragraph (b).

(b) 0.015 percent of taxable market value of the tax in paragraph (a) may be

```
used
    [D>solely <D]
```

[A>by the Cook ambulance service and the Orr ambulanceservice <A] for the
```
purpose of
    [D>capital expenditures as it relates to
```

<D] [A>: <A]

[A>(1) <A] ambulance acquisitions for the Cook ambulance service and the Orr

```
ambulance service
    [D>and not <D]
```

[A>; <A]

[A>(2) attached and portable equipment for use in and for the ambulances; and <A]

[A>(3) parts and replacement parts for maintenance and repair of the ambulances.

The money may not be used <A] for administrative
    [A>, operation, <A] or

salary expenses.

[A>(c) <A] The part of the levy referred to in paragraph (b) must be

administered by the Cook Hospital and passed on
    [A>in equal amounts <A]directly to the Cook area ambulance service board
and the city of Orr to be

[D>held in trust until funding for a new ambulance is needed by either the Cook ambulance service or the Orr ambulance service <D] [A>used for the purposes in paragraph (b) <A].

Sec. 34. Laws 1999, chapter 243, article 6, section 11, is amended to read: Sec. 11. CEMETERY LEVY FOR SAWYER BY CARLTON COUNTY.

[D>Subdivision 1. Levy authorized.

<D] Notwithstanding other law to the contrary, the Carlton county board of

commissioners may
    [A>annually <A] levy in and for the unorganized
   [D>township <D]

[A>territory <A] of Sawyer an amount
    [D>up to $1,000 annually
<D] for cemetery purposes
    [D>, beginning with taxes payable in 2000 and

ending with taxes payable in 2009 <D].

[D>Subd. 2. Effective date. This section is effective June 1, 1999, without local approval. <D]

[A>EFFECTIVE DATE; LOCAL APPROVAL. This section applies to taxes payable in 2014 and thereafter, and is effective the day after the Carlton County Board of Commissioners and its chief clerical officer timely complete their compliance with Minnesota Statutes, section 645.021 , subdivisions 2 and 3. <A]

Sec. 35. Laws 2008, chapter 366, article 5, section 33, the effective date, is amended to read: EFFECTIVE DATE.This section is effective for taxes levied in 2008, payable in

2009, and is repealed effective for taxes levied in

[D>2013 <D]

[A>2018 <A],payable in
[D>2014 <D]

[A>2019 <A], and thereafter.

[A>EFFECTIVE DATE. This section is effective beginning with taxes payable in 2014. <A]

Sec. 36. Laws 2009, chapter 88, article 2, section 46, subdivision 1, is amended to read: Subdivision 1. Agreement. The city of Cloquet and Perch Lake Township, by resolution of each of their governing bodies, may establish the Cloquet Area Fire and Ambulance Taxing

District for the purpose of providing fire
[D>and <D]

[A>or <A] ambulanceservices
[A>, or both, <A] throughout the district.

In this section, "municipality" means home rule charter and statutory cities, towns, and Indian tribes. The district may exercise all the powers relating to fire and ambulance

services of the municipalities that receive fire
[D>and <D]

[A>or <A]ambulance services
[A>, or both, <A] from the district.
[A>Upon application, <A]
any other municipality
[D>that is contiguous to a

municipality that is a member of the district <D] may join the district with the agreement of the municipalities that comprise the district at the time of its application to join.

Sec. 37. Laws 2009, chapter 88, article 2, section 46, subdivision 3, is amended to read: Subd. 3. Tax.

The district board may impose a property tax on taxable property
[D>in the

district <D] [A>as provided in this subdivision <A]. [D>This <D] [A>The board shall annually determine the total amount of the levy that is attributable to the cost of providing fire services and the cost of providing ambulance services within the primary service area. For those municipalities that only receive ambulance

services, the costs for the provision of ambulance services shall be levied against taxable property within those municipalities at a rate necessary not to exceed 0.019 percent of the estimated market value. For those municipalities that receive both fire and ambulance services, the <A]

```
tax shall be imposed at a rate that does not exceed 0.2835 percent of
    [D>taxable <D]
```

[A>estimated <A] market value
```
    [D>for taxes payable in 2010.
```

The board shall annually determine the separate amounts of the levy that are attributable to the cost of providing fire services and the cost of providing ambulance services. Costs for the provision of ambulance services shall be levied against taxable property within the area of the district that receive the services. Costs for the provision of fire services shall be levied against taxable property within the area of the district that receive the services <D].

```
When
    [A>a member municipality opts to receive fire service from the districtor
<A] an additional municipality becomes a member of the district, the
    [D>additional <D]
 cost of providing
    [D>ambulance and <D] fire services to
that
    [D>municipality will <D]
```

[A>community shall <A] be determined by the

board and added to the maximum levy amount. Each county auditor of a county that contains a municipality subject to the tax under this section must collect the tax and pay it to the Fire and Ambulance Special Taxing District. The district may also impose other fees or charges as allowed by law for the provision of fire and ambulance services.

Sec. 38. Laws 2010, chapter 389, article 1, section 12, the effective date, is amended to read:

```
EFFECTIVE DATE.This section is effective for assessment
    [D>years <D]
```

[A>year<A] 2010 and
```
    [D>2011, for taxes payable in 2011 and 2012 <D]
```

[A>thereafter

<A].

[A>EFFECTIVE DATE. This section is effective for assessment year 2012 and thereafter. <A]

Sec. 39. [A> MINNEAPOLIS AND ST. PAUL ENTERTAINMENT FACILITIES COORDINATION STUDY; APPROPRIATION. <A]

[A>Subdivision 1. Statement of purpose. The legislature finds that the national economic structure of professional sports financing, as directly or indirectly sanctioned by federal law, compels state and local governments in smaller metropolitan areas, such as Minneapolis and St. Paul, to help finance the construction and operation of venues for professional sports franchises as a condition of hosting these franchises. The burden and risk associated with providing this assistance justifies authorizing and directing the cities and any associated private entities to enter into arrangements that attempt to maximize the combined revenues of these facilities from direct users, including those unrelated to professional sports, such as, but not limited to, joint booking of concerts and other events, to minimize the cost and risk to general taxpayers. Any efforts to put in place such joint marketing, promotion, and scheduling arrangements by the cities or associated private entities, in the view of the legislature, is a petition for enactment of this or subsequent enabling legislation under the Noerr-Pennington doctrine or state action under the Parker antitrust doctrine. This legislation and any resulting arrangements are intended to minimize the potential burden on general taxpayers of financing and operation of the arenas. <A]

[A>Subd. 2. Study and report. On or before February 1, 2014, the cities of Minneapolis and St. Paul, in consultation with representatives of the primary professional sports team tenant of each arena, shall study and report to the legislature on establishing a joint governing structure to be responsible for the joint administration, financing, and operations of the facilities and the possible effects of joint governance on the finances of each arena and each city. The commissioner of administration, in consultation with the two cities, shall contract with an independent consultant to conduct all or a portion of the study. The cities of Minneapolis and St. Paul together shall pay one-half of the cost of the consultant contract. The commissioner may accept funding from other public entities and private organizations to pay for the contract. The study must: <A]

[A>(1) examine the current finances of each arena including past and projected costs and revenues, projected capital improvements, and the current and projected impact of each arena on each city's general fund; <A]

[A>(2) determine the impact of joint governance on the future finances of each city; <A]

[A>(3) examine joint scheduling, marketing, and promotion of events at the arenas, either within a joint governance structure or as separate entities; and <A]

[A>(4) estimate the amount of funding, if any, that would be required to operate and maintain the arenas under a joint governing structure. <A]

[A>Subd. 3. Appropriation. Up to $50,000 is appropriated to the commissioner of administration from the

general fund for fiscal year 2014 to pay up to one-half of the costs of the consultant contract under subdivision 2. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 40. [A> REIMBURSEMENT FOR PROPERTY TAX ABATEMENTS; APPROPRIATION. <A]

[A>Subdivision 1. Reimbursement. The commissioner of revenue shall reimburse taxing jurisdictions for property tax abatements granted in Hennepin County under Laws 2011, First Special Session chapter 7, article 5, section 13, notwithstanding the time limits contained in that section. The reimbursements must be made to each taxing jurisdiction pursuant to the certification of the Hennepin County auditor. <A]

[A>Subd. 2. Appropriation. In fiscal year 2014 only, $336,000 is appropriated to the commissioner of revenue from the general fund to make the payments required in this section. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 41. [A> ST. PAUL BALLPARK PROPERTY TAX EXEMPTION; SPECIAL ASSESSMENT. Any real or personal property acquired, owned, leased, controlled, used, or occupied by the city of St. Paul for the primary purpose of providing a ballpark for a minor league baseball team is declared to be acquired, owned, leased, controlled, used, and occupied for public, governmental, and municipal purposes, and is exempt from ad valorem taxation by the state or any political subdivision of the state, provided that the properties are subject to special assessments levied by a political subdivision for a local improvement in amounts proportionate to and not exceeding the special benefit received by the properties from the improvement. In determining the special benefit received by the properties, no possible use of any of the properties in any manner different from their intended use for providing a minor league ballpark at the time may be considered. Notwithstanding Minnesota Statutes, section 272.01 , subdivision 2, or 273.19 , real or personal property subject to a lease or use agreement between the city and another person for uses related to the purposes of the operation of the ballpark and related parking facilities is exempt from taxation regardless of the length of the lease or use agreement. This section, insofar as it provides an exemption or special treatment, does not apply to any real property that is leased for residential, business, or commercial development or other purposes different from those necessary to the provision and operation of the ballpark. <A]

[A>EFFECTIVE DATE. This section is effective the day after compliance by the governing body of the city of St. Paul with Minnesota Statutes, section 645.021 , subdivisions 2 and 3. <A]

Sec. 42. [A> PUBLIC ENTERTAINMENT FACILITY; PROPERTY TAX EXEMPTION; SPECIAL ASSESSMENT. Any real or personal property acquired, owned, leased, controlled, used, or occupied by the city of Minneapolis for the primary purpose of providing an arena for a professional basketball team is declared to be acquired, owned, leased, controlled, used, and occupied for public, governmental, and municipal purposes, and is exempt from ad valorem taxation by the state or any political subdivision of the state, provided that the properties are subject to special assessments levied by a political subdivision for

a local improvement in amounts proportionate to and not exceeding the special benefit received by the properties from the improvement. In determining the special benefit received by the properties, no possible use of any of the properties in any manner different from their intended use for providing a professional basketball arena at the time may be considered. Notwithstanding Minnesota Statutes, section 272.01 , subdivision 2, or 273.19 , real or personal property subject to a lease or use agreement between the city and another person for uses related to the purposes of the operation of the arena and related parking facilities is exempt from taxation regardless of the length of the lease or use agreement. This section, insofar as it provides an exemption or special treatment, does not apply to any real property that is leased for residential, business, or commercial development, or for other purposes different from those necessary to the provision and operation of the arena. <A]

[A>EFFECTIVE DATE. This section is effective the day after compliance by the governing body of the city of Minneapolis with Minnesota Statutes, section 645.021 , subdivisions 2 and 3. <A]

Sec. 43. [A> PUBLIC ENTERTAINMENT FACILITY; CONSTRUCTION MANAGER AT RISK. <A]

[A>(a) For any real or personal property acquired, owned, leased, controlled, used, or occupied by the city of Minneapolis for the primary purpose of providing an arena for a professional basketball team, the city of Minneapolis may contract for construction, materials, supplies, and equipment in accordance with Minnesota Statutes, section 471.345 , except that the city may employ or contract with persons, firms, or corporations to perform one or more or all of the functions of an engineer, architect, construction manager, or program manager with respect to all or any part of a project to renovate, refurbish, and remodel the arena under either the traditional design-bid-build plan or construction manager at risk plan, or a combination thereof. <A]

[A>(b) The city may prepare a request for proposals for one or more of the functions described in paragraph (a).

The request must be published in a newspaper of general circulation. The city may prequalify offerors by issuing a request for qualifications, in advance of the request for proposals, and select a short list of responsible offerors to submit proposals. <A]

[A>(c) As provided in the request for proposals, the city may conduct discussions and negotiations with responsible offerors in order to determine which proposal is most advantageous to the city and to negotiate the terms of an agreement. In conducting discussions, there shall be no disclosure of any information derived from proposals submitted by competing offerors and the content of all proposals is nonpublic data under Minnesota Statutes, chapter 13, until such time as a notice to award a contract is given by the city. <A]

[A>(d) Upon agreement on the guaranteed maximum price, the construction manager or program manager may enter into contracts with subcontractors for labor, materials, supplies, and equipment for the renovation project through the process of public bidding, except that the construction manager or program manager may, with the consent of the city: <A]

[A>(1) narrow the listing of eligible bidders to those that the construction manager or program manager determines to possess sufficient expertise to perform the intended functions; <A]

[A>(2) award contracts to the subcontractors that the construction manager or program manager determines provide the best value under a request for proposals, as described in Minnesota Statutes, section 16C.28, subdivision 1 , paragraph (a), clause (2), that are not required to be the lowest responsible bidder; and <A]

[A>(3) for work the construction manager or program manager determines to be critical to the completion schedule, perform work with its own forces without soliciting competitive bids or proposals, if the construction manager or program manager provides evidence of competitive pricing. <A]

[A>EFFECTIVE DATE. This section is effective the day after compliance by the governing body of the city of Minneapolis with Minnesota Statutes, section 645.021 , subdivisions 2 and 3. <A]

Sec. 44. [A> EXTENSION OF PROPERTY TAX DUE DATE; COMMERCIAL SEASONAL RECREATIONAL PROPERTIES. Notwithstanding the provisions of Minnesota Statutes, section 279.01, subdivision 1 , for taxes payable in 2013 only, the penalty on first-half property taxes does not accrue until June 15 on commercial use real property used for seasonal residential recreational purposes and classified as class 1c or 4c, and on other commercial use real property classified as class 3a, provided that over 60 percent of the gross income earned by the enterprise on the class 3a property is earned during the months of May, June, July, and August. In order for the first half of the tax due on class 3a property to be paid after May 15 and before June 15 without penalty, the owner of the property must attach an affidavit to the payment attesting to compliance with the income provision of this subdivision. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 45. [A> REPORT ON CLASS 4D TIER STRUCTURE. The commissioners of revenue and housing finance shall report to the legislature by January 31, 2015, on the implementation of a second tier of market value for class 4d property under Minnesota Statutes, section 273.13, subdivision 25 , paragraph (f).

The report shall include the number of class 4d properties subject to the second tier of market value for taxes payable in 2015 and the tax impact of the application of the second tier of market value. The report shall also include an analysis of the characteristics of the properties to which the second tier of market value applies, such as location, building type, and number of units. <A]

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 46. [A> REPORT AND STUDY ON CERTAIN PROPERTY USED IN BUSINESS AND PRODUCTION; ASSESSMENT MORATORIUM. <A]

[A>Subdivision 1. Study and report. <A]

[A>(a) In order to facilitate a legislative review of property tax assessment procedures for facilities used in the production of biofuels, wine, beer, distilled beverages, and dairy products, and the development of standards and criteria for determining the taxable status of these facilities, the commissioner of revenue must conduct a study and report the findings of the study. The study must: <A]

[A>(1) include a detailed survey of counties identifying the components and tax status of biofuel facilities; <A]

[A>(2) identify the function of components in facilities of the affected industries; <A]

[A>(3) consider the taxability for certain components related to size, function, and use; <A]

[A>(4) develop recommendations for assessment guidelines and policies for facilities of the affected industries; and <A]

[A>(5) identify possible impacts to state and local taxes resulting from study recommendations. <A]

[A>(b) The commissioner shall request the involvement and participation of stakeholders, including the affected industries, the assessment community, and others identified by the commissioner. <A]

[A>(c) The commissioner shall report the findings to the chairs of the house of representatives and senate committees with jurisdiction over taxes, agriculture, and economic development as well as the commissioners of agriculture and employment and economic development by February 1, 2014. <A]

[A>Subd. 2. Moratorium on changes in assessment practices. <A]

[A>(a) For the 2013 and 2014 assessments, assessors must continue to use assessment practices or policies in effect in that county on January 2, 2012, for determining the taxable status of property used in the production of biofuels, wine, beer, distilled beverages, or dairy products. <A]

[A>(b) An assessor must not change the taxable status of any existing property described in paragraph (a) from its status on January 2, 2012, unless the change is due to a change in the use of property, or to correct an error. For taxable properties, the assessor may change the estimated market value of the property and add value for any new construction that would have been taxable under practices and policies in place on January 2, 2012. <A]

[A>(c) This subdivision expires on December 31, 2014. Any changes to the taxable status of the properties in paragraph (a) resulting from the study will not be effective until the 2015 assessment. <A]

Sec. 47. [A> PROPERTY TAX SAVINGS REPORT. <A]

[A>(a) In addition to the certification of its proposed property tax levy underMinnesota Statutes, section 275.065 , each city that has a population over 500 and each county shall also include the amount of sales and use tax paid, or was estimated to be paid, in 2012. <A]

[A>(b) At the time the notice of the proposed property taxes is mailed as required under Minnesota Statutes, section 275.065, subdivision 3 , the county treasurer shall also include a separate statement providing a list of sales and use tax certified by the county and cities within their jurisdiction. <A]

[A>(c) At the public hearing required under Minnesota Statutes, section 275.065, subdivision 3 , the county and city must discuss the estimated savings realized to their budgets that resulted from the sales tax exemption authorized under Minnesota Statutes, section 297A.70, subdivision 2 , and how those savings will be used for property tax levy reductions, fee reductions, and other purposes as deemed appropriate. Reasonable costs of preparing the notice required in this section must be apportioned between taxing jurisdictions as follows: <A]

[A>(1) one-half is allocated to the county; and <A]

[A>(2) one-half is allocated among the cities. The amount allocated in clause (2) must be further apportioned among all the cities in the proportion that the number of parcels in the city bears to the number of parcels in all the cities that have populations over 500. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment, for taxes levied in 2013 and payable in 2014. <A]

Sec. 48. [A> LEVY LIMITS FOR TAXES LEVIED IN 2013. <A]

[A>Subdivision 1. Population. " Population" means the population for the local governmental unit as established by the last federal census, by a census taken under section Minnesota Statutes, section 275.14 , or by an estimate made by the metropolitan council or by the state demographer under Minnesota Statutes, section 4A.02 , whichever is most recent as to the stated date of the count or estimate up to and including June 1 of the current levy year. <A]

[A>Subd. 2. Local government unit. " Local governmental unit" means a county with a population greater than 5,000, or a statutory or home rule charter city with a population greater than 2,500. <A]

[A>Subd. 3. Levy limit base. " Levy limit base" for a local governmental unit for levy year 2013 means the sum of its certified net tax capacity levy plus the total of aids and reimbursements that the local governmental unit is certified to receive underMinnesota Statutes, sections 477A.011 to 477A.014 , minus any amounts that would qualify as a special levy under Minnesota Statutes, section 275.70, subdivision 5 , clauses (1) to (4) and <A]

[A>(7), for taxes levied in 2011 or 2012, whichever is greater. The levy limit base must be increased by three percent. <A]

[A>Subd. 4. Property tax levy limit. For taxes levied in 2013, the net tax capacity levy limit for a local governmental unit is equal to its levy limit base determined under subdivision 3 plus any additional levy authorized under Minnesota Statutes, section 275.73 , which is levied against net tax capacity, reduced by the total amount of aids and reimbursements that the local governmental unit is certified to receive

under Minnesota Statutes, sections 477A.011 to 477A.014 . The property tax levy limit for any local government cannot be less than the greater of its certified net tax capacity levies for taxes levied in 2011 or 2012. <A]

[A>Subd. 5. Limit on levies. Notwithstanding any other provision of law or municipal charter to the contrary which authorize ad valorem taxes in excess of the limits established by this section, the provisions of this section apply to local governmental units for all purposes other than those for which special levies under Minnesota Statutes, section 275.70, subdivision 5 , clauses (1) to (5) and (7), and special assessments are made. <A]

[A>Subd. 6. Levies in excess of levy limits. If the levy made by a city or county exceeds the levy limit provided in this section, except when the excess levy is due to the rounding of the rate in accordance with Minnesota Statutes, section 275.28 , the county auditor shall only extend the amount of taxes permitted under this section as provided for inMinnesota Statutes, section 275.16. <A]

[A>Subd. 7. Calculation and notification. The commissioner of revenue shall make all necessary calculations for determining levy limits for local governmental units and notify the affected governmental units of their levy limits directly by September 1, 2013. The local governmental units shall, upon request, provide the commissioner with any information needed to make the calculations. The local governmental unit shall report by September 30, in a manner prescribed by the commissioner, the maximum amount of taxes it plans to levy for each of the purposes listed under special levies and any additional levy authorized under Minnesota Statutes, section 275.73 , along with any necessary documentation. The commissioner shall review the proposed special levies and make any adjustments needed. The commissioner's decision is final. The final allowed special levy amounts and any levy limit adjustments must be certified back to the local governments by December 10. In addition, the commissioner of revenue shall notify all county auditors on or before five working days after December 20 of the sum of the levy limit plus the total of allowed special levies for each local governmental unit located within their boundaries so that they may fix the levies as required inMinnesota Statutes, section 275.16. The local governmental units shall provide the commissioner of revenue with all information that the commissioner deems necessary to make the calculations provided for in this section. <A]

[A>Subd. 8. Information necessary to calculate levy limit base. A local governmental unit must provide the commissioner with the information required to calculate the amount under subdivision 3, by July 20, 2013. If the information is not received by the commissioner by that date, or is not deemed sufficient to make the calculation under that clause, the commissioner has the discretion to set the local governmental unit's levy limit for all purposes including those purposes for which special levies may be made, equal to the amount of the local governmental unit's certified levy for the prior year. <A]

[A>EFFECTIVE DATE. This section is effective for taxes levied in 2013, payable in 2014, only. <A]

Sec. 49. [A> APPROPRIATION. $2,000,000 in fiscal year 2014 only is appropriated from the general fund to the commissioner of revenue for a grant to the city of Moose Lake to reimburse for costs related to connection of state facilities to the sewer line. <A]

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A] ARTICLE 5 SPECIAL TAXES

Section 1. AMEND Minnesota Statutes 2012, section 270C.56, subdivision 1 , is amended to read: Subdivision 1. Liability imposed. A person who, either singly or jointly with others, has the control of, supervision of, or responsibility for filing returns or reports, paying taxes, or collecting or withholding and remitting taxes and who fails to do so, or a person who is liable under any other law, is liable for the payment of taxes

```
arising under chapters 295, 296A, 297A, 297F, and 297G, or sections
```

[D>256.9658 , <D] 290.92 , and 297E.02 , and the applicable penalties and interest on those taxes.

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 2. AMEND Minnesota Statutes 2012, section 296A.09, subdivision 2 , is amended to read: Subd. 2. [A> Jet fuel and <A] special fuel tax imposed.

```
There is imposed an excise tax of
    [D>the same rate <D]
```

[A>15 cents <A] pergallon
```
    [D>as the aviation gasoline <D] on all jet fuel or special fuel
```

received, sold, stored, or withdrawn from storage in this state, for use as substitutes for aviation gasoline and not otherwise taxed as gasoline. Jet fuel is defined in section 296A.01, subdivision 8 .

[A>EFFECTIVE DATE. This section is effective July 1, 2014, and applied to sales and purchases made on or after that date. <A]

Sec. 3. AMEND Minnesota Statutes 2012, section 296A.17, subdivision 3 , is amended to read: Subd. 3. Refund on graduated basis. Any person who has directly or indirectly paid the excise tax on aviation

```
gasoline or special fuel for aircraft use provided for by this chapter
```

[A>and the airflight property tax under section 270.72 <A], shall, as to all such aviation gasoline and special fuel received, stored, or withdrawn from storage by the person in this state in any calendar year and not sold or otherwise disposed of to others, or intended for sale or other disposition to others, on which such tax has been so paid, be entitled to the following graduated reductions in such tax for that calendar year, to be obtained by means of the following refunds:

(1) on each gallon of such aviation gasoline or special fuel up to 50,000 gallons, all but five cents per gallon;

(2) on each gallon of such aviation gasoline or special fuel above 50,000 gallons and not more than 150,000 gallons, all but two cents per gallon;

(3) on each gallon of such aviation gasoline or special fuel above 150,000 gallons and not more than 200,000 gallons, all but one cent per gallon;

(4) on each gallon of such aviation gasoline or special fuel above 200,000, all but one-half cent per gallon.

[A>EFFECTIVE DATE. This section is effective July 1, 2014, and applied to sales and purchases made on or after that date. <A]

Sec. 4. AMEND Minnesota Statutes 2012, section 297A.82, subdivision 4 , is amended to read: Subd. 4. Exemptions. (a) The following transactions are exempt from the tax imposed in this chapter to the extent provided.

(b) The purchase or use of aircraft previously registered in Minnesota by a corporation or partnership is exempt if the transfer constitutes a transfer within the meaning of section 351 or 721 of the Internal Revenue Code.

(c) The sale to or purchase, storage, use, or consumption by a licensed aircraft dealer of an aircraft for which a commercial use permit has been issued pursuant to section 360.654 is exempt, if the aircraft is resold while the permit is in effect.

(d) Air flight equipment when sold to, or purchased, stored, used, or consumed by airline companies, as defined in section 270.071, subdivision 4 , is exempt. For purposes of this subdivision, "air flight equipment" includes airplanes and parts necessary for the repair and maintenance of such air flight equipment, and flight simulators, but does not include airplanes with a gross weight of less than 30,000 pounds that are used on intermittent or irregularly timed flights.

(e) Sales of, and the storage, distribution, use, or consumption of aircraft, as defined in section 360.511 and approved by the Federal Aviation Administration, and which the seller delivers to a purchaser outside Minnesota or which, without intermediate use, is shipped or transported outside Minnesota by the purchaser are exempt, but only if the purchaser is not a resident of Minnesota and provided that the aircraft is not thereafter returned to a point within Minnesota, except in the course of interstate commerce or isolated and occasional use, and will be registered in another state or country upon its removal from Minnesota. This exemption applies even if the purchaser takes possession of the aircraft in Minnesota and uses the aircraft in the state exclusively for training purposes for a period not to exceed ten days prior to removing the aircraft from this state.

[A>(f) The sale or purchase of the following items that relate to aircraft operated under Federal Aviation Regulations, Parts 91 and 135, and associated installation charges: equipment and parts necessary for repair and maintenance of aircraft; and equipment and parts to upgrade and improve aircraft. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 5. AMEND Minnesota Statutes 2012, section 297A.82 , is amended by adding a subdivision to read: [A>Subd. 4a. Deposit in state airports fund. Tax revenue collected from the sale or purchase of an aircraft taxable under this chapter must be deposited in the state airports fund, established in section 360.017 . <A]

[A>EFFECTIVE DATE. This section is effective July 1, 2013, and applied to sales and purchases made on or after that date. <A]

Sec. 6. AMEND Minnesota Statutes 2012, section 297F.01, subdivision 3 , is amended to read: Subd. 3. Cigarette. "

Cigarette" means any roll for smoking made wholly or in part of tobacco
    [D>,

<D] [A>that weighs 4.5 pounds or less per thousand: <A]

[A>(1) <A] the wrapper or cover of which is made of paper or another substance

or material except tobacco
    [A>; or <A]

[A>(2) wrapped in any substance containing tobacco, however labeled or named, which, because of its appearance, size, the type of tobacco used in the filler, or its packaging, pricing, marketing, or labeling, is likely to be offered to or purchased by consumers as a cigarette, as defined in clause (1), unless it is wrapped in whole tobacco leaf and does not have a cellulose acetate or other cigarette-like filter <A].

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 7. AMEND Minnesota Statutes 2012, section 297F.01 , is amended by adding a subdivision to read: [A>Subd. 10b. Moist snuff. " Moist snuff" means any finely cut, ground, or powdered smokeless tobacco that is intended to be placed or dipped in the mouth. <A]

[A>EFFECTIVE DATE. This section is effective January 1, 2014. <A]

Sec. 8. AMEND Minnesota Statutes 2012, section 297F.01 , is amended by adding a subdivision to read: [A>Subd. 13a. Premium cigar. " Premium cigar" means any cigar that is hand-constructed and hand-rolled, has a wrapper that is made entirely from whole tobacco leaf, has a filler and binder that is made entirely of tobacco, except for adhesives or other materials used to maintain size, texture, or flavor, and has a wholesale price of no less than $2. <A]

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 9. AMEND Minnesota Statutes 2012, section 297F.01, subdivision 19 , is amended to read: Subd. 19. Tobacco products.

[A>(a) <A] "Tobacco products" means any product containing, made, or derived from tobacco that is intended for human consumption, whether chewed, smoked, absorbed, dissolved, inhaled, snorted, sniffed, or ingested by any other means, or any component, part, or accessory of a tobacco product, including, but not

```
limited to, cigars;
    [D>little cigars; <D] cheroots; stogies; periques;
```

granulated, plug cut, crimp cut, ready rubbed, and other smoking tobacco; snuff; snuff flour; cavendish; plug and twist tobacco; fine-cut and other chewing tobacco; shorts; refuse scraps, clippings, cuttings and sweepings of tobacco, and other kinds and forms of tobacco; but does not include cigarettes as defined in this section. Tobacco products excludes any tobacco product that has been approved by the United States Food and Drug Administration for sale as a tobacco cessation product, as a tobacco dependence product, or for other medical purposes, and is being marketed and sold solely for such an approved purpose.

[A>(b) Except for the imposition of tax under section 297F.05 , subdivisions 3 and 4, tobacco products includes a premium cigar, as defined in subdivision 13a. <A]

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 10. AMEND Minnesota Statutes 2012, section 297F.05, subdivision 1 , is amended to read: Subdivision 1. Rates; cigarettes. A tax is imposed upon the sale of cigarettes in this state, upon having cigarettes in possession in this state with intent to sell, upon any person engaged in business as a distributor, and upon the use or storage by consumers, at the following rates:

```
(1) on cigarettes weighing not more than three pounds per thousand,
    [D>24
```

<D] [A>141.5 <A] mills on each such cigarette; and

```
(2) on cigarettes weighing more than three pounds per thousand,
    [D>48
```

<D] [A>283 <A] mills on each such cigarette.

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 11. AMEND Minnesota Statutes 2012, section 297F.05 , is amended by adding a subdivision to read:[A>Subd. 1a. Annual indexing. <A]

[A>(a) Each year the commissioner shall adjust the tax rates under subdivision 1, including any adjustment made in prior years under this subdivision, by multiplying the mill rates for the current calendar year by an adjustment factor and rounding the result to the nearest mill. The adjustment factor equals the in-lieu sales tax rate that applies to the following calendar year divided by the in-lieu sales tax rate for the current calendar year. For purposes of this subdivision, "in-lieu sales tax rate" means the tax rate established under section 297F.25, subdivision 1 . For purposes of the calculations under this subdivision to be made in any year in which an increase in the federal or state excise tax on cigarettes is implemented, the commissioner shall exclude from the calculated average price for the current year an amount equal to any increase in the state or federal excise tax rate. <A]

[A>(b) The commissioner shall publish the resulting rate by November 1 and the rate applies to sales made on or after January 1 of the following year. <A]

[A>(c) The determination of the commissioner under this subdivision is not a rule and is not subject to the Administrative Procedure Act in chapter 14. <A]

[A>EFFECTIVE DATE. This section is effective July 1, 2014. <A]

Sec. 12. AMEND Minnesota Statutes 2012, section 297F.05, subdivision 3 , is amended to read: Subd. 3. Rates; tobacco products.

[A>(a) Except as provided in subdivision 3a, <A] a tax is imposed upon all tobacco products in this state and upon any person engaged in business as a

```
distributor, at the rate of
    [D>35 <D]
```

[A>95 <A] percent of the wholesale

sales price of the tobacco products. The tax is imposed at the time the distributor:

(1) brings, or causes to be brought, into this state from outside the state tobacco products for sale;

(2) makes, manufactures, or fabricates tobacco products in this state for sale in this state; or

(3) ships or transports tobacco products to retailers in this state, to be sold by those retailers.

[A>(b) Notwithstanding paragraph (a), a minimum tax equal to the rate imposed on a pack of 20 cigarettes weighing not more than three pounds per thousand, as established under subdivision 1, is imposed on each container of moist snuff. For purposes of this subdivision, a "container" means the smallest consumer-size can, package, or other container that is marketed or packaged by the manufacturer, distributor, or retailer for separate sale to a retail purchaser. When more than one container is packaged together, each container is subject to tax. <A]

[A>EFFECTIVE DATE. This section is effective July 1, 2013, except the minimum tax under paragraph (b) is effective January 1, 2014. <A]

Sec. 13. AMEND Minnesota Statutes 2012, section 297F.05 , is amended by adding a subdivision to read:[A>Subd. 3a. Rates; tobacco. <A]

[A>(a) A tax is imposed upon all premium cigars in this state and upon any person engaged in business as a tobacco product distributor, at the lesser of: <A]

[A>(1) the rate of 95 percent of the wholesale sales price of the premium cigars; or <A]

[A>(2) $3.50 per premium cigar. <A]

[A>(b) The tax imposed under paragraph (a) is imposed at the time the tobacco products distributor: <A]

[A>(1) brings, or causes to be brought, into this state from outside the state premium cigars for sale; <A]

[A>(2) makes, manufactures, or fabricates premium cigars in this state for sale in this state; or <A]

[A>(3) ships or transports premium cigars to retailers in this state, to be sold by those retailers. <A]

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 14. AMEND Minnesota Statutes 2012, section 297F.05, subdivision 4 , is amended to read: Subd. 4. Use tax; tobacco products. [A>Except as provided in subdivision 4a, <A] a tax is imposed upon the use or storage by consumers of tobacco products in this state, and upon such

```
consumers, at the rate of
    [D>35 <D]
```

[A>95 <A] percent of the cost to theconsumer of the tobacco products
    [A>or the minimum tax under subdivision 3,

paragraph (b), whichever is greater <A].

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 15. AMEND Minnesota Statutes 2012, section 297F.05 , is amended by adding a subdivision to read:[A>Subd. 4a. Use tax; premium cigars. A tax is imposed upon the use or storage by consumers of all premium cigars in this state, and upon such consumers, at the lesser of: <A]

[A>(1) the rate of 95 percent of the cost to the consumer of the premium cigars; or <A]

[A>(2) $3.50 per premium cigar. <A]

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 16. AMEND Minnesota Statutes 2012, section 297F.24, subdivision 1 , is amended to read:
Subdivision 1. Fee imposed. (a) A fee is imposed upon the sale of nonsettlement cigarettes in this state, upon having nonsettlement cigarettes in possession in this state with intent to sell, upon any person engaged in business as a distributor, and upon the use or storage by consumers of nonsettlement cigarettes.

```
The fee equals a rate of
    [D>1.75 <D]
```

[A>2.5 <A] cents per cigarette.

(b) The purpose of this fee is to:

(1) ensure that manufacturers of nonsettlement cigarettes pay fees to the state that are comparable to costs attributable to the use of the cigarettes;

(2) prevent manufacturers of nonsettlement cigarettes from undermining the state's policy of discouraging underage smoking by offering nonsettlement cigarettes at prices substantially below the cigarettes of other manufacturers; and

(3) fund such other purposes as the legislature determines appropriate.

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 17. AMEND Minnesota Statutes 2012, section 297F.25, subdivision 1 , is amended to read:
Subdivision 1. Imposition. (a) A tax is imposed on distributors on the sale of cigarettes by a cigarette distributor to a retailer or cigarette subjobber for resale in this state.

```
The tax is equal to
    [D>6.5 percent of <D]
```

[A>the combined tax rate under

section 297A.62 , multiplied by <A] the weighted average retail price and must be expressed in cents per pack rounded to the nearest one-tenth of a cent. The weighted average retail price must be determined annually, with new rates published by November 1, and effective for sales on or after January 1 of the following year. The weighted average retail price must be established by surveying cigarette retailers statewide in a manner and time determined by the commissioner. The commissioner shall make an inflation adjustment in accordance with the Consumer Price Index for all urban consumers inflation indicator as published in the most recent state budget forecast. The commissioner shall use the inflation factor for the calendar year in which the new tax rate takes effect. If the survey indicates that the average retail price of cigarettes has not increased relative to the average retail price in the previous year's survey, then the commissioner shall not make an inflation adjustment. The determination of the commissioner

pursuant to this subdivision is not a "rule" and is not subject to the Administrative Procedure Act contained in chapter 14. For packs of cigarettes with other than 20 cigarettes, the tax must be adjusted proportionally.

(b) Notwithstanding paragraph (a), and in lieu of a survey of cigarette retailers, the tax calculation of the weighted average retail price for the sales of cigarettes from August 1, 2011, through December 31, 2011, shall be calculated by: (1) increasing the average retail price per pack of 20 cigarettes from the most recent survey by the percentage change in a weighted average of the presumed legal prices for cigarettes during the year after completion of that survey, as reported and published by the Department of Commerce under section 325D.371 ; (2) subtracting the sales tax included in the retail price; and (3) adjusting for expected inflation. The rate must be published by May 1 and is effective for sales after July 31. If the weighted average of the presumed legal prices indicates that the average retail price of cigarettes has not increased relative to the average retail price in the most recent survey, then no inflation adjustment must be made. For packs of cigarettes with other than 20 cigarettes, the tax must be adjusted proportionally.

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 18. AMEND Minnesota Statutes 2012, section 297G.04, subdivision 2 , is amended to read: Subd. 2. Tax credit. A qualified brewer producing fermented malt beverages is entitled to a tax credit of $4.60 per barrel on 25,000 barrels sold in any fiscal year beginning July 1, regardless of the alcohol content of the product. Qualified brewers may take the credit on the 18th day of each month, but the total credit allowed may not exceed in any fiscal year the lesser of:

(1) the liability for tax; or

(2) $115,000. For purposes of this subdivision, a "qualified brewer" means a brewer, whether

```
or not located in this state, manufacturing less than
    [D>100,000
```

<D] [A>250,000 <A] barrels of fermented malt beverages in the calendar year immediately preceding the calendar year for which the credit under this subdivision is claimed. In determining the number of barrels, all brands or labels of a brewer must be combined. All facilities for the manufacture of fermented malt beverages owned or controlled by the same person, corporation, or other entity must be treated as a single brewer.

[A>EFFECTIVE DATE. This section is effective for determinations based on calendar year 2012 production and thereafter. <A]

Sec. 19. AMEND Minnesota Statutes 2012, section 325D.32, subdivision 2 , is amended to read: Subd. 2. Cigarettes. " Cigarettes" means and includes any roll for smoking, made wholly or in part of tobacco, irrespective of size and shape and whether or not such tobacco is flavored, adulterated or mixed with any

other ingredient, the wrapper or cover

```
of which is made of paper or any other substance or material except
    [A>whole<A] tobacco
    [A>leaf, and includes any cigarette as defined in section
```

297F.01, subdivision 3 <A].

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 20. AMEND Minnesota Statutes 2012, section 325F.781, subdivision 1 , is amended to read: Subdivision 1. Definitions. (a) For purposes of this section, the following terms have the meanings given, unless the language or context clearly provides otherwise.

(b) "Consumer" means an individual who purchases, receives, or possesses tobacco products for personal consumption and not for resale.

(c) "Delivery sale" means:

(1) a sale of tobacco products to a consumer in this state when:

(i) the purchaser submits the order for the sale by means of a telephonic or other method of voice transmission, the mail or any other delivery service, or the Internet or other online service; or

(ii) the tobacco products are delivered by use of the mail or other delivery service; or

(2) a sale of tobacco products that satisfies the criteria in clause (1), item (i), regardless of whether the seller is located inside or outside of the state. A sale of tobacco products to an individual in this state must be treated as a sale to a consumer, unless the individual is licensed as a distributor or retailer of tobacco products.

(d) "Delivery service" means a person, including the United States Postal Service, that is engaged in the commercial delivery of letters, packages, or other containers.

(e) "Distributor" means a person, whether located inside or outside of this state, other than a retailer, who sells or distributes tobacco products in the state. Distributor does not include a tobacco products manufacturer, export warehouse proprietor, or importer with a valid permit under United States Code, title 26, section 5712 (1997), if the person sells or distributes tobacco products in this state only to distributors who hold valid and current licenses under the laws of a state, or to an export warehouse proprietor or another manufacturer. Distributor does not include a common or contract carrier that is transporting tobacco products under a proper bill of lading or freight bill that states the quantity, source, and destination of tobacco products, or a person who ships tobacco products through this state by common or contract carrier under a bill of lading or freight bill.

(f) "Retailer" means a person, whether located inside or outside this state, who sells or distributes tobacco

products to a consumer in this state.

(g) "Tobacco products" means:

```
(1) cigarettes, as defined in section 297F.01, subdivision 3;
    [D>and <D]
(2) smokeless tobacco as defined in section 325F.76
    [D>.
```

<D] [A>; and <A]

[A>(3) premium cigars as defined in section 297F.01, subdivision 13 a. <A]

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 21. AMEND Minnesota Statutes 2012, section 349.166, subdivision 1 , is amended to read: Subdivision 1. Exclusions. (a) Bingo, with the exception of linked bingo games, may be conducted without a license and without complying with sections 349.168 , subdivisions 1 and 2;349.17 , subdivisions 4 and 5; 349.18 , subdivision 1; and 349.19 , if it is conducted:

(1) by an organization in connection with a county fair, the state fair, or a civic celebration and is not conducted for more than 12 consecutive days and is limited to no more than four separate applications for activities applied for and approved in a calendar year; or

(2) by an organization that conducts bingo on four or fewer days in a calendar year. An organization that holds a license to conduct lawful gambling under this chapter may not conduct bingo under this subdivision.

(b) Bingo may be conducted within a nursing home or a senior citizen housing project or by a senior citizen organization if the prizes for a single bingo game do not exceed $10, total prizes awarded at a single bingo occasion do not exceed $200, no more than two bingo occasions are held by the organization or at the facility each week, only members of the organization or residents of the nursing home or housing project are allowed to play in a bingo game, no compensation is paid for any persons who conduct the bingo, and a manager is appointed to supervise the bingo. Bingo conducted under this paragraph is exempt from sections 349.11 to 349.23 , and the board may not require an organization that conducts bingo under this paragraph, or the manager who supervises the bingo, to register or file a report with the board. The gross receipts from bingo conducted under the limitations of this subdivision are exempt from taxation under chapter 297A.

(c) Raffles may be conducted by an organization without registering with the board if the value of all raffle prizes awarded by the organization in a

```
calendar year does not exceed $1,500
    [A>or, if the organization is a
```

501(c)(3) organization, if the value of all raffle prizes awarded by the organization at one event in a calendar year does not exceed $5,000 <A].

(d) Except as provided in paragraph (b), the organization must maintain all required records of excluded gambling activity for 3-1/2 years.

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 22. AMEND Minnesota Statutes 2012, section 360.531 , is amended to read: 360.531 TAXATION. Subdivision 1. In lieu tax. All aircraft using the air space overlying the state of Minnesota or the airports thereof, except as set forth in section 360.55 , shall be taxed in lieu of all other taxes thereon, on the basis and at the rate for the period January 1, 1966, to June 30, 1967, and for each fiscal year as follows.

Subd. 2. Rate.

```
The tax shall be
     [D>at the rate of one percent of value; provided that the
```

minimum tax on an aircraft subject to the provisions of sections 360.511 to360.67 shall not be less than 25 percent of the tax on said aircraft computed on its base price or $50 whichever is the higher. <D] [A>as follows: Base Price Tax Under $499,999 $100 $500,000 to $999,999 $200 $1,000,000 to $2,499,999 $2,000 $2,500,000 to $4,999,999 $4,000 $5,000,000 to $7,499,999 $7,500 $7,500,000 to $9,999,999 $10,000 $10,000,000 to $12,499,999 $12,500 $12,500,000 to $14,999,999 $15,000 $15,000,000 to $17,499,999 $17,500 $17,500,000 to $19,999,999 $20,000 $20,000,000 to $22,499,999 $22,500 $22,500,000 to $24,999,999 $25,000 $25,000,000 to $27,499,999 $27,500 $27,500,000 to $29,999,999 $30,000 $30,000,000 to $39,999,999 $50,000 $40,000,000 and over $75,000 <A]

Subd. 3. First year of life. " First year of life" means the year the aircraft was manufactured.

Subd. 4. Base price for taxation.

```
For the purpose of fixing a base price for taxation
     [D>from which
```

depreciation in value at a fixed percent per annum can be counted, such <D] [A>, the base <A] price is defined as follows:

(a) The base price for taxation of an aircraft shall be the manufacturer's list price.

(b) The commissioner shall have authority to fix the base value for taxation purposes of any aircraft of which no such similar or corresponding model has been manufactured, and of any rebuilt or foreign aircraft, any aircraft on which a record of the list price is not available, or any military aircraft

```
converted for civilian use, using as a basis for
    [D>such <D] valuation the
```

list price of aircraft with comparable performance characteristics, and taking into consideration the age and condition of the aircraft.

Subd. 5. Similarity of corresponding model. Models shall be deemed similar if substantially alike and of the same make. Models shall be deemed to be corresponding models for the purpose of taxation under sections 360.54 to 360.67 if of the same make and having approximately the same weight and type of frame and the same style and size of motor.

[D>Subd. 6. Depreciation. After the first year of aircraft life the base value for taxation purposes shall be reduced as follows: ten percent the second year, and 15 percent the third and each succeeding year thereafter, but in no event shall such tax be reduced below the minimum. <D]

Subd. 7. Prorating tax. When an aircraft first becomes subject to taxation during the period for which the tax is to be paid, the tax on it shall be for the remainder of that period, prorated on a monthly basis of 1/12 of the annual tax for each calendar month counting the month during which it becomes subject to the tax as the first month of such period.

Subd. 8. Tax, fiscal year. Every aircraft subject to the provisions of sections 360.511 to 360.67 which has at any time since April 19, 1945, used the air space overlying the state of Minnesota or the airports thereof shall be taxed for the period from January 1, 1966, through June 30, 1967, and for each fiscal year thereafter in which it is so used. Any aircraft which does not use the air space overlying the state of Minnesota or the airports thereof at any time during the period of January 1, 1966, to and including June 30, 1967, or at any time during any fiscal year thereafter shall not be subject to the tax provided by sections 360.511 to 360.67 for such period. Rebuilt aircraft shall be subject to the tax provided by sections 360.511 to360.67 for that portion of the aforesaid periods remaining after the aircraft has been rebuilt, prorated on a monthly basis.

Subd. 9. Assessed as personal property in certain cases. Aircraft subject to taxation under the provisions of sections 360.54 to 360.67 shall not be assessed as personal property and shall be subject to no tax except as provided for by these sections. Aircraft not subject to taxation as provided in these sections, but subject to taxation as personal property within the state of Minnesota shall be assessed and valued at 33-1/3 percent of the market value thereof and taxed at the rate and in the manner provided by law for the taxation of ordinary personal property. If the person against whom any tax has been levied on the ad valorem basis because of any aircraft shall, during the calendar year for which such ad valorem tax is levied, be also taxed under provisions of these sections, then and in that event, upon proper showing, the commissioner of revenue shall grant to the person against whom said ad valorem tax was levied, such reduction or abatement of net tax capacity or taxes as was occasioned by the so-called ad valorem tax imposed. If the ad valorem tax upon any aircraft has been assessed against a dealer in new and used aircraft, and the tax imposed by these sections for the required period is thereafter paid by the owner,

then and in that event, upon proper showing, the commissioner of revenue, upon the application of said dealer, shall grant to such dealer against whom said ad valorem tax was levied such reduction or abatement of net tax capacity or taxes as was occasioned by the so-called ad valorem tax imposed.

[A>EFFECTIVE DATE. This section is effective July 1, 2014, and applies to aircraft tax due on or after that date. <A]

Sec. 23. AMEND Minnesota Statutes 2012, section 360.66 , is amended to read: 360.66 STATE AIRPORTS FUND. Subdivision 1. Tax credited to fund.

```
The proceeds of the tax imposed on aircraft under sections
    [D>360.54
```

<D] [A>360.531 <A] to 360.67 and all fees and penalties provided for therein shall be collected by the commissioner and paid into the state treasury and credited to the state airports fund created by other statutes of this state.

Subd. 2. Reimbursement for expenses. There shall be transferred by the commissioner of management and budget each year from the state airports fund to the general fund in the state treasury the amount expended from the latter fund for expenses of administering the

```
provisions of sections
    [D>360.54 <D]
```

[A>360.531 <A] to 360.67.

[A>EFFECTIVE DATE. This section is effective July 1, 2014, and applies to aircraft tax due on or after that date. <A]

Sec. 24. [A> REPORT. On or before June 30, 2016, and every four years thereafter, the commissioner of transportation, in consultation with the commissioner of revenue, shall prepare and submit to the chairs and ranking minority members of the senate and house of representatives committees with jurisdiction over transportation policy and budget, a report that identifies the amount and sources of annual revenues attributable to each type of aviation tax, along with annual expenditures from the state airports fund, and any other transfers out of the fund, during the previous four years. The report must include draft legislation for any recommended statutory changes to ensure the future adequacy of the state airports fund. <A]

[A>EFFECTIVE DATE. This section is effective July 1, 2014, and applies to aircraft tax due on or after that date. <A]

Sec. 25. [A> FLOOR STOCKS TAX. <A]

[A>Subdivision 1. Cigarettes. <A]

[A>(a) A floor stocks tax is imposed on every person engaged in the business in this state as a distributor, retailer, subjobber, vendor, manufacturer, or manufacturer's representative of cigarettes, on the stamped cigarettes and unaffixed stamps in the person's possession or under the person's control at 12:01 a.m. on July 1, 2013. The tax is imposed at the rate of 80 mills on each cigarette plus the additional cigarette sales tax determined by an adjustment to the weighted average retail price which reflects the price including the increased tax. <A]

[A>(b) Each distributor, on or before July 11, 2013, shall file a return with the commissioner of revenue, in the form the commissioner prescribes, showing the stamped cigarettes and unaffixed stamps on hand at 12:01 a.m. on July 1, 2013, and the amount of tax due on the cigarettes and unaffixed stamps. Each retailer, subjobber, vendor, manufacturer, or manufacturer's representative, on or before July 11, 2013, shall file a return with the commissioner, in the form the commissioner prescribes, showing the cigarettes on hand at 12:01 a.m. on July 1, 2013, and the amount of tax due on the cigarettes. The tax imposed by this section is due and payable on or before September 4, 2013, and after that date bears interest at the rate of one percent per month. <A]

[A>Subd. 2. Audit and enforcement. The tax imposed by this section is subject to the audit, assessment, interest, appeal, refund, penalty, enforcement, administrative, and collection provisions of Minnesota Statutes, chapters 270C and 297F. The commissioner of revenue may require a distributor to receive and maintain copies of floor stocks fee returns filed by all persons requesting a credit for returned cigarettes. <A]

[A>Subd. 3. Deposit of proceeds. <A]

[A>(a) The commissioner of revenue shall deposit $26,500,000 of the revenues from the tax under this section in the state treasury and credit them to the general reserve account established under Minnesota Statutes 297E.021, subdivision 4 . <A]

[A>(b) The commissioner of revenue shall deposit any revenue remaining after the transfer under paragraph (a) to the general fund. <A]

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 26. [A> INTERIM SALES TAX RATE. Notwithstanding the provisions of Minnesota Statutes, section 297F.25 , the commissioner shall adjust the weighted average retail price in section 297F.25, subdivision 1 , on July 1, 2013, to reflect the price changes under this act. This weighted average shall be used to compute cigarette sales tax underMinnesota Statutes, section 297F.25, subdivision 1 , until December 31, 2013, when the commissioner shall resume annual adjustments to the weighted average sales price. The commissioner's determination of the adjustment that takes effect on January 1, 2014, must be limited to the change in the weighted average retail price that occurs during calendar year 2013 but after July 15, 2013. <A]

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 27. [A> TOBACCO TAX COLLECTION REPORT. <A]

[A>Subdivision 1. Report to legislature. <A]

[A>(a) The commissioner of revenue shall report to the 2014 legislature on the tobacco tax collection system, including recommendations to improve compliance under the excise tax for both cigarettes and other tobacco products. The purpose of the report is to provide information and guidance to the legislature on improvements to the tobacco tax collection system to: <A]

[A>(1) provide a unified system of collecting both the cigarette and other tobacco taxes, regardless of category, size, or shape, that ensures the highest reasonable rates of tax collection; <A]

[A>(2) discourage tax evasion; and <A]

[A>(3) help to prevent illegal sale of tobacco products, which may make these products more accessible to youth. <A]

[A>(b) In the report, the commissioner shall: <A]

[A>(1) provide a detailed review of the present excise tax collection and compliance system as it applies to both cigarettes and other tobacco products. This must include an assessment of the levels of compliance for each category of products and the effect of the stamping requirement on compliance for each category of products and the effect of the stamping requirement on compliance rates for cigarettes relative to other tobacco products. It also must identify any weaknesses in the system; <A]

[A>(2) survey the methods of collection and enforcement used by other states or nations, including identifying and discussing emerging best practices that ensure tracking of both cigarettes and other tobacco products and result in the highest rates of tax collection and compliance. These best practices must consider high-technology alternatives, such as use of bar codes, radio-frequency identification tags, or similar mechanisms for tracking compliance; <A]

[A>(3) evaluate the adequacy and effectiveness of the existing penalties and other sanctions for noncompliance; <A]

[A>(4) evaluate the adequacy of the resources allocated by the state to enforce the tobacco tax and prevention laws; and <A]

[A>(5) make recommendations on implementation of a comprehensive tobacco tax collection system for Minnesota that can be implemented by January 1, 2014, including: <A]

[A>(i) recommendations on the specific steps needed to institute and implement the new system, including estimates of the state's costs of doing so and any additional personnel requirements; <A]

[A>(ii) recommendations on methods to recover the cost of implementing the system from the industry; <A]

[A>(iii) evaluation of the extent to which the proposed system is sufficiently flexible and adaptable to adjust to modifications in the construction, packaging, formatting, and marketing of tobacco products by the industry; and <A]

[A>(iv) recommendations to modify existing penalties or to impose new penalties or other sanctions to ensure compliance with the system. <A]

[A>Subd. 2. Due date. The report required by subdivision 1 is due February 15, 2014. <A]

[A>Subd. 3. Procedure. The report required under this section must be made in the manner provided under Minnesota Statutes, section 3.195. In addition, copies must be provided to the chairs and ranking minority members of the legislative committees and divisions with jurisdiction over taxation. <A]

[A>Subd. 4. Appropriation. <A]

[A>(a) $100,000 is appropriated from the general fund to the commissioner of revenue for fiscal year 2014 for the cost of preparing the report under subdivision 1. <A]

[A>(b) The appropriation under this subdivision is a onetime appropriation and is not included in the base budget. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 28.

[A> REPEALER.    REPEAL Minnesota Statutes 2012, sections 16A.725 ;

andREPEAL 256.9658 , are repealed.<A] [A>EFFECTIVE DATE. This section is effective July 1, 2013. <A] ARTICLE 6 INDIVIDUAL INCOME AND CORPORATE FRANCHISE TAXES

Section 1. AMEND Minnesota Statutes 2012, section 116J.8737, subdivision 1 , is amended to read: Subdivision 1. Definitions. (a) For the purposes of this section, the following terms have the meanings given.

(b) "Qualified small business" means a business that has been certified by the commissioner under subdivision 2.

(c) "Qualified investor" means an investor who has been certified by the commissioner under subdivision 3.

(d) "Qualified fund" means a pooled angel investment network fund that has been certified by the commissioner under subdivision 4.

(e) "Qualified investment" means a cash investment in a qualified small business of a minimum of:

(1) $10,000 in a calendar year by a qualified investor; or

(2) $30,000 in a calendar year by a qualified fund. A qualified investment must be made in exchange for common stock, a partnership or membership interest, preferred stock, debt with mandatory conversion to equity, or an equivalent ownership interest as determined by the commissioner.

(f) "Family" means a family member within the meaning of the Internal Revenue Code, section 267(c)(4).

(g) "Pass-through entity" means a corporation that for the applicable taxable year is treated as an S corporation or a general partnership, limited partnership, limited liability partnership, trust, or limited liability company and which for the applicable taxable year is not taxed as a corporation under chapter 290.

(h) "Intern" means a student of an accredited institution of higher education, or a former student who has graduated in the past six months from an accredited institution of higher education, who is employed by a qualified small business in a nonpermanent position for a duration of nine months or less that provides training and experience in the primary business activity of the business.

[A>(i) "Liquidation event" means a conversion of qualified investment for cash, cash and other consideration, or any other form of equity or debt interest. <A]

[A>EFFECTIVE DATE. This section is effective for qualified small businesses certified after June 30, 2013. <A]

Sec. 2. AMEND Minnesota Statutes 2012, section 116J.8737, subdivision 2 , is amended to read: Subd. 2. Certification of qualified small businesses. (a) Businesses may apply to the commissioner for certification as a qualified small business for a calendar year. The application must be in the form and be made under the procedures specified by the commissioner, accompanied by an application fee of $150. Application fees are deposited in the small business investment tax credit administration account in the special revenue fund. The application for certification for 2010 must be made available on the department's Web site by August 1, 2010. Applications for subsequent years' certification must be made available on the department's Web site by November 1 of the preceding year.

(b) Within 30 days of receiving an application for certification under this subdivision, the commissioner must either certify the business as satisfying the conditions required of a qualified small business, request additional information from the business, or reject the application for certification. If the commissioner requests additional information from the business, the commissioner must either certify the business or reject the application within 30 days of receiving the additional information. If the commissioner neither certifies the business nor rejects the application within 30 days of receiving the original application or within 30 days of receiving the additional information requested, whichever is later, then the application is deemed rejected, and the commissioner must refund the $150 application fee. A business that applies for certification and is rejected may reapply.

(c) To receive certification, a business must satisfy all of the following conditions:

(1) the business has its headquarters in Minnesota;

(2) at least 51 percent of the business's employees are employed in Minnesota, and 51 percent of the business's total payroll is paid or incurred in the state;

(3) the business is engaged in, or is committed to engage in, innovation in Minnesota in one of the following as its primary business activity:

(i) using proprietary technology to add value to a product, process, or service in a qualified high-technology field;

(ii) researching or developing a proprietary product, process, or service in a qualified high-technology field; or

(iii) researching, developing, or producing a new proprietary technology for use in the fields of agriculture, tourism, forestry, mining, manufacturing, or transportation;

(4) other than the activities specifically listed in clause (3), the business is not engaged in real estate development, insurance, banking, lending, lobbying, political consulting, information technology consulting, wholesale or retail trade, leisure, hospitality, transportation, construction, ethanol production from corn, or professional services provided by attorneys, accountants, business consultants, physicians, or health care consultants;

(5) the business has fewer than 25 employees;

(6) the business must pay its employees annual wages of at least 175 percent of the federal poverty guideline for the year for a family of four and must pay its interns annual wages of at least 175 percent of the federal minimum wage used for federally covered employers, except that this requirement must be reduced proportionately for employees and interns who work less than full-time, and does not apply to an executive, officer, or member of the board of the business, or to any employee who owns, controls, or holds power to vote more than 20 percent of the outstanding securities of the business;

(7) the business has

[A>(i) <A] not been in operation for more than ten years
    [A>, or (ii) the

business has not been in operation for more than 20 years if the business is engaged in the research, development, or production of medical devices or pharmaceuticals for which United States Food and Drug Administration approval is required for use in the treatment or diagnosis of a disease or condition

<A];

(8) the business has not previously received private equity investments of more

than $4,000,000;
    [D>and <D]

(9) the business is not an entity disqualified under section 80A.50, paragraph

(b), clause (3)
    [D>.

<D] [A>; and <A]

[A>(10) the business has not issued securities that are traded on a public exchange. <A]

(d) In applying the limit under paragraph (c), clause (5), the employees in all members of the unitary business, as defined in section 290.17, subdivision 4 , must be included.

(e) In order for a qualified investment in a business to be eligible for tax

credits
    [D>, <D]

[A>: <A]

[A>(1) <A] the business must have applied for and received certification for the calendar year in which the investment was made prior to the date on which

the qualified investment was made
    [D>.

<D] [A>; <A]

[A>(2) the business must not have issued securities that are traded on a public exchange; <A]

[A>(3) the business must not issue securities that are traded on a public exchange within 180 days after the date on which the qualified investment was made; and <A]

[A>(4) the business must not have a liquidation event within 180 days after the date on which the qualified investment was made. <A]

(f) The commissioner must maintain a list of businesses certified under this subdivision for the calendar year and make the list accessible to the public on the department's Web site.

(g) For purposes of this subdivision, the following terms have the meanings given:

(1) "qualified high-technology field" includes aerospace, agricultural processing, renewable energy, energy efficiency and conservation, environmental engineering, food technology, cellulosic ethanol, information technology, materials science technology, nanotechnology, telecommunications, biotechnology, medical device products, pharmaceuticals, diagnostics, biologicals, chemistry, veterinary science, and similar fields; and

(2) "proprietary technology" means the technical innovations that are unique and legally owned or licensed by a business and includes, without limitation, those innovations that are patented, patent pending, a subject of trade secrets, or copyrighted.

[A>EFFECTIVE DATE. This section is effective for qualified small businesses certified after June 30, 2013, except the amendments to paragraph (c), clause (7), are effective the day following final enactment. <A]

Sec. 3. AMEND Minnesota Statutes 2012, section 116J.8737, subdivision 8 , is amended to read: Subd. 8. Data privacy. (a) Data contained in an application submitted to the commissioner under subdivision 2, 3, or 4 are nonpublic data, or private data on individuals, as defined in section 13.02, subdivision 9 or 12, except that the following data items are public:

```
(1) the name
      [A>, mailing address, telephone number, e-mail address, contact
```

person's name, and industry type <A] of a qualified small business upon approval of the application and certification by the commissioner under subdivision 2;

(2) the name of a qualified investor upon approval of the application and certification by the commissioner under subdivision 3;

(3) the name of a qualified fund upon approval of the application and certification by the commissioner under subdivision 4;

(4) for credit certificates issued under subdivision 5, the amount of the credit certificate issued, amount of the qualifying investment, the name of the qualifying investor or qualifying fund that received the certificate, and the name of the qualifying small business in which the qualifying investment was made;

(5) for credits revoked under subdivision 7, paragraph (a), the amount revoked and the name of the qualified investor or qualified fund; and

(6) for credits revoked under subdivision 7, paragraphs (b) and (c), the amount revoked and the name of the qualified small business.

(b) The following data, including data classified as nonpublic or private, must be provided to the

consultant for use in conducting the program evaluation under subdivision 10:

(1) the commissioner of employment and economic development shall provide data contained in an application for certification received from a qualified small business, qualified investor, or qualified fund, and any annual reporting information received on a qualified small business, qualified investor, or qualified fund; and

(2) the commissioner of revenue shall provide data contained in any applicable tax returns of a qualified small business, qualified investor, or qualified fund.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 4. [A> [136A.129 ] GREATER MINNESOTA INTERNSHIP PROGRAM. <A]

[A>Subdivision 1. Definitions. <A]

[A>(a) For the purposes of this section, the terms defined in this subdivision have the meanings given to them. <A]

[A>(b) "Eligible employer" means a taxpayer under section 290.01 with employees located in greater Minnesota. <A]

[A>(c) "Eligible institution" means a Minnesota public postsecondary institution or a Minnesota private, nonprofit, baccalaureate degree-granting college or university. <A]

[A>(d) "Eligible student" means a student enrolled in an eligible institution who has completed one-half of the credits necessary for the respective degree or certification. <A]

[A>(e) "Greater Minnesota" means the area of the state outside of the counties of Anoka, Carver, Chisago, Dakota, Hennepin, Isanti, Ramsey, Scott, Sherburne, Washington, and Wright. <A]

[A>Subd. 2. Program established. The Office of Higher Education shall administer a greater Minnesota internship program through eligible institutions to provide credit at the eligible institution for internships and tax credits for eligible employers who hire interns for employment in greater Minnesota. <A]

[A>Subd. 3. Program components. <A]

[A>(a) An intern must be an eligible student who has been admitted to a major program that is related to the intern experience as determined by the eligible institution. <A]

[A>(b) To participate in the program, an eligible institution must: <A]

[A>(1) enter into written agreements with eligible employers to provide internships that are at least 12 weeks long and located in greater Minnesota; <A]

[A>(2) determine that the work experience of the internship is related to the eligible student's course of

study; and <A]

[A>(3) provide academic credit for the successful completion of the internship or ensure that it fulfills requirements necessary to complete a vocational technical education program. <A]

[A>(c) To participate in the program, an eligible employer must enter into a written agreement with an eligible institution specifying that the intern: <A]

[A>(1) would not have been hired without the tax credit described in subdivision 4; <A]

[A>(2) did not work for the employer in the same or a similar job prior to entering the agreement; <A]

[A>(3) does not replace an existing employee; <A]

[A>(4) has not previously participated in the program; <A]

[A>(5) will be employed at a location in greater Minnesota; <A]

[A>(6) will be paid at least minimum wage for a minimum of 16 hours per week for a period of at least 12 weeks; and <A]

[A>(7) will be supervised and evaluated by the employer. <A]

[A>(d) The written agreement between the eligible institution and the eligible employer must certify a credit amount to the employer, not to exceed $2,000 per intern. The total dollar amount of credits that an eligible institution certifies to eligible employers in a calendar year may not exceed the amount of its allocation under subdivision 4. <A]

[A>(e) Participating eligible institutions and eligible employers must report annually to the office. The report must include at least the following: <A]

[A>(1) the number of interns hired; <A]

[A>(2) the number of hours and weeks worked by interns; and <A]

[A>(3) the compensation paid to interns. <A]

[A>(f) An internship required to complete an academic program does not qualify for the greater Minnesota internship program under this section. <A]

[A>Subd. 4. Tax credit allowed. An employer is entitled to a tax credit as provided in section 290.06, subdivision 36 . The total amount of credits allocated in a calendar year must not exceed $2,000,000. The office shall determine relevant criteria to allocate the tax credits including the geographic distribution of credits to work locations outside the metropolitan area, and shall allocate credits to eligible institutions that meet the criteria on a first come, first served basis. Any credits allocated to an institution but not used may be reallocated to eligible institutions. The office shall allocate a portion of the administrative fee

under section 290.06, subdivision 36 , to participating eligible institutions for their administrative costs. <A]

[A>Subd. 5. Reports to the legislature. <A]

[A>(a) By February 1, 2015, the office and the Department of Revenue shall report to the legislature on the greater Minnesota internship program. The report must include at least the following: <A]

[A>(1) the number and dollar amount of credits allowed; <A]

[A>(2) the number of interns employed under the program; and <A]

[A>(3) the cost of administering the program. <A]

[A>(b) By February 1, 2016, the office and the Department of Revenue shall report to the legislature with an analysis of the effectiveness of the program in stimulating businesses to hire interns and in assisting participating interns in finding permanent career positions. This report must include the number of students who participated in the program who were subsequently employed full-time by the employer. <A]

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2013. <A]

Sec. 5. AMEND Minnesota Statutes 2012, section 289A.08, subdivision 3 , is amended to read: Subd. 3. Corporations. (a) A corporation that is subject to the state's jurisdiction to tax under

```
section 290.014, subdivision 5, must file a return
    [D>, except that a
```

foreign operating corporation as defined in section 290.01, subdivision 6 b , is not required to file a return <D].

(b) Members of a unitary business that are required to file a combined report on one return must designate a member of the unitary business to be responsible for tax matters, including the filing of returns, the payment of taxes, additions to tax, penalties, interest, or any other payment, and for the receipt of refunds of taxes or interest paid in excess of taxes lawfully due. The designated member must be a member of the unitary business that is filing the single combined report and either:

(1) a corporation that is subject to the taxes imposed by chapter 290; or

(2) a corporation that is not subject to the taxes imposed by chapter 290:

(i) Such corporation consents by filing the return as a designated member under this clause to remit taxes, penalties, interest, or additions to tax due from the members of the unitary business subject to tax, and receive refunds or other payments on behalf of other members of the unitary business. The member designated under this clause is a "taxpayer" for the purposes of this chapter and chapter 270C, and is liable for any liability imposed on the unitary business under this chapter and chapter 290.

(ii) If the state does not otherwise have the jurisdiction to tax the member designated under this clause,

consenting to be the designated member does not create the jurisdiction to impose tax on the designated member, other than as described in item (i).

(iii) The member designated under this clause must apply for a business tax account identification number.

(c) The commissioner shall adopt rules for the filing of one return on behalf of the members of an affiliated group of corporations that are required to file a combined report. All members of an affiliated group that are required to file a combined report must file one return on behalf of the members of the group under rules adopted by the commissioner.

(d) If a corporation claims on a return that it has paid tax in excess of the amount of taxes lawfully due, that corporation must include on that return information necessary for payment of the tax in excess of the amount lawfully due by electronic means.

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 6. AMEND Minnesota Statutes 2012, section 290.01, subdivision 19 , as amended by Laws 2013, chapter 3, section 3, is amended to read: Subd. 19. Net income. The term "net income" means the federal taxable income, as defined in section 63 of the Internal Revenue Code of 1986, as amended through the date named in this subdivision, incorporating the federal effective dates of changes to the Internal Revenue Code and any elections made by the taxpayer in accordance with the Internal Revenue Code in determining federal taxable income for federal income tax purposes, and with the modifications provided in subdivisions 19a to 19f. In the case of a regulated investment company or a fund thereof, as defined in section 851(a) or 851(g) of the Internal Revenue Code, federal taxable income means investment company taxable income as defined in section 852(b)(2) of the Internal Revenue Code, except that:

(1) the exclusion of net capital gain provided in section 852(b)(2)(A) of the Internal Revenue Code does not apply;

(2) the deduction for dividends paid under section 852(b)(2)(D) of the Internal Revenue Code must be applied by allowing a deduction for capital gain dividends and exempt-interest dividends as defined in sections 852(b)(3)(C) and 852(b)(5) of the Internal Revenue Code; and

(3) the deduction for dividends paid must also be applied in the amount of any undistributed capital gains which the regulated investment company elects to have treated as provided in section 852(b)(3)(D) of the Internal Revenue Code. The net income of a real estate investment trust as defined and limited by section 856(a), (b), and (c) of the Internal Revenue Code means the real estate investment trust taxable income as defined in section 857(b)(2) of the Internal Revenue Code. The net income of a designated settlement fund as defined in section 468B(d) of the Internal Revenue Code means the gross income as defined in section 468B(b) of the Internal Revenue Code. The Internal Revenue Code of 1986, as amended through April 14, 2011, shall be in effect for taxable years beginning after December 31, 1996, and before January 1, 2012, and for taxable years beginning after December 31, 2012. The Internal Revenue Code of 1986,

as amended through January 3, 2013, is in effect for taxable years beginning after December 31, 2011, and before January 1, 2013. [A>The provisions of sections 315 and 331 of the American Taxpayer Relief Act of 2012, Public Law 112-240, extension of increased expensing limitations and treatment of certain real property as section 179 property and extension and modification of bonus depreciation, are effective at the same time they become effective for federal purposes. <A] Except as otherwise provided, references to the Internal Revenue Code in subdivisions 19 to 19f mean the code in effect for purposes of determining net income for the applicable year.

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 7. AMEND Minnesota Statutes 2012, section 290.01, subdivision 19 b , is amended to read: Subd. 19b. Subtractions from federal taxable income. For individuals, estates, and trusts, there shall be subtracted from federal taxable income:

(1) net interest income on obligations of any authority, commission, or instrumentality of the United States to the extent includable in taxable income for federal income tax purposes but exempt from state income tax under the laws of the United States;

(2) if included in federal taxable income, the amount of any overpayment of income tax to Minnesota or to any other state, for any previous taxable year, whether the amount is received as a refund or as a credit to another taxable year's income tax liability;

(3) the amount paid to others, less the amount used to claim the credit allowed under section 290.0674 , not to exceed $1,625 for each qualifying child in grades kindergarten to 6 and $2,500 for each qualifying child in grades 7 to 12, for tuition, textbooks, and transportation of each qualifying child in attending an elementary or secondary school situated in Minnesota, North Dakota, South Dakota, Iowa, or Wisconsin, wherein a resident of this state may legally fulfill the state's compulsory attendance laws, which is not operated for profit, and which adheres to the provisions of the Civil Rights Act of 1964 and chapter 363A. For the purposes of this clause, "tuition" includes fees or tuition as defined in section 290.0674, subdivision 1 , clause (1).

As used in this clause, "textbooks" includes books and other instructional materials and equipment purchased or leased for use in elementary and secondary schools in teaching only those subjects legally and commonly taught in public elementary and secondary schools in this state. Equipment expenses qualifying for deduction includes expenses as defined and limited in section 290.0674, subdivision 1 , clause (3).

"Textbooks" does not include instructional books and materials used in the teaching of religious tenets, doctrines, or worship, the purpose of which is to instill such tenets, doctrines, or worship, nor does it include books or materials for, or transportation to, extracurricular activities including sporting events, musical or dramatic events, speech activities, driver's education, or similar programs. No deduction is permitted for any expense the taxpayer incurred in using the taxpayer's or the qualifying child's vehicle to provide such transportation for a qualifying child. For purposes of the subtraction provided by this clause,

"qualifying child" has the meaning given in section 32(c)(3) of the Internal Revenue Code;

(4) income as provided under section 290.0802 ;

(5) to the extent included in federal adjusted gross income, income realized on disposition of property exempt from tax under section 290.491 ;

(6) to the extent not deducted or not deductible pursuant to section 408(d)(8)(E) of the Internal Revenue Code in determining federal taxable income by an individual who does not itemize deductions for federal income tax purposes for the taxable year, an amount equal to 50 percent of the excess of charitable contributions over $500 allowable as a deduction for the taxable year under section 170(a) of the Internal Revenue Code, under the provisions of Public Law 109-1 and Public Law 111-126;

(7) for individuals who are allowed a federal foreign tax credit for taxes that do not qualify for a credit under section 290.06, subdivision 22 , an amount equal to the carryover of subnational foreign taxes for the taxable year, but not to exceed the total subnational foreign taxes reported in claiming the foreign tax credit. For purposes of this clause, "federal foreign tax credit" means the credit allowed under section 27 of the Internal Revenue Code, and "carryover of subnational foreign taxes" equals the carryover allowed under section 904(c) of the Internal Revenue Code minus national level foreign taxes to the extent they exceed the federal foreign tax credit;

(8) in each of the five tax years immediately following the tax year in which an addition is required under subdivision 19a, clause (7), or 19c, clause

[D>(15) <D]

[A>(12) <A], in the case of a shareholder of a corporation that is an S corporation, an amount equal to one-fifth of the delayed depreciation. For purposes of this clause, "delayed depreciation" means the amount of the addition made by the taxpayer under subdivision 19a, clause (7), or subdivision 19c, clause

[D>(15) <D]

[A>(12) <A], in the case of a shareholder of an S corporation, minus the positive value of any net operating loss under section 172 of the Internal Revenue Code generated for the tax year of the addition. The resulting delayed depreciation cannot be less than zero;

(9) job opportunity building zone income as provided under section 469.316 ;

(10) to the extent included in federal taxable income, the amount of compensation paid to members of the Minnesota National Guard or other reserve components of the United States military for active service, excluding compensation for services performed under the Active Guard Reserve (AGR) program. For purposes of this clause, "active service" means (i) state active service as defined in section 190.05, subdivision 5 a, clause

(1); or (ii) federally funded state active service as defined in section 190.05, subdivision 5 b , but "active

service" excludes service performed in accordance with section 190.08, subdivision 3 ;

(11) to the extent included in federal taxable income, the amount of compensation paid to Minnesota residents who are members of the armed forces of the United States or United Nations for active duty performed under United States Code, title 10; or the authority of the United Nations;

(12) an amount, not to exceed $10,000, equal to qualified expenses related to a qualified donor's donation, while living, of one or more of the qualified donor's organs to another person for human organ transplantation. For purposes of this clause, "organ" means all or part of an individual's liver, pancreas, kidney, intestine, lung, or bone marrow; "human organ transplantation" means the medical procedure by which transfer of a human organ is made from the body of one person to the body of another person; "qualified expenses" means unreimbursed expenses for both the individual and the qualified donor for (i) travel, (ii) lodging, and (iii) lost wages net of sick pay, except that such expenses may be subtracted under this clause only once; and "qualified donor" means the individual or the individual's dependent, as defined in section 152 of the Internal Revenue Code. An individual may claim the subtraction in this clause for each instance of organ donation for transplantation during the taxable year in which the qualified expenses occur;

(13) in each of the five tax years immediately following the tax year in which an addition is required under subdivision 19a, clause (8), or 19c, clause

[D>(16) <D]

[A>(13) <A], in the case of a shareholder of a corporation that is an S corporation, an amount equal to one-fifth of the addition made by the taxpayer under subdivision 19a, clause (8), or 19c, clause

[D>(16) <D]

[A>(13) <A], in the case of a shareholder of a corporation that is an S corporation, minus the positive value of any net operating loss under section 172 of the Internal Revenue Code generated for the tax year of the addition. If the net operating loss exceeds the addition for the tax year, a subtraction is not allowed under this clause;

(14) to the extent included in the federal taxable income of a nonresident of Minnesota, compensation paid to a service member as defined in United States Code, title 10, section 101(a)(5), for military service as defined in the Servicemembers Civil Relief Act, Public Law 108-189, section 101(2);

(15) to the extent included in federal taxable income, the amount of national service educational awards received from the National Service Trust under United States Code, title 42, sections 12601 to 12604, for service in an approved Americorps National Service program;

(16) to the extent included in federal taxable income, discharge of indebtedness income resulting from reacquisition of business indebtedness included in federal taxable income under section 108(i) of the Internal Revenue Code. This subtraction applies only to the extent that the income was included in net

income in a prior year as a result of the addition under section 290.01 ,

subdivision 19a, clause (16);
    [D>and <D]

(17) the amount of the net operating loss allowed under section 290.095 ,

subdivision 11 , paragraph (c)
    [A>; and <A]

[A>(18) the amount of expenses not allowed for federal income tax purposes due to claiming the railroad track maintenance credit under section 45G(a) of the Internal Revenue Code <A].

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 8. AMEND Minnesota Statutes 2012, section 290.01, subdivision 19 c , is amended to read: Subd. 19c. Corporations; additions to federal taxable income. For corporations, there shall be added to federal taxable income:

(1) the amount of any deduction taken for federal income tax purposes for income, excise, or franchise taxes based on net income or related minimum taxes, including but not limited to the tax imposed under section 290.0922 , paid by the corporation to Minnesota, another state, a political subdivision of another state, the District of Columbia, or any foreign country or possession of the United States;

(2) interest not subject to federal tax upon obligations of: the United States, its possessions, its agencies, or its instrumentalities; the state of Minnesota or any other state, any of its political or governmental subdivisions, any of its municipalities, or any of its governmental agencies or instrumentalities; the District of Columbia; or Indian tribal governments;

(3) exempt-interest dividends received as defined in section 852(b)(5) of the Internal Revenue Code;

(4) the amount of any net operating loss deduction taken for federal income tax purposes under section 172 or 832(c)(10) of the Internal Revenue Code or operations loss deduction under section 810 of the Internal Revenue Code;

(5) the amount of any special deductions taken for federal income tax purposes under sections 241 to 247 and 965 of the Internal Revenue Code;

(6) losses from the business of mining, as defined in section 290.05, subdivision 1 , clause (a), that are not subject to Minnesota income tax;

(7) the amount of any capital losses deducted for federal income tax purposes under sections 1211 and 1212 of the Internal Revenue Code;

[D>(8) the exempt foreign trade income of a foreign sales corporation under sections 921(a) and 291 of the Internal Revenue Code; <D]

[D>(9) <D]

[A>(8) <A] the amount of percentage depletion deducted under sections 611 through 614 and 291 of the Internal Revenue Code;

[D>(10) <D]

[A>(9) <A] for certified pollution control facilities placed in service in a taxable year beginning before December 31, 1986, and for which amortization deductions were elected under section 169 of the Internal Revenue Code of 1954, as amended through December 31, 1985, the amount of the amortization deduction allowed in computing federal taxable income for those facilities;

[D>(11) the amount of any deemed dividend from a foreign operating corporation determined pursuant to section 290.17, subdivision 4 , paragraph (g).

The deemed dividend shall be reduced by the amount of the addition to income required by clauses (20), (21), <D]

[D>(22), and (23); <D]

[D>(12) <D]

[A>(10) <A] the amount of a partner's pro rata share of net income which does not flow through to the partner because the partnership elected to pay the tax on the income under section 6242(a)(2) of the Internal Revenue Code;

[D>(13) the amount of net income excluded under section 114 of the Internal Revenue Code; <D]

[D>(14) <D]

[A>(11) <A] any increase in subpart F income, as defined in section 952(a) of the Internal Revenue Code, for the taxable year when subpart F income is calculated without regard to the provisions of Division C, title III, section 303(b) of Public Law 110-343;

[D>(15) <D]

[A>(12) <A] 80 percent of the depreciation deduction allowed under section 168(k)(1)(A) and (k)(4)(A) of the Internal Revenue Code. For purposes of this clause, if the taxpayer has an activity that in the taxable year generates a deduction for depreciation under section 168(k)(1)(A) and (k)(4)(A) and the activity generates a loss for the taxable year that the taxpayer is not allowed to claim for the taxable year, "the depreciation allowed under section 168(k)(1)(A) and (k)(4)(A)" for the taxable year is limited to excess of the depreciation claimed by the activity under section 168(k)(1)(A) and (k)(4)(A) over the amount of the

loss from the activity that is not allowed in the taxable year. In succeeding taxable years when the losses not allowed in the taxable year are allowed, the depreciation under section 168(k)(1)(A) and (k)(4)(A) is allowed;

[D>(16) <D]

[A>(13) <A] 80 percent of the amount by which the deduction allowed by section 179 of the Internal Revenue Code exceeds the deduction allowable by section 179 of the Internal Revenue Code of 1986, as amended through December 31, 2003;

[D>(17) <D]

[A>(14) <A] to the extent deducted in computing federal taxable income, the amount of the deduction allowable under section 199 of the Internal Revenue Code;

[D>(18) for taxable years beginning before January 1, 2013, the exclusion allowed under section 139A of the Internal Revenue Code for federal subsidies for prescription drug plans; <D]

[D>(19) <D]

[A>(15) <A] the amount of expenses disallowed under section 290.10 , subdivision

2;
    [A>and <A]

[D>(20) an amount equal to the interest and intangible expenses, losses, and costs paid, accrued, or incurred by any member of the taxpayer's unitary group to or for the benefit of a corporation that is a member of the taxpayer's unitary business group that qualifies as a foreign operating corporation. For purposes of this clause, intangible expenses and costs include: <D]

[D>(i) expenses, losses, and costs for, or related to, the direct or indirect acquisition, use, maintenance or management, ownership, sale, exchange, or any other disposition of intangible property; <D]

[D>(ii) losses incurred, directly or indirectly, from factoring transactions or discounting transactions; <D]

[D>(iii) royalty, patent, technical, and copyright fees; <D]

[D>(iv) licensing fees; and <D]

[D>(v) other similar expenses and costs. For purposes of this clause, "intangible property" includes stocks, bonds, patents, patent applications, trade names, trademarks, service marks, copyrights, mask works, trade secrets, and similar types of intangible assets. This clause does not apply to any item of interest or intangible expenses or costs paid, accrued, or incurred, directly or indirectly, to a foreign operating corporation with respect to such item of income to the extent that the income to the foreign operating corporation is income from sources without the United States as defined in subtitle A, chapter 1,

subchapter N, part 1, of the Internal Revenue Code; <D]

[D>(21) except as already included in the taxpayer's taxable income pursuant to clause <D]

[D>(20), any interest income and income generated from intangible property received or accrued by a foreign operating corporation that is a member of the taxpayer's unitary group. For purposes of this clause, income generated from intangible property includes: <D]

[D>(i) income related to the direct or indirect acquisition, use, maintenance or management, ownership, sale, exchange, or any other disposition of intangible property; <D]

[D>(ii) income from factoring transactions or discounting transactions; <D]

[D>(iii) royalty, patent, technical, and copyright fees; <D]

[D>(iv) licensing fees; and <D]

[D>(v) other similar income. For purposes of this clause, "intangible property" includes stocks, bonds, patents, patent applications, trade names, trademarks, service marks, copyrights, mask works, trade secrets, and similar types of intangible assets. This clause does not apply to any item of interest or intangible income received or accrued by a foreign operating corporation with respect to such item of income to the extent that the income is income from sources without the United States as defined in subtitle A, chapter 1, subchapter N, part 1, of the Internal Revenue Code; <D]

[D>(22) the dividends attributable to the income of a foreign operating corporation that is a member of the taxpayer's unitary group in an amount that is equal to the dividends paid deduction of a real estate investment trust under section 561(a) of the Internal Revenue Code for amounts paid or accrued by the real estate investment trust to the foreign operating corporation; <D]

[D>(23) the income of a foreign operating corporation that is a member of the taxpayer's unitary group in an amount that is equal to gains derived from the sale of real or personal property located in the United States; <D]

[D>(24) for taxable years beginning before January 1, 2010, the additional amount allowed as a deduction for donation of computer technology and equipment under section 170(e)(6) of the Internal Revenue Code, to the extent deducted from taxable income; and <D]

[D>(25) <D]

[A>(16) <A] discharge of indebtedness income resulting from reacquisition of business indebtedness and deferred under section 108(i) of the Internal Revenue Code.

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 9. AMEND Minnesota Statutes 2012, section 290.01, subdivision 19 d , is amended to read: Subd.

19d. Corporations; modifications decreasing federal taxable income. For corporations, there shall be subtracted from federal taxable income after the increases provided in subdivision 19c:

(1) the amount of foreign dividend gross-up added to gross income for federal income tax purposes under section 78 of the Internal Revenue Code;

(2) the amount of salary expense not allowed for federal income tax purposes due to claiming the work opportunity credit under section 51 of the Internal Revenue Code;

(3) any dividend (not including any distribution in liquidation) paid within the taxable year by a national or state bank to the United States, or to any instrumentality of the United States exempt from federal income taxes, on the preferred stock of the bank owned by the United States or the instrumentality;

(4) amounts disallowed for intangible drilling costs due to differences between this chapter and the Internal Revenue Code in taxable years beginning before January 1, 1987, as follows:

(i) to the extent the disallowed costs are represented by physical property, an amount equal to the allowance for depreciation under Minnesota Statutes 1986, section 290.09, subdivision 7 , subject to the modifications contained in subdivision 19e; and

(ii) to the extent the disallowed costs are not represented by physical property, an amount equal to the allowance for cost depletion under Minnesota Statutes 1986, section 290.09, subdivision 8 ;

(5) the deduction for capital losses pursuant to sections 1211 and 1212 of the Internal Revenue Code, except that:

(i) for capital losses incurred in taxable years beginning after December 31, 1986, capital loss carrybacks shall not be allowed;

(ii) for capital losses incurred in taxable years beginning after December 31, 1986, a capital loss carryover to each of the 15 taxable years succeeding the loss year shall be allowed;

(iii) for capital losses incurred in taxable years beginning before January 1, 1987, a capital loss carryback to each of the three taxable years preceding the loss year, subject to the provisions of Minnesota Statutes 1986, section 290.16 , shall be allowed; and

(iv) for capital losses incurred in taxable years beginning before January 1, 1987, a capital loss carryover to each of the five taxable years succeeding the loss year to the extent such loss was not used in a prior taxable year and subject to the provisions of Minnesota Statutes 1986, section 290.16 , shall be allowed;

(6) an amount for interest and expenses relating to income not taxable for federal income tax purposes, if (i) the income is taxable under this chapter and (ii) the interest and expenses were disallowed as deductions under the provisions of section 171(a)(2), 265 or 291 of the Internal Revenue Code in computing federal taxable income;

(7) in the case of mines, oil and gas wells, other natural deposits, and timber for which percentage depletion was disallowed pursuant to subdivision 19c, clause

[D>(9) <D]

[A>(8) <A], a reasonable allowance for depletion based on actual cost. In the case of leases the deduction must be apportioned between the lessor and lessee in accordance with rules prescribed by the commissioner. In the case of property held in trust, the allowable deduction must be apportioned between the income beneficiaries and the trustee in accordance with the pertinent provisions of the trust, or if there is no provision in the instrument, on the basis of the trust's income allocable to each;

(8) for certified pollution control facilities placed in service in a taxable year beginning before December 31, 1986, and for which amortization deductions were elected under section 169 of the Internal Revenue Code of 1954, as amended through December 31, 1985, an amount equal to the allowance for depreciation under Minnesota Statutes 1986, section 290.09, subdivision 7 ;

(9) amounts included in federal taxable income that are due to refunds of income, excise, or franchise taxes based on net income or related minimum taxes paid by the corporation to Minnesota, another state, a political subdivision of another state, the District of Columbia, or a foreign country or possession of the United States to the extent that the taxes were added to federal taxable

```
income under
    [D>section 290.01, <D] subdivision 19c, clause (1), in a prior
```

taxable year;

[D>(10) 80 percent of royalties, fees, or other like income accrued or received from a foreign operating corporation or a foreign corporation which is part of the same unitary business as the receiving corporation, unless the income resulting from such payments or accruals is income from sources within the United States as defined in subtitle A, chapter 1, subchapter N, part 1, of the Internal Revenue Code; <D]

[D>(11) <D]

[A>(10) <A] income or gains from the business of mining as defined in section 290.05, subdivision 1 , clause (a), that are not subject to Minnesota franchise tax;

[D>(12) <D]

[A>(11) <A] the amount of disability access expenditures in the taxable year which are not allowed to be deducted or capitalized under section 44(d)(7) of the Internal Revenue Code;

[D>(13) <D]

[A>(12) <A] the amount of qualified research expenses not allowed for federal income tax purposes under

section 280C(c) of the Internal Revenue Code, but only to the extent that the amount exceeds the amount of the credit allowed under section 290.068 ;

[D>(14) <D]

[A>(13) <A] the amount of salary expenses not allowed for federal income tax purposes due to claiming the Indian employment credit under section 45A(a) of the Internal Revenue Code;

[D>(15) for a corporation whose foreign sales corporation, as defined in section 922 of the Internal Revenue Code, constituted a foreign operating corporation during any taxable year ending before January 1, 1995, and a return was filed by August 15, 1996, claiming the deduction under section 290.21, subdivision 4 , for income received from the foreign operating corporation, an amount equal to 1.23 multiplied by the amount of income excluded under section 114 of the Internal Revenue Code, provided the income is not income of a foreign operating company; <D]

[D>(16) <D]

[A>(14) <A] any decrease in subpart F income, as defined in section 952(a) of the Internal Revenue Code, for the taxable year when subpart F income is calculated without regard to the provisions of Division C, title III, section 303(b) of Public Law 110-343;

[D>(17) <D]

[A>(15) <A] in each of the five tax years immediately following the tax year in which an addition is required under subdivision 19c, clause

[D>(15) <D]

[A>(12) <A], an amount equal to one-fifth of the delayed depreciation. For purposes of this clause, "delayed depreciation" means the amount of the addition made by the taxpayer under subdivision 19c, clause

[D>(15) <D]

[A>(12) <A]. The resulting delayed depreciation cannot be less than zero;

[D>(18) <D]

[A>(16) <A] in each of the five tax years immediately following the tax year in which an addition is required under subdivision 19c, clause

[D>(16) <D]

[A>(13) <A], an amount equal to one-fifth of the amount of the addition;

[D>and <D]

[D>(19) <D]

[A>(17) <A] to the extent included in federal taxable income, discharge of indebtedness income resulting from reacquisition of business indebtedness included in federal taxable income under section 108(i) of the Internal Revenue Code. This subtraction applies only to the extent that the income was included in net

```
income in a prior year as a result of the addition under
    [D>section 290.01,
```

<D] subdivision 19c, clause

[D>(25). <D]

[A>(16); and <A]

[A>(18) the amount of expenses not allowed for federal income tax purposes due to claiming the railroad track maintenance credit under section 45G(a) of the Internal Revenue Code. <A]

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 10. AMEND Minnesota Statutes 2012, section 290.06, subdivision 2 c , is amended to read: Subd. 2c. Schedules of rates for individuals, estates, and trusts. (a) The income taxes imposed by this chapter upon married individuals filing joint returns and surviving spouses as defined in section 2(a) of the Internal Revenue Code must be computed by applying to their taxable net income the following schedule of rates:

```
(1) On the first
    [D>$25,680 <D]
```

[A>$35,480 <A], 5.35 percent;
```
 (2) On all over
    [D>$25,680 <D]
```

[A>$35,480 <A], but not over
```
    [D>$102,030
```

<D] [A>$140,960 <A], 7.05 percent;

```
(3) On all over
    [D>$102,030 <D]
```

[A>$140,960, but not over $250,000 <A], 7.85
```
percent
```

[D>.

<D] [A>; <A]

[A>(4) On all over $250,000, 9.85 percent. <A] Married individuals filing separate returns, estates, and trusts must compute their income tax by applying the above rates to their taxable income, except that the income brackets will be one-half of the above amounts.

(b) The income taxes imposed by this chapter upon unmarried individuals must be computed by applying to taxable net income the following schedule of rates:

```
(1) On the first
    [D>$17,570 <D]
```

[A>$24,270 <A], 5.35 percent;
```
 (2) On all over
    [D>$17,570 <D]
```

[A>$24,270 <A], but not over
```
    [D>$57,710
```

<D] [A>$79,730 <A], 7.05 percent;

```
(3) On all over
    [D>$57,710 <D]
```

[A>$79,730, but not over $150,000 <A], 7.85
```
percent
    [D>.
```

<D] [A>; <A]

[A>(4) On all over $150,000, 9.85 percent. <A]

(c) The income taxes imposed by this chapter upon unmarried individuals qualifying as a head of household as defined in section 2(b) of the Internal Revenue Code must be computed by applying to taxable net income the following schedule of rates:

```
(1) On the first
    [D>$21,630 <D]
```

[A>$29,880 <A], 5.35 percent;
```
 (2) On all over
    [D>$21,630 <D]
```

[A>$29,880 <A], but not over
[D>$86,910

<D] [A>$120,070 <A], 7.05 percent;

(3) On all over
[D>$86,910 <D]

[A>$120,070, but not over $200,000 <A], 7.85
percent
[D>.

<D] [A>; <A]

[A>(4) On all over $200,000, 9.85 percent. <A]

(d) In lieu of a tax computed according to the rates set forth in this subdivision, the tax of any individual taxpayer whose taxable net income for the taxable year is less than an amount determined by the commissioner must be computed in accordance with tables prepared and issued by the commissioner of revenue based on income brackets of not more than $100. The amount of tax for each bracket shall be computed at the rates set forth in this subdivision, provided that the commissioner may disregard a fractional part of a dollar unless it amounts to 50 cents or more, in which case it may be increased to $1.

(e) An individual who is not a Minnesota resident for the entire year must compute the individual's Minnesota income tax as provided in this subdivision. After the application of the nonrefundable credits provided in this chapter, the tax liability must then be multiplied by a fraction in which:

(1) the numerator is the individual's Minnesota source federal adjusted gross income as defined in section 62 of the Internal Revenue Code and increased by the additions required under section 290.01, subdivision 19 a, clauses (1), (5), (6), (7), (8), (9), (12),

(13), and (16) to (18), and reduced by the Minnesota assignable portion of the subtraction for United States government interest under section 290.01, subdivision 19 b, clause

(1), and the subtractions under section 290.01, subdivision 19 b, clauses (8), (9), (13),

(14), (16), and (17), after applying the allocation and assignability provisions of section 290.081 , clause (a), or 290.17 ; and

(2) the denominator is the individual's federal adjusted gross income as defined in section 62 of the Internal Revenue Code of 1986, increased by the amounts specified in section 290.01, subdivision 19 a, clauses (1), (5), (6), (7), (8), (9), (12), (13), and (16) to

(18), and reduced by the amounts specified in section 290.01, subdivision 19 b, clauses (1),

(8), (9), (13), (14), (16), and (17).

<span style="color:green">[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]</span>

Sec. 11. AMEND Minnesota Statutes 2012, section 290.06, subdivision 2 d , is amended to read: Subd. 2d. Inflation adjustment of brackets.

```
(a) For taxable years beginning after December 31,
    [D>2000 <D]
```

[A>2013 <A],

the minimum and maximum dollar amounts for each rate bracket for which a tax is imposed in subdivision 2c shall be adjusted for inflation by the percentage determined under paragraph (b).

For the purpose of making the adjustment as provided in this subdivision all of the rate brackets provided in subdivision 2c shall be the rate brackets as

```
they existed for taxable years beginning after December 31,
    [D>1999<D]
```

[A>2012 <A], and before January 1,
```
    [D>2001 <D]
```

[A>2014 <A].


The rate applicable to any rate bracket must not be changed. The dollar amounts setting forth the tax shall be adjusted to reflect the changes in the rate brackets. The rate brackets as adjusted must be rounded to the nearest $10 amount. If the rate bracket ends in $5, it must be rounded up to the nearest $10 amount.

(b) The commissioner shall adjust the rate brackets and by the percentage determined pursuant to the provisions of section 1(f) of the Internal Revenue

```
Code, except that in section 1(f)(3)(B) the word
    [D>"1999" <D]
```

[A>"2012" <A]

shall be substituted for the word "1992."

```
For
```

```
[D>2001 <D]

[A>2014 <A], the commissioner shall then determine thepercent change from the
12 months ending on August 31,
    [D>1999 <D]

[A>2012
<A], to the 12 months ending on August 31,
    [D>2000 <D]

[A>2013 <A], and in
each subsequent year, from the 12 months ending on August 31,
    [D>1999
```

<D] [A>2012 <A], to the 12 months ending on August 31 of the year preceding the taxable year. The determination of the commissioner pursuant to this subdivision shall not be considered a "rule" and shall not be subject to the Administrative Procedure Act contained in chapter 14. No later than December 15 of each year, the commissioner shall announce the specific percentage that will be used to adjust the tax rate brackets.

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 12. AMEND Minnesota Statutes 2012, section 290.06 , is amended by adding a subdivision to read: [A>Subd. 36. Greater Minnesota internship credit. <A]

[A>(a) A taxpayer who is an eligible employer may take a credit against the tax due under this chapter equal to the lesser of: <A]

[A>(1) 40 percent of the compensation paid to an intern qualifying under the program established under section 136A.129 , but not to exceed $2,000 per intern; or <A]

[A>(2) the amount certified to the taxpayer by an eligible institution out of the institution's allocation of credits for the calendar year, as provided in section 136A.129 . <A]

[A>(b) Credits allowed to a partnership, a limited liability company taxed as a partnership, an S corporation, or multiple owners of property are passed through to the partners, members, shareholders, or owners, respectively, pro rata to each partner, member, shareholder, or owner based on their share of the entity's income for the taxable year. <A]

[A>(c) If the amount of credit which the taxpayer is eligible to receive under this subdivision exceeds the taxpayer's tax liability under this chapter, the commissioner of revenue shall refund the excess to the taxpayer. <A]

[A>(d) An amount necessary to pay claims for refund provided in this subdivision is appropriated from the general fund to the commissioner of revenue. <A]

[A>(e) An amount equal to one percent of the total amount of the credits authorized under section 136A.129, subdivision 4 , for an administrative fee for the Office of Higher Education and participating eligible institutions is appropriated from the general fund to the commissioner of revenue, for a transfer to the Office of Higher Education. <A]

[A>(f) For purposes of this subdivision, the terms "eligible employer" and "eligible institution" have the meanings given in section 136A.129 . <A]

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2013. <A]

Sec. 13. AMEND Minnesota Statutes 2012, section 290.0677, subdivision 2 , is amended to read: Subd. 2. Definitions.

```
(a) For purposes of this section
    [A>, <A] the following terms have the
```

meanings given.

(b) "Designated area" means a:

(1) combat zone designated by Executive Order from the President of the United States;

(2) qualified hazardous duty area, designated in Public Law; or

(3) location certified by the U. S. Department of Defense as eligible for combat zone tax benefits due to the location's direct support of military operations.

(c) "Active military service" means active duty service in any of the United States armed forces, the National Guard, or reserves.

```
(d) "Qualified individual" means an individual who has
    [A>: <A]
(1)
    [D>either (i) <D]
```

[A>met one of the following criteria: <A]

[A>(i) has <A]
```
 served at least 20 years in the military
    [D>or <D]
```

[A>; <A]

(ii) has a service-connected disability rating of 100 percent for a total and

permanent disability;
    [A>or <A]

[A>(iii) has been determined by the military to be eligible for compensation from a pension or other retirement pay from the federal government for service in the military, as computed under United States Code, title 10, sections 1401 to 1414, 1447 to 1455, or 12733; <A] and

(2) separated from military service before the end of the taxable year.

(e) "Adjusted gross income" has the meaning given in section 61 of the Internal Revenue Code.

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 14. AMEND Minnesota Statutes 2012, section 290.068, subdivision 3 , is amended to read: Subd. 3. Limitation; carryover.

(a)(1) The credit for a taxable year beginning before January 1, 2010,

[A>and after December 31, 2012, <A] shall not exceed the liability for tax. "

Liability for tax" for purposes of this section means the
    [A>sum of the <A]tax imposed under section 290.06,
    [D>subdivision <D]

[A>subdivisions <A] 1

[A>and 2c <A], for the taxable year reduced by the sum of the nonrefundable

credits allowed under this chapter
    [A>, on all of the entities required to

be included on the combined report of the unitary business. If the amount of the credit allowed exceeds the liability for tax of the taxpayer, but is allowed as a result of the liability for tax of other members of the unitary group for the taxable year, the taxpayer must allocate the excess as a research credit to another member of the unitary group <A].

(2) In the case of a corporation which is a partner in a partnership, the credit allowed for the taxable year shall not exceed the lesser of the amount determined under clause (1) for the taxable year or an amount (separately computed with respect to the corporation's interest in the trade or business or entity) equal to the amount of tax attributable to that portion of taxable income which is allocable or apportionable to the corporation's interest in the trade or business or entity.

(b) If the amount of the credit determined under this section for any taxable

```
year exceeds the limitation under clause (a)
    [A>including amounts allocated
```

to other members of the unitary group <A], the excess shall be a research credit carryover to each of the 15 succeeding taxable years. The entire amount of the excess unused credit for the taxable year shall be carried first to the earliest of the taxable years to which the credit may be carried and then to each successive year to which the credit may be carried. The amount of the unused credit which may be added under this clause shall not exceed the taxpayer's liability for tax less the research credit for the taxable year.

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 15. AMEND Minnesota Statutes 2012, section 290.068, subdivision 6 a , is amended to read: Subd. 6a. Credit to be refundable. If the amount of credit allowed in this section for qualified research expenses

```
incurred in taxable years beginning after December 31, 2009,
    [A>and before
```

January 1, 2013, <A] exceeds the taxpayer's tax liability under this chapter, the commissioner shall refund the excess amount. The credit allowed for qualified research expenses incurred in taxable years

```
beginning after December 31, 2009,
    [A>and before January 1, 2013, <A] must
```

be used before any research credit earned under subdivision 3.

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 16. AMEND Minnesota Statutes 2012, section 290.0681, subdivision 1 , is amended to read: Subdivision 1. Definitions. (a) For purposes of this section, the following terms have the meanings given.

(b) "Account" means the historic credit administration account in the special revenue fund.

(c) "Office" means the State Historic Preservation Office of the Minnesota Historical Society.

(d) "Project" means rehabilitation of a certified historic structure, as defined in section 47(c)(3)(A) of the Internal Revenue Code, that is located in

```
Minnesota and is allowed a federal credit
    [D>under section 47(a)(2) of the
```

Internal Revenue Code <D].

(e) "Society" means the Minnesota Historical Society.

[A>(f) "Federal credit" means the credit allowed under section 47(a)(2) of the Internal Revenue Code. <A]

[A>(g) "Placed in service" has the meaning used in section 47 of the Internal Revenue Code. <A]

[A>(h) "Qualified rehabilitation expenditures" has the meaning given in section 47 of the Internal Revenue Code. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 17. AMEND Minnesota Statutes 2012, section 290.0681, subdivision 3 , is amended to read: Subd. 3. Applications; allocations. (a) To qualify for a credit or grant under this section, the developer of a project must apply to the office before the rehabilitation begins. The application must contain the information and be in the form prescribed by the office.

```
The office may collect a fee for application of up to
    [D>$5,000 <D]
```

[A>0.5

percent of qualified rehabilitation expenditures, up to $40,000 <A], based on

```
estimated qualified rehabilitation
    [D>expenses <D]
```

[A>expenditures <A], to

offset costs associated with personnel and administrative expenses related to administering the credit and preparing the economic impact report in subdivision 9. Application fees are deposited in the account. The application must indicate if the application is for a credit or a grant in lieu of the credit or a combination of the two and designate the taxpayer qualifying for the credit or the recipient of the grant.

(b) Upon approving an application for credit, the office shall issue allocation certificates that:

(1) verify eligibility for the credit or grant;

(2) state the amount of credit or grant anticipated with the project, with the credit amount equal to 100 percent and the grant amount equal to 90 percent of the federal credit anticipated in the application;

(3) state that the credit or grant allowed may increase or decrease if the federal credit the project receives at the time it is placed in service is different than the amount anticipated at the time the allocation certificate is issued; and

(4) state the fiscal year in which the credit or grant is allocated, and that the taxpayer or grant recipient is

entitled to receive the credit or grant at the time the project is placed in service, provided that date is within three calendar years following the issuance of the allocation certificate.

```
(c) The office, in consultation with the commissioner
    [D>of revenue <D],
```

shall determine if the project is eligible for a credit or a grant under this

```
section
    [A>and must notify the developer in writing of its determination
```

<A]. Eligibility for the credit is subject to review and audit by the commissioner

[D>of revenue <D].

(d) The federal credit recapture and repayment requirements under section 50 of the Internal Revenue Code do not apply to the credit allowed under this section.

[A>(e) Any decision of the office under paragraph (c) may be challenged as a contested case under chapter 14. The contested case proceeding must be initiated within 45 days of the date of written notification by the office. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment and the change in paragraph (a) applies to applications first received on or after the day following final enactment. <A]

Sec. 18. AMEND Minnesota Statutes 2012, section 290.0681, subdivision 4 , is amended to read:

```
Subd. 4. Credit certificates
    [A> ; grants  <A] .
```

(a)(1) The developer of a project for which the office has issued an allocation certificate must notify the office when the project is placed in service. Upon verifying that the project has been placed in service, and was allowed a federal credit, the office must issue a credit certificate to the taxpayer designated in the application or must issue a grant to the recipient designated in the application. The credit certificate must state the amount of the credit.

(2) The credit amount equals the federal credit allowed for the project.

(3) The grant amount equals 90 percent of the federal credit allowed for the project.

(b) The recipient of a credit certificate may assign the certificate to another taxpayer, which is then allowed the credit under this section or section 297I.20, subdivision 3 . [A>An assignment is not valid unless the assignee notifies the commissioner within 30 days of the date that the assignment is made.

<A]

The commissioner shall prescribe the forms necessary for
   [A>notifying the

commissioner of the assignment of a credit certificate and for <A] claiming a credit by assignment.

[A>(c) Credits passed through to partners, members, shareholders, or owners pursuant to subdivision 5 are not an assignment of a credit certificate under this subdivision. <A]

[A>(d) A grant agreement between the office and the recipient of a grant may allow the grant to be issued to another individual or entity. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 19. AMEND Minnesota Statutes 2012, section 290.0681, subdivision 5 , is amended to read: Subd. 5. Partnerships; multiple owners. Credits granted to a partnership, a limited liability company taxed as a partnership, S corporation, or multiple owners of property are passed through to the partners, members, shareholders, or owners, respectively, pro rata to each partner, member, shareholder, or owner based on their share of the

entity's assets or as specially allocated in their organizational documents

[A>or any other executed agreement <A], as of the last day of the taxable year.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 20. AMEND Minnesota Statutes 2012, section 290.0681, subdivision 10 , is amended to read: Subd. 10.

Sunset. This section expires after fiscal year
   [D>2015 <D]

[A>2021 <A],

except that the office's authority to issue credit certificates under subdivision 4 based on allocation certificates that were issued before fiscal

year
   [D>2016 <D]

[A>2022 <A] remains in effect through
   [D>2018 <D]

[A>2024

<A], and the reporting requirements in subdivision 9 remain in effect through the year following the year in which all allocation certificates have either

been canceled or resulted in issuance of credit certificates, or
    [D>2019

<D] [A>2025 <A], whichever is earlier.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 21. AMEND Minnesota Statutes 2012, section 290.091, subdivision 1 , is amended to read: Subdivision 1. Imposition of tax. In addition to all other taxes imposed by this chapter a tax is imposed on individuals, estates, and trusts equal to the excess (if any) of

(a) an amount equal to
    [D>6.4 <D]

[A>6.75 <A] percent of alternative minimum

taxable income after subtracting the exemption amount, over

(b) the regular tax for the taxable year.

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 22. AMEND Minnesota Statutes 2012, section 290.091, subdivision 2 , is amended to read: Subd. 2. Definitions. For purposes of the tax imposed by this section, the following terms have the meanings given:

(a) "Alternative minimum taxable income" means the sum of the following for the taxable year:

(1) the taxpayer's federal alternative minimum taxable income as defined in section 55(b)(2) of the Internal Revenue Code;

(2) the taxpayer's itemized deductions allowed in computing federal alternative minimum taxable income, but excluding:

(i) the charitable contribution deduction under section 170 of the Internal Revenue Code;

(ii) the medical expense deduction;

(iii) the casualty, theft, and disaster loss deduction; and

(iv) the impairment-related work expenses of a disabled person;

(3) for depletion allowances computed under section 613A(c) of the Internal Revenue Code, with respect to each property (as defined in section 614 of the Internal Revenue Code), to the extent not included in federal alternative minimum taxable income, the excess of the deduction for depletion allowable under section 611 of the Internal Revenue Code for the taxable year over the adjusted basis of the property at the end of the taxable year (determined without regard to the depletion deduction for the taxable year);

(4) to the extent not included in federal alternative minimum taxable income, the amount of the tax preference for intangible drilling cost under section 57(a)(2) of the Internal Revenue Code determined without regard to subparagraph (E);

(5) to the extent not included in federal alternative minimum taxable income, the amount of interest income as provided by section 290.01, subdivision 19 a, clause (1); and

(6) the amount of addition required by section 290.01, subdivision 19 a, clauses (7) to (9), (12), (13), and (16) to (18); less the sum of the amounts determined under the following:

(1) interest income as defined in section 290.01, subdivision 19 b, clause (1);

(2) an overpayment of state income tax as provided by section 290.01, subdivision 19 b , clause (2), to the extent included in federal alternative minimum taxable income;

(3) the amount of investment interest paid or accrued within the taxable year on indebtedness to the extent that the amount does not exceed net investment income, as defined in section 163(d)(4) of the Internal Revenue Code. Interest does not include amounts deducted in computing federal adjusted gross income;

(4) amounts subtracted from federal taxable income as provided by section 290.01, subdivision 19 b , clauses (6), (8) to (14), and (16); and

(5) the amount of the net operating loss allowed under section 290.095, subdivision 11 , paragraph (c).

In the case of an estate or trust, alternative minimum taxable income must be computed as provided in section 59(c) of the Internal Revenue Code.

(b) "Investment interest" means investment interest as defined in section 163(d)(3) of the Internal Revenue Code.

(c) "Net minimum tax" means the minimum tax imposed by this section.

(d) "Regular tax" means the tax that would be imposed under this chapter (without regard to this section and section 290.032 ), reduced by the sum of the nonrefundable credits allowed under this chapter.

```
(e) "Tentative minimum tax" equals
    [D>6.4 <D]
```

[A>6.75 <A] percent of

alternative minimum taxable income after subtracting the exemption amount determined under subdivision 3.

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 23. AMEND Minnesota Statutes 2012, section 290.091, subdivision 6 , is amended to read: Subd. 6. Credit for prior years' liability. (a) A credit is allowed against the tax imposed by this chapter on individuals, trusts, and estates equal to the minimum tax credit for the taxable year. The minimum tax credit equals the adjusted net minimum tax for taxable years beginning after December 31, 1988, reduced by the minimum tax credits allowed in a prior taxable year. The credit may not exceed the excess (if any) for the taxable year of

(1) the regular tax, over

(2) the greater of (i) the tentative alternative minimum tax, or (ii) zero.

(b) The adjusted net minimum tax for a taxable year equals the lesser of the net minimum tax or the excess (if any) of

(1) the tentative minimum tax, over

(2)
    [D>6.4 <D]

[A>6.75 <A] percent of the sum of

(i) adjusted gross income as defined in section 62 of the Internal Revenue Code,

(ii) interest income as defined in section 290.01, subdivision 19 a, clause (1),

(iii) interest on specified private activity bonds, as defined in section 57(a)(5) of the Internal Revenue Code, to the extent not included under clause (ii),

(iv) depletion as defined in section 57(a)(1), determined without regard to the last sentence of paragraph (1), of the Internal Revenue Code, less

(v) the deductions allowed in computing alternative minimum taxable income provided in subdivision 2, paragraph (a), clause (2) of the first series of clauses and clauses

(1), (2), and (3) of the second series of clauses, and

(vi) the exemption amount determined under subdivision 3. In the case of an individual who is not a Minnesota resident for the entire year, adjusted net minimum tax must be multiplied by the fraction defined in section 290.06, subdivision 2 c , paragraph (e).

In the case of a trust or estate, adjusted net minimum tax must be multiplied by the fraction defined under subdivision 4, paragraph (b).

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 24. AMEND Minnesota Statutes 2012, section 290.0921, subdivision 3 , is amended to read: Subd. 3. Alternative minimum taxable income. " Alternative minimum taxable income" is Minnesota net income as defined insection 290.01, subdivision 19 , and includes the adjustments and tax preference items in sections 56, 57, 58, and 59(d), (e),

(f), and (h) of the Internal Revenue Code. If a corporation files a separate company Minnesota tax return, the minimum tax must be computed on a separate company basis. If a corporation is part of a tax group filing a unitary return, the minimum tax must be computed on a unitary basis. The following adjustments must be made.

(1) For purposes of the depreciation adjustments under section 56(a)(1) and 56(g)(4)(A) of the Internal Revenue Code, the basis for depreciable property placed in service in a taxable year beginning before January 1, 1990, is the adjusted basis for federal income tax purposes, including any modification made in a taxable year under section 290.01, subdivision 19 e , or Minnesota Statutes 1986, section 290.09, subdivision 7 , paragraph (c).

For taxable years beginning after December 31, 2000, the amount of any remaining modification made under section 290.01, subdivision 19 e, or Minnesota Statutes 1986, section 290.09, subdivision 7 , paragraph (c), not previously deducted is a depreciation allowance in the first taxable year after December 31, 2000.

(2) The portion of the depreciation deduction allowed for federal income tax purposes under section 168(k) of the Internal Revenue Code that is required as an addition under section 290.01, subdivision 19 c, clause

[D>(15) <D]

[A>(12) <A], is disallowed in determining alternative minimum taxable income.

(3) The subtraction for depreciation allowed under section 290.01, subdivision 19 d , clause

[D>(17) <D]

[A>(15) <A], is allowed as a depreciation deduction in determining alternative minimum taxable income.

(4) The alternative tax net operating loss deduction under sections 56(a)(4) and 56(d) of the Internal Revenue Code does not apply.

(5) The special rule for certain dividends under section 56(g)(4)(C)(ii) of the Internal Revenue Code does not apply.

[D>(6) The special rule for dividends from section 936 companies under section 56(g)(4)(C)(iii) does not apply. <D]

[D>(7) <D]

[A>(6) <A] The tax preference for depletion under section 57(a)(1) of the Internal Revenue Code does not apply.

[D>(8) <D]

[A>(7) <A] The tax preference for intangible drilling costs under section 57(a)(2) of the Internal Revenue Code must be calculated without regard to subparagraph (E) and the subtraction under section 290.01, subdivision 19 d, clause (4).

[D>(9) <D]

[A>(8) <A] The tax preference for tax exempt interest under section 57(a)(5) of the Internal Revenue Code does not apply.

[D>(10) <D]

[A>(9) <A] The tax preference for charitable contributions of appreciated property under section 57(a)(6) of the Internal Revenue Code does not apply.

[D>(11) <D]

[A>(10) <A] For purposes of calculating the tax preference for accelerated depreciation or amortization on certain property placed in service before January 1, 1987, under section 57(a)(7) of the Internal Revenue Code, the deduction allowable for the taxable year is the deduction allowed under section 290.01, subdivision 19 e. For taxable years beginning after December 31, 2000, the amount of any remaining modification made under section 290.01, subdivision 19 e, not previously deducted is a depreciation or amortization allowance in the first taxable year after December 31, 2004.

[D>(12) <D]

[A>(11) <A] For purposes of calculating the adjustment for adjusted current earnings in section 56(g) of the Internal Revenue Code, the term "alternative minimum taxable income" as it is used in section 56(g) of the Internal Revenue Code, means alternative minimum taxable income as defined in this subdivision, determined without regard to the adjustment for adjusted current earnings in section 56(g) of the Internal Revenue Code.

[D>(13) <D]

[A>(12) <A] For purposes of determining the amount of adjusted current earnings under section 56(g)(3) of the Internal Revenue Code, no adjustment shall be made under section 56(g)(4) of the Internal

Revenue Code with respect to (i) the amount of foreign dividend gross-up subtracted as provided in section

```
290.01, subdivision 19d, clause (1),
    [A>or <A] (ii) the amount of refunds of
```

income, excise, or franchise taxes subtracted as provided in section 290.01 ,

```
subdivision 19d , clause (9)
    [D>, or (iii) the amount of royalties, fees or
```

other like income subtracted as provided in section 290.01, subdivision 19 d , clause (10) <D].

[D>(14) <D]

[A>(13) <A] Alternative minimum taxable income excludes the income from operating in a job opportunity building zone as provided under section 469.317 .

[D>(15) <D]

[A>(14) <A] Alternative minimum taxable income excludes the income from operating in a biotechnology and health sciences industry zone as provided under section 469.337 . Items of tax preference must not be reduced below zero as a result of the modifications in this subdivision.

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 25. AMEND Minnesota Statutes 2012, section 290.0922, subdivision 1 , is amended to read: Subdivision 1. Imposition. (a) In addition to the tax imposed by this chapter without regard to this section, the franchise tax imposed on a corporation required to file undersection 289A.08, subdivision 3 , other than a corporation treated as an "S" corporation under section 290.9725 for the taxable year includes a tax equal to the following amounts: If the sum of the corporation's Minnesota property,

```
payrolls, and sales or receipts is: the tax equals:
    [D>less than $ 500,000 $
```

0 $ 500,000 to $ 999,999 $ 100 $ 1,000,000 to $ 4,999,999 $ 300 $ 5,000,000 to $ 9,999,999 $ 1,000 $ 10,000,000 to $ 19,999,999 $ 2,000 $ 20,000,000 or more $ 5,000 <D] [A>less than $ 930,000 $ 0 $ 930,000 to $ 1,869,999 $ 190 $ 1,870,000 to $ 9,339,999 $ 560 $ 9,340,000 to $ 18,679,999 $ 1,870 $ 18,680,000 to $ 37,359,999 $ 3,740 $ 37,360,000 or more $ 9,340 <A]

(b) A tax is imposed for each taxable year on a corporation required to file a return under section 289A.12, subdivision 3 , that is treated as an "S" corporation under section 290.9725 and on a partnership required to file a return under section 289A.12, subdivision 3 , other than a partnership that derives over 80 percent of its income from farming. The tax imposed under this paragraph is due on or before the due

date of the return for the taxpayer due under section 289A.18, subdivision 1 . The commissioner shall prescribe the return to be used for payment of this tax. The tax under this paragraph is equal to the following amounts: If the sum of the S corporation's or partnership's Minnesota property, payrolls, and sales or

receipts is: the tax equals:
[D>less than $ 500,000 $ 0 $ 500,000 to $

999,999 $ 100 $ 1,000,000 to $ 4,999,999 $ 300 $ 5,000,000 to $ 9,999,999 $ 1,000 $ 10,000,000 to $ 19,999,999 $ 2,000 $ 20,000,000 or more $ 5,000 <D] [A>less than $ 930,000 $ 0 $ 930,000 to $ 1,869,999 $ 190 $ 1,870,000 to $ 9,339,999 $ 560 $ 9,340,000 to $ 18,679,999 $ 1,870 $ 18,680,000 to $ 37,359,999 $ 3,740 $ 37,360,000 or more $ 9,340 <A]

[A>(c) The commissioner shall adjust the dollar amounts of both the tax and the property, payrolls, and sales or receipts thresholds in paragraphs (a) and (b) by the percentage determined pursuant to the provisions of section 1(f) of the Internal Revenue Code, except that in section 1(f)(3)(B) the word "2012" must be substituted for the word "1992." For 2014, the commissioner shall determine the percentage change from the 12 months ending on August 31, 2012, to the 12 months ending on August 31, 2013, and in each subsequent year, from the 12 months ending on August 31, 2012, to the 12 months ending on August 31 of the year preceding the taxable year. The determination of the commissioner pursuant to this subdivision is not a "rule" subject to the Administrative Procedure Act contained in chapter 14. The tax amounts as adjusted must be rounded to the nearest $10 amount and the threshold amounts must be adjusted to the nearest $10,000 amount. For tax amounts that end in $5, the amount is rounded up to the nearest $10 amount and for the threshold amounts that end in $5,000, the amount is rounded up to the nearest $10,000. <A]

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 26. AMEND Minnesota Statutes 2012, section 290.095, subdivision 2 , is amended to read: Subd. 2. Defined and limited. (a) The term "net operating loss" as used in this section shall mean a net operating loss as defined in section 172(c) of the Internal Revenue Code, with the modifications specified in subdivision 4. The deductions provided in

section 290.21
[D>and the modification provided in section 290.01,

subdivision 19d , clause <D]

[D>(10), <D] cannot be used in the determination of a net operating loss.

(b) The term "net operating loss deduction" as used in this section means the aggregate of the net operating loss carryovers to the taxable year, computed in accordance with subdivision 3. The provisions of section 172(b) of the Internal Revenue Code relating to the carryback of net operating losses, do not

apply.

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 27. AMEND Minnesota Statutes 2012, section 290.10, subdivision 1 , is amended to read: Subdivision 1. Expenses, interest, and taxes. [D>Except as provided in section 290.17, subdivision 4 , paragraph (i), <D] In computing the net income of a taxpayer no deduction shall in any case be allowed for expenses, interest and taxes connected with or allocable against the production or receipt of all income not included in the measure of the tax imposed by this chapter, except that for corporations engaged in the business of mining or producing iron ore, the mining of which is subject to the occupation tax imposed by section 298.01, subdivision 4 , this shall not prevent the deduction of expenses and other items to the extent that the expenses and other items are allowable under this chapter and are not deductible, capitalizable, retainable in basis, or taken into account by allowance or otherwise in computing the occupation tax and do not exceed the amounts taken for federal income tax purposes for that year. Occupation taxes imposed under chapter 298, royalty taxes imposed under chapter 299, or depletion expenses may not be deducted under this subdivision.

Sec. 28. AMEND Minnesota Statutes 2012, section 290.17, subdivision 4 , is amended to read: Subd. 4. Unitary business principle. (a) If a trade or business conducted wholly within this state or partly within and partly without this state is part of a unitary business, the entire income of the unitary business is subject to apportionment pursuant to section 290.191 . Notwithstanding subdivision 2, paragraph (c), none of the income of a unitary business is considered to be derived from any particular source and none may be allocated to a particular place except as provided by the applicable apportionment formula. The provisions of this subdivision do not apply to business income subject to subdivision 5, income of an insurance company, or income of an investment company determined under section 290.36 .

(b) The term "unitary business" means business activities or operations which result in a flow of value between them. The term may be applied within a single legal entity or between multiple entities and without regard to whether each entity is a sole proprietorship, a corporation, a partnership or a trust.

(c) Unity is presumed whenever there is unity of ownership, operation, and use, evidenced by centralized management or executive force, centralized purchasing, advertising, accounting, or other controlled interaction, but the absence of these centralized activities will not necessarily evidence a nonunitary business. Unity is also presumed when business activities or operations are of mutual benefit, dependent upon or contributory to one another, either individually or as a group.

(d) Where a business operation conducted in Minnesota is owned by a business entity that carries on business activity outside the state different in kind from that conducted within this state, and the other business is conducted entirely outside the state, it is presumed that the two business operations are unitary in nature, interrelated, connected, and interdependent unless it can be shown to the contrary.

```
(e) Unity of ownership
    [D>is not deemed to <D]
```

[A>does not <A] exist when
    [D>a corporation is <D]

[A>two or more corporations are <A]
 involved unless

[D>that corporation is a member of a group of two or more business entities and

<D] more than 50 percent of the voting stock of each
    [D>member of the group

<D] [A>corporation <A] is directly or indirectly owned by a common owner or by common owners, either corporate or noncorporate, or by one or more of the member corporations of the group. For this purpose, the term "voting stock" shall include membership interests of mutual insurance holding companies formed under section 66A.40.

(f) The net income and apportionment factors under section 290.191 or 290.20 of foreign corporations and other foreign entities which are part of a unitary business shall not be included in the net income or the apportionment factors

of the unitary business
    [A>; except that the income and apportionment

factors of a foreign entity, other than an entity treated as a C corporation for federal income tax purposes, that are included in the federal taxable income, as defined in section 63 of the Internal Revenue Code as amended through the date named in section 290.01, subdivision 19 , of a domestic corporation, domestic entity, or individual must be included in determining net income and the factors to be used in the apportionment of net income pursuant to section 290.191 or 290.20 <A].

A foreign corporation or other foreign entity which is
    [A>not included on a

combined report and which is <A] required to file a return under this chapter shall file on a separate return basis. [D>The net income and apportionment factors under section 290.191 or 290.20 of foreign operating corporations shall not be included in the net income or the apportionment factors of the unitary business except as provided in paragraph (g). <D]

[D>(g) The adjusted net income of a foreign operating corporation shall be deemed to be paid as a dividend on the last day of its taxable year to each shareholder thereof, in proportion to each

shareholder's ownership, with which such corporation is engaged in a unitary business. Such deemed dividend shall be treated as a dividend under section 290.21, subdivision 4 . Dividends actually paid by a foreign operating corporation to a corporate shareholder which is a member of the same unitary business as the foreign operating corporation shall be eliminated from the net income of the unitary business in preparing a combined report for the unitary business. The adjusted net income of a foreign operating corporation shall be its net income adjusted as follows: <D]

[D>(1) any taxes paid or accrued to a foreign country, the commonwealth of Puerto Rico, or a United States possession or political subdivision of any of the foregoing shall be a deduction; and <D]

[D>(2) the subtraction from federal taxable income for payments received from foreign corporations or foreign operating corporations under section 290.01, subdivision 19 d , clause (10), shall not be allowed. If a foreign operating corporation incurs a net loss, neither income nor deduction from that corporation shall be included in determining the net income of the unitary business. <D]

[D>(h) <D]

[A>(g) <A] For purposes of determining the net income of a unitary business and the factors to be used in the apportionment of net income pursuant to section290.191 or 290.20 , there must be included only the income and apportionment

```
factors of domestic corporations or other domestic entities
    [D>other than
```

foreign operating corporations <D] that are determined to be part of the unitary business pursuant to this subdivision, notwithstanding that foreign corporations or other foreign entities might be included in the unitary

```
business
    [A>; except that the income and apportionment factors of a foreign
```

entity, other than an entity treated as a C corporation for federal income tax purposes, that is included in the federal taxable income, as defined in section 63 of the Internal Revenue Code as amended through the date named in section 290.01, subdivision 19 , of a domestic corporation, domestic entity, or individual must be included in determining net income and the factors to be used in the apportionment of net income pursuant to section 290.191 or 290.20 <A].

[D>(i) Deductions for expenses, interest, or taxes otherwise allowable under this chapter that are connected with or allocable against dividends, deemed dividends described in paragraph (g), or royalties, fees, or other like income described in section 290.01, subdivision 19 d , clause (10), shall not be disallowed. <D]

[D>(j) <D]

[A>(h) <A] Each corporation or other entity, except a sole proprietorship, that is part of a unitary business must file combined reports as the commissioner determines. On the reports, all intercompany transactions between entities included pursuant to paragraph

[D>(h) <D]

[A>(g) <A] must be eliminated and the entire net income of the unitary business determined in accordance with this subdivision is apportioned among the entities by using each entity's Minnesota factors for apportionment purposes in the numerators of the apportionment formula and the total factors for apportionment purposes of all entities included pursuant to paragraph

[D>(h) <D]

[A>(g) <A] in the denominators of the apportionment formula. [A>Except as otherwise provided by paragraph (f), all sales of the unitary business made within this state pursuant to section 290.191 or 290.20 must be included on the combined report of a corporation or other entity that is a member of the unitary business and is subject to the jurisdiction of this state to impose tax under this chapter. <A]

[D>(k) <D]

[A>(i) <A] If a corporation has been divested from a unitary business and is included in a combined report for a fractional part of the common accounting period of the combined report:

(1) its income includable in the combined report is its income incurred for that part of the year determined by proration or separate accounting; and

(2) its sales, property, and payroll included in the apportionment formula must be prorated or accounted for separately.

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 29. AMEND Minnesota Statutes 2012, section 290.191, subdivision 5 , is amended to read: Subd. 5. Determination of sales factor. For purposes of this section, the following rules apply in determining the sales factor.

(a) The sales factor includes all sales, gross earnings, or receipts received in the ordinary course of the business, except that the following types of income are not included in the sales factor:

(1) interest;

(2) dividends;

(3) sales of capital assets as defined in section 1221 of the Internal Revenue Code;

(4) sales of property used in the trade or business, except sales of leased

```
property of a type which is regularly sold as well as leased;
    [A>and <A]
```

(5) sales of debt instruments as defined in section 1275(a)(1) of the Internal

```
Revenue Code or sales of stock
    [D>; and <D]
```

[A>. <A]

[D>(6) royalties, fees, or other like income of a type which qualify for a subtraction from federal taxable income under section 290.01, subdivision 19 d , clause (10). <D]

(b) Sales of tangible personal property are made within this state if the property is received by a purchaser at a point within this state, and the taxpayer is taxable in this state, regardless of the f.o.b. point, other conditions of the sale, or the ultimate destination of the property.

(c) Tangible personal property delivered to a common or contract carrier or foreign vessel for delivery to a purchaser in another state or nation is a sale in that state or nation, regardless of f.o.b. point or other conditions of the sale.

(d) Notwithstanding paragraphs (b) and (c), when intoxicating liquor, wine, fermented malt beverages, cigarettes, or tobacco products are sold to a purchaser who is licensed by a state or political subdivision to resell this property only within the state of ultimate destination, the sale is made in that state.

(e) Sales made by or through a corporation that is qualified as a domestic international sales corporation under section 992 of the Internal Revenue Code are not considered to have been made within this state.

(f) Sales, rents, royalties, and other income in connection with real property is attributed to the state in which the property is located.

(g) Receipts from the lease or rental of tangible personal property, including finance leases and true leases, must be attributed to this state if the property is located in this state and to other states if the property is not located in this state. Receipts from the lease or rental of moving property including, but not limited to, motor vehicles, rolling stock, aircraft, vessels, or mobile equipment are included in the numerator of the receipts factor to the extent that the property is used in this state. The extent of the use of moving property is determined as follows:

(1) A motor vehicle is used wholly in the state in which it is registered.

(2) The extent that rolling stock is used in this state is determined by multiplying the receipts from the lease or rental of the rolling stock by a fraction, the numerator of which is the miles traveled within this state by the leased or rented rolling stock and the denominator of which is the total miles traveled by the leased or rented rolling stock.

(3) The extent that an aircraft is used in this state is determined by multiplying the receipts from the lease or rental of the aircraft by a fraction, the numerator of which is the number of landings of the aircraft in this state and the denominator of which is the total number of landings of the aircraft.

(4) The extent that a vessel, mobile equipment, or other mobile property is used in the state is determined by multiplying the receipts from the lease or rental of the property by a fraction, the numerator of which is the number of days during the taxable year the property was in this state and the denominator of which is the total days in the taxable year.

(h) Royalties and other income
    [D>not described in paragraph (a), clause

(6), <D] received for the use of or for the privilege of using intangible property, including patents, know-how, formulas, designs, processes, patterns, copyrights, trade names, service names, franchises, licenses, contracts, customer lists, or similar items, must be attributed to the state in which the property is used by the purchaser. If the property is used in more than one state, the royalties or other income must be apportioned to this state pro rata according to the portion of use in this state. If the portion of use in this state cannot be determined, the royalties or other income must be excluded from both the numerator and the denominator. Intangible property is used in this state if the purchaser uses the intangible property or the rights therein in the regular course of its business operations in this state, regardless of the location of the purchaser's customers.

(i) Sales of intangible property are made within the state in which the property is used by the purchaser. If the property is used in more than one state, the sales must be apportioned to this state pro rata according to the portion of use in this state. If the portion of use in this state cannot be determined, the sale must be excluded from both the numerator and the denominator of the sales factor. Intangible property is used in this state if the purchaser used the intangible property in the regular course of its business operations in this state.

(j) Receipts from the performance of services must be attributed to the state where the services are received. For the purposes of this section, receipts from the performance of services provided to a corporation, partnership, or trust may only be attributed to a state where it has a fixed place of doing business. If the state where the services are received is not readily determinable or is a state where the corporation, partnership, or trust receiving the service does not have a fixed place of doing business, the services shall be deemed to be received at the location of the office of the customer from which the services were ordered in the regular course of the customer's trade or business. If the ordering office cannot be determined, the services shall be deemed to be received at the office of the customer to which the services are billed.

(k) For the purposes of this subdivision and subdivision 6, paragraph (l), receipts from management, distribution, or administrative services performed by a corporation or trust for a fund of a corporation or trust regulated under United States Code, title 15, sections 80a-1 through 80a-64, must be attributed to

the state where the shareholder of the fund resides. Under this paragraph, receipts for services attributed to shareholders are determined on the basis of the ratio of: (1) the average of the outstanding shares in the fund owned by shareholders residing within Minnesota at the beginning and end of each year; and (2) the average of the total number of outstanding shares in the fund at the beginning and end of each year. Residence of the shareholder, in the case of an individual, is determined by the mailing address furnished by the shareholder to the fund. Residence of the shareholder, when the shares are held by an insurance company as a depositor for the insurance company policyholders, is the mailing address of the policyholders. In the case of an insurance company holding the shares as a depositor for the insurance company policyholders, if the mailing address of the policyholders cannot be determined by the taxpayer, the receipts must be excluded from both the numerator and denominator. Residence of other shareholders is the mailing address of the shareholder.

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 30. AMEND Minnesota Statutes 2012, section 290.21, subdivision 4 , is amended to read: Subd. 4. Dividends received from another corporation. (a)(1) Eighty percent of dividends received by a corporation during the taxable year from another corporation, in which the recipient owns 20 percent or more of the stock, by vote and value, not including stock described in section 1504(a)(4) of the Internal Revenue Code when the corporate stock with respect to which dividends are paid does not constitute the stock in trade of the taxpayer or would not be included in the inventory of the taxpayer, or does not constitute property held by the taxpayer primarily for sale to customers in the ordinary course of the taxpayer's trade or business, or when the trade or business of the taxpayer does not consist principally of the holding of the stocks and the collection of the income and gains therefrom; and

(2)(i) the remaining 20 percent of dividends if the dividends received are the stock in an affiliated company transferred in an overall plan of reorganization and the dividend is eliminated in consolidation under Treasury Department Regulation 1.1502-14(a), as amended through December 31, 1989;

(ii) the remaining 20 percent of dividends if the dividends are received from a corporation which is subject to tax under section 290.36 and which is a member of an affiliated group of corporations as defined by the Internal Revenue Code and the dividend is eliminated in consolidation under Treasury Department Regulation 1.1502-14(a), as amended through December 31, 1989, or is deducted under an election under section 243(b) of the Internal Revenue Code; or

(iii) the remaining 20 percent of the dividends if the dividends are received from a property and casualty insurer as defined under section 60A.60, subdivision 8 , which is a member of an affiliated group of corporations as defined by the Internal Revenue Code and either: (A) the dividend is eliminated in consolidation under Treasury Regulation 1.1502-14(a), as amended through December 31, 1989; or (B) the dividend is deducted under an election under section 243(b) of the Internal Revenue Code.

(b) Seventy percent of dividends received by a corporation during the taxable year from another corporation in which the recipient owns less than 20 percent of the stock, by vote or value, not including

stock described in section 1504(a)(4) of the Internal Revenue Code when the corporate stock with respect to which dividends are paid does not constitute the stock in trade of the taxpayer, or does not constitute property held by the taxpayer primarily for sale to customers in the ordinary course of the taxpayer's trade or business, or when the trade or business of the taxpayer does not consist principally of the holding of the stocks and the collection of income and gain therefrom.

(c) The dividend deduction provided in this subdivision shall be allowed only with respect to dividends that are included in a corporation's Minnesota taxable net income for the taxable year. The dividend deduction provided in this subdivision does not apply to a dividend from a corporation which, for the taxable year of the corporation in which the distribution is made or for the next preceding taxable year of the corporation, is a corporation exempt from tax under section 501 of the Internal Revenue Code. [A>The dividend deduction provided in this subdivision does not apply to a dividend received from a real estate investment trust as defined in section 856 of the Internal Revenue Code. <A] The dividend deduction provided in this subdivision applies to the amount of regulated investment company dividends only to the extent determined under section 854(b) of the Internal Revenue Code. The dividend deduction provided in this subdivision shall not be allowed with respect to any dividend for which a deduction is not allowed under the provisions of section 246(c) of the Internal Revenue Code.

(d) If dividends received by a corporation that does not have nexus with Minnesota under the provisions of Public Law 86-272 are included as income on the return of an affiliated corporation permitted or required to file a combined report under section 290.17, subdivision 4 , or 290.34 , subdivision 2, then for purposes of this subdivision the determination as to whether the trade or business of the corporation consists principally of the holding of stocks and the collection of income and gains therefrom shall be made with reference to the trade or business of the affiliated corporation having a nexus with Minnesota.

(e) The deduction provided by this subdivision does not apply if the dividends are paid by a FSC as defined in section 922 of the Internal Revenue Code.

(f) If one or more of the members of the unitary group whose income is included on the combined report received a dividend, the deduction under this subdivision for each member of the unitary business required to file a return under this chapter is the product of: (1) 100 percent of the dividends received by members of the group; (2) the percentage allowed pursuant to paragraph (a) or (b); and (3) the percentage of the taxpayer's business income apportionable to this state for the taxable year under section 290.191 or 290.20 .

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 31. AMEND Minnesota Statutes 2012, section 298.01, subdivision 3 b , is amended to read: Subd. 3b. Deductions. (a) For purposes of determining taxable income under subdivision 3, the deductions from gross income include only those expenses necessary to convert raw ores to marketable quality. Such expenses include costs associated with refinement but do not include expenses such as transportation, stockpiling, marketing, or marine insurance that are incurred after marketable ores are produced, unless

the expenses are included in gross income. The allowable deductions from a mine or plant that mines and produces more than one mineral, metal, or energy resource must be determined separately for the purposes of computing the deduction in section 290.01, subdivision 19 c, clause

[D>(9) <D]

[A>(8) <A]. These deductions may be combined on one occupation tax return to arrive at the deduction from gross income for all production.

(b) The provisions of section 290.01 , subdivisions 19c, clauses (6) and (9), and 19d, clauses (7) and

[D>(11) <D]

[A>(10) <A], are not used to determine taxable income.

Sec. 32. Laws 2010, chapter 216, section 11, the effective date, is amended to read: EFFECTIVE DATE.This section is effective for taxable years beginning after

December 31, 2009, for certified historic structures for which qualified

[D>costs of rehabilitation are first paid under construction contracts entered into after May 1, 2010 <D] [A>rehabilitation expenditures are first paid by the developer or taxpayer after May 1, 2010, for rehabilitation that occurs after May 1, 2010, provided that the application under subdivision 3 is submitted before the project is placed in service <A].

[A>EFFECTIVE DATE. This section is effective the day following final enactment and applies retroactively for taxable years beginning after December 31, 2009, and for certified historic structures placed in service after May 1, 2010, but the office may not issue certificates allowed under the change to this section until July 1, 2013. <A]

Sec. 33. [A> ESTIMATED TAXES; EXCEPTIONS. No addition to tax, penalties, or interest may be made under Minnesota Statutes, section 289A.25 , for any period before September 15, 2013, with respect to an underpayment of estimated tax, to the extent that the underpayment was created or increased by the increase in income tax rates under this article. <A]

[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

Sec. 34.

[A> REPEALER.    AMEND Minnesota Statutes 2012, sections 290.01, subdivision 6b

;AMEND 290.06 , subdivision 22a ; andAMEND 290.0921 , subdivision 7 , are repealed.<A]
[A>EFFECTIVE DATE. This section is effective for taxable years beginning after December 31, 2012. <A]

ARTICLE 7 ESTATE AND GIFT TAXES

Section 1. AMEND Minnesota Statutes 2012, section 270B.01, subdivision 8 , is amended to read: Subd. 8. Minnesota tax laws. For purposes of this chapter only, unless expressly stated otherwise, "Minnesota tax laws" means:

(1) the taxes, refunds, and fees administered by or paid to the commissioner under chapters 115B, 289A (except taxes imposed under sections 298.01 , 298.015 ,

```
and 298.24), 290, 290A, 291,
    [A>292, <A] 295, 297A, 297B, and 297H, or any
```

similar Indian tribal tax administered by the commissioner pursuant to any tax agreement between the state and the Indian tribal government, and includes any laws for the assessment, collection, and enforcement of those taxes, refunds, and fees; and

(2) section 273.1315 .

[A>EFFECTIVE DATE. This section is effective for gifts made after December 31, 2012. <A]

Sec. 2. AMEND Minnesota Statutes 2012, section 270B.03, subdivision 1 , is amended to read: Subdivision 1. Who may inspect. Returns and return information must, on request, be made open to inspection by or disclosure to the data subject. The request must be made in writing or in accordance with written procedures of the chief disclosure officer of the department that have been approved by the commissioner to establish the identification of the person making the request as the data subject. For purposes of this chapter, the following are the data subject:

(1) in the case of an individual return, that individual;

(2) in the case of an income tax return filed jointly, either of the individuals with respect to whom the return is filed;

(3) in the case of a return filed by a business entity, an officer of a corporation, a shareholder owning more than one percent of the stock, or any shareholder of an S corporation; a general partner in a partnership; the owner of a sole proprietorship; a member or manager of a limited liability company; a participant in a joint venture; the individual who signed the return on behalf of the business entity; or an employee who is responsible for handling the tax matters of the business entity, such as the tax manager, bookkeeper, or managing agent;

(4) in the case of an estate return:

(i) the personal representative or trustee of the estate; and

(ii) any beneficiary of the estate as shown on the federal estate tax return;

(5) in the case of a trust return:

(i) the trustee or trustees, jointly or separately; and

(ii) any beneficiary of the trust as shown in the trust instrument;

(6) if liability has been assessed to a transferee under section 270C.58, subdivision 1 , the transferee is the data subject with regard to the returns and return information relating to the assessed liability;

(7) in the case of an Indian tribal government or an Indian tribal government-owned entity,

(i) the chair of the tribal government, or

```
(ii) any person authorized by the tribal government;
    [D>and <D]
```

(8) in the case of a successor as defined in section 270C.57, subdivision 1 , paragraph

(b), the successor is the data subject and information may be disclosed as

```
provided by section 270C.57, subdivision 4
    [D>.
```

<D] [A>; and <A]

[A>(9) in the case of a gift return, the donor. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 3. AMEND Minnesota Statutes 2012, section 289A.10, subdivision 1 , is amended to read: Subdivision 1. Return required. In the case of a decedent who has an interest in property with a situs in Minnesota, the personal representative must submit a Minnesota estate tax return to the commissioner, on a form prescribed by the commissioner, if:

(1) a federal estate tax return is required to be filed; or

```
(2) the
    [A>sum of the <A] federal gross estate
    [A>and federal adjusted
```

taxable gifts made within three years of the date of the decedent's death <A]exceeds $1,000,000. The return must contain a computation of the Minnesota estate tax due. The return must be signed by the personal representative.

[A>EFFECTIVE DATE. This section is effective for estates of decedents dying after December 31, 2012.

<A]

Sec. 4. AMEND Minnesota Statutes 2012, section 291.005, subdivision 1 , is amended to read:
Subdivision 1. Scope. Unless the context otherwise clearly requires, the following terms used in this chapter shall have the following meanings:

(1) "Commissioner" means the commissioner of revenue or any person to whom the commissioner has delegated functions under this chapter.

(2) "Federal gross estate" means the gross estate of a decedent as required to be valued and otherwise determined for federal estate tax purposes under the Internal Revenue Code.

(3) "Internal Revenue Code" means the United States Internal Revenue Code of

1986, as amended through
    [D>April 14, 2011 <D]

[A>January 3, 2013 <A], butwithout regard to the provisions of
    [D>sections 501 and 901 of Public Law

107-16, as amended by Public Law 111-312, and section 301(c) of Public Law 111-312 <D] [A>section 2011, paragraph (f), of the Internal Revenue Code <A].

(4) "Minnesota adjusted taxable estate" means federal adjusted taxable estate as defined by section 2011(b)(3) of the Internal Revenue Code, plus

(i) the amount of deduction for state death taxes allowed under section 2058 of the Internal Revenue Code;

[A>(ii) the amount of taxable gifts, as defined in section 292.16 , and made by the decedent within three years of the decedent's date of death; <A] less

[D>(ii) <D]

[A>(iii) <A](A) the value of qualified small business property under section 291.03, subdivision 9 , and the value of qualified farm property under section 291.03, subdivision 10 , or (B) $4,000,000, whichever is less.

(5) "Minnesota gross estate" means the federal gross estate of a decedent after (a) excluding therefrom any property included therein which has its situs outside Minnesota, and (b) including therein any property omitted from the federal gross estate which is includable therein, has its situs in Minnesota, and was not disclosed to federal taxing authorities.

(6) "Nonresident decedent" means an individual whose domicile at the time of death was not in Minnesota.

(7) "Personal representative" means the executor, administrator or other person appointed by the court to administer and dispose of the property of the decedent. If there is no executor, administrator or other person appointed, qualified, and acting within this state, then any person in actual or constructive possession of any property having a situs in this state which is included in the federal gross estate of the decedent shall be deemed to be a personal representative to the extent of the property and the Minnesota estate tax due with respect to the property.

(8) "Resident decedent" means an individual whose domicile at the time of death was in Minnesota.

(9) "Situs of property" means, with respect to
    [A>: <A]

[A>(i) <A]
 real property, the state or country in which it is located;

[D>with respect to <D]

[A>(ii) <A] tangible personal property, the state or country in which it was

normally kept or located at the time of the decedent's death
    [A>or for a

gift of tangible personal property within three years of death, the state or country in which it was normally kept or located when the gift was executed

<A]; and
    [D>with respect to <D]

[A>(iii) <A] intangible personal property, the state or country in which the

decedent was domiciled at death
    [A>or for a gift of intangible personal

property within three years of death, the state or country in which the decedent was domiciled when the gift was executed <A]. [A>For a nonresident decedent with an ownership interest in a pass-through entity with assets that include real or tangible personal property, situs of the real or tangible personal property is determined as if the pass-through entity does not exist and the real or tangible personal property is personally owned by the decedent. If the pass-through entity is owned by a person or persons in addition to the decedent, ownership of the property is attributed to the decedent in proportion to the decedent's capital ownership share of the pass-through entity. <A]

[A>(10) "Pass-through entity" includes the following: <A]

[A>(i) an entity electing S corporation status under section 1362 of the Internal Revenue Code; <A]

[A>(ii) an entity taxed as a partnership under subchapter K of the Internal Revenue Code; <A]

[A>(iii) a single-member limited liability company or similar entity, regardless of whether it is taxed as an association or is disregarded for federal income tax purposes under Code of Federal Regulations, title 26, section 301.7701 -3; or <A]

[A>(iv) a trust to the extent the property is includible in the decedent's federal gross estate. <A]

[A>EFFECTIVE DATE. This section is effective for decedents dying after December 31, 2012. <A]

Sec. 5. AMEND Minnesota Statutes 2012, section 291.03, subdivision 1 , is amended to read: Subdivision 1. Tax amount. (a) The tax imposed shall be an amount equal to the proportion of the maximum credit for state death taxes computed under section 2011 of the Internal Revenue Code, but using Minnesota adjusted taxable estate instead of federal adjusted taxable estate, as the Minnesota gross estate bears to the value of the federal gross estate. [A>The tax is reduced by: <A]

[A>(1) the gift tax paid by the decedent under section 292.17 on gifts included in the Minnesota adjusted taxable estate and not subtracted as qualified farm or small business property; and <A]

[A>(2) any credit allowed under subdivision 1c. <A]

(b) The tax determined under this subdivision must not be greater than the sum of the following amounts multiplied by a fraction, the numerator of which is the Minnesota gross estate and the denominator of which is the federal gross estate:

(1) the rates and brackets under section 2001(c) of the Internal Revenue Code multiplied by the sum of:

(i) the taxable estate, as defined under section 2051 of the Internal Revenue Code; plus

(ii) adjusted taxable gifts, as defined in section 2001(b) of the Internal Revenue Code; less

(iii) the lesser of (A) the sum of the value of qualified small business property under subdivision 9, and the value of qualified farm property under subdivision 10, or

(B) $4,000,000; less

(2) the amount of tax allowed under section 2001(b)(2) of the Internal Revenue Code; and less

(3) the federal credit allowed under section 2010 of the Internal Revenue Code.

(c) For purposes of this subdivision, "Internal Revenue Code" means the Internal Revenue Code of 1986, as amended through December 31, 2000.

[A>EFFECTIVE DATE. This section is effective for decedents dying after December 31, 2012. <A]

Sec. 6. AMEND Minnesota Statutes 2012, section 291.03 , is amended by adding a subdivision to read: [A>Subd. 1c. Nonresident decedent tax credit. <A]

[A>(a) The estate of a nonresident decedent that is subject to tax under this chapter on the value of Minnesota situs property held in a pass-through entity is allowed a credit against the tax due under this section equal to the lesser of: <A]

[A>(1) the amount of estate or inheritance tax paid to another state that is attributable to the Minnesota situs property held in the pass-through entity; or <A]

[A>(2) the amount of tax paid under this section attributable to the Minnesota situs property held in the pass-through entity. <A]

[A>(b) The amount of tax attributable to the Minnesota situs property held in the pass-through entity must be determined by the increase in the estate or inheritance tax that results from including the market value of the property in the estate or treating the value as a taxable inheritance to the recipient of the property. <A]

[A>EFFECTIVE DATE. This section is effective for decedents dying after December 31, 2012. <A]

Sec. 7. AMEND Minnesota Statutes 2012, section 291.03, subdivision 8 , is amended to read: Subd. 8. Definitions. (a) For purposes of this section, the following terms have the meanings given in this subdivision.

(b) "Family member" means a family member as defined in section 2032A(e)(2) of

```
the Internal Revenue Code
    [A>, or a trust whose present beneficiaries are
```

all family members as defined in section 2032A(e)(2) of the Internal Revenue Code <A].

```
(c) "Qualified heir" means a family member who acquired qualified property
```

[D>from <D] [A>upon the death of <A] the decedent and satisfies the requirement under subdivision 9, clause

[D>(6) <D]

[A>(7) <A], or subdivision 10, clause

[D>(4) <D]

[A>(5) <A], for the property.

(d) "Qualified property" means qualified small business property under subdivision 9 and qualified farm property under subdivision 10.

[A>EFFECTIVE DATE. This section is effective retroactively for estates of decedents dying after June 30, 2011. <A]

Sec. 8. AMEND Minnesota Statutes 2012, section 291.03, subdivision 9 , is amended to read: Subd. 9. Qualified small business property. Property satisfying all of the following requirements is qualified small business property:

(1) The value of the property was included in the federal adjusted taxable estate.

(2) The property consists of the assets of a trade or business or shares of stock or other ownership interests in a corporation or other entity engaged in a trade or business. [D>The decedent or the decedent's spouse must have materially participated in the trade or business within the meaning of section 469 of the Internal Revenue Code during the taxable year that ended before the date of the decedent's death. <D] Shares of stock in a corporation or an ownership interest in another type of entity do not qualify under this subdivision if the shares or ownership interests are traded on a public stock exchange at any time during the three-year period ending on the decedent's date of death. [A>For purposes of this subdivision, an ownership interest includes the interest the decedent is deemed to own under sections 2036, 2037, and 2038 of the Internal Revenue Code. <A]

(3)
    [A>During the taxable year that ended before the decedent's death, the

trade or business must not have been a passive activity within the meaning of section 469(c) of the Internal Revenue Code, and the decedent or the decedent's spouse must have materially participated in the trade or business within the meaning of section 469(h) of the Internal Revenue Code, excluding section 469(h)(3) of the Internal Revenue Code and any other provision provided by United States Treasury Department regulation that substitutes material participation in prior taxable years for material participation in the taxable year that ended before the decedent's death. <A]

[A>(4) <A] The gross annual sales of the trade or business were $10,000,000 or less for the last taxable year that ended before the date of the death of the decedent.

[D>(4) <D]


[A>(5) <A] The property does not consist of cash
    [D>or <D]

[A>, <A] cash
equivalents
    [A>, publicly traded securities, or assets not used in the

operation of the trade or business <A]. For property consisting of shares of stock or other ownership interests in an

entity, the
    [D>amount <D]

[A>value <A] of cash
    [D>or <D]

[A>, <A] cashequivalents
    [A>, publicly traded securities, or assets not used in the

operation of the trade or business <A] held by the corporation or other entity must be deducted from the value of the property qualifying under this subdivision in proportion to the decedent's share of ownership of the entity on the date of death.

[D>(5) <D]


[A>(6) <A] The decedent continuously owned the property
    [A>, including

property the decedent is deemed to own under sections 2036, 2037, and 2038 of the Internal Revenue Code, <A] for the three-year period ending on the date of death of the decedent. [A>In the case of a sole proprietor, if the property replaced similar property within the three-year period, the replacement property will be treated as having been owned for the three-year period ending on the date of death of the decedent. <A]

[D>(6) A family member continuously uses the property in the operation of the trade or business for three years following the date of death of the decedent. <D]

(7)
    [A>For three years following the date of death of the decedent, the

trade or business is not a passive activity within the meaning of section 469(c) of the Internal Revenue Code, and a family member materially participates in the operation of the trade or business within the meaning of section 469(h) of the Internal Revenue Code, excluding section 469(h)(3) of the Internal Revenue Code and any other provision provided by United States Treasury Department regulation that

substitutes material participation in prior taxable years for material participation in the three years following the date of death of the decedent. <A]

[A>(8) <A] The estate and the qualified heir elect to treat the property as qualified small business property and agree, in the form prescribed by the commissioner, to pay the recapture tax under subdivision 11, if applicable.

[A>EFFECTIVE DATE. This section is effective retroactively for estates of decedents dying after June 30, 2011. <A]

Sec. 9. AMEND Minnesota Statutes 2012, section 291.03, subdivision 10 , is amended to read: Subd. 10. Qualified farm property. Property satisfying all of the following requirements is qualified farm property:

(1) The value of the property was included in the federal adjusted taxable estate.

(2) The property consists of
    [D>a farm meeting the requirements of

<D] [A>agricultural land and is owned by a person or entity that is either not

subject to or is in compliance with <A] section 500.24
    [D>, and was

classified for property tax purposes as the homestead of the decedent or the decedent's spouse or both under section 273.124 , and as class 2a property under section 273.13, subdivision 23 <D].

(3)
    [A>For property taxes payable in the taxable year of the decedent's

death, the property is classified as class 2a property under section 273.13, subdivision 23 , and is classified as agricultural homestead, agricultural relative homestead, or special agricultural homestead under section 273.124 . <A]

[A>(4) <A] The decedent continuously owned the property
    [A>, including

property the decedent is deemed to own under sections 2036, 2037, and 2038 of the Internal Revenue Code, <A] for the three-year period ending on the date of

death of the decedent
    [A>either by ownership of the agricultural land or

pursuant to holding an interest in an entity that is not subject to or is in compliance with section 500.24 <A].

[D>(4) A family member continuously uses the property in the operation of the trade or business <D]

[A>(5) The property is classified for property tax purposes as class 2a property under section 273.13, subdivision 23 , <A] for three years following the date of death of the decedent.

[D>(5) <D]

[A>(6) <A] The estate and the qualified heir elect to treat the property as qualified farm property and agree, in a form prescribed by the commissioner, to pay the recapture tax under subdivision 11, if applicable.

[A>EFFECTIVE DATE. This section is effective retroactively for estates of decedents dying after June 30, 2011. <A]

Sec. 10. AMEND Minnesota Statutes 2012, section 291.03, subdivision 11 , is amended to read: Subd. 11. Recapture tax. (a) If, within three years after the decedent's death and before the death of the qualified heir, the qualified heir disposes of any interest in the qualified property, other than by a disposition to a family member, or a family

member ceases to
    [D>use the qualified property which was acquired or passed

from the decedent <D] [A>satisfy the requirement under subdivision 9, clause (7); or 10, clause (5) <A], an additional estate tax is imposed on the property. [A>In the case of a sole proprietor, if the qualified heir replaces qualified small business property excluded under subdivision 9 with similar property, then the qualified heir will not be treated as having disposed of an interest in the qualified property. <A]

(b) The amount of the additional tax equals the amount of the exclusion claimed by the estate under subdivision 8, paragraph (d), multiplied by 16 percent.

(c) The additional tax under this subdivision is due on the day which is six months after the date of the disposition or cessation in paragraph (a).

[A>EFFECTIVE DATE. This section is effective retroactively for estates of decedents dying after June 30, 2011. <A]

Sec. 11. [A> [292.16 ] DEFINITIONS. <A]

[A>(a) For purposes of this chapter, the following definitions apply. <A]

[A>(b) The definitions of terms defined in section 291.005 apply. <A]

[A>(c) "Resident" has the meaning given in section 290.01, subdivision 7 , paragraph (a). <A]

[A>(d) "Taxable gifts" means: <A]

[A>(1) the transfers by gift which are included in taxable gifts for federal gift tax purposes under the following sections of the Internal Revenue Code: <A]

[A>(i) section 2503; <A]

[A>(ii) sections 2511 to 2514; and <A]

[A>(iii) sections 2516 to 2519; less <A]

[A>(2) the deductions allowed in sections 2522 to 2524 of the Internal Revenue Code. <A]

[A>EFFECTIVE DATE. This section is effective for taxable gifts made after June 30, 2013. <A]

Sec. 12. [A> [292.17 ] GIFT TAX. <A]

[A>Subdivision 1. Imposition. <A]

[A>(a) A tax is imposed on the transfer of property by gift by any individual resident or nonresident in an amount equal to ten percent of the amount of the taxable gift. <A]

[A>(b) The donor is liable for payment of the tax. If the gift tax is not paid when due, the donee of any gift is personally liable for the tax to the extent of the value of the gift. <A]

[A>Subd. 2. Lifetime credit. A credit is allowed against the tax imposed under this section equal to $100,000. This credit applies to the cumulative amount of taxable gifts made by the donor during the donor's lifetime. <A]

[A>Subd. 3. Out-of-state gifts. Taxable gifts exclude the transfer of: <A]

[A>(1) real property located outside of this state; <A]

[A>(2) tangible personal property that was normally kept at a location outside of the state on the date the gift was executed; and <A]

[A>(3) intangible personal property made by an individual who is not a resident at the time the gift was executed. <A]

[A>EFFECTIVE DATE. This section is effective for taxable gifts made after June 30, 2013. <A]

Sec. 13. [A> [292.18 ] RETURNS. <A]

[A>(a) Any individual who makes a taxable gift during the taxable year shall file a gift tax return in the form and manner prescribed by the commissioner. <A]

[A>(b) If the donor dies before filing the return, the executor of the donor's will or the administrator of the donor's estate shall file the return. If the donor becomes legally incompetent before filing the return, the guardian or conservator shall file the return. <A]

[A>(c) The return must include: <A]

[A>(1) each gift made during the calendar year which is to be included in computing the taxable gifts; <A]

[A>(2) the deductions claimed and allowable under section 292.16 , paragraph (d), clause (2); <A]

[A>(3) a description of the gift, and the donee's name, address, and Social Security number; <A]

[A>(4) the fair market value of gifts not made in money; and <A]

[A>(5) any other information the commissioner requires to administer the gift tax. <A]

[A>EFFECTIVE DATE. This section is effective for taxable gifts made after June 30, 2013. <A]

Sec. 14. [A> [292.19 ] FILING REQUIREMENTS. Gift tax returns must be filed by the April 15 following the close of the calendar year, except if a gift is made during the calendar year in which the donor dies, the return for the donor must be filed by the last date, including extensions, for filing the gift tax return for federal gift tax purposes for the donor. <A]

[A>EFFECTIVE DATE. This section is effective for taxable gifts made after June 30, 2013. <A]

Sec. 15. [A> [292.20 ] APPRAISAL OF PROPERTY; DECLARATION BY DONOR. The commissioner may require the donor or the donee to show the property subject to the tax under section 292.17 to the commissioner upon demand and may employ a suitable person to appraise the property. The donor shall submit a declaration, in a form prescribed by the commissioner and including any certification required by the commissioner, that the property shown by the donor on the gift tax return includes all of the property transferred by gift for the calendar year and not deductible under section292.16 , paragraph (d), clause (2). <A]

[A>EFFECTIVE DATE. This section is effective for taxable gifts made after June 30, 2013. <A]

Sec. 16. [A> [292.21 ] ADMINISTRATIVE PROVISIONS. <A]

[A>Subdivision 1. Payment of tax; penalty for late payment. The tax imposed under section 292.17 is due and payable to the commissioner by the April 15 following the close of the calendar year during which the gift was made. The return required under section 292.19 must be included with the payment. If a taxable gift is made during the calendar year in which the donor dies, the due date is the last date, including extensions, for filing the gift tax return for federal gift tax purposes for the donor. If any person fails to pay

the tax due within the time specified under this section, a penalty applies equal to ten percent of the amount due and unpaid or $100, whichever is greater. The unpaid tax and penalty bear interest at the rate under section 270C.40 from the due date of the return. <A]

[A>Subd. 2. Extensions. The commissioner may, for good cause, extend the time for filing a gift tax return, if a written request is filed with a tentative return accompanied by a payment of the tax, which is estimated in the tentative return, on or before the last day for filing the return. Any person to whom an extension is granted must pay, in addition to the tax, interest at the rate under section 270C.40 from the date on which the tax would have been due without the extension. <A]

[A>Subd. 3. Changes in federal gift tax. If the amount of a taxpayer's taxable gifts for federal gift tax purposes, as reported on the taxpayer's federal gift tax return for any calendar year, is changed or corrected by the Internal Revenue Service or other officer of the United States or other competent authority, the taxpayer shall report the change or correction in federal taxable gifts within 180 days after the final determination of the change or correction, and concede the accuracy of the determination or provide a letter detailing how the federal determination is incorrect or does not change the Minnesota gift tax. Any taxpayer filing an amended federal gift tax return shall also file within 180 days an amended return under this chapter and shall include any information the commissioner requires. The time for filing the report or amended return may be extended by the commissioner upon due cause shown. Notwithstanding any limitation of time in this chapter, if, upon examination, the commissioner finds that the taxpayer is liable for the payment of an additional tax, the commissioner shall, within a reasonable time from the receipt of the report or amended return, notify the taxpayer of the amount of additional tax, together with interest computed at the rate under section 270C.40 from the date when the original tax was due and payable. Within 30 days of the mailing of the notice, the taxpayer shall pay the commissioner the amount of the additional tax and interest. If, upon examination of the report or amended return and related information, the commissioner finds that the taxpayer has overpaid the tax due the state, the commissioner shall refund the overpayment to the taxpayer. <A]

[A>Subd. 4. Application of federal rules. In administering the tax under this chapter, the commissioner shall apply the provisions of sections 2701 to 2704 of the Internal Revenue Code. The words "secretary or his delegate," as used in those sections of the Internal Revenue Code, mean the commissioner. <A]

[A>EFFECTIVE DATE. This section is effective for taxable gifts made after June 30, 2013. <A] ARTICLE 8 SALES AND USE TAXES; LOCAL SALES TAXES

Section 1. [A> [116J.3738 ] QUALIFIED EXPANSIONS OF GREATER MINNESOTA BUSINESSES. <A]

[A>Subdivision 1. Definitions. <A]

[A>(a) For purposes of this section, the following terms have the meanings given unless the context clearly indicates otherwise. <A]

[A>(b) "Agricultural processing facility" means one or more facilities or operations that transform, package, sort, or grade livestock or livestock products, agricultural commodities, or plants or plant

products into goods that are used for intermediate or final consumption including goods for nonfood use, and surrounding property. <A]

[A>(c) "Business" means an individual, corporation, partnership, limited liability company, association, or any other entity engaged in operating a trade or business located in greater Minnesota. <A]

[A>(d) "City" means a statutory or home rule charter city. <A]

[A>(e) "Greater Minnesota" means the area of the state that excludes the metropolitan area, as defined in section 473.121, subdivision 2 . <A]

[A>(f) "Qualified business" means a business that satisfies the requirements of subdivision 2, has been certified under subdivision 3, and has not been terminated under subdivision 5. <A]

[A>Subd. 2. Qualified business. <A]

[A>(a) A business is a qualified business if it satisfies the requirement of this paragraph and is not disqualified under the provisions of paragraph <A]

[A>(b). To qualify, the business must: <A]

[A>(1) have operated its trade or business in a city or cities in greater Minnesota for at least one year before applying under subdivision 3; <A]

[A>(2) pay or agree to pay in the future each employee compensation, including benefits not mandated by law, that on an annualized basis equal at least 120 percent of the federal poverty level for a family of four; <A]

[A>(3) plan and agree to expand its employment in one or more cities in greater Minnesota by the minimum number of employees required under subdivision 3, paragraph (c); and <A]

[A>(4) received certification from the commissioner under subdivision 3 that it is a qualified business. <A]

[A>(b) A business is not a qualified business if it is either: <A]

[A>(1) primarily engaged in making retail sales to purchasers who are physically present at the business's location or locations in greater Minnesota; or <A]

[A>(2) a public utility, as defined in section 336B.01 . <A]

[A>(c) The requirements in paragraph (a) that the business' operations and expansion be located in a city do not apply to an agricultural processing facility. <A]

[A>Subd. 3. Certification of qualified business. <A]

[A>(a) A business may apply to the commissioner for certification as a qualified business under this

section. The commissioner shall specify the form of the application, the manner and times for applying, and the information required to be included in the application. The commissioner may impose an application fee in an amount sufficient to defray the commissioner's cost of processing certifications. A business must file a copy of its application with the chief clerical officer of the city at the same time it applies to the commissioner. For an agricultural processing facility located outside the boundaries of a city, the business must file a copy of the application with the county auditor. <A]

[A>(b) The commissioner shall certify each business as a qualified business that: <A]

[A>(1) satisfies the requirements of subdivision 2; <A]

[A>(2) the commissioner determines would not expand its operations in greater Minnesota without the tax incentives available under subdivision 4; and <A]

[A>(3) enters a business subsidy agreement with the commissioner that pledges to satisfy the minimum expansion requirements of paragraph (c) within three years or less following execution of the agreement. The commissioner must act on an application within 60 days after its filing. Failure by the commissioner to take action within the 60-day period is deemed approval of the application. <A]

[A>(c) The following minimum expansion requirements apply, based on the number of employees of the business at locations in greater Minnesota: <A]

[A>(1) a business that employees 50 or fewer full-time equivalent employees in greater Minnesota when the agreement is executed must increase its employment by five or more full-time equivalent employees; <A]

[A>(2) a business that employees more than 50 but fewer than 200 full-time equivalent employees in greater Minnesota when the agreement is executed must increase the number of its full-time equivalent employees in greater Minnesota by at least ten percent; or <A]

[A>(3) a business that employees 200 or more full-time equivalent employees in greater Minnesota when the agreement is executed must increase its employment by at least 21 full-time equivalent employees. <A]

[A>(d) The city, or a county for an agricultural processing facility located outside the boundaries of a city, in which the business proposes to expand its operations may file comments supporting or opposing the application with the commissioner. The comments must be filed within 30 days after receipt by the city of the application and may include a notice of any contribution the city or county intends to make to encourage or support the business expansion, such as the use of tax increment financing, property tax abatement, additional city or county services, or other financial assistance. <A]

[A>(e) Certification of a qualified business is effective for the 12-year period beginning on the first day of the calendar month immediately following execution of the business subsidy agreement. <A]

[A>Subd. 4. Available tax incentives. A qualified business is entitled to a sales tax exemption, as provided insection 297A.68, subdivision 49 , for purchases made during the period the business was certified as a qualified business under this section. <A]

[A>Subd. 5. Termination of status as a qualified business. <A]

[A>(a) The commissioner shall put in place a system for monitoring and ensuring that each certified business meets within three years or less the minimum expansion requirement in its business subsidy agreement and continues to satisfy those requirements for the rest of the duration of the certification under subdivision 3. This system must include regular reporting by the business to the commissioner of its baseline and current employment levels and any other information the commissioner determines may be useful to ensure compliance and for legislative evaluation of the effectiveness of the tax incentives. <A]

[A>(b) A business ceases to be a qualified business and to qualify for the sales tax exemption under section 297A.68, subdivision 49 , under this subdivision upon the earlier of the following dates: <A]

[A>(1) the end of the duration of its designation under subdivision 3, paragraph (e), effective as provided under this subdivision or other provision of law for the tax incentive; or <A]

[A>(2) the date the commissioner finds that the business has breached its business subsidy agreement and failed to satisfy the minimum expansion required by subdivision 3 and its agreement. <A]

[A>(c) A business may contest the commissioner's finding that it breached its business subsidy agreement under paragraph (b), clause (2), under the contested case procedures in the Administrative Procedure Act, chapter 14. <A]

[A>(d) The commissioner, after consulting with the commissioner of revenue, may waive a breach of the business subsidy agreement and permit continued receipt of tax incentives, if the commissioner determines that termination of the tax incentives is not in the best interest of the state or the local government units and the business' breach of the agreement is a result of circumstances beyond its control including, but not limited to: <A]

[A>(1) a natural disaster; <A]

[A>(2) unforeseen industry trends; <A]

[A>(3) a decline in economic activity in the overall or greater Minnesota economy; or <A]

[A>(4) loss of a major supplier or customer of the business. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 2. AMEND Minnesota Statutes 2012, section 297A.61, subdivision 3 , is amended to read: Subd. 3. Sale and purchase. (a) "Sale" and "purchase" include, but are not limited to, each of the transactions

listed in this subdivision. [A>In applying the provisions of this chapter, the terms "tangible personal property" and "retail sale" include the taxable services listed in paragraph (g), clause (6), items (i) to (vi) and (viii), and the provision of these taxable services, unless specifically provided otherwise. Services performed by an employee for an employer are not taxable. Services performed by a partnership or association for another partnership or association are not taxable if one of the entities owns or controls more than 80 percent of the voting power of the equity interest in the other entity. Services performed between members of an affiliated group of corporations are not taxable. For purposes of the preceding sentence, "affiliated group of corporations" means those entities that would be classified as members of an affiliated group as defined under United States Code, title 26, section 1504, disregarding the exclusions in section 1504(b). <A]

(b) Sale and purchase include:

(1) any transfer of title or possession, or both, of tangible personal property, whether absolutely or conditionally, for a consideration in money or by exchange or barter; and

(2) the leasing of or the granting of a license to use or consume, for a consideration in money or by exchange or barter, tangible personal property, other than a manufactured home used for residential purposes for a continuous period of 30 days or more.

(c) Sale and purchase include the production, fabrication, printing, or processing of tangible personal property for a consideration for consumers who furnish either directly or indirectly the materials used in the production, fabrication, printing, or processing.

(d) Sale and purchase include the preparing for a consideration of food. Notwithstanding section 297A.67, subdivision 2 , taxable food includes, but is not limited to, the following:

(1) prepared food sold by the retailer;

(2) soft drinks;

(3) candy;

(4) dietary supplements; and

(5) all food sold through vending machines.

(e) A sale and a purchase includes the furnishing for a consideration of electricity, gas, water, or steam for use or consumption within this state.

(f) A sale and a purchase includes the transfer for a consideration of prewritten computer software whether delivered electronically, by load and leave, or otherwise.

(g) A sale and a purchase includes the furnishing for a consideration of the following services:

(1) the privilege of admission to places of amusement, recreational areas, or athletic events, and the

making available of amusement devices, tanning facilities, reducing salons, steam baths, Turkish baths, health clubs, and spas or athletic facilities;

(2) lodging and related services by a hotel, rooming house, resort, campground, motel, or trailer camp, including furnishing the guest of the facility with access to telecommunication services, and the granting of any similar license to use real property in a specific facility, other than the renting or leasing of it for a continuous period of 30 days or more under an enforceable written agreement that may not be terminated without prior notice and including accommodations intermediary services provided in connection with other services provided under this clause;

(3) nonresidential parking services, whether on a contractual, hourly, or other periodic basis, except for parking at a meter;

(4) the granting of membership in a club, association, or other organization if:

(i) the club, association, or other organization makes available for the use of its members sports and athletic facilities, without regard to whether a separate charge is assessed for use of the facilities; and

(ii) use of the sports and athletic facility is not made available to the general public on the same basis as it is made available to members. Granting of membership means both onetime initiation fees and periodic membership dues. Sports and athletic facilities include golf courses; tennis, racquetball, handball, and squash courts; basketball and volleyball facilities; running tracks; exercise equipment; swimming pools; and other similar athletic or sports facilities;

(5) delivery of aggregate materials by a third party, excluding delivery of aggregate material used in road construction; and delivery of concrete block by a third party if the delivery would be subject to the sales tax if provided by

```
the seller of the concrete block
    [A>.
```

For purposes of this clause, "road construction" means construction of: <A]

[A>(i) public roads; <A]

[A>(ii) cartways; and <A]

[A>(iii) private roads in townships located outside of the seven-county metropolitan area up to the point of the emergency response location sign <A]; and

(6) services as provided in this clause:

(i) laundry and dry cleaning services including cleaning, pressing, repairing, altering, and storing clothes, linen services and supply, cleaning and blocking hats, and carpet, drapery, upholstery, and industrial

cleaning. Laundry and dry cleaning services do not include services provided by coin operated facilities operated by the customer;

(ii) motor vehicle washing, waxing, and cleaning services, including services provided by coin operated facilities operated by the customer, and rustproofing, undercoating, and towing of motor vehicles;

(iii) building and residential cleaning, maintenance, and disinfecting services and pest control and exterminating services;

(iv) detective, security, burglar, fire alarm, and armored car services; but not including services performed within the jurisdiction they serve by off-duty licensed peace officers as defined in section 626.84, subdivision 1 , or

```
services provided by a nonprofit organization
     [A>or any organization at the
```

direction of a county <A] for monitoring and electronic surveillance of persons placed on in-home detention pursuant to court order or under the direction of the Minnesota Department of Corrections;

(v) pet grooming services;

(vi) lawn care, fertilizing, mowing, spraying and sprigging services; garden planting and maintenance; tree, bush, and shrub pruning, bracing, spraying, and surgery; indoor plant care; tree, bush, shrub, and stump removal, except when performed as part of a land clearing contract as defined in section 297A.68, subdivision 40 ; and tree trimming for public utility lines. Services performed under a construction contract for the installation of shrubbery, plants, sod, trees, bushes, and similar items are not taxable;

(vii) massages, except when provided by a licensed health care facility or professional or upon written referral from a licensed health care facility or professional for treatment of illness, injury, or disease; and

(viii) the furnishing of lodging, board, and care services for animals in kennels and other similar arrangements, but excluding veterinary and horse boarding services. [D>In applying the provisions of this chapter, the terms "tangible personal property" and "retail sale" include taxable services listed in clause (6), items (i) to (vi) and (viii), and the provision of these taxable services, unless specifically provided otherwise. Services performed by an employee for an employer are not taxable. Services performed by a partnership or association for another partnership or association are not taxable if one of the entities owns or controls more than 80 percent of the voting power of the equity interest in the other entity. Services performed between members of an affiliated group of corporations are not taxable. For purposes of the preceding sentence, "affiliated group of corporations" means those entities that would be classified as members of an affiliated group as defined under United States Code, title 26, section 1504, disregarding the exclusions in section 1504(b).

For purposes of clause (5), "road construction" means construction of (1) public roads, (2) cartways, and

(3) private roads in townships located outside of the seven-county metropolitan area up to the point of the emergency response location sign. <D]

(h) A sale and a purchase includes the furnishing for a consideration of tangible personal property or taxable services by the United States or any of its agencies or instrumentalities, or the state of Minnesota, its agencies, instrumentalities, or political subdivisions.

(i) A sale and a purchase includes the furnishing for a consideration of telecommunications services, ancillary services associated with

```
telecommunication services,
    [D>cable <D]
```

[A>and pay <A] television services


[D>, and direct satellite services <D]. Telecommunication services include, but are not limited to, the following services, as defined in section 297A.669 : air-to-ground radiotelephone service, mobile telecommunication service, postpaid calling service, prepaid calling service, prepaid wireless calling service, and private communication services. The services in this paragraph are taxed to the extent allowed under federal law.

(j) A sale and a purchase includes the furnishing for a consideration of installation if the installation charges would be subject to the sales tax if the installation were provided by the seller of the item being installed.

(k) A sale and a purchase includes the rental of a vehicle by a motor vehicle dealer to a customer when (1) the vehicle is rented by the customer for a consideration, or (2) the motor vehicle dealer is reimbursed pursuant to a service contract as defined in section 59B.02, subdivision 11 .

[A>(l) A sale and a purchase includes furnishing for a consideration of specified digital products or other digital products or granting the right for a consideration to use specified digital products or other digital products on a temporary or permanent basis and regardless of whether the purchaser is required to make continued payments for such right. Wherever the term "tangible personal property" is used in this chapter, other than in subdivisions 10 and 38, the provisions also apply to specified digital products, or other digital products, unless specifically provided otherwise or the context indicates otherwise. <A]

[A>(m) A sale and purchase includes the furnishing for consideration of the following services: <A]

[A>(1) repairing and maintaining electronic and precision equipment, which service can be deducted as a business expense under the Internal Revenue Code. This includes, but is not limited to, repair or maintenance of electronic devices, computers and computer peripherals, monitors, computer terminals, storage devices, and CD-ROM drives; other office equipment such as photocopying machines, printers,

and facsimile machines; televisions, stereos, sound systems, video or digital recorders and players; two-way radios and other communications equipment; radar and sonar equipment, scientific instruments, microscopes, and medical equipment; <A]

[A>(2) repairing and maintaining commercial and industrial machinery and equipment. For purposes of this subdivision, the following items are not commercial or industrial machinery and equipment: (i) motor vehicles; (ii) furniture and fixtures; (iii) ships; (iv) railroad stock; and (v) aircraft; and <A]

[A>(3) warehousing or storage services for tangible personal property, excluding: <A]

[A>(i) agricultural products; <A]

[A>(ii) refrigerated storage; <A]

[A>(iii) electronic data; and <A]

[A>(iv) self-storage services and storage of motor vehicles, recreational vehicles, and boats, not eligible to be deducted as a business expense under the Internal Revenue Code. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013, except that paragraph (m), clause (3), is effective for sales and purchases made after March 31, 2014. <A]

Sec. 3. AMEND Minnesota Statutes 2012, section 297A.61, subdivision 4 , is amended to read: Subd. 4. Retail sale.

```
(a) A "retail sale" means
    [A>: <A]

[A>(1) <A]
 any sale, lease, or rental
    [A>of tangible personal property <A]
```

for any purpose, other than resale, sublease, or subrent of items by the

```
purchaser in the normal course of business as defined in subdivision 21
    [A>;
```

and <A]

[A>(2) any sale of a service enumerated in subdivision 3, for any purpose other than resale by the purchaser in the normal course of business as defined in subdivision 21 <A].

(b) A sale of property used by the owner only by leasing it to others or by holding it in an effort to lease it, and put to no use by the owner other than resale after the lease or effort to lease, is a sale of property for

resale.

(c) A sale of master computer software that is purchased and used to make copies for sale or lease is a sale of property for resale.

(d) A sale of building materials, supplies, and equipment to owners, contractors, subcontractors, or builders for the erection of buildings or the alteration, repair, or improvement of real property is a retail sale in whatever quantity sold, whether the sale is for purposes of resale in the form of real property or otherwise.

(e) A sale of carpeting, linoleum, or similar floor covering to a person who provides for installation of the floor covering is a retail sale and not a sale for resale since a sale of floor covering which includes installation is a contract for the improvement of real property.

(f) A sale of shrubbery, plants, sod, trees, and similar items to a person who provides for installation of the items is a retail sale and not a sale for resale since a sale of shrubbery, plants, sod, trees, and similar items that includes installation is a contract for the improvement of real property.

(g) A sale of tangible personal property that is awarded as prizes is a retail sale and is not considered a sale of property for resale.

(h) A sale of tangible personal property utilized or employed in the furnishing or providing of services under subdivision 3, paragraph (g), clause (1), including, but not limited to, property given as promotional items, is a retail sale and is not considered a sale of property for resale.

(i) A sale of tangible personal property used in conducting lawful gambling under chapter 349 or the State Lottery under chapter 349A, including, but not limited to, property given as promotional items, is a retail sale and is not considered a sale of property for resale.

(j) a sale of machines, equipment, or devices that are used to furnish, provide, or dispense goods or services, including, but not limited to, coin-operated devices, is a retail sale and is not considered a sale of property for resale.

(k) In the case of a lease, a retail sale occurs (1) when an obligation to make a lease payment becomes due under the terms of the agreement or the trade practices of the lessor or (2) in the case of a lease of a motor vehicle, as defined in section 297B.01, subdivision 11 , but excluding vehicles with a manufacturer's gross vehicle weight rating greater than 10,000 pounds and rentals of vehicles for not more than 28 days, at the time the lease is executed.

(l) In the case of a conditional sales contract, a retail sale occurs upon the transfer of title or possession of the tangible personal property.

(m) A sale of a bundled transaction in which one or more of the products included in the bundle is a taxable product is a retail sale, except that if one of the products is a telecommunication service, ancillary

service, Internet access, or audio or video programming service, and the seller has maintained books and records identifying through reasonable and verifiable standards the portions of the price that are attributable to the distinct and separately identifiable products, then the products are not considered part of a bundled transaction. For purposes of this paragraph:

(1) the books and records maintained by the seller must be maintained in the regular course of business, and do not include books and records created and maintained by the seller primarily for tax purposes;

(2) books and records maintained in the regular course of business include, but are not limited to, financial statements, general ledgers, invoicing and billing systems and reports, and reports for regulatory tariffs and other regulatory matters; and

(3) books and records are maintained primarily for tax purposes when the books and records identify taxable and nontaxable portions of the price, but the seller maintains other books and records that identify different prices attributable to the distinct products included in the same bundled transaction.

[A>(n) A sale of motor vehicle repair paint and materials by a motor vehicle repair or body shop business is a retail sale and the sales tax is imposed on the gross receipts from the retail sale of the paint and materials. The motor vehicle repair or body shop that purchases motor vehicle repair paint and motor vehicle repair materials for resale must either: <A]

[A>(1) separately state each item of paint and each item of materials, and the sales price of each, on the invoice to the purchaser; or <A]

[A>(2) in order to calculate the sales price of the paint and materials, use a method which estimates the amount and monetary value of the paint and materials used in the repair of the motor vehicle by multiplying the number of labor hours by a rate of consideration for the paint and materials used in the repair of the motor vehicle following industry standard practices that fairly calculate the gross receipts from the retail sale of the motor vehicle repair paint and motor vehicle repair materials. An industry standard practice fairly calculates the gross receipts if the sales price of the paint and materials used or consumed in the repair of a motor vehicle equals or exceeds the purchase price paid by the motor vehicle repair or body shop business. Under this clause, the invoice must either separately state the "paint and materials" as a single taxable item, or separately state "paint" as a taxable item and "materials" as a taxable item. This clause does not apply to wholesale transactions at an auto auction facility. <A]

[A>(o) A sale of specified digital products or other digital products to an end user with or without rights of permanent use and regardless of whether rights of use are conditioned upon payment by the purchaser is a retail sale. When a digital code has been purchased that relates to specified digital products or other digital products, the subsequent receipt of or access to the related specified digital products or other digital products is not a retail sale. <A]

[A>(p) A payment made to a cooperative electric association or public utility as a contribution in aid of construction is a contract for improvement to real property and is not a retail sale. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 4. AMEND Minnesota Statutes 2012, section 297A.61, subdivision 10 , is amended to read: Subd. 10. Tangible personal property. (a) "Tangible personal property" means personal property that can be seen, weighed, measured, felt, or touched, or that is in any other manner perceptible to the senses. " Tangible personal property" includes, but is not limited to, electricity, water, gas, steam, and prewritten computer software.

(b) Tangible personal property does not include:

(1) large ponderous machinery and equipment used in a business or production activity which at common law would be considered to be real property;

(2) property which is subject to an ad valorem property tax;

(3) property described in section 272.02, subdivision 9, clauses (a) to (d);

[D>and <D]

(4) property described in section 272.03, subdivision 2, clauses (3) and (5)

[D>. <D] [A>; and <A]

[A>(5) specified digital products, or other digital products, transferred electronically. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 5. AMEND Minnesota Statutes 2012, section 297A.61, subdivision 25 , is amended to read: Subd. 25.

[D> Cable  <D]

[A> Pay  <A] television service. "

[D>Cable <D] [A>Pay <A] television service" means the transmission of video, audio, or other programming service to purchasers, and the subscriber interaction, if any, required for the selection or use of the programming service, regardless of whether the programming is transmitted over facilities owned or operated by the cable service provider or over facilities owned or operated by one or more dealers of communications services.

The term includes point-to-multipoint distribution
    [A>direct to home

satellite <A] services by which programming is transmitted or broadcast by

microwave or other equipment directly to the subscriber's premises
    [A>, or

any similar or comparable method of service <A].

The term includes
    [D>basic, extended, premium, <D]

[A>all programming

services, including subscriptions, digital video recorders, <A] pay-per-view,

[D>digital, <D] and music services.

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 6. AMEND Minnesota Statutes 2012, section 297A.61, subdivision 38 , is amended to read: Subd. 38. Bundled transaction. (a) "Bundled transaction" means the retail sale of two or more products when the products are otherwise distinct and identifiable, and the products are sold for one nonitemized price. As used in this subdivision, "product" includes tangible personal property,

services, intangibles, and digital goods
    [A>, including specified digital

products or other digital products <A], but does not include real property or services to real property. A bundled transaction does not include the sale of any products in which the sales price varies, or is negotiable, based on the selection by the purchaser of the products included in the transaction.

(b) For purposes of this subdivision, "distinct and identifiable" products does not include:

(1) packaging and other materials, such as containers, boxes, sacks, bags, and bottles, wrapping, labels, tags, and instruction guides, that accompany the retail sale of the products and are incidental or immaterial to the retail sale. Examples of packaging that are incidental or immaterial include grocery sacks, shoe boxes, dry cleaning garment bags, and express delivery envelopes and boxes;

(2) a promotional product provided free of charge with the required purchase of another product. A promotional product is provided free of charge if the sales price of another product, which is required to be purchased in order to receive the promotional product, does not vary depending on the inclusion of the

promotional product; and

(3) items included in the definition of sales price.

(c) For purposes of this subdivision, the term "one nonitemized price" does not include a price that is separately identified by product on binding sales or other supporting sales-related documentation made available to the customer in paper or electronic form including but not limited to an invoice, bill of sale, receipt, contract, service agreement, lease agreement, periodic notice of rates and services, rate card, or price list.

(d) A transaction that otherwise meets the definition of a bundled transaction is not a bundled transaction if it is:

(1) the retail sale of tangible personal property and a service and the tangible personal property is essential to the use of the service, and is provided exclusively in connection with the service, and the true object of the transaction is the service;

(2) the retail sale of services if one service is provided that is essential to the use or receipt of a second service and the first service is provided exclusively in connection with the second service and the true object of the transaction is the second service;

(3) a transaction that includes taxable products and nontaxable products and the purchase price or sales price of the taxable products is de minimis; or

(4) the retail sale of exempt tangible personal property and taxable tangible personal property if:

(i) the transaction includes food and food ingredients, drugs, durable medical equipment, mobility enhancing equipment, over-the-counter drugs, prosthetic devices, or medical supplies; and

(ii) the seller's purchase price or sales price of the taxable tangible personal property is 50 percent or less of the total purchase price or sales price of the bundled tangible personal property. Sellers must not use a combination of the purchase price and sales price of the tangible personal property when making the 50 percent determination for a transaction.

(e) For purposes of this subdivision, "purchase price" means the measure subject to use tax on purchases made by the seller, and "de minimis" means that the seller's purchase price or sales price of the taxable products is ten percent or less of the total purchase price or sales price of the bundled products. Sellers shall use either the purchase price or the sales price of the products to determine if the taxable products are de minimis. Sellers must not use a combination of the purchase price and sales price of the products to determine if the taxable products are de minimis. Sellers shall use the full term of a service contract to determine if the taxable products are de minimis.

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 7. AMEND Minnesota Statutes 2012, section 297A.61, subdivision 45 , is amended to read: Subd.

45. Ring tone. " Ring tone" means a digitized sound file that is downloaded onto a device and

```
that may be used to alert the customer
     [D>of a telecommunication service <D]
```

with respect to a communication. [A>A ring tone does not include ring back tones or other digital audio files that are not stored on the purchaser's communication device. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 8. AMEND Minnesota Statutes 2012, section 297A.61 , is amended by adding a subdivision to read: [A>Subd. 49. Motor vehicle repair paint and motor vehicle repair materials. " Motor vehicle repair paint" means a substance composed of solid matter suspended in a liquid medium and applied as a protective or decorative coating to the surface of a motor vehicle in order to restore the motor vehicle to its original condition, and includes primer, body paint, clear coat, and paint thinner used to paint motor vehicles, as defined in section 297B.01 . " Motor vehicle repair materials" means items, other than motor vehicle repair paint or motor vehicle parts, that become a part of a repaired motor vehicle or are consumed in repairing the motor vehicle at retail, and include abrasives, battery water, body filler or putty, bolts and nuts, brake fluid, buffing pads, chamois, cleaning compounds, degreasing compounds, glaze, grease, grinding discs, hydraulic jack oil, lubricants, masking tape, oxygen and acetylene, polishes, rags, razor blades, sandpaper, sanding discs, scuff pads, sealer, solder, solvents, striping tape, tack cloth, thinner, waxes, and welding rods. Motor vehicle repair materials do not include items that are not used directly on the motor vehicle, such as floor dry that is used to clean the shop, or cleaning compounds and rags that are used to clean tools, equipment, or the shop and are not used to clean the motor vehicle. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 9. AMEND Minnesota Statutes 2012, section 297A.61 , is amended by adding a subdivision to read: [A>Subd. 50. Digital audio works. " Digital audio works" means works that result from a fixation of a series of musical, spoken, or other sounds, that are transferred electronically. Digital audio works includes such items as the following which may either be prerecorded or live: songs, music, readings of books or other written materials, speeches, ring tones, or other sound recordings. Digital audio works does not include audio greeting cards sent by electronic mail. Unless the context provides otherwise, in this chapter digital audio works includes the digital code, or a subscription to or access to a digital code, for receiving, accessing, or otherwise obtaining digital audio works. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 10. AMEND Minnesota Statutes 2012, section 297A.61 , is amended by adding a subdivision to read:[A>Subd. 51. Digital audiovisual works. " Digital audiovisual works" means a series of related images which, when shown in succession, impart an impression of motion, together with accompanying sounds, if any, that are transferred electronically. Digital audiovisual works includes such items as motion pictures, movies, musical videos, news and entertainment, and live events. Digital audiovisual works does

not include video greeting cards sent by electronic mail. Unless the context provides otherwise, in this chapter digital audiovisual works includes the digital code, or a subscription to or access to a digital code, for receiving, accessing, or otherwise obtaining digital audiovisual works. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 11. AMEND Minnesota Statutes 2012, section 297A.61 , is amended by adding a subdivision to read:[A>Subd. 52. Digital books. " Digital books" means any literary works, other than digital audiovisual works or digital audio works, expressed in words, numbers, or other verbal or numerical symbols or indicia so long as the product is generally recognized in the ordinary and usual sense as a "book." It includes works of fiction and nonfiction and short stories. It does not include periodicals, magazines, newspapers, or other news or information products, chat rooms, or weblogs. Unless the context provides otherwise, in this chapter digital books includes the digital code, or a subscription to or access to a digital code, for receiving, accessing, or otherwise obtaining digital books. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 12. AMEND Minnesota Statutes 2012, section 297A.61 , is amended by adding a subdivision to read:[A>Subd. 53. Digital code. " Digital code" means a code which provides a purchaser with a right to obtain one or more specified digital products or other digital products. A digital code may be transferred electronically, such as through electronic mail, or it may be transferred on a tangible medium, such as on a plastic card, a piece of paper or invoice, or imprinted on another product. A digital code is not a code that represents a stored monetary value that is deducted from a total as it is used by the purchaser, and it is not a code that represents a redeemable card, gift card, or gift certificate that entitles the holder to select a digital product of an indicated cash value. The end user of a digital code is any purchaser except one who receives the contractual right to redistribute a digital product which is the subject of the transaction. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 13. AMEND Minnesota Statutes 2012, section 297A.61 , is amended by adding a subdivision to read:[A>Subd. 54. Other digital products. " Other digital products" means the following items when transferred electronically: <A]

[A>(1) greeting cards; and <A]

[A>(2) online video or electronic games. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 14. AMEND Minnesota Statutes 2012, section 297A.61 , is amended by adding a subdivision to read:[A>Subd. 55. Specified digital products. " Specified digital products" means digital audio works, digital audiovisual works, and digital books that are transferred electronically to a customer. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 15. AMEND Minnesota Statutes 2012, section 297A.61 , is amended by adding a subdivision to read:[A>Subd. 56. Transferred electronically. " Transferred electronically" means obtained by the purchaser by means other than tangible storage media. For purposes of this subdivision, it is not necessary that a copy of the product be physically transferred to the purchaser. A product will be considered to have been transferred electronically to a purchaser if the purchaser has access to the product. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 16. AMEND Minnesota Statutes 2012, section 297A.61 , is amended by adding a subdivision to read:[A>Subd. 58. Self-storage service. " Self-storage service" means a storage service that provides secure areas, such as rooms, units, compartments or containers, whether accessible from outside or from within a building, that are designated for the use of a purchaser, where the purchaser retains the care custody and control of their property, including self-storage units, mini-storage units, and areas by any other name to which the purchaser retains either unlimited free access or free access within reasonable business hours or upon reasonable notice to the service provider to add or remove property, but does not mean the rental of an entire building, such as a warehouse. Self-storage service does not include general warehousing and storage services where the warehouse typically handles, stores, and retrieves a purchaser's property using the warehouse's staff and equipment, and does not allow the purchaser free access to the storage space and does not include bailments. <A]

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 17. AMEND Minnesota Statutes 2012, section 297A.64, subdivision 1 , is amended to read: Subdivision 1. Tax imposed. A tax is imposed on the lease or rental in this state for not more than 28 days of a passenger automobile as defined in section 168.002, subdivision 24 , a van as defined in section 168.002, subdivision 40 , or a pickup truck as defined insection 168.002, subdivision 26 .

```
The rate of tax is
    [D>6.2 <D]
```

[A>9.2 <A] percent of the sales price.


The tax applies whether or not the vehicle is licensed in the state.

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 18. AMEND Minnesota Statutes 2012, section 297A.66, subdivision 3 , is amended to read: Subd. 3. Retailer not maintaining place of business in this state.

```
(a) To the extent allowed by the United States Constitution and
    [D>the laws
```

of the United States <D] [A>in accordance with the terms and conditions of federal remote seller law <A], a retailer making retail sales from outside this state to a destination within this state and not maintaining a place of business in this state shall collect sales and use taxes and remit them to the

```
commissioner under section 297A.77
     [D>, <D]
```

[A>. <A]

[A>(b) To the extent allowed by the United States Constitution and the laws of the United States, a retailer making retail sales from outside this state to a destination within this state and not maintaining a place of business in this state shall collect sales and use taxes and remit them to the commissioner under section 297A.77 , <A] if the retailer engages in the regular or systematic soliciting of sales from potential customers in this state by:

(1) distribution, by mail or otherwise, of catalogs, periodicals, advertising flyers, or other written solicitations of business to customers in this state;

(2) display of advertisements on billboards or other outdoor advertising in this state;

(3) advertisements in newspapers published in this state;

(4) advertisements in trade journals or other periodicals the circulation of which is primarily within this state;

(5) advertisements in a Minnesota edition of a national or regional publication or a limited regional edition in which this state is included as part of a broader regional or national publication which are not placed in other geographically defined editions of the same issue of the same publication;

(6) advertisements in regional or national publications in an edition which is not by its contents geographically targeted to Minnesota but which is sold over the counter in Minnesota or by subscription to Minnesota residents;

(7) advertisements broadcast on a radio or television station located in Minnesota; or

(8) any other solicitation by telegraphy, telephone, computer database, cable, optic, microwave, or other communication system. This paragraph (a) must be construed without regard to the state from which distribution of the materials originated or in which they were prepared.

(b) The location within or without this state of independent vendors that provide products or services to the retailer in connection with its solicitation of customers within this state, including such products and services as creation of copy, printing, distribution, and recording, is not considered in determining whether the retailer is required to collect tax.

(c) A retailer not maintaining a place of business in this state is presumed, subject to rebuttal, to be engaged in regular solicitation within this state if it engages in any of the activities in paragraph (a) and:

(1) makes 100 or more retail sales from outside this state to destinations in this state during a period of 12 consecutive months; or

(2) makes ten or more retail sales totaling more than $100,000 from outside this state to destinations in this state during a period of 12 consecutive months.

[A>EFFECTIVE DATE. This section is effective the day after final enactment. <A]

Sec. 19. AMEND Minnesota Statutes 2012, section 297A.66 , is amended by adding a subdivision to read:[A>Subd. 4a. Solicitor. <A]

[A>(a) "Solicitor," for purposes of subdivision 1, paragraph (a), means a person, whether an independent contractor or other representative, who directly or indirectly solicits business for the retailer. <A]

[A>(b) A retailer is presumed to have a solicitor in this state if it enters into an agreement with a resident under which the resident, for a commission or other substantially similar consideration, directly or indirectly refers potential customers, whether by a link on an Internet Web site, or otherwise, to the seller. This paragraph only applies if the total gross receipts are at least $10,000 in the 12-month period ending on the last day of the most recent calendar quarter before the calendar quarter in which the sale is made. For purposes of this paragraph, gross receipts means receipts from sales to customers located in the state who were referred to the retailer by all residents with this type of agreement with the retailer. <A]

[A>(c) The presumption under paragraph (b) may be rebutted by proof that the resident with whom the seller has an agreement did not engage in any solicitation in the state on behalf of the retailer that would satisfy the nexus requirement of the United States Constitution during the 12-month period in question. Nothing in this section shall be construed to narrow the scope of the terms affiliate, agent, salesperson, canvasser, or other representative for purposes of subdivision 1, paragraph (a). <A]

[A>(d) For purposes of this paragraph, "resident" includes an individual who is a resident of this state, as defined in section 290.01 , or a business that owns tangible personal property located in this state or has one or more employees providing services for the business in this state. <A]

[A>(e) This subdivision does not apply to chapter 290 and does not expand or contract the jurisdiction to tax a trade or business under chapter 290. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 20. AMEND Minnesota Statutes 2012, section 297A.665 , is amended to read: 297A.665 PRESUMPTION OF TAX; BURDEN OF PROOF. (a) For the purpose of the proper administration of this chapter and to prevent evasion of the tax, until the contrary is established, it is presumed that:

(1) all gross receipts are subject to the tax; and

(2) all retail sales for delivery in Minnesota are for storage, use, or other consumption in Minnesota.

(b) The burden of proving that a sale is not a taxable retail sale is on the seller. However, a seller is relieved of liability if:

(1) the seller obtains a fully completed exemption certificate or all the relevant information required by section 297A.72, subdivision 2 , at the time of

```
the sale or within 90 days after the date of the sale;
    [D>or <D]
```

(2) if the seller has not obtained a fully completed exemption certificate or all the relevant information required by section 297A.72, subdivision 2 , within the time provided in clause (1), within 120 days after a request for substantiation by the commissioner, the seller either:

(i) obtains in good faith a fully completed exemption certificate or all the relevant information required by section 297A.72, subdivision 2 , from the purchaser; or

```
(ii) proves by other means that the transaction was not subject to tax
    [A>;
```

<A]

[A>(3) in the case of drop shipment sales, a seller engaged in drop shipping may claim a resale exemption based on an exemption certificate provided by its customer or reseller, or any other acceptable information available to the seller engaged in drop shipping evidencing qualification for a resale exemption, regardless of whether the customer or reseller is registered to collect and remit sales and use tax in the state <A].

(c) Notwithstanding paragraph (b), relief from liability does not apply to a seller who:

(1) fraudulently fails to collect the tax; or

(2) solicits purchasers to participate in the unlawful claim of an exemption.

(d) A certified service provider, as defined in section 297A.995, subdivision 2 , is relieved of liability under this section to the extent a seller who is its client is relieved of liability.

(e) A purchaser of tangible personal property or any items listed in section297A.63 that are shipped or brought to Minnesota by the purchaser has the burden of proving that the property was not purchased from a retailer for storage, use, or consumption in Minnesota.

(f) If a seller claims that certain sales are exempt and does not provide the certificate, information, or proof required by paragraph (b), clause (2), within 120 days after the date of the commissioner's request

for substantiation, then the exemptions claimed by the seller that required substantiation are disallowed.

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 21. AMEND Minnesota Statutes 2012, section 297A.668 , is amended by adding a subdivision to read:[A>Subd. 6a. Multiple points of use. <A]

[A>(a) Notwithstanding the provisions of subdivisions 2 and 3, a business purchaser that has not received authorization to pay the tax directly to the commissioner may use an exemption certificate indicating multiple points of use if: <A]

[A>(1) the purchaser knows at the time of its purchase of a digital good, computer software delivered electronically, or a service that the good or service will be concurrently available for use in more than one taxing jurisdiction; and <A]

[A>(2) the purchaser delivers to the seller the exemption certificate indicating multiple points of use at the time of purchase. <A]

[A>(b) Upon receipt of the fully completed exemption certificate indicating multiple points of use, the seller is relieved of the obligation to collect, pay, or remit the applicable tax and the purchaser is obligated to collect, pay, or remit the applicable tax on a direct pay basis. The provisions of section 297A.665 apply to this paragraph. <A]

[A>(c) The purchaser delivering the exemption certificate indicating multiple points of use may use any reasonable but consistent and uniform method of apportionment that is supported by the purchaser's business records as they exist at the time of the consummation of the sale. <A]

[A>(d) The purchaser shall provide the exemption certificate indicating multiple points of use to the seller at the time of purchase. <A]

[A>(e) A purchaser that has received authorization to pay the tax directly to the commissioner is not required to deliver to the seller an exemption certificate indicating multiple points of use. A purchaser that has received authorization to pay the tax directly to the commissioner shall follow the provisions of paragraph (c) in apportioning the tax due on a digital good, computer software delivered electronically, or a service that will be concurrently available for use in more than one taxing jurisdiction. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 22. AMEND Minnesota Statutes 2012, section 297A.67, subdivision 7 , is amended to read: Subd. 7. Drugs; medical devices. (a) Sales of the following drugs and medical devices for human use are exempt:

(1) drugs, including over-the-counter drugs;

(2) single-use finger-pricking devices for the extraction of blood and other single-use devices and single-use diagnostic agents used in diagnosing, monitoring, or treating diabetes;

(3) insulin and medical oxygen for human use, regardless of whether prescribed or sold over the counter;

(4) prosthetic devices;

(5) durable medical equipment for home use only;

(6) mobility enhancing equipment;

(7) prescription corrective eyeglasses; and

(8) kidney dialysis equipment, including repair and replacement parts.

[A>(b) Items purchased in transactions covered by: <A]

[A>(1) Medicare as defined under title XVIII of the Social Security Act, United States Code, title 42, section 1395, et seq.; or <A]

[A>(2) Medicaid as defined under title XIX of the Social Security Act, United States Code, title 42, section 1396, et seq. <A]

[D>(b) <D]

[A>(c) <A] For purposes of this subdivision:

(1) "Drug" means a compound, substance, or preparation, and any component of a compound, substance, or preparation, other than food and food ingredients, dietary supplements, or alcoholic beverages that is:

(i) recognized in the official United States Pharmacopoeia, official Homeopathic Pharmacopoeia of the United States, or official National Formulary, and supplement to any of them;

(ii) intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease; or

(iii) intended to affect the structure or any function of the body.

(2) "Durable medical equipment" means equipment, including repair and

```
replacement parts,
    [A>including single-patient use items, <A] but not
```

including mobility enhancing equipment, that:

(i) can withstand repeated use;

(ii) is primarily and customarily used to serve a medical purpose;

(iii) generally is not useful to a person in the absence of illness or injury; and

(iv) is not worn in or on the body. For purposes of this clause, "repair and replacement parts" includes all components or attachments used in conjunction with the durable medical

equipment,
    [D>but does not include <D]

[A>including <A] repair and

replacement parts which are for single patient use only.

(3) "Mobility enhancing equipment" means equipment, including repair and replacement parts, but not including durable medical equipment, that:

(i) is primarily and customarily used to provide or increase the ability to move from one place to another and that is appropriate for use either in a home or a motor vehicle;

(ii) is not generally used by persons with normal mobility; and

(iii) does not include any motor vehicle or equipment on a motor vehicle normally provided by a motor vehicle manufacturer.

(4) "Over-the-counter drug" means a drug that contains a label that identifies the product as a drug as required by Code of Federal Regulations, title 21, section 201.66 . The label must include a "drug facts" panel or a statement of the active ingredients with a list of those ingredients contained in the compound, substance, or preparation. Over-the-counter drugs do not include grooming and hygiene products, regardless of whether they otherwise meet the definition. " Grooming and hygiene products" are soaps, cleaning solutions, shampoo, toothpaste, mouthwash, antiperspirants, and suntan lotions and sunscreens.

(5) "Prescribed" and "prescription" means a direction in the form of an order, formula, or recipe issued in any form of oral, written, electronic, or other means of transmission by a duly licensed health care professional.

(6) "Prosthetic device" means a replacement, corrective, or supportive device, including repair and replacement parts, worn on or in the body to:

(i) artificially replace a missing portion of the body;

(ii) prevent or correct physical deformity or malfunction; or

(iii) support a weak or deformed portion of the body. Prosthetic device does not include corrective eyeglasses.

(7) "Kidney dialysis equipment" means equipment that:

(i) is used to remove waste products that build up in the blood when the kidneys are not able to do so on their own; and

(ii) can withstand repeated use, including multiple use by a single patient, notwithstanding the provisions of clause (2).

[A>(8) A transaction is covered by Medicare or Medicaid if any portion of the cost of the item purchased in the transaction is paid for or reimbursed by the federal government or the state of Minnesota pursuant to the Medicare or Medicaid program, by a private insurance company administering the Medicare or Medicaid program on behalf of the federal government or the state of Minnesota, or by a managed care organization for the benefit of a patient enrolled in a prepaid program that furnishes medical services in lieu of conventional Medicare or Medicaid coverage pursuant to agreement with the federal government or the state of Minnesota. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 23. AMEND Minnesota Statutes 2012, section 297A.67 , is amended by adding a subdivision to read:[A>Subd. 7a. Accessories and supplies. Accessories and supplies required for the effective use of durable medical equipment for home use only or purchased in a transaction covered by medicare or Medicaid, that are not already exempt under section 297A.67, subdivision 7 , are exempt. Accessories and supplies for the effective use of a prosthetic device that are not already exempt under section 297A.67, subdivision 7 , are exempt. For purposes of this subdivision "durable medical equipment," "prosthetic device," "Medicare," and "Medicaid" have the definitions given in section 297A.67, subdivision 7 . <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 24. AMEND Minnesota Statutes 2012, section 297A.67, subdivision 13 , is amended to read: Subd. 13.

```
Textbooks. Textbooks
    [A>, including digital books, <A] that are prescribed
```

for use in conjunction with a course of study in a school, college, university, and private career school to students who are regularly enrolled at such institutions are exempt. For purposes of this subdivision (1) a "school" is as defined in section 120A.22, subdivision 4 ; and (2) "private career school" means a school licensed under section 141.25 .

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 25. AMEND Minnesota Statutes 2012, section 297A.68, subdivision 2 , is amended to read: Subd. 2. Materials consumed in industrial production.

```
(a) Materials stored, used, or consumed in industrial production of
```

`[A>tangible <A]` personal property intended to be sold ultimately at retail

[A>, <A] are exempt, whether or not the item so used becomes an ingredient or constituent part of the property produced. Materials that qualify for this exemption include, but are not limited to, the following:

(1) chemicals, including chemicals used for cleaning food processing machinery and equipment;

(2) materials, including chemicals, fuels, and electricity purchased by persons engaged in industrial production to treat waste generated as a result of the production process;

(3) fuels, electricity, gas, and steam used or consumed in the production process, except that electricity, gas, or steam used for space heating, cooling, or lighting is exempt if (i) it is in excess of the average climate control or lighting for the production area, and

(ii) it is necessary to produce that particular product;

(4) petroleum products and lubricants;

(5) packaging materials, including returnable containers used in packaging food and beverage products;

(6) accessory tools, equipment, and other items that are separate detachable units with an ordinary useful life of less than 12 months used in producing a direct effect upon the product; and

(7) the following materials, tools, and equipment used in metal-casting: crucibles, thermocouple protection sheaths and tubes, stalk tubes, refractory materials, molten metal filters and filter boxes, degassing lances, and base blocks.

(b) This exemption does not include:

(1) machinery, equipment, implements, tools, accessories, appliances, contrivances and furniture and fixtures, except those listed in paragraph (a), clause (6); and

(2) petroleum and special fuels used in producing or generating power for propelling ready-mixed concrete trucks on the public highways of this state.

(c) Industrial production includes, but is not limited to, research, development, design or production of any tangible personal property, manufacturing, processing (other than by restaurants and consumers) of agricultural products (whether vegetable or animal), commercial fishing, refining, smelting, reducing, brewing, distilling, printing, mining, quarrying, lumbering, generating electricity, the production of road building materials, and the research, development, design, or production of computer software. Industrial production does not include painting, cleaning, repairing or similar processing of property except as part of the original manufacturing process.

(d) Industrial production does not include:

(1) the furnishing of services listed in section 297A.61, subdivision 3 ,

paragraph (g), clause (6), items (i) to (vi) and (viii)
    [A>, or paragraph

(m) <A]; or

(2) the transportation, transmission, or distribution of petroleum, liquefied gas, natural gas, water, or steam, in, by, or through pipes, lines, tanks, mains, or other means of transporting those products. For purposes of this paragraph, "transportation, transmission, or distribution" does not include blending of petroleum or biodiesel fuel as defined in section239.77 .

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 26. AMEND Minnesota Statutes 2012, section 297A.68, subdivision 5 , is amended to read: Subd. 5. Capital equipment. (a) Capital equipment is exempt. [D>The tax must be imposed and collected as if the rate under section 297A.62, subdivision 1 , applied, and then refunded in the manner provided in section 297A.75 . <D] " Capital equipment" means machinery and equipment purchased or leased, and used in this state by the purchaser or lessee primarily for manufacturing, fabricating, mining, or refining tangible personal property to be sold ultimately at retail if the machinery and equipment are essential to the integrated production process of manufacturing, fabricating, mining, or refining. Capital equipment also includes machinery and equipment used primarily to electronically transmit results retrieved by a customer of an online computerized data retrieval system.

(b) Capital equipment includes, but is not limited to:

(1) machinery and equipment used to operate, control, or regulate the production equipment;

(2) machinery and equipment used for research and development, design, quality control, and testing activities;

(3) environmental control devices that are used to maintain conditions such as temperature, humidity, light, or air pressure when those conditions are essential to and are part of the production process;

(4) materials and supplies used to construct and install machinery or equipment;

(5) repair and replacement parts, including accessories, whether purchased as spare parts, repair parts, or as upgrades or modifications to machinery or equipment;

(6) materials used for foundations that support machinery or equipment;

(7) materials used to construct and install special purpose buildings used in the production process;

(8) ready-mixed concrete equipment in which the ready-mixed concrete is mixed as part of the delivery process regardless if mounted on a chassis, repair parts for ready-mixed concrete trucks, and leases of

ready-mixed concrete trucks; and

(9) machinery or equipment used for research, development, design, or production of computer software.

(c) Capital equipment does not include the following:

(1) motor vehicles taxed under chapter 297B;

(2) machinery or equipment used to receive or store raw materials;

(3) building materials, except for materials included in paragraph (b), clauses (6) and (7);

(4) machinery or equipment used for nonproduction purposes, including, but not limited to, the following: plant security, fire prevention, first aid, and hospital stations; support operations or administration; pollution control; and plant cleaning, disposal of scrap and waste, plant communications, space heating, cooling, lighting, or safety;

(5) farm machinery and aquaculture production equipment as defined by section297A.61 , subdivisions 12 and 13;

(6) machinery or equipment purchased and installed by a contractor as part of an improvement to real property;

(7) machinery and equipment used by restaurants in the furnishing, preparing, or serving of prepared foods as defined in section 297A.61, subdivision 31 ;

(8) machinery and equipment used to furnish the services listed in section 297A.61, subdivision 3 , paragraph (g), clause (6), items (i) to (vi) and (viii);

(9) machinery or equipment used in the transportation, transmission, or distribution of petroleum, liquefied gas, natural gas, water, or steam, in, by, or through pipes, lines, tanks, mains, or other means of transporting those products. This clause does not apply to machinery or equipment used to blend petroleum or biodiesel fuel as defined in section 239.77 ; or

(10) any other item that is not essential to the integrated process of manufacturing, fabricating, mining, or refining.

(d) For purposes of this subdivision:

(1) "Equipment" means independent devices or tools separate from machinery but essential to an integrated production process, including computers and computer software, used in operating, controlling, or regulating machinery and equipment; and any subunit or assembly comprising a component of any machinery or accessory or attachment parts of machinery, such as tools, dies, jigs, patterns, and molds.

(2) "Fabricating" means to make, build, create, produce, or assemble components or property to work in a new or different manner.

(3) "Integrated production process" means a process or series of operations through which tangible personal property is manufactured, fabricated, mined, or refined. For purposes of this clause, (i) manufacturing begins with the removal of raw materials from inventory and ends when the last process prior to loading for shipment has been completed; (ii) fabricating begins with the removal from storage or inventory of the property to be assembled, processed, altered, or modified and ends with the creation or production of the new or changed product; (iii) mining begins with the removal of overburden from the site of the ores, minerals, stone, peat deposit, or surface materials and ends when the last process before stockpiling is completed; and (iv) refining begins with the removal from inventory or storage of a natural resource and ends with the conversion of the item to its completed form.

(4) "Machinery" means mechanical, electronic, or electrical devices, including computers and computer software, that are purchased or constructed to be used for the activities set forth in paragraph (a), beginning with the removal of raw materials from inventory through completion of the product, including packaging of the product.

(5) "Machinery and equipment used for pollution control" means machinery and equipment used solely to eliminate, prevent, or reduce pollution resulting from an activity described in paragraph (a).

(6) "Manufacturing" means an operation or series of operations where raw materials are changed in form, composition, or condition by machinery and equipment and which results in the production of a new article of tangible personal property. For purposes of this subdivision, "manufacturing" includes the generation of electricity or steam to be sold at retail.

(7) "Mining" means the extraction of minerals, ores, stone, or peat.

(8) "Online data retrieval system" means a system whose cumulation of information is equally available and accessible to all its customers.

(9) "Primarily" means machinery and equipment used 50 percent or more of the time in an activity described in paragraph (a).

(10) "Refining" means the process of converting a natural resource to an intermediate or finished product, including the treatment of water to be sold at retail.

(11) This subdivision does not apply to telecommunications equipment as provided in subdivision 35, and does not apply to wire, cable, fiber, poles, or conduit for telecommunications services.

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after August 31, 2014. <A]

Sec. 27. AMEND Minnesota Statutes 2012, section 297A.68, subdivision 42 , is amended to read: Subd. 42. Qualified data centers. (a) Purchases of enterprise information technology equipment and computer

```
software for use in a qualified data center
    [A>, or a qualified refurbished
```

data center, <A] are exempt. The tax on purchases exempt under this paragraph must be imposed and collected as if the rate under section 297A.62, subdivision 1 , applied, and then refunded after June 30, 2013, in the manner provided in section 297A.75 . This exemption includes enterprise information technology equipment and computer software purchased to replace or upgrade enterprise information

```
technology equipment and computer software in a qualified data center
    [A>,
```

or a qualified refurbished data center <A].

(b) Electricity used or consumed in the operation of a qualified data center is exempt.

```
(c) For purposes of this subdivision, "qualified data center
    [A>, or a
```

qualified refurbished data center, <A]" means a facility in Minnesota:

(1) that is comprised of one or more buildings that consist in the aggregate of

```
at least
    [D>30,000 <D]
```

[A>25,000 <A] square feet, and that are located on a

single parcel or on contiguous parcels, where the total cost of construction or refurbishment, investment in enterprise information technology equipment, and

```
computer software is at least
    [D>$50,000,000 <D]
```

[A>$30,000,000 <A] within a

[D>24 <D] [A>48 <A]-month period;

(2) that is constructed or substantially refurbished after June 30, 2012, where

```
"substantially refurbished" means that at least
    [D>30,000 <D]
```

[A>25,000 <A]square feet have been rebuilt or modified
```
    [D>; and <D]
```

[A>, including: <A]

[A>(i) installation of enterprise information technology equipment, environmental control, computer software, and energy efficiency improvements; and <A]

[A>(ii) building improvements; and <A]

(3) that is used to house enterprise information technology equipment, where the facility has the following characteristics:

(i) uninterruptible power supplies, generator backup power, or both;

(ii) sophisticated fire suppression and prevention systems; and

(iii) enhanced security. A facility will be considered to have enhanced security if it has restricted access to the facility to selected personnel; permanent security guards; video camera surveillance; an electronic system requiring pass codes, keycards, or biometric scans, such as hand scans and retinal or fingerprint recognition; or similar security features. In determining whether the facility has the required square footage, the square footage of the following spaces shall be included if the spaces support the operation of enterprise information technology equipment: office space, meeting space, and mechanical and other support facilities. [A>For purposes of this subdivision, "computer software" includes, but is not limited to, software utilized or loaded at the qualified data center, including maintenance, licensing, and software customization. <A]

[A>(d) For purposes of this subdivision, a "qualified refurbished data center" means an existing facility that qualifies as a data center under paragraph (c), clauses (2) and (3), but that is comprised of one or more buildings that consist in the aggregate of at least 25,000 square feet, and that are located on a single parcel or contiguous parcels, where the total cost of construction or refurbishment, investment in enterprise information technology equipment, and computer software is at least $50,000,000 within a 24-month period. <A]

[D>(d) <D]

[A>(e) <A] For purposes of this subdivision, "enterprise information technology equipment" means computers and equipment supporting computing, networking, or data storage, including servers and routers. It includes, but is not limited to: cooling systems, cooling towers, and other temperature control infrastructure; power infrastructure for transformation, distribution, or management of electricity used for the maintenance and operation of a qualified data center, including but not limited to exterior dedicated business-owned substations, backup power generation systems, battery systems, and related infrastructure; and racking systems, cabling, and trays, which are necessary for the maintenance and operation of the qualified data center.

[D>(e) <D]

[A>(f) <A] A qualified data center may claim the exemptions in this subdivision for purchases made either

within 20 years of the date of its first purchase qualifying for the exemption under paragraph (a), or by June 30, 2042, whichever is earlier.

[D>(f) <D]

[A>(g) <A] The purpose of this exemption is to create jobs in the construction and data center industries.

[D>(g) <D]

[A>(h) <A] This subdivision is effective for sales and purchases made after June 30, 2012, and before July 1, 2042.

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 28. AMEND Minnesota Statutes 2012, section 297A.68 , is amended by adding a subdivision to read:[A>Subd. 49. Greater Minnesota business expansions. <A]

[A>(a) Purchases and use of tangible personal property or taxable services by a qualified business, as defined in section 116J.3738 , are exempt if: <A]

[A>(1) the business subsidy agreement provides that the exemption under this subdivision applies; <A]

[A>(2) the property or services are primarily used or consumed in greater Minnesota; and <A]

[A>(3) the purchase was made and delivery received during the duration of the certification of the business as a qualified business under section 116J.3738 . <A]

[A>(b) Purchase and use of construction materials and supplies used or consumed in, and equipment incorporated into, the construction of improvements to real property in greater Minnesota are exempt if the improvements after completion of construction are to be used in the conduct of the trade or business of the qualified business, as defined in section 116J.3738 . This exemption applies regardless of whether the purchases are made by the business or a contractor. <A]

[A>(c) The exemptions under this subdivision apply to a local sales and use tax. <A]

[A>(d) The tax on purchases imposed under this subdivision must be imposed and collected as if the rate under section 297A.62 applied, and then refunded in the manner provided in section 297A.75 . No more than $7,000,000 may be refunded in a fiscal year for all purchases under this subdivision. Refunds must be allocated on a first come, first served basis. If more than $7,000,000 of eligible claims are made in a fiscal year, claims by qualified businesses carryover to the next fiscal year, and the commissioner must first allocate refunds to qualified businesses eligible for a refund in the preceding fiscal year. Any portion of the balance of funds allocated for refunds under this paragraph does not cancel and shall be carried forward to and available for refunds in subsequent fiscal years. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2014. <A]

Sec. 29. AMEND Minnesota Statutes 2012, section 297A.70, subdivision 2 , is amended to read: Subd. 2. Sales to government. (a) All sales, except those listed in paragraph (b), to the following governments and political subdivisions, or to the listed agencies or instrumentalities of governments and political subdivisions, are exempt:

(1) the United States and its agencies and instrumentalities;

```
(2) school districts,
     [A>local governments, <A] the University of Minnesota,
```

state universities, community colleges, technical colleges, state academies, the Perpich Minnesota Center for Arts Education, and an instrumentality of a political subdivision that is accredited as an optional/special function school by the North Central Association of Colleges and Schools;

(3) hospitals and nursing homes owned and operated by political subdivisions of the state of tangible personal property and taxable services used at or by hospitals and nursing homes;

(4) the Metropolitan Council, for its purchases of vehicles and repair parts to equip operations provided for in section 473.4051 ;

(5) other states or political subdivisions of other states, if the sale would

```
be exempt from taxation if it occurred in that state;
     [A>and <A]
```

(6) public libraries, public library systems, multicounty, multitype library systems as defined in section 134.001 , county law libraries under chapter 134A, state agency libraries, the state library under section 480.09 , and the

```
Legislative Reference Library
     [D>; and <D]
```

```
[A>. <A]
```

```
[D>(7) towns. <D]
```

(b) This exemption does not apply to the sales of the following products and services:

(1) building, construction, or reconstruction materials purchased by a contractor or a subcontractor as a part of a lump-sum contract or similar type of contract with a guaranteed maximum price covering both labor and materials for use in the construction, alteration, or repair of a building or facility;

(2) construction materials purchased by tax exempt entities or their contractors to be used in constructing buildings or facilities which will not be used principally by the tax exempt entities;

(3) the leasing of a motor vehicle as defined in section 297B.01, subdivision 11 , except for leases entered into by the United States or its agencies or instrumentalities;

(4) lodging as defined under section 297A.61, subdivision 3 , paragraph (g), clause

(2), and prepared food, candy, soft drinks, and alcoholic beverages as defined in section 297A.67, subdivision 2 , except for lodging, prepared food, candy, soft drinks, and alcoholic beverages purchased directly by the United States or its agencies or instrumentalities; or

```
(5) goods or services purchased by a
    [D>town <D]
```

[A>local government <A] as

inputs to goods and services that are generally provided by a private business and the purchases would be taxable if made by a private business engaged in the same activity.

(c) As used in this subdivision, "school districts" means public school entities and districts of every kind and nature organized under the laws of the state of Minnesota, and any instrumentality of a school district, as defined in section 471.59 .

[A>(d) As used in this subdivision, "local governments" means cities, counties, and townships. <A]

[D>(d) <D]

[A>(e) <A] As used in this subdivision, "goods or services generally provided by a private business" include, but are not limited to, goods or services provided by liquor stores, gas and electric utilities, golf courses, marinas, health and fitness centers, campgrounds, cafes, and laundromats. " Goods or services generally provided by a private business" do not include housing services, sewer and water services, wastewater treatment, ambulance and other public safety services, correctional services, chore or homemaking services provided to elderly or disabled individuals, or road and street maintenance or lighting.

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after December 31, 2013. <A]

Sec. 30. AMEND Minnesota Statutes 2012, section 297A.70, subdivision 4 , is amended to read: Subd. 4. Sales to nonprofit groups. (a) All sales, except those listed in paragraph

(b), to the following "nonprofit organizations" are exempt:

(1) a corporation, society, association, foundation, or institution organized and operated exclusively for charitable, religious, or educational purposes if the item purchased is used in the performance of charitable, religious, or educational functions; and

(2) any senior citizen group or association of groups that:

(i) in general limits membership to persons who are either age 55 or older, or physically disabled;

(ii) is organized and operated exclusively for pleasure, recreation, and other nonprofit purposes, not including housing, no part of the net earnings of which inures to the benefit of any private shareholders; and

(iii) is an exempt organization under section 501(c) of the Internal Revenue Code. For purposes of this subdivision, charitable purpose includes the maintenance of a cemetery owned by a religious organization.

(b) This exemption does not apply to the following sales:

(1) building, construction, or reconstruction materials purchased by a contractor or a subcontractor as a part of a lump-sum contract or similar type of contract with a guaranteed maximum price covering both labor and materials for use in the construction, alteration, or repair of a building or facility;

(2) construction materials purchased by tax-exempt entities or their contractors to be used in constructing buildings or facilities that will not be used principally by the tax-exempt entities; and

(3) lodging as defined under section 297A.61, subdivision 3 , paragraph (g), clause

(2), and prepared food, candy, soft drinks, and alcoholic beverages as defined in section 297A.67, subdivision 2 , except wine purchased by an established

```
religious organization for sacramental purposes
    [A>or as allowed under
```

subdivision 9a <A]; and

(4) leasing of a motor vehicle as defined in section 297B.01, subdivision 11 , except as provided in paragraph (c).

(c) This exemption applies to the leasing of a motor vehicle as defined insection 297B.01, subdivision 11 , only if the vehicle is:

(1) a truck, as defined in section 168.002 , a bus, as defined in section168.002 , or a passenger automobile, as defined in section 168.002 , if the automobile is designed and used for carrying more than nine persons including the driver; and

(2) intended to be used primarily to transport tangible personal property or individuals, other than employees, to whom the organization provides service in performing its charitable, religious, or educational purpose.

(d) A limited liability company also qualifies for exemption under this subdivision if

(1) it consists of a sole member that would qualify for the exemption, and (2) the items purchased qualify for the exemption.

[A>EFFECTIVE DATE. This section is effective retroactively for sales and purchases made after June 30, 2012. <A]

Sec. 31. AMEND Minnesota Statutes 2012, section 297A.70, subdivision 5 , is amended to read: Subd. 5. Veterans groups. Sales to an organization of military service veterans or an auxiliary unit of an organization of military service veterans are exempt if:

(1) the organization or auxiliary unit is organized within the state of Minnesota and is exempt from federal taxation under section 501(c), clause (19), of the Internal Revenue Code; and

```
(2) the tangible personal property
    [D>is <D]
```

[A>or services are <A] for

charitable, civic, educational, or nonprofit uses and not for social, recreational, pleasure, or profit uses.

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 32. AMEND Minnesota Statutes 2012, section 297A.70, subdivision 7 , is amended to read:

```
Subd. 7. Hospitals
    [D> and  <D]
```

```
[A> ,  <A] outpatient surgical centers
    [A>
```

, and critical access dental providers <A] . (a) Sales, except for those listed in paragraph

[D>(c) <D]

[A>(d) <A], to a hospital are exempt, if the items purchased are used in providing hospital services. For purposes of this subdivision, "hospital" means a hospital organized and operated for charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code, and licensed under chapter 144 or by any other jurisdiction, and "hospital services" are services authorized or required to be performed by a "hospital" under chapter 144.

(b) Sales, except for those listed in paragraph

[D>(c) <D]

[A>(d) <A], to an outpatient surgical center are exempt, if the items purchased are used in providing outpatient surgical services. For purposes of this subdivision, "outpatient surgical center" means an outpatient surgical center organized and operated for charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code, and licensed under chapter 144 or by any other jurisdiction. For the purposes of this subdivision, "outpatient surgical services" means:

(1) services authorized or required to be performed by an outpatient surgical center under chapter 144; and (2) urgent care. For purposes of this subdivision, "urgent care" means health services furnished to a person whose medical condition is sufficiently acute to require treatment unavailable through, or inappropriate to be provided by, a clinic or physician's office, but not so acute as to require treatment in a hospital emergency room.

(c)
   [A>Sales, except for those listed in paragraph (d), to a critical access

dental provider are exempt, if the items purchased are used in providing critical access dental care services. For the purposes of this subdivision, "critical access dental provider" means a dentist or dental clinic that qualifies under section 256B.76, subdivision 4 , paragraph (b) and, in the previous calendar year, had no more than 15 percent of its patients covered by private dental insurance. <A]

[A>(d) <A] This exemption does not apply to the following products and services:

(1) purchases made by a clinic, physician's office, or any other medical

facility not operating as a hospital
   [D>or <D]

[A>, <A] outpatient surgicalcenter,
   [A>or critical access dental provider, <A] even though the clinic, office, or facility may be owned and operated by a hospital
   [D>or <D]

[A>,
<A] outpatient surgical center
   [A>, or critical access dental provider <A];

(2) sales under section 297A.61, subdivision 3 , paragraph (g), clause (2), and prepared food, candy, and soft drinks;

(3) building and construction materials used in constructing buildings or

facilities that will not be used principally by the hospital
   [D>or <D]

```
[A>,<A] outpatient surgical center
    [A>, or critical access dental provider <A];
```

(4) building, construction, or reconstruction materials purchased by a contractor or a subcontractor as a part of a lump-sum contract or similar type of contract with a guaranteed maximum price covering both labor and materials

```
for use in the construction, alteration, or repair of a hospital
    [D>or<D]
```

```
[A>, <A] outpatient surgical center
    [A>, or critical access dental
```

provider <A]; or

(5) the leasing of a motor vehicle as defined in section 297B.01, subdivision 11 .

[D>(d) <D]

[A>(e) <A] A limited liability company also qualifies for exemption under this subdivision if (1) it consists of a sole member that would qualify for the exemption, and

(2) the items purchased qualify for the exemption.

[D>(e) <D]

[A>(f) <A] An entity that contains both a hospital and a nonprofit unit may claim this exemption on purchases made for both the hospital and nonprofit unit provided that:

(1) the nonprofit unit would have qualified for exemption under subdivision 4; and

(2) the items purchased would have qualified for the exemption.

[A>EFFECTIVE DATE. This section is effective retroactively for sales and purchases made after June 30, 2007. Purchasers may apply for a refund of tax paid for qualifying purchases under this subdivision made after June 30, 2007, and before July 1, 2013, in the manner provided in Minnesota Statutes, section 297A.75. Notwithstanding limitations on claims for refunds under Minnesota Statutes, section 297A.40 , claims may be filed with the commissioner until June 30, 2014. <A]

Sec. 33. AMEND Minnesota Statutes 2012, section 297A.70 , is amended by adding a subdivision to read:[A>Subd. 9a. Established religious orders. <A]

[A>(a) Sales of lodging, prepared food, candy, soft drinks, and alcoholic beverages at noncatered events between an established religious order and an affiliated institution of higher education are exempt. <A]

[A>(b) For purposes of this subdivision, "established religious order" means an organization directly or indirectly under the control or supervision of a church or convention or association of churches, where members of the organization: <A]

[A>(1) normally live together as part of a community; <A]

[A>(2) make long-term commitments to live under a strict set of moral and spiritual rules; and <A]

[A>(3) work or engage full time in a combination of prayer, religious study, church reform or renewal, or other religious, educational, or charitable goals of the organization. <A]

[A>(c) For purposes of this subdivision, an institution of higher education is "affiliated" with an established religious order if members of the religious order are represented on the governing board of the institution of higher education and the two organization share campus space and common facilities. <A]

[A>EFFECTIVE DATE. This section is effective retroactively for sales and purchases made after June 30, 2012. <A]

Sec. 34. AMEND Minnesota Statutes 2012, section 297A.70, subdivision 13 , is amended to read: Subd. 13. Fund-raising sales by or for nonprofit groups. (a) The following sales by the specified organizations for fund-raising purposes are exempt, subject to the limitations listed in paragraph (b):

(1) all sales made by a nonprofit organization that exists solely for the purpose of providing educational or social activities for young people primarily age 18 and under;

(2) all sales made by an organization that is a senior citizen group or association of groups if (i) in general it limits membership to persons age 55 or older; (ii) it is organized and operated exclusively for pleasure, recreation, and other nonprofit purposes; and (iii) no part of its net earnings inures to the benefit of any private shareholders;

(3) the sale or use of tickets or admissions to a golf tournament held in Minnesota if the beneficiary of the tournament's net proceeds qualifies as a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code; and

(4) sales of candy sold for fund-raising purposes by a nonprofit organization that provides educational and social activities primarily for young people age 18 and under.

(b) The exemptions listed in paragraph (a) are limited in the following manner:

(1) the exemption under paragraph (a), clauses (1) and (2), applies only if the gross annual receipts of the organization from fund-raising do not exceed $10,000; and

(2) the exemption under paragraph (a), clause (1), does not apply if the sales are derived from admission charges or from activities for which the money must be deposited with the school district treasurer under section 123B.49, subdivision 2 , or be recorded in the same manner as other revenues or expenditures of

the school district under section 123B.49, subdivision 4 .

```
(c) Sales of tangible personal property
    [A>and services <A] are exempt if
the entire proceeds, less the necessary expenses for obtaining the property
```

[A>or services <A], will be contributed to a registered combined charitable organization described in section 43A.50, to be used exclusively for charitable, religious, or educational purposes, and the registered combined charitable organization has given its written permission for the sale. Sales that occur over a period of more than 24 days per year are not exempt under this paragraph.

(d) For purposes of this subdivision, a club, association, or other organization of elementary or secondary school students organized for the purpose of carrying on sports, educational, or other extracurricular activities is a separate organization from the school district or school for purposes of applying the $10,000 limit.

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 35. AMEND Minnesota Statutes 2012, section 297A.70, subdivision 14 , is amended to read: Subd. 14. Fund-raising events sponsored by nonprofit groups.

```
(a) Sales of tangible personal property
    [A>or services <A] at, and admission
```

charges for fund-raising events sponsored by, a nonprofit organization are exempt if:

(1) all gross receipts are recorded as such, in accordance with generally accepted accounting practices, on the books of the nonprofit organization; and

(2) the entire proceeds, less the necessary expenses for the event, will be used solely and exclusively for charitable, religious, or educational purposes.

Exempt sales include the sale of prepared food, candy, and soft drinks at the fund-raising event.

(b) This exemption is limited in the following manner:

(1) it does not apply to admission charges for events involving bingo or other gambling activities or to charges for use of amusement devices involving bingo or other gambling activities;

(2) all gross receipts are taxable if the profits are not used solely and exclusively for charitable, religious, or educational purposes;

(3) it does not apply unless the organization keeps a separate accounting record, including receipts and disbursements from each fund-raising event that documents all deductions from gross receipts with

receipts and other records;

(4) it does not apply to any sale made by or in the name of a nonprofit corporation as the active or passive agent of a person that is not a nonprofit corporation;

(5) all gross receipts are taxable if fund-raising events exceed 24 days per year;

(6) it does not apply to fund-raising events conducted on premises leased for more than five days but less than 30 days; and

(7) it does not apply if the risk of the event is not borne by the nonprofit organization and the benefit to the nonprofit organization is less than the total amount of the state and local tax revenues forgone by this exemption.

(c) For purposes of this subdivision, a "nonprofit organization" means any unit of government, corporation, society, association, foundation, or institution organized and operated for charitable, religious, educational, civic, fraternal, and senior citizens' or veterans' purposes, no part of the net earnings of which inures to the benefit of a private individual.

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 36. AMEND Minnesota Statutes 2012, section 297A.70 , is amended by adding a subdivision to read:[A>Subd. 18. Nursing homes and boarding care homes. <A]

[A>(a) All sales, except those listed in paragraph (b), to a nursing home licensed under section 144A.02 or a boarding care home certified as a nursing facility under title 19 of the Social Security Act are exempt if the facility: <A]

[A>(1) is exempt from federal income taxation pursuant to section 501(c)(3) of the Internal Revenue Code; and <A]

[A>(2) is certified to participate in the medical assistance program under title 19 of the Social Security Act, or certifies to the commissioner that it does not discharge residents due to the inability to pay. <A]

[A>(b) This exemption does not apply to the following sales: <A]

[A>(1) building, construction, or reconstruction materials purchased by a contractor or a subcontractor as a part of a lump-sum contract or similar type of contract with a guaranteed maximum price covering both labor and materials for use in the construction, alteration, or repair of a building or facility; <A]

[A>(2) construction materials purchased by tax-exempt entities or their contractors to be used in constructing buildings or facilities that will not be used principally by the tax-exempt entities; <A]

[A>(3) lodging as defined under section 297A.61, subdivision 3 , paragraph (g), clause <A]

[A>(2), and prepared food, candy, soft drinks, and alcoholic beverages as defined in section 297A.67,

subdivision 2 ; and <A]

[A>(4) leasing of a motor vehicle as defined in section 297B.01, subdivision 11 , except as provided in paragraph (c). <A]

[A>(c) This exemption applies to the leasing of a motor vehicle as defined insection 297B.01, subdivision 11 , only if the vehicle is: <A]

[A>(1) a truck, as defined in section 168.002 ; a bus, as defined in section168.002 ; or a passenger automobile, as defined in section 168.002 , if the automobile is designed and used for carrying more than nine persons including the driver; and <A]

[A>(2) intended to be used primarily to transport tangible personal property or residents of the nursing home or boarding care home. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013. <A]

Sec. 37. AMEND Minnesota Statutes 2012, section 297A.71 , is amended by adding a subdivision to read:[A>Subd. 45. Biopharmaceutical manufacturing facility. <A]

[A>(a) Materials and supplies used or consumed in, capital equipment incorporated into, and privately owned infrastructure in support of the construction, improvement, or expansion of a biopharmaceutical manufacturing facility in the state are exempt if the following criteria are met: <A]

[A>(1) the facility is used for the manufacturing of biologics; <A]

[A>(2) the total capital investment made at the facility exceeds $50,000,000; and <A]

[A>(3) the facility creates and maintains at least 190 full-time equivalent positions at the facility. These positions must be new jobs in Minnesota and not the result of relocating jobs that currently exist in Minnesota. <A]

[A>(b) The tax must be imposed and collected as if the rate under section297A.62 applied, and refunded in the manner provided in section 297A.75 . <A]

[A>(c) To be eligible for a refund, the owner of the biopharmaceutical manufacturing facility must: <A]

[A>(1) initially apply to the Department of Employment and Economic Development for certification no later than one year from the final completion date of construction, improvement, or expansion of the facility; and <A]

[A>(2) for each year that the owner of the biopharmaceutical manufacturing facility applies for a refund, the owner must have received written certification from the Department of Employment and Economic Development that the facility has met the criteria of paragraph (a). <A]

[A>(d) The refund is to be paid annually at a rate of 25 percent of the total allowable refund payable to

date, with the commissioner making annual payments of the remaining refund until all of the refund has been paid. <A]

[A>(e) For purposes of this subdivision, "biopharmaceutical" and "biologics" are interchangeable and mean medical drugs or medicinal preparations produced using technology that uses biological systems, living organisms or derivatives of living organisms, to make or modify products or processes for specific use. The medical drugs or medicinal preparations include but are not limited to proteins, antibodies, nucleic acids, and vaccines. <A]

[A>EFFECTIVE DATE. This section is effective retroactively to capital investments made and jobs created after December 31, 2012, and effective retroactively for sales and purchases made after December 31, 2012, and before July 1, 2019. <A]

Sec. 38. AMEND Minnesota Statutes 2012, section 297A.71 , is amended by adding a subdivision to read:[A>Subd. 46. Research and development facility. Materials and supplies used or consumed in, and equipment incorporated into, the construction or improvement of a research and development facility that has laboratory space of at least 400,000 square feet and utilizes both high-intensity and low-intensity laboratories, provided that the project has a total construction cost of at least $140,000,000 within a 24-month period. The tax on purchases imposed under this subdivision must be imposed and collected as if the rate under section 297A.62 applied and then refunded in the manner provided in section 297A.75 . <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013, and before September 1, 2015. <A]

Sec. 39. AMEND Minnesota Statutes 2012, section 297A.71 , is amended by adding a subdivision to read:[A>Subd. 47. Industrial measurement manufacturing and controls facility. <A]

[A>(a) Materials and supplies used or consumed in, capital equipment incorporated into, fixtures installed in, and privately owned infrastructure in support of the construction, improvement, or expansion of an industrial measurement manufacturing and controls facility are exempt if: <A]

[A>(1) the total capital investment made at the facility is at least $60,000,000; <A]

[A>(2) the facility employs at least 250 full-time equivalent employees that are not employees currently employed by the company in the state; and <A]

[A>(3) the Department of Employment and Economic Development determines that the expansion, remodeling, or improvement of the facility has a significant impact on the state economy. <A]

[A>(b) The tax must be imposed and collected as if the rate under section297A.62 applied and refunded in the manner provided in section 297A.75 , only after the following criteria are met: <A]

[A>(1) a refund may not be issued until the owner of the facility has received certification from the

Department of Employment and Economic Development that the company meets the requirements in paragraph (a); and <A]

[A>(2) to receive the refund, the owner of the industrial measurement manufacturing and controls facility must initially apply to the Department of Employment and Economic Development for certification no later than one year from the final completion date of construction, improvement, or expansion of the industrial measurement manufacturing and controls facility. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2013, and before December 31, 2015. <A]

Sec. 40. AMEND Minnesota Statutes 2012, section 297A.75, subdivision 1 , is amended to read: Subdivision 1. Tax collected. The tax on the gross receipts from the sale of the following exempt items must be imposed and collected as if the sale were taxable and the rate under section 297A.62, subdivision 1 , applied. The exempt items include:

[D>(1) capital equipment exempt under section 297A.68, subdivision 5 ; <D]

[D>(2) <D]

[A>(1) <A] building materials for an agricultural processing facility exempt under section 297A.71, subdivision 13 ;

[D>(3) <D]

[A>(2) <A] building materials for mineral production facilities exempt undersection 297A.71, subdivision 14 ;

[D>(4) <D]

[A>(3) <A] building materials for correctional facilities under section 297A.71, subdivision 3 ;

[D>(5) <D]

[A>(4) <A] building materials used in a residence for disabled veterans exempt under section 297A.71, subdivision 11 ;

[D>(6) <D]

[A>(5) <A] elevators and building materials exempt under section 297A.71, subdivision 12 ;

[D>(7) <D]

[A>(6) <A] building materials for the Long Lake Conservation Center exempt under section 297A.71, subdivision 17 ;

[D>(8) <D]

[A>(7) <A] materials and supplies for qualified low-income housing undersection 297A.71, subdivision 23 ;

[D>(9) <D]

[A>(8) <A] materials, supplies, and equipment for municipal electric utility facilities under section 297A.71, subdivision 35 ;

[D>(10) <D]

[A>(9) <A] equipment and materials used for the generation, transmission, and distribution of electrical energy and an aerial camera package exempt under section 297A.68 , subdivision 37;

[D>(11) <D]

[A>(10) <A] commuter rail vehicle and repair parts under section 297A.70, subdivision 3 , paragraph (a), clause (10);

[D>(12) <D]

[A>(11) <A] materials, supplies, and equipment for construction or improvement of projects and facilities under section 297A.71, subdivision 40 ;

[D>(13) <D]

[A>(12) <A] materials, supplies, and equipment for construction or improvement of a meat processing facility exempt under section 297A.71, subdivision 41 ;

[D>(14) <D]

[A>(13) <A] materials, supplies, and equipment for construction, improvement,

or expansion of
    [A>: <A]

[A>(i) <A] an aerospace defense manufacturing facility exempt under section 297A.71, subdivision 42 ;

[A>(ii) a biopharmaceutical manufacturing facility exempt under section 297A.71, subdivision 45 ; <A]

[A>(iii) a research and development facility exempt under section 297A.71, subdivision 4 b; and <A]

[A>(iv) an industrial measurement manufacturing and controls facility exempt under section 297A.71, subdivision 47 ; <A]

[D>(15) <D]

[A>(14) <A] enterprise information technology equipment and computer software for use in a qualified data center exempt under section 297A.68 , subdivision

42;
    [D>and <D]

[D>(16) <D]

[A>(15) <A] materials, supplies, and equipment for qualifying capital projects

under section 297A.71, subdivision 44
    [A>; <A]

[A>(16) items purchased for use in providing critical access dental services exempt under section 297A.70, subdivision 7 , paragraph (c); and <A]

[A>(17) items and services purchased under a business subsidy agreement for use or consumption primarily in greater Minnesota exempt under section 297A.68, subdivision 49 <A].

[A>EFFECTIVE DATE. The change to clause (1) is effective for sales and purchases made after August 31, 2014. The changes in clauses (13), (16), and (17), are effective the day following final enactment. <A]

Sec. 41. AMEND Minnesota Statutes 2012, section 297A.75, subdivision 2 , is amended to read: Subd. 2. Refund; eligible persons. Upon application on forms prescribed by the commissioner, a refund equal to the tax paid on the gross receipts of the exempt items must be paid to the applicant. Only the following persons may apply for the refund:

(1) for subdivision 1, clauses (1)
    [D>to (3) <D]

[A>, (2), and (16) <A], the

applicant must be the purchaser;

(2) for subdivision 1, clauses

[D>(4) <D]

[A>(3) <A] and

[D>(7) <D]

[A>(6) <A], the applicant must be the governmental subdivision;

(3) for subdivision 1, clause

[D>(5) <D]

[A>(4) <A], the applicant must be the recipient of the benefits provided in United States Code, title 38, chapter 21;

(4) for subdivision 1, clause

[D>(6) <D]

[A>(5) <A], the applicant must be the owner of the homestead property;

(5) for subdivision 1, clause

[D>(8) <D]

[A>(7) <A], the owner of the qualified low-income housing project;

(6) for subdivision 1, clause

[D>(9) <D]

[A>(8) <A], the applicant must be a municipal electric utility or a joint venture of municipal electric utilities;

(7) for subdivision 1, clauses

[D>(10), <D]

```
[A>(9), (12), <A] (13), (14)
     [D>, and (15) <D]
```

[A>and (17) <A], the owner of

the qualifying business; and

(8) for subdivision 1, clauses

[A>(10), <A] (11),

[D>(12), <D] and

[D>(16) <D]

[A>(15) <A], the applicant must be the governmental entity that owns or contracts for the project or facility.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 42. AMEND Minnesota Statutes 2012, section 297A.75, subdivision 3 , is amended to read: Subd. 3. Application. (a) The application must include sufficient information to permit the commissioner to verify the tax paid. If the tax was paid by a contractor, subcontractor, or builder, under

```
subdivision 1,
    [D>clause (4), (5), (6), (7), (8), (9), (10), (11), <D]
```

[D>(12), (13), (14), <D] [A>clauses (3) to <A] (15), or

[D>(16) <D]

[A>(17) <A], the contractor, subcontractor, or builder must furnish to the refund applicant a statement including the cost of the exempt items and the taxes paid on the items unless otherwise specifically provided by this subdivision. The provisions of sections 289A.40 and 289A.50 apply to refunds under this section.

(b) An applicant may not file more than two applications per calendar year for refunds for taxes paid on capital equipment exempt under section 297A.68, subdivision 5 .

(c) Total refunds for purchases of items in section 297A.71, subdivision 40 , must not exceed $5,000,000 in fiscal years 2010 and 2011. Applications for refunds for purchases of items in sections 297A.70, subdivision 3 , paragraph (a), clause (11), and 297A.71 , subdivision 40, must not be filed until after June 30, 2009.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 43. AMEND Minnesota Statutes 2012, section 297A.99, subdivision 1 , is amended to read: Subdivision 1. Authorization; scope. (a) A political subdivision of this state may impose a general sales tax (1) under section 297A.992 , (2) under section 297A.993 , (3) if permitted by special law, or (4) if the political subdivision enacted and imposed the tax before January 1, 1982, and its predecessor provision.

(b) This section governs the imposition of a general sales tax by the political subdivision. The provisions of this section preempt the provisions of any special law:

(1) enacted before June 2, 1997, or

(2) enacted on or after June 2, 1997, that does not explicitly exempt the special law provision from this section's rules by reference.

(c) This section does not apply to or preempt a sales tax on motor vehicles or a special excise tax on motor vehicles.

(d) A political subdivision may not advertise or expend funds for the promotion of a referendum to support imposing a local option sales tax.

[A>(e) Notwithstanding paragraph (d), <A] a political subdivision may
    [D>only <D]
 expend funds to
    [A>: <A]

[A>(1) <A]
 conduct the referendum
    [D>.

<D] [A>; <A]

[A>(2) disseminate information included in the resolution adopted under subdivision 2; <A]

[A>(3) provide notice of, and conduct public forums at which proponents and opponents on the merits of the referendum are given equal time to express their opinions on the merits of the referendum; <A]

[A>(4) provide facts and data on the impact of the proposed sales tax on consumer purchases; and <A]

[A>(5) provide facts and data related to the programs and projects to be funded with the sales tax. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 44. Laws 1993, chapter 375, article 9, section 46, subdivision 2, as amended by Laws 1997, chapter 231, article 7, section 40, Laws 1998, chapter 389, article 8, section 30, Laws 2003, First Special Session chapter 21, article 8, section 13, Laws 2005, First Special Session chapter 3, article 5, section 26, and Laws 2009, chapter 88, article 4, section 15, is amended to read: Subd. 2. Use of revenues. Revenues received from the tax authorized by subdivision 1 may only be used by

the city to pay the cost of collecting the tax, and
    [A>, except as provided

in paragraph (e), <A] to pay for the following projects or to secure or pay any principal, premium, or interest on bonds issued in accordance with subdivision 3 for the following projects.

(a) To pay all or a portion of the capital expenses of construction, equipment and acquisition costs for the expansion and remodeling of the St. Paul Civic Center complex, including the demolition of the existing arena and the construction and equipping of a new arena.

(b) Except as provided in paragraphs (e) and (f), the remainder of the funds must be spent for:

(1) capital projects to further residential, cultural, commercial, and economic development in both downtown St. Paul and St. Paul neighborhoods; and

(2) capital and operating expenses of cultural organizations in the city, provided that the amount spent under this clause must equal ten percent of the total amount spent under this paragraph in any year.

(c) The amount apportioned under paragraph (b) shall be no less than 60 percent of the revenues derived from the tax each year, except to the extent that a portion of that amount is required to pay debt service on (1) bonds issued for the purposes of paragraph (a) prior to March 1, 1998; or (2) bonds issued for the purposes of paragraph (a) after March 1, 1998, but only if the city council determines that 40 percent of the revenues derived from the tax together with other revenues pledged to the payment of the bonds, including the proceeds of definitive bonds, is expected to exceed the annual debt service on the bonds.

(d) If in any year more than 40 percent of the revenue derived from the tax authorized by subdivision 1 is used to pay debt service on the bonds issued for the purposes of paragraph (a) and to fund a reserve for the bonds, the amount of the debt service payment that exceeds 40 percent of the revenue must be determined for that year. In any year when 40 percent of the revenue produced by the sales tax exceeds the amount required to pay debt service on the bonds and to fund a reserve for the bonds under paragraph (a), the amount of the excess must be made available for capital projects to further residential, cultural, commercial, and economic development in the neighborhoods and downtown until the cumulative amounts determined for all years under the preceding sentence have been made available under this sentence. The amount made available as reimbursement in the preceding sentence is not included in the 60 percent determined under paragraph (c).

(e)
    [D>In each of calendar years 2006 to 2014, revenue not to exceed

$3,500,000 may be used to pay the principal of bonds issued for capital projects of the city. After December 31, 2014, revenue from the tax imposed under subdivision 1 may not be used for this purpose. <D] [A>If the amount necessary to meet obligations under paragraphs (a) and (d) are less than 40 percent of the revenue from the tax in any year, the city may place the difference between 40 percent of the revenue and the amounts allocated under paragraphs (a) and (d) in an economic development fund to be used for any economic development purposes. <A]

(f) By January 15 of each year, the mayor and the city council must report to the legislature on the use of sales tax revenues during the preceding one-year period.

[A>EFFECTIVE DATE. This section is effective the day after compliance by the governing body of the city of St. Paul with Minnesota Statutes, section 645.021 , subdivisions 2 and 3. <A]

Sec. 45. Laws 1993, chapter 375, article 9, section 46, subdivision 5, as amended by Laws 1998, chapter 389, article 8, section 32, is amended to read: Subd. 5. Expiration of taxing authority. The authority granted by subdivision 1 to the city to impose a sales tax shall

expire on December 31,
    [D>2030 <D]

[A>2042 <A], or at an earlier time as the

city shall, by ordinance, determine. Any funds remaining after completion of projects approved under subdivision 2, paragraph (a) and retirement or redemption of any bonds or other obligations may be placed in the general fund of the city.

[A>EFFECTIVE DATE. This section is effective the day after compliance by the governing body of the city of St. Paul with Minnesota Statutes, section 645.021 , subdivisions 2 and 3. <A]

Sec. 46. Laws 2002, chapter 377, article 3, section 25, as amended by Laws 2009, chapter 88, article 4, section 19, and Laws 2010, chapter 389, article 5, section 3, is amended to read: Sec. 25. ROCHESTER LODGING TAX.

Subdivision 1. Authorization. Notwithstanding Minnesota Statutes, section 469.190 or 477A.016 , or any other law, the city of Rochester may impose an additional tax of one percent on the gross receipts from the furnishing for consideration of lodging at a hotel, motel, rooming house, tourist court, or resort, other than the renting or leasing of it for a continuous period of 30 days or more.

Subd. 1a. Authorization. Notwithstanding Minnesota Statutes, section 469.190 or 477A.016 , or any other law, and in addition to the tax authorized by subdivision 1, the

city of Rochester may impose an additional tax of
    [D>one <D]

[A>three <A]

percent on the gross receipts from the furnishing for consideration of lodging at a hotel, motel, rooming house, tourist court, or resort, other than the renting or leasing of it for a continuous period of 30 days or more only upon the approval of the city governing body of a total financial package for the project.

Subd. 2. Disposition of proceeds. (a) The gross proceeds from the tax imposed under subdivision 1 must be used by the city to fund a local convention or tourism bureau for the purpose of marketing and promoting the city as a tourist or convention center.

(b) The gross proceeds from the
    [D>one <D]

[A>three <A] percent tax imposed
under subdivision 1a shall be used to pay for (1)
    [A>design, <A]

construction, renovation, improvement, and expansion of the Mayo Civic Center

[A>Complex <A] and related
    [A>infrastructure, including but not limited to,

<A] skyway access, lighting, parking, or landscaping; and (2) for payment of any principal, interest, or premium on bonds issued to finance the construction, renovation, improvement, and expansion of the Mayo Civic Center Complex.

Subd. 2a. Bonds. The city of Rochester may issue, without an election, general obligation bonds of the city, in one or more series, in the aggregate principal amount not

to exceed
    [D>$43,500,000 <D]

[A>$50,000,000 <A], to pay for capital and

administrative costs for the design, construction, renovation, improvement, and

expansion of the Mayo Civic Center Complex, and related
    [A>infrastructure,

including but not limited to, <A] skyway, access, lighting, parking, and landscaping.

The city may pledge the lodging tax authorized by subdivision 1a
    [D>and the

food and beverage tax authorized under Laws 2009, chapter 88, article 4, section 23, <D] to the payment of the bonds. The debt represented by the bonds is not included in computing any debt limitations applicable to the city, and the levy of taxes required by Minnesota Statutes, section 475.61 , to pay the principal of and interest on the bonds is not subject to any levy limitation or included in computing or applying any levy limitation applicable to the city.

Subd. 3. Expiration of taxing authority. [D>The authority of the city to impose a tax under subdivision 1a shall expire when the principal and interest on any bonds or other obligations issued prior to December 31, 2014, to finance the construction, renovation, improvement, and expansion of the Mayo Civic Center Complex and related skyway access, lighting, parking, or landscaping have been paid, including any bonds issued to refund such bonds, or at an earlier time as the city shall, by ordinance, determine. Any funds remaining after completion of the project and retirement or redemption of the bonds shall be placed in the general fund of the city. <D] [A>The city may, by ordinance, repeal the tax provided that: <A]

[A>(1) the revenues raised before the repeal are sufficient to meet all bond or other obligations backed by revenues of the tax; and <A]

[A>(2) the repeal date meets the requirements of section 297A.99, subdivision 12 . <A]

[A>EFFECTIVE DATE. This section is effective the day after the governing body of the city of Rochester and its chief fiscal officer comply with Minnesota Statutes, section 645.021 , subdivisions 2 and 3. <A]

Sec. 47. Laws 2005, First Special Session chapter 3, article 5, section 37, subdivision 2, is amended to read: Subd. 2. Use of revenues. (a) Revenues received from the tax authorized by subdivision 1 by the city of St. Cloud must be used for the cost of collecting and administering the tax and to pay all or part of the capital or administrative costs of the development, acquisition, construction, improvement, and securing and paying debt service on bonds or other obligations issued to finance the following regional projects as approved by the voters and specifically detailed in the referendum authorizing

```
the tax
     [A>or extending the tax <A]:
```

(1) St. Cloud Regional Airport;

(2) regional transportation improvements;

```
(3)
     [A>regional <A] community and aquatics centers;
```

(4) regional public libraries; and

(5) acquisition and improvement of regional park land and open space.

(b) Revenues received from the tax authorized by subdivision 1 by the cities of St. Joseph, Waite Park, Sartell, Sauk Rapids, and St. Augusta must be used for the cost of collecting and administering the tax and to pay all or part of the capital or administrative costs of the development, acquisition, construction, improvement, and securing and paying debt service on bonds or other obligations issued to fund the projects specifically approved by the voters at the

```
referendum authorizing the tax
     [A>or extending the tax <A].
```

The portion of revenues from the city going to fund the regional airport or regional library located in the city of St. Cloud will be as required under the applicable joint powers agreement.

(c) The use of revenues received from the taxes authorized in subdivision 1 for projects allowed under paragraphs (a) and (b) are limited to the amount authorized for each project under the enabling referendum.

[A>EFFECTIVE DATE. This section is effective for the city that approves them the day after compliance

by the governing body of each city with Minnesota Statutes, section 645.021, subdivision 3 . <A]

Sec. 48. Laws 2005, First Special Session chapter 3, article 5, section 37, subdivision 4, is amended to read: Subd. 4. Termination of tax. The tax imposed in the cities of St. Joseph, St. Cloud, St. Augusta, Sartell, Sauk Rapids, and Waite Park under subdivision 1 expires when the city council determines that sufficient funds have been collected from the tax to retire or redeem the bonds and obligations authorized under subdivision 2, paragraph

(a), but no later than December 31, 2018. [A>Notwithstanding Minnesota Statutes, section 297A.99, subdivision 3 , paragraphs (a), (c), and (d), a city may extend the tax imposed under subdivision 1 through December 31, 2038, if approved by voters of the city no later than November 7, 2017, at either a general election or at a special election held on a first Tuesday after a first Monday in November. <A]

[A>EFFECTIVE DATE. This section is effective for the city that approves them the day after compliance by the governing body of each city with Minnesota Statutes, section 645.021, subdivision 3 . <A]

Sec. 49. Laws 2008, chapter 366, article 7, section 19, subdivision 3, as amended by Laws 2011, First Special Session chapter 7, article 4, section 8, is amended to read: Subd. 3. Use of revenues. Notwithstanding Minnesota Statutes, section 297A.99, subdivision 3 , paragraph (b), the proceeds of the tax imposed under this section shall be used to pay

```
for the costs of
     [A>improvements to the Sportsman Park/Ballfields, Riverside
```

Park, Lions Park/Pavilion, Cedar South Park also known as Eldorado Park, and Spring Street Park; improvements to and extension of the River County Bike

```
Trail; <A] acquisition
     [D>, <D]
```

```
[A>and <A] construction
     [D>, improvement,
```

and development of regional parks, bicycle trails, park land, open space, and

```
<D]
```

```
[A>of a <A] pedestrian
     [D>walkways, as described in the city improvement
```

plan adopted by the city council by resolution on December 12, 2006, and <D] [A>walkway over Interstate 94 and State Highway 24; and the acquisition of

```
<A] land and
   [A>construction of <A] buildings for a community and recreation
```

center. The total amount of revenues from the taxes in subdivisions 1 and 2 that may be used to fund these projects is $12,000,000 plus any associated bond costs.

[A>EFFECTIVE DATE. This section is effective the day after compliance by the governing body of the city of Clearwater with Minnesota Statutes, section 645.021 , subdivisions 2 and 3. <A]

Sec. 50. Laws 2010, chapter 389, article 5, section 6, subdivision 6, is amended to read: Subd. 6. Use of food and beverages tax. The revenues derived from the tax imposed under subdivision 5 must be used by the city of Marshall to pay the costs of collecting and administering the food and beverages tax, to pay all or part of the operating costs of the new and existing facilities of the Minnesota Emergency Response and Industry Training Center, including the payment of debt service on bonds issued under subdivision 2, and to pay all or part of the operating costs of the facilities of the Southwest Minnesota Regional Amateur Sports Center, including the payment of debt service on bonds issued under subdivision 2. [A>Authorized expenses for each organization include, but are not limited to, acquiring property; predesign; design; and paying construction, furnishing, and equipment costs related to these facilities and paying debt service on bonds or other obligations issued by the city. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 51. [A> CITY OF MARSHALL; VALIDATION OF PRIOR ACT. <A]

[A>(a) Notwithstanding the time limits in Minnesota Statutes, section 645.021 , the city of Marshall may approve Laws 2010, chapter 389, article 5, section 6, as amended by Laws 201l, First Special Session chapter 7, article 4, section 9, and file its approval with the secretary of state by June 15, 2013. If approved as authorized under this paragraph, actions undertaken by the city pursuant to the approval of the voters on November 6, 2012, and otherwise in accordance with Laws 2010, chapter 389, article 5, section 6, as amended by Laws 201l, First Special Session chapter 7, article 4, section 9, are validated. <A]

[A>(b) Notwithstanding the time limit on the imposition of tax under Laws 2010, chapter 389, article 5, section 6, subdivision 1, as amended by Laws 201l, First Special Session chapter 7, article 4, section 9, and subject to local approval under paragraph (a), the city of Marshall may impose the tax on or before July 1, 2013. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 52. [A> CITY OF PROCTOR; VALIDATION OF PRIOR ACT. Notwithstanding the time limits in Minnesota Statutes, section 645.021 , the city of Proctor may approve, by resolution, Laws 2008, chapter 366, article 7, section 13, and Laws 2010, chapter 389, article 5, sections 1 and 2, and file its approval with the secretary of state by January 1, 2014. If approved under this paragraph, actions undertaken by the city pursuant to the approval of the voters on November 2, 2010, and otherwise in accordance with those laws are validated. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 53. [A> REPEALER. <A]

[A>(a) AMEND Minnesota Statutes 2012, sections 297A.61, subdivision 27 ; andAMEND 297A.68 , subdivision 35 , are repealed.<A] [A>(b) Laws 2009, chapter 88, article 4, section 23, as amended by Laws 2010, chapter 389, article 5, section 4, is repealed. <A]

[A>EFFECTIVE DATE. Paragraph (a) is effective for sales and purchases made after June 30, 2013. Paragraph (b) is effective the day following final enactment. <A] ARTICLE 9 ECONOMIC DEVELOPMENT

Section 1. AMEND Minnesota Statutes 2012, section 469.071, subdivision 5 , is amended to read: Subd. 5. Exception; parking facilities. Notwithstanding section 469.068 , the Bloomington port authority need not

```
require competitive bidding with respect to a structured parking facility
```

[A>or other public improvements <A] constructed in conjunction with, and directly above or below, or adjacent and integrally related to, a development

```
and financed with the proceeds of tax increment
    [D>or <D]
```

[A>, <A] revenuebonds
```
    [A>, or other funds of the port authority and the city of Bloomington
```

<A].

[A>EFFECTIVE DATE. This section is effective upon compliance of the governing body of the city of Bloomington with the requirements of Minnesota Statutes, section 645.021, subdivision 3 . <A]

Sec. 2. AMEND Minnesota Statutes 2012, section 469.169 , is amended by adding a subdivision to read: [A>Subd. 19. Additional border city allocation; 2013. <A]

[A>(a) In addition to the tax reductions authorized in subdivisions 12 to 18, the commissioner shall allocate $750,000 for tax reductions to border city enterprise zones in cities located on the western border

of the state. The commissioner shall allocate this amount among cities on a per capita basis.

Allocations made under this subdivision may be used for tax reductions under section 469.171 , or for other offsets of taxes imposed on or remitted by businesses located in the enterprise zone, but only if the municipality determines that the granting of the tax reduction or offset is necessary to retain a business within or attract a business to the zone. The city alternatively may elect to use any portion of the allocation under this paragraph for tax reductions under section 469.1732 or 469.1734 . <A]

[A>(b) The commissioner shall allocate $750,000 for tax reductions under section 469.1732 or 469.1734 to cities with border city enterprise zones located on the western border of the state. The commissioner shall allocate this amount among the cities on a per capita basis. The city alternatively may elect to use any portion of the allocation provided in this paragraph for tax reductions under section 469.171 . <A]

[A>EFFECTIVE DATE. This section is effective July 1, 2013. <A]

Sec. 3. AMEND Minnesota Statutes 2012, section 469.176, subdivision 4 c , is amended to read: Subd. 4c. Economic development districts. (a) Revenue derived from tax increment from an economic development district may not be used to provide improvements, loans, subsidies, grants, interest rate subsidies, or assistance in any form to developments consisting of buildings and ancillary facilities, if more than 15 percent of the buildings and facilities (determined on the basis of square footage) are used for a purpose other than:

(1) the manufacturing or production of tangible personal property, including processing resulting in the change in condition of the property;

(2) warehousing, storage, and distribution of tangible personal property, excluding retail sales;

(3) research and development related to the activities listed in clause (1) or (2);

(4) telemarketing if that activity is the exclusive use of the property;

```
(5) tourism facilities;
    [A>or <A]
(6)
    [D>qualified border retail facilities; or <D]
```

[D>(7) <D] space necessary for and related to the activities listed in clauses (1) to

[D>(6) <D]

[A>(5) <A].

(b) Notwithstanding the provisions of this subdivision, revenues derived from tax increment from an economic development district may be used to provide improvements, loans, subsidies, grants, interest rate subsidies, or assistance in any form for up to 15,000 square feet of any separately owned

commercial facility located within the municipal jurisdiction of a small city, if the revenues derived from increments are spent only to assist the facility directly or for administrative expenses, the assistance is necessary to develop the facility, and all of the increments, except those for administrative expenses, are spent only for activities within the district.

(c) A city is a small city for purposes of this subdivision if the city was a small city in the year in which the request for certification was made and applies for the rest of the duration of the district, regardless of whether the city qualifies or ceases to qualify as a small city.

[D>(d) Notwithstanding the requirements of paragraph (a) and the finding requirements of section 469.174, subdivision 12 , tax increments from an economic development district may be used to provide improvements, loans, subsidies, grants, interest rate subsidies, or assistance in any form to developments consisting of buildings and ancillary facilities, if all the following conditions are met: <D]

[D>(1) the municipality finds that the project will create or retain jobs in this state, including construction jobs, and that construction of the project would not have commenced before July 1, 2012, without the authority providing assistance under the provisions of this paragraph; <D]

[D>(2) construction of the project begins no later than July 1, 2012; <D]

[D>(3) the request for certification of the district is made no later than June 30, 2012; and <D]

[D>(4) for development of housing under this paragraph, the construction must begin before January 1, 2012. The provisions of this paragraph may not be used to assist housing that is developed to qualify under section 469.1761, subdivision 2 or 3, or similar requirements of other law, if construction of the project begins later than July 1, 2011. <D]

[A>EFFECTIVE DATE. This section is effective for districts for which the request for certification was made after June 30, 2012. <A]

Sec. 4. AMEND Minnesota Statutes 2012, section 469.176, subdivision 4 g , is amended to read: Subd. 4g. General government use prohibited. (a) Tax increments may not be used to circumvent existing levy limit law.

(b) No tax increment from any district may be used for the acquisition, construction, renovation, operation, or maintenance of a building to be used primarily and regularly for conducting the business of a municipality, county, school district, or any other local unit of government or the state or federal government. This provision does not prohibit the use of revenues derived from tax increments for the construction or renovation of a parking structure.

[D>(c)(1) Tax increments may not be used to pay for the cost of public improvements, equipment, or other items, if: <D]

[D>(i) the improvements, equipment, or other items are located outside of the area of the tax increment

financing district from which the increments were collected; and <D]

[D>(ii) the improvements, equipment, or items that (A) primarily serve a decorative or aesthetic purpose, or (B) serve a functional purpose, but their cost is increased by more than 100 percent as a result of the selection of materials, design, or type as compared with more commonly used materials, designs, or types for similar improvements, equipment, or items. <D]

[D>(2) The provisions of this paragraph do not apply to expenditures related to the rehabilitation of historic structures that are: <D]

[D>(i) individually listed on the National Register of Historic Places; or <D]

[D>(ii) a contributing element to a historic district listed on the National Register of Historic Places. <D]

[A>EFFECTIVE DATE. This section is effective the day following final enactment for all tax increment financing districts, regardless of when the request for certification was made, but applies only to amounts spent after final enactment. <A]

Sec. 5. AMEND Minnesota Statutes 2012, section 469.176, subdivision 6 , is amended to read: Subd. 6. Action required. (a) If, after four years from the date of certification of the original net tax capacity of the tax increment financing district pursuant to section 469.177 , no demolition, rehabilitation, or renovation of property or other site preparation, including qualified improvement of a street adjacent to a parcel but not installation of utility service including sewer or water systems, has been commenced on a parcel located within a tax increment financing district by the authority or by the owner of the parcel in accordance with the tax increment financing plan, no additional tax increment may be taken from that parcel, and the original net tax capacity of that parcel shall be excluded from the original net tax capacity of the tax increment financing district. If the authority or the owner of the parcel subsequently commences demolition, rehabilitation, or renovation or other site preparation on that parcel including qualified improvement of a street adjacent to that parcel, in accordance with the tax increment financing plan, the authority shall certify to the county auditor that the activity has commenced, and the county auditor shall certify the net tax capacity thereof as most recently certified by the commissioner of revenue and add it to the original net tax capacity of the tax increment financing district. The county auditor must enforce the provisions of this subdivision. The authority must submit to the county auditor evidence that the required activity has taken place for each parcel in the district. The evidence for a parcel must be submitted by February 1 of the fifth year following the year in which the parcel was certified as included in the district. For purposes of this subdivision, qualified improvements of a street are limited to (1) construction or opening of a new street, (2) relocation of a street, and (3) substantial reconstruction or rebuilding of an existing street.

(b) For districts which were certified on or after January 1, 2005, and before

April 20, 2009, the four-year period under paragraph (a) is
    [D>increased to

six years <D] [A>deemed to end on December 31, 2016 <A].

[A>EFFECTIVE DATE. This section is effective the day following final enactment and applies to districts certified on or after January 1, 2005, and before April 20, 2009. <A]

Sec. 6. AMEND Minnesota Statutes 2012, section 469.177, subdivision 1 a , is amended to read: Subd. 1a. Original local tax rate. At the time of the initial certification of the original net tax capacity for a tax increment financing district or a subdistrict, the county auditor shall certify the original local tax rate that applies to the district or subdistrict.

```
The original local tax rate is the sum of all the local tax rates
     [A>,
```

excluding that portion of the school rate attributable to the general education levy under section 126C.13 , <A] that apply to a property in the district or subdistrict. The local tax rate to be certified is the rate in effect for the same taxes payable year applicable to the tax capacity values certified as the district's or subdistrict's original tax capacity. The resulting tax capacity rate is the original local tax rate for the life of the district or subdistrict.

[A>EFFECTIVE DATE. This section is effective for districts for which the request for certification is made after April 15, 2013. <A]

Sec. 7. AMEND Minnesota Statutes 2012, section 469.177 , is amended by adding a subdivision to read: [A>Subd. 1d. Original net tax capacity adjustment; homestead market value exclusion. <A]

[A>(a) Upon approval by the municipality, by resolution, the authority may elect to reduce the original net tax capacity of a qualified district by the amount of the tax capacity attributable to the market value exclusion undersection 273.13, subdivision 35 , for taxes payable in the year preceding the election. The amount of the reduction may not reduce the original net tax capacity below zero. <A]

[A>(b) For purposes of this subdivision, a qualified district means a tax increment financing district that satisfies the following conditions: <A]

[A>(1) for taxes payable in 2011, the authority received a homestead market value credit reimbursement under section 273.1384 for the district of $10,000 or more; <A]

[A>(2) for taxes payable in 2013, the reduction in captured tax capacity resulting from the market value exclusion for the district was equal to or greater than 1.75 percent of the district's captured tax capacity; and <A]

[A>(3) either (i) the authority is permitted to expend increments on activities under the provisions of section 469.1763, subdivision 3 , or an equivalent provision of special law on July 1, 2013, or (ii) the district's tax increments received for taxes payable in 2012 exceeded the amount of debt service

payments due during calendar year 2012 on bonds issued under section 469.178 to which the district's increments are pledged. The calculation of the amount under clause (2) must reflect any adjustments to original net tax capacity made under subdivision 1, paragraphs (d) and (e), for the homestead market value exclusion. <A]

[A>(c) The authority must notify the county auditor of its election under this section no later than July 1, 2014. Notifications made by July 1, 2013, are effective beginning for taxes payable in 2014, and notifications made after July 1, 2013, are effective beginning for taxes payable in 2015. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment and applies to all tax increment financing districts regardless of when the request for certification was made. <A]

Sec. 8. AMEND Minnesota Statutes 2012, section 469.177 , is amended by adding a subdivision to read: [A>Subd. 1e. Adjustments; qualifying districts. <A]

[A>(a) For any tax increment financing district that satisfies the requirements of paragraph (b), the original net tax capacity must be reduced by the full amount of the original net tax capacity or $20,000, whichever is less. <A]

[A>(b) A tax increment financing district qualifies under this subdivision if it satisfies the following conditions: <A]

[A>(1) the district was certified after January 1, 2011, and before January 1, 2012; <A]

[A>(2) for assessment year 2012, at least 75 percent of the tax capacity of the district is class 4d property; and <A]

[A>(3) for assessment year 2012, the average estimated market value is over $115,000 per housing unit for the portion of the property that is class 4d. <A]

[A>(c) An authority or a property owner within a tax increment financing district must notify the county assessor of a district that qualifies under this subdivision by July 1, 2013. <A]

[A>(d) This subdivision expires on December 31, 2021. <A]

[A>EFFECTIVE DATE. This section is effective beginning for taxes payable in 2014. <A]

Sec. 9. AMEND Minnesota Statutes 2012, section 469.177, subdivision 9 , is amended to read: Subd. 9. Distributions of excess taxes on captured net tax capacity. (a) If the amount of tax paid on captured net tax capacity exceeds the amount

of tax increment, the county auditor shall distribute the excess
    [A>, except

increment attributable to the general education levy, <A] to the municipality, county, and school district as

follows: each governmental unit's share of the excess equals

(1) the total amount of the excess for the tax increment financing district, multiplied by

(2) a fraction, the numerator of which is the current local tax rate of the governmental unit less the governmental unit's local tax rate for the year the original local tax rate for the district was certified (in no case may this amount be less than zero) and the denominator of which is the sum of the numerators for the municipality, county, and school district. If the entire increase in the local tax rate is attributable to a taxing district, other than the municipality, county, or school district, then the excess must be distributed to the municipality, county, and school district in proportion to their respective local tax rates.

(b) The amounts distributed shall be deducted in computing the levy limits of the taxing district for the succeeding taxable year.

(c) In the case of distributions to a school district, the county auditor shall report amounts distributed to the commissioner of education in the same manner as provided for excess increments under section 469.176, subdivision 2 , and the distribution shall be deducted from the school district's state aid payments and levy limitation according to section 127A.49, subdivision 3 .

[A>(d) The amount of taxes attributable to imposing the general education levy under section 126C.13 must be returned to the school district within which the tax increment financing district is located. <A]

[A>EFFECTIVE DATE. This section is effective for districts for which the request for certification is made after April 15, 2013. <A]

Sec. 10. AMEND Minnesota Statutes 2012, section 473F.08 , is amended by adding a subdivision to read:[A>Subd. 3c. Mall of America. <A]

[A>(a) When computing the net tax capacity under section 473F.05 , the Hennepin County auditor shall exclude the captured tax capacity of Tax Increment Financing Districts No. 1-C and No. 1-G in the city of Bloomington. <A]

[A>(b) Notwithstanding the provisions of subdivision 2, paragraph (a), the commercial-industrial contribution percentage for the city of Bloomington is the contribution net tax capacity divided by the total net tax capacity of commercial-industrial property in the city, excluding any commercial-industrial property that is captured tax capacity of Tax Increment Financing Districts No. 1-C and No. 1-G. <A]

[A>(c) The property taxes to be paid on commercial-industrial tax capacity that is included in the captured tax capacity of Tax Increment Financing Districts No. 1-C and No. 1-G in the city of Bloomington must be determined as described in subdivision 6, except that the portion of the tax that is based on the areawide tax rate is to be treated as tax increment under section 469.176 . <A]

[A>(d) The provisions of this subdivision take effect only if the clerk of the city of Bloomington certifies to the Hennepin County auditor that the city has entered into a binding written agreement with the Metropolitan Council to repair and restore, or to replace, the old Cedar Avenue bridge for use by bicycle

commuters and recreational users. <A]

[A>(e) This subdivision expires on the earliest of the following dates: <A]

[A>(1) when the tax increment financing districts have been decertified in 2024 or 2035, as provided by section 22, subdivision 2 or 4; or <A]

[A>(2) on January 1, 2014, if the city clerk fails to make the certification provided in paragraph (d) or if the city fails to file its local approval of section 23 with the secretary of state by December 31, 2013. <A]

[A>EFFECTIVE DATE. This section is effective beginning for property taxes payable in 2014. <A]

Sec. 11. Laws 2008, chapter 366, article 5, section 26, is amended to read: Sec. 26. BLOOMINGTON TAX INCREMENT FINANCING; FIVE-YEAR RULE.

[A>(a) <A] The requirements of Minnesota Statutes, section 469.1763, subdivision 3 , that activities must be undertaken within a five-year period from the date of certification of a tax increment financing district, are

```
increased to a
    [D>ten-year <D]
```

[A>15-year <A] period for the Port Authority

of the City of Bloomington's Tax Increment Financing District No. 1-I, Bloomington Central Station.

[A>(b) Notwithstanding the provisions of Minnesota Statutes, section 469.176 , or any other law to the contrary, the city of Bloomington and its port authority may extend the duration limits of the district for a period through December 31, 2039. <A]

[A>(c) Effective for taxes payable in 2014, tax increment for the district must be computed using the current local tax rate, notwithstanding the provisions of Minnesota Statutes, section 469.177, subdivision 1 a. <A]

[A>EFFECTIVE DATE. Paragraphs (a) and (c) are effective upon compliance by the governing body of the city of Bloomington with the requirements of Minnesota Statutes, section 645.021, subdivision 3 . Paragraph (b) is effective upon compliance by the governing bodies of the city of Bloomington, Hennepin County, and Independent School District No. 271 with the requirements of Minnesota Statutes, sections 469.1782, subdivision 2 , and 645.021 , subdivision 3. <A]

Sec. 12. Laws 2008, chapter 366, article 5, section 34, as amended by Laws 2009, chapter 88, article 5, section 11, is amended to read: Sec. 34.

```
CITY OF OAKDALE;
    [D> ORIGINAL TAX CAPACITY  <D]
```

[A> PARCELS DEEMED OCCUPIED

<A] .

[D>(a) The provisions of this section apply to redevelopment tax increment financing districts created by the Housing and Redevelopment Authority in and for the city of Oakdale in the areas comprised of the parcels with the following parcel identification numbers: (1) 3102921320053; 3102921320054; 3102921320055; 3102921320056; 3102921320057; 3102921320058; 3102921320062; 3102921320063; 3102921320059; 3102921320060; 3102921320061; 3102921330005; and 3102921330004; and (2) 2902921330001 and 2902921330005. <D]

[D>(b) For a district subject to this section, the Housing and Redevelopment Authority may, when requesting certification of the original tax capacity of the district under Minnesota Statutes, section 469.177 , elect to have the original tax capacity of the district be certified as the tax capacity of the land. <D]

[D>(c) The authority to request certification of a district under this section expires on July 1, 2013. <D]

[A>(a) Parcel numbers 3102921320054, 3102921320055, 3102921320056, 3102921320057, 3102921320061, and 3102921330004 are deemed to meet the requirements of Minnesota Statutes, section 469.174, subdivision 10 , paragraph (d), notwithstanding any contrary provisions of that paragraph, if the following conditions are met: <A]

[A>(1) a building located on any part of each of the specified parcels was demolished after the Housing and Redevelopment Authority for the city of Oakdale adopted a resolution under Minnesota Statutes, section 469.174, subdivision 10 , paragraph (d), clause (3); <A]

[A>(2) the building was removed either by the authority, by a developer under a development agreement with the Housing and Redevelopment Authority for the city of Oakdale, or by the owner of the property without entering into a development agreement with the Housing and Redevelopment Authority for the city of Oakdale; and <A]

[A>(3) the request for certification of the parcel as part of a district is filed with the county auditor by December 31, 2017. <A]

[A>(b) The provisions of this section allow an election by the Housing and Redevelopment Authority for the city of Oakdale for the parcels deemed occupied under paragraph (a), notwithstanding the provisions of Minnesota Statutes, sections 469.174, subdivision 10 , paragraph (d), and 469.177 , subdivision 1, paragraph (f). <A]

[A>(c) The city may elect, in the tax increment financing plan, to collect increment from a redevelopment district created under the provisions of this section for an additional ten years beyond the limit in Minnesota Statutes, section 469.176, subdivision 1 b. <A]

[A>EFFECTIVE DATE. This section is effective upon compliance by the governing body of the city of Oakdale with the requirements of Minnesota Statutes, section 645.021, subdivision 3 , except that the provisions of paragraph (c) are effective only upon compliance with Minnesota Statutes, section 469.1782, subdivision 2 , by Ramsey County and Independent School District No. 622. <A]

Sec. 13. Laws 2010, chapter 216, section 55, is amended to read: Sec. 55. OAKDALE; TAX INCREMENT FINANCING DISTRICT.

Subdivision 1. Duration of district. Notwithstanding the provisions of Minnesota Statutes, section 469.176, subdivision 1 b, the city of Oakdale may collect tax increments from Tax

Increment Financing District No. 6 (Bergen Plaza) through December 31,

[D>2024 <D] [A>2040 <A], subject to the conditions described in subdivision 2.

Subd. 2. Conditions for extension. (a) Subdivision 1 applies only if the following conditions are met:

(1) by July 1, 2011, the city of Oakdale has entered into a development agreement with a private developer for development or redevelopment of all or a

substantial part of the
    [D>area <D]

[A>parcels described in clause (2) <A];

and

(2) by November 1, 2011, the city of Oakdale or a private developer commences construction of streets, traffic improvements, water, sewer, or related infrastructure that serves one or both of the parcels with the following parcel identification numbers: 2902921330001 and 2902921330005. For the purposes of this section, construction commences upon grading or other visible improvements that are part of the subject infrastructure.

(b) All tax increments received by the city of Oakdale under subdivision 1

after December 31, 2016, must be used only to pay costs that are both
    [A>:

<A]

(1) related to redevelopment of the parcels specified in this subdivision

[A>or parcel numbers 3102921320053, 3102921320054, 3102921320055, 3102921320056, 3102921320057, 3102921320058, 3102921320059, 3102921320060, 3102921320061, 3102921320062, 3102921320063, 3102921330004, and 3102921330005,

```
<A] including, without limitation, any
    [D>of the <D] infrastructure
```

[D>referenced in this subdivision <D] [A>that serves any of the referenced parcels <A]; and

(2) otherwise eligible under law to be paid with increments from the specified

```
tax increment financing district
    [D>, except the authority under this clause
```

does not apply to increments collected after the conclusion of the duration limit under general law <D].

[A>EFFECTIVE DATE. This section is effective upon compliance by the governing body of the city of Oakdale with the requirements of Minnesota Statutes, section 645.021, subdivision 3 , except that the amendments to subdivision 1 are effective only upon compliance with Minnesota Statutes, section 469.1782, subdivision 2 , by Ramsey County and Independent School District No. 622. <A]

Sec. 14. [A> ST. CLOUD; TAX INCREMENT FINANCING. The request for certification of Tax Increment Financing District No. 2, commonly referred to as the Norwest District, in the city of St. Cloud is deemed to have been made on or after August 1, 1979, and before July 1, 1982. Revenues derived from tax increment for that district must be treated for purposes of any law as revenue of a tax increment financing district for which the request for certification was made during that time period. <A]

[A>EFFECTIVE DATE. This section is effective upon approval by the governing body of the city of St. Cloud and compliance with Minnesota Statutes, section 645.021, subdivision 3 . <A]

Sec. 15. [A> CITY OF GLENCOE; TAX INCREMENT FINANCING DISTRICT EXTENSION. <A]

[A>Subdivision 1. Duration of district. Notwithstanding the provisions of Minnesota Statutes, section 469.176, subdivision 1 b, paragraph (a), clause (4), or any other law to the contrary, the city of Glencoe may collect tax increments from Tax Increment Financing District No. 4 (McLeod County District No. 007) through December 31, 2023, subject to the conditions in subdivision 2. <A]

[A>Subd. 2. Exclusive use of revenues. <A]

[A>(a) All tax increments derived from Tax Increment Financing District No. 4 (McLeod County District No. 007) that are collected after December 31, 2013, must be used only to pay debt service on or to

defease bonds that were outstanding on January 1, 2013 and that were issued to finance improvements serving: <A]

[A>(1) Tax Increment Financing District No. 14 (McLeod County District No. 033) <A]

[A>(Downtown); <A]

[A>(2) Tax Increment Financing District No. 15 (McLeod County District No. 035) (Industrial Park); and <A]

[A>(3) benefited properties as further described in proceedings related to the city's series 2007A bonds, dated September 1, 2007, and any bonds issued to refund those bonds. <A]

[A>(b) Increments may also be used to pay debt service on or to defease bonds issued to refund the bonds described in paragraph (a), if the refunding bonds do not increase the present value of debt service due on the refunded bonds when the refunding is closed. <A]

[A>(c) When the bonds described in paragraphs (a) and (b) have been paid or defeased, the district must be decertified and any remaining increment returned to the city, county, and school district as provided in Minnesota Statutes, section 469.176, subdivision 2 , paragraph (c), clause (4). <A]

[A>EFFECTIVE DATE. This section is effective upon compliance by the governing bodies of the city of Glencoe, McLeod County, and Independent School District No. 2859 with the requirements of Minnesota Statutes, sections 469.1782, subdivision 2 , and645.021 , subdivision 3. <A]

Sec. 16. [A> CITY OF ELY; TAX INCREMENT FINANCING. <A]

[A>Subdivision 1. Extension of district. Notwithstanding Minnesota Statutes, section 469.176, subdivision 1 b, or any other law to the contrary, the city of Ely may collect tax increment from Tax Increment Financing District No. 1 through December 31, 2021. Increments from the district may only be used to pay binding obligations and administrative expenses. <A]

[A>Subd. 2. Binding obligations. For purposes of this section, "binding obligations" means the binding contractual or debt obligation of Tax Increment Financing District No. 1 entered into before January 1, 2013. <A]

[A>Subd. 3. Expenditures outside district. Notwithstanding Minnesota Statutes, section 469.1763, subdivision 2 , the governing body of the city of Ely may elect to transfer revenues derived from increments from its Tax Increment Financing District No. 3 to the tax increment account established under Minnesota Statutes, section 469.177, subdivision 5 , for Tax Increment Financing District No. 1. The amount that may be transferred is limited to the lesser of: <A]

[A>(1) $168,000; or <A]

[A>(2) the total amount due on binding obligations and outstanding on that date, less the amount of

increment collected by Tax Increment Financing District No. 1 after December 31, 2012, and administrative expenses of Tax Increment Financing District No. 1 incurred after December 31, 2012. <A]

[A>EFFECTIVE DATE. This section is effective upon approval by the governing bodies of the city of Ely, St. Louis County, and Independent School District No. 696 with the requirements of Minnesota Statutes, sections 469.1782, subdivision 2 , and645.021 , subdivision 3. <A]

Sec. 17. [A> DAKOTA COUNTY COMMUNITY DEVELOPMENT AGENCY; TAX INCREMENT FINANCING DISTRICT. <A]

[A>Subdivision 1. Authorization. Notwithstanding the provisions of any other law, the Dakota County Community Development Agency may establish a redevelopment tax increment financing district comprised of the properties that (1) were included in the CDA 10 Robert Street and Smith Avenue district in the city of West St. Paul, and (2) were not decertified before July 1, 2012. The district created under this section terminates no later than December 31, 2023. <A]

[A>Subd. 2. Special rules. The requirements for qualifying a redevelopment district under Minnesota Statutes, section 469.174, subdivision 10 , do not apply to parcels located within the district. Minnesota Statutes, section 469.176, subdivision 4 j, do not apply to the district. The original tax capacity of the district is $93,239. <A]

[A>Subd. 3. Authorized expenditures. Tax increment from the district may be expended to pay for any eligible activities authorized by Minnesota Statutes, chapter 469, within the redevelopment area that includes the district provided that the boundaries of the redevelopment area may not be expanded to add new area after April 1, 2013.

All such expenditures are deemed to be activities within the district underMinnesota Statutes, section 469.1763 , subdivisions 2 and 4. <A]

[A>Subd. 4. Adjusted net tax capacity. The captured tax capacity of the district must be included in the adjusted net tax capacity of the city, county, and school district for the purposes of determining local government aid, education aid, and county program aid. The county auditor shall report to the commissioner of revenue the amount of the captured tax capacity for the district at the time the assessment abstracts are filed. <A]

[A>EFFECTIVE DATE. This section is effective upon compliance by the governing body of the Dakota County Community Development Agency with the requirements of Minnesota Statutes, section 645.021, subdivision 3 . <A]

Sec. 18. [A> CITY OF APPLE VALLEY; TAX INCREMENT FINANCING DISTRICT. <A]

[A>Subdivision 1. Definitions. <A]

[A>(a) For the purposes of this section, the following terms have the meanings given to them. <A]

[A>(b) "City" means the city of Apple Valley. <A]

[A>(c) "Project area" means the following parcels: parcel numbers 01-03500-25-010, 01-03500-03-011, 01-03500-02-010, 01-03500-52-011, 01-03500-78-011, 01-03500-77-014, 01-03500-75-010, 01-03400-05-050, <A]

[A>(d) "Soil deficiency district" means a type of tax increment financing district consisting of a portion of the project area in which the city finds by resolution that the following conditions exist: <A]

[A>(1) unusual terrain or soil deficiencies that occurred over 70 percent of the acreage in the district require substantial filling, grading, or other physical preparation for use; and <A]

[A>(2) the estimated cost of the physical preparation under clause (1), but excluding costs directly related to roads as defined in Minnesota Statutes, section 160.01 , and local improvements as described in Minnesota Statutes, sections 429.021, subdivision 1 , other than clauses (8) to (10), and 430.01 , exceeds the fair market value of the land before completion of the preparation. <A]

[A>Subd. 2. Special rules. <A]

[A>(a) If the city elects, upon the adoption of the tax increment financing plan for a district, the rules under this section apply to a redevelopment district, renewal and renovation district, soil condition district, or soil deficiency district established by the city or a development authority of the city in the project area. The city, or a development authority acting on its behalf, may establish one or more soils deficiency districts within the project area. <A]

[A>(b) Prior to or upon the adoption of the first tax increment plan subject to the special rules under this subdivision, the city must find by resolution that parcels consisting of at least 70 percent of the acreage of the project area, excluding street and railroad rights-of-way, are characterized by one or more of the following conditions: <A]

[A>(1) peat or other soils with geotechnical deficiencies that impair development of commercial buildings or infrastructure; <A]

[A>(2) soils or terrain that requires substantial filling in order to permit the development of commercial buildings or infrastructure; <A]

[A>(3) landfills, dumps, or similar deposits of municipal or private waste; <A]

[A>(4) quarries or similar resource extraction sites; <A]

[A>(5) floodway; and <A]

[A>(6) substandard buildings, within the meaning of Minnesota Statutes, section 469.174, subdivision 10 . <A]

[A>(c) For the purposes of paragraph (b), clauses (1) to (5), a parcel is characterized by the relevant condition if at least 60 percent of the area of the parcel contains the relevant condition. For the purposes of paragraph (b), clause (6), a parcel is characterized by substandard buildings if substandard buildings occupy at least 30 percent of the area of the parcel. <A]

[A>(d) The five-year rule under Minnesota Statutes, section 469.1763, subdivision 3 , is extended to ten years for any district, and the period underMinnesota Statutes, section 469.1763, subdivision 4 , is extended to 11 years. <A]

[A>(e) Notwithstanding any provision to the contrary in Minnesota Statutes, section 469.1763, subdivision 2 , paragraph (a), not more than 80 percent of the total revenue derived from tax increments paid by properties in any district, measured over the life of the district, may be expended on activities outside the district but within the project area. <A]

[A>(f) For a soil deficiency district: <A]

[A>(1) increments may be collected through 20 years after the receipt by the authority of the first increment from the district; and <A]

[A>(2) except as otherwise provided in this subdivision, increments may be used only to: <A]

[A>(i) acquire parcels on which the improvements described in item (ii) will occur; <A]

[A>(ii) pay for the cost of correcting the unusual terrain or soil deficiencies and the additional cost of installing public improvements directly caused by the deficiencies; and <A]

[A>(iii) pay for the administrative expenses of the authority allocable to the district. <A]

[A>(g) The authority to approve tax increment financing plans to establish tax increment financing districts under this section expires December 31, 2022. <A]

[A>EFFECTIVE DATE. This section is effective upon compliance with Minnesota Statutes, section 645.021, subdivision 3 . <A]

Sec. 19. [A> CITY OF APPLE VALLEY; USE OF TAX INCREMENT FINANCING. <A]

[A>Subdivision 1. Developments consisting of building and ancillary facilities.

Notwithstanding Minnesota Statutes, section 469.176 , subdivisions 4c and 4m, the city of Apple Valley may use tax increment financing to provide improvements, loans, subsidies, grants, interest rate subsidies, or assistance in any form to developments consisting of buildings and ancillary facilities, if all of the following conditions are met: <A]

[A>(1) the city of Apple Valley finds that the project will create or retain jobs in Minnesota, including construction jobs; <A]

[A>(2) the city of Apple Valley finds that construction of the project will not commence before July 1, 2014, without the use of tax increment financing; <A]

[A>(3) the request for certification of the district is made no later than June 30, 2014; <A]

[A>(4) construction of the project begins no later than July 1, 2014; and <A]

[A>(5) for development of housing, construction of the project begins no later than December 31, 2013. <A]

[A>Subd. 2. Extension of authority to spend tax increments. Notwithstanding the time limits in Minnesota Statutes, section 469.176, subdivision 4 m, the city of Apple Valley has the authority to spend tax increments under Minnesota Statutes, section 469.176, subdivision 4 m, until December 31, 2014. <A]

[A>EFFECTIVE DATE. This section is effective upon approval by the governing body of the city of Apple Valley and timely compliance with Minnesota Statutes, section 645.021, subdivision 3 . <A]

Sec. 20. [A> CITY OF MINNEAPOLIS; STREETCAR FINANCING. <A]

[A>Subdivision 1. Definitions. <A]

[A>(a) For purposes of this section, the following terms have the meanings given them. <A]

[A>(b) "City" means the city of Minneapolis. <A]

[A>(c) "County" means Hennepin County. <A]

[A>(d) "District" means the areas certified by the city under subdivision 2 for collection of value capture taxes. <A]

[A>(e) "Project area" means the area including one city block on either side of a streetcar line designated by the city to serve the downtown and adjacent neighborhoods of the city. <A]

[A>Subd. 2. Authority to establish district. <A]

[A>(a) The governing body of the city may, by resolution, establish a value capture district consisting of some or all of the taxable parcels located within one or more of the following areas of the city, as described in the resolution: <A]

[A>(1) the area bounded by Nicollet Avenue on the west, 16th Street East on the south, First Avenue South on the east, and 14th Street East on the north; <A]

[A>(2) the area bounded by Spruce Place on the west, 14th Street West on the south, LaSalle Avenue on the east, and Grant Street West on the north; <A]

[A>(3) the area bounded by Nicollet Avenue or Mall on the west, Fifth Street South on the south,

Marquette Avenue on the east, and Fourth Street South on the north; <A]

[A>(4) the area bounded by First Avenue North on the west, Washington Avenue on the south, Hennepin Avenue on the east, and Second Street North on the north; and <A]

[A>(5) the area bounded by Fifth Street North East on the west, Central Avenue North East on the southeast, Sixth Street North East on the east, Hennepin Avenue East on the south, and First Avenue North East on the north. <A]

[A>(b) The city may establish the district and the project area only after holding a public hearing on its proposed creation after publishing notice of the hearing and the proposal at least once not less than ten days nor more than 30 days before the date of the hearing. <A]

[A>Subd. 3. Calculation of value capture district; administrative provisions. <A]

[A>(a) If the city establishes a value capture district under subdivision 2, the city shall request the county auditor to certify the district for calculation of the district's tax revenues. <A]

[A>(b) For purposes of calculating the tax revenues of the district, the county auditor shall treat the district as if it were a request for certification of a tax increment financing district under the provisions of Minnesota Statutes, section 469.177, subdivision 1 , and shall calculate the tax revenues of the district for each year of its duration under subdivision 5 as equaling the amount of tax increment that would be computed by applying the provisions of Minnesota Statutes, section 469.177 , subdivisions 1, 2, and 3, to determine captured tax capacity and multiplying by the current tax rate, excluding the state general tax rate. The city shall provide the county auditor with the necessary information to certify the district, including the option for calculating revenues derived from the areawide tax rate under Minnesota Statutes, chapter 473F. <A]

[A>(c) The county auditor shall pay to the city at the same times provided for settlement of taxes and payment of tax increments the tax revenues of the district. The city must use the tax revenues as provided under subdivision 4. <A]

[A>Subd. 4. Permitted uses of district tax revenues. <A]

[A>(a) In addition to paying for reasonable administrative costs of the district, the city may spend tax revenues of the district for property acquisition, improvements, and equipment to be used for operations within the project area, along with related costs, for: <A]

[A>(1) planning, design, and engineering services related to the construction of the streetcar line; <A]

[A>(2) acquiring property for, constructing, and installing a streetcar line; <A]

[A>(3) acquiring and maintaining equipment and rolling stock and related facilities, such as maintenance facilities, which need not be located in the project area; <A]

[A>(4) acquiring, constructing, or improving transit stations; and <A]

[A>(5) acquiring or improving public space, including the construction and installation of improvements to streets and sidewalks, decorative lighting and surfaces, and plantings related to the streetcar line. <A]

[A>(b) The city may issue bonds or other obligations under Minnesota Statutes, chapter 475, without an election, to fund acquisition or improvement of property of a capital nature authorized by this section, including any costs of issuance. The city may also issue bonds or other obligations to refund those bonds or obligations. Payment of principal and interest on the bonds or other obligations issued under this paragraph is a permitted use of the district's tax revenues. <A]

[A>(c) Tax revenues of the district may not be used for the operation of the streetcar line. <A]

[A>Subd. 5. Duration of the district. A district established under this section is limited to the lesser of (1) 25 years of tax revenues, or (2) the time necessary to collect tax revenues equal to the amount of the capital costs permitted under subdivision 4 or the amount needed to pay or defease bonds or other obligations issued under subdivision 4, whichever is later. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 21. [A> CITY OF MAPLEWOOD; TAX INCREMENT FINANCING DISTRICT; SPECIAL RULES. <A]

[A>(a) If the city of Maplewood elects, upon the adoption of a tax increment financing plan for a district, the rules under this section apply to one or more redevelopment tax increment financing districts established by the city or the economic development authority of the city. The area within which the redevelopment tax increment districts may be created is parcel 362922240002 (the "parcel") or any replatted parcels constituting a part of the parcel and the adjacent rights-of-way. For purposes of this section, the parcel is the "3M Renovation and Retention Project Area" or "project area." <A]

[A>(b) The requirements for qualifying redevelopment tax increment districts under Minnesota Statutes, section 469.174, subdivision 10 , do not apply to the parcel, which is deemed eligible for inclusion in a redevelopment tax increment district. <A]

[A>(c) The 90 percent rule under Minnesota Statutes, section 469.176, subdivision 4 j, does not apply to the parcel. <A]

[A>(d) The expenditures outside district rule under Minnesota Statutes, section 469.1763, subdivision 2 , does not apply; the five-year rule under Minnesota Statutes, section 469.1763, subdivision 3 , is extended to ten years; and expenditures must only be made within the project area. <A]

[A>(e) If, after one year from the date of certification of the original net tax capacity of the tax increment district, no demolition, rehabilitation, or renovation of property has been commenced on a parcel located within the tax increment district, no additional tax increment may be taken from that parcel, and the original net tax capacity of the parcel shall be excluded from the original net tax capacity of the tax

increment district. If 3M Company subsequently commences demolition, rehabilitation, or renovation, the authority shall certify to the county auditor that the activity has commenced, and the county auditor shall certify the net tax capacity thereof as most recently certified by the commissioner of revenue and add it to the original net tax capacity of the tax increment district. The authority must submit to the county auditor evidence that the required activity has taken place for each parcel in the district. <A]

[A>(f) The authority to approve a tax increment financing plan and to establish a tax increment financing district under this section expires December 31, 2018. <A]

[A>EFFECTIVE DATE. This section is effective upon approval by the governing body of the city of Maplewood and upon compliance with Minnesota Statutes, section 645.021, subdivision 3 . <A]

Sec. 22. [A> CITY OF BLOOMINGTON; TAX INCREMENT FINANCING. <A]

[A>Subdivision 1. Addition of property to Tax Increment Financing District No. 1-G. <A]

[A>(a) Notwithstanding the provisions of Minnesota Statutes, section 469.175, subdivision 4 , or any other law to the contrary, the governing bodies of the Port Authority of the city of Bloomington and the city of Bloomington may elect to eliminate the real property north of the existing building line on Lot 1, Block 1, Mall of America 7th Addition, exclusive of Lots 2 and 3 from Tax Increment Financing District No. 1-C within Industrial Development District No. 1 Airport South in the city of Bloomington, Minnesota, and expand the boundaries of Tax Increment Financing District No. 1-G to include that property. <A]

[A>(b) If the city elects to transfer parcels under this authority, the county auditor shall transfer the original tax capacity of the affected parcels from Tax Increment Financing District No. 1-C to Tax Increment Financing District No. 1-G. <A]

[A>Subd. 2. Authority to extend duration limit; computation of increment. <A]

[A>(a) Notwithstanding Minnesota Statutes, section 469.176 , or Laws 1996, chapter 464, article 1, section 8, or any other law to the contrary, the city of Bloomington and its port authority may extend the duration limits of Tax Increment Financing Districts No. 1-C and No. 1-G through December 31, 2034. <A]

[A>(b) Effective for property taxes payable in 2017 through 2034, the captured tax capacity of Tax Increment Financing District No. 1-C must be included in computing the tax rates of each local taxing district and the tax increment equals only the amount of tax computed under Minnesota Statutes, section 473F.08, subdivision 3 c, paragraph (c). <A]

[A>(c) Effective for property taxes payable in 2019 through 2034, the captured tax capacity of Tax Increment Financing District No. 1-G must be included in computing the tax rates of each local taxing district and the tax increment for the district equals only the amount of tax computed under Minnesota Statutes, section 473F.08, subdivision 3 c, paragraph (c). <A]

[A>Subd. 3. Treatment of increment. Increments received under the provisions of subdivision 2,

paragraph (b) or (c), and Minnesota Statutes, section 473F.08, subdivision 3 c, are deemed to be tax increments of Tax Increment Financing District No. 1-G, notwithstanding any law to the contrary, and without regard to whether they are attributable to captured tax capacity of Tax Increment Financing District No. 1-C. <A]

[A>Subd. 4. Condition. The authority under this section expires and Tax Increment Financing Districts No. 1-C and No. 1-G must be decertified for taxes payable in 2024 and thereafter, if the total estimated market value of improvements for parcels located in Tax Increment Financing District No. 1-G, as modified, do not exceed $100,000,000 by taxes payable in 2023. <A]

[A>EFFECTIVE DATE. This section is effective upon compliance of the governing body of the city of Bloomington with the requirements of Minnesota Statutes, section 645.021, subdivision 3 , but only if the city enters into a binding written agreement with the Metropolitan Council to repair and restore, or to replace, the old Cedar Avenue bridge for use by bicycle commuters and recreational users. This section is effective without approval of the county and school district under Minnesota Statutes, section 469.1782, subdivision 2 . The legislature finds that the county and school district are not "affected local government units" within the meaning of Minnesota Statutes, section 469.1782 , because the provision allowing extended collection of increment by the tax increment financing districts does not affect their tax bases and tax rates dissimilarly to other counties and school districts in the metropolitan area. <A]

Sec. 23. [A> CITY OF BLOOMINGTON; OLD CEDAR AVENUE BRIDGE. <A]

[A>(a) Notwithstanding any law to the contrary, the city of Bloomington shall transfer from the tax increment financing accounts for its Tax Increment Financing District No. 1-C and Tax Increment Financing District No. 1-G an amount equal to the tax increment for each district that is computed under the provisions of Minnesota Statutes, section 473F.08, subdivision 3 c, for taxes payable in 2014 to an account or fund established for the repair, restoration, or replacement of the Old Cedar Avenue bridge for use by bicycle commuters and recreational users. The city is authorized to and must use the transferred funds to complete the repair, renovation, or replacement of the bridge. <A]

[A>(b) No signs, plaques, or markers acknowledging or crediting donations for, sponsorships of, or naming rights may be posted on or in the vicinity of the Old Cedar Avenue bridge. <A]

[A>EFFECTIVE DATE. This section is effective upon compliance by the city of Bloomington with the requirements of Minnesota Statutes, section 645.021, subdivision 3 . <A] ARTICLE 10 DESTINATION MEDICAL CENTER

Section 1. AMEND Minnesota Statutes 2012, section 13.792 , is amended to read: 13.792 PRIVATE DONOR GIFT DATA. The following data maintained by the Minnesota Zoological Garden, the University of Minnesota, the Minnesota State Colleges and Universities, the

Regional Parks Foundation of the Twin Cities, State Services for the Blind,

[A>the Destination Medical Center Corporation established pursuant to section469.41 , <A] and any related entity subject to chapter 13 are classified as private or nonpublic: (1) research information about prospects and donors gathered to aid in determining appropriateness of solicitation and level of gift request;

(2) specific data in prospect lists that would identify prospects to be solicited, dollar amounts to be requested, and name of solicitor;

(3) portions of solicitation letters and proposals that identify the prospect being solicited and the dollar amount being requested;

(4) letters, pledge cards, and other responses received from donors regarding prospective gifts in response to solicitations;

(5) portions of thank-you letters and other gift acknowledgment communications that would identify the name of the donor and the specific amount of the gift, pledge, or pledge payment;

(6) donor financial or estate planning information, or portions of memoranda, letters, or other documents commenting on any donor's financial circumstances; and

(7) data detailing dates of gifts, payment schedule of gifts, form of gifts, and specific gift amounts made by donors. Names of donors and gift ranges are public data.

Sec. 2. AMEND Minnesota Statutes 2012, section 297A.71 , is amended by adding a subdivision to read: [A>Subd. 48. Construction materials, public infrastructure related to the destination medical center. Materials and supplies used in, and equipment incorporated into, the construction and improvement of publicly owned buildings and infrastructure included in the development plan adopted under section 469.43 , and financed with public funds, are exempt. <A]

[A>EFFECTIVE DATE. This section is effective for sales and purchases made after June 30, 2015, and before July 1, 2049. <A]

Sec. 3. [A> [469.40 ] DEFINITIONS. <A]

[A>Subdivision 1. Application. For the purposes of sections 469.40 to 469.47 , the terms defined in this section have the meanings given them. <A]

[A>Subd. 2. City. " City" means the city of Rochester. <A]

[A>Subd. 3. County. " County" means Olmsted County. <A]

[A>Subd. 4. Destination Medical Center Corporation, corporation, DMCC. "Destination Medical Center Corporation," "corporation," or "DMCC" means the nonprofit corporation created by the city as provided in section 469.41 , and organized under chapter 317A. <A]

[A>Subd. 5. Destination Medical Center Development District. " Destination medical center development district" or "development district" means a geographic area in the city identified in the DMCC development plan in which public infrastructure projects are implemented. <A]

[A>Subd. 6. Development plan. " Development plan" means the plan adopted by the DMCC under section 469.43 . <A]

[A>Subd. 7. Financial interest. " Financial interest" means a person's direct or indirect ownership or investment interest or compensation arrangement, whether through business, investment, or family, including spouse, children and stepchildren, and other relatives living with the person, as follows: <A]

[A>(1) ownership or investment interest in the development, acquisition, or construction of a project in the development district; <A]

[A>(2) compensation arrangement with respect to the development, acquisition, or construction of a project in the development district; or <A]

[A>(3) potential ownership or investment interest in, or compensation arrangement with respect to, the development, acquisition, or construction of a project in the development district. <A]

[A>Subd. 8. Medical business entity. " Medical business entity" means a medical business entity with its principal place of business in the city that, as of the effective date of this section, together with all business entities of which it is the sole member or sole shareholder, collectively employs more than 30,000 persons in the state. <A]

[A>Subd. 9. Nonprofit economic development agency, agency. " Nonprofit economic development agency" or "agency" means the nonprofit agency required under section 469.43 to provide experience and expertise to the DMCC for purposes of developing and marketing the destination medical center. <A]

[A>Subd. 10. Project. "Project" means a project to implement the development plan, whether public or private. <A]

[A>Subd. 11. Public infrastructure project. <A]

[A>(a) "Public infrastructure project" means a project financed in part or in whole with public money in order to support the medical business entity's development plans, as identified in the DMCC development plan. A public infrastructure project may: <A]

[A>(1) acquire real property and other assets associated with the real property; <A]

[A>(2) demolish, repair, or rehabilitate buildings; <A]

[A>(3) remediate land and buildings as required to prepare the property for acquisition or development; <A]

[A>(4) install, construct, or reconstruct elements of public infrastructure required to support the overall development of the destination medical center development district including, but not limited to, streets, roadways, utilities systems and related facilities, utility relocations and replacements, network and communication systems, streetscape improvements, drainage systems, sewer and water systems, subgrade structures and associated improvements, landscaping, façade construction and restoration, wayfinding and signage, and other components of community infrastructure; <A]

[A>(5) acquire, construct or reconstruct, and equip parking facilities and other facilities to encourage intermodal transportation and public transit; <A]

[A>(6) install, construct or reconstruct, furnish, and equip parks, cultural, and recreational facilities, facilities to promote tourism and hospitality, conferencing and conventions, broadcast and related multimedia infrastructure; <A]

[A>(7) make related site improvements including, without limitation, excavation, earth retention, soil stabilization and correction, and site improvements to support the destination medical center development district; <A]

[A>(8) prepare land for private development and to sell or lease land; <A]

[A>(9) costs of providing relocation benefits to occupants of acquired properties; and <A]

[A>(10) construct and equip all or a portion of one or more suitable structures on land owned by the city for sale or lease to private development; provided, however, that the portion of any structure directly financed by the city as a public infrastructure project must not be sold or leased to a medical business entity. <A]

[A>(b) A public infrastructure project is not a business subsidy under section116J.993 . <A]

[A>Subd. 12. Year. "Year" means a calendar year, except where otherwise provided. <A]

Sec. 4. [A> [469.41 ] DESTINATION MEDICAL CENTER CORPORATION ESTABLISHED. <A]

[A>Subdivision 1. DMCC created. The city must establish a destination medical center corporation as a nonprofit corporation under chapter 317A to provide the city with expertise in preparing and implementing the development plan to establish the city as a destination medical center. Except as provided in sections 469.40 to 469.47 , the nonprofit corporation is not subject to laws governing the city. <A]

[A>Subd. 2. Membership; quorum. <A]

[A>(a) The corporation's governing board consists of eight members appointed, as follows: <A]

[A>(1) the mayor of the city, or the mayor's designee, subject to approval by the city council; <A]

[A>(2) the city council president, or the city council president's designee, subject to approval by the city

council; <A]

[A>(3) the chair or member of the county board, appointed by the county board; <A]

[A>(4) a representative of the medical business entity appointed by and serving at the pleasure of the medical business entity; and <A]

[A>(5) four members appointed by the governor, subject to confirmation by the senate. <A]

[A>(b) Appointing authorities must make their respective appointments as soon as practicable after the effective date of this section, but no later than 60 days after enactment of this section. <A]

[A>(c) A quorum of the board is six members. <A]

[A>Subd. 3. Terms. <A]

[A>(a) A member first appointed after the effective date of this section under subdivision 2, paragraph (a), clauses (1), (2), and (3), serves for a term coterminous with the term of the elected office, but may be reappointed. <A]

[A>(b) Two members first appointed after the effective date of this section under subdivision 2, paragraph (a), clause (5), serve from the date of appointment until the first Tuesday after the first Monday in January 2017, and two members first appointed after the effective date of this section under subdivision 2, paragraph (a), clause (5), serve from the date of appointment until the first Tuesday after the first Monday in January 2020. Thereafter, members appointed by the governor serve six-year terms. <A]

[A>Subd. 4. Vacancies. A vacancy occurs as provided in section 351.02 or upon a member's removal under subdivision 7. A vacancy on the board must be filled by the appointing authority for the balance of the term in the same manner as a regular appointment. <A]

[A>Subd. 5. Chair. The board must elect a chair from among the governor's appointees. The governor must convene the first meeting within 30 days of completion of all appointments to the board. <A]

[A>Subd. 6. Pay. Members must be compensated as provided in section 15.0575, subdivision 3 . For the purposes of this subdivision, the member representing the medical business entity shall be treated as if an employee of a political subdivision. All money paid for compensation or reimbursement must be paid out of the corporation's budget. <A]

[A>Subd. 7. Removal for cause. A member may be removed by the board for inefficiency, neglect of duty, or misconduct in office. A member may be removed only after a hearing of the board. A copy of the charges must be given to the board member at least ten days before the hearing. The board member must be given an opportunity to be heard in person or by counsel at the hearing. When written charges have been submitted against a board member, the board may temporarily suspend the member. If the board finds that those charges have not been substantiated, the board member must be immediately reinstated. If a board member is removed, a record of the proceedings, together with the charges and

findings, must be filed with the office of the appointing authority. <A]

[A>Subd. 8. Open meeting law; data practices. Meetings of the corporation and any committee or subcommittee of the corporation are subject to the open meeting law in chapter 13D. The corporation is a government entity for purposes of chapter 13. <A]

[A>Subd. 9. Conflicts of interest. Except for the member appointed by the medical business entity, a member must not be a director, officer, or employee of the medical business entity. A member must not participate in or vote on a decision of the corporation relating to any project authorized by or under consideration by the corporation in which the member has either a direct or indirect financial interest. No member may serve as a lobbyist, as defined under section 10A.01, subdivision 21 . <A]

[A>Subd. 10. Public official. A member of the corporation is a public official, as defined in section 10A.01, subdivision 35 . <A]

[A>Subd. 11. Powers. The corporation may exercise any other powers that are granted by its articles of incorporation and bylaws to the extent that those powers are not inconsistent with the provisions of sections 469.40 to 469.47 . <A]

[A>Subd. 12. Contract for services. <A]

[A>(a) The corporation may contract for the services of the nonprofit economic development agency, financial advisors, other consultants, agents, public accountants, legal counsel, and other persons needed to perform its duties and exercise its powers. The corporation may contract with the city or county to provide administrative, clerical, and accounting services to the corporation. <A]

[A>(b) The corporation must contract with the nonprofit agency for the services enumerated in section 469.43, subdivision 6 , paragraph (a).

The requirement to contract with the nonprofit agency does not limit the corporation's authority to contract with other providers for the services. <A]

[A>Subd. 13. DMCC approval of projects. A project must be approved by the corporation before it is proposed to the city. The corporation must review the project proposed for consistency with the adopted development plan. <A]

[A>Subd. 14. Dissolution. The city must provide for the terms for dissolution of the corporation in the articles of incorporation. <A]

Sec. 5. [A> [469.42 ] OFFICERS; DUTIES; ORGANIZATIONAL MATTERS. <A]

[A>Subdivision 1. Bylaws, rules, seal. The corporation may adopt bylaws and rules of procedure and may adopt an official seal. <A]

[A>Subd. 2. Officers. The corporation must annually elect a treasurer. The chair must appoint a secretary

and assistant treasurer. The secretary and assistant treasurer need not, but may, be members of the board. <A]

[A>Subd. 3. Duties and powers. The officers have the usual duties and powers of their offices. They may be given other duties and powers by the corporation. The corporation must establish and maintain a Web site. <A]

[A>Subd. 4. Treasurer's duties. The treasurer: <A]

[A>(1) must receive and is responsible for corporation money; <A]

[A>(2) is responsible for the acts of the assistant treasurer; <A]

[A>(3) must disburse corporation money by check or electronic procedures; <A]

[A>(4) must keep an account of the source of all receipts, and of the nature, purpose, and authority of all disbursements; and <A]

[A>(5) must file the corporation's detailed financial statement with its secretary at least once a year at times set by the authority. <A]

[A>Subd. 5. Secretary. The secretary must perform duties as required by the board. <A]

[A>Subd. 6. Assistant treasurer. The assistant treasurer has the powers and duties of the treasurer if the treasurer is absent or disabled. <A]

Sec. 6. [A> [469.43 ] DEVELOPMENT PLAN. <A]

[A>Subdivision 1. Development plan; adoption by DMCC; notice; findings. <A]

[A>(a) The corporation, working with the city and the nonprofit economic development agency, must prepare and adopt a development plan. The corporation must hold a public hearing before adopting a development plan. At least 60 days before the hearing, the corporation must make copies of the proposed plan available to the public at the corporation and city offices during normal business hours, on the corporation's and city's Web site, and as otherwise determined appropriate by the corporation. At least ten days before the hearing, the corporation must publish notice of the hearing in the official newspaper of the city. The development plan may not be adopted, unless the corporation finds, by resolution, that: <A]

[A>(1) the plan provides an outline for the development of the city as a destination medical center, and the plan is sufficiently complete, including the identification of planned and anticipated projects, to indicate its relationship to definite state and local objectives; <A]

[A>(2) the proposed development affords maximum opportunity, consistent with the needs of the city, county, and state, for the development of the city by private enterprise as a destination medical center; <A]

[A>(3) the proposed development conforms to the general plan for the development of the city and is consistent with the city comprehensive plan; <A]

[A>(4) the plan includes: <A]

[A>(i) strategic planning consistent with a destination medical center in the core areas of commercial research and technology, learning environment, hospitality and convention, sports and recreation, livable communities, including mixed-use urban development and neighborhood residential development, retail/dining/entertainment, and health and wellness; <A]

[A>(ii) estimates of short- and long-range fiscal and economic impacts; <A]

[A>(iii) a framework to identify and prioritize short- and long-term public investment and public infrastructure project development and to facilitate private investment and development, including the criteria and process for evaluating and underwriting development proposals; <A]

[A>(iv) land use planning; <A]

[A>(v) transportation and transit planning; <A]

[A>(vi) operational planning required to support the medical center development district; and <A]

[A>(vii) ongoing market research plans; and <A]

[A>(5) the city has approved the plan. <A]

[A>(b) The identification of planned and anticipated projects under paragraph (a), clause <A]

[A>(1), must give priority to projects that will pay wages at least equal to the basic cost of living wage as calculated by the commissioner of employment and economic development for the county in which the project is located. The calculation of the basic cost of living wage must be done as provided for under section 116J.013 , if enacted by the 2013 legislature. <A]

[A>Subd. 2. Development plan approval by city. <A]

[A>Section 15.99 does not apply to review and approval of the development plan.

The city shall act on the development plan within 60 days following its submission by the corporation. The city may incorporate the development plan into the city's comprehensive plan. <A]

[A>Subd. 3. Subject to city requirements. All projects are subject to the planning, zoning, sanitary, and building laws; ordinances; regulations; and land use plans that apply to the city. <A]

[A>Subd. 4. Modification of development plan. The corporation may modify the development plan at any time. The corporation must update the development plan not less than every five years. A modification or update under this subdivision must be adopted by the corporation upon the notice and after the public

hearing and findings required for the original adoption of the development plan, including approval by the city. <A]

[A>Subd. 5. Medical center development districts; creation; notice; findings. As part of the development plan, the corporation may create and define the boundaries of medical center development districts and subdistricts at any place or places within the city. Projects may be undertaken within defined medical center development districts consistent with the development plan. <A]

[A>Subd. 6. Nonprofit economic development agency. <A]

[A>(a) The medical business entity must establish a nonprofit economic development agency organized under chapter 317A to provide experience and expertise in developing and marketing the destination medical center. The corporation must engage the agency to assist the corporation in preparing the development plan. The governing board of the agency must be comprised of members of the medical community, city, and county. The agency must collaborate with city, county, and other community representatives. The nonprofit agency must provide services to assist the corporation and city in implementing the goals, objectives, and strategies in the development plan including, but not limited to: <A]

[A>(1) facilitating private investment through development of a comprehensive marketing program to global interests; <A]

[A>(2) developing and updating the criteria for evaluating and underwriting development proposals; <A]

[A>(3) drafting and implementing the development plan, including soliciting and evaluating proposals for development and evaluating and making recommendations to the authority and the city regarding those proposals; <A]

[A>(4) providing transactional services in connection with approved projects; <A]

[A>(5) developing patient, visitor, and community outreach programs for a destination medical center development district; <A]

[A>(6) working with the corporation to acquire and facilitate the sale, lease, or other transactions involving land and real property; <A]

[A>(7) seeking financial support for the corporation, the city, and a project; <A]

[A>(8) partnering with other development agencies and organizations, the city, and the county in joint efforts to promote economic development and establish a destination medical center; <A]

[A>(9) supporting and administering the planning and development activities required to implement the development plan; <A]

[A>(10) preparing and supporting the marketing and promotion of the medical center development district;

<A]

[A>(11) preparing and implementing a program for community and public relations in support of the medical center development district; <A]

[A>(12) assisting the corporation or city and others in applications for federal grants, tax credits, and other sources of funding to aid both private and public development; and <A]

[A>(13) making other general advisory recommendations to the corporation and the city, as requested. <A]

[A>(b) The nonprofit economic development agency must disclose to the city and to the corporation the existence, nature, and all material facts regarding any financial interest its employees or contractors have in any public infrastructure project submitted to the city for approval and any financial interest its employees or contractors have in the destination medical center development. " Contractors" includes affiliates of the contractors or members or shareholders with an ownership interest of more than 20 percent in the contractor. <A]

[A>Subd. 7. Audit of nonprofit economic development agency contract. Any contract for services between the corporation and the nonprofit economic development agency paid, in whole or in part, with public money provides the corporation, the city, and the state auditor the right to audit the books and records of the agency that are necessary to certify: <A]

[A>(1) the nature and extent of the services furnished pursuant to the contract; and <A]

[A>(2) that the payment for services and related disbursements complies with all state laws, regulations, and the terms of the contract. Any contract for services between the corporation and the agency paid, in whole or in part, with public money must require the corporation to maintain for the life of the corporation accurate and complete books and records directly relating to the contract. <A]

[A>Subd. 8. Report. By February 15 of each year, the corporation and city must jointly submit a report to the chairs and ranking minority members of the legislative committees and divisions with jurisdiction over local and state government operations, economic development, and taxes, and to the commissioners of revenue and employment and economic development, and the county. The corporation and city must also submit the report as provided in section 3.195. The report must include: <A]

[A>(1) the development plan and any proposed changes to the development plan; <A]

[A>(2) progress of projects identified in the development plan; <A]

[A>(3) actual costs and financing sources, including the amount paid with state aid under section 469.47 , and required local contributions of projects completed in the previous two years by the corporation, city, county, and the medical business entity; <A]

[A>(4) estimated costs and financing sources for projects to be started in the next two years by the

corporation, city, county, and the medical business entity; and <A]

[A>(5) debt service schedules for all outstanding obligations of the city for debt issued for projects identified in the plan. <A]

Sec. 7. [A> [469.44 ] CITY POWERS, DUTIES; AUTHORITY TO ISSUE BONDS. <A]

[A>Subdivision 1. Port authority powers. The city may exercise the powers of a port authority under sections 469.048 to469.068 for the purposes of implementing the destination medical center development plan. <A]

[A>Subd. 2. Support to the corporation. The city must provide financial and administrative support, and office and other space, to the corporation. The city may appropriate city funds to the corporation for its work. <A]

[A>Subd. 3. City to issue debt. The city may issue general obligation bonds, revenue bonds, or other obligations, as it determines appropriate, to finance public infrastructure projects, as provided by chapter 475. Notwithstanding section 475.53 , obligations issued under this section are not subject to the limits on net debt, regardless of their source of security or payment. Notwithstanding section 475.58 or any other law or charter provision to the contrary, issuance of obligations under the provisions of this section are not subject to approval of the electors. The city may pledge any of its revenues, including property taxes, the taxes authorized by sections 469.45 and 469.46 , and the state aid under section469.47 , as security for and to pay the obligations. The city must not issue obligations that are only payable from or secured by state aid under section 469.47 . <A]

[A>Subd. 4. Local government tax base not reduced. Nothing in sections 469.40 to 469.47 reduces the tax base or affects the taxes due and payable to the city, the county, or any school district within the boundaries of the city, including without limitation, the city's general local sales tax. <A]

[A>Subd. 5. Project implementation before plan adoption. The city may exercise the powers under subdivision 3 with respect to any public infrastructure project commenced within the area that will be in the destination medical center development district after the effective date of this section but before the development plan is adopted subject to approval by the corporation. Actions taken under this authority must be approved by the corporation to be credited against the local contribution required under section 469.47, subdivision 4 . <A]

[A>Subd. 6. American made steel. The city must require that a public infrastructure project use American steel products to the extent practicable. In determining whether it is practicable, the city may consider the exceptions to the requirement in Public Law 111-5, section 1605. <A]

[A>Subd. 7. City contracts; construction requirements. For all public infrastructure projects, the city must make every effort to hire and cause the construction manager and any subcontractors to employ women and members of minority communities. Goals for construction contracts must be established in the manner required under the city's minority and women-owned business enterprises utilization plan. <A]

[A>Subd. 8. Conduit bond issuance. <A]

[A>(a) Upon the request of the corporation or the nonprofit agency, the city or its economic development authority shall issue revenue bonds or other similar obligations for a qualifying project. Revenue bonds or other obligations as used in this subdivision means bonds or other obligations issued under sections 469.152 to 469.165 or under chapter 462C, the interest on which is tax exempt. The city or its development authority shall use its best efforts to issue the bonds or other obligations as promptly and efficiently as possible following the request and the provision of the information and completion of the actions by the corporation or the nonprofit agency that are necessary for the issuance.

Upon request of the corporation or nonprofit agency, the city or its economic development authority shall adopt methods and procedures that preserve the confidentiality of private donors or other private participants in the qualifying project, including structures and methods that do not require disclosing information on the donors or participants to the city or its economic development authority, and shall segregate in separate accounts all funds related to a qualifying project from other city and authority funds. <A]

[A>(b) For purposes of this section, a "qualifying project" means a project, as that term is defined in section 469.153 , or a project that would qualify for financing under chapter 462C, that: <A]

[A>(1) the corporation finds is consistent with and will further the goals of the development plan; <A]

[A>(2) is located in a medical development district; and <A]

[A>(3) has a commitment of private funding sources such as donations of money or in-kind contributions, other than revenues generated by the project, equal to at least ten percent of the total capital cost of the project. <A]

[A>Subd. 9. Public bidding exemption. <A]

[A>(a) Notwithstanding section 469.068 or any other law to the contrary, the city need not require competitive bidding with respect to a parking facility or other public improvements constructed in conjunction with, and directly above or below, or adjacent and integrally related to, a private development financed or developed under the development plan. <A]

[A>(b) For purposes of this section, "city" includes the development authority established by the city. <A]

Sec. 8. [A> [469.45 ] CITY TAX AUTHORITY. <A]

[A>Subdivision 1. Rochester, other local taxes authorized. <A]

[A>(a) Notwithstanding section 477A.016 , or any other contrary provision of law, ordinance, or city charter, and in addition to any taxes the city may impose on these transactions under another statute or law, the city of Rochester may, by ordinance, impose at a rate or rates, determined by the city, any of the following taxes: <A]

[A>(1) a tax on the gross receipts from the furnishing for consideration of lodging and related services as defined in section 297A.61, subdivision 3 , paragraph (g), clause (2); the city may choose to impose a differential tax based on the number of rooms in the facility; <A]

[A>(2) a tax on the gross receipts of food and beverages sold primarily for consumption on the premises by restaurants and places of refreshment that occur in the city of Rochester; the city may elect to impose the tax in a defined district of the city; and <A]

[A>(3) a tax on the admission receipts to entertainment and recreational facilities, as defined by ordinance, in the city of Rochester. <A]

[A>(b) The provisions of section 297A.99 , subdivisions 4 to 13, govern the administration, collection, and enforcement of any tax imposed by the city under paragraph (a). <A]

[A>(c) The proceeds of any taxes imposed under this subdivision, less refunds and costs of collection, must be used by the city only to meet its share of obligations for public infrastructure projects contained in the development plan and approved by the corporation, including any associated financing costs.

Any tax imposed under paragraph <A]

[A>(a) expires at the earlier of December 31, 2049, or when the city council determines that sufficient funds have been raised from the tax plus all other local funding sources authorized in this article to meet the city obligation for financing public infrastructure projects contained in the development plan and approved by the corporation, including any associated financing costs. <A]

[A>Subd. 2. General sales tax authority. The city may elect to extend the existing local sales and use tax under section 13 or to impose an additional rate of up to one quarter of one percent tax on sales and use under section 11. The proceeds of any extended or additional taxes imposed under this subdivision, less refunds and costs of collection, must be used by the city only to meet its share of obligations for public infrastructure projects contained in the development plan and approved by the corporation, including all financing costs. Revenues collected in any year to meet the obligations must be used for payment of obligations or expenses for public infrastructure projects approved by the corporation. <A]

[A>Subd. 3. Special abatement rules. <A]

[A>(a) If the city or the county elects to use tax abatement under sections469.1812 to 469.1815 to finance costs of public infrastructure projects, including all financing costs, the special rules under this subdivision apply. Taxes abated for public infrastructure projects must be used only for obligations or other infrastructure projects approved by the corporation. <A]

[A>(b) The limitations under section 469.1813, subdivision 6 , do not apply to the city or the county. <A]

[A>(c) The limitations under section 469.1813, subdivision 8 , do not apply and property taxes abated by the city or the county to finance costs of public infrastructure projects are not included for purposes of

applying section 469.1813, subdivision 8 , to the use of tax abatement for other purposes of the city or the county; however, the total amount of property taxes abated by the city and the county under this authority must not exceed $87,750,000. <A]

[A>Subd. 4. Special tax increment financing rules. If the city elects to establish one or more redevelopment tax increment financing districts within the area of the destination medical center development district to fund public infrastructure projects, the requirements, definitions, limitations, or restrictions in the following statutes do not apply: sections 469.174 , subdivisions 10 and 25, clause (2); 469.176 , subdivisions 4j, 4l, and 5; and 469.1763 , subdivisions 2, 3, and 4. The provisions of this subdivision expire effective for tax increments expended after December 31, 2049. After that date, the provisions of section 469.1763, subdivision 4 , apply to any remaining unspent or unobligated increments. <A]

Sec. 9. [A> [469.46 ] COUNTY TAX AUTHORITY. <A]

[A>(a) Notwithstanding sections 297A.99 , 297A.993 , and 477A.016 , or any other contrary provision of law, ordinance, or charter, and in addition to any taxes the county may impose under another law or statute, the Board of Commissioners of Olmsted County may, by resolution, impose a transit tax of up to one quarter of one percent on retail sales and uses taxable under chapter 297A. The provisions of section 297A.99 , subdivisions 4 to 13, govern the imposition, administration, collection, and enforcement of the tax authorized under this paragraph. <A]

[A>(b) The Board of Commissioners of Olmsted County may, by resolution, levy an annual wheelage tax of up to $10 on each motor vehicle kept in the county when not in operation which is subject to annual registration and taxation under chapter 168, for transportation projects within the county. The wheelage tax must not be imposed on the vehicles exempt from wheelage tax under section 163.051, subdivision 1 . The board, by resolution, may provide for collection of the wheelage tax by county officials, or it may request that the tax be collected by the state registrar on behalf of the county. The provisions of section 163.051 , subdivisions 2, 2a, 3, and 7, must govern the administration, collection, and enforcement of the tax authorized under this paragraph. The tax authorized under this section is in addition to any tax the county may be authorized to impose under section 163.051 , but until January 1, 2018, the county tax imposed under this paragraph, in combination with any tax imposed under section 163.051 , must equal the specified rate under section 163.051 . <A]

[A>(c) The proceeds of any taxes imposed under paragraph (a), less refunds and costs of collection, must be first used by the county to meet its local matching contributions under section 469.47, subdivision 6 , for financing transit infrastructure related to the public infrastructure projects contained in the development plan and approved by the corporation, including any financing costs. Revenues collected in any calendar year in excess of the county obligation to pay for projects contained in the development plan may be retained by the county and used for funding other transportation projects, including roads and bridges, airports, and transportation improvements. <A]

[A>(d) Any taxes imposed under paragraph (a) expire December 31, 2049, or at an earlier time if

approved by resolution of the county board of commissioners. The taxes must not terminate before the county board of commissioners determines that revenues from these taxes and any other revenue source the county dedicates are sufficient to pay the county share of transit project costs and financing costs under the development plan. <A]

Sec. 10. [A> [469.47 ] STATE INFRASTRUCTURE AID. <A]

[A>Subdivision 1. Definitions. <A]

[A>(a) For purposes of this section, the following terms have the meanings given them. <A]

[A>(b) "Commissioner" means the commissioner of employment and economic development. <A]

[A>(c) "Construction projects" means: <A]

[A>(1) for expenditures by a medical business entity, construction of buildings in the city for which the building permit was issued after June 30, 2013; and <A]

[A>(2) for any other expenditures, construction of privately owned buildings and other improvements that are undertaken pursuant to or as part of the development plan and are located within a medical center development district. <A]

[A>(d) "Expenditures" means expenditures made by a medical business entity or by an individual or private entity on construction projects for the capital cost of the project including, but not limited to: <A]

[A>(1) design and predesign, including architectural, engineering, and similar services; <A]

[A>(2) legal, regulatory, and other compliance costs of the project; <A]

[A>(3) land acquisition, demolition of existing improvements, and other site preparation costs; <A]

[A>(4) construction costs, including all materials and supplies of the project; and <A]

[A>(5) equipment and furnishings that are attached to or become part of the real property. Expenditures excludes supplies and other items with a useful life of less than a year that are not used or consumed in constructing improvements to real property or are otherwise chargeable to capital costs. <A]

[A>(e) "Qualified expenditures" has the following meaning. In the first year in which aid is paid under this section, "qualified expenditures" means the total certified expenditures since June 30, 2013, through the end of the preceding year, minus $200,000,000. For subsequent years, "qualified expenditures" means the certified expenditures for the preceding year. <A]

[A>(f) "Transit costs" means the portions of a public infrastructure project that are for public transit intended primarily to serve the district, such as transit stations, equipment, rights-of-way, and similar costs. <A]

[A>Subd. 2. Certification of expenditures. By April 1 of each year, the medical business entity must certify to the commissioner the amount of expenditures made by the medical business entity in the preceding year. For expenditures made by an individual or entity other than the medical business entity, the corporation shall compile the information on the expenditures and may certify the amount to the commissioner. The certification must be made in the form that the commissioner prescribes and include any documentation of and supporting information regarding the expenditures that the commissioner requires. By August 1 of each year, the commissioner must determine the amount of the expenditures for the preceding year. <A]

[A>Subd. 3. General state infrastructure aid. <A]

[A>(a) General state infrastructure aid may not be paid out under this section until total expenditures exceed $200,000,000. <A]

[A>(b) The amount of the general state infrastructure aid for a fiscal year equals the sum of qualified expenditures, multiplied by 2.75 percent. The maximum amount of state aid payable in any year is limited to no more than $30,000,000. If the aid entitlement for the year exceeds the maximum annual limit, the excess is an aid carryover to later years. The carryover aid must be paid in the first year in which the aid entitlement for the current year is less than the maximum annual limit, but only to the extent the carryover, when added to the current year aid, is less than the maximum annual limit. If the commissioner determines that the city has made the required matching local contribution under subdivision 4, the commissioner must pay to the city the amount of general state infrastructure aid for the year by September 1. <A]

[A>(c) The city must use general state infrastructure aid it receives under this subdivision for improvements and other capital costs related to the public infrastructure projects approved by the corporation, other than transit costs. The city must maintain appropriate records to document the use of the funds under this requirement. <A]

[A>(d) The commissioner, in consultation with the commissioner of management and budget, and representatives of the city and the corporation, must establish a total limit on the amount of state aid payable under this subdivision that will be adequate to finance, in combination with the local contribution, $455,000,000 of general public infrastructure projects. <A]

[A>Subd. 4. General aid; local matching contribution. In order to qualify for general state infrastructure aid, the city must enter a written agreement with the commissioner that requires the city to make a qualifying local matching contribution to pay for $128,000,000 of the cost of public infrastructure projects approved by the corporation, including financing costs, using funds other than state aid received under this section. The $128,000,000 required local matching contribution is reduced by one half of the amounts the city pays for operating and administrative costs of the corporation up to a maximum amount agreed to by the board and the city. The agreement must provide for the manner, timing, and amounts of the city contributions, including the city's commitment for each year. Notwithstanding any law to the contrary, the

agreement may provide that the city contributions for public infrastructure project principal costs may be made over a 20-year period at a rate not greater than $1 from the city for each $2.55 from the state. The local match contribution may be provided by the city from any source identified in section 469.45 and any other local tax proceeds or other funds from the city and may include providing funds to assist developers undertaking projects in accordance with the development plan or by the city directly undertaking public infrastructure projects in accordance with the development plan, provided the projects have been approved by the corporation. City contributions that are in excess of this ratio carry forward and are credited towards subsequent years. The commissioner and city may agree to amend the agreement at any time in light of new information or other appropriate factors. The city may enter into arrangements with the county to pay for or otherwise meet the local matching contribution requirement. Any public infrastructure project within the area that will be in the destination medical center development district whose implementation is started or funded by the city after the effective date of this section but before the development plan is adopted, as provided by section 469.46, subdivision 5 , will be included for the purposes of determining the amount the city has contributed as required by this section and the agreement with the commissioner, subject to approval by the corporation. <A]

[A>Subd. 5. State transit aid. <A]

[A>(a) The city qualifies for state transit aid under this section if the county contributes the required local matching contribution under subdivision 6 or the city or county has agreed to make an equivalent contribution out of other funds for the year. <A]

[A>(b) If the city qualifies for aid under paragraph (a), the commissioner must pay the city the state transit aid in the amount calculated under this paragraph. The amount of the state transit aid for a fiscal year equals the sum of qualified expenditures, as certified by the commissioner for the prior year, multiplied by 0.75 percent, reduced by the amount of the local contribution under subdivision 6. The maximum amount of state transit aid payable in any year is limited to no more than $7,500,000. If the aid entitlement for the year exceeds the maximum annual limit, the excess is an aid carryover to later years. The carryover aid must be paid in the first year in which the aid entitlement for the current year is less than the maximum annual limit, but only to the extent the carryover, when added to the current year aid, is less than the maximum annual limit. <A]

[A>(c) The commissioner, in consultation with the commissioner of management and budget, and representatives of the city and the corporation, must establish a total limit on the amount of state aid payable under this subdivision that will be adequate to finance, in combination with the local contribution, $116,000,000 of transit costs. <A]

[A>(d) The city must use state transit aid it receives under this subdivision for transit costs. The city must maintain appropriate records to document the use of the funds under this requirement. <A]

[A>Subd. 6. Transit aid; local matching contribution. <A]

[A>(a) The required local matching contribution for state transit aid equals the lesser of: <A]

[A>(1) 40 percent of the state transit aid under subdivision 5; or <A]

[A>(2) the amount that would be raised by a 0.15 percent sales tax imposed by the county in the preceding year. The county may impose the sales tax or the wheelage tax under section 469.46 to meet this obligation. <A]

[A>(b) If the county elects not to impose any of the taxes authorized under section 469.46 , the county, or city, or both, may agree to make the local contribution out of other available funds, other than state aid payable under this section. The commissioner of revenue must estimate the required amount and certify it to the commissioner, city, and county. <A]

[A>Subd. 7. Prevailing wage requirement. During the construction, installation, remodelling, and repairs of any public infrastructure project funded by state aid or a local matching contribution under this section, laborers and mechanics at the site must be paid the prevailing wage rate as defined in section 177.42, subdivision 6 , and the project is subject to the requirements of sections 177.30 and 177.41 to 177.44 . <A]

[A>Subd. 8. Termination. No aid may be paid under this section after fiscal year 2049. <A]

[A>Subd. 9. Appropriation. An amount sufficient to pay the state general infrastructure and state transit aid authorized under this section is appropriated to the commissioner from the general fund. <A]

Sec. 11. Laws 1998, chapter 389, article 8, section 43, subdivision 1, is amended to read: Subdivision 1. Sales and use taxes authorized.

[A>(a) <A] Notwithstanding Minnesota Statutes, section 477A.016 , or any other contrary provision of law, ordinance, or city charter, upon termination of the taxes authorized under Laws 1992, chapter 511, article 8, section 33, subdivision 1, and if approved by the voters of the city at a general or special election held within one year of the date of final enactment of this act, the city of Rochester may, by ordinance, impose an additional sales and use tax of up to one-half of one percent.

```
The provisions of Minnesota Statutes, section
    [D>297A.48 <D]
```

[A>297A.99 <A],

govern the imposition, administration, collection, and enforcement of the tax

```
authorized under this
    [D>subdivision <D]
```

[A>paragraph <A].

[A>(b) Notwithstanding Minnesota Statutes, sections 297A.99 and 477A.016 , or any other contrary

provision of law, ordinance, or charter, the city of Rochester may, by ordinance, impose an additional sales and use tax of up to one quarter of one percent. The provisions of Minnesota Statutes, section 297A.99 , subdivisions 1 and 4 to 13, govern the imposition, administration, collection, and enforcement of the tax authorized under this paragraph. <A]

Sec. 12. Laws 1998, chapter 389, article 8, section 43, subdivision 3, as amended by Laws 2005, First Special Session chapter 3, article 5, section 28, and Laws 2011, First Special Session chapter 7, article 4, section 5, is amended to read: Subd. 3. Use of revenues.

```
(a) Revenues received from the taxes authorized by subdivisions 1
    [A>,
```

paragraph (a), <A] and 2 must be used by the city to pay for the cost of collecting and administering the taxes and to pay for the following projects:

(1) transportation infrastructure improvements including regional highway and airport improvements;

(2) improvements to the civic center complex;

(3) a municipal water, sewer, and storm sewer project necessary to improve regional ground water quality; and

(4) construction of a regional recreation and sports center and other higher education facilities available for both community and student use.

(b) The total amount of capital expenditures or bonds for projects listed in paragraph

(a) that may be paid from the revenues raised from the taxes authorized in this section may not exceed $111,500,000. The total amount of capital expenditures or bonds for the project in clause (4) that may be paid from the revenues raised from the taxes authorized in this section may not exceed $28,000,000.

(c) In addition to the projects authorized in paragraph (a) and not subject to the amount stated in paragraph (b), the city of Rochester may, if approved by the voters at an election under subdivision 5, paragraph (c), use the revenues received from the taxes and bonds authorized in this section to pay the costs of or bonds for the following purposes:

(1) $17,000,000 for capital expenditures and bonds for the following Olmsted County transportation infrastructure improvements:

(i) County State Aid Highway 34 reconstruction;

(ii) Trunk Highway 63 and County State Aid Highway 16 interchange;

(iii) phase II of the Trunk Highway 52 and County State Aid Highway 22 interchange;

(iv) widening of County State Aid Highway 22 West Circle Drive; and

(v) 60th Avenue Northwest corridor preservation;

(2) $30,000,000 for city transportation projects including:

(i) Trunk Highway 52 and 65th Street interchange;

(ii) NW transportation corridor acquisition;

(iii) Phase I of the Trunk Highway 52 and County State Aid Highway 22 interchange;

(iv) Trunk Highway 14 and Trunk Highway 63 intersection;

(v) Southeast transportation corridor acquisition;

(vi) Rochester International Airport expansion; and

(vii) a transit operations center bus facility;

(3) $14,000,000 for the University of Minnesota Rochester academic and complementary facilities;

(4) $6,500,000 for the Rochester Community and Technical College/Winona State University career technical education and science and math facilities;

(5) $6,000,000 for the Rochester Community and Technical College regional recreation facilities at University Center Rochester;

(6) $20,000,000 for the Destination Medical Community Initiative;

(7) $8,000,000 for the regional public safety and 911 dispatch center facilities;

(8) $20,000,000 for a regional recreation/senior center;

(9) $10,000,000 for an economic development fund; and

(10) $8,000,000 for downtown infrastructure.

(d) No revenues from the taxes raised from the taxes authorized in subdivisions 1 and 2 may be used to fund transportation improvements related to a railroad bypass that would divert traffic from the city of Rochester.

(e)
    [D>The city shall use $5,000,000 of the money allocated to the purpose

in paragraph <D]

[D>(c), clause (9), for grants to the cities of Byron, Chatfield, Dodge Center, Dover, Elgin, Eyota, Kasson, Mantorville, Oronoco, Pine Island, Plainview, St. Charles, Stewartville, Zumbrota, Spring Valley, West

Concord, and Hayfield for economic development projects that these communities would fund through their economic development authority or housing and redevelopment authority. <D] [A>Notwithstanding Minnesota Statutes, section 297A.99 , subdivisions 2 and 3, if the city decides to extend the taxes in subdivisions 1, paragraph (a), and 2, as allowed under subdivision 5, paragraph (c), the city must use any amount in excess of the amount necessary to meet obligations under paragraphs (a) to (c) from those taxes to fund obligations, including financing costs, related to public infrastructure projects in the development plan adopted underMinnesota Statutes, section 469.43. <A]

[A>(f) Revenues from the tax under subdivision 1, paragraph (b), must be used to fund obligations, including financing costs, related to the public infrastructure projects contained in the development plan approved by the DMCC and adopted by the city under Minnesota Statutes, section 469.43. <A]

Sec. 13. Laws 1998, chapter 389, article 8, section 43, subdivision 5, as amended by Laws 2005, First Special Session chapter 3, article 5, section 30, and Laws 2011, First Special Session chapter 7, article 4, section 7, is amended to read: Subd. 5. Termination of taxes. (a) The taxes imposed under subdivisions 1 and 2 expire at the later of (1) December 31, 2009, or (2) when the city council determines that sufficient funds have been received from the taxes to finance the first $71,500,000 of capital expenditures and bonds for the projects authorized in subdivision 3, including the amount to prepay or retire at maturity the principal, interest, and premium due on any bonds issued for the projects under subdivision 4, unless the taxes are extended as allowed in paragraph (b).

Any funds remaining after completion of the project and retirement or redemption of the bonds shall also be used to fund the projects under subdivision 3. The taxes imposed under subdivisions 1 and 2 may expire at an earlier time if the city so determines by ordinance.

(b) Notwithstanding Minnesota Statutes, sections 297A.99 and 477A.016 , or any other contrary provision of law, ordinance, or city charter, the city of Rochester may, by ordinance, extend the taxes authorized in subdivisions 1 and 2 beyond December 31, 2009, if approved by the voters of the city at a special election in 2005 or the general election in 2006. The question put to the voters must indicate that an affirmative vote would allow up to an additional $40,000,000 of sales tax revenues be raised and up to $40,000,000 of bonds to be issued above the amount authorized in the June 23, 1998, referendum for the projects specified in subdivision 3. If the taxes authorized in subdivisions 1 and 2 are extended under this paragraph, the taxes expire when the city council determines that sufficient funds have been received from the taxes to finance the projects and to prepay or retire at maturity the principal, interest, and premium due on any bonds issued for the projects under subdivision 4. Any funds remaining after completion of the project and retirement or redemption of the bonds may be placed in the general fund of the city.

(c) Notwithstanding Minnesota Statutes, sections 297A.99 and 477A.016 , or any other contrary provision of law, ordinance, or city charter, the city of

```
Rochester may, by ordinance, extend the taxes authorized in subdivisions 1
   [A>, paragraph (a), <A] and 2
```

[D>beyond the date <D]

[A>, up to December 31,

2049, provided that all additional revenues above those necessary to fund the projects and associated financing costs listed in subdivision 3, paragraphs (a) to <A]

[A>(e), are committed to fund public infrastructure projects contained in the development plan adopted under Minnesota Statutes, section 469.43 , including all financing costs; otherwise the taxes terminate when <A] the city council determines that sufficient funds have been received from the taxes to finance

[D>$111,500,000 of <D] expenditures and bonds for the projects authorized in

subdivision 3,
    [D>paragraph (a) <D]

[A>paragraphs (a) to (e) <A], plus an

amount equal to the costs of issuance of the bonds and including the amount to prepay or retire at maturity the principal, interest, and premiums due on any

bonds issued for the projects under subdivision 4
    [D>, paragraph (a), if

approved by the voters of the city at the general election in 2012. If the election to authorize the additional $139,500,000 of bonds plus an amount equal to the costs of the issuance of the bonds is placed on the general election ballot in 2012, the city may continue to collect the taxes authorized in subdivisions 1 and 2 until December 31, 2012. The question put to the voters must indicate that an affirmative vote would allow sales tax revenues be raised for an extended period of time and an additional $139,500,000 of bonds plus an amount equal to the costs of issuance of the bonds, to be issued above the amount authorized in the previous elections required under paragraphs <D]

[D>(a) and (b) for the projects and amounts specified in subdivision 3. If the taxes authorized in subdivisions 1 and 2 are extended under this paragraph, the taxes expire when the city council determines that $139,500,000 has been received from the taxes to finance the projects plus an amount sufficient to prepay or retire at maturity the principal, interest, and premium due on any bonds issued for the projects under subdivision 4, including any bonds issued to refund the bonds. Any funds remaining after completion of the projects and retirement or redemption of the bonds may be placed in the general fund of the city <D].

[A>(d) The tax imposed under subdivision 1, paragraph (b), expires at the earlier of 2049, or when the city council determines that sufficient funds have been raised from the tax plus all other city funding sources authorized in this article to meet the city obligation for financing the public infrastructure projects

contained in the development plan adopted under Minnesota Statutes, section 469.43 , including all financing costs. <A]

Sec. 14. [A> ROCHESTER SALES TAX SHARING. The city council may, after holding a public hearing and passing a resolution, use $5,000,000 of the $10,000,000 allocated to an economic development fund in Laws 1998, chapter 389, article 8, section 43, subdivision 3, as amended by Laws 2005, First Special Session chapter 3, article 5, section 28, and Laws 2011, First Special Session chapter 7, article 4, section 5, paragraph (c), clause (9), for grants to any or all of the cities of Byron, Chatfield, Dodge Center, Dover, Elgin, Eyota, Hayfield, Kasson, Mantorville, Oronoco, Pine Island, Plainview, Spring Valley, St. Charles, Stewartville, West Concord, and Zumbrota for economic development projects that these communities would fund through their economic development authority or housing and redevelopment authority. The public hearing may be part of a regular city council meeting. If the council does not pass the resolution by September 1, 2013, the $5,000,000 may not be used for grants to the other cities but shall instead be used to fund public infrastructure projects contained in the development plan under Minnesota Statutes, section 469.42. <A]

Sec. 15. [A> OLMSTED INTERREGIONAL PASSENGER RAIL STUDY. The study by the Olmsted County Regional Rail authority, in conjunction with the Minnesota Department of Transportation, on interregional passenger rail, and funded under Laws 2009, chapter 93, article 1, section 11, subdivision 5, must include analysis of the feasibility of a high-speed rail connection between Rochester and the Mall of America via Minnesota State Highway 77 with connections to the Minneapolis-St. Paul International Airport and the Union Depot in St. Paul; and, to the extent feasible, take into account available data, forecasts, available transportation demand modeling information, and transportation impacts of major economic initiatives and proposals including, but not limited to, expansion of the Mayo Clinic. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 16.

[A>EFFECTIVE DATE. Except as otherwise provided, this article is effective the day after the governing body of the city of Rochester and its chief clerical officer timely comply with Minnesota Statutes, section 645.021 , subdivisions 2 and 3. <A]ARTICLE 11 MINERALS TAXES

Section 1. AMEND Minnesota Statutes 2012, section 126C.48, subdivision 8 , is amended to read: Subd. 8. Taconite payment and other reductions. (1) Reductions in levies pursuant to subdivision 1 must be made prior to the reductions in clause (2).

(2) Notwithstanding any other law to the contrary, districts that have revenue pursuant to sections 298.018 ; 298.225 ; 298.24 to 298.28 , except an amount distributed under sections 298.26 ; 298.28 , subdivision 4, paragraphs (c), clause (ii), and (d); 298.34 to 298.39 ; 298.391 to 298.396 ; 298.405 ; 477A.15 ; and any law imposing a tax upon severed mineral values must reduce the levies authorized by this chapter and chapters 120B, 122A, 123A, 123B, 124A, 124D,

125A, and 127A by 95 percent of [A>the sum of <A] the previous year's revenue specified under this clause [A>and the amount attributable to the

same production year distributed to the cities and townships within the school district under section 298.28, subdivision 2 , paragraph (c) <A].

(3) The amount of any voter approved referendum, facilities down payment, and debt levies shall not be reduced by more than 50 percent under this subdivision. In administering this paragraph, the commissioner shall first reduce the nonvoter approved levies of a district; then, if any payments, severed mineral value tax revenue or recognized revenue under paragraph (2) remains, the commissioner shall reduce any voter approved referendum levies authorized under section 126C.17 ; then, if any payments, severed mineral value tax revenue or recognized revenue under paragraph (2) remains, the commissioner shall reduce any voter approved facilities down payment levies authorized under section 123B.63 and then, if any payments, severed mineral value tax revenue or recognized revenue under paragraph (2) remains, the commissioner shall reduce any voter approved debt levies.

(4) Before computing the reduction pursuant to this subdivision of the health and safety levy authorized by sections 123B.57 and 126C.40 , subdivision 5, the commissioner shall ascertain from each affected school district the amount it proposes to levy under each section or subdivision. The reduction shall be computed on the basis of the amount so ascertained.

(5) To the extent the levy reduction calculated under paragraph (2) exceeds the limitation in paragraph (3), an amount equal to the excess must be distributed from the school district's distribution under sections 298.225 , 298.28 , and477A.15 in the following year to the cities and townships within the school district in the proportion that their taxable net tax capacity within the school district bears to the taxable net tax capacity of the school district for property taxes payable in the year prior to distribution. No city or township shall receive a distribution greater than its levy for taxes payable in the year prior to distribution. The commissioner of revenue shall certify the distributions of cities and towns under this paragraph to the county auditor by September 30 of the year preceding distribution. The county auditor shall reduce the proposed and final levies of cities and towns receiving distributions by the amount of their distribution. Distributions to the cities and towns shall be made at the times provided under section 298.27 .

[A>EFFECTIVE DATE. This section is effective for levies certified in 2013 and later. <A]

Sec. 2. AMEND Minnesota Statutes 2012, section 298.17 , is amended to read: 298.17 OCCUPATION TAXES TO BE APPORTIONED.[A>(a) <A] All occupation taxes paid by persons, copartnerships, companies, joint stock companies, corporations, and associations, however or for whatever purpose organized, engaged in the business of mining or producing iron ore or other ores, when collected shall be apportioned and distributed in accordance with the Constitution of the state of Minnesota, article X, section 3 , in the manner following: 90 percent shall be deposited in the state treasury and credited to the general fund of which four-ninths shall be used for the support of elementary and secondary schools; and

ten percent of the proceeds of the tax imposed by this section shall be deposited in the state treasury and credited to the general fund for the general support of the university.

[A>(b) <A] Of the moneys apportioned to the general fund by this section

[A>: (1) there is annually appropriated and credited to the mining environmental and regulatory account in the special revenue fund an amount equal to that which would have been generated by a two and one-half cent tax imposed by section 298.24 on each taxable ton produced in the preceding calendar year. Money in the mining environmental and regulatory account is appropriated annually to the commissioner of natural resources to fund agency staff to work on environmental issues and provide regulatory services for ferrous and nonferrous mining operations in this state. Payment to the mining environmental and regulatory account shall be made by July 1 annually. The commissioner of natural resources shall execute an interagency agreement with the pollution control agency to assist with the provision of environmental regulatory services such as monitoring and permitting required for ferrous and nonferrous mining operations; and (2) <A] there is annually appropriated and credited to the Iron Range Resources and Rehabilitation Board account in the special revenue fund an amount equal to that which would have been generated by a 1.5 cent tax imposed by section 298.24 on each taxable ton produced in the preceding calendar year, to be expended for the purposes of section 298.22 .

The money appropriated pursuant to
    [D>this section <D]

[A>clause (2) <A]

shall be used

[D>(1) <D]

[A>(i) <A] to provide environmental development grants to local governments located within any county in region 3 as defined in governor's executive order number 60, issued on June 12, 1970, which does not contain a municipality qualifying pursuant to section 273.134 , paragraph (b) , or

[D>(2) <D]

[A>(ii) <A] to provide economic development loans or grants to businesses located within any such county, provided that the county board or an advisory group appointed by the county board to provide recommendations on economic development shall make recommendations to the Iron Range Resources and Rehabilitation Board regarding the loans. Payment to the Iron Range Resources and Rehabilitation Board account shall be made by May 15 annually.

[A>(c) <A] Of the money allocated to Koochiching County, one-third must be paid to the Koochiching County Economic Development Commission.

[A>EFFECTIVE DATE. This section is effective beginning for the 2013 production year. <A]

Sec. 3. AMEND Minnesota Statutes 2012, section 298.227 , as amended by Laws 2013, chapter 3, section 17, is amended to read: 298.227 TACONITE ECONOMIC DEVELOPMENT FUND. (a) An amount equal to that distributed pursuant to each taconite producer's taxable production and qualifying sales under section 298.28, subdivision 9 a, shall be held by the Iron Range Resources and Rehabilitation Board in a separate taconite economic development fund for each taconite and direct reduced ore producer. Money from the fund for each producer shall be released by the commissioner after review by a joint committee consisting of an equal number of representatives of the salaried employees and the nonsalaried production and maintenance employees of that producer. The District 11 director of the United States Steelworkers of America, on advice of each local employee president, shall select the employee members. In nonorganized operations, the employee committee shall be elected by the nonsalaried production and maintenance employees. The review must be completed no later than six months after the producer presents a proposal for expenditure of the funds to the committee. The funds held pursuant to this section may be released only for workforce development and associated public facility improvement, or for acquisition of plant and stationary mining equipment and facilities for the producer or for research and development in Minnesota on new mining, or taconite, iron, or steel production technology, but only if the producer provides a matching

```
expenditure
    [A>equal to the amount of the distribution <A] to be used forthe same
purpose
    [D>of at least 50 percent of the distribution based on 14.7
cents per ton <D] beginning with distributions in
    [D>2002 <D]
```

[A>2014 <A].


Effective for proposals for expenditures of money from the fund beginning May 26, 2007, the commissioner may not release the funds before the next scheduled meeting of the board. If a proposed expenditure is not approved by the board, the funds must be deposited in the Taconite Environmental Protection Fund under sections 298.222 to 298.225 . If a producer uses money which has been released from the fund prior to May 26, 2007 to procure haulage trucks, mobile equipment, or mining shovels, and the producer removes the piece of equipment from the taconite tax relief area defined in section 273.134 within ten years from the date of receipt of the money from the fund, a portion of the money granted from the fund must be repaid to the taconite economic development fund. The portion of the money to be repaid is 100 percent of the grant if the equipment is removed from the taconite tax relief area within 12 months after receipt of the money from the fund, declining by ten percent for each of the subsequent nine

years during which the equipment remains within the taconite tax relief area. If a taconite production facility is sold after operations at the facility had ceased, any money remaining in the fund for the former producer may be released to the purchaser of the facility on the terms otherwise applicable to the former producer under this section. If a producer fails to provide matching funds for a proposed expenditure within six months after the commissioner approves release of the funds, the funds are available for release to another producer in proportion to the distribution provided and under the conditions of this section. Any portion of the fund which is not released by the commissioner within one year of its deposit in the fund shall be divided between the taconite environmental protection fund created in section 298.223 and the Douglas J. Johnson economic protection trust fund created in section 298.292 for placement in their respective special accounts. Two-thirds of the unreleased funds shall be distributed to the taconite environmental protection fund and one-third to the Douglas J. Johnson economic protection trust fund.

(b)(i) Notwithstanding the requirements of paragraph (a), setting the amount of distributions and the review process, an amount equal to ten cents per taxable ton of production in 2007, for distribution in 2008 only, that would otherwise be distributed under paragraph (a), may be used for a loan or grant for the cost of providing for a value-added wood product facility located in the taconite tax relief area and in a county that contains a city of the first class. This amount must be deducted from the distribution under paragraph (a) for which a matching expenditure by the producer is not required. The granting of the loan or grant is subject to approval by the board. If the money is provided as a loan, interest must be payable on the loan at the rate prescribed in section 298.2213, subdivision 3 . (ii) Repayments of the loan and interest, if any, must be deposited in the taconite environment protection fund under sections 298.222 to 298.225 . If a loan or grant is not made under this paragraph by July 1, 2012, the amount that had been made available for the loan under this paragraph must be transferred to the taconite environment protection fund under sections 298.222 to 298.225 . (iii) Money distributed in 2008 to the fund established under this section that exceeds ten cents per ton is available to qualifying producers under paragraph (a) on a pro rata basis.

(c) Repayment or transfer of money to the taconite environmental protection fund under paragraph (b), item (ii), must be allocated by the Iron Range Resources and Rehabilitation Board for public works projects in house legislative districts in the same proportion as taxable tonnage of production in 2007 in each house legislative district, for distribution in 2008, bears to total taxable tonnage of production in 2007, for distribution in 2008. Notwithstanding any other law to the contrary, expenditures under this paragraph do not require approval by the governor. For purposes of this paragraph, "house legislative districts" means the legislative districts in existence on May 15, 2009.

[A>EFFECTIVE DATE. This section is effective beginning for the 2014 distribution. <A]

Sec. 4. AMEND Minnesota Statutes 2012, section 298.24, subdivision 1 , is amended to read: Subdivision 1. Imposed; calculation.

```
(a) For concentrate produced in
    [D>2001, 2002, and 2003 <D]
```

[A>2013 <A],

there is imposed upon taconite and iron sulphides, and upon the mining and quarrying thereof, and upon the production of iron ore concentrate therefrom,

and upon the concentrate so produced, a tax of
    [D>$2.103 <D]

[A>$2.56 <A] per

gross ton of merchantable iron ore concentrate produced therefrom. [D>For concentrates produced in 2005, the tax rate is the same rate imposed for concentrates produced in 2004. For concentrates produced in 2009 and subsequent years, <D] The tax is also imposed upon other iron-bearing material.

(b) For concentrates produced in
    [D>2006 <D]

[A>2014 <A] and subsequent

years, the tax rate shall be equal to the preceding year's tax rate plus an amount equal to the preceding year's tax rate multiplied by the percentage increase in the implicit price deflator from the fourth quarter of the second preceding year to the fourth quarter of the preceding year. " Implicit price deflator" means the implicit price deflator for the gross domestic product prepared by the Bureau of Economic Analysis of the United States Department of Commerce.

(c) An additional tax is imposed equal to three cents per gross ton of merchantable iron ore concentrate for each one percent that the iron content of the product exceeds 72 percent, when dried at 212 degrees Fahrenheit.

(d) The tax on taconite and iron sulphides shall be imposed on the average of the production for the current year and the previous two years. The rate of the tax imposed will be the current year's tax rate. This clause shall not apply in the case of the closing of a taconite facility if the property taxes on the facility would be higher if this clause and section 298.25 were not applicable. The tax on other iron-bearing material shall be imposed on the current year production.

(e) If the tax or any part of the tax imposed by this subdivision is held to be

unconstitutional, a tax of
    [D>$2.103 <D]

[A>$2.56 <A] per gross ton of

merchantable iron ore concentrate produced shall be imposed.

(f) Consistent with the intent of this subdivision to impose a tax based upon the weight of merchantable iron ore concentrate, the commissioner of revenue may indirectly determine the weight of merchantable iron ore concentrate included in fluxed pellets by subtracting the weight of the limestone, dolomite, or olivine derivatives or other basic flux additives included in the pellets from the weight of the pellets. For purposes of this paragraph, "fluxed pellets" are pellets produced in a process in which limestone, dolomite, olivine, or other basic flux additives are combined with merchantable iron ore concentrate. No subtraction from the weight of the pellets shall be allowed for binders, mineral and chemical additives other than basic flux additives, or moisture.

(g)(1) Notwithstanding any other provision of this subdivision, for the first two years of a plant's commercial production of direct reduced ore from ore mined in this state, no tax is imposed under this section. As used in this paragraph, "commercial production" is production of more than 50,000 tons of direct reduced ore in the current year or in any prior year, "noncommercial production" is production of 50,000 tons or less of direct reduced ore in any year, and "direct reduced ore" is ore that results in a product that has an iron content of at least 75 percent. For the third year of a plant's commercial production of direct reduced ore, the rate to be applied to direct reduced ore is 25 percent of the rate otherwise determined under this subdivision. For the fourth commercial production year, the rate is 50 percent of the rate otherwise determined under this subdivision; for the fifth commercial production year, the rate is 75 percent of the rate otherwise determined under this subdivision; and for all subsequent commercial production years, the full rate is imposed.

(2) Subject to clause (1), production of direct reduced ore in this state is subject to the tax imposed by this section, but if that production is not produced by a producer of taconite, iron sulfides, or other iron-bearing material, the production of taconite, iron sulfides, or other iron-bearing material, that is consumed in the production of direct reduced iron in this state is not subject to the tax imposed by this section on taconite, iron sulfides, or other iron-bearing material.

(3) Notwithstanding any other provision of this subdivision, no tax is imposed on direct reduced ore under this section during the facility's noncommercial production of direct reduced ore. The taconite or iron sulphides consumed in the noncommercial production of direct reduced ore is subject to the tax imposed by this section on taconite and iron sulphides. Three-year average production of direct reduced ore does not include production of direct reduced ore in any noncommercial year. Three-year average production for a direct reduced ore facility that has noncommercial production is the average of the commercial production of direct reduced ore for the current year and the previous two commercial years.

(4) This paragraph applies only to plants for which all environmental permits have been obtained and construction has begun before July 1, 2008.

[A>EFFECTIVE DATE. This section is effective beginning for the 2013 production year. <A]

Sec. 5. AMEND Minnesota Statutes 2012, section 298.28, subdivision 4 , is amended to read: Subd. 4.

School districts.

(a)
    [D>23.15 <D]

[A>32.15 <A] cents per taxable ton, plus the increase

provided in paragraph (d), less the amount that would have been computed under Minnesota Statutes 2008, section 126C.21, subdivision 4 , for the current year for that district, must be allocated to qualifying school districts to be distributed, based upon the certification of the commissioner of revenue, under paragraphs (b), (c), and (f).

(b)(i) 3.43 cents per taxable ton must be distributed to the school districts in which the lands from which taconite was mined or quarried were located or within which the concentrate was produced. The distribution must be based on the apportionment formula prescribed in subdivision 2.

(ii) Four cents per taxable ton from each taconite facility must be distributed to each affected school district for deposit in a fund dedicated to building maintenance and repairs, as follows:

(1) proceeds from Keewatin Taconite or its successor are distributed to Independent School Districts Nos. 316, Coleraine, and 319, Nashwauk-Keewatin, or their successor districts;

(2) proceeds from the Hibbing Taconite Company or its successor are distributed to Independent School Districts Nos. 695, Chisholm, and 701, Hibbing, or their successor districts;

(3) proceeds from the Mittal Steel Company and Minntac or their successors are distributed to Independent School Districts Nos. 712, Mountain Iron-Buhl, 706, Virginia, 2711, Mesabi East, and 2154, Eveleth-Gilbert, or their successor districts;

(4) proceeds from the Northshore Mining Company or its successor are distributed to Independent School Districts Nos. 2142, St. Louis County, and 381, Lake Superior, or their successor districts; and

(5) proceeds from United Taconite or its successor are distributed to Independent School Districts Nos. 2142, St. Louis County, and 2154, Eveleth-Gilbert, or their successor districts. Revenues that are required to be distributed to more than one district shall be apportioned according to the number of pupil units identified in section 126C.05, subdivision 1 , enrolled in the second previous year.

(c)(i)
    [D>15.72 <D]

[A>24.72 <A] cents per taxable ton, less any amount

distributed under paragraph

(e), shall be distributed to a group of school districts comprised of those school districts which qualify as a tax relief area under section 273.134 , paragraph (b), or in which there is a qualifying municipality as defined by section 273.134 , paragraph (a), in direct proportion to school district indexes as follows: for each school district, its pupil units determined under section126C.05 for the prior school year shall be multiplied by the ratio of the average adjusted net tax capacity per pupil unit for school districts receiving aid under this clause as calculated pursuant to chapters 122A, 126C, and 127A for the school year ending prior to distribution to the adjusted net tax capacity per pupil unit of the district. Each district shall receive that portion of the distribution which its index bears to the sum of the indices for all school districts that receive the distributions.

(ii) Notwithstanding clause (i), each school district that receives a distribution under sections 298.018 ; 298.23 to 298.28 , exclusive of any amount received under this clause; 298.34 to 298.39 ; 298.391 to 298.396 ; 298.405 ; or any law imposing a tax on severed mineral values after reduction for any portion distributed to cities and towns under section 126C.48, subdivision 8 , paragraph (5), that is less than the amount of its levy reduction under section 126C.48, subdivision 8 , for the second year prior to the year of the distribution shall receive a distribution equal to the difference; the amount necessary to make this payment shall be derived from proportionate reductions in the initial distribution to other school districts under clause (i).

If there are insufficient tax proceeds to make the distribution provided under this paragraph in any year, money must be transferred from the taconite property tax relief account in subdivision 6, to the extent of the shortfall in the distribution.

(d)

[A>(1) <A] Any school district described in paragraph (c) where a levy increase pursuant to section 126C.17, subdivision 9 , was authorized by referendum for taxes payable in 2001, shall receive a distribution of 21.3 cents per ton. Each district shall receive $175 times the pupil units identified in section 126C.05, subdivision 1 , enrolled in the second previous year or the 1983-1984 school year, whichever is greater, less the product of 1.8 percent times the

```
district's taxable net tax capacity in
    [D>the second previous year
```

<D] [A>2011 <A].

[A>(2) Districts qualifying under paragraph (c) must receive additional taconite aid each year equal to 22.5 percent of the amount obtained by subtracting: <A]

[A>(i) 1.8 percent of the district's net tax capacity for 2011, from: <A]

[A>(ii) the district's weighted average daily membership for fiscal year 2012 multiplied by the sum of: <A]

[A>(A) $415, plus <A]

[A>(B) the district's referendum revenue allowance for fiscal year 2013. <A] If the total amount provided by paragraph (d) is insufficient to make the payments herein required then the entitlement of $175 per pupil unit shall be reduced uniformly so as not to exceed the funds available. Any amounts received by a qualifying school district in any fiscal year pursuant to paragraph (d) shall not be applied to reduce general education aid which the district receives pursuant to section 126C.13 or the permissible levies of the district. Any amount remaining after the payments provided in this paragraph shall be paid to the commissioner of Iron Range resources and rehabilitation who shall deposit the same in the taconite environmental protection fund and the Douglas J. Johnson economic protection trust fund as provided in subdivision 11. Each district receiving money according to this paragraph shall reserve the lesser of the amount received under this paragraph or $25 times the number of pupil units served in the district.

```
It may use the money for early childhood programs
     [D>or for outcome-based
```

learning programs that enhance the academic quality of the district's curriculum. The outcome-based learning programs must be approved by the commissioner of education <D].

(e) There shall be distributed to any school district the amount which the school district was entitled to receive under section 298.32 in 1975.

(f) Four cents per taxable ton must be distributed to qualifying school districts according to the distribution specified in paragraph (b), clause

```
(ii), and
     [D>two <D]
```

[A>11 <A] cents per taxable ton must be distributed

according to the distribution specified in paragraph

(c). These amounts are not subject to sections 126C.21, subdivision 4 , and126C.48 , subdivision 8 .

[A>EFFECTIVE DATE. This section is effective beginning for the 2014 distribution. <A]

Sec. 6. AMEND Minnesota Statutes 2012, section 298.28, subdivision 6 , is amended to read: Subd. 6. Property tax relief.

```
(a) In
     [D>2002 <D]
```

```
[A>2014 <A] and thereafter,
     [D>33.9 <D]
```

[A>34.8 <A]

cents per taxable ton, less any amount required to be distributed under paragraphs (b) and (c), or section 298.2961, subdivision 5 , must be allocated to St. Louis County acting as the counties' fiscal agent, to be distributed as provided in sections 273.134 to 273.136 .

(b) If an electric power plant owned by and providing the primary source of power for a taxpayer mining and concentrating taconite is located in a county other than the county in which the mining and the concentrating processes are conducted, .1875 cent per taxable ton of the tax imposed and collected from such taxpayer shall be paid to the county.

(c) If an electric power plant owned by and providing the primary source of power for a taxpayer mining and concentrating taconite is located in a school district other than a school district in which the mining and concentrating processes are conducted, .4541 cent per taxable ton of the tax imposed and collected from the taxpayer shall be paid to the school district.

[A>EFFECTIVE DATE. This section is effective beginning for the 2014 distribution. <A]

Sec. 7. AMEND Minnesota Statutes 2012, section 298.28, subdivision 9 c , is amended to read: Subd. 9c. [D> Temporary <D] Distribution; city of Eveleth. 0.20 cent per taxable ton

must be paid to the city of Eveleth for distribution in
    [D>2007 through 2011

only <D] [A>2013 and thereafter <A], to be used for the support of the Hockey Hall of Fame, provided that it continues to operate in that city, and provided that the city of Eveleth certifies to the St. Louis County auditor that it has

received donations for the support of the Hockey Hall of Fame from
   [D>professional hockey organizations or <D] other donors
    [D>in an amount at

least equal to the amount of the distribution under this subdivision <D]. If the Hockey Hall of Fame ceases to operate in the city of Eveleth prior to

receipt of the distribution in
    [D>either <D]

[A>any <A] year, and the

governing body of the city determines that it is unlikely to resume operation there within a six-month period, the distribution under this subdivision shall be made to the Iron Range Resources and

Rehabilitation Board. [D>If the amount of the distribution authorized under this subdivision exceeds the total amount of donations for the support of the Hockey Hall of Fame during the 12-month period ending 30 days before the date of the distribution, the amount by which 0.20 cent per ton exceeds the donations shall be distributed to the Iron Range Resources and Rehabilitation Board. <D]

Sec. 8. AMEND Minnesota Statutes 2012, section 298.28, subdivision 10 , is amended to read: Subd. 10. Increase. (a) Except as provided in paragraph (b), beginning with distributions in 2000, the amount determined under subdivision 9 shall be increased in the same proportion as the increase in the implicit price deflator as provided in

```
section 298.24, subdivision 1 . Beginning with distributions in
    [D>2003
```

<D] [A>2015 <A], the amount determined under subdivision 6, paragraph (a), shall be increased in the same proportion as the increase in the implicit price deflator as provided in section 298.24, subdivision 1 .

(b) For distributions in 2005 and subsequent years, an amount equal to the increased tax proceeds attributable to the increase in the implicit price deflator as provided in section 298.24, subdivision 1 , for taxes paid in 2005, except for the amount of revenue increases provided in subdivision 4, paragraph (d), is distributed to the grant and loan fund established in section 298.2961, subdivision 4 .

[A>EFFECTIVE DATE. This section is effective beginning for the 2014 distribution. <A]

Sec. 9. [A> IRON RANGE FISCAL DISPARITIES STUDY. The commissioner of revenue, in coordination with the commissioner of the Iron Range Resources and Rehabilitation Board, shall conduct a study of the tax relief area revenue distribution program contained in Minnesota Statutes, chapter 276A, commonly known as the Iron Range fiscal disparities program. By February 1, 2014, the commissioner of revenue shall submit a report to the chairs and ranking minority members of the house of representatives and senate tax committees consisting of the findings of the study and identification of issues for policy makers to consider. The study must analyze: <A]

[A>(1) trends in population, property tax base, property tax rates, and contribution and distribution capacity across the region; <A]

[A>(2) the volatility of the program's distribution and causes of the volatility; <A]

[A>(3) the impact of state tax policy changes on the fiscal disparities program; and <A]

[A>(4) the interaction between the program and the distribution of property tax aids and credits, taconite aid, and Iron Range Resources and Rehabilitation Board funding across the region. <A]

[A>EFFECTIVE DATE. This section is effective June 1, 2013. <A]

Sec. 10. [A> 2013 DISTRIBUTION ONLY. For the 2013 distribution, a special fund is established to

receive 38.7 cents per ton of any excess of the balance remaining after distribution of amounts required under Minnesota Statutes, section 298.28, subdivision 6 . The following amounts are allocated to St. Louis County acting as the fiscal agent for the recipients for the following specific purposes: <A]

[A>(1) 5.1 cents per ton to the city of Hibbing for improvements to the city's water supply system; <A]

[A>(2) 4.3 cents per ton to the city of Mountain Iron for the cost of moving utilities required as a result of actions undertaken by United States Steel Corporation; <A]

[A>(3) 2.5 cents per ton to the city of Biwabik for improvements to the city's water supply system, payable upon agreement with ArcelorMittal to satisfy water permit conditions; <A]

[A>(4) 2 cents per ton to the city of Tower for the Tower Marina; <A]

[A>(5) 2.4 cents per ton to the city of Grand Rapids for an eco-friendly heat transfer system to replace aging effluent lines and for parking lot repaving; <A]

[A>(6) 2.4 cents per ton to the city of Two Harbors for wastewater treatment plant improvements; <A]

[A>(7) 0.9 cents per ton to the city of Ely for the sanitary sewer replacement project; <A]

[A>(8) 0.6 cents per ton to the town of Crystal Bay for debt service of the Claire Nelson Intermodal Transportation Center; <A]

[A>(9) 0.5 cents per ton to the Greenway Joint Recreation Board for the Coleraine hockey arena renovations; <A]

[A>(10) 1.2 cents per ton for the West Range Regional Fire Hall and Training Center to merge the existing fire services of Coleraine, Bovey, Taconite Marble, Calumet, and Greenway Township; <A]

[A>(11) 2.5 cents per ton to the city of Hibbing for the Memorial Building; <A]

[A>(12) 0.7 cents per ton to the city of Chisholm for public works infrastructure; <A]

[A>(13) 1.8 cents per ton to the Crane Lake Water and Sanitary District for sanitary sewer extension; <A]

[A>(14) 2.5 cents per ton for the city of Buhl for the roof on the Mesabi Academy; <A]

[A>(15) 1.2 cents per ton to the city of Gilbert for the New Jersey/Ohio Avenue project; <A]

[A>(16) 1.5 cents per ton to the city of Cook for street improvements, business park infrastructure, and a maintenance garage; <A]

[A>(17) 0.5 cents per ton to the city of Cook for a water line project; <A]

[A>(18) 1.8 cents per ton to the city of Eveleth to be used for Jones Street reconstruction and the city auditorium; <A]

[A>(19) 0.5 cents for the city of Keewatin for an electrical substation and water line replacements; <A]

[A>(20) 3.3 cents for the city of Virginia for Fourth Street North infrastructure and Franklin Park improvement; and <A]

[A>(21) 0.5 cents per ton to the city of Grand Rapids for an economic development project. <A]

[A>EFFECTIVE DATE. This section is effective for the 2013 distribution, and all payments must be made separately and within ten days of the date of the August 2013 payment. This section supersedes article 5, section 46, of 2013 H.F. No. 729, if enacted in the 2013 regular session of the legislature. <A]

Sec. 11. [A> IRON RANGE RESOURCES AND REHABILITATION COMMISSIONER; BONDS AUTHORIZED. <A]

[A>Subdivision 1. Issuance; purpose. Notwithstanding any provision of Minnesota Statutes, chapter 298, to the contrary, the commissioner of Iron Range resources and rehabilitation shall issue revenue bonds in a principal amount of $38,000,000 plus an amount sufficient to pay costs of issuance in one or more series, and thereafter may issue bonds to refund those bonds. The proceeds of the bonds must be used to pay costs of issuance and to make grants to school districts located in the taconite tax relief area defined inMinnesota Statutes, section 273.134 , or the taconite assistance area defined inMinnesota Statutes, section 273.1341 , to be used by the school districts to pay for building projects, such as energy efficiency, technology, infrastructure, health, safety, and maintenance improvements. Proceeds granted to School District No. 2142 must be used to reduce debt service on the building bond passed on December 8, 2009. <A]

[A>Subd. 2. Appropriation. <A]

[A>(a) There is annually appropriated from the distribution of taconite production tax revenues under Minnesota Statues, section 298.28 , prior to the calculation of the amount of the remainder under Minnesota Statutes, section 298.28, subdivision 11 , an amount sufficient to pay when due the principal and interest on the bonds issued pursuant to subdivision 1. The appropriation under this section must not exceed an amount equal to ten cents per taxable ton. <A]

[A>(b) If in any year the amount available under paragraph (a) is insufficient to pay principal and interest due on the bonds in that year, an additional amount is appropriated from the Douglas J. Johnson fund to make up the deficiency. <A]

[A>(c) The appropriation under this subdivision terminates upon payment or maturity of the last of the bonds issued under this section. <A]

[A>Subd. 3. Credit enhancement. The bonds issued under this section are "debt obligations" and the commissioner of Iron Range resources and rehabilitation is a "district" for purposes of Minnesota Statutes, section 126C.55 , provided that advances made underMinnesota Statutes, section 126C.55, subdivision 2 , are not subject toMinnesota Statutes, section 126C.55 , subdivisions 4 to 7. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment and applies beginning with the 2014 distribution under Minnesota Statutes, section 298.28. <A] ARTICLE 12 PUBLIC FINANCE

Section 1. AMEND Minnesota Statutes 2012, section 118A.04, subdivision 3 , is amended to read: Subd. 3. State and local securities. Funds may be invested in the following:

(1) any security which is a general obligation of any state or local government with taxing powers which is rated "A" or better by a national bond rating service;

(2) any security which is a revenue obligation of any state or local government

[D>with taxing powers <D] which is rated "AA" or better by a national bond

```
rating service;
     [D>and <D]
```

(3) a general obligation of the Minnesota housing finance agency which is a moral obligation of the state of Minnesota and is rated "A" or better by a

```
national bond rating agency
     [D>.
```

<D] [A>; and <A]

[A>(4) any security which is an obligation of a school district with an original maturity not exceeding 13 months and (i) rated in the highest category by a national bond rating service or (ii) enrolled in the credit enhancement program pursuant to section 126C.55 . <A]

Sec. 2. AMEND Minnesota Statutes 2012, section 118A.05, subdivision 5 , is amended to read: Subd. 5. Guaranteed investment contracts. Agreements or contracts for guaranteed investment contracts may be entered into if they are issued or guaranteed by United States commercial banks, domestic branches of foreign banks, United States insurance companies, or their Canadian subsidiaries, or the domestic affiliates of any of the foregoing. The credit quality of the issuer's or guarantor's short- and long-term unsecured debt must be rated in one of the two highest categories by a nationally recognized rating agency. [A>Agreements or contracts for guaranteed investment contracts with a term of 18 months or less may be entered into regardless of the credit quality of the issuer's or guarantor's long-term unsecured debt, provided that the credit quality of the issuer's short-term unsecured debt is rated in the highest category by a nationally recognized rating agency. <A] Should the issuer's or guarantor's credit quality be downgraded below "A", the government entity must have withdrawal rights.

Sec. 3. AMEND Minnesota Statutes 2012, section 216C.436, subdivision 7 , is amended to read: Subd. 7. Repayment. An implementing entity that finances an energy improvement under this section must:

```
(1) secure payment with a lien against the
    [D>benefited <D] qualifying real
```

property; and

(2) collect repayments as a special assessment as provided for in section

```
429.101 or by charter
    [A>, provided that special assessments may be made
```

payable in up to 20 equal annual installments <A]. If the implementing entity is an authority, the local government that authorized the authority to act as implementing entity shall impose and collect special assessments necessary to pay debt service on bonds issued by the implementing entity under subdivision 8, and shall transfer all collections of the assessments upon receipt to the authority.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 4. AMEND Minnesota Statutes 2012, section 373.01, subdivision 3 , is amended to read: Subd. 3. Capital notes. (a) A county board may, by resolution and without referendum, issue capital notes subject to the county debt limit to purchase capital equipment useful for county purposes that has an expected useful life at least equal to the term of the notes. The notes shall be payable in not more than ten years and shall be issued on terms and in a manner the board determines. A tax levy shall be made for payment of the principal and interest on the notes, in accordance with section 475.61 , as in the case of bonds.

(b) For purposes of this subdivision, "capital equipment" means:

(1) public safety, ambulance, road construction or maintenance, and medical equipment; and

(2) computer hardware and software, whether bundled with machinery or equipment

```
or unbundled
    [A>, together with application development services and
```

training related to the use of the computer hardware or software <A].

Sec. 5. AMEND Minnesota Statutes 2012, section 373.40, subdivision 1 , is amended to read: Subdivision 1. Definitions. For purposes of this section, the following terms have the meanings given.

(a) "Bonds" means an obligation as defined under section 475.51 .

(b) "Capital improvement" means acquisition or betterment of public lands, buildings, or other improvements within the county for the purpose of a county courthouse, administrative building, health or social service facility, correctional facility, jail, law enforcement center, hospital, morgue, library,

```
park, qualified indoor ice arena, roads and bridges,
    [A>public works
```

facilities, fairground buildings, and records and data storage facilities, <A]and the acquisition of development rights in the form of conservation easements under chapter 84C. An improvement must have an expected useful life of five years or more to qualify. " Capital improvement" does not include a recreation or sports facility building (such as, but not limited to, a gymnasium, ice arena, racquet sports facility, swimming pool, exercise room or health spa), unless the building is part of an outdoor park facility and is incidental to the primary purpose of outdoor recreation. [A>For purposes of this section, "capital improvement" includes expenditures for purposes described in this paragraph that have been incurred by a county before approval of a capital improvement plan, if such expenditures are included in a capital improvement plan approved on or before the date of the public hearing under subdivision 2 regarding issuance of bonds for such expenditures. <A]

(c) "Metropolitan county" means a county located in the seven-county metropolitan area as defined in section 473.121 or a county with a population of 90,000 or more.

(d) "Population" means the population established by the most recent of the following (determined as of the date the resolution authorizing the bonds was adopted):

(1) the federal decennial census,

(2) a special census conducted under contract by the United States Bureau of the Census, or

(3) a population estimate made either by the Metropolitan Council or by the state demographer under section 4A.02.

(e) "Qualified indoor ice arena" means a facility that meets the requirements of section 373.43 .

(f) "Tax capacity" means total taxable market value, but does not include captured market value.

Sec. 6. AMEND Minnesota Statutes 2012, section 373.40, subdivision 2 , is amended to read: Subd. 2. Application of election requirement. (a) Bonds issued by a county to finance capital improvements under an approved capital improvement plan are not subject to the election requirements of section 375.18 or 475.58 . The bonds must be approved by vote of at least three-fifths of the members of the county board. In the case of a metropolitan county, the bonds must be approved by vote of at least two-thirds of the members of the county board.

(b) Before issuance of bonds qualifying under this section, the county must publish a notice of its intention to issue the bonds and the date and time of a hearing to obtain public comment on the matter. The notice must be published in the official newspaper of the county or in a newspaper of general circulation in the county. The notice must be published at least 14, but not more than 28, days before the date of the hearing.

(c) A county may issue the bonds only upon obtaining the approval of a majority of the voters voting on the question of issuing the obligations, if a petition requesting a vote on the issuance is signed by voters equal to five percent of

```
the votes cast in the county in the last
    [A>county <A] general election and
```

is filed with the county auditor within 30 days after the public hearing. [D>The commissioner of revenue shall prepare a suggested form of the question to be presented at the election. <D] [A>If the county elects not to submit the question to the voters, the county shall not propose the issuance of bonds under this section for the same purpose and in the same amount for a period of 365 days from the date of receipt of the petition. If the question of issuing the bonds is submitted and not approved by the voters, the provisions of section 475.58, subdivision 1 a, shall apply. <A]

Sec. 7. AMEND Minnesota Statutes 2012, section 383D.41 , is amended by adding a subdivision to read: [A>Subd. 10. Housing improvement areas. <A]

[A>(a) In addition to its other powers, the Dakota County Community Development Agency shall have all powers of a city under sections 428A.11 to 428A.21 in connection with housing improvement areas in Dakota County. <A]

[A>(b) For purposes of the Dakota County Community Development Agency's exercise of the powers granted in this subdivision, references in sections428A.11 to 428A.21 to: <A]

[A>(1) a "mayor" shall be references to the chair of the board of commissioners of the Dakota County Community Development Agency; <A]

[A>(2) a "council" shall be references to the board of commissioners of the Dakota County Community Development Agency; and <A]

[A>(3) a "city clerk" shall be references to an official of the Dakota County Community Development Agency designated by the executive director of the Dakota County Community Development Agency. <A]

[A>(c) Notwithstanding sections 428A.11, subdivision 3 , and 428A.13 , subdivision 1, the governing body of the Dakota County Community Development Agency may adopt a resolution, rather than an ordinance, establishing one or more housing improvement areas, and "enabling ordinance" for purposes of sections 428A.11 to 428A.21 means a resolution under this clause. <A]

[A>(d) The community development agency (1) shall send a copy of each petition for the establishment of a housing improvement area to the city in which the proposed housing improvement area is located, and (2) may not hold the public hearing required in section 428A.13, subdivision 2 , fewer than 30 days after the date on which the related application was sent pursuant to clause (1).

The community development agency may not establish a housing improvement area if the applicable city

council opposes the establishment by resolution adopted within 30 days after the petition required to be sent pursuant to clause (1). <A]

Sec. 8. AMEND Minnesota Statutes 2012, section 410.32 , is amended to read: 410.32 CITIES MAY ISSUE CAPITAL NOTES FOR CAPITAL EQUIPMENT. (a) Notwithstanding any contrary provision of other law or charter, a home rule charter city may, by resolution and without public referendum, issue capital notes subject to the city debt limit to purchase capital equipment.

(b) For purposes of this section, "capital equipment" means:

(1) public safety equipment, ambulance and other medical equipment, road construction and maintenance equipment, and other capital equipment; and

(2) computer hardware and software, whether bundled with machinery or equipment

```
or unbundled
     [A>, together with application development services and
```

training related to the use of the computer hardware and software <A].

(c) The equipment or software must have an expected useful life at least as long as the term of the notes.

(d) The notes shall be payable in not more than ten years and be issued on terms and in the manner the city determines. The total principal amount of the capital notes issued in a fiscal year shall not exceed 0.03 percent of the market value of taxable property in the city for that year.

(e) A tax levy shall be made for the payment of the principal and interest on the notes, in accordance with section 475.61 , as in the case of bonds.

(f) Notes issued under this section shall require an affirmative vote of two-thirds of the governing body of the city.

(g) Notwithstanding a contrary provision of other law or charter, a home rule charter city may also issue capital notes subject to its debt limit in the manner and subject to the limitations applicable to statutory cities pursuant to section 412.301 .

Sec. 9. AMEND Minnesota Statutes 2012, section 412.301 , is amended to read: 412.301 FINANCING PURCHASE OF CERTAIN EQUIPMENT. (a) The council may issue certificates of indebtedness or capital notes subject to the city debt limits to purchase capital equipment.

(b) For purposes of this section, "capital equipment" means:

(1) public safety equipment, ambulance and other medical equipment, road construction and maintenance equipment, and other capital equipment; and

(2) computer hardware and software, whether bundled with machinery or equipment

```
or unbundled
    [A>, together with application development services and
```

training related to the use of the computer hardware or software <A].

(c) The equipment or software must have an expected useful life at least as long as the terms of the certificates or notes.

(d) Such certificates or notes shall be payable in not more than ten years and shall be issued on such terms and in such manner as the council may determine.

(e) If the amount of the certificates or notes to be issued to finance any such purchase exceeds 0.25 percent of the market value of taxable property in the city, they shall not be issued for at least ten days after publication in the official newspaper of a council resolution determining to issue them; and if before the end of that time, a petition asking for an election on the proposition signed by voters equal to ten percent of the number of voters at the last regular municipal election is filed with the clerk, such certificates or notes shall not be issued until the proposition of their issuance has been approved by a majority of the votes cast on the question at a regular or special election.

(f) A tax levy shall be made for the payment of the principal and interest on such certificates or notes, in accordance with section 475.61 , as in the case of bonds.

Sec. 10. AMEND Minnesota Statutes 2012, section 473.39 , is amended by adding a subdivision to read: [A>Subd. 1s. Obligations. After July 1, 2013, in addition to other authority in this section, the council may issue certificates of indebtedness, bonds, or other obligations under this section in an amount not exceeding $35,800,000 for capital expenditures as prescribed in the council's transit capital improvement program and for related costs, including the costs of issuance and sale of the obligations. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment and applies in the counties of Anoka, Carver, Dakota, Hennepin, Ramsey, Scott, and Washington. This section is not effective if the legislature authorizes and enacts issuance authority of at least $35,800,000 in 2013 H.F. No. 1444. If the legislature authorizes and enacts issuance authority of less than $35,800,000 in 2013 H.F. No. 1444, this section prevails, regardless of order of enactment. <A]

Sec. 11. AMEND Minnesota Statutes 2012, section 473.606, subdivision 3 , is amended to read: Subd. 3. Treasurer; investments. The treasurer shall receive and be responsible for all moneys of the corporation, from whatever source derived, and the same shall be considered public funds. The treasurer shall disburse the moneys of the corporation only on orders made by the executive and operating officer, herein provided for, countersigned by such other officer or such employee of the corporation as may be authorized and directed so to do by the corporation, showing the name of the claimant and the nature of the claim. No disbursement shall be certified by such officers until the same have been approved by said

commissioners at a meeting thereof. Whenever the executive director of the corporation shall certify, pursuant to action taken by the commissioners at a meeting thereof, that there are moneys and the amount thereof in the possession of the treasurer not currently needed,

then the treasurer may invest said amount or any part thereof in
    [D>: <D]

[D>(a) Treasury bonds, certificates of indebtedness, bonds or notes of the United States of America, or bonds, notes or certificates of indebtedness of the state of Minnesota, all of which must mature not later than three years from the date of purchase. <D]

[D>(b) Bonds, notes, debentures or other obligations issued by any agency or instrumentality of the United States or any securities guaranteed by the United States government, or for which the credit of the United States is pledged for the payment of the principal and interest thereof, all of which must mature not later than three years from date of purchase. <D]

[D>(c) Commercial paper of prime quality, or rated among the top third of the quality categories, not applicable to defaulted paper, as defined by a nationally recognized organization which rates such securities as eligible for investment in the state employees retirement fund except that any nonbanking issuing corporation, or parent company in the case of paper issued by operating utility or finance subsidiaries, must have total assets exceeding $500,000,000.

Such commercial paper may constitute no more than 30 percent of the book value of the fund at the time of purchase, and the commercial paper of any one corporation shall not constitute more than four percent of the book value of the fund at the time of such investment. <D]

[D>(d) Any securities eligible under the preceding provisions, purchased with simultaneous repurchase agreement under which the securities will be sold to the particular dealer on a specified date at a predetermined price. In such instances, all maturities of United States government securities, or securities issued or guaranteed by the United States government or an agency thereof, may be purchased so long as any such securities which mature later than three years from the date of purchase have a current market value exceeding the purchase price by at least five percent on the date of purchase, and so long as such repurchase agreement involving securities extending beyond three years in maturity be limited to a period not exceeding 45 days. <D]

[D>(e) Certificates of deposit issued by any official depository of the commission. The commission may purchase certificates of deposit from a depository bank in an amount exceeding that insured by federal depository insurance to the extent that those certificates are secured by collateral maintained by the bank in a manner as prescribed for investments of the State Board of Investment. <D]

[D>(f) <D] securities approved for investment under section 118A.04 . Whenever it shall appear to the commissioners that any invested funds are needed for current purposes before the maturity dates of the securities held, they shall cause the executive director to so certify to the treasurer and it shall then be the

duty of the treasurer to order the sale or conversion into cash of the securities in the amount so certified. All interest and profit on said investments shall be credited to and constitute a part of the funds of the commission. The treasurer shall keep an account of all moneys received and disbursed, and at least once a year, at times to be designated by the corporation, file with the secretary a financial statement of the corporation, showing in appropriate and identifiable groupings the receipts and disbursements since the last approved statements; moneys on hand and the purposes for which the same are appropriated; and shall keep an account of all securities purchased as herein provided, the funds from which purchased and the interest and profit which may have accrued thereon, and shall accompany the financial statement aforesaid with a statement setting forth such account. The corporation may pay to the treasurer from time to time compensation in such amount as it may determine to cover clerk hire to enable the treasurer to carry out duties and those required in connection with bonds issued by the corporation as in this act authorized.

Sec. 12. AMEND Minnesota Statutes 2012, section 474A.04, subdivision 1 a , is amended to read: Subd. 1a.

```
Entitlement reservations
    [D> ; carryforward; deduction  <D] .
```

Any amount returned by an entitlement issuer before July 15 shall be reallocated through the housing pool. Any amount returned on or after July 15 shall be reallocated through the unified pool. An amount returned after the last Monday in November shall be reallocated to the Minnesota Housing Finance Agency. [D>Any amount of bonding authority that an entitlement issuer carries forward under federal tax law that is not permanently issued or for which the governing body of the entitlement issuer has not enacted a resolution electing to use the authority for mortgage credit certificates and has not provided a notice of issue to the commissioner before 4:30 p.m. on the last business day in December of the succeeding calendar year shall be deducted from the entitlement allocation for that entitlement issuer in the next succeeding calendar year. Any amount deducted from an entitlement issuer's allocation under this subdivision shall be reallocated to other entitlement issuers, the housing pool, the small issue pool, and the public facilities pool on a proportional basis consistent with section 474A.03 . <D]

[A>EFFECTIVE DATE. This section is effective the day following final enactment and applies to any bonding authority allocated in 2012 and subsequent years. <A]

Sec. 13. AMEND Minnesota Statutes 2012, section 474A.062 , is amended to read: 474A.062 MINNESOTA OFFICE OF HIGHER EDUCATION 120-DAY ISSUANCE EXEMPTION. The Minnesota Office of Higher Education is exempt from the 120-day issuance requirements in this chapter and may carry forward allocations for student loan

```
bonds
    [D>into one successive calendar year <D], subject to carryforward
```

notice requirements of section 474A.131, subdivision 2 . [A>EFFECTIVE DATE. This section is effective the day following final enactment and applies to any bonding authority allocated in 2012 and subsequent years. <A]

Sec. 14. AMEND Minnesota Statutes 2012, section 474A.091, subdivision 3 a , is amended to read: Subd. 3a. Mortgage bonds. (a) Bonding authority remaining in the unified pool on October 1 is available for single-family housing programs for cities that applied in January and received an allocation under section 474A.061, subdivision 2 a, in the same calendar year. The Minnesota Housing Finance Agency shall receive an allocation for mortgage bonds pursuant to this section, minus any amounts for a city or consortium that intends to issue bonds on its own behalf under paragraph (c).

(b) The agency may issue bonds on behalf of participating cities. The agency shall request an allocation from the commissioner for all applicants who choose to have the agency issue bonds on their behalf and the commissioner shall allocate the requested amount to the agency. Allocations shall be awarded by the commissioner each Monday commencing on the first Monday in October through the last Monday in November for applications received by 4:30 p.m. on the Monday of the week preceding an allocation. For cities who choose to have the agency issue bonds on their behalf, allocations will be made loan by loan, on a first-come, first-served basis among the cities. The agency shall submit an application fee pursuant to section 474A.03, subdivision 4 , and an application deposit equal to two percent of the requested allocation to the commissioner when requesting an allocation from the unified pool. After awarding an allocation and receiving a notice of issuance for mortgage bonds issued on behalf of the participating cities, the commissioner shall transfer the application deposit to the Minnesota Housing Finance Agency. For purposes of paragraphs (a) to (d), "city" means a county or a consortium of local government units that agree through a joint powers agreement to apply together for single-family housing programs, and has the meaning given it insection 462C.02, subdivision 6 . "Agency" means the Minnesota Housing Finance Agency.

(c) Any city that received an allocation pursuant to section 474A.061, subdivision 2 a, paragraph (f) , in the current year that wishes to receive an additional allocation from the unified pool and issue bonds on its own behalf or pursuant to a joint powers agreement shall notify the Minnesota Housing Finance Agency by the third Monday in September. The total amount of allocation for mortgage bonds for a city choosing to issue bonds on its own behalf or through a joint powers agreement is limited to the lesser of: (i) the amount requested, or (ii) the product of the total amount available for mortgage bonds from the unified pool, multiplied by the ratio of the population of each city that applied in January and received an allocation under section 474A.061, subdivision 2 a, in the same calendar year, as determined by the most recent estimate of the city's population released by the state demographer's office to the total of the population of all the cities that applied in January and received an allocation under section 474A.061, subdivision 2 a, in the same calendar year. If a city choosing to issue bonds on its own behalf or through a joint powers agreement is located within a county that has also chosen to issue bonds on its own behalf or through a joint powers agreement, the city's population will be deducted from the county's population in calculating the amount of allocations under this paragraph. The Minnesota Housing Finance Agency shall

notify each city choosing to issue bonds on its own behalf or pursuant to a joint powers agreement of the amount of its allocation by October 15. Upon determining the amount of the allocation of each choosing to issue bonds on its own behalf or through a joint powers agreement, the agency shall forward a list specifying the amounts allotted to each city. A city that chooses to issue bonds on its own behalf or through a joint powers agreement may request an allocation from the commissioner by forwarding an application with an application fee pursuant to section 474A.03, subdivision 4 , and an application deposit equal to two percent of the requested amount to the commissioner no later than 4:30 p.m. on the Monday of the week preceding an allocation. Allocations to cities that choose to issue bonds on their own behalf shall be awarded by the commissioner on the first Monday after October 15 through the last Monday in November. No city may receive an allocation from the commissioner after the last Monday in November. The commissioner shall allocate the requested amount to the city or cities subject to the limitations under this subdivision. If a city issues mortgage bonds from an allocation received under this paragraph, the issuer must provide for the recycling of funds into new loans. If the issuer is not able to provide for recycling, the issuer must notify the commissioner in writing of the reason that recycling was not possible and the reason the issuer elected not to have the Minnesota Housing Finance Agency issue the bonds. " Recycling" means the use of money generated from the repayment and prepayment of loans for further eligible loans or for the redemption of bonds and the issuance of current refunding bonds.

(d) No entitlement city or county or city in an entitlement county may apply for or be allocated authority to issue mortgage bonds or use mortgage credit certificates from the unified pool.

(e) An allocation awarded to the agency for mortgage bonds under this section

```
may be carried forward by the agency
    [D>into the next succeeding calendaryear <D] subject to notice
requirements under section 474A.131
    [D>and is
```

available until the last business day in December of that succeeding calendar year <D].

[A>EFFECTIVE DATE. This section is effective the day following final enactment and applies to any bonding authority allocated in 2012 and subsequent years. <A]

Sec. 15. AMEND Minnesota Statutes 2012, section 475.521, subdivision 1 , is amended to read: Subdivision 1. Definitions. For purposes of this section, the following terms have the meanings given.

(a) "Bonds" mean an obligation defined under section 475.51 .

(b) "Capital improvement" means acquisition or betterment of public lands, buildings or other improvements for the purpose of a city hall, town hall, library, public safety facility, and public works facility. An improvement must have an expected useful life of five years or more to qualify. Capital improvement does not include light rail transit or any activity related to it, or a park, road, bridge, administrative building other than a city or town hall, or land for any of those facilities. [A>For purposes of

this section, "capital improvement" includes expenditures for purposes described in this paragraph that have been incurred by a municipality before approval of a capital improvement plan, if such expenditures are included in a capital improvement plan approved on or before the date of the public hearing under subdivision 2 regarding issuance of bonds for such expenditures. <A]

(c) "Municipality" means a home rule charter or statutory city or a town described in section 368.01, subdivision 1 or 1a.

Sec. 16. AMEND Minnesota Statutes 2012, section 475.521, subdivision 2 , is amended to read: Subd. 2. Election requirement. (a) Bonds issued by a municipality to finance capital improvements under an approved capital improvements plan are not subject to the election requirements of section 475.58 . The bonds must be approved by an affirmative vote of three-fifths of the members of a five-member governing body. In the case of a governing body having more or less than five members, the bonds must be approved by a vote of at least two-thirds of the members of the governing body.

(b) Before the issuance of bonds qualifying under this section, the municipality must publish a notice of its intention to issue the bonds and the date and time of the hearing to obtain public comment on the matter. The notice must be published in the official newspaper of the municipality or in a newspaper of general circulation in the municipality. Additionally, the notice may be posted on the official Web site, if any, of the municipality. The notice must be published at least 14 but not more than 28 days before the date of the hearing.

(c) A municipality may issue the bonds only after obtaining the approval of a majority of the voters voting on the question of issuing the obligations, if a petition requesting a vote on the issuance is signed by voters equal to five

```
percent of the votes cast in the municipality in the last
    [A>municipal <A]
```

general election and is filed with the clerk within 30 days after the public hearing. [D>The commissioner of revenue shall prepare a suggested form of the question to be presented at the election. <D] [A>If the municipality elects not to submit the question to the voters, the municipality shall not propose the issuance of bonds under this section for the same purpose and in the same amount for a period of 365 days from the date of receipt of the petition. If the question of issuing the bonds is submitted and not approved by the voters, the provisions of section 475.58, subdivision 1 a, shall apply. <A]

Sec. 17. AMEND Minnesota Statutes 2012, section 475.58, subdivision 3 b , is amended to read: Subd. 3b.

```
Street reconstruction
    [A> and bituminous overlays  <A] .
```

(a) A municipality may, without regard to the election requirement under

subdivision 1, issue and sell obligations for street reconstruction
    [A>or

bituminous overlays <A], if the following conditions are met:

(1) the streets are reconstructed
    [A>or overlaid <A] under a street
reconstruction
    [A>or overlay <A] plan that describes the street
reconstruction
    [A>or overlay <A] to be financed, the estimated costs, and
any planned reconstruction
    [A>or overlay <A] of other streets in the

municipality over the next five years, and the plan and issuance of the obligations has been approved by a vote of all of the members of the governing body present at the meeting following a public hearing for which notice has been published in the official newspaper at least ten days but not more than 28 days prior to the hearing; and

(2) if a petition requesting a vote on the issuance is signed by voters equal to five percent of the votes cast in the last municipal general election and is filed with the municipal clerk within 30 days of the public hearing, the municipality may issue the bonds only after obtaining the approval of a majority of the voters voting on the question of the issuance of the obligations. [A>If the municipality elects not to submit the question to the voters, the municipality shall not propose the issuance of bonds under this section for the same purpose and in the same amount for a period of 365 days from the date of receipt of the petition. If the question of issuing the bonds is submitted and not approved by the voters, the provisions of section 475.58, subdivision 1 a, shall apply. <A]

(b) Obligations issued under this subdivision are subject to the debt limit of the municipality and are not excluded from net debt under section 475.51, subdivision 4 .

(c) For purposes of this subdivision, street reconstruction
    [A>and

bituminous overlays <A] includes utility replacement and relocation and other activities incidental to the street reconstruction, turn lanes and other improvements having a substantial public safety function, realignments, other modifications to intersect with state and county roads, and the local share of state and county road projects. [A>For purposes of this subdivision, "street reconstruction" includes expenditures for street reconstruction that have been incurred by a municipality before approval of a street reconstruction plan, if such expenditures are included in a street reconstruction plan approved on or

before the date of the public hearing under paragraph (a), clause (1), regarding issuance of bonds for such expenditures. <A]

(d) Except in the case of turn lanes, safety improvements, realignments, intersection modifications, and the local share of state and county road

```
projects, street reconstruction
    [A>and bituminous overlays <A] does not
```

include the portion of project cost allocable to widening a street or adding curbs and gutters where none previously existed.

Sec. 18. Laws 1971, chapter 773, section 1, subdivision 2, as amended by Laws 1974, chapter 351, section 5, Laws 1976, chapter 234, sections 1 and 7, Laws 1978, chapter 788, section 1, Laws 1981, chapter 369, section 1, Laws 1983, chapter 302, section 1, Laws 1988, chapter 513, section 1, Laws 1992, chapter 511, article 9, section 23, Laws 1998, chapter 389, article 3, section 27, and Laws 2002, chapter 390, section 23, is amended to read:

```
Subd. 2. For each of the years
    [D>2003 to <D] 2013
    [A>to 2024 <A], the
```

city of St. Paul is authorized to issue bonds in the aggregate principal amount of $20,000,000 for each year.

[A>EFFECTIVE DATE. This section is effective the day after compliance by the governing body of the city of St. Paul with Minnesota Statutes, section 645.021 , subdivisions 2 and 3. <A]

Sec. 19. [A> CARRYFORWARD OF BONDING AUTHORITY FOR 2011; NO DEDUCTION FROM ENTITLEMENT ALLOCATION. Notwithstanding Minnesota Statutes, section 474A.04, subdivision 1 a, bonding authority that was allocated to an entitlement issuer in 2011 and that was carried forward under federal tax law, but for which the entitlement issuer did not provide a notice of issue to the commissioner of management and budget before 4:30 p.m. on the last business day of December 2012 must not be deducted from the entitlement allocation for that entitlement issuer in 2013. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment and applies retroactively to rescind any reallocation by the commissioner of management and budget under Minnesota Statues, section 474A.04, subdivision 1 a, of any amounts so deducted. <A]

Sec. 20. [A> LOCAL MATCH; INDEPENDENT SCHOOL DISTRICT NO. 435; WAUBUN-OGEMA-WHITE EARTH.

<A]

[A>(a) Independent School District No. 435, Waubun-Ogema-White Earth, may expand classroom space at its Ogema Elementary site using a grant of $551,532 that was awarded to the district by the Department of Human Services on August 12, 2012, pursuant to a grant agreement as provided by Minnesota Statutes, section 16A.695, subdivision 9 . Notwithstanding Minnesota Statutes, section 16A.695, subdivision 6 , to satisfy the match requirements of the grant agreement, the district may use a lease-purchase agreement. Notwithstanding Minnesota Statutes, section 465.71 , the lease-purchase agreement must provide that the title to the lease-purchased property must be held by the district. <A]

[A>(b) Notwithstanding Minnesota Statutes, section 126C.13, subdivision 4 , if the school district enters a lease-purchase agreement to satisfy the local match under paragraph (a), but fails to make a lease-purchase payment, the commissioner of education shall reduce its general education aid under Minnesota Statutes, section 126C.13, subdivision 4 , by the amount of the lease-purchase payment. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 21. [A> LEGISLATIVE OFFICE FACILITIES. <A]

[A>(a) The commissioner of administration may enter into a long-term lease-purchase agreement for a term of up to 25 years, to predesign, design, construct, and equip offices, hearing rooms, and parking facilities for legislative and other functions. The facility must be located on the block bounded by Sherburne Avenue on the north, Park Street on the west, University Avenue on the south, and North Capitol Boulevard on the east. The legislative office facility must provide office accommodations for all senators and senate staff who do not have offices in the Capitol building and on-site parking facilities for all members and staff and disabled visitors to senate offices. A parking structure may also be built on the state-owned land located in the block bounded by Sherburne Avenue on the north, Park Street on the east, University Avenue on the south, and Rice Street on the west. The commissioner of management and budget may issue lease revenue bonds or certificates of participation associated with the lease-purchase agreement. The lease-purchase agreements must not be terminated, except for nonappropriation of money. The lease-purchase agreements must provide the state with a unilateral right to purchase the leased premises at specified times for specified amounts. The lease-purchase agreements are exempt from Minnesota Statutes, section 16B.24 , subdivisions 6 and 6a. <A]

[A>(b) The facilities under the lease-purchase agreement are exempt from the design competition requirement under Minnesota Statutes, section 15B.10. Notwithstanding anything to the contrary under Minnesota Statutes, sections 16C.32 and 16C.33, if the commissioner of administration elects to use a design-build delivery method to design and construct one or more facilities under this appropriation, the Capitol Area Architectural and Planning Board, in cooperation with the commissioner, shall create a selection committee to act as the board under Minnesota Statutes, sections 16C.32 and 16C.33, for the design and construction of the facilities. Notwithstanding Minnesota Statutes, section 16B.33 , if the commissioner elects to contract with a primary designer to design one or more facilities under this appropriation, the Capitol Area Architectural and Planning Board, in cooperation with the commissioner, shall create a selection committee to conduct the selection process in accordance with standards under

Minnesota Statutes, chapters 15B, 16B, and 16C. A selection committee created under this section must contain no more than seven members, including at least three representatives designated by the senate Committee on Rules and Administration and three representatives designated by the speaker of the house. <A]

[A>(c) Notwithstanding any provision to the contrary in Minnesota Statutes, sections 16C.32 and 16C.33, if the commissioner of administration elects to use a design-build delivery method to design, construct, and equip one or more facilities and associated infrastructure to provide audio and video broadcast services for the Capitol building, State Office Building, and a new legislative office building, if applicable, the commissioner shall create a selection committee to act as the board under Minnesota Statutes, sections 16C.32 and 16C.33, to design, build, and equip the facilities. The selected design-builder may self-perform trade work or name an audio and video subcontractor as a member of the design-builder's team. If an audio and video subcontractor is named as a member of the design-builder's team, the design-builder is not required to competitively bid the trade work. Notwithstanding Minnesota Statutes, section 16C.33, subdivision 5 , paragraph (b), after obtaining and evaluating qualifications from each design-builder, in accordance with the weighted criteria and subcriteria and procedures provided in the request for qualifications, the selection committee shall select a short list of up to five proposals. If the commissioner does not receive any proposals, the commissioner may either: <A]

[A>(1) solicit new proposals; <A]

[A>(2) revise the request for qualifications and thereafter solicit new proposals using the revised request for qualifications; or <A]

[A>(3) request selection of a primary designer under Minnesota Statutes, section 16B.33 , 16C.08, or 16C.095, and proceed with competitive bidding pursuant to Minnesota Statutes, sections 16C.25 to 16C.29. <A]

[A>(d) The commissioner of administration may enter into a ground lease for state-owned property in the capitol area in conjunction with the execution of a lease-purchase agreement entered into under this section for any improvements constructed on that site. Notwithstanding the requirements of Minnesota Statutes, section 16A.695, subdivision 2 , paragraph (b), the ground lease must be for a term equal to the term of the lease-purchase agreement, and must include an option to purchase the land at its then fair market value, if the improvements are not purchased by the state at the end of the term of the lease-purchase agreement, or at any earlier time that the lease-purchase agreement is terminated. <A]

[A>(e) The commissioner of administration must not prepare final plans and specifications for any construction authorized under this section until the program plan and cost estimates for all elements necessary to complete the project have been approved by the senate Committee on Rules and Administration. <A]

[A>(f) $3,000,000 is appropriated in fiscal year 2014 from the general fund to the commissioner of administration for predesign and design of facilities authorized under paragraph (a).

This appropriation is available for expenditure the day following final enactment and until June 30, 2015. <A]

[A>(g) The commissioner of administration may reserve a portion of money from appropriations for office space costs of the legislature to fund future repairs for facilities constructed under the authority provided in this section. Money reserved under this paragraph must be credited to a segregated account for each building in the special revenue fund and is appropriated to the commissioner to make the repairs. When the state acquires title to a building with an account established under this paragraph, the account for that building must be abolished and the balance remaining in the account must be transferred to the appropriate asset preservation and replacement account. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 22. [A> APPROPRIATION; RELOCATION EXPENSES. $1,860,000 is appropriated from the general fund to the commissioner of administration for rent loss and relocation expenses related to the Capitol renovation project for fiscal year 2014. Notwithstanding Minnesota Statutes, section 16A.642 , this appropriation is available until June 30, 2015. The base for this appropriation is $1,380,000 in fiscal year 2016, $960,000 in fiscal year 2017, and $0 after that. <A] ARTICLE 13 MISCELLANEOUS PROVISIONS

Section 1. AMEND Minnesota Statutes 2012, section 16A.727 , is amended to read: 16A.727 BACKUP REVENUES; FOOTBALL STADIUM FUNDING. (a) If the commissioner of management and budget determines that the amount of

```
revenues under section 297E.021, subdivision 2, for the next fiscal year
```

[A>, plus $20,000,000, <A] will be less than the amounts specified in section

```
297E.021, subdivision 3,
    [D>paragraph (a), <D] clause (1), items (i) to
```

(iii), for that fiscal year, the commissioner may implement the revenue options authorized in Laws 2012, chapter 299, article 6; provided that this section does not constitute a pledge of tax revenues as security for the payment of principal and interest on appropriation bonds issued under section 16A.695. If the commissioner determines to exercise the authority under this section for a fiscal year, the commissioner must implement the revenue options, as necessary, in the following order:

(1) a sports-themed lottery game under section 349A.20 ; and

(2) a tax on suites as provided under section 473J.14 .

(b) Revenue raised under the authority granted by this section must be deposited in the general fund.

(c) If the commissioner determines to implement one or more of the revenue options authorized by this

section, each subsequent year the commissioner must determine if the revenue is needed and will be imposed and collected for the next fiscal year. If the commissioner determines that one or more revenue options implemented for a fiscal year are not needed for a subsequent fiscal year, the commissioner must terminate them in the reverse order they were required to be implemented by paragraph (a) with the last option implemented terminated first and so forth.

(d) Before implementing a revenue source authorized under this section, the commissioner must report the intent to do so to the Legislative Commission on Planning and Fiscal Policy. The commissioner must inform the commission of determinations to continue or discontinue each revenue source for a subsequent fiscal year.

(e) The provisions of this section no longer apply after the Minnesota Sports Facilities Authority certifies to the commissioner that it has determined that the revenues of the general fund under section 297A.994 , the increased revenues under chapter 297E, and other available resources of the authority provide adequate financial security for the state and the authority.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 2. [A> [116V.03 ] APPROPRIATION. $1,000,000 in fiscal year 2014 and each year thereafter is appropriated from the general fund to the commissioner of revenue for transfer to the agricultural project utilization account in the special revenue fund for the Agricultural Utilization Research Institute established under section 116V.01 . <A]

Sec. 3. AMEND Minnesota Statutes 2012, section 237.52, subdivision 3 , is amended to read: Subd. 3. Collection. Every provider of services capable of originating a TRS call, including cellular communications and other nonwire access services, in this state shall

[A>, except as provided in subdivision 3a, <A] collect the charges established by the commission under subdivision 2 and transfer amounts collected to the commissioner of public safety in the same manner as provided in section 403.11, subdivision 1 , paragraph (d).

The commissioner of public safety must deposit the receipts in the fund established in subdivision 1.

[A>EFFECTIVE DATE. This section is effective January 1, 2014. <A]

Sec. 4. AMEND Minnesota Statutes 2012, section 237.52 , is amended by adding a subdivision to read: [A>Subd. 3a. Fee for prepaid wireless telecommunications service. The fee established in subdivision 2 does not apply to prepaid wireless telecommunications services as defined in section 403.02, subdivision 17 b, which are instead subject to the prepaid wireless telecommunications access Minnesota fee established in section 403.161, subdivision 1 , paragraph (b).

Collection, remittance, and deposit of prepaid wireless telecommunications access Minnesota fees are governed by sections 403.161 and 403.162 . <A]

[A>EFFECTIVE DATE. This section is effective January 1, 2014. <A]

Sec. 5. AMEND Minnesota Statutes 2012, section 270B.01, subdivision 8 , is amended to read: Subd. 8. Minnesota tax laws. For purposes of this chapter only, unless expressly stated otherwise, "Minnesota tax laws" means:

(1) the taxes, refunds, and fees administered by or paid to the commissioner under chapters 115B, 289A (except taxes imposed under sections 298.01 , 298.015 ,

```
and 298.24), 290, 290A, 291, 295, 297A, 297B,
    [D>and <D] 297H,
    [A>and
```

403, <A] or any similar Indian tribal tax administered by the commissioner pursuant to any tax agreement between the state and the Indian tribal government, and includes any laws for the assessment, collection, and enforcement of those taxes, refunds, and fees; and

(2) section 273.1315 .

[A>EFFECTIVE DATE. This section is effective January 1, 2014. <A]

Sec. 6. AMEND Minnesota Statutes 2012, section 270B.12, subdivision 4 , is amended to read: Subd. 4. Department of Public Safety. The commissioner may disclose return information to the Department of Public

```
Safety for the purpose of and to the extent necessary to administer
    [D>section <D]
```

```
[A>sections <A] 270C.725
    [A>and 403.16 to 403.162 <A].
```

[A>EFFECTIVE DATE. This section is effective January 1, 2014. <A]

Sec. 7. AMEND Minnesota Statutes 2012, section 270C.03, subdivision 1 , is amended to read: Subdivision 1. Powers and duties. The commissioner shall have and exercise the following powers and duties:

(1) administer and enforce the assessment and collection of taxes;

(2) make determinations, corrections, and assessments with respect to taxes, including interest, additions to taxes, and assessable penalties;

(3) use statistical or other sampling techniques consistent with generally accepted auditing standards in examining returns or records and making assessments;

(4) investigate the tax laws of other states and countries, and formulate and submit to the legislature such legislation as the commissioner may deem expedient to prevent evasions of state revenue laws and to secure just and equal taxation and improvement in the system of state revenue laws;

(5) consult and confer with the governor upon the subject of taxation, the administration of the laws in regard thereto, and the progress of the work of the department, and furnish the governor, from time to time, such assistance and information as the governor may require relating to tax matters;

(6) execute and administer any agreement with the secretary of the treasury or the Bureau of Alcohol, Tobacco, Firearms and Explosives in the Department of Justice of the United States or a representative of another state regarding the exchange of information and administration of the state revenue laws;

(7) require town, city, county, and other public officers to report information as to the collection of taxes received from licenses and other sources, and such other information as may be needful in the work of the commissioner, in such form as the commissioner may prescribe;

(8) authorize the use of unmarked motor vehicles to conduct seizures or criminal investigations pursuant to the commissioner's authority;

(9)
    [A>authorize the participation in audits performed by the Multistate Tax

Commission. For the purposes of chapter 270B, the Multistate Tax Commission will be considered to be a state for the purposes of auditing corporate sales, excise, and income tax returns. <A]

[A>(10) <A] maintain toll-free telephone access for taxpayer assistance for calls from locations within the state; and

[D>(10) <D]

[A>(11) <A] exercise other powers and authority and perform other duties required of or imposed upon the commissioner by law.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 8. AMEND Minnesota Statutes 2012, section 271.06, subdivision 2 a , as added by Laws 2013, chapter 36, section 1, is amended to read: Subd. 2a. Timely mailing treated as timely filing. (a) If, after the period prescribed by subdivision 2, the original notice of appeal, proof of service upon the commissioner, and filing fee are delivered by

    [D>mail in the <D] United States
     [A>mail <A] to the Tax Court

administrator or the court administrator of district court acting as court administrator of the Tax Court, then the date of filing is the date of the United States postmark stamped on the envelope or other appropriate wrapper in which the notice of appeal, proof of service upon the commissioner, and filing fee are mailed.

(b) This subdivision applies only if the postmark date falls within the period prescribed by subdivision 2 and the original notice of appeal, proof of service

```
upon the commissioner, and filing fee are
    [A>, within the time prescribed by
```

subdivision 2, <A] deposited in the mail in the United States in an envelope or other appropriate wrapper, postage prepaid, properly addressed to the Tax Court administrator or the court administrator of district court acting as court administrator of the Tax Court.

(c) Only the postmark of the United States Postal Service qualifies as proof of timely mailing under this subdivision. Private postage meters do not qualify as proof of timely filing under this subdivision. If the original notice of appeal, proof of service upon the commissioner, and filing fee are sent by United States registered mail, the date of registration is the postmark date. If the original notice of appeal, proof of service upon the commissioner, and filing fee are sent by United States certified mail and the sender's receipt is postmarked by the postal employee to whom the envelope containing the original notice of appeal, proof of service upon the commissioner, and filing fee is presented, the date of the United States postmark on the receipt is the postmark date.

```
(d) A reference in this section to
    [D>mail in <D] the United States
```

[A>mail <A] must be treated as including a reference to any designated delivery service and a reference in this section to a postmark by the United States Postal Service must be treated as including a reference to any date recorded or marked by any designated delivery service in accordance with section 7502(f) of the Internal Revenue Code.

[A>EFFECTIVE DATE. This section is effective for filings delivered by the United States Postal Service with a postmark date after August 1, 2013. <A]

Sec. 9. AMEND Minnesota Statutes 2012, section 297E.021, subdivision 3 , is amended to read: Subd. 3. Available revenues. For purposes of this section, "available revenues" equals the amount determined

```
under subdivision 2
    [A>, plus up to $20,000,000 each fiscal year from the
```

taxes imposed under section 290.06, subdivision 1 <A]:

(1) reduced by the following amounts paid for the fiscal year under:

(i) the appropriation to principal and interest on appropriation bonds undersection 16A.965, subdivision 8 ;

(ii) the appropriation from the general fund to make operating expense payments under section 473J.13, subdivision 2 , paragraph (b);

(iii) the appropriation for contributions to the capital reserve fund undersection 473J.13, subdivision 4 , paragraph (c);

(iv) the appropriations under Laws 2012, chapter 299, article 4, for administration and any successor appropriation;

(v) the reduction in revenues resulting from the sales tax exemptions undersection 297A.71, subdivision 43 ;

(vi) reimbursements authorized by section 473J.15, subdivision 2 , paragraph (d);

(vii) the compulsive gambling appropriations under section 297E.02, subdivision 3 , paragraph (c), and any successor appropriation; and

(viii) the appropriation for the city of St. Paul under section 16A.726, paragraph

(c); and

(2) increased by the revenue deposited in the general fund under section 297A.994, subdivision 4 , clauses (1) to (3), for the fiscal year.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 10. AMEND Minnesota Statutes 2012, section 403.02 , is amended by adding a subdivision to read: [A>Subd. 17b. Prepaid wireless telecommunications service. " Prepaid wireless telecommunications service" means a wireless telecommunications service that allows the caller to dial 911 to access the 911 system, which service must be paid for in advance and is: <A]

[A>(1) sold in predetermined units or dollars of which the number declines with use in a known amount; or <A]

[A>(2) provides unlimited use for a predetermined time period. The inclusion of nontelecommunications services, including the download of digital products delivered electronically, content, and ancillary services, with a prepaid wireless telecommunications service does not preclude that service from being considered a prepaid wireless telecommunications service under this chapter. <A]

[A>EFFECTIVE DATE. This section is effective January 1, 2014. <A]

Sec. 11. AMEND Minnesota Statutes 2012, section 403.02 , is amended by adding a subdivision to read:

[A>Subd. 20a. Wireless telecommunications service. Wireless telecommunications service means a commercial mobile radio service, as that term is defined in United States Code, title 47, section 332, subsection (d), including all broadband personal communication services, wireless radio telephone services, and geographic area specialized mobile radio licensees, that offer real-time, two-way voice service interconnected with the public switched telephone network. <A]

[A>EFFECTIVE DATE. This section is effective January 1, 2014. <A]

Sec. 12. AMEND Minnesota Statutes 2012, section 403.02, subdivision 21 , is amended to read: Subd. 21. Wireless telecommunications service provider. "

```
Wireless telecommunications service provider" means a provider of
```

[D>commercial mobile radio services, as that term is defined in United States Code, title 47, section 332, subsection <D]

[D>(d), including all broadband personal communications services, wireless radio telephone services, geographic area specialized and enhanced specialized mobile radio services, and incumbent wide area specialized mobile radio licensees, that offers real-time, two-way voice service interconnected with the public switched telephone network and that is doing business in the state of Minnesota <D] [A>wireless telecommunications service <A].

[A>EFFECTIVE DATE. This section is effective January 1, 2014. <A]

Sec. 13. AMEND Minnesota Statutes 2012, section 403.06, subdivision 1 a , is amended to read: Subd. 1a. Biennial budget; annual financial report. The commissioner shall prepare a biennial budget for maintaining the 911 system. By December 15 of each year, the commissioner shall submit a report to the legislature detailing the expenditures for maintaining the 911 system, the 911

```
fees collected, the balance of the 911 fund,
    [D>and <D] the 911-relatedadministrative expenses of the commissioner
    [A>, and the most recent
```

forecast of revenues and expenditures for the 911 emergency telecommunications service account, including a separate projection of E911 fees from prepaid wireless customers and projections of year-end fund balances <A]. The commissioner is authorized to expend money that has been appropriated to pay for the maintenance, enhancements, and expansion of the 911 system.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 14. AMEND Minnesota Statutes 2012, section 403.11, subdivision 1 , is amended to read: Subdivision 1. Emergency telecommunications service fee; account. (a) Each customer of a wireless or wire-line switched or packet-based telecommunications service provider connected to the public switched

telephone network that furnishes service capable of originating a 911 emergency telephone call is assessed a fee based upon the number of wired or wireless telephone lines, or their equivalent, to cover the costs of ongoing maintenance and related improvements for trunking and central office switching equipment for 911 emergency telecommunications service, to offset administrative and staffing costs of the commissioner related to managing the 911 emergency telecommunications service program, to make distributions provided for in section 403.113 , and to offset the costs, including administrative and staffing costs, incurred by the State Patrol Division of the Department of Public Safety in handling 911 emergency calls made from wireless phones.

(b) Money remaining in the 911 emergency telecommunications service account after all other obligations are paid must not cancel and is carried forward to subsequent years and may be appropriated from time to time to the commissioner to provide financial assistance to counties for the improvement of local emergency telecommunications services. The improvements may include providing access to 911 service for telecommunications service subscribers currently without access and upgrading existing 911 service to include automatic number identification, local location identification, automatic location identification, and other improvements specified in revised county 911 plans approved by the commissioner.

(c) The fee may not be less than eight cents nor more than 65 cents a month until June 30, 2008, not less than eight cents nor more than 75 cents a month until June 30, 2009, not less than eight cents nor more than 85 cents a month until June 30, 2010, and not less than eight cents nor more than 95 cents a month on or after July 1, 2010, for each customer access line or other basic access service, including trunk equivalents as designated by the Public Utilities Commission for access charge purposes and including wireless telecommunications services. With the approval of the commissioner of management and budget, the commissioner of public safety shall establish the amount of the fee within the limits specified and inform the companies and carriers of the amount to be collected. When the revenue bonds authorized under section 403.27, subdivision 1 , have been fully paid or defeased, the commissioner shall reduce the fee to reflect that debt service on the bonds is no longer needed. The commissioner shall provide companies and carriers a minimum of 45 days' notice of each fee change.

```
The fee must be the same for all customers
    [A>, except that the fee imposed
```

under this subdivision does not apply to prepaid wireless telecommunications service, which is instead subject to the fee imposed under section 403.161, subdivision 1 , paragraph (a) <A].

(d) The fee must be collected by each wireless or wire-line telecommunications service provider subject to the fee. Fees are payable to and must be submitted to the commissioner monthly before the 25th of each month following the month of collection, except that fees may be submitted quarterly if less than $250 a month is due, or annually if less than $25 a month is due. Receipts must be deposited in the state treasury and credited to a 911 emergency telecommunications service account in the special revenue fund. The money in the account may only be used for 911 telecommunications services.

(e) This subdivision does not apply to customers of interexchange carriers.

(f) The installation and recurring charges for integrating wireless 911 calls into enhanced 911 systems are eligible for payment by the commissioner if the 911 service provider is included in the statewide design plan and the charges are made pursuant to contract.

(g) Competitive local exchanges carriers holding certificates of authority from the Public Utilities Commission are eligible to receive payment for recurring 911 services.

[A>EFFECTIVE DATE. This section is effective January 1, 2014. <A]

Sec. 15. AMEND Minnesota Statutes 2012, section 403.11 , is amended by adding a subdivision to read: [A>Subd. 3d. Eligible telecommunications carrier; requirement. No wireless communications provider may provide telecommunications services under a designation of eligible telecommunications carrier, as provided underMinnesota Rule 7811.1400 , until and unless the commissioner of public safety certifies to the chair of the public utilities commission that the wireless telecommunications provider is not in arrears in amounts owed to the 911 emergency telecommunications service account in the special revenue fund. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 16. AMEND Minnesota Statutes 2012, section 403.11 , is amended by adding a subdivision to read: [A>Subd. 6. Report. <A]

[A>(a) Beginning September 1, 2013, and continuing semiannually thereafter, each wireless telecommunications service provider shall report to the commissioner, based on the mobile telephone number, both the total number of prepaid wireless telecommunications subscribers sourced to Minnesota and the total number of wireless telecommunications subscribers sourced to Minnesota. The report must be filed on the same schedule as Federal Communications Commission Form 477. <A]

[A>(b) The commissioner shall make a standard form available to all wireless telecommunications service providers for submitting information required to compile the report required under this subdivision. <A]

[A>(c) The information provided to the commissioner under this subdivision is considered trade secret information under section 13.37 and may only be used for purposes of administering this chapter. <A]

[A>EFFECTIVE DATE. This section is effective January 1, 2014. <A]

Sec. 17. [A> [403.16 ] DEFINITIONS. <A]

[A>Subdivision 1. Scope. For the purposes of sections 403.16 to 403.164 , the terms defined in this section have the meanings given them. <A]

[A>Subd. 2. Consumer. " Consumer" means a person who purchases prepaid wireless telecommunications service in a retail transaction. <A]

[A>Subd. 3. Department. " Department" means the Department of Revenue. <A]

[A>Subd. 4. Prepaid wireless E911 fee. " Prepaid wireless E911 fee" means the fee that is required to be collected by a seller from a consumer as established in section 403.161, subdivision 1 , paragraph (a). <A]

[A>Subd. 5. Prepaid wireless telecommunications access Minnesota fee. " Prepaid wireless telecommunications access Minnesota fee" means the fee that is required to be collected by a seller from a consumer as established in section 403.161, subdivision 1 , paragraph (b). <A]

[A>Subd. 6. Provider. " Provider" means a person that provides prepaid wireless telecommunications service under a license issued by the Federal Communications Commission. <A]

[A>Subd. 7. Retail transaction. " Retail transaction" means the purchase of prepaid wireless telecommunications service from a seller for any purpose other than resale. <A]

[A>Subd. 8. Seller. " Seller" means a person who sells prepaid wireless telecommunications service to another person. <A]

[A>EFFECTIVE DATE. This section is effective January 1, 2014. <A]

Sec. 18. [A> [403.161 ] PREPAID WIRELESS FEES IMPOSED; COLLECTION; REMITTANCE. <A]

[A>Subdivision 1. Fees imposed. <A]

[A>(a) A prepaid wireless E911 fee of 80 cents per retail transaction is imposed on prepaid wireless telecommunications service until the fee is adjusted as an amount per retail transaction under subdivision 7. <A]

[A>(b) A prepaid wireless telecommunications access Minnesota fee, in the amount of the monthly charge provided for in section 237.52, subdivision 2 , is imposed on each retail transaction for prepaid wireless telecommunications service until the fee is adjusted as an amount per retail transaction under subdivision 7. <A]

[A>Subd. 2. Exemption. The fees established under subdivision 1 are not imposed on a minimal amount of prepaid wireless telecommunications service that is sold with a prepaid wireless device and is charged a single nonitemized price, and a seller may not apply the fees to such a transaction. For purposes of this subdivision, a minimal amount of service means an amount of service denominated as either ten minutes or less or $5 or less. <A]

[A>Subd. 3. Fee collected. The prepaid wireless E911 and telecommunications access Minnesota fees must be collected by the seller from the consumer for each retail transaction occurring in this state. The amount of each fee must be combined into one amount, which must be separately stated on an invoice, receipt, or other similar document that is provided to the consumer by the seller. <A]

[A>Subd. 4. Sales and use tax treatment. For purposes of this section, a retail transaction conducted in person by a consumer at a business location of the seller must be treated as occurring in this state if that business location is in this state, and any other retail transaction must be treated as occurring in this state if the retail transaction is treated as occurring in this state for purposes of the sales and use tax as specified in section 297A.669, subdivision 3 , paragraph (c). <A]

[A>Subd. 5. Remittance. The prepaid wireless E911 and telecommunications access Minnesota fees are the liability of the consumer and not of the seller or of any provider, except that the seller is liable to remit all fees as provided in section 403.162 . <A]

[A>Subd. 6. Exclusion for calculating other charges. The combined amount of the prepaid wireless E911 and telecommunications access Minnesota fees collected by a seller from a consumer must not be included in the base for measuring any tax, fee, surcharge, or other charge that is imposed by this state, any political subdivision of this state, or any intergovernmental agency. <A]

[A>Subd. 7. Fee changes. <A]

[A>(a) The prepaid wireless E911 and telecommunications access Minnesota fee must be proportionately increased or reduced upon any change to the fee imposed under section 403.11, subdivision 1 , paragraph (c), after July 1, 2013, or the fee imposed under section 237.52, subdivision 2 , as applicable. <A]

[A>(b) The department shall post notice of any fee changes on its Web site at least 30 days in advance of the effective date of the fee changes. It is the responsibility of sellers to monitor the department's Web site for notice of fee changes. <A]

[A>(c) Fee changes are effective 60 days after the first day of the first calendar month after the commissioner of public safety or the Public Utilities Commission, as applicable, changes the fee. <A]

[A>EFFECTIVE DATE. This section is effective January 1, 2014. <A]

Sec. 19. [A> [403.162 ] ADMINISTRATION OF PREPAID WIRELESS E911 FEES. <A]

[A>Subdivision 1. Remittance. Prepaid wireless E911 and telecommunications access Minnesota fees collected by sellers must be remitted to the commissioner of revenue at the times and in the manner provided by chapter 297A with respect to the general sales and use tax. The commissioner of revenue shall establish registration and payment procedures that substantially coincide with the registration and payment procedures that apply in chapter 297A. <A]

[A>Subd. 2. Seller's fee retention. A seller may deduct and retain three percent of prepaid wireless E911 and telecommunications access Minnesota fees collected by the seller from consumers. <A]

[A>Subd. 3. Department of Revenue provisions. The audit, assessment, appeal, collection, refund, penalty, interest, enforcement, and administrative provisions of chapters 270C and 289A that are

applicable to the taxes imposed by chapter 297A apply to any fee imposed under section 403.161 . <A]

[A>Subd. 4. Procedures for resale transactions. The commissioner of revenue shall establish procedures by which a seller of prepaid wireless telecommunications service may document that a sale is not a retail transaction. These procedures must substantially coincide with the procedures for documenting sale for resale transactions as provided in chapter 297A. <A]

[A>Subd. 5. Fees deposited. <A]

[A>(a) The commissioner of revenue shall, based on the relative proportion of the prepaid wireless E911 fee and the prepaid wireless telecommunications access Minnesota fee imposed per retail transaction, divide the fees collected in corresponding proportions. Within 30 days of receipt of the collected fees, the commissioner shall: <A]

[A>(1) deposit the proportion of the collected fees attributable to the prepaid wireless E911 fee in the 911 emergency telecommunications service account in the special revenue fund; and <A]

[A>(2) deposit the proportion of collected fees attributable to the prepaid wireless telecommunications access Minnesota fee in the telecommunications access fund established in section 237.52, subdivision 1 . <A]

[A>(b) The department may deduct and retain an amount, not to exceed two percent of collected fees, to reimburse its direct costs of administering the collection and remittance of prepaid wireless E911 fees and prepaid wireless telecommunications access Minnesota fees. <A]

[A>EFFECTIVE DATE. This section is effective January 1, 2014. <A]

Sec. 20. [A> [403.163 ] LIABILITY PROTECTION FOR SELLERS AND PROVIDERS. <A]

[A>(a) A provider or seller of prepaid wireless telecommunications service is not liable for damages to any person resulting from or incurred in connection with providing any lawful assistance in good faith to any investigative or law enforcement officer of the United States, this or any other state, or any political subdivision of this or any other state. <A]

[A>(b) In addition to the protection from liability provided by paragraph (a),section 403.08, subdivision 11 , applies to sellers and providers. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 21. [A> [403.164 ] EXCLUSIVITY OF PREPAID WIRELESS E911 FEE. The prepaid wireless E911 fee imposed by section 403.161 is the only E911 funding obligation imposed with respect to prepaid wireless telecommunications service in this state, and no tax, fee, surcharge, or other charge may be imposed by this state, any political subdivision of this state, or any intergovernmental agency, for E911 funding purposes, upon any provider, seller, or consumer with respect to the sale, purchase, use, or provision of prepaid wireless telecommunications service. <A]

[A>EFFECTIVE DATE. This section is effective January 1, 2014. <A]

Sec. 22. [A> PURPOSE STATEMENTS; TAX EXPENDITURES. <A]

[A>Subdivision 1. Authority. This section is intended to fulfill the requirement under Minnesota Statutes, section 3.192 , that a bill creating, renewing, or continuing a tax expenditure provide a purpose for the tax expenditure and a standard or goal against which its effectiveness may be measured. <A]

[A>Subd. 2. Federal conformity. The provisions of article 6 conforming Minnesota individual income tax to changes in federal law related to bonus depreciation and section 179 expensing are intended to simplify compliance with and administration of the individual income tax. <A]

[A>Subd. 3. Sales tax exemption for certain aircraft parts and labor. The provisions of article 5 exempting parts and labor for certain aircraft, is intended to encourage the growth of the aviation services industry in the state. <A]

[A>Subd. 4. Railroad track maintenance subtraction. The provisions of article 6 allowing an individual income and corporate franchise tax subtraction for the amount allowed under the federal credit for railroad maintenance expenses, are intended to increase the combined federal and state tax incentives available to Class II and Class III railroads for maintaining and upgrading track in Minnesota. The standard against which effectiveness is to be measured is the additional miles of track maintained or upgraded following allowance of the state tax subtraction in addition to the existing federal tax credit. <A]

[A>Subd. 5. Historic structure rehabilitation credit. The provisions of article 6 extending the sunset date of the historic structure rehabilitation credit and modifying the effective date of the credit, are intended to encourage the preservation of historic structures in Minnesota and to create and retain jobs related to rehabilitation of historic structures in the state. The standard against which the effectiveness of the extension of the credit and modification of the effective date is to be measured is the number of jobs created through the rehabilitation of historic structures and the number of historic structures rehabilitated and placed in service. <A]

[A>Subd. 6. Greater Minnesota internship credit. The provisions of article 6 providing a tax credit to employers of qualified interns, are intended to encourage Minnesota businesses to employ and provide valuable education and work experience to Minnesota students and foster long-term relationships between students and greater Minnesota employers. The standard against which the effectiveness of the extension of the credit is the number of students who participated in the program who were subsequently employed full time by the employer. <A]

[A>Subd. 7. Sales tax exemption for greater Minnesota business expansion. The provisions of article 8 are intended to induce existing businesses in greater Minnesota to increase investment and expand employment in greater Minnesota. <A]

[A>Subd. 8. Expansion of sales tax exemption on durable medical products and prosthetics. The provisions of article 8 expanding the definition of items included in repair and replacement parts of

durable medical equipment and prosthetics and exempting Medicare and medicaid purchases is intended to simplify sales tax administration in this area and provide relief for sellers who cannot collect the tax under these programs. <A]

[A>Subd. 9. Sales tax exemption for established religious orders. The provisions of article 8 exempting certain sales between a religious order and an affiliated institute of higher education, is intended to retain an existing sales tax exemption that exists between St. John's Abbey and St. John's University after a governing restructure between the two entities. <A]

[A>Subd. 10. Sales tax exemption for certain dental providers. The provisions of article 8 exempting certain purchases by qualifying critical access dental providers, is intended to assist critical access dental providers in defraying the overall cost of the services they provide to underserved communities. <A]

[A>Subd. 11. Sales tax exemption for nursing homes and boarding care homes. The provisions of article 8 exempting certain nursing homes and boarding care homes is intended to clarify that an existing exemption for these facilities is not affected by a recent property tax case related to defining nonprofit organizations engaged in charitable activities. <A]

[A>Subd. 12. Construction sales tax exemptions. The provisions of article 8 exempting from sales tax construction materials for various entities, are intended to increase jobs and reduce tax pyramiding by reducing the tax on inputs used to provide taxable goods and services. <A]

[A>Subd. 13. Sales tax exemption on certain public infrastructure. The provisions of article 10 exempting construction materials used in public infrastructure projects related to the destination medical center plan is intended to reduce city costs for those projects. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 23. [A> APPROPRIATIONS. <A]

[A>(a) $950,000 is appropriated from the general fund to the commissioner of revenue in fiscal year 2014 for administering this act. This appropriation does not cancel but is available until June 30, 2015. $300,000 of this amount is added to the annual base budget. <A]

[A>(b) $25,000 in fiscal year 2014 and $25,000 in fiscal year 2015 are appropriated from the general fund to the commissioner of employment and economic development for administering the provisions of article 10. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 24.

[A> REPEALER.    REPEAL Minnesota Statutes 2012, sections 290.171

;REPEAL 290.173 ; andREPEAL 290.174 , are repealed.<A]ARTICLE 14 MARKET VALUE DEFINITIONS Section 1. AMEND Minnesota Statutes 2012, section 38.18 , is amended to read: 38.18 COUNTY FAIRGROUNDS; IMPROVEMENT AIDED.[D>Any <D] [A>Each <A] town, statutory city, or school district in this state,

 [D>now or hereafter <D]

[A>at any time <A] having
    [D>a <D]

[A>an estimated<A] market value of all its taxable property
    [D>, exclusive of money and

credits, <D] of more than $105,000,000, and having a county fair located within

its corporate limits,
    [D>is hereby authorized to aid in defraying <D]

[A>maypay <A] part of the expense of improving
    [D>any such <D]

[A>the <A]
fairground
    [D>, by appropriating and paying over <D] to the treasurer of the
county owning the fairground
    [D>such sum of money <D], not exceeding
$10,000,
    [D>for each of the political subdivisions, <D] as
    [D>the
<D]

[A>its <A] governing body
    [D>of the town, statutory city, or school
district may <D], by resolution,
    [D>determine <D]

[A>determines <A] to be for
the best interest of the political subdivision
    [D>, <D]

[A>. <A] The

[D>sums so appropriated to <D] [A>amounts paid to the county must <A] be used

```
solely
    [D>for the purpose of aiding in the improvement of <D]
```

[A>to improve<A] the fairground in
```
    [D>such <D]
```

[A>the <A] manner
```
    [D>as <D] the county
board
    [D>of the county shall determine <D]
```

[A>determines <A] to be for the

best interest of the county.

Sec. 2. AMEND Minnesota Statutes 2012, section 40A.15, subdivision 2 , is amended to read:

Subd. 2. Eligible recipients. All counties within the state, municipalities that prepare plans and official controls instead of a county, and districts are eligible for assistance under the program. Counties and districts may apply for assistance on behalf of other municipalities. In order to be eligible for financial assistance a county or municipality must

```
agree to levy at least 0.01209 percent of
    [D>taxable <D]
```

[A>estimated <A]

market value for agricultural land preservation and conservation activities or otherwise spend the equivalent amount of local money on those activities, or spend $15,000 of local money, whichever is less.

Sec. 3. AMEND Minnesota Statutes 2012, section 69.011, subdivision 1 , is amended to read: Subdivision 1. Definitions. Unless the language or context clearly indicates that a different meaning is intended, the following words and terms, for the purposes of this chapter and chapters 423, 423A, 424 and 424A, have the meanings ascribed to them:

(a) "Commissioner" means the commissioner of revenue.

(b) "Municipality" means:

(1) a home rule charter or statutory city;

(2) an organized town;

(3) a park district subject to chapter 398;

(4) the University of Minnesota;

(5) for purposes of the fire state aid program only, an American Indian tribal government entity located within a federally recognized American Indian reservation;

(6) for purposes of the police state aid program only, an American Indian tribal government with a tribal police department which exercises state arrest powers under section 626.90 , 626.91 , 626.92 , or 626.93 ;

(7) for purposes of the police state aid program only, the Metropolitan Airports Commission; and

(8) for purposes of the police state aid program only, the Department of Natural Resources and the Department of Public Safety with respect to peace officers covered under chapter 352B.

(c) "Minnesota Firetown Premium Report" means a form prescribed by the commissioner containing space for reporting by insurers of fire, lightning, sprinkler leakage and extended coverage premiums received upon risks located or to be performed in this state less return premiums and dividends.

(d) "Firetown" means the area serviced by any municipality having a qualified fire department or a qualified incorporated fire department having a subsidiary volunteer firefighters' relief association.

```
(e) "
    [A>Estimated <A] market value" means latest available
    [A>estimated
```

<A] market value of all property in a taxing jurisdiction, whether the property is subject to taxation, or exempt from ad valorem taxation obtained from information which appears on abstracts filed with the commissioner of revenue or equalized by the State Board of Equalization.

(f) "Minnesota Aid to Police Premium Report" means a form prescribed by the commissioner for reporting by each fire and casualty insurer of all premiums received upon direct business received by it in this state, or by its agents for it, in cash or otherwise, during the preceding calendar year, with reference to insurance written for insuring against the perils contained in auto insurance coverages as reported in the Minnesota business schedule of the annual financial statement which each insurer is required to file with the commissioner in accordance with the governing laws or rules less return premiums and dividends.

(g) "Peace officer" means any person:

(1) whose primary source of income derived from wages is from direct employment by a municipality or county as a law enforcement officer on a full-time basis of not less than 30 hours per week;

(2) who has been employed for a minimum of six months prior to December 31 preceding the date of the current year's certification under subdivision 2, clause (b);

(3) who is sworn to enforce the general criminal laws of the state and local ordinances;

(4) who is licensed by the Peace Officers Standards and Training Board and is authorized to arrest with a warrant; and

(5) who is a member of the State Patrol retirement plan or the public employees police and fire fund.

(h) "Full-time equivalent number of peace officers providing contract service" means the integral or fractional number of peace officers which would be necessary to provide the contract service if all peace officers providing service were employed on a full-time basis as defined by the employing unit and the municipality receiving the contract service.

(i) "Retirement benefits other than a service pension" means any disbursement authorized under section 424A.05, subdivision 3 , clauses (3) and (4).

(j) "Municipal clerk, municipal clerk-treasurer, or county auditor" means:

(1) for the police state aid program and police relief association financial reports:

(i) the person who was elected or appointed to the specified position or, in the absence of the person, another person who is designated by the applicable governing body;

(ii) in a park district, the secretary of the board of park district commissioners;

(iii) in the case of the University of Minnesota, the official designated by the Board of Regents;

(iv) for the Metropolitan Airports Commission, the person designated by the commission;

(v) for the Department of Natural Resources or the Department of Public Safety, the respective commissioner;

(vi) for a tribal police department which exercises state arrest powers under section 626.90 , 626.91 , 626.92 , or 626.93 , the person designated by the applicable American Indian tribal government; and

(2) for the fire state aid program and fire relief association financial reports, the person who was elected or appointed to the specified position, or, for governmental entities other than counties, if the governing body of the governmental entity designates the position to perform the function, the chief financial official of the governmental entity or the chief administrative official of the governmental entity.

(k) "Voluntary statewide lump-sum volunteer firefighter retirement plan" means the retirement plan established by chapter 353G.

Sec. 4. AMEND Minnesota Statutes 2012, section 69.021, subdivision 7 , is amended to read: Subd. 7. Apportionment of fire state aid to municipalities and relief associations.

(a) The commissioner shall apportion the fire state aid relative to the premiums reported on the Minnesota

Firetown Premium Reports filed under this chapter to each municipality and/or firefighters relief association.

(b) The commissioner shall calculate an initial fire state aid allocation amount for each municipality or fire department under paragraph (c) and a minimum fire state aid allocation amount for each municipality or fire department under paragraph (d).

The municipality or fire department must receive the larger fire state aid amount.

(c) The initial fire state aid allocation amount is the amount available for apportionment as fire state aid under subdivision 5, without inclusion of any additional funding amount to support a minimum fire state aid amount undersection 423A.02, subdivision 3 , allocated one-half in proportion to the population as shown in the last official statewide federal census for each fire

```
town and one-half in proportion to the
    [A>estimated <A] market value of eachfire town, including (1) the
    [A>estimated <A] market value of tax-exempt
property and (2) the
    [A>estimated <A] market value of natural resources
```

lands receiving in lieu payments under sections 477A.11 to 477A.14 , but

```
excluding the
    [A>estimated <A] market value of minerals.
```

In the case of incorporated or municipal fire departments furnishing fire protection to other cities, towns, or townships as evidenced by valid fire service contracts filed with the commissioner, the distribution must be adjusted proportionately to take into consideration the crossover fire protection service. Necessary adjustments must be made to subsequent apportionments. In the case of municipalities or independent fire departments qualifying for the aid, the commissioner shall calculate the state aid for the municipality or

```
relief association on the basis of the population and the
    [A>estimated <A]
```

market value of the area furnished fire protection service by the fire department as evidenced by duly executed and valid fire service agreements filed with the commissioner. If one or more fire departments are furnishing contracted fire service to a

```
city, town, or township, only the population and
    [A>estimated <A] market
```

value of the area served by each fire department may be considered in calculating the state aid and the fire departments furnishing service shall enter into an agreement apportioning among themselves the percent of the

```
population and the
     [A>estimated <A] market value of each service area.
```

The agreement must be in writing and must be filed with the commissioner.

(d) The minimum fire state aid allocation amount is the amount in addition to the initial fire state allocation amount that is derived from any additional funding amount to support a minimum fire state aid amount under section 423A.02, subdivision 3 , and allocated to municipalities with volunteer firefighters relief associations or covered by the voluntary statewide lump-sum volunteer firefighter retirement plan based on the number of active volunteer firefighters who are members of the relief association as reported in the annual financial reporting for the calendar year 1993 to the Office of the State Auditor, but not to exceed 30 active volunteer firefighters, so that all municipalities or fire departments with volunteer firefighters relief associations receive in total at least a minimum fire state aid amount per 1993 active volunteer firefighter to a maximum of 30 firefighters. If a relief association is established after calendar year 1993 and before calendar year 2000, the number of active volunteer firefighters who are members of the relief association as reported in the annual financial reporting for calendar year 1998 to the Office of the State Auditor, but not to exceed 30 active volunteer firefighters, shall be used in this determination. If a relief association is established after calendar year 1999, the number of active volunteer firefighters who are members of the relief association as reported in the first annual financial reporting submitted to the Office of the State Auditor, but not to exceed 20 active volunteer firefighters, must be used in this determination. If a relief association is terminated as a result of providing retirement coverage for volunteer firefighters by the voluntary statewide lump-sum volunteer firefighter retirement plan under chapter 353G, the number of active volunteer firefighters of the municipality covered by the statewide plan as certified by the executive director of the Public Employees Retirement Association to the commissioner and the state auditor, but not to exceed 30 active firefighters, must be used in this determination.

(e) Unless the firefighters of the applicable fire department are members of the voluntary statewide lump-sum volunteer firefighter retirement plan, the fire state aid must be paid to the treasurer of the municipality where the fire department is located and the treasurer of the municipality shall, within 30 days of receipt of the fire state aid, transmit the aid to the relief association if the relief association has filed a financial report with the treasurer of the municipality and has met all other statutory provisions pertaining to the aid apportionment. If the firefighters of the applicable fire department are members of the voluntary statewide lump-sum volunteer firefighter retirement plan, the fire state aid must be paid to the executive director of the Public Employees Retirement Association and deposited in the voluntary statewide lump-sum volunteer firefighter retirement fund.

(f) The commissioner may make rules to permit the administration of the provisions of this section.

(g) Any adjustments needed to correct prior misallocations must be made to subsequent apportionments.

Sec. 5. AMEND Minnesota Statutes 2012, section 69.021, subdivision 8 , is amended to read:

```
Subd. 8. Population and
    [A> estimated  <A] market value.
```

(a) In computations relating to fire state aid requiring the use of population figures, only official statewide federal census figures are to be used. Increases or decreases in population disclosed by reason of any special census must not be taken into consideration.

```
(b) In calculations relating to fire state aid requiring the use of
    [A>estimated <A]
 market value property figures, only the latest available
```

[A>estimated <A] market value property figures may be used.

Sec. 6. AMEND Minnesota Statutes 2012, section 88.51, subdivision 3 , is amended to read:

```
Subd. 3. Determination of
    [A> estimated  <A] market value.
```

In determining the net tax capacity of property within any taxing district the value of the surface of lands within any auxiliary forest therein, as determined by the county board under the provisions of section 88.48, subdivision 3 , shall, for all purposes except the levying of taxes on lands

```
within any such forest, be deemed the
    [A>estimated <A] market value thereof.
```

Sec. 7. AMEND Minnesota Statutes 2012, section 103B.245, subdivision 3 , is amended to read: Subd. 3. Tax. After adoption of the ordinance under subdivision 2, a local government unit may annually levy a tax on all taxable property in the district for the purposes for which the tax district is established.

```
The tax may not exceed 0.02418 percent of
    [A>estimated <A] market value on
```

taxable property located in rural towns other than urban towns, unless allowed by resolution of the town electors. The proceeds of the tax shall be paid into a fund reserved for these purposes. Any proceeds remaining in the reserve fund at the time the tax is terminated or the district is dissolved shall be transferred and irrevocably pledged to the debt service fund of the local unit to be used solely to reduce

tax levies for bonded indebtedness of taxable property in the district.

Sec. 8. AMEND Minnesota Statutes 2012, section 103B.251, subdivision 8 , is amended to read: Subd. 8. Tax. (a) For the payment of principal and interest on the bonds issued under subdivision 7 and the payment required under subdivision 6, the county shall irrevocably pledge and appropriate the proceeds of a tax levied on all taxable property located within the territory of the watershed management organization or subwatershed unit for which the bonds are issued. Each year until the reserve for payment of the bonds is sufficient to retire the bonds, the county shall levy on all taxable property in the territory of the organization or unit, without respect to any statutory or other limitation on taxes, an amount of taxes sufficient to pay principal and interest on the bonds and to restore any deficiencies in reserves required to be maintained for payment of the bonds.

(b) The tax levied on rural towns other than urban towns may not exceed 0.02418

```
percent of
    [D>taxable <D]
```

[A>estimated <A] market value, unless approved by

resolution of the town electors.

(c) If at any time the amounts available from the levy on property in the territory of the organization are insufficient to pay principal and interest on the bonds when due, the county shall make payment from any available funds in the county treasury.

(d) The amount of any taxes which are required to be levied outside of the territory of the watershed management organization or unit or taken from the general funds of the county to pay principal or interest on the bonds shall be reimbursed to the county from taxes levied within the territory of the watershed management organization or unit.

Sec. 9. AMEND Minnesota Statutes 2012, section 103B.635, subdivision 2 , is amended to read: Subd. 2. Municipal funding of district. (a) The governing body or board of supervisors of each municipality in the district must provide the funds necessary to meet its proportion of the total cost determined by the board, provided the total funding from all municipalities in the district for the costs shall not exceed an amount equal

```
to .00242 percent of the total
    [D>taxable <D]
```

[A>estimated <A] market value

within the district, unless three-fourths of the municipalities in the district pass a resolution concurring to the additional costs.

(b) The funds must be deposited in the treasury of the district in amounts and at times as the treasurer of the district requires.

Sec. 10. AMEND Minnesota Statutes 2012, section 103B.691, subdivision 2 , is amended to read: Subd. 2. Municipal funding of district. (a) The governing body or board of supervisors of each municipality in the district shall provide the funds necessary to meet its proportion of the total cost to be borne by the municipalities as finally certified by the board.

(b) The municipality's funds may be raised by any means within the authority of the municipality.

```
The municipalities may each levy a tax not to exceed .02418 percent of
```

[D>taxable <D] [A>estimated <A] market value on the taxable property located in the district to provide the funds. The levy shall be within all other limitations provided by law.

(c) The funds must be deposited into the treasury of the district in amounts and at times as the treasurer of the district requires.

Sec. 11. AMEND Minnesota Statutes 2012, section 103D.905, subdivision 2 , is amended to read: Subd. 2. Organizational expense fund. (a) An organizational expense fund, consisting of an ad valorem tax levy, shall

```
not exceed 0.01596 percent of
    [D>taxable <D]
```

[A>estimated <A] market value,

or $60,000, whichever is less. The money in the fund shall be used for organizational expenses and preparation of the watershed management plan for projects.

(b) The managers may borrow from the affected counties up to 75 percent of the anticipated funds to be collected from the organizational expense fund levy and the counties affected may make the advancements.

(c) The advancement of anticipated funds shall be apportioned among affected counties in the same ratio as the net tax capacity of the area of the counties within the watershed district bears to the net tax capacity of the entire watershed district. If a watershed district is enlarged, an organizational expense fund may be levied against the area added to the watershed district in the same manner as provided in this subdivision.

(d) Unexpended funds collected for the organizational expense may be transferred to the administrative fund and used for the purposes of the administrative fund.

Sec. 12. AMEND Minnesota Statutes 2012, section 103D.905, subdivision 3 , is amended to read: Subd. 3. General fund. A general fund, consisting of an ad valorem tax levy, may not exceed 0.048

```
percent of
    [D>taxable <D]
```

[A>estimated <A] market value, or $250,000,

whichever is less. The money in the fund shall be used for general administrative expenses and for the construction or implementation and maintenance of projects of common benefit to the watershed district. The managers may make an annual levy for the general fund as provided in section 103D.911 . In addition to the annual general levy, the managers may annually levy a tax

```
not to exceed 0.00798 percent of
    [D>taxable <D]
```

[A>estimated <A] market value

for a period not to exceed 15 consecutive years to pay the cost attributable to the basic water management features of projects initiated by petition of a political subdivision within the watershed district or by petition of at least 50 resident owners whose property is within the watershed district.

Sec. 13. AMEND Minnesota Statutes 2012, section 103D.905, subdivision 8 , is amended to read: Subd. 8. Survey and data acquisition fund. (a) A survey and data acquisition fund is established and used only if other funds are not available to the watershed district to pay for making necessary surveys and acquiring data.

(b) The survey and data acquisition fund consists of the proceeds of a property tax that can be levied only once every five years.

```
The levy may not exceed 0.02418 percent of
    [D>taxable <D]
```

[A>estimated <A]

market value.

(c) The balance of the survey and data acquisition fund may not exceed $50,000.

(d) In a subsequent proceeding for a project where a survey has been made, the attributable cost of the survey as determined by the managers shall be included as a part of the cost of the work and the sum shall be repaid to the survey and data acquisition fund.

Sec. 14. AMEND Minnesota Statutes 2012, section 117.025, subdivision 7 , is amended to read: Subd. 7. Structurally substandard. " Structurally substandard" means a building:

(1) that was inspected by the appropriate local government and cited for one or more enforceable housing, maintenance, or building code violations;

(2) in which the cited building code violations involve one or more of the following:

(i) a roof and roof framing element;

(ii) support walls, beams, and headers;

(iii) foundation, footings, and subgrade conditions;

(iv) light and ventilation;

(v) fire protection, including egress;

(vi) internal utilities, including electricity, gas, and water;

(vii) flooring and flooring elements; or

(viii) walls, insulation, and exterior envelope;

(3) in which the cited housing, maintenance, or building code violations have not been remedied after two notices to cure the noncompliance; and

(4) has uncured housing, maintenance, and building code violations,

```
satisfaction of which would cost more than 50 percent of the
    [D>assessor's
```

taxable <D] [A>estimated <A] market value for the building, excluding land value, as determined under section 273.11 for property taxes payable in the year in which the condemnation is commenced. A local government is authorized to seek from a judge or magistrate an administrative warrant to gain access to inspect a specific building in a proposed development or redevelopment area upon showing of probable cause that a specific code violation has occurred and that the violation has not been cured, and that the owner has denied the local government access to the property. Items of evidence that may support a conclusion of probable cause may include recent fire or police inspections, housing inspection, exterior evidence of deterioration, or other similar reliable evidence of deterioration in the specific building.

Sec. 15. AMEND Minnesota Statutes 2012, section 127A.48, subdivision 1 , is amended to read: Subdivision 1. Computation. The Department of Revenue must annually conduct an assessment/sales ratio study

of the taxable property in each
    [A>county, city, town, and <A] school

district in accordance with the procedures in subdivisions 2 and 3. Based upon the results of this assessment/sales ratio study, the Department of Revenue

must determine an
    [D>aggregate <D] equalized net tax capacity for thevarious classes of taxable property in each
    [A>taxing <A] district,
    [A>the aggregate of <A]
 which
    [D>tax capacity shall be <D]

[A>is <A]

designated as the adjusted net tax capacity. [A>The adjusted net tax capacity must be reduced by the captured tax capacity of tax increment districts under section 469.177, subdivision 2 , fiscal disparities contribution tax capacities under sections 276A.06 and 473F.08 , and the tax capacity of transmission lines required to be subtracted from the local tax base under section 273.425 ; and increased by fiscal disparities distribution tax capacities under sections 276A.06 and 473F.08 . <A] The adjusted net tax capacities shall be determined using the net tax capacity percentages in effect for the assessment year following the assessment year of the study. The Department of Revenue must make whatever estimates are necessary to account for changes in the classification system. The Department of Revenue may incur the expense necessary to make the determinations. The commissioner of revenue may reimburse any county or governmental official for requested services performed in ascertaining the adjusted net tax capacity.

On or before March 15 annually, the Department of Revenue shall file with the chair of the Tax Committee of the house of representatives and the chair of the Committee on Taxes and Tax laws of the senate a report of adjusted net tax

capacities
    [A>for school districts <A].

On or before June 15 annually, the Department of Revenue shall file its final

report on the adjusted net tax capacities
    [A>for school districts <A]

established by the previous year's assessments and the current year's net tax capacity percentages with

the commissioner of education and each county auditor

```
for those
    [A>school <A] districts for which the auditor has the
```

responsibility for determination of local tax rates.

```
A copy of the report so filed shall be mailed to the clerk of each
    [A>school
```

<A] district involved and to the county assessor or supervisor of assessments

```
of the county or counties in which each
    [A>school <A] district is located.
```

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 16. AMEND Minnesota Statutes 2012, section 138.053 , is amended to read: 138.053 COUNTY HISTORICAL SOCIETY; TAX LEVY; CITIES OR TOWNS. The governing body of any home rule charter or statutory city or town may annually appropriate from its general fund an amount not to exceed 0.02418

```
percent of
    [D>taxable <D]
```

[A>estimated <A] market value, derived from ad

valorem taxes on property or other revenues, to be paid to the historical society of its respective county to be used for the promotion of historical work and to aid in defraying the expenses of carrying on the historical work in the county. No city or town may appropriate any funds for the benefit of any historical society unless the society is affiliated with and approved by the Minnesota Historical Society. Sec. 17. AMEND Minnesota Statutes 2012, section 144F.01, subdivision 4 , is amended to read:

Subd. 4. Property tax levy authority. The district's board may levy a tax on the taxable real and personal property in the district.

```
The ad valorem tax levy may not exceed 0.048 percent of the
    [D>taxable
```

<D] [A>estimated <A] market value of the district or $400,000, whichever is less. The proceeds of the levy must be used as provided in subdivision 5. The board shall certify the levy at the times as provided under section 275.07 . The board shall provide the county with whatever information is necessary to identify the property that is located within the district. If the boundaries include a part of a parcel, the entire parcel

shall be included in the district. The county auditors must spread, collect, and distribute the proceeds of the tax at the same time and in the same manner as provided by law for all other property taxes.

Sec. 18. AMEND Minnesota Statutes 2012, section 162.07, subdivision 3 , is amended to read: Subd. 3. Computation for rural counties.

```
An amount equal to a levy of 0.01596 percent on each rural county's total
```

[D>taxable <D] [A>estimated <A] market value for the last preceding calendar year shall be computed and shall be subtracted from the county's total estimated construction costs. The result thereof shall be the money needs of the county. For the purpose of this section, "rural counties" means all counties having a population of less than 175,000.

Sec. 19. AMEND Minnesota Statutes 2012, section 162.07, subdivision 4 , is amended to read: Subd. 4. Computation for urban counties.

```
An amount equal to a levy of 0.00967 percent on each urban county's total
```

[D>taxable <D] [A>estimated <A] market value for the last preceding calendar year shall be computed and shall be subtracted from the county's total estimated construction costs. The result thereof shall be the money needs of the county. For the purpose of this section, "urban counties" means all counties having a population of 175,000 or more.

Sec. 20. AMEND Minnesota Statutes 2012, section 163.04, subdivision 3 , is amended to read: Subd. 3. Bridges within certain cities. When the council of any statutory city or city of the third or fourth class may determine that it is necessary to build or improve any bridge or bridges, including approaches thereto, and any dam or retaining works connected therewith, upon or forming a part of streets or highways either wholly or partly within its limits, the county board shall appropriate one-half of the money as may be necessary therefor from the county road and bridge fund, not exceeding during any year one-half the amount of taxes paid into the county road and bridge fund during the preceding year, on property within the corporate limits of the city. The appropriation shall be made upon the petition of the council, which petition shall be filed by the council with the county board prior to the fixing by the board of the annual county tax levy. The county board shall determine the plans and specifications, shall let all necessary contracts, shall have charge of construction, and upon its request, warrants in payment thereof shall be issued by the county auditor, from time to time, as the construction work proceeds. Any unpaid balance may be paid or advanced by the city. On petition of the council, the appropriations of the county board, during not to exceed three successive years, may be made to apply on the construction of the same items and to repay any money advanced by the city in the construction thereof. None of the provisions of this section shall be construed to be mandatory as

applied to any city whose
[A>estimated <A] market value exceeds $2,100 per

capita of its population.

Sec. 21. AMEND Minnesota Statutes 2012, section 163.06, subdivision 6 , is amended to read: Subd. 6. Expenditure in certain counties. In any county having not less than 95 nor more than 105 full and fractional

townships, and having
[D>a <D]

[A>an estimated <A] market value of not lessthan $12,000,000 nor more than $21,000,000,
[D>exclusive of money and

credits, <D] the county board, by resolution, may expend the funds provided in

subdivision 4 in any organized
[D>or unorganized township <D]

[A>town or

unorganized territory <A] or portion thereof in such county.

Sec. 22. AMEND Minnesota Statutes 2012, section 165.10, subdivision 1 , is amended to read: Subdivision 1. Certain counties may issue and sell. The county board of any county having no outstanding road and bridge bonds may issue and sell county road bonds in an amount not exceeding 0.12089 percent of

the
[A>estimated <A] market value of the taxable property within the county

[D>exclusive of money and credits <D], for the purpose of constructing, reconstructing, improving, or maintaining any bridge or bridges on any highway under its jurisdiction, without submitting the matter to a vote of the electors of the county.

Sec. 23. AMEND Minnesota Statutes 2012, section 272.03 , is amended by adding a subdivision to read: [A>Subd. 14. Estimated market value. " Estimated market value" means the assessor's determination of market value, including the effects of any orders made under section 270.12 or chapter 274, for the parcel. The provisions of section 273.032 apply for certain uses in determining the total estimated market value for the taxing jurisdiction. <A]

Sec. 24. AMEND Minnesota Statutes 2012, section 272.03 , is amended by adding a subdivision to read: [A>Subd. 15. Taxable market value. " Taxable market value" means estimated market value for the parcel as reduced by market value exclusions, deferments of value, or other adjustments required by law, that reduce market value before the application of class rates. <A]

Sec. 25. AMEND Minnesota Statutes 2012, section 273.032 , is amended to read: 273.032 MARKET VALUE DEFINITION.[A>(a) Unless otherwise provided, <A] for the purpose of determining any

```
property tax levy limitation based on market value
    [A>or any limit on net
```

debt, the issuance of bonds, certificates of indebtedness, or capital notes based on market value <A], any qualification to receive state aid based on market value, or any state aid amount based on market value, the terms "market

```
value," "
    [D>taxable <D]
```

```
[A>estimated <A] market value," and "marketvaluation," whether equalized or
unequalized, mean the
    [D>total taxable
<D]
```

```
[A>estimated <A] market value of
    [A>taxable <A] property within the local
unit of government before any
    [A>of the following or similar <A] adjustments
for
    [A>: <A]
```

[A>(1) the market value exclusions under: <A]

[A>(i) section 273.11 , subdivisions 14a and 14c (vacant platted land); <A]

[A>(ii) section 273.11, subdivision 16 (certain improvements to homestead property); <A]

[A>(iii) section 273.11 , subdivisions 19 and 20 (certain improvements to business properties); <A]

[A>(iv) section 273.11, subdivision 21 (homestead property damaged by mold); <A]

[A>(v) section 273.11, subdivision 22 (qualifying lead hazardous reduction projects); <A]

[A>(vi) section 273.13, subdivision 34 (homestead of a disabled veteran or family caregiver); <A]

[A>(vii) section 273.13, subdivision 35 (homestead market value exclusion); or <A]

[A>(2) the deferment of value under: <A]

[A>(i) the Minnesota Agricultural Property Tax Law, section 273.111 ; <A]

[A>(ii) the Aggregate Resource Preservation Law, section 273.1115 ; <A]

[A>(iii) the Minnesota Open Space Property Tax Law, section 273.112 ; <A]

[A>(iv) the rural preserves property tax program, section 273.114 ; or <A]

[A>(v) the Metropolitan Agricultural Preserves Act, section 473H.10 ; or <A]

[A>(3) the adjustments to tax capacity for: <A]

```
[A>(i) <A] tax increment
     [D>, <D]
```

[A>financing under sections 469.174 to

469.1794; <A]

```
[A>(ii) <A] fiscal
     [D>disparity, <D]
```

[A>disparities under chapter 276A or

473F; or <A]

```
[A>(iii) <A] powerline credit
     [D>, or wind energy values, but after the
```

limited market adjustments under section 273.11, subdivision 1 a , and after the market value exclusions of certain improvements to homestead property undersection 273.11, subdivision 16 <D] [A>under section 273.425 <A].

[A>(b) Estimated market value under paragraph (a) also includes the market value of tax-exempt property if the applicable law specifically provides that the limitation, qualification, or aid calculation includes tax-exempt property. <A]

[A>(c) <A] Unless otherwise provided, "market value," "
     [D>taxable
<D]

[A>estimated <A] market value," and "market valuation" for purposes of

[D>this paragraph <D] [A>property tax levy limitations and calculation of state

aid <A], refer to the
     [D>taxable <D]

[A>estimated <A] market value for theprevious assessment year
     [A>and for purposes of limits on net debt, the

issuance of bonds, certificates of indebtedness, or capital notes refer to the estimated market value as last finally equalized <A]. [D>For the purpose of determining any net debt limit based on market value, or any limit on the issuance of bonds, certificates of indebtedness, or capital notes based on market value, the terms "market value," "taxable market value," and "market valuation," whether equalized or unequalized, mean the total taxable market value of property within the local unit of government before any adjustments for tax increment, fiscal disparity, powerline credit, or wind energy values, but after the limited market value adjustments under section273.11 , subdivision 1a, and after the market value exclusions of certain improvements to homestead property under section 273.11 , subdivision 16. Unless otherwise provided, "market value," "taxable market value," and "market valuation" for purposes of this paragraph, mean the taxable market value as last finally equalized. <D]

[A>(d) For purposes of a provision of a home rule charter or of any special law that is not codified in the statutes and that imposes a levy limitation based on market value or any limit on debt, the issuance of bonds, certificates of indebtedness, or capital notes based on market value, the terms "market value," "taxable market value," and "market valuation," whether equalized or unequalized, mean "estimated market value" as defined in paragraph (a). <A]

Sec. 26. AMEND Minnesota Statutes 2012, section 273.11, subdivision 1 , is amended to read: Subdivision 1. Generally. Except as provided in this section or section 273.17, subdivision 1 , all property shall be valued at its market value. The market value as determined pursuant to this section shall be stated such that any amount under $100 is rounded up to $100 and any amount exceeding $100 shall be rounded to the nearest $100. In estimating and determining such value, the assessor shall not adopt a lower or different standard of value because the same is to serve as a basis of taxation, nor shall the

assessor adopt as a criterion of value the price for which such property would sell at a forced sale, or in the aggregate with all the property in the town or district; but the assessor shall value each article or description of property by itself, and at such sum or price as the assessor believes the same to be fairly worth in money. The assessor shall take into account the effect on the market value of property of environmental factors in the vicinity of the property. In assessing any tract or lot of real property, the value of the land, exclusive of structures and improvements, shall be determined, and also the value of all structures and improvements thereon, and the aggregate value of the property, including all structures and improvements, excluding the value of crops growing upon cultivated land. In valuing real property upon which there is a mine or quarry, it shall be valued at such price as such property, including the mine or quarry, would sell for at a fair, voluntary sale, for cash, if the material being mined or quarried is not subject to taxation under section 298.015 and the mine or quarry is not exempt from the general property tax under section 298.25 . In valuing real property which is vacant, platted property shall be assessed as

```
provided in
    [D>subdivision 14 <D]
```

[A>subdivisions 14a and 14c <A].


All property, or the use thereof, which is taxable under section 272.01, subdivision 2 , or 273.19 , shall be valued at the market value of such property and not at the value of a leasehold estate in such property, or at some lesser value than its market value.

Sec. 27. AMEND Minnesota Statutes 2012, section 273.124, subdivision 3 a , is amended to read: Subd. 3a. Manufactured home park cooperative. (a) When a manufactured home park is owned by a corporation or association organized under chapter 308A or 308B, and each person who owns a share or shares in the corporation or association is entitled to occupy a lot within the park, the corporation or association may claim homestead treatment for the park. Each lot must be designated by legal description or number, and each lot is limited to not more than one-half acre of land.

(b) The manufactured home park shall be entitled to homestead treatment if all of the following criteria are met:

(1) the occupant or the cooperative corporation or association is paying the ad valorem property taxes and any special assessments levied against the land and structure either directly, or indirectly through dues to the corporation or association; and

(2) the corporation or association organized under chapter 308A or 308B is wholly owned by persons having a right to occupy a lot owned by the corporation or association.

(c) A charitable corporation, organized under the laws of Minnesota with no outstanding stock, and granted a ruling by the Internal Revenue Service for 501(c)(3) tax-exempt status, qualifies for homestead treatment with respect to a manufactured home park if its members hold residential participation warrants

entitling them to occupy a lot in the manufactured home park.

(d) "Homestead treatment" under this subdivision means the class rate provided for class 4c property classified under section 273.13, subdivision 25 , paragraph (d), clause (5), item (ii).

```
 The homestead market value
    [D>credit <D]
```

[A>exclusion <A] under section

[D>273.1384 <D] [A>273.13 , subdivision 35, <A] does not apply and the property taxes assessed against the park shall not be included in the determination of taxes payable for rent paid under section 290A.03 .

[A>EFFECTIVE DATE. This section is effective for taxes payable in 2013 and thereafter. <A]

Sec. 28. AMEND Minnesota Statutes 2012, section 273.124, subdivision 13 , is amended to read: Subd. 13. Homestead application. (a) A person who meets the homestead requirements under subdivision 1 must file a homestead application with the county assessor to initially obtain homestead classification.

(b) The format and contents of a uniform homestead application shall be prescribed by the commissioner of revenue. The application must clearly inform the taxpayer that this application must be signed by all owners who occupy the property or by the qualifying relative and returned to the county assessor in order for the property to receive homestead treatment.

(c) Every property owner applying for homestead classification must furnish to the county assessor the Social Security number of each occupant who is listed as an owner of the property on the deed of record, the name and address of each owner who does not occupy the property, and the name and Social Security number of each owner's spouse who occupies the property. The application must be signed by each owner who occupies the property and by each owner's spouse who occupies the property, or, in the case of property that qualifies as a homestead under subdivision 1, paragraph (c), by the qualifying relative. If a property owner occupies a homestead, the property owner's spouse may not claim another property as a homestead unless the property owner and the property owner's spouse file with the assessor an affidavit or other proof required by the assessor stating that the property qualifies as a homestead under subdivision 1, paragraph (e).

Owners or spouses occupying residences owned by their spouses and previously occupied with the other spouse, either of whom fail to include the other spouse's name and Social Security number on the homestead application or provide the affidavits or other proof requested, will be deemed to have elected to receive only partial homestead treatment of their residence. The remainder of the residence will be classified as nonhomestead residential. When an owner or spouse's name and Social Security number appear on homestead applications for two separate residences and only one application is signed, the owner or spouse will be deemed to have elected to homestead the residence for which the application

was signed. The Social Security numbers, state or federal tax returns or tax return information, including the federal income tax schedule F required by this section, or affidavits or other proofs of the property owners and spouses submitted under this or another section to support a claim for a property tax homestead classification are private data on individuals as defined by section 13.02, subdivision 12 , but, notwithstanding that section, the private data may be disclosed to the commissioner of revenue, or, for purposes of proceeding under the Revenue Recapture Act to recover personal property taxes owing, to the county treasurer.

(d) If residential real estate is occupied and used for purposes of a homestead by a relative of the owner and qualifies for a homestead under subdivision 1, paragraph (c), in order for the property to receive homestead status, a homestead application must be filed with the assessor. The Social Security number of each relative and spouse of a relative occupying the property shall be required on the homestead application filed under this subdivision. If a different relative of the owner subsequently occupies the property, the owner of the property must notify the assessor within 30 days of the change in occupancy. The Social Security number of a relative or relative's spouse occupying the property is private data on individuals as defined by section 13.02, subdivision 12 , but may be disclosed to the commissioner of revenue, or, for the purposes of proceeding under the Revenue Recapture Act to recover personal property taxes owing, to the county treasurer.

(e) The homestead application shall also notify the property owners that the application filed under this section will not be mailed annually and that if the property is granted homestead status for any assessment year, that same property shall remain classified as homestead until the property is sold or transferred to another person, or the owners, the spouse of the owner, or the relatives no longer use the property as their homestead. Upon the sale or transfer of the homestead property, a certificate of value must be timely filed with the county auditor as provided under section 272.115 .

Failure to notify the assessor within 30 days that the property has been sold, transferred, or that the owner, the spouse of the owner, or the relative is no longer occupying the property as a homestead, shall result in the penalty provided under this subdivision and the property will lose its current homestead status.

(f) If the homestead application is not returned within 30 days, the county will send a second application to the present owners of record. The notice of proposed property taxes prepared under section 275.065, subdivision 3 , shall reflect the property's classification. If a homestead application has not been filed with the county by December 15, the assessor shall classify the property as nonhomestead for the current assessment year for taxes payable in the following year, provided that the owner may be entitled to receive the homestead classification by proper application under section 375.192 .

(g) At the request of the commissioner, each county must give the commissioner a list that includes the name and Social Security number of each occupant of homestead property who is the property owner, property owner's spouse, qualifying relative of a property owner, or a spouse of a qualifying relative. The commissioner shall use the information provided on the lists as appropriate under the law, including for

the detection of improper claims by owners, or relatives of owners, under chapter 290A.

(h) If the commissioner finds that a property owner may be claiming a fraudulent homestead, the commissioner shall notify the appropriate counties. Within 90 days of the notification, the county assessor shall investigate to determine if the homestead classification was properly claimed. If the property owner does not qualify, the county assessor shall notify the county auditor who will determine the amount of homestead benefits that had been improperly allowed. For the purpose of this section, "homestead benefits" means the tax reduction

```
resulting from the classification as a homestead
    [A>and the homestead market
```

value exclusion <A] under section 273.13 , the taconite homestead credit under

```
section 273.135, the
    [D>residential homestead and <D] agricultural homestead
```

[D>credits <D] [A>credit <A] under section 273.1384 , and the supplemental homestead credit under section 273.1391 . The county auditor shall send a notice to the person who owned the affected property at the time the homestead application related to the improper homestead was filed, demanding reimbursement of the homestead benefits plus a penalty equal to 100 percent of the homestead benefits. The person notified may appeal the county's determination by serving copies of a petition for review with county officials as provided in section 278.01 and filing proof of service as provided in section 278.01 with the Minnesota Tax Court within 60 days of the date of the notice from the county. Procedurally, the appeal is governed by the provisions in chapter 271 which apply to the appeal of a property tax assessment or levy, but without requiring any prepayment of the amount in controversy. If the amount of homestead benefits and penalty is not paid within 60 days, and if no appeal has been filed, the county auditor shall certify the amount of taxes and penalty to the county treasurer. The county treasurer will add interest to the unpaid homestead benefits and penalty amounts at the rate provided in section 279.03 for real property taxes becoming delinquent in the calendar year during which the amount remains unpaid. Interest may be assessed for the period beginning 60 days after demand for payment was made. If the person notified is the current owner of the property, the treasurer may add the total amount of homestead benefits, penalty, interest, and costs to the ad valorem taxes otherwise payable on the property by including the amounts on the property tax statements under section 276.04, subdivision 3 . The amounts added under this paragraph to the ad valorem taxes shall include interest accrued through December 31 of the year preceding the taxes payable year for which the amounts are first added. These amounts, when added to the property tax statement, become subject to all the laws for the enforcement of real or personal property taxes for that year, and for any subsequent year. If the person notified is not the current owner of the property, the treasurer may collect the amounts due under the Revenue Recapture Act in chapter 270A, or use any of the powers granted in sections 277.20 and 277.21 without exclusion, to enforce payment of the homestead benefits, penalty, interest, and costs, as if those amounts were

delinquent tax obligations of the person who owned the property at the time the application related to the improperly allowed homestead was filed. The treasurer may relieve a prior owner of personal liability for the homestead benefits, penalty, interest, and costs, and instead extend those amounts on the tax lists against the property as provided in this paragraph to the extent that the current owner agrees in writing. On all demands, billings, property tax statements, and related correspondence, the county must list and state separately the amounts of homestead benefits, penalty, interest and costs being demanded, billed or assessed.

(i) Any amount of homestead benefits recovered by the county from the property owner shall be distributed to the county, city or town, and school district where the property is located in the same proportion that each taxing district's levy was to the total of the three taxing districts' levy for the current year. Any amount recovered attributable to taconite homestead credit shall be transmitted to the St. Louis County auditor to be deposited in the taconite property tax relief account. Any amount recovered that is attributable to supplemental homestead credit is to be transmitted to the commissioner of revenue for deposit in the general fund of the state treasury. The total amount of penalty collected must be deposited in the county general fund.

(j) If a property owner has applied for more than one homestead and the county assessors cannot determine which property should be classified as homestead, the county assessors will refer the information to the commissioner. The commissioner shall make the determination and notify the counties within 60 days.

(k) In addition to lists of homestead properties, the commissioner may ask the counties to furnish lists of all properties and the record owners. The Social Security numbers and federal identification numbers that are maintained by a county or city assessor for property tax administration purposes, and that may appear on the lists retain their classification as private or nonpublic data; but may be viewed, accessed, and used by the county auditor or treasurer of the same county for the limited purpose of assisting the commissioner in the preparation of microdata samples under section 270C.12 .

(l) On or before April 30 each year beginning in 2007, each county must provide the commissioner with the following data for each parcel of homestead property by electronic means as defined in section 289A.02, subdivision 8 :

(i) the property identification number assigned to the parcel for purposes of taxes payable in the current year;

(ii) the name and Social Security number of each occupant of homestead property who is the property owner, property owner's spouse, qualifying relative of a property owner, or spouse of a qualifying relative;

(iii) the classification of the property under section 273.13 for taxes payable in the current year and in the prior year;

(iv) an indication of whether the property was classified as a homestead for taxes payable in the current year because of occupancy by a relative of the owner or by a spouse of a relative;

(v) the property taxes payable as defined in section 290A.03, subdivision 13 , for the current year and the prior year;

(vi) the market value of improvements to the property first assessed for tax purposes for taxes payable in the current year;

(vii) the assessor's estimated market value assigned to the property for taxes payable in the current year and the prior year;

(viii) the taxable market value assigned to the property for taxes payable in the current year and the prior year;

(ix) whether there are delinquent property taxes owing on the homestead;

(x) the unique taxing district in which the property is located; and

(xi) such other information as the commissioner decides is necessary. The commissioner shall use the information provided on the lists as appropriate under the law, including for the detection of improper claims by owners, or relatives of owners, under chapter 290A.

[A>EFFECTIVE DATE. This section is effective for taxes payable in 2013 and thereafter. <A]

Sec. 29. AMEND Minnesota Statutes 2012, section 273.13, subdivision 21 b , is amended to read: Subd. 21b. [A> Net <A] tax capacity.

[D>(a) Gross tax capacity means the product of the appropriate gross class rates in this section and market values. <D]

[D>(b) <D] Net tax capacity means the product of the appropriate net class

```
rates in this section and
    [A>taxable <A] market values.
```

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 30. AMEND Minnesota Statutes 2012, section 273.1398, subdivision 3 , is amended to read: Subd. 3. Disparity reduction aid. The amount of disparity aid certified for each taxing district within each unique taxing jurisdiction for taxes payable in the prior year shall be multiplied by the ratio of (1) the jurisdiction's tax capacity using the class rates for taxes payable in the year for which aid is being computed, to (2) its tax capacity using the class rates for taxes payable in the year prior to that

```
for which aid is being computed, both based upon
    [A>taxable <A] market
```

values for taxes payable in the year prior to that for which aid is being computed. If the commissioner determines that insufficient information is available to reasonably and timely calculate the numerator in this ratio for the first taxes payable year that a class rate change or new class rate is effective, the commissioner shall omit the effects of that class rate change or new class rate when calculating this ratio for aid payable in that taxes payable year. For aid payable in the year following a year for which such omission was made, the commissioner shall use in the denominator for the class that was changed or created, the tax capacity for taxes payable two years prior to that in which

```
the aid is payable, based on
    [A>taxable <A] market values for taxes payable
```

in the year prior to that for which aid is being computed.

Sec. 31. AMEND Minnesota Statutes 2012, section 273.1398, subdivision 4 , is amended to read: Subd. 4. Disparity reduction credit. (a) Beginning with taxes payable in 1989, class 4a and class 3a property qualifies for a disparity reduction credit if: (1) the property is located in a border city that has an enterprise zone, as defined in section 469.166 ; (2) the property is located in a city with a population greater than 2,500 and less than 35,000 according to the 1980 decennial census; (3) the city is adjacent to a city in another state or immediately adjacent to a city adjacent to a city in another state; and (4) the adjacent city in the other state has a population of greater than 5,000 and less than 75,000 according to the 1980 decennial census.

(b) The credit is an amount sufficient to reduce (i) the taxes levied on class

```
4a property to 2.3 percent of the property's
    [A>taxable <A] market value and(ii) the tax on class 3a property to 2.3
percent of
    [A>taxable <A] market
```

value.

(c) The county auditor shall annually certify the costs of the credits to the Department of Revenue. The department shall reimburse local governments for the property taxes forgone as the result of the credits in proportion to their total levies.

Sec. 32. AMEND Minnesota Statutes 2012, section 275.011, subdivision 1 , is amended to read: Subdivision 1. Determination of levy limit. The property tax levied for any purpose under a special law that is not codified in Minnesota Statutes or a city charter provision and that is subject to a mill rate limitation imposed by the special law or city charter provision, excluding levies subject to mill rate limitations that use adjusted assessed values determined by the commissioner of revenue under section 124.2131 , must not exceed the following amount for the years specified:

(a) for taxes payable in 1988, the product of the applicable mill rate limitation imposed by special law or

city charter provision multiplied by the total assessed valuation of all taxable property subject to the tax as adjusted by the provisions of Minnesota Statutes 1986, sections 272.64 ; 273.13 , subdivision 7a; and 275.49 ;

(b) for taxes payable in 1989, the product of (1) the property tax levy limitation for the taxes payable year 1988 determined under clause (a) multiplied by (2) an index for market valuation changes equal to the assessment year 1988 total market valuation of all taxable property subject to the tax divided by the assessment year 1987 total market valuation of all taxable property subject to the tax; and

(c) for taxes payable in 1990 and subsequent years, the product of (1) the property tax levy limitation for the previous year determined pursuant to this subdivision multiplied by (2) an index for market valuation changes equal to the total market valuation of all taxable property subject to the tax for the current assessment year divided by the total market valuation of all taxable property subject to the tax for the previous assessment year. For the purpose of determining the property tax levy limitation for the taxes

```
payable year
    [D>1988 <D]
```

[A>2014 <A] and subsequent years under thissubdivision, "total market valuation" means the
```
    [D>total <D]
```

[A>estimated <A]
```
market
    [D>valuation <D]
```

[A>value <A] of all taxable property subject to the
```
tax
    [D>without valuation adjustments for fiscal disparities (chapters 276A
```

and 473F), tax increment financing (sections 469.174 to 469.179 ), or powerline credit (section 273.425 ) <D] [A>as provided under section 273.032 <A].

Sec. 33. AMEND Minnesota Statutes 2012, section 275.077, subdivision 2 , is amended to read: Subd. 2. Correction of levy amount. The difference between the correct levy and the erroneous levy shall be added to the township levy for the subsequent levy year; provided that if the amount

```
of the difference exceeds 0.12089 percent of
    [D>taxable <D]
```

[A>estimated <A]

market value, the excess shall be added to the township levy for the second and later subsequent levy

years, not to exceed an additional levy of 0.12089

percent of
    [D>taxable <D]

[A>estimated <A] market value in any year, until

the full amount of the difference has been levied. The funds collected from the corrected levies shall be used to reimburse the county for the payment required by subdivision 1.

Sec. 34. AMEND Minnesota Statutes 2012, section 275.71, subdivision 4 , is amended to read: Subd. 4. Adjusted levy limit base. For taxes levied in 2008 through 2010, the adjusted levy limit base is equal to the levy limit base computed under subdivision 2 or section 275.72 , multiplied by:

(1) one plus the percentage growth in the implicit price deflator, but the percentage shall not be less than zero or exceed 3.9 percent;

(2) one plus a percentage equal to 50 percent of the percentage increase in the number of households, if any, for the most recent 12-month period for which data is available; and

(3) one plus a percentage equal to 50 percent of the percentage increase in the

[D>taxable <D] [A>estimated <A] market value of the jurisdiction due to new construction of class 3 property, as defined in section 273.13, subdivision 4 , except for state-assessed utility and railroad property, for the most recent year for which data is available.

Sec. 35. AMEND Minnesota Statutes 2012, section 276.04, subdivision 2 , is amended to read: Subd. 2. Contents of tax statements. (a) The treasurer shall provide for the printing of the tax statements. The commissioner of revenue shall prescribe the form of the property tax statement and its contents. The tax statement must not state or imply that property tax credits are paid by the state of Minnesota. The statement must contain a tabulated statement of the dollar amount due to each taxing authority and the amount of the state tax from the parcel of real property for which a particular tax statement is prepared. The dollar amounts attributable to the county, the state tax, the voter approved school tax, the other local school tax, the township or municipality, and the total of the metropolitan special taxing districts as defined insection 275.065, subdivision 3 , paragraph (i), must be separately stated. The amounts due all other special taxing districts, if any, may be aggregated except that any levies made by the regional rail authorities in the county of Anoka, Carver, Dakota, Hennepin, Ramsey, Scott, or Washington under chapter 398A shall be listed on a separate line directly under the appropriate county's levy. If the county levy under this paragraph includes an amount for a lake improvement district as defined under sections 103B.501 to 103B.581 , the amount attributable for that purpose must be separately stated from the remaining county levy amount. In the case of Ramsey County, if the county levy under this paragraph includes an amount for public library service under section 134.07 , the amount attributable for that purpose may be separated from the remaining county levy amount. The amount of the tax on

homesteads qualifying under the senior citizens' property tax deferral program under chapter 290B is the total amount of property tax before subtraction of the deferred property tax amount. The amount of the tax on contamination value imposed under sections 270.91 to270.98 , if any, must also be separately stated. The dollar amounts, including the dollar amount of any special assessments, may be rounded to the nearest even whole dollar. For purposes of this section whole odd-numbered dollars may be adjusted to the next higher even-numbered dollar. The amount of market value excluded under section 273.11, subdivision 16 , if any, must also be listed on the tax statement.

(b) The property tax statements for manufactured homes and sectional structures taxed as personal property shall contain the same information that is required on the tax statements for real property.

(c) Real and personal property tax statements must contain the following information in the order given in this paragraph. The information must contain the current year tax information in the right column with the corresponding information for the previous year in a column on the left:

(1) the property's estimated market value under section 273.11, subdivision 1 ;

(2) the property's homestead market value exclusion under section 273.13, subdivision 35 ;

```
(3) the property's taxable market value
    [D>after reductions <D] under
```

[D>sections 273.11 , subdivisions 1a and 16, and 273.13 , subdivision 35 <D] [A>section 272.03, subdivision 15 <A];

(4) the property's gross tax, before credits;

(5) for homestead agricultural properties, the credit under section 273.1384 ;

(6) any credits received under sections 273.119 ; 273.1234 or 273.1235 ; 273.135 ;273.1391 ; 273.1398 , subdivision 4; 469.171 ; and 473H.10 , except that the amount of credit received under section 273.135 must be separately stated and identified as "taconite tax relief"; and

(7) the net tax payable in the manner required in paragraph (a).

(d) If the county uses envelopes for mailing property tax statements and if the county agrees, a taxing district may include a notice with the property tax statement notifying taxpayers when the taxing district will begin its budget deliberations for the current year, and encouraging taxpayers to attend the hearings. If the county allows notices to be included in the envelope containing the property tax statement, and if more than one taxing district relative to a given property decides to include a notice with the tax statement, the county treasurer or auditor must coordinate the process and may combine the information on a single announcement.

Sec. 36. AMEND Minnesota Statutes 2012, section 276A.01, subdivision 10 , is amended to read: Subd.

10.

[A> Adjusted   <A] market value. "

[A>Adjusted <A] market value" of real and personal property within a

municipality means the
    [D>assessor's estimated <D]

[A>taxable <A] marketvalue
    [A>, as defined in section 272.03, <A] of all real and personal

property, including the value of manufactured housing, within the municipality

[D>. For purposes of sections 276A.01 to 276A.09 , the commissioner of revenue shall annually make determinations and reports with respect to each municipality which are comparable to those it makes for school districts <D] [A>, adjusted for sales ratios in a manner similar to the adjustments made to city and town

net tax capacities <A] under section 127A.48, subdivisions 1 to 6
    [D>, in

the same manner and at the same times prescribed by the subdivision. The commissioner of revenue shall annually determine, for each municipality, information comparable to that required by section 475.53, subdivision 4 , for school districts, as soon as practicable after it becomes available. The commissioner of revenue shall then compute the equalized market value of property within each municipality <D].

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 37. AMEND Minnesota Statutes 2012, section 276A.01, subdivision 12 , is amended to read: Subd. 12. Fiscal capacity. "

Fiscal capacity" of a municipality means its
    [D>valuation <D]

[A>adjusted

market value <A], determined as of January 2 of any year, divided by its population, determined as of a

date in the same year.

Sec. 38. AMEND Minnesota Statutes 2012, section 276A.01, subdivision 13 , is amended to read: Subd. 13. Average fiscal capacity. "

Average fiscal capacity" of municipalities means the sum of the

[D>valuations <D] [A>adjusted market values <A] of all municipalities, determined as of January 2 of any year, divided by the sum of their populations, determined as of a date in the same year.

Sec. 39. AMEND Minnesota Statutes 2012, section 276A.01, subdivision 15 , is amended to read: Subd. 15. Net tax capacity. "

Net tax capacity" means the
[A>taxable <A] market value of real and personal

property multiplied by its net tax capacity rates in section 273.13 .

Sec. 40. AMEND Minnesota Statutes 2012, section 276A.06, subdivision 10 , is amended to read: Subd. 10.

Adjustment of values
[D> for other computations  <D] .  For the purpose of computing
[D>the amount or rate of any salary, aid, tax,

or debt authorized, required, or limited by any provision of any law or charter, where the authorization, requirement, or limitation is related to any value or valuation of taxable property within any governmental unit, the value or net tax capacity <D] [A>fiscal capacity under section 276A.01, subdivision 12 , a municipality's taxable market value <A] must be adjusted to reflect the

[D>adjustments <D] [A>reductions <A] to net tax capacity effected by

subdivision 2,
[A>clause (a), <A] provided that
[D>: (1) <D] indetermining the
[A>taxable <A] market value of commercial-industrial
property or any class thereof within a
[D>governmental unit for any purpose

other than section 276A.05 <D] [A>municipality <A],

[D>(a) <D] the reduction required by this subdivision is that amount which

```
bears the same proportion to the amount subtracted from the
    [D>governmental
```

unit's <D] [A>municipality's <A] net tax capacity pursuant to subdivision 2,

```
clause (a), as the
    [A>taxable <A] market value of commercial-industrialproperty, or such
class thereof, located within the
    [D>governmental unit
```

<D] [A>municipality <A] bears to the net tax capacity of commercial-industrial

```
property, or such class thereof, located within the
    [D>governmental unit,
```

and (b) the increase required by this subdivision is that amount which bears the same proportion to the amount added to the governmental unit's net tax capacity pursuant to subdivision 2, clause (b), as the market value of commercial-industrial property, or such class thereof, located within the governmental unit bears to the net tax capacity of commercial-industrial property, or such class thereof, located within the governmental unit; and (2) in determining the market value of real property within a municipality for purposes of section 276A.05 , the adjustment prescribed by clause (1)(a) must be made and that prescribed by clause (1)(b) must not be made <D] [A>municipality. No adjustment shall be made to taxable market value for the increase in net tax capacity under subdivision 2, clause (b) <A].

Sec. 41. AMEND Minnesota Statutes 2012, section 287.08 , is amended to read: 287.08 TAX, HOW PAYABLE; RECEIPTS. (a) The tax imposed by sections 287.01 to 287.12 must be paid to the treasurer of any county in this state in which the real property or some part is located at or before the time of filing the mortgage for record. The treasurer shall endorse receipt on the mortgage and the receipt is conclusive proof that the tax has been paid in the amount stated and authorizes any county recorder or registrar of titles to record the mortgage. Its form, in substance, shall be "registration tax hereon of .................... dollars paid." If the mortgage is exempt from taxation the endorsement shall, in substance, be "exempt from registration tax." In either case the receipt must be signed by the treasurer. In case the treasurer is unable to determine whether a claim of exemption should be allowed, the tax must be paid as in the case of a taxable mortgage. For documents submitted electronically, the endorsements and tax amount shall be affixed electronically and no signature by the treasurer will be required. The actual payment method must be arranged in advance between the submitter and the receiving county.

(b) The county treasurer may refund in whole or in part any mortgage registry tax overpayment if a written application by the taxpayer is submitted to the county treasurer within 3-1/2 years from the date of the overpayment. If the county has not issued a denial of the application, the taxpayer may bring an action in Tax Court in the county in which the tax was paid at any time after the expiration of six months from the time that the application was submitted. A denial of refund may be appealed within 60 days from the date

of the denial by bringing an action in Tax Court in the county in which the tax was paid. The action is commenced by the serving of a petition for relief on the county treasurer, and by filing a copy with the court. The county attorney shall defend the action. The county treasurer shall notify the treasurer of each county that has or would receive a portion of the tax as paid.

(c) If the county treasurer determines a refund should be paid, or if a refund is ordered by the court, the county treasurer of each county that actually received a portion of the tax shall immediately pay a proportionate share of three percent of the refund using any available county funds. The county treasurer of each county that received, or would have received, a portion of the tax shall also pay their county's proportionate share of the remaining 97 percent of the court-ordered refund on or before the 20th day of the following month using solely the mortgage registry tax funds that would be paid to the commissioner of revenue on that date under section 287.12 . If the funds on hand under this procedure are insufficient to fully fund 97 percent of the court-ordered refund, the county treasurer of the county in which the action was brought shall file a claim with the commissioner of revenue under section 16A.48 for the remaining portion of 97 percent of the refund, and shall pay over the remaining portion upon receipt of a warrant from the state issued pursuant to the claim.

(d) When any mortgage covers real property located in more than one county in this state the total tax must be paid to the treasurer of the county where the mortgage is first presented for recording, and the payment must be receipted as provided in paragraph

(a). If the principal debt or obligation secured by such a multiple county mortgage exceeds $10,000,000, the nonstate portion of the tax must be divided and paid over by the county treasurer receiving it, on or before the 20th day of each month after receipt, to the county or counties entitled in the ratio

```
that the
    [A>estimated <A] market value of the real property covered by themortgage
in each county bears to the
    [A>estimated <A] market value of all
```

the real property in this state described in the mortgage. In making the division and payment the county treasurer shall send a statement giving the description of the real property described in the mortgage and the

[A>estimated <A] market value of the part located in each county. For this purpose, the treasurer of any county may require the treasurer of any

```
other county to certify to the former the
    [A>estimated <A] market
```

[D>valuation <D] [A>value <A] of any tract of real property in any mortgage.

(e) The mortgagor must pay the tax imposed by sections 287.01 to 287.12 . The mortgagee may undertake to collect and remit the tax on behalf of the mortgagor. If the mortgagee collects money from the mortgagor to remit the tax on behalf of the mortgagor, the mortgagee has a fiduciary duty to remit the tax on behalf of the mortgagor as to the amount of the tax collected for that purpose and the mortgagor is relieved of any further obligation to pay the tax as to the amount collected by the mortgagee for this purpose.

Sec. 42. AMEND Minnesota Statutes 2012, section 287.23, subdivision 1 , is amended to read: Subdivision 1. Real property outside county. If any taxable deed or instrument describes any real property located in more than one county in this state, the total tax must be paid to the treasurer of the county where the document is first presented for recording, and the payment must be receipted as provided in section 287.08 . If the net consideration exceeds $700,000, the nonstate portion of the tax must be divided and paid over by the county treasurer receiving it, on or before the 20th day of each month after receipt, to the county or counties entitled in the

```
ratio which the
    [A>estimated <A] market value of the real property coveredby the document
in each county bears to the
    [A>estimated <A] market value of
```

all the real property in this state described in the document. In making the division and payment the county treasurer shall send a statement to the other involved counties giving the description of the real property

```
described in the document and the
    [A>estimated <A] market value of the part
```

located in each county. The treasurer of any county may require the treasurer of any other county to

```
certify to the former the
    [A>estimated <A] market
    [D>valuation
```

<D] [A>value <A] of any parcel of real property for this purpose.

Sec. 43. AMEND Minnesota Statutes 2012, section 353G.08, subdivision 2 , is amended to read: Subd. 2. Cash flow funding requirement. If the executive director determines that an account in the voluntary statewide lump-sum volunteer firefighter retirement plan has insufficient assets to meet the service pensions determined payable from the account, the executive director shall certify the amount of the potential service pension shortfall to the municipality or municipalities and the municipality or municipalities shall make an additional employer contribution to the account within ten days of the certification. If more than one municipality is associated with the account, unless the municipalities agree

to a different allocation, the municipalities shall allocate the additional employer contribution one-half in proportion to the

population of each municipality and one-half in proportion to the

[A>estimated <A] market value of the property of each municipality.

Sec. 44. AMEND Minnesota Statutes 2012, section 365.025, subdivision 4 , is amended to read: Subd. 4. Major purchases: notice, petition, election. Before buying anything under subdivision 2 that costs more than 0.24177 percent

of the
     [A>estimated <A] market value of the town, the town must follow this

subdivision. The town must publish in its official newspaper the board's resolution to pay for the property over time. Then a petition for an election on the contract may be filed with the clerk. The petition must be filed within ten days after the resolution is published. To require the election the petition must be signed by a number of voters equal to ten percent of the voters at the last regular town election. The contract then must be approved by a majority of those voting on the question. The question may be voted on at a regular or special election.

Sec. 45. AMEND Minnesota Statutes 2012, section 366.095, subdivision 1 , is amended to read: Subdivision 1. Certificates of indebtedness. The town board may issue certificates of indebtedness within the debt limits for a town purpose otherwise authorized by law. The certificates shall be payable in not more than ten years and be issued on the terms and in the manner as the board may determine.

If the amount of the certificates to be issued exceeds 0.25 percent of the

[A>estimated <A] market value of the town, they shall not be issued for at least ten days after publication in a newspaper of general circulation in the town of the board's resolution determining to issue them. If within that time, a petition asking for an election on the proposition signed by voters equal to ten percent of the number of voters at the last regular town election is filed with the clerk, the certificates shall not be issued until their issuance has been approved by a majority of the votes cast on the question at a regular or special election. A tax levy shall be made to pay the principal and interest on the certificates as in the case of bonds.

Sec. 46. AMEND Minnesota Statutes 2012, section 366.27 , is amended to read: 366.27 FIREFIGHTERS' RELIEF; TAX LEVY. The town board of any town in this state having therein a platted portion on which resides 1,200 or more people, and wherein a duly incorporated firefighters' relief association is located may each year levy a tax not to

```
exceed 0.00806 percent of
    [D>taxable <D]
```

```
[A>estimated <A] market value for
```

the benefit of the relief association. Sec. 47. AMEND Minnesota Statutes 2012, section 368.01, subdivision 23 , is amended to read:

Subd. 23. Financing purchase of certain equipment. The town board may issue certificates of indebtedness within debt limits to purchase fire or police equipment or ambulance equipment or street construction or maintenance equipment. The certificates shall be payable in not more than five years and be issued on terms and in the manner as the board may determine. If the amount of the certificates to be issued to finance a purchase exceeds

```
0.24177 percent of the
    [A>estimated <A] market value of the town,
```

[D>excluding money and credits, <D] they shall not be issued for at least ten days after publication in the official newspaper of a town board resolution determining to issue them. If before the end of that time, a petition asking for an election on the proposition signed by voters equal to ten percent of the number of voters at the last regular town election is filed with the clerk, the certificates shall not be issued until the proposition of their issuance has been approved by a majority of the votes cast on the question at a regular or special election. A tax levy shall be made for the payment of the principal and interest on the certificates as in the case of bonds.

Sec. 48. AMEND Minnesota Statutes 2012, section 368.47 , is amended to read: 368.47 TOWNS MAY BE DISSOLVED. (1) When the voters residing within a town have failed to elect any town officials for more than ten years continuously;

(2) when a town has failed for a period of ten years to exercise any of the powers and functions of a town;

```
(3) when the
    [A>estimated <A] market value of a town drops to less than
```

$165,000;

(4) when the tax delinquency of a town, exclusive of taxes that are delinquent or unpaid because they are contested in proceedings for the enforcement of taxes, amounts to 12 percent of its market value; or

(5) when the state or federal government has acquired title to 50 percent of the real estate of a town, which facts, or any of them, may be found and determined by the resolution of the county board of the county in which the town is located, according to the official records in the office of the county auditor, the

county board by resolution may declare the town, naming it, dissolved and no longer entitled to exercise any of the powers or functions of a town. In Cass, Itasca, and St. Louis Counties, before the dissolution is effective the voters of the town shall express their approval or disapproval. The town clerk shall, upon a petition signed by a majority of the registered voters of the town, filed with the clerk at least 60 days before a regular or special town election, give notice at the same time and in the same manner of the election that the question of dissolution of the town will be submitted for determination at the election. At the election the question shall be voted upon by a separate ballot, the terms of which shall be either "for dissolution" or "against dissolution." The ballot shall be deposited in a separate ballot box and the result of the voting canvassed, certified, and returned in the same manner and at the same time as other facts and returns of the election. If a majority of the votes cast at the election are for dissolution, the town shall be dissolved. If a majority of the votes cast at the election are against dissolution, the town shall not be dissolved. When a town is dissolved under sections 368.47 to 368.49 the county shall acquire title to any telephone company or other business conducted by the town.

The business shall be operated by the board of county commissioners until it can be sold. The subscribers or patrons of the business shall have the first opportunity of purchase. If the town has any outstanding indebtedness chargeable to the business, the county auditor shall levy a tax against the property situated in the dissolved town to pay the indebtedness as it becomes due.

Sec. 49. AMEND Minnesota Statutes 2012, section 370.01 , is amended to read: 370.01 CHANGE OF BOUNDARIES; CREATION OF NEW COUNTIES. The boundaries of counties may be changed by taking territory from a county and attaching it to an adjoining county, and new counties may be established out of territory of one or more existing counties. A new county shall contain at least 400 square miles and have at least 4,000 inhabitants.

```
A proposed new county must have a total
    [D>taxable <D]
```

[A>estimated <A]market value of at least 35 percent of (i) the total
```
    [D>taxable
```

<D] [A>estimated <A] market value of the existing county, or (ii) the average

```
total
    [D>taxable <D]
```

[A>estimated <A] market value of the existing counties,

included in the proposition.

```
The determination of the
    [D>taxable <D]
```

[A>estimated <A] market value of a

county must be made by the commissioner of revenue. An existing county shall not be reduced in area below 400 square miles, have

less than 4,000 inhabitants, or have a total
    [D>taxable <D]

[A>estimated <A]

market value of less than that required of a new county. No change in the boundaries of any county having an area of more than 2,500 square miles, whether by the creation of a new county, or otherwise, shall detach from the existing county any territory within 12 miles of the county seat. Sec. 50. AMEND Minnesota Statutes 2012, section 373.40, subdivision 1 , is amended to read:

Subdivision 1. Definitions. For purposes of this section, the following terms have the meanings given.

(a) "Bonds" means an obligation as defined under section 475.51 .

(b) "Capital improvement" means acquisition or betterment of public lands, buildings, or other improvements within the county for the purpose of a county courthouse, administrative building, health or social service facility, correctional facility, jail, law enforcement center, hospital, morgue, library, park, qualified indoor ice arena, roads and bridges, and the acquisition of development rights in the form of conservation easements under chapter 84C. An improvement must have an expected useful life of five years or more to qualify. " Capital improvement" does not include a recreation or sports facility building (such as, but not limited to, a gymnasium, ice arena, racquet sports facility, swimming pool, exercise room or health spa), unless the building is part of an outdoor park facility and is incidental to the primary purpose of outdoor recreation.

(c) "Metropolitan county" means a county located in the seven-county metropolitan area as defined in section 473.121 or a county with a population of 90,000 or more.

(d) "Population" means the population established by the most recent of the following (determined as of the date the resolution authorizing the bonds was adopted):

(1) the federal decennial census,

(2) a special census conducted under contract by the United States Bureau of the Census, or

(3) a population estimate made either by the Metropolitan Council or by the state demographer under section 4A.02.

(e) "Qualified indoor ice arena" means a facility that meets the requirements of section 373.43 .

[D>(f) "Tax capacity" means total taxable market value, but does not include captured market value. <D]

Sec. 51. AMEND Minnesota Statutes 2012, section 373.40, subdivision 4 , is amended to read: Subd. 4. Limitations on amount. A county may not issue bonds under this section if the maximum amount of principal and interest to become due in any year on all the outstanding bonds issued pursuant to this section (including the bonds to be issued) will equal

or exceed 0.12 percent of
    [D>taxable <D]

[A>the estimated <A] market value of

property in the county.

Calculation of the limit must be made using the
    [D>taxable <D]

[A>estimated

<A] market value for the taxes payable year in which the obligations are issued and sold. This section does not limit the authority to issue bonds under any other special or general law.

Sec. 52. AMEND Minnesota Statutes 2012, section 375.167, subdivision 1 , is amended to read: Subdivision 1. Appropriations. Notwithstanding any contrary law, a county board may appropriate from the general revenue fund to any nonprofit corporation a sum not to exceed 0.00604

percent of
    [D>taxable <D]

[A>estimated <A] market value to provide legal

assistance to persons who are unable to afford private legal counsel.

Sec. 53. AMEND Minnesota Statutes 2012, section 375.18, subdivision 3 , is amended to read: Subd. 3. Courthouse. Each county board may erect, furnish, and maintain a suitable courthouse. No indebtedness shall be created for a courthouse in excess of an amount equal

to a levy of 0.04030 percent of
    [D>taxable <D]

[A>estimated <A] market value

without the approval of a majority of the voters of the county voting on the question of issuing the

obligation at an election.

Sec. 54. AMEND Minnesota Statutes 2012, section 375.555 , is amended to read: 375.555 FUNDING. To implement the county emergency jobs program, the county board may expend an

```
amount equal to what would be generated by a levy of 0.01209 percent of
```

[D>taxable <D] [A>estimated <A] market value. The money to be expended may be from any available funds not otherwise earmarked. Sec. 55. AMEND Minnesota Statutes 2012, section 383B.152 , is amended to read: 383B.152 BUILDING AND MAINTENANCE FUND. The county board may by resolution levy a tax to provide money which shall be kept in a fund known as the county reserve building and maintenance fund. Money in the fund shall be used solely for the construction, maintenance, and equipping of county buildings that are constructed or maintained by the board. The levy shall not be subject to any limit fixed by any other law or by any board of tax levy or other corresponding body, but shall not exceed 0.02215

```
percent of
    [D>taxable <D]
```

```
[A>estimated <A] market value, less the amount
```

required by chapter 475 to be levied in the year for the payment of the principal of and interest on all bonds issued pursuant to Extra Session Laws 1967, chapter 47, section 1.

Sec. 56. AMEND Minnesota Statutes 2012, section 383B.245 , is amended to read: 383B.245 LIBRARY LEVY.

(a) The county board may levy a tax on the taxable property within the county to acquire, better, and construct county library buildings and branches and to pay principal and interest on bonds issued for that purpose.

(b) The county board may by resolution adopted by a five-sevenths vote issue and sell general obligation bonds of the county in the manner provided in sections 475.60 to 475.73 . The bonds shall not be subject to the limitations of sections 475.51 to 475.59 , but the maturity years and amounts and interest rates of each series of bonds shall be fixed so that the maximum amount of principal and interest to become due in any year, on the bonds of that series and of all outstanding series issued by or for the purposes of libraries, shall not exceed an amount equal to

```
0.01612 percent of
    [A>estimated <A] market value of all taxable property in
```

the county as last finally equalized before the issuance of the new series. When the tax levy authorized in

this section is collected it shall be appropriated and credited to a debt service fund for the bonds in amounts required each year in lieu of a countywide tax levy for the debt service fund under section 475.61 .

Sec. 57. AMEND Minnesota Statutes 2012, section 383B.73, subdivision 1 , is amended to read: Subdivision 1. Levy. To provide funds for the purposes of the Three Rivers Park District as set forth in its annual budget, in lieu of the levies authorized by any other special law for such purposes, the Board of Park District Commissioners may levy taxes on all the taxable property in the county and park district at a

```
rate not exceeding 0.03224 percent of
    [A>estimated <A] market value.
```

Notwithstanding section 398.16 , on or before October 1 of each year, after public hearing, the Board of Park District Commissioners shall adopt a budget for the ensuing year and shall determine the total amount necessary to be raised from ad valorem tax levies to meet its budget. The Board of Park District Commissioners shall submit the budget to the county board. The county board may veto or modify an item contained in the budget. If the county board determines to veto or to modify an item in the budget, it must, within 15 days after the budget was submitted by the district board, state in writing the specific reasons for its objection to the item vetoed or the reason for the modification. The Park District Board, after consideration of the county board's objections and proposed modifications, may reapprove a vetoed item or the original version of an item with respect to which a modification has been proposed, by a two-thirds majority. If the district board does not reapprove a vetoed item, the item shall be deleted from the budget. If the district board does not reapprove the original version of a modified item, the item shall be included in the budget as modified by the county board.

After adoption of the final budget and no later than October 1, the superintendent of the park district shall certify to the office of the Hennepin County director of tax and public records exercising the functions of the county auditor the total amount to be raised from ad valorem tax levies to meet its budget for the ensuing year. The director of tax and public records shall add the amount of any levy certified by the district to other tax levies on the property of the county within the district for collection by the director of tax and public records with other taxes. When collected, the director shall make settlement of such taxes with the district in the same manner as other taxes are distributed to the other political subdivisions in Hennepin County.

Sec. 58. AMEND Minnesota Statutes 2012, section 383E.20 , is amended to read: 383E.20 BONDING FOR COUNTY LIBRARY BUILDINGS. The Anoka County Board may, by resolution adopted by a four-sevenths vote, issue and sell general obligation bonds of the county in the manner provided in chapter 475 to acquire, better, and construct county library buildings. The bonds shall not be subject to the requirements of sections 475.57 to475.59 . The maturity years and amounts and interest rates of each series of bonds shall be fixed so that the maximum amount of principal and interest to become due in any year, on the bonds of that series and of all outstanding series issued by or for the purposes of

libraries, shall not exceed an amount equal to .01

```
percent of the
    [D>taxable <D]
```

```
[A>estimated <A] market value of all taxable
```

property in the county, excluding any taxable property taxed by any city for the support of any free public library. When the tax levy authorized in this section is collected, it shall be appropriated and credited to a debt service fund for the bonds. The tax levy for the debt service fund under section 475.61 shall be reduced by the amount available or reasonably anticipated to be available in the fund to make payments otherwise payable from the levy pursuant to section 475.61 . Sec. 59. AMEND Minnesota Statutes 2012, section 383E.23 , is amended to read: 383E.23 LIBRARY TAX. The Anoka County Board may levy a tax of not more than .01 percent of the [D>taxable <D] [A>estimated <A] market value of taxable property located within the county excluding any taxable property taxed by any city for the support of any free public library, to acquire, better, and construct county library buildings and to pay principal and interest on bonds issued for that purpose. The tax shall be disregarded in the calculation of levies or limits on levies provided by AMEND section 373.40 , or other law.

Sec. 60. AMEND Minnesota Statutes 2012, section 385.31 , is amended to read: 385.31 PAYMENT OF COUNTY ORDERS OR WARRANTS. When any order or warrant drawn on the treasurer is presented for payment, if there is money in the treasury for that purpose, the county treasurer shall redeem the same, and write across the entire face thereof the word "redeemed," the date of the redemption, and the treasurer's official signature. If there is not sufficient funds in the proper accounts to pay such orders they shall be numbered and registered in their order of presentation, and proper endorsement thereof shall be made on such orders and they shall be entitled to payment in like order. Such orders shall bear interest at not to exceed the rate of six percent per annum from such date of presentment. The treasurer, as soon as there is sufficient money in the treasury, shall appropriate and set apart a sum sufficient for the payment of the orders so presented and registered, and, if entitled to interest, issue to the original holder a notice that interest will cease in 30 days from the date of such notice; and, if orders thus entitled to priority of payment are not then presented, the next in order of registry may be paid until such orders are presented. No interest shall be paid on any order, except upon a warrant drawn by the county auditor for that purpose, giving the number and the date of the order on account of which the interest warrant is drawn.

```
In any county in this state now or hereafter having
    [D>a <D]
```

```
[A>an estimated<A] market value of all taxable property
    [D>, exclusive of money and
```

credits, <D] of not less than $1,033,000,000, the county treasurer, in order to save payment of interest on county warrants drawn upon a fund in which there shall be temporarily insufficient money in the treasury

to redeem the same, may borrow temporarily from any other fund in the county treasury in which there is a sufficient balance to care for the needs of such fund and allow a temporary loan or transfer to any other fund, and may pay such warrants out of such funds. Any such money so transferred and used in redeeming such county warrants shall be returned to the fund from which drawn as soon as money shall come in to the credit of such fund on which any such warrant was drawn and paid as aforesaid. Any county operating on a cash basis may use a combined form of warrant or order and check, which, when signed by the chair of the county board and by the auditor, is an order or warrant for the payment of the claim, and, when countersigned by the county treasurer, is a check for the payment of the amount thereof.

Sec. 61. AMEND Minnesota Statutes 2012, section 394.36, subdivision 1 , is amended to read:

Subdivision 1. Continuation of nonconformity; limitations. Except as provided in subdivision 2, 3, or 4, any nonconformity, including the lawful use or occupation of land or premises existing at the time of the adoption of an official control under this chapter, may be continued, although the use or occupation does not conform to the official control. If the nonconformity or occupancy is discontinued for a period of more than one year, or any nonconforming building or structure is destroyed by fire or other

```
peril to the extent of 50 percent of its
    [A>estimated <A] market value, any
```

subsequent use or occupancy of the land or premises shall be a conforming use or occupancy.

Sec. 62. AMEND Minnesota Statutes 2012, section 398A.04, subdivision 8 , is amended to read: Subd. 8. Taxation. Before deciding to exercise the power to tax, the authority shall give six weeks' published notice in all municipalities in the region. If a number of voters in the region equal to five percent of those who voted for candidates for governor at the last gubernatorial election present a petition within nine weeks of the first published notice to the secretary of state requesting that the matter be submitted to popular vote, it shall be submitted at the next general election. The question prepared shall be: "Shall the regional rail authority have the power to impose a property tax? Yes ..... No ..... " If a majority of those voting on the question approve or if no petition is presented within the prescribed time the authority may levy a tax at any annual

```
rate not exceeding 0.04835 percent of
    [A>estimated <A] market value of all
```

taxable property situated within the municipality or municipalities named in its organization resolution. Its recording officer shall file, on or before September 15, in the office of the county auditor of each county in which territory under the jurisdiction of the authority is located a certified copy of the board of commissioners' resolution levying the tax, and each county auditor shall assess and extend upon the tax rolls of each municipality named in the organization resolution the portion of the tax that bears the same ratio to the whole amount that the net tax capacity of taxable property in that municipality bears to the net

tax capacity of taxable property in all municipalities named in the organization resolution. Collections of the tax shall be remitted by each county treasurer to the treasurer of the authority. For taxes levied in 1991, the amount levied for light rail transit purposes under this subdivision shall not exceed 75 percent of the amount levied in 1990 for light rail transit purposes under this subdivision.

Sec. 63. AMEND Minnesota Statutes 2012, section 401.05, subdivision 3 , is amended to read: Subd. 3. Leasing. (a) A county or joint powers board of a group of counties which acquires or constructs and equips or improves facilities under this chapter may, with the approval of the board of county commissioners of each county, enter into a lease agreement with a city situated within any of the counties, or a county housing and redevelopment authority established under chapter 469 or any special law. Under the lease agreement, the city or county housing and redevelopment authority shall:

(1) construct or acquire and equip or improve a facility in accordance with plans prepared by or at the request of a county or joint powers board of the group of counties and approved by the commissioner of corrections; and

(2) finance the facility by the issuance of revenue bonds.

(b) The county or joint powers board of a group of counties may lease the facility site, improvements, and equipment for a term upon rental sufficient to produce revenue for the prompt payment of the revenue bonds and all interest accruing on them. Upon completion of payment, the lessee shall acquire title. The real and personal property acquired for the facility constitutes a project and the lease agreement constitutes a revenue agreement as provided in sections469.152 to 469.165 . All proceedings by the city or county housing and redevelopment authority and the county or joint powers board shall be as provided in sections 469.152 to469.165 , with the following adjustments:

(1) no tax may be imposed upon the property;

(2) the approval of the project by the commissioner of employment and economic development is not required;

(3) the Department of Corrections shall be furnished and shall record information concerning each project as it may prescribe, in lieu of reports required on other projects to the commissioner of employment and economic development;

(4) the rentals required to be paid under the lease agreement shall not exceed

```
in any year one-tenth of one percent of the
    [A>estimated <A] market value of
```

property within the county or group of counties as last equalized before the execution of the lease agreement;

(5) the county or group of counties shall provide for payment of all rentals due during the term of the lease

agreement in the manner required in subdivision 4;

(6) no mortgage on the facilities shall be granted for the security of the bonds, but compliance with clause (5) may be enforced as a nondiscretionary duty of the county or group of counties; and

(7) the county or the joint powers board of the group of counties may sublease any part of the facilities for purposes consistent with their maintenance and operation.

Sec. 64. AMEND Minnesota Statutes 2012, section 410.32 , is amended to read: 410.32 CITIES MAY ISSUE CAPITAL NOTES FOR CAPITAL EQUIPMENT. (a) Notwithstanding any contrary provision of other law or charter, a home rule charter city may, by resolution and without public referendum, issue capital notes subject to the city debt limit to purchase capital equipment.

(b) For purposes of this section, "capital equipment" means:

(1) public safety equipment, ambulance and other medical equipment, road construction and maintenance equipment, and other capital equipment; and

(2) computer hardware and software, whether bundled with machinery or equipment or unbundled.

(c) The equipment or software must have an expected useful life at least as long as the term of the notes.

(d) The notes shall be payable in not more than ten years and be issued on terms and in the manner the city determines. The total principal amount of the capital notes issued in a fiscal year shall

```
not exceed 0.03 percent of the
    [A>estimated <A] market value of taxable
```

property in the city for that year.

(e) A tax levy shall be made for the payment of the principal and interest on the notes, in accordance with section 475.61 , as in the case of bonds.

(f) Notes issued under this section shall require an affirmative vote of two-thirds of the governing body of the city.

(g) Notwithstanding a contrary provision of other law or charter, a home rule charter city may also issue capital notes subject to its debt limit in the manner and subject to the limitations applicable to statutory cities pursuant to section 412.301 .

Sec. 65. AMEND Minnesota Statutes 2012, section 412.221, subdivision 2 , is amended to read: Subd. 2. Contracts. The council shall have power to make such contracts as may be deemed necessary or desirable to make effective any power possessed by the council. The city may purchase personal property through a conditional sales contract and real property through a contract for deed under which contracts the seller is confined to the remedy of recovery of the property in case of nonpayment of all or

part of the purchase price, which shall be payable over a period of not to exceed five years. When the contract price of property to be purchased by contract for deed or

```
conditional sales contract exceeds 0.24177 percent of the
    [A>estimated <A]
```

market value of the city, the city may not enter into such a contract for at least ten days after publication in the official newspaper of a council resolution determining to purchase property by such a contract; and, if before the end of that time a petition asking for an election on the proposition signed by voters equal to ten percent of the number of voters at the last regular city election is filed with the clerk, the city may not enter into such a contract until the proposition has been approved by a majority of the votes cast on the question at a regular or special election.

Sec. 66. AMEND Minnesota Statutes 2012, section 412.301 , is amended to read: 412.301 FINANCING PURCHASE OF CERTAIN EQUIPMENT. (a) The council may issue certificates of indebtedness or capital notes subject to the city debt limits to purchase capital equipment.

(b) For purposes of this section, "capital equipment" means:

(1) public safety equipment, ambulance and other medical equipment, road construction and maintenance equipment, and other capital equipment; and

(2) computer hardware and software, whether bundled with machinery or equipment or unbundled.

(c) The equipment or software must have an expected useful life at least as long as the terms of the certificates or notes.

(d) Such certificates or notes shall be payable in not more than ten years and shall be issued on such terms and in such manner as the council may determine.

(e) If the amount of the certificates or notes to be issued to finance any such

```
purchase exceeds 0.25 percent of the
    [A>estimated <A] market value of
```

taxable property in the city, they shall not be issued for at least ten days after publication in the official newspaper of a council resolution determining to issue them; and if before the end of that time, a petition asking for an election on the proposition signed by voters equal to ten percent of the number of voters at the last regular municipal election is filed with the clerk, such certificates or notes shall not be issued until the proposition of their issuance has been approved by a majority of the votes cast on the question at a regular or special election.

(f) A tax levy shall be made for the payment of the principal and interest on such certificates or notes, in accordance with section 475.61 , as in the case of bonds.

Sec. 67. AMEND Minnesota Statutes 2012, section 428A.02, subdivision 1 , is amended to read: Subdivision 1. Ordinance. The governing body of a city may adopt an ordinance establishing a special service district. Only property that is classified under section 273.13 and used for commercial, industrial, or public utility purposes, or is vacant land zoned or designated on a land use plan for commercial or industrial use and located in the special service district, may be subject to the charges imposed by the city on the special service district. Other types of property may be included within the boundaries of the special service district but are not subject to the levies or charges imposed by the city on the special service district.

```
If 50 percent or more of the
    [A>estimated <A] market value of a parcel of
```

property is classified under section 273.13 as commercial, industrial, or vacant land zoned or designated on a land use plan for commercial or industrial

```
use, or public utility for the current assessment year, then the entire
```

[A>taxable <A] market value of the property is subject to a service charge based on net tax capacity for purposes of sections 428A.01 to 428A.10 . The ordinance shall describe with particularity the area within the city to be included in the district and the special services to be furnished in the district. The ordinance may not be adopted until after a public hearing has been held on the question. Notice of the hearing shall include the time and place of hearing, a map showing the boundaries of the proposed district, and a statement that all persons owning property in the proposed district that would be subject to a service charge will be given opportunity to be heard at the hearing. Within 30 days after adoption of the ordinance under this subdivision, the governing body shall send a copy of the ordinance to the commissioner of revenue.

Sec. 68. AMEND Minnesota Statutes 2012, section 430.102, subdivision 2 , is amended to read: Subd. 2. Council approval; special tax levy limitation. The council shall receive and consider the estimate required in subdivision 1 and the items of cost after notice and hearing before it or its appropriate committee as it considers necessary or expedient, and shall approve the estimate, with necessary amendments. The amounts of each item of cost estimated are then appropriated to operate, maintain, and improve the pedestrian mall during the next fiscal year. The amount of the special tax to be charged under subdivision 1, clause (3),

```
must not, however, exceed 0.12089 percent of
    [A>estimated <A] market value
```

of taxable property in the district. The council shall make any necessary adjustment in costs of operating and maintaining the district to keep the amount of the tax within this limitation.

Sec. 69. AMEND Minnesota Statutes 2012, section 447.10 , is amended to read: 447.10 TAX LEVY FOR OPERATING AND MAINTAINING HOSPITAL. The governing body of a city of the first class owning a hospital may annually levy a tax to operate and maintain the hospital.

```
The tax must not exceed 0.00806 percent of
    [D>taxable <D]
```

[A>estimated <A]

market value. Sec. 70. AMEND Minnesota Statutes 2012, section 450.19 , is amended to read: 450.19 TOURIST CAMPING GROUNDS. A home rule charter or statutory city or town may establish and maintain public tourist camping grounds. The governing body thereof may acquire by lease, purchase, or gift, suitable lands located either within or without the corporate limits for use as public tourist camping grounds and provide for the equipment, operation, and maintenance of the same. The amount that may be expended for the maintenance, improvement, or operation of tourist camping grounds shall not exceed, in any year, a sum equal to

```
0.00806 percent of
    [D>taxable <D]
```

[A>estimated <A] market value.

Sec. 71. AMEND Minnesota Statutes 2012, section 450.25 , is amended to read: 450.25 MUSEUM, GALLERY, OR SCHOOL OF ARTS OR CRAFTS; TAX LEVY. After the acquisition of any museum, gallery, or school of arts or crafts, the board of park commissioners of the city in which it is located shall cause to be included in the annual tax levy upon all the taxable property of the county in which the museum, gallery, or school of arts or crafts is located, a tax of

```
0.00846 percent of
    [A>estimated <A] market value.
```

The board shall certify the levy to the county auditor and it shall be added to, and collected with and as part of, the general, real, and personal property taxes, with like penalties and interest, in case of nonpayment and default, and all provisions of law in respect to the levy, collection, and enforcement of other taxes shall, so far as applicable, be followed in respect of these taxes.

All of these taxes, penalties, and interest, when collected, shall be paid to the city treasurer of the city in which is located the museum, gallery, or school of arts or crafts and credited to a fund to be known as the park museum fund, and shall be used only for the purposes specified in AMEND sections 450.23 toAMEND 450.25 . Any part of the proceeds of the levy not expended for the purposes specified in section 450.24 may be used for the erection of new buildings for the same purposes.

Sec. 72. AMEND Minnesota Statutes 2012, section 458A.10 , is amended to read: 458A.10 PROPERTY TAX.

```
The commission shall annually levy a tax not to exceed 0.12089 percent of
```

[A>estimated <A] market value on all the taxable property in the transit area at a rate sufficient to produce an amount necessary for the purposes of sections 458A.01 to 458A.15 , other than the payment of principal and interest due on any revenue bonds issued pursuant to section 458A.05 . Property taxes levied under this section shall be certified by the commission to the county auditors of the transit area, extended, assessed, and collected in the manner provided by law for the property taxes levied by the governing bodies of cities. The proceeds of the taxes levied under this section shall be remitted by the respective county treasurers to the treasurer of the commission, who shall credit the same to the funds of the commission for use for the purposes of sections 458A.01 to 458A.15 subject to any applicable pledges or limitations on account of tax anticipation certificates or other specific purposes. At any time after making a tax levy under this section and certifying it to the county auditors, the commission may issue general obligation certificates of indebtedness in anticipation of the collection of the taxes as provided by section 412.261 .

Sec. 73. AMEND Minnesota Statutes 2012, section 458A.31, subdivision 1 , is amended to read:

Subdivision 1. Levy limit. Notwithstanding anything to the contrary contained in the charter of the city of Duluth, any ordinance thereof, or any statute applicable thereto, limiting the amount levied in any one year for general or special purposes, the city council of the city of Duluth shall each year levy a tax in an amount not to

```
exceed 0.07253 percent of
    [D>taxable <D]
```

[A>estimated <A] market value, by

ordinance. An ordinance fixing the levy shall take effect immediately upon its passage and approval. The proceeds of the levy shall be paid into the city treasury and deposited in the operating fund provided for in section 458A.24, subdivision 3 .

Sec. 74. AMEND Minnesota Statutes 2012, section 465.04 , is amended to read: 465.04 ACCEPTANCE OF GIFTS.

```
Cities of the second, third, or fourth class, having at any time
    [D>a<D]
```

[A>an estimated <A] market value of not more than $41,000,000,

[D>exclusive of money and credits, <D] as officially equalized by the commissioner of revenue, either under home rule charter or under the laws of this state, in addition to all other powers possessed by them, hereby are authorized and empowered to receive and accept gifts and donations for the use and benefit of such cities and the inhabitants thereof upon terms and conditions to be approved by the governing bodies of such cities; and such cities are authorized to comply with and perform such terms and conditions, which may include payment to the donor or donors of interest on the value of the gift at not exceeding five percent per annum payable annually or semiannually, during the remainder of the natural life or lives of such donor or donors. Sec. 75. AMEND Minnesota Statutes 2012, section 469.033, subdivision 6 , is amended to read:

Subd. 6. Operation area as taxing district, special tax. All of the territory included within the area of operation of any authority shall constitute a taxing district for the purpose of levying and collecting special benefit taxes as provided in this subdivision. All of the taxable property, both real and personal, within that taxing district shall be deemed to be benefited by projects to the extent of the special taxes levied under this subdivision. Subject to the consent by resolution of the governing body of the city in and for which it was created, an authority may levy a tax upon all taxable property within that taxing district. The tax shall be extended, spread, and included with and as a part of the general taxes for state, county, and municipal purposes by the county auditor, to be collected and enforced therewith, together with the penalty, interest, and costs. As the tax, including any penalties, interest, and costs, is collected by the county treasurer it shall be accumulated and kept in a separate fund to be known as the "housing and redevelopment project fund." The money in the fund shall be turned over to the authority at the same time and in the same manner that the tax collections for the city are turned over to the city, and shall be expended only for the purposes of sections 469.001 to469.047 . It shall be paid out upon vouchers signed by the chair of the authority or an authorized representative. The amount of the levy shall be an amount approved by the governing body of the

```
city, but shall not exceed 0.0185 percent of
    [D>taxable <D]
```

[A>estimated <A]

market value. The authority shall each year formulate and file a budget in accordance with the budget procedure of the city in the same manner as required of executive departments of the city or, if no budgets are required to be filed, by August 1. The amount of the tax levy for the following year shall be based on that budget.

Sec. 76. AMEND Minnesota Statutes 2012, section 469.034, subdivision 2 , is amended to read: Subd. 2. General obligation revenue bonds. (a) An authority may pledge the general obligation of the general jurisdiction governmental unit as additional security for bonds payable from income or revenues of the project or the authority. The authority must find that the pledged revenues will equal or exceed 110 percent of the principal and interest due on the bonds for each year. The proceeds of the bonds must be

used for a qualified housing development project or projects. The obligations must be issued and sold in the manner and following the procedures provided by chapter 475, except the obligations are not subject to approval by the electors, and the maturities may extend to not more than 35 years for obligations sold to finance housing for the elderly and 40 years for other obligations issued under this subdivision. The authority is the municipality for purposes of chapter 475.

(b) The principal amount of the issue must be approved by the governing body of the general jurisdiction governmental unit whose general obligation is pledged.

Public hearings must be held on issuance of the obligations by both the authority and the general jurisdiction governmental unit. The hearings must be held at least 15 days, but not more than 120 days, before the sale of the obligations.

(c) The maximum amount of general obligation bonds that may be issued and outstanding under this section equals the greater of (1) one-half of one

percent of the
    [D>taxable <D]

[A>estimated <A] market value of the general

jurisdiction governmental unit whose general obligation is pledged, or (2) $3,000,000. In the case of county or multicounty general obligation bonds, the outstanding general obligation bonds of all cities in the county or counties issued under this subdivision must be added in calculating the limit under clause (1).

(d) "General jurisdiction governmental unit" means the city in which the housing development project is located. In the case of a county or multicounty authority, the county or counties may act as the general jurisdiction governmental unit. In the case of a multicounty authority, the pledge of the general obligation is a pledge of a tax on the taxable property in each of the counties.

(e) "Qualified housing development project" means a housing development project providing housing either for the elderly or for individuals and families with incomes not greater than 80 percent of the median family income as estimated by the United States Department of Housing and Urban Development for the standard metropolitan statistical area or the nonmetropolitan county in which the project is located. The project must be owned for the term of the bonds either by the authority or by a limited partnership or other entity in which the authority or another entity under the sole control of the authority is the sole general partner and the partnership or other entity must receive (1) an allocation from the Department of Management and Budget or an entitlement issuer of tax-exempt bonding authority for the project and a preliminary determination by the Minnesota Housing Finance Agency or the applicable suballocator of tax credits that the project will qualify for four percent low-income housing tax credits or (2) a reservation of nine percent low-income housing tax credits from the Minnesota Housing Finance Agency or a suballocator of tax credits for the project. A qualified housing development project may admit nonelderly

individuals and families with higher incomes if:

(1) three years have passed since initial occupancy;

(2) the authority finds the project is experiencing unanticipated vacancies resulting in insufficient revenues, because of changes in population or other unforeseen circumstances that occurred after the initial finding of adequate revenues; and

(3) the authority finds a tax levy or payment from general assets of the general jurisdiction governmental unit will be necessary to pay debt service on the bonds if higher income individuals or families are not admitted.

(f) The authority may issue bonds to refund bonds issued under this subdivision in accordance with section 475.67 . The finding of the adequacy of pledged revenues required by paragraph (a) and the public hearing required by paragraph (b) shall not apply to the issuance of refunding bonds. This paragraph applies to refunding bonds issued on and after July 1, 1992.

Sec. 77. AMEND Minnesota Statutes 2012, section 469.053, subdivision 4 , is amended to read: Subd. 4. Mandatory city levy. A city shall, at the request of the port authority, levy a tax in any year for the benefit of the port authority.

```
The tax must not exceed 0.01813 percent of
    [D>taxable <D]
```

[A>estimated <A]

market value. The amount levied must be paid by the city treasurer to the treasurer of the port authority, to be spent by the authority.

Sec. 78. AMEND Minnesota Statutes 2012, section 469.053, subdivision 4 a , is amended to read: Subd. 4a. Seaway port authority levy. A levy made under this subdivision shall replace the mandatory city levy under subdivision 4. A seaway port authority is a special taxing district under section 275.066 and may levy a tax in any year for the benefit of the seaway port authority.

```
The tax must not exceed 0.01813 percent of
    [D>taxable <D]
```

[A>estimated <A]

market value. The county auditor shall distribute the proceeds of the property tax levy to the seaway port authority.

Sec. 79. AMEND Minnesota Statutes 2012, section 469.053, subdivision 6 , is amended to read: Subd. 6. Discretionary city levy. Upon request of a port authority, the port authority's city may levy a tax to be spent

by and for its port authority. The tax must enable the port authority to carry out efficiently and in the public interest sections 469.048 to 469.068 to create and develop industrial development districts.

```
The levy must not be more than 0.00282 percent of
    [D>taxable <D]
```

[A>estimated

<A] market value. The county treasurer shall pay the proceeds of the tax to the port authority treasurer. The money may be spent by the authority in performance of its duties to create and develop industrial development districts. In spending the money the authority must judge what best serves the public interest. The levy in this subdivision is in addition to the levy in subdivision 4.

Sec. 80. AMEND Minnesota Statutes 2012, section 469.107, subdivision 1 , is amended to read: Subdivision 1. City tax levy. A city may, at the request of the authority, levy a tax in any year for the benefit of the authority.

```
The tax must be not more than 0.01813 percent of
    [D>taxable <D]
```

[A>estimated

<A] market value. The amount levied must be paid by the city treasurer to the treasurer of the authority, to be spent by the authority.

Sec. 81. AMEND Minnesota Statutes 2012, section 469.180, subdivision 2 , is amended to read: Subd. 2. Tax levies. Notwithstanding any law, the county board of any county may appropriate from the general revenue fund a sum not to exceed a county levy of 0.00080 percent

```
of
    [D>taxable <D]
```

[A>estimated <A] market value to carry out the purposes of

this section.

Sec. 82. AMEND Minnesota Statutes 2012, section 469.187 , is amended to read: 469.187 FIRST CLASS CITY SPENDING FOR PUBLICITY; PUBLICITY BOARD. Any city of the first class may expend money for city publicity purposes.

```
The city may levy a tax, not exceeding 0.00080 percent of
    [D>taxable
```

<D] [A>estimated <A] market value. The proceeds of the levy shall be expended in the manner and for the city publicity purposes the council directs. The council may establish and provide for a publicity board or bureau to administer the fund, subject to the conditions and limitations the council prescribes by ordinance. Sec. 83. AMEND Minnesota Statutes 2012, section 469.206 , is amended to read: 469.206 HAZARDOUS PROPERTY PENALTY.

```
A city may assess a penalty up to one percent of the
     [A>estimated <A] market
```

value of real property, including any building located within the city that the city determines to be hazardous as defined in section 463.15, subdivision 3 . The city shall send a written notice to the address to which the property tax statement is sent at least 90 days before it may assess the penalty. If the owner of the property has not paid the penalty or fixed the property within 90 days after receiving notice of the penalty, the penalty is considered delinquent and is increased by 25 percent each 60 days the penalty is not paid and the property remains hazardous. For the purposes of this section, a penalty that is delinquent is considered a delinquent property tax and subject to chapters 279, 280, and 281, in the same manner as delinquent property taxes.

Sec. 84. AMEND Minnesota Statutes 2012, section 471.24 , is amended to read: 471.24 TOWNS, STATUTORY CITIES; JOINT MAINTENANCE OF CEMETERY. Where a statutory city or town owns and maintains an established cemetery or burial ground, either within or without the municipal limits, the statutory city or town may, by mutual agreement with contiguous statutory cities and

```
towns, each having
     [D>a <D]
```

```
[A>an estimated <A] market value of not less than
```

$2,000,000, join together in the maintenance of such public cemetery or burial ground for the use of the inhabitants of each of such municipalities; and each such municipality is hereby authorized, by action of its council or governing body, to levy a tax or make an appropriation for the annual support and maintenance of such cemetery or burial ground; provided, the amount thus appropriated by each municipality shall not exceed a total of $10,000 in any one year.

Sec. 85. AMEND Minnesota Statutes 2012, section 471.571, subdivision 1 , is amended to read:

Subdivision 1. Application. This section applies to each city in which the net tax capacity of real and personal property consists in part of iron ore or lands containing taconite or

```
semitaconite and in which the total
     [D>taxable <D]
```

[A>estimated <A] market

value of real and personal property exceeds $2,500,000.

Sec. 86. AMEND Minnesota Statutes 2012, section 471.571, subdivision 2 , is amended to read: Subd. 2. Creation of fund, tax levy. The governing body of the city may create a permanent improvement and replacement fund to be maintained by an annual tax levy. The governing body may levy a tax in excess of any charter limitation for the support of the permanent improvement and replacement fund, but not exceeding the following:

(a) in cities having a population of not more than 500 inhabitants, the lesser

of $20 per capita or 0.08059 percent of
    [D>taxable <D]

[A>estimated <A]

market value;

(b) in cities having a population of more than 500 and less than
    [D>2500

<D] [A>2,500 <A], the greater of $12.50 per capita or $10,000 but not exceeding

0.08059 percent of
    [D>taxable <D]

[A>estimated <A] market value;
 (c) in cities having a population of
    [D>more than 2500 <D]

[A>2,500 or more

<A] inhabitants, the greater of $10 per capita or $31,500 but not exceeding

0.08059 percent of
    [D>taxable <D]

[A>estimated <A] market value.

Sec. 87. AMEND Minnesota Statutes 2012, section 471.73 , is amended to read: 471.73 ACCEPTANCE OF PROVISIONS.

In the case of any city within the class specified in
 [A>section <A] 471.72having
 [D>a <D]

[A>an estimated <A] market value
 [D>, as defined in

section 471.72 , <D] in excess of $37,000,000; and in the case of any statutory

city within such class having
 [D>a <D]

[A>an estimated <A] market value

[D>, as defined in section 471.72 , <D] of less than $5,000,000; and in the case of any statutory city within such class which is governed by Laws 1933, chapter 211, or Laws 1937, chapter 356; and in the case of any statutory city

within such class which is governed by Laws 1929, chapter 208, and has
 [D>a

<D] [A>an estimated <A] market value of less than $83,000,000; and in the case

of any school district within such class having
 [D>a <D]

[A>an estimated <A]market value
 [D>, as defined in section 471.72 , <D] of more than

$54,000,000; and in the case of all towns within said class; sections 471.71 to471.83 apply only if the governing body of the city or statutory city, the board of the school district, or the town board of the town shall have adopted a resolution determining to issue bonds under the provisions of sections 471.71 to 471.83 or to go upon a cash basis in accordance with the provisions thereof. Sec. 88. AMEND Minnesota Statutes 2012, section 473.325, subdivision 2 , is amended to read:

Subd. 2. Chapter 475 applies; exceptions. The Metropolitan Council shall sell and issue the bonds in the manner provided in chapter 475, and shall have the same powers and duties as a municipality issuing bonds under that law, except that the approval of a majority of the electors shall not be required and the net debt limitations shall not apply. The terms of each series of bonds shall be fixed so that the amount of principal and interest on all outstanding and undischarged bonds, together with the bonds proposed to be issued, due in any year shall not exceed 0.01209

percent of
[A>estimated <A] market value of all taxable property in the

metropolitan area as last finally equalized prior to a proposed issue. The bonds shall be secured in accordance with section 475.61, subdivision 1 , and any taxes required for their payment shall be levied by the council, shall not affect the amount or rate of taxes which may be levied by the council for other purposes, shall be spread against all taxable property in the metropolitan area and shall not be subject to limitation as to rate or amount. Any taxes certified by the council to the county auditors for collection shall be reduced by the amount received by the council from the commissioner of management and budget or the federal government for the purpose of paying the principal and interest on bonds to which the levy relates. The council shall certify the fact and amount of all money so received to the county auditors, and the auditors shall reduce the levies previously made for the bonds in the manner and to the extent provided in section 475.61, subdivision 3 .

Sec. 89. AMEND Minnesota Statutes 2012, section 473.629 , is amended to read: 473.629 VALUE OF PROPERTY FOR BOND ISSUES BY SCHOOL DISTRICTS.

As to any lands
[D>to be <D] detached from any school district under
[D>the provisions hereof <D]

[A>section 473.625 <A], notwithstanding
[D>such
prospective <D]

[A>the <A] detachment, the
[A>estimated market <A] value of

[D>such <D]

[A>the detached <A] lands and
[D>the net tax capacity of <D]
taxable properties
[D>now <D] located
[D>therein or thereon shall be and
<D]

[A>on the lands on the date of the detachment <A] constitute
[D>from and
after the date of the enactment hereof <D] a part of the
[A>estimated market
<A] value of properties
[D>upon the basis of which such <D]

[A>used to calculate the net debt limit of the <A] school district [D>may issue its

bonds, <D] [A>. <A]

The value of [D>such <D]

[A>the <A] lands [D>for such purpose to be

<D] [A>and other taxable properties for purposes of the school district's net

debt limit are <A] 33-1/3 percent of the [A>estimated <A] market valuethereof as determined and certified by [D>said <D]

[A>the <A] assessor to [D>said <D]

[A>the <A] school district, and [D>it shall be the duty of such <D]

[A>the <A] assessor annually on or before the tenth day of October

[D>from and after the passage hereof, to so <D] [A>of each year, shall <A]

determine and certify [A>that value <A]; provided, however, that the valueof [D>such <D]

[A>the <A] detached lands and [D>such <D] taxable properties shall never exceed 20 percent of the [A>estimated market <A] value of all properties [D>constituting and making up the basis aforesaid

<D] [A>used to calculate the net debt limit of the school district <A]. Sec. 90. AMEND Minnesota Statutes 2012, section 473.661, subdivision 3 , is amended to read:

Subd. 3. Levy limit. In any budget certified by the commissioners under this section, the amount included for operation and maintenance shall not exceed an amount which, when extended against the property taxable therefor under section 473.621 ,

```
subdivision 5, will require a levy at a rate of 0.00806 percent of
```

[A>estimated <A] market value. Taxes levied by the corporation shall not affect the amount or rate of taxes which may be levied by any other local government unit within the metropolitan area under the provisions of any charter.

Sec. 91. AMEND Minnesota Statutes 2012, section 473.667, subdivision 9 , is amended to read: Subd. 9. Additional taxes. Nothing herein shall prevent the commission from levying a tax not to exceed

```
0.00121 percent of
    [A>estimated <A] market value on taxable property within
```

its taxing jurisdiction, in addition to any levies found necessary for the debt service fund authorized by section 473.671 . Nothing herein shall prevent the levy and appropriation for purposes of the commission of any other tax on property or on any income, transaction, or privilege, when and if authorized by law. All collections of any taxes so levied shall be included in the revenues appropriated for the purposes referred to in this section, unless otherwise provided in the law authorizing the levies; but no covenant as to the continuance or as to the rate and amount of any such levy shall be made with the holders of the commission's bonds unless specifically authorized by law.

Sec. 92. AMEND Minnesota Statutes 2012, section 473.671 , is amended to read: 473.671 LIMIT OF TAX LEVY. The taxes levied against the property of the metropolitan area in any one year

```
shall not exceed 0.00806 percent of
    [D>taxable <D]
```

[A>estimated <A] market

value, exclusive of taxes levied to pay the principal or interest on any bonds or indebtedness of the city issued under Laws 1943, chapter 500, and exclusive of any taxes levied to pay the share of the city for payments on bonded indebtedness of the corporation provided for in Laws 1943, chapter 500. The levy of taxes authorized in Laws 1943, chapter 500, shall be in addition to the maximum rate allowed to be levied to defray the cost of government under the provisions of the charter of any city affected by Laws 1943, chapter 500. Sec. 93. AMEND Minnesota Statutes 2012, section 473.711, subdivision 2 a , is amended to

read:

Subd. 2a. Tax levy. (a) The commission may levy a tax on all taxable property in the district as defined in section 473.702 to provide funds for the purposes of sections473.701 to 473.716 . The tax shall not exceed the property tax levy limitation determined in this subdivision. A participating county may agree to levy an additional tax to be used by the commission for the purposes of sections 473.701 to 473.716 but the sum of the county's and commission's taxes may not exceed the county's proportionate share of the property tax levy limitation determined under this subdivision based on the ratio of its total net tax capacity to the total net tax capacity of the entire district as adjusted by section 270.12, subdivision 3 . The auditor of each county in the district shall add the amount of the levy made by the district to other taxes of the county for collection by the county treasurer with other taxes. When collected, the county treasurer shall make settlement of the tax with the district in the same manner as other taxes are distributed to political subdivisions. No county shall levy any tax for mosquito, disease vectoring tick, and black gnat (Simuliidae) control except under this section. The levy shall be in addition to other taxes authorized by law.

(b) The property tax levied by the Metropolitan Mosquito Control Commission shall not exceed the product of (i) the commission's property tax levy limitation for the previous year determined under this subdivision multiplied

```
by (ii) an index for market valuation changes equal to the total
   [A>estimated <A] market
    [D>valuation <D]

[A>value <A] of all taxable property
```

for the current tax payable year located within the district plus any area that

```
has been added to the district since the previous year, divided by the total
   [A>estimated <A] market
    [D>valuation <D]

[A>value <A] of all taxable property
```

located within the district for the previous taxes payable year.

[D>(c) For the purpose of determining the commission's property tax levy limitation under this subdivision, "total market valuation" means the total market valuation of all taxable property within the district without valuation adjustments for fiscal disparities (chapter 473F), tax increment financing (sections 469.174 to 469.179 ), and high voltage transmission lines (section273.425 ). <D]

Sec. 94. AMEND Minnesota Statutes 2012, section 473F.02, subdivision 12 , is amended to read: Subd. 12.

[A> Adjusted  <A] market value. "

[A>Adjusted <A] market value" of real and personal property within a

municipality means the
    [D>assessor's estimated <D]

[A>taxable <A] marketvalue
    [A>, as defined in section 272.03, <A] of all real and personal

property, including the value of manufactured housing, within the municipality

[A>, adjusted for sales ratios in a manner similar to the adjustments made to city and town net tax capacities <A] [D>. For purposes of sections 473F.01 to 473F.13 , the commissioner of revenue shall annually make determinations and reports with respect to each municipality which are comparable to those it makes for school districts <D] under section

127A.48, subdivisions 1 to 6
    [D>, in the same manner and at the same times

as are prescribed by the subdivisions. The commissioner of revenue shall annually determine, for each municipality, information comparable to that required by section 475.53, subdivision 4 , for school districts, as soon as practicable after it becomes available. The commissioner of revenue shall then compute the equalized market value of property within each municipality using the aggregate sales ratios from the Department of Revenue's sales ratio study <D].

Sec. 95. AMEND Minnesota Statutes 2012, section 473F.02, subdivision 14 , is amended to read: Subd. 14. Fiscal capacity. "

Fiscal capacity" of a municipality means its
    [D>valuation <D]

[A>adjusted

market value <A], determined as of January 2 of any year, divided by its population, determined as of a date in the same year.

Sec. 96. AMEND Minnesota Statutes 2012, section 473F.02, subdivision 15 , is amended to read: Subd. 15. Average fiscal capacity. "

Average fiscal capacity" of municipalities means the sum of the

[D>valuations <D] [A>adjusted market values <A] of all municipalities, determined as of January 2 of any year, divided by the sum of their populations, determined as of a date in the same year.

Sec. 97. AMEND Minnesota Statutes 2012, section 473F.02, subdivision 23 , is amended to read: Subd. 23. Net tax capacity. "

Net tax capacity" means the
    [A>taxable <A] market value of real and personal

property multiplied by its net tax capacity rates in section 273.13 .

Sec. 98. AMEND Minnesota Statutes 2012, section 473F.08, subdivision 10 , is amended to read: Subd. 10.

Adjustment of value
    [D> or net tax capacity  <D] .  For the purpose of computing
    [D>the amount or rate of any salary, aid, tax,

or debt authorized, required, or limited by any provision of any law or charter, where such authorization, requirement, or limitation is related in any manner to any value or valuation of taxable property within any governmental unit, such value or net tax capacity <D] [A>fiscal capacity under section 473F.02, subdivision 14 , a municipality's taxable market value <A] shall be

adjusted to reflect the
    [D>adjustments <D]

[A>reductions <A] to net taxcapacity effected by subdivision 2,
    [A>clause (a), <A] provided that
    [D>:
(1) <D] in determining the
    [A>taxable <A] market value of
commercial-industrial property or any class thereof within a
    [D>governmental

unit for any purpose other than section 473F.07 <D] [A>municipality <A],

[D>(a) <D] the reduction required by this subdivision shall be that amount

which bears the same proportion to the amount subtracted from the

[D>governmental unit's <D] [A>municipality's <A] net tax capacity pursuant to

```
subdivision 2, clause (a), as the
     [A>taxable <A] market value ofcommercial-industrial property, or such
class thereof, located within the
```

[D>governmental unit <D] [A>municipality <A] bears to the net tax capacity of

```
commercial-industrial property, or such class thereof, located within the
```

[D>governmental unit, and (b) the increase required by this subdivision shall be that amount which bears the same proportion to the amount added to the governmental unit's net tax capacity pursuant to subdivision 2, clause (b), as the market value of commercial-industrial property, or such class thereof, located within the governmental unit bears to the net tax capacity of commercial-industrial property, or such class thereof, located within the governmental unit; and (2) in determining the market value of real property within a municipality for purposes of section 473F.07 , the adjustment prescribed by clause (1)(a) hereof shall be made and that prescribed by clause (1)(b) hereof shall not be made <D] [A>municipality <A]. [A>No adjustment shall be made to taxable market value for the increase in net tax capacity under subdivision 2, clause (b). <A]

Sec. 99. AMEND Minnesota Statutes 2012, section 475.521, subdivision 4 , is amended to read: Subd. 4. Limitations on amount. A municipality may not issue bonds under this section if the maximum amount of principal and interest to become due in any year on all the outstanding bonds issued under this section, including the bonds to be issued, will equal or

```
exceed 0.16 percent of the
     [D>taxable <D]
```

[A>estimated <A] market value of

property in the municipality.

```
Calculation of the limit must be made using the
     [D>taxable <D]
```

[A>estimated

<A] market value for the taxes payable year in which the obligations are issued and sold. In the case of a municipality with a population of 2,500 or more, the bonds are subject to the net debt limits under section 475.53 . In the case of a shared facility in which more than one municipality participates, upon compliance

by each participating municipality with the requirements of subdivision 2, the limitations in this subdivision and the net debt represented by the bonds shall be allocated to each participating municipality in proportion to its required financial contribution to the financing of the shared facility, as set forth in the joint powers agreement relating to the shared facility. This section does not limit the authority to issue bonds under any other special or general law.

Sec. 100. AMEND Minnesota Statutes 2012, section 475.53, subdivision 1 , is amended to read: Subdivision 1. Generally. Except as otherwise provided in sections 475.51 to 475.74 , no municipality, except a school district or a city of the first class, shall incur or be

```
subject to a net debt in excess of three percent of the
     [A>estimated <A]
```

market value of taxable property in the municipality.

Sec. 101. AMEND Minnesota Statutes 2012, section 475.53, subdivision 3 , is amended to read: Subd. 3. Cities first class. Unless its charter permits a greater net debt a city of the first class may not

```
incur a net debt in excess of two percent of the
     [A>estimated <A] market
```

value of all taxable property therein. If the charter of the city permits a net debt of the city in excess of two percent of its valuation, it may not incur a net debt in excess of 3-2/3

```
percent of the
     [A>estimated <A] market value of the taxable property
```

therein. The county auditor, at the time of preparing the tax list of the city, shall

```
compile a statement setting forth the total net tax capacity and the total
```

[A>estimated <A] market value of each class of taxable property in such city for such year.

Sec. 102. AMEND Minnesota Statutes 2012, section 475.53, subdivision 4 , is amended to read: Subd. 4. School districts. Except as otherwise provided by law, no school district shall be subject to a

```
net debt in excess of 15 percent of the
     [D>actual <D]
```

[A>estimated <A] market

value of all taxable property situated within its corporate limits, as computed in accordance with this

subdivision. The county auditor of each county containing taxable real or personal property situated within any school district shall certify to the district upon request

the
[A>estimated <A] market value of all such property.


Whenever the commissioner of revenue, in accordance with section 127A.48 ,

subdivisions 1 to 6, has determined that the
[D>net tax capacity of any

district furnished by county auditors is not based upon the <D] [A>adjusted <A]

market value of taxable property in the district
[A>exceeds the estimated

market value of property within the district <A], the commissioner of revenue shall certify to the district upon request the ratio most recently ascertained

to exist between
[D>such <D]

[A>the estimated market <A] value and the
[D>actual <D]

[A>adjusted <A] market value of property within the district


[D>.


<D]

[A>, and <A] the
[D>actual market value of property within a district, onwhich its <D] debt limit under this subdivision
[D>is <D]

[A>will be <A]
based
[D>, is (a) the value certified by the county auditors, or (b) this

<D] [A>on the estimated market <A] value divided by the ratio certified by the

```
commissioner of revenue
    [D>, whichever results in a higher value <D].
```

Sec. 103. AMEND Minnesota Statutes 2012, section 475.58, subdivision 2 , is amended to read: Subd. 2. Funding, refunding. Any county, city, town, or school district whose outstanding gross debt, including all items referred to in section 475.51, subdivision 4 , exceed in

```
amount 1.62 percent of its
    [A>estimated <A] market value may issue bonds
```

under this subdivision for the purpose of funding or refunding such indebtedness or any part thereof. A list of the items of indebtedness to be funded or refunded shall be made by the recording officer and treasurer and filed in the office of the recording officer. The initial resolution of the governing body shall refer to this subdivision as authority for the issue, state the amount of bonds to be issued and refer to the list of indebtedness to be funded or refunded. This resolution shall be published once each week for two successive weeks in a legal newspaper published in the municipality or if there be no such newspaper, in a legal newspaper published in the county seat. Such bonds may be issued without the submission of the question of their issue to the electors unless within ten days after the second publication of the resolution a petition requesting such election signed by ten or more voters who are taxpayers of the municipality, shall be filed with the recording officer. In event such petition is filed, no bonds shall be issued hereunder unless authorized by a majority of the electors voting on the question.

Sec. 104. AMEND Minnesota Statutes 2012, section 475.73, subdivision 1 , is amended to read: Subdivision 1. May purchase these bonds; conditions. Obligations sold under the provisions of section 475.60 may be purchased by the State Board of Investment if the obligations meet the requirements of section 11A.24, subdivision 2 , upon the approval of the attorney general as to form and execution of the application therefor, and under rules as the board may specify, and the state board shall have authority to purchase the same to an

```
amount not exceeding 3.63 percent of the
    [A>estimated <A] market value of
```

the taxable property of the municipality, according to the last preceding assessment. The obligations shall not run for a shorter period than one year, nor for a longer period than 30 years and shall bear interest at a rate to be fixed by the state board but not less than two percent per annum. Forthwith upon the delivery to the state of Minnesota of any obligations issued by virtue thereof, the commissioner of management and budget shall certify to the respective auditors of the various counties wherein are situated the municipalities issuing the same, the number, denomination, amount, rate of interest and date of maturity of each obligation.

Sec. 105. AMEND Minnesota Statutes 2012, section 477A.011, subdivision 20 , is amended to read: Subd. 20. City net tax capacity. " City net tax capacity" means

[D>(1) the net tax capacity computed using the net tax capacity rates in section 273.13 for taxes payable in the year of the aid distribution, and the market values, after the exclusion in section 273.13, subdivision 35 , for taxes payable in the year prior to the aid distribution plus (2) a city's fiscal disparities distribution tax capacity under section 276A.06, subdivision 2 , paragraph (b), or 473F.08 , subdivision 2 , paragraph (b), for taxes payable in the year prior to that for which aids are being calculated. The market value utilized in computing city net tax capacity shall be reduced by the sum of (1) a city's market value of commercial industrial property as defined in section 276A.01, subdivision 3 , or 473F.02 , subdivision 3 , multiplied by the ratio determined pursuant to section 276A.06, subdivision 2 , paragraph <D]

[D>(a), or 473F.08 , subdivision 2 , paragraph (a), (2) the market value of the captured value of tax increment financing districts as defined in section 469.177, subdivision 2 , and (3) the market value of transmission lines deducted from a city's total net tax capacity under section 273.425 . The city net tax capacity will be computed using equalized market values <D] [A>the city's adjusted net tax capacity under section 273.1325 <A].

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 106. AMEND Minnesota Statutes 2012, section 477A.0124, subdivision 2 , is amended to read: Subd. 2. Definitions. (a) For the purposes of this section, the following terms have the meanings given them.

(b) "County program aid" means the sum of "county need aid," "county tax base equalization aid," and "county transition aid."

(c) "Age-adjusted population" means a county's population multiplied by the county age index.

(d) "County age index" means the percentage of the population over age 65 within the county divided by the percentage of the population over age 65 within the state, except that the age index for any county may not be greater than 1.8 nor less than 0.8.

(e) "Population over age 65" means the population over age 65 established as of July 15 in an aid calculation year by the most recent federal census, by a special census conducted under contract with the United States Bureau of the Census, by a population estimate made by the Metropolitan Council, or by a population estimate of the state demographer made pursuant to section 4A.02, whichever is the most recent as to the stated date of the count or estimate for the preceding calendar year and which has been certified to the commissioner of revenue on or before July 15 of the aid calculation year. A revision to an estimate or count is effective for these purposes only if certified to the commissioner on or before July 15 of the aid calculation year.

Clerical errors in the certification or use of estimates and counts established as of July 15 in the aid calculation year are subject to correction within the time periods allowed under section 477A.014 .

(f) "Part I crimes" means the three-year average annual number of Part I crimes reported for each county by the Department of Public Safety for the most recent years available. By July 1 of each year, the commissioner of public safety shall certify to the commissioner of revenue the number of Part I crimes reported for each county for the three most recent calendar years available.

(g) "Households receiving food stamps" means the average monthly number of households receiving food stamps for the three most recent years for which data is available. By July 1 of each year, the commissioner of human services must certify to the commissioner of revenue the average monthly number of households in the state and in each county that receive food stamps, for the three most recent calendar years available.

(h) "County net tax capacity" means the
   [D>net tax capacity of the county,

computed analogously to city net tax capacity under section 477A.011, subdivision 20 <D] [A>county's adjusted net tax capacity under section 273.1325 <A].

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 107. AMEND Minnesota Statutes 2012, section 641.23 , is amended to read: 641.23 FUNDS; HOW PROVIDED. Before any contract is made for the erection of a county jail, sheriff's residence, or both, the county board shall either levy a sufficient tax to provide the necessary funds, or issue county bonds therefor in accordance with the provisions of chapter 475, provided that no election is required if the amount of all bonds issued for this purpose and interest on them which are due and payable in any year does not exceed an amount equal to 0.09671 percent of

[A>estimated <A] market value of taxable property within the county, as last determined before the bonds are issued. Sec. 108. AMEND Minnesota Statutes 2012, section 641.24 , is amended to read: 641.24 LEASING. The county may, by resolution of the county board, enter into a lease agreement with any statutory or home rule charter city situated within the county, or a county housing and redevelopment authority established pursuant to chapter 469 or any special law whereby the city or county housing and redevelopment authority will construct a jail or other law enforcement facilities for the county sheriff, deputy sheriffs, and other employees of the sheriff and other law enforcement agencies, in accordance with plans prepared by or at the request of the county board and, when required, approved by the commissioner of corrections and will finance it by the issuance of revenue bonds, and the county may lease the site and improvements for a term and upon rentals sufficient to produce revenue for the prompt payment of the bonds and all interest accruing thereon and, upon completion of payment, will acquire title thereto. The real and personal property acquired for the jail shall constitute a project and the lease agreement shall constitute a revenue agreement as contemplated in chapter 469, and all proceedings shall be taken by the city or county housing and redevelopment authority and the county in the manner and with the force and effect provided in chapter 469; provided that:

(1) no tax shall be imposed upon or in lieu of a tax upon the property;

(2) the approval of the project by the commissioner of commerce shall not be required;

(3) the Department of Corrections shall be furnished and shall record such information concerning each project as it may prescribe;

(4) the rentals required to be paid under the lease agreement shall not exceed

in any year one-tenth of one percent of the
     [A>estimated <A] market value of

property within the county, as last finally equalized before the execution of the agreement;

(5) the county board shall provide for the payment of all rentals due during the term of the lease, in the manner required in section 641.264, subdivision 2 ;

(6) no mortgage on the property shall be granted for the security of the bonds, but compliance with clause (5) hereof may be enforced as a nondiscretionary duty of the county board; and

(7) the county board may sublease any part of the jail property for purposes consistent with the maintenance and operation of a county jail or other law enforcement facility.

Sec. 109. AMEND Minnesota Statutes 2012, section 645.44 , is amended by adding a subdivision to read:[A>Subd. 20. Estimated market value. When used in determining or calculating a limit on taxation, spending, state aid amounts, or debt, bond, certificate of indebtedness, or capital note issuance by or for a local government unit, "estimated market value" has the meaning given in section 273.032 . <A]

Sec. 110. [A> REVISOR'S INSTRUCTION.

The revisor of statutes shall recodify    RECOD Minnesota Statutes, section

127A.48, subdivisions 1 to 6 , as section 273.1325 , subdivisions 1 to 6, and change all cross-references to the affected subdivisions accordingly.<A] [A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 111.

[A> REPEALER.    AMEND Minnesota Statutes 2012, sections 276A.01, subdivision

11 ;AMEND 473F.02 , subdivision 13 ; andAMEND 477A.011 , subdivision 21 , are repealed.<A]Sec. 112.

[A>EFFECTIVE DATE. Unless otherwise specifically provided, this article is effective the day following final enactment for purposes of limits on net debt, the issuance of bonds, certificates of indebtedness, and capital notes and is effective beginning for taxes payable in 2014 for all other purposes. <A] ARTICLE 15

DEPARTMENT POLICY AND TECHNICAL: INCOME AND FRANCHISE TAXES; ESTATE TAXES

Section 1. AMEND Minnesota Statutes 2012, section 289A.10 , is amended by adding a subdivision to read:[A>Subd. 1a. Recapture tax return required. If a disposition or cessation as provided by section 291.03, subdivision 11 , paragraph (a), has occurred, the qualified heir, as defined under section 291.03, subdivision 8 , paragraph (c), or personal representative of the decedent's estate must submit a recapture tax return to the commissioner. <A]

[A>EFFECTIVE DATE. This section is effective for estates of decedents dying after June 30, 2011. <A]

Sec. 2. AMEND Minnesota Statutes 2012, section 289A.12, subdivision 14 , is amended to read: Subd. 14. Regulated investment companies; reporting exempt-interest dividends. (a) A regulated investment company paying $10 or more in exempt-interest dividends to an individual who is a resident of Minnesota must make a return indicating the amount of the exempt-interest dividends, the name, address, and Social Security number of the recipient, and any other information that the commissioner specifies. The return must be provided to the shareholder by February 15 of the year following the year of the payment. The return provided to the shareholder must include a clear statement, in the form prescribed by the commissioner, that the exempt-interest dividends must be included in the computation of Minnesota taxable income. By June 1 of each year, the regulated investment company must file a copy of the return with the commissioner.

[D>(b) This subdivision applies to regulated investment companies required to register under chapter 80A. <D]

[D>(c) <D]

[A>(b) <A] For purposes of this subdivision, the following definitions apply.

(1) "Exempt-interest dividends" mean exempt-interest dividends as defined in section 852(b)(5) of the Internal Revenue Code, but does not include the portion of exempt-interest dividends that are not required to be added to federal taxable income under section 290.01, subdivision 19 a, clause (1)(ii).

(2) "Regulated investment company" means regulated investment company as defined in section 851(a) of the Internal Revenue Code or a fund of the regulated investment company as defined in section 851(g) of the Internal Revenue Code.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 3. AMEND Minnesota Statutes 2012, section 289A.12 , is amended by adding a subdivision to read: [A>Subd. 18. Returns by qualified heirs. A qualified heir, as defined in section 291.03, subdivision 8 , paragraph (c), must file two returns with the commissioner attesting that no disposition or cessation as provided by section 291.03, subdivision 11 , paragraph <A]

[A>(a), occurred. The first return must be filed no earlier than 24 months and no later than 26 months after the decedent's death. The second return must be filed no earlier than 36 months and no later than

39 months after the decedent's death. <A]

[A>EFFECTIVE DATE. This section is effective for returns required to be filed after December 31, 2013. <A]

Sec. 4. AMEND Minnesota Statutes 2012, section 289A.18 , is amended by adding a subdivision to read: [A>Subd. 3a. Recapture tax return. A recapture tax return must be filed with the commissioner within six months after the date of the disposition or cessation as provided by section 291.03, subdivision 11 , paragraph (a). <A]

[A>EFFECTIVE DATE. This section is effective for estates of decedents dying after June 30, 2011. <A]

Sec. 5. AMEND Minnesota Statutes 2012, section 289A.20, subdivision 3 , is amended to read: Subd. 3. Estate tax.

```
Taxes imposed by
    [D>chapter 291 <D]
```

[A>section 291.03, subdivision 1, <A]

take effect at and upon the death of the person whose estate is subject to taxation and are due and payable on or before the expiration of nine months from that death.

[A>EFFECTIVE DATE. This section is effective for estates of decedents dying after June 30, 2011. <A]

Sec. 6. AMEND Minnesota Statutes 2012, section 289A.20 , is amended by adding a subdivision to read: [A>Subd. 3a. Recapture tax. The additional estate tax imposed by section 291.03, subdivision 11 , paragraph (b), is due and payable on or before the expiration of the date provided bysection 291.03, subdivision 11 , paragraph (c). <A]

[A>EFFECTIVE DATE. This section is effective for estates of decedents dying after June 30, 2011. <A]

Sec. 7. AMEND Minnesota Statutes 2012, section 289A.26, subdivision 3 , is amended to read: Subd. 3. Short taxable year.

```
(a)
    [A>A corporation or <A] an entity with a short taxable year of less than
```

12 months, but at least four months, must pay estimated tax in equal installments on or before the 15th day of the third, sixth, ninth, and final month of the short taxable year, to the extent applicable based on the number of months in the short taxable year.

```
(b)
    [A>A corporation or <A] an entity is not required to make estimated tax
```

payments for a short taxable year unless its tax liability before the first day of the last month of the taxable year can reasonably be expected to exceed $500.

(c) No payment is required for a short taxable year of less than four months.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 8. AMEND Minnesota Statutes 2012, section 289A.26, subdivision 4 , is amended to read: Subd. 4. Underpayment of estimated tax.

```
If there is an underpayment of estimated tax by a corporation
    [A>or an
```

entity <A], there shall be added to the tax for the taxable year an amount determined at the rate in section 270C.40 on the amount of the underpayment, determined under subdivision 5, for the period of the underpayment determined under subdivision 6. This subdivision does not apply in the first taxable year

```
that a corporation is subject to the tax imposed under section 290.02
    [A>or
```

an entity is subject to the tax imposed under section 290.05, subdivision 3 <A].

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 9. AMEND Minnesota Statutes 2012, section 289A.26, subdivision 7 , is amended to read: Subd. 7. Required installments. (a) Except as otherwise provided in this subdivision, the amount of a required installment is 25 percent of the required annual payment.

(b) Except as otherwise provided in this subdivision, the term "required annual payment" means the lesser of:

(1) 100 percent of the tax shown on the return for the taxable year, or, if no return is filed, 100 percent of the tax for that year; or

```
(2) 100 percent of the tax shown on the return of the
    [A>corporation or <A]
```

entity for the preceding taxable year provided the return was for a full

```
12-month period, showed a liability, and was filed by the
    [A>corporation or
```

<A] entity.

(c) Except for determining the first required installment for any taxable year, paragraph (b), clause (2), does not apply in the case of a large corporation. The term "large corporation" means a corporation or any predecessor corporation that had taxable net income of $1,000,000 or more for any taxable year during the testing period. The term "testing period" means the three taxable years immediately preceding the taxable year involved. A reduction allowed to a large corporation for the first installment that is allowed by applying paragraph (b), clause (2), must be recaptured by increasing the next required installment by the amount of the reduction.

(d) In the case of a required installment, if the corporation
    [A>or entity

<A] establishes that the annualized income installment is less than the amount determined in paragraph (a), the amount of the required installment is the annualized income installment and the recapture of previous quarters' reductions allowed by this paragraph must be recovered by increasing later required installments to the extent the reductions have not previously been recovered.

(e) The "annualized income installment" is the excess, if any, of:

(1) an amount equal to the applicable percentage of the tax for the taxable year computed by placing on an annualized basis the taxable income:

(i) for the first two months of the taxable year, in the case of the first required installment;

(ii) for the first two months or for the first five months of the taxable year, in the case of the second required installment;

(iii) for the first six months or for the first eight months of the taxable year, in the case of the third required installment; and

(iv) for the first nine months or for the first 11 months of the taxable year, in the case of the fourth required installment, over

(2) the aggregate amount of any prior required installments for the taxable year.

(3) For the purpose of this paragraph, the annualized income shall be computed by placing on an annualized basis the taxable income for the year up to the end of the month preceding the due date for the quarterly payment multiplied by 12 and dividing the resulting amount by the number of months in the taxable year (2, 5, 6, 8, 9, or 11 as the case may be) referred to in clause (1).

(4) The "applicable percentage" used in clause (1) is: For the following required installments: The applicable percentage is: 1st 25 2nd 50 3rd 75 4th 100

(f)(1) If this paragraph applies, the amount determined for any installment must be determined in the following manner:

(i) take the taxable income for the months during the taxable year preceding the filing month;

(ii) divide that amount by the base period percentage for the months during the taxable year preceding the filing month;

(iii) determine the tax on the amount determined under item (ii); and

(iv) multiply the tax computed under item (iii) by the base period percentage for the filing month and the months during the taxable year preceding the filing month.

(2) For purposes of this paragraph:

(i) the "base period percentage" for a period of months is the average percent that the taxable income for the corresponding months in each of the three preceding taxable years bears to the taxable income for the three preceding taxable years;

(ii) the term "filing month" means the month in which the installment is required to be paid;

(iii) this paragraph only applies if the base period percentage for any six consecutive months of the taxable year equals or exceeds 70 percent; and

(iv) the commissioner may provide by rule for the determination of the base

```
period percentage in the case of reorganizations, new corporations
     [A>or
```

entities <A], and other similar circumstances.

(3) In the case of a required installment determined under this paragraph, if

```
the
     [A>corporation or <A] entity determines that the installment is less
```

than the amount determined in paragraph (a), the amount of the required installment is the amount determined under this paragraph and the recapture of previous quarters' reductions allowed by this paragraph must be recovered by increasing later required installments to the extent the reductions have not previously been recovered.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 10. AMEND Minnesota Statutes 2012, section 289A.26, subdivision 9 , is amended to read: Subd. 9. Failure to file an estimate.

```
In the case of
     [A>a corporation or <A] an entity that fails to file an
```

estimated tax for a taxable year when one is required, the period of the underpayment runs from the four installment dates in subdivision 2 or 3, whichever applies, to the earlier of the periods in subdivision 6, clauses (1) and (2).

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 11. AMEND Minnesota Statutes 2012, section 290.9705, subdivision 1 , is amended to read: Subdivision 1. Withholding of payments to out-of-state contractors. (a) In this section, "person" means a person, corporation, or cooperative, the state of Minnesota and its political subdivisions, and a city, county, and school district in Minnesota.

(b) A person who in the regular course of business is hiring, contracting, or

```
having a contract with a nonresident person or foreign corporation
    [D>, as
```

defined in Minnesota Statutes 1986, section 290.01, subdivision 5 , <D] to perform construction work in Minnesota, shall deduct and withhold eight percent

```
of
    [D>cumulative calendar year <D] payments
    [A>made <A] to the contractor
```

[D>which exceed <D] [A>if the value of the contract exceeds <A] $50,000.

[A>EFFECTIVE DATE. This section is effective for payments made to contractors after December 31, 2013. <A] ARTICLE 16 DEPARTMENT POLICY AND TECHNICAL: SALES AND USE TAXES; SPECIAL TAXES

Section 1. AMEND Minnesota Statutes 2012, section 287.20 , is amended by adding a subdivision to read:[A>Subd. 11. Partition. "Partition" means the division by conveyance of real property that is held jointly or in common by two or more persons into individually owned interests. If one of the co-owners gives consideration for all or a part of the individually owned interest conveyed to them, that portion of the conveyance is not a part of the partition. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 2. AMEND Minnesota Statutes 2012, section 289A.20, subdivision 4 , is amended to read: Subd. 4. Sales and use tax. (a) The taxes imposed by chapter 297A are due and payable to the commissioner monthly on or before the 20th day of the month following the month in which the taxable event occurred, or following another reporting period as the commissioner prescribes or as allowed under section 289A.18, subdivision 4 ,

paragraph (f) or (g), except that
    [D>: <D]

[D>(1) <D] use taxes due on an annual use tax return as provided under section 289A.11, subdivision 1 , are payable by April 15 following the close of the

calendar year
    [D>; and <D]

[A>. <A]

[D>(2) except as provided in paragraph (f), for a vendor having a liability of $120,000 or more during a fiscal year ending June 30, 2009, and fiscal years thereafter, the taxes imposed by chapter 297A, except as provided in paragraph (b), are due and payable to the commissioner monthly in the following manner: <D]

[D>(i) On or before the 14th day of the month following the month in which the taxable event occurred, the vendor must remit to the commissioner 90 percent of the estimated liability for the month in which the taxable event occurred. <D]

[D>(ii) On or before the 20th day of the month in which the taxable event occurs, the vendor must remit to the commissioner a prepayment for the month in which the taxable event occurs equal to 67 percent of the liability for the previous month. <D]

[D>(iii) On or before the 20th day of the month following the month in which the taxable event occurred, the vendor must pay any additional amount of tax not previously remitted under either item (i) or (ii ) or, if the payment made under item (i) or (ii) was greater than the vendor's liability for the month in which the taxable event occurred, the vendor may take a credit against the next month's liability in a manner prescribed by the commissioner. <D]

[D>(iv) Once the vendor first pays under either item (i) or (ii), the vendor is required to continue to make payments in the same manner, as long as the vendor continues having a liability of $120,000 or more during the most recent fiscal year ending June 30. <D]

[D>(v) Notwithstanding items (i), (ii), and (iv), if a vendor fails to make the required payment in the first month that the vendor is required to make a payment under either item <D]

[D>(i) or (ii), then the vendor is deemed to have elected to pay under item (ii) and must make subsequent monthly payments in the manner provided in item (ii). <D]

[D>(vi) For vendors making an accelerated payment under item (ii), for the first month that the vendor is required to make the accelerated payment, on the 20th of that month, the vendor will pay 100 percent of the liability for the previous month and a prepayment for the first month equal to 67 percent of the liability

for the previous month. <D]

(b)
[D>Notwithstanding paragraph (a), <D] A vendor having a liability of

$120,000 or more during a fiscal year ending June 30 must remit the June liability for the next year in the following manner:

(1) Two business days before June 30 of the year, the vendor must remit 90 percent of the estimated June liability to the commissioner.

(2) On or before August 20 of the year, the vendor must pay any additional amount of tax not remitted in June.

(c) A vendor having a liability of:

(1) $10,000 or more, but less than $120,000 during a fiscal year ending June 30, 2009, and fiscal years thereafter, must remit by electronic means all liabilities on returns due for periods beginning in the subsequent calendar year on or before the 20th day of the month following the month in which the taxable event occurred, or on or before the 20th day of the month following the month in which the sale is reported under section 289A.18, subdivision 4 ; or

(2) $120,000 or more, during a fiscal year ending June 30, 2009, and fiscal years thereafter, must remit by electronic means all liabilities in the manner

provided in paragraph (a)
[D>, clause (2), <D] on returns due for periods

beginning in the subsequent calendar year, except for 90 percent of the estimated June liability, which is due two business days before June 30. The remaining amount of the June liability is due on August 20.

(d) Notwithstanding paragraph (b) or (c), a person prohibited by the person's religious beliefs from paying electronically shall be allowed to remit the payment by mail. The filer must notify the commissioner of revenue of the intent to pay by mail before doing so on a form prescribed by the commissioner. No extra fee may be charged to a person making payment by mail under this paragraph. The payment must be postmarked at least two business days before the due date for making the payment in order to be considered paid on a timely basis.

[D>(e) Whenever the liability is $120,000 or more separately for: (1) the tax imposed under chapter 297A; (2) a fee that is to be reported on the same return as and paid with the chapter 297A taxes; or (3) any other tax that is to be reported on the same return as and paid with the chapter 297A taxes, then the payment of all the liabilities on the return must be accelerated as provided in this subdivision. <D]

[D>(f) At the start of the first calendar quarter at least 90 days after the cash flow account established in

section 16A.152, subdivision 1 , and the budget reserve account established in section 16A.152, subdivision 1 a , reach the amounts listed in section 16A.152, subdivision 2 , paragraph (a), the remittance of the accelerated payments required under paragraph (a), clause (2), must be suspended. The commissioner of management and budget shall notify the commissioner of revenue when the accounts have reached the required amounts. Beginning with the suspension of paragraph (a), clause (2), for a vendor with a liability of $120,000 or more during a fiscal year ending June 30, 2009, and fiscal years thereafter, the taxes imposed by chapter 297A are due and payable to the commissioner on the 20th day of the month following the month in which the taxable event occurred. Payments of tax liabilities for taxable events occurring in June under paragraph (b) are not changed. <D]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 3. AMEND Minnesota Statutes 2012, section 297A.665 , is amended to read: 297A.665 PRESUMPTION OF TAX; BURDEN OF PROOF. (a) For the purpose of the proper administration of this chapter and to prevent evasion of the tax, until the contrary is established, it is presumed that:

(1) all gross receipts are subject to the tax; and

(2) all retail sales for delivery in Minnesota are for storage, use, or other consumption in Minnesota.

(b) The burden of proving that a sale is not a taxable retail sale is on the seller. However, a seller is relieved of liability if:

(1) the seller obtains a fully completed exemption certificate or all the relevant information required by section 297A.72, subdivision 2 , at the time of the sale or within 90 days after the date of the sale; or

(2) if the seller has not obtained a fully completed exemption certificate or all the relevant information required by section 297A.72, subdivision 2 , within the time provided in clause (1), within 120 days after a request for substantiation by the commissioner, the seller either:

```
(i) obtains
      [D>in good faith <D]
```

[A>from the purchaser <A] a fully completed

exemption certificate or all the relevant information required by section

```
297A.72, subdivision 2,
      [D>from the purchaser <D]
```

[A>taken in good faith

which means that the exemption certificate claims an exemption that (A) was statutorily available on the date of the transaction, (B) could be applicable to the item for which the exemption is claimed, and (C) is

reasonable for the purchaser's type of business <A]; or

(ii) proves by other means that the transaction was not subject to tax.

(c) Notwithstanding paragraph (b), relief from liability does not apply to a seller who:

(1) fraudulently fails to collect the tax; or

(2) solicits purchasers to participate in the unlawful claim of an exemption.

[A>(d) Notwithstanding paragraph (b), relief from liability does not apply to a seller who has obtained information under paragraph (b), clause (2), if through the audit process the commissioner finds the following: <A]

[A>(1) that at the time the information was provided the seller had knowledge or had reason to know that the information relating to the exemption was materially false; or <A]

[A>(2) that the seller knowingly participated in activity intended to purposefully evade the sales tax due on the transaction. <A]

[D>(d) <D]

[A>(e) <A] A certified service provider, as defined in section 297A.995, subdivision 2 , is relieved of liability under this section to the extent a seller who is its client is relieved of liability.

[D>(e) <D]

[A>(f) <A] A purchaser of tangible personal property or any items listed in section 297A.63 that are shipped or brought to Minnesota by the purchaser has the burden of proving that the property was not purchased from a retailer for storage, use, or consumption in Minnesota.

[D>(f) <D]

[A>(g) <A] If a seller claims that certain sales are exempt and does not provide the certificate, information, or proof required by paragraph (b), clause (2), within 120 days after the date of the commissioner's request for substantiation, then the exemptions claimed by the seller that required substantiation are disallowed.

[A>EFFECTIVE DATE. This section is effective retroactively from January 1, 2013. <A]

Sec. 4. AMEND Minnesota Statutes 2012, section 297F.01, subdivision 23 , is amended to read: Subd. 23. Wholesale sales price. "

```
Wholesale sales price" means the price
     [D>stated on the price list in effect
```

at the time of sale for which a manufacturer or person sells a tobacco product to a distributor, exclusive of any discount, promotional offer, or other reduction. For purposes of this subdivision, "price list" means the manufacturer's price at which tobacco products are made available for sale to all distributors on an ongoing basis <D> [A>at which a distributor purchases a tobacco product. Wholesale sales price includes the applicable federal excise tax, freight charges, or packaging costs, regardless of whether they were included in the purchase price <A].

[A>EFFECTIVE DATE. This section is effective for purchases made after December 31, 2013. <A]

Sec. 5. AMEND Minnesota Statutes 2012, section 297G.04, subdivision 2 , is amended to read: Subd. 2. Tax credit. A qualified brewer producing fermented malt beverages is entitled to a tax credit of $4.60 per barrel on 25,000 barrels sold in any fiscal year beginning July 1, regardless of the alcohol content of the product. Qualified brewers may take the credit on the 18th day of each month, but the total credit allowed may not exceed in any fiscal year the lesser of:

(1) the liability for tax; or

(2) $115,000. For purposes of this subdivision, a "qualified brewer" means a brewer, whether or not located in this state, manufacturing less than 100,000 barrels of

```
fermented malt beverages in the calendar year immediately preceding the
```

[D>calendar <D] [A>fiscal <A] year for which the credit under this subdivision is claimed. In determining the number of barrels, all brands or labels of a brewer must be combined. All facilities for the manufacture of fermented malt beverages owned or controlled by the same person, corporation, or other entity must be treated as a single brewer.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 6. AMEND Minnesota Statutes 2012, section 297I.05, subdivision 7 , is amended to read: Subd. 7. Nonadmitted insurance premium tax. (a) A tax is imposed on surplus lines brokers. The rate of tax is equal to three percent of the gross premiums less return premiums paid by an insured whose home state is Minnesota.

```
(b) A tax is imposed on
    [D>persons, firms, or corporations <D]
```

```
[A>a person,
```

firm, corporation, or purchasing group as defined in section 60E.02, or any

member of a purchasing group, <A] that
[D>procure <D]

[A>procures <A]

insurance directly from a nonadmitted insurer. The rate of tax is equal to two percent of the gross premiums less return premiums paid by an insured whose home state is Minnesota.

(c) No state other than the home state of an insured may require any premium tax payment for nonadmitted insurance. When Minnesota is the home state of the insured, as provided under section 297I.01 , 100 percent of the gross premiums are taxable in Minnesota with no allocation of the tax to other states.

[A>EFFECTIVE DATE. This section is effective for premiums received after December 31, 2013. <A]

Sec. 7. AMEND Minnesota Statutes 2012, section 297I.05, subdivision 11 , is amended to read: Subd. 11. Retaliatory provisions. (a) If any other state or country imposes any taxes, fines, deposits, penalties, licenses, or fees upon any insurance companies of this state and their agents doing business in another state or country that are in addition to or in excess of those imposed by the laws of this state upon foreign insurance companies and their agents doing business in this state, the same taxes, fines, deposits, penalties, licenses, and fees are imposed upon every similar insurance company of that state or country and their agents doing or applying to do business in this state.

(b) If any conditions precedent to the right to do business in any other state or country are imposed by the laws of that state or country, beyond those imposed upon foreign companies by the laws of this state, the same conditions precedent are imposed upon every similar insurance company of that state or country and their agents doing or applying to do business in that state.

(c) For purposes of this subdivision, "taxes, fines, deposits, penalties, licenses, or fees" means an amount of money that is deposited in the general revenue fund of the state or other similar fund in another state or country and is not dedicated to a special purpose or use or money deposited in the general revenue fund of the state or other similar fund in another state or country and appropriated to the commissioner of commerce or insurance for the operation of the Department of Commerce or other similar agency with jurisdiction over insurance. Taxes, fines, deposits, penalties, licenses, or fees do not include:

(1) special purpose obligations or assessments imposed in connection with particular kinds of insurance, including but not limited to assessments imposed in connection with residual market mechanisms; or

(2) assessments made by the insurance guaranty association, life and health guarantee association, or similar association.

(d) This subdivision applies to taxes imposed under subdivisions 1

[D>,
<D]

[A>; <A] 3
    [D>, <D]

[A>; <A] 4
    [D>, 6, and <D]

[A>; <A] 12, paragraph
(a), clauses (1) and (2)
    [A>; and 14 <A].

(e) This subdivision does not apply to insurance companies organized or domiciled in a state or country, the laws of which do not impose retaliatory taxes, fines, deposits, penalties, licenses, or fees or which grant, on a reciprocal basis, exemptions from retaliatory taxes, fines, deposits, penalties, licenses, or fees to insurance companies domiciled in this state.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 8. AMEND Minnesota Statutes 2012, section 297I.05, subdivision 12 , is amended to read: Subd. 12. Other entities. (a) A tax is imposed equal to two percent of:

(1) gross premiums less return premiums written for risks resident or located in Minnesota by a risk retention group;

(2) gross premiums less return premiums received by an attorney in fact acting in accordance with chapter 71A;

(3) gross premiums less return premiums received pursuant to assigned risk

policies and contracts of coverage under chapter 79;
    [A>and <A]

(4) the direct funded premium received by the reinsurance association under section 79.34 from self-insurers approved under section 176.181 and political

subdivisions that self-insure
    [D>; and <D]

[A>. <A]

[D>(5) gross premiums less return premiums paid to an insurer other than a licensed insurance company or a surplus lines broker for coverage of risks resident or located in Minnesota by a purchasing group or

<span style="color:red">any members of the purchasing group to a broker or agent for the purchasing group. <D]</span>

(b) A tax is imposed on a joint self-insurance plan operating under chapter 60F. The rate of tax is equal to two percent of the total amount of claims paid during the fund year, with no deduction for claims wholly or partially reimbursed through stop-loss insurance.

(c) A tax is imposed on a joint self-insurance plan operating under chapter 62H. The rate of tax is equal to two percent of the total amount of claims paid during the fund's fiscal year, with no deduction for claims wholly or partially reimbursed through stop-loss insurance.

(d) A tax is imposed equal to the tax imposed under section 297I.05, subdivision 5 , on the gross premiums less return premiums on all coverages received by an accountable provider network or agents of an accountable provider network in Minnesota, in cash or otherwise, during the year.

<span style="color:green">[A>EFFECTIVE DATE. This section is effective for premiums received after December 31, 2013. <A]</span>

Sec. 9. AMEND Minnesota Statutes 2012, section 297I.30, subdivision 1 , is amended to read: Subdivision 1. General rule. On or before March 1, every taxpayer subject to taxation under section 297I.05 ,

```
subdivisions 1 to 5
    [D>, <D]
```

<span style="color:green">[A>; <A]</span> `7, paragraph (b)`
```
    [D>, <D]
```

<span style="color:green">[A>; <A]</span> `12`

<span style="color:red">[D>, paragraphs (a), clauses (1) to (4), (b), (c), and (d), <D]</span> <span style="color:green">[A>; <A]</span> and 14, shall file an annual return for the preceding calendar year in the form prescribed by the commissioner.

<span style="color:green">[A>EFFECTIVE DATE. This section is effective for premiums received after December 31, 2013. <A]</span>

Sec. 10. AMEND Minnesota Statutes 2012, section 297I.30, subdivision 2 , is amended to read:

```
Subd. 2. Surplus lines brokers
    [D> and purchasing groups  <D] .
```

On or before February 15 and August 15 of each year, every surplus lines broker

```
subject to taxation under section 297I.05, subdivision 7, paragraph (a),
```

[D>and every purchasing group or member of a purchasing group subject to tax under section 297I.05, subdivision 12 , paragraph (a), clause (5), <D] shall file a return with the commissioner for the preceding six-month period ending December 31, or June 30, in the form prescribed by the commissioner.

[A>EFFECTIVE DATE. This section is effective for premiums received after December 31, 2013. <A]

Sec. 11.

[A> REPEALER.    AMEND Minnesota Statutes 2012, section 289A.60, subdivision 31

, is repealed.<A] [A>EFFECTIVE DATE. This section is effective the day following final enactment. <A] ARTICLE 17 DEPARTMENT POLICY AND TECHNICAL: MINERALS TAXES; PROPERTY TAX

Section 1. AMEND Minnesota Statutes 2012, section 123A.455, subdivision 1 , is amended to read: Subdivision 1. Definitions. " Split residential property parcel" means a parcel of real estate that is located within the boundaries of more than one school district and that is classified as residential property under:

(1) section 273.13, subdivision 22 , paragraph (a) or (b);

(2) section 273.13, subdivision 25 , paragraph (b), clause (1); or

(3) section 273.13, subdivision 25, paragraph (c) [D>, clause (1) <D].

[A>EFFECTIVE DATE. This section is effective for taxes payable in 2014 and thereafter. <A]

Sec. 2. AMEND Minnesota Statutes 2012, section 270.077 , is amended to read: 270.077 TAXES CREDITED TO STATE AIRPORTS FUND.

All taxes levied under sections 270.071 to 270.079 must be [A>collected by

the commissioner and <A] credited to the state airports fund created in section360.017 . [A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 3. AMEND Minnesota Statutes 2012, section 270.41, subdivision 5 , is amended to read: Subd. 5. Prohibited activity. A licensed assessor or other person employed by an assessment jurisdiction or contracting with an assessment jurisdiction for the purpose of valuing or classifying property for property tax purposes is prohibited from making appraisals or analyses, accepting an appraisal assignment, or preparing an appraisal report as defined in section 82B.021, subdivisions 2, 4, 6, and 7, on any property within the assessment jurisdiction where the individual is employed or performing the duties of the assessor under contract. Violation of this prohibition shall result in immediate revocation of the individual's license to assess property for property tax purposes. This prohibition must not be construed to prohibit an

individual from carrying out any duties required for the proper assessment of property for property tax purposes or performing duties enumerated in section 273.061, subdivision 7 or 8. If a formal resolution has been adopted by the governing body of a governmental unit, which specifies the purposes for which such work will be done, this prohibition does not apply to appraisal activities undertaken on behalf of and at the request of the governmental unit that has employed or contracted with the individual. The resolution may only allow appraisal activities which are related to

```
condemnations, right-of-way acquisitions,
    [A>land exchanges, <A] or special
```

assessments.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 4. AMEND Minnesota Statutes 2012, section 270C.34, subdivision 1 , is amended to read: Subdivision 1. Authority. (a) The commissioner may abate, reduce, or refund any penalty or interest that is imposed by a law administered by the commissioner, or imposed by section

```
270.0725, subdivision 1 or 2,
    [A>or 270.075, subdivision 2, <A] as a result
```

of the late payment of tax or late filing of a return, or any part of an additional tax charge under section 289A.25, subdivision 2 , or 289A.26 , subdivision 4, if the failure to timely pay the tax or failure to timely file the return is due to reasonable cause, or if the taxpayer is located in a presidentially declared disaster or in a presidentially declared state of emergency area or in an area declared to be in a state of emergency by the governor under section 12.31.

(b) The commissioner shall abate any part of a penalty or additional tax charge under section 289A.25, subdivision 2 , or 289A.26 , subdivision 4, attributable to erroneous advice given to the taxpayer in writing by an employee of the department acting in an official capacity, if the advice:

(1) was reasonably relied on and was in response to a specific written request of the taxpayer; and

(2) was not the result of failure by the taxpayer to provide adequate or accurate information.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 5. AMEND Minnesota Statutes 2012, section 272.01, subdivision 2 , is amended to read: Subd. 2. Exempt property used by private entity for profit. (a) When any real or personal property which is exempt from ad valorem taxes, and taxes in lieu thereof, is leased, loaned, or otherwise made available and used by a private individual, association, or corporation in connection with a business conducted for profit, there shall be imposed a tax, for the privilege of so using or possessing such real or personal property, in the same amount and to the same extent as though the lessee or user was the owner of such property.

(b) The tax imposed by this subdivision shall not apply to:

(1) property leased or used as a concession in or relative to the use in whole or part of a public park, market, fairgrounds, port authority, economic development authority established under chapter 469, municipal auditorium, municipal parking facility, municipal museum, or municipal stadium;

(2) property of an airport owned by a city, town, county, or group thereof which is:

(i) leased to or used by any person or entity including a fixed base operator; and

(ii) used as a hangar for the storage or repair of aircraft or to provide aviation goods, services, or facilities to the airport or general public; the exception from taxation provided in this clause does not apply to:

(i) property located at an airport owned or operated by the Metropolitan Airports Commission or by a city of over 50,000 population according to the most recent federal census or such a city's airport authority; or

(ii) hangars leased by a private individual, association, or corporation in connection with a business conducted for profit other than an aviation-related business;

(3) property constituting or used as a public pedestrian ramp or concourse in connection with a public airport;

(4) property constituting or used as a passenger check-in area or ticket sale counter, boarding area, or luggage claim area in connection with a public airport but not the airports owned or operated by the Metropolitan Airports Commission or cities of over 50,000 population or an airport authority therein.

Real estate owned by a municipality in connection with the operation of a public airport and leased or used for agricultural purposes is not exempt;

(5) property leased, loaned, or otherwise made available to a private individual, corporation, or association under a cooperative farming agreement made pursuant to section 97A.135; or

(6) property leased, loaned, or otherwise made available to a private individual, corporation, or association under section 272.68, subdivision 4 .

(c) Taxes imposed by this subdivision are payable as in the case of personal property taxes and shall be assessed to the lessees or users of real or personal property in the same manner as taxes assessed to owners of real or personal property, except that such taxes shall not become a lien against the property. When due, the taxes shall constitute a debt due from the lessee or user to the state, township, city, county, and school district for which the taxes were assessed and shall be collected in the same manner as personal property taxes. If property subject to the tax imposed by this subdivision is leased or used jointly by two or more persons, each lessee or user shall be jointly and severally liable for payment of the tax.

(d) The tax on real property of the

```
[A>federal government, the <A] state or
any of its political subdivisions that is leased
    [D>by <D]
```

```
[A>, loaned, or
```

otherwise made available to <A] a private individual, association, or corporation and becomes taxable under this subdivision or other provision of law must be assessed and collected as a personal property assessment. The taxes do not become a lien against the real property.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 6. AMEND Minnesota Statutes 2012, section 272.02, subdivision 97 , is amended to read: Subd. 97. Property used in business of mining subject to net proceeds tax. The following property used in the business of mining that is subject to the net proceeds tax under section 298.015 is exempt:

(1) deposits of ores, metals, and minerals and the lands in which they are contained;

(2) all real and personal property used in mining, quarrying, producing, or refining ores, minerals, or metals, including lands occupied by or used in connection with the mining, quarrying, production, or ore refining facilities; and

```
(3) concentrate
    [D>or direct reduced ore <D].
```

This exemption applies for each year that a person subject to tax under section298.015 uses the property for mining, quarrying, producing, or refining ores, metals, or minerals.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 7. AMEND Minnesota Statutes 2012, section 272.03, subdivision 9 , is amended to read: Subd. 9. Person. "

```
Person"
    [D>includes <D]
```

```
[A>means an individual, association, estate, trust,
```

partnership, <A] firm, company, or corporation.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 8. AMEND Minnesota Statutes 2012, section 273.114, subdivision 6 , is amended to read: Subd. 6. Additional taxes.

[A>(a) <A] When real property which is being, or has been valued and assessed

under this section
    [A>is sold, transferred, or <A] no longer qualifies undersubdivision 2, the portion
    [A>sold, transferred, or <A] no longer qualifying

shall be subject to additional taxes in the amount equal to the difference between the taxes determined in accordance with subdivision 3 and the amount determined under subdivision 4, provided that the amount determined under subdivision 4 shall not be greater than it would have been had the actual bona fide sale price of the real property at an arm's-length transaction been used in lieu of the market value determined under subdivision 4. The additional

taxes shall be extended against the property on the tax list for
    [A>taxes

payable in <A] the current year, provided that no interest or penalties shall

be levied on the additional taxes if timely paid and
    [A>provided <A] that

the additional taxes shall only be levied with respect to the current year plus two prior years that the property has been valued and assessed under this section.

[A>(b) In the case of a sale or transfer, the additional taxes under paragraph (a) shall not be extended against the property if the new owner submits a successful application under this section by the later of May 1 of the current year or 30 days after the sale or transfer. <A]

[A>(c) For the purposes of this section, the following events do not constitute a sale or transfer for property that qualified under subdivision 2 prior to the event: <A]

[A>(1) death of a property owner when the surviving owners retain ownership of the property; <A]

[A>(2) divorce of a married couple when one of the spouses retains ownership of the property; <A]

[A>(3) marriage of a single property owner when that owner retains ownership of the property in whole or in part; <A]

[A>(4) the organization or reorganization of a farm ownership entity that is not prohibited from owning agricultural land in this state under section500.24 , if all owners maintain the same beneficial interest both before and after the organization or reorganization; and <A]

[A>(5) transfer of the property to a trust or trustee, provided that the individual owners of the property are the grantors of the trust and they maintain the same beneficial interest both before and after placement of

the property in trust. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 9. AMEND Minnesota Statutes 2012, section 273.13, subdivision 23 , is amended to read: Subd. 23. Class 2. (a) An agricultural homestead consists of class 2a agricultural land that is homesteaded, along with any class 2b rural vacant land that is contiguous to the class 2a land under the same ownership. The market value of the house and garage and immediately surrounding one acre of land has the same class rates as class 1a or 1b property under subdivision 22. The value of the remaining land including improvements up to the first tier valuation limit of agricultural homestead property has a net class rate of 0.5 percent of market value. The remaining property over the first tier has a class rate of one percent of market value. For purposes of this subdivision, the "first tier valuation limit of agricultural homestead property" and "first tier" means the limit certified under section 273.11, subdivision 23 .

(b) Class 2a agricultural land consists of parcels of property, or portions thereof, that are agricultural land and buildings. Class 2a property has a net class rate of one percent of market value, unless it is part of an agricultural homestead under paragraph (a).

Class 2a property must also include any property that would otherwise be classified as 2b, but is interspersed with class 2a property, including but not limited to sloughs, wooded wind shelters, acreage abutting ditches, ravines, rock piles, land subject to a setback requirement, and other similar land that is impractical for the assessor to value separately from the rest of the property or that is unlikely to be able to be sold separately from the rest of the property. An assessor may classify the part of a parcel described in this subdivision that is used for agricultural purposes as class 2a and the remainder in the class appropriate to its use.

(c) Class 2b rural vacant land consists of parcels of property, or portions thereof, that are unplatted real estate, rural in character and not used for agricultural purposes, including land used for growing trees for timber, lumber, and wood and wood products, that is not improved with a structure. The presence of a minor, ancillary nonresidential structure as defined by the commissioner of revenue does not disqualify the property from classification under this paragraph. Any parcel of 20 acres or more improved with a structure that is not a minor, ancillary nonresidential structure must be split-classified, and ten acres must be assigned to the split parcel containing the structure. Class 2b property has a net class rate of one percent of market value unless it is part of an agricultural homestead under paragraph (a), or qualifies as class 2c under paragraph (d).

(d) Class 2c managed forest land consists of no less than 20 and no more than 1,920 acres statewide per taxpayer that is being managed under a forest management plan that meets the requirements of chapter 290C, but is not enrolled in the sustainable forest resource management incentive program. It has a class rate of .65 percent, provided that the owner of the property must apply to the assessor in order for the property to initially qualify for the reduced rate and provide the information required by the assessor to verify that the property qualifies for the reduced rate. If the assessor receives the application and

information before May 1 in an assessment year, the property qualifies beginning with that assessment year. If the assessor receives the application and information after April 30 in an assessment year, the property may not qualify until the next assessment year. The commissioner of natural resources must concur that the land is qualified. The commissioner of natural resources shall annually provide county assessors verification information on a timely basis. The presence of a minor, ancillary nonresidential structure as defined by the commissioner of revenue does not disqualify the property from classification under this paragraph.

(e) Agricultural land as used in this section means
[A>: <A]

[A>(1) <A] contiguous acreage of ten acres or more, used during the preceding

year for agricultural purposes
[D>.

<D] [A>; or <A]

[A>(2) contiguous acreage used during the preceding year for an intensive livestock or poultry confinement operation, provided that land used only for pasturing or grazing does not qualify under this clause. <A] " Agricultural purposes" as used in this section means the raising, cultivation, drying, or storage of agricultural products for sale, or the storage of machinery or equipment used in support of agricultural production by the same farm entity. For a property to be classified as agricultural based only on the drying or storage of agricultural products, the products being dried or stored must have been produced by the same farm entity as the entity operating the drying or storage facility. " Agricultural purposes" also includes enrollment in the Reinvest in Minnesota program under sections 103F.501 to 103F.535 or the federal Conservation Reserve Program as contained in Public Law 99-198 or a similar state or federal conservation program if the property was classified as agricultural (i) under

this subdivision for
[D>the assessment year 2002 <D]

[A>taxes payable in 2003

because of its enrollment in a qualifying program and the land remains enrolled <A] or (ii) in the year prior to its enrollment. Agricultural classification shall not be based upon the market value of any residential structures on the parcel or contiguous parcels under the same ownership. [A>"Contiguous acreage," for purposes of this paragraph, means all of, or a contiguous portion of, a tax parcel as described in section 272.193 , or all of, or a contiguous portion of, a set of contiguous tax parcels under that section that are owned by the same person. <A]

(f)

[D>Real estate of <D]

[A>Agricultural land under this section also

includes: <A]

[A>(1) contiguous acreage that is <A] less than ten acres
    [D>, which is
<D]

[A>in size and <A] exclusively
    [D>or intensively <D] used
    [A>in the
preceding year <A] for raising or cultivating agricultural products
    [D>,

shall be considered as agricultural land. To qualify under this paragraph, property that includes a residential structure must be used intensively for one of the following purposes: <D] [A>; or <A]

[A>(2) contiguous acreage that contains a residence and is less than 11 acres in size, if the contiguous acreage exclusive of the house, garage, and surrounding one acre of land was used in the preceding year for one or more of the following three uses: <A]

(i) for
    [A>an intensive grain <A] drying or storage
    [D>of grain
<D]

[A>operation, <A] or
    [A>for intensive machinery or equipment <A] storage

[D>of machinery or equipment <D] [A>activities <A] used to support agricultural activities on other parcels of property operated by the same farming entity;

(ii) as a nursery, provided that only those acres used
    [A>intensively <A] to
produce nursery stock are considered agricultural land;
    [A>or <A]

[D>(iii) for livestock or poultry confinement, provided that land that is used only for pasturing and grazing does not qualify; or <D]

[D>(iv) <D]


[A>(iii) <A] for
    [A>intensive <A] market farming; for purposes of this

paragraph, "market farming" means the cultivation of one or more fruits or vegetables or production of animal or other agricultural products for sale to local markets by the farmer or an organization with which the farmer is affiliated. [A>"Contiguous acreage," for purposes of this paragraph, means all of a tax parcel as described in section 272.193 , or all of a set of contiguous tax parcels under that section that are owned by the same person. <A]

(g) Land shall be classified as agricultural even if all or a portion of the agricultural use of that property is the leasing to, or use by another person for agricultural purposes. Classification under this subdivision is not determinative for qualifying under section 273.111 .

(h) The property classification under this section supersedes, for property tax purposes only, any locally administered agricultural policies or land use restrictions that define minimum or maximum farm acreage.

(i) The term "agricultural products" as used in this subdivision includes production for sale of:

(1) livestock, dairy animals, dairy products, poultry and poultry products, fur-bearing animals, horticultural and nursery stock, fruit of all kinds, vegetables, forage, grains, bees, and apiary products by the owner;

(2) fish bred for sale and consumption if the fish breeding occurs on land zoned for agricultural use;

(3) the commercial boarding of horses, which may include related horse training and riding instruction, if the boarding is done on property that is also used for raising pasture to graze horses or raising or cultivating other agricultural products as defined in clause (1);

(4) property which is owned and operated by nonprofit organizations used for equestrian activities, excluding racing;

(5) game birds and waterfowl bred and raised (i) on a game farm licensed under section 97A.105, provided that the annual licensing report to the Department of Natural Resources, which must be submitted annually by March 30 to the assessor, indicates that at least 500 birds were raised or used for breeding stock on the property during the preceding year and that the owner provides a copy of the owner's most recent schedule F; or (ii) for use on a shooting preserve licensed under section 97A.115;

(6) insects primarily bred to be used as food for animals;

(7) trees, grown for sale as a crop, including short rotation woody crops, and not sold for timber, lumber, wood, or wood products; and

(8) maple syrup taken from trees grown by a person licensed by the Minnesota Department of Agriculture under chapter 28A as a food processor.

(j) If a parcel used for agricultural purposes is also used for commercial or industrial purposes, including but not limited to:

(1) wholesale and retail sales;

(2) processing of raw agricultural products or other goods;

(3) warehousing or storage of processed goods; and

(4) office facilities for the support of the activities enumerated in clauses (1), (2), and (3), the assessor shall classify the part of the parcel used for agricultural purposes as class 1b, 2a, or 2b, whichever is appropriate, and the remainder in the class appropriate to its use. The grading, sorting, and packaging of raw agricultural products for first sale is considered an agricultural purpose. A greenhouse or other building where horticultural or nursery products are grown that is also used for the conduct of retail sales must be classified as agricultural if it is primarily used for the growing of horticultural or nursery products from seed, cuttings, or roots and occasionally as a showroom for the retail sale of those products. Use of a greenhouse or building only for the display of already grown horticultural or nursery products does not qualify as an agricultural purpose.

(k) The assessor shall determine and list separately on the records the market value of the homestead dwelling and the one acre of land on which that dwelling is located. If any farm buildings or structures are located on this homesteaded acre of land, their market value shall not be included in this separate determination.

(l) Class 2d airport landing area consists of a landing area or public access area of a privately owned public use airport. It has a class rate of one percent of market value. To qualify for classification under this paragraph, a privately owned public use airport must be licensed as a public airport under section 360.018 . For purposes of this paragraph, "landing area" means that part of a privately owned public use airport properly cleared, regularly maintained, and made available to the public for use by aircraft and includes runways, taxiways, aprons, and sites upon which are situated landing or navigational aids. A landing area also includes land underlying both the primary surface and the approach surfaces that comply with all of the following:

(i) the land is properly cleared and regularly maintained for the primary purposes of the landing, taking off, and taxiing of aircraft; but that portion of the land that contains facilities for servicing, repair, or maintenance of aircraft is not included as a landing area;

(ii) the land is part of the airport property; and

(iii) the land is not used for commercial or residential purposes. The land contained in a landing area under this paragraph must be described and certified by the commissioner of transportation. The

certification is effective until it is modified, or until the airport or landing area no longer meets the requirements of this paragraph. For purposes of this paragraph, "public access area" means property used as an aircraft parking ramp, apron, or storage hangar, or an arrival and departure building in connection with the airport.

(m) Class 2e consists of land with a commercial aggregate deposit that is not actively being mined and is not otherwise classified as class 2a or 2b, provided that the land is not located in a county that has elected to opt-out of the aggregate preservation program as provided in section 273.1115, subdivision 6 . It has a class rate of one percent of market value. To qualify for classification under this paragraph, the property must be at least ten contiguous acres in size and the owner of the property must record with the county recorder of the county in which the property is located an affidavit containing:

(1) a legal description of the property;

(2) a disclosure that the property contains a commercial aggregate deposit that is not actively being mined but is present on the entire parcel enrolled;

(3) documentation that the conditional use under the county or local zoning ordinance of this property is for mining; and

(4) documentation that a permit has been issued by the local unit of government or the mining activity is allowed under local ordinance. The disclosure must include a statement from a registered professional geologist, engineer, or soil scientist delineating the deposit and certifying that it is a commercial aggregate deposit. For purposes of this section and section 273.1115 , "commercial aggregate deposit" means a deposit that will yield crushed stone or sand and gravel that is suitable for use as a construction aggregate; and "actively mined" means the removal of top soil and overburden in preparation for excavation or excavation of a commercial deposit.

(n) When any portion of the property under this subdivision or subdivision 22 begins to be actively mined, the owner must file a supplemental affidavit within 60 days from the day any aggregate is removed stating the number of acres of the property that is actively being mined. The acres actively being mined must be (1) valued and classified under subdivision 24 in the next subsequent assessment year, and (2) removed from the aggregate resource preservation property tax program under section 273.1115 , if the land was enrolled in that program. Copies of the original affidavit and all supplemental affidavits must be filed with the county assessor, the local zoning administrator, and the Department of Natural Resources, Division of Land and Minerals. A supplemental affidavit must be filed each time a subsequent portion of the property is actively mined, provided that the minimum acreage change is five acres, even if the actual mining activity constitutes less than five acres.

(o) The definitions prescribed by the commissioner under paragraphs (c) and (d) are not rules and are exempt from the rulemaking provisions of chapter 14, and the provisions in section 14.386 concerning exempt rules do not apply.

[A>EFFECTIVE DATE. This section is effective for taxes payable in 2014 and thereafter. <A]

Sec. 10. AMEND Minnesota Statutes 2012, section 273.19, subdivision 1 , is amended to read: Subdivision 1. Tax-exempt property; lease. Except as provided in subdivision 3 or 4, tax-exempt property held under a lease for a term of at least one year, and not taxable under section 272.01, subdivision 2 , or under a contract for the purchase thereof, shall be considered, for all purposes of taxation, as the property of the person holding it. In this subdivision, "tax-exempt property" means property owned by the United

```
States, the state
    [A>or any of its political subdivisions <A], a school, or
```

any religious, scientific, or benevolent society or institution, incorporated or unincorporated, or any corporation whose property is not taxed in the same manner as other property. This subdivision does not apply to property exempt from taxation under section 272.01, subdivision 2 , paragraph (b), clauses

(2), (3), and (4), or to property exempt from taxation under section 272.0213 .

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 11. AMEND Minnesota Statutes 2012, section 273.372, subdivision 4 , is amended to read: Subd. 4. Administrative appeals. (a) Companies that submit the reports under section 270.82 or 273.371 by the date specified in that section, or by the date specified by the commissioner in an extension, may appeal administratively to the commissioner prior to bringing

```
an action in court
    [D>by submitting <D]
```

```
[A>. <A]
```

[A>(b) Companies that must submit reports under section 270.82 must submit <A]

```
a written request
    [D>with <D]
```

```
[A>to <A] the commissioner for a conference
```

within ten days after the date of the commissioner's valuation certification or

```
notice to the company, or by
    [D>May <D]
```

```
[A>June <A] 15, whichever is earlier.
```

[A>(c) Companies that submit reports under section 273.371 must submit a written request to the commissioner for a conference within ten days after the date of the commissioner's valuation certification or notice to the company, or by July 1, whichever is earlier. <A]

[A>(d) <A] The commissioner shall conduct the conference upon the commissioner's entire files and records and such further information as may be offered. The conference must be held no later than 20 days after the date of the commissioner's valuation certification or notice to the company, or by the date specified by the commissioner in an extension. Within 60 days after the conference the commissioner shall make a final determination of the matter and shall notify the company promptly of the determination. The conference is not a contested case hearing.

[D>(b) <D]

[A>(e) <A] In addition to the opportunity for a conference under paragraph (a), the commissioner shall also provide the railroad and utility companies the opportunity to discuss any questions or concerns relating to the values established by the commissioner through certification or notice in a less formal manner. This does not change or modify the deadline for requesting a conference under paragraph (a), the deadline in section 271.06 for appealing an order of the commissioner, or the deadline in section 278.01 for appealing property taxes in court.

[A>EFFECTIVE DATE. This section is effective beginning with assessment year 2014. <A]

Sec. 12. AMEND Minnesota Statutes 2012, section 273.39 , is amended to read: 273.39 RURAL AREA. As used in AMEND sections 273.39 toAMEND 273.41 , the term "rural area" shall be deemed to mean any area of the state not included within the boundaries of any[D>incorporated<D] [A>statutory city or home rule charter<A]city, and such term shall be deemed to include both farm and nonfarm population thereof.[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 13. AMEND Minnesota Statutes 2012, section 279.06, subdivision 1 , is amended to read: Subdivision 1. List and notice. Within five days after the filing of such list, the court administrator shall return a copy thereof to the county auditor, with a notice prepared and signed by the court administrator, and attached thereto, which may be substantially in the following form: State of Minnesota ) ) ss. County of ..... ) District Court ..... Judicial District. The state of Minnesota, to all persons, companies, or corporations who have or claim any estate, right, title, or interest in, claim to, or lien upon, any of the several parcels of land described in the list hereto attached: The list of taxes and penalties on real property for the county of .............................. remaining delinquent on the first Monday in January, ......., has been filed in the office of the court administrator of the district court of said county, of which that hereto attached is a copy. Therefore, you, and each of you, are hereby required to file in the office of said court administrator, on or before the 20th day after the publication of this notice and list, your answer, in writing, setting forth any objection or defense you may have to the taxes, or any part thereof, upon any parcel of land described in the list, in, to, or on which you have or claim any estate, right, title, interest, claim, or lien, and, in default thereof, judgment will be entered against such parcel of land for the taxes on

such list appearing against it, and for all penalties, interest, and costs. Based upon said judgment, the land shall be sold to the state of Minnesota on the second Monday in May, ....... [D>The period of redemption for all lands sold to the state at a tax judgment sale shall be three years from the date of sale to the state of Minnesota if the land is within an incorporated area unless it is: <D]

[D>(a) nonagricultural homesteaded land as defined in section 273.13, subdivision 22 ; <D]

[D>(b) homesteaded agricultural land as defined in section 273.13, subdivision 23 , paragraph (a); <D]

[D>(c) seasonal residential recreational land as defined in section 273.13 , subdivisions 22, paragraph (c) , and 25, paragraph (d), clause (1), in which event the period of redemption is five years from the date of sale to the state of Minnesota; <D]

[D>(d) abandoned property and pursuant to section 281.173 a court order has been entered shortening the redemption period to five weeks; or <D]

[D>(e) vacant property as described under section 281.174, subdivision 2 , and for which a court order is entered shortening the redemption period under section 281.174 . The period of redemption for all other lands sold to the state at a tax judgment sale shall be five years from the date of sale. <D] Inquiries as to the proceedings set forth above can be made to the county auditor of ..... county whose address is ......

(Signed) ..... , Court Administrator of the District Court of the County of .....

(Here insert list.)

[A>The notice must contain a narrative description of the various periods to redeem specified in sections 281.17 , 281.173 , and 281.174 , in the manner prescribed by the commissioner of revenue under subdivision 2. <A] The list referred to in the notice shall be substantially in the following form: List of real property for the county of ......................, on which taxes remain delinquent on the first Monday in January, ....... Town of (Fairfield), Township (40), Range (20), Names (and Current Filed Addresses) for the Taxpayers and Fee Owners and in Addition Those Parties Who Have Filed Their Addresses Pursuant to section 276.041

Subdivision of

Section

Section Tax Parcel Number Total Tax and Penalty $ cts. John Jones (825 Fremont Fairfield, MN 55000) S.E. 1/4 of S.W. 1/4 10 23101 2.20 Bruce Smith (2059 Hand Fairfield, MN 55000) and Fairfield State Bank (100 Main Street Fairfield, MN 55000) That part of N.E. 1/4 of S.W. 1/4 desc. as follows: Beg. at the S.E. corner of said N.E. 1/4 of S.W. 1/4; thence N. along the E. line of said N.E. 1/4 of S.W. 1/4 a distance of 600 ft.; thence W. parallel with the S. line of said N.E. 1/4 of S.W. 1/4 a distance of 600 ft.; thence S. parallel with said E. line a distance of 600 ft. to S. line of said N.E. 1/4 of S.W. 1/4; thence E.

along said S. line a distance of 600 ft. to the point of beg. 21 33211 3.15 As to platted property, the form of heading shall conform to circumstances and be substantially in the following form: City of (Smithtown) Brown's Addition, or Subdivision Names (and Current Filed Addresses) for the Taxpayers and Fee Owners and in Addition Those Parties Who Have Filed Their Addresses Pursuant to section 276.041 Lot Block Tax Parcel Number Total Tax and Penalty $ cts. John Jones (825 Fremont Fairfield, MN 55000) 15 9 58243 2.20 Bruce Smith (2059 Hand Fairfield, MN 55000) and Fairfield State Bank (100 Main Street Fairfield, MN 55000) 16 9 58244 3.15 The names, descriptions, and figures employed in parentheses in the above forms are merely for purposes of illustration. The name of the town, township, range or city, and addition or subdivision, as the case may be, shall be repeated at the head of each column of the printed lists as brought forward from the preceding column. Errors in the list shall not be deemed to be a material defect to affect the validity of the judgment and sale.

[A>EFFECTIVE DATE. This section is effective for lists and notices required after December 31, 2013. <A]

Sec. 14. AMEND Minnesota Statutes 2012, section 290B.04, subdivision 2 , is amended to read: Subd. 2. Approval; recording. The commissioner shall approve all initial applications that qualify under this chapter and shall notify qualifying homeowners on or before December 1. The commissioner may investigate the facts or require confirmation in regard to an application. The commissioner shall record or file a notice of qualification for deferral, including the names of the qualifying homeowners and a legal description of the property, in the office of the county recorder, or registrar of titles, whichever is applicable, in the county where the qualifying property is located. The notice must state that it serves as a notice of lien and that it includes deferrals under this section for future years. [A>The commissioner shall prescribe the form of the notice. Execution of the notice by the original or facsimile signature of the commissioner or a delegate entitles them to be recorded, and no other attestation, certification, or acknowledgment is necessary. <A] The homeowner shall pay the recording or filing fees for the notice, which, notwithstanding section 357.18 , shall be paid by the homeowner at the time of satisfaction of the lien.

[A>EFFECTIVE DATE. This section is effective for notices that are both executed and recorded after June 30, 2013. <A]

Sec. 15. AMEND Minnesota Statutes 2012, section 298.01, subdivision 3 , is amended to read: Subd. 3. Occupation tax; other ores. Every person engaged in the business of mining, refining, or producing ores, metals, or minerals in this state, except iron ore or taconite concentrates, shall pay an occupation tax to the state of Minnesota as provided in this subdivision. For purposes of this subdivision, mining includes the application of hydrometallurgical processes. [A>Hydrometallurgical processes are processes that extract the ores, metals, or minerals, by use of aqueous solutions that leach, concentrate, and recover the ore, metal, or mineral. <A] The tax is determined in the same manner as the tax imposed by section 290.02 , except that sections 290.05, subdivision 1 , clause (a), 290.17 , subdivision 4 , and 290.191 , subdivision 2, do not apply, and the occupation tax must be computed by applying to taxable income the rate of 2.45 percent. A person subject to occupation tax under this section shall apportion its net income on the basis of the percentage obtained by taking the sum of:

(1) 75 percent of the percentage which the sales made within this state in connection with the trade or business during the tax period are of the total sales wherever made in connection with the trade or business during the tax period;

(2) 12.5 percent of the percentage which the total tangible property used by the taxpayer in this state in connection with the trade or business during the tax period is of the total tangible property, wherever located, used by the taxpayer in connection with the trade or business during the tax period; and

(3) 12.5 percent of the percentage which the taxpayer's total payrolls paid or incurred in this state or paid in respect to labor performed in this state in connection with the trade or business during the tax period are of the taxpayer's total payrolls paid or incurred in connection with the trade or business during the tax period. The tax is in addition to all other taxes.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 16. AMEND Minnesota Statutes 2012, section 298.018 , is amended to read: 298.018 DISTRIBUTION OF PROCEEDS. Subdivision 1. Within taconite assistance area.

```
The proceeds of the tax paid under sections 298.015 and 298.016 on
    [A>ores,metals, or <A] minerals
    [D>and energy resources <D] mined or extracted
```

within the taconite assistance area defined in section 273.1341 , shall be allocated as follows:

(1) five percent to the city or town within which the minerals or energy resources are mined or extracted;

(2) ten percent to the taconite municipal aid account to be distributed as provided in section 298.282 ;

(3) ten percent to the school district within which the minerals or energy resources are mined or extracted;

(4) 20 percent to a group of school districts comprised of those school districts wherein the mineral or energy resource was mined or extracted or in which there is a qualifying municipality as defined by section 273.134 , paragraph (b), in direct proportion to school district indexes as follows: for each school district, its pupil units determined under section 126C.05 for the prior school year shall be multiplied by the ratio of the average adjusted net tax capacity per pupil unit for school districts receiving aid under this clause as calculated pursuant to chapters 122A, 126C, and 127A for the school year ending prior to distribution to the adjusted net tax capacity per pupil unit of the district. Each district shall receive that portion of the distribution which its index bears to the sum of the indices for all school districts that receive the distributions;

(5) 20 percent to the county within which the minerals or energy resources are mined or extracted;

(6) 20 percent to St. Louis County acting as the counties' fiscal agent to be distributed as provided in sections 273.134 to 273.136 ;

(7) five percent to the Iron Range Resources and Rehabilitation Board for the purposes of section 298.22 ;

(8) five percent to the Douglas J. Johnson economic protection trust fund; and

(9) five percent to the taconite environmental protection fund. The proceeds of the tax shall be distributed on July 15 each year.

Subd. 2. Outside taconite assistance area.

```
The proceeds of the tax paid under sections 298.015 and 298.016 on
     [A>ores,metals, or <A] minerals
     [D>and energy resources <D] mined or extracted
```

outside of the taconite assistance area defined in section 273.1341 , shall be deposited in the general fund.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 17. AMEND Minnesota Statutes 2012, section 373.01, subdivision 1 , is amended to read: Subdivision 1. Public corporation; listed powers. (a) Each county is a body politic and corporate and may:

(1) Sue and be sued.

(2) Acquire and hold real and personal property for the use of the county, and lands sold for taxes as provided by law.

(3) Purchase and hold for the benefit of the county real estate sold by virtue of judicial proceedings, to which the county is a party.

(4) Sell, lease, and convey real or personal estate owned by the county, and give contracts or options to sell, lease, or convey it, and make orders respecting it as deemed conducive to the interests of the county's inhabitants.

(5) Make all contracts and do all other acts in relation to the property and concerns of the county necessary to the exercise of its corporate powers.

(b) No sale, lease, or conveyance of real estate owned by the county, except the lease of a residence acquired for the furtherance of an approved capital improvement project, nor any contract or option for it, shall be valid, without first advertising for bids or proposals in the official newspaper of the county for three consecutive weeks and once in a newspaper of general circulation in the area where the property is located. The notice shall state the time and place of considering the proposals, contain a legal description of any real estate, and a brief description of any personal property. Leases that do not exceed $15,000 for any one year may be negotiated and are not subject to the competitive bid procedures of this section. All proposals estimated to exceed $15,000 in any one year shall be considered at the time set for the bid

opening, and the one most favorable to the county accepted, but the county board may, in the interest of the county, reject any or all proposals.

(c) Sales of personal property the value of which is estimated to be $15,000 or more shall be made only after advertising for bids or proposals in the county's official newspaper, on the county's Web site, or in a recognized industry trade journal. At the same time it posts on its Web site or publishes in a trade journal, the county must publish in the official newspaper, either as part of the minutes of a regular meeting of the county board or in a separate notice, a summary of all requests for bids or proposals that the county advertises on its Web site or in a trade journal. After publication in the official newspaper, on the Web site, or in a trade journal, bids or proposals may be solicited and accepted by the electronic selling process authorized in section 471.345, subdivision 17 . Sales of personal property the value of which is estimated to be less than $15,000 may be made either on competitive bids or in the open market, in the discretion of the county board. " Web site" means a specific, addressable location provided on a server connected to the Internet and hosting World Wide Web pages and other files that are generally accessible on the Internet all or most of a day.

(d) Notwithstanding anything to the contrary herein, the county may, when acquiring real property for county highway right-of-way, exchange parcels of real property of substantially similar or equal value without advertising for bids. The estimated values for these parcels shall be determined by the county assessor.

(e) Notwithstanding anything in this section to the contrary, the county may, when acquiring real property for purposes other than county highway right-of-way, exchange parcels of real property of substantially similar or equal value without advertising for bids. The estimated values for these parcels must be determined by the county assessor or a private appraisal performed by a licensed Minnesota real estate appraiser. [A>For the purpose of determining for the county the estimated values of parcels proposed to be exchanged, the county assessor need not be licensed under chapter 82B. <A] Before giving final approval to any exchange of land, the county board shall hold a public hearing on the exchange. At least two weeks before the hearing, the county auditor shall post a notice in the auditor's office and the official newspaper of the county of the hearing that contains a description of the lands affected.

(f) If real estate or personal property remains unsold after advertising for and consideration of bids or proposals the county may employ a broker to sell the property. The broker may sell the property for not less than 90 percent of its appraised market value as determined by the county. The broker's fee shall be set by agreement with the county but may not exceed ten percent of the sale price and must be paid from the proceeds of the sale.

(g) A county or its agent may rent a county-owned residence acquired for the furtherance of an approved capital improvement project subject to the conditions set by the county board and not subject to the conditions for lease otherwise provided by paragraph (a), clause (4), and paragraphs (b), (c), (d), (f), and (h).

(h) In no case shall lands be disposed of without there being reserved to the county all iron ore and other valuable minerals in and upon the lands, with right to explore for, mine and remove the iron ore and other valuable minerals, nor shall the minerals and mineral rights be disposed of, either before or after disposition of the surface rights, otherwise than by mining lease, in similar general form to that provided by section 93.20 for mining leases affecting state lands. The lease shall be for a term not exceeding 50 years, and be issued on a royalty basis, the royalty to be not less than 25 cents per ton of 2,240 pounds, and fix a minimum amount of royalty payable during each year, whether mineral is removed or not. Prospecting options for mining leases may be granted for periods not exceeding one year. The options shall require, among other things, periodical showings to the county board of the results of exploration work done.

(i) Notwithstanding anything in this subdivision to the contrary, the county may, when selling real property owned in fee simple that cannot be improved because of noncompliance with local ordinances regarding minimum area, shape, frontage, or access, proceed to sell the nonconforming parcel without advertising for bid. At the county's discretion, the real property may be restricted to sale to adjoining landowners or may be sold to any other interested party. The property shall be sold to the highest bidder, but in no case shall the property be sold for less than 90 percent of its fair market value as determined by the county assessor. All owners of land adjoining the land to be sold shall be given a written notice at least 30 days before the sale. This paragraph shall be liberally construed to encourage the sale of nonconforming real property and promote its return to the tax roles.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 18.

[A> REPEALER.    AMEND Minnesota Statutes 2012, sections 272.69 ;

andAMEND 273.11 , subdivisions 1a and 22, are repealed.<A] [A>EFFECTIVE DATE. This section is effective the day following final enactment. <A] ARTICLE 18 DEPARTMENT POLICY AND TECHNICAL: MISCELLANEOUS PROVISIONS

Section 1. AMEND Minnesota Statutes 2012, section 16A.46 , is amended to read: 16A.46 LOST OR DESTROYED WARRANT DUPLICATE; INDEMNITY.[A>Subdivision 1. Duplicate warrant.

<A] The commissioner may issue a duplicate of an unpaid warrant to an owner if the owner certifies that the original was lost or destroyed. The commissioner may require certification be documented by affidavit. [A>The commissioner may refuse to issue a duplicate of an unpaid state warrant.

If the commissioner acts in good faith, the commissioner is not liable, whether the application is granted or denied. <A]

[A>Subd. 2. Original warrant is void.

<A] When the duplicate is issued, the original is void. The commissioner may require an indemnity bond from the applicant to the state for double the amount of the warrant for anyone damaged by the issuance of the duplicate.

```
The commissioner
    [D>may refuse to issue a duplicate of an unpaid state
```

warrant. If the commissioner acts in good faith the commissioner is not liable, whether the application is granted or denied <D] [A>is not liable to any holder who took the void original warrant for value, whether or not the commissioner required an indemnity bond from the applicant <A].

[A>Subd. 3. Unpaid refund or rebate.

<A] For an unpaid refund or rebate issued under a tax law administered by the commissioner of revenue that has been lost or destroyed, an affidavit is not required for the commissioner to issue a duplicate if the duplicate is issued to the same name and Social Security number as the original warrant and that information is verified on a tax return filed by the recipient.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 2. AMEND Minnesota Statutes 2012, section 270C.38, subdivision 1 , is amended to read: Subdivision 1. Sufficient notice.

[A>(a) <A] If no method of notification of a written determination or action of the commissioner is otherwise specifically provided for by law, notice of the determination or action sent postage prepaid by United States mail to the taxpayer or other person affected by the determination or action at the taxpayer's or person's last known address, is sufficient. If the taxpayer or person being notified is deceased or is under a legal disability, or, in the case of a corporation being notified that has terminated its existence, notice to the last known address of the taxpayer, person, or corporation is sufficient, unless the department has been provided with a new address by a party authorized to receive notices from the commissioner.

[A>(b) If a taxpayer or other person agrees to accept notification by electronic means, notice of a determination or action of the commissioner sent by electronic mail to the taxpayer's or person's last known electronic mailing address as provided for in section 325L.08 is sufficient. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 3. AMEND Minnesota Statutes 2012, section 270C.42, subdivision 2 , is amended to read: Subd. 2. Penalty for failure to pay electronically. In addition to other applicable penalties imposed by law, after notification from the commissioner to the taxpayer that payments for a tax payable to the commissioner are required to be made by electronic means, and the payments are remitted by some other means, there is a penalty in the amount of five percent of each payment that should have been remitted electronically.

After the commissioner's initial notification to the taxpayer that payments are required to be made by electronic means, the commissioner is not required to notify the taxpayer in subsequent periods if the initial notification specified the amount of tax liability at which a taxpayer is required to remit payments by electronic means. The penalty can be abated under the abatement procedures prescribed in section 270C.34 if the failure to remit the payment electronically is due to reasonable cause.

The penalty bears interest at the rate specified in section 270C.40 from the
    [D>due <D] date
     [D>of the payment of the tax <D]

[A>provided in section

270C.40, subdivision 3, <A] to the date of payment of the penalty.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 4. AMEND Minnesota Statutes 2012, section 287.385, subdivision 7 , is amended to read: Subd. 7. Interest on penalties.

A penalty imposed under this chapter bears interest from the date
    [D>payment

was required to be paid, including any extensions, <D] [A>provided in section 270C.40, subdivision 3 , <A] to the date of payment of the penalty.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 5. AMEND Minnesota Statutes 2012, section 289A.55, subdivision 9 , is amended to read: Subd. 9. Interest on penalties. (a) A penalty imposed under section 289A.60, subdivision 1 , 2, 2a, 4, 5, 6, or

21 bears interest from the date
    [D>the return or payment was required to be

filed or paid, including any extensions <D] [A>provided in section 270C.40, subdivision 3 <A], to the date of payment of the penalty.

(b) A penalty not included in paragraph (a) bears interest only if it is not paid within 60 days from the date of notice. In that case interest is imposed from the date of notice to the date of payment.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 6. AMEND Minnesota Statutes 2012, section 289A.60, subdivision 4 , is amended to read: Subd. 4. Substantial understatement of liability; penalty. (a) The commissioner of revenue shall impose a penalty for substantial understatement of any tax payable to the commissioner, except a tax imposed under

chapter 297A.

(b) There must be added to the tax an amount equal to 20 percent of the amount of any underpayment attributable to the understatement. There is a substantial understatement of tax for the period if the amount of the understatement for the period exceeds the greater of:

(1) ten percent of the tax required to be shown on the return for the period; or

(2)(i) $10,000 in the case of a mining company or a corporation, other than an S corporation as defined in section 290.9725 , when the tax is imposed by chapter 290 or section 298.01 or 298.015 , or

(ii) $5,000 in the case of any other taxpayer, and in the case of a mining company or a corporation any tax not imposed by chapter 290 or section 298.01 or 298.015 .

(c) For a corporation, other than an S corporation, there is also a substantial understatement of tax for any taxable year if the amount of the understatement for the taxable year exceeds the lesser of:

(1) ten percent of the tax required to be shown on the return for the taxable year (or, if greater, $10,000); or

(2) $10,000,000.

(d) The term "understatement" means the excess of the amount of the tax required to be shown on the return for the period, over the amount of the tax imposed that is shown on the return. The excess must be determined without regard to items to which subdivision 27 applies. The amount of the understatement shall be reduced by that part of the understatement that is attributable to the tax treatment of any item by the taxpayer if

(1) there is or was substantial authority for the treatment, or (2)(i) any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in a statement attached to the return and (ii) there is a reasonable basis for the tax treatment of the item. The exception for substantial authority under clause (1) does not apply to positions listed by the Secretary of the Treasury under section 6662(d)(3) of the Internal Revenue Code. A corporation does not have a reasonable basis for its tax treatment of an item attributable to a multiple-party financing transaction if the treatment does not clearly reflect the income of the corporation within the meaning of section 6662(d)(2)(B) of the Internal Revenue Code. The special rules in cases involving tax shelters provided in section 6662(d)(2)(C) of the Internal Revenue Code shall apply and shall apply to a tax shelter the principal purpose of which is the avoidance or evasion of state taxes.

(e) The commissioner may abate all or any part of the addition to the tax provided by this section on a showing by the taxpayer that there was reasonable cause for the understatement, or part of it, and that the taxpayer acted in good faith.

The additional tax and penalty shall bear interest

[D>at the rate <D]

[A>as<A] specified in section 270C.40
[D>from the time the tax should have been

paid <D] until paid.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 7. AMEND Minnesota Statutes 2012, section 296A.01, subdivision 7 , is amended to read: Subd. 7. Aviation gasoline. " Aviation gasoline" means any gasoline that is capable of use for the purpose of producing or generating power for propelling internal combustion engine

aircraft, that meets the specifications in ASTM specification
[D>D910-07a

<D] [A>D910-11 <A], and that either:

(1) is invoiced and billed by a producer, manufacturer, refiner, or blender to a distributor or dealer, by a distributor to a dealer or consumer, or by a dealer to consumer, as "aviation gasoline"; or

(2) whether or not invoiced and billed as provided in clause (1), is received, sold, stored, or withdrawn from storage by any person, to be used for the purpose of producing or generating power for propelling internal combustion engine aircraft.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 8. AMEND Minnesota Statutes 2012, section 296A.01, subdivision 8 , is amended to read: Subd. 8. Aviation turbine fuel and jet fuel. " Aviation turbine fuel" and "jet fuel" mean blends of hydrocarbons derived from crude petroleum, natural gasoline, and synthetic hydrocarbons, intended for use in aviation turbine engines, and that meet the specifications in ASTM

specification
[D>D1655-08a <D]

[A>D1655-12 <A].


[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 9. AMEND Minnesota Statutes 2012, section 296A.01 , is amended by adding a subdivision to read: [A>Subd. 8b. Biobutanol. "Biobutanol" means isobutyl alcohol produced by fermenting agriculturally generated organic material that is to be blended with gasoline and meets either: <A]

[A>(1) the initial ASTM Standard Specification for Butanol for Blending with Gasoline for use as an

Automotive Spark-Ignition Engine Fuel once it has been released by ASTM for general distribution; or <A]

[A>(2) in the absence of an ASTM Standard Specification, the following list of requirements: <A]

[A>(i) visually free of sediment and suspended matter; <A]

[A>(ii) clear and bright at the ambient temperature of 21 degrees Celsius or the ambient temperature whichever is higher; <A]

[A>(iii) free of any adulterant or contaminant that can render it unacceptable for its commonly used applications; <A]

[A>(iv) contains not less than 96 volume percent isobutyl alcohol; <A]

[A>(v) contains not more than 0.4 volume percent methanol; <A]

[A>(vi) contains not more than 1.0 volume percent water as determined by ASTM standard test method E203 or E1064; <A]

[A>(vii) acidity (as acetic acid) of not more than 0.007 mass percent as determined by ASTM standard test method D1613; <A]

[A>(viii) solvent washed gum content of not more than 5.0 milligrams per 100 milliliters as determined by ASTM standard test method D381; <A]

[A>(ix) sulfur content of not more than 30 parts per million as determined by ASTM standard test method D2622 or D5453; and <A]

[A>(x) contains not more than 4 parts per million total inorganic sulfate. <A]

Sec. 10. AMEND Minnesota Statutes 2012, section 296A.01, subdivision 14 , is amended to read: Subd. 14. Diesel fuel oil. " Diesel fuel oil" means a petroleum distillate or blend of petroleum distillate and residual fuels that is intended for use as a motor fuel in internal

```
combustion diesel engines and that meets ASTM specification
    [D>D975-07b
```

<D] [A>D975-11b <A].

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 11. AMEND Minnesota Statutes 2012, section 296A.01, subdivision 19 , is amended to read: Subd. 19. E85. "E85" means a petroleum product that is a blend of agriculturally derived

```
denatured ethanol and gasoline or natural gasoline that
    [D>typically <D]contains
```

`[A>not more than <A]` 85 percent ethanol by volume, but at a minimum must contain

`[D>60 <D]`

`[A>greater than 50 <A]` percent ethanol by volume.

For the purposes of this chapter, the energy content of E85 will be considered to be 82,000 BTUs per gallon. E85 produced for use as a motor fuel in alternative fuel vehicles as defined in

subdivision 5 must comply with ASTM specification

`[D>D5798-07 <D]`

`[A>D5798-11`

`<A]`.

`[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]`

Sec. 12. AMEND Minnesota Statutes 2012, section 296A.01, subdivision 20 , is amended to read: Subd. 20. Ethanol, denatured. " Ethanol, denatured" means ethanol that is to be blended with gasoline, has been

agriculturally derived, and complies with ASTM specification

`[D>D4806-08`

`<D]` `[A>D4806-11a <A]`. This includes the requirement that ethanol may be denatured only as specified in Code of Federal Regulations, title 27, parts 20 and 21.

`[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]`

Sec. 13. AMEND Minnesota Statutes 2012, section 296A.01, subdivision 23 , is amended to read: Subd. 23. Gasoline. (a) "Gasoline" means:

(1) all products commonly or commercially known or sold as gasoline regardless of their classification or uses, except casinghead gasoline, absorption gasoline, condensation gasoline, drip gasoline, or natural gasoline that under the requirements of section 239.761, subdivision 3 , must not be blended with gasoline that has been sold, transferred, or otherwise removed from a refinery or terminal; and

(2) any liquid prepared, advertised, offered for sale or sold for use as, or commonly and commercially used as, a fuel in spark-ignition, internal combustion engines, and that when tested by the Weights and Measures Division

meets the specifications in ASTM specification

[D>D4814-08b <D]

[A>D4814-11b

<A].

(b) Gasoline that is not blended with ethanol must not be contaminated with

water or other impurities and must comply with both ASTM specification

[D>D4814-08b <D] [A>D4814-11b <A] and the volatility requirements in Code of Federal Regulations, title 40, part 80.

(c) After gasoline is sold, transferred, or otherwise removed from a refinery or terminal, a person responsible for the product:

(1) may blend the gasoline with agriculturally derived ethanol, as provided in subdivision 24;

(2) must not blend the gasoline with any oxygenate other than denatured, agriculturally derived ethanol;

(3) must not blend the gasoline with other petroleum products that are not gasoline or denatured, agriculturally derived ethanol;

(4) must not blend the gasoline with products commonly and commercially known as casinghead gasoline, absorption gasoline, condensation gasoline, drip gasoline, or natural gasoline; and

(5) may blend the gasoline with a detergent additive, an antiknock additive, or an additive designed to replace tetra-ethyl lead, that is registered by the EPA.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 14. AMEND Minnesota Statutes 2012, section 296A.01, subdivision 24 , is amended to read: Subd. 24. Gasoline blended with nonethanol oxygenate. " Gasoline blended with nonethanol oxygenate" means gasoline blended with ETBE, MTBE, or other alcohol or ether, except denatured ethanol, that is approved as

an oxygenate by the EPA, and that complies with ASTM specification

[D>D4814-08b <D] [A>D4814-11b <A]. Oxygenates, other than denatured ethanol, must not be blended into gasoline after the gasoline has been sold, transferred, or otherwise removed from a refinery or terminal.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 15. AMEND Minnesota Statutes 2012, section 296A.01, subdivision 26 , is amended to read: Subd. 26. Heating fuel oil. " Heating fuel oil" means a petroleum distillate, blend of petroleum distillates and residuals, or petroleum residual heating fuel that meets the specifications

```
in ASTM specification
    [D>D396-08b <D]
```

[A>D396-12 <A].


[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 16. AMEND Minnesota Statutes 2012, section 296A.22, subdivision 1 , is amended to read: Subdivision 1. Penalty for failure to pay tax, general rule. Upon the failure of any person to pay any tax or fee when due, a penalty of one percent per day for the first ten days of delinquency shall accrue, and thereafter the tax, fees, and penalty shall bear interest at the rate specified

```
in section 270C.40
    [A>until paid <A].
```


[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 17. AMEND Minnesota Statutes 2012, section 296A.22, subdivision 3 , is amended to read: Subd. 3. Operating without license. If any person operates as a distributor, special fuel dealer, bulk purchaser, or motor carrier without first securing the license required under this chapter, any tax or fee imposed by this chapter shall become immediately due and payable. A penalty of 25 percent is imposed upon the tax and fee due.

```
The tax
    [D>, <D]
```

[A>and <A] fees
```
    [D>, and penalty <D] shall bear interest
```

at the rate specified in section 270C.40 . [A>The penalty imposed in this subdivision shall bear interest from the date provided in section 270C.40, subdivision 3 , to the date of payment of the penalty. <A]

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 18. AMEND Minnesota Statutes 2012, section 297B.11 , is amended to read: 297B.11 REGISTRAR AS AGENT OF COMMISSIONER OF REVENUE; POWERS. The state commissioner of revenue is charged with the administration of the sales tax on motor vehicles. The commissioner may prescribe all

rules not inconsistent with the provisions of this chapter, necessary and advisable for the proper and efficient administration of the law. The collection of this sales tax on motor vehicles shall be carried out by the motor vehicle registrar who shall act as the agent of the commissioner and who shall be subject to all rules not inconsistent with the provisions of this chapter, that may be prescribed by the commissioner. The provisions of chapters 270C, 289A, and 297A relating to the commissioner's authority to audit, assess, and collect the tax, and to issue refunds and to hear appeals, are applicable to the sales tax on motor vehicles. The commissioner may impose civil penalties as provided in chapters 289A and 297A, and the additional tax and penalties are subject to interest at the rate

```
provided in section 270C.40
    [A>from the date provided in section 270C.40,
```

subdivision 3, until paid <A]. [A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 19. AMEND Minnesota Statutes 2012, section 297E.14, subdivision 7 , is amended to read: Subd. 7. Interest on penalties. (a) A penalty imposed under section 297E.12, subdivision 1 , 2, 3, 4, or 5,

```
bears interest from the date
    [D>the return or payment was required to be
```

filed or paid, including any extensions <D] [A>provided in section 270C.40, subdivision 3 <A], to the date of payment of the penalty.

(b) A penalty not included in paragraph (a) bears interest only if it is not paid within ten days from the date of notice. In that case interest is imposed from the date of notice to the date of payment.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 20. AMEND Minnesota Statutes 2012, section 297F.09, subdivision 9 , is amended to read: Subd. 9. Interest.

```
The amount of tax not timely paid
    [D>, together with any penalty imposed in
```

this section, <D] bears interest at the rate specified in section 270C.40 from the time such tax should have been paid until paid. [A>The penalty imposed in this section bears interest at the rate specified in section 270C.40 from the date provided in section 270C.40, subdivision 3 , to the date of payment of the penalty. <A] Any interest and penalty is added to the tax and collected as a part of it.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 21. AMEND Minnesota Statutes 2012, section 297F.18, subdivision 7 , is amended to read: Subd. 7. Interest on penalties. (a) A penalty imposed under section 297F.19 , subdivisions 2 to 7, bears

```
interest from the date
     [D>the return or payment was required to be filed or
```

paid, including any extensions <D] [A>provided in section 270C.40, subdivision 3 <A], to the date of payment of the penalty.

(b) A penalty not included in paragraph (a) bears interest only if it is not paid within ten days from the date of the notice. In that case interest is imposed from the date of notice to the date of payment.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 22. AMEND Minnesota Statutes 2012, section 297G.09, subdivision 8 , is amended to read: Subd. 8. Interest.

```
The amount of tax not timely paid
     [D>, together with any penalty imposed by
```

this chapter, <D] bears interest at the rate specified in section 270C.40 from the time the tax should have been paid until paid. [A>Any penalty imposed by this chapter bears interest from the date provided in section 270C.40, subdivision 3 , to the date of payment of the penalty. <A] Any interest and penalty is added to the tax and collected as a part of it.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 23. AMEND Minnesota Statutes 2012, section 297G.17, subdivision 7 , is amended to read: Subd. 7. Interest on penalties. (a) A penalty imposed under section 297G.18 , subdivisions 2 to 7, bears

```
interest from the date
     [D>the return or payment was required to be filed or
```

paid, including any extensions <D] [A>provided in section 270C.40, subdivision 3 <A], to the date of payment of the penalty.

(b) A penalty not included in paragraph (a) bears interest only if it is not paid within ten days from the date of the notice. In that case interest is imposed from the date of notice to the date of payment.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 24. AMEND Minnesota Statutes 2012, section 297I.80, subdivision 1 , is amended to read: Subdivision 1. Payable to commissioner. (a) When interest is required under this section, interest is computed at the rate specified in section 270C.40 .

(b) If a tax or surcharge is not paid within the time named by law for payment, the unpaid tax or surcharge bears interest from the date the tax or surcharge should have been paid until the date the tax or

surcharge is paid.

(c) Whenever a taxpayer is liable for additional tax or surcharge because of a redetermination by the commissioner or other reason, the additional tax or surcharge bears interest from the time the tax or surcharge should have been paid until the date the tax or surcharge is paid.

```
(d) A penalty bears interest from the date
    [D>the return or payment was
```

required to be filed or paid <D] [A>provided in section 270C.40, subdivision 3 , <A] to the date of payment of the penalty.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 25. AMEND Minnesota Statutes 2012, section 469.319, subdivision 4 , is amended to read: Subd. 4. Repayment procedures. (a) For the repayment of taxes imposed under chapter 290 or 297A or local taxes collected pursuant to section 297A.99 , a business must file an amended return with the commissioner of revenue and pay any taxes required to be repaid within 30 days after becoming subject to repayment under this section. The amount required to be repaid is determined by calculating the tax for the period or periods for which repayment is required without regard to the exemptions and credits allowed under section 469.315 .

(b) For the repayment of taxes imposed under chapter 297B, a business must pay any taxes required to be repaid to the motor vehicle registrar, as agent for the commissioner of revenue, within 30 days after becoming subject to repayment under this section.

(c) For the repayment of property taxes, the county auditor shall prepare a tax statement for the business, applying the applicable tax extension rates for each payable year and provide a copy to the business and to the taxpayer of record. The business must pay the taxes to the county treasurer within 30 days after receipt of the tax statement. The business or the taxpayer of record may appeal the valuation and determination of the property tax to the Tax Court within 30 days after receipt of the tax statement.

(d) The provisions of chapters 270C and 289A relating to the commissioner's authority to audit, assess, and collect the tax and to hear appeals are applicable to the repayment required under paragraphs (a) and (b).

The commissioner may impose civil penalties as provided in chapter 289A, and the additional tax and penalties are subject to interest at the rate provided

```
in section 270C.40
    [D>, <D]
```

[A>. The additional tax shall bear interest <A]

from 30 days after becoming subject to repayment under this section until the date the tax is paid. [A>Any penalty imposed pursuant to this section shall bear interest from the date provided in section 270C.40, subdivision 3 , to the date of payment of the penalty. <A]

(e) If a property tax is not repaid under paragraph (c), the county treasurer shall add the amount required to be repaid to the property taxes assessed against the property for payment in the year following the year in which the auditor provided the statement under paragraph (c).

(f) For determining the tax required to be repaid, a reduction of a state or local sales or use tax is deemed to have been received on the date that the good or service was purchased or first put to a taxable use. In the case of an income tax or franchise tax, including the credit payable under section 469.318 , a reduction of tax is deemed to have been received for the two most recent tax years that have ended prior to the date that the business became subject to repayment under this section. In the case of a property tax, a reduction of tax is deemed to have been received for the taxes payable in the year that the business became subject to repayment under this section and for the taxes payable in the prior year.

(g) The commissioner may assess the repayment of taxes under paragraph (d) any time within two years after the business becomes subject to repayment under subdivision 1, or within any period of limitations for the assessment of tax under section 289A.38 , whichever period is later. The county auditor may send the statement under paragraph

(c) any time within three years after the business becomes subject to repayment under subdivision 1.

(h) A business is not entitled to any income tax or franchise tax benefits, including refundable credits, for any part of the year in which the business becomes subject to repayment under this section nor for any year thereafter. Property is not exempt from tax under section 272.02, subdivision 64 , for any taxes payable in the year following the year in which the property became subject to repayment under this section nor for any year thereafter. A business is not eligible for any sales tax benefits beginning with goods or services purchased or first put to a taxable use on the day that the business becomes subject to repayment under this section.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

Sec. 26. AMEND Minnesota Statutes 2012, section 469.340, subdivision 4 , is amended to read: Subd. 4. Repayment procedures. (a) For the repayment of taxes imposed under chapter 290 or 297A or local taxes collected pursuant to section 297A.99 , a business must file an amended return with the commissioner of revenue and pay any taxes required to be repaid within 30 days after ceasing to do business in the zone. The amount required to be repaid is determined by calculating the tax for the period or periods for which repayment is required without regard to the exemptions and credits allowed under section 469.336 .

(b) For the repayment of property taxes, the county auditor shall prepare a tax statement for the business, applying the applicable tax extension rates for each payable year and provide a copy to the business. The business must pay the taxes to the county treasurer within 30 days after receipt of the tax statement. The

taxpayer may appeal the valuation and determination of the property tax to the Tax Court within 30 days after receipt of the tax statement.

(c) The provisions of chapters 270C and 289A relating to the commissioner's authority to audit, assess, and collect the tax and to hear appeals are applicable to the repayment required under paragraph (a).

The commissioner may impose civil penalties as provided in chapter 289A, and the additional tax and penalties are subject to interest at the rate provided

```
in section 270C.40
    [D>, <D]
```

[A>. The additional tax shall bear interest <A]

from 30 days after ceasing to do business in the biotechnology and health sciences industry zone until the date the tax is paid. [A>Any penalty imposed pursuant to this section shall bear interest from the date provided in section 270C.40, subdivision 3 , to the date of payment of the penalty. <A]

(d) If a property tax is not repaid under paragraph (b), the county treasurer shall add the amount required to be repaid to the property taxes assessed against the property for payment in the year following the year in which the treasurer discovers that the business ceased to operate in the biotechnology and health sciences industry zone.

(e) For determining the tax required to be repaid, a tax reduction is deemed to have been received on the date that the tax would have been due if the taxpayer had not been entitled to the exemption, or on the date a refund was issued for a refundable credit.

(f) The commissioner may assess the repayment of taxes under paragraph (c) any time within two years after the business ceases to operate in the biotechnology and health sciences industry zone, or within any period of limitations for the assessment of tax under section 289A.38 , whichever period is later.

[A>EFFECTIVE DATE. This section is effective the day following final enactment. <A]

© 2015 Thomson Reuters/Tax & Accounting. All Rights Reserved.

Checkpoint Contents

State & Local Tax Library

State Legislation

Prior Legislative Sessions

2014

Full Text of Prior Enacted Legislation

Michigan

Senate

2014 MI S 337 - 2013 MI S 577

**2013 MI S 156, Adopted**

*2013 Michigan Senate Bill No. 156, Michigan Ninety-Seventh Legislature - Regular Session of 2014*

TITLE: Michigan business tax; administration; gross receipts, certain credit and apportionment provisions; modify to clarify original intent.

*Author:* Mark C Jansen
*Version:* Adopted
*Version date:* 20140911

Changes are annotated clearly to make it easy to review modifications. See the color scheme listed below.

A. **[D] Text Deleted [D]**

B. **[A] Text Added [A]**

C. **[V] Text Vetoed [V]**

## Full Text

TEXT: STATE OF MICHIGAN

97TH LEGISLATURE

REGULAR SESSION OF 2014

Introduced by Senators Jansen and Hildenbrand

ENROLLED SENATE BILL No. 156

AN ACT to amend 2007 PA 36, entitled "An act to meet deficiencies in state funds by providing for the imposition, levy, computation, collection, assessment, reporting, payment, and enforcement of taxes on certain commercial, business, and financial activities; to prescribe the powers and duties of public officers and state departments; to provide for the inspection of certain taxpayer records; to provide for interest and penalties; to provide exemptions, credits, and refunds; to provide for the disposition of funds; to provide for the interrelation of this act with other acts; and to make appropriations," by amending sections 111, 305, 403, and 433 ( AMEND MCL 208.1111 ,AMEND208.1305 ,AMEND208.1403 , andAMEND208.1433 ), sections 111 and 305 as amended by 2012 PA 605, section 403 as amended by 2008 PA 434, and section 433 as amended by 2007 PA 215, and by adding section 508; and to repeal acts and parts of acts. The People of the State of Michigan enact:

Sec. 111. (1) "Gross receipts" means the entire amount received by the taxpayer as determined by using the taxpayer's method of accounting used for federal income tax purposes, less any amount deducted as bad debt for federal income tax purposes that corresponds to items of gross receipts included in the modified gross receipts tax base for the current tax year or a past tax year phased in over a 5-year period starting with 50% of that amount in the 2008 tax year, 60% in the 2009 tax year, 60% in the 2010 tax year, 75% in the 2011 tax year, and 100% in the 2012 tax year and each tax year thereafter, from any activity whether in intrastate, interstate, or foreign commerce carried on for direct or indirect gain, benefit, or advantage to the taxpayer or to others except for the following:

(a) Proceeds from sales by a principal that the taxpayer collects in an agency capacity solely on behalf of the principal and delivers to the principal.

(b) Amounts received by the taxpayer as an agent solely on behalf of the principal that are expended by the taxpayer for any of the following:

( i ) The performance of a service by a third party for the benefit of the principal that is required by law to be performed by a licensed person.

( ii ) The performance of a service by a third party for the benefit of the principal that the taxpayer has not undertaken a contractual duty to perform.

( iii ) Principal and interest under a mortgage loan or land contract, lease or rental payments, or taxes, utilities, or insurance premiums relating to real or personal property owned or leased by the principal.

( iv ) A capital asset of a type that is, or under the internal revenue code will become, eligible for depreciation, amortization, or accelerated cost recovery by the principal for federal income tax purposes, or for real property owned or leased by the principal.

( v ) Property not described under subparagraph ( iv ) that is purchased by the taxpayer on behalf of the principal and that the taxpayer does not take title to or use in the course of performing its contractual business activities.

( vi ) Fees, taxes, assessments, levies, fines, penalties, or other payments established by law that are paid to a governmental entity and that are the legal obligation of the principal.

(c) Amounts that are excluded from gross income of a foreign corporation engaged in the international operation of aircraft under section 883(a) of the internal revenue code.

(d) Amounts received by an advertising agency used to acquire advertising media time, space, production, or talent on behalf of another person.

(e) Amounts received by a newspaper to acquire advertising space not owned by that newspaper in another newspaper on behalf of another person. This subdivision does not apply to any consideration received by the taxpayer for acquiring that advertising space.

(f) Notwithstanding any other provision of this section, amounts received by a taxpayer that manages real property owned by a third party that are deposited into a separate account kept in the name of that third party and that are not reimbursements to the taxpayer and are not indirect payments for management services that the taxpayer provides to that third party.

(g) Proceeds from the taxpayer's transfer of an account receivable if the sale that generated the account receivable was included in gross receipts for federal income tax purposes. This subdivision does not apply to a taxpayer that during the tax year both buys and sells any receivables.

(h) Proceeds from any of the following:

( i ) The original issue of stock or equity instruments or equity issued by a regulated investment company as that term is defined under section 851 of the internal revenue code.

( ii ) The original issue of debt instruments.

(i) Refunds from returned merchandise.

(j) Cash and in-kind discounts.

(k) Trade discounts.

( l ) Federal, state, or local tax refunds.

(m) Security deposits.

(n) Payment of the principal portion of loans.

(o) Value of property received in a like-kind exchange.

(p) Proceeds from a sale, transaction, exchange, involuntary conversion, maturity, redemption, repurchase, recapitalization, or other disposition or reorganization of tangible, intangible, or real property, less any gain from the disposition or reorganization to the extent that the gain is included in the taxpayer's

federal taxable income, if the property satisfies 1 or more of the following:

( i ) The property is a capital asset as defined in section 1221(a) of the internal revenue code.

( ii ) The property is land that qualifies as property used in the trade or business as defined in section 1231(b) of the internal revenue code.

( iii ) The property is used in a hedging transaction entered into by the taxpayer in the normal course of the taxpayer's trade or business primarily to manage the risk of exposure to foreign currency fluctuations that affect assets, liabilities, profits, losses, equity, or investments in foreign operations; interest rate fluctuations; or commodity price fluctuations. For purposes of this subparagraph, the actual transfer of title of real or tangible personal property to another person is not a hedging transaction. Only the overall net gain from the hedging transactions entered into during the tax year is included in gross receipts. As used in this subparagraph, "hedging transaction" means that term as defined under section 1221 of the internal revenue code regardless of whether the transaction was identified by the taxpayer as a hedge for federal income tax purposes, provided, however, that transactions excluded under this subparagraph and not identified as a hedge for federal income tax purposes shall be identifiable to the department by the taxpayer as a hedge in its books and records.

( iv ) The property is investment and trading assets managed as part of the person's treasury function. For purposes of this subparagraph, a person principally engaged in the trade or business of purchasing and selling investment and trading assets is not performing a treasury function. Only the overall net gain from the treasury function incurred during the tax year is included in gross receipts. As used in this subparagraph, "treasury function" means the pooling and management of investment and trading assets for the purpose of satisfying the cash flow or liquidity needs of the taxpayer's trade or business.

(q) The proceeds from a policy of insurance, a settlement of a claim, or a judgment in a civil action less any proceeds under this subdivision that are included in federal taxable income.

(r) For a sales finance company, as defined in section 2 of the motor vehicle sales finance act, 1950 (Ex Sess) PA 27, MCL 492.102, and directly or indirectly owned in whole or in part by a motor vehicle manufacturer as of January 1, 2008, and for a person that is a broker or dealer as defined under section 78c(a)(4) or (5) of the securities exchange act of 1934, 15 USC 78c, or a person included in the unitary business group of that broker or dealer that buys and sells for its own account, contracts that are subject to the commodity exchange act, 7 USC 1 to 27f, amounts realized from the repayment, maturity, sale, or redemption of the principal of a loan, bond, or mutual fund, certificate of deposit, or similar marketable instrument provided such instruments are not held as inventory.

(s) For a sales finance company, as defined in section 2 of the motor vehicle sales finance act, 1950 (Ex Sess) PA 27, MCL 492.102, and directly or indirectly owned in whole or in part by a motor vehicle manufacturer as of January 1, 2008, and for a person that is a broker or dealer as defined under section 78c(a)(4) or (5) of the securities exchange act of 1934, 15 USC 78c, or a person included in the unitary business group of that broker or dealer that buys and sells for its own account, contracts that are subject

to the commodity exchange act, 7 USC 1 to 27f, the principal amount received under a repurchase agreement or other transaction properly characterized as a loan.

(t) For a mortgage company, proceeds representing the principal balance of loans transferred or sold in the tax year. For purposes of this subdivision, "mortgage company" means a person that is licensed under the mortgage brokers, lenders, and servicers licensing act, 1987 PA 173, MCL 445.1651 to 445.1684, or the secondary mortgage loan act, 1981 PA 125, MCL 493.51 to 493.81, and has greater than 90% of its revenues, in the ordinary course of business, from the origination, sale, or servicing of residential mortgage loans.

(u) For a professional employer organization, any amount charged by a professional employer organization that represents the actual cost of wages and salaries, benefits, worker's compensation, payroll taxes, withholding, or other assessments paid to or on behalf of a covered employee by the professional employer organization under a professional employer arrangement.

(v) Any invoiced items used to provide more favorable floor plan assistance to a person subject to the tax imposed under this act than to a person not subject to this tax and paid by a manufacturer, distributor, or supplier.

(w) For an individual, estate, or person organized for estate or gift planning purposes, amounts received other than those from transactions, activities, and sources in the regular course of the person's trade or business. For purposes of this subdivision, all of the following apply:

( i ) Amounts received from transactions, activities, and sources in the regular course of the person's business include, but are not limited to, the following:

(A) Receipts from tangible and intangible property if the acquisition, rental, lease, management, or disposition of the property constitutes integral parts of the person's regular trade or business operations.

(B) Receipts received in the course of the person's trade or business from stock and securities of any foreign or domestic corporation and dividend and interest income.

(C) Receipts derived from isolated sales, leases, assignments, licenses, divisions, or other infrequently occurring dispositions, transfers, or transactions involving tangible, intangible, or real property if the property is or was used in the person's trade or business operation.

(D) Receipts derived from the sale of an interest in a business that constitutes an integral part of the person's regular trade or business.

(E) Receipts derived from the lease or rental of real property.

( ii ) Receipts excluded from gross receipts include, but are not limited to, the following:

(A) Receipts derived from investment activity, including interest, dividends, royalties, and gains from an investment portfolio or retirement account, if the investment activity is not part of the person's trade or

business.

(B) Receipts derived from the disposition of tangible, intangible, or real property held for personal use and enjoyment, such as a personal residence or personal assets.

(x) Receipts derived from investment activity other than receipts from transactions, activities, and sources in the regular course of the person's trade or business by a person that is organized exclusively to conduct investment activity and that does not conduct investment activity for any person other than an individual or a person related to that individual or by a common trust fund established under the collective investment funds act, 1941 PA 174, MCL 555.101 to 555.113. For purposes of this subdivision, a person is related to an individual if that person is a spouse, brother or sister, whether of the whole or half blood or by adoption, ancestor, lineal descendent of that individual or related person, or a trust benefiting that individual or 1 or more persons related to that individual.

(y) Interest income and dividends derived from obligations or securities of the United States government, this state, or any governmental unit of this state. As used in this subdivision, "governmental unit" means that term as defined in section 3 of the shared credit rating act, 1985 PA 227, MCL 141.1053.

(z) Dividends and royalties received or deemed received from a foreign operating entity or a person other than a United States person, including, but not limited to, the amounts determined under section 78 of the internal revenue code and sections 951 to 964 of the internal revenue code, phased in over a 5-year period starting with 50% of that amount in the 2008 tax year, 60% in the 2009 tax year, 60% in the 2010 tax year, 75% in the 2011 tax year, and 100% in the 2012 tax year and each tax year thereafter.

(aa) To the extent not deducted as purchases from other firms under section 203, each of the following:

( i ) Sales or use taxes collected from or reimbursed by a consumer or other taxes the taxpayer collected directly from or was reimbursed by a purchaser and remitted to a local, state, or federal tax authority, phased in over a 5-year period starting with 50% of that amount in the 2008 tax year, 60% in the 2009 tax year, 60% in the 2010 tax year, 75% in the 2011 tax year, and 100% in the 2012 tax year and each tax year thereafter.

( ii ) In the case of receipts from the sale of cigarettes or tobacco products by a wholesale dealer, retail dealer, distributor, manufacturer, or seller, an amount equal to the federal and state excise taxes paid by any person on or for such cigarettes or tobacco products under subtitle E of the internal revenue code or other applicable state law, phased in over a 3-year period starting with 60% of that amount in the 2008 tax year, 75% in the 2009 tax year, and 100% in the 2010 tax year and each tax year thereafter.

( iii ) In the case of receipts from the sale of motor fuel by a person with a motor fuel tax license or a retail dealer, an amount equal to federal and state excise taxes paid by any person on such motor fuel under section 4081 of the internal revenue code or under other applicable state law, phased in over a 5-year period starting with 50% of that amount in the 2008 tax year, 60% in the 2009 tax year, 60% in the 2010 tax year, 75% in the 2011 tax year, and 100% in the 2012 tax year and each tax year thereafter.

( iv ) In the case of receipts from the sale of beer, wine, or intoxicating liquor by a person holding a license to sell, distribute, or produce those products, an amount equal to federal and state excise taxes paid by any person on or for such beer, wine, or intoxicating liquor under subtitle E of the internal revenue code or other applicable state law, phased in over a 5-year period starting with 50% of that amount in the 2008 tax year, 60% in the 2009 tax year, 60% in the 2010 tax year, 75% in the 2011 tax year, and 100% in the 2012 tax year and each tax year thereafter.

( v ) In the case of receipts from the sale of communication, video, internet access and related services and equipment, any government imposed tax, fee, or other imposition in the nature of a tax or fee required by law, ordinance, regulation, ruling, or other legal authority and authorized to be charged on a customer's bill or invoice, phased in over a 5-year period starting with 50% of that amount in the 2008 tax year, 60% in the 2009 tax year, 60% in the 2010 tax year, 75% in the 2011 tax year, and 100% in the 2012 tax year and each tax year thereafter. This subparagraph does not include the recovery of net income taxes, net worth taxes, property taxes, or the tax imposed under this act.

( vi ) In the case of receipts from the sale of electricity, natural gas, or other energy source, any government imposed tax, fee, or other imposition in the nature of a tax or fee required by law, ordinance, regulation, ruling, or other legal authority and authorized to be charged on a customer's bill or invoice, phased in over a 5-year period starting with 50% of that amount in the 2008 tax year, 60% in the 2009 tax year, 60% in the 2010 tax year, 75% in the 2011 tax year, and 100% in the 2012 tax year and each tax year thereafter. This subparagraph does not include the recovery of net income taxes, net worth taxes, property taxes, or the tax imposed under this act.

( vii ) Any deposit required under any of the following, phased in over a 5-year period starting with 50% of that amount in the 2008 tax year, 60% in the 2009 tax year, 60% in the 2010 tax year, 75% in the 2011 tax year, and 100% in the 2012 tax year and each tax year thereafter:

(A) 1976 IL 1, MCL 445.571 to 445.576.

(B) of the Michigan administrative code.

(C) a of the Michigan administrative code.

(D) Any substantially similar beverage container deposit law of another state.

( viii ) An excise tax collected pursuant to the airport parking tax act, 1987 PA 248, MCL 207.371 to 207.383, collected from or reimbursed by a consumer and remitted as provided in the airport parking tax act, 1987 PA 248, MCL 207.371 to 207.383, phased in over a 5-year period starting with 50% of that amount in the 2008 tax year, 60% in the 2009 tax year, 60% in the 2010 tax year, 75% in the 2011 tax year, and 100% in the 2012 tax year and each tax year thereafter.

(bb) Amounts attributable to an ownership interest in a pass-through entity, regulated investment company, real estate investment trust, or cooperative corporation whose business activities are taxable under section 203 or would be subject to the tax under section 203 if the business activities were in this

state. For purposes of this subdivision:

( i ) "Cooperative corporation" means those organizations described under subchapter T of the internal revenue code.

( ii ) "Pass-through" entity means a partnership, subchapter S corporation, or other person, other than an individual, that is not classified for federal income tax purposes as an association taxed as a corporation.

( iii ) "Real estate investment trust" means that term as defined under section 856 of the internal revenue code.

( iv ) "Regulated investment company" means that term as defined under section 851 of the internal revenue code.

(cc) For a regulated investment company as that term is defined under section 851 of the internal revenue code, receipts derived from investment activity by that regulated investment company.

(dd) For fiscal years that begin after September 30, 2009, unless the state budget director certifies to the state treasurer by January 1 of that fiscal year that the federally certified rates for actuarial soundness required under 42 CF and that are specifically developed for Michigan's health maintenance organizations that hold a contract with this state for medicaid services provide explicit adjustment for their obligations required for payment of the tax under this act, amounts received by the taxpayer during that fiscal year for medicaid premium or reimbursement of costs associated with service provided to a medicaid recipient or beneficiary.

(ee) For a taxpayer that provides health care management consulting services, amounts received by the taxpayer as fees from its clients that are expended by the taxpayer to reimburse those clients for labor and nonlabor services that are paid by the client and reimbursed to the client pursuant to a services agreement.

(ff) Amounts attributed to the taxpayer pursuant to a discharge of indebtedness as described under section 61(a)(12) of the internal revenue code, including forgiveness of a nonrecourse debt.

(2) "Insurance company" means an authorized insurer as defined in sections 106 and 108 of the insurance code of 1956, 1956 PA 218, MCL 500.106 and 500.108.

(3) "Internal revenue code" means the United States internal revenue code of 1986 in effect on January 1, 2008 or, at the option of the taxpayer, in effect for the tax year.

(4) "Inventory" means, except as provided in subdivision (e), all of the following:

(a) The stock of goods held for resale in the regular course of trade of a retail or wholesale business, including electricity or natural gas purchased for resale.

(b) Finished goods, goods in process, and raw materials of a manufacturing business purchased from

another person.

(c) For a person that is a new motor vehicle dealer licensed under the Michigan vehicle code, 1949 PA 300, MCL 257.1 to 257.923, floor plan interest expenses for new motor vehicles. For purposes of this subdivision, "floor plan interest" means interest paid that finances any part of the person's purchase of new motor vehicle inventory from a manufacturer, distributor, or supplier. However, amounts attributable to any invoiced items used to provide more favorable floor plan assistance to a person subject to the tax imposed under this act than to a person not subject to this tax is considered interest paid by a manufacturer, distributor, or supplier.

(d) For a person that is a securities trader, broker, or dealer or a person included in the unitary business group of that securities trader, broker, or dealer that buys and sells for its own account, contracts that are subject to the commodity exchange act, 7 USC 1 to 27f, the cost of securities as defined under section 475(c)(2) of the internal revenue code and for a securities trader the cost of commodities as defined under section 475(e)(2) and for a broker or dealer the cost of commodities as defined under section 475(e)(2)(B), (C), and (D) of the internal revenue code, excluding interest expense other than interest expense related to repurchase agreements. As used in this subdivision:

( i ) "Broker" means that term as defined under section 78c(a)(4) of the securities exchange act of 1934, 15 USC 78c.

( ii ) "Dealer" means that term as defined under section 78c(a)(5) of the securities exchange act of 1934, 15 USC 78c.

( iii ) "Securities trader" means a person that engages in the trade or business of purchasing and selling investments and trading assets.

(e) Inventory does not include either of the following:

( i ) Personal property under lease or principally intended for lease rather than sale.

( ii ) Property allowed a deduction or allowance for depreciation or depletion under the internal revenue code.

(5) "Officer" means an officer of a corporation other than a subchapter S corporation, including all of the following:

(a) The chairperson of the board.

(b) The president, vice president, secretary, or treasurer of the corporation or board.

(c) Persons performing similar duties and responsibilities to persons described in subdivisions (a) and (b) that include, at a minimum, major decision making.

Sec. 305. (1) Sales of the taxpayer in this state are determined as follows:

(a) Sales of tangible personal property are in this state if the property is shipped or delivered, or, in the case of electricity and gas, the contract requires the property to be shipped or delivered, to any purchaser within this state based on the ultimate destination at the point that the property comes to rest regardless of the free on board point or other conditions of the sales. Property stored in transit for 60 days or more prior to receipt by the purchaser or the purchaser's designee, or in the case of a dock sale not picked up for 60 days or more, is deemed to have come to rest at this ultimate destination. Property stored in transit for fewer than 60 days prior to receipt by the purchaser or the purchaser's designee, or in the case of a dock sale picked up before 60 days, is not deemed to have come to rest at this ultimate destination. For purposes of this subdivision:

( i ) "Dock sale" means a sale in which the purchaser uses its own or rented vehicles, or makes arrangements with a carrier, to pick up the property at the seller's location.

( ii ) "Stored in transit" means storing, staging, forwarding, or consolidating activities undertaken for further shipment or transfer of the property to the purchaser or purchaser's designee.

(b) Receipts from the sale, lease, rental, or licensing of real property are in this state if that property is located in this state.

(c) Receipts from the lease or rental of tangible personal property are sales in this state to the extent that the property is utilized in this state. The extent of utilization of tangible personal property in this state is determined by multiplying the receipts by a fraction, the numerator of which is the number of days of physical location of the property in this state during the lease or rental period in the tax year and the denominator of which is the number of days of physical location of the property everywhere during all lease or rental periods in the tax year. If the physical location of the property during the lease or rental period is unknown or cannot be determined, the tangible personal property is utilized in the state in which the property was located at the time the lease or rental payer obtained possession.

(d) Receipts from the lease or rental of mobile transportation property owned by the taxpayer are in this state to the extent that the property is used in this state. The extent an aircraft will be deemed to be used in this state and the amount of receipts that is to be included in the numerator of this state's sales factor is determined by multiplying all the receipts from the lease or rental of the aircraft by a fraction, the numerator of the fraction is the number of landings of the aircraft in this state and the denominator of the fraction is the total number of landings of the aircraft. If the extent of the use of any transportation property within this state cannot be determined, then the receipts are in this state if the property has its principal base of operations in this state.

(e) Royalties and other income received for the use of or for the privilege of using intangible property, including patents, know-how, formulas, designs, processes, patterns, copyrights, trade names, service names, franchises, licenses, contracts, customer lists, computer software, or similar items, are attributed to the state in which the property is used by the purchaser. If the property is used in more than 1 state, the royalties or other income shall be apportioned to this state pro rata according to the portion of use in

this state. If the portion of use in this state cannot be determined, the royalties or other income shall be excluded from both the numerator and the denominator. Intangible property is used in this state if the purchaser uses the intangible property or the rights to the intangible property in the regular course of its business operations in this state, regardless of the location of the purchaser's customers.

(2) Sales from the performance of services are in this state and attributable to this state as follows:

(a) Except as otherwise provided in this section, all receipts from the performance of services are included in the numerator of the apportionment factor if the recipient of the services receives all of the benefit of the services in this state. If the recipient of the services receives some of the benefit of the services in this state, the receipts are included in the numerator of the apportionment factor in proportion to the extent that the recipient receives benefit of the services in this state.

(b) Sales derived from securities brokerage services attributable to this state are determined by multiplying the total dollar amount of receipts from securities brokerage services by a fraction, the numerator of which is the sales of securities brokerage services to customers within this state, and the denominator of which is the sales of securities brokerage services to all customers. Receipts from securities brokerage services include commissions on transactions, the spread earned on principal transactions in which the broker buys or sells from its account, total margin interest paid on behalf of brokerage accounts owned by the broker's customers, and fees and receipts of all kinds from the underwriting of securities. If receipts from brokerage services can be associated with a particular customer, but it is impractical to associate the receipts with the address of the customer, then the address of the customer shall be presumed to be the address of the branch office that generates the transactions for the customer.

(c) Sales of services that are derived directly or indirectly from the sale of management, distribution, administration, or securities brokerage services to, or on behalf of, a regulated investment company or its beneficial owners, including receipts derived directly or indirectly from trustees, sponsors, or participants of employee benefit plans that have accounts in a regulated investment company, shall be attributable to this state to the extent that the shareholders of the regulated investment company are domiciled within this state. For purposes of this subdivision, "domicile" means the shareholder's mailing address on the records of the regulated investment company. If the regulated investment company or the person providing management services to the regulated investment company has actual knowledge that the shareholder's primary residence or principal place of business is different than the shareholder's mailing address, then the shareholder's primary residence or principal place of business is the shareholder's domicile. A separate computation shall be made with respect to the receipts derived from each regulated investment company. The total amount of sales attributable to this state shall be equal to the total receipts received by each regulated investment company multiplied by a fraction determined as follows:

( i ) The numerator of the fraction is the average of the sum of the beginning-of-year and end-of-year number of shares owned by the regulated investment company shareholders who have their domicile in this state.

( ii ) The denominator of the fraction is the average of the sum of the beginning-of-year and end-of-year number of shares owned by all shareholders.

( iii ) For purposes of the fraction, the year shall be the tax year of the regulated investment company that ends with or within the tax year of the taxpayer.

(3) Receipts from the origination of a loan or gains from the sale of a loan secured by residential real property is deemed a sale in this state only if 1 or more of the following apply:

(a) The real property is located in this state.

(b) The real property is located both within this state and 1 or more other states and more than 50% of the fair market value of the real property is located within this state.

(c) More than 50% of the real property is not located in any 1 state and the borrower is located in this state.

(4) Interest from loans secured by real property is in this state if the property is located within this state or if the property is located both within this state and 1 or more other states, if more than 50% of the fair market value of the real property is located within this state, or if more than 50% of the fair market value of the real property is not located within any 1 state, if the borrower is located in this state. The determination of whether the real property securing a loan is located within this state shall be made as of the time the original agreement was made and any and all subsequent substitutions of collateral shall be disregarded.

(5) Interest from a loan not secured by real property is in this state if the borrower is located in this state.

(6) Gains from the sale of a loan not secured by real property, including income recorded under the coupon stripping rules of section 1286 of the internal revenue code, are in this state if the borrower is in this state.

(7) Receipts from credit card receivables, including interest, fees, and penalties from credit card receivables and receipts from fees charged to cardholders, such as annual fees, are in this state if the billing address of the cardholder is in this state.

(8) Receipts from the sale of credit card or other receivables is in this state if the billing address of the customer is in this state. Credit card issuer's reimbursements fees are in this state if the billing address of the cardholder is in this state. Receipts from merchant discounts, computed net of any cardholder chargebacks, but not reduced by any interchange transaction fees or by any issuer's reimbursement fees paid to another for charges made by its cardholders, are in this state if the commercial domicile of the merchant is in this state.

(9) Loan servicing fees derived from loans of another secured by real property are in this state if the real property is located in this state, or the real property is located both within and outside of this state and 1

or more states if more than 50% of the fair market value of the real property is located in this state, or more than 50% of the fair market value of the real property is not located in any 1 state, and the borrower is located in this state. Loan servicing fees derived from loans of another not secured by real property are in this state if the borrower is located in this state. If the location of the security cannot be determined, then loan servicing fees for servicing either the secured or the unsecured loans of another are in this state if the lender to whom the loan servicing service is provided is located in this state.

(10) Receipts from the sale of securities and other assets from investment and trading activities, including, but not limited to, interest, dividends, and gains are in this state in either of the following circumstances:

(a) The person's customer is in this state.

(b) If the location of the person's customer cannot be determined, both of the following:

( i ) Interest, dividends, and other income from investment assets and activities and from trading assets and activities, including, but not limited to, investment securities; trading account assets; federal funds; securities purchased and sold under agreements to resell or repurchase; options; futures contracts; forward contracts; notional principal contracts such as swaps; equities; and foreign currency transactions are in this state if the average value of the assets is assigned to a regular place of business of the taxpayer within this state. Interest from federal funds sold and purchased and from securities purchased under resale agreements and securities sold under repurchase agreements are in this state if the average value of the assets is assigned to a regular place of business of the taxpayer within this state. The amount of receipts and other income from investment assets and activities is in this state if assets are assigned to a regular place of business of the taxpayer within this state.

( ii ) The amount of receipts from trading assets and activities, including, but not limited to, assets and activities in the matched book, in the arbitrage book, and foreign currency transactions, but excluding amounts otherwise sourced in this section, are in this state if the assets are assigned to a regular place of business of the taxpayer within this state.

(11) Receipts from transportation services rendered by a person subject to tax in another state are in this state and shall be attributable to this state as follows:

(a) Except as otherwise provided in subdivisions (b) through (e), receipts shall be proportioned based on the ratio that revenue miles of the person in this state bear to the revenue miles of the person everywhere.

(b) Receipts from maritime transportation services shall be attributable to this state as follows:

( i ) 50% of those receipts that either originate or terminate in this state.

( ii ) 100% of those receipts that both originate and terminate in this state.

(c) Receipts attributable to this state of a person whose business activity consists of the transportation both of property and of individuals shall be proportioned based on the total gross receipts for passenger miles and ton mile fractions, separately computed and individually weighted by the ratio of gross receipts from passenger transportation to total gross receipts from all transportation, and by the ratio of gross receipts from freight transportation to total gross receipts from all transportation, respectively.

(d) Receipts attributable to this state of a person whose business activity consists of the transportation of oil by pipeline shall be proportioned based on the ratio that the gross receipts for the barrel miles transported in this state bear to the gross receipts for the barrel miles transported by the person everywhere.

(e) Receipts attributable to this state of a person whose business activities consist of the transportation of gas by pipeline shall be proportioned based on the ratio that the gross receipts for the 1,000 cubic feet miles transported in this state bear to the gross receipts for the 1,000 cubic feet miles transported by the person everywhere.

(12) For purposes of subsection (11), if a taxpayer can show that revenue mile information is not available or cannot be obtained without unreasonable expense to the taxpayer, receipts attributable to this state shall be that portion of the revenue derived from transportation services everywhere performed that the miles of transportation services performed in this state bears to the miles of transportation services performed everywhere. If the department determines that the information required for the calculations under subsection (11) are not available or cannot be obtained without unreasonable expense to the taxpayer, the department may use other available information that in the opinion of the department will result in an equitable allocation of the taxpayer's receipts to this state.

(13) Except as provided in subsections (14) through (19), receipts from the sale of telecommunications service or mobile telecommunications service are in this state if the customer's place of primary use of the service is in this state. As used in this subsection, "place of primary use" means the customer's residential street address or primary business street address where the customer's use of the telecommunications service primarily occurs. For mobile telecommunications service, the customer's residential street address or primary business street address is the place of primary use only if it is within the licensed service area of the customer's home service provider.

(14) Receipts from the sale of telecommunications service sold on an individual call-by-call basis are in this state if either of the following applies:

(a) The call both originates and terminates in this state.

(b) The call either originates or terminates in this state and the service address is located in this state.

(15) Receipts from the sale of postpaid telecommunications service are in this state if the origination point of the telecommunication signal, as first identified by the service provider's telecommunication system or as identified by information received by the seller from its service provider if the system used to transport

telecommunication signals is not the seller's, is located in this state.

(16) Receipts from the sale of prepaid telecommunications service or prepaid mobile telecommunications service are in this state if the purchaser obtains the prepaid card or similar means of conveyance at a location in this state. Receipts from recharging a prepaid telecommunications service or mobile telecommunications service is in this state if the purchaser's billing information indicates a location in this state.

(17) Receipts from the sale of private communication services are in this state as follows:

(a) 100% of the receipts from the sale of each channel termination point within this state.

(b) 100% of the receipts from the sale of the total channel mileage between each termination point within this state.

(c) 50% of the receipts from the sale of service segments for a channel between 2 customer channel termination points, 1 of which is located in this state and the other is located outside of this state, which segments are separately charged.

(d) The receipts from the sale of service for segments with a channel termination point located in this state and in 2 or more other states or equivalent jurisdictions, and which segments are not separately billed, are in this state based on a percentage determined by dividing the number of customer channel termination points in this state by the total number of customer channel termination points.

(18) Receipts from the sale of billing services and ancillary services for telecommunications service are in this state based on the location of the purchaser's customers. If the location of the purchaser's customers is not known or cannot be determined, the sale of billing services and ancillary services for telecommunications service are in this state based on the location of the purchaser.

(19) Receipts to access a carrier's network or from the sale of telecommunications services for resale are in this state as follows:

(a) 100% of the receipts from access fees attributable to intrastate telecommunications service that both originates and terminates in this state.

(b) 50% of the receipts from access fees attributable to interstate telecommunications service if the interstate call either originates or terminates in this state.

(c) 100% of the receipts from interstate end user access line charges, if the customer's service address is in this state. As used in this subdivision, "interstate end user access line charges" includes, but is not limited to, the surcharge approved by the federal communications commission and levied pursuant to 47 CFR 69.

(d) Gross receipts from sales of telecommunications services to other telecommunication service providers for resale shall be sourced to this state using the apportionment concepts used for non-resale

receipts of telecommunications services if the information is readily available to make that determination. If the information is not readily available, then the taxpayer may use any other reasonable and consistent method.

(20) Except as otherwise provided under this subsection, for a taxpayer whose business activities include live radio or television programming as described in subsector code 7922 of industry group 792 under the standard industrial classification code as compiled by the United States department of labor or are included in industry group 483, 484, 781, or 782 under the standard industrial classification code as compiled by the United States department of labor, or any combination of the business activities included in those groups, media receipts are in this state and attributable to this state only if the commercial domicile of the customer is in this state and the customer has a direct connection or relationship with the taxpayer pursuant to a contract under which the media receipts are derived. For media receipts from the sale of advertising, if the customer of that advertising is commercially domiciled in this state and receives some of the benefit of the sale of that advertising in this state, the media receipts from the advertising to that customer are included in the numerator of the apportionment factor in proportion to the extent that the customer receives the benefit of the advertising in this state. For purposes of this subsection, if the taxpayer is a broadcaster and if the customer receives some of the benefit of the advertising in this state, the media receipts for that sale of advertising from that customer shall be proportioned based on the ratio that the broadcaster's viewing or listening audience in this state bears to its total viewing or listening audience everywhere. As used in this subsection:

(a) "Media property" means motion pictures, television programs, internet programs and websites, other audiovisual works, and any other similar property embodying words, ideas, concepts, images, or sound without regard to the means or methods of distribution or the medium in which the property is embodied.

(b) "Media receipts" means receipts from the sale, license, broadcast, transmission, distribution, exhibition, or other use of media property and receipts from the sale of media services. Media receipts do not include receipts from the sale of media property that is a consumer product that is ultimately sold at retail.

(c) "Media services" means services in which the use of the media property is integral to the performance of those services.

(21) Terms used in subsections (13) through (20) have the same meaning as those terms defined in the streamlined sales and use tax agreement administered under the streamlined sales and use tax administration act, 2004 PA 174, MCL 205.801 to 205.833.

(22) For purposes of this section, a borrower is considered located in this state if the borrower's billing address is in this state.

Sec. 403. (1) Notwithstanding any other provision in this act, the credits provided in this section shall be taken before any other credit under this act. Except as otherwise provided in subsection (6), for the 2008 tax year, the total combined credit allowed under this section shall not exceed 50% of the tax liability

imposed under this act before the imposition and levy of the surcharge under section 281. For the 2009 tax year and each tax year after 2009, the total combined credit allowed under this section shall not exceed 52% of the tax liability imposed under this act before the imposition and levy of the surcharge under section 281.

(2) Subject to the limitation in subsection (1), for the 2008 tax year a taxpayer may claim a credit against the tax imposed by this act equal to 0.296% of the taxpayer's compensation in this state. For the 2009 tax year and each tax year after 2009, subject to the limitation in subsection (1), a taxpayer may claim a credit against the tax imposed by this act equal to 0.370% of the taxpayer's compensation in this state. For purposes of this subsection, a taxpayer includes a person subject to the tax imposed under chapter 2A and a person subject to the tax imposed under chapter 2B. A professional employer organization shall not include payments by the professional employer organization to the officers and employees of a client of the professional employer organization whose employment operations are managed by the professional employer organization. A client may include payments by the professional employer organization to the officers and employees of the client whose employment operations are managed by the professional employer organization.

(3) Subject to the limitation in subsection (1), for the 2008 tax year a taxpayer may claim a credit against the tax imposed by this act equal to 2.32% multiplied by the result of subtracting the sum of the amounts calculated under subdivisions (d), (e), and (f) from the sum of the amounts calculated under subdivisions (a), (b), and (c).

Subject to the limitation in subsection (1), for the 2009 tax year and each tax year after 2009, a taxpayer may claim a credit against the tax imposed by this act equal to 2.9% multiplied by the result of subtracting the sum of the amounts calculated under subdivisions (d), (e), and (f) from the sum of the amounts calculated under subdivisions (a), (b), and (c):

(a) Calculate the cost, including fabrication and installation, paid or accrued in the taxable year of tangible assets of a type that are, or under the internal revenue code will become, eligible for depreciation, amortization, or accelerated capital cost recovery for federal income tax purposes, provided that the assets are physically located in this state for use in a business activity in this state and are not mobile tangible assets.

(b) Calculate the cost, including fabrication and installation, paid or accrued in the taxable year of mobile tangible assets of a type that are, or under the internal revenue code will become, eligible for depreciation, amortization, or accelerated capital cost recovery for federal income tax purposes. This amount shall be multiplied by the apportionment factor for the tax year as prescribed in chapter 3.

(c) For tangible assets, other than mobile tangible assets, purchased or acquired for use outside of this state in a tax year beginning after December 31, 2007 and subsequently transferred into this state and purchased or acquired for use in a business activity, calculate the federal basis used for determining gain or loss as of the date the tangible assets were physically located in this state for use in a business activity

plus the cost of fabrication and installation of the tangible assets in this state.

(d) If the cost of tangible assets described in subdivision (a) was paid or accrued in a tax year beginning after December 31, 2007, or before December 31, 2007 to the extent the credit is used and at the rate at which the credit was used under former 1975 PA 228 or to the extent the credit was used, and at the rate at which the credit was used under this act, calculate the gross proceeds or benefit derived from the sale or other disposition of the tangible assets minus the gain, multiplied by the apportionment factor for the taxable year as prescribed in chapter 3, and plus the loss, multiplied by the apportionment factor for the taxable year as prescribed in chapter 3 from the sale or other disposition reflected in federal taxable income.

(e) If the cost of mobile tangible assets described in subdivision (b) was paid or accrued in a tax year beginning after December 31, 2007, or before December 31, 2007 to the extent the credit is used and at the rate at which the credit was used under former 1975 PA 228 or to the extent the credit was used, and at the rate at which the credit was used under this act, calculate the gross proceeds or benefit derived from the sale or other disposition of the mobile tangible assets minus the gain and plus the loss from the sale or other disposition reflected in federal taxable income. This amount shall be multiplied by the apportionment factor for the tax year as prescribed in chapter 3.

(f) For assets purchased or acquired in a tax year beginning after December 31, 2007, or before December 31, 2007 to the extent the credit is used and at the rate at which the credit was used under former 1975 PA 228 or to the extent the credit was used, and at the rate at which the credit was used under this act, that were eligible for a credit under subdivision (a) or (c) and that were transferred out of this state, calculate the federal basis used for determining gain or loss as of the date of the transfer. For purposes of this subdivision, "transferred out of this state" means removal from this state of tangible assets, other than mobile tangible assets, by means other than sale or other disposition.

(4) For a tax year in which the amount of the credit calculated under subsection (3) is negative, the absolute value of that amount is added to the taxpayer's tax liability for the tax year.

(5) A taxpayer that claims a credit under this section is not prohibited from claiming a credit under section 405. However, the taxpayer shall not claim a credit under this section and section 405 based on the same costs and expenses.

(6) For a taxpayer primarily engaged in furnishing electric and gas utility service that makes capital investments in electric and gas distribution assets for which a portion of the credit provided under subsection (3) would be denied for the 2008 tax year by reason of the 50% limitation of subsection (1), the 50% limitation on the total combined credit for the 2008 tax year provided in subsection (1) shall be increased by an amount not to exceed the lesser of the amount of the denied credit or 50% of the tax increase under this act accrued for financial reporting purposes due to the elimination of the deduction under section 168(k) of the internal revenue code by 2008 PA 434. Provided, however, that the total combined credit allowed under this section for the 2008 tax year shall not exceed 80% of the tax liability

imposed under this act after the imposition and levy of the surcharge under section 281.

Sec. 433. (1) A taxpayer that is a business located and conducting business activity within a renaissance zone may claim a credit against the tax imposed by this act for the tax year to the extent and for the duration provided pursuant to the Michigan renaissance zone act, 1996 PA 376, MCL 125.2681 to 125.2696, as follows:

(a) Except as otherwise provided under subdivision (b), for a taxpayer located and conducting business activity in a renaissance zone after November 30, 2002, a credit equal to the lesser of the following:

( i ) The tax liability attributable to business activity conducted within a renaissance zone in the tax year.

( ii ) Ten percent of adjusted services performed in a designated renaissance zone.

(b) For a taxpayer located and conducting business activity in a renaissance zone before December 1, 2002, a credit equal to the greater of the following:

( i ) The amount calculated under subdivision (a)( i ) or ( ii ), whichever is less.

( ii ) The product of the following:

(A) The credit claimed under section 39b of former 1975 PA 228 for the tax year ending in 2007.

(B) The ratio of the taxpayer's payroll in this state in the tax year divided by the taxpayer's payroll in this state in its tax year ending in 2007 under former 1975 PA 228.

(C) The ratio of the taxpayer's renaissance zone business activity factor for the tax year divided by the taxpayer's renaissance zone business activity factor for its tax year ending in 2007 under section 39b of former 1975 PA 228.

(2) Any portion of the taxpayer's tax liability that is attributable to illegal activity conducted in the renaissance zone shall not be used to calculate a credit under this section.

(3) The credit allowed under this section continues through the tax year in which the renaissance zone designation expires.

(4) If the amount of the credit allowed under this section exceeds the tax liability of the taxpayer for the tax year, that portion of the credit that exceeds the tax liability shall not be refunded.

(5) A taxpayer that claims a credit under this section shall not employ, pay a speaker fee to, or provide any remuneration, compensation, or consideration to any person employed by the state, the state administrative board created in 1921 PA 2, MCL 17.1 to 17.3, or the renaissance zone review board created in section 5 of the renaissance zone act, 1996 PA 376, MCL 125.2685, whose employment relates or related in any way to the authorization or enforcement of the credit allowed under this section for any year in which the taxpayer claims a credit under this section and for the 3 years after the last year

that a credit is claimed.

(6) To be eligible for the credit allowed under this section, an otherwise qualified taxpayer shall file an annual return under this act in a format determined by the department.

(7) Any portion of the taxpayer's tax liability that is attributable to business activity related to the operation of a casino, and business activity that is associated or affiliated with the operation of a casino, including, but not limited to, the operation of a parking lot, hotel, motel, or retail store, shall not be used to calculate a credit under this section.

(8) For purposes of this section, taxpayer includes a person subject to the tax imposed under chapter 2A and a person subject to the tax imposed under chapter 2B.

(9) As used in this section:

(a) "Adjusted services performed in a designated renaissance zone" means either of the following:

( i ) Except as provided in subparagraph ( ii ), the sum of the taxpayer's payroll for services performed in a designated renaissance zone plus an amount equal to the amount deducted in arriving at federal taxable income for the tax year for depreciation, amortization, or immediate or accelerated write-off for tangible property exempt under section 7ff of the general property tax act, 1893 PA 206, MCL 211.7ff, in the tax year or, for new property, in the immediately following tax year.

( ii ) For a partnership, limited liability company, S corporation, or individual, the amount determined under subparagraph ( i ) plus the product of the following as related to the taxpayer if greater than zero:

(A) Business income.

(B) The ratio of the taxpayer's total sales in this state during the tax year divided by the taxpayer's total sales everywhere during the tax year.

(C) The renaissance zone business activity factor.

(b) "Casino" means a casino regulated by this state pursuant to the Michigan gaming control and revenue act, 1996 IL 1, MCL 432.201 to 432.226.

(c) "New property" means property that has not been subject to, or exempt from, the collection of taxes under the general property tax act, 1893 PA 206, MCL 211.1 to 211.155, and has not been subject to, or exempt from, ad valorem property taxes levied in another state, except that receiving an exemption as inventory property does not disqualify property.

(d) "Payroll" means total salaries and wages before deducting any personal or dependency exemptions.

(e) "Renaissance zone" means that term as defined in the Michigan renaissance zone act, 1996 PA 376, MCL 125.2681 to 125.2696.

(f) "Renaissance zone business activity factor" means a fraction, the numerator of which is the ratio of the average value of the taxpayer's property located in a designated renaissance zone to the average value of the taxpayer's property in this state plus the ratio of the taxpayer's payroll for services performed in a designated renaissance zone to all of the taxpayer's payroll in this state and the denominator of which is 2.

(g) "Tax liability attributable to business activity conducted within a renaissance zone" means the taxpayer's tax liability multiplied by the renaissance zone business activity factor.

Sec. 508. (1) If, as a result of the changes enacted by the amendatory act that added this section, a taxpayer has an overpayment of tax for any tax year beginning after December 31, 2009 through the tax year beginning after December 31, 2013, the taxpayer shall, in accordance with sections 27a and 30 of 1941 PA 122, MCL 205.27a and 205.30, file a claim for a refund, on or after January 1, 2015 but no later than December 31, 2015, using a form, process, or format as prescribed by the department. A claim filed pursuant to this section is limited to the determination of any tax liability and any overpayment resulting from the changes enacted by the amendatory act that added this section. Interest shall be calculated in accordance with section 23 of 1941 PA 122, MCL 205.23. Any refund paid under this section shall be paid in equal annual payments over 6 years beginning in 2016.

(2) Notwithstanding section 21(6) and (7) of 1941 PA 122, MCL 205.21, and the statute of limitations period prescribed under section 27a(2) of 1941 PA 122,MCL 205.27a , the department may assess a taxpayer that claimed a refund pursuant to this section for any amount determined after audit or investigation to have exceeded the proper and correct amount of overpayment resulting from the changes enacted by the amendatory act that added this section. The assessment issued under this subsection shall not be issued more than 4 years after the date the taxpayer filed its claim under this section and shall be limited to the changes enacted by the amendatory act that added this section.

(3) There is appropriated to the department for the 2014-2015 state fiscal year the sum of $1,000,000.00 to begin implementing the requirements of the amendatory act that added this section. Any portion of this amount under this section that is not expended in the 2014-2015 state fiscal year shall not lapse to the general fund but shall be carried forward in a work project account that is in compliance with section 451a of the management and budget act, 1984 PA 431, MCL 18.1451a, for the following state fiscal year.

Enacting section 1. 1969 PA 343, MCL 205.581 to 205.589 [FN1] , is repealed retroactively and effective beginning January 1, 2008. It is the intent of the legislature that the repeal of 1969 PA 343, MCL 205.581 to 205.589 [FN1] , is to express the original intent of the legislature regarding the application of section 301 of the Michigan business tax act, 2007 PA 36, AMEND MCL 208.1301 , and the intended effect of that section to eliminate the election provision included within section 1 of 1969 PA 343,AMENDMCL 205.581 , and that the 2011 amendatory act that amended section 1 of 1969 PA 343,AMENDMCL 205.581 , was to further express the original intent of the legislature regarding the application of section 301 of the Michigan business tax act, 2007 PA 36,AMENDMCL 208.1301 , and to clarify that the election provision included within section 1 of 1969 PA 343,AMENDMCL 205.581 , is not available under the

income tax act of 1967, 1967 PA 281, MCL 206.1 to206.713 [FN2]. Enacting section 2. This amendatory act is retroactive and is effective for tax years beginning on and after January 1, 2010.

This act is ordered to take immediate effect.

Secretary of the Senate Clerk of the House of Representatives Approved Governor

© 2015 Thomson Reuters/Tax & Accounting. All Rights Reserved.



Deering's California Codes Annotated
Copyright © 2015 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** This document is current through the 2015 Supplement ***
(All 2014 legislation)

FISH AND GAME CODE
Division 11.  Pacific Marine Fisheries Compact
Chapter 1.  The Compact

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

Cal Fish & G Code § 14001 (2015)

### § 14001.  Form and contents; Interpretation; Administration

The form and contents of the Pacific Marine Fisheries Compact shall be substantially as provided in this section and the effect of its provisions shall be interpreted and administered in conformity with the provisions of this division:

**PACIFIC MARINE FISHERIES COMPACT**

The contracting states do hereby agree as follows:

**Article I**

The purposes of this compact are and shall be to promote the better utilization of fisheries, marine, shell and anadromous, which are of mutual concern, and to develop a joint program of protection and prevention of physical waste of such fisheries in all of those areas of the Pacific Ocean over which the compacting states jointly or separately now have or may hereafter acquire jurisdiction.

Nothing herein contained shall be construed so as to authorize the compacting states or any of them to limit the production of fish or fish products for the purpose of establishing or fixing the prices thereof or creating and perpetuating a monopoly.

**Article II**

This agreement shall become operative immediately as to those states executing it in the form that is in accordance with the laws of the executing state and when the Congress has given its consent.

**Article III**

Each state joining herein shall appoint, as determined by state statutes, one or more representatives to a commission hereby constituted and designated as the Pacific States Marine Fisheries Commission, of whom one shall be the administrative or other officer of the agency of such state charged with the conservation of the fisheries resources to which this compact pertains. This commission shall be invested with the powers and duties set forth herein.

The term of each commissioner of the Pacific States Marine Fisheries Commission shall be four years. A commissioner shall hold office until his successor shall be appointed and qualified but such successor's term shall expire four years from legal date of expiration of the term of his predecessor. Vacancies occurring in the office of such commissioner from any reason or cause shall be filled for the unexpired term, or a commissioner may be removed from office, as provided by the statutes of the state concerned. Each commissioner may delegate in writing from time to time, to a deputy, the power to be present and participate, including voting as his representative or substitute, at any meeting of or hearing by or other proceeding of the commission.

Voting powers under this compact shall be limited to one vote for each state regardless of the number of representatives.

**Article IV**

The duty of the said commission shall be to make inquiry and ascertain from time to time such methods, practices, circumstances and conditions as may be disclosed for bringing about the conservation and the prevention of the depletion and physical waste of the fisheries, marine, shell, and anadromous in all of those areas of the Pacific Ocean over which the states signatory to this compact jointly or separately now have or may hereafter acquire jurisdiction. The commission shall have power to recommend the coordination of the exercise of the police powers of the several states within their respective jurisdictions and said conservation zones to promote the preservation of those fisheries and their protection against overfishing, waste, depletion or any abuse whatsoever and to assure a continuing yield from the fisheries resources of the signatory parties hereto.

To that end the commission shall draft and, after consultation with the advisory committee hereinafter authorized, recommend to the governors and legislative branches of the various signatory states hereto legislation dealing with the conservation of the marine, shell, and anadromous fisheries in all of those areas of the Pacific Ocean over which the states signatory to this compact jointly or separately now have or may hereafter acquire jurisdiction. The commission shall, more than one month prior to any regular meeting of the legislative branch in any state signatory hereto, present to the governor of such state its recommendations relating to enactments by the legislative branch of that state in furthering the intents and purposes of this compact.

The commission shall consult with and advise the pertinent administrative agencies in the signatory states with regard to problems connected with the fisheries and recommend the adoption of such regulations as it deems advisable and which lie within the jurisdiction of such agencies.

The commission shall have power to recommend to the states signatory hereto the stocking of the waters of such states with marine, shell or anadromous fish and fish eggs or joint stocking by some or all of such states and when two or more of the said states shall jointly stock waters the commission shall act as the coordinating agency for such stocking.

**Article V**

The commission shall elect from its number a chairman and a vice chairman and shall appoint and at its pleasure remove or discharge such officers and employees as may be required to carry the provisions of this compact into effect and shall fix and determine their duties, qualifications and compensation. Said commission shall adopt rules and regulations for the conduct of its business. It may establish and maintain one or more offices for the transaction of its business and may meet at any time or place within the territorial limits of the signatory states but must meet at least once a year.

**Article VI**

No action shall be taken by the commission except by the affirmative vote of a majority of the whole number of compacting states represented at any meeting. No recommendation shall be made by the commission in regard to any species of fish except by the vote of a majority of the compacting states which have an interest in such species.

**Article VII**

The fisheries research agencies of the signatory states shall act in collaboration as the official research agency of the Pacific States Marine Fisheries Commission.

An advisory committee to be representative of the commercial fishermen, commercial fishing industry and such other interests of each state as the commission deems advisable shall be established by the commission as soon as practicable for the purpose of advising the commission upon such recommendations as it may desire to make.

**Article VIII**

Nothing in this compact shall be construed to limit the powers of any state or to repeal or prevent the enactment of any legislation or the enforcement of any requirement by any state imposing additional conditions and restrictions to conserve its fisheries.

**Article IX**

Continued absence of representation or of any representative on the commission from any state party hereto, shall be brought to the attention of the governor thereof.

**Article X**

The states agree to make available annual funds for the support of the commission on the following basis:

Eighty percent of the annual budget shall be shared equally by those member states having as a boundary the Pacific Ocean. Not less than 5 percent of the annual budget shall be contributed by any other member state. The balance of the annual budget shall be shared by those member states having as a boundary the Pacific Ocean, in proportion to the primary market value of the products of their commercial fisheries on the basis of the latest five-year catch records.

The annual contribution of each member state shall be figured to the nearest one hundred dollars ($100).

**Article XI**

This compact shall continue in force and remain binding upon each state until renounced by it. Renunciation of this compact must be preceded by sending six months' notice in writing of intention to withdraw from the compact to the other parties hereto.

**Article XII**

Hawaii or any other state having rivers or streams tributary to the Pacific Ocean may become a contracting state by enactment of the Pacific Marine Fisheries Compact. Upon admission of any new state to the compact, the purposes of the compact and the duties of the commission shall extend to the development of joint programs for the conservation, protection and prevention of physical waste of fisheries in which the contracting states are mutually concerned and to all waters of the newly admitted state necessary to develop such programs.

This compact shall become effective upon its enactment by the states signatory to this compact and upon ratification by Congress by virtue of the authority vested in it under Article 1, Section 10, of the Constitution of the

United States.

**HISTORY:**

Enacted 1957. Amended Stats 1959 ch 1316 § 2; Stats 1961 ch 1052 § 2; Stats 1969 ch 361 § 2; Stats 1996 ch 870 § 54.

**NOTES:**

**Amendments:**

**1959 Amendment:**

(1) Substituted "compacting states" for "States of California, Oregon, and Washington" in the first paragraph of Article I, in Article II, and wherever it appears in Article IV; (2) added ", other than Idaho or Montana," in the first paragraph of Article X; (3) substituted the first sentence of the second paragraph of Article X for the former first sentence which read: "The compacting states agree to make available initially the annual amounts scheduled below, which amounts are calculated in the manner set forth herein, on the basis of the latest five-year catch records."; (4) deleted "Subsequent" before "Budgets shall" in the second sentence of the second paragraph of Article X; (5) deleted the table at the end of Article X which read:

Click here to view image.

and (6) added Article XII.

**1961 Amendment:**

(1) Substituted "States of California, Oregon, and Washington" for "compacting states" in the first paragraph of Article I, in Article II, and wherever it appears in Article IV; (2) deleted ", other than Idaho or Montana," after "provided, no state" in the first paragraph of Article X; (3) substituted the first sentence of the second paragraph of Article X for the former first sentence which read: "Idaho or Montana, on agreeing to this compact, shall contribute one thousand dollars ($1,000) per annum."; (4) added "Subsequent" before "budgets shall" in the second sentence of the second paragraph of Article X; (5) added the table at the end of Article X; (6) substituted "States of Alaska or Hawaii" for "State of Alaska, the State of Hawaii," in the first sentence of the first paragraph of Article XII; (7) substituted "joint programs" for "a joint program" after "development of" in the second sentence of the first paragraph of Article XII; (8) substituted "programs" for "a program" after "develop such" in the second sentence of the first paragraph of Article XII; (9) substituted "States the second sentence of the first paragraph of Article XII; (9) substituted "States of California, Oregon and Washington" for "other compacting states" in the second paragraph of Article XII; and (10) substituted "ratification by" for "consent and approval of" before "Congress" in the second paragraph of Article XII.

**1969 Amendment:**

(1) Substituted "compacting states" for "States of California, Oregon, and Washington" in the first paragraph of Article I; (2) substituted "compacting" for "aforesaid" after "authorize the" in the second paragraph of Article I; (3) deleted "whenever two or more of the States of California, Oregon and Washington have executed it" after "executing it" in Article II; (4) added "when" before "the Congress" in Article II; (5) substituted "states signatory to this compact" for "States of California, Oregon and Washington" in the first and second paragraphs of Article IV and in the second

paragraph of Article XII; (6) substituted Article X for former Article X which read:

"The states agree to make available annual funds for the support of the commission in proportion to the primary market value of the products of their fisheries as recorded in the latest published reports (five-year average); provided, no state shall contribute less than two thousand dollars ($2,000) per annum and the annual contribution of each state above the minimum shall be figured to the nearest one hundred dollars ($100).

"The compacting states agree to make available initially the annual amounts scheduled below, which amounts are calculated in the manner set forth herein, on the basis of the latest five year catch records. Subsequent budgets shall be recommended by a majority of the commission and the total amount thereof allocated equitably among the states in accordance with the above formula.

Click here to view image.

(7) deleted "The States of Alaska or" at the beginning of Article XII; (8) added "other" after "Hawaii or any" in the first paragraph of Article XII; and (9) substituted "compact" for "article" before "shall become" in the second paragraph of Article XII.

**1996 Amendment:**

Substituted (1) "the Pacific Marine Fisheries Compact" for "such compact" in the introductory clause; and (2) "Pacific States Marine Fisheries Commission" for "Pacific Marine Fisheries Commission" wherever it appears.

**Historical Derivation:**

Stats 1947 ch 1447 § 1, as amended Stats 1949 ch 76 § 1.

**Collateral References:**

Consent of Congress July 24, 1947, c 419, 61 Stats 419, as amended July 10, 1970: 84 Statutes at Large 415.

**Hierarchy Notes:**

Div. 11 Note

Div. 11, Ch. 1 Note

**LexisNexis 50 State Surveys, Legislation & Regulations**

Fish & Game



Deering's California Codes Annotated
Copyright © 2015 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** This document is current through the 2015 Supplement ***
(All 2014 legislation)

GOVERNMENT CODE
Title 7.4.  Tahoe Regional Planning Compact

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

Cal Gov Code § 66800 (2015)

**§ 66800.  Ratification and approval by Legislature**

The Legislature of California hereby ratifies and approves the "Tahoe Regional Planning Compact" as set forth below.

**HISTORY:**

Added Stats 1967 ch 1589 § 1.

**NOTES:**

**Note**

Stats 1967 ch 1589 provides:

SEC. 2. Proclamation by Governor.

The Secretary of State of the State of California shall transmit a duly certified copy of Section 1 of this act to the Governor of the State of Nevada. The Governor of this state, whenever officially advised that the State of Nevada has ratified and approved the compact set forth in Section 1 and whenever the Congress of the United States has approved the compact, shall make proclamation of that fact. A copy of such proclamation shall be published one time in one newspaper of general circulation in the county seats of Placer, El Dorado and Nevada Counties.

SEC 4. Section 1 of this act shall become operative only if the compact creating the Tahoe Regional Planning Agency as provided for in Section 1 of this act is adopted by the State of Nevada and approved by the Congress of the United States. [As amended by Stats 1968 ch 988 § 6.]

**Editor's Notes**

The compact was enacted by the State of Nevada as Nevada Revised Stats § 277.200, and approved by the Congress of the United States on December 18, 1969 (Public Law 91-148, 83 Stat 360).

**Collateral References:**

Cal. Legal Forms, (Matthew Bender) §§ 30B.30, 30B.126.

**Law Review Articles:**

Water quality control at Lake Tahoe-regional planning. 58 CLR 1320.

State land use control: Why pending federal legislation will help. 25 Hast LJ 1165.

**Hierarchy Notes:**

Tit. 7.4 Note

NOTES OF DECISIONS 1. Immunity

**1. Immunity**

The Tahoe Regional Planning Agency, created by compact between the States of California and Nevada, is not entitled to the immunity that the Eleventh Amendment provides to the compacting states, and is thus subject to the "Judicial power of the United States" within the meaning of that Amendment, where both states disclaim any intent to confer immunity on the agency, the terms of the compact indicate that the agency is to be regarded as a political subdivision rather than as an arm of the state, and the actual operations of the agency involve the regulation of land use. Lake Country Estates, Inc. v. Tahoe Regional Planning Agency (1979) 440 US 391, 59 L Ed 2d 401, 99 S Ct 1171, 1979 US LEXIS 68.

The individual members of the Tahoe Regional Planning Agency are entitled to absolute immunity from federal damage liability to the extent that they act in a capacity comparable to that of members of a state legislature. Lake Country Estates, Inc. v. Tahoe Regional Planning Agency (1979) 440 US 391, 59 L Ed 2d 401, 99 S Ct 1171, 1979 US LEXIS 68.

The Tahoe Regional Planning Agency is not immune from monetary liability for inverse condemnation, even though it has only the power to regulate, not the power to condemn. Even a temporary regulation of land may result in a substantial burden to landowners, and where the burden results from governmental action amounting to a taking, the government must pay the landowner for the value of the use of the land during the period. Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency (1990, 9th Cir Nev) 911 F2d 1331, 1990 US App LEXIS 13540, cert. denied, Tahoe-Sierra v. Tahoe Regional Planning Agency (1991) 499 US 943, 113 L Ed 2d 459, 111 S Ct 1404, 1991 US LEXIS 1788.



Deering's California Codes Annotated
Copyright © 2015 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** This document is current through the 2015 Supplement ***
(All 2014 legislation)

VEHICLE CODE
Division 6.  Drivers' Licenses
Chapter 6.  Driver License Compact
Article 2.  Compact Terms

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

Cal Veh Code § 15027 (2015)

**§ 15027.  Compact as law; Withdrawal procedure**

(a) This compact shall become effective as to any state in which this compact becomes effective as the law of that state.

(b) Any party state may withdraw from this compact by enacting a statute repealing this compact as the law of that state, but no such withdrawal shall take effect until six months after the executive head of the withdrawing state has given notice of the withdrawal to the executive heads of all other party states. No withdrawal shall affect the validity or applicability by the licensing authorities of states remaining party to the compact of any report of conviction occurring prior to the withdrawal.

**HISTORY:**

Added Stats 1963 ch 237 § 10.

**NOTES:**

**Hierarchy Notes:**

Div. 6 Note

Div. 6, Ch. 6 Note

**LexisNexis 50 State Surveys, Legislation & Regulations**

Non-commercial Drivers Licenses

## § 205.581. Multistate tax compact; enactment.

**Sec. 1.** The multistate tax compact is enacted into law and entered into with all jurisdictions legally joining therein, in the form substantially as follows:

MULTISTATE TAX COMPACT

**Article I.** Purposes.

The purposes of this compact are to:

**(1)** Facilitate proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases and settlement of apportionment disputes.

**(2)** Promote uniformity or compatibility in significant components of tax systems.

**(3)** Facilitate taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration.

**(4)** Avoid duplicative taxation.

**Article II.** Definitions.

As used in this compact:

**(1)** ″State″ means a state of the United States, the district of Columbia, the commonwealth of Puerto Rico, or any territory or possession of the United States.

**(2)** ″Subdivision″ means any governmental unit or special district of a state.

**(3)** ″Taxpayer″ means any corporation, partnership, firm, association, governmental unit or agency or person acting as a business entity in more than 1 state.

**(4)** ″Income tax″ means a tax imposed on or measured by net income including any tax imposed on or measured by an amount arrived at by deducting expenses from gross income, 1 or more forms of which expenses are not specifically and directly related to particular transactions.

**(5)** ″Capital stock tax″ means a tax measured in any way by the capital of a corporation considered in its entirety.

**(6)** ″Gross receipts tax″ means a tax, other than a sales tax, which is imposed on or measured by the gross volume of business, in terms of gross receipts or in other terms, and in the determination of which no deduction is allowed which would constitute the tax an income tax.

**(7)** ″Sales tax″ means a tax imposed with respect to the transfer for a consideration of

ownership, possession or custody of tangible personal property or the rendering of services measured by the price of the tangible personal property transferred or services rendered and which is required by state or local law to be separately stated from the sales price by the seller, or which is customarily separately stated from the sales price, but does not include a tax imposed exclusively on the sale of a specifically identified commodity or article or class of commodities or articles.

**(8)** "Use tax" means a nonrecurring tax, other than a sales tax, which (a) is imposed on or with respect to the exercise or enjoyment of any right or power over tangible personal property incident to the ownership, possession or custody of that property or the leasing of that property from another including any consumption, keeping, retention, or other use of tangible personal property and (b) is complementary to a sales tax.

**(9)** "Tax" means an income tax, capital stock tax, gross receipts tax, sales tax, use tax, and any other tax which has a multistate impact, except that the provisions of articles III, IV and V of this compact shall apply only to the taxes specifically designated therein and the provisions of article IX of this compact shall apply only in respect to determinations pursuant to article IV.

**Article III.** Elements of Income Tax Laws.

Taxpayer Option, State and Local Taxes.

**(1)** Any taxpayer subject to an income tax whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a party state or pursuant to the laws of subdivisions in 2 or more party states may elect to apportion and allocate his income in the manner provided by the laws of such state or by the laws of such states and subdivisions without reference to this compact, or may elect to apportion and allocate in accordance with article IV except that beginning January 1, 2011 any taxpayer subject to the Michigan business tax act, 2007 PA 36, *MCL 208.1101* to *208.1601*, or the income tax act of 1967, 1967 PA 281, *MCL 206.1* to 206.697, shall, for purposes of that act, apportion and allocate in accordance with the provisions of that act and shall not apportion or allocate in accordance with article IV . This election for any tax year may be made in all party states or subdivisions thereof or in any one or more of the party states or subdivisions thereof without reference to the election made in the others. For the purposes of this paragraph, taxes imposed by subdivisions shall be considered separately from state taxes and the apportionment and allocation also may be applied to the entire tax base. In no instance wherein article IV is employed for all subdivisions of a state may the sum of all apportionments and allocations to subdivisions within a state be greater than the apportionment and allocation that would be assignable to that state if the apportionment or allocation were being made with respect to a state income tax.

Taxpayer Option, Short Form.

**(2)** Each party state or any subdivision thereof which imposes an income tax shall provide by law that any taxpayer required to file a return, whose only activities within the taxing jurisdiction consist of sales and do not include owning or renting real estate or tangible personal property, and whose dollar volume of gross sales made during the tax year within

the state or subdivision, is not in excess of $100,000.00 may elect to report and pay any tax due on the basis of a percentage of such volume, and shall adopt rates which shall produce a tax which reasonably approximates the tax otherwise due. The multistate tax commission, not more than once in 5 years, may adjust the $100,000.00 figure in order to reflect such changes as may occur in the real value of the dollar, and such adjusted figure, upon adoption by the commission, shall replace the $100,000.00 figure specifically provided herein. Each party state and subdivision thereof may make the same election available to taxpayers additional to those specified in this paragraph.

Coverage.

**(3)** Nothing in this article relates to the reporting or payment of any tax other than an income tax.

**Article IV.** Division of Income.

**(1)** As used in this article, unless the context otherwise requires:

**(a)** "Business income" means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations.

**(b)** "Commercial domicile" means the principal place from which the trade or business of the taxpayer is directed or managed.

**(c)** "Compensation" means wages, salaries, commissions and any other form of remuneration paid to employees for personal services.

**(d)** "Financial organization" means any bank, trust company, savings bank, industrial bank, land bank, safe deposit company, private banker, savings and loan association, credit union, cooperative bank, small loan company, sales finance company, investment company, or any type of insurance company.

**(e)** "Nonbusiness income" means all income other than business income.

**(f)** "Public utility" means any business entity (1) which owns or operates any plant, equipment, property, franchise, or license for the transmission of communications, transportation of goods or persons, except by pipe line, or the production, transmission, sale, delivery, or furnishing of electricity, water or steam; and (2) whose rates of charges for goods or services have been established or approved by a federal, state or local government or governmental agency.

**(g)** "Sales" means all gross receipts of the taxpayer not allocated under paragraphs of this article.

**(h)** "State" means any state of the United States, the district of Columbia, the commonwealth of Puerto Rico, any territory or possession of the United States, and any foreign country or political subdivision thereof.

**(i)** "This state" means the state in which the relevant tax return is filed or, in the case of application of this article to the apportionment and allocation of income for local tax

purposes, the subdivision or local taxing district in which the relevant tax return is filed.

**(2)** Any taxpayer having income from business activity which is taxable both within and without this state, other than activity as a financial organization or public utility or the rendering of purely personal services by an individual, shall allocate and apportion his net income as provided in this article. If a taxpayer has income from business activity as a public utility but derives the greater percentage of his income from activities subject to this article, the taxpayer may elect to allocate and apportion his entire net income as provided in this article.

**(3)** For purposes of allocation and apportionment of income under this article, a taxpayer is taxable in another state if (1) in that state he is subject to a net income tax, a franchise tax measured by net income, a franchise tax for the privilege of doing business, or a corporate stock tax, or (2) that state has jurisdiction to subject the taxpayer to a net income tax regardless of whether, in fact, the state does or does not.

**(4)** Rents and royalties from real or tangible personal property, capital gains, interest, dividends or patent or copyright royalties, to the extent that they constitute nonbusiness income, shall be allocated as provided in paragraphs 5 through 8 of this article.

**(5)**

**(a)** Net rents and royalties from real property located in this state are allocable to this state.

**(b)** Net rents and royalties from tangible personal property are allocable to this state: (1) If and to the extent that the property is utilized in this state, or (2) in their entirety if the taxpayer's commercial domicile is in this state and the taxpayer is not organized under the laws of or taxable in the state in which the property is utilized.

**(c)** The extent of utilization of tangible personal property in a state is determined by multiplying the rents and royalties by a fraction, the numerator of which is the number of days of physical location of the property in the state during the rental or royalty period in the taxable year and the denominator of which is the number of days of physical location of the property everywhere during all rental or royalty periods in the taxable year. If the physical location of the property during the rental or royalty period is unknown or unascertainable by the taxpayer, tangible personal property is utilized in the state in which the property was located at the time the rental or royalty payer obtained possession.

**(6)**

**(a)** Capital gains and losses from sales of real property located in this state are allocable to this state.

**(b)** Capital gains and losses from sales of tangible personal property are allocable to this state if (1) the property had a situs in this state at the time of the sale, or (2) the taxpayer's commercial domicile is in this state and the taxpayer is not taxable in the state in which the property had a situs.

**(c)** Capital gains and losses from sales of intangible personal property are allocable to this state if the taxpayer's commercial domicile is in this state.

**(7)** Interest and dividends are allocable to this state if the taxpayer's commercial domicile is in

this state.

**(8)**

    **(a)** Patent and copyright royalties are allocable to this state: (1) if and to the extent that the patent or copyright is utilized by the payer in this state, or (2) if and to the extent that the patent copyright is utilized by the payer in a state in which the taxpayer is not taxable and the taxpayer's commercial domicile is in this state.

    **(b)** A patent is utilized in a state to the extent that it is employed in production, fabrication, manufacturing, or other processing in the state or to the extent that a patented product is produced in the state. If the basis of receipts from patent royalties does not permit allocation to states or if the accounting procedures do not reflect states of utilization, the patent is utilized in the state in which the taxpayer's commercial domicile is located.

    **(c)** A copyright is utilized in a state to the extent that printing or other publication originates in the state. If the basis of receipts from copyright royalties does not permit allocation to states or if the accounting procedures do not reflect states of utilization, the copyright is utilized in the state in which the taxpayer's commercial domicile is located.

**(9)** All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is 3.

**(10)** The property factor is a fraction, the numerator of which is the average value of the taxpayer's real and tangible personal property owned or rented and used in this state during the tax period and the denominator of which is the average value of all the taxpayer's real and tangible personal property owned or rented and used during the tax period.

**(11)** Property owned by the taxpayer is valued at its original cost. Property rented by the taxpayer is valued at 8 times the net annual rental rate. Net annual rental rate is the annual rental rate paid by the taxpayer less any annual rental rate received by the taxpayer from subrentals.

**(12)** The average value of property shall be determined by averaging the values at the beginning and ending of the tax period but the tax administrator may require the averaging of monthly values during the tax period if reasonably required to reflect properly the average value of the taxpayer's property.

**(13)** The payroll factor is a fraction, the numerator of which is the total amount paid in this state during the tax period by the taxpayer for compensation and the denominator of which is the total compensation paid everywhere during the tax period.

**(14)** Compensation is paid in this state if:

    **(a)** The individual's service is performed entirely within the state;

    **(b)** The individual's service is performed both within and without the state, but the service performed without the state is incidental to the individual's service within the state; or

    **(c)** Some of the service is performed in the state and (1) the base of operations or, if there is no base of operations, the place from which the service is directed or controlled is in the state, or (2) the base of operations or the place from which the service is directed

or controlled is not in any state in which some part of the service is performed, but the individual's residence is in this state.

**(15)** The sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this state during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period.

**(16)** Sales of tangible personal property are in this state if:

**(a)** The property is delivered or shipped to a purchaser, other than the United States government, within this state regardless of the f.o.b. point or other conditions of the sale; or

**(b)** The property is shipped from an office, store, warehouse, factory, or other place of storage in this state and (1) the purchaser is the United States government or (2) the taxpayer is not taxable in the state of the purchaser.

**(17)** Sales, other than sales of tangible personal property, are in this state if:

**(a)** The income-producing activity is performed in this state; or

**(b)** The income-producing activity is performed both in and outside this state and a greater proportion of the income-producing activity is performed in this state than in any other state, based on costs of performance.

**(18)** If the allocation and apportionment provisions of this article do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for or the tax administrator may require, in respect to all or any part of the taxpayer's business activity, if reasonable:

**(a)** Separate accounting;

**(b)** The exclusion of any one or more of the factors;

**(c)** The inclusion of 1 or more additional factors which will fairly represent the taxpayer's business activity in this state; or

**(d)** The employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income.

**Article V.** Elements of Sales and Use Tax Laws.

Tax Credit.

**(1)** Each purchaser liable for a use tax on tangible personal property shall be entitled to full credit for the combined amount or amounts of legally imposed sales or use taxes paid by him with respect to the same property to another state and any subdivision thereof. The credit shall be applied first against the amount of any use tax due the state, and any unused portion of the credit shall then be applied against the amount of any use tax due a subdivision.

Tax Credit

Exemption Certificates, Vendors May Rely.

EDWARD BEEBY

**(2)** Whenever a vendor receives and accepts in good faith from a purchaser a resale or other exemption certificate or other written evidence of exemption authorized by the appropriate state or subdivision taxing authority, the vendor shall be relieved of liability for a sales or use tax with respect to the transaction.

**Article VI.** The Commission.

Organization and Management.

**(1)**

**(a)** The multistate tax commission is hereby established. It shall be composed of 1 "member" from each party state who shall be the head of the state agency charged with the administration of the types of taxes to which this compact applies. If there is more than 1 such agency, the state shall provide by law for the selection of the commission member from the heads of the relevant agencies. State law may provide that a member of the commission be represented by an alternate but only if there is on file with the commission written notification of the designation and identity of the alternate. The attorney general of each party state or his designee, or other counsel if the laws of the party state specifically provide, shall be entitled to attend the meetings of the commission, but shall not vote. Such attorneys general, designees, or other counsel shall receive all notices of meetings required under paragraph 1 (e) of this article.

**(b)** Each party state shall provide by law for the selection of representatives from its subdivisions affected by this compact to consult with the commission member from that state.

**(c)** Each member shall be entitled to 1 vote. The commission shall not act unless a majority of the members are present, and no action shall be binding unless approved by a majority of the total number of members.

**(d)** The commission shall adopt an official seal to be used as it may provide.

**(e)** The commission shall hold an annual meeting and such other regular meetings as its bylaws may provide and such special meetings as its executive committee may determine. The commission bylaws shall specify the dates of the annual and any other regular meetings, and shall provide for the giving of notice of annual, regular and special meetings. Notices of special meetings shall include the reasons therefor and an agenda of the items to be considered.

**(f)** The commission shall elect annually, from among its members, a chairman, a vice chairman and a treasurer. The commission shall appoint an executive director who shall serve at its pleasure, and it shall fix his duties and compensation. The executive director shall be secretary of the commission. The commission shall make provision for the bonding of such of its officers and employees as it may deem appropriate.

**(g)** Irrespective of the civil service, personnel or other merit system laws of any party state, the executive director shall appoint or discharge such personnel as may be necessary for the performance of the functions of the commission and shall fix their duties and compensation. The commission bylaws shall provide for personnel policies and

programs.

**(h)** The commission may borrow, accept or contract for the services of personnel from any state, the United States, or any other governmental entity.

**(i)** The commission may accept for any of its purposes and functions any and all donations and grants of money, equipment, supplies, materials and services, conditional or otherwise, from any governmental entity, and may utilize and dispose of the same.

**(j)** The commission may establish 1 or more offices for the transacting of its business.

**(k)** The commission shall adopt bylaws for the conduct of its business. The commission shall publish its bylaws in convenient form, and shall file a copy of the bylaws and any amendments thereto with the appropriate agency or officer in each of the party states.

**(l)** The commission annually shall make to the governor and legislature of each party state a report covering its activities for the preceding year. Any donation or grant accepted by the commission or services borrowed shall be reported in the annual report of the commission, and shall include the nature, amount and conditions, if any, of the donation, gift, grant or services borrowed and the identity of the donor or lender. The commission may make additional reports as it may deem desirable.

Committees.

**(2)**

**(a)** To assist in the conduct of its business when the full commission is not meeting, the commission shall have an executive committee of 7 members, including the chairman, vice chairman, treasurer and 4 other members elected annually by the commission. The executive committee, subject to the provisions of this compact and consistent with the policies of the commission, shall function as provided in the bylaws of the commission.

**(b)** The commission may establish advisory and technical committees, membership on which may include private persons and public officials, in furthering any of its activities. Such committees may consider any matter of concern to the commission, including problems of special interest to any party state and problems dealing with particular types of taxes.

**(c)** The commission may establish such additional committees as its bylaws may provide.

Powers.

**(3)** In addition to powers conferred elsewhere in this compact, the commission shall have power to:

**(a)** Study state and local tax systems and particular types of state and local taxes.

**(b)** Develop and recommend proposals for an increase in uniformity or compatibility of state and local tax laws with a view toward encouraging the simplification and improvement of state and local tax law and administration.

**(c)** Compile and publish information as in its judgment would assist the party states in implementation of the compact and taxpayers in complying with state and local tax

EDWARD BEEBY

laws.

**(d)** Do all things necessary and incidental to the administration of its functions pursuant to this compact.

Finance.

**(4)**

**(a)** The commission shall submit to the governor or designated officer or officers of each party state a budget of its estimated expenditures for such period as may be required by the laws of that state for presentation to the legislature thereof.

**(b)** Each of the commission's budgets of estimated expenditures shall contain specific recommendations of the amounts to be appropriated by each of the party states. The total amount of appropriations requested under any such budget shall be apportioned among the party states as follows: one-tenth in equal shares; and the remainder in proportion to the amount of revenue collected by each party state and its subdivisions from income taxes, capital stock taxes, gross receipts taxes, sales and use taxes. In determining such amounts, the commission shall employ such available public sources of information as, in its judgment, present the most equitable and accurate comparisons among the party states. Each of the commission's budgets of estimated expenditures and requests for appropriations shall indicate the sources used in obtaining information employed in applying the formula contained in this paragraph.

**(c)** The commission shall not pledge the credit of any party state. The commission may meet any of its obligations in whole or in part with funds available to it under paragraph (1) (i) of this article: provided that the commission takes specific action setting aside such funds prior to incurring any obligation to be met in whole or in part in such manner. Except where the commission makes use of funds available to it under paragraph (1) (i), the commission shall not incur any obligation prior to the allotment of funds by the party states adequate to meet the same.

**(d)** The commission shall keep accurate accounts of all receipts and disbursements. The receipts and disbursements of the commission shall be subject to the audit and accounting procedures established under its bylaws. All receipts and disbursements of funds handled by the commission shall be audited yearly by a certified or licensed public accountant and the report of the audit shall be included in and become part of the annual report of the commission.

**(e)** The accounts of the commission shall be open at any reasonable time for inspection by duly constituted officers of the party states and by any persons authorized by the commission.

**(f)** Nothing contained in this article shall be construed to prevent commission compliance with laws relating to audit or inspection of accounts by or on behalf of any government contributing to the support of the commission.

**Article VII.** Uniform Regulations and Forms.

**(1)** Whenever any 2 or more party states, or subdivisions of party states, have uniform or

similar provisions of law relating to an income tax, capital stock tax, gross receipts tax, sales or use tax, the commission may adopt uniform regulations for any phase of the administration of such law, including assertion of jurisdiction to tax, or prescribing uniform tax forms. The commission may also act with respect to the provisions of article IV of this compact.

**(2)** Prior to the adoption of any regulation, the commission shall:

**(a)** As provided in its bylaws, hold at least 1 public hearing on due notice to all affected party states and subdivisions thereof and to all taxpayers and other persons who have made timely request of the commission for advance notice of its regulation-making proceedings.

**(b)** Afford all affected party states and subdivisions and interested persons an opportunity to submit relevant written data and views, which shall be considered fully by the commission.

**(3)** The commission shall submit any regulations adopted by it to the appropriate officials of all party states and subdivisions to which they might apply. Each such state and subdivision shall consider any such regulation for adoption in accordance with its own laws and procedures.

**Article VIII.** Interstate Audits.

**(1)** This article shall be in force only in those party states that specifically provide therefor by statute.

**(2)** Any party state or subdivision thereof desiring to make or participate in an audit of any accounts, books, papers, records or other documents may request the commission to perform the audit on its behalf. In responding to the request, the commission shall have access to and may examine, at any reasonable time, such accounts, books, papers, records, and other documents and any relevant property or stock of merchandise. The commission may enter into agreements with party states or their subdivisions for assistance in performance of the audit. The commission shall make charges, to be paid by the state or local government or governments for which it performs the service, for any audits performed by it in order to reimburse itself for the actual costs incurred in making the audit.

**(3)** The commission may require the attendance of any person within the state where it is conducting an audit or part thereof at a time and place fixed by it within such state for the purpose of giving testimony with respect to any account, book, paper, document, other record, property or stock of merchandise being examined in connection with the audit. If the person is not within the jurisdiction, he may be required to attend for such purpose at any time and place fixed by the commission within the state of which he is a resident: provided that such state has adopted this article.

**(4)** The commission may apply to any court having power to issue compulsory process for orders in aid of its powers and responsibilities pursuant to this article and any and all such courts shall have jurisdiction to issue such orders. Failure of any person to obey any such order shall be punishable as contempt of the issuing court. If the party or subject matter on account of which the commission seeks an order is within the jurisdiction of the court to

which application is made, such application may be to a court in the state or subdivision on behalf of which the audit is being made or a court in the state in which the object of the order being sought is situated. The provisions of this paragraph apply only to courts in a state that has adopted this article.

(5) The commission may decline to perform any audit requested if it finds that its available personnel or other resources are insufficient for the purpose or that, in the terms requested, the audit is impracticable of satisfactory performance. If the commission, on the basis of its experience, has reason to believe that an audit of a particular taxpayer, either at a particular time or on a particular schedule, would be of interest to a number of party states or their subdivisions, it may offer to make the audit or audits, the offer to be contingent on sufficient participation therein as determined by the commission.

(6) Information obtained by any audit pursuant to this article shall be confidential and available only for tax purposes to party states, their subdivisions or the United States. Availability of information shall be in accordance with the laws of the states or subdivisions on whose account the commission performs the audit, and only through the appropriate agencies or officers of such states or subdivisions. Nothing in this article shall be construed to require any taxpayer to keep records for any period not otherwise required by law.

(7) Other arrangements made or authorized pursuant to law for cooperative audit by or on behalf of the party states or any of their subdivisions are not superseded or invalidated by this article.

(8) In no event shall the commission make any charge against a taxpayer for an audit.

(9) As used in this article, "tax," in addition to the meaning ascribed to it in article II, means any tax or license fee imposed in whole or in part for revenue purposes.

**Article IX.** Arbitration.

(1) Whenever the commission finds a need for settling disputes concerning apportionments and allocations by arbitration, it may adopt a regulation placing this article in effect, notwithstanding the provisions of article VII.

(2) The commission shall select and maintain an arbitration panel composed of officers and employees of state and local governments and private persons who shall be knowledgeable and experienced in matters of tax law and administration.

(3) Whenever a taxpayer who has elected to employ article IV, or whenever the laws of the party state or subdivision thereof are substantially identical with the relevant provisions of article IV, the taxpayer, by written notice to the commission and to each party state or subdivision thereof that would be affected, may secure arbitration of an apportionment or allocation, if he is dissatisfied with the final administrative determination of the tax agency of the state or subdivision with respect thereto on the ground that it would subject him to double or multiple taxation by 2 or more party states or subdivisions thereof. Each party state and subdivision thereof hereby consents to the arbitration as provided herein, and agrees to be bound thereby.

(4) The arbitration board shall be composed of 1 person selected by the taxpayer, 1 by the agency or agencies involved, and 1 member of the commission's arbitration panel. If the

agencies involved are unable to agree on the person to be selected by them, such person shall be selected by lot from the total membership of the arbitration panel. The 2 persons selected for the board in the manner provided by the foregoing provisions of this paragraph shall jointly select the third member of the board. If they are unable to agree on the selection, the third member shall be selected by lot from among the total membership of the arbitration panel. No member of a board selected by lot shall be qualified to serve if he is an officer or employee or is otherwise affiliated with any party to the arbitration proceeding. Residence within the jurisdiction of a party to the arbitration proceeding shall not constitute affiliation within the meaning of this paragraph.

**(5)** The board may sit in any state or subdivision party to the proceeding, in the state of the taxpayer's incorporation, residence or domicile, in any state where the taxpayer does business, or in any place that it finds most appropriate for gaining access to evidence relevant to the matter before it.

**(6)** The board shall give due notice of the times and places of its hearings. The parties shall be entitled to be heard, to present evidence, and to examine and cross-examine witnesses. The board shall act by majority vote.

**(7)** The board shall have power to administer oaths, take testimony, subpoena and require the attendance of witnesses and the production of accounts, books, papers, records, and other documents, and issue commissions to take testimony. Subpoenas may be signed by any member of the board. In case of failure to obey a subpoena, and upon application by the board, any judge of a court of competent jurisdiction of the state in which the board is sitting or in which the person to whom the subpoena is directed may be found may make an order requiring compliance with the subpoena, and the court may punish failure to obey the order as a contempt. The provisions of this paragraph apply only in states that have adopted this article.

**(8)** Unless the parties otherwise agree the expenses and other costs of the arbitration shall be assessed and allocated among the parties by the board in such manner as it may determine. The commission shall fix a schedule of compensation for members of arbitration boards and of other allowable expenses and costs. No officer or employee of a state or local government who serves as a member of a board shall be entitled to compensation therefor unless he is required on account of his service to forego the regular compensation attaching to his public employment, but any such board member shall be entitled to expenses.

**(9)** The board shall determine the disputed apportionment or allocation and any matters necessary thereto. The determinations of the board shall be final for purposes of making the apportionment or allocation, but for no other purpose.

**(10)** The board shall file with the commission and with each tax agency represented in the proceeding: the determination of the board; the board's written statement of its reasons therefor; the record of the board's proceedings; and any other documents required by the arbitration rules of the commission to be filed.

**(11)** The commission shall publish the determinations of boards together with the statements of the reasons therefor.

**(12)** The commission shall adopt and publish rules of procedure and practice and shall file a

copy of such rules and of any amendment thereto with the appropriate agency or officer in each of the party states.

**(13)** Nothing contained herein shall prevent at any time a written compromise of any matter or matters in dispute, if otherwise lawful, by the parties to the arbitration proceeding.

**Article X.** Entry Into Force and Withdrawal.

**(1)** This compact shall enter into force when enacted into law by any 7 states. Thereafter, this compact shall become effective as to any other state upon its enactment thereof. The commission shall arrange for notification of all party states whenever there is a new enactment of the compact.

**(2)** Any party state may withdraw from this compact by enacting a statute repealing the same. No withdrawal shall affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal.

**(3)** No proceeding commenced before an arbitration board prior to the withdrawal of a state and to which the withdrawing state or any subdivision thereof is a party shall be discontinued or terminated by the withdrawal, nor shall the board thereby lose jurisdiction over any of the parties to the proceeding necessary to make a binding determination therein.

**Article XI.** Effect on Other Laws and Jurisdiction.

Nothing in this compact shall be construed to:

**(a)** Affect the power of any state or subdivision thereof to fix rates of taxation, except that a party state shall be obligated to implement article III (2) of this compact.

**(b)** Apply to any tax or fixed fee imposed for the registration of a motor vehicle or any tax on motor fuel, other than a sales tax: provided that the definition of ″tax″ in article VIII (9) may apply for the purposes of that article and the commission's powers of study and recommendation pursuant to article VI (3) may apply.

**(c)** Withdraw or limit the jurisdiction of any state or local court or administrative officer or body with respect to any person, corporation or other entity or subject matter, except to the extent that such jurisdiction is expressly conferred by or pursuant to this compact upon another agency or body.

**(d)** Supersede or limit the jurisdiction of any court of the United States.

**Article XII.** Construction and Serverability.

This compact shall be liberally construed so as to effectuate the purposes thereof. The provisions of this compact shall be severable and if any phrase, clause, sentence or provision of this compact is declared to be contrary to the constitution of any state or of the United States or the applicability thereof to any government, agency, person or circumstance is held invalid, the validity of the remainder of this compact and the applicability thereof to any government, agency, person or circumstance shall not be affected thereby. If this compact shall be held contrary to the constitution of any state participating therein, the compact shall remain in full force and effect as to the remaining party states and in full force and effect as to the state affected as to all severable matters.

EDWARD BEEBY

## History

Act 343, 1969, p 770; eff July 1, 1970.
Pub Acts 1969, No. 343, § 1, by § 9 eff July 1, 1970.
Amended by *Pub Acts 2011, No. 40*, imd eff May 25, 2011.

MICHIGAN COMPILED LAWS SERVICE

Copyright © 2015 Matthew Bender & Company, Inc. a member of the LexisNexis Group. All rights reserved.



LEXISNEXIS (TM) MISSOURI ANNOTATED STATUTES
Copyright © 2014 by Matthew Bender & Company, Inc.,
a member of the LexisNexis Group.
All rights reserved.

*** CURRENT THROUGH THE 97TH GENERAL ASSEMBLY, 2ND REGULAR SESSION ***

TITLE 4.  EXECUTIVE BRANCH (Chs. 26-37)
CHAPTER 32.  STATE DEPARTMENT OF REVENUE
MULTISTATE TAX COMPACT

**GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION**

§ 32.200 R.S.Mo.  (2014)

§ 32.200. Multistate tax compact


The "Multistate Tax Compact" is hereby enacted into law and entered into with all jurisdictions legally joining therein, in the form substantially as follows:


MULTISTATE TAX COMPACT



Article I


The purposes of this compact are to:

1. Facilitate proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases and settlement of apportionment disputes.

2. Promote uniformity or compatibility in significant components of tax systems.

3. Facilitate taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration.

4. Avoid duplicative taxation.

Article II

As used in this compact:

1. "State" means a state of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States.

2. "Subdivision" means any governmental unit or special district of a state.

3. "Taxpayer" means any corporation, partnership, firm, association, governmental unit or agency or person acting as a business entity in more than one state.

4. "Income tax" means a tax imposed on or measured by net income including any tax imposed on or measured by an amount arrived at by deducting expenses from gross income, one or more forms of which expenses are not specifically and directly related to particular transactions.

5. "Capital stock tax" means a tax measured in any way by the capital of a corporation considered in its entirety.

6. "Gross receipts tax" means a tax, other than a sales tax, which is imposed on or measured by the gross volume of business, in terms of gross receipts or in other terms, and in the determination of which no deduction is allowed which would constitute the tax an income tax.

7. "Sales tax" means a tax imposed with respect to the transfer for a consideration of ownership, possession or custody of tangible personal property or the rendering of services measured by the price of the tangible personal property transferred or services rendered and which is required by state or local law to be separately stated from the sales price by the seller, or which is customarily separately stated from the sales price, but does not include a tax imposed exclusively on the sale of a specifically identified commodity or article or class of commodities or articles.

8. "Use tax" means a nonrecurring tax, other than a sales tax, which

(a) is imposed on or with respect to the exercise or enjoyment of any right or power over tangible personal property incident to the ownership, possession or custody of that property or the leasing of that property from another including any consumption, keeping, retention, or other use of tangible personal property; and

(b) is complementary to a sales tax.

9. "Tax" means an income tax, capital stock tax, gross receipts tax, sales tax, use tax, and any other tax which has a multistate impact, except that the provisions of articles III, IV and V of this compact shall apply only to the taxes specifically designated therein and the provisions of article IX of this compact shall apply only in respect to determinations pursuant to article IV.

Article III

1. Any taxpayer subject to an income tax whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a party state or pursuant to the laws of subdivisions in two or more party states may elect to apportion and allocate his income in the manner provided by the laws of such state or by the laws of such states and subdivisions without reference to this compact, or may elect to apportion and allocate in accordance with article IV.

This election for any tax year may be made in all party states or subdivisions thereof or in any one or more of the party states or subdivisions thereof without reference to the election made in the others. For the purposes of this paragraph, taxes imposed by subdivisions shall be considered separately from state taxes and the apportionment and allocation also may be applied to the entire tax base. In no instance wherein article IV is employed for all subdivisions of a state may the sum of all apportionments and allocations to subdivisions within a state be greater than the apportionment and allocation that would be assignable to that state if the apportionment or allocation were being made with respect to a state income tax.

2. Each party state or any subdivision thereof which imposes an income tax shall provide by law that any taxpayer required to file a return, whose only activities within the taxing jurisdiction consist of sales and do not include owning or renting real estate or tangible personal property, and whose dollar volume of gross sales made during the tax year within the state or subdivision, as the case may be, is not in excess of $ 100,000 may elect to report and pay any tax due on the basis of a percentage of such volume, and shall adopt rates which shall produce a tax which reasonably approximates the tax otherwise due. The multistate tax commission, not more than once in five years, may adjust the $ 100,000 figure in order to reflect such changes as may occur in the real value of the dollar, and such adjusted figure, upon adoption by the commission, shall replace the $ 100,000 figure specifically provided herein. Each party state and subdivision thereof may make the same election available to taxpayers additional to those specified in this paragraph.

3. Nothing in this article relates to the reporting or payment of any tax other than an income tax.

Article IV

1. As used in this article, unless the context otherwise requires:

(1) "Business income" means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations.

(2) "Commercial domicile" means the principal place from which the trade or business of the taxpayer is directed or managed.

(3) "Compensation" means wages, salaries, commissions and any other form of remuneration paid to employees for personal services.

(4) "Financial organization" means any bank, trust company, savings bank, industrial bank, land bank, safe deposit company, private banker, savings and loan association, credit union, cooperative bank, small loan company, sales finance company, investment company, or any type of insurance company.

(5) "Nonbusiness income" means all income other than business income.

(6) "Public utility" means any business entity

(a) which owns or operates any plant, equipment, property, franchise, or license for the transmission of communications, transportation of goods or persons, except by pipeline, or the production, transmission, sale, delivery, or furnishing of electricity, water or steam; and

(b) whose rates of charges for goods or services have been established or approved by a federal, state or local government or governmental agency.

(7) "Sales" means all gross receipts of the taxpayer not allocated under paragraphs of this article.

(8) "State" means any state of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, and any foreign country or political subdivision thereof.

(9) "This state" means the state in which the relevant tax return is filed or, in the case of application of this article, to the apportionment and allocation of income for local tax purposes, the subdivision or local taxing district in which the relevant tax return is filed.

2. Any taxpayer having income from business activity which is taxable both within and without this state, other than activity as a financial organization or public utility or the rendering of purely personal services by an individual, shall allocate and apportion his net income as provided in this article. If a taxpayer has income from business activity as a public utility but derives the greater percentage of his income from activities subject to this article, the taxpayer may elect to allocate and apportion his entire net income as provided in this article.

3. For purposes of allocation and apportionment of income under this article, a taxpayer is taxable in another state if

(1) in that state he is subject to a net income tax, a franchise tax measured by net income, a franchise tax for the privilege of doing business, or a corporate stock tax; or

(2) that state has jurisdiction to subject the taxpayer to a net income tax regardless of whether, in fact, the state does or does not.

4. Rents and royalties from real or tangible personal property, capital gains, interest, dividends or patent or copyright royalties, to the extent that they constitute nonbusiness income, shall be allocated as provided in paragraphs 5 through 8 of this article.

5. (1) Net rents and royalties from real property located in this state are allocable to this state.

(2) Net rents and royalties from tangible personal property are allocable to this state:

(a) if and to the extent that the property is utilized in this state; or

(b) in their entirety if the taxpayer's commercial domicile is in this state and the taxpayer is not organized under the laws of or taxable in the state in which the property is utilized.

(3) The extent of utilization of tangible personal property in a state is determined by multiplying the rents and royalties by a fraction, the numerator of which is the number of days of physical location of the property in the state during the rental or royalty period in the taxable year and the denominator of which is the number of days of physical location of the property everywhere during all rental or royalty periods in the taxable year. If the physical location of the property during the rental or royalty period is unknown or unascertainable by the taxpayer, tangible personal property is utilized in the state in which the property was located at the time the rental or royalty payer obtained possession.

6. (1) Capital gains and losses from sales of real property located in this state are allocable to this state.

(2) Capital gains and losses from sales of tangible personal property are allocable to this state if

(a) the property had a situs in this state at the time of the sale; or

(b) the taxpayer's commercial domicile is in this state and the taxpayer is not taxable in the state in which the property had a situs.

(3) Capital gains and losses from sales of intangible personal property are allocable to this state if the taxpayer's commercial domicile is in this state.

7. Interest and dividends are allocable to this state if the taxpayer's commercial domicile is in this state.

8. (1) Patent and copyright royalties are allocable to this state:

(a) if and to the extent that the patent or copyright is utilized by the payer in this state; or

(b) if and to the extent that the patent copyright is utilized by the payer in a state in which the taxpayer is not taxable and the taxpayer's commercial domicile is in this state.

(2) A patent is utilized in a state to the extent that it is employed in production, fabrication, manufacturing, or other processing in the state or to the extent that a patented product is produced in the state. If the basis of receipts from patent royalties does not permit allocation to states or if the accounting procedures do not reflect states of utilization, the patent is utilized in the state in which the taxpayer's commercial domicile is located.

(3) A copyright is utilized in a state to the extent that printing or other publication originates in the state. If the basis of receipts from copyright royalties does not permit allocation to states or if the accounting procedures do not reflect states of utilization, the copyright is utilized in the state in which the taxpayer's commercial domicile is located.

9. All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three.

10. The property factor is a fraction, the numerator of which is the average value of the taxpayer's real and tangible personal property owned or rented and used in this state during the tax period and the denominator of which is the average value of all the taxpayer's real and tangible personal property owned or rented and used during the tax period.

11. Property owned by the taxpayer is valued at its original cost. Property rented by the taxpayer is valued at eight times the net annual rental rate. Net annual rental rate is the annual rental rate paid by the taxpayer less any annual rental rate received by the taxpayer from subrentals.

12. The average value of property shall be determined by averaging the values at the beginning and ending of the tax period but the tax administrator may require the averaging of monthly values during the tax period if reasonably required to reflect properly the average value of the taxpayer's property.

13. The payroll factor is a fraction, the numerator of which is the total amount paid in this state during the tax period by the taxpayer for compensation and the denominator of which is the total compensation paid everywhere during the tax period.

14. Compensation is paid in this state if:

(1) the individual's service is performed entirely within the state;

(2) the individual's service is performed both within and without the state, but the service performed without the state is incidental to the individual's service within the state; or

(3) some of the service is performed in the state; and

(a) the base of operations or, if there is no base of operations, the place from which the service is directed or controlled is in the state; or

(b) the base of operations or the place from which the service is directed or controlled is not in any state in which some part of the service is performed, but the individual's residence is in this state.

15. The sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this state during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period.

16. Sales of tangible personal property are in this state if:

(1) the property is delivered or shipped to a purchaser, other than the United States government, within this state regardless of the f.o.b. point or other conditions of the sale; or

(2) the property is shipped from an office, store, warehouse, factory, or other place of storage in this state; and

(a) the purchaser is the United States government; or

(b) the taxpayer is not taxable in the state of the purchaser.

17. Sales, other than sales of tangible personal property, are in this state if:

(1) the income-producing activity is performed in this state; or

(2) the income-producing activity is performed both in and outside this state and a greater proportion of the income-producing activity is performed in this state than in any other state, based on costs of performance.

18. If the allocation and apportionment provisions of this article do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for or the tax administrator may require, in respect to all or any part of the taxpayer's business activity, if reasonable:

(1) separate accounting;

(2) the exclusion of any one or more of the factors;

(3) the inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or

(4) the employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income.

Article V

1. Each purchaser liable for a use tax on tangible personal property shall be entitled to full credit for the combined amount or amounts of legally imposed sales or use taxes paid by him with respect to the same property to another state and any subdivision thereof. The credit shall be applied first against the amount of any use tax due the state, and any unused portion of the credit shall then be applied against the amount of any use tax due a subdivision.

2. Whenever a vendor receives and accepts in good faith from a purchaser a resale or other exemption certificate or other written evidence of exemption authorized by the appropriate state or subdivision taxing authority, the vendor shall be relieved of liability for a sales or use tax with respect to the transaction.

Article VI

     1. (a) The multistate tax commission is hereby established. It shall be composed of one "member" from each party state who shall be the head of the state agency charged with the administration of the types of taxes to which this compact applies. If there is more than one such agency the state shall provide by law for the selection of the commission member from the heads of the relevant agencies. State law may provide that a member of the commission be represented by an alternate but only if there is on file with the commission written notification of the designation and identity of the alternate. The attorney general of each party state or his designee, or other counsel if the laws of the party state specifically provide, shall be entitled to attend the meetings of the commission, but shall not vote. Such attorneys general, designees, or other counsel shall receive all notices of meetings required under paragraph 1 (e) of this article.

     (b) Each party state shall provide by law for the selection of representatives from its subdivisions affected by this compact to consult with the commission member from that state.

     (c) Each member shall be entitled to one vote. The commission shall not act unless a majority of the members are present, and no action shall be binding unless approved by a majority of the total number of members.

     (d) The commission shall adopt an official seal to be used as it may provide.

     (e) The commission shall hold an annual meeting and such other regular meetings as its bylaws may provide and such special meetings as its executive committee may determine. The commission bylaws shall specify the dates of the annual and any other regular meetings, and shall provide for the giving of notice of annual, regular and special meetings. Notices of special meetings shall include the reasons therefor and an agenda of the items to be considered.

     (f) The commission shall elect annually, from among its members, a chairman, a vice chairman and a treasurer. The commission shall appoint an executive director who shall serve at its pleasure, and it shall fix his duties and compensation. The executive director shall be secretary of the commission. The commission shall make provision for the bonding of such of its officers and employees as it may deem appropriate.

     (g) Irrespective of the civil service, personnel or other merit system laws of any party state, the executive director shall appoint or discharge such personnel as may be necessary for the performance of the functions of the commission and shall fix their duties and compensation. The commission bylaws shall provide for personnel policies and programs.

     (h) The commission may borrow, accept or contract for the services of personnel from any state, the United States, or any other governmental entity.

     (i) The commission may accept for any of its purposes and functions any and all donations and grants of money, equipment, supplies, materials and services, conditional or otherwise, from any governmental entity, and may utilize and dispose of the same.

     (j) The commission may establish one or more offices for the transacting of its business.

     (k) The commission shall adopt bylaws for the conduct of its business. The commission shall publish its bylaws in convenient form, and shall file a copy of the bylaws and any amendments thereto with the appropriate agency or officer in each of the party states.

     (l) The commission annually shall make to the governor and legislature of each party state a report covering its activities for the preceding year. Any donation or grant accepted by the commission or services borrowed shall be reported in the annual report of the commission, and shall include the nature, amount and conditions, if any, of the

donation, gift, grant or services borrowed and the identity of the donor or lender. The commission may make additional reports as it may deem desirable.

2. (a) To assist in the conduct of its business when the full commission is not meeting, the commission shall have an executive committee of seven members, including the chairman, vice chairman, treasurer and four other members elected annually by the commission. The executive committee, subject to the provisions of this compact and consistent with the policies of the commission, shall function as provided in the bylaws of the commission.

(b) The commission may establish advisory and technical committees, membership on which may include private persons and public officials, in furthering any of its activities. Such committees may consider any matter of concern to the commission, including problems of special interest to any party state and problems dealing with particular types of taxes.

(c) The commission may establish such additional committees as its bylaws may provide.

3. In addition to powers conferred elsewhere in this compact, the commission shall have power to:

(a) Study state and local tax systems and particular types of state and local taxes.

(b) Develop and recommend proposals for an increase in uniformity or compatibility of state and local tax laws with a view toward encouraging the simplification and improvement of state and local tax law and administration.

(c) Compile and publish information as in its judgment would assist the party states in implementation of the compact and taxpayers in complying with state and local tax laws.

(d) Do all things necessary and incidental to the administration of its functions pursuant to this compact.

4. (a) The commission shall submit to the governor or designated officer or officers of each party state a budget of its estimated expenditures for such period as may be required by the laws of that state for presentation to the legislature thereof.

(b) Each of the commission's budgets of estimated expenditures shall contain specific recommendations of the amounts to be appropriated by each of the party states. The total amount of appropriations requested under any such budget shall be apportioned among the party states as follows: one-tenth in equal shares; and the remainder in proportion to the amount of revenue collected by each party state and its subdivisions from income taxes, capital stock taxes, gross receipts taxes, sales and use taxes. In determining such amounts, the commission shall employ such available public sources of information as, in its judgment, present the most equitable and accurate comparisons among the party states. Each of the commission's budgets of estimated expenditures and requests for appropriations shall indicate the sources used in obtaining information employed in applying the formula contained in this paragraph.

(c) The commission shall not pledge the credit of any party state. The commission may meet any of its obligations in whole or in part with funds available to it under paragraph 1 (i) of this article; provided that the commission takes specific action setting aside such funds prior to incurring any obligation to be met in whole or in part in such manner. Except where the commission makes use of funds available to it under paragraph 1 (i), the commission shall not incur any obligation prior to the allotment of funds by the party states adequate to meet the same.

(d) The commission shall keep accurate accounts of all receipts and disbursements. The receipts and disbursements of the commission shall be subject to the audit and accounting procedures established under its bylaws. All receipts and disbursements of funds handled by the commission shall be audited yearly by a certified or licensed public accountant and the report of the audit shall be included in and become part of the annual report of the commission.

(e) The accounts of the commission shall be open at any reasonable time for inspection by duly constituted officers of the party states and by any persons authorized by the commission.

(f) Nothing contained in this article shall be construed to prevent commission compliance with laws relating to audit or inspection of accounts by or on behalf of any government contributing to the support of the commission.

Article VII

1. Whenever any two or more party states, or subdivisions of party states, have uniform or similar provisions of law relating to an income tax, capital stock tax, gross receipts tax, sales or use tax, the commission may adopt uniform regulations for any phase of the administration of such law, including assertion of jurisdiction to tax, or prescribing uniform tax forms. The commission may also act with respect to the provisions of article IV of this compact.

2. Prior to the adoption of any regulation, the commission shall:

(a) As provided in its bylaws, hold at least one public hearing on due notice to all affected party states and subdivisions thereof and to all taxpayers and other persons who have made timely request of the commission for advance notice of its regulation-making proceedings.

(b) Afford all affected party states and subdivisions and interested persons an opportunity to submit relevant written data and views, which shall be considered fully by the commission.

3. The commission shall submit any regulations adopted by it to the appropriate officials of all party states and subdivisions to which they might apply. Each such state and subdivision shall consider any such regulation for adoption in accordance with its own laws and procedures.

Article VIII*

1. This article shall be in force only in those party states that specifically provide therefor by statute.

2. Any party state or subdivision thereof desiring to make or participate in an audit of any accounts, books, papers, records or other documents may request the commission to perform the audit on its behalf. In responding to the request, the commission shall have access to and may examine, at any reasonable time, such accounts, books, papers, records, and other documents and any relevant property or stock of merchandise. The commission may enter into agreements with party states or their subdivisions for assistance in performance of the audit. The commission shall make charges, to be paid by the state or local government or governments for which it performs the service, for any audits performed by it in order to reimburse itself for the actual costs incurred in making the audit.

3. The commission may require the attendance of any person within the state where it is conducting an audit or part thereof at a time and place fixed by it within such state for the purpose of giving testimony with respect to any account, book, paper, document, other record, property or stock of merchandise being examined in connection with the audit. If the person is not within the jurisdiction, he may be required to attend for such purpose at any time and place fixed by the commission within the state of which he is a resident; provided that such state has adopted this article.

4. The commission may apply to any court having power to issue compulsory process for orders in aid of its powers and responsibilities pursuant to this article and any and all such courts shall have jurisdiction to issue such

orders. Failure of any person to obey any such order shall be punishable as contempt of the issuing court. If the party or subject matter on account of which the commission seeks an order is within the jurisdiction of the court to which application is made, such application may be to a court in the state or subdivision on behalf of which the audit is being made or a court in the state in which the object of the order being sought is situated. The provisions of this paragraph apply only to courts in a state that has adopted this article.

5. The commission may decline to perform any audit requested if it finds that its available personnel or other resources are insufficient for the purpose or that, in the terms requested, the audit is impracticable of satisfactory performance. If the commission, on the basis of its experience, has reason to believe that an audit of a particular taxpayer, either at a particular time or on a particular schedule, would be of interest to a number of party states or their subdivisions, it may offer to make the audit or audits, the offer to be contingent on sufficient participation therein as determined by the commission.

6. Information obtained by any audit pursuant to this article shall be confidential and available only for tax purposes to party states, their subdivisions or the United States. Availability of information shall be in accordance with the laws of the states or subdivisions on whose account the commission performs the audit, and only through the appropriate agencies or officers of such states or subdivisions. Nothing in this article shall be construed to require any taxpayer to keep records for any period not otherwise required by law.

7. Other arrangements made or authorized pursuant to law for cooperative audit by or on behalf of the party states or any of their subdivisions are not superseded or invalidated by this article.

8. In no event shall the commission make any charge against a taxpayer for an audit.

9. As used in this article, "tax" in addition to the meaning ascribed to it in article II, means any tax or license fee imposed in whole or in part for revenue purposes.


Article IX

1. Whenever the commission finds a need for settling disputes concerning apportionments and allocations by arbitration, it may adopt a regulation placing this article in effect, notwithstanding the provisions of article VII.

2. The commission shall select and maintain an arbitration panel composed of officers and employees of state and local governments and private persons who shall be knowledgeable and experienced in matters of tax law and administration.

3. Whenever a taxpayer who has elected to employ article IV, or whenever the laws of the party state or subdivision thereof are substantially identical with the relevant provisions of article IV, the taxpayer, by written notice to the commission and to each party state or subdivision thereof that would be affected, may secure arbitration of an apportionment or allocation, if he is dissatisfied with the final administrative determination of the tax agency of the state or subdivision with respect thereto on the ground that it would subject him to double or multiple taxation by two or more party states or subdivisions thereof. Each party state and subdivision thereof hereby consents to the arbitration as provided herein, and agrees to be bound thereby.

4. The arbitration board shall be composed of one person selected by the taxpayer, one by the agency or agencies involved, and one member of the commission's arbitration panel. If the agencies involved are unable to agree on the person to be selected by them, such person shall be selected by lot from the total membership of the arbitration panel. The two persons selected for the board in the manner provided by the foregoing provisions of this paragraph shall jointly select the third member of the board. If they are unable to agree on the selection, the third member shall be

selected by lot from among the total membership of the arbitration panel. No member of a board selected by lot shall be qualified to serve if he is an officer or employee or is otherwise affiliated with any party to the arbitration proceeding. Residence within the jurisdiction of a party to the arbitration proceeding shall not constitute affiliation within the meaning of this paragraph.

5. The board may sit in any state or subdivision party to the proceeding, in the state of the taxpayer's incorporation, residence or domicile, in any state where the taxpayer does business, or in any place that it finds most appropriate for gaining access to evidence relevant to the matter before it.

6. The board shall give due notice of the times and places of its hearings. The parties shall be entitled to be heard, to present evidence, and to examine and cross-examine witnesses. The board shall act by majority vote.

7. The board shall have power to administer oaths, take testimony, subpoena and require the attendance of witnesses and the production of accounts, books, papers, records, and other documents, and issue commissions to take testimony. Subpoenas may be signed by any member of the board. In case of failure to obey a subpoena, and upon application by the board, any judge of a court of competent jurisdiction of the state in which the board is sitting or in which the person to whom the subpoena is directed may be found may make an order requiring compliance with the subpoena, and the court may punish failure to obey the order as a contempt. The provisions of this paragraph apply only in states that have adopted this article.

8. Unless the parties otherwise agree the expenses and other costs of the arbitration shall be assessed and allocated among the parties by the board in such manner as it may determine. The commission shall fix a schedule of compensation for members of arbitration boards and of other allowable expenses and costs. No officer or employee of a state or local government who serves as a member of a board shall be entitled to compensation therefor unless he is required on account of his service to forego the regular compensation attaching to his public employment, but any such board member shall be entitled to expenses.

9. The board shall determine the disputed apportionment or allocation and any matters necessary thereto. The determinations of the board shall be final for purposes of making the apportionment or allocation, but for no other purpose.

10. The board shall file with the commission and with each tax agency represented in the proceeding: the determination of the board; the board's written statement of its reasons therefor; the record of the board's proceedings; and any other documents required by the arbitration rules of the commission to be filed.

11. The commission shall publish the determinations of boards together with the statements of the reasons therefor.

12. The commission shall adopt and publish rules of procedure and practice and shall file a copy of such rules and of any amendment thereto with the appropriate agency or officer in each of the party states.

13. Nothing contained herein shall prevent at any time a written compromise of any matter or matters in dispute, if otherwise lawful, by the parties to the arbitration proceeding.

Article X

1. This compact shall enter into force when enacted into law by any seven states. Thereafter, this compact shall become effective as to any other state upon its enactment thereof. The commission shall arrange for notification of all party states whenever there is a new enactment of the compact.

2. Any party state may withdraw from this compact by enacting a statute repealing the same. No withdrawal shall affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal.

3. No proceeding commenced before an arbitration board prior to the withdrawal of a state and to which the withdrawing state or any subdivision thereof is a party shall be discontinued or terminated by the withdrawal, nor shall the board thereby lose jurisdiction over any of the parties to the proceeding necessary to make a binding determination therein.

Article XI

Nothing in this compact shall be construed to:

(a) Affect the power of any state or subdivision thereof to fix rates of taxation, except that a party state shall be obligated to implement article III 2 of this compact.

(b) Apply to any tax or fixed fee imposed for the registration of a motor vehicle or any tax on motor fuel, other than a sales tax; provided that the definition of "tax" in article VIII 9 may apply for the purposes of that article and the commission's powers of study and recommendation pursuant to article VI 3 may apply.

(c) Withdraw or limit the jurisdiction of any state or local court or administrative officer or body with respect to any person, corporation or other entity or subject matter, except to the extent that such jurisdiction is expressly conferred by or pursuant to this compact upon another agency or body.

(d) Supersede or limit the jurisdiction of any court of the United States.

Article XII

This compact shall be liberally construed so as to effectuate the purposes thereof. The provisions of this compact shall be severable and if any phrase, clause, sentence or provision of this compact is declared to be contrary to the constitution of any state or of the United States or the applicability thereof to any government, agency, person or circumstance is held invalid, the validity of the remainder of this compact and the applicability thereof to any government, agency, person or circumstance shall not be affected thereby. If this compact shall be held contrary to the constitution of any state participating therein, the compact shall remain in full force and effect as to the remaining party states and in full force and effect as to the state affected as to all severable matters.

**HISTORY:** L. 1967 p. 102 § 1

**NOTES:**

   *Article VIII adopted in this state, RSMo 32.205

MISSOURI NOTES TO DECISIONS. (1980) The Multistate Tax Compact has altered the focus of an inquiry from the search for the source of income to a simple showing of the tax liability in another state. M. V. Marine Co. v. State Tax Commission (Mo.), 606 S.W.2d 644.

LexisNexis (R) Notes:

CASE NOTES

1. Court had to transfer the appeal to the Missouri Supreme Court, where the case required construction of the term "business income" in the Multistate Tax Compact, Mo. Rev. Stat. § 32.200, art. IV.1, because the Missouri Supreme Court has exclusive appellate jurisdiction in all cases involving the construction of the state revenue laws. ABB C-E Nuclear Power, Inc. v. Dir. of Revenue, 2006 Mo. App. LEXIS 997 (Mo. Ct. App. June 30 2006).

2. Supreme Court of Missouri had exclusive jurisdiction pursuant to Mo. Const. art. V, § 3 over a Connecticut Administrative Hearing Commission finding that two corporations were subject to the Missouri income tax because the case necessarily involved the construction of the revenue laws of this state, including Mo. Rev. Stat. § 143.431.1, Mo. Rev. Stat. § 143.451, and Mo. Rev. Stat. § 32.200. Acme Royalty Co. v. Dir. of Revenue, 96 S.W.3d 72, 2002 Mo. LEXIS 107 (Mo. 2002).

3. Even if the U.S. Internal Revenue Code and accompanying rules and regulations and rulings were in some way binding upon the State Director of Revenue in his construction and interpretation of Mo. Rev. Stat. ch. 143, they cannot be relied on as indicative of a policy which other state statutes, such as Mo. Rev. Stat. § 32.200, did not adopt. M. V. Marine Co. v. State Tax Com., 606 S.W.2d 644, 1980 Mo. LEXIS 325 (Mo. 1980).

4. The Missouri Tax Commission failed to apply the plain language of the Multistate Tax Compact, Mo. Rev. Stat. § 32.200 et seq., when it affirmed an order of the Director of Revenue which assessed additional income tax against a taxpayer. Goldberg v. State Tax Com., 618 S.W.2d 635, 1981 Mo. LEXIS 322 (Mo. 1981), not followed by State ex rel. Nesslage v. Flint Hill, 718 S.W.2d 210, 1986 Mo. App. LEXIS 4858 (Mo. Ct. App. 1986).

5. The Administrative Hearing Commission properly held that top officials of a subsidiary corporation located in Missouri were employees of a corporate taxpayer, a Virginia corporation, and that investment interest earned by a financial subsidiary of the taxpayer on funds in overseas stock was not just a bookkeeping transaction; an income tax deficiency as to both items was properly assessed against the taxpayer. Philip Morris, Inc. v. Director of Revenue, 1988 Mo. LEXIS 112 (Mo. Dec. 13 1988).

6. Where corporate taxpayer had elected to pay subsidiary's employees and elected the formula for determining its tax, employees were the taxpayer's employees for income tax purposes, and the salaries were not paid simply as an accounting transaction. Philip Morris, Inc. v. Director of Revenue, 760 S.W.2d 888, 1988 Mo. LEXIS 100 (Mo. 1988).

7. Taxpayers' royalty income from licensing agreement was outside the scope of Missouri taxation under Mo. Rev. Stat.

§ 143.431.1, Mo. Rev. Stat. § 143.451, and Mo. Rev. Stat. § 32.200 because the taxpayers had no contact, and specifically no sales, within the state of Missouri. Acme Royalty Co. v. Dir. of Revenue, 96 S.W.3d 72, 2002 Mo. LEXIS 107 (Mo. 2002).

8. Supreme Court of Missouri had exclusive jurisdiction pursuant to Mo. Const. art. V, § 3 over a Connecticut Administrative Hearing Commission finding that two corporations were subject to the Missouri income tax because the case necessarily involved the construction of the revenue laws of this state, including Mo. Rev. Stat. § 143.431.1, Mo. Rev. Stat. § 143.451, and Mo. Rev. Stat. § 32.200. Acme Royalty Co. v. Dir. of Revenue, 96 S.W.3d 72, 2002 Mo. LEXIS 107 (Mo. 2002).

9. The Administrative Hearing Commission properly held that top officials of a subsidiary corporation located in Missouri were employees of a corporate taxpayer, a Virginia corporation, and that investment interest earned by a financial subsidiary of the taxpayer on funds in overseas stock was not just a bookkeeping transaction; an income tax deficiency as to both items was properly assessed against the taxpayer. Philip Morris, Inc. v. Director of Revenue, 1988 Mo. LEXIS 112 (Mo. Dec. 13 1988).

10. Where a Delaware corporation that did business in Missouri divested itself of certain subsidiaries, the long-term capital gains created were "extraordinary" and treated as "nonbusiness income"; thus, the gains were not taxable in Missouri pursuant to Mo. Rev. Stat. § 32.200. James v. International Tel. & Tel. Corp., 654 S.W.2d 865, 1983 Mo. LEXIS 391 (Mo. 1983).

11. Where the Missouri Multistate Tax Compact, Mo. Rev. Stat. § 32.200 et seq., superseded former Mo. Rev. Stat. § 143.040.2 (now Mo. Rev. Stat. § 143.071) and Mo. Rev. Stat. § 143.451.2(2)(a) and changed the evaluation issue from the source of the income to the jurisdiction of foreign states to tax the taxpayer's income, the State Tax Commission of Missouri's assessment of a taxpayer's income tax liability for foreign royalty payments was remanded for further review because the effect of the Missouri Multistate Tax Compact was not considered in the original claim. A. P. Green Refractories Co. v. State Tax Com., 621 S.W.2d 340, 1981 Mo. App. LEXIS 3024, 217 U.S.P.Q. (BNA) 1357 (Mo. Ct. App. 1981).

12. Even if the U.S. Internal Revenue Code and accompanying rules and regulations and rulings were in some way binding upon the State Director of Revenue in his construction and interpretation of Mo. Rev. Stat. ch. 143, they cannot be relied on as indicative of a policy which other state statutes, such as Mo. Rev. Stat. § 32.200, did not adopt. M. V. Marine Co. v. State Tax Com., 606 S.W.2d 644, 1980 Mo. LEXIS 325 (Mo. 1980).

13. Although taxpayers still are given an option on the method of allocation they may use, all other questions that reference apportionment of income were to be resolved by reference to the Multistate Tax Compact under Mo. Const. art. III, § 1, Mo. Rev. Stat. §§ 32.200, 32.210, and 143.451, and former Mo. Rev. Stat. § 143.040 (now Mo. Rev. Stat. § 143.071); while duplicative taxation by multiple states was to be avoided, so too was the taxpayer's avoidance of all taxation by any state. M. V. Marine Co. v. State Tax Com., 606 S.W.2d 644, 1980 Mo. LEXIS 325 (Mo. 1980).

14. Missouri Administrative Hearing Commission properly found that the sale of the taxpayer's assets in a complete liquidation was not the type of business transaction in which it regularly engaged, nor did it constitute an integral part of the taxpayer's ordinary business; thus, the taxpayer, a Delaware corporation headquartered in Connecticut with operational facilities in several states including Missouri, was not liable for Missouri corporate income tax under Mo. Rev. Stat. § 32.200. ABB C-E Nuclear Power Inc. v. Dir. of Revenue, 215 S.W.3d 85, 2007 Mo. LEXIS 8, 26 A.L.R.6th 789 (Mo. 2007).

15. To be relieved from liability for sales and use taxes by accepting out-of-state exemption certificates in "good faith" pursuant to Mo. Rev. Stat. § 32.200 and Mo. Const. art. V, § 2, "good faith" requires an honesty of intention and freedom from knowledge of circumstances which ought to put the holder upon inquiry. Blevins Asphalt Constr. Co. v. Director of Revenue, 938 S.W.2d 899, 1997 Mo. LEXIS 20 (Mo. 1997).

16. To be relieved from liability for sales and use taxes by accepting out-of-state exemption certificates in "good faith" pursuant to Mo. Rev. Stat. § 32.200 and Mo. Const. art. V, § 2, "good faith" requires an honesty of intention and freedom from knowledge of circumstances which ought to put the holder upon inquiry. Blevins Asphalt Constr. Co. v. Director of Revenue, 938 S.W.2d 899, 1997 Mo. LEXIS 20 (Mo. 1997).

LAW REVIEWS

1. 51 J. Mo. B. 217, ARTICLE: SALES AND USE TAX ISSUES AT THE ADMINISTRATIVE HEARING COMMISSION (PART II), Dan Jordan and Kevin Thompson, July/August, 1995, Copyright (c) 1995 Journal of the Missouri Bar Journal of the Missouri Bar.

**LexisNexis Practice Insights**

1.

2.

3.

4.

5.

6.



LexisNexis (R) Montana Code Annotated

*** Current through 2013 Regular Session and the 2014 General Election ***

Title 15  Taxation
Chapter 1  Tax Administration
Part 6  Multistate Tax Compact

**Go to the Montana Code Archive Directory**

15-1-601, MCA (2013)

**15-1-601  Compact adopted -- text.**

The Multistate Tax Compact is enacted into law and entered into with all jurisdictions legally joining in the compact, in the form substantially as set forth in this section. Article VIII of the Multistate Tax Compact relating to interstate audits is specifically adopted.

### Article I. Purposes

The purposes of this compact are to:

**(1)** facilitate proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases and settlement of apportionment disputes;

**(2)** promote uniformity or compatibility in significant components of tax systems;

**(3)** facilitate taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration;

**(4)** avoid duplicative taxation.

### Article II. Definitions

As used in this compact:

**(1)** "state" means a state of the United States, the District of Columbia, the Commonwealth of Puerto Rico, or any territory or possession of the United States;

**(2)** "subdivision" means any government unit or special district of a state;

**(3)** "taxpayer" means any corporation, partnership, firm, association, governmental unit or agency, or person acting as a business entity in more than one state;

**(4)** "income tax" means a tax imposed on or measured by net income including any tax imposed on or

measured by an amount arrived at by deducting expenses from gross income, one or more forms of which expenses are not specifically and directly related to particular transactions;

(5) "capital stock tax" means a tax measured in any way by the capital of a corporation considered in its entirety;

(6) "gross receipts tax" means a tax, other than a sales tax, which is imposed on or measured by the gross volume of business, in terms of gross receipts or in other terms, and in the determination of which no deduction is allowed which would constitute the tax an income tax;

(7) "sales tax" means a tax imposed with respect to the transfer for a consideration of ownership, possession, or custody of tangible personal property or the rendering of services measured by the price of the tangible personal property transferred or services rendered and which is required by state or local law to be separately stated from the sales price by the seller or which is customarily separately stated from the sales price but does not include a tax imposed exclusively on the sale of a specifically identified commodity or article or class of commodities or articles;

(8) "use tax" means a nonrecurring tax, other than a sales tax, which:

(a) is imposed on or with respect to the exercise or enjoyment of any right or power over tangible personal property incident to the ownership, possession, or custody of that property or the leasing of that property from another including any consumption, keeping, retention, or other use of tangible personal property; and

(b) is complementary to a sales tax;

(9) "tax" means an income tax, capital stock tax, gross receipts tax, sales tax, use tax, and any other tax which has a multistate impact, except that the provisions of Articles III, IV, and V of this compact shall apply only to the taxes specifically designated therein and the provisions of Article IX of this compact shall apply only in respect to determinations pursuant to Article IV.

**Article III. Elements of Income Tax Laws Taxpayer Option, State and Local Taxes**

(1) Any taxpayer subject to an income tax whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a party state or pursuant to the laws of subdivisions in two or more party states may elect to apportion and allocate the taxpayer's income in the manner provided by the laws of such state or by the laws of such states and subdivisions without reference to this compact or may elect to apportion and allocate in accordance with Article IV. This election for any tax year may be made in all party states or subdivisions thereof or in any one or more of the party states or subdivisions thereof without reference to the election made in the others. For the purposes of this subsection, taxes imposed by subdivisions shall be considered separately from state taxes and the apportionment and allocation also may be applied to the entire tax base. In no instance wherein Article IV is employed for all subdivisions of a state may the sum of all apportionments and allocations to subdivisions within a state be greater than the apportionment and allocation that would be assignable to that state if the apportionment or allocation were being made with respect to a state income tax.

Taxpayer Option, Short Form

(2) Each party state or any subdivision thereof which imposes an income tax shall provide by law that any taxpayer required to file a return whose only activities within the taxing jurisdiction consist of sales and do not include owning or renting real estate or tangible personal property and whose dollar volume of gross sales made during the tax year within the state or subdivision, as the case may be, is not in excess of $ 100,000 may elect to report and pay any tax due on the basis of a percentage of such volume and shall adopt rates which shall produce a tax which reasonably approximates the tax otherwise due. The multistate tax commission, not more than once in 5 years, may adjust the $ 100,000 figure in order to reflect such changes as may occur in the real value of the dollar, and such adjusted figure,

upon adoption by the commission, shall replace the $ 100,000 figure specifically provided herein. Each party state and subdivision thereof may make the same election available to taxpayers additional to those specified in this subsection.

Coverage

**(3)** Nothing in this article relates to the reporting or payment of any tax other than an income tax.

## Article IV. Division of Income

**(1)** As used in this article, unless the context otherwise requires:

**(a)** "business income" means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations;

**(b)** "commercial domicile" means the principal place from which the trade or business of the taxpayer is directed or managed;

**(c)** "compensation" means wages, salaries, commissions, and any other form of remuneration paid to employees for personal services;

**(d)** "financial organization" means any bank, trust company, savings bank, industrial bank, land bank, safe deposit company, private banker, savings and loan association, credit union, cooperative bank, small loan company, sales finance company, investment company, or any type of insurance company;

**(e)** "nonbusiness income" means all income other than business income;

**(f)** "public utility" means any business entity:

**(i)** which owns or operates any plant, equipment, property, franchise, or license for the transmission of communications, transportation of goods or persons, except by pipeline, or the production, transmission, sale, delivery, or furnishing of electricity, water, or steam; and

**(ii)** whose rates of charges for goods or services have been established or approved by a federal, state, or local government or governmental agency;

**(g)** "sales" means all gross receipts of the taxpayer not allocated under subsections of this article;

**(h)** "state" means any state of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, and any foreign country or political subdivision thereof;

**(i)** "this state" means the state in which the relevant tax return is filed or, in the case of application of this article to the apportionment and allocation of income for local tax purposes, the subdivision or local taxing district in which the relevant tax return is filed.

**(2)** Any taxpayer having income from business activity which is taxable both within and without this state, other than activity as a financial organization or public utility or the rendering of purely personal services by an individual, shall allocate and apportion the taxpayer's net income as provided in this article. If a taxpayer has income from business activity as a public utility but derives the greater percentage of the taxpayer's income from activities subject to this article, the taxpayer may elect to allocate and apportion the taxpayer's entire net income as provided in this article.

**(3)** For purposes of allocation and apportionment of income under this article, a taxpayer is taxable in another

state if:

**(a)** in that state the taxpayer is subject to a net income tax, a franchise tax measured by net income, a franchise tax for the privilege of doing business, or a corporate stock tax; or

**(b)** that state has jurisdiction to subject the taxpayer to a net income tax regardless of whether, in fact, the state does or does not.

**(4)** Rents and royalties from real or tangible personal property, capital gains, interest, dividends, or patent or copyright royalties, to the extent that they constitute nonbusiness income, shall be allocated as provided in subsections (5) through (8) of this article.

**(5)** **(a)** Net rents and royalties from real property located in this state are allocable to this state.

**(b)** Net rents and royalties from tangible personal property are allocable to this state:

**(i)** if and to the extent that the property is utilized in this state; or

**(ii)** in their entirety if the taxpayer's commercial domicile is in this state and the taxpayer is not organized under the laws of or taxable in the state in which the property is utilized.

**(c)** The extent of utilization of tangible personal property in a state is determined by multiplying the rents and royalties by a fraction, the numerator of which is the number of days of physical location of the property in the state during the rental or royalty period in the taxable year and the denominator of which is the number of days of physical location of the property everywhere during all rental or royalty periods in the taxable year. If the physical location of the property during the rental or royalty period is unknown or unascertainable by the taxpayer, tangible personal property is utilized in the state in which the property was located at the time the rental or royalty payer obtained possession.

**(6)** **(a)** Capital gains and losses from sales of real property located in this state are allocable to this state.

**(b)** Capital gains and losses from sales of tangible personal property are allocable to this state if:

**(i)** the property had a situs in this state at the time of the sale; or

**(ii)** the taxpayer's commercial domicile is in this state and the taxpayer is not taxable in the state in which the property had a situs.

**(c)** Capital gains and losses from sales of intangible personal property are allocable to this state if the taxpayer's commercial domicile is in this state.

**(7)** Interest and dividends are allocable to this state if the taxpayer's commercial domicile is in this state.

**(8)** (a)  Patent and copyright royalties are allocable to this state:

**(i)** if and to the extent that the patent or copyright is utilized by the payer in this state; or

**(ii)** if and to the extent that the patent or copyright is utilized by the payer in a state in which the taxpayer is not taxable and the taxpayer's commercial domicile is in this state.

**(b)** A patent is utilized in a state to the extent that it is employed in production, fabrication, manufacturing, or other processing in the state or to the extent that a patented product is produced in the state. If the basis of receipts from patent royalties does not permit allocation to states or if the accounting procedures do not reflect states of utilization, the patent is utilized in the state in which the taxpayer's commercial domicile is located.

**(c)** A copyright is utilized in a state to the extent that printing or other publication originates in the state. If the basis of receipts from copyright royalties does not permit allocation to states or if the accounting procedures do not reflect states of utilization, the copyright is utilized in the state in which the taxpayer's commercial domicile is located.

**(9)** All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor and the denominator of which is 3.

**(10)** The property factor is a fraction, the numerator of which is the average value of the taxpayer's real and tangible personal property owned or rented and used in this state during the tax period and the denominator of which is the average value of all the taxpayer's real and tangible personal property owned or rented and used during the tax period.

**(11)** Property owned by the taxpayer is valued at its original cost. Property rented by the taxpayer is valued at eight times the net annual rental rate. Net annual rental rate is the annual rental rate paid by the taxpayer less any annual rental rate received by the taxpayer from subrentals.

**(12)** The average value of property shall be determined by averaging the values at the beginning and ending of the tax period, but the tax administrator may require the averaging of monthly values during the tax period if reasonably required to reflect properly the average value of the taxpayer's property.

**(13)** The payroll factor is a fraction, the numerator of which is the total amount paid in this state during the tax period by the taxpayer for compensation and the denominator of which is the total compensation paid everywhere during the tax period.

**(14)** Compensation is paid in this state if:

**(a)** the individual's service is performed entirely within the state;

**(b)** the individual's service is performed both within and without the state, but the service performed without the state is incidental to the individual's service within the state; or

**(c)** some of the service is performed in the state and:

**(i)** the base of operations or, if there is no base of operations, the place from which the service is directed or controlled is in the state; or

**(ii)** the base of operations or the place from which the service is directed or controlled is not in any state in which some part of the service is performed, but the individual's residence is in this state.

**(15)** The sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this state during the tax period and the denominator of which is the total sales of the taxpayer everywhere during the tax period.

**(16)** Sales of tangible personal property are in this state if:

**(a)** the property is delivered or shipped to a purchaser, other than the United States government, within this state regardless of the f.o.b. point or other conditions of the sale; or

**(b)** the property is shipped from an office, store, warehouse, factory, or other place of storage in this state and:

**(i)** the purchaser is the United States government; or

**(ii)** the taxpayer is not taxable in the state of the purchaser.

**(17)** Sales, other than sales of tangible personal property, are in this state if:

**(a)** the income-producing activity is performed in this state; or

**(b)** the income-producing activity is performed both in and outside this state and a greater proportion of the income-producing activity is performed in this state than in any other state, based on costs of performance.

**(18)** If the allocation and apportionment provisions of this article do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for or the tax administrator may require, in respect to all or any part of the taxpayer's business activity, if reasonable:

**(a)** separate accounting;

**(b)** the exclusion of any one or more of the factors;

**(c)** the inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or

**(d)** the employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income.

### Article V. Elements of Sales and Use Tax Laws Tax Credit

**(1)** Each purchaser liable for a use tax on tangible personal property shall be entitled to full credit for the combined amount or amounts of legally imposed sales or use taxes paid by the purchaser with respect to the same property to another state and any subdivision thereof. The credit shall be applied first against the amount of any use tax due the state, and any unused portion of the credit shall then be applied against the amount of any use tax due a subdivision.

Exemption Certificates -- Vendors May Rely

**(2)** Whenever a vendor receives and accepts in good faith from a purchaser a resale or other exemption certificate or other written evidence of exemption authorized by the appropriate state or subdivision taxing authority, the vendor shall be relieved of liability for a sales or use tax with respect to the transaction.

### Article VI. The Commission Organization and Management

**(1)** **(a)** The Multistate Tax Commission is hereby established. It shall be composed of one member from each party state who shall be the head of the state agency charged with the administration of the types of taxes to which this compact applies. If there is more than one such agency, the state shall provide by law for the selection of the commission member from the heads of the relevant agencies. State law may provide that a member of the commission be represented by an alternate, but only if there is on file with the commission written notification of the designation and identity of the alternate. The attorney general of each party state or the attorney general's designee or other counsel if the laws of the party state specifically provide, shall be entitled to attend the meetings of the commission but shall not vote. Such attorneys general, designees, or other counsel shall receive all notices of meetings required under subsection (1)(e) of this article.

**(b)** Each party state shall provide by law for the selection of representatives from its subdivisions affected by this compact to consult with the commission member from that state.

**(c)** Each member shall be entitled to one vote. The commission shall not act unless a majority of the

members are present, and no action shall be binding unless approved by a majority of the total number of members.

(d) The commission shall adopt an official seal to be used as it may provide.

(e) The commission shall hold an annual meeting and such other regular meetings as its bylaws may provide and such special meetings as its executive committee may determine. The commission bylaws shall specify the dates of the annual and any other regular meetings and shall provide for the giving of notice of annual, regular, and special meetings. Notice of special meetings shall include the reasons therefor and an agenda of the items to be considered.

(f) The commission shall elect annually, from among its members, a presiding officer, a vice presiding officer, and a treasurer. The commission shall appoint an executive director who shall serve at its pleasure, and it shall fix the executive director's duties and compensation. The executive director shall be secretary of the commission. The commission shall make provision for the bonding of such of its officers and employees as it may deem appropriate.

(g) Irrespective of the civil service, personnel, or other merit system laws of any party state, the executive director shall appoint or discharge such personnel as may be necessary for the performance of the functions of the commission and shall fix their duties and compensation. The commission bylaws shall provide for personnel policies and programs.

(h) The commission may borrow, accept, or contract for the services of personnel from any state, the United States, or any other governmental entity.

(i) The commission may accept for any of its purposes and functions any and all donations and grants of money, equipment, supplies, materials, and services, conditional or otherwise, from any governmental entity and may utilize and dispose of the same.

(j) The commission may establish one or more offices for the transacting of its business.

(k) The commission shall adopt bylaws for the conduct of its business. The commission shall publish its bylaws in convenient form and shall file a copy of the bylaws and any amendments thereto with the appropriate agency or officer in each of the party states.

(l) The commission annually shall make to the governor and legislature of each party state a report covering its activities for the preceding year. Any donation or grant accepted by the commission or services borrowed shall be reported in the annual report of the commission and shall include the nature, amount, and conditions, if any, of the donation, gift, grant, or services borrowed and the identity of the donor or lender. The commission may make additional reports as it may deem desirable.

Committees

(2) (a) To assist in the conduct of its business when the full commission is not meeting, the commission shall have an executive committee of seven members, including the presiding officer, vice presiding officer, treasurer, and four other members elected annually by the commission. The executive committee, subject to the provisions of this compact and consistent with the policies of the commission, shall function as provided in the bylaws of the commission.

(b) The commission may establish advisory and technical committees, membership on which may include private persons and public officials, in furthering any of its activities. Such committees may consider any matter of concern to the commission, including problems of special interest to any party state and problems dealing with particular types of taxes.

(c) The commission may establish such additional committees as its bylaws may provide.

Powers

(**3**) In addition to powers conferred elsewhere in this compact, the commission shall have power to:

(**a**) study state and local tax systems and particular types of state and local taxes;

(**b**) develop and recommend proposals for an increase in uniformity or compatibility of state and local tax laws with a view toward encouraging the simplification and improvement of state and local tax law and administration;

(**c**) compile and publish information as in its judgment would assist the party states in implementation of the compact and taxpayers in complying with state and local tax laws;

(**d**) do all things necessary and incidental to the administration of its functions pursuant to this compact.

Finance

(**4**) (**a**) The commission shall submit to the governor or designated officer or officers of each party state a budget of its estimated expenditures for such period as may be required by the laws of that state for presentation to the legislature thereof.

(**b**) Each of the commission's budgets of estimated expenditures shall contain specific recommendations of the amounts to be appropriated by each of the party states. The total amount of appropriations requested under any such budget shall be apportioned among the party states as follows: one-tenth in equal shares and the remainder in proportion to the amount of revenue collected by each party state and its subdivisions from income taxes, capital stock taxes, gross receipts taxes, sales and use taxes. In determining such amounts, the commission shall employ such available public sources of information as, in its judgment, present the most equitable and accurate comparisons among the party states. Each of the commission's budgets of estimated expenditures and requests for appropriations shall indicate the sources used in obtaining information employed in applying the formula contained in this subsection.

(**c**) The commission shall not pledge the credit of any party state. The commission may meet any of its obligations in whole or in part with funds available to it under subsection (1)(i) of this article, provided that the commission takes specific action setting aside such funds prior to incurring any obligation to be met in whole or in part in such manner. Except where the commission makes use of funds available to it under subsection (1)(i), the commission shall not incur any obligation prior to the allotment of funds by the party states adequate to meet the same.

(**d**) The commission shall keep accurate accounts of all receipts and disbursements. The receipts and disbursements of the commission shall be subject to the audit and accounting procedures established under its bylaws. All receipts and disbursements of funds handled by the commission shall be audited yearly by a certified or licensed public accountant, and the report of the audit shall be included in and become part of the annual report of the commission.

(**e**) The accounts of the commission shall be open at any reasonable time for inspection by duly constituted officers of the party states and by any person authorized by the commission.

(**f**) Nothing contained in this article shall be construed to prevent commission compliance with laws relating to audit or inspection of accounts by or on behalf of any government contributing to the support of the commission.

**Article VII. Uniform Regulations and Forms**

(**1**) Whenever any two or more party states or subdivisions of party states have uniform or similar provisions of law relating to an income tax, capital stock tax, gross receipts tax, sales or use tax, the commission may adopt uniform regulations for any phase of the administration of such law, including assertion of jurisdiction to tax or

prescribing uniform tax forms. The commission may also act with respect to the provisions of Article IV of this compact.

**(2)** Prior to the adoption of any regulation, the commission shall:

**(a)** as provided in its bylaws, hold at least one public hearing on due notice to all affected party states and subdivisions thereof and to all taxpayers and other persons who have made timely request of the commission for advance notice of its regulation-making proceedings;

**(b)** afford all affected party states and subdivisions and interested persons an opportunity to submit relevant written data and views, which shall be considered fully by the commission.

**(3)** The commission shall submit any regulations adopted by it to the appropriate officials of all party states and subdivisions to which they might apply. Each such state and subdivision shall consider any such regulation for adoption in accordance with its own laws and procedures.

### Article VIII. Interstate Audits

**(1)** This article shall be in force only in those party states that specifically provide therefor by statute.

**(2)** Any party state or subdivision thereof desiring to make or participate in an audit of any accounts, books, papers, records, or other documents may request the commission to perform the audit on its behalf. In responding to the request, the commission shall have access to and may examine, at any reasonable time, such accounts, books, papers, records, and other documents and any relevant property or stock of merchandise. The commission may enter into agreements with party states or their subdivisions for assistance in performance of the audit. The commission shall make charges, to be paid by the state or local government or governments for which it performs the service, for any audits performed by it in order to reimburse itself for the actual costs incurred in making the audit.

**(3)** The commission may require the attendance of any person within the state where it is conducting an audit or part thereof at a time and place fixed by it within such state for the purpose of giving testimony with respect to any account, book, paper, document, other record, property, or stock of merchandise being examined in connection with the audit. If the person is not within the jurisdiction, the person may be required to attend for such purpose at any time and place fixed by the commission within the state of which the person is a resident, provided that such state has adopted this article.

**(4)** The commission may apply to any court having power to issue compulsory process for orders in aid of its powers and responsibilities pursuant to this article, and any and all such courts shall have jurisdiction to issue such orders. Failure of any person to obey any such order shall be punishable as contempt of the issuing court. If the party or subject matter on account of which the commission seeks an order is within the jurisdiction of the court to which application is made, such application may be to a court in the state or subdivision on behalf of which the audit is being made or a court in the state in which the object of the order being sought is situated. The provisions of this subsection apply only to courts in a state that has adopted this article.

**(5)** The commission may decline to perform any audit requested if it finds that its available personnel or other resources are insufficient for the purpose or that, in the terms requested, the audit is impracticable of satisfactory performance. If the commission, on the basis of its experience, has reason to believe that an audit of a particular taxpayer, either at a particular time or on a particular schedule, would be of interest to a number of party states or their subdivisions, it may offer to make the audit or audits, the offer to be contingent on sufficient participation therein as determined by the commission.

**(6)** Information obtained by any audit pursuant to this article shall be confidential and available only for tax purposes to party states, their subdivisions, or the United States. Availability of information shall be in accordance with

the laws of the states or subdivisions on whose account the commission performs the audit and only through the appropriate agencies or officers of such states or subdivisions. Nothing in this article shall be construed to require any taxpayer to keep records for any period not otherwise required by law.

**(7)** Other arrangements made or authorized pursuant to law for cooperative audit by or on behalf of the party states or any of their subdivisions are not superseded or invalidated by this article.

**(8)** In no event shall the commission make any charge against a taxpayer for an audit.

**(9)** As used in this article, "tax", in addition to the meaning ascribed to it in Article II, means any tax or license fee imposed in whole or in part for revenue purposes.

## Article IX. Arbitration

**(1)** Whenever the commission finds a need for settling disputes concerning apportionments and allocations by arbitration, it may adopt a regulation placing this article in effect, notwithstanding the provisions of Article VII.

**(2)** The commission shall select and maintain an arbitration panel composed of officers and employees of state and local governments and private persons who shall be knowledgeable and experienced in matters of tax law and administration.

**(3)** Whenever a taxpayer who has elected to employ Article IV or whenever the laws of the party state or subdivision thereof are substantially identical with the relevant provisions of Article IV, the taxpayer, by written notice to the commission and to each party state or subdivision thereof that would be affected, may secure arbitration of an apportionment or allocation if the taxpayer is dissatisfied with the final administrative determination of the tax agency of the state or subdivision with respect thereto on the ground that it would subject the taxpayer to double or multiple taxation by two or more party states or subdivisions thereof. Each party state and subdivision thereof hereby consents to the arbitration as provided herein and agrees to be bound thereby.

**(4)** The arbitration board shall be composed of one person selected by the taxpayer, one by the agency or agencies involved, and one member of the commission's arbitration panel. If the agencies involved are unable to agree on the person to be selected by them, such person shall be selected by lot from the total membership of the arbitration panel. The two persons selected for the board in the manner provided by the foregoing provisions of this subsection shall jointly select the third member of the board. If they are unable to agree on the selection, the third member shall be selected by lot from among the total membership of the arbitration panel. No member of a board selected by lot shall be qualified to serve if he is an officer or employee or is otherwise affiliated with any party to the arbitration proceeding. Residents within the jurisdiction of a party to the arbitration proceeding shall not constitute affiliation within the meaning of this subsection.

**(5)** The board may sit in any state or subdivision party to the proceeding, in the state of the taxpayer's incorporation, residence, or domicile, in any state where the taxpayer does business, or in any place that it finds most appropriate for gaining access to evidence relevant to the matter before it.

**(6)** The board shall give due notice of the times and places of its hearings. The parties shall be entitled to be heard, to present evidence, and to examine and cross-examine witnesses. The board shall act by majority vote.

**(7)** The board shall have power to administer oaths, take testimony, subpoena and require the attendance of witnesses and the production of accounts, books, papers, records, and other documents, and issue commissions to take testimony. Subpoenas may be signed by any member of the board. In case of failure to obey a subpoena and upon application by the board, any judge of a court of competent jurisdiction of the state in which the board is sitting or in which the person to whom the subpoena is directed may be found may make an order requiring compliance with the subpoenas, and the court may punish failure to obey the order as a contempt. The provisions of this subsection apply

only in states that have adopted this article.

**(8)** Unless the parties otherwise agree, the expenses and other costs of the arbitration shall be assessed and allocated among the parties by the board in such manner as it may determine. The commission shall fix a schedule of compensation for members of arbitration boards and of other allowable expenses and costs. No officer or employee of a state or local government who serves as a member of a board shall be entitled to compensation therefor unless the member is required on account of the service to forego the regular compensation attaching to the member's public employment, but any such board member shall be entitled to expenses.

**(9)** The board shall determine the disputed apportionment or allocation and any matters necessary thereto. The determinations of the board shall be final for purposes of making the apportionment or allocation, but for no other purpose.

**(10)** The board shall file with the commission and with each tax agency represented in the proceeding: the determination of the board, the board's written statement of its reasons therefor, the record of the board's proceedings, and any other documents required by the arbitration rules of the commission to be filed.

**(11)** The commission shall publish the determinations of boards, together with the statements of the reasons therefor.

**(12)** The commission shall adopt and publish rules of procedure and practice and shall file a copy of such rules and of any amendment thereto with the appropriate agency or officer in each of the party states.

**(13)** Nothing contained herein shall prevent at any time a written compromise of any matter or matters in dispute, if otherwise lawful, by the parties to the arbitration proceedings.

## Article X. Entry Into Force and Withdrawal

**(1)** This compact shall enter into force when enacted into law by any seven states. Thereafter, this compact shall become effective as to any other state upon its enactment thereof. The commission shall arrange for notification of all party states whenever there is a new enactment of the compact.

**(2)** Any party state may withdraw from this compact by enacting a statute repealing the same. No withdrawal shall affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal.

**(3)** No proceeding commenced before an arbitration board prior to the withdrawal of a state and to which the withdrawing state or any subdivision thereof is a party shall be discontinued or terminated by the withdrawal, nor shall the board thereby lose jurisdiction over any of the parties to the proceeding necessary to make a binding determination therein.

## Article XI. Effect on Other Laws and Jurisdiction

Nothing in this compact shall be construed to:

**(1)** affect the power of any state or subdivision thereof to fix rates of taxation, except that a party state shall be obligated to implement Article III, subsection (2), of this compact;

**(2)** apply to any tax or fixed fee imposed for the registration of a motor vehicle or any tax on motor fuel, other than a sales tax; provided that the definition of "tax" in Article VIII, subsection (9), may apply for the purposes of that article and the commission's powers of study and recommendation pursuant to Article VI, subsection (3), may apply;

**(3)** withdraw or limit the jurisdiction of any state or local court or administrative officer or body with

respect to any person, corporation, or other entity or subject matter, except to the extent that such jurisdiction is expressly conferred by or pursuant to this compact upon another agency or body;

(4) supersede or limit the jurisdiction of any court of the United States.

### Article XII. Construction and Severability

This compact shall be liberally construed so as to effectuate the purposes thereof. The provisions of this compact shall be severable, and if any phrase, clause, sentence, or provision of this compact is declared to be contrary to the constitution of any state or of the United States or if the applicability thereof to any government, agency, person, or circumstance is held invalid, the validity of the remainder of this compact and the applicability thereof to any government, agency, person, or circumstance shall not be affected thereby. If this compact shall be held contrary to the constitution of any state participating therein, the compact shall remain in full force and effect as to the remaining party states and in full force and effect as to the state affected as to all severable matters.

**HISTORY:** En. Sec. 1, Ch. 17, L. 1969; amd. Sec. 1, Ch. 249, L. 1973; amd. Sec. 1, Ch. 163, L. 1975; R.C.M. 1947, 84-6701; amd. Sec. 142, Ch. 56, L. 2009.

### NOTES: Compiler's Comments

*2009 Amendment:* Chapter 56 made section gender neutral; and made minor changes in style. Amendment effective October 1, 2009.

*Uniform Act:* Article IV of this Compact consists of the Uniform Division of Income for Tax Purposes Act.

### Official Comments

### Commission Notes for Article IV.

The Uniform Division of Income for Tax Purposes Act is designed for enactment in those states which levy taxes on or measured by net income.

The need for a uniform method of division of income for tax purposes among the several taxing jurisdictions has been recognized for many years and has long been recommended by the Council of State Governments. There is no other practical means of assuring that a taxpayer is not taxed on more than its net income. At present, the several states have various formulae for determining the amount of income to be taxed, and the differences in the formulae produce inequitable results. The problem has been well analyzed and its historical background outlined in an article appearing in 18 Ohio State Law Journal, page 84.

The Uniform Division of Income for Tax Purposes Act is the result of conferences with the representatives of the Controller's Institute of America, the Council of State Governments and various interested individuals.

Subsection 1

This definition is derived from the Model Unemployment Compensation Act which has been adopted in all states.

It is expected that "public utility" will be defined to include all taxpayers subject to the control of the state's regulatory bodies on the theory that separate legislation will provide for the apportionment and allocation of the income of such taxpayers.

Each state may wish to enact separate legislation to apportion and allocate the income of taxpayers subject to the control of its regulatory bodies.

Subsection 11

This section is admittedly arbitrary in using original cost rather than depreciated cost, and in valuing rented property as eight times the annual rental. This approach is justified because the act does not impose a tax, nor prescribe the depreciation allowable in computing the tax, but merely provides a basis for division of the taxable income among the several states. The use of original cost obviates any differences due to varying methods of depreciation, and has the advantage that the basic figure is readily ascertainable from the taxpayer's books. No method of valuing the property would probably be universally acceptable.

Subsection 14

This section is derived from the Model Unemployment Compensation Act. This is the same figure which will be used by taxpayers for unemployment compensation purposes.

Subsection 16

Sales to the United States Government are treated separately because they are not necessarily attributable to a market existing in the state to which the goods are originally shipped.

Subsection 18

It is anticipated that this act will be made a part of the income tax acts of the several states. For that reason, this section does not spell out the procedure to be followed in the event of a disagreement between the taxpayer and the tax administrator. The income tax acts of each state presumably outline the procedure to be followed.

**Case Notes**

*Audit Information Subject to Discovery by Taxpayer:*   Pacificorp appealed taxes imposed by the Department of Revenue that were in part based on audits by other states belonging to the Multistate Tax Commission. The lower court affirmed the State Tax Appeal Board's refusal to turn over copies of the audits pursuant to discovery requests by Pacificorp. The Supreme Court held that the audits were subject to discovery under this section because the action was brought in Montana and its confidentiality rules were controlling and not those of the state performing the audit. Pacificorp v. Dept. of Revenue, 254 M 387, 838 P2d 914, 49 St. Rep. 774 (1992).

**Administrative Rules**

ARM  42.9.107 Multitiered pass-through entity structures with Montana source income -- reporting requirements.

ARM  42.15.120 Income tax -- intent.

Title 42, chapter 26, subchapter 2, ARM Corporate multistate activities -- income allocation and apportionment.

Title 42, chapter 26, subchapter 12, ARM Telecommunication services for corporation license taxes.



North Dakota Century Code Annotated
Copyright © 2015 Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** This document is current through the 2013 Regular Legislative Session ***

TITLE 57  Taxation
CHAPTER 57-59  Multistate Tax Compact

**Go to the North Dakota Code Archive Directory**

N.D. Cent. Code, § 57-59-01  (2014)

**57-59-01.  Multistate tax compact.**

The multistate tax compact is hereby entered into law and entered into with all jurisdictions legally joining therein, in the form substantially as follows:

**MULTISTATE TAX COMPACT**

**Article I Purposes**

The purposes of this compact are to:

**1.** Facilitate proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases and settlement of apportionment disputes.

**2.** Promote uniformity or compatibility in significant components of tax systems.

**3.** Facilitate taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration.

**4.** Avoid duplicative taxation.

**Article II Definitions**

As used in this compact:

**1.** "Capital stock tax" means a tax measured in any way by the capital of a corporation considered in its entirety.

**2.** "Gross receipts tax" means a tax, other than a sales tax, which is imposed on or measured by the gross volume of business, in terms of gross receipts or in other terms, and in the determination of which no deduction is allowed which would constitute the tax an income tax.

**3.** "Income tax" means a tax imposed on or measured by net income including any tax imposed on or measured by an amount arrived at by deducting expenses from gross income, one or more forms of which expenses are not specifically and directly related to particular transactions.

**4.** "Sales tax" means a tax imposed with respect to the transfer for a consideration of ownership, possession, or custody of tangible personal property or the rendering of services measured by the price of the tangible personal property transferred or services rendered and which is required by state or local law to be separately stated from the sales price by the seller, or which is customarily separately stated from the sales price, but does not include a tax imposed exclusively on the sale of a specifically identified commodity or article or class of commodities or articles.

**5.** "State" means a state of the United States, the District of Columbia, the commonwealth of Puerto Rico, or any territory or possession of the United States.

**6.** "Subdivision" means any governmental unit or special district of a state.

**7.** "Tax" means an income tax, capital stock tax, gross receipts tax, sales tax, use tax, and any other tax which has a multistate impact, except that the provisions of articles III, IV, and V of this compact shall apply only to the taxes specifically designated therein and the provisions of article IX of this compact shall apply only in respect to determinations pursuant to article IV.

**8.** "Taxpayer" means any corporation, partnership, firm, association, governmental unit, or agency or person acting as a business entity in more than one state.

**9.** "Use tax" means a nonrecurring tax, other than a sales tax, which (a) is imposed on or with respect to the exercise or enjoyment of any right or power over tangible personal property incident to the ownership, possession, or custody of that property or the leasing of that property from another including any consumption, keeping, retention, or other use of tangible personal property, and (b) is complementary to a sales tax.

**Article III Elements of Income Tax LawsTaxpayer Option, State and Local Taxes**

**1.** Any taxpayer subject to an income tax whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a party state or pursuant to the laws of subdivisions in two or more party states may elect to apportion and allocate the taxpayer's income in the manner provided by the laws of such state or by the laws of such states and subdivisions without reference to this compact, or may elect to apportion and allocate in accordance with article IV. This election for any tax year may be made in all party states or subdivisions thereof or in any one or more of the party states or subdivisions thereof without reference to the election made in the others. For the purposes of this subsection, taxes imposed by subdivisions shall be considered separately from state taxes and the apportionment and allocation also may be applied to the entire tax base. In no instance wherein article IV is employed for all subdivisions of a state may the sum of all apportionments and allocations to subdivisions within a state be greater than the apportionment and allocation that would be assignable to that state if the apportionment or allocation were being made with respect to a state income tax.

**Taxpayer Option, Short Form**

**2.** Each party state or any subdivision thereof which imposes an income tax shall provide by law that any taxpayer required to file a return, whose only activities within the taxing jurisdiction consist of sales and do not include owning or renting real estate or tangible personal property, and whose dollar volume of gross sales made during the tax year within the state or subdivision, as the case may be, is not in excess of one hundred thousand dollars may elect to report and pay any tax due on the basis of a percentage of such volume, and shall adopt rates which shall produce a tax which reasonably approximates the tax otherwise due. The multistate tax commission, not more than once in five years, may adjust the one hundred thousand dollar figure in order to reflect such changes as may occur in the real value of the dollar, and such adjusted figure, upon adoption by the commission, shall replace the one hundred thousand dollar figure

specifically provided herein. Each party state and subdivision thereof may make the same election available to taxpayers additional to those specified in this subsection.

**Coverage**

**3.** Nothing in this article relates to the reporting or payment of any tax other than an income tax.

**Article IV Division of Income**

**1.** As used in this article, unless the context otherwise requires:

**(a)** "Business income" means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations.

**(b)** "Commercial domicile" means the principal place from which the trade or business of the taxpayer is directed or managed.

**(c)** "Compensation" means wages, salaries, commissions, and any other form of remuneration paid to employees for personal services.

**(d)** "Financial organization" means any bank, trust company, savings bank, industrial bank, land bank, safe deposit company, private banker, savings and loan association, credit union, cooperative bank, small loan company, sales finance company, investment company, or any type of insurance company.

**(e)** "Nonbusiness income" means all income other than business income.

**(f)** "Public utility" means any business entity (1) which owns or operates any plant, equipment, property, franchise, or license for the transmission of communications, transportation of goods or persons, except by pipeline, or the production, transmission, sale, delivery, or furnishing of electricity, water, or steam; and (2) whose rates of charges for goods or services have been established or approved by a federal, state, or local government or governmental agency.

**(g)** "Sales" means all gross receipts of the taxpayer not allocated under subsections of this article.

**(h)** "State" means any state of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, and any foreign country or political subdivision thereof.

**(i)** "This state" means the state in which the relevant tax return is filed or, in the case of application of this article to the apportionment and allocation of income for local tax purposes, the subdivision or local taxing district in which the relevant tax return is filed.

**2.** Any taxpayer having income from business activity which is taxable both within and without this state, other than activity as a financial organization or public utility or the rendering of purely personal services by an individual, shall allocate and apportion that taxpayer's net income as provided in this article. If a taxpayer has income from business activity as a public utility but derives the greater percentage of the taxpayer's income from activities subject to this article, the taxpayer may elect to allocate and apportion the taxpayer's entire net income as provided in this article.

**3.** For purposes of allocation and apportionment of income under this article, a taxpayer is taxable in another state if (a) in that state the taxpayer is subject to a net income tax, a franchise tax measured by net income, a franchise tax for the privilege of doing business, or a corporate stock tax, or (b) that state has jurisdiction to subject the taxpayer to a net income tax regardless of whether, in fact, the state does or does not.

**4.** Rents and royalties from real or tangible personal property, capital gains, interest, dividends, or patent or copyright royalties, to the extent that they constitute nonbusiness income, shall be allocated as provided in subsections 5 through 8 of this article.

**5. (a)** Net rents and royalties from real property located in this state are allocable to this state.

**(b)** Net rents and royalties from tangible personal property are allocable to this state: (1) if and to the extent that the property is utilized in this state, or (2) in their entirety if the taxpayer's commercial domicile is in this state and the taxpayer is not organized under the laws of or taxable in the state in which the property is utilized.

**(c)** The extent of utilization of tangible personal property in a state is determined by multiplying the rents and royalties by a fraction, the numerator of which is the number of days of physical location of the property in the state during the rental or royalty period in the taxable year and the denominator of which is the number of days of physical location of the property everywhere during all rental or royalty periods in the taxable year. If the physical location of the property during the rental or royalty period is unknown or unascertainable by the taxpayer, tangible personal property is utilized in the state in which the property was located at the time the rental or royalty payer obtained possession.

**6. (a)** Capital gains and losses from sales of real property located in this state are allocable to this state.

**(b)** Capital gains and losses from sales of tangible personal property are allocable to this state if (1) the property had a situs in this state at the time of the sale, or (2) the taxpayer's commercial domicile is in this state and the taxpayer is not taxable in the state in which the property had a situs.

**(c)** Capital gains and losses from sales of intangible personal property are allocable to this state if the taxpayer's commercial domicile is in this state.

**7.** Interest and dividends are allocable to this state if the taxpayer's commercial domicile is in this state.

**8. (a)** Patent and copyright royalties are allocable to this state: (1) if and to the extent that the patent or copyright is utilized by the payer in this state, or (2) if and to the extent that the patent or copyright is utilized by the payer in a state in which the taxpayer is not taxable and the taxpayer's commercial domicile is in this state.

**(b)** A patent is utilized in a state to the extent that it is employed in production, fabrication, manufacturing, or other processing in the state or to the extent that a patented product is produced in the state. If the basis of receipts from patent royalties does not permit allocation to states or if the accounting procedures do not reflect states of utilization, the patent is utilized in the state in which the taxpayer's commercial domicile is located.

**(c)** A copyright is utilized in a state to the extent that printing or other publication originates in the state. If the basis of receipts from copyright royalties does not permit allocation to states or if the accounting procedures do not reflect states of utilization, the copyright is utilized in the state in which the taxpayer's commercial domicile is located.

**9.** All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three.

**10.** The property factor is a fraction, the numerator of which is the average value of the taxpayer's real and tangible personal property owned or rented and used in this state during the tax period and the denominator of which is the average value of all the taxpayer's real and tangible personal property owned or rented and used during the tax period.

**11.** Property owned by the taxpayer is valued at its original cost. Property rented by the taxpayer is valued at eight times the net annual rental rate. Net annual rental rate is the annual rental rate paid by the taxpayer less any annual rental rate received by the taxpayer from subrentals.

**12.** The average value of property shall be determined by averaging the values at the beginning and ending of the

tax period but the tax administrator may require the averaging of monthly values during the tax period if reasonably required to reflect properly the average value of the taxpayer's property.

**13.** The payroll factor is a fraction, the numerator of which is the total amount paid in this state during the tax period by the taxpayer for compensation and the denominator of which is the total compensation paid everywhere during the tax period.

**14.** Compensation is paid in this state if:

**(a)** The individual's service is performed entirely within the state;

**(b)** The individual's service is performed both within and without the state, but the service performed without the state is incidental to the individual's service within the state; or

**(c)** Some of the service is performed in the state and (1) the base of operations or, if there is no base of operations, the place from which the service is directed or controlled is in the state, or (2) the base of operations or the place from which the service is directed or controlled is not in any state in which some part of the service is performed, but the individual's residence is in this state.

**15.** The sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this state during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period.

**16.** Sales of tangible personal property are in this state if:

**(a)** The property is delivered or shipped to a purchaser, other than the United States government, within this state regardless of the f.o.b. point or other conditions of the sale; or

**(b)** The property is shipped from an office, store, warehouse, factory, or other place of storage in this state and (1) the purchaser is the United States government, or (2) the taxpayer is not taxable in the state of the purchaser.

**17.** Sales, other than sales of tangible personal property, are in this state if:

**(a)** The income-producing activity is performed in this state; or

**(b)** The income-producing activity is performed both in and outside this state and a greater proportion of the income-producing activity is performed in this state than in any other state, based on costs of performance.

**18.** If the allocation and apportionment provisions of this article do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for or the tax administrator may require, in respect to all or any part of the taxpayer's business activity, if reasonable:

**(a)** Separate accounting;

**(b)** The exclusion of any one or more of the factors;

**(c)** The inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or

**(d)** The employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income.

**Article V Elements of Sales and Use Tax LawsTax Credit**

**1.** Each purchaser liable for a use tax on tangible personal property shall be entitled to full credit for the combined

amount or amounts of legally imposed sales or use taxes paid by the purchaser with respect to the same property to another state and any subdivision thereof. The credit shall be applied first against the amount of any use tax due the state, and any unused portion of the credit shall then be applied against the amount of any use tax due a subdivision.

### Exemption Certificates, Vendors May Rely

**2.** Whenever a vendor receives and accepts in good faith from a purchaser a resale or other exemption certificate or other written evidence of exemption authorized by the appropriate state or subdivision taxing authority, the vendor shall be relieved of liability for a sales or use tax with respect to the transaction.

### Article VI The CommissionOrganization and Management

**1.** **(a)** The multistate tax commission is hereby established. It shall be composed of one "member" from each party state who shall be the head of the state agency charged with the administration of the types of taxes to which this compact applies. If there is more than one such agency the state shall provide by law for the selection of the commission member from the heads of the relevant agencies. State law may provide that a member of the commission be represented by an alternate but only if there is on file with the commission written notification of the designation and identity of the alternate. The attorney general of each party state or the attorney general's designee, or other counsel if the laws of the party state specifically provide, shall be entitled to attend the meetings of the commission, but shall not vote. Such attorneys general, designees, or other counsel shall receive all notices of meetings required under subdivision e of subsection 1 of this article.

**(b)** Each party state shall provide by law for the selection of representatives from its subdivisions affected by this compact to consult with the commission member from that state.

**(c)** Each member shall be entitled to one vote. The commission shall not act unless a majority of the members are present, and no action shall be binding unless approved by a majority of the total number of members.

**(d)** The commission shall adopt an official seal to be used as it may provide.

**(e)** The commission shall hold an annual meeting and such other regular meetings as its bylaws may provide and such special meetings as its executive committee may determine. The commission bylaws shall specify the dates of the annual and any other regular meetings, and shall provide for the giving of notice of annual, regular, and special meetings. Notices of special meetings shall include the reasons therefor and an agenda of the items to be considered.

**(f)** The commission shall elect annually, from among its members, a chairman, a vice chairman, and a treasurer. The commission shall appoint an executive director who shall serve at its pleasure, and it shall fix the executive director's duties and compensation. The executive director shall be secretary of the commission. The commission shall make provision for the bonding of such of its officers and employees as it may deem appropriate.

**(g)** Irrespective of the civil service, personnel, or other merit system laws of any party state, the executive director shall appoint or discharge such personnel as may be necessary for the performance of the functions of the commission and shall fix their duties and compensation. The commission bylaws shall provide for personnel policies and programs.

**(h)** The commission may borrow, accept, or contract for the services of personnel from any state, the United States, or any other governmental entity.

**(i)** The commission may accept for any of its purposes and functions any and all donations and grants of money, equipment, supplies, materials, and services, conditional or otherwise, from any governmental entity, and may utilize and dispose of the same.

**(j)** The commission may establish one or more offices for the transacting of its business.

**(k)** The commission shall adopt bylaws for the conduct of its business. The commission shall publish its bylaws in convenient form, and shall file a copy of the bylaws and any amendments thereto with the appropriate agency or officer in each of the party states.

**(l)** The commission annually shall make to the governor and legislature of each party state a report covering its activities for the preceding year. Any donation or grant accepted by the commission or services borrowed shall be reported in the annual report of the commission, and shall include the nature, amount, and conditions, if any, of the donation, gift, grant, or services borrowed and the identity of the donor or lender. The commission may make additional reports as it may deem desirable.

**Committees**

**2. (a)** To assist in the conduct of its business when the full commission is not meeting, the commission shall have an executive committee of seven members, including the chairman, vice chairman, treasurer, and four other members elected annually by the commission. The executive committee subject to the provisions of this compact and consistent with the policies of the commission, shall function as provided in the bylaws of the commission.

**(b)** The commission may establish advisory and technical committees, membership on which may include private persons and public officials, in furthering any of its activities. Such committees may consider any matter of concern to the commission, including problems of special interest to any party state and problems dealing with particular types of taxes.

**(c)** The commission may establish such additional committees as its bylaws may provide.

**Powers**

**3.** In addition to powers conferred elsewhere in this compact, the commission shall have power to:

**(a)** Study state and local tax systems and particular types of state and local taxes.

**(b)** Develop and recommend proposals for an increase in uniformity or compatibility of state and local tax laws with a view toward encouraging the simplification and improvement of state and local tax law and administration.

**(c)** Compile and publish information as in its judgment would assist the party states in implementation of the compact and taxpayers in complying with state and local tax laws.

**(d)** Do all things necessary and incidental to the administration of its functions pursuant to this compact.

**Finance**

**4. (a)** The commission shall submit to the governor or designated officer or officers of each party state a budget of its estimated expenditures for such period as may be required by the laws of that state for presentation to the legislature thereof.

**(b)** Each of the commission's budgets of estimated expenditures shall contain specific recommendations of the amounts to be appropriated by each of the party states. The total amount of appropriations requested under any such budget shall be apportioned among the party states as follows: one-tenth in equal shares; and the remainder in proportion to the amount of revenue collected by each party state and its subdivisions from income taxes, capital stock taxes, gross receipts taxes, and sales and use taxes. In determining such amounts, the commission shall employ such available public sources of information as, in its judgment, present the most equitable and accurate comparisons among the party states. Each of the commission's budgets of estimated expenditures and requests for appropriations shall

indicate the sources used in obtaining information employed in applying the formula contained in this subsection.

**(c)** The commission shall not pledge the credit of any party state. The commission may meet any of its obligations in whole or in part with funds available to it under subdivision i of subsection 1 of this article; provided, that the commission takes specific action setting aside such funds prior to incurring any obligation to be met in whole or in part in such manner. Except where the commission makes use of funds available to it under subdivision i of subsection 1, the commission shall not incur any obligation prior to the allotment of funds by the party states adequate to meet the same.

**(d)** The commission shall keep accurate accounts of all receipts and disbursements. The receipts and disbursements of the commission shall be subject to the audit and accounting procedures established under its bylaws. All receipts and disbursements of funds handled by the commission shall be audited yearly by a certified or licensed public accountant and the report of the audit shall be included in and become part of the annual report of the commission.

**(e)** The accounts of the commission shall be open at any reasonable time for inspection by duly constituted officers of the party states and by any persons authorized by the commission.

**(f)** Nothing contained in this article shall be construed to prevent commission compliance with laws relating to audit or inspection of accounts by or on behalf of any government contributing to the support of the commission.

### Article VII Uniform Regulations and Forms

**1.** Whenever any two or more party states, or subdivisions of party states, have uniform or similar provisions of law relating to an income tax, the commission may adopt uniform regulations for any phase of the administration of such law, including assertion of jurisdiction to tax, or prescribing uniform tax forms. The commission may also act with respect to the provisions of article IV of this compact.

**2.** Prior to the adoption of any regulation, the commission shall:

**(a)** As provided in its bylaws, hold at least one public hearing on due notice to all affected party states and subdivisions thereof and to all taxpayers and other persons who have made timely request of the commission for advance notice of its regulation-making proceedings.

**(b)** Afford all affected party states and subdivisions and interested persons an opportunity to submit relevant written data and views, which shall be considered fully by the commission.

**3.** The commission shall submit any regulations adopted by it to the appropriate officials of all party states and subdivisions to which they might apply. Each such state and subdivision shall consider any such regulation for adoption in accordance with its own laws and procedures.

### Article VIII Interstate Audits

**1.** This article shall be in force only in those party states that specifically provide therefor by statute.

**2.** Any party state or subdivision thereof desiring to make or participate in an audit of any accounts, books, papers, records, or other documents may request the commission to perform the audit on its behalf. In responding to the request, the commission shall have access to and may examine, at any reasonable time, such accounts, books, papers, records, and other documents and any relevant property or stock of merchandise. The commission may enter into agreements with party states or their subdivisions for assistance in performance of the audit. The commission shall make charges, to be paid by the state or local government or governments for which it performs the service, for any audits performed by it in order to reimburse itself for the actual costs incurred in making the audit.

**3.** The commission may require the attendance of any person within the state where it is conducting an audit or part thereof at a time and place fixed by it within such state for the purpose of giving testimony with respect to any account, book, paper, document, other record, property, or stock of merchandise being examined in connection with the audit. If the person is not within the jurisdiction, the person may be required to attend for such purpose at any time and place fixed by the commission within the state of which the person is a resident; provided, that such state has adopted this article.

**4.** The commission may apply to any court having power to issue compulsory process for orders in aid of its powers and responsibilities pursuant to this article and any and all such courts shall have jurisdiction to issue such orders. Failure of any person to obey any such order shall be punishable as contempt of the issuing court. If the party or subject matter on account of which the commission seeks an order is within the jurisdiction of the court to which application is made, such application may be to a court in the state or subdivision on behalf of which the audit is being made or a court in the state in which the object of the order being sought is situated. The provisions of this subsection apply only to courts in a state that has adopted this article.

**5.** The commission may decline to perform any audit requested if it finds that its available personnel or other resources are insufficient for the purpose or that, in the terms requested, the audit is impracticable of satisfactory performance. If the commission, on the basis of its experience, has reason to believe that an audit of a particular taxpayer, either at a particular time or on a particular schedule, would be of interest to a number of party states or their subdivisions, it may offer to make the audit or audits, the offer to be contingent on sufficient participation therein as determined by the commission.

**6.** Information obtained by any audit pursuant to this article shall be confidential and available only for tax purposes to party states, their subdivisions, or the United States. Availability of information shall be in accordance with the laws of the states or subdivisions on whose account the commission performs the audit, and only through the appropriate agencies or officers of such states or subdivisions. Nothing in this article shall be construed to require any taxpayer to keep records for any period not otherwise required by law.

**7.** Other arrangements made or authorized pursuant to law for cooperative audit by or on behalf of the party states or any of their subdivisions are not superseded or invalidated by this article.

**8.** In no event shall the commission make any charge against a taxpayer for an audit.

**9.** As used in this article, "tax", in addition to the meaning ascribed to it in article II, means any tax or license fee imposed in whole or in part for revenue purposes.

**Article IX Arbitration**

**1.** Whenever the commission finds a need for settling disputes concerning apportionments and allocations by arbitration, it may adopt a regulation placing this article in effect, notwithstanding the provisions of article VII.

**2.** The commission shall select and maintain an arbitration panel composed of officers and employees of state and local governments and private persons who shall be knowledgeable and experienced in matters of tax law and administration.

**3.** Whenever a taxpayer who has elected to employ article IV, or whenever the laws of the party state or subdivision thereof are substantially identical with the relevant provisions of article IV, the taxpayer, by written notice to the commission and to each party state or subdivision thereof that would be affected, may secure arbitration of an apportionment or allocation, if the taxpayer is dissatisfied with the final administrative determination of the tax agency of the state or subdivision with respect thereto on the ground that it would subject the taxpayer to double or multiple taxation by two or more party states or subdivisions thereof. Each party state and subdivision thereof hereby consents to the arbitration as provided herein, and agrees to be bound thereby.

**4.** The arbitration board shall be composed of one person selected by the taxpayer, one by the agency or agencies involved, and one member of the commission's arbitration panel. If the agencies involved are unable to agree on the person to be selected by them, such person shall be selected by lot from the total membership of the arbitration panel. The two persons selected for the board in the manner provided by the foregoing provisions of this subsection shall jointly select the third member of the board. If they are unable to agree on the selection, the third member shall be selected by lot from among the total membership of the arbitration panel. No member of a board selected by lot shall be qualified to serve if that member is an officer or employee or is otherwise affiliated with any party to the arbitration proceeding. Residence within the jurisdiction of a party to the arbitration proceeding shall not constitute affiliation within the meaning of this subsection.

**5.** The board may sit in any state or subdivision party to the proceeding, in the state of the taxpayer's incorporation, residence, or domicile, in any state where the taxpayer does business, or in any place that it finds most appropriate for gaining access to evidence relevant to the matter before it.

**6.** The board shall give due notice of the times and places of its hearings. The parties shall be entitled to be heard, to present evidence, and to examine and cross-examine witnesses. The board shall act by majority vote.

**7.** The board shall have power to administer oaths, take testimony, subpoena, and require the attendance of witnesses and the production of accounts, books, papers, records, and other documents, and issue commissions to take testimony. Subpoenas may be signed by any member of the board. In case of failure to obey a subpoena, and upon application by the board, any judge of a court of competent jurisdiction of the state in which the board is sitting or in which the person to whom the subpoena is directed may be found may make an order requiring compliance with the subpoena, and the court may punish failure to obey the order as a contempt. The provisions of this subsection apply only in states that have adopted this article.

**8.** Unless the parties otherwise agree the expenses and other costs of the arbitration shall be assessed and allocated among the parties by the board in such manner as it may determine. The commission shall fix a schedule of compensation for members of arbitration boards and of other allowable expenses and costs. No officer or employee of a state or local government who serves as a member of a board shall be entitled to compensation therefor unless that person is required on account of that person's service to forego the regular compensation attaching to that person's public employment, but any such board member shall be entitled to expenses.

**9.** The board shall determine the disputed apportionment or allocation and any matters necessary thereto. The determinations of the board shall be final for purposes of making the apportionment or allocation, but for no other purpose.

**10.** The board shall file with the commission and with each tax agency represented in the proceeding: the determination of the board; the board's written statement of its reasons therefor; the record of the board's proceedings; and any other documents required by the arbitration rules of the commission to be filed.

**11.** The commission shall publish the determinations of boards together with the statements of the reasons therefor.

**12.** The commission shall adopt and publish rules of procedure and practice and shall file a copy of such rules and of any amendment thereto with the appropriate agency or officer in each of the party states.

**13.** Nothing contained herein shall prevent at any time a written compromise of any matter or matters in dispute, if otherwise lawful, by the parties to the arbitration proceeding.

**Article X Entry Into Force and Withdrawal**

**1.** This compact shall enter into force when enacted into law by any seven states. Thereafter, this compact shall become effective as to any other state upon its enactment thereof. The commission shall arrange for notification of all

party states whenever there is a new enactment of the compact.

**2.** Any party state may withdraw from this compact by enacting a statute repealing the same. No withdrawal shall affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal.

**3.** No proceeding commenced before an arbitration board prior to the withdrawal of a state and to which the withdrawing state or any subdivision thereof is a party shall be discontinued or terminated by the withdrawal, nor shall the board thereby lose jurisdiction over any of the parties to the proceeding necessary to make a binding determination therein.

### Article XI Effect on Other Laws and Jurisdiction

Nothing in this compact shall be construed to:

**1.** Affect the power of any state or subdivision thereof to fix rates of taxation, except that a party state shall be obligated to implement subsection 2 of article III of this compact.

**2.** Apply to any tax or fixed fee imposed for the registration of a motor vehicle or any tax on motor fuel, other than a sales tax; provided, that the definition of "tax" in subsection 9 of article VIII may apply for the purposes of that article and the commission's powers of study and recommendation pursuant to subsection 3 of article VI may apply.

**3.** Withdraw or limit the jurisdiction of any state or local court or administrative officer or body with respect to any person, corporation, limited liability company, or other entity or subject matter, except to the extent that such jurisdiction is expressly conferred by or pursuant to this compact upon another agency or body.

**4.** Supersede or limit the jurisdiction of any court of the United States.

### Article XII Construction and Severability

This compact shall be liberally construed so as to effectuate the purposes thereof. The provisions of this compact shall be severable and if any phrase, clause, sentence, or provision of this compact is declared to be contrary to the constitution of any state or of the United States or the applicability thereof to any government, agency, person, or circumstance is held invalid, the validity of the remainder of this compact and the applicability thereof to any government, agency, person, or circumstance shall not be affected thereby. If this compact shall be held contrary to the constitution of any state participating therein, the compact shall remain in full force and effect as to the remaining party states and in full force and effect as to the state affected as to all severable matters.

**HISTORY:** S.L. 1969, ch. 537, § 1; 1993, ch. 54, § 106.

**NOTES: Comparative Legislation.**

Multistate Tax Compact:

Ala. Code § 47-27-1 et seq.

Alaska Stat. § 43-19-010 et seq.

Ark. Stat. Ann. § 84.4101.

Cal. Revenue and Taxation Code § 38001.

Colo. Rev. Stat. § 24-60-1301.

D.C. Law 4-17.

Fla. Stat. § 213.15 et seq.

Hawaii Rev. Stat. § 255-1 et seq.

Idaho Code § 63-3701 et seq.

Kan. Stat. Ann. § 79-4301.

Mich. Comp. Laws §§ 205.581-205.589.

Mo. Rev. Stat. § 32.200 et seq.

Mont. Code Ann. § 15-31-122.

Neb. Rev. Stat. § 77-2901 et seq.

Nev. Rev. Stat. § 376.010 et seq.

N. M. Stat. Ann. § 7-5-1 et seq.

Or. Rev. Stat. § 305.655 et seq.

S. D. Codified Laws § 10-54-1.

Tex. Rev. Civ. Stat., Art. 7359a.

Utah Code Ann. § 59-22-1.

Wash. Rev. Code § 82.56.010.

W. Va. Code c. 11, art. 10A.



Michie's TM Annotated Statutes of New Mexico
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** Statutes current through end of the Second Regular Session of the Fifty-First Legislature (2014 legislation) ***

Chapter 7  Taxation
Article 5  Multistate Tax Compact

**Go to the New Mexico Code Archive Directory**

N.M. Stat. Ann. § 7-5-1  (2014)

**7-5-1.  Compact enacted and entered into.**

The "Multistate Tax Compact" is enacted into law and entered into with all jurisdictions legally joining therein, in the form substantially as follows:

**"MULTISTATE TAX COMPACT Article I. Purposes.**

The purposes of this compact are to:

**1.** Facilitate proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases and settlement of apportionment disputes.

**2.** Promote uniformity or compatibility in significant components of tax systems.

**3.** Facilitate taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration.

**4.** Avoid duplicative taxation.

**Article II. Definitions.**

As used in this compact:

**1.** "State" means a state of the United States, the District of Columbia, the commonwealth of Puerto Rico, or any territory or possession of the United States.

**2.** "Subdivision" means any governmental unit or special district of a state.

**3.** "Taxpayer" means any corporation, partnership, firm, association, governmental unit or agency or person acting as a business entity in more than one state.

**4.** "Income tax" means a tax imposed on or measured by net income including any tax imposed on or measured by an amount arrived at by deducting expenses from gross income, one or more forms of which expenses are not specifically and directly related to particular transactions.

**5.** "Capital stock tax" means a tax measured in any way by the capital of a corporation considered in its entirety.

**6.** "Gross receipts tax" means a tax, other than a sales tax, which is imposed on or measured by the gross volume of business, in terms of gross receipts or in other terms, and in the determination of which no deduction is allowed which would constitute the tax an income tax.

**7.** "Sales tax" means a tax imposed with respect to the transfer for a consideration of ownership, possession or custody of tangible personal property or the rendering of services measured by the price of the tangible personal property transferred or services rendered and which is required by state or local law to be separately stated from the sales price by the seller, or which is customarily separately stated from the sales price, but does not include a tax imposed exclusively on the sale of a specifically identified commodity or article or class of commodities or articles.

**8.** "Use tax" means a nonrecurring tax, other than a sales tax, which (a) is imposed on or with respect to the exercise or enjoyment of any right or power over tangible personal property incident to the ownership, possession or custody of that property or the leasing of that property from another including any consumption, keeping, retention, or other use of tangible personal property and (b) is complementary to a sales tax.

**9.** "Tax" means an income tax, capital stock tax, gross receipts tax, sales tax, use tax, and any other tax which has a multistate impact, except that the provisions of Articles III, IV and V of this compact shall apply only to the taxes specifically designated therein and the provisions of Article IX of this compact shall apply only in respect to determinations pursuant to Article IV.

### Article III. Elements of Income Tax Laws. Taxpayer Option, State and Local Taxes.

**1.** Any taxpayer subject to an income tax whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a party state or pursuant to the laws of subdivisions in two or more party states may elect to apportion and allocate his income in the manner provided by the laws of such state or by the laws of such states and subdivisions without reference to this compact, or may elect to apportion and allocate in accordance with Article IV. This election for any tax year may be made in all party states or subdivisions thereof or in any one or more of the party states or subdivisions thereof without reference to the election made in the others. For the purposes of this paragraph, taxes imposed by subdivisions shall be considered separately from state taxes and the apportionment and allocation also may be applied to the entire tax base. In no instance wherein Article IV is employed for all subdivisions of a state may the sum of all apportionments and allocations to subdivisions within a state be greater than the apportionment and allocation that would be assignable to that state if the apportionment or allocation were being made with respect to a state income tax.

#### Taxpayer Option, Short Form.

**2.** Each party state or any subdivision thereof which imposes an income tax shall provide by law that any taxpayer required to file a return, whose only activities within the taxing jurisdiction consist of sales and do not include owning or renting real estate or tangible personal property, and whose dollar volume of gross sales made during the tax year within the state or subdivision, as the case may be, is not in excess of $ 100,000 may elect to report and pay any tax due on the basis of a percentage of such volume, and shall adopt rates which shall produce a tax which reasonably approximates the tax otherwise due. The multistate tax commission, not more than once in five years, may adjust the $ 100,000 figure in order to reflect such changes as may occur in the real value of the dollar, and such adjusted figure, upon adoption by the commission, shall replace the $ 100,000 figure specifically provided herein. Each party state and subdivision thereof may make the same election available to taxpayers additional to those specified in this paragraph.

**Coverage.**

**3.** Nothing in this Article relates to the reporting or payment of any tax other than an income tax.

**Article IV. Division of Income.**

**1.** As used in this Article, unless the context otherwise requires:

(a) "Business income" means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations.

(b) "Commercial domicile" means the principal place from which the trade or business of the taxpayer is directed or managed.

(c) "Compensation" means wages, salaries, commissions and any other form of remuneration paid to employees for personal services.

(d) "Financial organization" means any bank, trust company, savings bank, industrial bank, land bank, safe deposit company, private banker, savings and loan association, credit union, cooperative bank, small loan company, sales finance company, investment company, or any type of insurance company.

(e) "Nonbusiness income" means all income other than business income.

(f) "Public utility" means any business entity (1) which owns or operates any plant, equipment, property, franchise, or license for the transmission of communications, transportation of goods or persons, except by pipeline, or the production, transmission, sale, delivery, or furnishing of electricity, water or steam; and (2) whose rates of charges for goods or services have been established or approved by a federal, state or local government or governmental agency.

(g) "Sales" means all gross receipts of the taxpayer not allocated under paragraphs of this Article.

(h) "State" means any state of the United States, the District of Columbia, the commonwealth of Puerto Rico, any territory or possession of the United States, and any foreign country or political subdivision thereof.

(i) "This state" means the state in which the relevant tax return is filed or, in the case of application of this Article to the apportionment and allocation of income for local tax purposes, the subdivision or local taxing district in which the relevant tax return is filed.

**2.** Any taxpayer having income from business activity which is taxable both within and without this state, other than activity as a financial organization or public utility or the rendering of purely personal services by an individual, shall allocate and apportion his net income as provided in this Article. If a taxpayer has income from business activity as a public utility but derives the greater percentage of his income from activities subject to this Article, the taxpayer may elect to allocate and apportion his entire net income as provided in this Article.

**3.** For purposes of allocation and apportionment of income under this Article, a taxpayer is taxable in another state if (1) in that state he is subject to a net income tax, a franchise tax measured by net income, a franchise tax for the privilege of doing business, or a corporate stock tax, or (2) that state has jurisdication [jurisdiction] to subject the taxpayer to a net income tax regardless of whether, in fact, the state does or does not.

**4.** Rents and royalties from real or tangible personal property, capital gains, interest, dividends or patent or copyright royalties, to the extent that they constitute nonbusiness income, shall be allocated as provided in paragraphs 5 through 8 of this Article.

**5.** **(a)** Net rents and royalties from real property located in this state are allocable to this state.

**(b)** Net rents and royalties from tangible personal property are allocable to this state: (1) if and to the extent that the property is utilized in this state, or (2) in their entirety if the taxpayer's commercial domicile is in this state and the taxpayer is not organized under the laws of or taxable in the state in which the property is utilized.

**(c)** The extent of utilization of tangible personal property in a state is determined by multiplying the rents and royalties by a fraction, the numerator of which is the number of days of physical location of the property in the state during the rental or royalty period in the taxable year and the denominator of which is the number of days of physical location of the property everywhere during all rental or royalty periods in the taxable year. If the physical location of the property during the rental or royalty period is unknown or unascertainable by the taxpayer, tangible personal property is utilized in the state in which the property was located at the time the rental or royalty payer obtained possession.

**6.** **(a)** Capital gains and losses from sales of real property located in this state are allocable to this state.

**(b)** Capital gains and losses from sales of tangible personal property are allocable to this state if (1) the property had a situs in this state at the time of the sale, or (2) the taxpayer's commercial domicile is in this state and the taxpayer is not taxable in the state in which the property had a situs.

**(c)** Capital gains and losses from sales of intangible personal property are allocable to this state if the taxpayer's commercial domicile is in this state.

**7.** Interest and dividends are allocable to this state if the taxpayer's commercial domicile is in this state.

**8.** **(a)** Patent and copyright royalties are allocable to this state: (1) if and to the extent that the patent or copyright is utilized by the payer in this state, or (2) if and to the extent that the patent [or] copyright is utilized by the payer in a state in which the taxpayer is not taxable and the taxpayer's commercial domicile is in this state.

**(b)** A patent is utilized in a state to the extent that it is employed in production, fabrication, manufacturing, or other processing in the state or to the extent that a patented product is produced in the state. If the basis of receipts from patent royalties does not permit allocation to states or if the accounting procedures do not reflect states of utilization, the patent is utilized in the state in which the taxpayer's commercial domicile is located.

**(c)** A copyright is utilized in a state to the extent that printing or other publication originates in the state. If the basis of receipts from copyright royalties does not permit allocation to states or if the accounting procedures do not reflect states of utilization, the copyright is utilized in the state in which the taxpayer's commercial domicile is located.

**9.** All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three.

**10.** The property factor is a fraction, the numerator of which is the average value of the taxpayer's real and tangible personal property owned or rented and used in this state during the tax period and the denominator of which is the average value of all the taxpayer's real and tangible personal property owned or rented and used during the tax period.

**11.** Property owned by the taxpayer is valued at its original cost. Property rented by the taxpayer is valued at eight times the net annual rental rate. Net annual rental rate is the annual rental rate paid by the taxpayer less any annual rental rate received by the taxpayer from subrentals.

**12.** The average value of property shall be determined by averaging the values at the beginning and ending of the tax period but the tax administrator may require the averaging of monthly values during the tax period if reasonably required to reflect properly the average value of the taxpayer's property.

**13.** The payroll factor is a fraction, the numerator of which is the total amount paid in this state during the tax

period by the taxpayer for compensation and the denominator of which is the total compensation paid everywhere during the tax period.

**14.** Compensation is paid in this state if:

**(a)** the individual's service is performed entirely within the state;

**(b)** the individual's service is performed both within and without the state, but the service performed without the state is incidental to the individual's service within the state; or

**(c)** some of the service is performed in the state and (1) the base of operations or, if there is no base of operations, the place from which the service is directed or controlled is in the state, or (2) the base of operations or the place from which the service is directed or controlled is not in any state in which some part of the service is performed, but the individual's residence is in this state.

**15.** The sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this state during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period.

**16.** Sales of tangible personal property are in this state if:

**(a)** the property is delivered or shipped to a purchaser, other than the United States government, within this state regardless of the f.o.b. point or other conditions of the sale; or

**(b)** the property is shipped from an office, store, warehouse, factory or other place of storage in this state and (1) the purchaser is the United States government or (2) the taxpayer is not taxable in the state of the purchaser.

**17.** Sales, other than sales of tangible personal property, are in this state if:

**(a)** the income-producing activity is performed in this state; or

**(b)** the income-producing activity is performed both in and outside this state and a greater proportion of the income-producing activity is performed in this state than in any other state, based on costs of performance.

**18.** If the allocation and apportionment provisions of this Article do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for or the tax administrator may require, in respect to all or any part of the taxpayer's business activity, if reasonable:

**(a)** separate accounting;

**(b)** the exclusion of any one or more of the factors;

**(c)** the inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or

**(d)** the employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income.

### Article V. Elements of Sales and Use Tax Laws. Tax Credit.

**1.** Each purchaser liable for a use tax on tangible personal property shall be entitled to full credit for the combined amount or amounts of legally imposed sales or use taxes paid by him with respect to the same property to another state and any subdivision thereof. The credit shall be applied first against the amount of any use tax due the state, and any unused portion of the credit shall then be applied against the amount of any use tax due a subdivision.

**Exemption Certificates, Vendors May Rely.**

**2.** Whenever a vendor receives and accepts in good faith from a purchaser a resale or other exemption certificate or other written evidence of exemption authorized by the appropriate state or subdivision taxing authority, the vendor shall be relieved of liability for a sales or use tax with respect to the transaction.

**Article VI. The Commission. Organization and Management.**

**1.** **(a)** The multistate tax commission is hereby established. It shall be composed of one "member" from each party state who shall be the head of the state agency charged with the administration of the types of taxes to which this compact applies. If there is more than one such agency the state shall provide by law for the selection of the commission member from the heads of the relevant agencies. State law may provide that a member of the commission be represented by an alternate but only if there is on file with the commission written notification of the designation and identity of the alternate. The attorney general of each party state or his designee, or other counsel if the laws of the party state specifically provide, shall be entitled to attend the meetings of the commission, but shall not vote. Such attorneys general, designees, or other counsel shall receive all notices of meetings required under paragraph 1(e) of this Article.

**(b)** Each party state shall provide by law for the selection of representatives from its subdivisions affected by this compact to consult with the commission member from that state.

**(c)** Each member shall be entitled to one vote. The commission shall not act unless a majority of the members are present, and no action shall be binding unless approved by a majority of the total number of members.

**(d)** The commission shall adopt an official seal to be used as it may provide.

**(e)** The commission shall hold an annual meeting and such other regular meetings as its bylaws may provide and such special meetings as its executive committee may determine. The commission bylaws shall specify the dates of the annual and any other regular meetings, and shall provide for the giving of notice of annual, regular and special meetings. Notices of special meetings shall include the reasons therefor and an agenda of the items to be considered.

**(f)** The commission shall elect annually, from among its members, a chairman, a vice chairman and a treasurer. The commission shall appoint an executive director who shall serve at its pleasure, and it shall fix his duties and compensation. The executive director shall be secretary of the commission. The commission shall make provision for the bonding of such of its officers and employees as it may deem appropriate.

**(g)** Irrespective of the civil service, personnel or other merit system laws of any party state, the executive director shall appoint or discharge such personnel as may be necessary for the performance of the functions of the commission and shall fix their duties and compensation. The commission bylaws shall provide for personnel policies and programs.

**(h)** The commission may borrow, accept or contract for the services of personnel from any state, the United States, or any other governmental entity.

**(i)** The commission may accept for any of its purposes and functions any and all donations and grants of money, equipment, supplies, materials and services, conditional or otherwise, from any governmental entity, and may utilize and dispose of the same.

**(j)** The commission may establish one or more offices for the transacting of its business.

**(k)** The commission shall adopt bylaws for the conduct of its business. The commission shall publish its bylaws in convenient form, and shall file a copy of the bylaws and any amendments thereto with the appropriate agency or officer in each of the party states.

(l) The commission annually shall make to the governor and legislature of each party state a report covering its activities for the preceding year. Any donation or grant accepted by the commission or services borrowed shall be reported in the annual report of the commission, and shall include the nature, amount and conditions, if any, of the donation, gift, grant or services borrowed and the identity of the donor or lender. The commission may make additional reports as it may deem desirable.

**Committees.**

**2. (a)** To assist in the conduct of its business when the full commission is not meeting, the commission shall have an executive committee of seven members, including the chairman, vice chairman, treasurer and four other members elected annually by the commission. The executive committee, subject to the provisions of this compact and consistent with the policies of the commission, shall function as provided in the bylaws of the commission.

**(b)** The commission may establish advisory and technical committees, membership on which may include private persons and public officials, in furthering any of its activities. Such committees may consider any matter of concern to the commission, including problems of special interest to any party state and problems dealing with particular types of taxes.

**(c)** The commission may establish such additional committees as its bylaws may provide.

**Powers.**

**3.** In addition to powers conferred elsewhere in this compact, the commission shall have power to:

**(a)** Study state and local tax systems and particular types of state and local taxes.

**(b)** Develop and recommend proposals for an increase in uniformity or compatibility of state and local tax laws with a view toward encouraging the simplification and improvement of state and local tax law and administration.

**(c)** Compile and publish information as in its judgment would assist the party states in implementation of the compact and taxpayers in complying with state and local tax laws.

**(d)** Do all things necessary and incidental to the administration of its functions pursuant to this compact.

**Finance.**

**4. (a)** The commission shall submit to the governor or designated officer or officers of each party state a budget of its estimated expenditures for such period as may be required by the laws of that state for presentation to the legislature thereof.

**(b)** Each of the commission's budgets of estimated expenditures shall contain specific recommendations of the amounts to be appropriated by each of the party states. The total amount of appropriations requested under any such budget shall be apportioned among the party states as follows: one-tenth in equal shares; and the remainder in proportion to the amount of revenue collected by each party state and its subdivisions from income taxes, capital stock taxes, gross receipts taxes, sales and use taxes. In determining such amounts, the commission shall employ such available public sources of information as, in its judgment, present the most equitable and accurate comparisons among the party states. Each of the commission's budgets of estimated expenditures and requests for appropriations shall indicate the sources used in obtaining information employed in applying the formula contained in this paragraph.

**(c)** The commission shall not pledge the credit of any party state. The commission may meet any of its obligations in whole or in part with funds available to it under paragraph (1)(i) of this Article: provided that the commission takes specific action setting aside such funds prior to incurring any obligation to be met in whole or in part in such manner. Except where the commission makes use of funds available to it under paragraph 1(i), the commission

shall not incur any obligation prior to the allotment of funds by the party states adequate to meet the same.

**(d)** The commission shall keep accurate accounts of all receipts and disbursements. The receipts and disbursements of the commission shall be subject to the audit and accounting procedures established under its bylaws. All receipts and disbursements of funds handled by the commission shall be audited yearly by a certified or licensed public accountant and the report of the audit shall be included in and become part of the annual report of the commission.

**(e)** The accounts of the commission shall be open at any reasonable time for inspection by duly constituted officers of the party states and by any persons authorized by the commission.

**(f)** Nothing contained in this Article shall be construed to prevent commission compliance with laws relating to audit or inspection of accounts by or on behalf of any government contributing to the support of the commission.

### Article VII. Uniform Regulations and Forms.

**1.** Whenever any two or more party states, or subdivisions of party states, have uniform or similar provisions of law relating to an income tax, capital stock tax, gross receipts tax, sales or use tax, the commission may adopt uniform regulations for any phase of the administration of such law, including assertion of jurisdiction to tax, or prescribing uniform tax forms. The commission may also act with respect to the provisions of Article IV of this compact.

**2.** Prior to the adoption of any regulation, the commission shall:

**(a)** As provided in its bylaws, hold at least one public hearing on due notice to all affected party states and subdivisions thereof and to all taxpayers and other persons who have made timely request of the commission for advance notice of its regulation-making proceedings.

**(b)** Afford all affected party states and subdivisions and interested persons an opportunity to submit relevant written data and views, which shall be considered fully by the commission.

**3.** The commission shall submit any regulations adopted by it to the appropriate officials of all party states and subdivisions to which they might apply. Each such state and subdivision shall consider any such regulation for adoption in accordance with its own laws and procedures.

### Article VIII. Interstate Audits.

**1.** This Article shall be in force only in those party states that specifically provide therefor by statute.

**2.** Any party state or subdivision thereof desiring to make or participate in an audit of any accounts, books, papers, records or other documents may request the commission to perform the audit on its behalf. In responding to the request, the commission shall have access to and may examine, at any reasonable time, such accounts, books, papers, records, and other documents and any relevant property or stock of merchandise. The commission may enter into agreements with party states or their subdivisions for assistance in performance of the audit. The commission shall make charges, to be paid by the state or local government or governments for which it performs the service, for any audits performed by it in order to reimburse itself for the actual costs incurred in making the audit.

**3.** The commission may require the attendance of any person within the state where it is conducting an audit or part thereof at a time and place fixed by it within such state for the purpose of giving testimony with respect to any account, book, paper, document, other record, property or stock of merchandise being examined in connection with the audit. If the person is not within the jurisdiction, he may be required to attend for such purpose at any time and place fixed by the commission within the state of which he is a resident; provided that such state has adopted this Article.

**4.** The commission may apply to any court having power to issue compulsory process for orders in aid of its powers

and responsibilities pursuant to this Article and any and all such courts shall have jurisdiction to issue such orders. Failure of any person to obey any such order shall be punishable as contempt of the issuing court. If the party or subject matter on account of which the commission seeks an order is within the jurisdiction of the court to which application is made, such application may be to a court in the state or subdivision on behalf of which the audit is being made or a court in the state in which the object of the order being sought is situated. The provisions of this paragraph apply only to courts in a state that has adopted this Article.

**5.** The commission may decline to perform any audit requested if it finds that its available personnel or other resources are insufficient for the purpose or that, in the terms requested, the audit is impracticable of satisfactory performance. If the commission, on the basis of its experience, has reason to believe that an audit of a particular taxpayer, either at a particular time or on a particular schedule, would be of interest to a number of party states or their subdivisions, it may offer to make the audit or audits, the offer to be contingent on sufficient participation therein as determined by the commission.

**6.** Information obtained by any audit pursuant to this Article shall be confidential and available only for tax purposes to party states, their subdivisions or the United States. Availability of information shall be in accordance with the laws of the states or subdivisions on whose account the commission performs the audit, and only through the appropriate agencies or officers of such states or subdivisions. Nothing in this Article shall be construed to require any taxpayer to keep records for any period not otherwise required by law.

**7.** Other arrangements made or authorized pursuant to law for cooperative audit by or on behalf of the party states or any of their subdivisions are not superseded or invalidated by this Article.

**8.** In no event shall the commission make any charge against a taxpayer for an audit.

**9.** As used in this Article, "tax," in addition to the meaning ascribed to it in Article II, means any tax or license fee imposed in whole or in part for revenue purposes.

**Article IX. Arbitration.**

**1.** Whenever the commission finds a need for settling disputes concerning apportionments and allocations by arbitration, it may adopt a regulation placing this Article in effect, notwithstanding the provisions of Article VII.

**2.** The commission shall select and maintain an arbitration panel composed of officers and employees of state and local governments and private persons who shall be knowledgeable and experienced in matters of tax law and administration.

**3.** Whenever a taxpayer who has elected to employ Article IV, or whenever the laws of the party state or subdivision thereof are substantially identical with the relevant provisions of Article IV, the taxpayer, by written notice to the commission and to each party state or subdivision thereof that would be affected, may secure arbitration of an apportionment or allocation, if he is dissatisfied with the final administrative determination of the tax agency of the state or subdivision with respect thereto on the ground that it would subject him to double or multiple taxation by two or more party states or subdivisions thereof. Each party state and subdivision thereof hereby consents to the arbitration as provided herein, and agrees to be bound thereby.

**4.** The arbitration board shall be composed of one person selected by the taxpayer, one by the agency or agencies involved, and one member of the commission's arbitration panel. If the agencies involved are unable to agree on the person to be selected by them, such person shall be selected by lot from the total membership of the arbitration panel. The two persons selected for the board in the manner provided by the foregoing provisions of this paragraph shall jointly select the third member of the board. If they are unable to agree on the selection, the third member shall be selected by lot from among the total membership of the arbitration panel. No member of a board selected by lot shall be qualified to serve if he is an officer or employee or is otherwise affiliated with any party to the arbitration proceeding.

Residence within the jurisdiction of a party to the arbitration proceeding shall not constitute affiliation within the meaning of this paragraph.

**5.** The board may sit in any state or subdivision party to the proceeding, in the state of the taxpayer's incorporation, residence or domicile, in any state where the taxpayer does business, or in any place that it finds most appropriate for gaining access to evidence relevant to the matter before it.

**6.** The board shall give due notice of the times and places of its hearings. The parties shall be entitled to be heard, to present evidence, and to examine and cross-examine witnesses. The board shall act by majority vote.

**7.** The board shall have power to administer oaths, take testimony, subpoena and require the attendance of witnesses and the production of accounts, books, papers, records, and other documents, and issue commissions to take testimony. Subpoenas may be signed by any member of the board. In case of failure to obey a subpoena, and upon application by the board, any judge of a court of competent jurisdiction of the state in which the board is sitting or in which the person to whom the subpoena is directed may be found may make an order requiring compliance with the subpoena, and the court may punish failure to obey the order as a contempt. The provisions of this paragraph apply only in states that have adopted this Article.

**8.** Unless the parties otherwise agree the expenses and other costs of the arbitration shall be assessed and allocated among the parties by the board in such manner as it may determine. The commission shall fix a schedule of compensation for members of arbitration boards and of other allowable expenses and costs. No officer or employee of a state or local government who serves as a member of a board shall be entitled to compensation therefor unless he is required on account of his service to forego the regular compensation attaching to his public employment, but any such board member shall be entitled to expenses.

**9.** The board shall determine the disputed apportionment or allocation and any matters necessary thereto. The determinations of the board shall be final for the purposes of making the apportionment or allocation, but for no other purpose.

**10.** The board shall file with the commission and with each tax agency represented in the proceeding: the determination of the board; the board's written statement of its reasons therefor; the record of the board's proceedings; and any other documents required by the arbitration rules of the commission to be filed.

**11.** The commission shall publish the determinations of boards together with the statements of the reasons therefor.

**12.** The commission shall adopt and publish rules of procedure and practice and shall file a copy of such rules and of any amendment thereto with the appropriate agency or officer in each of the party states.

**13.** Nothing contained herein shall prevent at any time a written compromise of any matter or matters in dispute, if otherwise lawful, by the parties to the arbitration proceeding.

### Article X. Entry Into Force and Withdrawal.

**1.** This compact shall enter into force when enacted into law by any seven states. Thereafter, this compact shall become effective as to any other state upon its enactment thereof. The commission shall arrange for notification of all party states whenever there is a new enactment of the compact.

**2.** Any party state may withdraw from this compact by enacting a statute repealing the same. No withdrawal shall affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal.

**3.** No proceeding commenced before an arbitration board prior to the withdrawal of a state and to which the withdrawing state or any subdivision thereof is a party shall be discontinued or terminated by the withdrawal, nor shall

the board thereby lose jurisdiction over any of the parties to the proceeding necessary to make a binding determination therein.

### Article XI. Effect on Other Laws and Jurisdiction.

Nothing in this compact shall be construed to:

**(a)** Affect the power of any state or subdivision thereof to fix rates of taxation, except that a party state shall be obligated to implement Article III 2 of this compact.

**(b)** Apply to any tax or fixed fee imposed for the registration of a motor vehicle or any tax on motor fuel, other than a sales tax; provided that the definition of "tax" in Article VIII 9 may apply for the purposes of that Article and the commission's powers of study and recommendation pursuant to Article VI 3 may apply.

**(c)** Withdraw or limit the jurisdiction of any state or local court or administrative officer or body with respect to any person, corporation or other entity or subject matter, except to the extent that such jurisdiction is expressly conferred by or pursuant to this compact upon another agency or body.

**(d)** Supersede or limit the jurisdiction of any court of the United States.

### Article XII. Construction and Severability.

This compact shall be liberally construed so as to effectuate the purposes thereof. The provisions of this compact shall be severable and if any phrase, clause, sentence or provision of this compact is declared to be contrary to the constitution of any state or of the United States or the applicability thereof to any government, agency, person or circumstance is held invalid, the validity of the remainder of this compact and the applicability thereof to any government, agency, person or circumstance shall not be affected thereby. If this compact shall be held contrary to the constitution of any state participating therein, the compact shall remain in full force and effect as to the remaining party states and in full force and effect as to the state affected as to all severable matters."

**HISTORY:** 1953 Comp., § 72-15A-37, enacted by Laws 1967, ch. 56, § 1.

**NOTES:**

**LexisNexis Practice Insights**

1.

2.

3.

4.

5.

6.

7.

8.

9.

10.

11.

## Notes to Decisions

Constitutionality. Registration. Tax certificate number. Tax challenge.

### Constitutionality.

Allegations that the Multistate Tax Commission, had abused its powers by conducting a campaign of harassment against members of plaintiff class of taxpayers failed to establish that the compact was in violation of the Commerce Clause, U.S. Const. art. I, § 8. United States Steel Corp. v. Multistate Tax Comm'n, 434 U.S. 452, 98 S. Ct. 799, 54 L. Ed. 2d 682, 1978 U.S. LEXIS 58 (U.S. 1978).

Multistate Tax Compact, did not violate the Compact Clause, U.S. Const. art. I, § 10, because it granted the states no powers that they did not already have individually, and was entirely voluntary to the states. United States Steel Corp. v. Multistate Tax Comm'n, 434 U.S. 452, 98 S. Ct. 799, 54 L. Ed. 2d 682, 1978 U.S. LEXIS 58 (U.S. 1978).

### Registration.

Mere possession of a New Mexico registration number does not mean that a taxpayer is registered with New Mexico for gross receipts tax purposes. Siemens Energy & Automation v. New Mexico Taxation & Revenue Dep t, 119 N.M. 316, 889 P.2d 1238, 1994 N.M. App. LEXIS 171 (Ct. App. 1994).

### Tax certificate number.

The presence of a purchaser's taxpayer identification number on a sales and use tax exemption certificate is not, by itself, evidence that a seller did not accept the certificate in good faith. Siemens Energy & Automation v. New Mexico Taxation & Revenue Dep t, 119 N.M. 316, 889 P.2d 1238, 1994 N.M. App. LEXIS 171 (Ct. App. 1994).

### Tax challenge.

In a taxpayer's challenge of an assessment of gross receipts tax against it, a hearing officer's finding that a sales and use tax exemption certificate delivered by a purchaser to the taxpayer was not in the proper form required to merit a tax exemption violated 7-1-25C(1), (2) NMSA 1978 where the taxpayer submitted valid multi-state certificates on the three sales in question, where the New Mexico Taxation and Revenue Department presented no testimony on the subject and did not even cross-examine the taxpayer's representative on why the certificates were not valid, where a reference in the testimony to the certificates as "multi-jurisdictional certificates," rather than "multi-state certificates," caused no confusion, and where thus there was no evidence to support the hearing officer's finding. Siemens Energy & Automation v. New Mexico Taxation & Revenue Dep t, 119 N.M. 316, 889 P.2d 1238, 1994 N.M. App. LEXIS 171 (Ct. App. 1994).

## Research References and Practice Aids

### New Mexico Law Review.

New Mexico Taxes: Taking Another Look, Robert J. Desiderio, James La Fata and Maria Siemel McCulley, 32 N.M. L. Rev. 351 (2002).



LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

*** This document is current through the 2013 3rd Called Session ***

CODE OF CRIMINAL PROCEDURE
TITLE 1.  CODE OF CRIMINAL PROCEDURE OF 1965
PROCEEDINGS AFTER VERDICT
CHAPTER 42.  JUDGMENT AND SENTENCE

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

Tex. Code Crim. Proc. art. 42.19  (2014)

Art. 42.19.  Interstate Corrections Compact

Article I. Purpose and Policy

The party states, desiring by common action to fully utilize and improve their institutional facilities and provide adequate programs for the confinement, treatment, and rehabilitation of various types of offenders, declare that it is the policy of each of the party states to provide such facilities and programs on a basis of cooperation with one another, thereby serving the best interests of such offenders and of society and effecting economies in capital expenditures and operational costs. The purpose of this compact is to provide for the mutual development and execution of such programs of cooperation for the confinement, treatment, and rehabilitation of offenders with the most economical use of human and material resources.

*Article II. Definitions*

As used in this compact, unless the context clearly requires otherwise:

(a) "State" means a state of the United States; the United States of America; a territory or possession of the United States; the District of Columbia; the commonwealth of Puerto Rico.

(b) "Sending state" means a state party to this compact in which conviction or court commitment was had.

(c) "Receiving state" means a state party to this compact to which an inmate is sent for confinement other than a state in which conviction or court commitment was had.

(d) "Inmate" means a male or female offender who is committed, under sentence to or confined in a penal or correctional institution.

(e) "Institution" means any penal or correctional facility, including but not limited to a facility for the mentally ill or mentally defective, in which inmates as defined in (d) above may lawfully be confined.

*Article III. Contracts*

(a) Each party state may make one or more contracts with any one or more of the other party states for the confinement of inmates on behalf of a sending state in institutions situated within receiving states. Any such contract shall provide for:

1. Its duration.

2. Payments to be made to the receiving state by the sending state for inmate maintenance, extraordinary medical and dental expenses, and any participation in or receipt by inmates of rehabilitative or correctional services, facilities, programs, or treatment not reasonably included as part of normal maintenance.

3. Participation in programs of inmate employment, if any; the disposition or crediting of any payments received by inmates on account thereof; and the crediting of proceeds from or disposal of any products resulting therefrom.

4. Delivery and retaking of inmates.

5. Such other matters as may be necessary and appropriate to fix the obligations, responsibilities, and rights of the sending and receiving states.

(b) The terms and provisions of this compact shall be a part of any contract entered into by the authority of or pursuant thereto, and nothing in any such contract shall be inconsistent therewith.

*Article IV. Procedures and Rights*

(a) Whenever the duly constituted authorities in a state party to this compact, and which has entered into a contract pursuant to Article III, shall decide that confinement in, or transfer of an inmate to, an institution within the territory of another party state is necessary or desirable in order to provide adequate quarters and care or an appropriate program of rehabilitation or treatment, such official may direct that the confinement be within an institution within the territory of such other party state, the receiving state to act in that regard solely as agent for the sending state.

(b) The appropriate officials of any state party to this compact shall have access, at all reasonable times, to any institution in which it has a contractual right to confine inmates for the purpose of inspecting the facilities thereof and visiting such of its inmates as may be confined in the institution.

(c) Inmates confined in an institution pursuant to this compact shall at all times be subject to the jurisdiction of the sending state and may at any time be removed therefrom for transfer to a prison or other institution within the

sending state, for transfer to another institution in which the sending state may have a contractual or other right to confine inmates, for release on probation or parole, for discharge, or for any other purpose permitted by the laws of the sending state. However, the sending state shall continue to be obligated to such payments as may be required pursuant to the terms of any contract entered into under the terms of Article III.

(d) Each receiving state shall provide regular reports to each sending state on the inmates of that sending state who are in institutions pursuant to this compact including a conduct record of each inmate and shall certify such record to the official designated by the sending state, in order that each inmate may have official review of his or her record in determining and altering the disposition of the inmate in accordance with the law which may obtain in the sending state and in order that the same may be a source of information for the sending state.

(e) All inmates who may be confined in an institution pursuant to this compact shall be treated in a reasonable and humane manner and shall be treated equally with such similar inmates of the receiving state as may be confined in the same institution. The fact of confinement in a receiving state shall not deprive any inmate so confined of any legal rights which the inmate would have had if confined in an appropriate institution of the sending state.

(f) Any hearing or hearings to which an inmate confined pursuant to this compact may be entitled by the laws of the sending state may be had before the appropriate authorities of the sending state, or of the receiving state if authorized by the sending state. The receiving state shall provide adequate facilities for such hearing as may be conducted by the appropriate officials of a sending state. In the event such hearing or hearings are had before officials of the receiving state, the governing law shall be that of the sending state and a record of the hearing or hearings as prescribed by the sending state shall be made. The record together with any recommendations of the hearing officials shall be transmitted forthwith to the official or officials before whom the hearing would have been had if it had taken place in the sending state. In any and all proceedings had pursuant to the provisions of this paragraph (f), the officials of the receiving state shall act solely as agents of the sending state and no final determination shall be made in any matter except by the appropriate officials of the sending state.

(g) Any inmate confined pursuant to this compact shall be released within the territory of the sending state unless the inmate and the sending and receiving states shall agree upon release in some other place. The sending state shall bear the cost of such return to its territory.

(h) Any inmate confined pursuant to this compact shall have any rights and all rights to participate in and derive any benefits or incur or be relieved of any obligations or have such obligations modified or his status changed on account of any action or proceeding in which he could have participated if confined in any appropriate institution of the sending state located within such state.

(i) The parent, guardian, trustee, or other person or persons entitled under the laws of the sending state to act for, advise, or otherwise function with respect to any inmate shall not be deprived of or restricted in his exercise of any power in respect of any inmate confined pursuant to the terms of this compact.

*Article V. Act Not Reviewable in Receiving State: Extradition*

(a) Any decision of the sending state in respect of any matter over which it retains jurisdiction pursuant to this compact shall be conclusive upon and not reviewable within the receiving state, but if at the time the sending state seeks to remove an inmate from an institution in the receiving state there is pending against the inmate within such state any criminal charge or if the inmate is formally accused of having committed within such state a criminal offense, the inmate shall not be returned without the consent of the receiving state until discharged from prosecution or other form of proceeding, imprisonment, or detention for such offense. The duly accredited officer of the sending state shall be

permitted to transport inmates pursuant to this compact through any and all states party to this compact without interference.

(b) An inmate who escapes from an institution in which he is confined pursuant to this compact shall be deemed a fugitive from the sending state and from the state in which the institution escaped from is situated. In the case of an escape to a jurisdiction other than the sending or receiving state, the responsibility for institution of extradition or rendition proceedings shall be that of the sending state, but nothing contained herein shall be construed to prevent or affect the activities of officers and agencies of any jurisdiction directed toward the apprehension and return of an escapee.

*Article VI. Federal Aid*

Any state party to this compact may accept federal aid for use in connection with any institution or program, the use of which is or may be affected by this compact or any contract pursuant thereto. Any inmate in a receiving state pursuant to this compact may participate in any such federally aided program or activity for which the sending and receiving states have made contractual provision. However, if such program or activity is not part of the customary correctional regimen, the express consent of the appropriate official of the sending state shall be required therefor.

*Article VII. Entry into Force*

This compact shall enter into force and become effective and binding upon the states so acting when it has been enacted into law by any two states. Thereafter, this compact shall enter into force and become effective and binding as to any other of such states upon similar action by such state.

*Article VIII. Withdrawal and Termination*

This compact shall continue in force and remain binding upon a party state until it shall have enacted a statute repealing the compact and providing for the sending of formal written notice of withdrawal from the compact to the appropriate officials of all other party states. An actual withdrawal shall not take effect until one year after the notices provided in the statute have been sent. Such withdrawal shall not relieve the withdrawing state from its obligations assumed hereunder prior to the effective date of withdrawal. Before the effective date of withdrawal, a withdrawal state shall remove to its territory, at its own expense, such inmates as it may have confined pursuant to the provisions of this compact.

*Article IX. Other Arrangements Unaffected*

Nothing contained in this compact shall be construed to abrogate or impair an agreement or other arrangement which a party state may have with a nonparty state for the confinement, rehabilitation, or treatment of inmates, nor to repeal any other laws of a party state authorizing the making of cooperative institutional arrangements.

*Article X. Construction and Severability*

(a) The provisions of this compact shall be liberally construed and shall be severable. If any phrase, clause, sentence, or provision of this compact is declared to be contrary to the constitution of any participating state or of the United States or the applicability thereof to any government, agency, person, or circumstance is held invalid, the validity of the remainder of this compact and the applicability thereof to any government, agency, person, or circumstance shall not be affected thereby. If this compact shall be held contrary to the constitution of any state participating therein, the compact shall remain in full force and effect as to the remaining states and in full force and effect as to the state affected as to all severable matters.

(b) Powers. The director of the Texas Department of Criminal Justice is authorized and directed to do all things necessary or incidental to the carrying out of the compact in every particular.

**HISTORY:** Enacted by Acts 1985, 69th Leg., ch. 24 (S.B. 126), § 1, effective January 1, 1986; am. Acts 1987, 70th Leg., ch. 167 (S.B. 892), § 5.01(a 9), effective September 1, 1987 (renumbered from art. 42.18); am. Acts 2009, 81st Leg., ch. 87 (S.B. 1969), § 25.031, effective September 1, 2009.

**NOTES:**

2009 amendment,
substituted "Texas Department of Criminal Justice" for "Texas Department of Corrections" in Art. X(b).

LexisNexis (R) Notes:

CASE NOTES

1. Pursuant to Tex. Code Crim. Proc. Ann. art. 42.19, § 9(c)(1), defendant's pre-sentence investigation report (PSI) was ordered after defendant entered his plea of guilty. Any inspection by the trial court necessarily took place after such plea, in conformance with the statutory requirement, and could not have influenced its finding of guilt. Smith v. State, 2004 Tex. App. LEXIS 10566 (Tex. App. Houston 1st Dist. Nov. 24 2004).

2. Revocation of community supervision was proper, because the petitioner pled true to counts one and two of the State's motion to revoke, the petitioner received notice of and pled true to count one, which, standing alone, was sufficient evidence for the trial court's revocation of his community supervision, notwithstanding his argument with regard to count two, and imposition of a nineteen-year sentence was within the applicable punishment range for the offense of possession of a controlled substance to which the petitioner pled guilty. Dellatorre v. State, 2012 Tex. App. LEXIS 1823 (Tex. App. Beaumont Mar. 7 2012).

3. Tex. Code Crim. Proc. Ann. art. 42.08(b) required stacking for any offense an inmate committed during the time he was an inmate processed into the Texas Department of Criminal Justice -- Institutional Division (TDCJ-ID), and was actually serving a sentence in TDCJ-ID, regardless of the inmate's temporal physical location at the time he committed the offense. The court noted that the term "inmate" generally connoted the offender''s permanent institutional status, not his temporary physical location, and cited Tex. Code Crim. Proc. Ann. art. 42.19 as an example. Rhodes v. State, 175 S.W.3d 348, 2004 Tex. App. LEXIS 9136 (Tex. App. Houston 1st Dist. 2004).

4. Although Tex. Code Crim. Proc. Ann. art. 42.12 itself does not define "state," the Code Construction Act, defines "state" to include Puerto Rico pursuant to Tex. Gov't Code Ann. § 311.005, and 48 U.S.C.S. § 734. Additionally, the code of criminal procedure elsewhere adopts definitions of "state" that include Puerto Rico, for example, Tex. Code Crim. Proc. Ann. arts. 24.29 and 42.19, and Tex. Gov't Code Ann. § 311.011(b). Robles v. State, 141 S.W.3d 250, 2004 Tex. App. LEXIS 5787 (Tex. App. Austin 2004).

5. Pursuant to Tex. Code Crim. Proc. Ann. art. 42.19, § 9(c)(1), defendant's pre-sentence investigation report (PSI) was ordered after defendant entered his plea of guilty. Any inspection by the trial court necessarily took place after such plea, in conformance with the statutory requirement, and could not have influenced its finding of guilt. Smith v. State, 2004 Tex. App. LEXIS 10566 (Tex. App. Houston 1st Dist. Nov. 24 2004).

6. Although Tex. Code Crim. Proc. Ann. art. 42.12 itself does not define "state," the Code Construction Act, defines "state" to include Puerto Rico pursuant to Tex. Gov't Code Ann. § 311.005, and 48 U.S.C.S. § 734. Additionally, the code of criminal procedure elsewhere adopts definitions of "state" that include Puerto Rico, for example, Tex. Code Crim. Proc. Ann. arts. 24.29 and 42.19, and Tex. Gov't Code Ann. § 311.011(b). Robles v. State, 141 S.W.3d 250, 2004 Tex. App. LEXIS 5787 (Tex. App. Austin 2004).

TREATISES AND ANALYTICAL MATERIALS

1. 4-92 Texas Criminal Practice Guide § 92.05, POSTCONVICTION REMEDIES, PRISONERS' RIGHTS, Disciplinary Procedures, Texas Criminal Practice Guide.

2. 4-92 Texas Criminal Practice Guide § 92.201, POSTCONVICTION REMEDIES, PRISONERS' RIGHTS, Statutes and Rules, Texas Criminal Practice Guide.



LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

\*\*\* This document is current through the 2013 3rd Called Session \*\*\*

TEXAS FAMILY CODE
TITLE 3.  JUVENILE JUSTICE CODE
CHAPTER 60.  UNIFORM INTERSTATE COMPACT ON JUVENILES

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

Tex. Fam. Code § 60.010  (2014)

§ 60.010.  Interstate Compact for Juveniles

ARTICLE I

PURPOSE

The compacting states to this Interstate Compact recognize that each state is responsible for the proper supervision or return of juveniles, delinquents, and status offenders who are on probation or parole and who have absconded, escaped, or run away from supervision and control and in so doing have endangered their own safety and the safety of others. The compacting states also recognize that each state is responsible for the safe return of juveniles who have run away from home and in doing so have left their state of residence. The compacting states also recognize that congress, by enacting the Crime Control Act, 4 U.S.C. Section 112 (1965), has authorized and encouraged compacts for cooperative efforts and mutual assistance in the prevention of crime.

It is the purpose of this compact, through means of joint and cooperative action among the compacting states to: (A) ensure that the juveniles who are moved under this compact to another state for probation or parole supervision and services are governed in the receiving state by the same standards that apply to juveniles receiving such supervision and services in the receiving state; (B) ensure that the public safety interests of the citizens, including the victims of juvenile offenders, in both the sending and receiving states are adequately protected and balanced with the juvenile's and the juvenile's family's best interests and welfare when an interstate movement is under consideration; (C) return juveniles who have run away, absconded, or escaped from supervision or control or have been accused of an offense to the state requesting their return through a fair and prompt judicial review process that ensures that the requisition is in order and that the transport is properly supervised; (D) make provisions for contracts between member states for the cooperative institutionalization in public facilities in member states for delinquent youth needing special services; (E) provide for

the effective tracking of juveniles who move interstate under the compact's provisions; (F) equitably allocate the costs, benefits, and obligations of the compacting states; (G) establish procedures to manage the movement between states of juvenile offenders released to the community under the jurisdiction of courts, juvenile departments, or any other criminal or juvenile justice agency which has jurisdiction over juvenile offenders, ensuring that a receiving state accepts supervision of a juvenile when the juvenile's parent or other person having legal custody resides or is undertaking residence there; (H) ensure immediate notice to jurisdictions where defined offenders are authorized to travel or to relocate across state lines; (I) establish a system of uniform data collection on information pertaining to juveniles who move interstate under this compact that prevents public disclosure of identity and individual treatment information but allows access by authorized juvenile justice and criminal justice officials and regular reporting of compact activities to heads of state executive, judicial, and legislative branches and juvenile and criminal justice administrators; (J) monitor compliance with rules governing interstate movement of juveniles and initiate interventions to address and correct noncompliance; (K) coordinate training and education regarding the regulation of interstate movement of juveniles for officials involved in such activity; and (L) coordinate the implementation and operation of the compact with the Interstate Compact for the Placement of Children, the Interstate Compact for Adult Offender Supervision and other compacts affecting juveniles particularly in those cases where concurrent or overlapping supervision issues arise. It is the policy of the compacting states that the activities conducted by the Interstate Commission created herein are the formation of public policies and therefore are public business. Furthermore, the compacting states shall cooperate and observe their individual and collective duties and responsibilities for the prompt return and acceptance of juveniles subject to the provisions of this compact. The provisions of this compact shall be reasonably and liberally construed to accomplish the purposes and policies of the compact.

ARTICLE II

DEFINITIONS

As used in this compact, unless the context clearly requires a different construction:

A. "Bylaws" means those bylaws established by the Interstate Commission for its governance or for directing or controlling the Interstate Commission's actions or conduct.

B. "Compact administrator" means the individual in each compacting state appointed pursuant to the terms of this compact responsible for the administration and management of the state's supervision and transfer of juveniles subject to the terms of this compact and to the rules adopted by the Interstate Commission under this compact.

C. "Compacting state" means any state which has enacted the enabling legislation for this compact.

D. "Commissioner" means the voting representative of each compacting state appointed pursuant to Article III of this compact.

E. "Court" means any court having jurisdiction over delinquent, neglected, or dependent children.

F. "Deputy compact administrator" means the individual, if any, in each compacting state appointed to act on behalf of a compact administrator pursuant to the terms of this compact, responsible for the administration and management of the state's supervision and transfer of juveniles subject to the terms of this compact and to the rules adopted by the Interstate Commission under this compact.

G. "Interstate Commission" means the Interstate Commission for Juveniles created by Article III of this compact.

H. "Juvenile" means any person defined as a juvenile in any member state or by the rules of the Interstate Commission, including:

(1) Accused Delinquent -- a person charged with an offense that, if committed by an adult, would be a criminal offense;

(2) Adjudicated Delinquent -- a person found to have committed an offense that, if committed by an adult, would be a criminal offense;

(3) Accused Status Offender -- a person charged with an offense that would not be a criminal offense if committed by an adult;

(4) Adjudicated Status Offender -- a person found to have committed an offense that would not be a criminal offense if committed by an adult; and

(5) Nonoffender -- a person in need of supervision who has not been accused or adjudicated a status offender or delinquent.

I. "Noncompacting state" means any state which has not enacted the enabling legislation for this compact.

J. "Probation or parole" means any kind of supervision or conditional release of juveniles authorized under the laws of the compacting states.

K. "Rule" means a written statement by the Interstate Commission promulgated pursuant to Article VI of this compact that is of general applicability, implements, interprets, or prescribes a policy or provision of the compact, or an organizational, procedural, or practice requirement of the Interstate Commission, and has the force and effect of statutory law in a compacting state, and includes the amendment, repeal, or suspension of an existing rule.

L. "State" means a state of the United States, the District of Columbia (or its designee), the Commonwealth of Puerto Rico, the U.S. Virgin Islands, Guam, American Samoa, and the Northern Marianas Islands.

ARTICLE III

INTERSTATE COMMISSION FOR JUVENILES

A. The compacting states hereby create the Interstate Commission for Juveniles. The Interstate Commission shall be a body corporate and joint agency of the compacting states. The commission shall have all the responsibilities, powers, and duties set forth herein, and such additional powers as may be conferred upon it by subsequent action of the respective legislatures of the compacting states in accordance with the terms of this compact.

B. The Interstate Commission shall consist of commissioners appointed by the appropriate appointing authority in each state pursuant to the rules and requirements of each compacting state. The commissioner shall be the compact administrator, deputy compact administrator, or designee from that state who shall serve on the Interstate Commission in such capacity under or pursuant to the applicable law of the compacting state.

C. In addition to the commissioners who are the voting representatives of each state, the Interstate Commission shall include individuals who are not commissioners, but who are members of interested organizations. Such noncommissioner members must include a member of the national organizations of governors, legislators, state chief justices, attorneys general, Interstate Compact for Adult Offender Supervision, Interstate Compact for the Placement of Children, juvenile justice and juvenile corrections officials, and crime victims. All noncommissioner members of the Interstate Commission shall be ex officio (nonvoting) members. The Interstate Commission may provide in its bylaws for such additional ex officio (nonvoting) members, including members of other national organizations, in such numbers as shall be determined by the commission.

D. Each compacting state represented at any meeting of the Interstate Commission is entitled to one vote. A majority of the compacting states shall constitute a quorum for the transaction of business, unless a larger quorum is required by the bylaws of the Interstate Commission.

E. The Interstate Commission shall meet at least once each calendar year. The chairperson may call additional meetings and, upon the request of a simple majority of the compacting states, shall call additional meetings. Public notice shall be given of all meetings and meetings shall be open to the public.

F. The Interstate Commission shall establish an executive committee, which shall include commission officers, members, and others as determined by the bylaws. The executive committee shall have the power to act on behalf of the Interstate Commission during periods when the Interstate Commission is not in session, with the exception of rulemaking or amendment to the compact. The executive committee shall oversee the day-to-day activities of the administration of the compact managed by an executive director and Interstate Commission staff; administers enforcement and compliance with the provisions of the compact, its bylaws and rules, and performs such other duties as directed by the Interstate Commission or set forth in the bylaws.

G. Each member of the Interstate Commission shall have the right and power to cast a vote to which that compacting state is entitled and to participate in the business and affairs of the Interstate Commission. A member shall vote in person and shall not delegate a vote to another compacting state. However, a commissioner shall appoint another authorized representative, in the absence of the commissioner from that state, to cast a vote on behalf of the compacting state at a specified meeting. The bylaws may provide for members' participation in meetings by telephone or other means of telecommunication or electronic communication.

H. The Interstate Commission's bylaws shall establish conditions and procedures under which the Interstate Commission shall make its information and official records available to the public for inspection or copying. The Interstate Commission may exempt from disclosure any information or official records to the extent they would adversely affect personal privacy rights or proprietary interests.

I. Public notice shall be given of all meetings and all meetings shall be open to the public, except as set forth in the rules or as otherwise provided in the compact. The Interstate Commission and any of its committees may close a meeting to the public when it determines by two-thirds vote that an open meeting would be likely to:

1. Relate solely to the Interstate Commission's internal personnel practices and procedures;

2. Disclose matters specifically exempted from disclosure by statute;

3. Disclose trade secrets or commercial or financial information which is privileged or confidential;

4. Involve accusing any person of a crime or formally censuring any person;

5. Disclose information of a personal nature where disclosure would constitute a clearly unwarranted invasion of personal privacy;

6. Disclose investigative records compiled for law enforcement purposes;

7. Disclose information contained in or related to examination, operating or condition reports prepared by, or on behalf of or for the use of, the Interstate Commission with respect to a regulated person or entity for the purpose of regulation or supervision of such person or entity;

8. Disclose information, the premature disclosure of which would significantly endanger the stability of a regulated person or entity; or

9. Specifically relate to the Interstate Commission's issuance of a subpoena, or its participation in a civil action or

other legal proceeding.

J. For every meeting closed pursuant to this provision, the Interstate Commission's legal counsel shall publicly certify that, in the legal counsel's opinion, the meeting may be closed to the public, and shall reference each relevant exemptive provision. The Interstate Commission shall keep minutes which shall fully and clearly describe all matters discussed in any meeting and shall provide a full and accurate summary of any actions taken, and the reasons therefore, including a description of each of the views expressed on any item and the record of any roll call vote (reflected in the vote of each member on the question). All documents considered in connection with any action shall be identified in such minutes.

K. The Interstate Commission shall collect standardized data concerning the interstate movement of juveniles as directed through its rules which shall specify the data to be collected, the means of collection and data exchange, and reporting requirements. Such methods of data collection, exchange, and reporting shall insofar as is reasonably possible conform to up-to-date technology and coordinate the Interstate Commission's information functions with the appropriate repository of records.

ARTICLE IV

POWERS AND DUTIES OF THE INTERSTATE COMMISSION

The commission shall have the following powers and duties:

1. To provide for dispute resolution among compacting states.

2. To promulgate rules to effect the purposes and obligations as enumerated in this compact, which shall have the force and effect of statutory law and shall be binding in the compacting states to the extent and in the manner provided in this compact.

3. To oversee, supervise, and coordinate the interstate movement of juveniles subject to the terms of this compact and any bylaws adopted and rules promulgated by the Interstate Commission.

4. To enforce compliance with the compact provisions, the rules promulgated by the Interstate Commission, and the bylaws, using all necessary and proper means, including but not limited to the use of judicial process.

5. To establish and maintain offices which shall be located within one or more of the compacting states.

6. To purchase and maintain insurance and bonds.

7. To borrow, accept, hire, or contract for services of personnel.

8. To establish and appoint committees and hire staff which it deems necessary for the carrying out of its functions including, but not limited to, an executive committee as required by Article III of this compact, which shall have the power to act on behalf of the Interstate Commission in carrying out its powers and duties hereunder.

9. To elect or appoint officers, attorneys, employees, agents, or consultants, and to fix their compensation, define their duties, and determine their qualifications, and to establish the Interstate Commission's personnel policies and programs relating to, inter alia, conflicts of interest, rates of compensation, and qualifications of personnel.

10. To accept any and all donations and grants of money, equipment, supplies, materials, and services, and to receive, utilize, and dispose of same.

11. To lease, purchase, accept contributions or donations of, or otherwise to own, hold, improve, or use any property, whether real, personal, or mixed.

12. To sell, convey, mortgage, pledge, lease, exchange, abandon, or otherwise dispose of any property, whether real, personal, or mixed.

13. To establish a budget and make expenditures and levy dues as provided in Article VIII of this compact.

14. To sue and be sued.

15. To adopt a seal and bylaws governing the management and operation of the Interstate Commission.

16. To perform such functions as may be necessary or appropriate to achieve the purposes of this compact.

17. To report annually to the legislatures, governors, and judiciary of the compacting states concerning the activities of the Interstate Commission during the preceding year. Such reports shall also include any recommendations that may have been adopted by the Interstate Commission.

18. To coordinate education, training, and public awareness regarding the interstate movement of juveniles for officials involved in such activity.

19. To establish uniform standards of the reporting, collecting, and exchanging of data.

20. The Interstate Commission shall maintain its corporate books and records in accordance with the bylaws.

ARTICLE V

ORGANIZATION AND OPERATION OF THE INTERSTATE COMMISSION

Sec. A. Bylaws

1. The Interstate Commission shall, by a majority of the members present and voting, within 12 months of the first Interstate Commission meeting, adopt bylaws to govern its conduct as may be necessary or appropriate to carry out the purposes of the compact, including, but not limited to:

a. Establishing the fiscal year of the Interstate Commission;

b. Establishing an executive committee and such other committees as may be necessary;

c. Providing for the establishment of committees governing any general or specific delegation of any authority or function of the Interstate Commission;

d. Providing reasonable procedures for calling and conducting meetings of the Interstate Commission and ensuring reasonable notice of each such meeting;

e. Establishing the titles and responsibilities of the officers of the Interstate Commission;

f. Providing a mechanism for concluding the operations of the Interstate Commission and the return of any surplus funds that may exist upon the termination of the compact after the payment or reserving of all of its debts and obligations;

g. Providing start-up rules for initial administration of the compact; and

h. Establishing standards and procedures for compliance and technical assistance in carrying out the compact.

Sec. B. Officers and Staff

1. The Interstate Commission shall, by a majority of the members, elect annually from among its members a chairperson and a vice chairperson, each of whom shall have such authority and duties as may be specified in the bylaws. The chairperson or, in the chairperson's absence or disability, the vice chairperson shall preside at all meetings of the Interstate Commission. The officers so elected shall serve without compensation or remuneration from the Interstate Commission, provided that, subject to the availability of budgeted funds, the officers shall be reimbursed for any ordinary and necessary costs and expenses incurred by them in the performance of their duties and responsibilities as officers of the Interstate Commission.

2. The Interstate Commission shall, through its executive committee, appoint or retain an executive director for such period, upon such terms and conditions, and for such compensation as the Interstate Commission may deem appropriate. The executive director shall serve as secretary to the Interstate Commission, but shall not be a member and shall hire and supervise such other staff as may be authorized by the Interstate Commission.

Sec. C. Qualified Immunity, Defense, and Indemnification

1. The Interstate Commission's executive director and employees shall be immune from suit and liability, either personally or in their official capacity, for any claim for damage to or loss of property or personal injury or other civil liability caused or arising out of or relating to any actual or alleged act, error, or omission that occurred, or that such person had a reasonable basis for believing occurred, within the scope of Interstate Commission employment, duties, or responsibilities, provided that any such person shall not be protected from suit or liability for any damage, loss, injury, or liability caused by the intentional or wilful and wanton misconduct of any such person.

2. The liability of any commissioner, or the employee or agent of a commissioner, acting within the scope of such person's employment or duties for acts, errors, or omissions occurring within such person's state may not exceed the limits of liability set forth under the constitution and laws of that state for state officials, employees, and agents. Nothing in this subsection shall be construed to protect any such person from suit or liability for any damage, loss, injury, or liability caused by the intentional or wilful and wanton misconduct of any such person.

3. The Interstate Commission shall defend the executive director or the employees or representatives of the Interstate Commission and, subject to the approval of the attorney general of the state represented by any commissioner of a compacting state, shall defend such commissioner or the commissioner's representatives or employees in any civil action seeking to impose liability arising out of any actual or alleged act, error, or omission that occurred within the scope of Interstate Commission employment, duties, or responsibilities, or that the defendant had a reasonable basis for believing occurred within the scope of Interstate Commission employment, duties, or responsibilities, provided that the actual or alleged act, error, or omission did not result from intentional or wilful and wanton misconduct on the part of such person.

4. The Interstate Commission shall indemnify and hold the commissioner of a compacting state, or the commissioner's representatives or employees, or the Interstate Commission's representatives or employees, harmless in the amount of any settlement or judgment obtained against such persons arising out of any actual or alleged act, error, or omission that occurred within the scope of Interstate Commission employment, duties, or responsibilities, or that such persons had a reasonable basis for believing occurred within the scope of Interstate Commission employment, duties, or responsibilities, provided that the actual or alleged act, error, or omission did not result from intentional or wilful and wanton misconduct on the part of such persons.

ARTICLE VI

RULEMAKING FUNCTIONS OF THE INTERSTATE COMMISSION

A. The Interstate Commission shall promulgate and publish rules in order to effectively and efficiently achieve the purposes of the compact.

B. Rulemaking shall occur pursuant to the criteria set forth in this article and the bylaws and rules adopted pursuant thereto. Such rulemaking shall substantially conform to the principles of the "Model State Administrative Procedures Act," 1981 Act, Uniform Laws Annotated, Vol. 15, p.1 (2000), or such other administrative procedures act, as the Interstate Commission deems appropriate consistent with due process requirements under the United States Constitution as now or hereafter interpreted by the United States Supreme Court. All rules and amendments shall become binding as of the date specified, as published with the final version of the rule as approved by the Interstate Commission.

C. When promulgating a rule, the Interstate Commission shall, at a minimum:

1. Publish the proposed rule's entire text stating the reason or reasons for that proposed rule;

2. Allow and invite persons to submit written data, facts, opinions, and arguments, which information shall be added to the record and be made publicly available;

3. Provide an opportunity for an informal hearing, if petitioned by 10 or more persons; and

4. Promulgate a final rule and its effective date, if appropriate, based on input from state or local officials, or interested parties.

D. Allow, not later than 60 days after a rule is promulgated, any interested person to file a petition in the United States District Court for the District of Columbia or in the federal district court where the Interstate Commission's principal office is located for judicial review of the rule. If the court finds that the Interstate Commission's action is not supported by substantial evidence in the rulemaking record, the court shall hold the rule unlawful and set it aside. For purposes of this subsection, evidence is substantial if it would be considered substantial evidence under the Model State Administrative Procedures Act.

E. If a majority of the legislatures of the compacting states rejects a rule, those states may, by enactment of a statute or resolution in the same manner used to adopt the compact, cause that such rule shall have no further force and effect in any compacting state.

F. The existing rules governing the operation of the Interstate Compact on Juveniles superceded by this Act shall be null and void 12 months after the first meeting of the Interstate Commission created under this compact.

G. Upon determination by the Interstate Commission that an emergency exists, the Interstate Commission may promulgate an emergency rule which shall become effective immediately upon adoption, provided that the usual rulemaking procedures provided hereunder shall be retroactively applied to said rule as soon as reasonably possible, but no later than 90 days after the effective date of the emergency rule.

ARTICLE VII

OVERSIGHT, ENFORCEMENT, AND DISPUTE RESOLUTION
BY THE INTERSTATE COMMISSION

Sec. A. Oversight

1. The Interstate Commission shall oversee the administration and operations of the interstate movement of juveniles subject to this compact in the compacting states and shall monitor such activities being administered in noncompacting states which may significantly affect compacting states.

2. The courts and executive agencies in each compacting state shall enforce this compact and shall take all actions necessary and appropriate to effectuate the compact's purposes and intent. The provisions of this compact and the rules promulgated hereunder shall be received by all the judges, public officers, commissions, and departments of the state government as evidence of the authorized statute and administrative rules. All courts shall take judicial notice of the compact and the rules. In any judicial or administrative proceeding in a compacting state pertaining to the subject matter of this compact which may affect the powers, responsibilities, or actions of the Interstate Commission, the Interstate Commission shall be entitled to receive all service of process in any such proceeding, and shall have standing to intervene in the proceeding for all purposes.

Sec. B. Dispute Resolution

1. The compacting states shall report to the Interstate Commission on all issues and activities necessary for the administration of the compact as well as issues and activities pertaining to compliance with the provisions of the compact and its bylaws and rules.

2. The Interstate Commission shall attempt, upon the request of a compacting state, to resolve any disputes or other issues which are subject to the compact and which may arise among compacting states and between compacting and noncompacting states. The Interstate Commission shall promulgate a rule providing for both mediation and binding dispute resolution for disputes among the compacting states.

3. The Interstate Commission, in the reasonable exercise of its discretion, shall enforce the provisions and rules of this compact using any or all means set forth in Article X of this compact.

ARTICLE VIII

FINANCE

A. The Interstate Commission shall pay or provide for the payment of the reasonable expenses of its establishment, organization, and ongoing activities.

B. The Interstate Commission shall levy on and collect an annual assessment from each compacting state to cover the cost of the internal operations and activities of the Interstate Commission and its staff which must be in a total amount sufficient to cover the Interstate Commission's annual budget as approved each year. The aggregate annual assessment amount shall be allocated based upon a formula to be determined by the Interstate Commission, taking into consideration the population of each compacting state and the volume of interstate movement of juveniles in each compacting state. The Interstate Commission shall promulgate a rule binding upon all compacting states that governs said assessment.

C. The Interstate Commission shall not incur any obligations of any kind prior to securing the funds adequate to meet the same, nor shall the Interstate Commission pledge the credit of any of the compacting states, except by and with the authority of the compacting state.

D. The Interstate Commission shall keep accurate accounts of all receipts and disbursements. The receipts and disbursements of the Interstate Commission shall be subject to the audit and accounting procedures established under its

bylaws. However, all receipts and disbursements of funds handled by the Interstate Commission shall be audited yearly by a certified or licensed public accountant and the report of the audit shall be included in and become part of the annual report of the Interstate Commission.

ARTICLE IX

COMPACTING STATES, EFFECTIVE DATE, AND AMENDMENT

A. Any state, as defined in Article II of this compact, is eligible to become a compacting state.

B. The compact shall become effective and binding upon legislative enactment of the compact into law by no less than 35 of the states. The initial effective date shall be the later of July 1, 2004, or upon enactment into law by the 35th jurisdiction. Thereafter, the compact shall become effective and binding, as to any other compacting state, upon enactment of the compact into law by that state. The governors of noncompacting states or their designees shall be invited to participate in Interstate Commission activities on a nonvoting basis prior to adoption of the compact by all states.

C. The Interstate Commission may propose amendments to the compact for enactment by the compacting states. No amendment shall become effective and binding upon the Interstate Commission and the compacting states unless and until it is enacted into law by unanimous consent of the compacting states.

ARTICLE X

WITHDRAWAL, DEFAULT, TERMINATION, AND JUDICIAL ENFORCEMENT

Sec. A. Withdrawal

1. Once effective, the compact shall continue in force and remain binding upon each and every compacting state, provided that a compacting state may withdraw from the compact by specifically repealing the statute which enacted the compact into law.

2. The effective date of withdrawal is the effective date of the repeal.

3. The withdrawing state shall immediately notify the chairperson of the Interstate Commission in writing upon the introduction of legislation repealing this compact in the withdrawing state. The Interstate Commission shall notify the other compacting states of the withdrawing state's intent to withdraw within 60 days of its receipt thereof.

4. The withdrawing state is responsible for all assessments, obligations, and liabilities incurred through the effective date of withdrawal, including any obligations, the performance of which extend beyond the effective date of withdrawal.

5. Reinstatement following withdrawal of any compacting state shall occur upon the withdrawing state reenacting the compact or upon such later date as determined by the Interstate Commission.

Sec. B. Technical Assistance, Fines, Suspension, Termination, and Default

1. If the Interstate Commission determines that any compacting state has at any time defaulted in the performance of any of its obligations or responsibilities under this compact, or the bylaws or duly promulgated rules, the Interstate

Commission may impose any or all of the following penalties:

     a. Remedial training and technical assistance as directed by the Interstate Commission;

     b. Alternative dispute resolution;

     c. Fines, fees, and costs in such amounts as are deemed to be reasonable as fixed by the Interstate Commission; and

     d. Suspension or termination of membership in the compact, which shall be imposed only after all other reasonable means of securing compliance under the bylaws and rules have been exhausted and the Interstate Commission has determined that the offending state is in default. Immediate notice of suspension shall be given by the Interstate Commission to the governor, the chief justice or the chief judicial officer of the state, and the majority and minority leaders of the defaulting state's legislature. The grounds for default include, but are not limited to, failure of a compacting state to perform such obligations or responsibilities imposed upon it by this compact, the bylaws or duly promulgated rules, and any other grounds designated in commission bylaws and rules. The Interstate Commission shall immediately notify the defaulting state in writing of the penalty imposed by the Interstate Commission and of the default pending a cure of the default. The Interstate Commission shall stipulate the conditions and the time period within which the defaulting state must cure its default. If the defaulting state fails to cure the default within the time period specified by the Interstate Commission, the defaulting state shall be terminated from the compact upon an affirmative vote of a majority of the compacting states and all rights, privileges, and benefits conferred by this compact shall be terminated from the effective date of termination.

    2. Within 60 days of the effective date of termination of a defaulting state, the Interstate Commission shall notify the governor, the chief justice or chief judicial officer of the state, and the majority and minority leaders of the defaulting state's legislature of such termination.

    3. The defaulting state is responsible for all assessments, obligations, and liabilities incurred through the effective date of termination including any obligations, the performance of which extends beyond the effective date of termination.

    4. The Interstate Commission shall not bear any costs relating to the defaulting state unless otherwise mutually agreed upon in writing between the Interstate Commission and the defaulting state.

    5. Reinstatement following termination of any compacting state requires both a reenactment of the compact by the defaulting state and the approval of the Interstate Commission pursuant to the rules.

   Sec. C. Judicial Enforcement

    The Interstate Commission may, by majority vote of the members, initiate legal action in the United States District Court for the District of Columbia or, at the discretion of the Interstate Commission, in the federal district where the Interstate Commission has its offices, to enforce compliance with the provisions of the compact, its duly promulgated rules and bylaws, against any compacting state in default. In the event judicial enforcement is necessary the prevailing party shall be awarded all costs of such litigation including reasonable attorney's fees.

   Sec. D. Dissolution of Compact

    1. The compact dissolves effective upon the date of the withdrawal or default of the compacting state, which reduces membership in the compact to one compacting state.

    2. Upon the dissolution of this compact, the compact becomes null and void and shall be of no further force or effect, and the business and affairs of the Interstate Commission shall be concluded and any surplus funds shall be

distributed in accordance with the bylaws.

ARTICLE XI

SEVERABILITY AND CONSTRUCTION

A. The provisions of this compact shall be severable, and if any phrase, clause, sentence, or provision is deemed unenforceable, the remaining provisions of the compact shall be enforceable.

B. The provisions of this compact shall be liberally construed to effectuate its purposes.

ARTICLE XII

BINDING EFFECT OF COMPACT AND OTHER LAWS

Sec. A. Other Laws

1. Nothing herein prevents the enforcement of any other law of a compacting state that is not inconsistent with this compact.

2. All compacting states' laws other than state constitutions and other interstate compacts conflicting with this compact are superseded to the extent of the conflict.

Sec. B. Binding Effect of the Compact

1. All lawful actions of the Interstate Commission, including all rules and bylaws promulgated by the Interstate Commission, are binding upon the compacting states.

2. All agreements between the Interstate Commission and the compacting states are binding in accordance with their terms.

3. Upon the request of a party to a conflict over meaning or interpretation of Interstate Commission actions, and upon a majority vote of the compacting states, the Interstate Commission may issue advisory opinions regarding such meaning or interpretation.

4. In the event any provision of this compact exceeds the constitutional limits imposed on the legislature of any compacting state, the obligations, duties, powers, or jurisdiction sought to be conferred by such provision upon the Interstate Commission shall be ineffective and such obligations, duties, powers, or jurisdiction shall remain in the compacting state and shall be exercised by the agency thereof to which such obligations, duties, powers, or jurisdiction are delegated by law in effect at the time this compact becomes effective.

**HISTORY:** Enacted by Acts 2005, 79th Leg., ch. 1007 (H.B. 706), § 1.01, effective September 1, 2005.

**NOTES:**

Editor's Notes. --
Acts 2005, 79th Leg., ch. 1007 (H.B. 706) implemented a significant revision of the original 1955 Interstate Compact on Juveniles, effective on the date that the new version of the compact was adopted by 35 states. The new compact was

adopted by the 35th state, Illinois, on August 26, 2008, making the compact and conforming amendments effective on that date.

LexisNexis (R) Notes:

TREATISES AND ANALYTICAL MATERIALS

1. 5-111 Texas Criminal Practice Guide § 111.04, JUVENILE PROCEEDINGS, ARREST AND PRELIMINARY PROCEEDINGS, Extradition of Juveniles, Texas Criminal Practice Guide.